# EXHIBIT C

LEXSEE 89 F.R.D. 695

**IN RE SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION**

Misc. No. 78-0040, MDL No. 330

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*89 F.R.D. 695; 1980 U.S. Dist. LEXIS 16446*

**September 16, 1980**

**SUBSEQUENT HISTORY: [**1]**

Opinion Awarding Attorneys' Fees March 23, 1981.

**COUNSEL:**

Mark P. Friedlander, Jr., pro se, Friedlander, Friedlander & Brooks, Arlington, Va., Liaison Counsel for plaintiffs: Plaintiffs' Swine Flu Steering Committee; Joseph W. Cotchett, Chairman, Daniel E. Bechnel, Jr., Thomas R. Bopeley, Zanesville, Ohio, Louis M. Silber, West Palm Beach, Fla., R. Gordon Pate, Paul D. Rheingold, New York City, Thomas Rutter, Philadelphia, Pa., R. K. Whittington, Paul Melodia, John H. Welch, Jr., Shelton, Conn., R. Ben Hogan, Jr., Burton M. Greenberg, Michael Myers, Clifford J. Shoemaker, St. Louis, Mo., Ida Abbott, San Francisco, Cal., Stanley Shingles, William Bradley, Susan Illston, San Mateo, Cal.

Alice Daniel, Acting Asst. Atty. Gen., Jeffrey Axelrad, Director, Torts Branch, Emilia M. DeMeo, Thaddeus B. Hodgdon, Mary L. McElroy, Laura D. Millman, Mary Ann Murphy, Paula M. Potoczak, Alan Rubin, Leon B. Taranto, W. Russell Welsh, Attys., Torts Branch, Civil Division, Dept. of Justice, Washington, D. C., for defendant United States of America.

**OPINION BY:**

GESELL

**OPINION:**

[*697]

PRELIMINARY RULING ON FEE APPLICATIONS IN AID OF EVIDENTIARY

HEARING

It appears to the Court that it is now desirable [**2] to schedule proceedings for final determinations of fees and disbursements to be awarded in this litigation. Although additional cases will be filed during the next nine months, approximately 75 percent of the complaints have completed multi-district processing and the plaintiffs in these cases as demonstrated by the responses filed to date to the fee application adequately represent all the categories of plaintiffs and the full range of contentions that can be advanced. Because an evidentiary hearing is necessary and is being contemporaneously set by separate Order, the Court believes it is necessary to make this preliminary ruling in order to guide these future proceedings.

Upon consideration of the submissions, briefs, and arguments of counsel, and after carefully reviewing the pertinent portions of the record, the Court has determined in its discretion that it will not approve any form of compensation for members of the Steering Committee, Liaison Counsel, or other attorneys applying to the Court for fees that measures the amount of such awards contingent on the aggregate amounts received by plaintiffs or their counsel as a result of the Swine Flu litigation or prior administrative [**3] settlements.

Although the monetary results achieved by plaintiffs as a group may be one measure [*698] of the services performed by counsel, a contingency award in this instance would lack any objective basis for truly valuing the services performed. Moreover, the Court believes that use of any contingent yardstick is inconsistent with the true function of counsel. By volunteering to perform their duties in this complex litigation, counsel have served the Court on behalf of plaintiffs as a group and in so doing

EXHIBIT C, PAGE 38

Page 2

89 F.R.D. 695, *698; 1980 U.S. Dist. LEXIS 16446, **3

have assumed a quasi-public service. Counsel have no contractual relationship with individual plaintiffs or their respective counsel, except, of course, in those cases in which they are also individually retained under separate financial arrangements. A fee based on contingent fee recoveries by individual counsel is, under the circumstances, unacceptable.

Neither the fact that many of the counsel applying routinely work on a contingent basis, nor the fact that the Swine Flu Act recognizes that individual plaintiff's counsel may receive a percentage fee, mandates that a contingent fee be awarded by this Court to the Steering Committee or Liaison Counsel. The services for [**4] which compensation is sought differs from the full range of duties falling on individual counsel in tort litigation. Statutory recognition of contingent compensation in Swine Flu cases does not apply because the attorneys making application to the Court seek compensation for services where they have not been involved either in the settlement or all phases of the litigation of any individual action. Furthermore, one common reason for contingent compensation the sharing of risks between counsel and client when the possibility of recovery is uncertain, thereby ensuring that counsel will be available is inapplicable to these proceedings. Although the final sum to be received by plaintiffs is still far from certain, by the time these fee proceedings began it was evident that recoveries would be substantial. The strong possibility of a windfall exists whether or not the seven million dollar limit suggested by counsel "as a cap" were to be accepted by the Court.

The Court intends to use the "lodestar" approach in setting fees. Decisions in this Circuit strongly suggest, if they do not demand, use of the so-called "lodestar" approach, also known as the Lindy rule after *Lindy Brothers Builders,* [**5] *Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973)* (Lindy I ) and its successor case, *540 F.2d 102 (3d Cir. 1976)* (Lindy II ). See, e.g., *Kiser v. Miller, 364 F. Supp. 1311, 1315-19 (D.D.C.1973),* aff'd sub nom. *Kiser v. Huge, 170 U.S. App. D.C. 407, 517 F.2d 1237 (D.C.Cir. 1974),* aff'd en banc, *171 U.S. App. D.C. 1, 517 F.2d 1275 (D.C.Cir.1975); Pete v. United Mine Workers of America Welfare & Retirement Fund of 1950, 171 U.S. App. D.C. 1, 517 F.2d 1275, 1293 (D.C.Cir.1975); Larinoff v. United States, 175 U.S. App. D.C. 32, 533 F.2d 1167, 1187 (D.C.Cir.1976); cf. Copeland v. Marshall, 205 U.S. App. D.C. 390, 641 F.2d 880*

*(D.C.Cir. 1980)* (en banc). As these cases reiterate, the "lodestar" representing the hours worked and reasonable hourly fees "provides the only objective basis for valuing an attorney's services," see, e.g., Copeland v. Marshall, supra, at 891; *National Treasury Employees Union v. Nixon, 172 U.S. App. D.C. 217, 521 F.2d 317, 322 (D.C.Cir.1975).* This initial "lodestar" is subject to upward or downward adjustments by the Court for each counsel as facts and application of traditional factors make appropriate. See *Copeland v. Marshall, supra;* [**6] *Evans v. Sheraton Park Hotel, 164 U.S. App. D.C. 86, 503 F.2d 177 (D.C.Cir.1974).*

Accordingly, the Court proposes to make individual awards to each attorney who has requested fees from the Court and to Liaison Counsel for his continuing work in that capacity. Counsel may, if they so desire, supplement their applications accordingly but such filings must be completed and filed by October 3, 1980. The Court recognizes that this "lodestar" approach presents additional administrative problems with respect to the timing and method to be used for distributing fees awarded and the Court will welcome assistance of the Steering Committee and Liaison Counsel in this respect.

SO ORDERED.

OPINION AWARDING ATTORNEYS' FEES

Members of the Steering Committee and Liaison Counsel have applied to the Court [*699] for a final award of attorneys' fees now that consolidated pretrial *proceedings in this multidistrict litigation have been* completed n1 and the bulk of the cases remanded to various District Courts for trial. After receiving written material in support of and in opposition to the application, and after several hearings n2 have been held, the Court files this Memorandum Opinion in support [**7] of its award of attorneys' fees. n3

n1. The Final Pretrial Order was issued by the Court on November 15, 1979, and the process of remanding cases to their originating courts for trial began. Although numerous tag-along cases have continued to be transferred to this Court and approximately 321 cases are now in this Court awaiting transfer back for trial, the substantive work of this litigation was completed with the signing of the Final Pretrial Order.

EXHIBIT C, PAGE 39

89 F.R.D. 695, *699; 1980 U.S. Dist. LEXIS 16446, **7

Page 3

n2. The application was made on May 6, 1980. Hearings were held on July 10, 1980, and September 2, 1980, regarding the application, and a final evidentiary hearing was held on February 2, 1981.

n3. The authority of the Court to appoint a Steering Committee and Liaison Counsel for this litigation, and then to award them compensation, is beyond question. See, e.g., *Vincent v. Hughes Air West, 557 F.2d 759 (9th Cir. 1977); In re Air Crash Disaster at Florida Everglades on December 29, 1972, 549 F.2d 1006 (5th Cir. 1977);* Manual for Complex Litigation §§ 1.90, 1.92. Indeed, plaintiffs' only contentions here are that the fees sought are too high, or that certain plaintiffs should not be required to contribute to those fees.

[**8]

Background

In 1976, Congress enacted the National Swine Flu Immunization Program, Pub.L.No. 94-380, 94th Cong., 2d Sess., in response to a serious concern of a threatened swine flu epidemic. During the winter of 1976-1977, millions of individuals were thereafter inoculated with a swine flu vaccine by federal, state, and local authorities and by private physicians as part of a national immunization program initiated by the Federal Government. Under the Act, the United States accepted primary responsibility for injuries caused by the manufacture, distribution, or administration of this swine flu vaccine. Subsequent to the inoculations numerous personal injury and wrongful death claims were filed.

As a first step, individuals claiming injury were required to proceed through an administrative process already established for claims against the United States under the Federal Tort Claims Act. See *28 U.S.C. §§ 2671 et seq.* (1976). Approximately 4,000 claims were filed administratively. Claimants were barred from filing suit for six months unless a claim was specifically rejected. The government rejected 2,707 of the claims and failed to act on most of the other claims within the statutory [**9] six months. n4

n4. To date, only 398 claims have been settled through the administrative process.

By early 1978, several dozen suits were pending in various United States District Courts around the country. It was soon apparent that substantial common pretrial discovery, primarily into government sources, would be required to explore details concerning the origination and implementation of the program. n5 The Judicial Panel on Multidistrict Litigation, over the opposition of the United States and some plaintiffs, entered an Order on February 28, 1978, assigning all then pending cases and those to follow to this Court for consolidated pretrial discovery on all common issues. n6 *In re Swine Flu Immunization Products Liability Litigation, 446 F. Supp. 244 (Jud.Pan.Mult.Lit.1978).*

n5. Discovery against the government was necessary both for an understanding of the administrative decision to institute the vaccination program, and to obtain scientific material because the vaccine had been the subject of much investigation and analysis at the federal Center for Disease Control in Atlanta.

[**10]

n6. Although the Order covered only pending cases, of course, the Panel recognized that there would be a great many subsequent tag-along cases that would require the same pretrial discovery. These tag-along cases have all been transferred to this Court as well.

This Court promptly noticed a hearing for April 19, 1978, to initiate a plan for coordinated discovery. Having in mind the requirements of this type of massive pretrial effort, a Steering Committee consisting of fourteen plaintiffs' lawyers volunteering to [*700] undertake the work was appointed on April 26, 1978, and directed to designate a Liaison Counsel. n7 Work began immediately, and every possible effort was made to bring the consolidated discovery to a prompt conclusion. n8 Counsel on both sides cooperated in this effort. At short intervals of approximately one or two months, the Steering Committee and government counsel reported in open court on the progress of discovery. Conflicts and disagreements were resolved and the course of future discovery was determined.

89 F.R.D. 695, *700; 1980 U.S. Dist. LEXIS 16446, **10

n7. Pretrial Order No. 1, April 26, 1978. The Order tentatively designated the firm of *Sutherland, Asbill & Brennan as Liaison Counsel.* However, that firm was replaced before the second pretrial conference by the firm of Friedlander, Friedlander & Brooks of Arlington, Virginia. The Friedlander firm had been appointed to the Steering Committee at the first pretrial conference and thus assumed a dual role.

[**11]

n8. Individual plaintiffs were not permitted to conduct discovery during the period of these consolidated proceedings.

The enormity of the work undertaken by the Steering Committee cannot be overemphasized. Between the time of the first meeting with the Court on April 19, 1978, and the time the Final Pretrial Order was filed on November 15, 1979, the Steering Committee examined approximately 50,000 documents comprising millions of pages, took 70 depositions, and appeared before this Court on 17 separate occasions. Difficult questions of interpretation of the Swine Flu Act were resolved after appearances in this Court that subsequently resulted in two arguments before the United States Court of Appeals for the District of Columbia Circuit and several appearances before the Panel on Multidistrict Litigation. Counsel for the United States also began the initial phase of defendant's local discovery by serving a set of standard interrogatories directed to each plaintiff, and this too was monitored by the Court through Liaison Counsel. To date, approximately 1,460 cases have been consolidated to receive [**12] the benefits of pretrial discovery. Some 976 cases have been processed and remanded for trial, and about 300 cases currently are pending before this Court. The remainder have been settled or were dismissed prior to remand.

The Fee Claim

Determining a proper fee involves two separate issues. First, the Court must determine what would be the proper amount of the fee, and, second, the Court must then allocate the burden of paying that fee among the plaintiffs. n9 Not surprisingly, the Steering Committee and Liaison Counsel have focused primarily on the first issue, while those few plaintiffs who have formally objected have focused primarily on the second. The Court will deal with each matter in turn.

n9. In Pretrial Order No. 1, April 26, 1978, the Court ordered that each plaintiff, at the time his case was transferred to this Court, pay $ 250 into a fund to be used to reimburse the out-of-pocket expenses of the Liaison Counsel.

Anticipating that a claim for fees and costs would be made in due course, the [**13] Court, on June 22, 1978, directed as an interim measure that all plaintiffs deposit with the Court five percent of any recovery, or twenty percent of the fee payable to local trial counsel, whichever proved to be less. n10 Thus a fund has been accumulating slowly as cases settled or have gone to judgment. Much later, following the Court's Final Pretrial Order of November 15, 1979, the Steering Committee and Liaison Counsel filed an application for fees and costs on May 6, 1980, with substantial supporting affidavits and other material. The Committee members initially sought a contingent fee in the full amount set aside by the interim order, that is, the lesser of five percent of each recovery, or twenty percent of the attorney's fee in each case. Because it was impossible to determine the maximum possible recovery of all the cases in advance, a top contingent fee of $ 7 million [*701] was suggested. n11 The Committee proposed to divide the fee among the Steering Committee members based on the Committee's own determination of the relative contribution of each member firm to the joint effort. n12

n10. Under *28 U.S.C. § 2678* (1976), attorneys in these cases are limited to a maximum fee of 25 percent of the recovery. If an attorney received the statutory maximum, then 20 percent of the fee would equal five percent of the total award.

[**14]

n11. The Steering Committee suggested that the total recovery received by all plaintiffs might reach $ 700 million, in which case the $ 7 million granted the Steering Committee would have been only one percent of the total. On a total recovery of $ 140 million for plaintiffs, the $ 7 million

Page 5

89 F.R.D. 695, *701; 1980 U.S. Dist. LEXIS 16446, **14

would represent the full five percent initially sought. See Petition of Plaintiffs' Swine Flu Steering Committee for Attorneys' Fees and Reimbursement of Expenses, Vol. I, filed May 6, 1980. As of March 12, 1980, plaintiffs had recovered $ 19,822,464 in those cases that have been settled or have gone to judgment.

n12. The Committee members agreed among themselves on percentage figures ranging from five percent to 11 percent which they found to represent their relative contributions to the effort.

Notice was sent to all plaintiffs' counsel setting a hearing on July 10, 1980, to consider this application. Approximately 40 plaintiffs protested one or more aspects of the award sought. In general, it was contended that the amount sought was too high, that compensation should not be made on a contingent basis, [**15] that the Steering Committee's work had had or would have limited beneficial effect on recoveries in particular cases, that the Steering Committee should not receive payment from those few plaintiffs who sought early remand orders over the Committee's successful opposition, n13 and that, despite the substantial documentation already provided, more information was needed in order to determine a proper award. Several plaintiffs suggested an evidentiary hearing.

n13. While the cases were consolidated in this Court for common pretrial discovery, some plaintiffs sought immediate remand back to their originating courts, and other plaintiffs opposed any transfer of their cases to this Court for the multidistrict proceedings. The Steering Committee opposed both of these groups, insisting that all cases should be consolidated in this Court until the common pretrial proceedings were completed. Ultimately, this view was adopted by the Judicial Panel on Multidistrict Litigation.

After receiving further submissions, the [**16] Court ruled that an evidentiary hearing should be held and rejected the contingent fee method of compensation. See supra, p. 695. The Court indicated that it would follow the "lodestar" approach endorsed by its Court of Appeals in *Copeland v. Marshall, 205 U.S. App. D.C.*

*390, 641 F.2d 880 (D.C.Cir. 1980).* All plaintiffs opposing the fee award were then given an opportunity to conduct discovery and a final evidentiary hearing was set for February 2, 1981. Discovery was taken by several objectors, further submissions were received, and an evidentiary hearing was held as scheduled, supplemented by further submissions from some plaintiffs. Thus an extensive record is before the Court relating to all aspects of the fee award and interested parties have had full opportunity to be heard. n14

n14. A summary of the material which composes the record in this case has been filed by the Court under a separate Order this date.

The Steering Committee's Lodestar

Before turning to an analysis of the lodestar and factors [**17] affecting the award, it is basic to an understanding of these particular fee claims to note that the Steering Committee and Liaison Counsel seek no fee from any plaintiff directly. Rather, they only seek an award which represents a portion of the fee each plaintiff will, in any event, pay his own counsel. Counsel for each plaintiff are prohibited by statute from charging a fee that exceeds 25 percent of the recovery if the claim goes to court. *28 U.S.C. § 2678* (1976). Steering Committee members and Liaison Counsel seek a portion of these authorized fees. No plaintiff will receive less money on his claim. If a particular lawyer charges less than the modest statutory fee allowed, that plaintiff's contribution to the fee will also be proportionately less. Indeed, if a claim of a plaintiff is handled by his lawyer without charge, no assessment will be made for the [*702] Steering Committee fee award. n15 Thus, the Court is only concerned in this instance with apportioning fees earned among lawyers, some of whom assert conflicting claims as to the value of their individual efforts.

n15. To the extent that a few plaintiffs' lawyers have chosen to challenge the claim here under review, the Court confronts a mercenary dispute between lawyers over fees. That does not reduce the importance of the issues but it does place them in a different perspective.

[**18]

89 F.R.D. 695, *702; 1980 U.S. Dist. LEXIS 16446, **18

Having rejected a contingent fee claim in favor of the lodestar technique, the Court necessarily is obliged to fix a separate fee for each of the firms participating on the Steering Committee and as Liaison Counsel. n16

> n16. The Liaison Counsel also served as a member of the Steering Committee. See footnote 7, supra. For reasons discussed at pages 708-709, infra, the hours submitted by the Liaison Counsel firm of Friedlander, Friedlander & Brooks in these fee proceedings will be allocated as one-third for the work of the Steering Committee and two-thirds for the work of Liaison Counsel.

Thirteen firms contributed to the work of the Steering Committee as members. n17 The member firms logged 10,037.33 hours during the period from April 19, 1978, to November 15, 1979, as follows: n18

> n17. There is some dispute as to whether one person, Daniel Shapiro, is a member of the Steering Committee. Dr. Shapiro contends that he

was considered to be a member all during the discovery proceedings, but the Steering Committee itself contends that he was actually a consultant. Because the Court has determined that it will award fees on a lodestar basis, and thus fix each fee individually, it is not necessary to determine whether Dr. Shapiro was or was not properly a member of the committee. The fee for Dr. Shapiro is discussed at pages 706-707, infra.

[**19]

> n18. In making this fee award, the Court will rely on the Steering Committee's statement of hours worked which is contained in its answers to interrogatories filed on February 2, 1981, the day of the evidentiary hearing. This appears to be the most complete record available, although it must be noted that the figures differ in some respects from records previously presented by the Steering Committee.

| Cotchett, Dyer & Illston | |
|---|---|
| Partners | 1,650.04 |
| Associates | 125.4 |

| Graham & Graham | |
|---|---|
| Partners | 250.5 |
| Associates | 24.5 |

| London, Greenberg & Fleming | |
|---|---|
| Partners | 999.7 |
| Associates | 114.5 |

89 F.R.D. 695, *702; 1980 U.S. Dist. LEXIS 16446, **19

| Offices of Daniel Becnel, Jr. | |
|---|---|
| Partner | 316.15 |
| Associate | 258.55 |

| Patmont & Myers | |
|---|---|
| Partner | 329.5 |
| Associate | 797.7 |

| Hare, Wynn, Newell & Newton | |
|---|---|
| Partners | 619.8 |
| Associate | 21 |

| Paul D. Rheingold | |
|---|---|
| Partner | 595.8 |
| Associate | 14.5 |

| Offices of Stanley Shingles | |
|---|---|
| Partner | 460.75 |

| Hogan, Smith & Alspaugh, P.C. | |
|---|---|
| Partners | 517.2 |
| Associate | 29 |

Page 8

89 F.R.D. 695, *702; 1980 U.S. Dist. LEXIS 16446, **19



| | |
|---|---|
| Cone, Owen, Wagner et al. | |
| Partners | 452.09 |
| [**20] | |
| John J. Welch, Ltd. | |
| Partner | 326.25 |
| Stapleton & Whittington | |
| Partners | 638.6 |
| Friedlander, Friedlander | |
| & Brooks (Liaison & Steering) | |
| Partner | 443.8 |
| Associate | 1,052 |

The Steering Committee recommends that all attorneys associated with member firms receive $ 100 per hour, resulting in a lodestar of $ 1,003,733. The Court is then asked to enhance this amount by a substantial multiplier.

The Committee's work was in the nature of a public service for which all members volunteered and the Court has determined it should apply more conservative hourly rates to establish the lodestar. The Court will use the hourly rates generally applied in this jurisdiction when fixing [*703] fees in litigation against the government. That rate will be $ 40 an hour for associates and $ 75 an hour for partners. n19 The Court rejects the testimony of the only witness presented on this issue as too general and lacking in specificity. Current Washington, D. C., rates may now be somewhat higher, but these figures represent a conservative median of charges during the period from April, 1978, to November, 1979, when the Steering Committee was functioning. [**21] In response to the suggestion that Washington, D. C., rates are somewhat higher than the rates in some localities throughout the country, the Court feels recognition must also be given to the fact that Steering Committee members, some of whom are leaders in products liability litigation, were frequently in travel status away from home and indeed often in Washington. Furthermore, most

Case 8:10-ml-02151-JVS-FMO   Document 40-3   Filed 04/30/10   Page 10 of 25   Page ID
#:1236

Page 9

89 F.R.D. 695, *703; 1980 U.S. Dist. LEXIS 16446, **21

Committee members had never established hourly rates for their services because they are usually counsel for plaintiffs compensated on a contingent fee basis. Hence, on balance, the Washington, D. C., standard appears to be the most equitable under all the circumstances.

n19. Although several cases have applied or suggested use of varying rates of pay for varying tasks, see, e.g., Copeland v. Marshall, supra, at 891-892; In re Coordinated Pretrial Proceedings in *Antibiotic Antitrust Actions, 410 F. Supp. 680 (D.Minn.1975),* the Court has chosen to use a single hourly rate in computing the lodestar, making no allowance for the nature of the work performed. The Steering Committee work was a team effort; furthermore, the manner in which time charges were recorded and the wide variety of tasks performed make it impractical to establish separate rates for each task. By distinguishing between associate and partners although the Court is mindful that this distinction is not the same in every firm some effort has been made to account for the differing skills required for the various tasks undertaken. Adjustments, to some extent, also are provided for by special awards that the Court will grant to several individuals for their outstanding work.

[**22]

The various firms which were recognized members of the Steering Committee performed a wide variety of tasks, including consultation, depositions, documentary discovery, research, writing legal memoranda, and court appearances. Without weighing the value of these different categories of activity, n20 and using the rates indicated, the lodestar recovery for the Steering Committee firms, based on carefully recorded time charges submitted, is a total of $ 617,256.05.

n20. See footnote 19, supra.

Adjustment of the Lodestar

It is now necessary to determine whether this lodestar should be adjusted, upward or downward, to reflect factors other than simply the hours worked and the rate of pay per hour. For the reasons set forth below, the

Court finds that the lodestar should be adjusted upward to recognize properly factors such as those cited in Copeland and in *Evans v. Sheraton Park Hotel, 164 U.S. App. D.C. 86, 503 F.2d 177 (D.C.Cir.1974).* Because certain factors are common to the work of all members of the Steering [**23] Committee, a general multiplier will be selected to be applied to all firms, with further awards to particular firms to recognize exceptional contributions.

The following favorable factors are applicable to all firms participating on the Steering Committee.

(1) The work of the Committee was performed efficiently, on schedule, and in a highly professional manner. n21 The effort was a group effort. Under the direction of members with prior multidistrict experience, n22 the Committee was able to anticipate problems of organization and reporting that might arise. Teams with specialties were established. There was substantial [*704] delegation of responsibility under coordinated control.

n21. One indication of the professionalism of the Committee was its approach to expenses by Committee members. Stringent standards were established at an early stage limiting reimbursable expenses to $ 70 per diem for lodging, $ 25 per diem for meals, coach air fare, and actual documented costs for other expenses, including law clerks and paralegals. These standards are quite responsible and were conscientiously followed.

[**24]

n22. Several Committee members had experience in the Dalkon Shield MDL which is the MDL most comparable to Swine Flu. Some members also had experience in other various products liability multidistrict cases.

The Court had opportunity throughout this litigation to follow the Committee's work at close range, holding frequent meetings with counsel at which plans for the work were outlined, schedules for completion set, and disputes ironed out. Without the professional approach taken by Committee members in this give-and-take, less experienced, more cantankerous attorneys likely would

EXHIBIT C, PAGE 46

Case 8:10-ml-02151-JVS-FMO   Document 40-3   Filed 04/30/10   Page 11 of 25   Page ID #:1237

Page 10

89 F.R.D. 695, *704; 1980 U.S. Dist. LEXIS 16446, **24

have pursued the pretrial multidistrict proceedings for many more months without gaining any additional advantage.

(2) This was not a routine case, even when measured by multidistrict standards. The pretrial discovery was complex. Novel issues of statutory interpretation and factual analysis were presented. Throughout, government counsel vigorously opposed various aspects of the Committee's discovery initiatives in a highly professional and effective way. The government also sought by summary judgment motions to limit [**25] its exposure, advancing a wide variety of defenses, but was effectively resisted by the Committee. Problems of statutory interpretation were created by the lack of legislative history underlying the Swine Flu Immunization Act. The coverage and meaning of the statute were sharply litigated. In addition, precedents under the Federal Tort Claims Act and other federal statutes had to be meshed with the Swine Flu circumstances. Factual problems were compounded by the variety of injuries alleged and the varied instrumentalities and circumstances under which the vaccine was dispensed.

(3) At the conclusion of the discovery effort, the Steering Committee prepared an elaborate trial package which was sent to every plaintiff's attorney. n23 This document, in several volumes, was filed in camera in these fee proceedings. Its scope is indicated by the table of contents found as Appendix I to this Memorandum. The Committee then scheduled several sessions at locations around the country to develop further its findings and suggestions for the benefit of all plaintiffs' counsel who desired to attend. Although it is impossible to determine in monetary terms the value of the Steering Committee's work, [**26] a number of experienced plaintiffs' counsel have appeared at the fee hearings to testify to the benefits they obtained from the work and to indicate the respects in which they have found the depositions and materials in the Trial Package useful in their particular cases. Although selective, these representations have not appeared to the Court to be contrived. These endorsements are not disputed except by a few Guillain-Barre plaintiffs whose opposition is later discussed. Notably, the principal spokesman for these objectors has never examined the package although he has it, unopened, in his office.

n23. The trial package was submitted as an in camera exhibit in this fee proceeding. It is a

comprehensive work in six volumes touching on every phase of the litigation. Seminars were conducted on two occasions to aid individual counsel in using the trial package materials. The package already has benefited many plaintiffs and will continue to prove of inestimable value as the hundreds of cases now filed are litigated. The package presents an account of the Swine Flu program and the various steps taken in the MDL discovery. It analyzes legal theories supporting recovery and defenses expected. Thereafter, in practical sections, it covers proof under various theories of liability, proof of causation, and proof of damages. Advice is given covering presentation at trial, and documents and excerpts from depositions of special significance are reproduced for convenient reference. To the extent any counsel refuse to consider the material for use at trial and some counsel have so refused they forgo an extremely valuable working tool.

[**27]

(4) The Steering Committee time charges do not cover all the useful services performed. While the time charges for the period covered, i. e., from April 26, 1978, to November 15, 1979, are complete and in no way challenged for accuracy, the Steering Committee did not record time spent after the Final Pretrial Order issued on November 15, 1979. Yet substantial time was spent after that date by Committee members conducting the intensive seminars with groups of plaintiffs' counsel, explaining and [*705] elaborating on the trial package. In addition, further time was expended in preparing the fee claim, responding to discovery requests relating to fees, and participating in the hearings held regarding fees.

(5) Other considerations that point toward an award beyond the lodestar level are the heavy demands of the Committee's work, which required almost constant out-of-town travel for major participants during certain periods, the concomitant preclusion of other work, and the fact that payment of any fee awarded will be long delayed.

Two other factors must be mentioned. The Steering Committee suggests that its representation contained elements of uncertainty which entitle the Court [**28] to recognize a degree of contingency in the award. Although it is true that at the outset many novel issues were

89 F.R.D. 695, *705; 1980 U.S. Dist. LEXIS 16446, **28

presented, the likelihood that some plaintiffs would make substantial recoveries was always present. Members of the Steering Committee volunteered for this duty and indeed were already committed to undertake some of the same work on behalf of their own clients. It does not appear, on balance, that the contingency factor warrants significant weight in determining the final award although the total recovery remains uncertain.

Similarly, no special consideration is justified on the ground the Steering Committee work was unattractive. Multidistrict work is becoming an increasingly significant aspect of complex tort litigation. n24 Experience earned in this area may attract other business for at least some of these participants. Indeed, in a few instances members may have been retained in other Swine Flu cases by reason of their involvement as Steering Committee members. n25 The Court does not believe this favorable factor should weigh against the Committee's claims, because the proper administration of justice requires that skilled attorneys be encouraged to take on special [**29] multidistrict duties, but certainly no additional award should be made on the suggestion that the work, at least in some of its aspects, was unattractive.

n24. In the year ending June 30, 1980, the Judicial Panel on Multidistrict Litigation considered approximately 50 separate groups of cases for multidistrict treatment under *28 U.S.C. § 1407* (1976). As of that date, the Panel had considered a total of approximately 435 groups of cases for multidistrict proceedings, totaling more than 9,000 separate civil actions.

n25. See Steering Committee's Answers to Interrogatories filed January 29, 1981.

On the basis of the favorable considerations outlined, and viewing the work of the Steering Committee as a whole against the backdrop of this entire litigation and the work of the government attorneys and of individual counsel, the Court finds it appropriate to double the lodestar figure for each member firm.

Special Meritorious Service

Four individuals, however, deserve special recognition over this general [**30] multiplier. Those

four are Joseph Cotchett, Paul D. Rheingold, Burton M. Greenberg, and Clifford Shoemaker. The Court will make special awards to the firms of these individuals as follows:

Joseph Cotchett, partner in Cotchett, Dyer and Illston, and lead counsel for plaintiffs' Steering Committee, deserves special mention. He is an experienced plaintiffs' trial attorney with a thorough knowledge of how to prepare a major products liability case for trial. In addition, he brought to the Swine Flu Litigation a wealth of experience in multidistrict litigation. This background enabled Cotchett to establish immediately an efficient organization for the Committee's work, eliminating much duplication of effort through effective assignment of lawyers, permitting a synthesis of the discovery product by use of regular status reports, and guiding the course of the litigation with regular committee meetings. In his role as primary liaison with the United States on major issues, he was able to resolve numerous disputes with a minimum of Court involvement or paperwork. His original drafts of the Committee position on Guillain-Barre Syndrome in response [*706] to government proposals, and his [**31] pleadings and appearances before the Multidistrict Panel on Guillain-Barre, materially affected the course of the litigation. In his appearances before this Court, he was able to present the Committee's facts and positions in such a way that this Court was greatly facilitated in managing this complex multi-faceted matter. Cotchett's participation materially benefited the Court and the plaintiffs, and his firm is awarded an additional $ 45,000 in recognition of his work.

Paul D. Rheingold, of Paul D. Rheingold, P.C., brought to this litigation valuable experience in the area of products liability litigation and medical malpractice. He is the author of four books in the area of drug-related liability litigation and has participated in several multidistrict drug cases, including the MER/29, Sabin Polio, Aralen, and Dalkon Shield cases. As chairman of both the medical and expert subcommittees, he utilized his experience to assemble the impressive array of plaintiffs' experts, to depose twelve of these personally, and to analyze the medical/legal literature available on swine flu and toxic reactions. As part of his contribution to the Committee, he prepared a "medical book" that was used [**32] by the Committee in taking depositions, and played a major part in drafting and arguing the Committee's response to the government's motion for

Case 8:10-ml-02151-JVS-FMO    Document 40-3    Filed 04/30/10    Page 13 of 25    Page ID
#:1239

Page 12

89 F.R.D. 695, *706; 1980 U.S. Dist. LEXIS 16446, **32

summary judgment, and in preparing Pretrial Order No. 1. This Court's decision on the liability of the government for activities of program participants under the Swine Flu Act reflects Mr. Rheingold's efforts. He made extraordinarily effective use of his time. In recognition of these factors, the Court awards an additional sum of $ 40,000 to his firm.

Burton M. Greenberg, a partner in London, Greenberg and Fleming, did much of the groundwork required to consolidate the early cases and to formulate the plaintiffs' position in the first stages of the MDL proceedings. Greenberg is not compensated in the "lodestar" award for his efforts as spokesperson for the plaintiffs before the MDL Panel that originally consolidated these cases, nor for the 25-page manual that went to all counsel of record prior to the first pretrial conference before this Court. Greenberg was active in all phases of Committee endeavor as a member of the three-person strategy subcommittee, chairman of the documents subcommittee, primary author of the deposition manual, author [**33] of the Request for Admissions, and preparer of the source manual used to draft the Stipulation of Facts with the Department of Justice. He effectively argued positions for the Committee before this Court related to these varied activities. Given the scope of his involvement, his hours claimed are relatively modest and do not reflect any of his efforts prior to the first pretrial conference. Thus, the Court awards an additional sum of $ 30,000 to his firm.

Clifford Shoemaker, an associate with Friedlander, Friedlander & Brooks, assumed a major role in the daily administration of this litigation. Shoemaker performed many of the Committee's manifold responsibilities that were required to be performed in the Washington, D. C., area, including almost daily contact with the Department of Justice on discovery matters such as the finalization of Plaintiffs' Interrogatories, the contested depositions of former HEW Secretaries Califano and Mathews, and the coordination of document discovery in the Washington area. He frequently appeared, often on short notice, before this Court to represent the Committee or at the behest of individual plaintiffs. His appearances during the Court's drafting [**34] of the Final Pretrial Order to reflect the final government position on Guillain-Barre Syndrome and to summarize accurately this Court's summary judgment rulings were of especial assistance to the Court and all plaintiffs in this litigation. Compensation under the lodestar formula would not be

sufficient to recognize Shoemaker's contribution, and thus the Court awards an additional sum of $ 20,000 to his firm exclusively for his services.

Contributing Firms and Daniel Shapiro

In addition to the lawyers who served on the Steering Committee, it is necessary to [*707] set fees for the "contributing attorneys" and for Dr. Daniel Shapiro. Each of these cases present special considerations that differ from those involved in the Steering Committee fee award.

Shapiro, admitted to the bar in 1978, is an associate in Gair, Gair and Conason, of New York, a firm with considerable experience in products liability cases. He logged 239 hours. During the time of the consolidated pretrial discovery in this case, Shapiro clearly believed that he was a regular member of the Steering Committee, and on some occasions, the Steering Committee appeared to believe so as well. During these fee proceedings, [**35] however, the Steering Committee has contended that he was not a member, but only a consultant.

It is not productive for the Court to attempt to determine whether Shapiro was or was not a member of the Steering Committee. The central question is simply what fee would be appropriate for his services. The Steering Committee, over his objection, recommended that he be compensated at approximately $ 51 an hour. While Shapiro's legal experience is limited, he brought to the Committee an extensive, useful experience and specialized training as a physician. His assignments from the Committee made use of his medical knowledge. He seeks an award of $ 275 an hour. This is excessive; he was not a medical consultant but a lawyer. However, both his considerable medical experience, and his limited legal experience must be taken into account in appraising his full contribution to this MDL proceeding. Most of his activities required specialized medical training. In the period under review, the Department of Justice suggested a maximum hourly rate for examination time of expert medical witnesses of $ 100. See Dept. of Justice Order 2110.12. Under all the circumstances, this rate more closely approximates [**36] what Mr. Shapiro should receive considering the varied talents and experience that he brought to this group effort. The Court will award his firm $ 100 per hour, or $ 23,900, for his services.

Two additional fees must be considered, the fees for the firm of Naman, Howell, Smith & Muldrow, and the

Case 8:10-ml-02151-JVS-FMO   Document 40-3   Filed 04/30/10   Page 14 of 25   Page ID #:1240

89 F.R.D. 695, *707; 1980 U.S. Dist. LEXIS 16446, **36

Page 13

fee for the firm of Walkup, Downing, Shelby, Bastian, Melodia, Kelly & O'Reilly. In each case, these firms had only a limited participation in the work of the Steering Committee and in the consolidated pretrial discovery.

Naman, Howell agreed with the Steering Committee to resolve their fee request by receiving a fee of $ 75 per hour for 67 hours expended by partner Hilton Howell and $ 50 an hour for 564 hours by associates. The vast majority of all hours were spent by associate William Trail, who devoted 547.75 hours to this litigation. Mr. Trail was involved in a variety of documentary and deposition work, and contributed to preparation of the plaintiffs' trial package. Trail left the firm well before completion of the consolidated proceedings, although he continued to work occasionally with Steering Committee members on various activities. It would not be appropriate to consider the firm [**37] a regular member of the Steering Committee, however. Considering all the circumstances, the fee for Naman, Howell should be based on the same rates applied in computing the lodestar for the Steering Committee $ 75 an hour for partners' time and $ 40 an hour for associates' time. There will be no adjustments, either up or down, based on·the quality of the work, the delay in receiving payment, or other factors. To the extent that these factors need to be considered, they are sufficiently off-setting to support awarding simply the lodestar. The total award approved is $ 27,585.

The firm of Walkup, Downing had a very limited participation in the work of the Steering Committee. The firm contributed an initial $ 2,000 assessment made against each committee member, a sum that subsequently was refunded to each member, but thereafter the firm played a very minor role in Committee affairs. The firm is seeking payment for 45.5 hours of partners' time and 83 hours of work by associates. Because of the minimal showing of the firm's contribution to the work of these [*708] proceedings, and because of the firm's limited participation, the Court finds that a total award of $ 5,000 is proper to [**38] compensate the Walkup, Downing firm for its work.

Liaison Counsel

The local firm of Friedlander, Friedlander & Brooks played a dual role. As experienced litigators in this Court, the firm was a member of the Steering Committee. Mr. Mark P. Friedlander appeared frequently before this Court on motions and other matters. The Friedlander firm was also Liaison Counsel, however. In this role, the firm

acted primarily as an information center. It responded to hundreds of inquiries from plaintiffs' counsel across the country, it was responsible for service of Court Orders, it reported developments to the plaintiffs as a group, it managed the funds and expenses, and it generally performed the services that the term liaison connotes. These services are in part legal, in part administrative, and in part purely mechanical. Given the volume of cases, the demands on the firm's limited resources were heavy. The firm employed extra nonlegal staff to do some of the work and has submitted periodic requests to this Court to approve disbursements for many of these secretarial and administrative nonlegal services.

During the period between April, 1978, and November, 1979, Mr. Friedlander, a partner, [**39] devoted 443.8 hours to the work of this litigation, and Mr. Clifford Shoemaker spent 1,052 hours on these cases. As a practical matter, it was impossible for the firm accurately to record separately the time spent on the Steering Committee and Liaison functions. These were intertwined roles, since even a single telephone call, for example, might well require the firm to act as both Liaison Counsel and as a member of the Steering Committee. Accordingly, the Court must apportion as best it can the time of the Friedlander firm between these two functions and then determine the proper rate of compensation to apply to the liaison work.

Based on all available data, the Court finds that the time of the firm's attorneys from April, 1978, through November 15, 1979, should be allocated as one-third to the work of the Steering Committee and two-thirds to the work of Liaison Counsel. This determination, albeit somewhat arbitrary, is based on a review of the firm's rather sketchy time charges submitted and on the Court's own experience in dealing with the Friedlander firm.

It would be improper to compensate the firm for its entire time at the rates paid to the Steering Committee, for much of [**40] the liaison work was of a ministerial nature even though it was performed by experienced, knowledgeable counsel. At the same time, it would be improper not to recognize the firm's participation in the work of the Steering Committee. For the hours attributable to the Steering Committee, the Court will apply the same rates of pay and the same multiplier previously determined.

As for the rate of compensation to be awarded for liaison work, it appears to the Court that attorneys

89 F.R.D. 695, *708; 1980 U.S. Dist. LEXIS 16446, **40

working on liaison work, whatever their professional qualifications, must be compensated at a rate of not more than $ 40 an hour, the rate used for associates' time in setting the lodestar. In choosing this figure the Court takes cognizance of the complaints directed against Liaison Counsel's performance. A number of plaintiffs' counsel gave testimony to the useful services received from Liaison Counsel, and many of its duties were carried out in satisfactory fashion. It is apparent to the Court, however, from personal experience and from testimony by several plaintiffs' counsel, that recordkeeping and follow-up work were deficient, requests for information were sometimes unanswered, and some plaintiffs seeking [**41] specific assistance were not effectively aided. The Friedlander firm took on liaison duties when previous liaison counsel defaulted, and the firm was understandably strained by the pressures of the work. Indeed, the Government staff itself for a while suffered from these same deficiencies. Nonetheless, the firm's performance as Liaison Counsel, as opposed to its work on the Steering Committee, must be judged on the merits of [*709] what appears to the Court to have sometimes been a halting and indifferent performance.

Accordingly, for the firm's work as Liaison Counsel the Court will award $ 40 an hour for the time spent to November 15, 1979. This sum is for attorneys' time only and is in addition to various approved out-of-pocket expenses for administrative staff and disbursements. The Court will continue to review the issues of attorneys' time and costs incurred by Liaison Counsel and will approve payments for expenses that are properly incurred and adequately documented. Now that these proceedings rapidly are coming to a close, however, Liaison Counsel is expected to terminate its work in the near future. The Court will not approve continuing work by Liaison Counsel beyond [**42] April 30, 1981.

Total Award of Fees

Using the criteria set forth above, that is, an hourly rate of $ 75 for partners and $ 40 for associates, a multiplier of 2, separate awards in the amounts stated, and a rate of $ 40 an hour for time spent as Liaison Counsel, a total award of reasonable fees in the amount of $ 1,465,885.10 is granted as follows:

**Cotchett, Dyer & Illston**

| Partners | | |
|---|---|---|
| 1,650.04 X $ 75 = $ 123,753 | DOUBLED | $ 247,506 |
| | | |
| **Associates** | | |
| 125.4 X $ 40 = $ 5,016 | DOUBLED | 10,032 |
| | | |
| Special Award | | 45,000 |
| | | $ 302,538 |

**Graham & Graham**

| Partners | | |
|---|---|---|
| 250.5 X $ 75 = $ 18,787.50 | DOUBLED | $ 37,575 |

Associate

EXHIBIT C, PAGE 51

89 F.R.D. 695, *709; 1980 U.S. Dist. LEXIS 16446, **42

Graham & Graham
24.5 X $ 40 = $ 980                    DOUBLED          1,960
                                                        $ 39,535

London, Greenberg & Fleming

Partners
999.7 X $ 75 = $ 74,977.50             DOUBLED          $ 149,955

Associates
114.5 X $ 40 = $ 4,580                 DOUBLED          9,160

Special Award                                           30,000
                                                        $ 189,115

Offices of Daniel Becnel, Jr.

Partner
316.15 X $ 75 = $ 23,711.25            DOUBLED          $ 47,422.50

Associate
258.55 X $ 40 = $ 10,342              DOUBLED          20,684
                                                        $ 68,106.50

Patmont & Myers

Partner
329.5 X $ 75 = $ 24,712.50             DOUBLED          $ 49,425

Case 8:10-ml-02151-JVS-FMO   Document 40-3   Filed 04/30/10   Page 17 of 25   Page ID
#:1243

89 F.R.D. 695, *709; 1980 U.S. Dist. LEXIS 16446, **42

Page 16

Patmont & Myers
Associate
797.7 X $ 40 = $ 31,908          DOUBLED          63,816
                                                 $ 113,241

[**43]

Hare, Wynn, Newell & Newton
Partners
619.8 X $ 75 = $ 46,485          DOUBLED          $ 92,970

Associate
21 X $ 40 = $ 840                DOUBLED          1,680
                                                 $ 94,650

Paul D. Rheingold
Partner
595.8 X $ 75 = $ 44,685          DOUBLED          $ 89,370

Associate
14.5 X $ 40 = $ 580              DOUBLED          1,160

Special Award                                    40,000
                                                 $ 130,530

Offices of Stanley Shingles
Partner
460.75 X $ 75 = $ 34,556.25      DOUBLED          $ 69,112.50

89 F.R.D. 695, *709; 1980 U.S. Dist. LEXIS 16446, **43

Hogan, Smith, & Alspaugh, P.C.
Partners
517.2 X $ 75 = $ 38,790            DOUBLED        $ 77,580

Associate
29 X $ 40 = $ 1,160               DOUBLED          2,230
                                                 $ 79,900

Cone, Owen, Wagner et al.
Partners
452.09 X $ 75 = $ 33,906.75       DOUBLED      $ 67,813.50

John J. Welch, Ltd.
Partner
326.25 X $ 75 = $ 24,468.75       DOUBLED      $ 48,937.50

Stapleton & Whittington
Partners
638.6 X $ 75 = $ 47,895           DOUBLED      $ 95,790

Gair, Gair & Conason (Daniel Shapiro)
239 X $ 100 = $ 23,900                         $ 23,900

EXHIBIT C, PAGE 54

89 F.R.D. 695, *709; 1980 U.S. Dist. LEXIS 16446, **43

Naman, Howell, Smith & Muldrow
Partner
67 X $ 75 = $ 5,025                                  $ 5,025

Associates
564 X $ 40 = $ 22,560                                 22,560
                                                     $ 27,585

---

Walkup, Downing, Shelby, et al.
Total Award of $ 5,000                              $ 5,000

---

[**44]

Friedlander, Friedlander & Brooks
Partner (Steering Committee)
147.93 X $ 75 = $ 11,094.75        DOUBLED        $ 22,189.50

Associate (Steering Committee)
350.67 X $ 40 = $ 14,026.80        DOUBLED          28,053.60

Special Award (Steering Committee)                 20,000

Liaison Counsel
997.20 X $ 40 = $ 39,888                           39,888
                                                 $ 110,131.10

---

Allocation

Initially, a number of plaintiffs opposed a contingent fee award. When this objection was resolved against the Steering Committee, it appeared that the focus of the objections [*710] was narrowed substantially. Except for those limited objections previously noted, the thrust of the remaining objections centered on a single issue: the responsibility of counsel for victims of Guillain-Barre to bear their portion of the payment to the Steering Committee.

Many of the swine flu cases, including some that are expected to result in the largest recoveries, are based on paralysis or death allegedly caused by Guillain-Barre Syndrome contracted as a result of the inoculation. Approximately 820 plaintiffs, more than 55 percent of the total, claim to have suffered from Guillain-Barre. Attorneys for a few of these Guillain-Barre claimants

89 F.R.D. 695, *710; 1980 U.S. Dist. LEXIS 16446, **45

[**45] vigorously oppose any order requiring them to contribute to a fee award. In most of these cases, their claims have not been resolved at the trial level. Nonetheless, these attorneys confidently assert that they have not and will not receive any benefit from the Steering Committee's work and state, in effect, that there was never any reason for the Steering Committee to carry out discovery relating to Guillain-Barre because the United States from the outset recognized its liability. n26

n26. A few objectors take the argument one step further and contend that the Steering Committee, far from being an advocate for the plaintiffs, was an adversary. This view is grounded on appearances by the Steering Committee before the Judicial Panel on Multidistrict Litigation opposing efforts by some Guillain-Barre plaintiffs to avoid being consolidated. See footnote 13, supra. Because the Steering Committee opposed the plaintiffs in their efforts, some of the plaintiffs oppose paying the Steering Committee any fees. It is the Court's view that the Steering Committee acted quite responsibly in opposing these remands prior to the completion of the consolidated proceedings, because, for tactical reasons, it may well have been counterproductive to the plaintiffs as a group to have various transferee courts deciding issues that were included, or might have been included, in the proceedings before this Court before full discovery of the underlying facts.

[**46]

These protests are without merit and, for the reasons indicated below, must be rejected in determining how to allocate the burden of paying fees. It is significant to note that only about 30 Guillain-Barre claimants out of a total of about 820 have protested. In the following paragraphs the Court will outline at some length the course of the Steering Committee's useful discovery efforts concerned with Guillain-Barre.

From the beginning of these multidistrict proceedings, the Steering Committee, with the full approval of the Court, initiated extensive discovery into all aspects of the Guillain-Barre problem. It was evident that a significant number of inoculations had caused paralysis, which in some instances was permanent or even lead to death. This suggested there had been a

Guillain-Barre reaction in some cases. The committee, in the very first months, undertook highly relevant inquiries into the extent of the government's information showing an awareness of the nature of the disease and its possible relation to the swine flu vaccine. Once the probability of a Guillain-Barre reaction to the vaccine under certain conditions was ascertained, difficult fact issues were still presented [**47] in the area of causation. Government experts and others with specialized knowledge were scheduled to be deposed and material indicating the extent of the government's knowledge and lack of proper warning notices was explored.

The United States attempted to halt this discovery. On June 20, 1978, Joseph A. Califano, Jr., then-Secretary of the Department of Health, Education, and Welfare, issued an ambiguous, nonbinding press statement announcing that the government had decided that Guillain-Barre claimants "will not need to prove negligence" in order to receive compensation. The press announcement was presented to the Court at a hearing already scheduled the same day, and the government asked at that hearing that pending discovery requests be stayed in light of the announcement. After consulting with counsel for the government and for the Steering Committee, the Court granted a short stay in order for the government to put into stipulation form the "concession" implied in the press announcement and to indicate the way in which that concession might justify limiting discovery against the government.

[*711] Difficulties arose almost immediately. Although the counsel for the government [**48] contended otherwise, it was the view of the Court and of the Steering Committee that the stipulation as submitted on July 21 differed materially from the concession implied by the press announcement and the representations of the government's counsel at the June 20 hearing. There then began a long, tortuous process involving the Court, the Steering Committee, and the government to reduce to stipulation form some agreement limiting the proof necessary by a Guillain-Barre victim. There is no need to recite each step in that process; it is sufficient to say that at no time prior to the Final Pretrial Order was the government willing to enter into a legally binding stipulation that offered any assurance to individual plaintiffs. In the face of the government's reluctance, the Court rescinded the stay on discovery and the Steering Committee engaged in extensive discovery on all aspects of Guillain-Barre. The results of this work

89 F.R.D. 695, *711; 1980 U.S. Dist. LEXIS 16446, **48

are included in the trial package made available to each plaintiff and have been used to great advantage by at least some of the plaintiffs who already have recovered damages against the government.

The objectors in this fee proceeding contend that the work of [**49] the Steering Committee after the June 20, 1978, press announcement was superfluous, or even counterproductive because it generated delay, and that the objectors therefore should not be required to pay. The objectors note that with the June 20 announcement, the government evinced a willingness to stipulate to legal fault in any case for which the plaintiff could prove both a Guillain-Barre diagnosis and that the Guillain-Barre was caused by the swine flu vaccine. Because diagnosis and causation still must be proved, even under the stipulation in the Final Pretrial Order, these objectors view the committee's work as inconsequential.

These objections are without merit. There are several factors which the protestors fail to appreciate.

1. It is clear from the government's actions following the June 20 announcement and hearing that the government was not willing to give its statement the legal force the objectors ascribe to it. When the government was given time to reduce the announcement to a binding stipulation, government counsel returned with a wholly inadequate proposal. The government in hearings, in motions, and in negotiations continued to retreat from the announcement in what [**50] it was willing to concede.

Most importantly, the government flatly represented in proceedings before the Multidistrict Panel that the Califano statement did not have the legal effect which objectors then attributed to it. Based on the press statement, several Guillain-Barre plaintiffs attempted to withdraw from the multidistrict proceedings or to avoid being consolidated. These efforts were opposed by the Steering Committee and the government, and, at one point, counsel for the government stated that in a previous ruling the Panel "erred in concluding that Secretary Califano's statement removed the issue of liability from (the MDL-330 proceedings with respect to actions involving Guillain-Barre claims). Secretary Califano's statement did not have that effect." In light of these statements and actions, the objectors' argument appears considerably overstated. n27

n27. The weakness in the objectors' view that

there was a concession prior to the Final Pretrial Order is demonstrated by the experience of the one plaintiff who received a stipulation from the government as to liability prior to issuance of the Order. The government sent letters in late June, 1978, to all Guillain-Barre claimants in which the so-called concession was explained, yet only one claimant, Ina M. Overton, effected a binding stipulation prior to November, 1979. Extensive correspondence in Ms. Overton's case attests to the difficulties which individual plaintiffs faced in having the government act on the press statement. See Response in Opposition by Attorneys of Record for Plaintiff Ina M. Overton, Exhibits 1 through 17, filed June 26, 1980.

[**51]

2. In any event, the government's agreement whatever it was did not remove the need to prove an accurate diagnosis of Guillain-Barre and to prove causation. [*712] The Steering Committee's work is highly valuable in establishing these two factors. Even if the June 20 press statement had been legally binding, the committee would have been required to engage in its deposition and document work to unearth information that plaintiffs could use to show diagnosis and causation. It is conceivable that some plaintiffs in absolute liability states may be able to prove both diagnosis and causation without the work of the Steering Committee, but this cannot be the norm in determining what discovery work was appropriate in these multidistrict proceedings. Indeed, the issue of causation already has been shown to be a sharply disputed question in the few cases that have gone to trial and plaintiffs have not always prevailed. The committee did an excellent job in culling through the information available on diagnosis and causation and in making that information of use to individual plaintiffs; any plaintiff who refuses to employ the material does so at the risk of failing to succeed on his [**52] case.

3. The press announcement concession was inadequate for the purposes of these consolidated proceedings because it was not a legally binding document that could have any effect in individual cases. As the transferee court for pretrial discovery in these cases, this Court had a responsibility to reach legally binding, explicit decisions that could be included in the jacket of each case as the cases were transferred back to their originating courts for trial. The government made it

Page 21

89 F.R.D. 695, *712; 1980 U.S. Dist. LEXIS 16446, **52

clear that it considered itself bound only by papers formally filed in court, see, e.g., Transcript of Hearing of February 7, 1979, at page 8. The Court would have failed to meet its duty as the multidistrict court for these proceedings if it had denied the Steering Committee the right to pursue discovery simply because of the June 20 press release. The final stipulation was only reached at the strong intervention of the Court when the rest of the Final Pretrial Order had been completed and was in the process of being signed.

4. The work of the Steering Committee may well have been the prod that moved the government to commence its fumbling efforts toward a concession on June 20, 1978, even though [**53] the committee at that time was still in the early stages of its work. The timing of the June 20 statement is significant. It was released at precisely the same time that the committee was beginning massive documentary discovery against the government on the issue of Guillain-Barre liability. Based on the statement of Secretary Califano, the government immediately sought a stay of that discovery and attempted to argue that such discovery was unnecessary in light of the press announcement. It is likely that the presence of the Steering Committee and its clear intention to explore the government's liability for Guillain-Barre prompted the government to reassess its position.

5. Similar considerations undermine the claims of several objectors that the work of the Committee was unnecessary in their cases because the government granted them special concessions that reduced the need for the Steering Committee's results. The Court is persuaded that these concessions all but one of which came only after the Final Pretrial Order was filed n28 were in significant part the result of the work of the Committee during consolidated pretrial proceedings in demonstrating the responsibility of the swine [**54] flu program for the increased incidence of Guillain-Barre.

n28. See footnote 27, supra.

6. An additional consideration in this Court's decision to permit the Steering Committee to go forward after the press release was the fact that the Guillain-Barre claims constituted well over half of all the claims, and an even higher percentage of the most serious claims. In dollar value, the Guillain-Barre victims clearly will receive a great deal more compensation than all other

victims of the swine flu program. Under these circumstances, it was particularly important that the Steering Committee leave no stone unturned in its pursuit of possible liability by the government for the [*713] Guillain-Barre injuries. n29 Once this premise is reached, it follows that there would be considerable unfairness in requiring some Guillain-Barre claimants to bear the costs of common discovery and not requiring others to pay.

n29. The need for the Steering Committee to continue its work, even after the June 20 statement by the government, is demonstrated by the government's own statements, shortly after the press announcement, in letters written to each Guillain-Barre claimant. In expressing the reach of the concession, the letters each stated: "Although negligence will no longer be an issue, Guillain-Barre claims will be closely examined to determine whether the claimant was in fact injured, whether the injury resulted from administration of the vaccine and what is the fair amount of compensation." The question "whether the injury resulted from administration of the vaccine," of course, required detailed examination into the medical literature and the administration of the program. Resolving "whether the claimant was in fact injured" required proof of a Guillain-Barre diagnosis, which in turn required discovery into methods of proof of Guillain-Barre.

[**55]

In sum, it can be said with confidence that the work of the Steering Committee in exploring all aspects of Guillain-Barre injury was appropriate and was at all stages encouraged by the Court. The position to the contrary which has been advanced by some of the objectors is based on a simplistic view of these proceedings. If some plaintiffs find the Steering Committee's effort in this regard useless or choose not to examine the materials provided, it makes no difference.

As for the objections raised by some plaintiffs' counsel who settled cases prior to the Final Pretrial Order, the Court can only repeat some of the considerations discussed above. The first settlement of a litigated case occurred on March 15, 1979, well after the Steering Committee was established and had commenced its work. The Court recognizes that those few counsel

89 F.R.D. 695, *713; 1980 U.S. Dist. LEXIS 16446, **55

who thereafter settled with the government without trial at early stages of the multidistrict process feel it is unfair to require them to share their fees with the Steering Committee in the absence of an affirmative showing that the Committee's work aided the results obtained. Without in any way meaning to minimize the effective work or skill of these [**56] attorneys, the Court must recognize, however, that the government's tactical decisions and appraisal of its exposure necessarily were being influenced by the day-to-day pretrial discovery being conducted under the aegis of the Steering Committee. To determine what factors led the government to settle in any particular case is beyond the reach of this Court, plaintiff's counsel, or the Steering Committee, since the Government's privilege in this regard must be honored.

It is the very nature of multidistrict products liability litigation such as this, with numerous parties and varied liability claims, that the work performed by a central Steering Committee will benefit different plaintiffs in varying degrees, depending on the types of claims, the experience of counsel, the type of proof available at trial level, and a host of other factors. It is possible that certain of the plaintiffs objecting here could achieve the same results in their individual cases without the work of the Steering Committee. But it is clear to the Court that the Steering Committee's efforts had a major effect on the course of this litigation and on the government's responses to all of the claims presented. There [**57] being no way in which the Court can achieve mathematical precision in allocating the burden of paying the common expenses, and keeping in mind the purposes of multidistrict litigation, the Court has concluded that it should not and will not attempt to differentiate the burden of paying fees based on the date of settlement, the issues presented at trial, or the litigating strategy of particular trial counsel. n30

n30. A few plaintiffs' counsel have contended that their cases are being tried in strict liability states, and that they therefore have no need for, or at least a reduced need for, the work of the Steering Committee. Thus, these objectors conclude, they should not be required to contribute to the same degree as counsel in states that require a higher degree of proof. The Court rejects any allocation based on differences in state law for reasons similar to those stated above. As an initial matter, it is impossible for this Court to determine which states should be considered strict liability states for purposes of this fee award. Furthermore, much of the work of the committee would be of value to plaintiffs regardless of state law. There is no more basis for distinguishing between plaintiffs on the basis of their state of residence than there is on the basis of the underlying claim.

It is significant that only in the rarest circumstances have courts permitted plaintiffs in multidistrict litigation to be exempted from contribution to the common costs. Cf., e.g., *Vincent v. Hughes Air West, Inc., supra, 557 F.2d at 765-66*. No plaintiff in this case presents a sufficiently unique argument to warrant exclusion, nor has any discrete class of plaintiffs demonstrated that they should be treated differently.

[**58]

[*714] On the other hand, the Court believes that a system of payment based wholly on the size of the recovery is to be avoided if the total recovery by all plaintiffs is sufficient to make another equitable arrangement possible. A straight percentage scheme could place a significantly heavier burden of payment toward committee fees on those plaintiffs achieving the largest recoveries. The size of the recovery is primarily attributable not to the work of the Steering Committee but to the skill of local trial counsel and the special distress of their unfortunate clients. Although the Court will not recognize the claim of some objectors that the Committee's work was of no value to them, an attempt will be made, if it is feasible, to spread the fee award among plaintiffs in a manner that will minimize the assessment against any single plaintiff. n31

n31. A variety of mechanisms for payment of Steering Committee fees have been adopted in previous multidistrict litigation. In the Dalkon Shield litigation, for instance, each plaintiff was required to pay the sum of $ 400, without regard to the amount recovered, or, indeed, to whether any amount was recovered at all. See Final Order, In re: A. H. Robins Company, Inc., "Dalkon Shield" *IUD Products Liability Litigation, 438 F. Supp. 942* (D.C.Kan., 1977). By contrast, the steering committee in the Hughes Air West

89 F.R.D. 695, *714; 1980 U.S. Dist. LEXIS 16446, **58

litigation received a straight percentage of all recoveries. See *Vincent v. Hughes Air West, Inc., 557 F.2d 759, 775 n.16 (9th Cir. 1977)*. The Court has considered the merits of each of these approaches and has determined that some combination of the two methods best allocates the burden of the expenses in this swine flu litigation.

[**59]

It is impossible, at this stage, to know what the total recovery by all plaintiffs might be, or how those recoveries will be divided among large and small sums. Only about 15 percent of the cases have yet gone to settlement or judgment, and the Court will not hazard a guess at what the final outcome will be. It is the Court's intention, however, to consider setting a cap on the amount that any single plaintiff will be required to pay toward the Steering Committee fee, if the amounts

recovered make that possible. The Court will monitor the sums received by plaintiffs and the sums available for payment of the fees granted herein, and establish a cap at such time, if any, that it seems appropriate to do so. In the meantime, the interim procedure established requiring payment into an escrow account of five percent of the gross award, or twenty percent of the attorney's fee, whichever is less will be continued. The Steering Committee may make application to the Court for payment of the fees awarded herein as sums accumulate in the escrow account. At such time as the full fee has been paid, the Court will issue additional orders regarding refunds to any plaintiffs. The Steering Committee [**60] and Liaison Counsel are to report to the Court periodically on payments into and out of the escrow account.

TABLE

108B9N

********** Print Completed **********

Time of Request: Thursday, January 25, 2007  14:42:38 EST

Print Number:    1821:8632384
Number of Lines: 846
Number of Pages: 23

Send To:  MANUEL, RYAN
          COTCHETT PITRE SIMON
          840 MALCOLM RD STE 200
          BURLINGAME, CA 94010-1413