Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Marc M. Seltzer, Bar No. 054534
*mseltzer@susmangodfrey.com*
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

*Co-Lead Counsel for Consumer Economic Loss Plaintiffs*

Frank M. Pitre, Bar No. 100077
*fpitre@cpmlegal.com*
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

*Lead Counsel for Non-Consumer Economic Loss Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx)<br><br>FIRST AMENDED CONSOLIDATED COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This Document Relates To:

*Dale Baldisseri v. Toyota Motor Sales, U.S.A., Inc., et al.*, 2:09-cv-09386

*Ebony Brown v. Toyota Motor Sales, U.S.A., Inc.*, 2:10-cv-02080

*Gary Davis v. Toyota Motor Sales, U.S.A., Inc.*, 2:10-cv-02078

*John Flook v. Toyota Motor Sales, U.S.A., Inc.*, 2:10-cv-02023

*Lacey Laudicina, et al. v. Toyota Motor Corporation, et al.*, 2:10-cv-01030

*Joseph Hauter, et al. v. Toyota Motor Sales, U.S.A., Inc., et al.*, 8:10-cv-00105

*Rodney Josephson v. Toyota Motor Sales, U.S.A., Inc.*, 2:10-cv-02077

*Robert Navarro v. Toyota Motor Sales, U.S.A., Inc., et al.*, 2:10-cv-02276

*Seong Bae Choi, et al. v. Toyota Motor Corporation, et al.*, 2:09-cv-08143

*Elizabeth Van Zyl v. Toyota Motor Sales, U.S.A., Inc.*, 2:10-cv-02147

*Green Spot Motors Co., et al. v. Toyota Motor Corp., et al.*, 8:10-cv-00312

*Deluxe Holdings, Inc. v. Toyota Motor Sales, U.S.A., Inc., et al.*, 2:10-cv-02147

1

# TABLE OF CONTENTS

2
<u>PAGE</u>

3

I.   INTRODUCTION ............................................................................. 1

4

II.  JURISDICTION AND VENUE ..................................................... 10

5

6

III. PARTIES ........................................................................................ 11

7

    A.   Consumer Plaintiffs ............................................................... 11

8

    B.   Non-Consumer Plaintiffs ...................................................... 14

9

    C.   Defendants .............................................................................. 15

10

IV.  FACTUAL BACKGROUND ......................................................... 17

11

12

    A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand ..................................... 17

13

    B.   Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism .......................................... 32

14

15

    C.   Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002 ....................... 34

16

        1.   First reports of unintended acceleration to Toyota ...... 34

17

18

        2.   Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls ...... 36

19

        3.   Runaway Lexus problem and the floor mat explanation .............. 50

20

        4.   Unintended acceleration in Tacomas and Siennas ....... 58

21

        5.   The floor mat recall ..................................................... 65

22

        6.   The sticky accelerator recall ....................................... 72

23

    D.   Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall Complaints ........................................... 75

24

25

    E.   Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall ...................................... 78

26

27

    F.   Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers and Affirmatively Misled Consumers ............ 83

28

G.    Summary of the Defects in Defective Vehicles .......................................87

    1.    Electronics Issues: ...........................................................87

    2.    Mechanical Issues: .........................................................89

    3.    The lack of an appropriate fail-safe: ..........................90

    4.    Failure to appropriately test and validate the
    vehicle systems: ...........................................................91

H.    Toyota Belatedly Installs a Brake-Override as a "Confidence"
Booster ...........................................................................................92

I.    The Defects Causing Unintended Accelerations Have Caused
Defective Vehicles' Values to Plummet ...................................97

J.    Choice of Law Allegations .........................................................98

V.    CLASS ALLEGATIONS ..................................................................103

A.    The Nationwide Consumer Class ..............................................103

B.    Non-Consumer Economic Loss Class .......................................107

VI.    COUNTS ...........................................................................................111

COUNT I Violations of the Consumer Legal Remedies Act
(CAL. CIV. CODE § 1750, *et seq.*) ....................................................111

COUNT II Violation of the California Unfair Competition Law
(CAL. BUS. & PROF. CODE § 17200, *et seq.*) ..................................117

COUNT III Violation of the California False Advertising Law
(CAL. BUS. & PROF. CODE § 17500, *et seq.*) ..................................120

COUNT IV Breach of Express Warranty
(CAL. COM. CODE § 2313) ...............................................................122

COUNT V Breach of the Implied Warranty of Merchantability
(CAL. COM. CODE § 2314) ...............................................................127

COUNT VI Revocation of Acceptance
(CAL. COM. CODE § 2608) ...............................................................129

COUNT VII Violation of Magnuson-Moss Warranty Act
(15 U.S.C. § 2301, *et seq.*) .............................................................132

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT VIII Breach of Contract/Common Law Warranty ........................... 135

COUNT IX Fraud by Concealment (Based on California Law) .................... 136

COUNT X Unjust Enrichment (Based Upon California Law) ...................... 139

PRAYER FOR RELIEF ................................................................. 140

DEMAND FOR JURY TRIAL ..................................................... 143

Pursuant to Scheduling Order No. 3, Plaintiffs in the "Economic Loss" cases file this Consolidated Complaint in case numbers:  2:09-cv-09386, 2:10-cv-02080, 2:10-cv-02078, 2:10-cv-02023, 2:10-cv-01030, 8:10-cv-00105, 2:10-cv-02077, 2:10-cv-02276, 2:09-cv-08143, 2:10-cv-02147, 8:10-cv-00312, and 2:10-cv-02147.

## I.    INTRODUCTION

1.    During the period 2001 to the present, Toyota Motor Corporation ("TMC") and its affiliates (Lexus and Scion) have sold tens of millions of cars throughout the United States and worldwide that use an electronic throttle control system ("ETCS" or "ETCS-i").

2.    ETCS vehicles operate with an electronic throttle control system that severs the mechanical link between the accelerator pedal and the engine.  In place of the cable that connects the two components, complex computer and sensor systems communicate an accelerator pedal's position to the engine throttle, telling the vehicle how fast it should go.  Toyota began installing these electronic control systems in some Lexus models in 1998 and in Camry and Prius models in 2001 and 2002, and in all Toyota-made vehicles by 2006.[1]  Toyota promised that these new systems would operate safely.  This promise turned out to be false in several material respects.  In reality, Toyota concealed and did not fix a serious safety problem plaguing all ETC cars.

3.    In press releases, sales literature, brochures and other consumer-oriented documents, Toyota has consistently promoted "safety" as a top priority in all of its

---

[1] *See* U.S. Bound Vehicle Models and MY with ETCS-i, at TOYEC-0000577.

vehicles and has specifically promoted ETCS. Toyota promised that a "fundamental component of building safe cars" was testing and analyzing why accidents occur.

4.      Toyota has received tens of thousands of complaints from consumers about sudden unintended acceleration ("SUA"). It also received evidence that the number of complaints of sudden unintended acceleration increased substantially in vehicles with electronic throttle controls as opposed to those with mechanical controls. For example, on June 3, 2004, Scott Yon, an investigator in the U.S. National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI"), sent Toyota Assistant Manager of Technical and Regulatory Affairs Chris Santucci – who himself had previously worked at NHTSA – an e-mail attaching a chart showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles.

5.      Toyota also received reports of crashes and injuries that put Toyota on notice of the serious safety issues presented by SUA. Two of the top five categories of injury claims in NHTSA's Early Warning Reporting Database involved "speed control" issues on the 2007 Lexus ES350 and Toyota Camry. As one internal document observed the issues presented by a SUA-related defect are "catastrophic."[2] Despite the catastrophic nature of this defect Toyota has concealed its existence and has failed to repair the problem.

6.      Complaint data lodged with NHTSA – assuming it has been properly and adequately disclosed by Toyota – reveals a SUA defect in vehicles with ETCS.

---

[2] TOY-MDLID00003908.

- 2 -

Within the first year of changing from non-ETCS to ETCS, there was a material increase in SUA events such that Toyota knew of a safety-related defect:

| | |
|---|---|
| Lexus RX | 1.8-fold increase |
| 4Runner | 6-fold increase |
| Avalon | 2-fold increase |
| Camry | 3.7-fold increase |
| Highlander | 2.8-fold increase |
| RAV4 | 2-fold increase |
| Sienna | 2-fold increase |
| Tacoma | 14-fold increase |
| Lexus ES | 5-fold increase |

7.     On information and belief, this trend may prove to be much greater once the complaints known only to Toyota are analyzed.  Toyota has received at least 39,000 complaints, and possibly as many as 60,000, involving alleged SUA incidents.

8.     Irrespective of whether these SUA events are caused by floor mats, pedals, an unknown failure in the ETCS, or a failure in other aspects of the electrical systems, Toyota vehicles with ETCS are defective.

9.     This defect renders the vehicles unsafe.  For example, from 2003-2009, there were 23 claims of death or injury involving speed control on the 2005 Camry, 20 on the 2007 Camry, and 18 on the 2007 Lexus ES.

10.     Despite notice of the SUA defect in ETCS vehicles, no disclosure was made to consumers that their vehicles – which Toyota marketing and sales literature for years represented as "safe" – were in fact not as safe as a reasonable consumer expected due to the increased risk of an unintended acceleration versus the rate of

- 3 -

such incidents in cars without ETCS.  Toyota never disclosed that it had no credible or scientific explanation for SUA events in ETCS vehicles.  Rather than disclose the truth, Toyota concealed the existence of this defect.  Toyota's strategy was to "stop this from moving forward" – referring to the possibility of a public hearing before the United States Congress on SUA years before the congressional hearings in 2010.[3]

11.     By late 2009 and early 2010, as NHTSA and Toyota received more and more reports of SUA, Toyota finally admitted there might be "mechanical problems." After years of consistently blaming such events on driver error and emphatically denying the existence of any defect, Toyota now claimed that some SUA events could be explained by the entrapment of the accelerator pedal by the floor mats, or by so-called "sticky pedals."  Toyota recalled certain vehicles to address these potential problems and publicly proclaimed that these recalls resolved all concerns of SUA in Toyota vehicles.  But SUA events kept occurring, even in vehicles that did not have floor mats and vehicles that were not subject to the sticky pedal recall.

12.     In response to a Congressional Committee's January 28, 2010, request for internal Toyota documents involving SUA complaints, Toyota provided a representative sample of reports describing calls received through the company's telephone complaint line.  To produce this sample, Toyota first identified 37,900 customer contact reports in its database as potentially related to SUA.  Toyota then randomly selected 3,430 of those complaints for review.  Toyota ultimately determined that 1,008 of those complaints were directly related to SUA, and provided these 1,008 reports to the Committee.

---

[3] TOY-MDLID00050747.

- 4 -

13.     In responding to Congress, Toyota unilaterally excluded calls after October 1, 2009, calls that it claimed did not involve SUA incidents, and calls involving vehicles produced before 2001.  Toyota then acknowledged 233 reports of SUA from the random sample of 3,430 complaints Toyota produced to the Committee.  Of these 233 complaints, Toyota claimed 69 involved vehicle crashes.

14.     These 233 incidents occurred in a broad variety of Toyota vehicles, and were reported in vehicles produced in every model year from 2001 through 2010.[4] Assuming the 3,430 complaints selected by Toyota for review were in fact a random sample of the 37,900 complaints in the Toyota database, Toyota would have received an estimated 2,600 complaints of sudden unintended acceleration from Toyota and Lexus drivers between January 2000 and October 2009.  These complaints would have included an estimated 760 crashes.

15.     In the data the Committee reviewed, operators on the Toyota customer complaint line (who relied on customer reports and information from dealer inspections) identified floor mats or pedals as the cause of only 16% of the SUA incident reports.  Approximately 70% of the SUA events in Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

---

[4] Twenty-nine percent of the complaints involved Camry models, 13% involved Lexus models, 10% involved Corollas, and 9% involved Tacoma models.  Model year 2007 vehicles were the subject of 17% of all sudden unintended acceleration complaints, and model year 2002 and 2004 vehicles were each the subject of 13% of these complaints.

010172-25  386580 v1

16.     Analyses of publicly available databases by other researchers indicate that from 1999 to the present, there were more than 5,800 SUA incidents involving Toyotas that resulted in 2,166 crashes, 1,011 injuries and 78 deaths.

17.     Despite years of warnings, Toyota has still failed to properly disclose, explain or fix the underlying problem with ETCS.  This leaves millions of Toyota owners with vehicles that potentially could race out of control.  Until 2009, consumers were unaware of even the potential for such events.

18.     SUA is preventable.  For example, "brake-override" systems designed to recognize an attempt by the driver to brake while at the same time requesting an open throttle have been employed in vehicles sold in the United States by other manufacturers for years.  Toyota, however, failed to incorporate a brake-override or other appropriate fail-safe mechanism.  Indeed, until late 2009, no Toyota vehicle had a "brake-override" system or other adequate fail-safe mechanical system that was sufficient to prevent SUA.  Only after extensive publicity concerning the SUA defect in Toyota vehicles did Toyota add a brake-override as standard equipment in 2011 model-year vehicles.  Toyota has recently announced that it will provide brake-overrides to the following models:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250.  But this announcement is not an effective remedy or repair.  First, it was announced not as a safety recall but as a "confidence booster."  Most consumers did not and will not take their vehicles in for a brake-override remedy described misleadingly as a "confidence" measure.  Second, the "confidence booster" does not cover all vehicles with a SUA defect.  Third, the

- 6 -

brake-override being offered is not as robust or effective as an override as implemented by other manufacturers.

19.    Toyota recognized the need for a brake-override" as early as 2007, if not before:  when discussing the "floor mat issue," it was suggested that "a fail safe option similar to that used by other companies to prevent unintended acceleration" should be investigated.  The fail-safe referred to, used by both GM and Audi at the time, was a brake-override.  Belatedly, in 2009 Toyota engineers again addressed this issue after the well-publicized death of a police officer due to unintended acceleration.

> During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration."  I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div."  Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008.  (The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)[5]

20.    Toyota admits that the recalls have not addressed the problem.  James Lentz, Toyota's second-highest ranking North American executive was asked:  "Do you [] believe that the recall on the carpet changes and the recall on the sticky pedal will solve the problem of sudden unintended acceleration?"  His reply:  "Not totally."

_____

[5] TOY-MDLID00041130T-0001.

- 7 -

21.     In prepared testimony before the Committee on Oversight and
Government Reform of the U.S. House of Representatives on February 24, 2010,
TMC President and Chief Executive Officer Akio Toyoda admitted that Toyota's
growth in recent years was "too quick" and the company's priorities of "first, safety;
second, quality; third, volume" had become "confused."  Mr. Toyoda went on to
apologize to American consumers:  "I regret that this has resulted in the safety issues
described in the recalls we face today, and I am deeply sorry for any accidents that
Toyota drivers have experienced."

22.     Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor
North America, Inc., likewise acknowledged that Toyota had failed its customers.
Mr. Inaba testified in the United States Senate Sub-Committee hearings on Toyota
recalls:

> In recent months we have not lived up to the high standard
> our customers and the public have come to expect from
> Toyota, despite our good faith efforts.  As our president,
> Akio Toyota, told members of Congress last week, we
> sincerely regret that our shortcomings have resulted in the
> issues associated with our recent recalls.

23.     Shinichi Sasaki, TMC's Executive Vice President admitted before
Congress that Toyota "did not listen to its customers":

> How this issue came about is because there were many
> vehicle – excuse me – many voices were sent to us from
> the customers, but we really did not listen to every one of
> them very carefully, one by one.  We should have really

- 8 -

listened to them carefully and rendered some technical

analysis so that it would be connected to our following

product improvement.  However, the quality of this work

or the efficiency of our work or speed with which we

worked had become sluggish, or sort [sic] failed gradually,

and this has come to a much larger issue.

24.   As the long-concealed SUA defect finally began to see the light of day and the public realized that Toyota had no fail-safe mechanisms to prevent SUA, the value of Toyota cars diminished.  Many consumers sought to return their cars out of fear that SUA could occur and cause catastrophic injury or death.  One class member and SUA victim wrote:  "I drive a 4 year old and 3 year old child around and am extremely thankful they were not in the car.…  Had this happened on the freeway, we would have all been dead."  Her request for the "original purchase price of the car refunded" was rejected.[6]  Her concerns and request for revocation of her purchase is not an isolated incident.  Toyota has refused to take class members' vehicles back, and has refused to and cannot provide an adequate repair.

25.   This action seeks class action status pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of nationwide Consumer and Commercial Classes of Toyota vehicle owners/lessors of all vehicles with ETCS, as defined in Paragraphs 277 and 286 below.

26.   Toyota does substantial business in California, the principal offices of Toyota Motor Sales, U.S.A., Inc. ("TMS") are in California, and much of the

---

[6] TOY-MDLID90011054.

conduct that forms the basis of the complaint emanated from Toyota's headquarters

in Torrance, California.  California has a larger percentage of class members than

any other state.

27.    The consumer class members ("Consumer Class") assert claims under

California law under the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750;

California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; California

False Advertising Law, CAL. BUS. & PROF. CODE § 17500; Breach of Express

Warranty, CAL. COM. CODE § 2313; Breach of Implied Warranty of Merchantability,

CAL. COM. CODE § 2314; Revocation of Acceptance, CAL. COM. CODE § 2608;

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; Common Law Breach of

Contract; Fraud by Concealment and Unjust Enrichment.

28.    The non-consumer economic loss class members ("Commercial Class")

assert claims under California law under the California Unfair Competition Law,

CAL. BUS. & PROF. CODE § 17200; Breach of Express Warranty, CAL. COM. CODE

§ 2313; Breach of Implied Warranty of Merchantability, CAL. COM. CODE § 2314;

Revocation of Acceptance, CAL. COM. CODE § 2608; Common Law Breach of

Contract; Fraud by Concealment and Unjust Enrichment.

29.    Plaintiffs have reviewed their potential legal claims and causes of action

against the Defendants and have intentionally chosen only to pursue claims based on

state-law.  Any reference to any federal agency, regulation or rule is stated solely as

background information and does not raise a federal question.

## II.    JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to the Class Action

Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of

- 10 -

diverse citizenship from one Defendant, there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

31.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and Defendants have caused harm to class members residing in this District.

### III.   PARTIES

**A.   Consumer Plaintiffs**

32.     Plaintiff Dale Baldisseri is a resident and citizen of California and purchased a 2009 Toyota Camry on September 1, 2008.  In November 2009, Mr. Baldisseri received a notice from Toyota that described unintended acceleration. Mr. Baldisseri was concerned, based on the notice, about unintended acceleration, and eventually rented a car rather than continuing to drive his Camry.  Mr. Baldisseri called Toyota's Customer Experience Center and asked that Toyota supply him with a substitute car, but Toyota refused.  Mr. Baldisseri and his wife are afraid to drive the Camry because of its SUA defect, so the vehicle has remained parked since December 2009.

33.     Plaintiff Ebony Brown is a resident and citizen of Illinois.  She owns a 2009 Toyota Camry.

34.     Plaintiff Gary Davis is a resident and citizen of Tennessee.  He owns a 2008 Toyota Camry LE.  Mr. Davis purchased his Toyota based on its reputation for safety.

35.     Plaintiff John Flook is a resident and citizen of Maryland.  He owns a 2010 Toyota Corolla.

36.     Plaintiff Kevin Funez is a resident and citizen of Florida.  He owns a 2006 Toyota Avalon.

37.     Plaintiff Joseph Hauter is a resident and citizen of California.  He owns a 2008 Toyota Tundra.  Mr. Hauter experienced two SUA incidents.  The first incident was in late December 2009/early January 2010, and the second incident was on or around January 19, 2010.  The first incident occurred when Mr. Hauter was pulling into a gas station.  When Mr. Hauter had his foot on the brake pedal, the car suddenly accelerated.  He slammed on his brakes, but his engine was still racing.  When his vehicle slowed down, he was able to put the vehicle in park.  The second incident occurred when Mr. Hauter was approaching a left turn lane and began to apply the brakes.  The vehicle suddenly accelerated.  Mr. Hauter stood on the brake pedal with both feet while the vehicle was lurching forward, until the vehicle finally slowed and stopped.  Mr. Hauter could feel the anti-lock brakes pumping and the vehicle lurching forward at the time.  After the second incident, Mr. Hauter notified the dealer (Penske Toyota) of the two incidents.  The dealer performed the recall repair for the pedal, and the vehicle was inspected in an inspection including Toyota counsel on March 30, 2010.  Mr. Hauter has not yet been notified to bring the truck in for floor mat "repairs."  He is still driving the truck, but practices emergency measures to be ready in case the SUA occurs again.

38.     Plaintiff Rodney Josephson is a resident and citizen of Massachusetts. He owns a 2010 Toyota Corolla.

- 12 -

39.     Plaintiff Robert Navarro is a resident and citizen of Ohio.  He owns a 2010 Toyota Avalon Limited.  Mr. Navarro asked his dealer and the Toyota Customer Experience Center to take the car back, but both the dealer and the representative from Toyota refused.  The representative from the Toyota Customer Experience Center directed Mr. Navarro to the National Center for Dispute Settlement ("NCDS") to submit a claim; the NCDS told Mr. Navarro that they could not resolve his type of claim.

40.     Plaintiff Sandra Reech is a resident and citizen of Pennsylvania.  She owns a 2008 Toyota Tacoma.  On March 8, 2009, Ms. Reech experienced an SUA incident when her truck accelerated while she was traveling on the road.  She applied the brakes, but the vehicle did not slow down.  When she put all of her weight on the brakes and shifted the vehicle into neutral, the engine continued to rev at high RPMs. She was finally able to steer off the road and stop the vehicle.  Ms. Reech wrote a letter to Toyota's Customer Experience Center, and she received a voicemail from a Toyota representative stating she could file an arbitration complaint.

41.     Plaintiff Elizabeth I. Van Zyl is a resident and citizen of Florida.  She leases a 2010 Toyota Camry LE.  Ms. Van Zyl has experienced SUA incidents over several months where the vehicle surges forward.  Ms. Van Zyl has reported the surging to her dealer and to the Toyota Customer Experience Center.  Ms. Van Zyl tried to trade in her Toyota for a Honda, but the dealer did not want her Toyota as a trade-in.  Ms. Van Zyl paid more for her lease than she would have otherwise agreed to pay had she known of the defect.  Ms. Van Zyl paid for a good, her Toyota, that has failed of its essential purpose.

- 13 -

42.     Each of the Consumer Plaintiffs have purchased or leased a car with a defect and in a transaction where Toyota did not disclose material facts related to a vehicle's essential purpose – safe transportation.  As a result each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect.

**B.     Non-Consumer Plaintiffs**

43.     Plaintiff Green Spot Motors Co. ("Green Spot Motors") is a California corporation with its principal place of business in Salinas, California.  Plaintiff Green Spot Motors is an auto dealership.  In mid-2009, Green Spot Motors purchased a 2007 Toyota Camry.  Later that year, Green Spot Motors purchased a 2009 Toyota Camry from Toyota.  As a result of the wrongful and deceptive actions and business practices of Toyota, Green Spot Motors purchased vehicles that were not of the quality or reliability that was advertised.  As a result, Green Spot Motors overpaid for the vehicles and has been unable to re-sell them even at substantially reduced prices.  If Toyota had disclosed the nature and extent of the problems alleged herein, Green Spot Motors would not have purchased a vehicle from Toyota, or would not have purchased the vehicles for the prices paid.  The value of Green Spot Motors' two Camry vehicles has diminished as a result of the SUA defect.  In addition, Green Spot Motors has suffered lost profits and other economic losses due to its inability to sell the Toyota vehicles.

44.     Plaintiff Deluxe Holdings Inc. ("Deluxe Holdings"), dba Deluxe Rent a Car, a Nevada corporation, operates a rental car business and has its "nerve center" and principal place of business at 5315 W. 102nd Street, Los Angeles, California

- 14 -

90045.  As of the date of the filing of the consolidated master complaint, Plaintiff owns about 258 of the Subject Vehicles (defined in Paragraph 50, *infra*) manufactured and sold by the Defendants, and has previously owned about 105 of the Subject Vehicles during the relevant time frame.  The value of the Subject Vehicles owned by Deluxe Holdings has diminished as a result of the SUA defect.  Deluxe Holdings has also suffered damages for the Subject Vehicles that it previously owned and sold at a loss.  In addition, Deluxe Holdings has suffered lost profits and other economic losses.  Deluxe Holdings, by and through its employees/agents, has had direct dealing during the relevant time frame with the Defendants regarding the purchase of Toyota vehicles, so that Deluxe Holdings is in privity with those Defendants.

45.     Green Spot Motors and Deluxe Holdings are hereinafter referred to as the "Commercial Plaintiffs."

**C.     Defendants**

46.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation.  TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc.  TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota, Lexus and Scion automobiles in California and multiple other locations in the United States and worldwide.

47.     Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in California.  TMS is Toyota's U.S. sales and marketing arm, which oversees sales and other operations in 49 states.  TMS distributes Toyota, Lexus and Scion vehicles and sells these vehicles through its network of dealers.  Money received from the purchase of a Toyota vehicle from a dealer flows from the

010172-25 386580 v1

dealer to TMS.  Money received by the dealer from a purchaser can be traced to TMS and TMC.

48.     TMS and TMC sell Toyota vehicles through a network of dealers who are the agents of TMS and TMC.

49.     TMS and TMC are collectively referred to in this complaint as "Toyota" or the "Toyota Defendants" unless identified as TMC or TMS.

50.     As used in this complaint, "Toyota vehicles", "Defective Vehicles" or "Subject Vehicles" refers to the following models that have ETCS:

### Toyota Vehicles

| | |
|---|---|
| 2001 – 2010 | 4Runner |
| 2005 – 2010 | Avalon |
| 2002 – 2010 | Camry |
| 2007 – 2010 | Camry HV |
| 2003 – 2005 | Celica (2ZZ-GE Engine) |
| 2005 – 2010 | Corolla (1ZZ-FE, 2AZ-FE, 2ZR-FE) |
| 2007 – 2010 | FJ Cruiser |
| 2004 – 2010 | Highlander |
| 2006 – 2010 | Highlander HV |
| 1998 – 2010 | Land Cruiser |
| 2005 – 2010 | Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD)) |
| 2001 – 2010 | Prius |
| 2004 – 2010 | Rav4 |
| 2001 – 2010 | Sequoia |
| 2004 – 2010 | Sienna |
| 2002 – 2008 | Solara |
| 2003 – 2004 | Tacoma (5VZ-FE except Sport Model) |
| 2005 – 2010 | Tacoma |
| 2000 – 2010 | Tundra (not including the 2000-2002 with 5VZ-FE) |
| 2009 – 2010 | Venza |
| 2004 – 2010 | Yaris |

### Lexus Vehicles

| | |
|---|---|
| 2002 – 2003 | ES300 |
| 2004 – 2006 | ES330 |
| 2007 – 2010 | ES350 |
| 1998 – 2006 | GS300 |
| 2007 – 2010 | GS350 |

- 16 -

| 1998 – 2000 | GS400 |
| 2001 – 2007 | GS430 |
| 2007 – 2010 | GS450h |
| 2008 – 2010 | GS460 |
| 2003 – 2009 | GX470 |
| 2010 | HS250h |
| 2008 – 2010 | IS F |
| 2006 – 2010 | IS250 |
| 2010 | IS250c |
| 2001 – 2005 | IS300 |
| 2006 – 2010 | IS350 |
| 2010 | IS350c |
| 1999 – 2000 | IS400 |
| 1998 | LS400 |
| 2001 – 2006 | LS430 |
| 2007 – 2010 | LS460 |
| 2008 – 2010 | LS600h |
| 1998 – 2007 | LX470 |
| 2008 – 2010 | LX570 |
| 2004 – 2006 | RX330 |
| 2007 – 2010 | RX350 |
| 2006 – 2008 | RX400h |
| 2010 | RX450h |
| 1998 – 2000 | SC300 |
| 1998 – 2000 | SC400 |
| 2002 – 2010 | SC430 |

**Scion Vehicles**

| 2005 – 2010 | Scion tC |
| 2008 – 2010 | Scion xB |
| 2008 – 2010 | Scion xD |

## IV.   FACTUAL BACKGROUND

**A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand**

51.     Toyota has consistently marketed its vehicles as "safe" and proclaimed that safety is one of its "highest corporate priorities."  It has promoted ETCS as providing "stable vehicle control."  Examples of such representations follow.

52.     Toyota's 1996 Annual Report explained that safety always has been a top priority in each phase of Toyota's research and development.  But translating that

- 17 -

effort into "overall safety gains" required an "integrated methodology that unifies

evaluation criteria for safety throughout development organization."  In a 1996

brochure entitled "Toyota and Automotive Safety," Toyota again stated, "[a]t

Toyota, we feel that building safe automobiles is the most important thing we can

do."  Toyota explained this focus on safety is part of its broad philosophy:

> The more indispensable automobiles become, the greater
> they affect society in terms of safety and the environment.
> We at Toyota are fully aware of our responsibilities in this
> regard.  We do our utmost to minimize our products'
> environmental impact and work hard to ensure overall
> safety.  This means identifying the causes of any problems,
> devising workable remedies, and then putting those
> remedies into action.

53.    Toyota's safety promises included its new electronic throttle control

system that it began to implement in the late 1990s.  When Toyota began installing

ETCS in the 1998 Lexus, it announced ETCS as one of the latest developments:

> The intelligent electric throttle control system (ETCS-i)
> gives improved acceleration control under all driving
> conditions.  It provides excellent response and stable
> vehicle control, especially when the road is slippery.
> Using ETCS-i the throttle valve opening is controlled by a
> throttle actuator which is a small electric motor.  Under
> normal road conditions the throttle opens in direct

- 18 -

010172-25  386580 v1

1  |  proportion to the accelerator providing maximum response

2  |  and performance.

3  |  However, under slippery road conditions and with the snow

4  |
5  |  mode selected the actuator slows the throttle opening

6  |  relative to the accelerator to suppress sudden engine output

7  |  and provide improved acceleration control.

8  |  The ETCS-i is controlled by the engine management

9  |  computer and communicates with the intelligent automatic

10 |  gear shift and the traction control systems.

11 |
12 | The release claimed "[t]he safety and security of driver and passenger has always

13 | been an absolute priority for Lexus."

14 |  54.  The Toyota Camry, in which some of the earliest deadly sudden

15 | acceleration accidents occurred, was marketed by Toyota as a high quality and safe

16 | family vehicle.  According to a Toyota press release:

17 |  The fifth-generation Toyota Camry, introduced for 2002,

18 |
19 |  has become the platinum standard in midsize family sedans

20 |  by offering more of everything sedan buyers want – room,

21 |  comfort, performance, *safety and value – along with*

22 |  *award-winning Toyota quality*.  "Camry has come to define

23 |  what a family sedan should be," said Don Esmond, Toyota

24 |  Division senior vice president and general manager.  "It's

25 |
26 |  [sic] continuing success in the U.S. stems from the

27 |  combination of truly unbeatable quality, comfort and value

28 |  that it provides."  [Emphasis added.]

010172-25  386580 v1

55.   TMS touted safety as a key feature of Lexus vehicles in a 2002 press kit:

Raising the Standards on Standard Safety Features.

**The Lexus Commitment to Safety**

Lexus designs all its new vehicles to provide customers with advanced safety engineering and technology.  Lexus also recognizes the driver's responsibility to operate a vehicle in as safe a manner as possible, and the company has been at the forefront of technology that enhances both passive safety (occupant protection in a collision) and active safety (driving dynamics).

Road-Reading Throttle Control:  Seeking to enhance driving smoothness at every level, Lexus equipped the LS 430 with a system called Intuitive Powertrain Control. Working with the electronic throttle control (drive by wire), the system helps to smooth out acceleration from a standing start by very slightly delaying throttle opening when the driver steps on the accelerator pedal.

56.   TMC highlighted safety as a key quality in a 2003 brochure:

**Toyota Next Generation Technology**

We are stepping up our safety technology development to ensure that customers can enjoy their vehicles in safety.  In addition to "passive" safety technology, Toyota is energetically developing "active" safety systems that

- 20 -

prevent collisions.  We are working particularly hard to

develop advanced safety systems based on our key

peripheral monitoring technologies.

57.     In a 2003 Toyota brochure devoted to its "Next Generation Technology," Toyota discussed the future of its safety systems:  "We are stepping up our safety technology development to ensure that customers can enjoy their vehicles in safety."

58.     In a press kit regarding the 2003 Prius, Toyota proclaimed its bold use of more "drive by wire" (electronic rather than mechanical features), including a drive-by-wire throttle:

Many of the new technologies used in the Prius – some

unique to the car and world firsts – have been made

possible by Toyota's bold move to redefine the vehicle's

power train and electrical architecture.  The higher voltages

created by the batteries and converter have enabled

Toyota's engineers to equip the Prius with a far larger suite

of 'drive-by wire' technologies than has previously been

seen in any production car.  Throttle, transmission and

braking is [sic] all electronically controlled and free of the

traditional mechanical linkages.

59.     The same brochure lists the new electronic throttle as a safety feature of the car:  "Safety … First car in the world to use 'by-wire' technology for throttle, brakes and gearshift simultaneously."  The brochure describes Toyota's "radical"

- 21 -

and "futuristic" adoption of more electronically controlled features in the Prius
because of their increased reliability, including:

> By suppressing mechanical and hydraulic links and
> replacing them with electric and electronic connections it's
> possible to achieve shorter activation times.  In addition,
> the communication between all these systems will be
> faster.  "By-wire" also brings advantages in weight
> reduction and saves precious space that can be used to
> house other systems…

> "By-wire" technology was originally developed for the
> aerospace industry, where certain mechanisms had to be
> activated without any hydraulic or mechanical link.  The
> only way to achieve this was through an electronic
> connection and electric activation.  This technology not
> only saves weight and space, but also provides a more
> immediate action than hydraulic or mechanical links, with
> even higher reliability.

> For this reason, Prius uses more "by-wire" technology than
> any other car on the road today.  Throttle, brakes, shift
> lever, Traction Control and Vehicle Stability Control Plus
> use this technology to improve their operation or even to
> provide improved ergonomics.

　　　60.　　In an advertisement appearing in the June 2003 issue of GOOD
HOUSEKEEPING, Toyota promised the Sienna had "more safety."

61.   In a 2004 press release introducing the new Prius, TMS claimed:

Designed to easily accommodate a small family, the 2004 Prius is also designed to provide the level of safety a family car buyer demands.  Passive safety features include front seatbelts with pre-tensioners and force limiters, 3-point seatbelts for all rear seating positions and two-step dual front airbags (SRS), with driver and passenger side and curtain airbags available as an option.

Prius also features a high level of dynamic control, with some features that are not yet available in other midsize cars.  The standard anti-lock brake system (ABS) integrates Brake Assist and Electronic Brake Distribution features, which can help apply maximum braking pressure in an emergency stop.  Vehicle Stability Control (VSC) is available as an option.  The new Hill Acceleration Control helps the driver maintain better control on ascents and descents.

The new Prius uses an electronically controlled "throttle-by-wire" throttle, which provides greater precision than a conventional cable-type throttle setup.  A new by-wire shift control replaces the traditional gearshift lever and allows tap-of-the-finger shifting using a small joystick mounted on the dash.

- 23 -

62.    This general promise of safety and specific promise that the new electronic components being installed in Defective Vehicles are more reliable than their mechanical predecessors is a repeated theme in Toyota marketing:

- 2004 Toyota 4Runner press release:  "It features a new linkless electronic throttle control system with intelligence (ETCS-i) that helps improve performance and increase fuel economy…*The 4Runner utilizes the latest technology to deliver a high level of occupant safety*."  [Emphasis added.]

- August 2004 Lexus Press Kit:  "Technical innovation is a key element of Lexus's all-around excellence, *delivering real benefits to owners in terms of safety*, performance, comfort and convenience."  [Emphasis added.]

- November 2004 GOOD HOUSEKEEPING:  "Your destination should always be safety.  And [] Toyota SUV's raise the standard…."

- In GOOD HOUSEKEEPING's November 2004 issue and elsewhere:  "Safety First to Last," an advertisement for RAV4, Sequoia and Land Cruiser.

- 2005 Press Release regarding Toyota SUVs:  "'Toyota customers have long counted on the brand for the best in performance, quality and durability,' said [Don] Esmond [senior vice president and

- 24 -

general manager, Toyota Division].  '*They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs.*'"  [Emphasis added.]

- In GOOD HOUSEKEEPING's May 2001 issue:  "Happy Mother's Day from the people obsessed with safety," an advertisement for the Sienna.

- In GOOD HOUSEKEEPING's March 2001 issue, Special Advertising Section:  "Serious about safety.  Camry utilizes the latest technology to ensure you and yours arrive at your destination safe and sound."  Also, "Value and safety.  Part of the Corolla equation has always been high value and high safety."

63.    These proclamations of "safety" were false and misleading because they failed to disclose the dangerous SUA defect.  Toyota knew or should have known these representations were false and misleading because, as discussed in detail below, Toyota knew there was a significant increase in SUA events in vehicles with electronic throttle controls over vehicles with mechanical throttle controls.

64.    In 2004, TMS issued a brochure that discussed the safety features of the Sienna:

A safe place for your children to grow up.  Sienna has a proud safety heritage, boasting some of the very best scores in its class on government and insurance industry crash

- 25 -

1    tests.  We've equipped the 2004 Sienna with even more

2    safety features.  [Lists the safety features.]

3       65.   In 2004, TMS issued a press kit noting that its RAV4 had enhanced

4  safety features:

5

6       The second-generation model, designed in Southern

7       California by Toyota's Calty Design Research and

8       introduced for the 2001 model year, increased Toyota's

9       share of this growing segment.  The 2004 revision is

10      designed to strengthen the brand's position in the segment

11      that it created, and to give the customer even greater value

12      and enhanced standard safety features.

13      "Toyota invented the formula for this segment, and for

14      2004 we're perfecting it with more of what everyone who

15      buys a small SUV wants – more power, more safety

16      features, more style and more value," said Don Esmond,

17      Toyota Division senior vice president and general manager.

18      "What's more RAV4 still holds the ultimate advantage

19      with Toyota quality."

20

21

22      66.   In a 2005 press release, TMS boasted about its safety in its RAV4,

23  4Runner, Land Cruiser and Sequoia SUVs:

24      "Toyota offers one of the widest selections of SUVs on the

25      market, and we equip every model with the same level of

26      advanced safety technology," said Don Esmond, senior

27      vice president and general manager, Toyota Division.  "By

28

- 26 -

making this technology standard on all our SUV models,

Toyota provides the customer with peace of mind when

purchasing and when driving."

….

"'Toyota customers have long counted on the brand for the

best in performance, quality and durability,' said Esmond.

'They can take comfort knowing that driving safety is just

as high a priority in our full line of SUVs.'"

67.    A 2006 brochure devoted entirely to Toyota's safety efforts

acknowledged Toyota's responsibility as a vehicle manufacturer for the safety of its

vehicles.  The brochure stated that "Toyota is working to reduce traffic accidents,

deaths and injuries" because accidents "have an enormous economic impact:  lost

productivity, medical bills and compensation for victims, physical losses of vehicles

and structures and institutional costs (insurance management, police, trial costs,

etc.)."  The brochure then explained how Toyota pursues what it refers to as "real

safety":

A fundamental component of building safe cars is

gathering information and analyzing why accidents occur

and what causes injuries.  Toyota analyzes data from real

accidents that take place all over the world.  By analyzing

accident data and using simulation, Toyota develops new

safety technologies, testing them on actual vehicles before

being offered to the public in our product line-up.  This is a

010172-25  386580 v1

perpetual cycle through which Toyota seeks to enhance

safety technologies and reduce accidents continuously.

These same messages were echoed in safety brochures used by TMS in 2007.  These statements were false and misleading because Toyota had not performed the tests necessary to diagnose, identify and fix the defect causing SUA.

68.    In January 2006, a press release issued by TMS highlighted the safety features of the RAV4:

TOYOTA RAISES THE BAR IN SMALL SUV

SEGMENT WITH ALL-NEW 2006 RAV4

Advancements in Ride Handling

Ride handling is further enhanced with a new electronically controlled on-demand four-wheel-drive system.  The new system features an electronic controlled coupling that distributes torque transmitted between the front and rear wheels, allowing the RAV4 to switch continuously from front-wheel-drive to four-wheel-drive mode.  Because the system switches between two- and four-wheel-drive based on road conditions, vehicle control and fuel economy are improved.  When in auto mode, torque distribution to the rear wheels is decreased during low speed cornering to avoid tight corner braking.  A 4WD manual locking switch will disengage the auto mode, maximizing torque distribution to the rear wheels.  When the vehicle speed reaches 25 mph the Lock mode will disengage, reverting

- 28 -

back to Auto mode.  The Lock mode also disengages when the brakes are engaged, optimizing ABS and VSC.  Ride handling is addressed on all RAV4 4x2 models with an automatic Limited Slip Differential as standard equipment.

69.    In the 2007 "Camry Owners Warranty Manual," Toyota represented that it builds "vehicles of the highest quality":

At Toyota, our top priority is always our customers.  We know your Toyota is an important part of your life and something you depend on every day.  That's why we're dedicated to building products of the highest quality and reliability.

Our excellent warranty coverage is evidence that we stand behind the quality of our vehicles.  We're confident – as you should be – that your Toyota will provide you with many years of enjoyable driving.

\*    \*    \*

Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind throughout their ownership experience.

70.    This warranty language appears in identical text for all Toyota models. The foregoing language was false and misleading because in fact Toyota vehicles were not of the highest quality and reliability but instead were unsafe and unreliable due to the SUA defect and the failure to have an adequate brake-override and other fail-safe mechanisms.

71.     In September 2009, Toyota announced a new marketing campaign that highlights six claims that Toyota has achieved through its philosophy of *kaizen*, or "constant improvement."  Included in the six claims are "Dependability," "Quality," "Reliability" and "Safety."

72.     A 2010 video of Toyota's Star Safety System includes the following description of Toyota's standard for vehicle control safety:

> If a stereo system comes standard on an SUV, shouldn't a
> safety system?  Introducing Toyota's Star Safety System
> TM, a combination of five safety features that comes
> standard with every one of Toyota's five SUVs:  Vehicle
> Stability Control, Traction Control, Anti-lock Brakes,
> Electronic Brake-force Distribution, and Brake Assist.  All
> designed for one purpose:  to help keep the driver in
> control of the vehicle at all times.  Because when it comes
> to the well-being of you and your passengers, Toyota has
> raised the standard.

The video is misleading as it does not mention the vehicle recalls, the unintended acceleration defect or the lack of a fail-safe mechanism to override unintended acceleration.

73.     In a video released in February 2010, Toyota states:

> For over 50 years providing you with a safe, reliable and
> high quality vehicles has been our first priority.  In recent
> days, our company hasn't been living up to the standards
> that you have come to expect from us or that we expect

from ourselves.  That's why 172,000 Toyota and dealership

employees are dedicated to making things right.  We have a

fix for our recalls.  We stopped production so we could

focus on our customers' cars, first.  Our technicians are

making repairs.  We're working around the clock to ensure

we build vehicles of the highest quality, to restore your

faith in our company.

The commercial does not mention that the recalls do not explain even a majority of the reports of unintended acceleration.

74.     These claims of safety were intended to and did cause individuals to trust the safety of Defective Vehicles and purchase them.  As stated in a 1998 Corolla brochure, "Toyota is now one of the most trusted names in the automotive world – one of the few things you can really depend on."  As stated in a 2004 Lexus LS brochure, "[t]he value of owning a Lexus involves much more than just its purchase price.  It also includes our well-earned reputation for vehicle dependability, projected low repair costs and high retained value.  In addition to such intangibles as outstanding customer satisfaction, unparalleled quality, peace of mind and loyalty."  Even Toyota's logo of three overlapping ovals is meant to convey a trust between the customer and Toyota.[7]

75.     Despite Toyota's proclamations of safety and severe testing regimes, it was also growing rapidly, adding new technology to its vehicles and was increasingly unable to live up to its promises.

_____

[7] *See* http://www2.toyota.co.jp/en/vision/traditions/nov_dec_04.html.

- 31 -

**B.**     **Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism**

76.     Toyota calls its electronic throttle control system the ETCS-intelligent, or ETCS-i.  ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle. Toyota began installing ETCS-i in models of the 1998 Lexus.  This ETCS included a mechanical link that shut off the throttle.

77.     In 2001, Toyota began producing the substantially redesigned 2002 Camry.  It was the first Toyota to be equipped with linkless ETCS-i, which was one of several new or revised vehicle systems (including transmission and braking systems) introduced for 2002 Toyota Camrys, Solaras and the Lexus ES300 line. Linkless ETCS-i did not have a mechanical link to shut the throttle.

78.     Toyota's earlier ETCS-i equipped vehicles retained a mechanical system that would close the throttle if the electronic system failed.  However, Toyota had phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002 Camry.  Toyota knew other manufacturers continued to use a manual fail-safe mechanism.  For example, Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied.[8]

79.     In order to address potential malfunctions of the ETCS-i – in other words, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies.  The fail-safe strategies are:

---

[8] TOY-MDLID00041130T-0001.

- 32 -

a. If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

b. The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

c. The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

d. If one or both throttle position sensors fail, or the throttle itself is not responding properly to the accelerator pedal but the throttle itself is not physically stuck, the throttle should close but will provide minimal acceleration.

80. As explained herein, Toyota knew no later than 2002 that these fail-safes were insufficient to prevent unintended acceleration events in its vehicles and that additional fail-safes were necessary. Toyota did not, however, move to address these issues by installing additional fail-safes.

81. Toyota had several options. For example, Toyota could have installed a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing unintended acceleration. Or, Toyota could have employed a hardware-redundant, fault tolerant solution (BMW's approach). Or, Toyota could have provided an override of the engine

- 33 -

control module (*e.g.*, a key switch to physically remove the power to the Engine Control Module ("ECM").  Or, Toyota could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system.  Toyota did none of these things.

82.     In 2007, recognizing the risks of unintended acceleration, "TMS suggested that there should be 'a fail safe option similar to that used by other companies to prevent unintended acceleration.'"[9]  Toyota did not act on this suggestion until 2010.

## C.     Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002

83.     Toyota had advance notice of a defect and safety risks involving SUA in ETCS-i equipped vehicles as early as 2002.  Toyota hid this notice from the public through calculated manipulation of information supplied to NHTSA during its various investigations of SUA incidents.  Toyota exploited strategic relationships with current and former NHTSA employees and negotiated "deals that limited the nature and scope of NHTSA's investigations."  Toyota knew and intended that these limited investigations were unlikely to reveal a defect in the ETCS.

### 1.     First reports of unintended acceleration to Toyota

84.     On February 2, 2002, Toyota received its first consumer complaint of a 2002 Camry engine surging when the brakes were depressed.  Toyota received ten other similar complaints before August 2002.

85.     In March 2002, TMS asked TMC to investigate the root cause of the surging.  On May 20, 2002, internal records reported that the "root cause of the

---

[9] TOY-MDLID00041130T-0001.

'surging' condition remains unknown" and "[n]o known remedy exists for the

'surging' condition at this time."[10]

86.     In response to a NHTSA investigation into similar incidents, Toyota

issued at least three "Technical Service Bulletins" related to SUA.  On August 30,

2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may

exhibit a surging during light throttle input at speeds between 38-42 MPH with lock-

up (L/U) 'ON.'"  Toyota advised that the cars' ECM calibration had been revised to

correct the problem.  Yet, on December 23, 2002, Toyota released another bulletin

noting that 2002 and 2003 Camrys, produced at Toyota Motor Manufacturing of

Kentucky ("TMMK"), "may exhibit a triple shock (shudder) during the shift under

'light throttle' acceleration."  The bulletin advised dealers to follow the repair

procedure in the bulletin to rectify the situation.  Less than nine months later, Toyota

released a nearly identical advisory notice on May 16, 2003, which stated that some

2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-

42 mph with lock-up (L/U) 'ON.'"  Again, Toyota claimed the ECM calibration had

been revised to correct this condition.  Toyota did not disclose the existence of these

technical service bulletins to consumers, or the fact that Toyota could not solve the

problem.

87.     On August 31, 2002, Toyota recorded its first warranty claim to correct

a throttle problem on a 2002 Camry.  Customer warranty claims are handled by the

TMS Claims Department in Torrance, California.[11]

---

[10] TOY-MDLID00062906.

[11] *See* TOY-MDLID00023851.

- 35 -

88.     On April 17, 2003, Peter Boddaert of Braintree, Massachusetts, filed with NHTSA a report of SUA involving his 1999 Lexus.  In response, NHTSA opened Defect Petition DP03-003.  Mr. Boddaert petitioned the agency to analyze 1997-2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal."  In his petition, Mr. Boddaert noted that 271 other complaints about these vehicles had been lodged on NHTSA's website, 36 of which involved problems with "vehicle speed control."  Of those 36 complaints, several involved collisions, including one in which a Lexus had "collided with five other cars in the space of ½ mile before it could be stopped."

### 2.     Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls

89.     On January 15, 2004, Carol Mathews asked NHTSA to investigate 2002 and 2003 Lexus ES300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash."  On March 3, 2004, NHTSA's ODI opened a Preliminary Evaluation.  NHTSA documents describe the problem to be investigated as:  "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge."  The investigation was initially expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES300 vehicles.  ODI had received 37 complaints and reports of 30 crashes resulting in five injuries.

90.     Mr. Scott Yon was the designated investigator.  He would remain NHTSA's principal investigator on many subsequent SUA-related investigations and

- 36 -

1    developed a close relationship with Toyota executives, some of whom had been

2    NHTSA employees.

3           91.     The NHTSA investigation described the defect allegations as:

                     Allegations of (A) an engine speed increase without the

                     driver pressing on the accelerator pedal or, (B) the engine

                     speed failing to decrease when the accelerator pedal was no

                     longer being depressed – both circumstances requiring

                     greater than expected brake pedal application force to

                     control or stop the vehicle and where the brake system

                     function was reportedly normal.[12]

          92.     On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota

employee in Technical and Regulatory Affairs, an e-mail showing a greater than

400% difference in "Vehicle Speed" complaints between Camrys with manually

controlled and electronically controlled throttles:

               From:         Yon, Scott

               Sent:          Thursday, June 03, 2004  9:15 AM

               To:             Chris Santucci (Toyota.com)

               Subject:      For review

               Categories:  PE04021-ToyotaThrottleControl

               Attachments: CamryVSCTrend-200402.pdf

---

[12] TOY-MDLID00041712.

See attached.  Give me a call, when you have time; I want

to discuss the submission and the attached.

Scott



93.   Motor vehicle manufacturers frequently re-design their vehicles, as

when Toyota implemented ETCS.  But having taken that step, Toyota should have

monitored NHTSA's consumer safety database for indications of changing patterns

in the complaints by model that signaled the need to review the safety of ETCS and

the need to implement a robust fail-safe, including but not limited to, an effective

brake-override.

94.     *Publicly available consumer complaints* which exclude the 37,000

complaints Toyota has yet to reveal, show a pronounced increase in SUA complaints

from Toyota Camry owners after Toyota introduced ETCS-i in that vehicle.

Through April 30, 2003, more than 9% of all complaints for Camrys equipped with

ETCS-i related to SUA, while only 5% of all complaints (41 of 810) for Camrys

without ETCS-i related to SUA.  This difference is statistically significant based on

Fisher's two-tailed exact test, p = 0.0369.  The twin Lexus ES model showed a very

similar pattern of SUA complaints.

95.     The Toyota Tacoma pickup also showed a marked increase in SUA

complaints after Toyota introduced ETCS-i in this model.  By the end of January

2007, nearly 5% of all complaints (12 of 241) for Tacomas equipped with ETCS-i

related to SUA (12 of 241) while only 2% of all complaints (9 of 449) for Tacomas

without ETCS-i.  This difference is statistically significant based on Fisher's two-

tailed exact test, p = 0.0368.

96.     A similarly striking trend occurs in several other models:  Lexus ES

(5-fold increase), Lexus RX (1.8-fold increase), 4Runner (6-fold increase), Avalon

(2-fold increase), Camry (3.7-fold increase), Highlander (2.8-fold increase), and

Tacoma (14-fold increase).

97.     State Farm observed the same trend in Toyota Camrys and Corollas, as

reflected in the chart below (which State Farm provided to Congress):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



**State Farm UIA Claims (Pre-ETC v. Post-ETC)**

17    98.    This statistically significant increase in the number of unintended

18  acceleration complaints put Toyota on notice that there was a SUA defect in its

19  vehicles with ETCS that could cause SUA.

20    99.    Toyota's complaint database was not the only source of information

21  available to Toyota.  Internally, as early as May 5, 2003, in secret "Field Technical

22  Reports" Toyota was documenting "sudden[] acceleration against our intention," as

23  an "extremely serious problem for customers."[13]  A technician reported a SUA

24  incident and stated "we found mis-synchronism between engines speed and throttle

25  position movement."  The probable cause was unknown but "[e]ven after

26

27  _____

28    [13] TOY-MDLID00087951-52.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

replacement of those parts, this problem remains." The author requested immediate action due to the "extremely dangerous problem" and "we are also much afraid of frequency of this problem in near future."

100.   At the outset of its 2004 investigation into SUA in Toyota vehicles, NHTSA asked Toyota for information on similar incidents. The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, California. The scope of NHTSA's information request became the subject of negotiations between Messrs. Tinto and Santucci of Toyota and NHTSA representatives. Ultimately, NHTSA agreed to exclude, certain highly relevant categories of incidents from its investigation.

101.   In response to NHTSA's information request, Toyota denied that a defect existed, stated that there was no defect trend and that its electronic control system could not fail in ways its engineers had not already perceived. Toyota reported 123 complaints that it said "may relate to the alleged defect." But Toyota excluded from its response the following relevant categories of complaints, among others:

> (1)   An incident alleging uncontrollable acceleration that occurred for a long duration;
>
> (2)   An incident in which the customer alleged that he could not control a vehicle by applying the brake; and

- 41 -

(3)     An incident alleging unintended acceleration

occurred when moving the shift lever to the reverse or the

drive position.

102.   The Toyota Defendants thus concealed from NHTSA and the public

relevant customer complaints.

103.   NHTSA closed the investigation without testing of the integrity of the

ETCS-i, without reviewing any records of Toyota's test reports concerning the

ETCS-i, and without reviewing whether the braking system was effective in an open-

throttle condition.  Toyota itself did not have the capability of fully modeling, testing

or validating the safety of ETCS-i because of its failure to implement standard design

platforms, its failure to develop and/or conduct meaningful ECM test procedures,

and its failure to exercise appropriate control over third-party subsystem designs.

104.   While Toyota denied any SUA defect, independent experts concluded

otherwise.  In May 2004, a Forensic Technologist and MSME examined a vehicle in

New Jersey that had experienced a SUA event.  The report was forwarded to Toyota

on January 13, 2005.  It concluded that the vehicle's ETCS was not operating

correctly.[14]  This report was not provided to NHTSA.

105.   On July 8, 2005, Mr. Jordan Ziprin of Phoenix, Arizona, filed a formal

request for a defect investigation into unintended acceleration in the 2002 Toyota.

106.   On August 5, 2005, NHTSA opened Defect Petition DP05-002 to

investigate Mr. Ziprin's claims.  Scott Yon again was assigned as NHTSA's

---

[14] TOY-MDLID90064979.

investigator.  The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES models.  The Opening Resume stated, in part:

> The Petitioner owns a 2002 Camry and states that in July 2005 the vehicle accelerated without application of the throttle pedal while reversing out of a driveway; the acceleration caused a loss of vehicle control and subsequent crash.…  The Petitioner states a similar throttle control incident occurred in April 2002 and additionally cites other ODI reports which also allege loss of throttle control and or uncontrollable acceleration.  The Petitioner discusses NHTSA investigation PE04-021, which involved the Camry and ES models, and makes a request for certain information.  ODI will evaluate the petition and other pertinent information.

107.   After receiving the petition and reviewing the underlying complaints, Toyota did not launch its own investigation or identify any new tests that it would perform to check for a defect in the ETCS.  Instead, Toyota's formal responses to NHTSA's investigation recommend NHTSA deny the petition based only on the information Toyota had previously provided "as well as the lack of evidence supporting concurrent failure of the vehicle braking systems."  After explaining how the electronic throttle system and its fail-safes were designed to operate, Toyota concluded:

> [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota believes this Defect

petition to be similar to other, prior petitions and

investigations into mechanical throttle controls.  Toyota

has found no evidence that differentiates that consumers

alleging vehicles equipped with electronic throttle controls

can suddenly accelerate when compared to those equipped

with mechanical throttle controls.  Toyota has not found

any evidence on the subject vehicles of brake failure, let

alone brake failure concurrent with ETC failure.

*See* Toyota's Response re DP05-002, dated November 15, 2005.

108.   This response of "no evidence" ignores and concealed the spike in SUA

events that occur within one year of a vehicle switching to ETCS, a trend known to

Toyota.

109.   Mr. Yon, who is not an electrical engineer or expert in electronic control

systems, inspected Mr. Ziprin's vehicle and found no evidence of a system

malfunction.  Mr. Ziprin directed to NHTSA's attention some 1,172 Vehicle Owner

Questionnaire reports, from which ODI identified 432 reports that alleged an

"abnormal throttle control event."  The 432 reports involved 2002 to 2005 Camry,

Solara and Lexus ES models (all equipped with electronic throttle controls).  Toyota

had knowledge of the 432 reports.

110.   Upon learning of the denial, Mr. Ziprin, who had conducted

considerable research into the issues set forth in his petition and filed his findings

with the agency, reacted with an angry letter to NHTSA dated January 5, 2006, and

accused the agency of bias:

010172-25  386580 v1

Frankly, I anticipated that decision from the very first time

I was in contact with Mr. Scott Yon, the assigned

investigator.  He made statements during our first

telephone conversation which tended to establish that the

purpose of his inquiry was to establish a basis to dismiss

the petition based upon NHTSA policy rather than to deal

with and examine all of the facts and circumstances

involved.  When Mr. Yon subsequently visited Phoenix, he

told me quite clearly and emphatically that it was

NHTSA's firm policy not to investigate safety issues

regarding hesitations in acceleration by vehicles.

111.   On September 14, 2006, ODI opened Defect Petition DP06-003 in

response to a request from William Jeffers III for an investigation of 2002-2006

Camry and Camry Solara vehicles for incidents relating to vehicle surging.  Scott

Yon was again assigned to investigate.  According to the petition, Mr. Jeffers owned

a 2006 Camry and previously owned a model-year 2003 Camry.  He alleged that both

vehicles exhibited "engine surging," which he described as a short duration (one- to

two-second) increase in engine speed occurring while the accelerator pedal is not

depressed.  For his 2006 vehicle, the petitioner estimated that six to eight surge

incidents, of varying magnitude, occurred over the course of 10,000 miles and nearly

seven months of ownership.  In the last and most alarming instance, Mr. Jeffers noted

that the malfunction indication lamp was illuminated during and after this incident.

112.   Toyota received a fax from NHTSA on September 15, 2006, stating that

it had agreed to open the defect petition.  In internal e-mails, Chris Santucci

- 45 -

expressed skepticism of Mr. Jeffers' account of the unintended acceleration and hope that NHTSA would not ask Toyota to provide any additional data as part of the investigation:

> Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner.  Hopefully, they will not grant the petition and open another investigation.[15]

113.   Although Mr. Jeffers reported that the brake system was effective at overcoming the engine surge, he informed NHTSA of his concerns that this might not always be the case.  NHTSA summarized in its ODI Closing Resume:  "[H]e is concerned about reports filed with NHTSA alleging uncontrolled surging in MY 2002 to 2006 Camry vehicles bringing those vehicles to a high rate of speed (in some cases, purportedly, with the brakes applied)."

114.   Following one of his incidents, the Jeffers vehicle was returned to the Toyota dealership, where service personnel discovered diagnostic codes also related to throttle actuator operation stored in the engine control computer.  The invoice for this service visit indicated that an electrical connector for the newly installed throttle actuator was "adjusted" and the ground circuits were checked.

115.   On October 30, 2006, NHTSA sent Toyota an Information Request.  In its response, Toyota stated that it issued three service bulletins that instruct a dealer to replace the electronic throttle actuator assemblies if certain diagnostic trouble codes are detected and stored in any of the subject vehicles.  One bulletin issued

---

[15] TOY-MDLID00044092.

related to the service campaign concerning throttle motor failure that Toyota

conducted in the past.  In addition, Toyota stated that it had issued 40 service

bulletins related to the transmission control system, the brake and ABS system and

the engine management system of the 2002-2006 Camry and Camry Solara vehicles.

116.  Toyota also claimed to have investigated the throttle recovered from the

Petitioner's vehicle, and:

> [W]e could find no abnormality with the throttle actuator.
> During the investigations on the other returned throttle
> actuators, it was found that some parts inside the throttle
> actuator had corroded due to water intrusion.  Further
> investigation and analysis revealed that the corrosion
> problem was concentrated in specific areas where water
> could intrude into the throttle actuator from the drain hose.
> It was found that this could occur as a result of vehicle
> operation under certain circumstances, such as driving
> through a flooded road, in the heavy rain, or a hurricane.
> Although the rate of occurrence of this type of failure is
> low, to eliminate any possibility of water intrusion under
> such circumstances, Toyota modified the drain hose.

117.  While NHTSA's investigation was ongoing, two other related events

occurred.  First, on February 5, 2007, a fatal crash occurred in San Luis Obispo,

California, involving a 2005 Camry that suddenly accelerated in a restaurant parking

lot, went through a guard rail and over a cliff into the Pacific Ocean.  Second, on

March 14, 2007, TMS President James Lentz received a letter at his office in

- 47 -

Torrance from a consumer explaining a sudden unintended acceleration event in a 2003 Toyota Camry.[16]  The writer insisted he was pressing the brake, and not the accelerator, when the event occurred.  Further, the writer believed that the vehicle's electronic throttle caused the event.

118.   After the cursory evaluation of Mr. Jeffers' claims, NHTSA denied the petition and stated it found no evidence of a defect.

119.   Toyota never fully disclosed to the regulators the actual numbers of customer reports of unintended acceleration events in the various Toyota models under investigation that the company had received.  In fact, Toyota disclosed that it had received only 1,008 such complaints.  Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received *37,900* complaints potentially relating to sudden acceleration in Defective Vehicles from January 1, 2000, through January 27, 2010.

120.   One of Toyota's strategies in responding to SUA complaints even to the present time was to blame any report of SUA on driver error.  Toyota failed to disclose that its own technicians often replicated SUA events without driver error.  The following is an example:

> **Condition Description**
>
> Customer states while at a stop the engine started to rev
>
> and tried to take off.  Customer turned off vehicle and
>
> restarted.  Vehicle continue to rev when running.  Turning

---

[16] TOY-MDLID90045217.

vehicle off 3rd time and restarted vehicle operated normally after third start.

**Diagnostic Steps**

- Technician who was inspecting the vehicle had driven it approximately 10-12 minutes.

- **7**-8 minutes into the drive the technician was sitting at a stop light.  When the stop light changed the tech started to lightly accelerate.

- After traveling 20-30 feet the vehicle exhibited a slight hesitation *then began to accelerate on its own*.

- Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence.

- Vehicle traveling 9-10 mph at time of occurrence.  Approximate maximum speed reached was 20 mph prior to accelerator pedal release / brake application.

- Estimated throttle position at the time of the occurrence was 15-20 percent.[17]  [Emphasis added.]

121.   Upon the technicians replicating a SUA event, Toyota decided it was in the customer's "interest" for Toyota to buy back the vehicle, meaning in reality that Toyota decided to remove this vehicle from the market since it was experiencing SUA incidents that could not be blamed on the driver.  This confirmation of a clear SUA non driver related SUA was not reported to NHTSA.

---

[17] TOY-MDLID00075242.

122.   On another occasion in October 2007, a Field Technical Report confirmed a case of SUA in an ES330.[18]

123.   In a Dealership Report in 2005, on a 2005 Sequoia, the dealer verified two separate SUA incidents and identified the probable cause as a "software issue of the engine control unit."

124.   In December 2003, in a secret Field Technical Report, a technician verified a surge event during "cold engine operation" even where the scan tool showed no trouble code.

### 3.   Runaway Lexus problem and the floor mat explanation

125.   On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES350 vehicles, opened PE07-016.  The principal investigator was again Scott Yon.  The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal."

126.   Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES350 owners "reminding them not to install all weather mats on top of existing mats."[19]  NHTSA did not agree, due to "too many complaints on this one vehicle to drop the issue" and because the results "of a stuck throttle are catastrophic."

127.   On April 5, 2007, ODI sent its Information Request to Toyota, describing its purpose as being "to investigate incidents of *vehicle runaway* due to interference between the Lexus accessory floor mat (all-weather floor mat) and the accelerator pedal" in 2007 Lexus ES350 vehicles.  (Emphasis added.)  The request

---

[18] TOY-MDLID00075600.

[19] TOY-MDLID00003908.

further described "[a]llegations of A) excessive engine speed and or power output without the driver pressing on the accelerator pedal or B) the engine speed and or power output failing to decrease when the accelerator pedal was no longer being depressed or, C) the subject component interfering with the operation of the throttle pedal."

128.   During this inquiry, Toyota was careful to eliminate any hint that a much broader issue was at stake – namely, SUA.  Telling a consumer of an SUA defect is far more serious than being told of a possible "mat" problem.  In describing the NHTSA investigation TMS eliminated reference to ETCS problems and changed the description to a floor mat problem:[20]

> Sorry we had a last minute change to the Q&A.  Please
> utilize this revised version of the Statement and Q&A.  The
> issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding
> *unintended throttle control* in the subject vehicles.
>
> [New]
>
> NHTSA received five consumer where the All Weather
> Floor Mat may have interfered with the accelerator pedal
> operation.
>
> * * *

---

[20] TOY-MDLID00000566.

010172-25  386580 v1

1         George Morino

2         National Manager

3         Quality Compliance Department

4         Product Quality and Service Support

5         Toyota Motor Sales, U.S.A., Inc.

6

7         Tel. 310-468-3392

8         Fax 310-468-3399  [Emphasis added.]

9      129.   Culling any reference to vehicle speed control was a standard tactic at

10   Toyota.  In 2005, in connection with the IS 250 All Weather Drive investigation,

11   TMC removed any reference to speed control in letters sent to owners:  "They pulled

12   out the 'vehicle speed control' part.  NHTSA may come back, but TMC wanted to

13

14   try."[21]

15      130.   Another tactic TMC used with NHTSA to keep the SUA defect a secret

16   was to keep NHTSA away from employees who had knowledge of ECU failures.  In

17   2007, while preparing for a meeting with NHTSA, Toyota plotted to keep away from

18   the meeting the "engineer who knows the failure":

19

20         [I]f the engineer who knows the failures well attends the

21         meeting, NHTSA will ask a bunch of questions about the

22         ECU.  (I want to avoid such situations).[22]

23      131.   Toyota kept documents and informed personnel away from NHTSA

24   despite the fact it knew the results of a "stuck throttle are 'catastrophic.'"[23]

25

26        [21] TOY-MDLID00002896.

27        [22] TOY-MDLID00075574.

28        [23] TOY-MDLID00003908.

- 52 -

132.   On August 8, 2007, ODI upgraded the preliminary evaluation to
engineering analysis EA07-010 to investigate unintended accelerations in a target
population of 98,454 2007 Lexus ES350s.  The Opening Resume for EA07010
states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12
> injuries.  Complainants interviewed by ODI stated that they
> applied the throttle pedal to accelerate the vehicle then
> experienced unwanted acceleration after release.
> Subsequent (and sometimes repeated) applications of the
> brake pedal reduced acceleration but did not stop the
> vehicle.  In some incidents drivers traveled significant
> distances (miles) at high vehicle speeds (greater than
> 90 mph) before the vehicle stopped (ODI notes that
> multiple brake applications with the throttle in an open
> position can deplete the brake system's power [vacuum]
> assist reserve resulting in diminished braking).

133.   Despite having received a number of complaints of unintended
acceleration that could not be explained in terms of floor mats, Mr. Yon's description
of the investigation made no mention of any intent to study the electronic throttle
control system employed.  Toyota did not study the ETCS system either.

134.   In internal e-mails between Toyota employees including Chris Santucci
and Chris Tinto exchanged in August 2007, Santucci stated that NHTSA
investigators had discussed with him fail-safe mechanisms used by other vehicle
manufacturers to protect against unintended acceleration.  The fail-safes that NHTSA

- 53 -

regulators discussed with him included "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied."  Mr. Santucci also noted, "Jeff [Quandt, Chief, Vehicle Controls Division, Office of Defects Investigation] mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly."  Despite the growing number of unintended acceleration complaints starting from 2002, Toyota did not use the fail-safe mechanisms used by other manufacturers to protect against unintended acceleration.

135.   While Toyota was attempting to deflect this inquiry, it was aware that the root cause of SUA was not often traceable:  "[O]ne big problem is that no codes are thrown in the ECU, so the allege [sic] failure (as far as we know) can not be documented or replicated."  The implications were "[t]he service tech therefore can't fix anything, and has no evidence that any problem exists."[24]  Toyota would later claim the lack of a diagnostic code indicated that there was no SUA problem.

136.   On August 30, 2007, ODI filed a memo about the inspection of a Lexus ES350 that had experienced an unintended acceleration, and ODI conducted a telephone interview with the owners.  An inspection of the vehicle found all-weather mats installed at all four seating positions.  The driver's side all weather mat was found to be installed by itself; it was not on top of another floor mat.  While the installed mat was found to be unsecured by the retention hooks, the mat did not interfere with the accelerator pedal in the position in which it was originally inspected.

---

[24] TOY-MDLID00050747.

137.   While this investigation was ongoing, a woman named Jean Bookout was involved in a fatal crash in Oklahoma due to the unintended acceleration of a 2005 Camry.  On September 20, 2007, Jean Bookout and her best friend, Barbara Schwarz, were exiting Interstate Highway 69 in Oklahoma in a 2005 Camry.  As Bookout drove, she realized that she could not stop her car.  She pulled the parking brake and pushed the brake pedal, leaving a 100-foot skid mark from the right rear tire, and a 50-foot skid mark from the left.  As Bookout later stated, "I did everything I could to stop the car."[25]  The Camry, however, continued speeding down a ramp, across another road and finally slamming into an embankment.  Schwarz was killed; Bookout spent a month in a coma and awoke permanently disfigured and disabled.

138.   On September 26, 2007, Toyota issued a recall of 55,000 Lexus/Toyota optional All-Weather Floor Mats.  All owners of 2007 and early 2008 model year Lexus ES350 and Toyota Camry vehicles were to be notified of the safety campaign and the timing when the replacement mats would become available.  Once the replacement mats were available, a second owner notification would be sent to notify owners to return their mats for the driver's seating position to any Lexus/Toyota dealer for an exchange.  Toyota also stopped the sale of the Toyota/Lexus All-Weather Floor Mat designed specifically for 2007 and early 2008 model year Camry and ES350 Lexus vehicles.

139.   Internally, Toyota executives were pleased that NHTSA had limited the ES350 issue to "floor mat issues" as opposed to SUA:[26]

---

[25] Los Angeles Times, *Runaway Toyota Cases Ignored*, November 8, 2009.
[26] TOY-MDLID00004973.

> Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off" switch. We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

140.   On other occasions Toyota was able to keep NHTSA away from the truth regarding SUA events by negotiating what terms it would use to search for relevant complaints.  An example occurred in September 2007 when the company searched for incidents regarding "mats" as opposed to "surging."  A search for surging on just the Camry in 2004 revealed "60,000 complaints."  Surging may be related to SUA, but Toyota never revealed the 60,000 surging complaints.[27]

141.   Throughout Toyota's consideration of SUA incidents, the "global ramifications" of a vehicle defect was a motivating factor.  Thus, for example, in September 2009, Toyota executives indicated TMC would not easily budge from its "no defect" position:

> TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications.  In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this

---

[27] TOY-MDLID00083551.

issue, TMC may feel that we can weather an investigation
and additional media coverage.[28]

142.   As described herein, this "no defect" position and the worry of "global
ramifications" ultimately caused Toyota to offer fail-safe mechanisms such as a
brake-override as a "confidence" booster as opposed to a "safety recall."

143.   In an internal Toyota PowerPoint presentation by Chris Tinto dated
January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation
as a "difficult issue" that it "ha[d] been quite successful in mediating."  The
presentation went on to note that such "mediations" were "becoming increasingly
challenging" and that "despite the fact that we rigorously defend our products
through good negotiation and analysis, we have a less defensible product."  Of
course "mediation" is not the equivalent of meeting the pledge of "safety" first that
Toyota had repeatedly promised vehicle owners.

144.   An internal PowerPoint addressing "Key Safety Issues" contains the
following:

- "Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.
- Recurring issue, PL/Design Implications.[29]

145.   The footnote to the slide has an entry stating "[f]laws in Toyota
Regulatory and Defect Process."[30]

146.   Toyota was also pleased that the floor mat issue was limited to All
Weather Floor Mats as opposed to floor mats in all vehicles.  Internally it recognized

---

[28] TOY-MDLID00075713.

[29] TOY-MDLID00052959.

[30] *Id*. at 52963.

- 57 -

that "floor mat interference is possible in any vehicle with any combination of floor mats." Despite this admission, no broader floor mat recall or effort to implement a brake-override took place.[31]

### 4.   Unintended acceleration in Tacomas and Siennas

147.   Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of unintended acceleration in Tacomas in late 2007. On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration."[32] Toyota internal e-mails also indicate that they were finding Internet blog posts regarding unintended acceleration events in Tacomas in November 2007.[33]

148.   On January 10, 2008, William Kronholm of Helena, Montana, filed a request for a defect investigation into unintended acceleration in 2006 Toyota Tacoma pickup trucks. Kronholm reported experiencing two incidents of unintended acceleration and investigated the NHTSA complaint database for light truck fleets for model years 2006 and 2007. Under the category "vehicle speed control," Mr. Kronholm found 32 complaints of sudden unintended acceleration involving Tacomas, whereas the most reported for any other manufacturer's trucks was one incident. Scott Yon was again the ODI's principal investigator.

---

[31] TOY-MDLID00002839.

[32] TOY-MDLID00028006.

[33] TOY-MDLID00012135.

- 58 -

149.   Internally, Toyota was diligently working hard to "write a letter for the committee to try to stop this from moving forward – we need to keep this within NHTSA rather than have it expand to a hearing."[34]

150.   In NHTSA's February 8, 2008 information request to Toyota, it defined the defect as:

> [A]llegations or complaints that the accelerator and or
> cruise control system operated improperly, malfunctioned,
> failed, or operated in an unsafe manner, including but not
> limited to, allegations that the engine speed (power output)
> increased without driver application of the accelerator
> pedal (including allegations that may be related to cycling
> of the air conditioning compressor clutch or other so called
> 'normal' idle speed/engine control functions), or
> allegations that the engine speed (power output) failed to
> return to an idle state after the operator released the
> accelerator pedal (including allegations that may be related
> to engine speeds experienced between gear shifts on
> manual transmission vehicles at road speeds) or allegations
> that the cruise control system caused the engine speed
> (power output) to change in an unsafe manner.

151.   While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004

---

[34] TOY-MDLID00050749.

Toyota Siennas.  PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal.  Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration.

152.   Five years earlier, in April 2003, Toyota had experienced an unintended acceleration event during testing of a 2004 Sienna.  This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

153.   On April 18, 2008, Toyota filed its first response in DP0-8001, reporting a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

154.   On April 25, 2008, Toyota filed its second response in the Tacoma investigation, outlining its investigation into the problem and analyzing the consumer complaints submitted to Toyota and to NHTSA that could be related to alleged unintended acceleration.  In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the subject vehicles, much less a safety-related defect.

155.   Toyota disputed the assertion in the petition that the 32 complaints in the NHTSA database "in and of themselves justify opening an investigation." Toyota claimed that the Tacoma had been the subject of extensive media coverage related to the possibility of sudden acceleration.  In addition, Toyota claimed that there had been a high level of internal activity on this subject (as far back as early

2007) including reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

156.   On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Siennas, followed by a second response on June 25, 2008.  Toyota stated that complaints about unintended accelerations in Siennas took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver.  Toyota also said that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem.  Toyota did not disclose that it considered and knew it needed to incorporate a brake-override and other fail-safe mechanisms that were not in Toyota vehicles to address this problem.

157.   On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

> The complaints fell into three groups.  A majority of the
> complaints may have involved the Tacoma's throttle
> control system.  Some complaints did not involve a failure
> of the throttle control system.  For the remaining reports,
> although there may have been an issue with the throttle
> control system as one possible explanation, we have been
> unable to determine a cause related to throttle control or
> any underlying cause that gave rise to the complaint.  For
> those vehicles where the throttle control system did not
> perform as the owner believes it should have, the

- 61 -

information suggesting a possible defect related to motor

vehicle safety is quite limited.  Additional investigation is

unlikely to result in a finding that a defect related to motor

vehicle safety exists or a NHTSA order for the notification

and remedy of a safety-related defect as requested by the

petitioner. Therefore, in view of the need to allocate and

prioritize NHTSA's limited resources to best accomplish

the agency's safety mission, the petition is denied.

158.   On October 15, 2008, Toyota made a confidential PowerPoint

presentation to ODI regarding unintended acceleration and trim interference in 2004

Siennas as part of EA08-014.  Toyota demonstrated how an unrestrained early

design-level trim panel interacted with the accelerator after pedal depression.  Toyota

also advised that the company was conducting a field survey to examine panel

retention and that preliminarily one vehicle had been identified with a concern.

159.   On January 26, 2009, ODI closed EA08-014, regarding SUA involving

2004 early-production Siennas, after Toyota agreed to recall subject vehicles built

between January 10, 2003, and June 11, 2003.  Toyota then issued Recall 09V023

for 26,501 model year 2004 Siennas.  Toyota did not describe this as a defect, but

called the actions a "safety improvement campaign" that was not being conducted

under the Safety Act.  Toyota's recall instructed dealers to replace the original floor

carpet cover with the newer-design floor carpet (and retention clip) at no charge to

the owner.  The repair was expected to reduce the potential for trim panel

interference with the accelerator pedal should the retaining clips become missing

because of improper service or other reasons.  Dealers were to replace the retention clip and floor carpet cover at no charge.

160.   On March 19, 2009, Mr. Jeffrey Pepski of Plymouth, Minnesota filed a detailed defect petition, asking NHTSA to re-open its sudden unintended acceleration investigation into Lexus vehicles.  Mr. Pepski was the owner of a 2007 Lexus ES350.  He experienced a sudden unintended acceleration event while driving at high speed, in which the vehicle accelerated to 80 mph.  Mr. Pepski tried pumping and pulling up the accelerator with his foot to no avail.  He explained the electronics of the accelerator, brake pedals and throttle systems, and charged that the Lexus ES350 vehicles violate several federal motor vehicle safety standards regarding brake and throttle systems.  He also disputed some of the statements from previous investigations that drivers could easily stop the vehicle by depressing the ignition button for three seconds.  He maintained that the owner's manual indicates that this would lock the steering wheel and move it forward.

161.   On April 8, 2009, ODI issued an Opening Resume for DP09-001 in response to Mr. Pepski's petition.  ODI characterized it as requesting "an additional investigation into the unwanted and unintended acceleration of MY 2007 Lexus ES350 as the initial investigation (PE7-016) was too narrow in scope and did not adequately address all complaints made to the NHTSA with respect to vehicle speed control concerns."  Additionally, according to ODI, the petitioner requested an "investigation of MY 2002-2003 Lexus ES300 for 'longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect' that were determined not to be within the scope of Investigation PE04021."

- 63 -

162.   On May 14, 2009, Toyota's Christopher Tinto filed a direct response to Mr. Pepski's petition in DP09-001.  Mr. Tinto dismissed all of the issues Mr. Pepski raised in his petition and claimed there was no basis for an investigation.  Mr. Tinto stated that when Lexus inspected Mr. Pepski's vehicle, it found that the floor mat was unsecured and blamed the event on pedal entrapment.  Mr. Tinto maintained that Toyota's electronic throttle and brakes systems were in compliance with all applicable federal motor vehicle safety standards, and that Mr. Pepski had misinterpreted the warnings in the owner's manual about steering wheel lockup when the ignition is in the "Off" mode.

163.   Toyota knew that NHTSA inspected Pepski's car and "did not see clearly the witness marks of the carpeted floor mat in the forward unhooked position" and instead "suspect[ed]" this was the case.  Santucci made it clear that NHTSA wanted Toyota to blame this on a floor mat issue, because if Toyota did not do so, NHTSA would have to ask "for non-floormat reports":

> So they should ask us for non-floormat related reports, right?  But they are concerned that if they ask for these other reports, *they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them*.  Does that make sense?  I think it is good news for Toyota.[35]  [Emphasis added.]

---

[35] TOY-MDLID00052918.

- 64 -

164.   What was good news for Toyota, *i.e.*, NHTSA avoiding inquiry into non-floor-mat issues, was bad news for consumers who continued to purchase and drive vehicles subject to a hidden SUA defect.

165.   On October 29, 2009, NHTSA denied the Pepski petition.  Once again, ODI issued its denial without requiring Toyota fully to disclose the actual numbers of customer reports of sudden unintended acceleration events in the Toyota models under investigation it received.

**5.      The floor mat recall**

166.   In August 2009, Officer Mark Saylor, a 19-year veteran of the California Highway Patrol, his wife, thirteen-year-old daughter and his brother-in-law, Chris Lastrella, were driving in a 2009 Lexus ES350 loaned to them from the dealership while Officer Saylor's Lexus was being repaired.  Witnesses later reported that Officer Saylor had pulled onto the shoulder going roughly 25-45 mph and appeared to have some engine difficulty.  Witnesses reported that Officer Saylor turned on his emergency lights.  Shortly thereafter the Lexus's speed accelerated to over 100 mph.  Chris Lastrella called 911 from the vehicle and reported that the accelerator was stuck and "we're in trouble."  He then repeated:  "We're approaching the intersection.  We're approaching the intersection.  We're approaching the intersection."  Others in the car could be heard saying "hold on" and "pray."  The Lexus then crashed into the back of an SUV and continued through a fence, crashing head first into an embankment, becoming airborne, rolling over, bursting into flames and coming to rest in a dry riverbed.  All four members of the Saylor family were killed by extensive blunt force injuries.

167.   When officers inspected the vehicle, the all weather floor mat was melted to the accelerator pedal and unsecured by the retaining clips.  It was also the incorrect all weather floor mat for that Lexus model.  When officers tested the pedal clearance using the same model of Lexus and the same mismatched floor mat, they observed that the pedal could easily become stuck under its edge.

168.   Officers investigating the Saylor tragedy also learned that a similar complaint of unintended acceleration had been made about the vehicle involved in the Saylor crash only days before it was loaned to Officer Saylor.  The San Diego County Sheriffs' report chronicles the prior complaint as follows:

> [Frank Bernard] was on the Poway Road on-ramp to
> Interstate 15 North.  As he was merging onto the freeway,
> he saw a truck nearby and accelerated 'briskly' to get in
> front of it.  Witness Bernard got onto the freeway, and once
> in front of the truck, let his foot off the accelerator.  [The
> Lexus] kept accelerating on its own, to about 80-85 MPH.
>
> Witness Bernard stopped on the brakes and tried to lift up
> on the accelerator with his right foot.  He was attempting to
> access the shoulder of the freeway, and still applying the
> brakes, was able to slow [the Lexus] to about 50-60 MPH.
> While he was slowing, he pushed the ignition button 'a few
> times' and was not able to turn the engine off.  He also
> 'popped the throttle' with his foot to see if he could get it to

- 66 -

clear itself.  None of this worked.  [The Lexus] kept

moving at an uncontrolled and high rate of speed.

Witness Bernard kept on the brakes, slowing [the Lexus] to

25-30 MPH and pulled over to the shoulder.  He was able

to then place [the Lexus] into neutral with the gear shift.

When he did this, the engine made a very loud whining,

racing sound.  Witness Bernard was able to stop [the

Lexus].

Witness Bernard looked down at his feet and saw the

accelerator was stuck underneath the floor mat.  He was

able to pull it up with his foot, and said he had to apply a

significant amount of pressure to do so.[36]

169.   Mr. Bernard told a receptionist at the dealership of the unintended

acceleration and that it was due to the floor mat.

170.   The San Diego County Sherriff's Report concludes that the Saylor crash

was likely caused by the mismatched floor mat and the following "associated"

factors:

The vehicle was not equipped with a key that would other

wise allow for manual emergency shut off.  The push

---

[36] TOY-MDLID000091970 at 9193.

- 67 -

1  
2  

> button ignition feature had no emergency instantaneous
> shut capability.

3  
4  
5  
6  
7  

> As evidenced in the inspection of [the Lexus], the brakes
> most likely failed due to over burdened, excessive, and
> prolonged application at high speed.[37]

8  

9  
10  
11  
12  

171.   The report also notes that additional factors could have played a role in the unintended acceleration, specifically naming electrical, mechanical or computer generated.

13  
14  
15  
16  
17  
18  
19  
20  
21  

172.   Following the widespread publicity surrounding the four-fatality Saylor crash near San Diego, California, Toyota issued a "Safety Advisory," saying that the company had "taken a closer look" at the potential for the accelerator to get "stuck in the full open position" *due to interfering floor mats*.  The advisory stated that the company would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in all, to address the issue – the largest recall in Toyota's history and the sixth largest in the United States.  According to Senator Waxman, Toyota's advisory is dangerously misleading, for the following reasons, among others:

22  
23  
24  
25  
26  

> By suggesting that only a trapped floor mat can cause a
> loss of throttle and braking control, it lulls owners of
> models with no driver's side floor mat into believing there
> is no possibility of a potentially catastrophic loss of throttle

27  
28  

---

[37] *Id*. at 9197.

and braking control.  According to documents supplied by Toyota to the Committee on Energy and Commerce of the U.S. House of Representatives, fewer than 16% of sudden, unintended acceleration events reported by customers involved floor mats and/or "sticky pedals."

The advisory also misleads owners with a driver's-side floor mat into believing that, in the event of a sustained near-wide-open throttle malfunction, the first response should be to visually determine if the floor mat is interfering with the accelerator pedal.

173.   On September 29, 2009, the same day that TMC recalled 3.4 million vehicles in the United States because of possible floor mat entrapment, Toyota Motor Europe issued a Technical Information ("TI") to Toyota distributors in Austria, Belgium, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland, Turkey, Portugal, Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United Kingdom, Georgia, Kazakhstan, and Romania identifying a production improvement and repair procedure to address complaints by customers in those countries of sticky accelerator pedals, sudden RPM increase and/or sudden acceleration – but nothing similar was issued to warn United States distributors.

174.   Despite its claimed extensive investigation into the sticky pedal phenomenon, and its efforts to remedy the sticky pedal defect for overseas consumers, TMC continued to conceal information from United States consumers

regarding potential causes for sudden unintended acceleration events.  On September 29, 2009, TMC issued a Consumer Safety Advisory claiming that the sudden acceleration problem was caused by floor mats without mention of the sticking accelerator pedal defect it knew about since July 6, 2006, at the latest, and had confirmed no later than June 2009.

175.   Contemporaneously with the floor mat recall, Toyota made media statements inaccurately stating that NHTSA had determined that no defect exists in vehicles wherein the driver's side floor mat is compatible with the vehicle and is properly secured.  For example, a November 2, 2009 press release issued from Torrance, CA announced:

> Toyota Motor Sales … today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position.  The letter, in compliance with the National Traffic and Motor Vehicle Safety Act and reviewed by the National Highway Traffic Safety Administration … also confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.

176.   On November 4, 2009, NHTSA issued a press release to correct this misleading and inaccurate information.  NHTSA clarified that it told Toyota and consumers that "removing the recalled floor mats is the most immediate way to

- 70 -

address the safety risk and avoid the possibility of the accelerator becoming stuck." NHTSA reiterated that the floor mat recall was simply an interim measure, and did not correct the underlying defect.

177.   Despite initiating its plan to repair defective accelerator pedals for overseas consumers, Toyota's misinformation to United States consumers continued. TMC posted the following response to a question posed by the LOS ANGELES TIMES:

> Q2:  Toyota has conducted numerous recalls related to
>
> sudden acceleration over the past decade in the U.S.
>
> and Canada, including two previous floor mat recalls.
>
> But the problem has continued.  Does this mean that
>
> the previous recalls were not successful in eliminating
>
> the problems and if so, why not?  In particular, why
>
> wasn't the 2007 recall of Lexus ES and Camry floor
>
> mats effective in preventing catastrophic accidents
>
> such as the Saylor case?
>
> A.  Toyota has conducted two all-weather floor mat
>
> (AWFM) recalls after receiving reports that if the
>
> floor mat (either by itself, or if it is placed on top of an
>
> existing carpeted floor mat) is not secured by the
>
> retaining hooks, the mat can move forward and
>
> interfere with the accelerator pedal returning to the
>
> idle position.  If the mat is properly secured, it will not
>
> interfere with the accelerator pedal.

- 71 -

As reported in the law enforcement investigation, the
floor mat in the Saylor accident was not only
improperly secured, it was incompatible and incorrect
for the vehicle.  The recall recently announced
addresses the fact that incompatible floor mats, or
multiple floor mats could be installed and that the
remedy must address that possibility.

178.   When Transportation Secretary Ray LaHood testified before the House Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials chose to meet directly with Toyota executives in Japan to discuss safety issues because NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

**6.     The sticky accelerator recall**

179.   On or about October 13, 2009, TMC issued an Intra-Company Communication ("ICC") to Toyota personnel in Japan and in the United States concerning a Toyota Corolla sold in Missouri that was the subject of a sticky accelerator pedal complaint.  The ICC noted that sticky pedal was identified on or about September 24, 2009, five days prior to Toyota's floor mat advisory to United States consumers (and the sticky pedal TI to European consumers also issued on the same day).  The ICC further documented that Toyota recovered the accelerator pedal and installed it on a 2010 Corolla fleet vehicle, that Toyota verified the sticking accelerator pedal, and that the subject accelerator pedal was then handed over Customer Quality Engineering – Los Angeles for further analysis on or about October 5, 2009.

180.   On or about October 22, 2009, through October 28, 2009, Toyota issued three Field Technical Reports ("FTRs") concerning sticky accelerator pedals in Corollas sold in the United States and conducted a parts recovery.

181.   On January 16, 2010, Katsuhiko Koganei (a.k.a. "Kogi"), TMS Executive Coordinator – Corporate Communications, sent an e-mail to Mike Michels at Toyota, stating "we should not mention about the mechanical failures of acc. [sic] pedal, because we have not clarified the real cause of the sticking accelerator pedal formally, and the remedy for the matter has not been confirmed."

182.   The e-mail came three days before a meeting scheduled with (among others) Toyota's two lead North American executives, James Lentz (Torrance, CA) and Yoshimi Inaba (New York, NY), and NHTSA.  It was copied to at least 15 other Toyota Executives, including Irv Miller (Torrance, CA), TMS Group Vice President, Environmental and Public Affairs.

183.   On January 16, 2010, Irv Miller sent an e-mail to Koganei stating:

> I hate to break this to you but WE HAVE A tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options.

> We better just hope that they can get NHTSA to work with
> us in coming with a workable solution that does not put us
> out of business.[38]

184.    The foregoing mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

185.    On or about January 19, 2010, Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC.  In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents.  Toyota did not issue any safety advisories to United States consumers regarding the sticking pedal issue until January 21, 2010, when it issued the sticky pedal recall.  The recall involved approximately 2.3 million Defective Vehicles.

186.    On or about January 26, 2010, Toyota announced in a press release issued from Torrance, California that it was voluntarily suspending sales of eight models involved in the January 21, 2010 recall for sticking accelerator pedals, including its top selling Camry and Corolla models.  Group Vice President and Toyota Division General Manager Bob Carter made clear that "[t]his action is necessary until a remedy is finalized."  Toyota further announced that due to the sales suspension, Toyota was expected to stop producing vehicles on several North American production lines.  Toyota did not resume sales of these vehicles until February 5, 2010.

---

[38] TOY-MDLID00027481.

187.   On or about April 5, 2010, NHTSA announced that it was seeking a $16.375 million civil penalty from TMC due to the Toyota Defendants' failure to appropriately inform NHTSA with regard to a potential defect in its vehicles stemming from TMC's knowledge of the sticking pedal defect.  This sanction presented the largest financial penalty ever imposed on an automaker by the United States Government and was the largest fine permitted by law.  Transportation Secretary Ray LaHood stated, "[b]y failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

188.   On or about April 19, 2010, TMC agreed to pay NHTSA's record $16.375 million fine, and avoided any official findings of fact by NHTSA.  TMC admits that it "could have done a better job of sharing relevant information within our [Toyota's] global operations and outside the company …"

**D.    Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall Complaints**

189.   Toyota and NHTSA have continued to receive complaints of unintended acceleration by vehicles not involved in the recalls or by vehicles which have participated in the recalls and been "fixed."  These numbers have been increasing.

190.   On February 22, 2010, Toyota conducted a "webinar" purporting to address the various safety concerns plaguing Toyota and Lexus vehicles.  While Toyota had previously claimed that the braking problems in the Prius and Lexus ES 250h were unrelated to the unintended acceleration problem, in the webinar Toyota admitted they were linked by suggesting that the ETCS-i system facilitates electronic braking control (among the other "advantages" Toyota touted in regard to the ETCS-i system).

- 75 -

191.   On March 2, 2010, Takeshi Uchiyamada, Executive Vice President,
Toyota Motor Corporation submitted prepared testimony to the Senate Committee on
Commerce, Science and Transportation.  Mr. Uchiyamada's testimony purported that
the ETCS-i system is tested "extensively both in the design phase and after it is
developed to ensure that there is no possibility of 'sudden unintended acceleration.'"
In reality, Toyota relies heavily upon its component suppliers to perform such
testing.  Toyota's part suppliers typically complete Toyota's parts level testing
independently.  Toyota performance standards apply only to Tier 1 suppliers.
Toyota does not have any clearly written rules or regulations about who must
conform to Toyota's standards below its Tier 1 suppliers.  For instance, while Toyota
may impose testing standards on CTS, the supplier of the sticky accelerator pedals at
issue, when questioned before Congress, Toyota engineers could not testify that
Toyota imposed similar controls on the manufacturers of the sensors and circuit
board that CTS utilizes in its pedal.  Moreover, Toyota's engineers admitted that
"there is no particular or special testing that would directly prove that there is no
unintended acceleration."

192.   On March 5, 2010, Congressmen Henry A. Waxman and Bart T.
Stupak, Chairmen of the House Subcommittee on Oversight and Investigation, wrote
a letter to James E. Lentz, President and Chief Operations Officer of Toyota Motor
Sales U.S.A., Inc., stating, among other things:

> We do not understand the basis for Toyota's repeated
> assertions that it is "confident" there are no electronic
> defects contributing to incidents of sudden acceleration.
> We wrote you on February 2, 1010, to request "all analyses

- 76 -

1   or documents that substantiate" Toyota's claim that

2   electronic malfunctions are not causing sudden unintended

3   acceleration.  The documents that Toyota provided in

4   response to this request did not provide convincing

5   substantiation.  We explained our concerns about the

6   failure of Toyota to substantiate its assertions in our letter

7   to you in February 22, 2010.

8

9

10   After we sent our letter on February 22, Toyota provided a

11   few additional documents to the Committee early in the

12   morning on the day of the hearing.  Several of these

13   documents were written in Japanese.  While some of these

14   documents appear to contain preliminary fault analyses that

15   could be used in planning a rigorous study of potential

16   cause of sudden unintended acceleration, not one of them

17   suggested that such a rigorous study had taken place.  As

18   we explained in our February 22 letter, the only document

19   Toyota has provided to the Committee that claims to study

20   the phenomenon of sudden unintended acceleration in a

21   comprehensive way, is an interim report from the

22   consulting firm Exponent, Inc.  This report has serious

23   deficiencies, as we explained in our February 22 letter.

24   193.   Toyota has continued to maintain that there are no problems with its

25

26

27   ETCS-i in public and in depositions, but has provided little or no support for these

28

statements.  For example, when asked why Mr. Landis believed there were no problems with the ETCS-i, he testified, "This basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

**E.      Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall**

194.   Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations:

> First, the documents appear to show that Toyota
> consistently dismissed the possibility that electronic
> failures could be responsible for incidents of sudden
> unintended acceleration.  Since 2001, when Toyota first
> began installing electronic throttle controls on vehicles,
> Toyota has received thousands of consumer complaints of
> sudden unintended acceleration.  In June 2004, the
> National Highway Traffic Safety Administration (NHTSA)
> sent Toyota a chart showing that Toyota Camrys with
> electronic throttle controls had over 400% more 'vehicle
> speed' complaints than Camrys with manual controls.  Yet,
> despite these warnings, Toyota appears to have conducted
> no systematic investigation into whether electronic defects
> could lead to sudden unintended acceleration.

010172-25  386580 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

195.   This concern is significant.  If Toyota had a report explaining the incidents occurring from 2004 to 2009, it could produce no such report for Congress. Thus, during this period Toyota was selling cars without knowledge of what caused the defect or disclosure of the defect.

196.   Next, the Committee rejected tests submitted by Toyota that were conducted at the request of Toyota's counsel, Bowman and Brooke, LLP:

> Second, the one report that Toyota has produced that
> purports to test and analyze potential electronic causes of
> sudden unintended acceleration was initiated just two
> months ago and appears to have serious flaws.  This report
> was prepared for Toyota by the consulting firm Exponent,
> Inc. at the request of Toyota's defense counsel, Bowman
> and Brooke, LLP.  Michael Pecht, a professor of
> mechanical engineering at the University of Maryland, and
> director of the University's Center for Advanced Life
> Cycle Engineering (CALCE), told the Committee that
> Exponent 'did not conduct a fault tree analysis, a failure
> modes and effects analysis … or provide any other
> scientific or rigorous study to describe all the various
> potential ways in which a sudden acceleration event could
> be trigger' 'only to have focused on some simple and
> obvious failure causes'; used 'extremely small sample
> sizes'; and as a result produced a report that "I would not

- 79 -

1    consider … of value … in getting to the root causes of

2    sudden acceleration in Defective Vehicles.'

3    197.   Again, the concern over the Exponent-Bowman and Brooke report

4

5   highlights (a) that Toyota had no credible prior report or analysis of SUA; (b) that

6   Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's

7   inability to understand the basis for the defect; and (d) its failure to provide a fail-

8   safe to prevent unintended acceleration.

9    198.   The Committee then addressed Toyota's lack of truthfulness in its

10  statements and rejected the notion that floor mats or pedals were the sole cause of the

11

12  problem:

13       Third, Toyota's public statements about the adequacy of its

14       recent recalls appear to be misleading.  In a February 1,

15       2010, appearance on the *Today* show, you stated that

16       Toyota has "studied the events of unintended acceleration,

17       and [it] is quite clear that it has come down to two different

18

19       issues," entrapment of accelerator pedals in floor mats and

20       sticky accelerator pedals.  In an appearance the same day

21       on CNBC you repeated this claim and reported that Toyota

22       is "very confident that the fix in place is going to stop

23       what's going on."

24

25       The documents provided to the Committee appear to

26       undermine these public claims.  We wrote to you on

27       February 2, 2010, to request any analyses by Toyota that

28

- 80 -

show sticky pedals can cause sudden unintended acceleration.  Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "[typically … does not translate into a sudden, high-speed acceleration event." Moreover, our review of the consumer complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

199.   Toyota's denials of an ETCS defect persisted even when independent professional engineers concluded in February 2009, that a SUA incident in Tennessee was caused by deviations with ETCS.[39]

200.   One reason why Toyota lacks sufficient test data on the reliability of ETCS, and had to rely on a report belatedly ginned up by Exponent-Bowman & Brooke, is the overall slip at Toyota in its attention to quality control.  Toyota has sacrificed safety for speed.

---

[39] TOY-MDLID90053223.

- 81 -

201.   The disconnect between Toyota's professed emphasis on safety and quality and its actual practices in those areas are evidenced in part by its conduct at its Georgetown, Kentucky manufacturing plant.

202.   Toyota's plant in Georgetown, Kentucky is responsible for the manufacture of some proportion of the Toyota vehicles that suffered from SUA.

203.   Employees of the quality control department at the Georgetown plant indicate that Toyota's practices have drastically changed.  When the Toyota plant first opened more than two decades ago, there was a culture called the "Toyota Way" that included:  never pass on a defect to the next process in assembly; every process is a customer; you cannot deliver a defective item.  Booklets were handed out describing this "Toyota Way."

204.   In the last ten years, the culture has changed.  Now, as acknowledged by Toyota, the emphasis is on fast production.  While production and production goals have increased, the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

205.   The result has been a significant increase in quality control problems per vehicle.  Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are overlooked. Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a recall.  Quality control employees are given goals that set an upper limit on the number of defects they are to report.

**F.     Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers
        and Affirmatively Misled Consumers**

206.   When a customer reports a SUA event, Toyota uniformly rejects any
claim of any defect and fails to disclose the existence of hundreds if not thousands of
similar SUA claims.

207.   Typical of such a response is the following letter sent from TMS'
California offices:

> Re:     Date of Loss:       February 2, 2009
>
>         Vehicle:            2007 Lexus ES 350
>
>         VIN:                …
>
>
> Dear _____:
>
>
> This letter is in response to your communication with
>
> Lexus Customer Satisfaction.  Toyota Motor Sales, USA,
>
> Inc. ("TMS") has reviewed your claim and conducted a
>
> technical inspection of your vehicle.
>
>
> You reported that while driving the vehicle on the interstate
>
> it accelerated on its own and you were unable to stop it for
>
> nearly two miles when it finally slowed after a concerted
>
> effort on your part.  You believe that this was due to a
>
> defect in your vehicle.

010172-25  386580 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The inspection of your vehicle revealed no evidence of any vehicle defects or malfunction.  The throttle assembly and accelerator pedal were operating as designed, with no binding or sticking of any of the components.  The brakes showed signs of excessive wear which is consistent with what you described happened to you.

The inspection also revealed that the floor mat was in a position where it could interfere with the operation and travel of the accelerator pedal.  When the vehicle was taken in to the dealership, the floor mat retaining clips were not properly secured which allowed the floor mat to move out of position.  While we understand that you feel the floor mat was not the problem, the evidence revealed during our inspection showed otherwise.

We are very sorry about to learn of this unfortunate incident, however, our inspection of your vehicle found that the incident was not due to any sort of manufacturing or design defect, and we are unable to offer additional assistance.

010172-25  386580 v1

1

2          Thank you for allowing us the opportunity to address your

3          concerns.

4

5

6          Very truly yours,

7

8          Troy Higa

9          Claims Administrator[40]

10    208.   One 2007 Lexus ES350 owner reported that she had a SUA event that was not

11    caused by floor mats (as there was no floor mat on the drivers' side) and it was not

12    caused by pressing the gas instead of the brake.  In a detailed e-mail to Toyota in

13    October 2009, she described how she had dropped her daughter off one evening, just

14    as she normally did five times a week.  As usual, she backed into the neighbor's

15    driveway.  Her daughter and her son-in-law were watching her.  Her friend was in

16    the passenger seat.  All of a sudden the Lexus began to race out of control.  She tried

17    unsuccessfully to brake, but the car kept accelerating until it reached speeds up to 90

18    miles an hour.

19

20    209.   The Lexus hit several curbs, cracking and lifting the concrete.  It was

21    travelling so fast that the passenger side door flew open and smashed against the

22    front of the car.  She told Toyota that the only thing that saved their lives was a

23    concrete wall into which the car smashed and finally came to a halt.

24

25

26

27    _____

28    [40] TOY-MDLID00199764.

- 85 -

210.   The driver insisted that she was healthy and active, had good reflexes and that she did not wear glasses or contacts.  She then directly asked Toyota a number of questions like how she could have kept her foot on the accelerator pedal as she and her passenger were thrown about the interior of the car, only being held in place by the seat belts and how could she have accelerated enough in a small parking turn about to reach a speed that the car broke concrete.

211.   Toyota responded to this customer by claiming the vehicle was "in proper working order free of any type of mechanical defect."[41]  Toyota failed to address the points raised by the SUA victim or to interview witnesses to verify her account.

212.   Even where a consumer had a professional engineer conclude that the ETCS system was at fault, Toyota through a TMS claims manager in Torrance, California, informed the consumer "there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the brake/acceleration or electrical systems."[42]  It was Toyota's standard practice to issue uniform denials like the above from its claims manager in Torrance.

213.   Such letters of denial were sent despite instances where police officers found "physical evidence at the scene suggesting that vehicle #1 was continually accelerating throughout the incident."  The officer in this incident noted the impact caused the driver to "shift violently in her seat.  This officer feels it is unlikely she would have been able to manually accelerate throughout the event."[43]

---

[41] TOY-MDLID90011084.

[42] TOY-MDLID90054928.

[43] TOY-MDLID90053562.

- 86 -

214.   To make matters worse a TMS manager from Torrance falsely stated on repeated occasions that "the brakes will always override the throttle."[44]  This was a flat-out lie as Toyota did not have a brake-override until 2010, and in most vehicles, there is no such override.

## G.   Summary of the Defects in Defective Vehicles

215.   Toyota negligently designed, manufactured, sold and/or marketed the Defective Vehicles, which are prone to sudden unintended acceleration and are thus defective and unreasonably dangerous due to the failure to include fail-safe mechanisms system that would prevent a SUA event when the brake is applied. Upon information and belief, the SUA defect in the Defective Vehicles may be found to be caused by any of the following:

### 1.   Electronics Issues:

Upon information and belief defects in the Subject Vehicles' electronic system which can and sometimes do cause sudden unintended acceleration include, but are not limited to:

a.   The unwarranted and improper safety-critical reliance on electronic engine control and braking systems, including, but not limited to, the ETCS, which lacks a hardware redundant fault tolerant design;

b.   Unwarranted and improper safety-critical reliance on analog sensor inputs from two similar analog sensors in A) the throttle body assembly, and B) the accelerator pedal assembly, which are subject to failure in various modes;

---

[44] TOY-MDLID90059533.

c.      Unwarranted and improper safety-critical reliance on software running in a single CPU within the vehicle electronic system, which is subject to failure in various modes;

d.      Unwarranted and improper safety-critical reliance on individual hardware components used in the vehicle electronic system;

e.      The susceptibility of the ETCS-i (particularly the wiring harnesses connected to the accelerator pedal position sensors and the throttle position sensors) to currents generated by radio frequency (RF) interference, combined with an improper system for detecting and filtering RF currents;

f.      The susceptibility of the ETCS-i (particularly the accelerator pedal position sensors) to drops in supply voltage which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

g.      The susceptibility of the ETCS-i (particularly the wiring harnesses) to various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

h.      The failure to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

i.      The safety critical reliance on a purported fault detection system that does not always generate and/or recognize faults in the vehicle electronic system as they occur;

j.      The inability of the software running within the ETCS-i to properly self-calibrate when certain changes are detected;

- 88 -

k.      The failure to design and include an appropriate EDR system which properly records the position of the accelerator, brake, and throttle assembly in order to allow proper examination of SUA events; and

l.      The failure to include properly redundant systems with the ability to cross-check bus reported accelerator and throttle positions with "actual sensor data."

**2.      Mechanical Issues:**

Upon information and belief, certain mechanical defects in the Subject Vehicles which can and sometimes do cause sudden unintended acceleration include, but are not limited to:

a.      The propensity for mechanical involvement and interference between the accelerator pedal and the Subject Vehicles' floor mats which can cause the pedal to become stuck and remain depressed, keeping the throttle open despite the operator's application of the brake pedal, resulting in unintended acceleration;

b.      Mechanical resistance that can cause the accelerator pedal to become stuck in a fully or partially depressed position and to fail to return to its idle position (referred by Toyota as a "sticky pedal"), resulting in unintended acceleration;

c.      Floor mat interference in all Toyota vehicles, recognized as early as 2000 when Toyota recalled 1999-2000 model years Lexus LS 200 for SUA-floor mat issues in the UK and again in 2007 when internally Toyota recognized floor mats could be an issue in all vehicles[45]; and

---

[45] TOY-MDLID00002839.

d.      Mechanical resistance which can cause the throttle body or throttle plate
to become stuck in a fully or partially open position resulting in unintended
acceleration.

### 3.      The lack of an appropriate fail-safe:

Toyota was aware the SUA events were caused by any of the above in a given
Defective Vehicle, but Toyota could not predict which of the faults listed above
caused a SUA event in any given vehicle.  Toyota could not identify the root cause
of most SUA events.  This made it critically important for Toyota to have an
adequate fail-safe.  The Defective Toyotas did not have an adequate fail-safe due to:

a.      The unwarranted and improper reliance on safety-critical but untested or
improperly tested "failsafe strategies" ostensibly designed to detect faults in the
vehicle electronic systems and prevent those faults from causing sudden unintended
acceleration.  These "failsafe strategies" can and sometimes do fail to recognize fault
conditions which, if left unchecked, result in unintended acceleration and record no
direct evidence of the fault that initially triggered the unintended acceleration event;

b.      The lack of a proper "brake override system" or other fail-safe logic that
would close the throttle while allowing the brakes to be applied in the event the
vehicles' electronic systems received commands to open the throttle and apply the
brakes simultaneously;

c.      The lack of a hardware-redundant fault tolerant electronic engine
control and braking system such as those employed by other vehicle manufacturers;
and

d.      The lack of a proper ignition shut off in the event of a SUA event.

**4.      Failure to appropriately test and validate the vehicle systems:**

a.      An inability to identify the root cause for SUA.  As alleged above, Toyota has been aware since 2002 that its vehicles with ETCS have the potential for SUA or "surging" at a rate that exceeds that in manually controlled vehicles.  Toyota has been unable to find the root cause of the problem.  In a 2002 Toyota Field Technical Report, Toyota acknowledged that "[t]he root cause for 'surging' remains unknown" and thus "[n]o known remedy exists for the 'surging' condition at this time."[46]  In 2010, Toyota still had not tested its ETCS, as it had to hire Exponent to answer Congress' inquiry over what proof Toyota had to show its ETCS did not cause SUA.  Congressman Waxman observed:

> The results of our investigation raise serious questions.
> Toyota has repeatedly told the public that it has conducted
> extensive testing of its vehicles for electronic defects.  We
> can find no basis for these assertions.  Toyota's assertions
> may be good public relations, but they don't appear to be
> true.

b.      The faults and defects in Toyota's safety critical vehicle electronic systems described above show that Toyota has not properly tested or validated these systems individually or as a whole; and

c.      Moreover, Toyota has failed to verify that all electronic vehicle systems capable of requesting torque are robust enough, and contain sufficient redundancies to prevent sudden unintended acceleration events.

---

[46] TOY-MDLID00062906.

**H.     Toyota Belatedly Installs a Brake-Override as a "Confidence" Booster**

216.   Toyota began facing complaints of runaway cars years ago, but the company did not install "brake override" systems in those vehicles, even as several other automakers deployed the technology to address such malfunctions.

217.   The brake-override systems allow a driver to stop a car with the footbrake even if the accelerator is depressed and the vehicle is running at full throttle.  The systems are an outgrowth of new electronics in cars, specifically in engine control.

218.   "If the brake and the accelerator are in an argument, the brake wins," a spokesman at Chrysler said in describing the systems, which it began installing in 2003.

219.   Shockingly, given the potential gravity of SUA events, internal documents reveal Toyota knew it needed a brake-override years earlier:[47]

> **Subject**:     Important information:  America ES350
>                     article…addition #2
>
> **From**:  Koji Sakakibara@toyota.com
>
> **Date**:  Tue. 1 Sep 2009 16.16.01 -0700
>
> **To**:     yoshioka@mail.tec.toyota.cojp. Shunsuka Noguchi
>              syun@nano.tec.toyota.cojp.
>              rkitsura@mail.tec.toyota.coj.
>              Kako kako@email.tec.toyota.cojp>

---

[47] TOY-MDLID00041130T-0001.

- 92 -

1        cc:     Kato  maktoh@mail.tec.toyota.cojp,

2                    Hirokazu.Sakamoto@toyota.com,

3                    Koji_Takara@toyota.com,

4                    Keiichi_Fukushima@toyota.com,

5                    washino@mail.tec.toyota.cojp,

6

7                    jamagush@earth.tec.toyota.cojp, r-

8                    Kawamu@earth.tec.toyota.cojp,

9                    y_yamai@email.tec.toyota.cjp.  Kanamori

10                   kanamori@earth.tec.toyota.cojp,

11

12                   ssakamt@earth.tec.toyota.cojp,

13                   joji@giga.tec.toyota.cojp

14

15     To all concerned staff,

16

17     Thank you for your continued business.  I am Sakakibara

18     from TEC-2Gr, COE-LA.

19

20

21     - The following information has been received from TMS-

22     POSS Public Affairs Group regarding the above (America

23     ES350 article…addition #2).  (Please see photos at the

24     bottom of this mail.)

25

26

27     - During the floor mat sticking issue of 2007, TMS

28     suggested that there should be "*a fail safe option similar to*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*that used by other companies to prevent unintended*

*acceleration." I remember being told by the accelerator*

*pedal section Project General Manager at the time (Mr. M)*

*that "This kind of system will be investigated by Toyota,*

*not by Body Engineering Div." Also, that information*

*concerning the sequential inclusion of a fail safe system*

*would be given by Toyota to NHTSA when Toyota was*

*invited in 2008. (The NHTSA knows that Audi as adopted*

*a system that closes the throttle when the brakes are*

*applied and that GM will also introduce such a system.)*

=>In light of the information that "2 minutes before the

crash an occupant made a call to 911 stating that the

accelerator pedal was stuck and the vehicle would not

stop." I think that Body Engineering Div. should act

proactively first (investigate issues such as whether the

accelerator assy [sic] structure is the cause, how to secure

the floor mats, the timing for introducing shape

improvements).

- Furthermore, taking into account the circumstances that

"in this event a police officer and his entire family

including his child died." TMS-POSS Public Affairs

Group thinks that "the NHTSA and USA public already

- 94 -

hold very harsh opinions in regards to Toyota."  (As I think you know, in some cases in the USA "killing a police officer means the death penalty.")

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div.," the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues."

Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager.  (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)  [Emphasis added.]

220.   Volkswagen, Audi, BMW and Mercedes-Benz also install such systems in at least some of their cars, the companies and industry experts said, some as far back as 10 years ago.  General Motors installs brake-override in all of its cars in which it is possible for the engine at full throttle to overwhelm the brakes.

- 95 -

221.   On December 5, 2010, TMS announced it will install brake-overrides in 2011 vehicles.

222.   On February 22, 2010, TMC announced that it would install a brake-override system on an expanded range of customers' vehicles to provide an additional "measure of confidence."  According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

223.   The following models are eligible for the brake-override "confidence" upgrade:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250 models.

224.   "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when SUA complaints were received. Lentz did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

225.   Importantly, the brake-override was not announced as a "Safety Recall." Rather, it was implemented to boost consumer "confidence."  And the confidence booster is not being installed in all models with the SUA defect, such as the 2002-2006 Camrys.

- 96 -

## I.   The Defects Causing Unintended Accelerations Have Caused Defective Vehicles' Values to Plummet

226.   A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of an uncontrollable and possibly life-threatening SUA event.  All purchasers of the Defective Vehicles overpaid for their cars.  As news of the SUA defect hit the press, the value of Toyota vehicles have materially diminished.  Some class members attempted to return their vehicles due to the fear of a SUA event.  Toyota has uniformly refused to refund the price of a vehicle a Plaintiff or class member sought to return.

227.   The economic loss suffered by class members is revealed by the following few examples.  From the start of the spring market through the summer of 2009, the 2007 Toyota Camry LE and the 2007 Nissan Altima stayed consistent with each other, depreciating $438 and $295 respectively through these five months (April 09-Aug 09).  As news of the Camry recall started to spread, however, the Camry took a nose dive, losing nearly 2.5 times the loss in value of its competitor, the 2007 Nissan Altima.  More staggering is that the Camry lost $400 in value from January-April 2010 when almost every used vehicle historically gains significant value during these months. By March 2010 the delta between the Nissan and the Camry was over $1,200.

228.   From April 2009 through September 2009, the Corolla increased in value over its competitor, the Nissan and the Sentra by $210.  However, as the storm clouds started to gather over the rest of the Toyota line, the trend reversed.  During the next seven months, the Sentra only dropped $174 in value, while the Corolla

- 97 -

dropped $839.  This is a difference of $665.  The change in this trend resulted in an $875 negative swing for the Corolla versus the Sentra in a year's time, a decrease in value for the Corolla of almost four times that of the Sentra.

229.   From April 2009 through August 2009, the Toyota RAV4 increased in value over its competitor the Honda CRV by $472.  But as the Toyota problems continued, this trend also reversed.  During the next eight months, the CRV dropped $1,273 in value, while the RAV4 dropped $2,206.  This is a net difference of $933.  The change in this trend resulted in a $1,405 negative swing for the RAV4 versus the CRV in a year's time.

230.   Purchasers and lessees paid more for the car, through a higher purchase price or higher lease payments, than they would have had the defects and non-conformities been disclosed.  In addition to being tied to a defective vehicle and having paid a higher rate than would have been the case if the defects were disclosed, lessees can, in some cases, end up paying for the difference in projected residual value and actual or realized value (*e.g.*, early termination clauses; open-end leases) at the end of their leases.  In these situations, lessees must come out of pocket to pay for the diminution in value caused by the partial disclosure of the SUA and brake-override defects to terminate their leases.

## J.      Choice of Law Allegations

231.   Toyota Motor Sales is headquartered in Torrance, California.  According to a Toyota brochure regarding its United States Operations 2009, Toyota

- 98 -

Motor Sales is "Toyota's U.S. sales and marketing arm," which "oversees sales and other operations in 49 states."[48]

232.    Toyota does substantial business in California, with a significant portion of the proposed Nationwide Class located in California.  For example, approximately 18% of Toyotas were sold in California[49] and 16% of Lexus vehicles were sold or leased in California.

233.    California hosts a significant number of Toyota's U.S. operations.  In California, Toyota maintains both Toyota and Lexus Sales and Service Offices, Financial Service Offices, Manufacturing Facilities, a Research and Development Center, and a Design Center.  Also, Toyota Motor Engineering and Manufacturing North America, Inc. is headquartered in Kentucky, but has major operations in Torrance, California, as well as in Michigan and Arizona.

234.    In addition, the conduct that forms the basis for each and every class members' claims against Toyota emanated from Toyota Motor Sales' headquarters in Torrance, California.

235.    Toyota personnel responsible for customer communications are located at Toyota Motor Sales' California headquarters, and the core decision not to disclose the sudden acceleration defect to consumers was made and implemented from there.

236.    Throughout the class period, Toyota Motor Sales, in concert with its California advertising agencies, failed to disclose the existence of the sudden acceleration defect.  Toyota is a major client of Saatchi & Saatchi LA, also located in

---

[48] http://pressroom.toyota.com/pr/tms/document/TNA_OPS_MAP_2009.pdf.

[49] Available at http://www.nytimes.com/2010/03/16/opinion/16herbert.html?_r=1, date last visited August 1, 2010.

- 99 -

Torrance, California.  The only client work displayed on its website is for Toyota, and it has received many awards over the years for various Toyota campaigns.[50]

237.   Personnel at Saatchi & Saatchi LA have direct ties to Toyota, including CEO Kurt Ritter, who is a member of the Toyota Worldwide Executive Board, and Chief Strategy Officer Mark Turner, who also "sits on Toyota's Worldwide Executive Board, as the strategic lead for all Toyota business managed by the Saatchi network throughout the world."  President Chuck Maguy is described as a longtime veteran of the Toyota account who returned to Saatchi LA in early 2009 after serving as Executive Director at Saatchi & Saatchi LA's sister agency, Team One, where he managed the Lexus brand.

238.   Team One is also located in California with its headquarters in El Segundo (about 12 miles from Torrance, California), and its CEO, Kurt Ritter, who is a member of the Toyota Worldwide Executive Board, is also CEO for Saatchi & Saatchi LA.[51]

239.   The marketing campaign falsely promoting Toyotas as safe was conceived and designed in California.

240.   Toyota personnel responsible for managing Toyota's customer service division are located at the Toyota Motor Sales' California headquarters.  The "Customer Experience Center" directs customers to call 1-800-331-4331, which is a landline in Torrance, California, and to fax to 310-468-7814, which includes the area code for Torrance, California.[52]  Customers are directed to send correspondence to

---

[50] http://www.saatchila.com/.

[51] http://www.teamone-usa.com/.

[52] http://www.toyota.com/help/contactus.html.

Toyota Motor Sales, U.S.A., Inc., 19001 South Western Ave., Dept. WC11,

Torrance, CA 90501.  In addition, personnel from Toyota Motor Sales in Torrance,

California, also communicate via e-mail with customers concerned about sudden

acceleration.

241.   These California personnel implemented Toyota's decision to deny the

existence of the sudden acceleration defect when customers called to complain and

instead blame floor mats and sticking accelerator pedals or driver error.  For

example, a series of e-mail exchanges with a customer concerned about incidents of

sudden acceleration with his Prius show that the California personnel indicated that

upon inspection Toyota found his vehicle "to be operating as designed" and

"recommend[ed] removing the driver's side floor mat."  The California personnel

also indicated that "Toyota has commissioned Exponent, one of the country's

leading engineering ad scientific consulting firms, to conduct a comprehensive

analysis of the electronic throttle control systems in Toyota and Lexus vehicles."

242.   According to the LOS ANGELES TIMES, a 56-page report that Menlo

Park, California-based Exponent sent to Congress on February 9, 2010, found that

the system behaved as intended and that Exponent was "unable to induce …

unintended acceleration or behavior that might be a precursor to such an event."[53]

Presumably, the tests performed by Exponent took place in California because

Southern Illinois University's David Gilbert had to fly to California to see a

demonstration at Exponent after he testified before the House Energy and Commerce

---

[53] *Toyota Calls in Exponent, Inc. As Hired Gun*, LA TIMES (Feb. 18, 2010),
available at http://articles.latimes.com/2010/feb/18/business/la-fi-toyota-exponent18-
2010feb18, date last visited August 1, 2010.

- 101 -

Committee regarding his ability to demonstrate electronic failure modes in a Toyota

Avalon to recreate the acceleration without triggering any trouble codes in the

vehicle's computer.

243.   Toyota personnel responsible for communicating with dealers regarding

known problems with Defective Vehicles are also located at Toyota Motor Sales'

California headquarters, and the decision not to inform Toyota dealers of the sudden

acceleration defect was made and implemented from there.

244.   Toyota personnel responsible for managing the distribution of

replacement floor mats and accelerator pedal parts to Toyota dealerships are located

at Toyota Motor Sales' California headquarters.  The decision to supply replacement

parts inadequate to address the sudden acceleration defect was made and

implemented from Toyota's California headquarters.

245.   In addition, some of the most renowned cases of sudden acceleration

occurred in California.  For example, in August 2009, California Highway Patrol

Officer Mark Saylor and his family were killed after the Lexus ES350 they were

driving went out of control during an episode of unintended acceleration.  The

vehicle crashed into an SUV, ran through a fence, rolled over and burst into flames

in San Diego, California.

246.   Toyota's presence is more substantial in California than any other state.

Since 1991, it has manufactured 2,454,336 Tacomas and since 1986, 3,000,935

Corollas in California.  It has four "Financial Service Offices" in California, a Hiro

operation or manufacturing facility, a research and development center, and a design

center in California.  It has more employees in California than any other state, with

10,725 "direct employees" and 21,485 "indirect employees."

- 102 -

247.   Lexus is also headquartered in Torrance, California.  Advertisements for Lexus, and decisions on how to respond to customer complaints on SUA, were made in California.

## V.    CLASS ALLEGATIONS

### A.    The Nationwide Consumer Class

248.   Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Nationwide Consumer Class initially defined as follows:

> All individuals or entities who purchased, own or lease a
> Toyota vehicle manufactured, designed or sold in the
> United States with ETCS.

249.   Excluded from the Nationwide Consumer Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries arising from a SUA incident.

250.   The Nationwide Consumer Class pursues claims for violation of the Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq*.; violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq*.; breach of express warranty under CAL. COM. CODE § 2313; breach of implied warranty of merchantability under CAL. COM. CODE § 2314; revocation of acceptance under CAL.

COM. CODE § 2608; violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*; breach of the California common law of contract and warranty; common law of unjust enrichment or restitution.[54]

251.    Pursuant to Rule 23(a)(1), the Nationwide Consumer Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade and commerce involved, the members of the Nationwide Consumer Class are geographically dispersed throughout the United States and joinder of all Nationwide Consumer Class members would be impracticable.  While the exact number of Nationwide Consumer Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are, at least, millions of members of the Nationwide Consumer Class.

252.    Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other members of the Nationwide Consumer Class.  Plaintiffs and other class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of Defective Vehicles.  Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.  Plaintiffs and class members purchased or leased Toyotas that they would not have purchased or leased at all, or for as much as they paid, had they known the truth regarding a sudden unintended acceleration defect.  Plaintiffs and the members of the Nationwide Class have all sustained injury in that they overpaid for Toyotas due to Defendants' wrongful conduct.

---

[54] Should the Court decline to apply California law to claims of non-California residents Plaintiffs in both classes will seek leave to amend to allege the applicable laws in the fifty states.

253.   Pursuant to Rule 23(a)(4) and (g)(1), Plaintiffs will fairly and adequately protect the interests of the members of the Nationwide Consumer Class and have retained counsel competent and experienced in class action and consumer fraud litigation.

254.   Pursuant to Rules 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Nationwide Consumer Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  In particular, Toyota has failed to properly repair Subject Vehicles and has failed to adequately implement a brake-override repair.

255.   Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Nationwide Consumer Class and predominate over any questions solely affecting individual members thereof.  Among the common questions of law and fact are as follows:

a.      Whether Toyota had knowledge of the defects prior to its issuance of the current safety recalls;

b.      Whether Toyota concealed defects affecting Defective Vehicles;

c.      Whether Toyota misrepresented the safety of the automotive vehicles at issue;

d.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the CLRA;

e.      Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

- 105 -

f.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

g.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

h.      Whether Toyota's business practices, including the manufacture and sale of vehicles with an unintended acceleration defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

i.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

j.      Whether Toyota breached its express warranties regarding the safety and quality of its vehicles;

k.      Whether Toyota breached the implied warranty of merchantability because its vehicles were not fit for their ordinary purpose due to their sudden acceleration defect;

l.      Whether Toyota was unjustly enriched at the expense of Plaintiffs and the Nationwide Consumer Class;

m.      Whether Plaintiffs and class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief; and

n.      The amount and nature of such relief to be awarded to Plaintiffs and the Nationwide Consumer Class.

- 106 -

256.   Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Nationwide Consumer Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

**B.**     **Non-Consumer Economic Loss Class**

257.   Pursuant to Rules 23(a), (a)(2), and (b)(3) of the Federal Rules of Civil Procedure, the Commercial Plaintiffs bring this action on behalf of themselves and a Nationwide Commercial Class initially defined as follows:

> All individuals or entities in the United States who
> purchased, leased and/or insured the residual value of a
> Toyota vehicle with ETCS and were engaged in the
> business of vehicle sales, rentals, or providing residual
> value insurance for those vehicles.

Excluded from the Nationwide Commercial Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

- 107 -

258.   The Nationwide Commercial Class pursues claims for violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.*; breach of express warranty under CAL. COM. CODE § 2313; breach of implied warranty of merchantability under CAL. COM. CODE § 2314; revocation of acceptance under CAL. COM. CODE § 2608; breach of the California common law of contract; and violation of the California common law for fraudulent concealment, unjust enrichment or restitution.

259.   Pursuant to Rule 23(a)(1), the Nationwide Commercial Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade and commerce involved, the members of the Nationwide Commercial Class are geographically dispersed throughout the United States, and joinder of all Nationwide Commercial Class members would be impracticable.  While the exact number of Nationwide Commercial Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members of the Nationwide Commercial Class.

260.   Pursuant to Rule 23(a)(3), Commercial Plaintiffs' claims are typical of the claims of the other members of the Nationwide Commercial Class.  Commercial Plaintiffs and other class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of Defective Vehicles.  Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.  Commercial Plaintiffs and class members purchased or leased Toyotas for commercial purposes, and they would not have purchased or leased the vehicles, or paid as much as they paid, had

- 108 -

they known the truth regarding a sudden unintended acceleration defect. Commercial Plaintiffs and the members of the Nationwide Commercial Class have all sustained injury in that they overpaid for Toyotas due to Defendants' wrongful conduct and experienced damages from the inability to use the vehicles for the commercial purposes for which they were purchased or leased.

261.    Pursuant to Rule 23(a)(4) and (g)(1), Commercial Plaintiffs will fairly and adequately protect the interests of the members of the Nationwide Commercial Class and California Subclass and have retained counsel competent and experienced in class action and consumer fraud litigation.

262.    Pursuant to Rule 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Nationwide Commercial Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to those classes as a whole.

263.    Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Nationwide Commercial Class and predominate over any questions solely affecting individual members thereof.  Among the common questions of law and fact are as follows:

a.    Whether Toyota had knowledge of the design defects prior to its issuance of the current safety recalls;

b.    Whether Toyota concealed design defects affecting Defective Vehicles;

c.    Whether Toyota misrepresented the safety of the automotive vehicles at issue;

- 109 -

d.      Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

e.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

f.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

g.      Whether Toyota's business practices, including the manufacture and sale of vehicles with a sudden unintended acceleration defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

h.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

i.      Whether Toyota breached its express warranties regarding the safety and quality of its vehicles;

j.      Whether Toyota breached the implied warranty of merchantability because its vehicles were not fit for their ordinary purpose due to their sudden acceleration defect;

k. Whether Toyota was unjustly enriched at the expense of Plaintiffs and the Nationwide Commercial Class;

l. Whether Commercial Plaintiffs and class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief;

m. The amount and nature of such relief to be awarded to Commercial Plaintiffs and the Nationwide Commercial Class; and

n. Whether Defendants committed fraud by intentionally concealing omitted facts.

264. Pursuant to Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Nationwide Commercial Class members is impracticable. The prosecution of separate actions by individual members of the Nationwide Commercial Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

## VI.   COUNTS

### COUNT I

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, *et seq.*)

265. The Nationwide Consumer Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

- 111 -

266.   TMC and TMS are "persons" under California Civil Code § 1761(c).

267.   Consumer Plaintiffs are "consumers," as defined by California Civil Code § 1761(d), who purchased or leased one or more Defective Vehicles.

268.   Consumer Plaintiffs attach as Exhibit A an affidavit that shows venue in this District is proper, to the extent such an affidavit is required by California Civil Code § 1780(d).

269.   TMC and TMS both participated in unfair or deceptive acts or practices that violated the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, as described above and below.  TMC and TMS each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the CLRA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

270.   By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, TMC and TMS engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

- 112 -

271.   As alleged above, TMC and TMS made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

272.   TMC and TMS knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  TMC and TMS nevertheless failed to warn Consumer Plaintiffs about these inherent dangers despite having a duty to do so.

273.   TMC and TMS each owed Consumer Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

a.   Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Consumer Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Consumer Plaintiffs that contradicted these representations.

274.   Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Consumer Plaintiffs, passengers, other motorists,

1   pedestrians, and the public at large, because they are susceptible to incidents of

2   sudden unintended acceleration.

3       275.   Whether or not a vehicle (a) accelerates only when commanded to do so

4   and (b) decelerates and stops when commanded to do so are facts that a reasonable

5   consumer would consider important in selecting a vehicle to purchase or lease.

6   When Consumer Plaintiffs bought a Toyota Vehicle for personal, family, or

7   household purposes, they reasonably expected the vehicle would (a) not accelerate

8   unless commanded to do so by application of the accelerator pedal or other driver-

9   controlled means; (b) decelerate to a stop when the brake pedal was applied, and was

10  equipped with any necessary fail-safe mechanisms including a brake-override.

11

12      276.   TMC's and TMS's unfair or deceptive acts or practices were likely to

13  and did in fact deceive reasonable consumers, including Consumer Plaintiffs, about

14  the true safety and reliability of Defective Vehicles.

15      277.   As a result of its violations of the CLRA detailed above, TMC and TMS

16  caused actual damage to Consumer Plaintiffs and, if not stopped, will continue to

17  harm Consumer Plaintiffs.  Consumer Plaintiffs currently own or lease, or within the

18  class period have owned or leased, Defective Vehicles that are defective and

19  inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents

20  have caused the value of Defective Vehicles to plummet.

21      278.   Consumer Plaintiffs risk irreparable injury as a result of TMC's and

22  TMS's acts and omissions in violation of the CLRA, and these violations present a

23  continuing risk to Consumer Plaintiffs as well as to the general public.

24      279.   As early as November 24, 2009, notice was sent to TMS in compliance

25  with California Civil Code § 1782.  On information and belief, numerous other

- 114 -

notices have been sent, including, on or about June 4, 2010, Consumer Plaintiffs sent a notice and demand letter via certified mail to TMS's principal place of business in California, thereby satisfying California Civil Code § 1782(a).   On or about March 23, 2010, a notice and demand letter was set via certified mail to TMC's headquarters in Japan, where TMC acted with its California subsidiary, TMS, to take actions violating the CLRA, and where TMC otherwise acted in violation of that statute, thereby satisfying California Civil Code § 1782(a).  Over thirty days have since passed without TMS or TMC taking, or agreeing to take, the appropriate corrective measures.

280.   Pursuant to California Civil Code § 1780(a), Consumer Plaintiffs seek monetary relief against TMS and TMC measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Consumer Plaintiff and each member of the class they seek to represent.

281.   Pursuant to California Civil Code § 1780(b), Consumer Plaintiffs seek an additional award against TMS and TMC of up to $5,000 for each Consumer Plaintiff and class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  TMS knew or should have known that its conduct was directed to one or more of the Consumer Plaintiffs who are senior citizens or disabled persons.  TMS's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more of the Consumer Plaintiffs who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct

because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them actually suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

282.   Consumer Plaintiffs also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Consumer Plaintiffs to cruel and unjust hardship as a result.  Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Consumer Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

283.   The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

284.   Consumer Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under California Civil Code § 1780(e), and any other just and proper relief available under the CLRA.

010172-25  386580 v1

# COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

285.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

286.   Plaintiffs assert this claim on behalf of themselves and members of the Nationwide Consumer and Commercial Classes on behalf of all persons or entities that purchased or leased a vehicle from Toyota or a Toyota dealership.

287.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

288.   Defendants have violated the unlawful prong of section 17200 by their violations of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I by the acts and practices set forth in this Complaint.

289.   Defendants have also violated the unlawful prong because TMC and TMS have engaged in business acts or practices that are unlawful because they violate the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

290.   FMVSS 124, codified at 49 C.F.R. § 571.124, sets the standard for accelerator control systems. Specifically, FMVSS 124 establishes requirements for the return of a vehicle's throttle to the idle position when the driver removes the actuating force from the accelerator control, or in the event of a severance or disconnection in the accelerator control system. The purpose of FMVSS 124 is to

- 117 -

reduce deaths and injuries resulting from engine overspeed caused by malfunctions in the accelerator control system.

291.   FMVSS 124 requires that throttles in passenger vehicles return to the idle position within certain maximum allowable times after the driver has removed the actuating force from the accelerator control:  one second for vehicles of 4,536 kilograms or less gross vehicle weight rating ("GVWR"), two seconds for vehicles of more than 4,536 kilograms GVWR, and three seconds for any vehicle that is exposed to ambient air at – 18 degrees Celsius to – 40 degrees Celsius.

292.   Defective Vehicles equipped with ETCS do not comply with FMVSS 124 because a design defect causes their throttles to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

293.   TMC and TMS each violated 49 U.S.C. § 3-112(a)(1) by manufacturing for sale, selling, offering for introduction in interstate commerce, or importing into the United States, Defective Vehicles equipped with ETCS that failed to comply with FMVSS 124.

294.   TMC and TMS each violated 49 U.S.C. § 30115(a) by certifying that Defective Vehicles equipped with ETCS complied with FMVSS 124 when, in the exercise of reasonable care, TMC and TMS each had reason to know that the certification was false or misleading because a design defect causes throttles in Defective Vehicles equipped with ETCS to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum

- 118 -

allowable time after the driver has removed the actuating force from the accelerator control.

295.   Defendants have violated the fraudulent prong of section 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

296.   Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanism, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease Defective Vehicles.

297.   The Named Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  In purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect of the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control. Had the Named Plaintiffs known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

010172-25  386580 v1

1    298.   All of the wrongful conduct alleged herein occurred, and continues to

2    occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part

3    of a pattern or generalized course of conduct that is still perpetuated and repeated,

4    both in the State of California and nationwide.

5    299.   Plaintiffs request that this Court enter such orders or judgments as may

6    be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or

7    deceptive practices and to restore to Plaintiffs and members of the Class any money

8    Toyota acquired by unfair competition, including restitution and/or restitutionary

9    disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE

10   § 3345; and for such other relief set forth below.

### COUNT III

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
(CAL. BUS. & PROF. CODE § 17500, *et seq.*)

300.   Plaintiffs reallege and incorporate by reference all paragraphs alleged

herein.

301.   Plaintiffs assert this claim on behalf of themselves and members of the

Nationwide Consumer and Commercial Classes on behalf of any person or entity

that purchased or leased a vehicle from Toyota or a Toyota dealership.

302.   California Business and Professions Code § 17500 states:  "It is

unlawful for any … corporation … with intent directly or indirectly to dispose of real

or personal property … to induce the public to enter into any obligation relating

thereto, to make or disseminate or cause to be made or disseminated … from this

state before the public in any state, in any newspaper or other publication, or any

advertising device, … or in any other manner or means whatever, including over the

- 120 -

Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

303.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiffs.

304.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

305.   Named Plaintiffs and members of the classes have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  In purchasing or leasing their vehicles, the Named Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect to the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control.  Had the Named Plaintiffs known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

306.   Accordingly, the Named Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain.  One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed.  Both trade-in prices and auction prices for Subject Vehicles have declined as a result of

- 121 -

Defendants' misconduct.  This decline in value measures the overpayment, or lost benefit of the bargain, at the time of the Named Plaintiffs' purchases.

307.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

308.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT IV

### BREACH OF EXPRESS WARRANTY
(CAL. COM. CODE § 2313)

309.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

310.   This Count is asserted by the Nationwide Consumer and Commercial Classes.

311.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

312.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty that provided for the following:

- 122 -

010172-25  386580 v1

*Accelerator pedal failure, except pedal position sensor*

*malfunction*

36 months or 36,000 miles for the Vehicles and 48 months

or 50,000 miles for the Lexus vehicles from the vehicle's

date-of-first-use, whichever occurs first.

*Other electronic throttle control system failure including*

*pedal position sensor malfunction*

60 months or 60,000 miles for the Vehicles and 72 months

or 70,000 miles for the Lexus vehicles from the vehicle's

date-of-first-use, whichever occurs first.

313.    Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

314.    In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, including that:

- The "by-wire' technology used in the Toyota throttles was a safety feature;

- Toyota designed their cars at the forefront of technology to enhance active safety (driving dynamics);

- The use of the electronic throttle control system results in even greater reliability and precision than systems based on hydraulic or mechanical linkages;

- Toyota uses technology to deliver a high level of safety;

- 123 -

- Toyota employs a revolutionary electronic control systems that boosts active safety;

- Toyota's ETCS-i helps improve performance;

- Class-leading passive safety including 5 Star Euro NCAP rating;

- Toyota's ETCS-i is at the forefront of active safety systems;

- Toyota promises advanced safety technology;

- Toyota customers have long counted on the brand for the best in performance, quality and durability;

- To build safe cars, Toyota promises that it gathers information and analyzes why accidents occur and what causes injuries, and that "Toyota analyzes data from real accidents that take place all over the world," which it uses to develop new safety technologies, testing them on actual vehicles before offering them to the public in Toyota's product line-up.  Toyota claims that this "is a perpetual cycle through which Toyota seeks to enhance safety technologies and reduce accidents continuously"; and

- When it comes to the well-being of Toyota drivers and their passengers, Toyota has raised the standard.

315.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by

- 124 -

Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

316.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

317.   Defendants fraudulently concealed material information from their customers and from NHTSA regarding the nature and extent of the defects in their vehicles.  Therefore, any limitations imposed by the Defendants as to scope of its obligations under the warranties to repair and adjust defective parts, and/or any disclaimers in the written warranties contained in the owners manual or other warranty booklets prepared by the Defendants that purport to preclude the recovery by the Consumer or Commercial Plaintiffs and the Nationwide Commercial Plaintiff Class of incidental or consequential damages, are unconscionable, both substantively and procedurally, and are unenforceable as a matter of law.

318.   Any such limitations or exclusions have been imposed unilaterally by Defendants in adhesion, "take it or leave it" contracts with no ability by the Nationwide Consumer and Commercial Plaintiff Classes to negotiate the substance or coverage of the warranties, and Plaintiffs do not have any meaningful choices of reasonably available alternative sources of supply of suitable vehicles free of the above unconscionable conditions.

- 125 -

010172-25  386580 v1

319.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and Plaintiff Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

320.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

321.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiff Classes were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable pursuant to CAL. CIVIL CODE § 1760.5 and/or § 1668.

322.   Additionally, the enforcement under these circumstances of any limitations whatsoever on the recovery of incidental and/or consequential damages is unenforceable because any such limitations work to reallocate the risks between the parties in an unconscionable and objectively unreasonable manner, and result in overly harsh or one-sided results, which shock the conscience.

323.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to

- 126 -

Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Consumer Plaintiffs' and the Nationwide Commercial Plaintiff Class's remedies would be insufficient to make Consumer Plaintiffs and the Nationwide Commercial Plaintiff Class whole.

324.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Classes assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Classes of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE §§ 2711 and 2608.

325.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

326.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Classes have been damaged in an amount to be determined at trial.

### COUNT V

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (CAL. COM. CODE § 2314)

327.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

- 127 -

328. This Count is asserted by the Nationwide Consumer and Commercial Classes.

329. Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

330. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to CAL. COM. CODE § 2314.

331. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

332. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

333. Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members. Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not

- 128 -

1   intended to be the ultimate consumers of the Defective Vehicles and have no rights

2   under the warranty agreements provided with the Defective Vehicles; the warranty

3   agreements were designed for and intended to benefit the ultimate consumers only.

4   Finally, privity is also not required because Plaintiffs' and Class members' Toyotas

5
6   are dangerous instrumentalities due to the aforementioned defects and

7   nonconformities.

8       334.   As a direct and proximate result of Toyota's breach of the warranties of

9   merchantability, Plaintiffs and the Class have been damaged in an amount to be

10  proven at trial.

11
12                              **COUNT VI**

13                      **REVOCATION OF ACCEPTANCE**
                        **(CAL. COM. CODE § 2608)**

14
15      335.   Each of the preceding paragraphs is incorporated by reference as though

16  fully set forth herein.

17      336.   The Nationwide Consumer and Commercial Plaintiffs assert this claim

18  for revocation of acceptance of their vehicles.  Plaintiffs Dale Baldisseri, Robert

19  Navarro and Class members Kathleen Atwater, Joel and Lucy Barker, John Geddis,

20  Susan Gonzalez, Matthew Heidenreich, John and Mary Laidlaw, Carl Nyquist,

21
22  Peggie Perkin, Frank Visconi, and Carole Young demanded revocation and the

23  demands were refused.

24      337.   Plaintiffs and the Classes had no knowledge of such defects and

25  nonconformities, were unaware of these defects, and reasonably could not have

26  discovered them when they purchased or leased their automobiles from Toyota.  On

27

28
                              - 129 -

010172-25  386580 v1

the other hand, Toyota was aware of the defects and nonconformities at the time of
sale and thereafter.

338.   Acceptance was reasonably induced by the difficulty of discovery of the
defects and nonconformities before acceptance.

339.   There has been no change in the condition of Plaintiffs' vehicles not
caused by the defects and nonconformities.

340.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept
return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies
paid.

341.   Plaintiffs and the Classes would suffer economic hardship if they
returned their vehicles but did not receive the return of all payments made by them.
Because Toyota is refusing to acknowledge any revocation of acceptance and return
immediately any payments made, Plaintiffs and the Classes have not re-accepted
their Defective Vehicles by retaining them.

342.   These defects and nonconformities substantially impaired the value of
the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two
basic sources.  First, the Defective Vehicles fail in their essential purpose because
they present an unreasonably high risk of sudden unintended acceleration (a risk
acknowledged by Toyota's recall), rendering them unsafe in a very material way.
Second, the repair and adjust warranty has failed of its essential purpose because
Toyota cannot repair or adjust the Defective Vehicles.

343.   Plaintiffs and the Class provided notice of their intent to seek revocation
of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs
(and many Class members) have requested that Toyota accept return of their vehicles

- 130 -

and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

344.   Plaintiffs and the Classes would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Classes have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

345.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Classes assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Classes of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE § 2711.

346.   Consequently, Plaintiffs and Class members are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT VII

## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

347.    Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.  This Count is asserted by the Nationwide Consumer Plaintiffs and by Class members Carl Nyquist and Susan Gonzalez.

348.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2301 (d)-(a).

349.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

350.    Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

351.    The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

352.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

353.    Toyota's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

354.    Toyota breached these warranties as described in more detail above, but generally by not repairing or adjusting the Defective Vehicles' materials and workmanship defects; providing Defective Vehicles not in merchantable condition and which present an unreasonable risk of sudden unintended acceleration and not fit

- 132 -

for the ordinary purpose for which vehicles are used; providing Vehicles that were not fully operational, safe, or reliable; and not curing defects and nonconformities once they were identified.

355.   Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

356.   Class members Susan Gonzalez and Carl Nyquist participated in Toyota's informal dispute resolution mechanism to completion and fully satisfied any obligations under 15 U.S.C. § 2310(a)(3), and also provided Toyota an opportunity to cure, even though no such opportunity is required in these circumstances.

357.   Plaintiffs have engaged in each of Toyota's three steps to customer satisfaction without their concerns being resolved.  Plaintiffs Joseph Hauter, Robert Navarro, Elizabeth Van Zyl and Class members Kathleen Atwater, Joel and Lucy Barker, Susan Chambers, John Geddis, Matthew Heidenreich, Thomas and Connie Kamphaus, John and Mary Laidlaw, Carl Nyquist, Peggie Perkin, Mary Ann Tucker,

Frank Visconi, Susan Gonzalez, and Carole Young have contacted their dealerships to discuss their situation with the dealership customer relations manager, without adequate resolution.  Plaintiffs Dale Baldisseri, Robert Navarro, Sandra Reech, Elizabeth Van Zyl and Class members Kathleen Atwater, Susan Chambers, Susan Gonzalez, Carl Nyquist, Peggie Perkin, Thomas and Catherine Roe, and Mary Ann Tucker have called Toyota's Customer Experience Center for assistance in working with the dealership to find a satisfactory solution, without adequate resolution.  And Class members Susan Gonzalez and Carl Nyquist have submitted claims for free, nonbinding arbitration before the National Center for Dispute Resolution, without adequate resolution.

358.   Even if this were not the case, requiring an informal dispute settlement procedure, or affording Toyota a reasonable opportunity to cure its breach of written warranties, would be unnecessary and futile.  At the time of sale or lease of each Defective Vehicle, Toyota knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

359.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return

- 134 -

immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

360.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

361.    Plaintiffs seek to revoke their acceptance of the Defective Vehicles, or, in the alternative, seek all damages, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT VIII

## BREACH OF CONTRACT/COMMON LAW WARRANTY

362.    The Nationwide Consumer Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

363.    To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under California's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

364.    Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

365.    As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to

- 135 -

1   be proven at trial, which shall include, but is not limited to, all compensatory

2   damages, incidental and consequential damages, and other damages allowed by law.

3   ### COUNT IX

4   ### FRAUD BY CONCEALMENT
5   ### (BASED ON CALIFORNIA LAW)

6       366.   Each of the preceding paragraphs is incorporated by reference as though

7   fully set forth herein.

8       367.   This Count is asserted by the Nationwide Consumer Class and

9

10  Commercial Class.

11      368.   As set forth above, Defendants concealed and/or suppressed material

12  facts concerning the safety of their vehicles.  Starting in 2002, for example,

13  Defendants had advance notice of a defect involving sudden unintended acceleration

14  in its ETCS-i equipped vehicles, yet they hid this defect from regulators and the

15  marketplace.  Additionally, in response to various NHTSA investigations,

16  Defendants failed to disclose all or even a substantial fraction of their records of

17  customer reports of unintended acceleration events and excluded certain relevant

18  categories of incidents.  Further, Defendants failed to disclose their findings that

19

20  reports of unintended acceleration in Toyotas with electronic throttle controls were

21  400% higher than in Toyotas with mechanical throttle controls, which is a

22  statistically significant increase in the number of unintended acceleration complaints.

23  In issuing various recalls from 2002-2009, Defendants failed to disclose that the real

24  reason for the recall was a defect in the vehicles, whether or not the root cause of

25  such defect was known to Defendants.  Also, Defendants failed to disclose that in

26  April 2003, a 2004 Sienna experienced an unintended acceleration event during

27

28

- 136 -

testing, which was apparently caused by a trim panel on the center console interfering with the accelerator pedal.  Defendants also failed to disclose other incidents where the floor mats and sticky pedals were a cause of unintended acceleration.  In September 2009, when Toyota finally recalled certain vehicles, it failed to disclose that there were causes of unintended acceleration events other than floor mats.  Until January 2010, Defendants failed to disclose the issues of the sticking accelerator pedal defect about which it has been aware since at least July 6, 2006, and had confirmed no later than June 2009.  Defendants failed to issue any safety advisories to United States consumers regarding the sticky pedal until January 21, 2010, when it issued the sticky pedal recall.  Defendants also failed to disclose mechanical failures of the accelerator pedal.  These facts and other facts as set forth above were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

369.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

370.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts

- 137 -

010172-25  386580 v1

were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

371.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

372.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

373.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

374.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to affirm the sale, these damages, pursuant to CAL. CIV. CODE § 3343, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs

and the Class are entitled to restitution and consequential damages pursuant to CAL. CIV. CODE § 1692.

375.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT X

### UNJUST ENRICHMENT
### (BASED UPON CALIFORNIA LAW)

376.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

377.   This Count is asserted by the Nationwide Consumer and Commercial Classes for restitution under California law based on Defendants' unjust enrichment.

378.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

379.   Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

380.   Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

010172-25  386580 v1

**PRAYER FOR RELIEF**

(a)     Injunctive relief, restitution, statutory, and punitive damages under the CLRA;

(b)     Restitution and/or restitution disgorgement as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3342;

(c)     Injunctive relief, restitution and appropriate relief under CAL. BUS. & PROF. CODE § 17500;

(d)     For appropriate damages for breach of express and implied warranties;

(e)     For revocation of acceptance;

(f)     For damages under the Magnuson-Moss Warranty Act;

(g)     Punitive damages;

(h)     Attorneys' fees; and

(i)     An injunction ordering Toyota to implement an effective fail-safe mechanism on all vehicles with ETCS.

DATED:  August 2, 2010.

HAGENS BERMAN SOBOL SHAPIRO LLP


By:_____ s/ Steve W. Berman_____
        Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
Email:  steve@hbsslaw.com

- 140 -

010172-25  386580 v1

1

2

By:        s/ Marc M. Seltzer
                Marc M. Seltzer (State Bar No. 054534)
SUSMAN GODFREY LLP

3

1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029

4

Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

5

Email:  mseltzer@susmangodfrey.com

6

*Plaintiffs Co-Lead Counsel for Economic Loss*

7

*Cases (Consumer)*

8

9

By:        s/ Frank M. Pitre
                Frank M. Pitre (Cal. SBN 100077)

10

COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200

11

Burlingame, CA  94010
Telephone:  (650) 697-6000

12

Facsimile:  (650) 697-0577
Email:  fpitre@cpmlegal.com

13

14

*Co-Lead Plaintiffs' Counsel for Economic Loss*
*Cases (Non-Consumer)*

15

16

By:        s/ Richard J. Arsenault
                Richard J. Arsenault

17

Neblett, Beard & Arsenault

18

Post Office Box 1190
Alexandria, LA  71309-1190

19

Telephone:  (800) 256-1050
Facsimile:  (318) 561-2592

20

Email:  rarsenault@nbalawfirm.com

21

22

By:        s/ Benjamin L. Bailey
                Benjamin L. Bailey

23

Bailey & Glasser LLP
209 Capitol Street

24

Charleston, WV  25301

25

Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110

26

Email:  bbailey@baileyglasser.com

27

28

- 141 -

1

By:_____s/ Stanley M. Chesley_____

2
     Stanley M. Chesley
Waite Schneider Bayless & Chesley

3
1 West 4th Street
1513 4th & Vine Tower

4
Cincinnati, OH  45202
Telephone:  (513) 621-0267

5
Facsimile:  (513) 621-0262
Email:  stanchesley@wsbclaw.com

6

7

By:_____s/ Jayne Conroy_____

8
     Jayne Conroy
Hanly Conroy Bierstein Sheridan

9
     Fisher & Hayes LLP
112 Madison Avenue 7th Floor

10
New York, NY  10016
Telephone:  (212) 784-6400

11
Facsimile:  (212) 213-5949
Email:  jconroy@hanlyconroy.com

12

13

14

By:_____s/ Michael L. Kelly_____
     Michael L. Kelly

15
Kirtland & Packard LLP
2361 Rosecrans Avenue 4th Floor

16
El Segundo, CA  90245
Telephone:  (310) 536-1000

17
Facsimile:  (310) 536-1001
Email:  mlk@kirtlandpackard.com

18

19

20

By:_____s/ Jerome L. Ringler_____
     Jerome L. Ringler

21
Ringler Kearney Alvarez
633 W Fifth Street 28th Fl

22
Los Angeles, CA  90071
Telephone:  (213) 473-1900

23
Facsimile:  (213) 473-1919
Email:  jringler@rkallp.com

24

25
*Plaintiffs Lead Counsel Committee for Economic Loss Cases*

26

27

28

010172-25  386580 v1

# DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED:  August 2, 2010.

HAGENS BERMAN SOBOL SHAPIRO LLP


By:_____ s/ Steve W. Berman_____
    Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile: (206) 623-0594
Email:  steve@hbsslaw.com

By:_____ s/ Marc M. Seltzer_____
    Marc M. Seltzer (State Bar No. 054534)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
Email:  mseltzer@susmangodfrey.com

*Plaintiffs Co-Lead Counsel for Economic Loss Cases (Consumer)*


By:_____ s/ Frank M. Pitre_____
    Frank M. Pitre (Cal. SBN 100077)
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  fpitre@cpmlegal.com

*Co-Lead Plaintiffs' Counsel for Economic Loss Cases (Non-Consumer)*

- 143 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

By:      s/ Richard J. Arsenault
              Richard J. Arsenault
Neblett, Beard & Arsenault
Post Office Box 1190
Alexandria, LA  71309-1190
Telephone:  (800) 256-1050
Facsimile:  (318) 561-2592
Email:  rarsenault@nbalawfirm.com


By:      s/ Benjamin L. Bailey
              Benjamin L. Bailey
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV  25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
Email:  bbailey@baileyglasser.com


By:      s/ Stanley M. Chesley
              Stanley M. Chesley
Waite Schneider Bayless & Chesley
1 West 4th Street
1513 4th & Vine Tower
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  stanchesley@wsbclaw.com


By:      s/ Jayne Conroy
              Jayne Conroy
Hanly Conroy Bierstein Sheridan
      Fisher & Hayes LLP
112 Madison Avenue 7th Floor
New York, NY  10016
Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
Email:  jconroy@hanlyconroy.com

- 144 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:_____ s/ Michael L. Kelly_____
        Michael L. Kelly
Kirtland & Packard LLP
2361 Rosecrans Avenue 4th Floor
El Segundo, CA  90245
Telephone:  (310) 536-1000
Facsimile:  (310) 536-1001
Email:  mlk@kirtlandpackard.com


By:_____ s/ Jerome L. Ringler_____
        Jerome L. Ringler
Ringler Kearney Alvarez
633 W Fifth Street 28th Fl
Los Angeles, CA  90071
Telephone:  (213) 473-1900
Facsimile:  (213) 473-1919
Email:  jringler@rkallp.com

*Plaintiffs Lead Counsel Committee for Economic Loss Cases*

010172-25 386580 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on August 2, 2010.

/s/ Steve W. Berman
Steve W. Berman

010172-25 386580 v1