1   WILLIAM A. COHAN
    WILLIAM A. COHAN, P.C.
2   California Bar No. 141804
    Colorado Bar No. 7426
3   P.O. Box 3448
    Rancho Santa Fe, CA 92067
4   (858) 832-1632; 832-1845 (FAX)
    E-mail: bill@williamacohan.com
5
    Attorney for Plaintiffs
6   Melanie Berlieb, Elvira Gesell,
    and the Putative Class of
7   German Plaintiffs

8

9                  UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
10                     SOUTHERN DIVISION

11  MELANIE BERLIEB and ELVIRA          )    Case No. 8:10ML02151JVS(FMOx)
    GESELL, individually and on behalf  )
12  of all others similarly situated in )
    Germany,                            )    .
13                                      )    **(P R O P O S E D)**
                  Plaintiffs,           )
14                                      )    **RICO CASE STATEMENT**
          v.                            )
15                                      )
    TOYOTA MOTOR CORPORATION,           )
16  a Japanese corporation; TOYOTA      )
    MOTOR NORTH AMERICA, INC., a        )
17  California corporation; TOYOTA MOTOR )
    ENGINEERING & MANUFACTURING         )
18  NORTH AMERICA, INC., a Kentucky     )
    corporation; TOYOTA MOTOR SALES     )
19  U.S.A., INC., a California corporation; )
    TOYOTA MOTOR CREDIT                 )
20  CORPORATION, a California corporation; )
    TOYOTA DEUTSCHLAND GmbH, a          )
21  German limited liability company;   )
    CTS CORPORATION, an Indiana         )
22  corporation; and JOHN DOE           )
    DEFENDANTS 1 through 50 inclusive,  )
23                                      )
                  Defendants.           )
24  _____  )

25

26        Plaintiffs MELANIE BERLIEB and ELVIRA GESELL, individually and on behalf of all

27  _____

28  **(PROPOSED) RICO CASE STATEMENT**                              **1**

others similarly situated (hereinafter "Plaintiffs"), by and through their attorney, William A.

Cohan, of the law firm William A. Cohan, P.C., respectfully submit their (PROPOSED) RICO

CASE STATEMENT, as follows:

**1.**     **RICO Provision.**  **State whether the alleged unlawful conduct is in violation of 18
U.S.C. §§1962(a), (b), (c) and/or (d).**

The unlawful conduct is in violation of all subsections (a), (b), (c) and (d) of 18 U.S.C.

§1962.

**2.**     **Defendants.**  **List each RICO defendant and state the alleged misconduct and basis
of liability of each defendant**.

Each RICO Defendant named is: (1) Toyota Motor Corporation, a Japanese corporation;

(2) Toyota Motor North America, Inc., a California corporation; (3) Toyota Motor Engineering &

Manufacturing North America, Inc., a Kentucky corporation; (4) Toyota Motor Sales U.S.A.,

Inc., a California Corporation; (5) Toyota Motor Credit Corporation, a California corporation; (6)

Toyota Deutschland GmbH, a German limited liability Company; (7) CTS Corporation, an

Indiana corporation; and (8) JOHN DOES 1 through 50 inclusive.

Toyota Motor Corporation ("TMC"), it's co-defendants, subsidiaries, and affiliates,

including Toyota Deutschland GmbH (Toyota's German sales limited liability company),

through their respective officers and spokespersons conducted certain aspects of Toyota's

worldwide marketing, advertising and promotion activities by means of intentionally and/or

recklessly false statements and omissions of material facts to sell and lease certain Toyota

vehicles which defendants knew to be unreasonably dangerous and defective through domestic

and foreign mail and wire carriers.

In the late 1990's Toyota manufactured, distributed, leased and sold vehicles with an

electronic throttle control system (hereinafter "ETCS").  In 2002, Toyota began using a "drive-

by-wire" system.  The drive-by-wire system uses sensors, microprocessors and electric motors

rather than a mechanical link such as a steel cable to connect the accelerator pedal to the throttle

**(PROPOSED) RICO CASE STATEMENT**                                                              **2**

plate in the engine.  The acceleration pedal has no direct connection to the engine through a cable or mechanical link.  Instead, the connection between the pedal and the engine is made by electrical signals traveling through wires.

After the "innovation" eliminating physical linkage between accelerator and throttle, an extraordinarily high number of Toyota consumers worldwide began complaining of sudden unintended acceleration problems (hereinafter "SUA").  SUA occurs when the throttle, not necessarily the accelerator, becomes stuck in the wide-open position contrary to the driver's intention.  The vehicle will continue to accelerate despite attempts by the driver to employ the brakes.  Toyota's computerized engine control system, unlike other manufacturers', lacks an appropriate fail-safe mechanism that can quickly extinguish unintended acceleration.  As designed, SUA in Toyota vehicles can overpower the vehicles' brakes, leading to an out-of-control vehicle which has resulted in extensive property damage, serious bodily injury and death.  Toyota has been aware of complaints concerning SUA occurring in certain Toyota  models since at least 2004.

Since at least 2004, to increase sales and profits and to deceive owners and potential consumers worldwide as to the true inherent hazardous nature of certain Toyota products, Defendants' officers and spokespersons have issued press releases to domestic and international wire carriers (*e.g., Associated Press, Detroit Free Press, New York Times, Los Angeles Times, International Herald Tribune)* which were disseminated throughout the World (a) falsely denying that: (1) there were no throttle or electronic control system malfunctions; (2) SUA could occur in any of Toyota's products, and (3) their ETC systems could contribute to an SUA event; and (b) further, falsely claiming that such incidents complained of were: (1) "media driven" and/or  the result of, *inter alia*: (2) driver error, (3) aftermarket floor mats (i.e. "pedal entrapment"); and/or (4) sticky gas pedals.    With respect to the alleged gas pedals Toyota officials falsely claimed that this was a drivability issue and not a safety issue.

**(PROPOSED) RICO CASE STATEMENT**                                    **3**

As of this date, Toyota continues by false and misleading public statements to deny worldwide that SUA is likely the result of problems with the electronics in Toyota vehicles.

**A.    FALSE AND MISLEADING PRESS RELEASES CONCERNING SAFETY OF TOYOTA VEHICLES INVOLVING SUA COMPLAINTS, DENYING ANY DEFECTS WITH ETC SYSTEMS, AND BLAMING FAULTY FLOOR MATS, DRIVER ERROR, STICKY PEDALS, AND CLAIMING NHTSA INVESTIGATIONS SUPPORTED TOYOTA'S CLAIMS:**

Defendants' false and fraudulent public statements which were and were intended to be disseminated globally constituting acts of wire and mail fraud include, but are not limited to, statements on the following dates as explained in detail below: (1) April 7, 2008; (2) June 10, 2008; (3) April 23, 2009; (4) September 14, 2009; (5) September 29, 2009; (6) November 2, 2009; (7) November 29, 2009; (8) December 9, 2009; (9) November 23, 2009; (10) December 25, 2009; (11) January 21, 2010; and (12) January 27, 2010.

**B.    FALSE AND MISLEADING RECALLS:**

Toyota has issued recalls from 2005 to February, 2010, though the mails to purchasers and lessees of certain Toyota vehicles residing in the United States and around the world, including, but not limited to Germany, England, Ireland, Mexico and Turkey for alleged: (1) floor mats; and (2) "accelerator pedal" problems.

In or about December, 2008, Toyota began an investigation of SUA occurring in Toyota's vehicles in Europe.  Toyota allegedly found that "condensation from heaters" caused increased friction in the accelerator pedal, making it stick.  In mid-August 2009, Toyota made a design change in its European cars that lengthened the arm of the friction lever and changed its materials in all vehicles being produced in Europe. On September 29, 2009, Toyota's European division issued technical information "identifying a production improvement and repair procedure to address complaints by customers in those countries of sticking accelerator pedals, sudden rpm increase and/or sudden vehicle acceleration."  Distributors throughout Europe and in Russia, Georgia, Kazakhstan, Turkey and Israel received the technical information.  A document turned over to the US government reveals that the SUA phenomenon experienced in the United States

**(PROPOSED) RICO CASE STATEMENT**                                                        **4**

was essentially the same as the SUA phenomenon experienced in Europe.

To date, Toyota has recalled approximately 8 million vehicles worldwide for the unintended acceleration problems, but Toyota insists none of the recalls involve Toyota's ETCS systems.  Instead, Toyota attributed the cause of the recalls to "accelerator pedal problems." Notwithstanding the variety of alleged "fixes" to accelerator pedals pursuant to these worldwide recalls, owners continue to experience sudden, uncontrolled acceleration, including Plaintiff Berlieb, who continues to experience sudden, unintended engine "revving" despite the "fix."

These recalls were intended to lull owners' and potential consumer concerns as to the safety of Toyota vehicles and to conceal an inherently dangerous design defect lurking in those vehicles, notwithstanding the "floor mat" and "accelerator pedal" "fixes."

On November 4, 2009, the NHTSA publicly reprimanded Toyota for making misleading statements in it's October 30, 2009,  notification letters to owners in the United States.

**3.**   **Other RICO Violators.**   **List all alleged RICO violators, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

**A.**   **Including, but not limited to, Toyota Officials' and Spokespersons' Statements via domestic and international wire communications:**

1.   **BILL KWONG, Toyota spokesman**, falsely told the press, *inter alia:*

April 7, 2008, that there was no issue with the Toyota Tacoma and, instead "a misapplication of the pedals by the driver;"

June 10, 2008, that complaints were "inspired by publicity" and "related to minor drivability issues and are not indicative of a safety-related defect;"

April 23, 2009, the acceleration problems in 2007 were the result of "faulty floor mats," "simple driver errors;" and "[drivers] are not stepping on the brake;"

2.   **ROBERT S. CARTER, Group Vice President and Toyota Division General Manager of Toyota USA,** held a conference call with the media, in which he falsely claimed:

November 2, 2009, there is absolutely no evidence to support any concerns with Toyota's

fuel delivery, braking or throttle systems, and unequivocally agreed that "the locus is just the floor mat, floor mat design, and nothing beyond that;"

3.     B**OB DALY, Toyota Motor Sales ("TMS") senior vice president** told the press:

November 2, 2009, certain Toyota vehicles had been repeatedly and thoroughly investigated by NHTSA without any finding of defect other than the risk from an unsecured or incompatible driver's floor mat;

4.     **IRVING A. MILLER, Group Vice President of Environmental and Public Affairs of TMS-USA,** falsely told the press:

November 25, 2009, "we can come up with no indication whatsoever that there is a throttle or electronic control system malfunction;"

November 29, 2009, "We have come to the conclusion this is pedal misapplication or pedal entrapment" and "we continue to find no reason to believe that there is a problem with the electronic control systems;"

December 9, 2009, in a letter to the press Mr. Miller emphatically denied that there was any problem with the electronic throttle control system.

5.     **JOHN HANSON, Toyota's U.S. safety spokesperson** falsely told the press in connection with the January, 2010, recall:

January 25, 2010, "The quickness that this all came together is one reason why I don't have numbers of complaints, and why we don't have a fix."

6.     **AKIO TOYODA, Toyota Motor Corporation President** – without acknowledging any problem with any Toyota vehicle, told the international press:

October 2, 2009, "Toyota was cooperating with the NHTSA," and "NHTSA investigators determined that a rubber all-weather floor mat could have snared or covered the accelerator pedal" in a crash in San Diego, California, which resulted in fatalities.

7.     **BRIAN LYONS, a Toyota spokesman**, stated with regard to instances of SUA

**(PROPOSED) RICO CASE STATEMENT**                                      **6**

when floor mats are not present:

January 21, 2010, "these situations are rare and can occur when accelerator pedal mechanisms become worn," "the problem usually develops gradually, the pedal may become harder to press and may become slower to return when released."

**B.  Current Toyota Officials/Former U.S. National Highway Transportation and Safety Administration Officials exerting influence to derail government investigations:**

Christopher Tinto, vice president of regulatory affairs in Toyota's Washington, D.C. office and Christopher Santucci, member of Toyota's regulatory affairs in Toyota's Washington, D.C. office.

From 2003 to 2009, the NHTSA opened eight investigations of SUA involving various Toyota vehicles.  Of those, three resulted in floor mat recalls and five were closed.  According to court records and other public documents, Tinto and Santucci worked with NHTSA on Toyota's responses to consumer complaints.  The first involved SUA events with 2002 and 2003 Toyota Camrys and Solaras, and a lawsuit filed on behalf of a woman who was killed in a 2008 accident. The lawsuit blamed a defect in the electronic throttle control system for the fatal accident. Santucci testified in a deposition that Toyota and NHTSA discussed limiting an investigation of SUA to incidents lasting less than a second.

Twenty days after starting its probe and discussions with Tinto, NHTSA decided not to investigate "longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect."  The decision was made to limit the cases to eliminate instances in which a driver *may have* used the wrong pedal.

The second NHTSA investigation in 2005 was prompted by a consumer complaint of two instances of sudden acceleration in a 2002 Camry, one of which involved a crash.  The vehicle owner who filed the petition cited eight complaints from other drivers about similar episodes with other Toyota vehicles.  Toyota publicly admitted that dealer representatives had investigated 59 of 100 vehicles whose owners complained.

**(PROPOSED) RICO CASE STATEMENT**                                                    **7**

In November, 2005, Tinto wrote to the NHTSA that no evidence of a system or component failure was found and that the vehicles were operating as designed.  Based on Tinto's representations and statements, the NHTSA ended that probe in January, 2006, citing lack of evidence of a problem and the agency's need to allocate "limited resources" to other investigations.

The third case, which arose from a consumer complaint made in August, 2006, again involved the Camry, model years 2002 to 2006.  The Camry owner's complaint blamed the throttle actuator or controller.  Tinto wrote to the agency that Toyota had not found a defect with the throttle actuator but, instead, found evidence that returned actuators had corroded due to water intrusion.  According to Tinto, intrusion was usually caused by drivers going through a flooded road or similar circumstances.  Although NHTSA itself noted 3,546 cases where Toyota had replaced throttle actuators under warranty terms, the NHTSA decided not to pursue the probe, saying it was "not warranted."

The final investigation in 2008, involved 2006-2007 Toyota Tacoma pickup trucks.  The consumer who made the initial complaint reported two incidents of unintended acceleration in his 2006 Tacoma and pointed to 32 similar complaints in the NHTSA database.  Tinto acknowledged in a memo that Toyota had received similar complaints involving more than 400 Tacomas, model years 2004 to 2009; of those reports, 49 involved crashes.   Tinto wrote a letter to the NHTSA stating that he felt the complaints didn't warrant an NHTSA investigation and that he believed that media attention played a major role in the filing of these complaints.  The NHTSA closed that investigation in August, 2008, saying it was unable to find any underlying cause for the issue.

**C.**     **Other efforts to conceal from consumers and the public that design defects in Toyota's electronic systems may be causing SUA:**

Based on the following report made by the *Associated Press* in an article published in *The San Diego Union-Tribune,* on July 11, 2010, Plaintiffs believe that Toyota continues its ongoing

worldwide efforts to conceal from government investigators, consumers and the public at large that Toyota's electronic accelerator systems are defective. The article, entitled "A 'startling discovery' leads to fallout for school," states:

CARBONDALE, Ill – It's the kind of publicity any university might dream about: **An instructor uncovers a possible flaw that's causing some of the world's most popular cars to accelerate suddenly. His ground breaking work attracts interest from Congress and reporters worldwide.**

But as Southern Illinois University's David Gilbert sought to show that electronics might be to blame for the problem in Toyotas, the world's largest automaker tried to cast doubt on his findings. One Toyota employee even questioned whether he should be employed by the school, which has long been a recipient of company donations.

Electronic messages obtained by The Associated Press show the automaker grew increasingly frustrated with Gilbert's work and made its displeasure clear to his bosses at the 20,000-student school. "It did kind of catch us off-guard," university spokesman Rod Sievers said.

So did the fallout. Two Toyota employees quickly resigned from an advisory board of the school's auto-technology program and the company withdrew offers to fund two spring-break internships.

"**I didn't really set out to take on Toyota. I set out to tell the truth, and I felt very strongly about that,**" said Gilbert, **who was among the first to suggest that electronics, not sticky gas pedals or badly designed floor mats, caused the acceleration** that required the Japanese automaker to recall millions of vehicles.

Toyota insists its relationship with the school remains "strong," and company officials say they have no plans to stop contributing to SIU. They also say the two Toyota representatives who stepped down from the advisory board did so merely to avoid any appearance that the company was exerting influence over Gilbert's testimony.

Driven by his own curiosity, **Gilbert in January found he could manipulate the electronics in a Toyota Avalon to re-create the acceleration without triggering any trouble codes in the vehicle's computer. Such codes send the vehicle's computer into a fail-safe mode that allows the brake to override the gas.**

**Gilbert said he reported his "startling discovery" to Toyota, and the automaker "listened attentively."** But Gilbert said he never heard back from the company, which has steadfastly maintained the problems were mechanical, not electronic.

**A short time later, Mark Thompson – identifying himself as an SIU alumnus and, without elaboration, a Toyota Motor Sales employee – voiced in an e-mail to the university's then-chancellor, Sam Goldman, his "great concern and disappointment" about Gilbert. Thompson said he was "deeply disturbed" by what he called Gilbert's false accusations about the automaker.**

Thompson reminded Goldman that he and Toyota regularly contributed to the university

**(PROPOSED) RICO CASE STATEMENT**                                                9

– including a $100,000 check to the auto-tech program in late 2008 – and "due to the outstanding reputation your automotive technology program has, we donate much more than money," including cars. [Emphasis added].

**4.    Victims.   List the alleged victims and state how each victim was allegedly injured**.

The victims are German residents Melanie Berlieb, Elvira Gesell and the members of the potential Class who own or lease Toyota vehicles.  On September 18, 2009, Plaintiff Melanie Berlieb purchased a 2010 model year Auris as a new vehicle from Autohaus Herpich GmbH, an independent new car dealership located in Erbach, Germany.  On March 27, 2008, Plaintiff Elvira Gesell purchased a 2008 model year Yaris as a new vehicle from Autohaus NIX GmbH, an authorized Toyota dealership located in Offenbach, Germany.   On January 29, 2010, Toyota recalled 215,796 vehicles in Germany and German owners of affected cars were contacted personally and requested to bring their cars to a dealership for the accelerator pedals to be inspected and modified.  Plaintiff Melanie Berlieb's Auris and Plaintiff Elvira Gessell's Yaris were among those included in the recall.

Plaintiffs did not learn of their vehicles' unique propensity for sudden unexpected and unintended acceleration or that Toyota failed to provide adequate fail-safe systems until after their purchases.  Given: (1) the serious safety concerns, (2) Toyota's public denials of any design defects, (3) worldwide publicity concerning crashes resulting in fatalities in which floor mats could not have been the cause, and (4) Toyota's advices to consumers who suspect that they have the accelerator problem to stop using the car and drive it to the nearest safe location to have the engine shut off and a Toyota dealer contacted for assistance,  Plaintiffs reasonably and understandably are reluctant to operate their vehicles.

Plaintiffs have and others who have purchased a Recalled Toyota vehicle have suffered injury in fact and have suffered an economic loss by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the products purchased, (3) purchasing a product that poses a

**(PROPOSED) RICO CASE STATEMENT**                                                10

danger to the health and safety of not only the purchaser, but also to other occupants, motorists and pedestrians, and (4) incurring increased costs to repair the products purchased.

**5.**   **Pattern of Racketeering Activity.  Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering shall include the following information:**

　　**a.**   **List the alleged predicate acts and the specific statutes which were allegedly violated**;

The predicate acts are mail fraud (18 U.S.C. §1341), wire fraud (18 U.S.C. §1343), laundering of monetary instruments which involve the proceeds of specified unlawful activity (18 U.S.C. §1956) and transportation or transfers in interstate or foreign commerce of money of the value of $5,000 or more, knowing the same to have been taken by fraud (18 U.S.C. §2314)

　　**b.**   **Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

Given the widely published facts that Toyota is the largest automaker in the word and in 2008, surpassed General Motors for the top spot amongst automakers, selling 8.97 million automobiles world wide, on information and belief, Plaintiffs believe and hereby allege that Defendants and their worldwide subsidiaries and affiliates have engaged in millions of predicate acts, from at least 2005 and continuing to date, of: (1) mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, respectively, as described in response to items and numbers 2 and 3 herein above; (2) laundering monetary instruments which involve receipts from sales and leases of certain Toyota vehicles having inherently dangerous design defects, constituting proceeds derived from related acts of mail and wire fraud stated herein above in violation of 18 U.S.C. §1956; and (3) transportation or transfers in interstate or foreign commerce of money obtained from sales and leases of certain Toyota vehicles having inherently dangerous design defects of the value of $5,000 or more, knowing the same to have been taken by fraud in violation of 18 U.S.C. §2314.

     **c.**    **If the RICO claim is based on the predicate offenses of mail fraud, wire fraud or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ.P. 9(b). Identify the time, place and contents of the alleged failures to disclose and/or misrepresentations, the identity of persons to whom and by whom the alleged misrepresentations and/or failures to disclose were made.**

The dates, places and contents of the failures to disclose and/or misrepresentations, and identities of speakers making statements which were and were intended to be disseminated globally are set forth in detail in response to items number 2 and 3 herein above.

     **d.**    **State whether there has been a criminal conviction for violations of the predicate acts and if so, provide particulars;**

Your undersigned is unaware of any such criminal convictions.

     **e.**    **State whether civil litigation has resulted in a judgment with respect to the predicate acts and if so, provide particulars;**

Your undersigned is unaware of any such judgment.

     **f.**    **Describe how the predicate acts are both "related" and "continuous" within the meaning of *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239 [] (1989) and its progeny, including *Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1527 (9th Cir. 1995).**

The relationship between predicate acts enumerated herein above and continuity is shown by the ongoing campaigns to (1) sell and lease certain defective Toyota vehicles globally through continued false and misleading statements disseminated globally and (2) continue to transmit the proceeds of sales and leases of those certain Toyota vehicles in interstate and foreign commerce.

**6.**    **Enterprise. Describe in detail the alleged enterprise for each RICO claim and specify just what structure it had. A description of the enterprise shall include the following information:**

Since at least 2004, Toyota-Japan (Defendant TMC), its subsidiaries (co-defendants), worldwide affiliates, including Toyota Deutschland GmbH (Toyota's German sales company), and their spokespersons, have associated-in-fact to conduct certain aspects of Toyota's

---

**(PROPOSED) RICO CASE STATEMENT**                  **12**

"marketing, advertising, promotion and sales and leasing" activities (hereinafter Toyota's

"misleading marketing enterprise") by means of false statements and omissions of material facts

to sell and lease certain vehicles known to defendants to be unreasonably dangerous and

defective through a pattern of racketeering activity in violation of 18 U.S.C. §§1341 (mail fraud);

1343 (wire fraud); laundering and transmitting sales and lease proceeds by violating 1956

(laundering of monetary instruments) and 2314 (transferring in interstate or foreign commerce

sums of $5,000 or more with knowledge that said sums have been taken by fraud).

**a.      The names of the individuals, partnerships, corporations, associations or other legal entities that allegedly constitute the enterprise;**

See preceding Answer.

**b.      The purpose, function and course of conduct of the enterprise, and whether its usual and daily activities were part of or separate from the pattern of racketeering activity. See *Chang v. Chen*, 80 F.3d 1293, 1298 (9th Cir. 1996);**

*Chang v. Chen, supra*, has been overruled by *Odom v. Microsoft,* 486 F.3d 541 (9th Cir.

2007)(*en banc)*; *See also, Boyle v. United States,* ___ U.S. ___, 129 S.Ct. 2237 (2009).   The

purpose, function and course of conduct of Toyota's "misleading marketing enterprise,"

generally are distinguishable from the pattern of racketeering activity: normal truthful marketing,

advertising, promotion; sales, leases and transmissions of sales and lease proceeds of  Toyota

vehicles having no inherently dangerous design defects versus false and fraudulent marketing,

advertising and promotion in furtherance of sales and leases of certain Toyota vehicles having

inherently dangerous design defects which create sudden unintended acceleration ("SUA") and

lack fail-safe mechanisms to allow the driver to effectively stop or slow the car in event such

circumstances occur.

**c.      Whether any named defendants are or were employees, officers or directors of the alleged enterprise;**

Named defendants are all business entities, none are employees, officers or directors.

d.   **Whether you are alleging that the defendants are or were separate from the alleged enterprise, collectively constitute the enterprise itself, or are or were members of the enterprise; and**

Some defendants are separate from the marketing, advertising, promotion, sales and leasing activities and laundering and transmission of funds.

e.   **Whether (and if so how) the enterprise was affected by or benefitted from the pattern of racketeering activity.**

Defendants' sales and leases of certain dangerously defective Toyota vehicles have benefitted and continue to benefit from the fraudulent statements and omissions and laundering and transfer of sales and lease proceeds.

7.   **Interstate or Foreign Commerce.**   **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

Continuing sales and leases of certain dangerously defective Toyota vehicles, impeding repair and/or replacement of those and similarly defective vehicles, causing injuries to purchasers, lessees and third parties and continuing unjust enrichment of defendants.

8.   **Section 1962(a):   If the complaint alleges a violation of 18 U.S.C. §1962(a), provide the following information:**

a.   **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

All defendants have received and continue to receive proceeds from sales and leases of defective vehicles based in part on defendants' continuing false and misleading statements disseminated in interstate and foreign commerce around the globe.

b.   **Describe the use or investment of such income.**

On information and belief the income is used to continue all of Toyota's activities

**(PROPOSED) RICO CASE STATEMENT**                                                    **14**

worldwide, including its disinformation campaign concerning the safety issues described in detail herein above.

**9.     Section 1962(b).  If the complaint alleges a violation of 18 U.S.C. §1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

On information and belief income from sales and leases worldwide continues to fund all global activities of Toyota, including continued sales, leases and false and fraudulent statements to continue sales and leases of all Toyota vehicle models worldwide.

**10.    Section 1962(c):  If the complaint alleges a violation of 18 U.S.C. §1962(c), provide the following information:**

**a.     State who is employed by or associated with the enterprise; and**

Employees of the Toyota misleading marketing enterprise include, but are not limited to: (1) Bill Kwong, Toyota spokesman; (2) Robert S. Carter, Group Vice President and Toyota Division General Manager of Toyota USA; (3) Bob Daly, Toyota Motor Sales ("TMS") senior vice president; (4) Irving A. Miller, Group Vice President of Environmental and Public Affairs of TMS-USA; (5) John Hanson, Toyota's U.S. safety spokesperson; (6) Akio Toyoda, Toyota Motor Corporation President; (7) Brian Lyons, Toyota spokesman; (8) Christopher Tinto, Toyota Vice President of Regulatory Affairs, Toyota's Washington, D.C.; and (9) Christopher Santucci, employee in Toyota's Washington, D.C. regulatory affairs office.

Defendants CTS Corporation and Toyota Motor Engineering & Manufacturing North America, Inc., are associated with the enterprise.  Additionally, the website for Toyota Motor Europe NV/SA (TME), which oversees all of Toyota's European operations, states:

Toyota's operations in Europe are supported by a network of 31 National Marketing and Sales Companies across 56 countries.

Based on the foregoing, Plaintiffs contend that the "31 National Marketing and Sales Companies across 56 countries," are associated with Toyota's "misleading marketing enterprise."

---

**(PROPOSED) RICO CASE STATEMENT**                                                    **15**

**b.     State whether the same entity is both the liable "person" and the "enterprise" under §1962(c).**

All of the named defendants and JOHN DOE defendants are liable, e.g. Toyota Motor Engineering & Manufacturing North America, Inc. and CTS Corporation, neither of which is part of the enterprise, which includes the other defendants engaged in advertising, marketing, promotion, sales, leases and distributing proceeds to continue all Toyota operations both legal and illegal.

**11.     Section 1962(d).   If the complaint alleges a violation of 18 U.S.C. §1962(d), describe in detail the alleged conspiracy.**

At all relevant times, each defendant was and is the agent of each of the remaining Defendants, and Defendants associated in fact with each defendants' various officers, spokespersons, employees, subsidiaries and affiliates in doing the acts alleged herein, whose officers, spokespersons, employees, subsidiaries and affiliates were acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the other defendants, their officers spokespersons, employees, subsidiaries and affiliates.  There is a unity of interest and ownership between the Defendants listed above, such that the acts of the one are for the benefit and can be imputed as the acts of the other.  Defendants conspired with each other, subsidiaries, affiliates and spokespersons to violate 18 U.S.C. §§1962(a), (b) and (c).

**12.     Injury to Business or Property.**

**a.     Describe the alleged injury to business or property;**

Plaintiffs and the potential Class members have suffered injury in fact and have suffered an economic loss – i.e., injury to property – by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the Toyota vehicles purchased; (3) purchasing a Toyota vehicle that poses a danger to the health and safety of not only the Plaintiffs, who are amongst the

**(PROPOSED) RICO CASE STATEMENT                                          16**

purchasers of the 215,796 vehicles recalled by Toyota on January 29, 2010, but also their

passengers, other motorists and pedestrians; and (4) incurring increased costs to repair and/or get

out of the lease of the Toyota vehicle recalled on January 29, 2010.

> **b.     Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The violations of 18 U.S.C. §§1341 and 1343 are the false and fraudulent statements

denying that ETCS design flaws cause SUA injuries, facilitating sales and leases and impeding

repairs and/or replacements of parts and/or entire vehicles.  Violations of 18 U.S.C. §§1956 and

2314 transmit proceeds of sales and leases (tainted by violations of 18 U.S.C. §§1341 and 1343)

to all Toyota operations to enable the RICO violations to continue.

**13.     Damages.   List the damages sustained for which each defendant is allegedly liable.**

All defendants are liable for all damages as set forth in Response to Item #4 herein above.

**14.     State Claims.  List all supplemental state claims, if any.**

Second Claim: Unfair Competition Law: California Bus. & Prof Code §17200 et seq.;

Third Claim: False Advertising Act: California Bus. & Prof. Code §17500 et seq.;

Fourth Claim: Consumer Legal Remedy Act: California Civil Code §1750, et seq.;

Fifth Claim: Breach of Implied Warranty;

Sixth Claim: Breach of Express Warranty;

Seventh Claim: Unjust Enrichment;

Eighth Claim: Negligence

RESPECTFULLY SUBMITTED this 2nd day of August, 2010.

WILLIAM A. COHAN, P.C.

By: *s/ William A. Cohan*
    William A. Cohan, Esq.

Attorney for Plaintiffs
MELANIE BERLIER, ELVIRA GESELL and

---

**(PROPOSED) RICO CASE STATEMENT                               17**

The Putative Class