**Monica R. Kelly** (Illinois Bar ID 6225920)
monicakelly@ribbecklaw.com
manuelribbeck@ribbecklaw.com
fernandotorres@ribbecklaw.com
mervinmateo@ribbecklaw.com
**RIBBECK LAW CHARTERED**
505 N. Lake Shore Drive, Suite 102
Chicago, Illinois 60611
Telephone: 1 312 822 9999

Attorney for Foreign Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: TOYOTA CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | Case No. 8:10ML02151JVS(FMOx) <br><br> **MASTER CONSOLIDATED COMPLAINT ON BEHALF OF FOREIGN PLAINTIFFS** |
| **THIS DOCUMENT RELATES TO LAURA CENTENO JIMENEZ, ELIZA LOZANO ESQUIVEL, ALFREDO BARRANCO HERNANDEZ, ERNESTO DIAZ REYES, EMILIO QUINTANAR MOGOLLON, GONZALO VILLALOBOS OROS, XIAOBIN WANG, DAWEI LI, GUICAI LIU, ZHIJIE DENG, LIANFANG WANG, LIN ZHANG, YIQIN ZHANG, LIN YANG, CHENGLI ZHANG, WEI GUO, YILONG LIU, HU JIN, GABRIELLE ZIEME-DIEDRICH, HATICE HULYA YIGIT, PAUL BANTON, AUGUSTO PANEZ, CATHERINE DE BRUIN, MOSTAFA FAHMY, SISILIANA RIDWAN, SUNARTO NAZUA, NANI INDRIYASTUTI, MELATI INDRAYANI, JASNI, AND FRANCIS JOSEPH CORONEL** | **JUDGE JAMES V. SELNA** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

## I.  INTRODUCTION

Plaintiffs, **LAURA CENTENO JIMENEZ**, individually and on behalf of all other similarly situated persons or entities in Mexico, **ELIZA LOZANO ESQUIVEL, ALFREDO BARRANCO HERNANDEZ, ERNESTO DIAZ REYES, EMILIO QUINTANAR MOGOLLON,** and **GONZALO VILLALOBOS OROS**, citizens and residents of Mexico, **XIAOBIN WANG**, individually and on behalf of all other similarly situated persons or entities in China, **DAWEI LI, GUICAI LIU, ZHIJIE DENG, LIANFANG WANG, LIN ZHANG, YIQIN ZHANG, LIN YANG, CHENGLI ZHANG, WEI GUO, YILONG LIU,** and **HU JIN,** citizens and residents of China, **GABRIELLE ZIEME-DIEDRICH**,  individually and on behalf of all other similarly situated persons or entities in Germany, **HATICE HULYA YIGIT**, individually and on behalf of all other similarly situated persons or entities in Turkey, **PAUL BANTON**, individually and on behalf of all other similarly situated persons or entities in Jamaica, **AUGUSTO PANEZ**, individually and on behalf of all other similarly situated persons or entities in Peru, **CATHERINE DE BRUIN**, individually and on behalf of all other similarly situated persons or entities in South Africa, **MOSTAFA FAHMY**, individually and on behalf of all other similarly situated persons or entities in Egypt, **SISILIANA RIDWAN**, individually and on behalf of all other similarly situated persons or entities in Indonesia, **SUNARTO NAZUA, NANI INDRIYASTUTI, MELATI INDRAYANI,** and **JASNI,** citizens and residents of Indonesia, and **FRANCIS JOSEPH CORONEL**, individually and on behalf of all other similarly situated persons or entities in the Philippines (hereinafter "Plaintiffs"), by and through their attorney, **RIBBECK LAW CHARTERED**, for their Master Consolidated Complaint against the Defendants,  **Toyota Motor Corporation**, a Japanese corporation, **Toyota Motor North America, Inc.**, a California corporation, **Toyota Motor Engineering and Manufacturing North America, Inc.**, a Kentucky corporation, **Toyota Motor Sales, U.S.A, Inc.**, a California corporation, **Toyota Motor Credit Corporation**, a California corporation, **CTS Corporation**, an Indiana corporation,   and **John Doe Defendants 1-10** (hereinafter collectively "Toyota" or "Defendants"), allege, upon information and belief,  as follows:

1.      This Master Consolidated Complaint is filed pursuant to the Order of this court on behalf of all persons or entities in all foreign countries who suffered economic injuries, personal injuries, death and other compensatory injuries as the result of their purchase and/or lease of Toyota vehicles that share common design and engineering defects allowing the vehicles to experience sudden and unintentional acceleration without driver input and against the intentions of the driver.

2.      **Specifically, this action is brought on behalf of <u>all foreign Plaintiffs</u> and other persons or entities who purchased or leased a recalled Toyota vehicle to recoup, *inter alia*, the diminished resale value in the car caused by the recall, as well as other damages sustained as a result of Defendants' conduct.**

3.      These Toyota vehicles have demonstrated that they are unreasonably dangerous due to the sudden and unintentional acceleration, and have caused numerous injuries and fatalities.  The extent of these problems is still being discovered.

4.      For years, Toyota has suppressed the dangers of sudden unintended acceleration that have plagued their vehicles. Even more egregiously, Toyota suppressed the fact that this, problem was the result of a defect or design flaw in their vehicles. Rather than make an effort to repair these problems, Toyota made and continues making concerted efforts to conceal this information from consumers worldwide.

5.      These issues have been known to Toyota for years. On information and belief, Toyota has known since at least 2000 that there were serious problems with its newly implemented electronic throttle control system ("ETCS"). Toyota failed to include several failsafes in their vehicles, failsafes that may have prevented many of the sudden unintended acceleration problems encountered by Toyota owners. For the past decade, Toyota suppressed information, including test results, denied that there were any problems with their cars, failed to

provide notice to consumers, denied that any problem or defect existed and failed to provide a necessary and available design or components to enable drivers to bring their vehicles back under control in case a runaway event occurred, as other vehicle manufacturers have done.

6.      Despite knowledge of the common design and engineering defects which created such risks, Toyota continues to advertise and market its vehicles as safe and reliable.

7.      Over the last decade, Toyota grew into the largest automaker in the world. In 2008, Toyota surpassed General Motors for the top spot amongst automakers, selling 8.97 million automobiles in comparison to 8.35 million by General Motors. In advertisements and sales materials, Toyota proclaimed and continues to proclaim that it is a safe brand and that it makes high quality, reliable vehicles.

8.      In a rush to cut costs and increase profits, Toyota began to make more and more shortcuts. Quality fell and instead of making efforts to fix problems, Toyota simply used its financial clout to either suppress or hide faults and defects.

9.      Although Toyota was able to conceal most of its troubles for many years, the laws and design defects would not go away. For nearly a decade, Toyota executives made false misrepresentations of material facts and omitted material facts regarding the serious problems with their vehicles. Toyota claimed that improperly installed floor mats bought in the aftermarket or driver error explained all of the sudden unintended acceleration problems. As the complaints against Toyota began to pile up worldwide, it soon became apparent that Toyota's excuses could not explain away everything.

10.     Everything changed in August of 2009 when a horrible tragedy in San Diego that killed four people drew national and international attention to the problems of sudden unintended acceleration. As the probe grew, it became more and more apparent that Toyota vehicles had an extraordinarily high number of sudden acceleration problems, resulting from a combination of manufacturing defects, design flaws or failures to incorporate safety features that could have saved lives in the United States and around the globe.

11.     On September 29, 2009, Toyota announced its first recall, still claiming at that time that faulty aftermarket floor mats explained all of the sudden unintended acceleration problems. In its recall, Toyota included eight models from its Toyota and Lexus brands. Toyota spokespersons and executives stated definitively that there were "no defects" that could not be explained by the floor mats.

12.     According to documents obtained by the *Associated Press*, on September 29, 2009, Toyota's European division issued technical information identifying a production improvement and repair procedure to address complaints by customers in those countries of sticking accelerator pedals, sudden rpm increases and/or sudden vehicle accelerations. Toyota Distributors throughout Europe and in Russia, Georgia, Kazakhstan, Turkey and Israel received the technical information. According to an April 7, 2010, article in the StarTribune.com entitled, "Toyota Warned European Distributors About Pedal Problems Well Before Telling US Government," Toyota admitted in a document turned over to the US government that: "[Toyota's] engineers concluded that the phenomenon experienced in the United States was essentially the same as the phenomenon experienced in Europe."

13.     In early 2010, Toyota issued several recalls worldwide wherein Toyota admitted that in "rare circumstances," sticky gas pedals may also be a culprit for sudden unintended acceleration. Toyota advised consumers that if they experienced problems with the accelerator pad, "[t]he vehicle should be driven to the nearest safe location, the engine shut off and a Toyota dealer contacted for assistance." Although Toyota increased the size of its recall, covering a wider range of Toyota models than those included in the first recall, Toyota vociferously denied any problems existed with its electronic throttle control system, blaming all incidents of sudden unintended acceleration on faulty floor mats and sticky gas pedals.

14.     Despite acknowledging that the defect was serious enough that it was necessary to stop selling those vehicles, Toyota failed to prevent vehicles already sold or leased from being operated, and it did not offer to cancel leases and purchases and refund the monies paid by its customers.

15.     To date, more than eight million Toyota cars have been recalled worldwide due to the sudden and unintentional acceleration problem.

16.     Based on the unusually high number of acceleration problems with Toyota and the fact that those problems grew exponentially after Toyota introduced its ETCS systems, automotive experts believe that there may be serious defects relating to Toyota's ETCS that contribute to the problems with Toyota's vehicles.

17.     Nevertheless, Toyota continues to cover up the fact that drivers were experiencing sudden unintentional acceleration when their foot was on the brake and not touching the accelerator. Toyota conceals the fact that when Toyota replaced its mechanical throttle linkage in the late 1990's with a computer-controlled accelerator system, it could be adversely affected by "radio waves." Upon information and belief, unlike American automobile companies, Toyota failed to include sufficient back-up safety systems that would prevent SUA. Consequently, there is no adequate fail-safe mechanism to stop Toyota vehicles in the event the acceleration systems malfunction and engage in uncontrolled acceleration.

18.     In light of these serious safety concerns identified by Toyota, Plaintiffs reasonably and understandably no longer wish to operate their vehicles. Additionally, the fair market values of Plaintiffs' vehicles have been substantially and permanently diminished as a result of the defect. Moreover, requiring similarly situated consumers who lease these vehicles to continue to do so and/or to incur a fee to prematurely end the leases of the defective Toyota vehicles is unfair and unlawful under the circumstances.

## THE PARTIES

19.     **Plaintiffs, LAURA CENTENO JIMENEZ, ELIZA LOZANO ESQUIVEL, ALFREDO BARRANCO HERNANDEZ, ERNESTO DIAZ REYES, EMILIO QUINTANAR MOGOLLON, GONZALO VILLALOBOS OROS, are consumers who, at all times relevant to the Complaint, reside in Aguascalientes, Mexico, and are thus citizens and residents of the Republic of Mexico.** Plaintiff **LAURA CENTENO JIMENEZ** purchased

a 2007 Toyota Camry (VIN 4T1BE46K17U125520) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Plaintiff **ELIZA LOZANO ESQUIVEL** purchased a 2009 Toyota Corolla as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Plaintiff **ALFREDO BARRANCO HERNANDEZ** purchased a 2009 Toyota Corolla (VIN 9BRBA42E995029298) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Plaintiff **ERNESTO DIAZ REYES** purchased a 2009 Toyota Corolla (VIN 2T1BE40E79C001579) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Plaintiff **EMILIO QUINTANAR MOGOLLON** purchased a 2009 Toyota Corolla (VIN 2T1B042EX9C032437) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Plaintiff **GONZALO VILLALOBOS OROS** purchased a 2009 Toyota Camry (VIN 4T1BE46K79U403680) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. **Plaintiff, XIAOBIN WANG**, **DAWEI LI, GUICAI LIU, ZHIJIE DENG, LIANFANG WANG, LIN ZHANG, YIQIN ZHANG, LIN YANG, CHENGLI ZHANG, WEI GUO, YILONG LIU, and HU JIN are consumers who, at all times relevant to the Complaint, reside in China, and are thus citizens and residents of** <u>**China.**</u> Plaintiff **XIAOBIN WANG** purchased a 2007 Toyota Camry (VIN: LVGBE40K27G157112) as a new vehicle from an authorized Toyota dealership located in Shanghai, China. Plaintiff  **DAWEI LI** purchased a 2008 Toyota Camry (VIN: LVGBE40K08G283874) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **GUICAI LIU** purchased a 2010 Toyota RAV4 (VIN: LFMKV30F7A0026027) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **ZHIJIE DENG** purchased a 2010 Toyota RAV4 (VIN: LFMJW30F5A0061688) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **LIANFANG WANG** purchased a 2010 Toyota RAV4 (VIN: LFMKV30F190023166) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **LIN ZHANG** purchased a 2010 Toyota Camry (VIN: LVGBH40K0AG381199) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **YIQIN ZHANG** purchased a 2010 Toyota Corolla (VIN: LFMARE2C0A0251968) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **LIN YANG** purchased a 2008 Toyota Corolla (VIN: LFMAP22C280061197) as a new vehicle from an authorized Toyota

dealership located in China. Plaintiff **CHENGLI ZHANG** purchased a 2008 Toyota Camry (VIN: LVGBH40K38G072899) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **WEI GUO** purchased a 2010 Toyota Camry (VIN: LVGBH40K1AG387836) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **YILONG LIU** purchased a 2007 Toyota Camry (VIN: LVGBE40K47G146483) as a new vehicle from an authorized Toyota dealership located in China. Plaintiff **HU JIN** purchased a 2009 Toyota Camry (VIN: LVGBH40K29G323364) as a new vehicle from an authorized Toyota dealership located in China. **Plaintiff, GABRIELE ZIEME-DIEDRICH, is a consumer who, at all times relevant to the Complaint, resides in Nennhausen, Germany, and is thus a citizen and resident of** <u>**Germany**</u>**.** Plaintiff **GABRIELLE ZIEME-DIEDRICH** purchased a 2009 Toyota Auris (VIN: SB1KE56EX0E012559) as a new vehicle from an authorized Toyota dealership located in Nennhausen, Germany. **Plaintiff, HATICE HULYA YIGIT, is a consumer who, at all times relevant to the Complaint, resides in Istanbul, Turkey, and is thus a citizen and resident of the Republic of** <u>**Turkey**</u>**.** Plaintiff **HATICE HULYA YIGIT** purchased a 2008 Toyota Auris 1.6 MM (VIN NMTKV56EX0R020830) as a new vehicle from Toyota-Beykoz Otomotiv San ve Ticaret AS, an authorized Toyota dealership located in Istanbul, Turkey. **Plaintiff, PAUL BANTON, is a consumer who, at all times relevant to the Complaint, resides in Kingston, Jamaica, and is thus a citizen and resident of** <u>**Jamaica**</u>**.** Plaintiff **PAUL BANTON** purchased a 2007 Toyota Tacoma (VIN: 3TMJ462NO7MO444) as a new vehicle from an authorized Toyota dealership located in Riversdale, Georgia. **Plaintiff, AUGUSTO PANEZ, is a consumer who, at all times relevant to the Complaint, resides in Lima, Peru, and is thus a citizen and resident of** <u>**Peru**</u>**.** Plaintiff **AUGUSTO PANEZ** purchased a 2008 Toyota Corolla (VIN: 9BRBC41E-4-95001789) as a new vehicle from an authorized Toyota dealership located in Lima, Peru. **Plaintiff, CATHERINE DE BRUIN, is a consumer who, at all times relevant to the Complaint, resides in Johannesburg, South Africa, and is thus a citizen and resident of** <u>**South Africa**</u>**.** Plaintiff **CATHERINE DE BRUIN** purchased a 2006 Toyota Corolla (VIN: AHT53ZEC003074866) as a new vehicle from an authorized Toyota dealership located in Johannesburg, South Africa. **Plaintiff, MOSTAFA FAHMY, is a consumer who, at all times relevant to the Complaint, resides in Giza, Egypt, and is thus a citizen and resident of** <u>**Egypt**</u>**.** Plaintiff **MOSTAFA FAHMY** purchased a 2009 Toyota Corolla

as a new vehicle from an authorized Toyota dealership located in Giza, Egypt. **Plaintiff,
SISILIANA RIDWAN, SUNARTO NAZUA, NANI INDRIYASTUTI, MELATI
INDRAYANI, and JASNI are consumers who, at all times relevant to the Complaint, reside
in Indonesia, and are thus citizens and residents of** <u>**Indonesia.**</u> Plaintiff **SISILIANA
RIDWAN** purchased a 2009 Toyota Camry (VIN MR053BK4099006869) as a new vehicle from
an authorized Toyota dealership located in Jakarta, Indonesia. Plaintiff **SUNARTO NAZUA**
purchased a 2007 Toyota Yaris as a new vehicle from an authorized Toyota dealership located in
Indonesia. Plaintiff **NANI INDRIYASTUTI** purchased a 2007 Toyota Yaris (VIN
MR054HY9174611610) as a new vehicle from an authorized Toyota dealership located in
Indonesia. Plaintiff **MELATI INDRAYANI** purchased a 2006 Toyota Yaris (VIN
MR054HY9164604253) as a new vehicle from an authorized Toyota dealership located in
Indonesia. Plaintiff **JASNI** purchased a 2008 Toyota Yaris (VIN MR054HY9184622555) as a
new vehicle from an authorized Toyota dealership located in Indonesia. **Plaintiff, FRANCIS
JOSEPH CORONEL, is a consumer who, at all times relevant to the Complaint, resides in
Makati City, Philippines, and is thus a citizen and resident of the** <u>**Philippines.**</u> Plaintiff
**FRANCIS JOSEPH CORONEL** purchased a 2009 Toyota Altis (formerly Corolla) as a new
vehicle from an authorized Toyota dealership located in Makati City, Philippines.

20.     Plaintiffs did not learn of their vehicles' unique propensity for runaway
acceleration, or that Toyota failed to provide adequate fail-safes, until after their purchases, and
after Toyota issued a safety warning regarding the floor mats in certain Toyota vehicles.

21.     As a consequence of Defendants' RICO activity and unlawful and misleading
business practices, Plaintiffs have suffered injury in fact and have otherwise been damaged as a
result of Defendants' wrongful conduct.

22.     Plaintiffs appear in this action on behalf of themselves and on behalf of all others
similarly situated in **<u>all countries around the world except the United States</u>**.

23.     Defendant, Toyota Motor Corporation, is a Japanese corporation; defendant,
Toyota Motor North America, Inc. is a California corporation; defendant, Toyota Motor

Engineering and Manufacturing North America, Inc., is a Kentucky corporation; defendant, Toyota Motor Sales U.S.A., Inc., is a California corporation; defendant, Toyota Motor Credit Corporation, is a California corporation; and defendant, CTS Corporation, is an Indiana corporation. Upon information and belief, Defendants are and were responsible for the manufacture, design, distribution, sale and lease of Toyota vehicles, or parts thereof, all over the world, including those which are the subject of this action.

24.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants John Doe 1 through John Doe 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each of said fictitious John Doe Defendants is in some manner responsible for the acts, conduct, and occurrences alleged herein, as either actual perpetrators or co-conspirators, aiders and abettors, or primary officers and/or managers with knowledge and control of the perpetrators' activities. Plaintiffs will seek leave of Court to amend this complaint to allege the true names and capacities of the John Doe Defendants when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiffs.

25.     Defendants, and each of them, are sued as participants and as aiders and abettors herein. At all relevant times, each defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the other defendants. There is a unity of interest and ownership between the Defendants listed above, such that the acts of one are for the benefit and can be imputed as the acts of the others.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act of 2005 ("CAFA") because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

27.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over the Defendants because Defendants have sufficient minimum contacts with this State, and otherwise intentionally availed themselves of markets in this state through the promotion, marketing and sales of their products and services in this state to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

28.     In particular, Defendants marketed, advertised and sold automotive vehicles in this state having the same SUA defect as Toyota vehicles sold worldwide. The primary sale, marketing and advertising arm of Toyota is located in this District. On information and belief, the decision to withhold information from worldwide consumers, and engage in deceptive marketing was made, in part, in California.

29.     Additionally, this Court has subject matter jurisdiction pursuant to 18 U.S.C. §1961, et seq. In particular, Defendants' racketeering activity includes many acts within the last four (4) years chargeable under 18 U.S.C. §2314, which provides in pertinent part that:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; ... shall be fined under this title or imprisoned not more than ten years or both.

30.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(c) because defendants, as corporations, are "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced," because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this district and because Defendants conduct substantial business in this judicial district.

## FACTUAL BACKGROUND

31.     Toyota is currently the largest automobile manufacturer in the world by sales. Over the last decade, Toyota sold or leased more than 21 million vehicles globally.

32.     Toyota manufactures, sells and leases various models of passenger and commercial vehicles (including Plaintiffs' Corolla, Auris, Yaris, Camry and Tacoma models) to customers worldwide.

33.     In the late 1990's, Toyota manufactured, distributed and sold vehicles with an electronic throttle control system (hereinafter "ETCS"). In 2002, Toyota redesigned the gas pedal of its vehicles.

34.     Contrasting a traditional throttle control system, where a physical linkage connects the accelerator pedal to the engine throttle, in the ETCS, the engine throttle is controlled by electronic signals sent from the accelerator pedal to the engine throttle. A sensor at the accelerator detects how far the gas pedal is depressed and transmits that information to a computer module which controls a motorized engine throttle. The computer module determines how far the accelerator is depressed, and, in turn, tells the engine throttle motor how far to open the throttle valve. This is also called a "by wire" system.

35.     While earlier ETCS were accompanied by a mechanical linkage, as of 2002, Toyota models contained no such linkage.

36.     Defendant CTS's Automotive Products Division operates multiple manufacturing locations in North America, Europe and the Far East. CTS Automotive Products supplies the world's vehicle original equipment manufacturers (hereinafter "OEMs") and Tier II suppliers with rotary and linear position sensors, rotary actuators and electronic accelerator pedal modules.

37.     CTS issued a news release on March 30, 2001 announcing that CTS Automotive Products had received the Toyota "Value Improvement Award for 2000," from Toyota Motor Manufacturing North America (hereinafter "TMMNA"), stating *inter alia:*

> CTS Automotive Products received the 2000 award for the throttle position sensors supplied for use on the Camry, Solara and Avalon model automobiles and the Sienna minivan. CTS has now achieved the "Value Improvement Award" in three out of the last four years, which complements its overall business development strategy, including continual product and process improvements.

> CTS Automotive Products designs and manufactures a variety of electronic
> position sensors and actuators used in automotive powertrain, suspension, fuel
> system and emission control systems for automotive manufacturers throughout
> the world....

38.    On September 20, 2005, CTS issued a press release announcing that it had received an "Excellent Launch Award" from Toyota TMMNA "for design quality and launch coordination of its Electronic Throttle Control Pedal Assembly," which recognized CTS' achievement in *inter alia,* "[c]oordination of launches in North America and Europe."

39.    Defendant's ETCS fails to include a failsafe measure incorporated by other vehicle manufacturers which overrides any other instruction, and commands the ETCS to automatically set the engine to idle whenever the brakes are applied without success.

40.    Shortly thereafter, Toyota became aware of multiple complaints that its vehicles in which the ETCS was incorporated sometimes accelerated without the driver stepping on the gas pedal. These complaints included reports of multiple accidents related to the unexpected and unintended acceleration.

41.    This sudden unexpected and unintended acceleration would often overpower the vehicles' brakes, leading to an out-of-control vehicle.

42.    Toyota knew of the sudden unintended acceleration problem of its vehicles for several years before alerting consumers.

43.    **Long before admitting the problem in the United States, Toyota issued a warning to its <u>non-U.S. distributors</u> regarding problems with the accelerator pedal manufactured by Defendant CTS Corporation and the modifications necessary to allegedly correct the problem.**

44.    **Long before admitting the problem in the United States, Toyota began equipping its <u>non-U.S.</u> vehicles with accelerator pedals from other manufacturers, rather**

**than from Defendant CTS Corporation, due to the known problems with the CTS
accelerator pedals.**

45.     Only recently has Toyota acknowledged that its U.S.-sold vehicles suffer sticking
accelerator pedals and recalled them. This acknowledgement came far too late, as drivers,
passengers and members of the public have already died or suffered serious injuries and property
damage as a result of Defendants' wrongdoings.

46.     In addition to being too late, Toyota's initial acknowledgement of a problem did
not even identify the true problems, but claimed that other things, such as floor mats and driver
error, were the source of the problems.

47.     The combination of the lack of safety systems creates a situation in which there
are no mechanical or electronic failsafe mechanisms to allow the driver to effectively stop or
slow the car in such circumstances.

48.     All of the Toyota vehicles obtained and driven by Plaintiffs have ETCS or
Electronic Throttle Control System with Intelligence (hereinafter "ETCS-i").

49.     As a result of the common design and manufacturing defects and Toyota's
responses, all owners and lessees of Toyota vehicles have suffered economic damage to their
property.

50.     Toyota and its affiliates have known since at least 2002 that its vehicles could
accelerate uncontrollably, resulting in crashes causing serious injuries and deaths of occupants.
Through the fall of 2009, Toyota received more than 2,000 complaints that its vehicles had
incidents of sudden unintended acceleration and was the subject of multiple investigations by the
U.S. federal government. In spite of the numerous complaints by customers and the government
investigators, Toyota denied there was a problem and did nothing to mitigate or remedy the
common design and engineering defects.

51.     After multiple incidents in which Toyota vehicles suddenly accelerated and their brakes failed to stop the vehicle causing or resulting in deaths or serious injuries and property damage, Toyota for the first time attempted to minimize the problem and conceal the extent of the problem by blaming the sudden accelerations on floor mats. Toyota informed customers that they could prevent any risk of danger by simply removing the driver side floor mat.

52.     As of November 2009, Toyota stated "there is no evidence to support" any other conclusion than that sudden accelerations were caused by floor mats. Toyota stated to Toyota vehicle owners, Toyota customers and the public that the National Highway Traffic Safety Administration (hereinafter "NHTSA") supported the company's conclusion. The NHTSA responded to Toyota's public statement by stating that it was "misleading and inaccurate."

53.     Instead of being told the truth about the dangerous propensity of Toyota vehicles to suddenly accelerate, consumers like Plaintiffs were given assurances that their vehicles were safe and defect-free. For example, in the Warranty and Maintenance Guide given to Toyota vehicle owners, it states: "At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability…. Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind…."

54.     After years of covering up the life-threatening problems in its vehicles, it was not until January 21, 2010, that Toyota initiated a massive unintended acceleration recall covering approximately 8 million vehicles worldwide (and millions more due to other defects not the subject of this litigation).

55.     Toyota attributed the cause of the recall to "accelerator pedal problems," whereby the accelerator pedal sticks in a partially- or fully-depressed position. Specifically, Toyota claims that "[i]n rare instances, there is a possibility that certain accelerator pedal mechanisms may mechanically stick in a partially-depressed position or return slowly to the idle position."

56.     The Toyota models affected by the "accelerator pedal problems" and which are being recalled and/or are otherwise defective include, but are not limited to the following (hereinafter the "Recalled Toyota Vehicle(s)"):

- 2004-2010 RAV4,
- 2005-2010 Corolla,
- 2005-2010 Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD)),
- 2005-2010 Avalon,
- 2002-2010 Camry,
- 2007-2010 Camry HV,
- 2003-2005 Celica (2ZZ-GE Engine),
- 2004-2010 Highlander,
- 2006-2010 Highlander HV,
- 2000 -2010 Tundra (not including the 2000-2002 with 5VZ-FE),
- 2001-2010 Sequoia
- 2001-2010 4Runners SUV
- 2007-2010 FJ Cruiser
- 1998-2010 Land Cruiser
- 2001-2010 Prius,
- 2004-2010 Sienna
- 2002-2008 Solara,
- 2003-2004 Tacoma (5VZ-FE except Sport Model)
- 2005-2010 Tacoma,
- 2009-2010 Venza,
- 2004-2010 Yaris
- 2002-2003 Lexus ES300,
- 2004-2006 Lexus ES330,
- 2007-2010 Lexus ES350,
- 1998-2006 Lexus GS300,
- 2007-2010 Lexus GS350,
- 1998-2000 Lexus GS400,
- 2001-2007 Lexus GS430,
- 2007-2010 Lexus GS450h,
- 2008-2010 Lexus GS460,
- 2003-2009 Lexus GX470,
- 2010 Lexus HS250h,
- 2008-2010 Lexus IS F,
- 2006-2010 Lexus IS250,
- 2010 Lexus IS250c,
- 2001-2005 Lexus IS300,
- 2006-2010 Lexus IS350,
- 2010 Lexus IS350c,
- 1999-2000 Lexus IS400,

- 1998 Lexus LS400,
- 2001-2006 Lexus LS430,
- 2007-2010 Lexus LS460,
- 2008-2010 Lexus LS600h,
- 1998-2007 Lexus LX470,
- 2008-2010 Lexus LX570,
- 2004-2006 Lexus RX330,
- 2007-2010 Lexus RX350,
- 2006-2008 Lexus RX400h,
- 2010 Lexus RX450h,
- 1998-2000 Lexus SC300,
- 1998-2000 Lexus SC400,
- 2002-2010 Lexus SC430,
- 2005-2010 Scion tC,
- 2008-2010 Scion xB,
- 2008-2010 Scion xD,
- AYGO (manufactured from 02/2010 to 08/2009)
- iQ (manufactured from 11/2008 to 11/2009)
- Avensus (manufactured from 11/2008 to 12/2009)
- Certain Auris
- Certain Verso
- Certain 2007-2010 Radford

57.     Plaintiffs reserve the right to amend the foregoing definition of Recalled Toyota
Vehicle(s) to include any additional Toyotas (or other Toyota brands) that are involved in a
subsequent recall related to the one at issue in this case.

58.     Automotive safety experts have rejected Toyota's explanation that these sudden
acceleration problems are solely the result of human error, floor mats and/or sticky gas pedals.

59.     Toyota immediately suspended the sale of Recalled Toyota Vehicle(s).
Significantly, this moratorium on Toyota sales will remain in place until an adequate remedy is
developed by Toyota.

60.     Toyota has not even been able to provide an estimated date when the fix will be
made. In response to the question, "When do you expect to have a remedy?" on its website, the

listed response is "Toyota is making every effort to remedy this situation for customers as quickly as possible."

61.     Toyota advises consumers who suspect that they have the accelerator problem to stop using the car and drive it "to the nearest safe location, [to have] the engine shut off and a Toyota dealer contacted for assistance."

62.     Plaintiffs and others who purchased a Recalled Toyota Vehicle have suffered injury in fact or have otherwise been damaged because of, *inter alia,* the diminished resale value of the subject vehicles. Class members who leased Recalled Toyota Vehicle(s) have been injured because, *inter alia,* they must continue to pay for leasing the subject vehicles (or pay a penalty to break the lease prematurely).

63.     Toyota has reportedly begun providing a "fix" to certain dealers. However, given the widespread publicity associated with the recall, the resale and fair market values of the Recalled Toyota Vehicle(s) are and will substantially be depreciated. Further, until the point in time when this is done, consumers who lease the Recalled Toyota Vehicle(s) must continue to make lease payments.

64.     Moreover, there is no guarantee that the "fix" will work effectively. According to a recent article in *Barrons,* "the effectiveness of the solution - basically a shim to increase tension in a spring connected to the pedal – won't be known for months after suspect vehicles are modified at dealerships and on Toyota assembly lines." Indeed, it has been reported that the same supplier of pedals used in the Recalled Toyota Vehicles is also making the replacement parts. There have also been complaints to the NHTSA that consumers who have taken their Toyota Recalled Vehicles to their respective dealers to have the recall repairs performed continue to experience sudden, uncontrolled acceleration.

65.     It has been reported that the recall of the Recalled Toyota Vehicles was not the result of voluntary conduct on the part of Toyota, but was done at the urging of the NHTSA. Ray

LaHood, the Secretary of the NHTSA, said that Toyota halted production of the Recalled Toyota Vehicles "because we asked them to."

66.    In or around the fall of 2009, Toyota announced that it was confident that loose floor mats were the sole cause of sudden acceleration. Toyota had long affirmatively denied that the problem could be linked to sticky gas pedals; in fact, Bob Daly, a Toyota executive, specifically stated that "[t]here is no evidence to support these theories." These statements were and are materially misleading.

67.    Upon information and belief, Toyota knew and was aware, prior to marketing and selling the Toyota Recalled Vehicles, that they were inherently defective in that they had a defect that could cause the accelerator pedals to stick. Toyota covered up the fact that when it replaced the traditional mechanical throttle linkage in the late 1990s with a computer-controlled accelerator system, unlike American automobile companies, Toyota failed to include back-up safety systems that would prevent uncontrolled acceleration. Toyota omitted the back-up safety systems in order to save money and increase profits. As a result of the lack of safety systems, there is no mechanical or electronic failsafe mechanism to allow drivers to stop Toyota Recalled Vehicles in the event the computerized "drive-by-wire" acceleration systems malfunction and engage in uncontrolled acceleration.

68.    Toyota was in the exclusive possession of the information above, which was material to Plaintiffs and Class members (defined below), and Toyota had a duty, under all of the circumstances, to disclose the defect to Plaintiffs and Class members. Plaintiffs and Class members reasonably expected that the subject vehicles would not contain a serious safety defect that, *inter alia,* would result in them being instructed not to use the Toyota Recalled Vehicles and substantially diminish the value of the said vehicles. Nevertheless, Toyota failed and refused to warn its customers of the serious defect inherent in the aforementioned vehicles.

69.    As a result of the defect that plagues the Toyota Recalled Vehicles, Plaintiffs and other members of the Class overpaid for them because their value is and will remain diminished.

Had Plaintiffs and Class members been made aware of the defect, they would not have purchased or leased the subject vehicles, or would have paid substantially less for said vehicles. In light of Toyota's knowledge of the problems associated with and the serious nature of the defect at issue, Toyota knew or should have known that it was selling and leasing vehicles to consumers with a value that was substantially less than they reasonably expected to receive and been able to rely upon receiving under all of the circumstances.

70.     Toyota was aware that the defect with the subject vehicles posed a potentially grave safety risk to Plaintiffs and members of the Class. Rather than notify consumers of the defect and attendant safety risk, Toyota opted to conceal the existence of the defect for an unreasonable period of time, even after being contacted by consumers who experienced the problem. Toyota was in the exclusive possession of this information, which was material to Plaintiffs and Class members, and Toyota had a duty, under all circumstances, to disclose the defect and associated safety hazard to Plaintiffs and Class members.

71.     Toyota's conduct was commercially unconscionable and unfair to consumers, including Plaintiffs.

72.     As a result of Toyota's conduct (including its acts of concealment), Plaintiffs and Class members purchased and/or leased thousands of Toyota Recalled Vehicles and have suffered and continue to suffer injury in fact as a result of the defective nature of the subject vehicles.

73.     Plaintiffs allege that Toyota vehicles equipped with ETCS or ETCS-i are defective and unsafe in that such vehicles are susceptible to incidents of sudden, unintended acceleration rendering such vehicles uncontrollable.

74.     Plaintiffs further allege that Toyota vehicles equipped with ETCS or ETCS-i are defective and unsafe in that Toyota failed to incorporate essential failsafe measures critical to assisting a driver in maintaining control of the vehicle during a sudden, unintended acceleration event.

## CLASS ACTION ALLEGATIONS

75.     Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class consisting of:

> (a) All persons or entities in **Mexico**;  the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

> (b) All persons or entities in **China**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

> (c) All persons or entities in **Germany**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

> (d) All persons or entities in **Turkey**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

> (e) All persons or entities in **Jamaica**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said

manufactured vehicles to experience sudden unintentional acceleration.

(f) All persons or entities in **Peru**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

(g) All persons or entities in **South Africa**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

(h) All persons or entities in **Egypt**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

(i) All persons or entities in **Indonesia**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

(j) All persons or entities in the **Philippines**; the estates, representatives, guardians and administrators of all persons; the spouses, children, relatives and "significant others" that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

(k) All persons or entities in all other countries other than the United States, Mexico, China, Germany, Turkey, Jamaica,

Peru, South Africa, Egypt, Indonesia and the Philippines that purchased or leased, not for resale, Recalled Toyota Vehicle(s), that share common design and engineering defects that allow said manufactured vehicles to experience sudden unintentional acceleration.

76.   Specifically excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries and/or assigns of Defendants and any Judge assigned to this action, and her or his immediate family. Plaintiffs reserve the right to modify the Class definition as discovery and/or further investigation so warrant.

77.   This action may properly be maintained as a class action under Federal Rules of Civil Procedure Rule 23 because the action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of the Rule.

78.   The Plaintiffs and all Class Members seek damages and other relief, including but not limited to compensatory damages for economic losses, property damages, reimbursement of costs, litigation expenses, interest to the extent legally applicable, punitive damages, injunctive relief, attorneys' fees and any other relief to which they may be entitled in law and/or equity.

79.   The number of members in the Class is so large as to render joinder impracticable.  Upon information and belief, there are, at a minimum, 8 million members of the Class. Upon information and belief, the precise size (and identity and contact information) of the Class can be readily determined from documents and records maintained by the Defendants.

80.   There are questions of law and fact common to the Class which predominate over any questions affecting only individual members.  The questions of law and fact common to the Class arising from Defendants' actions include, without limitation, the following:

(a) Whether Defendants should be declared financially responsible for notifying all class members of the defective nature of the

cars and for the costs and expenses of inspecting, repairing, and replacing all such defective parts and/or entire vehicles;

(b)  Whether Toyota vehicles suffer from a SUA defect;

(c)  Whether design defects cause the vehicles to suffer from SUA;

(d)  Whether Defendants knew or became aware that the vehicles were not properly designed, yet continued to manufacture, distribute, advertise, and market the cars without correcting the problems and while concealing the defective design from consumers worldwide, including the class;

(e)  Whether Defendants violated 18 U.S.C. §1962(a), (b), (c) and/or (d) through a pattern of racketeering activity designed to deceive and defraud consumers worldwide, including the class, and to conceal serious and dangerous defects of Toyota vehicles from consumers worldwide, including the class;

(f)  Whether Defendant Toyota Motor Corporation (hereinafter "TMC") engaged in a worldwide deceptive and unlawful advertising and marketing campaign by concealing serious defects in Toyota vehicles;

(g)  Whether Defendants failed to give adequate warning regarding Toyota vehicles;

(h)  Whether Defendants created express or implied warranties through written advertising and other representations that were breached;

(i)  Whether the conduct complained of herein constitutes deceptive and misleading advertising in violation of the California Business & Professions Code §17200, et seq;

(j)  Whether the conduct complained of herein constitutes an unfair, illegal and/or fraudulent business practice, in violation of the California Business & Professions Code Section 17500, et seq.;

(k)  Whether Toyota's conduct complained of herein is intentional and knowing;

(l) Whether Defendants conspired to hide from Plaintiffs the truth regarding the hazards of their products;

(m) Whether Defendants' have been unjustly enriched by its conduct;

(n) Whether Plaintiffs and members of the Class are entitled to damages, restitution, disgorgement of profits, declaratory relief, punitive damages and/or injunctive relief, as a result of Toyota's conduct complained of herein; and

(o) Whether Plaintiffs and members of the proposed class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest and costs of suit.

81.     Plaintiffs' claims are typical of the claims of the proposed Class, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. Plaintiffs do not have any interests antagonistic to those of the Class. Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation. The questions of law and fact common to the Class members, some of which are set out above, predominate over any questions affecting only individual Class members.

82.     Defendants have acted on grounds generally applicable to all Class members, thereby making final equitable relief with respect to the Class as a whole appropriate with respect to the Defendants.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the

same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

84.     Any applicable statutes of limitations have been tolled by the Defendants' knowing and active concealment and denial of the facts as alleged herein.  Plaintiffs and members of the Class have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the defective nature of the vehicles at the time of purchase.

85.     Defendants are and were under a continuing duty to disclose the true character, quality and nature of the vehicles.  Because of their concealment of the true character, quality and nature of their vehicle, Defendants must be estopped from relying on any statute of limitations.

86.     Defendants' misconduct is continuing: to this day, Defendants continue to sell and promote these vehicles without disclosing their true defective nature and dangerous condition.

## COUNT I

**Violation of Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961, et seq.**

**A. THE ENTERPRISE**

87.     Since at least 2004, Toyota-Japan (Defendant TMC), its subsidiaries (codefendants), worldwide affiliates, and their spokespersons, have associated-in-fact to conduct certain aspects of Toyota's "marketing, advertising, promotion and sales and leasing" activities (hereinafter Toyota's "misleading marketing enterprise") by means of false statements and omissions of material facts to sell and lease certain vehicles known to defendants to be unreasonably dangerous and defective through a pattern of racketeering activity in violation of 18 U.S.C. §§1341 (mail fraud); 1343 (wire fraud); laundering and transmitting sales and lease proceeds by violating 1956 (laundering of monetary instruments) and 2314 (transferring in

interstate or foreign commerce sums of $5,000 or more with knowledge that said sums have been taken by fraud).

88.     Toyota's "misleading marketing enterprise" as set forth in the preceding paragraph constitutes an "enterprise" as that term is defined in 18 U.S.C. §1961(4).

89.     Toyota's "misleading marketing enterprise" has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants have engaged since at least 2007.

90.     Defendants, their subsidiaries and worldwide affiliates are ongoing organizations which engage in, and the activities of which affect interstate and foreign commerce.

91.     Each defendant associated with the enterprise.

92.     Each defendant intended that the enterprise transmit false and misleading information as set forth herein to Plaintiffs, members of the proposed Class, government investigators, and worldwide consumers through means of domestic and international mail and wire carriers.

93.     Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity indictable under 18 U.S.C. §§1341, 1343, 1956 and 2314.

94.     Defendants are "persons" as defined by 18 U.S.C. §1961(3) and have: (1) derived income directly or indirectly from a pattern of racketeering activity in violation of 18 U.S.C. §1962(a); (2) through a pattern of racketeering activity have maintained, directly or indirectly, an interest in and control of the Toyota marketing enterprise which is engaged in and the activities of which affect interstate or foreign commerce in violation of 18 U.S.C. §1962(b); (3) conducted or participated, directly or indirectly in the conduct of the Toyota marketing enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c); and (4) conspired with each other, subsidiaries, affiliates and spokespersons to violate 18 U.S.C. §§1962(a),(b) and (c).

**B. PREDICATE ACTS**

  **1.**   **OMISSIONS OF MATERIAL FACTS**

  95.  Toyota has generated a worldwide reputation for quality and safety which is the center piece of Toyota's marketing enterprise to increase sales of Toyota vehicles. Toyota's marketing enterprise touts its safety awards, including an award in 2008 from the Insurance Institute for Highway Safety (hereinafter "IIHS") naming the Toyota Tundra and the Toyota Highlander as their "Top Safety Picks." Toyota did not disclose at the time the defects and design flaws with its vehicles that could lead to SUA.

  96.  Toyota was aware that the defect with certain vehicles posed a potentially dire safety risk to Plaintiffs and members of the Class. Rather than notify consumers of the defect and attendant safety risk, Toyota opted to conceal the existence of the defect for an unreasonable period of time, even after being contacted by consumers who experienced the problem. Toyota was in the exclusive possession of this information, which was material to Plaintiffs and Class members, and Toyota had a duty, under all circumstances, to disclose the defect and associated safety hazards to Plaintiffs and Class members.

  97.  Instead of warning consumers that Toyota vehicles may experience a SUA event and providing instructions in the event a SUA occurred, Toyota vehicle owners, like Plaintiffs, were provided a Warranty and Maintenance Guide which states, *inter alia:*

     At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability.... Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind....

  **(a)**  **Toyota's History of Exerting Undue Influence To Conceal Material Facts Concerning Deadly Design Flaws**

98.     According to Reuters, Christopher Tinto, vice president of regulatory affairs in Toyota's Washington, D.C. office, left NHTSA in 1994 and joined Toyota. Christopher Santucci, who now works for Tinto, did the same in 2003. These two individuals may have exerted influence over the former regulatory agency they worked in to stall or otherwise misdirect investigation into complaints to conceal material defects.

99.     From 2003 to 2009, NHTSA opened eight investigations of SUA involving Toyota vehicles. Of those, three resulted in floor mat recalls, and five were closed. According to court papers and other documents, Tinto and Santucci worked with NHTSA on Toyota's responses to the consumer complaints.

100.     The first investigation of SUA events involved 2002 and 2003 Toyota Camrys and Solaras, and a lawsuit filed on behalf of a Michigan woman who was killed in an April 2008 accident. The lawsuit blamed a defect in the electronic throttle control system for the fatal accident. According to Reuters, Santucci testified in a deposition for that lawsuit that Toyota and NHTSA discussed limiting an investigation of SUA to incidents lasting less than a second.

101.     The Reuters report went on to say that twenty days after starting its probe – and after talking with Tinto – NHTSA decided not to investigate "longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect." The decision was made to limit the cases to eliminate instances in which a driver may have used the wrong pedal.

102.     The second NHTSA investigation, which occurred in 2005, was prompted by a consumer complaint of two instances of sudden acceleration in a 2002 Camry, one of which involved a crash. The vehicle owner who filed the petition with NHTSA also cited eight complaints from other drivers about similar episodes with other Toyota vehicles. According to Reuters, Toyota itself said dealer representatives investigated 59 of 100 vehicles whose owners complained.

103.     In November of that year, Tinto wrote to NHTSA that no evidence of a system or component failure was found and the vehicles were operating as designed. Based on the

representations and statement of Tinto, NHTSA ended that probe in January, 2006, citing lack of evidence of a problem and the agency's need to allocate "limited resources" to other investigations.

104.    The third case, which started with a consumer complaint made in August, 2006, again involved the Camry, model years 2002 to 2006. The Camry owner who made the complaint to NHTSA blamed the throttle actuator or controller. According to Reuters, NHTSA also noted 3,546 cases where Toyota had replaced throttle actuators under warranty terms. Tinto wrote to the agency that Toyota had not found a defect with the throttle actuator, but did find evidence that returned actuators had corroded due to water intrusion. According to Tinto, intrusion was usually caused by drivers going through a flooded road or similar circumstances. NHTSA decided not to pursue the probe, saying it was "not warranted."

105.    The final investigation, in 2008, involved 2006-2007 Toyota Tacoma pickup trucks. According to Reuters, the consumer who made the initial complaint reported two incidents of unintended acceleration in his 2006 Tacoma and pointed to 32 similar complaints in the NHTSA database. A memo from Tinto also said that Toyota had received similar complaints involving more than 400 Tacomas, model years 2004 to 2009. Of those reports, 49 involved crashes.

106.    Reuters discovered that Tinto wrote a letter to NHTSA stating that he felt the complaints didn't warrant NHTSA investigation and that he believed that media attention played a major role in the filing of these complaints. NHTSA closed that investigation in August, 2008, saying it was unable to find any underlying cause for the issue.

107.    Toyota continues to take actions to "shut-down" any material disclosures that its electronic accelerator system is defective, as revealed in an *Associated Press* article published in *The San Diego Union-Tribune,* on July 11, 2010, entitled, "A 'startling discovery' leads to fall out for school:"

> CARBONDALE, Ill – It's the kind of publicity any university might dream about: **An instructor uncovers a possible flaw that's causing some of the**

**world's most popular cars to accelerate suddenly. His ground breaking work attracts interest from Congress and reporters worldwide.**

But as Southern Illinois University's David Gilbert sought to show that electronics might be to blame for the problem in Toyotas, the world's largest automaker tried to cast doubt on his findings. One Toyota employee even questioned whether he should be employed by the school, which has long been a recipient of company donations.

Electronic messages obtained by The Associated Press show the automaker grew increasingly frustrated with Gilbert's work and made its displeasure clear to his bosses at the 20,000-student school. "It did kind of catch us off-guard," university spokesman Rod Sievers said.

So did the fallout. Two Toyota employees quickly resigned from an advisory board of the school's auto-technology program and the company withdrew offers to fund two springbreak internships.

"**I didn't really set out to take on Toyota. I set out to tell the truth, and I felt very strongly about that,**" said Gilbert, **who was among the first to suggest that electronics, not sticky gas pedals or badly designed floor mats, caused the acceleration** that required the Japanese automaker to recall millions of vehicles.

Toyota insists its relationship with the school remains "strong," and company officials say they have no plans to stop contributing to SIU. They also say the two Toyota representatives who stepped down from the advisory board did so merely to avoid any appearance that the company was exerting influence over Gilbert's testimony.

Driven by his own curiosity, **Gilbert in January found he could manipulate the electronics in a Toyota Avalon to re-create the acceleration without triggering any trouble codes in the vehicle's computer. Such codes send the vehicle's computer into a fail-safe mode that allows the brake to override the gas.**

**Gilbert said he reported his "startling discovery" to Toyota, and the automaker "listened attentively."** But Gilbert said he never heard back from the company, which has steadfastly maintained the problems were mechanical, not electronic.

**A short time later, Mark Thompson – identifying himself as an SIU alumnus and, without elaboration, a Toyota Motor Sales employee – voiced in an e-mail to the university's then-chancellor, Sam Goldman, his "great concern and disappointment" about Gilbert. Thompson said he was "deeply disturbed" by what he called Gilbert's false accusations about the automaker.**

Thompson reminded Goldman that he and Toyota regularly contributed to the university – including a $100,000 check to the auto-tech program in late 2008 –

and "due to the outstanding reputation your automotive technology program has, we donate much more than money," including cars. [Emphasis added].

### 2.   FALSE AND MISLEADING STATEMENTS WHICH WERE AND WERE INTENDED TO BE DISSEMINATED BY INTERSTATE AND FOREIGN CARRIERS OF MAIL AND WIRE COMMUNICATIONS WITH KNOWLEDGE OF THEIR FALSITY CONCERNING THE CAUSES OF SUA (18 U.S.C. §1341 AND 1343)

108.   Driver complaints resulted in at least eight separate investigations into Toyota vehicles by NHTSA. In response to the complaints and investigations, Toyota issued six minor recalls to fix various problems related to its acceleration system, but defendants blamed human error for the problems.

109.   Toyota intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential consumers and owners that the electronic throttle control system in its vehicles may contribute to a SUA event. In a June 19, 2004, letter to NHTSA, Toyota falsely stated that its ETC system contained a built in redundancy to prevent acceleration and that in the event of sudden acceleration the "vehicle brakes would have restrained vehicle motion." Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience SUA and that applications of the brakes have failed to restrain vehicle motion.

110.   Defendants intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential customers and owners that Toyota's vehicles were subject to SUA. In a November 15, 2005, letter to NHTSA, Toyota falsely denied that its vehicles could ever experience SUA. According to Toyota, SUA cannot occur "without the driver applying the accelerator pedal because of ... several detection systems ..." Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience sudden unintended acceleration without application of the accelerator pedal.

111.   In March of 2007, Toyota identified problems with the accelerator pedals in the Tundra pickup. According to Toyota, it determined the problem was caused by the material in

the accelerators' friction lever and made a change. Toyota falsely claimed that this was a drivability issue and not a safety issue.

112.    Similar issues arose with the Toyota Tacoma. Toyota denied that there was any problem with the acceleration system. An April 7, 2008, article in the *Detroit Free Press* entitled, "Toyota Pickup Probe Pushed; Sudden Accelerations Claims Hard to Pin Down," states:

> Toyota spokesman Bill Kwong says the company has found no problems with the Tacoma that would explain the complaints. "We don't feel it's an issue with the vehicle," he said. Regulators "get sudden acceleration complaints from consumers for various manufacturers. ... and in most cases they have found it's a misapplication of the pedals by the driver."

113.    Toyota further claimed that there were no flaws in its trucks' design and the reports of  sudden acceleration were "inspired by publicity." As reported in an article in the *Detroit Free Press* on June 10, 2008, entitled, "Toyota Denies Tacoma is Defective; Media Inspired Acceleration Claims, It Says:"

> Some 431 customers from around the country have reported unintended or sudden acceleration in their Toyota Tacoma pickups, resulting in 51 crashes and 12 injuries, but the automaker said there are no flaws in the trucks and that many reports were "**inspired by publicity."** [Emphasis added].

114.    Toyota went on to blame "extensive media coverage" for spurring additional reports of problems with Toyota which would explain why no other pickup has similar complaints:

> Toyota believes that it is likely that many of the consumer complaints about the general issue of unwanted acceleration ... **as well as many of the complaints about this subject that have been received by Toyota,** were inspired by publicity," Toyota said in a letter to the NHTSA released Thursday. But even taking them at face value, it is clear that the majority of the complaints are related to *minor drivability issues and are **not indicative of a safety-related defect.*** * * * Toyota spokesman Bill Kwong said tests by the automaker and the NHTSA revealed no problems that would explain the complaints. He said the problems were not as prevalent as the number of complaints suggested, saying the NHTSA asked for any cases where engine idle speed increased. "We remain confident in the safety of the vehicles," Kwong said. [Emphasis added].

115.    In December 2008, a similar issue arose in Europe in the right-hand drive versions of Toyota's Aygo and Yaris models. After an investigation, Toyota allegedly found that condensation from heaters caused increased friction in the accelerator pedal, making it stick. In mid-August 2009, Toyota made a design change in its European cars which lengthened the arm of the friction lever and changed its materials on all vehicles being produced in Europe. Despite the fact that the same material used in manufacturing of gas pedals in Europe -- the material that allegedly caused the sudden acceleration problems in Europe – was the same material used in the United States, Toyota did not make the change to vehicles sold in the United States.

116.    On April 23, 2009, *Westword* published an article entitled, "The Prius can take owners on a wild ride." The article discussed several incidents involving situations where Prius drivers experienced SUA. When asked for a response, Toyota denied any problems with its accelerators:

> Toyota responded to the acceleration problem in 2007 by recalling "*faulty floor mats*" that the company said could cause the gas pedal to stick. Another explanation from Toyota is *simple driver error*. "You get these customers that say, 'I stood on the brake with all my might and the car just kept on accelerating.' **They're not stepping on the brake,"** says corporate spokesman Bill Kwong. "People are so under stress right now, people have so much on their minds. With pagers and cell phones and IM, people are just so busy with kids and family and boyfriends and girlfriends. So you're driving along, and the next thing you know, you're two miles down the road and you don't remember driving, because you're thinking about something else." [Emphasis added].

117.    On September 14, 2009, Toyota issued a press release entitled, "Lexus ES 350 Accident Investigation," which stated *inter alia*:

> On August 28th, 2009, California Highway Patrol Officer Mark Saylor and three members of his family tragically lost their lives on a highway near San Diego California, while driving a 2009 ES350 loaned to them by a local Lexus dealer. Our deepest sympathies go out to the friends and family of Mark, Cleofe, Mahala, and Cleofe's brother Chris Lastrella. Preliminary information from law enforcement investigators indicates that **the cause may have been an all-weather floor mat** from a different Lexus model which, if installed incorrectly in the ES350, could cause it to interfere with the accelerator pedal.
>
> All-weather floor mats are installed by dealers or customers as an accessory item. Driver's floor mat interference with the accelerator pedal is possible in any

vehicle make with any combination of floor mats when the floor mat is not properly secured or if it is not the factory designed floor mat for the vehicle.

Toyota Motor Sales, USA, Inc. takes public safety very seriously and will fully cooperate with any investigation. We believe our vehicles to be among the safest on the road today. **We are instructing all of our Lexus and Toyota dealers** to immediately inspect their new, used, and loaner fleet vehicles and we urge all other automakers, dealers, vehicle owners, and the independent service and car wash industries to assure that any floor mat, whether factory or aftermarket, is correct for the vehicle and properly installed and secured [Emphasis added].

118.     In a press release issued after the September 29, 2009, recall, Toyota unequivocally and falsely stated, "no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured." Toyota repeated such assurances in subsequent months, stating that the faulty floor mats were the only cause of SUA in Toyota vehicles.

119.     On November 2, 2009, Robert S. Carter, Group Vice President and Toyota Division General Manager of Toyota USA appeared on a conference call with the media at Thomson Reuters Autos Summit where he unequivocally denied all problems with Toyota vehicles, claiming that all incidents of sudden unintended acceleration could be traced to floor mats and denying any other problems with Toyota vehicles:

>    [CARTER]: *There has been speculation and theories that there are some concerns with our fuel delivery systems, our braking systems, our throttle systems. I will tell you there is absolutely no evidence to support any of that.*
>
>    In fact, last week NHTSA just closed another investigation of a vehicle that was looked at, and again they concluded that the source was an incompatible floor mat or a floor mat that was not attached properly. So our position is this. Until we thoroughly review this and work with NHTSA, is to tell consumers that this potential exists; if there is any concern, remove the floor mat.
>
>    At the same time, if it is a properly designed floor mat for the vehicle and it is attached on the hooks that come from the factory, there is no concern, there is no evidence of any accelerator pedal interference. If consumers would like to keep the floor mat installed, we are suggesting four things. One, make sure it is a compatible mat. Two, make sure that it is hooked properly to the floor. Three, that floormats are designed to fit in the car. Don't reverse the floormat and expose the rubber side. And then the fourth is, in many inclement areas such as Detroit, some consumers will keep their carpet and floormats in their car and

place a rubber mat on top and stack the mats. We highly recommend against that. * * *

[MEDIA]: But at the moment, though, as this moves to recall, I guess what you said will happen. ***The locus is just the floormat, floormat design, nothing beyond that?***

[CARTER]: ***Absolutely. Absolutely. There is no evidence that goes beyond that.*** [Emphasis added].

120.    On November 2, 2009, Toyota issued a press release entitled, "Toyota Begins Interim Notification to Owners Regarding Future Voluntary Safety Recall Related to Floor Mats," which states in part:

> Toyota Motor Sales (TMS), U.S.A., Inc., today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position.
>
> The letter, in compliance with National Traffic and Motor Vehicle Safety Act and reviewed by the [NHTSA] also confirms that **no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.** * * *
>
> This is the sixth time in the past six years that NHTSA has undertaken such an exhaustive review of allegations of unintended acceleration on Toyota and Lexus vehicles and the sixth time the agency has found **no vehicle based cause for the unwanted acceleration allegations. The question of unintended acceleration involving Toyota and Lexus vehicles has been repeatedly and thoroughly investigated by NHTSA, without any finding of defect other than the risk from an unsecured or incompatible driver's floor mat,** said Bob Daly, TMS senior vice president. * * *

121.    In a highly unusual move, NHTSA publicly reprimanded Toyota for statements made by the Company in its October 30th notification letter to owners. On November 4, 2009, an *Associated Press* article entitled, "Govt Criticizes Toyota Press Release on Floor Mats," states in part:

> **Toyota Motor Corp. released misleading information about an investigation into problems with stuck gas pedals** that led to a massive Toyota recall, the government said Wednesday, stressing the issue is still under review by federal safety regulators. The National Highway Traffic Safety Administration said it was still investigating the case and meeting with Toyota to hear about the company's plan to redesign the vehicles and fix "this very dangerous problem." * * * Toyota said in a statement on Monday that NHTSA had confirmed " that *no*

*defect exists* in vehicles in which the driver's floor mat is compatible with the
vehicle and properly secured."

**But NHTSA said that was inaccurate and the government was investigating
possible causes of the acceleration problem. Removing the floor mats was
"simply an interim measure" and "does not correct the underlying defect in
the vehicles involving the potential for entrapment of the accelerator by
floor mats,** which is related to accelerator and floor pan design." **"The matter is
not closed until Toyota has effectively addressed the defect by providing a
suitable vehicle based solution,"** NHTSA said in the statement, which the
department said was issued *to correct "inaccurate and misleading information"
from the automaker.* * * *

122.    On November 25, 2009, without admitting fault or any design defects, Toyota
issued a press release entitled, "Toyota Announces Details of Remedy to Address Potential
Accelerator Pedal Entrapment," which states in part:

> ... In addition, as a separate measure independent of the vehicle based remedy,
> Toyota **will install a brake override system onto the involved [vehicles] as an
> extra measure of confidence. This system cuts engine power in case of
> simultaneous application of both the accelerator and brake pedals.** Toyota is
> in the process of completing development of these actions for the ES 350,
> Camry, and Avalon and will start notifying owners of the involved vehicles via
> first-class mail by the end of the year. The remedy process regarding the other
> five models will occur on a rolling schedule during 2010. [Emphasis added].

123.    The *International Herald Tribune* reported that on November 25, 2009, Toyota
spokesman, Irving Miller, stated on a conference call that, "We are very confident that we have
addressed this issue [referring to the sudden unintended acceleration problems]. Mr. Miller went
on to say, "We can come up with **no indication whatsoever that there is a throttle or
electronic control system malfunction."**

124.    On November 29, 2009, *The New York Times* reported that Irving Miller stated
that Toyota would begin shortening its vehicles' existing gas pedals by about three-quarters of an
inch and would start equipping its vehicles with smart gas pedals, even though smart gas pedals
have been used for years by European automakers like BMW, Audi and Volkswagen. Irving
Miller, Toyota's spokesman stated that Toyota was confident that these steps would solve the
SUA problem. According to Mr. Miller, "We have come to the conclusion this is pedal

misapplication or pedal entrapment." Mr. Miller went on to say, "We continue to find no reason
to believe that there is a problem with the electronic control systems."

125.    On December 9, 2009, Mr. Miller submitted a letter to the *Los Angeles Times*
vigorously challenging a December 5, 2009 editorial that questioned Toyota's ETCS and ETCS-i
system. The *Los Angeles Times* noted that incidents of sudden unintended acceleration grew
exponentially after the introduction of Toyota's electronic throttle control system. Mr. Miller's
letter emphatically denied that there was any problem with the electronic throttle control system.

126.    On December 23, 2009, the *Los Angeles Times* released another story accusing
Toyota of hiding the defects and design flaws in its vehicles for years. According to the *Los
Angeles Times,* Toyota destroyed documents and hid testing results from American consumers,
as well as paying cash settlements to people who say their vehicles have raced out of control and
caused serious accidents. According to the news story, a computerized search of NHTSA records
had issued eight previous recalls related to **SUA** – more than any other automaker. The *Los
Angeles Times* news report found that Toyota had been allowing sudden acceleration problems to
fester for nearly a decade, since the introduction of the electronic throttle controls system in the
early 2000's.

127.    Mr. Miller, Toyota's spokesman, responded with a press release entitled, "Setting
the Record Straight." The press release stated:

> Today the *Los Angeles Times* published an article that wrongly and unfairly
> attacks Toyota's integrity and reputation. While outraged by the Times' attack,
> we were not totally surprised. The tone of the article was foreshadowed by the
> phrasing of a lengthy list of detailed questions that the Times emailed to us
> recently. The questions were couched in accusatory terms. Despite the tone, we
> answered each of the many questions and sent them to the Times. Needless to
> say, we were disappointed by the article and much of what was used [sic] was
> distorted. Toyota has a well-earned reputation for integrity and we will
> vigorously defend it.

128.    On December 26, 2009, four people were killed in an accident involving a Toyota
Avalon. At the time, a problem with the accelerator pedal was the suspected cause for the crash.
However, it was determined that the floor mats could not have caused the accident as the mats

were in the trunk at the time of the crash. This caused Toyota to change its story. On January 21, 2010, Toyota released a statement saying:

> Toyota has investigated *isolated reports* of sticking accelerator pedal mechanisms in certain vehicles without the presence of floor mats. *There is a possibility* that **certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position.** [Emphasis added].

A vehicle with the throttle stuck in a partially depressed position can lead to accidents which can kill or maim not only the drivers and passengers of the defective vehicles, but others whom the vehicles might run into. This is a serious design flaw and defect that poses serious risk to not only consumers but also the public as a whole worldwide.

129.    A January 25, 2010 *USA Today* article revealed that Toyota knew that there were problems with accelerator-pedal assemblies from one of its Canadian suppliers since 2009 but decided that it did not warrant a recall at that time. However, Toyota announced the January 2010 recall because the defect trend had picked up. John Hanson, Toyota's U.S. safety spokesperson stated, "The quickness that this all came together is one reason why I don't have numbers of complaints." Mr. Hanson further stated, "And why we don't have a fix."

130.    During a Congressional hearing on January 27, 2010, Toyota officials stated that they first learned of "sticking pedals" in England and Ireland in the spring of 2009. But Toyota acknowledged that it had received reports in England and Ireland as early as December 2008.

## C. PATTERN OF RACKETEERING INJURY

131.    As a result, and by reason of the foregoing pattern of racketeering activity, false statements of material facts and omissions of material facts, the Plaintiffs and the proposed Class members have sustained injury to their property, to wit:

A.    Toyota was in the exclusive possession of the information set forth *supra,* which

was material to Plaintiffs and Class members and Toyota had a duty, under all the circumstances, to disclose the defects and associated safety hazards to Plaintiffs and prospective Class members;

B.     Plaintiffs and prospective Class members reasonably expected that the subject vehicles would not contain a serious safety defect that could, *inter alia,* result in putting the occupants at risk of serious bodily injury or death;

C.     As a result of the lack of safety systems, there is no mechanical or electronic failsafe mechanism to allow Plaintiffs and the prospective Class members to stop their Toyota recalled vehicles in the event the computerized "drive-by-wire" acceleration systems malfunction and engage in uncontrolled acceleration, putting the occupants at risk of serious bodily injury or death;

D.     As a result of the defect plaguing the Toyota recalled vehicles, Plaintiffs and the prospective Class members overpaid for their vehicles because their value is and will remain diminished;

E.     Given the widespread publicity associated with the recall, Plaintiffs and other prospective Class members who purchased a recalled Toyota vehicle have suffered injury in fact or otherwise been damaged because the resale and fair market values of the recalled Toyota vehicles are and will remain substantially depreciated;

F.     Prospective Class members who leased a recalled Toyota vehicle have been injured because they must continue to pay for leasing the subject unsafe vehicle or pay a penalty to break the lease prematurely.

132.    Plaintiffs and the prospective Class members are therefore entitled to recover treble damages and the costs of their suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

## COUNT II

### Unfair Competition Law: Bus. & Prof. Code §17200 et seq.

133.    Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

134.    The Unfair Competition Law, Business and Professions Code §17200, provides that "unfair competition shall mean and include any unlawful unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the False Advertising Act, Business and Professions Code §17500. The Unfair Competition Law provides that a Court may order injunctive relief and restitution as remedies for any violation of the Act.

135.    Plaintiffs may pursue a representative claim on behalf of others if Plaintiffs meet the standing requirements of California Business and Professions Code §§17204 and comply with Section 382 of the Code of Civil Procedure.

136.    At all times herein, Defendants have engaged in unfair and unlawful business practices. Defendants' business practices include, without limitation:

a.  Selling to Plaintiffs and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.  Failing to disclose to Plaintiffs and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.  Failing to remedy the defects or design flaws which make the Defendants' vehicles inherently more dangerous than other similar vehicles;

    d. Failing to manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable consumer;

    e. Violating the other statutes as alleged in this complaint.

137.    The business acts and practices of Defendants, as herein above described, constitute an unlawful business practice in violation of the Unfair Competition Law for the reasons set forth below, without limitation:

    a. The acts and practices violate California Civil Code §§ 1709 and 1710 and are therefore unlawful;

    b. The acts and practices violate California Civil Code §1750 et seq., and are therefore unlawful.

138.    The business acts and practices of Defendants as herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

139.    The business acts and practices of Defendants as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers as to their legal rights and obligations with respect to the purchase of Toyota's vehicles.

140.    Defendants' conduct has further injured Plaintiffs and the Class by impairing competition within the automotive vehicles markets and preventing Plaintiffs and the Class from making fully informed decisions about whether or not to purchase or lease Toyota vehicles and/or the price to be paid to purchase or lease Toyota vehicles.

141.    Plaintiffs and the Class have suffered harm as a proximate result of the wrongful conduct of the Defendants alleged herein, and therefore bring this claim for restitution and disgorgement. Plaintiffs and the Class have suffered injury in fact and have suffered an economic

loss by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the products purchased, (3) purchasing a product that poses a danger to the health and safety of not only the purchaser or leaser but also other motorists and pedestrians, and (4) incurring increased costs to repair the products purchased. Named Plaintiffs are persons who have suffered injury in fact and have lost money as a result of such unfair competition.

142.    In purchasing the vehicles from Defendants, Plaintiffs and the Class reasonably believed and/or relied on the material false statements and/or omissions of material facts provided by Defendants with respect to the safety and quality of the vehicles manufactured and sold by Defendants. Defendants induced Plaintiffs and the Class to purchase or lease Toyota vehicles through the acts and omissions alleged herein.

143.    Unless restrained and enjoined, Defendants will continue in the acts and practices alleged above. Accordingly, the Court must issue an injunction restraining and enjoining Defendants from advertising, selling, or otherwise disseminating false and misleading information about their products or failing to disclose relevant material information.

144.    Plaintiffs further request an order restoring to Plaintiffs any money or property which may have been lost by means of Defendants' unfair and deceptive business practices.

145.    Additionally, pursuant to California Code of Civil Procedure §1021.5, Plaintiffs are entitled to recover their reasonable attorneys' fees, costs and expenses incurred in bringing this action.

## COUNT III

### False Advertising Act: Bus. & Prof. Code §17500 et seq.

146.    Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

147.    Business and Professions Code §17500 et seq., the False Advertising Act, prohibits any person, firm, corporation or association, or any employee thereof, with the intent to dispose of real or personal property, from performing services or inducing the public to enter into any obligation relating to property or services, disseminating an untrue or misleading statement concerning such property or services which the Defendants knew, or in the exercise of reasonable care should have known, was untrue or misleading. A Court may order injunctive relief and restitution to affected members as remedies for any violations of Business and Professions Code §17500 as part of the Unfair Competition Law.

148.    At all times herein, Defendants have engaged in disseminating false and misleading communications which misrepresent the characteristics, nature, quality and safety of the vehicles being sold to Plaintiffs and the Class and have failed to disclose the true quality and defects of these products. Defendants' business practices include, without limitation:

a.    Selling to Plaintiffs and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.    Failing to disclose to Plaintiffs and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.    Failing to remedy the defects or design flaws which make the Defendants' vehicles inherently more dangerous than other similar vehicles;

d.    Failing to manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable customer;

e.    Violating the other statutes and common law causes of action as alleged in this complaint.

149.    Defendants engaged in the advertising and the failure to disclose the defects and design flaws in its products herein alleged with the intent to induce Plaintiffs and all class members to purchase and/or lease Defendants' products.

150.    Defendants caused to be made or disseminated throughout California and the world, including Germany, through advertising, marketing and other publications, statements that are untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants to be untrue, misleading to consumers and Plaintiffs and members of the Class. Defendants' advertising was untrue or misleading and likely to deceive the public in that the true characteristics and nature of the vehicles sold by Toyota were not as advertised.

151.    In purchasing the vehicles from Defendants, Plaintiffs reasonably believed and/or relied on the material false and/or misleading information and omission of material facts provided by Defendants with respect to the quality and safety of the vehicles being sold. Defendants induced Plaintiffs and the Class to purchase or lease Toyota products through the acts and omissions alleged herein.

152.    In making and disseminating the statements herein alleged, Defendants knew, or by the exercise of reasonable care should have known, that the statements were and are untrue or misleading and so acted in violation of California Business and Professions Code §17500. Moreover, Plaintiffs were exposed to Defendants' advertising and its false and misleading statements and were affected by the advertising in that they believed it to be true and/or relied on it when making purchasing decisions.

153.    The business acts and practices of Defendants herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

154.    In addition, the business acts and practices of Defendants as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers as to their legal rights and obligations with respect to the purchase of vehicles from Toyota.

155.     Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the products purchased, (3) purchasing a product that poses a danger to the health and safety of not only the purchaser but also occupants, other motorists and pedestrians, and (4) incurring increased costs to repair the products purchased.

156.     Accordingly, the Court must issue an injunction restraining and enjoining defendants from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendants.

157.     Plaintiffs further request an order restoring to Plaintiffs any money or property which may have been lost by means of Defendants' false advertising.

158.     Additionally, pursuant to California Code of Civil Procedure §1021.5, Plaintiffs are entitled to recover their reasonable attorneys' fees, costs and expenses incurred in bringing this action.

## COUNT IV

### Consumer Legal Remedies Act: Civil Code §1750, et seq.

159.     Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

160.     The Consumer Legal Remedies Act, California Civil Code §1750 et seq. (Hereinafter "CLRA"), was designed to protect consumers from unfair and deceptive business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and practices that are specifically prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

161.    Defendants are "persons" within the meaning of Civil Code §§761(c) and 1770, and sell "goods" within the meaning of Civil Code §§1761(b) and 1770.

162.    Plaintiffs are consumers within the meaning of Civil Code §1761(d).

163.    The subject vehicles constitute "goods" under California Civil Code §1761(a).

164.    Plaintiffs' purchase or lease of vehicles from Defendants constitutes a transaction within the meaning of Civil Code §§1761(e) and 1770.

165.    Civil Code §1770(a) provides that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful," including:

a.    In violation of §1770(a)(2) of the CLRA, Toyota "misrepresent[ed] the source, sponsorship, approval, or certification of goods."

b.    In violation of §1770(a)(5) of the CLRA, Toyota "represent[ed] that goods .... have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities
which they do not have."

c.    In violation of §1770(a)(7) of the CLRA, Toyota represented that goods are of a particular standard, quality or grade when they are of another.

d.    In violation of §1770(a)(9) of the CLRA, Toyota advertised goods with the intent not to sell them as advertised.

e.    In violation of §1770(a)(14) of the CLRA, Toyota represented that the transaction was supplied in accordance with a previous representation when it was not.

166.    By reason of the acts and practices alleged herein, Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in a transaction intended to result or which results in the sale of goods to any customer, in violation of *inter alia*, Civil Code §§1770(a)(2), (5), (7), (9) and (14).

167.    Defendants engaged in these unfair and/or deceptive acts and practices with the intent that they result, and which did result, in the sale of the Toyota vehicles to Plaintiffs and members of the Class.

168.    In purchasing the vehicles from Defendants, Plaintiffs reasonably believed and/or relied on the material false and/or misleading information provided by Defendants with respect to the safety and quality of the Toyota vehicles. Defendants induced Plaintiffs to purchase the vehicles through the acts and omissions alleged herein.

169.    In engaging in unfair or deceptive conduct in violation of the CLRA, Defendants actively concealed and failed to disclose material facts about the true characteristics and nature of the Toyota vehicles purchased by Plaintiffs.

170.    As a result of the unfair and deceptive acts and practices of Defendant herein described, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

171.    Pursuant to California Civil Code §§1780 and 1781, Plaintiffs and the Class hereby request certification of the Class, damages, injunctive relief, restitution and attorneys' fees, costs and expenses pursuant to California Civil Code §1780(d) and California Code of Civil Procedure §1021.5

172.    As a direct and proximate result of Defendants' violations of law, Plaintiffs have been injured. Pursuant to the provisions of California Civil Code § 1782, Plaintiffs demand that within thirty (30) days from service of this Complaint, Defendants correct the deceptive practices described in this Complaint, pursuant to California Civil Code §1770. This includes providing notice and full compensation to consumers who have purchased the affected vehicles from Toyota. If Defendants fail to do so, Plaintiffs will amend this Complaint to seek damages pursuant to Civil Code §1782.

## COUNT V

### Breach of Implied Warranty

173.    Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

174.    Defendants impliedly warranted to persons purchasing or leasing their products that the products were what they were represented to be.

175.    These implied warranties induced the worldwide community in general and the Plaintiffs and other Class members in particular to purchase or lease the products from the Defendants. These implied warranties were both directly and indirectly believed and relied upon by Plaintiffs and Class members and induced them to choose Defendants' product. This reliance was justified by Defendants' skill, expertise, and judgment in the manufacturing, testing, labeling, distribution or sale of such products.

176.    At the time of the sale or lease, Defendants had knowledge of the purpose for which their products were purchased and impliedly warranted the same to be, in all respects, fit and proper for this purpose.

177.    Defendants breached their aforesaid warranties in that the products were not fit for the purpose for which they were intended and used; rather Defendants sold to Plaintiffs a product which was not fit for use. The defect in the products existed prior to the delivery of the products to Plaintiffs.

178.    Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the products purchased, (3) purchasing a product that poses a danger to the health and safety of not only the purchaser but also other occupants, motorists and pedestrians and (4) incurring increased costs to repair the products purchased.

179.     Accordingly, the Court must issue an injunction restraining and enjoining Defendants from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendants.

## COUNT VI

### Breach of Express Warranty

180.     Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

181.     Defendants expressly warranted to persons purchasing their products that they were what they were represented to be.

182.     These express warranties induced the community in general and the Plaintiffs and members of the Class in particular to use and purchase Defendants' products. These express warranties were both directly and indirectly believed and relied upon by Plaintiffs and induced Plaintiffs to choose Defendants' products.

183.     Defendants breached their aforesaid warranties in that their products were not fit for the use and purpose expressly warranted by the Defendants.

184.     Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia,* (1) purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (2) incurring costs for diminished resale value of the products purchased, (3) purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists and pedestrians and (4) incurring increased costs to repair the products purchased.

185.    Accordingly, the Court must issue an injunction restraining and enjoining Defendants from sending or transmitting false and misleading advertising to individuals or entities concerning the purposed safety and quality of vehicles from Defendants.

## COUNT VII

### Conspiracy

186.    Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

187.    Defendants conspired among themselves and formed the deliberate design and purpose to prevent public awareness and hide the truth regarding the safety, expected and known serious injuries caused by operating said vehicles and other material information regarding said vehicles.

188.    Pursuant to said conspiracy and in furtherance of said design and purpose, Defendants maliciously, unlawfully and wrongfully committed fraud and conspired to hide the truth regarding the safety, expected and known hazardous risks caused by operating said vehicles and other material information regarding said vehicles.

189.    Pursuant to said conspiracy and in furtherance of said design and purpose, Defendants knowingly and purposely made false and fraudulent representations, directly or indirectly to Plaintiffs including but not limited to, that said vehicles were fit and safe for their intended purpose, had been adequately and reliably tested when they had not, that they were safe, and that they were appropriate for use.

190.    Pursuant to said conspiracy and in furtherance of said design and purpose, Defendants intentionally hid the scientific data that showed that said vehicles were unsafe and linked to serious injuries.  Defendants intentionally and/or recklessly hid this information or misrepresented this information to federal regulatory agencies, Plaintiffs and the public at large.

191.    Pursuant to said conspiracy and in furtherance of said design and purpose,
Defendants induced Plaintiffs to purchase said vehicles by misrepresenting the safe condition of
said vehicles.

192.    Pursuant to said conspiracy and in furtherance of said design and purpose,
Defendants failed to recall said vehicles from the market place upon learning of the unreasonable
harm to Plaintiffs.

193.    The aforesaid conduct of Defendants demonstrates willful and malicious or
intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference
toward, and a disregard of Plaintiffs safety.

194.    As a direct and proximate result of Defendants' breach, Plaintiffs and the Class
have been damaged as a result of the products' malfunctioning and the nonuse of their vehicles.

## COUNT VIII

### Unjust Enrichment

195.    Plaintiffs hereby incorporate by reference the above paragraphs as if those
allegations were fully set out herein.

196.    As a result of their continuous and systematic misrepresentations and failure to
disclose that the vehicles they had manufactured contained serious defects that affected the
acceleration and braking of their vehicles, Defendants were able to charge a higher price for their
vehicles, which did not match the item's value. Based on these practices, Defendants were
unjustly enriched.

197.    Defendants knew, or should have known of the benefit it was receiving due to
their misrepresentations and failure to disclose, and enjoyed the benefit of increased financial
gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for a
product with a lower value. It would be inequitable and unjust for Defendants to retain these
unlawfully obtained profits.

198.     Plaintiffs seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## COUNT IX

### Negligence

199.     Plaintiffs hereby incorporate by reference the above paragraphs as if those allegations were fully set out herein.

200.     As the manufacturer and seller of automotive vehicles, Defendants had a duty to Plaintiffs and the Class to act not to sell products that were defective and could result in serious injuries or death to either Plaintiffs or even innocent third parties. Defendants breached that duty by manufacturing and selling products to Plaintiffs and the Class that had serious accelerator problems without disclosing these facts to Plaintiffs and the Class. That breach caused the economic harm, injury and/or damage to Plaintiffs that are herein above set forth.

201.     As a direct and legal result of this wrongful conduct, Plaintiffs and the Class have been damaged in an amount to be ascertained at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as follows:

1.      That this Court certify this case as a class action;

2.      That this Court find and declare Defendants' acts and practices as described herein to be unlawful, unfair and fraudulent;

3.      For threefold the damages actually sustained and the costs of suit including a reasonable attorney's fee, pursuant to 18 U.S.C. §1964(c) with interest thereon at the legal rate;

4.      For general damages according to proof;

5.      For special damages according to proof;

6.      For exemplary and punitive damages;

7.      For statutory damages;

8.      For declaratory relief;

9.      For restitution to Plaintiffs;

10.     That Plaintiffs be awarded attorney fees and expenses pursuant to California Code of Civil Procedure §1021.5, California Civil Code §1780 and pursuant to any other statute which provides for award of such fees and expenses;

11.     That Plaintiffs be awarded prejudgment interest on all sums collected; and

12.     Any other and further relief the court may deem proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: August 2, 2010

Respectfully submitted,

**RIBBECK LAW CHARTERED**

**By:       /s/Monica R. Kelly**
   **Attorney for Plaintiffs Gabriele Zieme-Diedrich,**
   **Hatice Hulya Yigit, Laura Jimenez Centeno, Elisa**
   **Lozano Esquivel, Alfredo Barranco Hernandez,**
   **Ernesto Diaz Reyes, Emilio Quintanar Mogollon,**
   **Gonzalo Villalobos Oros, Paul Banton, Augusto**
   **Panez, Xiaobin Wang, Dawei Li, Guicai Lui, Zhijie**
   **Deng, Lianfang Wang, Lin Zhang, Yiqin Zhang, Lin**
   **Yang, Cheng Li Zhang, Wei Guo, Yilong Liu, Hu Jin,**
   **Catherine De Bruin, Mostafa Fahmy, Sisiliana**
   **Ridwan, Nani Indriyastuti, Melati Indrayani, Jasni,**
   **and Francis Joseph Coronel**

**Monica R. Kelly, Esq.**
**RIBBECK LAW CHARTERERD**
505 N. Lake Shore Drive
Lake Point Tower
Chicago, Illinois, 60611
Phone  (312) 822-9999
E-mail: monicakelly@ribbecklaw.com
E-mail: manuelribbeck@ribbecklaw.com
E-mail: fernandotorres@ribbecklaw.com
E-mail: mervinmateo@ribbecklaw.com
Firm I.D. No.  42698

## <u>PROOF OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on August 2, 2010.


By:      **/s/Monica R. Kelly**
                    Monica R. Kelly