Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Marc M. Seltzer, Bar No. 054534
*mseltzer@susmangodfrey.com*
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

*Co-Lead Counsel for Consumer Economic Loss Plaintiffs*

Frank M. Pitre, Bar No. 100077
*fpitre@cpmlegal.com*
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

*Lead Counsel for Non-Consumer Economic Loss Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) |
| | AMENDED ECONOMIC LOSS MASTER CONSOLIDATED COMPLAINT |
| | <u>JURY TRIAL DEMANDED</u> |
| This Document Relates To: | |
| ALL ECONOMIC LOSS ACTIONS | |

010172-25  398181 v1

1

**TABLE OF CONTENTS**

2

**PAGE**

3

I.    INTRODUCTION ................................................................. 1

4

II.   JURISDICTION AND VENUE ................................................. 11

5

III.  PARTIES ............................................................................ 12

6

    A.   Consumer Plaintiffs ......................................................... 12

7

    B.   Non-Consumer Plaintiffs ................................................. 40

8

    C.   Consumer Plaintiffs in the Event California Law Does Not Apply ........ 44

9

    D.   Defendants ................................................................... 77

10

IV.   FACTUAL BACKGROUND ................................................... 81

11

    A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand ................................. 81

12

13

    B.   Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism ..................................................... 94

14

15

    C.   Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002 ....................... 96

16

        1.   First reports of unintended acceleration to Toyota .................. 97

17

18

        2.   Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls ................ 99

19

20

        3.   Unintended acceleration in Tacomas and Siennas ................. 128

21

        4.   The floor mat recall ................................................... 137

22

        5.   The sticky accelerator recall ........................................ 144

23

    D.   The Internal Death by SUA Chart ...................................... 151

24

    E.   Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall Complaints ................................................... 157

25

26

    F.   Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall .............................................. 159

27

28

G.  Toyota Identifies Many Root Causes of SUA Confirming the Need for Brake Override ........................................................ 164

H.  Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers and Affirmatively Misled Consumers .............................. 165

I.  Continuing Warranties and Misrepresentations .................................. 169

J.  Summary of the Defects in Defective Vehicles ................................... 170

  1.  Electronics Issues: ..................................................... 171

  2.  Mechanical Issues: .................................................... 173

  3.  The lack of an appropriate fail-safe: ........................... 174

  4.  Failure to appropriately test and validate the vehicle systems: ................................................................ 175

K.  Toyota Belatedly Installs a Brake-Override as a "Confidence" Booster ............................................................................ 176

L.  The Defects Causing Unintended Accelerations Have Caused Defective Vehicles' Values to Plummet ........................................ 184

M.  Choice of Law Allegations ..................................................... 186

V.  CLASS ALLEGATIONS ................................................................... 191

A.  The Nationwide Consumer Class ................................................. 191

B.  Non-Consumer Economic Loss Class ............................................ 195

C.  Alternate State Law Classes ..................................................... 199

COUNT I  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ............................................. 208

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) .......................... 214

COUNT III  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) .......................... 217

COUNT IV  BREACH OF EXPRESS WARRANTY (Cal. Com. Code § 2313) ............................................................. 219

COUNT V  BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Com. Code § 2314) ............................... 224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT VI  REVOCATION OF ACCEPTANCE (Cal. Com. Code § 2608) .......... 226

COUNT VII  VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
    (15 U.S.C. § 2301, *et seq.*) ................................................................ 228

COUNT VIII  BREACH OF CONTRACT/COMMON LAW WARRANTY .......... 231

COUNT IX  FRAUD BY CONCEALMENT (Based on California Law) ............... 232

COUNT X  UNJUST ENRICHMENT (Based Upon California Law) .................... 234

ALTERNATE STATE LAW COUNTS ................................................................ 235

ALABAMA .......................................................................................................... 235

COUNT I  VIOLATION OF ALABAMA DECEPTIVE TRADE
    PRACTICES ACT  (Ala. Code § 8-19-1, *et seq.*) .......................... 235

COUNT II  BREACH OF EXPRESS WARRANTY  (Ala. Code § 7-2-313) .......... 236

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Ala. Code § 7-2-314) ................................ 239

COUNT IV  REVOCATION OF ACCEPTANCE  (Ala. Code § 7-2-608) ............. 241

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On Alabama Law) ................................................................ 243

COUNT VI  FRAUD BY CONCEALMENT  (Based On Alabama Law) ............... 244

COUNT VII  UNJUST ENRICHMENT  (Based On Alabama Law) ...................... 246

ALASKA     ......................................................................................................... 247

COUNT I  VIOLATION OF THE ALASKA UNFAIR TRADE
    PRACTICES  AND CONSUMER PROTECTION ACT
    (Alaska Stat. § 45.50.471, *et seq.*) ............................................... 247

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Alaska Stat. § 45.02.314) ......................... 249

COUNT III  REVOCATION OF ACCEPTANCE  (Alaska Stat. § 45.02.608) ........ 250

COUNT IV  UNJUST ENRICHMENT  (Based On Alaska Law) ........................... 252

ARIZONA     ....................................................................................................... 253

010172-25  398181 v1

COUNT I  BREACH OF THE IMPLIED WARRANTY OF
        MERCHANTABILITY  (Arizona Common Law)...........................................253

COUNT II  IN THE ALTERNATIVE, UNJUST ENRICHMENT
        (Based On Arizona Law)........................................................................254

ARKANSAS ...........................................................................................................255

COUNT I  ARKANSAS PRODUCTS LIABILITY ACT
        (Ark. Code Ann. § 16-116-101, *et seq.*)............................................255

COUNT II  BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY   (Ark. Code Ann. §§ 4-2-314) ................................257

COUNT III  NEGLIGENCE  (Under Arkansas Law) ...............................................257

COUNT IV  REVOCATION OF ACCEPTANCE
        (Ark. Code Ann. § 4-2-608) .................................................................259

COUNT V  NEGLIGENT MISREPRESENTATION/FRAUD
        (Ark. Code Ann. § 4-2-721) .................................................................261

COUNT VI  UNJUST ENRICHMENT  (Based On Arkansas Law)........................263

CALIFORNIA ........................................................................................................264

COUNT I  VIOLATION OF THE SONG-BEVERLY CONSUMER
        WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
        (Cal. Civ. Code §§ 1793.2(d) & 1791.2)............................................264

COUNT II  VIOLATION OF THE SONG-BEVERLY CONSUMER
        WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
        OF MERCHANTABILITY  (Cal. Civ. Code §§ 1792 & 1791.1)..................266

COLORADO ..........................................................................................................268

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER
        PROTECTION ACT  (Col. Rev. Stat. § 6-1-101. et seq.)...........................268

COUNT II  BREACH OF EXPRESS WARRANTY
        (Col. Rev. Stat. § 4-2-313) ..................................................................270

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
        MERCHANTABILITY  (Col. Rev. Stat. § 4-2-314).........................................273

COUNT IV  REVOCATION OF ACCEPTANCE
        (Col. Rev. Stat. § 4-2-608) ..................................................................274

COUNT V  BREACH OF COMMON LAW WARRANTY
(Based On Colorado Law)......................................................277

COUNT VI  FRAUD BY CONCEALMENT  (Based On Colorado Law) ..............277

COUNT VII  UNJUST ENRICHMENT  (Based On Colorado Law) ......................279

CONNECTICUT ........................................................................280

COUNT I  VIOLATION OF CONNECTICUT UNLAWFUL TRADE
PRACTICES ACT  (Conn. Gen. Stat. § 42-110a, *et seq.*)............................280

COUNT II  BREACH OF CONTRACT  (Based On Connecticut Law)..................282

COUNT III  IN THE ALTERNATIVE, UNJUST ENRICHMENT
(Based On Connecticut Law) ..................................................283

DELAWARE ..............................................................................283

COUNT I  VIOLATION OF THE DELAWARE CONSUMER FRAUD
ACT  (6 Del. Code § 2513, et seq.)...............................................283

COUNT II  VIOLATION OF THE DELAWARE DECEPTIVE TRADE
PRACTICES ACT  (6 Del. Code § 2532, *et seq.*) ...........................285

COUNT III  BREACH OF EXPRESS WARRANTY  (6 Del. Code § 2-313) .........286

COUNT IV  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (6 Del. Code § 2-314) ..............................289

COUNT V  REVOCATION OF ACCEPTANCE  (6 Del. Code § 2-608)...............290

COUNT VI  BREACH OF CONTRACT/COMMON LAW
WARRANTY  (Based On Delaware Law)......................................292

COUNT VII  IN THE ALTERNATIVE, UNJUST ENRICHMENT
(Based On Delaware Law) ......................................................293

DISTRICT OF COLUMBIA............................................................294

COUNT I  VIOLATION OF THE CONSUMER PROTECTION
PROCEDURES ACT  (D.C. Code § 28-3901 *et seq.*)....................294

COUNT II  BREACH OF EXPRESS WARRANTY
(D.C. Code § 28:2-313) ..........................................................296

010172-25  398181 v1

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (D.C. Code § 28:2-314) ........................................ 298

COUNT IV  UNJUST ENRICHMENT
    (Based On District Of Columbia Law) ................................................ 299

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On D.C. Law) ................................................................................ 300

FLORIDA   ........................................................................................................... 301

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE
    TRADE PRACTICES ACT  (Fla. Stat. § 501.201, *et seq.*) .......................... 301

COUNT II  BREACH OF EXPRESS WARRANTY  (Fla. Stat. § 672.313) ............ 302

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Fla. Stat. § 672.314) ....................................... 305

COUNT IV  REVOCATION OF ACCEPTANCE  (Fla. Stat. § 672.608) ............... 306

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On Florida Law) ......................................................................... 308

COUNT VI  FRAUD BY CONCEALMENT  (Based On Florida Law) .................. 309

COUNT VII  UNJUST ENRICHMENT  (Based On Florida Law) ......................... 311

GEORGIA   ........................................................................................................... 312

COUNT I  VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE
    TRADE PRACTICES ACT  (Ga. Code Ann. § 10-1-370, *et seq.*) ................ 312

COUNT II  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES
    ACT  (Ga. Code Ann. § 10-1-390, *et seq.*) ........................................... 313

COUNT III  BREACH OF EXPRESS WARRANTY
    (Ga. Code Ann. § 11-2-313) ................................................................. 314

COUNT IV  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Ga. Code Ann. § 11-2-314) ................................ 317

COUNT V  REVOCATION OF ACCEPTANCE
    (Ga. Code Ann. § 11-2-608) ................................................................. 318

COUNT VI  BREACH OF CONTRACT/COMMON LAW WARRANTY ............ 321

010172-25 398181 v1

COUNT VII  FRAUD BY CONCEALMENT  (Ga. Code Ann. § 51-6-2)..............321

COUNT VIII  UNJUST ENRICHMENT  (Based On Georgia Law).......................323

HAWAII       ...................................................................................................324

COUNT I  UNFAIR COMPETITION AND PRACTICES
      (Haw. Rev. Stat. § 480, *et seq.*)..........................................................324

COUNT II  VIOLATION OF HAWAII'S UNIFORM DECEPTIVE
      TRADE PRACTICE ACT  (Hawaii Rev. Stat. § 481A, *et seq.*)....................326

COUNT III  BREACH OF EXPRESS WARRANTY
      (Hawaii Rev. Stat. § 490:2-313)..........................................................328

COUNT IV  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY  (Haw. Rev. Stat. § 490:2-314)................................331

COUNT V  REVOCATION OF ACCEPTANCE
      (Haw. Rev. Stat. § 490:2-608)..............................................................332

COUNT VI  BREACH OF CONTRACT/COMMON LAW WARRANTY
      (Based On Hawaii Law) ......................................................................335

COUNT VII  UNJUST ENRICHMENT  (Based On Hawaii Law).........................335

IDAHO       ...................................................................................................336

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER PROTECTION
      ACT  (Idaho Civ. Code § 48-601, *et seq.*) ........................................336

COUNT II  BREACH OF EXPRESS WARRANTY
      (Idaho Com. Code § 28-2-313) ..........................................................340

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
      MERCHANTABILITY  (Idaho Com. Code § 28-2-314)...............................342

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
      (Under Idaho Law) ............................................................................344

COUNT V  FRAUD BY CONCEALMENT  (Based On Idaho Law) .....................345

COUNT VI  UNJUST ENRICHMENT  (Based On Idaho Law) ............................346

ILLINOIS      ...................................................................................................347

010172-25  398181 v1

COUNT I  VIOLATION OF ILLINOIS CONSUMER FRAUD
    AND DECEPTIVE BUSINESS PRACTICES ACT
    (815 Ill. Comp. Stat. 505/1, *et seq.* and 720 Ill. Comp. Stat. 295/1a)............. 347

COUNT II  VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE
    TRADE PRACTICES ACT (815 Ill. Comp. Stat. 510/1, *et. seq.*
    and 720 Ill. Comp. Stat. 295/1a) ....................................................... 348

COUNT III  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY   (810 Ill. Comp. Stat. 5/2-314  and 810 Ill.
    Comp. Stat. 5/2A-212) ...................................................................... 349

COUNT IV  BREACH OF EXPRESS WARRANTIES   (810 Ill. Comp.
    Stat. 5/2-313) ................................................................................... 350

COUNT V  NEGLIGENCE  (Based On Illinois Law) ................................ 351

COUNT VI  STRICT PRODUCT LIABILITY (DEFECTIVE DESIGN)
    (Based On Illinois Law) .................................................................... 352

COUNT VII  STRICT PRODUCT LIABILITY (Failure to warn)  (Based
    on Illinois Law) ................................................................................ 354

COUNT VIII  UNJUST ENRICHMENT  (Based On Illinois Law) ......... 355

COUNT IX  FRAUDULENT CONCEALMENT / FRAUD BY OMISSION
    (Based On Illinois Law) .................................................................... 356

COUNT X  BREACH OF LEASE / CONTRACT  (Based On Illinois Law)........... 358

INDIANA   ...................................................................................................... 359

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
    SALES ACT  (Ind. Code § 24-5-0.5-3) ............................................... 359

COUNT II  BREACH OF EXPRESS WARRANTY
    (Ind. Code § 26-1-2-313)................................................................... 361

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Ind. Code § 26-1-2-314)....................... 363

COUNT IV  REVOCATION OF ACCEPTANCE
    (Ind. Code § 26-1-2-608)................................................................... 364

COUNT V  BREACH OF CONTRACT/COMMON LAW
    WARRANTY  (Based On Indiana Law) ......................................... 366

010172-25 398181 v1

COUNT VI  IN THE ALTERNATIVE, UNJUST ENRICHMENT
(Based On Indiana Law)................................................................367

COUNT VII  FRAUDULENT CONCEALMENT  (Based On Indiana Law) ..........368

IOWA           ..........................................................................................370

COUNT I  Violations of the Private Right of Action  for Consumer
Frauds Act  (Iowa Code § 714h.1, *et seq.*)........................................370

COUNT II  BREACH OF EXPRESS WARRANTY
(Iowa Code § 554.2313)................................................................373

COUNT III  Breach of the Implied Warranty of Merchantability
(Iowa Code § 544.2314)................................................................376

COUNT IV  Revocation of Acceptance  (Iowa Code § 544.2608)............................377

COUNT V  Breach of Contract/Common Law Warranty
(Based On Iowa Law)...................................................................379

COUNT VI  FRAUD BY CONCEALMENT  (Based On Iowa Law) .....................380

COUNT VII  UNJUST ENRICHMENT  (Based On Iowa Law) ...........................382

KANSAS         ..........................................................................................382

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER
PROTECTION ACT  (Kan. Stat. Ann. § 50-623, *et seq.*).............................382

COUNT II  BREACH OF EXPRESS WARRANTY
(Kan. Stat. Ann. § 84-2-313)........................................................386

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (Kan. Stat. Ann. § 84-2-314) ...................................389

COUNT IV  REVOCATION OF ACCEPTANCE
(Kan. Stat. Ann. § 84-2-608)........................................................390

COUNT V  BREACH OF CONTRACT/COMMON LAW
WARRANTY  (Based On Kansas Law).........................................................392

COUNT VI  FRAUD BY CONCEALMENT  (Based On Kansas Law)...................393

COUNT VII  UNJUST ENRICHMENT  (Based On Kansas Law)..........................395

KENTUCKY ..........................................................................................396

- ix -

COUNT I  VIOLATION OF THE KENTUCKY CONSUMER
    PROTECTION ACT  (Ky. Rev. Stat. § 367.110, *et seq*.) ..............................396

COUNT II  BREACH OF EXPRESS WARRANTY
    (Ky. Rev. Stat. § 355.2-313) ...............................................................397

COUNT III  BREACH OF IMPLIED WARRANTIES OF
    MERCHANTABILITY  (Ky. Rev. Stat. § 335.2-314).................................397

COUNT IV  FRAUDULENT CONCEALMENT
    (Based On Kentucky Law) .....................................................................398

COUNT V  UNJUST ENRICHMENT  (Based On Kentucky Law) ........................400

LOUISIANA.................................................................................................................401

COUNT I  LOUISIANA PRODUCTS LIABILITY ACT  (La. Rev. Stat.
    § 9:2800.51, *et seq*.) ...........................................................................401

COUNT II  REDHIBITION  (La. Civ. Code Art. 2520, *et seq*. and 2545) ..............403

COUNT III  BREACH OF IMPLIED WARRANTY OF FITNESS FOR
    ORDINARY USE  (La. Civ. Code Art. 2524)....................................404

COUNT IV  NEGLIGENCE  (La. Civ. Code Art. 2315) .......................................405

MAINE     .................................................................................................407

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
    (Me. Rev. Stat. Ann. tit. 5 § 205-A, *et seq*.).......................................407

COUNT II  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY  (Me. Rev. Stat. Ann. tit. 11 § 2-314) .......................409

COUNT III  REVOCATION OF ACCEPTANCE
    (Me. Rev. Stat. Ann. tit. 11 § 2-608)........................................................... 41

COUNT IV  BREACH OF CONTRACT  (Based On Maine Law) .........................412

COUNT V  UNJUST ENRICHMENT  (Based On Maine Law).............................412

MARYLAND .................................................................................................................413

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION
    ACT  (Md. Code Com. Law § 13-101, *et seq*.)................................413

- x -

COUNT II  BREACH OF EXPRESS WARRANTY
    (Md. Code Com. Law § 2-313) ......................................................... 415

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Md. Code Com. Law § 2-314) ............................ 418

COUNT IV  REVOCATION OF ACCEPTANCE
    (Md. Code Com. Law § 2-608) ......................................................... 419

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On Maryland Law) ................................................................ 421

COUNT VI  FRAUD BY CONCEALMENT  (Based On Maryland Law) .............. 422

COUNT VII  NEGLIGENCE  (Based On Maryland Law) ................................ 424

COUNT VIII  STRICT PRODUCTS LIABILITY – DESIGN DEFECT
    (Based On Maryland Law) ................................................................ 425

COUNT IX  STRICT PRODUCTS LIABILITY – DEFECTIVE
    MANUFACTURING  (Based On Maryland Law) .......................................... 427

COUNT X  STRICT PRODUCTS LIABILITY –  DEFECT DUE TO
    NONCONFORMANCE WITH REPRESENTATIONS
    (Based On Maryland Law) ................................................................ 428

COUNT XI  UNJUST ENRICHMENT  (Based On Maryland Law) ..................... 429

MASSACHUSETTS ............................................................................... 430

COUNT I  VIOLATION OF THE MASSACHUSETTS  CONSUMER
    PROTECTION ACT  (Chapter 93A) ..................................................... 430

COUNT II  BREACH OF EXPRESS WARRANTY
    (ALM GL. ch. 106, § 2-313) ............................................................. 431

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (ALM GL ch. 106, § 2-314) ................................ 434

COUNT IV  REVOCATION OF ACCEPTANCE
    (ALM GL ch. 106, § 2-608) ............................................................. 435

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On Massachusetts Law) ........................................................ 437

COUNT VI  UNJUST ENRICHMENT  (Based On Massachusetts Law) .............. 438

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

010172-25  398181 v1

MICHIGAN ......................................................................................... 438

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER
 PROTECTION ACT  (Mich. Comp. Laws § 445.901, *et seq.*) ...................... 438

COUNT II  BREACH OF EXPRESS WARRANTY
 (Mich. Comp. Laws § 440.2313) ................................................. 440

COUNT III  BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY  (Mich. Comp. Laws § 440.2314).......................... 440

MINNESOTA ..................................................................................... 441

COUNT I VIOLATION OF MINNESOTA FALSE STATEMENT IN
 ADVERTISING STATUTE  (Minn. Stat. §§ 325F.67 *et seq.*) ...................... 441

COUNT II VIOLATION OF MINNESOTA UNIFORM DECEPTIVE
 TRADE PRACTICES ACT  (Minn. Stat. § 325D.43-48, *et seq.*).................. 442

COUNT III VIOLATION OF MINNESOTA PREVENTION OF
 CONSUMER FRAUD ACT   (Minn. Stat. § 325F.68, *et seq.*) ...................... 444

COUNT IV  FRAUDULENT MISREPRESENTATION &  FRAUDULENT
 CONCEALMENT  (Based On Minnesota Law) ............................................ 445

COUNT V  BREACH OF EXPRESS WARRANTY
 (Minn. Stat. § 325G.19 Express Warranties) ..................................... 447

COUNT VI  BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY (STRICT LIABILITY)  (Minn.
 Stat. § 336.2-314 Implied Warranty;  Merchantability;  Usage Of Trade)....... 448

COUNT VII  UNJUST ENRICHMENT  (Based On Minnesota Law)..................... 449

COUNT VIII  STRICT LIABILITY (DESIGN DEFECT)
 (Based On Minnesota Law)............................................................ 450

COUNT IX  STRICT LIABILITY (FAILURE TO WARN)
 (Based On Minnesota Law)............................................................ 451

MISSISSIPPI ...................................................................................... 453

COUNT I  MISSISSIPPI PRODUCTS LIABILITY ACT
 (Miss. Code Ann. § 11-1-63, *et seq.*) ........................................... 453

COUNT II  BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY   (Miss. Code Ann. §§ 75-2-314)............................. 455

010172-25 398181 v1

COUNT III  NEGLIGENCE  (Under Mississippi Law)............................................455

COUNT IV  REVOCATION OF ACCEPTANCE
    (Miss. Code Ann. § 75-2-608)..................................................................457

COUNT V  NEGLIGENT MISREPRESENTATION/FRAUD
    (Based On Mississippi Law) ....................................................................459

COUNT VI  UNJUST ENRICHMENT  (Based On Mississippi Law) ....................461

MISSOURI ........................................................................................................................462

COUNT I  VIOLATION OF MISSOURI MERCHANDISING
    PRACTICES ACT  (Mo. Rev. Stat. § 407.010, *et seq.*)..................................462

COUNT II  BREACH OF EXPRESS WARRANTY
    (Mo. Rev. Stat. § 400.2-313)...................................................................463

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY  (Mo. Rev. Stat. § 400.2-314) ..................................466

COUNT IV  REVOCATION OF ACCEPTANCE
    (Mo. Rev. Stat. § 400.2-608).................................................................467

COUNT V  BREACH OF CONTRACT/COMMON LAW
    WARRANTY  (Based On Missouri Law)...................................................469

COUNT VI  FRAUD BY CONCEALMENT  (Based On Missouri Law)...............470

COUNT VII  UNJUST ENRICHMENT  (Based On Missouri Law).......................472

MONTANA ......................................................................................................................473

COUNT I  BREACH OF EXPRESS WARRANTY
    (Mont. Code § 30-2-313)......................................................................473

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY   (Mont. Code § 30-2-314)......................................476

COUNT III  REVOCATION OF ACCEPTANCE  (Mont. Code § 30-2-608) .........477

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On Montana Law) .......................................................................479

COUNT V  FRAUD BY CONCEALMENT  (Based On Montana Law) ................480

COUNT VI  UNJUST ENRICHMENT  (Based On Montana Law) ........................481

010172-25  398181 v1

NEBRASKA ...................................................................................................... 482

COUNT I  VIOLATION OF THE NEBRASKA CONSUMER
     PROTECTION ACT  (Neb. Rev. Stat. § 59-1601, *et seq.*) ............................ 482

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
     MERCHANTABILITY  (Neb. Rev. Stat. Neb. § 2-314) ................................ 483

COUNT III  REVOCATION OF ACCEPTANCE
     (Nev. Rev. Stat. Neb. § 2-608) ........................................................................ 484

COUNT IV  IN THE ALTERNATIVE, UNJUST ENRICHMENT
     (Based On Nebraska Law) ................................................................................ 487

NEVADA   ........................................................................................................ 487

COUNT I  VIOLATION OF THE NEVADA DECEPTIVE TRADE
     PRACTICES ACT  (Nev. Rev. Stat. § 598.0903, *et seq.*) .............................. 487

COUNT II  BREACH OF EXPRESS WARRANTY
     (Nev. Rev. Stat. § 104.2313) ........................................................................... 489

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
     MERCHANTABILITY  (Nev. Rev. Stat. § 104.2314) ................................. 492

COUNT IV  REVOCATION OF ACCEPTANCE
     (Nev. Rev. Stat. § 104.2608) ........................................................................... 493

COUNT V  BREACH OF CONTRACT/COMMON LAW
     WARRANTY  (Based On Nevada Law) ......................................................... 495

COUNT VI  BREACH OF IMPLIED COVENANT OF GOOD FAITH
     AND FAIR DEALING  (Based On Nevada Law) .......................................... 496

COUNT VII  FRAUD BY CONCEALMENT  (Based On Nevada Law) ................. 497

COUNT VIII  UNJUST ENRICHMENT  (Based On Nevada Law) ........................ 499

NEW HAMPSHIRE ........................................................................................... 499

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT
     (N.H. Rev. Stat. Ann. § 358A:1, *et seq.*) ....................................................... 499

Count II  Breach of Express Warranty  (N.H. Rev. Stat. Ann. § 382-A:2-313) ........ 501

Count III  Breach of Implied Warranty of Merchantability  (N.H. Rev. Stat. Ann.
     § 382-A:2-314) ................................................................................................. 504

- xiv -

COUNT IV  REVOCATION OF ACCEPTANCE
    (N.H. Rev. Stat. Ann. § 382-A:2-608) ...................................................... 505

COUNT V  BREACH OF COMMON LAW WARRANTY
    (Based On New Hampshire Law) ....................................................... 507

COUNT VI  UNJUST ENRICHMENT  (Based On New Hampshire Law) ............. 508

NEW JERSEY ............................................................................................. 509

COUNT I  VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
    (N.J. Stat. Ann. § 56:8-1, *et seq.*) ...................................................... 509

COUNT II  BREACH OF EXPRESS WARRANTY
    (N.J. Stat. Ann. § 12A:2-313) ............................................................. 511

COUNT III  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY  (N.J. Stat. Ann. § 12A:2-314) ................................ 513

COUNT IV  REVOCATION OF ACCEPTANCE
    (N.J. Stat. Ann. § 12A:2-608) ............................................................. 514

COUNT V  BREACH OF CONTRACT  (Based On New Jersey Law) .................. 516

COUNT VI  IN THE ALTERNATIVE, UNJUST ENRICHMENT
    (Based On New Jersey Law) ............................................................... 517

NEW MEXICO ............................................................................................ 518

COUNT I  BREACH OF EXPRESS WARRANTY
    (N.M. Stat. Ann. § 55-2-313) ............................................................. 518

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (N.M. Stat. Ann. § 55-2-314)................................. 521

COUNT III  REVOCATION OF ACCEPTANCE
    (N.M. Stat. Ann. § 55-2-608) ............................................................. 522

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
    (Based On New Mexico Laws) ............................................................ 524

COUNT V  FRAUD BY CONCEALMENT  (Based On New Mexico Law).......... 525

COUNT VI  UNJUST ENRICHMENT  (Based On New Mexico Law)................. 527

COUNT VII  VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE
    PRACTICES ACT  (N.M. Stat. Ann. §§ 57-12-1, *et seq.*) ........................... 528

- xv -

COUNT VIII  VIOLATIONS OF THE NEW MEXICO MOTOR
         VEHICLE DEALERS FRANCHISING ACT
         (N.M. Stat. Ann. §§ 57-16-1, *et seq.*)................................................. 529

NEW YORK ........................................................................................................ 530

COUNT I  DECEPTIVE ACTS OR PRACTICES
         (N.Y. Gen. Bus. Law § 349)............................................................... 530

COUNT II  FALSE ADVERTISING  (N.Y. Gen. Bus. Law § 350) ....................... 531

COUNT III  BREACH OF EXPRESS WARRANTY
         (N.Y. U.C.C. § 2-313) ....................................................................... 533

COUNT IV  BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY  (N.Y. U.C.C. § 2-314) ................................... 536

COUNT V  REVOCATION OF ACCEPTANCE  (N.Y. U.C.C. § 2-608).............. 537

COUNT VI  BREACH OF CONTRACT/COMMON LAW
         WARRANTY  (Based On New York Law)............................................ 539

COUNT VII  UNJUST ENRICHMENT  (Based On New York Law) ................... 540

NORTH CAROLINA ......................................................................................... 541

COUNT I  BREACH OF THE IMPLIED WARRANTY OF
         MERCHANTABILITY  (N.C. Gen. Stat. § 25-2-314)......................... 541

COUNT II  FRAUD BY CONCEALMENT  (Based On North Carolina Law)........ 542

COUNT III  UNJUST ENRICHMENT   (Based On North Carolina Law) ............. 544

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
         (Based On North Carolina Law) ........................................................ 545

NORTH DAKOTA.............................................................................................. 545

COUNT I  BREACH OF EXPRESS WARRANTY
         (N.D. Cent. Code. § 41-02-30)........................................................... 545

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
         MERCHANTABILITY  (N.D. Cent. Code § 41-02-31) ....................... 548

COUNT III  UNJUST ENRICHMENT  (Based On North Dakota Law)................. 549

010172-25 398181 v1

COUNT IV  VIOLATION OF THE NORTH DAKOTA CONSUMER
 FRAUD ACT  (N.D. Cent. Code § 51-15-02) ................................... 550

COUNT V  REVOCATION OF ACCEPTANCE
 (N.D. Cent. Code § 41-02-71 (2-608)) ......................................... 551

COUNT VI  BREACH OF CONTRACT/COMMON LAW WARRANTY
 (Based On North Dakota Law) ...................................................... 553

COUNT VII  FRAUD BY CONCEALMENT  (Based On North Dakota Law) ....... 554

OHIO         .................................................................................... 556

COUNT I  VIOLATION OF OHIO CONSUMER SALES PRACTICES
 ACT  (Ohio Rev. Code Ann. § 1345.01, *et seq.*) ............................. 556

COUNT II  VIOLATION OF OHIO DECEPTIVE TRADE PRACTICES ACT
 (Ohio Rev. Code Ann. § 4165.01, *et seq* ....................................... 557

COUNT III  BREACH OF EXPRESS WARRANTY  (Ohio Rev. Code
 Ann. § 1302.26, *et seq.* (U.C.C. § 2-313)) ................................... 559

COUNT IV  OHIO BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY STRICT LIABILITY  (Ohio Rev. Code Ann.
 § 1302.27 (U.C.C. § 2-314)) ...................................................... 559

COUNT V  OHIO NEGLIGENT DESIGN, ENGINEERING &
 MANUFACTURE  (Based On Ohio Law) ........................................... 560

COUNT VI  FRAUD & FRAUDULENT CONCEALMENT
 (Based On Ohio Law) ................................................................. 562

COUNT VII  UNJUST ENRICHMENT  (Based On Ohio Law) .............................. 563

OKLAHOMA ...................................................................................... 564

COUNT I  VIOLATION OF OKLAHOMA CONSUMER PROTECTION
 ACT  (Okla. Stat. tit. 15 § 751, *et seq.*) ........................................ 564

COUNT II  VIOLATION OF OKLAHOMA DECEPTIVE TRADE
 PRACTICES ACT  (78 Okla. Stat. Ann. § 51, *et seq.*) ..................... 565

COUNT III  BREACH OF EXPRESS WARRANTY
 (12A Okla. Stat. Ann. § 2-313) ................................................... 566

COUNT IV  BREACH OF THE IMPLIED WARRANTY OF
 MERCHANTABILITY  (12A Okla. Stat. Ann. § 2-314) ..................... 569

010172-25  398181 v1

COUNT V  REVOCATION OF ACCEPTANCE
(12A Okla. Stat. Ann. § 2-608) ..................................................571

COUNT VI  BREACH OF CONTRACT/COMMON LAW WARRANTY
(Based On Oklahoma Law) ........................................................573

COUNT VII  FRAUD BY CONCEALMENT  (Based On Oklahoma Law) ............574

COUNT VIII  UNJUST ENRICHMENT  (Based On Oklahoma Law) ...................576

OREGON       ....................................................................................577

COUNT I  VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT  (Or. Rev. Stat. §§ 646.605, et seq.) ..................577

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (Or. Rev. Stat. § 72.3140)........................579

COUNT III  REVOCATION OF ACCEPTANCE  (Or. Rev. Stat. § 72.6080) ........580

COUNT IV  FRAUD BY CONCEALMENT  (Based On Oregon Law) ..................582

COUNT V  UNJUST ENRICHMENT  (Based On Oregon Law)............................584

PENNSYLVANIA.................................................................................585

COUNT I  VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION
LAW  (73 P.S. § 201-1, et seq.) .................................................585

COUNT II  BREACH OF EXPRESS WARRANTY  (13 Pa. Cons. Stat. Ann.
§ 2313)....................................................................................586

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (13 Pa. Cons. Stat. Ann. § 2314) ............589

COUNT IV  UNJUST ENRICHMENT  (Based On Pennsylvania Law).................590

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
(Based On Pennsylvania Law) ...................................................590

RHODE ISLAND .................................................................................591

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT
(R.I. Gen. Laws § 6-13.1, et seq.) .............................................591

010172-25  398181 v1

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
  MERCHANTABILITY  (R.I. Gen. Laws § 6A-2-314) .................................. 593

COUNT III  REVOCATION OF ACCEPTANCE
  (R.I. Gen. Laws § 6A-2-608) .......................................................... 594

COUNT IV  UNJUST ENRICHMENT  (Based On Rhode Island Law) ................. 596

SOUTH CAROLINA ................................................................................ 597

COUNT I  BREACH OF THE IMPLIED WARRANTY OF
  MERCHANTABILITY  (S.C. Code § 36-2-314) .................................. 597

COUNT II  UNJUST ENRICHMENT  (Based On South Carolina Law) ................ 598

COUNT III  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
  TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10, *et seq.*) ................. 599

COUNT IV  VIOLATIONS OF THE SOUTH CAROLINA REGULATION
  OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT
  (S.C. Code Ann. § 56-15-10, *et seq.*) .............................................. 602

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
  (Based On South Carolina Law) .................................................... 604

SOUTH DAKOTA ................................................................................. 605

COUNT I  BREACH OF EXPRESS WARRANTY
  (S.D. Codified Laws § 57A-2-313) ................................................. 605

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
  MERCHANTABILITY  (S.D. Codified Laws § 57A-2-314) ...................... 608

COUNT III  UNJUST ENRICHMENT  (Based On South Dakota Law) ................ 609

COUNT IV  VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE
  TRADE PRACTICES ACT  (S.D. Codified Laws § 37-24-6) ..................... 610

COUNT V  REVOCATION OF ACCEPTANCE
  (S.D. Codified Laws § 57A-2-608) ................................................. 611

COUNT VI  BREACH OF CONTRACT/COMMON LAW WARRANTY
  (Based On South Dakota Law) ...................................................... 613

TENNEESSEE ...................................................................................... 614

010172-25  398181 v1

COUNT I  VIOLATION OF TENNESSEE CONSUMER PROTECTION
      ACT  (Tenn. Code Ann. § 47-18-101, *et seq.*)....................................614

COUNT II  FRAUDULENT MISREPRESENTATION &  FRAUDULENT
      CONCEALMENT  (Based On Tennessee Law) ...............................615

COUNT III  BREACH OF EXPRESS WARRANTY
      (Tenn. Code Ann. § 47-2-313)........................................................616

COUNT IV  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY  (Tenn. Code Ann. § 47-2-314) ..............617

COUNT V  UNJUST ENRICHMENT  (Based On Tennesse Law)........................618

TEXAS        ...............................................................................................619

COUNT I  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
      PRACTICES ACT  (Tex. Bus. & Com. Code §§ 17.41, *et seq.*) ..................619

COUNT II  BREACH OF EXPRESS WARRANTY  (Tex. Bus. &
      Com. Code § 2.313) ........................................................................621

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
      MERCHANTABILITY (Tex. Bus. & Com. Code § 2.314)...........624

COUNT IV  REVOCATION OF ACCEPTANCE
      (Tex. Bus. & Com. Code § 2.608) ...................................................625

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
      (Based On Texas Law)......................................................................627

COUNT VI  FRAUD BY CONCEALMENT  (Based On Texas Law)....................628

COUNT VII  UNJUST ENRICHMENT  (Based On Texas Law)...........................630

UTAH        ...............................................................................................631

COUNT I  BREACH OF EXPRESS WARRANTY
      (Utah Code Ann. § 70A-2-313)........................................................631

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
      MERCHANTABILITY  (Utah Code Ann. § 70A-2-314)..............633

COUNT III  REVOCATION OF ACCEPTANCE
      (Utah Code Ann. § 70A-2-608).......................................................634

010172-25 398181 v1

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
(Based On Utah Law).................................................................637

COUNT V  UNJUST ENRICHMENT  (Based On Utah Law)..................................637

VERMONT ..................................................................................638

COUNT I  VIOLATION OF VERMONT CONSUMER FRAUD ACT
(Vt. Stat. Ann. tit. 9, § 2451 *et seq*.)...............................................638

COUNT II  BREACH OF EXPRESS WARRANTY
(Vt. Stat. Ann. tit. 9A § 2-313).......................................................640

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY  (Vt. Stat. Ann. tit. 9A §2-314)..................................643

COUNT IV  REVOCATION OF ACCEPTANCE
(Vt. Stat. Ann. tit. 9A §2-608)........................................................644

COUNT V  BREACH OF CONTRACT  (Based On Vermont Law).........................646

COUNT VI  UNJUST ENRICHMENT  (Based On Vermont Law) .........................646

WASHINGTON ..............................................................................647

COUNT I  VIOLATION OF THE CONSUMER PROTECTION ACT
(Rev. Code Wash. Ann. §§ 19.86.010, *et seq*.)...................................647

COUNT II  BREACH OF EXPRESS WARRANTY
(Rev. Code Wash. § 62A.2-313).....................................................648

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY  (Rev. Code Wash. § 62A.2-614) ...........................651

COUNT IV  REVOCATION OF ACCEPTANCE
(Rev. Code Wash. § 62A.2-608).....................................................652

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
(Based On Washington Law) .........................................................655

COUNT VI  FRAUD BY CONCEALMENT  (Based On Washington Law)...........655

COUNT VII  UNJUST ENRICHMENT  (Based On Washington Law)..................657

WEST VIRGINIA ..........................................................................658

010172-25 398181 v1

COUNT I  VIOLATIONS OF THE CONSUMER CREDIT AND
   PROTECTION ACT  (W. Va. Code § 46A-1-101, *et seq.*) ........................... 658

COUNT II  BREACH OF EXPRESS WARRANTY
   (W. Va. Code § 46-2-313) ................................................................ 663

COUNT III  BREACH OF IMPLIED WARRANTY OF
   MERCHANTABILITY  (W. Va. Code § 46-2-314) ....................................... 666

COUNT IV  REVOCATION OF ACCEPTANCE/STATUTORY CLAIM
   FOR DIMINISHED VALUE  (W. Va. Code § 46A-6A-1, *et seq.* and
   W. Va. Code § 46-2-608) .................................................................. 668

COUNT V  UNJUST ENRICHMENT  (Based On West Virginia Law) ................. 670

COUNT VI  BREACH OF CONTRACT/COMMON LAW
   WARRANTY/BREACH OF DUTY OF GOOD FAITH AND
   FAIR DEALING  (Based On West Virginia Law) .......................................... 671

WISCONSIN ........................................................................................ 672

COUNT I  VIOLATIONS OF THE WISCONSIN  DECEPTIVE TRADE
   PRACTICES ACT  (Wisc. Stat. § 110.18) ............................................... 672

COUNT II_  BREACH OF EXPRESS WARRANTY  (Wisc. Stat. § 402.313)....... 674

COUNT III  REVOCATION OF ACCEPTANCE  (Wisc. Stat § 402.608)............. 677

COUNT IV  BREACH OF CONTRACT/COMMON LAW WARRANTY
   (Based On Wisconsin Law) ................................................................ 679

COUNT V  FRAUD BY CONCEALMENT  (Based On Wisconsin Law)............... 680

COUNT VI  UNJUST ENRICHMENT  (Based On Wisconsin Law)....................... 682

WYOMING ......................................................................................... 682

COUNT I  VIOLATION OF THE WYOMING CONSUMER
   PROTECTION ACT  (Wyo. Stat. §§ 45-12-105 *et seq.*) ............................. 682

COUNT II  BREACH OF EXPRESS WARRANTY
   (Wyo. Stat. § 34.1-2-313) ................................................................ 684

COUNT III  BREACH OF THE IMPLIED WARRANTY OF
   MERCHANTABILITY  (Wyo. Stat. §§ 34.1-2-314) ..................................... 687

010172-25 398181 v1

COUNT IV  REVOCATION OF ACCEPTANCE IN WHOLE OR
     IN PART  (Wyo. Stat. § 34.1-2-608) ............................................................. 688

COUNT V  BREACH OF CONTRACT/COMMON LAW WARRANTY
     (Based On Wyoming Law) ............................................................................... 690

COUNT VI  BREACH OF IMPLIED COVENANT OF GOOD FAITH
     AND FAIR DEALING  (Based On Wyoming Law) ....................................... 691

COUNT VII  FRAUD BY CONCEALMENT  (Based On Wyoming Law) ............. 692

COUNT VIII  UNJUST ENRICHMENT  (Based On Wyoming Law) .................... 693

PRAYER FOR RELIEF ............................................................................................. 694

DEMAND FOR JURY TRIAL ................................................................................... 697

010172-25  398181 v1

Pursuant to Scheduling Order No. 3, Plaintiffs in the "Economic Loss" cases file this Amended Economic Loss Master Consolidated Complaint.

# I.   INTRODUCTION

1.      Since 2001, Toyota Motor Corporation ("TMC") and its United States sales and marketing arm Toyota Motor Sales, U.S.A., Inc. ("TMS") (together, "Toyota" or "Defendants") have sold tens of millions of vehicles (under the Toyota, Lexus, and Scion brand names) throughout the United States and worldwide that use an electronic throttle control system ("ETCS" or "ETCS-i").

2.      ETCS vehicles operate with an electronic throttle control system that severs the mechanical link between the accelerator pedal and the engine.  In place of the cable that connects the two components, complex computer and sensor systems communicate an accelerator pedal's position to the engine throttle, telling the vehicle how fast it should go.  Toyota began installing these electronic control systems in some Lexus models in 1998, in Camry and Prius models in 2001 and 2002, and in all Toyota-made vehicles by 2006.[1]  Toyota promised that these new systems would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, Toyota concealed and did not fix a serious safety problem plaguing all ETCS cars.

3.      In press releases, sales literature, brochures and other consumer-oriented documents, Toyota has consistently promoted "safety" and "reliability" as top priorities in all of its vehicles and has specifically promoted ETCS.  Toyota promised

---

[1] *See* U.S. Bound Vehicle Models and MY with ETCS-i, at TOYEC-0000577.

that a "fundamental component of building safe cars" was testing and analyzing why accidents occur.

4.      Toyota has received tens of thousands of complaints from consumers about sudden unintended acceleration ("SUA").  It also received evidence that the number of complaints of sudden unintended acceleration increased substantially in vehicles with electronic throttle controls as opposed to those with mechanical controls.  For example, on June 3, 2004, Scott Yon, an investigator in the U.S. National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI"), sent Toyota Assistant Manager of Technical and Regulatory Affairs Chris Santucci – who himself had previously worked at NHTSA – an e-mail attaching a chart showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles.

5.      Toyota also received reports of crashes and injuries that put Toyota on notice of the serious safety issues presented by SUA.  Two of the top five categories of injury claims in NHTSA's Early Warning Reporting Database involved "speed control" issues on the 2007 Lexus ES350 and Toyota Camry.  As one internal document observed, the issues presented by a SUA-related defect are "catastrophic."[2]  Despite the catastrophic nature of this defect, Toyota has concealed its existence and has failed to repair the problem.

6.      Complaint data lodged with NHTSA – assuming it has been properly and adequately disclosed by Toyota – reveals a SUA defect in vehicles with ETCS.

---

[2] TOY-MDLID00003908.

- 2 -

Within the first year of changing from non-ETCS to ETCS, there was a material increase in SUA events such that Toyota knew of a safety-related defect:

| | |
|---|---|
| Lexus RX | 1.8-fold increase |
| 4Runner | 6-fold increase |
| Avalon | 2-fold increase |
| Camry | 3.7-fold increase |
| Highlander | 2.8-fold increase |
| RAV4 | 2-fold increase |
| Sienna | 2-fold increase |
| Tacoma | 14-fold increase |
| Lexus ES | 5-fold increase |

7.      On information and belief, this trend may prove to be much greater once the complaints known only to Toyota are analyzed.  Toyota has received at least 37,000 complaints, and possibly as many as 100,000 or more, involving SUA incidents.

8.      Irrespective of whether these SUA events are caused by floor mats, pedals, an unknown failure in the ETCS, or a failure in other aspects of the electrical and mechanical systems, Toyota vehicles with ETCS are defective.

9.      This defect renders the vehicles unsafe.  For example, from 2003-2009, there were 23 claims of death or injury involving speed control on the 2005 Camry, 20 on the 2007 Camry, and 18 on the 2007 Lexus ES.

10.      Despite notice of the SUA defect in ETCS vehicles, Toyota did not disclose to consumers that its vehicles – which Toyota for years had advertised as "safe" and "reliable" – were in fact not as safe or reliable as a reasonable consumer

- 3 -

expected due to the heightened risk of unintended acceleration.  Toyota never

disclosed that it had no credible or scientific explanation for SUA events in ETCS

vehicles.  Rather than disclose the truth, Toyota concealed the existence of this

defect.  Toyota's strategy was to "stop this from moving forward" – referring to the

possibility of a public hearing before the United States Congress on SUA years

before the congressional hearings in 2010.[3]

11.     By late 2009 and early 2010, as NHTSA and Toyota received more and

more reports of SUA, Toyota finally admitted there might be "mechanical problems."

After years of consistently blaming such events on driver error and emphatically

denying the existence of any defect, Toyota claimed that some SUA events could be

explained by the entrapment of the accelerator pedal by the floor mats, or by so-called

"sticky pedals."  Toyota recalled certain vehicles to address these potential problems

and publicly proclaimed that these recalls resolved all concerns of SUA in Toyota

vehicles.  But SUA events kept occurring, even in vehicles that did not have floor

mats and vehicles that were not subject to the sticky pedal recall.

12.     In response to a Congressional Committee's January 28, 2010 request

for internal Toyota documents involving SUA complaints, Toyota provided a

representative sample of reports describing calls received through the company's

telephone complaint line.  To produce this sample, Toyota first identified 37,900

customer contact reports in its database as potentially related to SUA.  Toyota then

randomly selected 3,430 of those complaints for review.  Toyota ultimately

---

[3] TOY-MDLID00050747.

determined that 1,008 of those complaints were directly related to SUA and provided these 1,008 reports to the Committee.

13.     In responding to Congress, Toyota unilaterally excluded calls after October 1, 2009, calls that it claimed did not involve SUA incidents, and calls involving vehicles produced before 2001.  Toyota then acknowledged 233 reports of SUA from the random sample of 3,430 complaints Toyota produced to the Committee.  Of these 233 complaints, Toyota claimed 69 involved vehicle crashes.

14.     These 233 incidents occurred in a broad variety of Toyota vehicles and were reported in vehicles produced in every model year from 2001 through 2010.[4] Assuming the 3,430 complaints selected by Toyota for review were in fact a random sample of the 37,900 complaints in the Toyota database, Toyota would have received an estimated 2,600 complaints of sudden unintended acceleration from Toyota and Lexus drivers between January 2000 and October 2009.  These complaints would have included an estimated 760 crashes.

15.     In the data the Committee reviewed, operators on the Toyota customer complaint line (who relied on customer reports and information from dealer inspections) identified floor mats or pedals as the cause of only 16% of the SUA incident reports.  Approximately 70% of the SUA events in Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

---

[4] Twenty-nine percent of the complaints involved Camry models, 13% involved Lexus models, 10% involved Corollas, and 9% involved Tacoma models.  Model year 2007 vehicles were the subject of 17% of all sudden unintended acceleration complaints, and model year 2002 and 2004 vehicles were each the subject of 13% of these complaints.

- 5 -

16.     Analyses of publicly available databases by other researchers indicate that from 1999 to the present there were more than 5,800 SUA incidents involving Toyotas that resulted in 2,166 crashes, 1,011 injuries and 78 deaths.  Internally, Toyota was tallying the deaths caused by SUA.

17.     Despite years of warnings, Toyota has still failed to properly disclose, explain or fix the underlying problem with ETCS.  This leaves millions of Toyota owners with vehicles that potentially could race out of control.  Until 2009, consumers were unaware of even the potential for such events.

18.     SUA is preventable.  For example, "brake-override" systems designed to recognize an attempt by the driver to brake while at the same time requesting an open throttle have been employed in vehicles sold in the United States by other manufacturers for years.  Toyota, however, failed to incorporate a brake-override or other appropriate fail-safe mechanism.  Indeed, until late 2009, no Toyota vehicle had a "brake-override" system or other adequate fail-safe mechanical system that was sufficient to prevent SUA.  Only after extensive publicity concerning the SUA defect in Toyota vehicles did Toyota add a brake-override as standard equipment in 2011 model-year vehicles.  Toyota has recently announced that it will provide brake-overrides to the following models:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250.  But this announcement is not an effective remedy or repair.  First, it was announced not as a safety recall but as a "confidence booster."  Most consumers did not and will not take their vehicles in for a brake-override remedy described misleadingly as a "confidence" measure.  Second, the "confidence booster" does not cover all vehicles with a SUA defect.  Third, the

- 6 -

brake-override being offered is not as robust or effective as an override as implemented by other manufacturers.

19.     Many of the major automobile manufacturers have had a brake-override or smart pedal for years.  Not so Toyota.  Toyota recognized the need for a brake-override" as early as 2007, if not before:  when discussing the "floor mat issue," it was suggested that "a fail safe option similar to that used by other companies to prevent unintended acceleration" should be investigated.  The fail-safe referred to, used by both GM and Audi at the time, was a brake-override.  Belatedly, in 2009 Toyota engineers again addressed this issue after the well-publicized death of a police officer due to unintended acceleration.

> During the floor mat sticking issue of 2007, TMS
> suggested that there should be "a fail safe option similar to
> that used by other companies to prevent unintended
> acceleration."  I remember being told by the accelerator
> pedal section Project General Manager at the time (Mr. M)
> that "This kind of system will be investigated by Toyota,
> not by Body Engineering Div."  Also, that information
> concerning the sequential inclusion of a fail safe system
> would be given by Toyota to NHTSA when Toyota was
> invited in 2008.  (The NHTSA knows that Audi has
> adopted a system that closes the throttle when the brakes

- 7 -

1    are applied and that GM will also introduce such a

2    system.)[5]

3        20.    Toyota admits that the recalls have not addressed the problem.  James

4    Lentz, Toyota's second-highest ranking North American executive was asked:  "Do

5    you [] believe that the recall on the carpet changes and the recall on the sticky pedal

6

7    will solve the problem of sudden unintended acceleration?"  His reply:  "Not totally."

8        21.    In prepared testimony before the Committee on Oversight and

9    Government Reform of the U.S. House of Representatives on February 24, 2010,

10   TMC President and Chief Executive Officer Akio Toyoda admitted that Toyota's

11   growth in recent years was "too quick" and the company's priorities of "first, safety;

12

13   second, quality; third, volume" had become "confused."  Mr. Toyoda went on to

14   apologize to American consumers:  "I regret that this has resulted in the safety issues

15   described in the recalls we face today, and I am deeply sorry for any accidents that

16   Toyota drivers have experienced."

17       22.    Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor

18   North America, Inc., likewise acknowledged that Toyota had failed its customers.

19   Mr. Inaba testified in the United States Senate Sub-Committee hearings on Toyota

20

21   recalls:

22           In recent months we have not lived up to the high standard

23           our customers and the public have come to expect from

24           Toyota, despite our good faith efforts.  As our president,

25           Akio Toyota, told members of Congress last week, we

26

27   _____

28       [5] TOY-MDLID00041130T-0001.

- 8 -

1    sincerely regret that our shortcomings have resulted in the

2    issues associated with our recent recalls.

3    23.   Shinichi Sasaki, TMC's Executive Vice President admitted before

4    Congress that Toyota "did not listen to its customers":

5

6    How this issue came about is because there were many

7    vehicle – excuse me – many voices were sent to us from

8    the customers, but we really did not listen to every one of

9    them very carefully, one by one.  We should have really

10   listened to them carefully and rendered some technical

11   analysis so that it would be connected to our following

12   product improvement.  However, the quality of this work

13   or the efficiency of our work or speed with which we

14   worked had become sluggish, or sort [sic] failed gradually,

15   and this has come to a much larger issue.

16

17   24.   In testifying to Congress, Toyota made no mention of instances where

18   its own "reliable" employees replicated SUA events not caused by pedals or mats.  In

19   one instance, a "reliable" service manager had the vehicle accelerate to 95 mph in

20   "five to 10 seconds."  When these SUA events were replicated by Toyota

21   technicians; Toyota repurchased the vehicles and if possible made the vehicle owner

22   sign a confidentiality agreement.

23   25.   Rather than disclose these confirmed SUA events Toyota concealed the

24   defect.  Additionally, these confirmed SUA events revealed another aspect of the

25   defect – the failure of the vehicle's diagnostic tools to capture the malfunction.  In

26   other words, no diagnostic trouble code ("DTC") or fault code was triggered during

27

28

- 9 -

these SUA events.  A properly designed and manufactured vehicle would trigger a fault when a SUA event occurs and force the vehicle into a "limp home" mode.

26.     As the long-concealed SUA defect finally began to see the light of day and the public realized that Toyota had no fail-safe mechanisms to prevent SUA, the value of Toyota cars diminished.  Many consumers sought to return their cars out of fear that SUA could occur and cause catastrophic injury or death.  One class member and SUA victim wrote:  "I drive a 4 year old and 3 year old child around and am extremely thankful they were not in the car.…  Had this happened on the freeway, we would have all been dead."  Her request for the "original purchase price of the car refunded" was rejected.[6]  Her concerns and request for revocation of her purchase is not an isolated incident.  Toyota has refused to take class members' vehicles back, and has refused to and cannot provide an adequate repair.

27.     Plaintiffs seek class action status pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of nationwide Consumer and Commercial Classes of Toyota vehicle owners/lessors of all vehicles with ETCS.

28.     Toyota does substantial business in California, the principal offices of Toyota Motor Sales, U.S.A., Inc. ("TMS") are in California, and much of the conduct that forms the basis of the complaint emanated from Toyota's headquarters in Torrance, California.  California has a larger percentage of class members than any other state.

29.     The consumer class members ("Consumer Class") assert claims under California law under the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750;

---

[6] TOY-MDLID90011054.

California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; California False Advertising Law, CAL. BUS. & PROF. CODE § 17500; Breach of Express Warranty, CAL. COM. CODE § 2313; Breach of Implied Warranty of Merchantability, CAL. COM. CODE § 2314; Revocation of Acceptance, CAL. COM. CODE § 2608; Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; Common Law Breach of Contract; Fraud by Concealment and Unjust Enrichment.

30.   The non-consumer economic loss class members ("Commercial Class") assert claims under California law under the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; CAL. BUS. & PROF. CODE § 17500; Breach of Express Warranty, CAL. COM. CODE § 2313; Breach of Implied Warranty of Merchantability, CAL. COM. CODE § 2314; Revocation of Acceptance, CAL. COM. CODE § 2608; Common Law Breach of Contract; Fraud by Concealment and Unjust Enrichment.

31.   In the event California law does not apply on a nationwide basis, Plaintiffs assert the laws of the States and the District of Columbia as set forth below.

32.   Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state-law.

## II.   JURISDICTION AND VENUE

33.   This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members

010172-25 398181 v1

1    nationwide; and the aggregate amount in controversy exceeds $5,000,000 and

2    minimal diversity exists.

3        34.    Venue is proper in this District under 28 U.S.C. § 1391(a) because a

4    substantial part of the events or omissions giving rise to the claims occurred and/or

5    emanated from this District, and Defendants have caused harm to class members

6    residing in this District.

7

8                        **III.    PARTIES**

9    **A.    Consumer Plaintiffs**

10       35.    Plaintiff Kathleen Atwater is a resident and citizen of California.  She

11   owned a 2009 Toyota RAV4 Sport.  After learning about the risk of SUA, Ms. Atwater

12   called Toyota's Customer Experience Center and was assigned claim number

13   1001133126.  Ms. Atwater's RAV4 was included in the "sticky pedal" recall.  Pursuant

14   to the recall, Ms. Atwater's local Toyota dealership installed an accelerator

15   reinforcement bar.  At that time, she asked a Toyota service advisor if the installation

16   of the accelerator reinforcement bar would eliminate the risk of SUA.  The service

17   advisor responded that "to be honest" he did not believe the "shim" would suffice

18   because he thought the problem was probably electronic.  Ms. Atwater asked both her

19   dealership and Toyota to take back the RAV4; neither would do so.  On February 13,

20   2010, Ms. Atwater traded in her 2009 RAV4 for a 2010 Ford Fusion.  Ms. Atwater

21   received less for the sale of her RAV4 than she would have received if the vehicle did

22   not have a SUA defect.  She saw advertisements for Toyota vehicles on television, in

23   magazines, on billboards, in brochures at the dealership, and on the Internet for several

24   years before she purchased her Toyota RAV4 Sport on April 5, 2009.  Although she

25   does not recall the specifics of the many Toyota advertisements she saw before she

- 12 -

1   purchased her RAV4 Sport, she does recall that safety and reliability were consistent

2   themes across the advertisements she saw.  Those representations about safety and

3   reliability influenced her decision to purchase her RAV4 Sport.  She also reviewed the

4   window sticker affixed to the window of her RAV4 Sport.  Had those advertisements,

5   window sticker, or any other materials disclosed that Toyota vehicles could accelerate

6   suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism

7   to overcome this, she would not have purchased her RAV4 Sport.

8

9           36.     Plaintiff Dale Baldisseri is a resident and citizen of California.  He owns

10  a 2009 Toyota Camry. In November 2009, Mr. Baldisseri received a notice from

11  Toyota that described UA.  Mr. Baldisseri was concerned, based on the notice, about

12  UA, and eventually rented a car rather than continuing to drive his Camry. Mr.

13  Baldisseri called Toyota's Customer Experience Center and asked that Toyota

14  supply him with a substitute car, but Toyota refused. Mr. Baldisseri and his wife are

15  afraid to drive the Camry because of its SUA defect, so the vehicle has remained

16  parked since December 2009.  He saw advertisements for Toyota vehicles on

17  television, in magazines, on billboards, in brochures at the dealership, and on the

18  Internet during the five to ten years before he purchased his Toyota Camry on

19  September 1, 2008.  Although he does not recall the specifics of the many Toyota

20  advertisements he saw before he purchased his Camry, he does recall that safety and

21  reliability were a very frequent theme across the advertisements he saw.  Those

22  advertisements about safety and reliability influenced his decision to purchase his

23  Camry.  Had those advertisements or any other materials disclosed that Toyota

24  vehicles could accelerate suddenly and dangerously out of the driver's control, and

25  lacked a fail-safe mechanism to overcome this, he would not have purchased his

- 13 -

Camry.  He certainly would not have paid as much for it, but regardless of that, he wouldn't have purchased it.

37.     Plaintiffs Joel and Lucy Barker are residents and citizens of Washington State and own a 2010 Toyota Corolla. The Barkers purchased their Corolla on March 3, 2010. The dealer did not tell the Barkers that their Corolla was subject to the Toyota recall, and they did not become aware of this fact until they registered the Corolla at the Toyota website. Dismayed with the dealer's failure to disclose the recall at the time of sale, the Barkers met with the general manager of their dealer on March 9, 2010, to discuss their concerns. At the meeting, the Barkers requested that the dealer repurchase the Corolla and return their cash down payment along with the trade in allowance, or at a minimum address their concerns about the car's resale value. The dealer refused to repurchase the car or address their concerns about the resale value. The Barkers saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and display ads while driving past the dealership during the 10 years before they purchased their Toyota Corolla on March 3, 2010. Although they do not recall the specifics of the many Toyota advertisements they saw before they purchased their Corolla, they do recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and/or reliability influenced their decision to purchase their Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their Corolla.  They certainly would not have paid as much for it.

- 14 -

38.     Plaintiff Richard Benjamin is a resident and citizen of Missouri. He owns a 2007 Toyota Sienna. Mr. Benjamin began investigating a trade of his 2007 Sienna for a 2011 Sienna just before the recalls were made public. He has seen his trade-in value drop $2,000 since the recalls according to KELLEY BLUE BOOK, NADA GUIDE, and Edmunds.com.  Mr. Benjamin saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Toyota Sienna on October 25, 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Sienna, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Sienna.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Toyota Sienna, or he would not have paid as much for it.

39.     Plaintiff Brandon Bowron is a resident and citizen of Arizona. He owned a 2007 Lexus IS 350. He sold his Lexus on July 7, 2010. Mr. Bowron received less value for the car due to the SUA defect.  Mr. Bowron saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the six to eight months before he purchased his Lexus IS 350. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his IS 350, he recalls that safety and reliability were a consistent theme across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase

- 15 -

his Lexus IS 350.  Had those advertisements or any other materials disclosed that Lexus vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Lexus IS 350, and he would not have paid as much for it.

40.    Plaintiff Karina Brazdys is a resident and citizen of California. She owns a 2009 Toyota Highlander. In April 2010, Ms. Brazdys experienced an SUA incident. While driving to work, Ms. Brazdys was going approximately 65 mph on the highway when her car suddenly accelerated to 85 mph. Ms. Brazdys was able to slow the car by applying the brake.  During the 18 months leading up to the purchase of her Toyota Highlander in June 2009, Ms. Brazdys saw advertisements for Toyota vehicles in magazines, in brochures at the dealership, and on Toyota's website. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Highlander, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Highlander.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Highlander.

41.    Plaintiff Ebony Brown is a resident and citizen of Illinois. She owns a 2009 Toyota Camry. Ms. Brown saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, on the Internet, in newspapers, and on banners in front of the dealership, during the two years before she purchased her Camry on July 26, 2008. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her

- 16 -

Camry, she does recall that safety and reliability were a consistent theme across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it.

42.    Plaintiffs David and Arlene Caylor are residents of Arizona. They own a 2002 Toyota Camry. On June 2, 2010, Mrs. Caylor experienced a collision as a result of SUA. Mrs. Caylor was backing out of a parking space when her car rapidly accelerated.  She shot back two or three car lengths and hit a parked car. The Caylors saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, several years before they purchased their Toyota Camry on July 6, 2002.  Although they do not recall the specifics of the many Toyota advertisements they saw before they purchased their Camry, they recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase their Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their Camry.

43.    Plaintiff Susan Chambers is a resident and citizen of Iowa. She owns a 2005 Toyota Camry. On November 12, 2009, Ms. Chambers experienced a collision as a result of SUA. Ms. Chambers had slowed her vehicle to a near stop to park her

- 17 -

car. Just before she put the car in park, the car suddenly accelerated and slammed into the car parked in front of her. Ms. Chambers had pressed the brake, but it had no effect on the vehicle's speed. Ms. Chambers' Camry had Toyota floor mats that were secured by both clips at the time of the collision.  Ms. Chambers called her dealer, which told her to call Toyota's Customer Experience Center. Ms. Chambers called Toyota's Customer Experience Center. Toyota subsequently inspected the vehicle, and on December 1, 2009, Toyota wrote a letter to Ms. Chambers stating there was nothing wrong with the vehicle.  During the years before she purchased her Toyota Camry on November 17, 2008, Ms. Chambers saw advertisements for Toyota vehicles on television, in magazines, and on billboards.  Furthermore, during the years before she purchased her Toyota Camry, she viewed the news regularly on television, in magazines, and on the Internet.  Had these advertisements, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she probably would not have purchased her Camry. She certainly would not have paid as much for it.

44.     Plaintiff Gary Davis is a resident and citizen of Tennessee, and he owns a 2008 Toyota Camry LE.  Mr. Davis purchased his Toyota based on its reputation for safety.  Mr. Davis saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several months, if not years, before he purchased his Camry on January 17, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about

- 18 -

safety and reliability influenced his decision to purchase his Camry. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry. He certainly would not have paid as much for it.

45.     Plaintiffs Rocco and Bridie Doino are residents and citizens of New York. They owned a 2010 Toyota Camry. On April 21, 2010, the Doinos experienced a collision caused by SUA while entering a parking lot. The Camry suddenly accelerated and landed on two parked cars. The Camry was totaled. When purchasing their car, the dealer assured the Doinos that SUA was a floor mat problem, and that they would not have a floor mat or SUA issue. The Doinos suffered economic loss because they were not fully compensated for the value of their Toyota Camry. The Doinos saw advertisements for Toyota vehicles on television and in brochures at the dealership during the period before they purchased their Camry. They also reviewed the window sticker and warranty information. Although they do not recall the specifics of the many Camry advertisements they saw before they purchased their Camry, they do recall that safety was a consistent theme across the advertisements they saw. Those representations about safety influenced their decision to purchase their Camry. Had those advertisements, window sticker, warranty information, or any other materials disclosed that Camry vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their Camry. They certainly would not have paid as much for it.

010172-25 398181 v1

46.     Plaintiff Alexander Farrugia is a resident and citizen of New York. He owns a 2008 Toyota Highlander.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his Highlander in November 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Highlander, he does recall that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Highlander.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Highlander.  He certainly would not have paid as much for it.

47.     Plaintiff Carole Fisher is a resident and citizen of Nevada and owns a 2010 Toyota Prius.  Ms. Fisher saw advertisements for Toyota vehicles on television for several months before she purchased her Prius on June 6, 2009.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Prius, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Prius.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Prius.  She certainly would not have paid as much for it.

010172-25 398181 v1

48.     Plaintiff Maureen Fitzgerald is a resident and citizen of Michigan. She owns a 2009 Toyota Corolla LE. The first time Ms. Fitzgerald drove the Corolla with the salesman, it accelerated at the corner to turn into a busy four-lane road. She slammed on the brakes and remarked to the salesman that everything felt too "loose." The salesman told her that she just had to "get used to it."  Ms. Fitzgerald then experienced an SUA on October 6, 2010.  While coasting and looking for a parking spot, the car suddenly accelerated.  She applied the brake, but the car did not respond.  She swerved into a parking space to avoid hitting a pedestrian and another car.  She hit the handicapped bar, and the car stopped so violently that her dog nearly went through the windshield.  Ms. Fitzgerald saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Corolla on March 31, 2009. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and/or reliability were consistent themes across the advertisements she saw.  Those representations about safety and/or reliability influenced her decision to purchase her Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it.

49.     Plaintiff John Flook is a resident and citizen of Maryland. He owns a 2010 Toyota Corolla. He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the 17 years before he purchased his Corolla on July 10, 2009. Although he does not

- 21 -

recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he does recall that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla.  He certainly would not have paid as much for it.

50.     Plaintiff Kevin Funez is a resident and citizen of Florida. He owns a 2006 Toyota Avalon.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the two years before he purchased his Avalon on August 2006.  He also reviewed his window sticker.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Avalon, he does recall that reliability was a consistent theme across the advertisements he saw.  Those representations about reliability influenced his decision to purchase his Avalon.  Had those advertisements, window sticker, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he probably would not have purchased his Avalon.  He certainly would not have paid as much for it.

51.     Plaintiff John Geddis is a resident and citizen of Washington. He owns a 2010 Toyota RAV4. Within a month of his purchase, the news broke about the acceleration issues. Mr. Geddis's vehicle only has about 600 miles on it, but it sits in the driveway practically unused for fear of an SUA event. When the recall repairs

were performed by the dealer, Mr. Geddis told the service person that he wanted to be rid of the car and that he wanted all of his money back, but the dealer refused to accept the RAV4. He believes that the value of the vehicle is greatly diminished because of the recall.  Mr. Geddis saw advertisements for Toyota vehicles on television, in magazines, in brochures at the dealership, and on the Internet during the six to eight months before he purchased his Toyota RAV4 on October 24, 2009. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his RAV4, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Toyota RAV4.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his RAV4, and he would not have paid as much for it.

52.     Plaintiff Susan Gonzalez is a resident and citizen of Arizona. She owns a 2010 Toyota Corolla that she purchased in November 2009. She does not feel safe driving the car. Although she had planned to share the car with her son when she purchased it, she cannot let her 16-year-old son drive the car out of safety concerns. Ms. Gonzalez contacted Toyota's Customer Experience Center about returning the car; they told her to arbitrate. Ms. Gonzalez sought to return the car and arbitrated her claim with the National Center for Dispute Settlement, but lost.  She saw advertisements for Toyota vehicles on television, in magazines, on billboards, and in brochures at the dealership for several years before she purchased her Corolla on November 7, 2009.  Although she does not recall the specifics of the many Toyota

advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Toyota Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it.

53.     Plaintiff Donald Graham is a resident and citizen of Colorado. He owns a 2007 Toyota Prius. Mr. Graham saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Prius on May 4, 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Prius, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Prius.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Prius.

54.     Plaintiff Joseph Hauter is a resident and citizen of California. He owns a 2008 Toyota Tundra. Mr. Hauter experienced two SUA incidents. The first incident, in late December 2009 or early January 2010, occurred when Mr. Hauter was pulling into a gas station. When Mr. Hauter had his foot on the brake pedal, the car suddenly accelerated. He slammed on his brakes, but his engine continued to race.  When his vehicle slowed down, he was able to put the vehicle in park. The second incident

- 24 -

occurred on January 19, 2010, when Mr. Hauter was approaching a left turn lane and began to apply the brakes. The vehicle suddenly accelerated. Mr. Hauter stood on the brake pedal with both feet while the vehicle continued to lurch forward, until the vehicle finally slowed and stopped. After the second incident, Mr. Hauter notified his dealer of the two incidents. The dealer performed the recall repair for the pedal on March 30, 2010.  Mr. Hauter saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the many years before he purchased his Tundra on March 8, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tundra, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Tundra.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Tundra.  He certainly would not have paid as much for it.

55.     Plaintiff Matthew Heidenreich is a resident and citizen of Ohio and leased a 2010 Toyota Corolla.  In spring 2010, he experienced three SUA incidents. The first incident occurred on March 5, 2010, when Mr. Heidenreich was sitting in a bank drive-through.  The car was in park when the engine revved twice to 3000 RPM.  Both times it returned to idle on its own.  The second incident occurred on April 1, 2010, while Mr. Heidenreich was at the post office.  Mr. Heidenreich put the car in park and got out to drop mail in the box.  The engine revved while he was out of the vehicle.  He turned the car off, then on again, and the car idled normally.  The

- 25 -

third incident occurred on April 28, 2010, after Mr. Heidenreich backed the car out of his garage.  The car idled at about 2000 RPM.  He turned the engine off and back on, the tachometer redlined for three separate starts, and the engine "sounded like it was going to explode."  Mr. Heidenreich refuses to drive the vehicle again.  All three incidents were after Mr. Heidenreich submitted his vehicle for recall repairs.  Mr. Heidenreich asked the dealership to cancel his lease and return his money.  Toyota refuses to cancel the lease, but offered to let him trade the car in for another.  Because the new car would have cost him more money, he declined.  In May 2010, Mr. Heidenreich sold his 2010 Corolla to NHTSA for research and lost money on the sale.  Mr. Heidenreich saw advertisements misrepresenting the safety of Toyota vehicles on television, in brochures at the dealership, and on the Internet for years prior to leasing his Toyota on September 30, 2009.  Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Heidenreich leased his 2010 Toyota Corolla.  He also reviewed the window sticker, warranty information, and news reports about Toyota, which he understands are based on press releases from Toyota.  Had these advertisements, window sticker, warranty, news reports or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Mr. Heidenreich would not have leased his 2010 Corolla and/or paid as much for it.

56.     Plaintiff Connie A. Kamphaus is a resident and citizen of Ohio.  She was the lessee of a 2009 Toyota Camry and currently is the lessee of a 2010 Toyota Camry.  Mrs. Kamphaus's late husband, Thomas Kamphaus, experienced the following SUA incidents with the 2009 Camry:  on January 15, 2010, the vehicle

- 26 -

accelerated on its own in a parking lot, but he forced the brake down and shifted into the parking gear; on February 9, 2010, the engine revved and the brake appeared to freeze, but he applied the brakes as hard as possible and was able to shift into the parking gear; and on February 10, 2010, he experienced a nearly identical incident to the day before. These last two incidents occurred after the recall repair was performed. The Kamphauses took the vehicle to Performance Toyota after the incidents and were told the problem was fixed. On February 13, 2010, they called Performance Toyota to complain and requested to get out of the remaining lease. The dealership asked them to sign an arbitration agreement and did not provide them with a loaner vehicle. On February 19, 2010, the Kamphauses traded in the 2009 Toyota Camry for the 2010 Toyota Camry. On March 14, 2010, the 2010 Toyota Camry suddenly accelerated in a parking lot and jumped a concrete wheel stop. The Kamphauses called Performance Toyota shortly after this incident. They put the 2010 Camry in storage because they were afraid to drive it, and they had to purchase a replacement vehicle. The Kamphauses paid more for their lease than they would have otherwise agreed to pay, but were forced to agree to the lease terms to trade in their 2009 Camry that had three SUA incidents. The Kamphauses paid more for their lease of the 2010 Camry than they would have paid, or they would not have leased it at all, if they had known the 2010 Camry also had the SUA defect. The Kamphauses have paid for a good, their Toyota, that has failed its essential purpose. Mrs. Kamphaus saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before she leased her Toyotas on June 22, 2008 and February 19, 2010. Based on these misrepresentations as to the safety of Toyota vehicles, Mrs. Kamphaus leased her 2009 Camry and 2010 Camry.

- 27 -

She also reviewed the window stickers on the vehicles and their warranty information. Had these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have leased her 2009 Camry and 2010 Camry and/or paid as much for them.

57.     Plaintiffs Victoria and Barry Karlin are residents and citizens of Colorado. They were the owners of a 2007 Toyota Prius, which was totaled on August 14, 2009, as a result of SUA.  Mrs. Karlin was parked with her foot on the brake.  She put the transmission in drive, and the car surged forward, crashing through a wooden fence beside her driveway. The car continued downhill, crashed into a tree and was totaled. The floor mat was still hooked in place after the accident. They reported the accident to Toyota, but the car had been disposed of, so Toyota denied the claim of loss. The Karlins suffered economic loss because they were not fully compensated for the value of the Prius. The Karlins saw advertisements for Toyota Prius vehicles generally in the media during the period before they purchased their Prius. They also reviewed the window sticker and warranty information. Although they do not recall the specifics of the many Prius advertisements they saw before they purchased their Prius, they do recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase their Prius and the previous Toyotas they had owned.  Had those advertisements, window sticker, warranty information, or any other materials disclosed that Prius vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe

010172-25 398181 v1

mechanism to overcome this, they would not have purchased their Prius.  They certainly would not have paid as much for it.

58.     Plaintiffs John and Mary Laidlaw are residents and citizens of New York. They leased a 2010 Toyota Camry LE in December 2009. After the sudden acceleration issues were uncovered by the media, the Laidlaws were afraid to drive the vehicle. They took it back to the dealer with just 980 miles on it and having leased the car for just one month. The dealer refused to give them their money back. The Laidlaws surrendered the vehicle by leaving it in the dealer's lot.  Had advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their Camry.

59.     Plaintiff Robert Navarro is a resident and citizen of Ohio. He owns a 2010 Toyota Avalon Limited. Mr. Navarro asked his dealer and the Toyota Customer Experience Center to take the car back, but both the dealer and the representative from Toyota refused. The representative from the Toyota Customer Experience Center directed Mr. Navarro to the National Center for Dispute Settlement ("NCDS") to submit a claim; the NCDS told Mr. Navarro that they could not resolve his type of claim.  Mr. Navarro saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Avalon on December 23, 2009. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Avalon, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and/or reliability influenced his decision to purchase his Avalon.  Had those advertisements

- 29 -

1   or any other materials disclosed that Toyota vehicles could accelerate suddenly and

2   dangerously out of the driver's control and lacked a fail-safe mechanism to overcome

3   this, he would not have purchased his Avalon.  He certainly would not have paid as

4   much for it.

5       60.     Plaintiff Carl Nyquist is a resident and citizen of Nebraska. He owns a

6   2006 Toyota Avalon. Mr. Nyquist twice observed the Avalon's engine, while in

7   park, increase idle speed to redline by itself; he did not apply his foot to the

8   accelerator. After these incidents, he was driving on the interstate with his wife at

9   approximately 75 mph when the Avalon accelerated to 90 mph. He turned the car off

10  and slowed to 75 mph, but then turned the car back on and it again accelerated to 90

11  mph. After turning the car off and on again, the Avalon accelerated normally.  He

12  took it to a dealer in Lincoln, Nebraska and a dealer in Scott's Bluff, Nebraska, but

13  both dealers said they found nothing wrong. He contacted Toyota's Customer

14  Experience Center, which also stated there was nothing wrong with the vehicle.  Mr.

15  Nyquist filed a complaint with the National Center for Dispute Resolution and

16  requested he be allowed to return the Avalon and be provided a replacement car, but

17  the arbitrator denied his claim.  Mr. Nyquist saw advertisements for Toyota vehicles

18  on television, in magazines, on billboards, in brochures at the dealership, and on the

19  Internet during the ten years before he purchased his Toyota Avalon on or about

20  December 6, 2007. Although he does not recall the specifics of the many Toyota

21  advertisements he saw before he purchased his Avalon, he recalls that safety and

22  reliability were consistent themes across the advertisements he saw. Those

23  representations about safety and reliability influenced his decision to purchase his

24  Avalon.  Had those advertisements or any other materials disclosed that Toyota

- 30 -

vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he probably would not have purchased his Avalon.  He certainly would not have paid as much for it.

61.     Plaintiff Peggie Perkin is a resident and citizen of California. She owned a 2005 Lexus ES 330. She was involved in a collision as a result of SUA on May 24, 2010. Ms. Perkin was driving between 5-10 mph in a parking lot when the engine revved and the car suddenly accelerated rapidly up to 35 mph, despite application of the brakes. Ms. Perkin made a 90-degree turn to avoid a collision with vehicles and pedestrians around the store front, but ended up hitting three cars and then stopping. She tried to turn off the car with such force that the key broke. After the collision, Ms. Perkin demanded in writing that either the dealer or Toyota Motor Sales, U.S.A., Inc. repurchase the vehicle; neither did so. After the ES 330 was repaired, Ms. Perkin traded it in and received substantially less value than she would have received if the vehicle did not have the SUA defect.  Ms. Perkin saw advertisements for Lexus vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the year before she purchased her Lexus ES 330 on February 28, 2009.  Although she does not recall the specifics of the many Lexus advertisements she saw before she purchased her ES 330, she does recall that reliability was a consistent theme across the advertisements she saw. Those representations about reliability influenced her decision to purchase her ES 330.  Had those advertisements or any other materials disclosed that Lexus vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her ES 330. She certainly would not have paid as much for it.

- 31 -

62.     Plaintiffs Bianca and Steven Prade are residents and citizens of
Virginia.  They own a 2009 Toyota Camry XLE.  Mr. Prade is a police officer for the
District of Columbia.  On February 2, 2010, he experienced SUA when he attempted
to park the Camry in the garage at the Prades' home, causing damage to both the
garage and the vehicle's driver-side door.  The Prades saw advertisements
misrepresenting the safety of Toyota vehicles on television for years prior to
purchasing their Camry on July 23, 2008.  Based on these misrepresentations as to
the safety of Toyota vehicles, Mr. and Mrs. Prade purchased their 2009 Camry.
They also reviewed the window sticker, warranty information, and news reports
based on press releases issued by Toyota.  Had these advertisements, window sticker,
warranty information, news reports or any other materials disclosed that Toyota
vehicles could accelerate suddenly and dangerously out of the driver's control and
lacked a fail-safe mechanism to overcome this, the Prades would not have purchased
their 2009 Camry and/or paid as much for it.

63.     Plaintiff Sandra Reech is a resident and citizen of Pennsylvania. She
owns a 2008 Toyota Tacoma. On March 8, 2009, Ms. Reech experienced SUA; her
truck suddenly accelerated while she was traveling down a road. She applied the
brakes, but the vehicle did not slow down. When she put all of her weight on the
brakes and shifted the vehicle into neutral, the engine continued to rev at high RPMs.
She was finally able to steer off the road and stop the vehicle. Ms. Reech wrote a
letter to Toyota's Customer Experience Center, and she received a voicemail from a
Toyota representative stating she could file an arbitration complaint.  Sandra Reech
read the window sticker at the time that she and her husband purchased their 2008

- 32 -

Tacoma, and she also follows the news, and understands that Toyota sometimes issues press releases upon which news reports are based.  If the window sticker, news reports, or any other materials had disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Tacoma.

64.     Plaintiffs Thomas F. and Catherine A. Roe are residents and citizens of California. They own a 2006 Lexus ES 330. On July 24, 2009, Mrs. Roe experienced a collision as a result of SUA. When she was pulling into a driveway and slowing to a stop, the engine of the car unexpectedly roared, the vehicle surged forward, then crashed over a low cement wall and knocked down a metal rail fence.  The car finally came to a rest on top of the collapsed fence with the right front wheel partially submerged in a backyard pool. The Roes sent a letter to Toyota Motor Sales reporting the SUA incident. Toyota stated that the car could not be inspected because it had already been repaired from the collision, and Toyota was "unable to offer further assistance in this matter."  The Roes saw advertisements for Lexus vehicles on television and in newspapers during the years prior to purchasing the ES 330 on March 29, 2009.  Although they do not recall the specifics of the many Lexus advertisements they saw before they purchased the ES 330, they do recall that safety and reliability were consistent themes across the advertisements they saw.  They also reviewed the window sticker on their vehicle, warranty information, and news reports based on information supplied from Toyota press releases.  Those representations about safety and reliability influenced their decision to purchase their ES 330.  Had those advertisements, window sticker, warranty information, news reports, or any other materials disclosed that Lexus vehicles could accelerate

- 33 -

suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their ES 330.

65.    Plaintiff Barbara J. Saunders is a resident and citizen of Ohio.  She owned a 2006 Toyota Avalon and owns a 2009 Toyota Matrix.  On May 3, 2008, Ms. Saunders experienced a collision as a result of SUA in her 2006 Toyota Avalon, causing her to lose control of her vehicle and skid into a guardrail and concrete divider.  The Avalon was totaled.  On February 2, 2009, Ms. Saunders experienced a collision as a result of SUA in her 2009 Toyota Matrix, causing her to rear-end a pick-up truck.  On March 11, 2010, Ms. Saunders experienced a second SUA incident in her 2009 Toyota Matrix.  The value of her Toyota Matrix has diminished as a result of the SUA defect.  Ms. Saunders saw advertisements misrepresenting the safety of Toyota vehicles on television and through direct mail and emails from Toyota during the years prior to when she purchased her Toyotas in August 2006 and on May 23, 2008.  Based on these misrepresentations as to the safety and reliability of Toyotas, Ms. Saunders purchased her 2006 Avalon and 2009 Matrix.  Ms. Saunders also reviewed the window stickers, warranty information, and news reports based in press releases issued by Toyota.  Had these advertisements, window stickers, warranty information, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Ms. Saunders would not have purchased her 2006 Avalon and 2009 Matrix and/or paid as much for them.

66.    Plaintiffs Janette and Tully Seymour are residents and citizens of California. They own a 2002 Lexus ES300. In November or December 2008, Mrs. Seymour experienced a SUA incident when she was pulling out of the garage at her

- 34 -

home. She had her foot on the brake, put the transmission in reverse and then moved her foot off the brake and lightly applied the accelerator. At that moment the vehicle accelerated rapidly, and the car shot out of the garage and down the driveway. Mrs. Seymour sensed the car continuing to accelerate even as she applied the brake. The car traveled the length of the driveway (30-40 feet), and she was unable to stop the car until the rear wheels had extended into the street. Shortly after learning of the accident involving CHP Officer Saylor and his family, Mr. Seymour took the Lexus to the dealership and asked if there was a plan to remedy the SUA problem; the dealership stated there was no problem with this model.  The Seymours saw advertisements for Lexus vehicles generally in the media during the period before they leased and then purchased their Lexus ES 300.  They also reviewed the window sticker and warranty information.  Although they do not recall the specifics of the many Lexus advertisements they saw before they leased and then purchased their Lexus ES 300, they do recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase their Lexus ES300.  Had those advertisements, window sticker, warranty information, or any other materials disclosed that Lexus ES300 vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have leased and then purchased their Lexus ES300.

67.     Plaintiff Mary Ann Tucker is a resident and citizen of California. She owns a 2005 Toyota Camry. She stopped driving the Camry in October 2009 out of safety concerns, and she sold it on March 10, 2010.  Ms. Tucker received less for her vehicle than she would have had her Camry not had a SUA defect.  Ms. Tucker

- 35 -

called her dealership, which referred her to the Toyota Customer Experience Center. She called the Toyota Customer Experience Center, which assigned her Case Number 0912136858 and promised to send her paperwork to begin arbitration. Ms. Tucker did not receive the paperwork. During the years prior to Mary Ann Tucker's Toyota Camry purchase on 08/2005, she saw advertisements for Toyota vehicles on television. Ms. Tucker also reviewed the window sticker, warranty information, and news reports based on press releases issued by Toyota. When she purchased her Camry, she was not aware that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this. Ms. Tucker cannot speculate as to what she would have done had she been in possession of this information, but she would have based her decision on her analysis of the risk, her ability to pay, and alternatives in the market.

68.    Plaintiff Elizabeth I. Van Zyl is a resident and citizen of Florida. She leases a 2010 Toyota Camry LE. Ms. Van Zyl has experienced SUA incidents over the course of several months. During the SUA incidents, the vehicle surges forward. Ms. Van Zyl has reported the surging to her dealer and to the Toyota Customer Experience Center. Ms. Van Zyl tried to trade in her Toyota for a Honda, but the dealer did not want her Toyota as a trade-in. Ms. Van Zyl paid more for her lease than she would have otherwise agreed to pay had she known of the defect. Ms. Van Zyl paid for a good, her Toyota, that has failed of its essential purpose. She saw advertisements for Toyota vehicles on television, in newspapers, in magazines, in brochures at the dealership, and on the Internet, during the ten years before she leased her Toyota Camry on August 23, 2009. Although Ms. Van Zyl does not recall the specifics of the many Toyota advertisements she saw before she leased her

- 36 -

Camry, she does recall that safety and reliability were a consistent theme across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have leased her Camry. She certainly would not have paid as much for it.

69.     Plaintiff Frank Visconi is a resident and citizen of Tennessee. He was the owner of a 2007 Toyota Tacoma, which was totaled when Mr. Visconi experienced a SUA collision on June 8, 2007.  After Mr. Visconi tapped his brakes to slow down on the highway, the engine accelerated to 7000-8000 RPMs, spinning the vehicle out of control. The vehicle drove into an embankment, started to flip over and was airborne for 35-40 feet. The vehicle then landed on its roof and rolled another three times before stopping. In addition to the SUA collision, Mr. Visconi also experienced the following SUA incidents: on February 9, 2007, his vehicle lurched forward from a stop; on February 12, 2007, his vehicle suddenly accelerated while he was stopped with his foot on the brakes – his rear wheels were spinning uncontrollably and his engine was making loud noises; on April 24, 2007, his vehicle suddenly accelerated while he was braking to slow down on a highway entrance ramp; and on May 23, 2007, his vehicle suddenly accelerated while he was braking to slow down on a downhill.  Mr. Visconi took his Tacoma to the dealership twice and was told nothing could be done if they could not replicate the incident. Mr. Visconi talked to the Toyota regional sales manager and asked him to repurchase the vehicle; the manager refused.  Mr. Visconi saw advertisements for Toyota vehicles

- 37 -

on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his 2007 Toyota Tacoma in October 2006.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tacoma, he does recall that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Tacoma.  Had those advertisements any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Tacoma.  He certainly would not have paid as much for it.

70.    Plaintiffs Dana C. and Douglas W. Weller are residents and citizens of Washington. They were the owners of a 2009 Toyota RAV4 that they sold on March 13, 2010. They were unwilling to drive the RAV4 with children in the car due to the SUA defect.  The Wellers received less for their trade-in vehicle than they would have had their RAV4 not had a SUA defect.  They saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for years, especially during the period while they were researching new cars, before they purchased the Toyota RAV4. Although they do not recall the specifics of the many Toyota advertisements they saw before they purchased the RAV4, they do recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase the RAV4.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate

010172-25 398181 v1

suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased the RAV4.

71.   Plaintiff Carole R. Young is a resident and citizen of Ohio. She owns a 2009 Toyota Corolla. On December 19, 2009, Ms. Young had a collision as a result of SUA when she was approaching a red light. She applied the brakes, but the vehicle only slowed to 15-20 mph and did not stop. Ms. Young had to swerve to avoid a SUV in the intersection and was forced to run the red light. She took her foot off the brake pedal after clearing the intersection, and the Corolla accelerated to 50 MPH. She applied pressure on the brake pedal again, and this time the vehicle slowed down. Ms. Young was able to drive home and found that the floor mat was not impeding the accelerator pedal in any way. Ms. Young discussed the incident with her dealership and asked the dealer to get her another vehicle, but the dealer did not help her. She tried to call the Toyota Customer Experience Center but was unable to reach a representative.  Ms. Young saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before she purchased her 2009 Toyota Corolla LE on November 4, 2008.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were a consistent theme across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it.

- 39 -

72.     Each of the Consumer Plaintiffs have purchased or leased a car with a defect and in a transaction where Toyota did not disclose material facts related to a vehicle's essential purpose – safe transportation.  As a result, each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect.

**B.     Non-Consumer Plaintiffs**

73.     Plaintiff Green Spot Motors Co. ("Green Spot Motors") is a California corporation with its principal place of business in Salinas, California.  Plaintiff Green Spot Motors is an auto dealership.  In mid-2009, Green Spot Motors purchased a 2007 Toyota Camry.  Later that year, Green Spot Motors purchased a 2009 Toyota Camry from Toyota.  As a result of the wrongful and deceptive actions and business practices of Toyota, Green Spot Motors purchased vehicles that were not of the quality or reliability that was advertised.  As a result, Green Spot Motors overpaid for the vehicles and has been unable to re-sell them even at substantially reduced prices.  If Toyota had disclosed the nature and extent of the problems alleged herein, Green Spot Motors would not have purchased a vehicle from Toyota, or would not have purchased the vehicles for the prices paid.  The value of Green Spot Motors' two Camry vehicles has diminished as a result of the SUA defect.  In addition, Green Spot Motors has suffered lost profits and other economic losses due to its inability to sell the Toyota vehicles.

74.     Plaintiff Jerry Baker Auto Sales, LLC is a family-owned and operated independent automotive sales business in Sedalia, Missouri.  It has been in continuous operation for almost 40 years, since 1972.  Jerry Baker Auto Sales, LLC

- 40 -

employs 10 people in its sales and service departments.  Jerry Baker Auto Sales, LLC obtains vehicles for sale from a variety of sources, such as trade-ins, auctions, and direct purchases.  Normally, it carries some Defective Vehicles (defined in Paragraph 80, *infra*) for sale on its lot.  At the time of Toyota's Stop Sales Order, Jerry Baker Auto Sales, LLC owned a 2008 Toyota Highlander and a 2007 Toyota Tacoma.  Both of these vehicles were the subject of Toyota's Stop Sales Order and had been purchased by Jerry Baker Auto Sales, LLC for the purpose of reselling them at a profit to the general public.  Because of Toyota's Stop Sales Order, Jerry Baker Auto Sales, LLC was required to hold the vehicles and not place them for sale to the general public.  As a result, Jerry Baker Auto Sales, LLC overpaid for the vehicles.  The value of Jerry Baker Auto Sales, LLC's Highlander and Tacoma have diminished as a result of the SUA defect.  In addition, Jerry Baker Auto Sales, LLC has suffered lost profits and other economic losses due to its inability to sell the Toyota vehicles.

75.    Plaintiff Auto Lenders Liquidation Center, Inc. ("Auto Lenders") was established over twenty years ago and is a New Jersey S corporation with no partnerships.  Auto Lenders is a residual value insurer, guarantor and lease maturity vehicle liquidator.  In addition to its wholesale division, Auto Lenders also operates five New Jersey retail automobile dealerships and service centers.  Its retail operations help maximize overall performance of the residual guarantee.  In addition, Auto Lenders supports both its retail and wholesale operations with a state-of-the-art, 40-thousand-square-foot reconditioning facility located on nineteen acres.  Auto Lenders is contracted directly to a third party, a regional new vehicle lessor, Hann Financial Service Corporation ("Hann").  Hann is a wholly owned subsidiary of

010172-25 398181 v1

Susquehanna Bankshares, Inc.  Acting as Hann's residual insurer and guarantor, Auto Lenders is ultimately responsible, upon lease maturity, for a vehicle's residual value.  Hann's lease portfolio currently consists of over a billion dollars in receivables and includes various Toyota and Lexus vehicles.  Auto Lenders insured the residual value for hundreds of Defective Vehicles and has suffered (and continues to suffer) economic harm as a direct and legal result of the diminished value of these vehicles.

76.     As alleged above, Plaintiff Auto Lenders is a residual value insurer and guarantor and a lease maturity vehicle liquidator.  In other words, before a new vehicle's initial lease begins, Auto Lenders sets a residual value for the vehicle, using a proprietary and confidential process developed and refined over several years and at a considerable cost.  The residual value is used in calculating the financial particulars of the vehicle lease.  Auto Lenders then adds to the residual the predicted cost of reconditioning and liquidating the vehicle and an appropriate profit margin. Auto Lenders is ultimately responsible, at lease maturity, for reconditioning and liquidating the off-lease vehicles and paying the residual to the leasing bank, which, in the case of the Subject Vehicles, was Hann Financial Services Corporation ("Hann Financial"), a subsidiary of Susquehanna Bankshares, Inc.

77.     As a result of its contracts with Hann Financial, off-lease vehicles are delivered to Auto Lenders for reconditioning and sale, and Auto Lenders becomes the owner of each off-lease vehicle upon its contractually required payment of the residual.  Ownership then transfers from Auto Lenders to the vehicle purchaser.

78.     For several years prior to September 2009, Auto Lenders insured and guaranteed residuals on Toyota and Lexus vehicles.  Those vehicles – for example,

the Toyota Camry and the Toyota Corolla – became staples of Auto Lenders' fleet because they predictably and consistently maintained resale value, they had a seemingly well-deserved reputation for quality, dependability and reliability, and they seemed to conform to Defendants' claims that Toyota and Lexus vehicles were safe. As set forth in detail above, that changed in mid-2009, when the propensity of Toyota vehicles to suddenly and uncontrollably accelerate against the intentions of the driver – a defect known to Toyota for years – became known publicly.

79.     On September 1, 2009, Auto Lenders was insuring the residual values of approximately 3,456 Toyota vehicles still on lease or off-lease and in inventory, and approximately 2,231 Lexus vehicles still on lease or off-lease and in inventory.

80.     Beginning in September 2009, the resale values for Toyota Vehicles plummeted. In an effort to liquidate the flood of off-lease Toyota and Lexus Vehicles, Auto Lenders made a business decision to lower prices on these vehicles. The price reductions were, in large part, made systematically. At a certain price point, the market reacted, and the vehicles began selling. Additionally, some of the Toyota and Lexus vehicles were liquidated at auction.

81.     Between September 30, 2009, and September 20, 2010, Auto Lenders sold approximately 1,668 Toyota vehicles. The difference between the predicted market value of those vehicles, and the actual sales revenue was $5,465,325.90.

82.     Between September 17, 2009, and September 20, 2010, Auto Lenders sold approximately 895 Lexus vehicles. The difference between the predicted market value of those vehicles, and the actual sales revenue was $5,873,527.18.

83.     In a further attempt to mitigate losses and sell the Toyota and Lexus vehicles, Auto Lenders transported 538 vehicles to Prestige Toyota in Mahwah, New

Jersey for administration of recall-related repairs.  Auto Lenders spent $80 per vehicle to have the vehicles transported to the dealer, for a total of $43,040.00.

84.     Plaintiff Deluxe Holdings Inc. ("Deluxe Holdings"), dba Deluxe Rent a Car, a Nevada corporation, operates a rental car business and has its "nerve center" and principal place of business at 5315 W. 102nd Street, Los Angeles, California 90045.  As of the date of the filing of the consolidated master complaint, Plaintiff owns about 258 of the Subject Vehicles (defined in Paragraph 80, *infra*) manufactured and sold by the Defendants, and has previously owned about 105 of the Subject Vehicles during the relevant time frame.  The value of the Subject Vehicles owned by Deluxe Holdings has diminished as a result of the SUA defect. Deluxe Holdings has also suffered damages for the Subject Vehicles that it previously owned and sold at a loss.  In addition, Deluxe Holdings has suffered lost profits and other economic losses.  Deluxe Holdings, by and through its employees/agents, has had direct dealing during the relevant time frame with the Defendants regarding the purchase of Toyota vehicles, so that Deluxe Holdings is in privity with those Defendants.

85.     Green Spot Motors, Jerry Baker Auto Sales, Deluxe Holdings and Auto Lenders are hereinafter referred to as the "Commercial Plaintiffs."

**C.     Consumer Plaintiffs in the Event California Law Does Not Apply**

86.     Plaintiff Adam Aleszczyk is a resident of Illinois and the owner of a 2006 Toyota Tacoma.  Mr. Aleszczyk is a police officer in Chicago, Illinois.  He experienced more than one SUA event in his Tacoma and also had a collision due to SUA. While driving to work, his truck accelerated near an intersection; when the brakes would not respond to stop the vehicle, Mr. Aleszczyk steered the vehicle into

- 44 -

two concrete barriers to avoid hitting other motorists.  He has had the pedal and floor mat recall repairs performed on the Tacoma.  The floor mats were not near the pedal during any of the SUA events.  He saw advertisements for Toyota vehicles on television during the time before he purchased his Tacoma in September 2005. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his 2006 Toyota Tacoma, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Tacoma.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his 2006 Toyota Tacoma.  He certainly would not have paid as much for it.

87.     Plaintiff Kathleen Allen is a resident of Indiana and owns a 2010 Toyota Camry LE.  She has experienced SUA in her vehicle.  She saw advertisements misrepresenting the safety of Toyota vehicles on television and in magazines during the years prior to when she purchased her Toyota in August 2009.  She also reviewed the window sticker of her vehicle, warranty information, and news programs, which she understood provided information supplied from Toyota press releases.  Based on these representations as to the safety of Toyota vehicles, Mrs. Allen purchased her 2010 Camry.  Had these advertisements, window sticker, warranty information, news programs, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Mrs. Allen would not have purchased her 2010 Camry or would not have paid as much for it.

- 45 -

88.   Plaintiff Jude Anheluk is a resident and citizen of Minnesota.  He owns a 2008 Toyota Camry.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for at least seven years before he purchased his Camry.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry in December 2007, he recalls that safety, reliability and quality were consistent themes across the advertisements he saw.  Those representations about safety, reliability and quality influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  He certainly would not have paid as much for it.

89.   Plaintiffs Albert and Wanda Bosse are residents and citizens of Kentucky.  They owned a 2002 Toyota Camry and currently own a 2006 Avalon and a 2009 Corolla.  They sold their Camry below market value after they experienced SUA in the Camry.  For years prior to purchasing their Toyotas on July 16, 2002 and August 26, 2008, the Bosses reviewed information about Toyota in brochures at the dealership, on the window stickers, warranty information, and news reports based on Toyota press releases.  Based on these misrepresentations as to the safety and reliability of Toyota vehicles, the Bosses purchased their 2002 Camry and 2009 Corolla.  Had these brochures, window stickers, warranty information, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to

- 46 -

overcome this, the Bosses would not have purchased their 2002 Camry and 2009 Corolla and would not have paid as much for them.

90.     Plaintiffs Rich and Jan Bowling are residents of Maryland.  They own a 2005 Toyota Avalon.  While Mrs. Bowling was pulling into a parking spot with her husband, the car suddenly accelerated.  The car hit an iron railing and some steps, causing five thousand dollars in damage to the car.  The Bowlings had the car inspected, but Toyota said the collision was caused by driver error.  The Bowlings saw advertisements for Toyota vehicles on television, in magazines, on billboards, newspapers, and in brochures at the dealership for a few months before they purchased their Avalon.  Although they do not recall the specifics of the many Toyota advertisements they saw before they purchased their Avalon, they do recall that safety and reliability were consistent themes across the advertisements they saw.  The Bowlings specifically remember Toyota advertising that their cars were still on the road after several years.  These representations about safety and reliability influenced their decision to purchase their Avalon.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they probably would not have purchased their Avalon.  They certainly would not have paid as much for it.

91.     Plaintiff Vanessa Bozeman is a resident of West Virginia and owns a 2007 Toyota Camry XLE.  Ms. Bozeman, an elementary school principal, has experienced multiple SUA events.  During the first event, with her parents in the car, the brakes would not respond to stop the vehicle; Ms. Bozeman was able to shift the vehicle in neutral and bring it to a stop to avoid hitting the motorist in front of her.

- 47 -

The second SUA incident took place on a busy highway in Barboursville, West Virginia.  Again, the vehicle began accelerating and did not respond when Ms. Bozeman applied the brake.  Ms. Bozeman shifted the vehicle into neutral and was able to bring the vehicle to a stop.  Ms. Bozeman has had both the accelerator pedal and floor mat recall repairs implemented on her vehicle.  She has also had the vehicle inspected at a local Toyota dealership multiple times, with no resolution to the problem.  After the dealer performed the recall repairs, Ms. Bozeman experienced another SUA event in the summer of 2010 when taking her parents to a doctor – the vehicle again accelerated, did not respond to the brakes, and had to be stopped by putting it in neutral.  Ms. Bozeman cannot afford to trade the vehicle due to the diminished value.  She saw advertisements for Toyota vehicles on television for years before purchasing her Camry on May 13, 2008. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her 2007 Camry XLE.  She certainly would not have paid as much for it.

92.     Plaintiff Deshawna Carter is a resident of West Virginia and owns a 2008 Toyota Camry LE.  Ms. Carter has experienced a persistent SUA problem in her Camry; the engine revs high and then pulls back on its own.  It does not drive at a steady speed.  Ms. Carter has reported this problem frequently to the local Toyota

- 48 -

dealership and has had the Camry inspected, but the dealer stated there were no error codes.  The issues persisted after Ms. Carter had the recall repairs implemented.  She saw advertisements for Toyota vehicles on television during the three years before she purchased her Camry in October 2008. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she does recall that reliability was a consistent theme across the advertisements she saw.  Those representations about reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it.

93.     Plaintiff Mark Casto is a resident and citizen of Alabama.  He owns a 2009 Toyota Corolla.  He has taken the Corolla to several dealers to discuss trading it in, but the dealers told him they didn't want it, and he realized he would take a large loss if he traded it in due to the depreciation from the SUA defect.  He spoke to a service representative at his dealer to ask what he should do in the event of SUA, and she said she did not "have a magic wand."  He also complained to Toyota's Customer Experience Center, but did not get any relief.  Mr. Casto saw advertisements for Toyota vehicles on television for years before he purchased his Corolla.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he does recall that safety and reliability were consistent themes across the advertisements he saw.  He also reviewed the window sticker of his car and warranty information. Those representations about safety and reliability, as well as Toyota's reputation for

- 49 -

holding value, influenced his decision to purchase his Corolla. Had those
advertisements or any other materials disclosed that Toyota vehicles could accelerate
suddenly and dangerously out of the driver's control and lacked a fail-safe
mechanism to overcome this, he would not have purchased his Corolla.

94.    Plaintiff Joseph John Chant is a resident and citizen of Idaho. He owns
a 2010 Toyota Camry LE. Mr. Chant saw advertisements for Toyota vehicles on
television, in magazines, on billboards, in brochures at the dealership, and on the
Internet for at least ten years before he purchased his Camry. Although he does not
recall the specifics of the many Toyota advertisements he saw before he purchased
his Camry, he recalls that safety and reliability were consistent themes across the
advertisements he saw. Those representations about safety and reliability influenced
his decision to purchase his Camry. Had those advertisements or any other materials
disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the
driver's control and lacked a fail-safe mechanism to overcome this, he would not
have purchased his Camry. He certainly would not have paid as much for it.

95.    Plaintiff Demetra Christopher owns a 2006 Toyota Avalon XL and
resides in Kentucky. She experienced SUA in her vehicle as she turned the corner at
an intersection. After making the turn, the vehicle accelerated on its own, causing
her to hit a curb and then a fire hydrant. Ms. Christopher saw advertisements
misrepresenting the safety of Toyota vehicles on television, in magazines, and on
billboards for years prior purchasing her Avalon in December 2005. She also
reviewed the window sticker and warranty information and saw news reports based
on Toyota press releases. Based on these representations as to the safety of Toyota
vehicles, she purchased her Avalon. Had these advertisements, window sticker,

- 50 -

warranty information, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Ms. Christopher would not have purchased her Avalon and/or paid as much for it.

96.     Plaintiff Maria Cisneros is a resident of Texas.  She owned a 2009 Toyota Corolla.  After purchasing her Corolla, Ms. Cisneros noticed that the engine idled at more than 2000 rpms and that sometimes the idle rate would fluctuate up and down while the car was in park.  She also noticed that the engine sometimes "roared" while she was driving it.  She took the car to the dealer on multiple occasions, but the problem was never fixed.  On April 7, 2009, Ms. Cisneros was driving between 30-35 mph when the vehicle jerked and accelerated to 50-55 mph.  She applied the brakes, regained control of the vehicle, and drove to the dealer.  The dealer did not find a problem.  Ms. Cisneros had a similar experience later April 13, 2009, when the car suddenly accelerated while she was driving 40-45 mph.  She was able to regain control after applying the brakes.  On August 15, 2009, while exiting a parking lot, the Corolla accelerated and shot out of the parking lot and into traffic.  Ms. Cisneros applied the brakes, but was not able to regain control of the Corolla before it collided with a vehicle in oncoming traffic.  The Corolla was totaled.  Ms. Cisneros suffered economic loss because she overpaid for the defective Corolla and because she would not have purchased it had she known about the SUA defect.  Ms. Cisneros saw and heard advertisements for Toyota vehicles on television, in magazines, and on billboards during the several years before she purchased her Toyota Corolla. Although she does not recall the specifics of the many Toyota advertisements she saw and heard before she purchased her Corolla, she does recall that safety and

reliability were consistent themes across the advertisements.  Those representations about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased it.

97.     Plaintiff Donna Cramer is a resident of Georgia and owns a 2005 Toyota 4Runner.  Ms. Cramer experienced SUA while driving with her sister; her vehicle accelerated out of control into a group of mangrove trees before coming to a stop.  Ms. Cramer had Toyota inspect the vehicle and filed a complaint with NHTSA.  She saw advertisements for Toyota vehicles on television and on the Internet for approximately ten years before she purchased her 4Runner in February 2006. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her 4Runner, she does recall that safety and reliability were a consistent theme across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her 4Runner.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her 4Runner.  She certainly would not have paid as much for it.

98.     Plaintiff Walter Crigler is a resident and citizen of Arizona.  He owned a 2008 Toyota Prius.  Due to his concerns regarding the Toyota SUA defect, Mr. Crigler traded his Prius in for another vehicle.  He incurred a significant loss on the trade.  He received less for his trade because of the defects now associated with Toyota vehicles, yet purchased the vehicle because he believed it would have a high

- 52 -

resale value.  Mr. Crigler saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Prius on December 31, 2007.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Prius, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Prius.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Prius.  He certainly would not have paid as much for it.

99.     Plaintiff Hal Farrington is a resident and citizen of Massachusetts.  He owns a 2009 Toyota Camry.  Mr. Farrington has experienced two SUA incidents.  On January 21, 2010, he pulled his car into his neighbor's driveway.  His car suddenly accelerated, and he hit his neighbor's car.  He took the car to the dealer; it did not identify a problem.  Two weeks later, he was moving his car closer to his garage door to make room for his wife's car in the driveway, but it accelerated when he took his foot off the brake.  He pressed the brake again, but the car did not stop and hit the garage door.  The car was towed to the dealer for inspection and repair.  Mr. Farrington saw advertisements for Toyota vehicles on television and on the Internet for several months before he purchased his Camry.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry on January 5, 2010, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about

010172-25 398181 v1

safety and reliability influenced his decision to purchase his Camry.  When he
purchased his Camry, he asked the salesman about the "sticky pedal" issue but was
told it was no big deal, and that a correction would be issued shortly.  Had those
advertisements or any other materials disclosed that Toyota vehicles could accelerate
suddenly and dangerously out of the driver's control and lacked a fail-safe
mechanism to overcome this, he would not have purchased his Camry.  He certainly
would not have paid as much for it.

100.   Plaintiff Phillip Finkel is a resident and citizen of Illinois and owns a
2006 Lexus GS 300.  He has experienced two SUA events in his Lexus.  During both
events, the vehicle would not respond when he applied the brakes.  In one, he
accelerated to pass a car when his Lexus accelerated and would not stop.  Dr.
Finkel's wife then had the same experience while Dr. Finkel was a passenger.  Both
times, the Finkels had to shift the vehicle into neutral to bring the car to a stop.  The
dealer informed Dr. Finkel the mats were the cause of the problem.  Dr. Finkel has
since traded his Lexus vehicle at a loss.  During the years before he purchased his
Lexus on January 1, 2006, Dr. Finkel saw advertisements for Lexus vehicles on
television, and these advertisements promoted safety and reliability as consistent
themes.  Had these advertisements or any other materials disclosed that Lexus
vehicles could accelerate suddenly and dangerously out of the driver's control and
lacked a fail-safe mechanism to overcome this, he would not have purchased his GS
300.  He certainly would not have paid as much for it.

101.   Plaintiff Ann Fleming-Weaver is a resident and citizen of North
Carolina.  Ms. Fleming-Weaver owns a 2005 Toyota Avalon and has experienced
several SUA incidents.  During these incidents, the car suddenly accelerates, forcing

- 54 -

Ms. Fleming-Weaver to put the car in neutral to slow down.  On one occasion, her car suddenly accelerated in a parking lot, and she was able to slow the car.  Ms. Fleming-Weaver then returned home, and when pulling into her driveway, the car suddenly accelerated again, causing her to collide with her garage door.  Toyota inspected the car, and the inspector told her there were "serious problems with the car."  Nevertheless, Toyota later informed her the car was not defective and claimed the SUA incidents had been caused by driver error.  Ms. Fleming-Weaver saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Avalon.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Avalon, she does recall that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Avalon.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Avalon.  She certainly would not have paid as much for it.

102.   Plaintiffs Charles and Karen Gibbens owned a 2009 Toyota Corolla LE and reside in Aurora, Indiana.  They experienced SUA in their Corolla and later traded in the Corolla to the dealer.  They took a loss on the trade-in due to the depreciation in value of their Corolla from the defect.  The Gibbens saw advertisements misrepresenting the safety of Toyota vehicles on television for years before purchasing their Toyotas on February 26, 2009 and November 19, 2009.  The Gibbens also reviewed the window sticker, warranty information, and news reports

- 55 -

based on information provided by Toyota in press releases.  Based on these misrepresentations as to the safety of Toyota vehicles, the Gibbens purchased their 2009 Corolla and 2010 Corolla. Had these television advertisements, or the window stickers, warranty information, news reports based on Toyota press releases that they reviewed, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, the Gibbens would not have purchased their Corollas or would not have paid as much for them.

103.   Plaintiff Douglas Guilbert is a resident and citizen of Rhode Island.  He owns a 2010 Toyota Camry.  Mr. Guilbert saw advertisements misrepresenting the safety of Toyota vehicles on television, the Internet, brochures, and from salespeople for years before purchasing his Camry in November 2009.  Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Guilbert purchased his 2010 Camry.  Mr. Guilbert also reviewed the window sticker, warranty information, and news reports based on information provided by Toyota in press releases.  Had these advertisements, sticker, warranty, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Mr. Guilbert would not have purchased his 2010 Camry or would not have paid as much for it.

104.   Bruce Alan Harkey is a resident and citizen of North Carolina.  He owns a 2008 Toyota Tacoma. Mr. Harkey's son, Jeffrey, experienced SUA while driving the Tacoma; it began accelerating down a hill towards a school bus that had stopped to let children out.  The truck did not respond to tapping or standing on the brakes

and increased in speed.  To avoid hitting the children, Jeffrey steered to truck to a grassy area and turned the vehicle off.  Upon stopping the vehicle, Jeffrey and Plaintiff Harkey discovered that the brake pedal was frozen approximately three-fourths of the way down.  Jeffrey and his father had two Toyota dealerships inspect the vehicle, and both responded that nothing was wrong with the vehicle.  The truck has since been sold.  Mr. Harkey saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for years before he purchased his Tacoma on September 5, 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tacoma, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Tacoma.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his 2008 Tacoma.  He certainly would not have paid as much for it.

105.   Plaintiff Jeremy Henson is a resident and citizen of Oklahoma.  He owns a 2006 Toyota Tundra.  Mr. Henson saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, for many years before he purchased his Tundra.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tundra, he recalls that safety and reliability were consistent themes across the advertisements he saw.  The safety and reliability representations have been a part of Toyota's advertising for as long as Mr. Henson has know of Toyota.  Those

representations about safety and reliability influenced his decision to purchase his

Tundra.  Had those advertisements or any other materials disclosed that Toyota

vehicles could accelerate suddenly and dangerously out of the driver's control and

lacked a fail-safe mechanism to overcome this, he would not have purchased his

Tundra.  He certainly would not have paid as much for it.

106.   Plaintiff Barbara Jackson is a resident and citizen of New York.  She

owns a 2008 Toyota Camry.  She saw advertisements for Toyota vehicles on

television, in magazines, on billboards, in brochures at the dealership, and on the

Internet for years before she purchased her Camry. Although she does not recall the

specifics of the many Toyota advertisements she saw before she purchased her

Camry, she does recall that safety and reliability were consistent themes across the

advertisements she saw.  Those representations about safety and reliability

influenced her decision to purchase her Camry.  Had those advertisements or any

other materials disclosed that Toyota vehicles could accelerate suddenly and

dangerously out of the driver's control and lacked a fail-safe mechanism to

overcome this, she would not have purchased her Camry.  She certainly would not

have paid as much for it.

107.   Plaintiffs William and Darlene Kleinfeldt are residents and citizens of

Illinois. They own a 2010 Toyota Camry LE. The Kleinfeldts saw advertisements

misrepresenting the safety of Toyota vehicles on television and received information

from a Toyota dealer during the years prior to purchasing their Toyota on October

20, 2009.  Based on these misrepresentations as to the safety of Toyota vehicles, the

Kleinfeldts purchased their 2010 Camry.  They also reviewed the window sticker,

warranty information, and news reports based on press releases issued by Toyota.

Had these advertisements, window sticker, warranty information, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, the Kleinfeldts would not have purchased their 2010 Camry or would not have paid as much for it.

108.   Plaintiffs Richard and Elise Kuhner are residents and citizens of Washington.  They own a 2006 Toyota Avalon.  The Kuhners had the pedal recall performed prior to driving the Avalon to Arizona for vacation.  While in Arizona, they were in a large parking lot, traveling approximately eight to ten miles per hour.  Mr. Kuhner attempted to slow the car down further because pedestrians were ahead.  He pressed the brake hard, twice, but each time the car lurched and then resumed acceleration.  Mr. Kuhner then put the car in neutral, slammed on the brake, and the car lurched, made a loud "thunk," and stopped.  A dealership in Phoenix inspected the car, but said there was no defect.  Mr. Kuhner filed a complaint with Toyota.  The Kuhners saw advertisements for Toyota vehicles on television, in magazines, in brochures at the dealership, on the Internet for approximately two years before they purchased their Toyota Avalon on July 18, 2006. Although they do not recall the specifics of the many Toyota advertisements they saw before they purchased their Avalon, they do recall that safety and reliability were consistent themes across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase their Avalon.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to

overcome this, they would not have purchased their Avalon. They certainly would not have paid as much for it.

109.   Plaintiff Christopher Lenney is a resident and citizen of Massachusetts. Mr. Lenney is a state trooper and owns a 2010 Toyota Sequoia. Mr. Lenney was at an intersection when the light changed, and traffic began to move forward. The car in front of him stopped to avoid hitting a jaywalker. Mr. Lenney tried to stop the car, applying the brake as hard as he could, but the engine kept revving and the car accelerated. He rear-ended the car in front of him. Mr. Lenney saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for years before he purchased his Sequoia on September 19, 2009. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Sequoia, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Sequoia. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Sequoia. He certainly would not have paid as much for it.

110.   Plaintiff Monica Lowe is a resident and citizen of Maryland and owns a 2005 Toyota Prius. While driving her son to school, Ms. Lowe's vehicle suddenly accelerated from 60 mph to over 80 mph. Ms. Lowe was able to shift the vehicle into neutral and bring the vehicle to a stop. When she turned the vehicle back on, the engine revved on its own. Toyota inspected the vehicle. Ms. Lowe currently has the vehicle stored at her home, and she is afraid to drive it. She saw advertisements for

- 60 -

Toyota vehicles on television during the three years before she purchased her Prius in August 2005. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Prius, she does recall that safety and reliability were a consistent theme across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Prius. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Prius. She certainly would not have paid as much for it.

111.   Plaintiffs Dr. Aly A. Mahmoud and Lucinda K. Mahmoud are residents and citizens of California. They owned a 2004 Corolla, which they purchased new. The Mahmouds were pulling into a parking spot with Dr. Mahmoud's foot on the brake. The car had almost come to a complete stop when suddenly the engine surged and the car shot forward about six feet. It ran over the parking stop and came to a rest up against a chain link fence. Dr. Mahmoud turned off the vehicle. Mrs. Mahmoud then got into the driver's seat to back the car away from the fence. When she started the car, it initially ran at idle, then without any input from her, the engine again surged to a high RPM. The car was then towed to the Toyota dealership. Mr. Craig Smith, from the Toyota Collision Center, called Dr. Mahmoud informed him that when he had attempted to move the car at the dealership, the engine had once again surged out of control, and that he had determined that the throttle was stuck in the open position. He told them he had emailed Toyota "Corporate" to advise them of the situation. Dr. and Mrs. Mahmoud later received a letter from Toyota stating that there was nothing wrong with the vehicle other than the crash damage. Dr.

- 61 -

Mahmoud attempted to sell the car to the Toyota dealership, but was offered only $7,000.00 due to its depreciated value. Dr. Mahmoud was later able to sell the car to a private party, but still lost money on the sale. The Mahmouds understood that Toyota had a reputation for safety. If they had known or if Toyota had disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased their Corolla.

112.   Plaintiff Priscilla Manarino-Leggett is a resident and citizen of North Carolina. She owns a 2010 Toyota Avalon. Ms. Manarino-Leggett saw advertisements misrepresenting the safety of Toyota vehicles in *Consumer Reports*, on television, and on the Internet for years before she purchased her Avalon on January 5, 2010. Based on these misrepresentations as to the safety of Toyota vehicles, Mrs. Manarino-Leggett purchased her Avalon. She also reviewed the window sticker, warranty information, and news reports based on press releases issued by Toyota. Had these advertisements, window sticker, warranty information, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Mrs. Manarino-Leggett would not have purchased her 2010 Toyota Avalon and/or paid as much for it.

113.   Plaintiff Patrick Mann is a resident and citizen of Missouri. He owns a 2009 Toyota Prius. Mr. Mann saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his Prius on May 22, 2009. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased

- 62 -

010172-25 398181 v1

his Prius, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Prius.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Prius.  He certainly would not have paid as much for it.

114.   Plaintiff Steven McDaniel, Jr. is a resident and citizen of Mississippi. He owns a 2006 Lexus IS 250 and a 2007 Toyota Camry.  Mr. McDaniel was on the freeway on-ramp when his Lexus suddenly accelerated.  He lost control of the vehicle and went over the side of the ramp.  He reported the incident to his dealer and to Toyota Motor Services; his dealer claimed it had never heard of the SUA problem.  Mr. McDaniel saw advertisements for Toyota and Lexus vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for years before he purchased his IS 250 and Camry. Although he does not recall the specifics of the many Lexus and Toyota advertisements he saw before he purchased his IS 250 and Camry, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his IS 250 and Camry.  Had those advertisements or any other materials disclosed that Lexus and Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his IS 250 or his Camry. He certainly would not have paid as much for them.

115.   Plaintiff Nancy Montemerlo is a resident and citizen of New Hampshire.  She owns a 2009 Toyota RAV4, which she purchased on January 26,

- 63 -

010172-25 398181 v1

2009.  After the news broke about the SUA defect, she asked her dealer to take the car back or reduce her payment, or to reduce her interest rate, but the dealer refused. She has experienced SUA while driving her RAV4.  While accelerating from a stop, the car will surge forward and accelerate on its own; these incidents happen approximately every two weeks.  Ms. Montemerlo saw advertisements for Toyota vehicles on television, in magazines, in brochures at the dealership, and on the Internet during the two years prior to purchasing her RAV4 on January 26, 2009. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her RAV4, she recalls that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her RAV4.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her RAV4.  She certainly would not have paid as much for it.

116.   Plaintiff John Moscicki is a resident and citizen of California.  He owns a 2007 Toyota Camry LE, which he purchased as a certified used vehicle from a Toyota dealer in Oregon.  Mr. Moscicki has experienced five sudden unintended acceleration incidents while living in Oregon.  During these incidents, the "gas pedal went to the floor."  Mr. Moscicki saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for many years before he purchased his Toyota Camry in November 2007. Although he does not recall the specifics of the many advertisements he saw before he purchased his Camry, he recalls that safety and reliability were consistent themes

- 64 -

across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  He certainly would not have paid as much for it.

117.   Plaintiff Katherine Musgrave is a resident and citizen of Maine.  She owns a 2006 Toyota Prius.  Ms. Musgrave first experienced SUA in a parking lot, but did not have a collision.  She then had a second experience when was traveling down a city street when she began slowing to stop at a stop sign.  She had slowed from approximately 35 mph to approximately 25 mph when the car accelerated.  She was forced to go through the intersection, weave around three different cars, and then go up on the curb.  She collided with a utility pole.  She tried to brake, but could not stop or slow the car.  She spoke to her dealer, who referred her to Toyota's Customer Experience Center, because the dealer said Toyota had told him not to get involved with SUA incidents because Toyota was afraid the dealer would take the side of its customer.  After she contacted the Customer Experience Center, a case manager called her back and said she would be the case manager, but despite several phone calls, Ms. Musgrave was never able to reach that person again.  Toyota inspected the car, and then sent her a letter saying the car was not defective.  Ms. Musgrave asked to see the report, but the inspector said the report was the property of Toyota.  Ms. Musgrave saw advertisements for Toyota vehicles on television and in magazines for years before she purchased her Prius. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Prius, she does

recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Prius.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Prius.  She certainly would not have paid as much for it.

118.   Plaintiff Lawrence Nelson is a resident and citizen of Montana.  He owns a 2009 Toyota Camry LE.  When all of the recalls began, Mr. Nelson took his car back to the dealership and was willing to do a trade-in for a non-Toyota vehicle, but the dealership would not discuss it with him.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for six months before he purchased his Camry.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  He certainly would not have paid as much for it.

119.   Plaintiff Alyson L. Oliver is a resident and citizen of Michigan.  She owns a 2007 Toyota Prius.  Ms. Oliver saw advertisements for Toyota vehicles on the television and internet, including on Toyota's website, during the approximately two to four months during which she researched various vehicles before she

- 66 -

purchased her Prius in 2007.  Although she does not recall the specifics of many of
the Toyota advertisements she saw before she purchased her 2007 Toyota Prius, she
does recall that Toyota promoted its vehicles as safe and reliable.  Those
representations about safety and reliability influenced her decision to purchase her
Prius.  Had those advertisements or any other materials disclosed that Toyota
vehicles could accelerate suddenly and dangerously out of the driver's control and
lacked a fail-safe mechanism to overcome this, she would not have purchased her
Prius.  She certainly would not have paid as much for it.

120.   Plaintiff Karen Pedigo is a resident and citizen of Illinois.  She owned a
2005 Toyota Camry.  While taking her daughter to church, Ms. Pedigo was looking
for street parking.  She had her foot off the gas and was pulling into a parallel space
when the car suddenly accelerated.  The sudden acceleration caused her car to hit a
minivan.  The car then recoiled and hit the minivan a second time.  Ms. Pedigo called
Toyota's Customer Experience Center, but they stated there was nothing they could
do to help her.  Due to the SUA, Ms. Pedigo sold her Camry and took a loss on the
vehicle.  Ms. Pedigo saw advertisements for Toyota vehicles on television and in
magazines for several years before she obtained her Toyota Camry in 2005.
Although she does not recall the specifics of the many Toyota advertisements she
saw before she purchased her Camry, she does recall that safety and reliability were
consistent themes across the advertisements she saw.  Those representations about
safety and reliability influenced her decision to purchase her Camry.  Had those
advertisements or any other materials disclosed that Toyota vehicles could accelerate
suddenly and dangerously out of the driver's control and lacked a fail-safe

010172-25 398181 v1

mechanism to overcome this, she would not have selected a Camry.  She certainly
would not have paid as much for it.

121.   Plaintiff Roland Pippin is a resident and citizen of Louisiana.  He owns
a 2009 Toyota Camry. Dr. Pippin purchased his Camry on October 17, 2009, only
days before the first of several recalls affecting his vehicle.  This was the fourth
Toyota vehicle, and the third Camry, that Dr. Pippin had purchased since 1994.
Before each purchase, Dr. Pippin performed exhaustive research on the attributes of
various vehicles.  During an approximate three-month period in which he
investigated and researched vehicles before purchase of his 2009 Camry, Dr. Pippin
saw advertisements for Toyota vehicles in brochures at Toyota dealerships and on
the Internet, including Toyota's website.  Safety and reliability were consistent
themes across these advertisements.  Toyota's representations of safety and
reliability influenced his decision to purchase the Camry.  Had those advertisements
or any other materials disclosed that the Camry could accelerate suddenly and
dangerously out of control and lacked a failsafe mechanism to overcome this, Dr.
Pippin would not have purchased the vehicle.  Safety and reliability, along with fuel
efficiency, are the most important factors in any vehicle Dr. Pippin purchases. Upon
notification that his vehicle was subject to recall, Dr. Pippin communicated a number
of times with the dealer from whom he bought the vehicle, as well as Toyota.  No
satisfaction was given to any of Dr. Pippin's concerns.  Dr. Pippin was so concerned
about the safety of his Camry after the recall that he parked his vehicle and did not
drive it for eight months.

122.   Plaintiff George D. Radmall is a resident and citizen of Kansas.  He
owns a 2007 Toyota Camry.  On June 6, 2009, Mr. Radmall was parked in a parking

- 68 -

1    lot.  He started the car, and with his foot on the brake, shifted into reverse.  The car

2    suddenly accelerated in reverse, and Mr. Radmall was unable to stop the car by

3    applying the brake.  The car slammed into another car in the parking lot.  On May 1,

4    2010, Mr. Radmall was pulling into a parking spot with his foot on the brake.  When

5    he applied pressure to the brake to stop the car, the car accelerated.  Mr. Radmall

6    pushed on the brake with both feet, but hit a storm drain cover (a large block of

7    concrete).  On May 24, 2010, Mr. Radmall was turning into a parking spot, but had

8    to stop and put the car in reverse in order to align the car properly with the spot.

9    After he put the car in reverse, the engine revved loudly as though the throttle was

10   wide open, but the brakes stopped the car.  Mr. Radmall released the brake after

11   shifting into drive, and the car lunged forward and hit a car and a cement block.  He

12   sold the Camry in July 2010, and received less for the sale than he otherwise would

13   have but for the defect.  Mr. Radmall saw advertisements for Toyota vehicles on

14   television, in magazines, on billboards, in brochures at the dealership, and on the

15   Internet during the years before he purchased his Toyota Camry on September 18,

16   2007. Although he does not recall the specifics of the many Toyota advertisements

17   he saw before he purchased his Camry, he does recall that safety and reliability were

18   consistent themes across the advertisements he saw.  Those representations about

19   safety and reliability influenced his decision to purchase his Camry.  Had those

20   advertisements or any other materials disclosed that Toyota vehicles could accelerate

21   suddenly and dangerously out of the driver's control and lacked a fail-safe

22   mechanism to overcome this, he would not have purchased his Camry.  He certainly

23   would not have paid as much for it.

010172-25 398181 v1

123.   Plaintiff John Jeremy Robson is a resident and citizen of Alaska.  He owned a 2007 Toyota Tundra.  He purchased the vehicle in 2009 and sold it in May 2010.  Mr. Robson received less for the sale of his Tundra than he would have received if the vehicle did not have a SUA defect.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Toyota Tundra in 2009. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tundra, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Tundra.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Tundra.

124.   Plaintiff Randee Romaner is a resident and citizen of New Jersey.  She leased and then purchased a 2007 Toyota Camry.  Ms. Romaner lives in a rural part of New Jersey where there is no public transportation, so she relies heavily on her Camry.  She saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, for several months before she leased and then purchased her Camry.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and

010172-25 398181 v1

dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have leased her Camry.  She certainly would not have paid as much for it.

125.   Plaintiff Keith Sealing is a resident and citizen of Pennsylvania. He leases a 2009 Toyota Corolla and is a dean of Widener Law School.  Dean Sealing explored ending his lease early, but the market value had dropped so much due to the defect that it was worth less than the remaining lease buy-out.  He would have had to pay out cash or else go into negative equity on a trade, so he was forced to keep it. Dean Sealing saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for at least ten years before he leased his Corolla on May 28, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have leased his Corolla.  He certainly would not have paid as much for it.

126.   Plaintiff Nancy Seamons is a resident and citizen of Utah.  She owns a 2009 Toyota RAV4.  She spoke to her dealer about her concerns, but was brushed off.  She saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for at least ten years before she purchased her RAV4. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her RAV4, she recalls

that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her RAV4 at the end of 2009. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her RAV4. She certainly would not have paid as much for it.

127. Plaintiff Richard Swalm is a resident and citizen of South Carolina. Mr. Swalm leases a 2007 Toyota Camry LE. Mr. Swalm and his wife have experienced multiple instances of the vehicle hesitating, then lunging forward. These problems began after the first week of his lease. He has taken the vehicle several times to his local dealership, which informed Mr. Swalm the problem was "just a glitch" in the computer, but the problem still occurs. Mr. Swalm pursued arbitration in late February/early March of 2010 to terminate his lease on the vehicle, but the arbitrator ruled against Mr. Swalm. He saw advertisements for Toyota vehicles on television approximately one to two years before he leased his Camry on March 3, 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he leased his 2007 Toyota Camry LE, he does recall that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Camry. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have leased his 2007 Toyota Camry LE. He certainly would not have paid as much for it.

- 72 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

128.   Plaintiff Linda Tang is a resident and citizen of California.  She owned a 2007 Camry.  On March 1, 2010, nine days after Toyota performed the pedal recall repair on Ms. Tang's vehicle, she had an SUA incident.  Ms. Tang was making a left turn when her vehicle began accelerating on its own.  Her vehicle continued to accelerate as she turned; she felt she had no control over her vehicle. She stepped on the brake and was able to turn the engine off in the middle of the street. She waited a few minutes, restarted the vehicle, and the RPMs immediately increased again. She again turned the engine off. Ms. Tang never drove the vehicle again after her SUA. In June 2010, she traded the vehicle in for a non-Toyota vehicle at a substantial loss. She saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the many years before she purchased her Toyota Camry on February 3, 2007. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she does recall that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it.

129.   Plaintiff Jane Taylor is a resident and citizen of Hawaii.  She owns a 2005 Toyota Prius.  Ms. Taylor saw advertisements for Toyota vehicles on television, in magazines, on billboards for several years before she purchased the Prius. This advertising, along with Toyota's reputation for quality, influenced her

- 73 -

decision to buy the Prius, and she trusted that Toyota would make a safe and reliable car.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased the Prius.  She certainly would not have paid as much for it.

130.   Plaintiff Kenny Teaster is a resident and citizen of Arkansas.  He owned a 2008 Toyota Tundra.  Due to his concerns about its safety, especially because Mr. Teaster has a young son, Mr. Teaster decided to trade in the Tundra for a 2010 Tundra.  He took a loss on the vehicle due to the depreciation in value.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, for several years before he purchased his 2008 Tundra. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his 2008 Tundra, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his 2008 Tundra.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have leased his Tundra. He certainly would not have paid as much for it.

131.   Plaintiff Shirley Ward is a resident of Virginia.  She owned a 2005 Lexus ES 330.  On April 2, 2010, Ms. Ward experienced a collision as a result of SUA when her car accelerated while she was attempting to park at her condominium complex.  The vehicle suddenly took off, going over the curb and into a cinder-block wall.  After impact, the tires continued to spin and the engine continued to rev even

- 74 -

though Ms. Ward had both feet on the brake.  When she put the vehicle into reverse, the engine went back to normal.  Ms. Ward traded in her ES 330 and received substantially less value than she would have received if the vehicle did not have the SUA defect.  Ms. Ward saw advertisements for Lexus vehicles on television, in magazines, in newspapers, and on billboards before she purchased her first Lexus in 1999 or 2000.  She continued to see Lexus advertisements up until the time she purchased her ES 330 in January 2010.  Although she does not recall the specifics of the many Lexus advertisements she saw before she purchased her ES 330, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her ES 330.  Had those advertisements or any other materials disclosed that Lexus vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her ES 330.

132.   Plaintiff Ted M. Wedul is a resident and citizen of Wisconsin.  He owns a 2010 Toyota Prius.  Mr. Wedul saw advertisements for Toyota vehicles on television, on the Internet, and in magazines during the months before he purchased his Prius in August 2009.  Although he does not recall the specifics of many of the Toyota advertisements he saw before he purchased his Prius, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Mr. Wedul recalls Toyota advertising suggesting that its vehicles had the highest ratings in crash tests and were among the safest vehicles on the road today.  Mr. Wedul researched the safety of various vehicles extensively before he made his decision to purchase a Toyota Prius.  Toyota's representations about safety and reliability

- 75 -

influenced his decision to purchase his Prius.  Had Toyota's advertisements or any

other materials disclosed that Toyota vehicles could accelerate suddenly and

dangerously out of the driver's control and lacked a fail-safe mechanism to

overcome this, he would not have purchased his Prius.

133.   Plaintiff Georgeann Whelan is a resident and citizen of Maryland.  She

owned a 2005 Toyota Avalon.  She experienced SUA several times at intersections,

when her car seemed to hesitate after stopping and then accelerate.  While driving

with her adult daughter in a parking lot, driving less than 5 mph, Ms. Whelan heard

the engine roar and the car rapidly accelerated for approximately two parking lot

spaces into a Chevrolet Suburban.  She checked the floor mat after the incident, and

it was in place. Ms. Whelan requested Toyota buy her vehicle back and wrote a letter

to Toyota Motor Sales. Ms. Whelan is generally aware that Toyota has a reputation

for reliability and safety from reading publications such as *Consumer Reports*.  She

also reviewed the advertising booklet from the dealer before purchasing her Avalon,

which made representations about safety and reliability, including, "The Avalon not

only takes care of all your indulgences, but your safety as well….So you can truly

enjoy your ride from the standpoint of luxury and safety….  A standard of luxury

exceeded only by a standard of safety." She reviewed the window sticker of her

vehicle prior to her purchase, and reviews news reports regularly.  Had these

advertisements or any other materials disclosed that Toyota vehicles could accelerate

suddenly and dangerously out of the driver's control and lacked a fail-safe

mechanism to overcome this, she would not have purchased her Toyota Avalon.

134.   Plaintiff Richard Wolf is a resident and citizen of Nevada.  He and his

son own a 2006 Toyota Tacoma (Mr. Wolf is the co-signer on the loan), and he owns

a 2006 RAV4.  Both vehicles have experienced SUA events.  Mr. Wolf's son and his daughter-in-law have been involved in collisions caused by SUA while driving the Tacoma.  Mr. Wolf's wife has experienced throttle issues and acceleration while driving the RAV4.  Mr. Wolf has retained both vehicles, and has had them inspected by Toyota.  He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, for years before he purchased his 2006 Toyota Tacoma. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Tacoma, he does recall that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Tacoma.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Tacoma.  He certainly would not have paid as much for it.

**D.    Defendants**

135.    Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation.  TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc. TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota, Lexus and Scion automobiles in California and multiple other locations in the United States and worldwide.

136.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in California.  TMS is Toyota's U.S. sales and marketing arm, which oversees sales and other operations in 49 states.  TMS distributes Toyota, Lexus and Scion vehicles and sells these vehicles through its network of dealers.

- 77 -

Money received from the purchase of a Toyota vehicle from a dealer flows from the dealer to TMS.  Money received by the dealer from a purchaser can be traced to TMS and TMC.

137.   TMS and TMC sell Toyota vehicles through a network of dealers who are the agents of TMS and TMC.

138.   TMS and TMC are collectively referred to in this complaint as "Toyota" or the "Toyota Defendants" unless identified as TMS or TMC.

139.   As used in this complaint, "Toyota vehicles", "Defective Vehicles" or "Subject Vehicles" refers to the following models that have ETCS:

**Toyota Vehicles**

| | |
|---|---|
| 2001 – 2010 | 4Runner |
| 2005 – 2010 | Avalon |
| 2002 – 2010 | Camry |
| 2007 – 2010 | Camry HV |
| 2003 – 2005 | Celica (2ZZ-GE Engine) |
| 2005 – 2010 | Corolla (1ZZ-FE, 2AZ-FE, 2ZR-FE) |
| 2007 – 2010 | FJ Cruiser |
| 2004 – 2010 | Highlander |
| 2006 – 2010 | Highlander HV |
| 1998 – 2010 | Land Cruiser |
| 2005 – 2010 | Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD)) |
| 2001 – 2010 | Prius |
| 2004 – 2010 | Rav4 |
| 2001 – 2010 | Sequoia |

- 78 -

| | | |
|---|---|---|
| 2004 – 2010 | Sienna | |
| 2002 – 2008 | Solara | |
| 2003 – 2004 | Tacoma (5VZ-FE except Sport Model) | |
| 2005 – 2010 | Tacoma | |
| 2000 – 2010 | Tundra (not including the 2000-2002 with 5VZ-FE) | |
| 2009 – 2010 | Venza | |
| 2004 – 2010 | Yaris | |

**Lexus Vehicles**

| | |
|---|---|
| 2002 – 2003 | ES300 |
| 2004 – 2006 | ES330 |
| 2007 – 2010 | ES350 |
| 1998 – 2006 | GS300 |
| 2007 – 2010 | GS350 |
| 1998 – 2000 | GS400 |
| 2001 – 2007 | GS430 |
| 2007 – 2010 | GS450h |
| 2008 – 2010 | GS460 |
| 2003 – 2009 | GX470 |
| 2010 | HS250h |
| 2008 – 2010 | IS F |
| 2006 – 2010 | IS250 |
| 2010 | IS250c |
| 2001 – 2005 | IS300 |
| 2006 – 2010 | IS350 |

- 79 -

| | | |
|---|---|---|
| 1 | 2010 | IS350c |
| 2 | 1999 – 2000 | IS400 |
| 3 | 1998 | LS400 |
| 4 | 2001 – 2006 | LS430 |
| 5 | 2007 – 2010 | LS460 |
| 6 | 2008 – 2010 | LS600h |
| 7 | 1998 – 2007 | LX470 |
| 8 | 2008 – 2010 | LX570 |
| 9 | 2004 – 2006 | RX330 |
| 10 | 2007 – 2010 | RX350 |
| 11 | 2006 – 2008 | RX400h |
| 12 | 2010 | RX450h |
| 13 | 1998 – 2000 | SC300 |
| 14 | 1998 – 2000 | SC400 |
| 15 | 2002 – 2010 | SC430 |

**Scion Vehicles**

| | | |
|---|---|---|
| 2005 – 2010 | Scion tC |
| 2008 – 2010 | Scion xB |
| 2008 – 2010 | Scion xD |

- 80 -

# IV.   FACTUAL BACKGROUND

## A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand

140.   Toyota has consistently marketed its vehicles as "safe" and proclaimed that safety is one of its "highest corporate priorities."  It has promoted ETCS as providing "stable vehicle control."  Examples of such representations follow.

141.   Toyota's 1996 Annual Report explained that safety always has been a top priority in each phase of Toyota's research and development.  But translating that effort into "overall safety gains" required an "integrated methodology that unifies evaluation criteria for safety throughout development organization."  In a 1996 brochure entitled "Toyota and Automotive Safety," Toyota again stated, "[a]t Toyota, we feel that building safe automobiles is the most important thing we can do."  Toyota explained this focus on safety is part of its broad philosophy:

> The more indispensable automobiles become, the greater
> they affect society in terms of safety and the environment.
> We at Toyota are fully aware of our responsibilities in this
> regard.  We do our utmost to minimize our products'
> environmental impact and work hard to ensure overall
> safety.  This means identifying the causes of any problems,
> devising workable remedies, and then putting those
> remedies into action.

142.   Toyota's safety promises included its new electronic throttle control system that it began to implement in the late 1990s.  When Toyota began installing ETCS in the 1998 Lexus, it announced ETCS as one of the latest developments:

- 81 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The intelligent electric throttle control system (ETCS-i) gives improved acceleration control under all driving conditions.  It provides excellent response and stable vehicle control, especially when the road is slippery. Using ETCS-i the throttle valve opening is controlled by a throttle actuator which is a small electric motor.  Under normal road conditions the throttle opens in direct proportion to the accelerator providing maximum response and performance.

However, under slippery road conditions and with the snow mode selected the actuator slows the throttle opening relative to the accelerator to suppress sudden engine output and provide improved acceleration control.

The ETCS-i is controlled by the engine management computer and communicates with the intelligent automatic gear shift and the traction control systems.

The release claimed "[t]he safety and security of driver and passenger has always been an absolute priority for Lexus."

143.   The Toyota Camry, in which some of the earliest deadly sudden acceleration accidents occurred, was marketed by Toyota as a high quality and safe family vehicle.  According to a Toyota press release:

The fifth-generation Toyota Camry, introduced for 2002, has become the platinum standard in midsize family sedans by offering more of everything sedan buyers want – room,

- 82 -

comfort, performance, *safety and value – along with award-winning Toyota quality.*  "Camry has come to define what a family sedan should be," said Don Esmond, Toyota Division senior vice president and general manager.  "It's [sic] continuing success in the U.S. stems from the combination of truly unbeatable quality, comfort and value that it provides."  [Emphasis added.]

144.   TMS touted safety as a key feature of Lexus vehicles in a 2002 press kit:

Raising the Standards on Standard Safety Features.

**<u>The Lexus Commitment to Safety</u>**

Lexus designs all its new vehicles to provide customers with advanced safety engineering and technology.  Lexus also recognizes the driver's responsibility to operate a vehicle in as safe a manner as possible, and the company has been at the forefront of technology that enhances both passive safety (occupant protection in a collision) and active safety (driving dynamics).

<u>Road-Reading Throttle Control</u>:  Seeking to enhance driving smoothness at every level, Lexus equipped the LS 430 with a system called Intuitive Powertrain Control. Working with the electronic throttle control (drive by wire), the system helps to smooth out acceleration from a

1    standing start by very slightly delaying throttle opening

2    when the driver steps on the accelerator pedal.

3    145.    TMC highlighted safety as a key quality in a 2003 brochure:

4    **Toyota Next Generation Technology**

5

6    We are stepping up our safety technology development to

7    ensure that customers can enjoy their vehicles in safety.  In

8    addition to "passive" safety technology, Toyota is

9    energetically developing "active" safety systems that

10    prevent collisions.  We are working particularly hard to

11    develop advanced safety systems based on our key

12    peripheral monitoring technologies.

13

14    146.    In a press kit regarding the 2003 Prius, Toyota proclaimed its bold use

15    of more "drive by wire" (electronic rather than mechanical features), including a

16    drive-by-wire throttle:

17    Many of the new technologies used in the Prius – some

18    unique to the car and world firsts – have been made

19    possible by Toyota's bold move to redefine the vehicle's

20    power train and electrical architecture.  The higher voltages

21    created by the batteries and converter have enabled

22    Toyota's engineers to equip the Prius with a far larger suite

23    of 'drive by wire' technologies than has previously been

24    seen in any production car.  Throttle, transmission and

25    braking is [sic] all electronically controlled and free of the

26    traditional mechanical linkages.

27

28

- 84 -

147.   The same brochure lists the new electronic throttle as a safety feature of the car:  "Safety … First car in the world to use 'by-wire' technology for throttle, brakes and gearshift simultaneously."  The brochure describes Toyota's "radical" and "futuristic" adoption of more electronically controlled features in the Prius because of their increased reliability, including:

> By suppressing mechanical and hydraulic links and replacing them with electric and electronic connections it's possible to achieve shorter activation times.  In addition, the communication between all these systems will be faster.  "By-wire" also brings advantages in weight reduction and saves precious space that can be used to house other systems…
>
> "By-wire" technology was originally developed for the aerospace industry, where certain mechanisms had to be activated without any hydraulic or mechanical link.  The only way to achieve this was through an electronic connection and electric activation.  This technology not only saves weight and space, but also provides a more immediate action than hydraulic or mechanical links, with even higher reliability.
>
> For this reason, Prius uses more "by-wire" technology than any other car on the road today.  Throttle, brakes, shift lever, Traction Control and Vehicle Stability Control Plus

- 85 -

1    use this technology to improve their operation or even to

2    provide improved ergonomics.

3        148.   In an advertisement appearing in the June 2003 issue of GOOD

4    HOUSEKEEPING, Toyota promised the Sienna had "more safety."

5        149.   In a 2004 press release introducing the new Prius, TMS claimed:

6            Designed to easily accommodate a small family, the 2004

7            Prius is also designed to provide the level of safety a family

8            car buyer demands.  Passive safety features include front

9            seatbelts with pre-tensioners and force limiters, 3-point

10           seatbelts for all rear seating positions and two-step dual

11           front airbags (SRS), with driver and passenger side and

12           curtain airbags available as an option.

13

14           Prius also features a high level of dynamic control, with

15           some features that are not yet available in other midsize

16           cars.  The standard anti-lock brake system (ABS) integrates

17           Brake Assist and Electronic Brake Distribution features,

18           which can help apply maximum braking pressure in an

19           emergency stop.  Vehicle Stability Control (VSC) is

20           available as an option.  The new Hill Acceleration Control

21           helps the driver maintain better control on ascents and

22           descents.

23

24           The new Prius uses an electronically controlled "throttle-

25           by-wire" throttle, which provides greater precision than a

26           conventional cable-type throttle setup.  A new by-wire shift

27

28

1  control replaces the traditional gearshift lever and allows

2  tap-of-the-finger shifting using a small joystick mounted on

3  the dash.

4  150.   This general promise of safety and specific promise that the new

5

6  electronic components being installed in Defective Vehicles are more reliable than

7  their mechanical predecessors is a repeated theme in Toyota marketing:

8  ● 2004 Toyota 4Runner press release: "It features a

9  new linkless electronic throttle control system with

10  intelligence (ETCS-i) that helps improve

11  performance and increase fuel economy…*The*

12  *4Runner utilizes the latest technology to deliver a*

13  *high level of occupant safety*." [Emphasis added.]

14

15  ● August 2004 Lexus Press Kit: "Technical

16  innovation is a key element of Lexus's all-around

17  excellence, *delivering real benefits to owners in*

18  *terms of safety*, performance, comfort and

19  convenience." [Emphasis added.]

20

21  ● November 2004 GOOD HOUSEKEEPING: "Your

22  destination should always be safety. And [] Toyota

23  SUV's raise the standard…."

24  ● In GOOD HOUSEKEEPING's November 2004 issue and

25  elsewhere: "Safety First to Last," an advertisement

26  for RAV4, Sequoia and Land Cruiser.

27

28

- 2005 Press Release regarding Toyota SUVs:
  "'Toyota customers have long counted on the brand for the best in performance, quality and durability,' said [Don] Esmond [senior vice president and general manager, Toyota Division]. *'They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs.'"* [Emphasis added.]

- In GOOD HOUSEKEEPING's May 2001 issue: "Happy Mother's Day from the people obsessed with safety," an advertisement for the Sienna.

- In GOOD HOUSEKEEPING's March 2001 issue, Special Advertising Section: "Serious about safety. Camry utilizes the latest technology to ensure you and yours arrive at your destination safe and sound." Also, "Value and safety. Part of the Corolla equation has always been high value and high safety."

151.   These proclamations of "safety" and "reliability" were false and misleading because they failed to disclose the dangerous SUA defect and fail-safe mechanism defects.  Toyota knew or should have known these representations were false and misleading because, as discussed in detail below, Toyota knew there was a significant increase in SUA events in vehicles with electronic throttle controls over vehicles with mechanical throttle controls.

152.    In 2004, TMS issued a brochure that discussed the safety features of the Sienna:

> A safe place for your children to grow up.  Sienna has a proud safety heritage, boasting some of the very best scores in its class on government and insurance industry crash tests.  We've equipped the 2004 Sienna with even more safety features.  [Lists the safety features.]

153.    In 2004, TMS issued a press kit noting that its RAV4 had enhanced safety features:

> The second-generation model, designed in Southern California by Toyota's Calty Design Research and introduced for the 2001 model year, increased Toyota's share of this growing segment.  The 2004 revision is designed to strengthen the brand's position in the segment that it created, and to give the customer even greater value and enhanced standard safety features.
>
> "Toyota invented the formula for this segment, and for 2004 we're perfecting it with more of what everyone who buys a small SUV wants – more power, more safety features, more style and more value," said Don Esmond, Toyota Division senior vice president and general manager.  "What's more RAV4 still holds the ultimate advantage with Toyota quality."

010172-25 398181 v1

154.   In a 2005 press release, TMS boasted about its safety in its RAV4, 4Runner, Land Cruiser and Sequoia SUVs:

> "Toyota offers one of the widest selections of SUVs on the market, and we equip every model with the same level of advanced safety technology," said Don Esmond, senior vice president and general manager, Toyota Division.  "By making this technology standard on all our SUV models, Toyota provides the customer with peace of mind when purchasing and when driving."
>
> ….
>
> "Toyota customers have long counted on the brand for the best in performance, quality and durability,' said Esmond.  'They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs."

155.   A 2006 brochure devoted entirely to Toyota's safety efforts acknowledged Toyota's responsibility as a vehicle manufacturer for the safety of its vehicles.  The brochure stated that "Toyota is working to reduce traffic accidents, deaths and injuries" because accidents "have an enormous economic impact:  lost productivity, medical bills and compensation for victims, physical losses of vehicles and structures and institutional costs (insurance management, police, trial costs, etc.)."  The brochure then explained how Toyota pursues what it refers to as "real safety":

> A fundamental component of building safe cars is gathering information and analyzing why accidents occur

- 90 -

1    and what causes injuries.  Toyota analyzes data from real

2    accidents that take place all over the world.  By analyzing

3    accident data and using simulation, Toyota develops new

4    safety technologies, testing them on actual vehicles before

5    being offered to the public in our product line-up.  This is a

6    perpetual cycle through which Toyota seeks to enhance

7    safety technologies and reduce accidents continuously.

8

9    These same messages were echoed in safety brochures used by TMS in 2007.  These

10   statements were false and misleading because Toyota had not performed the tests

11   necessary to diagnose, identify and fix the defect causing SUA.

12

13   156.   In the 2007 "Camry Owners Warranty Manual," Toyota represented that

14   it builds "vehicles of the highest quality" and "reliability":

15   At Toyota, our top priority is always our customers.  We

16   know your Toyota is an important part of your life and

17   something you depend on every day.  That's why we're

18   dedicated to building products of the highest quality and

19   reliability.

20

21   Our excellent warranty coverage is evidence that we stand

22   behind the quality of our vehicles.  We're confident – as

23   you should be – that your Toyota will provide you with

24   many years of enjoyable driving.

25                          *    *    *

26

27

28

- 91 -

1
2
3
4

> Our goal is for every Toyota customer to enjoy outstanding
> quality, dependability and peace of mind throughout their
> ownership experience.

5
6
7
8
9

157.   This warranty language appears in identical text for all Toyota models. The foregoing language was false and misleading because in fact Toyota vehicles were not of the highest quality and reliability but instead were unsafe and unreliable due to the SUA defect and the failure to have an adequate brake-override and other fail-safe mechanisms.

10
11
12
13
14

158.   In September 2009, Toyota announced a new marketing campaign that highlights six claims that Toyota has achieved through its philosophy of *kaizen*, or "constant improvement." Included in the six claims are "Dependability," "Quality," "Reliability" and "Safety."

15
16

159.   A 2010 video of Toyota's Star Safety System includes the following description of Toyota's standard for vehicle control safety:

17
18
19
20
21
22
23
24
25
26
27
28

> If a stereo system comes standard on an SUV, shouldn't a
> safety system? Introducing Toyota's Star Safety System
> TM, a combination of five safety features that comes
> standard with every one of Toyota's five SUVs: Vehicle
> Stability Control, Traction Control, Anti-lock Brakes,
> Electronic Brake-force Distribution, and Brake Assist. All
> designed for one purpose: to help keep the driver in
> control of the vehicle at all times. Because when it comes
> to the well-being of you and your passengers, Toyota has
> raised the standard.

- 92 -

The video is misleading as it does not mention the vehicle recalls, the unintended acceleration defect or the lack of a fail-safe mechanism to override unintended acceleration. Written advertisements also made representations about the Star Safety System as part of an accident avoidance system that "keeps you in control and out of harm's way." Toyota knew these representations were false due to the deaths and crashes it was aware of due to SUA and lack of a fail-safe.

160. In a video released in February 2010, Toyota states:

> For over 50 years providing you with a safe, reliable and high quality vehicles has been our first priority. In recent days, our company hasn't been living up to the standards that you have come to expect from us or that we expect from ourselves. That's why 172,000 Toyota and dealership employees are dedicated to making things right. We have a fix for our recalls. We stopped production so we could focus on our customers' cars, first. Our technicians are making repairs. We're working around the clock to ensure we build vehicles of the highest quality, to restore your faith in our company.

The commercial does not mention that the recalls do not explain even a majority of the reports of unintended acceleration.

161. These claims of safety were intended to and did cause individuals to trust the safety of Defective Vehicles and purchase them. As stated in a 1998 Corolla brochure, "Toyota is now one of the most trusted names in the automotive world – one of the few things you can really depend on." As stated in a 2004 Lexus

LS brochure, "[t]he value of owning a Lexus involves much more than just its purchase price.  It also includes our well-earned reputation for vehicle dependability, projected low repair costs and high retained value.  In addition to such intangibles as outstanding customer satisfaction, unparalleled quality, peace of mind and loyalty."  Even Toyota's logo of three overlapping ovals is meant to convey a trust between the customer and Toyota.[7]

162.   Despite Toyota's proclamations of safety and severe testing regimes, it was also growing rapidly, adding new technology to its vehicles and increasingly unable to live up to its promises.

## B.   Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism

163.   Toyota calls its electronic throttle control system the ETCS-intelligent, or ETCS-i.  ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle. Toyota began installing ETCS-i in models of the 1998 Lexus.  This ETCS included a mechanical link that shut off the throttle.

164.   In 2001, Toyota began producing the substantially redesigned 2002 Camry.  It was the first Toyota to be equipped with linkless ETCS-i, which was one of several new or revised vehicle systems (including transmission and braking systems) introduced for 2002 Toyota Camrys, Solaras and the Lexus ES300 line. Linkless ETCS-i did not have a mechanical link to shut the throttle.

---

[7] See http://www2.toyota.co.jp/en/vision/traditions/nov_dec_04.html.

- 94 -

165.   Toyota's earlier ETCS-i equipped vehicles retained a mechanical system that would close the throttle if the electronic system failed.  However, Toyota had phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002 Camry.  Toyota knew other manufacturers continued to use a manual fail-safe mechanism.  For example, Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied.[8]

166.   In order to address potential malfunctions of the ETCS-i – in other words, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies.  The fail-safe strategies are:

    a.    If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

    b.    The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

    c.    The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

    d.    If one or both throttle position sensors fail, or the throttle itself is not responding properly to the

---

[8] TOY-MDLID00041130T-0001.

accelerator pedal but the throttle itself is not

physically stuck, the throttle should close but will

provide minimal acceleration.

167.   As explained herein, Toyota knew no later than 2002 that these fail-safes were insufficient to prevent SUA events in its vehicles and that additional fail-safes were necessary.  Toyota did not, however, move to address these issues by installing additional fail-safes.

168.   Toyota had several options.  For example, Toyota could have installed a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing SUA.  Or, Toyota could have employed a hardware-redundant, fault tolerant solution (BMW's approach).  Or, Toyota could have provided an override of the engine control module, such as a key switch to physically remove the power to the Engine Control Module ("ECM").  Or, Toyota could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system.  Toyota did none of these things.

169.   In 2007, recognizing the risks of unintended acceleration, "TMS suggested that there should be 'a fail safe option similar to that used by other companies to prevent unintended acceleration.'"[9]  Toyota did not act on this suggestion until 2010.

C.     **Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002**

170.   Toyota had advance notice of a defect and safety risks involving SUA in ETCS-i equipped vehicles as early as 2002.  Toyota hid this notice from the public

---

[9] TOY-MDLID00041130T-0001.

- 96 -

through calculated manipulation of information supplied to NHTSA during its various investigations of SUA incidents.  Toyota exploited strategic relationships with current and former NHTSA employees and negotiated "deals that limited the nature and scope of NHTSA's investigations."  Toyota knew that these limited investigations were unlikely to reveal a defect in the ETCS and did everything it could to keep it that way.

### 1. First reports of unintended acceleration to Toyota

171.   On February 2, 2002, Toyota received its first consumer complaint of a 2002 Camry engine surging when the brakes were depressed.  Toyota received ten other similar complaints before August 2002.

172.   In March 2002, TMS asked TMC to investigate the root cause of the surging.  On May 20, 2002, internal records reported that the "root cause of the 'surging' condition remains unknown" and "[n]o known remedy exists for the 'surging' condition at this time."[10]

173.   In response to a NHTSA investigation into similar incidents, Toyota issued at least three "Technical Service Bulletins" related to SUA.  On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38-42 MPH with lock-up (L/U) 'ON.'"  Toyota advised that the cars' ECM calibration had been revised to correct the problem.  Yet, on December 23, 2002, Toyota released another bulletin noting that 2002 and 2003 Camrys, produced at Toyota Motor Manufacturing of Kentucky ("TMMK"), "may exhibit a triple shock (shudder) during the shift under

---

[10] TOY-MDLID00062906.

- 97 -

'light throttle' acceleration."  The bulletin advised dealers to follow the repair procedure in the bulletin to rectify the situation.  Less than nine months later, Toyota released a nearly identical advisory notice on May 16, 2003, which stated that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-42 mph with lock-up (L/U) 'ON.'"  Again, Toyota claimed the ECM calibration had been revised to correct this condition.  Toyota did not disclose the existence of these technical service bulletins to consumers, or the fact that Toyota could not solve the problem.

174.   On August 31, 2002, Toyota recorded its first warranty claim to correct a throttle problem on a 2002 Camry.  Customer warranty claims are handled by the TMS Claims Department in Torrance, California.[11]

175.   On April 17, 2003, Peter Boddaert of Braintree, Massachusetts, filed with NHTSA a report of SUA involving his 1999 Lexus.  In response, NHTSA opened Defect Petition DP03-003.  Mr. Boddaert petitioned the agency to analyze 1997-2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal."  In his petition, Mr. Boddaert noted that 271 other complaints about these vehicles had been lodged on NHTSA's website, 36 of which involved problems with "vehicle speed control."  Of those 36 complaints, several involved collisions, including one in which a Lexus had "collided with five other cars in the space of ½ mile before it could be stopped."

_____

[11] *See* TOY-MDLID00023851.

- 98 -

## 2. Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls

176. On January 15, 2004, Carol Mathews asked NHTSA to investigate 2002 and 2003 Lexus ES300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash." On March 3, 2004, NHTSA's ODI opened a Preliminary Evaluation (PE04-021). NHTSA documents describe the problem to be investigated as: "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge." The investigation was initially expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES300 vehicles. ODI had received 37 complaints and reports of 30 crashes resulting in five injuries.

177. Mr. Scott Yon was the designated investigator. He would remain NHTSA's principal investigator on many subsequent SUA-related investigations and developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

178. The NHTSA investigation described the defect allegations as:

Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system function was reportedly normal.[12]

---

[12] TOY-MDLID00041712.

- 99 -

179.   On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota employee in Technical and Regulatory Affairs, an e-mail showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles:

From:        Yon, Scott

Sent:        Thursday, June 03, 2004  9:15 AM

To:          Chris Santucci (Toyota.com)

Subject:     For review

Categories:  PE04021-ToyotaThrottleControl

Attachments: CamryVSCTrend-200402.pdf

See attached.  Give me a call, when you have time; I want to discuss the submission and the attached.

Scott

- 100 -



Feb 2004 VOQs:  MY >1994, Make = Toyota, Model = Camry, Comp Desc like "Vehicle Speed%".  Populations from EWR submission tables.

|      |     | Camry VOQs | CamPopEWR | Camry/YIS/100k |
|------|-----|------------|-----------|----------------|
| 1995 | MTC | 10         | 314066    | 0.35           |
| 1996 | MTC | 22         | 344599    | 0.80           |
| 1997 | MTC | 12         | 365752    | 0.47           |
| 1998 | MTC | 35         | 404850    | 1.44           |
| 1999 | MTC | 19         | 435654    | 0.87           |
| 2000 | MTC | 25         | 396646    | 1.58           |
| 2001 | MTC | 5          | 312208    | 0.53           |
| 2002 | ETC | 32         | 433112    | 3.69           |
| 2003 | ETC | 14         | 390691    | 3.58           |
| 2004 | ETC | 0          | ??        |                |

Avg Rate/YIS/100k

0.86    MTC

3.64    ETC

180.   Motor vehicle manufacturers frequently re-design their vehicles, as when Toyota implemented ETCS.  But having taken that step, Toyota should have monitored NHTSA's consumer safety database for indications of changing patterns in the complaints by model that signaled the need to review the safety of ETCS and the need to implement a robust fail-safe, including, but not limited to, an effective brake-override.

181.   Publicly available consumer complaints which exclude the 37,000 complaints Toyota has yet to reveal, show a pronounced increase in SUA complaints

- 101 -

from Toyota Camry owners after Toyota introduced ETCS-i in that vehicle.

Through April 30, 2003, more than 9% of all complaints for Camrys equipped with

ETCS-i related to SUA, while only 5% of all complaints (41 of 810) for Camrys

without ETCS-i related to SUA.  This difference is statistically significant based on

Fisher's two-tailed exact test, p = 0.0369.  The twin Lexus ES model showed a very

similar pattern of SUA complaints.

182.   The Toyota Tacoma pickup also showed a marked increase in SUA

complaints after Toyota introduced ETCS-i in this model.  By the end of January

2007, nearly 5% of all complaints (12 of 241) for Tacomas equipped with ETCS-i

related to SUA (12 of 241) while only 2% of all complaints (9 of 449) for Tacomas

without ETCS-i.  This difference is statistically significant based on Fisher's two-

tailed exact test, p = 0.0368.

183.   A similarly striking trend occurs in several other models:  Lexus ES

(5-fold increase), Lexus RX (1.8-fold increase), 4Runner (6-fold increase), Avalon

(2-fold increase), Camry (3.7-fold increase), Highlander (2.8-fold increase), and

Tacoma (14-fold increase).

184.   State Farm observed the same trend in Toyota Camrys and Corollas, as

reflected in the chart below (which State Farm provided to Congress):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



185.   This statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that there was a defect in its vehicles with ETCS that could cause SUA.

186.   Toyota's complaint database was not the only source of information available to Toyota.  Internally, as early as May 5, 2003, in secret "Field Technical Reports" Toyota was documenting "sudden[] acceleration against our intention," as an "extremely serious problem for customers."[13]  A technician reported a SUA incident and stated "we found mis-synchronism between engines speed and throttle position movement."  The probable cause was unknown but "[e]ven after

_____

[13] TOY-MDLID00087951-52.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

replacement of those parts, this problem remains."  The author requested immediate action due to the "extremely dangerous problem" and "we are also much afraid of frequency of this problem in near future."

187.  At the outset of its 2004 investigation into SUA in Toyota vehicles, NHTSA asked Toyota for information on similar incidents.  The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, California.  The scope of NHTSA's information request became the subject of negotiations between Messrs. Tinto and Santucci of Toyota and NHTSA representatives.  Ultimately, NHTSA agreed to exclude, certain highly relevant categories of incidents from its investigation.

188.  In response to NHTSA's information request, Toyota denied that a defect existed, stated that there was no defect trend and that its electronic control system could not fail in ways its engineers had not already perceived.  Toyota reported 123 complaints that it said "may relate to the alleged defect."  But Toyota excluded from its response the following relevant categories of complaints, among others:

> (1)    An incident alleging uncontrollable acceleration that occurred for a long duration;
>
> (2)    An incident in which the customer alleged that he could not control a vehicle by applying the brake; and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   (3) An incident alleging unintended acceleration

occurred when moving the shift lever to the reverse or the

drive position.

  189. The Toyota Defendants thus concealed from NHTSA and the public

relevant customer complaints.

  190. NHTSA closed the investigation without testing of the integrity of the

ETCS-i, without reviewing any records of Toyota's test reports concerning the

ETCS-i, and without reviewing whether the braking system was effective in an open-

throttle condition.  Toyota itself did not have the capability of fully modeling, testing

or validating the safety of ETCS-i because of its failure to implement standard design

platforms, its failure to develop and/or conduct meaningful ECM test procedures,

and its failure to exercise appropriate control over third-party subsystem designs.

  191. While Toyota denied any SUA defect, independent experts concluded

otherwise.  In May 2004, a Forensic Technologist and MSME examined a vehicle in

New Jersey that had experienced a SUA event.  The report was forwarded to Toyota

on January 13, 2005.  It concluded that the vehicle's ETCS was not operating

correctly.[14]  This report was not provided to NHTSA.

  192. Internally, Toyota was replicating the SUA defect; "was able to

duplicate customer complaints … engine speed remains at 5,000 rpm."  In these

cases it was often secretly replacing throttle bodies.

  193. On July 8, 2005, Mr. Jordan Ziprin of Phoenix, Arizona, filed a formal

request for a defect investigation into unintended acceleration in the 2002 Toyota.

---

[14] TOY-MDLID90064979.

- 105 -

194.   On August 5, 2005, NHTSA opened Defect Petition DP05-002 to investigate Mr. Ziprin's claims.  Scott Yon again was assigned as NHTSA's investigator.  The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES models.  The Opening Resume stated, in part:

> The Petitioner owns a 2002 Camry and states that in July
> 2005 the vehicle accelerated without application of the
> throttle pedal while reversing out of a driveway; the
> acceleration caused a loss of vehicle control and
> subsequent crash.…  The Petitioner states a similar throttle
> control incident occurred in April 2002 and additionally
> cites other ODI reports which also allege loss of throttle
> control and or uncontrollable acceleration.  The Petitioner
> discusses NHTSA investigation PE04-021, which involved
> the Camry and ES models, and makes a request for certain
> information.  ODI will evaluate the petition and other
> pertinent information.

195.   After receiving the petition and reviewing the underlying complaints, Toyota did not launch its own investigation or identify any new tests that it would perform to check for a defect in the ETCS.  Instead, Toyota's formal responses to NHTSA's investigation recommend NHTSA deny the petition based only on the information Toyota had previously provided "as well as the lack of evidence supporting concurrent failure of the vehicle braking systems."  After explaining how the electronic throttle system and its fail-safes were designed to operate, Toyota concluded:

- 106 -

1
2
3
4
5
6
7
8
9
10
11
12

> [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota believes this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls.  Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls.  Toyota has not found any evidence on the subject vehicles of brake failure, let alone brake failure concurrent with ETC failure.

13

*See* Toyota's Response re DP05-002, dated November 15, 2005.

14
15
16

196.    This response of "no evidence" ignores and concealed the spike in SUA events that occur within one year of a vehicle switching to ETCS, a trend known to Toyota.

17
18
19
20
21
22
23
24

197.    Mr. Yon, who is not an electrical engineer or expert in electronic control systems, inspected Mr. Ziprin's vehicle and found no evidence of a system malfunction.  Mr. Ziprin directed to NHTSA's attention some 1,172 Vehicle Owner Questionnaire reports, from which ODI identified 432 reports that alleged an "abnormal throttle control event."  The 432 reports involved 2002 to 2005 Camry, Solara and Lexus ES models (all equipped with ETCS).  Toyota had knowledge of the 432 reports.

25
26
27

198.    Upon learning of the denial, Mr. Ziprin, who had conducted considerable research into the issues set forth in his petition and filed his findings

28

010172-25 398181 v1

with the agency, reacted with an angry letter to NHTSA dated January 5, 2006, and

accused the agency of bias:

> Frankly, I anticipated that decision from the very first time
> I was in contact with Mr. Scott Yon, the assigned
> investigator.  He made statements during our first
> telephone conversation which tended to establish that the
> purpose of his inquiry was to establish a basis to dismiss
> the petition based upon NHTSA policy rather than to deal
> with and examine all of the facts and circumstances
> involved.  When Mr. Yon subsequently visited Phoenix, he
> told me quite clearly and emphatically that it was
> NHTSA's firm policy not to investigate safety issues
> regarding hesitations in acceleration by vehicles.

199.   On September 14, 2006, ODI opened Defect Petition DP06-003 in

response to a request from William Jeffers III for an investigation of 2002-2006

Camry and Camry Solara vehicles for incidents relating to vehicle surging.  Scott

Yon was again assigned to investigate.  According to the petition, Mr. Jeffers owned

a 2006 Camry and previously owned a model-year 2003 Camry.  He alleged that both

vehicles exhibited "engine surging," which he described as a short duration (one- to

two-second) increase in engine speed occurring while the accelerator pedal is not

depressed.  For his 2006 vehicle, the petitioner estimated that six to eight surge

incidents, of varying magnitude, occurred over the course of 10,000 miles and nearly

seven months of ownership.  In the last and most alarming instance, Mr. Jeffers noted

that the malfunction indication lamp was illuminated during and after this incident.

200.   Toyota received a fax from NHTSA on September 15, 2006, stating that it had agreed to open the defect petition.  In internal e-mails, Chris Santucci expressed skepticism of Mr. Jeffers' account of the unintended acceleration and hope that NHTSA would not ask Toyota to provide any additional data as part of the investigation:

> Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner.  Hopefully, they will not grant the petition and open another investigation.[15]

201.   Although Mr. Jeffers reported that the brake system was effective at overcoming the engine surge, he informed NHTSA of his concerns that this might not always be the case.  NHTSA summarized in its ODI Closing Resume:  "[H]e is concerned about reports filed with NHTSA alleging uncontrolled surging in MY 2002 to 2006 Camry vehicles bringing those vehicles to a high rate of speed (in some cases, purportedly, with the brakes applied)."

202.   While NHTSA's investigation was ongoing, two other related events occurred.  First, on February 5, 2007, a fatal crash occurred in San Luis Obispo, California, involving a 2005 Camry that suddenly accelerated in a restaurant parking lot, went through a guard rail and over a cliff into the Pacific Ocean.  Second, on March 14, 2007, TMS President James Lentz received a letter at his office in Torrance from a consumer explaining a SUA event in a 2003 Toyota Camry.[16]  The writer insisted he was pressing the brake, and not the accelerator, when the event

---

[15] TOY-MDLID00044092.

[16] TOY-MDLID90045217.

010172-25 398181 v1

occurred.  Further, the writer believed that the vehicle's electronic throttle caused the event.

203.   After the cursory evaluation of Mr. Jeffers' claims, NHTSA denied the petition and stated it found no evidence of a defect.

204.   Toyota never fully disclosed to the regulators the actual numbers of customer reports of unintended acceleration events in the various Toyota models under investigation that the company had received.  In fact, Toyota disclosed that it had received only 1,008 such complaints.  Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received *37,900* complaints potentially relating to sudden acceleration in Defective Vehicles from January 1, 2000, through January 27, 2010.

205.   One of Toyota's strategies in responding to SUA complaints has been to blame any report of SUA on driver error.  Toyota failed to disclose that its own technicians often replicated SUA events without driver error.  The following is an example:

**Condition Description**

Customer states while at a stop the engine started to rev and tried to take off.  Customer turned off vehicle and restarted.  Vehicle continue to rev when running.  Turning vehicle off 3rd time and restarted vehicle operated normally after third start.

**Diagnostic Steps**

- Technician who was inspecting the vehicle had driven it approximately 10-12 minutes.

- 110 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 7-8 minutes into the drive the technician was sitting at a stop light.  When the stop light changed the tech started to lightly accelerate.

- After traveling 20-30 feet the vehicle exhibited a slight hesitation *then began to accelerate on its own*.

- Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence.

- Vehicle traveling 9-10 mph at time of occurrence. Approximate maximum speed reached was 20 mph prior to accelerator pedal release / brake application.

- Estimated throttle position at the time of the occurrence was 15-20 percent.[17]  [Emphasis added.]

206.   Upon the technicians replicating a SUA event, Toyota decided it was in the customer's "interest" for Toyota to buy back the vehicle, meaning in reality that Toyota decided to remove this vehicle from the market since it was experiencing SUA incidents that could not be blamed on the driver.  And, to further conceal the defect Toyota required as a condition of the vehicle repurchase that the owner sign a confidentiality agreement and agree not to sue.  This confirmation of a clear SUA event not reported to NHTSA and was concealed.

207.   In a Field Technical Report dated April 18, 2006, involving a 2007 Camry, a technician confirmed the "Vehicle Lunges forward":

Condition Description

---

[17] TOY-MDLID00075242.

1    Vehicle lunges forward when coming to a stop

2

3    Diagnostic Steps:

4
5      • Drove vehicle at 55mph, got vehicle to go into 5th
6        gear, when slowing down and coming to stop, right at
7        5 mph the vehicle would lunge forward

8      • Drove vehicle in 4th gear, and when coming to a stop,
9        once the vehicle reached 5mph, vehicle would lunge
10       forward
11
12     • Drove vehicle in 3rd gear, and when coming to a stop,
13       when the vehicle reached 5mph, vehicle would lunge
14       forward

15     • Each of these test were complete with the A/C on and
16       off, no change
17

18   Probable Cause
19   Unknown[18]
20
21   208.   "Lunging" apparently was a problem service managers were aware of:
22   From: Mike Robinson/=Mobile/Toyota.
23   Sent:  5/25/2007 5:15 PM.
24
25
26
27   _____
     [18] TOY-MDLID00065813
28

| 1 | To:    Gordon Rush/=Lexus/Toyota@Toyota. |
|---|---|

To:    Gordon Rush/=Lexus/Toyota@Toyota.

Cc;    Gary_Heine@Toyota.com.

Bcc:

Subject:  Avalon Drivability Customer Verbatim

Information - Updated.


Gordon, can you please review the below comments and let me know if this is the type of information you are looking for?  I have added some PQS data verbatims as well, but was unsure if they would be suitable for your purposes.


\*\*\*


"(I) Have recently purchased a 2006 Avalon LTDand have experienced the hesitation problem.  The situation is dangerous … not so much the hesitation as the lunge after the hesitation.  Toyota had better get going quick as I predict this will result in numerous accidents and possible deaths.  I have talked with my service manager and he said, "they all do it"

Regards,

Mike

Mike Robinson

Technical Supervisor

- 113 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Quality Assurance Powertrain Group

Toyota/Lexus Product Quality & Service Support

Office:  (310) 468-2411

209.   On another occasion in October 2007, a Field Technical Report confirmed a case of SUA in an ES330.[19]

210.   In a Dealership Report in 2005, on a 2005 Sequoia, the dealer verified two separate SUA incidents and identified the probable cause as a "software issue of the engine control unit."

211.   In December 2003, in a secret Field Technical Report, a technician verified a surge event during "cold engine operation" even where the scan tool showed no DTC.

212.   In a series of Field Technical Reports from 2006-2010 involving Toyota Camrys, technicians from Hong Kong confirmed UA events and that these events were not caused by pedal or floor mats.  The UA events were duplicated without triggering a DTC.  These technicians strongly urged TMS to investigate since the problem was highly dangerous and the incidents were stacking up.  In many of these instances, the report noted that "no effective rectification can be done at this moment" and that the exact cause was "unknown."  These reports "strongly request TMS to investigate this case a top priority."[20]

213.   In an Intra-Company Communication, between Toyota Motor North America, Inc. and TMS, the company confirmed a SUA event and that floor mats were not the issue:

---

[19] TOY-MDLID00075600.

[20] TOY-MDL-88641.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Introduction</u>**

The purpose of this document is to provide a summary of a Go-and-See related to a customer's claim of Cruise Control Malfunction in a 2009 Tacoma vehicle.

**<u>Customer Observed Condition</u>**

Customer alleges that he experienced the following:

Vehicle: 2009 Tacoma with 2,387 Miles (at time of incident)

1. Vehicle was traveling at a steady 60 MPH Speed on the Freeway, with cruise control engaged

2. As he reached a slight incline, he started to approach a slower vehicle in the lane in front of him

3. He applied pressure to the accelerator (25% - 30% throttle angle) and increased speed to 75 MPH to pass the other vehicle

4. Once he passed the slower vehicle, he returned to the right hand lane and released the accelerator (expecting the vehicle to return to the previously set speed)

5. After releasing the accelerator pedal, the vehicle continued to accelerate

6. He stepped on the brakes and the vehicle acceleration did not stop

7. Customer cycled the key to the "OFF" position and slowed to a stop using the brakes

- 115 -

8. After sitting for a couple of minutes on the side of the road he restarted the engine and it operated normally and took it to the dealership

**Dealer Investigation**

Upon arrival at the dealership the Following was performed / found:

1. Inspected Floor Mats and found them properly secured, with no signs of witness marks upon them

2. No Present, Pending or History of any DTC's in the ECM (also confirmed at TMS by MILi)

3. Engine connections were secure and showed no damage

4. The vehicle was driven for 361 miles, at which time an abnormal condition *was duplicated* (an account of this condition can be found on Page 2.)

**Requests**

- Vehicle repurchase has been agreed upon, please evaluate vehicle upon receipt

**Service Manager Observed Condition:**

On 7/19/09, one of the dealership's Service Managers drove the vehicle and observed the following:

1. Vehicle was being driven on the Freeway with the Cruise Control engaged at a 70 MPH Target Speed on Flat Terrain

- 116 -

2. The Service Manager depressed the accelerator pedal slightly (less than 10% throttle input)

3. As the vehicle reached what was estimated as 71 MPH, it downshifted abruptly and accelerated at what was perceived as a high throttle angle

4. As there was no traffic in front of him, the Service Manager removed his foot from the accelerator immediately upon the downshift and moved it completely away from the pedal area

5. The vehicle continued to accelerate at what felt like an estimated at a 70% throttle input with no pedal contact from the driver

6. Within 300 feet of the initial acceleration, the vehicle had reached 95 MPH. The estimated time to reach this speed from 71 MPH was "between 5 and 10 Seconds"

7. The driver then applied the brake pedal and the acceleration stopped


NTF Techstream Data

- As the Service Manager who experienced the condition above is considered to be trustworthy and reliable, the vehicle will be repurchased for further investigation under SETR 9J467

010172-25 398181 v1

214.   On March 20, 2007, a truck owned by the service manager at Cedar Rapids Toyota experienced a SUA event and confirmed it was not caused due to floor mats.  The throttle pedal assembly was replaced.

215.   On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES350 vehicles, opened PE07-016.  The principal investigator was again Scott Yon.  The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal."

216.   Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES350 owners "reminding them not to install all weather mats on top of existing mats."[21]   NHTSA did not agree, due to "too many complaints on this one vehicle to drop the issue" and because the results "of a stuck throttle are catastrophic."

217.   On April 5, 2007, ODI sent its Information Request to Toyota, describing its purpose as being "to investigate incidents of *vehicle runaway* due to interference between the Lexus accessory floor mat (all-weather floor mat) and the accelerator pedal" in 2007 Lexus ES350 vehicles.  (Emphasis added.)  The request further described "[a]llegations of A) excessive engine speed and or power output without the driver pressing on the accelerator pedal or B) the engine speed and or power output failing to decrease when the accelerator pedal was no longer being depressed or, C) the subject component interfering with the operation of the throttle pedal."

218.   During this inquiry, Toyota was careful to eliminate any hint that a much broader issue was at stake – namely, SUA.  Telling a consumer of a SUA defect is far

---

[21] TOY-MDLID00003908.

more serious than being told of a possible "mat" problem.  In describing the NHTSA investigation TMS eliminated reference to throttle control problems and changed the description to a "floor mat" problem:[22]

> Sorry we had a last minute change to the Q&A.  Please
>
> utilize this revised version of the Statement and Q&A.  The
>
> issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding
>
> *unintended throttle control* in the subject vehicles.
>
> [New]
>
> NHTSA received five consumer where the All Weather
>
> Floor Mat may have interfered with the accelerator pedal
>
> operation.

<div style="text-align:center">* * *</div>

---

[22] TOY-MDLID00000566.

<div style="text-align:center">- 119 -</div>

George Morino

National Manager

Quality Compliance Department

Product Quality and Service Support

Toyota Motor Sales, U.S.A., Inc.

Tel. 310-468-3392

Fax 310-468-3399  [Emphasis added.]

219.   Culling any reference to vehicle speed control has been a standard tactic at Toyota.  In 2005, in connection with the IS 250 All Weather Drive investigation, TMC removed any reference to speed control in letters sent to owners:  "They pulled out the 'vehicle speed control' part.  NHTSA may come back, but TMC wanted to try."[23]

220.   Another tactic TMC has used with NHTSA to keep the SUA defect a secret has been to keep NHTSA away from employees who had knowledge of ECU failures.  In 2007, while preparing for a meeting with NHTSA, Toyota plotted to keep away from the meeting the "engineer who knows the failure":

[I]f the engineer who knows the failures well attends the

meeting, NHTSA will ask a bunch of questions about the

ECU.  (I want to avoid such situations).[24]

221.   Toyota kept documents and informed personnel away from NHTSA despite the fact it knew the results of a "stuck throttle are 'catastrophic.'"[25]

---

[23] TOY-MDLID00002896.

[24] TOY-MDLID00075574.

[25] TOY-MDLID00003908.

222.   While this investigation was pending, an SUA victim sent Toyota employees a video of his SUA event that showed the brake lights were on while the car was accelerating – conclusive proof that the incident could not be chalked up to "driver error."  As usual, Toyota found nothing wrong with the car.  The SUA victim informed the Toyota specialist of other instances that needed investigation:

> One just occurred last Friday, June 15, when this person pulled into a parking lot with very few vehicles, he applied the brakes and the Tacoma just kept going, he wasn't about to collide so, he let off the brake and re-applied the brake and the vehicle stopped.  The vehicle is a 2004 Tacoma, purchased new by this person.  The other incident involves a 2006 Tacoma where all of sudden at a stop the tachometer shot up to approximately 6,000 or 6,800 RPM's with his *right* foot off the accelerator and the *right* foot on the brake.[26]

All of these incidents were concealed from NHTSA and the public.

223.   On August 8, 2007, ODI upgraded the preliminary evaluation to investigate unintended accelerations in a target population of 98,454 2007 Lexus ES350s.  The Opening Resume for EA07010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries.  Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then

---

[26]TOY-MDLID00206917.

experienced unwanted acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle.  In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

224.   While Toyota was pointing the finger at floor mats it was investigating UA events that it knew were not caused by floor mats, including an event where the service manager at Cedar Rapids Toyota confirmed the UA was not caused by the mat.  Toyota replaced the throttle pedal assembly.

225.   Despite having received a number of complaints of unintended acceleration that could not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of any intent to study the electronic throttle control system employed.  Toyota did not study the ETCS system either.

226.   In internal e-mails between Toyota employees including Chris Santucci and Chris Tinto exchanged in August 2007, Santucci stated that NHTSA investigators had discussed with him fail-safe mechanisms used by other vehicle manufacturers to protect against unintended acceleration.  The fail-safes that NHTSA regulators discussed with him included "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied."  Mr. Santucci also noted, "Jeff [Quandt, Chief, Vehicle Controls Division, Office of Defects Investigation]

mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly." Despite the growing number of SUA complaints starting from 2002, Toyota did not use the fail-safe mechanisms used by other manufacturers to protect against unintended acceleration.

227. While Toyota was attempting to deflect this inquiry, it was aware that the root cause of SUA was not often traceable: "[O]ne big problem is that no codes are thrown in the ECU, so the allege [sic] failure (as far as we know) can not be documented or replicated." The implications were "[t]he service tech therefore can't fix anything, and has no evidence that any problem exists."[27] Toyota would later claim the lack of a diagnostic code indicated that there was no SUA problem.

228. On August 30, 2007, ODI filed a memo about the inspection of a Lexus ES350 that had experienced SUA, and ODI conducted a telephone interview with the owners. An inspection of the vehicle found all-weather mats installed at all four seating positions. The driver's side all weather mat was found to be installed by itself; it was not on top of another floor mat. While the installed mat was found to be unsecured by the retention hooks, the mat did not interfere with the accelerator pedal in the position in which it was originally inspected.

229. While this investigation was ongoing, a woman named Jean Bookout was involved in a fatal crash in Oklahoma due to the unintended acceleration of a 2005 Camry. On September 20, 2007, Ms. Bookout and her best friend, Barbara Schwarz, were exiting Interstate Highway 69 in Oklahoma in a 2005 Camry. As Bookout drove, she realized that she could not stop her car. She pulled the parking

---

[27] TOY-MDLID00050747.

brake and pushed the brake pedal, leaving a 100-foot skid mark from the right rear tire, and a 50-foot skid mark from the left.  As Bookout later stated, "I did everything I could to stop the car."[28]  The Camry, however, continued speeding down a ramp, across another road and finally slamming into an embankment.  Schwarz was killed; Bookout spent a month in a coma and awoke permanently disfigured and disabled.

230.   On September 26, 2007, Toyota issued a recall of 55,000 Lexus/Toyota optional All-Weather Floor Mats.  All owners of 2007 and early 2008 model year Lexus ES350 and Toyota Camry vehicles were to be notified of the safety campaign and the timing when the replacement mats would become available.  Once the replacement mats were available, a second owner notification would be sent to notify owners to return their mats for the driver's seating position to any Lexus/Toyota dealer for an exchange.  Toyota also stopped the sale of the Toyota/Lexus All-Weather Floor Mat designed specifically for 2007 and early 2008 model year Camry and ES350 Lexus vehicles.

231.   Internally, Toyota executives were pleased that NHTSA had limited the ES350 issue to "floor mat issues" as opposed to SUA:[29]

> Of note, NHTSA was beginning to look at vehicle design
> parameters as being a culprit, focusing on the accelerator
> pedal geometry coupled with the push button "off" switch.
> We estimate that had the agency instead pushed hard for
> recall of the throttle pedal assembly (for instance), we

---

[28] Los Angeles Times, *Runaway Toyota Cases Ignored*, November 8, 2009.
[29] TOY-MDLID00004973.

1    would be looking at upwards of $100M + in unnecessary

2    cost.

3    232.   Other top level Toyota officials were incredulous with the news that

4    NHTSA had limited the issue to floor mats.  Irv Miller of TMS observed when he

5    learned of the recall:  "Yea I know, but floor mats!"[30]

6

7    233.   NHTSA remained concerned that a "serious issue" remains and that a

8    factor other than mats was causing SUA events.  NHTSA was considering an

9    announcement that would instruct vehicle owners how to turn off the vehicle in the

10   event of a SUA event.[31]  NHTSA also expressed concern that other vehicles,

11   including Prius, Camry and Avalon maybe subject to floor mat jamming and pedal

12   design issues.[32]  Toyota did not disclose these concerns and took no action to remedy

13   these defects.  Years later, in 2010, Toyota recalled the ES 350, Camry and Avalon,

14   due to a defect in the shape of the floor surface and the lack of adequate space

15   between the accelerated pedal and the floor.[33]

16   234.   On other occasions Toyota was able to keep NHTSA away from the

17   truth regarding SUA events by negotiating what terms it would use to search for

18   relevant complaints.  An example occurred in September 2007 when the company

19   searched for incidents regarding "mats" as opposed to "surging."  A search for

---

[30] TOY-MDLID00000601.

[31] TOY-MDLID00011140.

[32] TOY-MDLID00011139.

[33] TOY-MDLID00200832.

010172-25  398181 v1

surging on just the Camry in 2004 revealed "60,000 complaints."  Surging may be related to SUA, but Toyota never revealed the 60,000 surging complaints.[34]

235.   In 2008, Toyota knew that it had received a "huge number of complaints" alleging forms of UA Toyota labeled as "surge," or "lunge" or "lurch" if it searched for UA events just on the Camry:

> Let's discuss the response with George sometime on 10/13.
> We just started to gather the field information in order to
> update it requested in Q2, 3, 4 of IR for PE07-016.
> However, I'm very concerned about how many customer
> complaints will be extracted from CAN2000 by keyword
> search which we usually do.  Because NHTSA expanded
> the scope of the subject vehicles to 2007-2009MY ES and
> "CAMRY."  As you know, Camry has had an issue on the
> 6 speed automatic transmission and there may be a huge
> number of complaints alleging the surge or lunch or lurch
> and we usually include those words for the keyword
> search.  If this is the case, it will take long time to
> complete.[35]

236.   Throughout Toyota's consideration of SUA incidents, the "global ramifications" of a vehicle defect was a motivating factor.  Thus, for example, in September 2009, Toyota executives indicated TMC would not easily budge from its "no defect" position:

_____

[34] TOY-MDLID00083551.

[35] TOY-MDLID0012726.

- 126 -

TMC on the other hand will most likely not easily budge

from their position that there is no vehicle defect.

Especially considering the global ramifications.  In

addition, since no one of any rank (VP or higher) at TMS

has communicated the significance and impact of this

issue, TMC may feel that we can weather an investigation

and additional media coverage.[36]

237.   As described herein, this "no defect" position and the worry of "global ramifications" ultimately caused Toyota to offer fail-safe mechanisms such as a brake-override as a "confidence" booster as opposed to a "safety recall."

238.   In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating."  The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."  Of course "mediation" is not the equivalent of meeting the pledge of "safety" first that Toyota had repeatedly promised vehicle owners.

239.   An internal PowerPoint addressing "Key Safety Issues" contains the following:

- "Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.

---

[36] TOY-MDLID00075713.

- 127 -

- Recurring issue, PL/Design Implications.[37]

240.   The footnote to the slide has an entry stating "[f]laws in Toyota Regulatory and Defect Process."[38]

241.   Toyota was also pleased that the floor mat issue was limited to All Weather Floor Mats as opposed to floor mats in all vehicles.  Internally it recognized that "floor mat interference is possible in any vehicle with any combination of floor mats."  Despite this admission, no broader floor mat recall or effort to implement a brake-override took place.[39]

242.   No broader floor mat recall was implemented despite evidence that Prius, Camry and Avalon models were sensitive to floor mat interference and that the problem was not limited to after market mats.[40]

**3.     Unintended acceleration in Tacomas and Siennas**

243.   Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of SUA in Tacomas in late 2007.  On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration."[41]  Toyota internal e-mails also indicate that they were finding Internet blog posts regarding SUA events in Tacomas in November 2007.[42]

---

[37] TOY-MDLID00052959.
[38] *Id*. at 52963.
[39] TOY-MDLID00002839.
[40] TOY-MDLID00021197.
[41] TOY-MDLID00028006.
[42] TOY-MDLID00012135.

- 128 -

244.   Toyota received a report in 2006 that a 2006 Tacoma "suddenly accelerated out of control:

> Mr. _____ has reported that his 2006 Toyota
>
> Tacoma suddenly accelerated out of control into a
>
> telephone pole as he was backing on 10/21/06.
>
>
> After the truck collided with the pole he shifted into Drive
>
> and the truck accelerated at a high rate into a parked
>
> vehicle and a trailer, pushing the trailer into another parked
>
> vehicle.[43]

245.   An insurance investigator interviewed the mechanic who was a witness:

> Mr. _____ observed the 2006 Toyota Tacoma as it
>
> backed into the telephone pole.  He said that the engine
>
> was racing and after the collision with the pole, the vehicle
>
> lunged forward colliding with another vehicle and the box
>
> trailer.  The vehicle became pinned under the front of the
>
> box trailer which prevented it from traveling any further.
>
>
> Mr. _____ said that he ran to the truck and assisted
>
> the driver, Mr. _____, out of it.

---

[43] TOY-MDLID00206868.

- 129 -

1   I asked Mr. _____ as to how the engine

2   stopped racing.  He said that the engine was still

3   racing/idling high at approximately 2500 - 3000 RPM's

4   after Mr. _____ exited the vehicle and while he was

5   standing in the parking lot, Mr. _____ said

6   

7   that he reached in and turned the ignition key off to stop

8   the engine.  Later, a police officer shifted the transmission

9   into park.

10

11   Mr. _____ offered to testify as to what he

12   witnessed in court if necessary.  Because he is a mechanic,

13   I believe that he would be a formidable witness.

14   

15                              * * *

16   The most significant observation was made by the eye

17   witness, Mechanic _____ who witnessed the

18   incident and aided Mr. _____ from the truck.  He

19   states that the engine was still racing at 2500-3000 RPM

20   after Mr. _____ exited the vehicle.  The Toyota

21   was only brought under control when _____ reached

22   in and shut the engine off with the ignition key.

23

24

25

26

27

28

As, _____ is employed by the City Tire as a mechanic his estimate of the engine RPM's is rather credible and consistent with Mr. _____'s report.[44]

246.   On January 10, 2008, William Kronholm of Helena, Montana, filed a request for a defect investigation into unintended acceleration in 2006 Toyota Tacoma pickup trucks.  Kronholm reported experiencing two SUA incidents and investigated the NHTSA complaint database for light truck fleets for model years 2006 and 2007.  Under the category "vehicle speed control," Mr. Kronholm found 32 complaints of sudden unintended acceleration involving Tacomas, whereas the most reported for any other manufacturer's trucks was one incident.  Scott Yon was again ODI's principal investigator.

247.   Internally, Toyota was diligently working hard to "write a letter for the committee to try to stop this from moving forward – we need to keep this within NHTSA rather than have it expand to a hearing."[45]

248.   In NHTSA's February 8, 2008 information request to Toyota, it defined the defect as:

[A]llegations or complaints that the accelerator and or cruise control system operated improperly, malfunctioned, failed, or operated in an unsafe manner, including but not limited to, allegations that the engine speed (power output) increased without driver application of the accelerator pedal (including allegations that may be related to cycling

_____

[44] [44] TOY-MDLID00206876-6880.

[45] TOY-MDLID00050749.

- 131 -

of the air conditioning compressor clutch or other so called 'normal' idle speed/engine control functions), or allegations that the engine speed (power output) failed to return to an idle state after the operator released the accelerator pedal (including allegations that may be related to engine speeds experienced between gear shifts on manual transmission vehicles at road speeds) or allegations that the cruise control system caused the engine speed (power output) to change in an unsafe manner.

249.   While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004 Toyota Siennas.  PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal.  Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration.

250.   Five years earlier, in April 2003, Toyota had experienced an unintended acceleration event during testing of a 2004 Sienna.  This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

251.   On April 18, 2008, Toyota filed its first response in DP0-8001, reporting a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

252.   On April 25, 2008, Toyota filed its second response in the Tacoma investigation, outlining its investigation into the problem and analyzing the consumer complaints submitted to Toyota and to NHTSA that could be related to alleged unintended acceleration.  In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the subject vehicles, much less a safety-related defect.

253.   Toyota disputed the assertion in the petition that the 32 complaints in the NHTSA database "in and of themselves justify opening an investigation." Toyota claimed that the Tacoma had been the subject of extensive media coverage related to the possibility of sudden acceleration.  In addition, Toyota claimed that there had been a high level of internal activity on this subject (as far back as early 2007) including reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

254.   On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Siennas, followed by a second response on June 25, 2008.  Toyota stated that complaints about unintended accelerations in Siennas took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver.  Toyota also said that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem.  Toyota did not disclose that it considered and knew it needed to incorporate a brake-override and other fail-safe mechanisms that were not in Toyota vehicles to address this problem.

- 133 -

255.   On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

The complaints fell into three groups.  A majority of the

complaints may have involved the Tacoma's throttle

control system.  Some complaints did not involve a failure

of the throttle control system.  For the remaining reports,

although there may have been an issue with the throttle

control system as one possible explanation, we have been

unable to determine a cause related to throttle control or

any underlying cause that gave rise to the complaint.  For

those vehicles where the throttle control system did not

perform as the owner believes it should have, the

information suggesting a possible defect related to motor

vehicle safety is quite limited.  Additional investigation is

unlikely to result in a finding that a defect related to motor

vehicle safety exists or a NHTSA order for the notification

and remedy of a safety-related defect as requested by the

petitioner. Therefore, in view of the need to allocate and

prioritize NHTSA's limited resources to best accomplish

the agency's safety mission, the petition is denied.

256.   On October 15, 2008, Toyota made a confidential PowerPoint

presentation to ODI regarding unintended acceleration and trim interference in 2004

Siennas as part of EA08-014.  Toyota demonstrated how an unrestrained early

design-level trim panel interacted with the accelerator after pedal depression.  Toyota

010172-25 398181 v1

also advised that the company was conducting a field survey to examine panel retention and that preliminarily one vehicle had been identified with a concern.

257.   On January 26, 2009, ODI closed EA08-014, regarding SUA involving 2004 early-production Siennas, after Toyota agreed to recall subject vehicles built between January 10, 2003, and June 11, 2003.  Toyota then issued Recall 09V023 for 26,501 model year 2004 Siennas.  Toyota did not describe this as a defect, but called the actions a "safety improvement campaign" that was not being conducted under the Safety Act.  Toyota's recall instructed dealers to replace the original floor carpet cover with the newer-design floor carpet (and retention clip) at no charge to the owner.  The repair was expected to reduce the potential for trim panel interference with the accelerator pedal should the retaining clips become missing because of improper service or other reasons.  Dealers were to replace the retention clip and floor carpet cover at no charge.

258.   On March 19, 2009, Mr. Jeffrey Pepski of Plymouth, Minnesota filed a detailed defect petition, asking NHTSA to re-open its sudden unintended acceleration investigation into Lexus vehicles.  Mr. Pepski was the owner of a 2007 Lexus ES350.  He experienced a sudden unintended acceleration event while driving at high speed, in which the vehicle accelerated to 80 mph.  Mr. Pepski tried pumping and pulling up the accelerator with his foot to no avail.  He explained the electronics of the accelerator, brake pedals and throttle systems, and charged that the Lexus ES350 vehicles violate several federal motor vehicle safety standards regarding brake and throttle systems.  He also disputed some of the statements from previous investigations that drivers could easily stop the vehicle by depressing the ignition

- 135 -

button for three seconds.  He maintained that the owner's manual indicates that this would lock the steering wheel and move it forward.

259.   On April 8, 2009, ODI issued an Opening Resume for DP09-001 in response to Mr. Pepski's petition.  ODI characterized it as requesting "an additional investigation into the unwanted and unintended acceleration of MY 2007 Lexus ES350 as the initial investigation (PE7-016) was too narrow in scope and did not adequately address all complaints made to the NHTSA with respect to vehicle speed control concerns."  Additionally, according to ODI, the petitioner requested an "investigation of MY 2002-2003 Lexus ES300 for 'longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect' that were determined not to be within the scope of Investigation PE04021."

260.   On May 14, 2009, Toyota's Christopher Tinto filed a direct response to Mr. Pepski's petition in DP09-001.  Mr. Tinto dismissed all of the issues Mr. Pepski raised in his petition and claimed there was no basis for an investigation.  Mr. Tinto stated that when Lexus inspected Mr. Pepski's vehicle, it found that the floor mat was unsecured and blamed the event on pedal entrapment.  Mr. Tinto maintained that Toyota's electronic throttle and brakes systems were in compliance with all applicable federal motor vehicle safety standards, and that Mr. Pepski had misinterpreted the warnings in the owner's manual about steering wheel lockup when the ignition is in the "Off" mode.

261.   Toyota knew that NHTSA inspected Pepski's car and "did not see clearly the witness marks of the carpeted floor mat in the forward unhooked position" and instead "suspect[ed]" this was the case.  Santucci made it clear that

- 136 -

NHTSA wanted Toyota to blame this on a floor mat issue, because if Toyota did not

do so, NHTSA would have to ask "for non-floormat reports":

> So they should ask us for non-floormat related reports,
>
> right?  But they are concerned that if they ask for these
>
> other reports, *they will have many reports that just cannot*
>
> *be explained.  And since they do not think that they can*
>
> *explain them, they don't really want them*.  Does that make
>
> sense?  I think it is good news for Toyota.[46]  [Emphasis
>
> added.]

262.   What was good news for Toyota, *i.e.*, NHTSA avoiding inquiry into

non-floor-mat issues, was bad news for consumers who continued to purchase and

drive vehicles subject to a hidden SUA defect.

263.   On October 29, 2009, NHTSA denied the Pepski petition.  Once again,

ODI issued its denial without requiring Toyota fully to disclose the actual numbers

of customer reports of sudden unintended acceleration events in the Toyota models

under investigation it received.

### 4.   The floor mat recall

264.   In August 2009, Officer Mark Saylor, a 19-year veteran of the

California Highway Patrol, his wife, thirteen-year-old daughter and his brother-in-

law, Chris Lastrella, were driving in a 2009 Lexus ES350 loaned to them from the

dealership while Officer Saylor's Lexus was being repaired.  Witnesses later

reported that Officer Saylor had pulled onto the shoulder going roughly 25-45 mph

---

[46] TOY-MDLID00052918.

and appeared to have some engine difficulty.  Witnesses reported that Officer Saylor turned on his emergency lights.  Shortly thereafter the Lexus's speed accelerated to over 100 mph.  Chris Lastrella called 911 from the vehicle and reported that the accelerator was stuck and "we're in trouble."  He then repeated:  "We're approaching the intersection.  We're approaching the intersection.  We're approaching the intersection."  Others in the car could be heard saying "hold on" and "pray."  The Lexus then crashed into the back of an SUV and continued through a fence, crashing head first into an embankment, becoming airborne, rolling over, bursting into flames and coming to rest in a dry riverbed.  All four members of the Saylor family were killed by extensive blunt force injuries.

265.   When officers inspected the vehicle, the all weather floor mat was melted to the accelerator pedal and unsecured by the retaining clips.  It was also the incorrect all weather floor mat for that Lexus model.  When officers tested the pedal clearance using the same model of Lexus and the same mismatched floor mat, they observed that the pedal could easily become stuck under its edge.

266.   Officers investigating the Saylor tragedy also learned that a similar complaint of unintended acceleration had been made about the vehicle involved in the Saylor crash only days before it was loaned to Officer Saylor.  The San Diego County Sheriffs' report chronicles the prior complaint as follows:

> [Frank Bernard] was on the Poway Road on-ramp to
> Interstate 15 North.  As he was merging onto the freeway,
> he saw a truck nearby and accelerated 'briskly' to get in
> front of it.  Witness Bernard got onto the freeway, and once

1   in front of the truck, let his foot off the accelerator.  [The

2   Lexus] kept accelerating on its own, to about 80-85 MPH.

3

4   Witness Bernard stopped on the brakes and tried to lift up

5   on the accelerator with his right foot.  He was attempting to

6   access the shoulder of the freeway, and still applying the

7   brakes, was able to slow [the Lexus] to about 50-60 MPH.

8   While he was slowing, he pushed the ignition button 'a few

9   times' and was not able to turn the engine off.  He also

10  'popped the throttle' with his foot to see if he could get it to

11  clear itself.  None of this worked.  [The Lexus] kept

12  moving at an uncontrolled and high rate of speed.

13

14

15

16  Witness Bernard kept on the brakes, slowing [the Lexus] to

17  25-30 MPH and pulled over to the shoulder.  He was able

18  to then place [the Lexus] into neutral with the gear shift.

19  When he did this, the engine made a very loud whining,

20  racing sound.  Witness Bernard was able to stop [the

21  Lexus].

22

23

24  Witness Bernard looked down at his feet and saw the

25  accelerator was stuck underneath the floor mat.  He was

26

27

28

1    able to pull it up with his foot, and said he had to apply a

2    significant amount of pressure to do so.[47]

3    267.   Mr. Bernard told a receptionist at the dealership of the unintended

4    acceleration and that it was due to the floor mat.

5

6    268.   The San Diego County Sherriff's Report concludes that the Saylor crash

7    was likely caused by the mismatched floor mat and the following "associated"

8    factors:

9          The vehicle was not equipped with a key that would other

10         wise allow for manual emergency shut off.  The push

11         button ignition feature had no emergency instantaneous

12         shut capability.

13

14

15         As evidenced in the inspection of [the Lexus], the brakes

16         most likely failed due to over burdened, excessive, and

17         prolonged application at high speed.[48]

18

19

20   269.   The report also notes that additional electrical, mechanical or computer

21   generated factors could have played a role in the unintended acceleration.

22   270.   Following the widespread publicity surrounding the four-fatality Saylor

23   crash near San Diego, Toyota issued a "Safety Advisory," saying that the company

24   had "taken a closer look" at the potential for the accelerator to get "stuck in the full

25   open position" *due to interfering floor mats*.  The advisory stated that the company

26   _____

27   [47] TOY-MDLID000091970 at 9193.

28   [48] *Id*. at 9197.

- 140 -

1   would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in

2   all, to address the issue – the largest recall in Toyota's history and the sixth largest in

3   the United States.  According to Senator Waxman, Toyota's advisory is dangerously

4   misleading, for the following reasons, among others:

5

6            By suggesting that only a trapped floor mat can cause a

7            loss of throttle and braking control, it lulls owners of

8            models with no driver's side floor mat into believing there

9            is no possibility of a potentially catastrophic loss of throttle

10           and braking control.  According to documents supplied by

11           Toyota to the Committee on Energy and Commerce of the

12           U.S. House of Representatives, fewer than 16% of sudden,

13           unintended acceleration events reported by customers

14           involved floor mats and/or "sticky pedals."

15

16

17           The advisory also misleads owners with a driver's-side

18           floor mat into believing that, in the event of a sustained

19           near-wide-open throttle malfunction, the first response

20           should be to visually determine if the floor mat is

21           interfering with the accelerator pedal.

22

23           271.   On September 29, 2009, the same day that TMC recalled 3.4 million

24   vehicles in the United States because of possible floor mat entrapment, Toyota Motor

25   Europe issued a Technical Information ("TI") to Toyota distributors in Austria,

26   Belgium, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany,

27   Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland,

28

Turkey, Portugal, Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United

Kingdom, Georgia, Kazakhstan, and Romania identifying a production improvement

and repair procedure to address complaints by customers in those countries of sticky

accelerator pedals, sudden RPM increase and/or sudden acceleration – but nothing

similar was issued to warn United States distributors.

272.   Despite its claimed extensive investigation into the sticky pedal

phenomenon, and its efforts to remedy the sticky pedal defect for overseas

consumers, TMC continued to conceal information from United States consumers

regarding potential causes for sudden unintended acceleration events.  On

September 29, 2009, TMC issued a Consumer Safety Advisory claiming that the

sudden acceleration problem was caused by floor mats without mention of the

sticking accelerator pedal defect it knew about since July 6, 2006, at the latest, and

had confirmed no later than June 2009.

273.   Contemporaneously with the floor mat recall, Toyota made media

statements inaccurately stating that NHTSA had determined that no defect exists in

vehicles wherein the driver's side floor mat is compatible with the vehicle and is

properly secured.  For example, a November 2, 2009 press release issued from

Torrance, CA announced:

> Toyota Motor Sales … today announced that it has begun
>
> mailing letters to owners of certain Toyota and Lexus
>
> models regarding the potential for an unsecured or
>
> incompatible driver's floor mat to interfere with the
>
> accelerator pedal and cause it to get stuck in the wide-open
>
> position.  The letter, in compliance with the National

- 142 -

1   Traffic and Motor Vehicle Safety Act and reviewed by the

2   National Highway Traffic Safety Administration … also

3   confirms that no defect exists in vehicles in which the

4   driver's floor mat is compatible with the vehicle and

5   properly secured.

6

7   274.   On November 4, 2009, NHTSA issued a press release to correct this

8   misleading and inaccurate information.  NHTSA clarified that it told Toyota and

9   consumers that "removing the recalled floor mats is the most immediate way to

10  address the safety risk and avoid the possibility of the accelerator becoming stuck."

11  NHTSA reiterated that the floor mat recall was simply an interim measure, and did

12  not correct the underlying defect.

13

14  275.   Despite initiating its plan to repair defective accelerator pedals for

15  overseas consumers, Toyota's misinformation to United States consumers continued.

16  TMC posted the following response to a question posed by the LOS ANGELES TIMES:

17  Q2:  Toyota has conducted numerous recalls related to

18  sudden acceleration over the past decade in the U.S.

19  and Canada, including two previous floor mat recalls.

20  But the problem has continued.  Does this mean that

21  the previous recalls were not successful in eliminating

22  the problems and if so, why not?  In particular, why

23  wasn't the 2007 recall of Lexus ES and Camry floor

24  mats effective in preventing catastrophic accidents

25  such as the Saylor case?

26

27

28

- 143 -

A.   Toyota has conducted two all-weather floor mat

(AWFM) recalls after receiving reports that if the

floor mat (either by itself, or if it is placed on top of an

existing carpeted floor mat) is not secured by the

retaining hooks, the mat can move forward and

interfere with the accelerator pedal returning to the

idle position.  If the mat is properly secured, it will not

interfere with the accelerator pedal.

As reported in the law enforcement investigation, the

floor mat in the Saylor accident was not only

improperly secured, it was incompatible and incorrect

for the vehicle.  The recall recently announced

addresses the fact that incompatible floor mats, or

multiple floor mats could be installed and that the

remedy must address that possibility.

276.   When Transportation Secretary Ray LaHood testified before the House

Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials

chose to meet directly with Toyota executives in Japan to discuss safety issues

because NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

**5.   The sticky accelerator recall**

277.   On or about October 13, 2009, TMC issued an Intra-Company

Communication ("ICC") to Toyota personnel in Japan and in the United States

concerning a Toyota Corolla sold in Missouri that was the subject of a sticky

- 144 -

accelerator pedal complaint.  The ICC noted that sticky pedal was identified on or about September 24, 2009, five days prior to Toyota's floor mat advisory to United States consumers (and the sticky pedal TI to European consumers also issued on the same day).  The ICC further documented that Toyota recovered the accelerator pedal and installed it on a 2010 Corolla fleet vehicle, that Toyota verified the sticking accelerator pedal, and that the subject accelerator pedal was then handed over Customer Quality Engineering – Los Angeles for further analysis on or about October 5, 2009.

278.   On or about October 22, 2009, through October 28, 2009, Toyota issued three Field Technical Reports ("FTRs") concerning sticky accelerator pedals in Corollas sold in the United States and conducted a parts recovery.

279.   On January 16, 2010, Katsuhiko Koganei (a.k.a. "Kogi"), TMS Executive Coordinator – Corporate Communications, sent an e-mail to Mike Michels at Toyota, stating "we should not mention about the mechanical failures of acc. [sic] pedal, because we have not clarified the real cause of the sticking accelerator pedal formally, and the remedy for the matter has not been confirmed."

280.   The e-mail came three days before a meeting scheduled with (among others) Toyota's two lead North American executives, James Lentz (Torrance, CA) and Yoshimi Inaba (New York, NY), and NHTSA.  It was copied to at least 15 other Toyota Executives, including Irv Miller (Torrance, CA), TMS Group Vice President, Environmental and Public Affairs.

281.   On January 16, 2010, Irv Miller sent an e-mail to Koganei stating:

I hate to break this to you but WE HAVE A tendency for
MECHANICAL failure in accelerator pedals of a certain

- 145 -

manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options.

We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business.[49]

282.   The foregoing mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

283.   Secretly while it was interacting with NHTSA on these issues, Toyota was investigating SUA events observed by its own employees in Toyota vehicles they were driving:

Jason,

Here is the summary of events.

Went across Buffalo Bridge, stopped & turned left on 35.

Went across bridge and started up the hill.

Briefly accelerated at W.O.T. for down shift.

Let off throttle & vehicle continued to accelerate.

Depressed brake (thinking something was wrong with cruise control)

---

[49] TOY-MDLID00027481.

No change vehicle continued to accelerate.

Depressed brake peddle hard, vehicle continued to pull.

Shifted to Neutral and engine reved to rev limiter.

Not for certain what occurred to get the throttle back to normal condition, but I did move my foot around the accelerator & brake peddle after the vehicle was in Neutral & acceleration stopped.

David Kovich

Customer Quality Engineering (CQE-CIN), Quality Division

284.   On January 21, 2010, Toyota notified NHTSA that it was submitting a "Defect Information Report" concerning a recall of eight models due to a "defect [that] exists in the accelerator pedal assembly which may result in the accelerator pedal becoming harder to depress, slower to return, or, in the worst case, mechanically stuck . . . .".[50]  Toyota issued this Defect Report despite indicating that the percentage of vehicles estimated to experience malfunction was "unknown," meaning that Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle.

285.   On or about January 19, 2010, Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC.  In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents.  Toyota did not issue any safety

---

[50] TOY-MDLID00041350.

1   advisories to United States consumers regarding the sticking pedal issue until

2   January 21, 2010, when it issued the sticky pedal recall.  The recall involved

3   approximately 2.3 million Defective Vehicles.

4
5   286.   On or about January 26, 2010, Toyota announced in a press release

6   issued from Torrance, California that it was voluntarily suspending sales of eight

7   models involved in the January 21, 2010 recall for sticking accelerator pedals,

8   including its top selling Camry and Corolla models.  Group Vice President and

9   Toyota Division General Manager Bob Carter made clear that "[t]his action is

10   necessary until a remedy is finalized."  Toyota further announced that due to the

11   sales suspension, Toyota was expected to stop producing vehicles on several North

12   American production lines.  Toyota did not resume sales of these vehicles until

13
14   February 5, 2010.

15   287.   While Toyota executives were claiming the defect was due to pedal

16   entrapment dealers believed otherwise:[51]

17
I'm afraid that many of us in the dealer body feel

18
embarrassed and not a little ashamed regarding a

19
perception that we may have been used to faithfully

20
endorse the (apparently inaccurate) party line that the only

21
customer concerns have been as a result of pedal

22
entrapment.  While I'm sure that this was never Toyota's

23
intent, there is a palpable feeling somewhere between

24
disappointment and betrayal at the retail level.  As you

25

26

27
_____
[51] TOY-MDLID00015943.

28

- 148 -

1     know, this would be best addressed by a prompt, effective

2     cure for customer concerns.

3

4     The other thought is that it was not the Watergate break-in

5     that brought down President Nixon; it was the aftermath.

6

7     Please help us with your endorsement that all

8     communications be frank, complete, and 100% accurate.

9     288.   Toyota continued to receive reports from qualified engineers opining

10 the abnormalities in the ECTS.  For example, on January 28, 2009 a Professional

11 Engineer examined a 4Runner that:[52]

12

13     According to the driver of the vehicle, she had driven the

14     4Runner earlier in the day of the incident.  She stated that

15     when she started the vehicle, placed the gear selector lever

16     in the reverse and depressed the accelerator pedal, the

17     vehicle accelerated rearward in an uncontrolled manner.

18     The vehicle traveled down her driveway, crossed a road,

19     struck a stump and entered a stream.  The vehicle came to

20     rest on its driver side.  She exited the vehicle through the

21     sun roof.  She stated that she had never had any drivability

22     issues with the 4Runner.

23

24     289.   The report concluded:

25

26

27

28
   [52] TOY-MDLID90053224.

1   Based on the foregoing observations and analysis, the

2   following are my opinions, to a reasonable degree of

3   engineering certainty, regarding the condition and

4   operation of the Toyota 4Runner.

5                        * * *

6

7   Third, the voltages associated with the throttle position

8   sensor malfunction detection (w/ pedal depressed) and the

9   accelerator pedal position sensor for engine control (w/

10  pedal depressed) were not within specifications.  The

11  voltage deviations indicate that the electronic throttle

12  control system featured abnormalities.  The inability to

13  start the vehicle precluded testing the functional operation

14  of the system.

15

16     290.   Toyota was careful to make certain it would be difficult to discover

17  what it knew about the SUA defect, which models were effected and which

18  managers were involved.  Employees were instructed to disguise emails:

19

20         • When you send a mail to somebody outside the

21           company, drop cc to your boss.[]

22           Check the subject/text/attachment(*)

23           *Any emails from Quality Control Department are

24           basically "confidential."

25         • Put "Secret" and "Don't forward" in the beginning

26           of every email (including reply and forward.) []

27         • Do not include both project code and car names. []

28

- Attached documents (prepared by your department
  or other department) should be classified. []
- When you reply to emails, generally delete the
  tracking record and attachment. []

masato_kosugi@mta.mx.toyota.co.jp  on 1/26/2010
20:13:39

291.   On or about April 5, 2010, NHTSA announced that it was seeking a $16.375 million civil penalty from TMC due to the Toyota Defendants' failure to appropriately inform NHTSA with regard to a potential defect in its vehicles stemming from TMC's knowledge of the sticking pedal defect.  This sanction presented the largest financial penalty ever imposed on an automaker by the United States Government and was the largest fine permitted by law.  Transportation Secretary Ray LaHood stated, "[b]y failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

292.   On or about April 19, 2010, TMC agreed to pay NHTSA's record $16.375 million fine, and avoided any official findings of fact by NHTSA.  TMC admits that it "could have done a better job of sharing relevant information within our [Toyota's] global operations and outside the company …"

**D.     The Internal Death by SUA Chart**

293.   Throughout the years Toyota received reports covering various Toyota models detailing incidents involving deaths due to SUA.  Belatedly, in February 10, 2010, Toyota assembled these into what is in effect an internal death by SUA chart:

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| SIENNA | 2007 | 20070811 | ON AUGUST 11, 2007, MY FAMILY EXPERIENCED A HEAD ON COLLISION. WE WERE DRIVING A 2007 TOYOTA SIENNA. MY HUSBAND WAS DRIVING AND DIED AT THE SCENE. THE INVESTIGATION NEVER FOUND ANY REASON FOR THE CAUSE OF THE ACCIDENT. MY HUSBAND CROSSED THE CENTER LINE WHILE GOING ROUND A SLIGHT CURVE. HE WAS 47, POOR WEATHER WAS NOT ISSUE. IF THE ACCELERATOR ON THE SIENNA MALFUNCTIONED AND DID NOT RESPOND, THAT COULD DEFINITELY BE A FACTOR. OUR VAN HAD LESS THAN 3000 MILES ON IT. WE PURCHASED IN MAY 11, 2007. THE AUTOPSY FOR MY HUSBAND CAME BACK NEGATIVE FOR ANY MEDICAL CONDITION CONCERN. PLEASE INVESTIGATE OUR ACCIDENT REPORT AND BE SURE THE SAFETY AND RELIABILITY OF SIENNAS IS SOUND. |
| GX470 | 2003 | 20090206 | I WAS TRAVELING WEST ON A TWO LANE PAVED ROAD (SUTTON ROAD) NEAR SUTTON SCHOOL. WEATHER WAS SNOWING AND ROAD CONDITIONS SLIPPERY WHEN MY ACCERERATOR FAILED TO RETURN TO IDLE POSITION. I APPLIED BRAKES AS I WAS APPROACHING A VEHICLE IN FRONT OF ME TRAVELING IN THE SAME DIRECTION. THE ELECTRONIC STABILITY CONTROL FAILED TO MAINTAIN STRAIGHT DIRECTION AS PER DESIGN INTENT AND MANUALS. FRONT BEGAN SLIDING TO LEFT AND REAR OF VEHICLE BEGAN SLIDING TO RIGHT. I NCREASED BRAKE PRESSURE AND STEERED INTO TH SKID , TO THE RIGHT. I WAS ABLE TO MISS THE CONTACT WITH ANY OTHER VEHICLES AND OR DAMAGE ANY PROPERTY , BUT DID END UP SLIDING INTO A DITCH OFF OF THE ROAD. WITH THE IMPACT RESULTING IN THE DEATH OF MY SERVICE DOG . AS I AM HANDICAPPED. NO DAMAGE TO MY VEHICLE , BUT NO I AM VIRTUALLY IMMOBILE WITH THE LOSS IF MY DEAR SERVICE DOG. |
| PRIUS | 2005 | 20091022 | OUR SON WAS KILLED ON OCT 22ND IN A SINGLE CAR CRASH WHILE DRIVING A 2005 TOYOTA PRIUS( THE POLICE REPORT STATES THAT HE LOST CONTROL, JUMPED THE CURB AND DIED IN THE ENSUING CRASH) WHILE NEGOTIATING A CURVE WHILE ATTEMPTING TO ENTER THE FREEWAY IN TUCSON AZ. WE STRONGLY BELIEVE THAT THIS MAY HAVE BEEN CAUSED BY SUDDEN ACCELERATION AND OR BREAK PROBLEMS. I KNOW THIS IS AN OLDER MODEL, BUT IN LIGHT OF TOYOTA'S LIES AND COVERUPS TIME WILL ONLY TELL. |
| SCION TC | 2007 | 20090811 | 2007 SCIION TC SET ON CRUISE AT 70 MPH CRASHED INTO GUARDRAIL ON HIGHWAY. MY SON WAS DRIVING AND HE DOES NOT REMEMBER THE CAUSE OF THE ACCIDENT BUT STATE POLICE ACCIDENT RECONSTRUCTION CLAIM CAR HIT THE GUARDRAIL AT A SPEED IN EXCESS OF 100 MPH UPON CRASH. CRASH SEVERLY INJURED MY SON AND KILLED HIS CHILDHOOD FRIEND. TWO THINGS ARE KNOWN FOR CERTAIN, DRIVER CLAIMS CAR WAS ON CRUISE AND ACCIDENT REPORT STATES SPEED OVER 100 MPH. THE CRASHES ON THESE CARS ARE OVERLOOKED BECAUSE MOSTLY TEENAGERS AND YOUNG ADULTS ARE BUYING THEM AND OFFICIALS AND INSURANCE COMPANIES BLAME ACCIDENTS ON DRIVER INEXPERIENCE. |
| 4RUNNER | 1992 | 19920303 | A 1992 TOYOTA 4-RUNNER WAS PURCHASED AND WE ONLY HAD IT FOR TWO WEEKS. THE TRUCK WAS DRIVEN TO WEST VIRGINIA. THE NEXT DAY THE TRUCK SUDDENLY ACCELERATED AT A HIGH SPEED AND WHEN THE BRAKES WERE APPLIED IT WOULD NOT STOP. IT CRASHED AND FLIPPED OVER. MY HUSBAND DIED IN THAT TRUCK. THERE WAS A LAW SUITE BUT IT NEVER WENT TO COURT AFTER FIVE YEARS. MY LAWYERS GAVE UP. TOYOTA NEVER SETTLED WITH ME AND ONLY SAID IT WAS DRIVER ERROR. THE ENGINEER WHO WAS ON THE CASE SAID THERE WAS A DESIGN DEFECT BUT THEY COULD NOT PROVE IT. SEE ALSO ODI 10121117 *DSY *TR |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| HIGHLANDER | 2008 | 20091130 | TL* THE CONTACT'S SISTER OWNS A 2008 TOYOTA HIGHLANDER. THE CONTACT'S SISTER WAS DRIVING AND THE VEHICLE ACCELERATED ACROSS THE INTERSTATE, HIT AN EMBANKMENT AND THEN WAS HIT BY A TRUCK. THE VEHICLE BURNED AND THE DRIVER WAS KILLED AS A RESULT OF THE ACCIDENT. THE VEHICLE WAS DESTROYED BUT THERE WAS NO INVESTIGATION INTO THE CAUSE FOR THE ACCIDENT. THE CONTACT CALLED THE MANUFACTURER BUT WAS NOT ABLE TO GET IN TOUCH WITH ANY REPRESENTATIVES. THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 33,000. |
| TACOMA | 2008 | 20100126 | TOYOTA TACOMA 2008  PLEASE STUDY THIS ACCIDENT. IT MAY RELATE TO THE GAS PEDAL, SO LET TOYOTA KNOW TO RECALL THIS MODEL TOO SO TO PREVENT AN ANOTHER FATAL ACCIDENT LIKE MY  BROTHER HAD. *TR |
| SOLARA | 2004 | 20090928 | ON SEPTEMBER 28, 2009 MY MOTHER WAS DRIVING HER 2004 TOYOTA SOLARA AND HAD AN ACCIDENT. THE CAR JUMPED THE CURB, HIT A TREE, A LAMP POST, AND CRASHED INTO A STONE SIGN. SHE WAS TAKEN TO THE HOSPITAL WHERE THEY FOUND A LARGE BRUISE ON HER ARM. THE DOCTORS SENT HER FOR A SCAN RIGHT AWAY, BUT SHE HAD A STROKE AND NEVER RECOVERED. SHE DIED FOUR DAYS LATER. I REALIZE THAT THE CURRENT TOYOTA ACCELERATOR RECALL DOES NOT INVOLVE THE SOLARA AT THIS TIME, BUT OUR FAMILY IS NOW SUSPICIOUS. A CAUSE OF MY MOTHER'S ACCIDENT HAS NOT BE DETERMINED. SHE DIED BEFORE THE POLICE WERE ABLE TO ASK HER ABOUT THE ACCIDENT. THE CAR IS STILL SMASHED UP AND HAS NOT BEEN REPAIRED. SHOULD WE INVESTIGATE THIS MATTER FURTHER?  TW* |
| HIGHLANDER | 2005 | 20091013 | TOYOTA HIGHLANDER 2005. PETERBORO , NH. 11 AM. DRIVER WAS REPORTED TO PASS VEHICLE ON RIGHT IN BREAK DOWN LANE, THEN TRIED TO PASS ANOTHER CAR  BY GOING INTO LEFT LANE AND HIT ONCOMING VEHICLE. FOUR PEOPLE KILLED. DRIVER WAS VERY EXPERIENCED --EXCELLENT SAFETY RECORD. I HAD BEEN IN HIS CAR WITH HIM HUNDREDS OF TIMES. VERY SAFE DRIVER --NO COWBOY.   BELIEVE CAR HAD UNCONTROLLED ACCELERATION.  *CN |
| CAMRY | 2007 | 20080412 | TL* THE CONTACT OWNED A 2007 TOYOTA CAMRY LE. WHILE DRIVING THE ACCELERATOR PEDAL BECAME ENTRAPPED BY THE FLOOR-MAT.  AS A CONSEQUENCE HE CRASHED INTO ANOTHER VEHICLE.  THE DRIVER OF THE OTHER VEHICLE WAS KILLED. BOTH VEHICLES CAUGHT ON FIRE. THE FAILURE AND CURRENT MILEAGES WERE UNKNOWN. THE VEHICLE IDENTIFICATION NUMBER WAS UNAVAILABLE. |
| IS250 | 2006 | 20090410 | TL* THE CONTACT OWNS A 2006 LEXUS IS250.  WHILE DRIVING THE VEHICLE RAPIDLY INCREASED ITS SPEED UP TO 90 MPH . HE ATTEMPTED TO REMOVE THE FLOOR- MAT FROM UNDER THE ACCELERATOR PEDAL. HOWEVER, THE VEHICLE VEERED OFF OF THE ROAD AND THEN INTO A DITCH.  WHEN THE VEHICLE ROLLED OVER, ONE OCCUPANT WAS EJECTED FROM THE FRONT SEAT; SINCE HE WAS NOT WEARING A SEAT BELT. THE OTHER THREE PASSENGERS HAD BRUISES LACERATIONS, AND WERE HOSPITALIZED.  THE VEHICLE WAS COMPLETELY DESTROYED. A POLICE REPORT WAS AVAILABLE. THE FAILURE MILEAGE WAS 24,000. |

- 153 -

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|----------|---------|----------|--------|
| AVALON | 2001 | 20070409 | LET ME EXPLAIN FIRST, I CAN'T SUBSTANTIATE THE CLAIM I AM MAKING ABOUT THE POSSIBLE CAUSE OF THE ACCIDENT THAT KILLED MY WIFE WHEN DRIVING A 2001 TOYOTA AVALON.  THE REASON THE ACCIDENT OCCURRED IS THAT SHE DID NOT STOP AT AN INTERSECTION CONTROLLED WITH A STOP SIGN. THE ACCIDENT OCCURRED IN CALLAHAN COUNTY, TEXAS AT THE INTERSECTION OF FM 1750 AND HIGHWAY 36 ON APRIL 9, 2007 AT APPROXIMATELY 8:30PM.  SHE DROVE UNDER THE TRAILER OF AN 18 WHEELER, WAS KILLED INSTANTLY AND DRAGGED UNDER THE TRAILER FOR 800 TO 900 FIT.  IT TOOK THE ABILENE FIRE DEPARTMENTS EXPERTISE TO REMOVE HER BODY FROM THE WRECKAGE. THE LOCAL VOLUNTEER FIRE DEPARTMENTS DID NOT WANT TO ATTEMPT IT.  THERE WERE NO SKID MARKS.  SHE HAD DRIVEN THIS ROUTE COUNTLESS TIMES AND WAS AWARE OF THE STOP SIGN.  I CHECKED CELL PHONE RECORDS AND THERE WAS NO EVIDENCE THAT SHE COULD HAVE BEEN ON THE PHONE.  ADMITTEDLY SHE WAS UPSET.  SHE WAS DRIVING FROM ABILENE TO MEXIA, TEXAS TO BE WITH HER ELDERLY MOTHER WHO WAS IN A DIABETIC COMA WHEN SHE LAST SPOKE TO SOMEONE.  HOWEVER RAY ANN WAS A GOOD DRIVER.  I CAN'T BELIEVE THAT SHE WAS SO DISTRACTED TO ALLOW THIS TO HAPPEN. IN LIGHT OF THE RECENT RECALL BY TOYOTA, I BELIEVE THAT HER AVALON SUDDENLY ACCELERATED OUT OF CONTROL.  NO SKID MARKS WERE AT THE SCENE ONLY CUTOUTS IN THE PAYMENT THAT WERE CAUSED BY HER CAR AS IT WENT UNDER THE TRAILER.  WHY NO SKID MARKS?  AS SHOWN ON CONSUMER REPORT INTERNET VIDEO, THE BRAKES ARE NOT ABLE TO SLOW THE CAR DOWN AS IT IS ACCELERATING AND SKID MARKS WOULD NOT HAVE BEEN POSSIBLE. THERE IS NO OTHER EXPLANATION IN MY MIND AS TO HOW RAY ANN COULD HAVE MISSED THE STOP SIGN.  THE CAR WAS OUT OF HER CONTROL AND IT KILLED HER.  IF YOU WOULD LIKE TO HAVE THE VIN, PLEASE CONTACT ME.  I WILL PULL IT OUT OF THE RECORDS I HAVE.  THANK YOU FOR YOUR CONSIDERATION AND ANY RESPONSE.  THIS IS SUCH A TRAGEDY THAT UNTIL THE RECALL LEFT ME WITHOUT ANY EXPLANATION THAT WAS BELIEVABLE.  I NOW BELIEVE I KNOW WHAT HAPPENED. *TR |
| CAMRY | 2005 | 20090804 | TL* THE DRIVER OWNS A 2005 TOYOTA CAMRY.  HER SON IN LAW,  WHILE DRIVING, WAS KILLED IN A VEHICLE CRASH. THE POLICE REPORT STATES THAT THE VEHICLE WAS SPEEDING AND THAT THE DRIVER COULD NOT CONTROL THE VEHICLE. SHE FILED A COMPLAINT WITH TOYOTA MANUFACTURER REGARDING UNINTENDED VEHICLE ACCELERATION. THE FAILURE MILEAGE WAS 45,000.  THE VIN NUMBER WAS UNKNOWN. |
| CAMRY | 2007 | 20090527 | HIGH SPEED COLLISION INVOLVING A 2007 TOYOTA CAMRY.    DRIVER WAS FAMILIAR WITH ROAD AND WAS NOT KNOWN TO DRIVE AGGRESSIVELY OR SIGNIFICANTLY ABOVE SPEED LIMIT. TOXICOLOGY REPORTS CAME BACK NEGATIVE. DRIVER HAD BIPOLAR DISORDER AND WAS DRIVING SELF TO HOSPITAL, BUT THERE WAS NO INDICATION AT ALL OF SUICIDAL BEHAVIOR/INTENT.   POLICE REPORT PUT RATE OF SPEED AT TIME OF COLLISION AT  LEAST 85 MPH. CONVERSATIONS WITH INVESTIGATORS INDICATE THAT SEVERITY OF COLLISION INDICATES SPEED MAY HAVE BEEN 100MPH. POSTED SPEED WAS APPROXIMATELY 40MPH. *TR |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| ES350 | 2009 | 20090828 | ON AUGUST 28, 2009, FOUR OCCUPANTS OF A 2009 LEXUS ES350 TRAGICALLY AND UNNECESSARILY DIED IN SANTEE, CALIFORNIA IN SAN DIEGO COUNTY FOLLOWING A HIGH SPEED LOSS OF CONTROL AND ROLLOVER EVENT.  THE VEHICLE IN QUESTION WAS A LOANER CAR FROM BOB BAKER LEXUS IN EL CAJON, CALIFORNIA.  DRIVER OF THE VEHICLE, 45, A 19 YEAR VETERAN OF THE CALIFORNIA HIGHWAY PATROL.  THE DRIVER HAD OBTAINED THE VEHICLE THAT DAY AFTER DROPPING OFF HIS LEXUS FOR SERVICE.  WITNESSES REPORT THAT THE OFFICER WAS MANEUVERING THE LEXUS IN AND OUT OF TRAFFIC AT HIGH RATES OF SPEED ON STATE ROUTE 125, HONKING HIS HORN WITH THE HAZARD LIGHTS ON, PRIOR TO THE HIGHWAY ENDING AT AN INTERSECTION.     THE OFFICER ATTEMPTED TO NEGOTIATE A TURN BUT COULD NOT AVOID STRIKING ANOTHER VEHICLE AND LOSING CONTROL BECAUSE OF HIS HIGH RATE OF SPEED.  THE VEHICLE LOST CONTROL, ROLLED SEVERAL TIMES, AND CAUGHT FIRE.  ALL FOUR OCCUPANTS ARE REPORTED TO HAVE DIED ALMOST IMMEDIATELY.   PRIOR TO ENTERING THE INTERSECTION, AN OCCUPANT OF THE VEHICLE CALLED 911 EMERGENCY TO REPORT THAT THE ACCELERATOR WAS STUCK.  HE REPORTED THAT THE VEHICLE WAS TRAVELING 120 MILES PER HOUR AND THAT THEY WERE APPROACHING AN INTERSECTION.  OCCUPANTS ARE HEARD TELLING EACH OTHER TO PRAY BEFORE A WOMAN SCREAMS AND THE CALL SUDDENLY ENDS.   THE OFFICER(DRIVER OF THE VEHICLE, HIS WIFE , 45, AND THEIR 14 YEAR OLD DAUGHTER  ALL DIED IN THE CRASH.  THE WIFE'S BROTHER, 38, ALSO DIED.   ON BEHALF OF THE SURVIVING FAMILY MEMBERS OF THE DECEDENTS, WE RESPECTFULLY REQUEST YOU TO INVESTIGATE WHY THIS LEXUS VEHICLE'S ACCELERATOR MALFUNCTIONED, AND WHY A HIGHLY-TRAINED OFFICER AND DRIVER LIKE THE OFFICER WAS UNABLE TO RE-GAIN CONTROL OF THE LEXUS VEHICLE AT ISSUE OR OTHERWISE AVOID CATASTROPHE.  WE CURRENTLY ARE AWAITING ADDITIONAL FACTS SURROUNDING THE INCIDENT, AND THE MALFUNCTION OF THE LEXUS, BUT WILL SUPPLEMENT THIS COMPLAINT UPON RECEIPT. *TR UPDATED 12/01/09 *BF  UPDATED 12/01/09 |
| ES330 | 2006 | 20080826 | TL*THE CONTACT OWNS A 2006 LEXUS ES330.  WHILE MERGING INTO THE RIGHT LANE AT APPROXIMATELY 25 MPH, THE VEHICLE SUDDENLY ACCELERATED.  THE CONTACT WAS UNABLE TO BRAKE AND STRUCK A PEDESTRIAN.  THE PEDESTRIAN DIED DUE TO INJURIES.  THE CONTACT ALSO REAR ENDED TWO OTHER VEHICLES AND DROVE THROUGH A FENCE.  THE VEHICLE CAME TO A STOP WHEN IT CRASHED INTO A GUARD RAIL.  THE MANUFACTURER STATED THAT THE CAUSE OF THE FAILURE COULD HAVE BEEN THE FLOORMAT.  THE INSURANCE COMPANY CLAIMED THAT THE VEHICLE WAS DESTROYED.  THE CONTACT RECEIVED INJURIES TO HER BACK, NECK, AND LEG.  TWO OTHERS WERE ALSO INJURED.  STATE POLICE REPORT NUMBER 5271887 WAS FILED.  THE FAILURE AND CURRENT MILEAGES WERE 26,286. UPDATED 10/01/08. *LJ  THE MANUFACTURER STATED THE FLOOR MATS MAY HAVE BECOME STUCK UNDER THE ACCELERATOR WHICH CAUSED THE VEHICLE TO ACCELERATE OUT OF CONTROL. UPDATED 10/08/08. *JB |
| TUNDRA | 2007 | 20080220 | TL*THE CONTACT OWNED A 2007 TOYOTA TUNDRA. WHILE THE CONTACT'S HUSBAND WAS DRIVING AT AN UNKNOWN SPEED, THE VEHICLE ACCELERATED BETWEEN APPROXIMATELY 80-100 MPH,  CRASHED INTO A TREE AND THE DRIVER WAS KILLED.  THE VEHICLE WAS DESTROYED.  THE CONTACT BELIEVED THAT THE CRASH WAS RELATED TO THE RECALL ABOUT THE AFTERMARKET ALL WEATHER FLOOR MATS BECOMING STUCK AND CAUSING THE VEHICLE TO ACCELERATE.   A POLICE REPORT WAS FILED.  THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 35,000.  UPDATED 03-11-08 *BF |

010172-25 398181 v1

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| CAMRY | 2004 | 20040314 | MY MOTHER AND FRIEND STARTED OUT FOR CHURCH, THE FRIEND HAD COME TO PICK HER UP WHEN THE 2004 TOYOTA CAMRY WITH LESS THAN 3000 MILES ON IT WAS HAVING DIFFICULTY SHIFTING INTO REVERSE, THEN WHEN SHE SHIFTED INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY EST SPEED ON 80 - 92 MILE A HOUR IN LESS THAN 250 FT WHEN THE CAR HIT A MOBILE HOME. THEY HIT SO HARD IT MOVED DOUBLE WIDE ALMOST A FOOT. KILLING MY MOTHER THE PASSENGER AND INJURY TO HER FRIEND THE DRIVER. NO AIR BAG DEPLOYED AND WHEN TOYOTA WAS CONTACTED THEY REFUSED TO SPECK TO US.  ATTORNEYS HAVE SAID THAT TOYOTA IS SO BIG, NOT COST AFFECTIVE....SO I WATCH AND IN TWO YEARS THERE ARE MANY MANY MORE NOW....HOW MANY MORE HAVE TO DIE BEFORE SOMETHING IS DONE.  SEE ALSO 10074472. *DSY *NM |
| AVALON | 2003 | 20041109 | MY MOTHER-IN-LAW WHO ALWAYS WORE HER SEAT BELT WAS DRIVING HOME AT NIGHT AND SOMEHOW RAN OFF THE ROAD HIT A LITTLE CHERRY TREE AND WAS THROWN FROM HER CAR & KILLED HER. THE SIDE NOR THE FRONT AIR BAGS WENT OFF. AND APPARENTLY THE SEAT BELTS FAILED TOO. THE HIGHWAY PARTROL CAN'T FIGURE OUT WHAT HAPPENED.*AK |
| CAMRY | 2003 | 20040315 | WHILE IN A PARKING LOT AND BACKING OUT OF A PARKING SPACE VEHICLE ACCELERATED SUDDENLY HITTING A PEDESTRIAN. *AK  ONE PERSON WAS INJURED AND ONE PERSON WAS KILLED IN THIS ACCIDENT.  THE CONSUMER REFUSED TO DRIVE THE VEHICLE AFTER THIS INCIDENT AND RETURNED THE VEHICLE TO THE DEALER.  *NM |
| CAMRY | 2004 | 20040314 | DIFFICULTY SHIFTING FROM PARK TO REVERSE, THEN UPON SHIFTING INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY, WOULD NOT STOP, COLLIDED WITH A MOBILE HOME, AIR BAGS DID NOT DEPLOY, RESULTING IN THE DEATH OF ONE PASSENGER AND INJURY OF DRIVER  *LA  SEE ALSO VOQ 10171110. *DSY. |
| CAMRY | 2002 | 20030904 | MAKIA CAFUA, DRIVING HER 2002 TOYOTA CAMRY, VIN 4TIE32K92U636868, WAS ENTERING I-93 AT EXIT 39 AT 5:30 IN THE MORNING WHEN HER CAR SUDDENLY SHOT ACROSS THREE LANES OF TRAVEL AND WAS HIT, BROAD SIDE, BY ANOTHER VEHICLE TRAVELING IN THE HIGH SPEED (3RD) LANE. TRAFFIC AT THE TIME OF THE ACCIDENT WAS LIGHT.  IT IS BELIEVED THAT THE CAMRY EXPERIENCED AN UN-COMMANDED ACCELERATION CAUSING MRS. CAFUA TO LOSE CONTROL RESULTING IN THE ACCIDENT AND HER DEATH.  THE CAMRY HAS BEEN STORED SINCE THE ACCIDENT AND NO CHANGES HAVE BEEN MADE TO ITS POST ACCIDENT CONDITION. VEHICLE IS AVAILABLE FOR INPECTION/TESTING BY NHTSA. *AK |
| CAMRY | 2002 | 20040122 | WITNESSES SAW MY PARENTS VEHICLE (A 2002 TOYOTA CAMRY) COMING TO A STOP AND THEN SUDDENLY ACCELERATE.*AK |
| CAMRY | 2003 | 20040316 | WHEN COMING OUT OF A PARKING LOT ACCELERATOR  STUCK, CAUSING THE VEHICLE TO ACCELERATE OUT OF CONTROL.  VEHICLE GRAZED ANOTHER VEHICLE, WENT ACROSS A STREET, GRAZED A BUILDING, AND DROVE STRAIGHT INTO ANOTHER BUILDING.  DRIVER WAS CONSCIOUS WHEN PARAMEDIC ARRIVED.  THEY  FOUND THE DRIVER WITH BOTH FEET STILL ON THE BRAKE PEDAL.  DRIVER WAS TRANSPORTED TO THE HOSPITAL, AND LATER DIED DUE TO FATAL INJURIES FROM THE CRASH.  THE INSURANCE COMPANY  PRESERVED THE VEHICLE AS EVIDENCE.  THE POLICE REPORT STATED THE CRASH WAS DUE TO A MECHANICAL DEFECT. *AK  *NM |

53

294.   The gravity of the SUA defect and Toyota's knowledge of the defect is evident from the descriptions provided by vehicle owners.  Attached as Exhibit A is

---

[53] TOY-MDLID00017271

a summary of customer SUA complaints described by Toyota as complaints taken

just from the Field Reports database where the floor mat or pedal was not implicated.

**E.     Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall
         Complaints**

295.   Toyota and NHTSA continued to receive complaints of unintended

acceleration by vehicles not involved in the recalls or by vehicles which have

participated in the recalls and been "fixed."

296.   On February 22, 2010, Toyota conducted a "webinar" purporting to

address the various safety concerns plaguing Toyota and Lexus vehicles.  While

Toyota had previously claimed that the braking problems in the Prius and Lexus ES

250h were unrelated to the unintended acceleration problem, in the webinar Toyota

admitted they were linked by suggesting that the ETCS-i system facilitates electronic

braking control (among the other "advantages" Toyota touted in regard to the

ETCS-i system).

297.   On March 2, 2010, TMC Executive Vice President, Takeshi

Uchiyamada, Executive Vice President, submitted prepared testimony to the Senate

Committee on Commerce, Science and Transportation.  Mr. Uchiyamada's

testimony purported that the ETCS-i system is tested "extensively both in the design

phase and after it is developed to ensure that there is no possibility of 'sudden

unintended acceleration.'"  In reality, Toyota relies heavily upon its component

suppliers to perform such testing.  Toyota's suppliers typically complete Toyota's

parts level testing independently.  Toyota performance standards apply only to Tier 1

suppliers.  Toyota does not have any clearly written rules or regulations about who

must conform to Toyota's standards below its Tier 1 suppliers.  For instance, while

- 157 -

Toyota may impose testing standards on CTS, the supplier of the sticky accelerator pedals at issue, when questioned before Congress, Toyota engineers could not testify that Toyota imposed similar controls on the manufacturers of the sensors and circuit board that CTS utilizes in its pedal.  Moreover, Toyota's engineers admitted that "there is no particular or special testing that would directly prove that there is no unintended acceleration."

298.   On March 5, 2010, Congressmen Henry A. Waxman and Bart T. Stupak, Chairmen of the House Subcommittee on Oversight and Investigation, wrote a letter to James E. Lentz, President and Chief Operations Officer of Toyota Motor Sales U.S.A., Inc., stating, among other things:

> We do not understand the basis for Toyota's repeated assertions that it is "confident" there are no electronic defects contributing to incidents of sudden acceleration.  We wrote you on February 2, 1010, to request "all analyses or documents that substantiate" Toyota's claim that electronic malfunctions are not causing sudden unintended acceleration.  The documents that Toyota provided in response to this request did not provide convincing substantiation.  We explained our concerns about the failure of Toyota to substantiate its assertions in our letter to you in February 22, 2010.
>
> After we sent our letter on February 22, Toyota provided a few additional documents to the Committee early in the

- 158 -

morning on the day of the hearing.  Several of these documents were written in Japanese.  While some of these documents appear to contain preliminary fault analyses that could be used in planning a rigorous study of potential cause of sudden unintended acceleration, not one of them suggested that such a rigorous study had taken place.  As we explained in our February 22 letter, the only document Toyota has provided to the Committee that claims to study the phenomenon of sudden unintended acceleration in a comprehensive way, is an interim report from the consulting firm Exponent, Inc.  This report has serious deficiencies, as we explained in our February 22 letter.

299.   Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements.  For example, when asked why Toyota believed there were no problems with the ETCS-i, its technical analysis manager testified falsely, "[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

**F.     Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall**

300.   Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations:

- 159 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First, the documents appear to show that Toyota

consistently dismissed the possibility that electronic

failures could be responsible for incidents of sudden

unintended acceleration.  Since 2001, when Toyota first

began installing electronic throttle controls on vehicles,

Toyota has received thousands of consumer complaints of

sudden unintended acceleration.  In June 2004, the

National Highway Traffic Safety Administration (NHTSA)

sent Toyota a chart showing that Toyota Camrys with

electronic throttle controls had over 400% more 'vehicle

speed' complaints than Camrys with manual controls.  Yet,

despite these warnings, Toyota appears to have conducted

no systematic investigation into whether electronic defects

could lead to sudden unintended acceleration.

301.    This concern is significant because it appears from 2004 to 2009;

Toyota was selling cars without knowledge of what caused the defect or disclosure

of the defect.

302.    Next, the Committee rejected tests submitted by Toyota that were

conducted at the request of Toyota's litigation counsel, Bowman and Brooke, LLP:

Second, the one report that Toyota has produced that

purports to test and analyze potential electronic causes of

sudden unintended acceleration was initiated just two

months ago and appears to have serious flaws.  This report

was prepared for Toyota by the consulting firm Exponent,

- 160 -

1   Inc. at the request of Toyota's defense counsel, Bowman

2   and Brooke, LLP.  Michael Pecht, a professor of

3   mechanical engineering at the University of Maryland, and

4   director of the University's Center for Advanced Life

5   Cycle Engineering (CALCE), told the Committee that

6   Exponent 'did not conduct a fault tree analysis, a failure

7   modes and effects analysis … or provide any other

8   scientific or rigorous study to describe all the various

9   potential ways in which a sudden acceleration event could

10   be trigger' 'only to have focused on some simple and

11   obvious failure causes'; used 'extremely small sample

12   sizes'; and as a result produced a report that "I would not

13   consider … of value … in getting to the root causes of

14   sudden acceleration in Defective Vehicles.'

15   303.   Again, the concern over the Exponent Bowman and Brooke report

16   highlights (a) that Toyota had no credible prior report or analysis of SUA; (b) that

17   Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's

18   inability to understand the basis for the defect; and (d) its failure to provide a fail-

19   safe to prevent unintended acceleration.

20   304.   The Committee then addressed Toyota's lack of truthfulness in its

21   statements and rejected the notion that floor mats or pedals were the sole cause of the

22   problem:

23   Third, Toyota's public statements about the adequacy of its

24   recent recalls appear to be misleading.  In a February 1,

- 161 -

2010, appearance on the *Today* show, you stated that Toyota has "studied the events of unintended acceleration, and [it] is quite clear that it has come down to two different issues," entrapment of accelerator pedals in floor mats and sticky accelerator pedals.  In an appearance the same day on CNBC you repeated this claim and reported that Toyota is "very confident that the fix in place is going to stop what's going on."

The documents provided to the Committee appear to undermine these public claims.  We wrote to you on February 2, 2010, to request any analyses by Toyota that show sticky pedals can cause sudden unintended acceleration.  Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "typically … does not translate into a sudden, high-speed acceleration event." Moreover, our review of the consumer complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved

- 162 -

vehicles that are not subject to the 2009 and 2010 floor mat

and "sticky pedal" recalls.

305. Toyota's denials of an ETCS defect persisted even when independent professional engineers concluded in February 2009, that a SUA incident in Tennessee was caused by deviations with ETCS.[54]

306. One reason why Toyota lacks sufficient test data on the reliability of ETCS, and had to rely on a report belatedly ginned up by Exponent Bowman & Brooke, is the overall slip at Toyota in its attention to quality control. Toyota has sacrificed safety for speed.

307. In the last ten years, the culture has changed. Now, as acknowledged by Toyota, the emphasis is on fast production. While production and production goals have increased, the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

308. The result has been a significant increase in quality control problems per vehicle. Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are overlooked. Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a recall. Quality control employees are given goals that set an upper limit on the number of defects they are to report.

---

[54] TOY-MDLID90053223.

**G.   Toyota Identifies Many Root Causes of SUA Confirming the Need for Brake Override**

309.   Toyota received numerous Field Technical Reports ("FTR") where SUA events were confirmed and where the cause was not a mat or "sticky" pedal. For example, on December 9, 2009, a FTR was issued concerning a 2009 Camry. The customer reported RPM surge of up to 1200 RPM.  The FTR confirmed the UA event and the condition could be replicated.  To fix the problem in this instance Toyota replaced the "Head SUB-ASSY, Cylinder."

310.   In May 2005, a customer complained that after releasing the throttle engine speed remained at 5,000 RPM.  A dealer could not replicate the problem but when the dealer reinstalled the throttle body he replicated the condition and confirmed it was not caused by a floor mat.  Toyota replaced the throttle (Part 222102 1020).[55]

311.   A customer driving a 2008 Corolla reported the engine accelerated up to 60 mph.  On inspection the "condition was duplicated" without triggering a DTC Code.  Toyota replaced the ECU.  (Part #8966102M92.)

312.   In 2007, after a SUA event that caused the vehicle to accelerate up to 70 mph, the dealer found a faulty pedal sensor.  Case 200704030437.

313.   On December 12, 2008, an Early Warning Report was generated by Toyota de Brasil regarding a Corolla.  The report noted that this is a, "new Corolla which presented a spontaneous engine speed acceleration.  This is the first case and it is a dangerous problem because it can cause a serious accident, putting the life of the

_____

[55] TOY-MDLID002444.

- 164 -

customer and other people at risk."  The report noted that "this incident resulted in a light collision."  The dealer confirmed this was not a carpet or floor mat problem.

314.   In one FTR Toyota found the SUA was caused by the accelerator pedal position sensor and despite engine idles at 4000 RPM there are no "diagnostic trouble codes."

315.   Toyota recognized that SUA can be triggered by a malfunction from many different failures.  In a 2004 "check sheet" it identified that the accelerator pedal, cable, cruise control, air valve, throttle body, accelerator and throttle sensor, EFI computer, wire harness and cruise control all were possible factors.

**H.     Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers and Affirmatively Misled Consumers**

316.   When a customer reports a SUA event, Toyota uniformly rejects any claim of any defect and fails to disclose the existence of hundreds if not thousands of similar SUA claims.

317.   Typical of such a response is the following letter sent from TMS' California offices:

> Re:    Date of Loss:      February 2, 2009
>
>        Vehicle:           2007 Lexus ES 350
>
>        VIN:               …
>
> Dear _____:
>
> This letter is in response to your communication with
>
> Lexus Customer Satisfaction.  Toyota Motor Sales, USA,

1    Inc. ("TMS") has reviewed your claim and conducted a

2    technical inspection of your vehicle.

3

4    You reported that while driving the vehicle on the interstate

5    it accelerated on its own and you were unable to stop it for

6    nearly two miles when it finally slowed after a concerted

7    effort on your part.  You believe that this was due to a

8    defect in your vehicle.

9

10

11   The inspection of your vehicle revealed no evidence of any

12   vehicle defects or malfunction.  The throttle assembly and

13   accelerator pedal were operating as designed, with no

14   binding or sticking of any of the components.  The brakes

15   showed signs of excessive wear which is consistent with

16   what you described happened to you.

17

18

19   The inspection also revealed that the floor mat was in a

20   position where it could interfere with the operation and

21   travel of the accelerator pedal.  When the vehicle was taken

22   in to the dealership, the floor mat retaining clips were not

23   properly secured which allowed the floor mat to move out

24   of position.  While we understand that you feel the floor

25   mat was not the problem, the evidence revealed during our

26   inspection showed otherwise.

27

28

We are very sorry about to learn of this unfortunate

incident, however, our inspection of your vehicle found

that the incident was not due to any sort of manufacturing

or design defect, and we are unable to offer additional

assistance.

Thank you for allowing us the opportunity to address your

concerns.

Very truly yours,

Troy Higa

Claims Administrator[56]

318.    One 2007 Lexus ES350 owner reported that she had a SUA event that

was not caused by floor mats (as there was no floor mat on the drivers' side) and it

was not caused by pressing the gas instead of the brake.  In a detailed e-mail to

Toyota in October 2009, she described how she had dropped her daughter off one

evening, just as she normally did five times a week.  As usual, she backed into the

neighbor's driveway.  Her daughter and her son-in-law were watching her.  Her

friend was in the passenger seat.  All of a sudden the Lexus began to race out of

---

[56] TOY-MDLID00199764.

- 167 -

control.  She tried unsuccessfully to brake, but the car kept accelerating until it reached speeds up to 90 miles an hour.

319.   The Lexus hit several curbs, cracking and lifting the concrete.  It was travelling so fast that the passenger side door flew open and smashed against the front of the car.  She told Toyota that the only thing that saved their lives was a concrete wall into which the car smashed and finally came to a halt.

320.   The driver insisted that she was healthy and active, had good reflexes and that she did not wear glasses or contacts.  She then directly asked Toyota a number of questions like how she could have kept her foot on the accelerator pedal as she and her passenger were thrown about the interior of the car, only being held in place by the seat belts and how could she have accelerated enough in a small parking turn about to reach a speed that the car broke concrete.

321.   Toyota responded to this customer by claiming the vehicle was "in proper working order free of any type of mechanical defect."[57]  Toyota failed to address the points raised by the SUA victim or to interview witnesses to verify her account.

322.   Even where a consumer had a professional engineer conclude that the ETCS system was at fault, Toyota through a TMS claims manager in Torrance, California, informed the consumer "there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the

---

[57] TOY-MDLID90011084.

brake/acceleration or electrical systems."[58]  It was Toyota's standard practice to issue
uniform denials like that above from its claims manager in Torrance.

323.   Such letters of denial were sent despite instances where police officers
found "physical evidence at the scene suggesting that vehicle #1 was continually
accelerating throughout the incident."  The officer in this incident noted the impact
caused the driver to "shift violently in her seat.  This officer feels it is unlikely she
would have been able to manually accelerate throughout the event."[59]

324.   To make matters worse a TMS manager from Torrance falsely stated on
repeated occasions that "the brakes will always override the throttle."[60]  This was a
flat-out lie as Toyota did not have a brake-override until 2010, and in most vehicles,
there is no such override.

**I.     Continuing Warranties and Misrepresentations**

325.   On November 25, 2009, Toyota falsely represented and warranted that
floor mats were the cause of SUA.  In print media and in statements made to Toyota
dealers for dissemination to new vehicle buyers, Toyota falsely represented that
"Toyota vehicles are among the safest on the road today," that there was no problem
with ETCS and that ETCS has been "evaluated numerous times."

326.   On November 2, 2009, Toyota announced that "no defect exists in
vehicles in which the driver's floor mat is compatible with the vehicle and properly
secured."[61]  Toyota further represented and warranted falsely that:

---

[58] TOY-MDLID90054928.

[59] TOY-MDLID90053562.

[60] TOY-MDLID90059533.

[61] TOY-MDLID00008630.

- 169 -

The question of unintended acceleration involving Toyota
and Lexus vehicles has been repeatedly and thoroughly
investigated by NHTSA, without any finding of defect
other than the risk from an unsecured or incompatible
driver's floor mat;

Toyota takes public safety seriously.  We believe our
vehicles are among the safest on the road.  Our engineers
are working hard to develop an effective remedy that can
help prevent floor mat interference with the pedal.  As soon
as it is ready, we will notify owners of the relevant models
to bring their vehicle to a dealer for the necessary
modification at no charge.

**J.     Summary of the Defects in Defective Vehicles**

327.   Vehicles with ETCS manufactured, marketed, sold and/or distributed by
Toyota and its affiliated companies suffer from the same overarching defect, in that,
they are vulnerable to incidents of sudden unintended acceleration ("SUA"),
including surges, lurching, revving engines, and other instances of unintended
acceleration captured as part of the more than 39,000 complaints to NHTSA and the
100,000 complaints received by Toyota.  Regardless of the many root causes which
create this overarching defect, an effective brake-override system would serve as a
fail-safe design feature to prevent and/or minimize the risk of injury, harm or
damage to Toyota vehicle owners or their occupants from SUA events.

328.   In addition to the lack of an effective brake-override system, there are
other specific defects in the Subject Vehicles that cause and/or contribute to the

- 170 -

overarching defect of SUA, including, but not limited to, defective pedals and poorly designed floor mats, and there are design defects in the Subject Vehicles that caused, contributed to, and/or failed to prevent SUA events, including the following:  (1) an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including SUA; (2) the ETCS and its components are highly susceptible to malfunction caused by various electronic failures, including, but not limited to, short circuits, software glitches, and electromagnetic interference from sources outside the vehicle; and (3) there was a failure to warn consumers as to how to properly push and hold buttons of shift into neutral in order to stop SUA events once the aforementioned defects had set the SUA events in motion.

329.   These defects are further set forth below:

**1.   Electronics Issues:**

Defects in the Subject Vehicles' electronic system which can and sometimes do cause SUA include, but are not limited to:

a.   The unwarranted and improper safety-critical reliance on electronic engine control and braking systems, including, but not limited to, the ETCS, which lacks a hardware redundant fault tolerant design;

b.   Unwarranted and improper safety-critical reliance on analog sensor inputs from two similar analog sensors in A) the throttle body assembly, and B) the accelerator pedal assembly, which are subject to failure in various modes;

c.   Unwarranted and improper safety-critical reliance on software running in a single CPU within the vehicle electronic system, which is subject to failure in various modes;

- 171 -

d.     Unwarranted and improper safety-critical reliance on individual hardware components used in the vehicle electronic system;

e.     The susceptibility of the ETCS-i (particularly the wiring harnesses connected to the accelerator pedal position sensors and the throttle position sensors) to currents generated by radio frequency (RF) interference, combined with an improper system for detecting and filtering RF currents;

f.     The susceptibility of the ETCS-i (particularly the accelerator pedal position sensors) to drops in supply voltage which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

g.     The susceptibility of the ETCS-i (particularly the wiring harnesses) to various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

h.     The failure to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

i.     The safety critical reliance on a purported fault detection system that does not always generate and/or recognize faults in the vehicle electronic system as they occur;

j.     The inability of the software running within the ETCS-i to properly self-calibrate when certain changes are detected;

- 172 -

k.      The failure to design and include an appropriate EDR system which properly records the position of the accelerator, brake, and throttle assembly in order to allow proper examination of SUA events; and

l.      The failure to include properly redundant systems with the ability to cross-check bus reported accelerator and throttle positions with "actual sensor data."

## 2.      Mechanical Issues:

Upon information and belief, certain mechanical defects in the Subject Vehicles which can and sometimes do cause SUA include, but are not limited to:

a.      The propensity for mechanical involvement and interference between the accelerator pedal and the Subject Vehicles' floor mats which can cause the pedal to become stuck and remain depressed, keeping the throttle open despite the operator's application of the brake pedal, resulting in unintended acceleration;

b.      Mechanical resistance that can cause the accelerator pedal to become stuck in a fully or partially depressed position and to fail to return to its idle position (referred by Toyota as a "sticky pedal"), resulting in unintended acceleration;

c.      Floor mat interference in all Toyota vehicles, recognized as early as 2000 when Toyota recalled 1999-2000 model years Lexus LS 200 for SUA-floor mat issues in the UK and again in 2007 when internally Toyota recognized floor mats could be an issue in all vehicles[62];

---

[62] TOY-MDLID00002839.

d.      Mechanical resistance which can cause the throttle body or throttle plate to become stuck in a fully or partially open position resulting in unintended acceleration; and

e.      The gap between pedals is 20mm smaller on certain models including but not limited to the RAV4 and Venza models, which contributed to UA.[63]

### 3.      The lack of an appropriate fail-safe:

Toyota was aware the SUA events were caused by any of the above in a given Defective Vehicle, but Toyota could not predict which of the faults listed above caused a SUA event in any given vehicle.  Toyota could not identify the root cause of most SUA events.  This made it critically important for Toyota to have an adequate fail-safe.  The Defective Toyotas did not have an adequate fail-safe due to:

a.      The unwarranted and improper reliance on safety-critical but untested or improperly tested "failsafe strategies" ostensibly designed to detect faults in the vehicle electronic systems and prevent those faults from causing SUA.  These "failsafe strategies" can and sometimes do fail to recognize fault conditions which, if left unchecked, result in unintended acceleration and record no direct evidence of the fault that initially triggered the unintended acceleration event;

b.      The lack of a proper "brake-override system" or other "fail-safe" logic that would close the throttle while allowing the brakes to be applied in the event the vehicles' electronic systems received commands to open the throttle and apply the brakes simultaneously;

---

[63] 41201T000.

c.     The lack of a hardware-redundant fault tolerant electronic engine control and braking system such as those employed by other vehicle manufacturers;

d.     The lack of enough memory in the computer systems of certain models to accommodate a brake-override system;

e.     The lack of a proper ignition shut off in the event of a SUA event. NHTSA identified this as a problem as early as August 2007 when it notified Toyota that it was considering requiring a public service announcement to inform the public "how to shut off the vehicle with the push button start," meaning consumers did not understand that it takes three seconds for the shut off to occur.  Toyota was not only aware of the problem it also failed to implement a kill switch;

f.     The lack of a proper fault detection system that would recognize a SUA event, or surge, or rpm run up beyond the maximum design tolerance and respond by shutting down the throttle; and

g.     The lack of an appropriate layout in the transmission system.  In many of the vehicles the shift system is confusing and results in drivers experiencing an SUA event mistakenly placing the transmission in "D" when they thought they were placing the transmission in "N."

4.     **Failure to appropriately test and validate the vehicle systems:**

a.     An inability to identify the root cause for SUA.  As alleged above, Toyota has been aware since 2002 that its vehicles with ETCS have the potential for SUA or "surging" at a rate that exceeds that in manually controlled vehicles.  Toyota has been unable to find the root cause of the problem.  In a 2002 Toyota Field Technical Report, Toyota acknowledged that "[t]he root cause for 'surging' remains unknown" and thus "[n]o known remedy exists for the 'surging'

- 175 -

condition at this time."[64]  In 2010, Toyota still had not tested its ETCS, as it had to hire Exponent to answer Congress' inquiry over what proof Toyota had to show its ETCS did not cause SUA.  Congressman Waxman observed:

> The results of our investigation raise serious questions.
> Toyota has repeatedly told the public that it has conducted extensive testing of its vehicles for electronic defects.  We can find no basis for these assertions.  Toyota's assertions may be good public relations, but they don't appear to be true.

> b.      The faults and defects in Toyota's safety critical vehicle electronic systems described above show that Toyota has not properly tested or validated these systems individually or as a whole; and

> c.      Moreover, Toyota has failed to verify that all electronic vehicle systems capable of requesting torque are robust enough, and contain sufficient redundancies to prevent SUA events.

**K.      Toyota Belatedly Installs a Brake-Override as a "Confidence" Booster**

330.   Toyota began facing complaints of runaway cars years ago, but the company did not install "brake-override" systems in those vehicles, even as several other automakers deployed the technology to address such malfunctions.

331.   The brake-override systems allow a driver to stop a car with the footbrake even if the accelerator is depressed and the vehicle is running at full

---

[64] TOY-MDLID00062906.

1  throttle.  The systems are an outgrowth of new electronics in cars, specifically in

2  engine control.

3      332.   "If the brake and the accelerator are in an argument, the brake wins," a

4  spokesman at Chrysler said in describing the systems, which it began installing in

5  2003.

6

7      333.   Shockingly, given the potential gravity of SUA events, internal

8  documents reveal Toyota knew it needed a brake-override years earlier:[65]

9                **Subject**:     Important information:  America ES350

10                                 article…addition #2

11              **From**:  Koji Sakakibara@toyota.com

12              **Date**:  Tue. 1 Sep 2009 16.16.01 -0700

13              **To**:    yoshioka@mail.tec.toyota.cojp. Shunsuka Noguchi

14                         syun@nano.tec.toyota.cojp.

15                         rkitsura@mail.tec.toyota.coj.

16                         Kako kako@email.tec.toyota.cojp>

17              cc:    Kato   maktoh@mail.tec.toyota.cojp,

18                     Hirokazu.Sakamoto@toyota.com,

19                     Koji_Takara@toyota.com,

20                     Keiichi_Fukushima@toyota.com,

21                     washino@mail.tec.toyota.cojp,

22                     jamagush@earth.tec.toyota.cojp, r-

23                     Kawamu@earth.tec.toyota.cojp,

24

25

26

27  _____

28  [65] TOY-MDLID00041130T-0001.

- 177 -

1    y_yamai@email.tec.toyota.cjp.  Kanamori

2    kanamori@earth.tec.toyota.cojp,

3    ssakamt@earth.tec.toyota.cojp,

4    joji@giga.tec.toyota.cojp

5

6

7    To all concerned staff,

8

9    Thank you for your continued business.  I am Sakakibara

10   from TEC-2Gr, COE-LA.

11

12

13   - The following information has been received from TMS-

14   POSS Public Affairs Group regarding the above (America

15   ES350 article…addition #2).  (Please see photos at the

16   bottom of this mail.)

17

18   - During the floor mat sticking issue of 2007, TMS

19   suggested that there should be "*a fail safe option similar to*

20   *that used by other companies to prevent unintended*

21   *acceleration."  I remember being told by the accelerator*

22   *pedal section Project General Manager at the time (Mr. M)*

23   *that "This kind of system will be investigated by Toyota,*

24   *not by Body Engineering Div."  Also, that information*

25   *concerning the sequential inclusion of a fail safe system*

26   *would be given by Toyota to NHTSA when Toyota was*

27

28

- 178 -

1   *invited in 2008.  (The NHTSA knows that Audi as adopted*
2   *a system that closes the throttle when the brakes are*
3   *applied and that GM will also introduce such a system.)*
4
5
6   =>In light of the information that "2 minutes before the
7   crash an occupant made a call to 911 stating that the
8   accelerator pedal was stuck and the vehicle would not
9   stop."  I think that Body Engineering Div. should act
10  proactively first (investigate issues such as whether the
11  accelerator assy [sic] structure is the cause, how to secure
12  the floor mats, the timing for introducing shape
13  improvements).
14
15
16  - Furthermore, taking into account the circumstances that
17  "in this event a police officer and his entire family
18  including his child died."  TMS-POSS Public Affairs
19  Group thinks that "the NHTSA and USA public already
20  hold very harsh opinions in regards to Toyota."  (As I think
21  you know, in some cases in the USA "killing a police
22  officer means the death penalty.")
23
24
25  - In light of the above, it would not be an exaggeration to
26  say that even more than the nuance of the information
27  passed from Customer Quality Engineering Div. External
28

- 179 -

Relations Dept. to Body Engineering Div.," the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues."  [Emphasis added.]

334.   Volkswagen, Audi, BMW and Mercedes-Benz also install such systems in at least some of their cars, some as far back as 10 years ago.  Nissan has been using brake-override since 2004.  Infiniti also has such a system.  General Motors installs brake-override in all of its cars in which it is possible for the engine at full throttle to overwhelm the brakes.

335.   It is estimated that it would cost $1 million in development costs – typically less than $1 per vehicle – to add such a system.

336.   On December 5, 2010, TMS announced it will install brake-overrides in 2011 vehicles.

337.   On February 22, 2010, TMC announced that it would install a brake-override system on an expanded range of customers' vehicles to provide an additional "measure of confidence."  According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

338.   The following models are eligible for the brake-override "confidence" upgrade:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250 models.

339.   "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have

- 180 -

for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when SUA complaints were received. Lentz did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

340.   Importantly, the brake-override was not announced as a "Safety Recall." Rather, it was implemented to boost consumer "confidence."  And the confidence booster is not being installed in all models with the SUA defect, such as the 2002-2006 Camrys.

341.   In view of the propensity of UA Toyota's vehicles to suddenly accelerate out of the drivers' control, each vehicle was defective for failure to have an appropriate fail safe.  Toyota identified each of these fail safes yet failed to implement them in a timely fashion as reflected in an internal "Privileged and Confidential" e-mail:

> Push Button Ignition
>
> One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion.  NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion.  In addition, the ES350 owners manual is unclear (see attached letter re: Pepski Petition).  NHTSA has surveyed ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality.  The Toyota

- 181 -

1   Smart Key System requires the operator to hold the ignition

2   button for 3 seconds to shut off the engine when the vehicle

3   is in motion.  When the vehicle is stopped, a momentary

4   press of the ignition button shuts off the engine.  NHTSA

5   has reports that some owners tried tapping the ignition

6   button to shut it off instead of holding it for three seconds.

7   While they do not believe this is the correct method, they

8   have been working with the SAE to develop a standard for

9   keyless ignition systems.  But it is important to note that

10  they think it is one of the attributes that may lead to the

11  occurrence of the long-duration, high speed events.

12

13  Sequential Shift Transmission

14

15  Another way to stop a runaway vehicle is by placing the

16  transmission in Neutral.  NHTSA is concerned that the

17  layout of the Sequential Shift Transmission my confuse the

18  operator (especially in a panic situation) because the "N" is

19  adjacent to the "+." To the left of the D position is a gated

20  area where the shift lever can be pushed forward to upshift,

21  and pulled back for a downshift.  The N position is above

22  the D position. In such a layout, the "+" and the "N" are very

23  close to the same longitudinal position, with the "+" closer to

24  the driver.  If, NHTSA supposes, the transmission was in

25  the Sequential Shift mode, the driver could confuse the

- 182 -

upshift position for the neutral position.  They believe that in a panic situation, there is a chance this could occur.

Braking Effectiveness

With an accelerator pedal stuck at wide open throttle, NHTSA agrees that one forceful application of the brake pedal can safely stop the vehicle.  However, in many reports and inspections they have found brakes burned or brake pads completely depleted after the event.  NHTSA understands that with the engine at wide open throttle, vacuum is not being supplied to the brake booster.  This means that the power braking system has potentially two or three applications left before the vacuum assist is depleted. They believe that in the long duration events, the brake booster is being depleted by the driver.  They think that the driver that initially experiences the event recognizes the vehicle is accelerating and presses the brakes.  The vehicle slows, so the driver releases the brakes and the vehicle accelerates again.  They repeat this process and before they realize, the power assist is lost and the vehicle becomes more difficult to stop.  The driver applies the brake pedal with a lot of force, and this can result in severe damage to the braking system, and/or a brake fire.

342.   In a January 22, 2010 internal email, Toyota Canada, admitted that due to the UA issues created by floor mats and gas pedals there was "logic" in that a "brake over-ride would be effective in any failures to prevent accidents.  TC wanted us to employ it as soon as possible."

**L.     The Defects Causing Unintended Accelerations Have Caused Defective Vehicles' Values to Plummet**

343.   A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of an uncontrollable and possibly life-threatening SUA event.  All purchasers of the Defective Vehicles overpaid for their cars.  As news of the SUA defect hit the press, the value of Toyota vehicles have materially diminished.  Some class members attempted to return their vehicles due to the fear of a SUA event.  Toyota has uniformly refused to refund the price of a vehicle a Plaintiff or class member sought to return.

344.   The economic loss suffered by class members is revealed by the following few examples.  From the start of the spring market through the summer of 2009, the 2007 Toyota Camry LE and the 2007 Nissan Altima stayed consistent with each other, depreciating $438 and $295 respectively through these five months (April 09-Aug 09).  As news of the Camry recall started to spread, however, the Camry took a nose dive, losing nearly 2.5 times the loss in value of its competitor, the 2007 Nissan Altima.  More staggering is that the Camry lost $400 in value from January-April 2010 when almost every used vehicle historically gains significant value during these months.  By March 2010, the delta between the Nissan and the Camry was over $1,200.

- 184 -

345.   From April 2009 through September 2009, the Corolla increased in value over its competitor, the Nissan and the Sentra by $210.  However, as the storm clouds started to gather over the rest of the Toyota line, the trend reversed.  During the next seven months, the Sentra only dropped $174 in value, while the Corolla dropped $839.  This is a difference of $665.  The change in this trend resulted in an $875 negative swing for the Corolla versus the Sentra in a year's time, a decrease in value for the Corolla of almost four times that of the Sentra.

346.   From April 2009 through August 2009, the Toyota RAV4 increased in value over its competitor the Honda CRV by $472.  But as the Toyota problems continued, this trend also reversed.  During the next eight months, the CRV dropped $1,273 in value, while the RAV4 dropped $2,206.  This is a net difference of $933.  The change in this trend resulted in a $1,405 negative swing for the RAV4 versus the CRV in a year's time.

347.   Purchasers and lessees paid more for the car, through a higher purchase price or higher lease payments, than they would have had the defects and non-conformities been disclosed.  In addition to being tied to a defective vehicle and having paid a higher rate than would have been the case if the defects were disclosed, lessees can, in some cases, end up paying for the difference in projected residual value and actual or realized value (*e.g.*, early termination clauses; open-end leases) at the end of their leases.  In these situations, lessees must come out of pocket to pay for the diminution in value caused by the partial disclosure of the SUA and brake-override defects to terminate their leases.

## M.    Choice of Law Allegations

348.   TMS is headquartered in Torrance, California.  According to a Toyota brochure regarding its United States Operations 2009, TMS is "Toyota's U.S. sales and marketing arm," which "oversees sales and other operations in 49 states."[66]

349.   Toyota does substantial business in California, with a significant portion of the proposed Nationwide Class located in California.  For example, approximately 18% of Toyotas were sold in California[67] and 16% of Lexus vehicles were sold or leased in California.

350.   California hosts a significant number of Toyota's U.S. operations.  In California, Toyota maintains both Toyota and Lexus Sales and Service Offices, Financial Service Offices, Manufacturing Facilities, a Research and Development Center, and a Design Center.  Also, Toyota Motor Engineering and Manufacturing North America, Inc. is headquartered in Kentucky, but has major operations in Torrance, California, as well as in Michigan and Arizona.

351.   In addition, the conduct that forms the basis for each and every class members' claims against Toyota emanated from TMS' headquarters in Torrance, California.

---

[66] http://pressroom.toyota.com/pr/tms/document/TNA_OPS_MAP_2009.pdf.

[67] Available at http://www.nytimes.com/2010/03/16/opinion/16herbert.html?_r=1, date last visited August 1, 2010.

352.    Toyota personnel responsible for customer communications are located at TMS' California headquarters, and the core decision not to disclose the sudden acceleration defect to consumers was made and implemented from there.

353.    Throughout the class period, TMS, in concert with its California advertising agencies, failed to disclose the existence of the sudden acceleration defect.  Toyota is the exclusive client of Saatchi & Saatchi LA, also located in Torrance, California.  The only client work displayed on its website is for Toyota, and it has received many awards over the years for various Toyota campaigns.[68]

354.    Personnel at Saatchi & Saatchi LA have direct ties to Toyota, including CEO Kurt Ritter, who is a member of the Toyota Worldwide Executive Board, and Chief Strategy Officer Mark Turner, who also "sits on Toyota's Worldwide Executive Board, as the strategic lead for all Toyota business managed by the Saatchi network throughout the world."  President Chuck Maguy is described as a longtime veteran of the Toyota account who returned to Saatchi LA in early 2009 after serving as Executive Director at Saatchi & Saatchi LA's sister agency, Team One, where he managed the Lexus brand.

355.    Team One is also located in California with its headquarters in El Segundo (about 12 miles from Torrance, California), and its CEO, Kurt Ritter, who

[68] http://www.saatchila.com/.

- 187 -

is a member of the Toyota Worldwide Executive Board, is also CEO for Saatchi & Saatchi LA.[69]

356.   Marketing campaigns falsely promoting Toyotas as safe and reliable were conceived and designed in California.

357.   Toyota personnel responsible for managing Toyota's customer service division are located at the TMS' California headquarters.  The "Customer Experience Center" directs customers to call 1-800-331-4331, which is a landline in Torrance, California, and to fax to 310-468-7814, which includes the area code for Torrance, California.[70]  Customers are directed to send correspondence to Toyota Motor Sales, U.S.A., Inc., 19001 South Western Ave., Dept. WC11, Torrance, CA 90501.  In addition, personnel from Toyota Motor Sales in Torrance, California, also communicate via e-mail with customers concerned about sudden acceleration.

358.   These California personnel implemented Toyota's decision to deny the existence of the SUA and brake-override defects when customers called to complain and instead blame floor mats and sticking accelerator pedals or driver error.  For example, a series of e-mail exchanges with a customer concerned about incidents of sudden acceleration with his Prius show that the California personnel indicated that upon inspection Toyota found his vehicle "to be operating as designed" and "recommend[ed] removing the driver's side floor mat."  The California personnel

---

[69] http://www.teamone-usa.com/.

[70] http://www.toyota.com/help/contactus.html.

also indicated that "Toyota has commissioned Exponent, one of the country's leading engineering ad scientific consulting firms, to conduct a comprehensive analysis of the electronic throttle control systems in Toyota and Lexus vehicles."

359.   According to the LOS ANGELES TIMES, a 56-page report that Menlo Park, California-based Exponent sent to Congress on February 9, 2010, found that the system behaved as intended and that Exponent was "unable to induce … unintended acceleration or behavior that might be a precursor to such an event."[71] Presumably, the tests performed by Exponent took place in California because Southern Illinois University's David Gilbert had to fly to California to see a demonstration at Exponent after he testified before the House Energy and Commerce Committee regarding his ability to demonstrate electronic failure modes in a Toyota Avalon to recreate the acceleration without triggering any trouble codes in the vehicle's computer.

360.   Toyota personnel responsible for communicating with dealers regarding known problems with Defective Vehicles are also located at TMS' California headquarters, and the decision not to inform Toyota dealers of the SUA defect was made and implemented from there.

361.   Toyota personnel responsible for managing the distribution of replacement floor mats and accelerator pedal parts to Toyota dealerships are located

---

[71] *Toyota Calls in Exponent, Inc. As Hired Gun*, LA TIMES (Feb. 18, 2010), available at http://articles.latimes.com/2010/feb/18/business/la-fi-toyota-exponent18-2010feb18, date last visited August 1, 2010.

at TMS' California headquarters.  The decision to supply replacement parts inadequate to address the SUA defect was made and implemented from Toyota's California headquarters.

362.  In addition, some of the most renowned cases of sudden acceleration occurred in California.  For example, in August 2009, California Highway Patrol Officer Mark Saylor and his family were killed after the Lexus ES350 they were driving went out of control during an episode of unintended acceleration.  The vehicle crashed into an SUV, ran through a fence, rolled over and burst into flames in San Diego, California.

363.  Toyota's presence is more substantial in California than any other state. Since 1991, it has manufactured 2,454,336 Tacomas and since 1986, 3,000,935 Corollas in California.  It has four "Financial Service Offices" in California, a "Hiro" operation or manufacturing facility, a research and development center, and a design center in California.  It has more employees in California than any other state, with 10,725 "direct employees" and 21,485 "indirect employees."

364.  Lexus is also headquartered in Torrance, California.  Advertisements for Lexus, and decisions on how to respond to customer complaints on SUA, were made in California.

365.  On information and belief, during the class period hundreds of thousands or millions of Defective Vehicles manufactured in Japan have entered the United States at ports in California.

# V.    CLASS ALLEGATIONS

## A.    The Nationwide Consumer Class

366.   Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Nationwide Consumer Class initially defined as follows:

> All individuals or entities who purchased, own or lease a
> Toyota vehicle manufactured, designed or sold in the
> United States with ETCS.

367.   Excluded from the Nationwide Consumer Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries arising from a SUA incident.

368.   The Nationwide Consumer Class pursues claims for violation of the Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.*; violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.*; breach of express warranty under CAL. COM. CODE § 2313; breach of implied warranty of merchantability under CAL. COM. CODE § 2314; revocation of acceptance under CAL. COM. CODE § 2608; violations of the Magnuson-Moss Warranty Act, 15 U.S.C.

- 191 -

§ 2301 *et seq.*; breach of the California common law of contract and warranty; and violation of the California common law of unjust enrichment or restitution.[72]

369.   Pursuant to Rule 23(a)(1), the Nationwide Consumer Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade and commerce involved, the members of the Nationwide Consumer Class are geographically dispersed throughout the United States and joinder of all Nationwide Consumer Class members would be impracticable.  While the exact number of Nationwide Consumer Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are, at least, millions of members of the Nationwide Consumer Class.

370.   Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other members of the Nationwide Consumer Class.  Plaintiffs and other class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of Defective Vehicles.  Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.  Plaintiffs and class members purchased or leased Toyotas that they would not have purchased or leased at all, or for as much as they paid, had they known the truth regarding a SUA defect.  Plaintiffs and the members of the Nationwide Class have all sustained injury in that they overpaid for Toyotas due to Defendants' wrongful conduct.

---

[72] Should the Court decline to apply California law to claims of non-California residents Plaintiffs in both classes will seek leave to amend to allege the applicable laws in the fifty states.

371.   Pursuant to Rule 23(a)(4) and (g)(1), Plaintiffs will fairly and adequately protect the interests of the members of the Nationwide Consumer Class and have retained counsel competent and experienced in class action and consumer fraud litigation.

372.   Pursuant to Rules 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Nationwide Consumer Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  In particular, Toyota has failed to properly repair Subject Vehicles and has failed to adequately implement a brake-override repair.

373.   Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Nationwide Consumer Class and predominate over any questions solely affecting individual members thereof.  Among the common questions of law and fact are as follows:

a.   Whether Toyota had knowledge of the defects prior to its issuance of the current safety recalls;

b.   Whether Toyota concealed defects affecting Defective Vehicles;

c.   Whether Toyota misrepresented the safety of the automotive vehicles at issue;

d.   Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the CLRA;

e.   Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

- 193 -

f.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

g.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

h.      Whether Toyota's business practices, including the manufacture and sale of vehicles with an unintended acceleration defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

i.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

j.      Whether Toyota breached its express warranties regarding the safety and quality of its vehicles;

k.      Whether Toyota breached the implied warranty of merchantability because its vehicles were not fit for their ordinary purpose due to their sudden acceleration defect;

l.      Whether Toyota was unjustly enriched at the expense of Plaintiffs and the Nationwide Consumer Class;

m.      Whether Plaintiffs and class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief; and

n.      The amount and nature of such relief to be awarded to Plaintiffs and the Nationwide Consumer Class.

010172-25 398181 v1

374.   Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Nationwide Consumer Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

**B.**     **Non-Consumer Economic Loss Class**

375.   Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the Commercial Plaintiffs bring this action on behalf of themselves and a Nationwide Commercial Class initially defined as follows:

> All individuals or entities in the United States who
> purchased, leased and/or insured the residual value of a
> Toyota vehicle with ETCS and were engaged in the
> business of vehicle sales, rentals, or providing residual
> value insurance for those vehicles.

Excluded from the Nationwide Commercial Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

- 195 -

376.   The Nationwide Commercial Class pursues claims for violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.*; breach of express warranty under CAL. COM. CODE § 2313; breach of implied warranty of merchantability under CAL. COM. CODE § 2314; revocation of acceptance under CAL. COM. CODE § 2608; breach of the California common law of contract; and common law for fraudulent concealment, unjust enrichment or restitution.

377.   Pursuant to Rule 23(a)(1), the Nationwide Commercial Class is so numerous that joinder of all members is impracticable.  Due to the nature of the trade and commerce involved, the members of the Nationwide Commercial Class are geographically dispersed throughout the United States, and joinder of all Nationwide Commercial Class members would be impracticable.  While the exact number of Nationwide Commercial Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members of the Nationwide Commercial Class.

378.   Pursuant to Rule 23(a)(3), Commercial Plaintiffs' claims are typical of the claims of the other members of the Nationwide Commercial Class.  Commercial Plaintiffs and other class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of Defective Vehicles.  Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.  Commercial Plaintiffs and class members purchased or leased Toyotas for commercial purposes, and they would not have purchased or leased the vehicles, or paid as much as they paid, had they known the truth regarding a SUA defect.  Commercial Plaintiffs and the

- 196 -

members of the Nationwide Commercial Class have all sustained injury in that they overpaid for Toyotas due to Defendants' wrongful conduct and experienced damages from the inability to use the vehicles for the commercial purposes for which they were purchased or leased.

379.   Pursuant to Rule 23(a)(4) and (g)(1), Commercial Plaintiffs will fairly and adequately protect the interests of the members of the Nationwide Commercial Class and California Subclass and have retained counsel competent and experienced in class action and consumer fraud litigation.

380.   Pursuant to Rule 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Nationwide Commercial Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to those classes as a whole.

381.   Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Nationwide Commercial Class and predominate over any questions solely affecting individual members thereof.  Among the common questions of law and fact are as follows:

a.      Whether Toyota had knowledge of the design defects prior to its issuance of the current safety recalls;

b.      Whether Toyota concealed design defects affecting Defective Vehicles;

c.      Whether Toyota misrepresented the safety of the automotive vehicles at issue;

d.      Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

e.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

f.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

g.      Whether Toyota's business practices, including the manufacture and sale of vehicles with a SUA defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

h.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

i.      Whether Toyota breached its express warranties regarding the safety and quality of its vehicles;

j.      Whether Toyota breached the implied warranty of merchantability because its vehicles were not fit for their ordinary purpose due to their sudden acceleration defect;

k.      Whether Toyota was unjustly enriched at the expense of Plaintiffs and the Nationwide Commercial Class;

- 198 -

l.    Whether Commercial Plaintiffs and class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief;

m.    The amount and nature of such relief to be awarded to Commercial Plaintiffs and the Nationwide Commercial Class; and

n.    Whether Defendants committed fraud by intentionally concealing omitted facts.

382.   Pursuant to Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Nationwide Commercial Class members is impracticable.  The prosecution of separate actions by individual members of the Nationwide Commercial Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

**C.    Alternate State Law Classes**

383.   In the event that the Court does not apply California law on a nationwide basis, plaintiffs allege a separate class for each State and the District of Columbia based upon the applicable laws set forth in the alternate state law counts. Each class is defined as follows for the claims asserted under a particular jurisdiction's law:

- 199 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Alabama a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Alaska a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Arizona a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Arkansas a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of California a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Colorado a Toyota vehicle with ETCS.

010172-25 398181 v1

1    During the fullest period allowed by law, all persons or

2    entities, who purchased or leased in the state of

3    Connecticut a Toyota vehicle with ETCS.

4

5

6    During the fullest period allowed by law, all persons or

7    entities, who purchased or leased in the state of Delaware a

8    Toyota vehicle with ETCS.

9

10    During the fullest period allowed by law, all persons or

11    entities, who purchased or leased in the District of

12    Columbia a Toyota vehicle with ETCS.

13

14

15    During the fullest period allowed by law, all persons or

16    entities, who purchased or leased in the state of Florida a

17    Toyota vehicle with ETCS.

18

19

20    During the fullest period allowed by law, all persons or

21    entities, who purchased or leased in the state of Georgia a

22    Toyota vehicle with ETCS.

23

24    During the fullest period allowed by law, all persons or

25    entities, who purchased or leased in the state of Hawaii a

26    Toyota vehicle with ETCS.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Idaho a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Illinois a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Indiana a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Iowa a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Kansas a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Kentucky a Toyota vehicle with ETCS.

- 202 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Louisiana a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Maine a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Maryland a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Massachusetts a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Michigan a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Minnesota a Toyota vehicle with ETCS.

010172-25 398181 v1

1          During the fullest period allowed by law, all persons or

2          entities, who purchased or leased in the state of Mississippi

3          a Toyota vehicle with ETCS.

4

5

6          During the fullest period allowed by law, all persons or

7          entities, who purchased or leased in the state of Missouri a

8          Toyota vehicle with ETCS.

9

10          During the fullest period allowed by law, all persons or

11          entities, who purchased or leased in the state of Montana a

12          Toyota vehicle with ETCS.

13

14

15          During the fullest period allowed by law, all persons or

16          entities, who purchased or leased in the state of Nebraska a

17          Toyota vehicle with ETCS.

18

19

20          During the fullest period allowed by law, all persons or

21          entities, who purchased or leased in the state of Nevada a

22          Toyota vehicle with ETCS.

23

24          During the fullest period allowed by law, all persons or

25          entities, who purchased or leased in the state of New

26          Hampshire a Toyota vehicle with ETCS.

27

28

010172-25 398181 v1

1         During the fullest period allowed by law, all persons or

2         entities, who purchased or leased in the state of New Jersey

3         a Toyota vehicle with ETCS.

4

5

6         During the fullest period allowed by law, all persons or

7         entities, who purchased or leased in the state of New

8         Mexico a Toyota vehicle with ETCS.

9

10        During the fullest period allowed by law, all persons or

11        entities, who purchased or leased in the state of New York

12        a Toyota vehicle with ETCS.

13

14

15        During the fullest period allowed by law, all persons or

16        entities, who purchased or leased in the state of North

17        Carolina a Toyota vehicle with ETCS.

18

19

20        During the fullest period allowed by law, all persons or

21        entities, who purchased or leased in the state of North

22        Dakota a Toyota vehicle with ETCS.

23

24        During the fullest period allowed by law, all persons or

25        entities, who purchased or leased in the state of Ohio a

26        Toyota vehicle with ETCS.

27

28

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Oklahoma a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Oregon a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Pennsylvania a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Rhode Island a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of South Carolina a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of South Dakota a Toyota vehicle with ETCS.

- 206 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Tennessee a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Texas a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Utah a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Vermont a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Virginia a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Washington a Toyota vehicle with ETCS.

010172-25 398181 v1

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of West Virginia a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Wisconsin a Toyota vehicle with ETCS.

During the fullest period allowed by law, all persons or entities, who purchased or leased in the state of Wyoming a Toyota vehicle with ETCS.

384.   As to each state class plaintiffs incorporate by reference the previous allegations as to the Rule 23 requirements.

385.   Counts I-X are asserted on behalf of the nationwide classes and in the event the Court declines to apply California law nationwide, these Counts are asserted on behalf of the California Class.

## COUNT I

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *et seq.*)

386.   The Nationwide Consumer Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

387.   TMC and TMS are "persons" under CAL. CIV. CODE § 1761(c).

388.   Consumer Plaintiffs are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

- 208 -

389.   Consumer Plaintiffs attach as Exhibit A an affidavit that shows venue in this District is proper, to the extent such an affidavit is required by CAL. CIV. CODE § 1780(d).

390.   TMC and TMS both participated in unfair or deceptive acts or practices that violated the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, as described above and below.  TMC and TMS each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the CLRA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

391.   By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, TMC and TMS engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

392.   As alleged above, TMC and TMS made numerous material statements about the safety and reliability of Defective Vehicles that were either false or

010172-25 398181 v1

misleading.  Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

393.   TMC and TMS knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  TMC and TMS nevertheless failed to warn Consumer Plaintiffs about these inherent dangers despite having a duty to do so.

394.   TMC and TMS each owed Consumer Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

a.      Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Consumer Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Consumer Plaintiffs that contradicted these representations.

395.   Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Consumer Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of SUA.

- 210 -

396.   Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Consumer Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

397.   TMC's and TMS's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Consumer Plaintiffs, about the true safety and reliability of Defective Vehicles.

398.   As a result of its violations of the CLRA detailed above, TMC and TMS caused actual damage to Consumer Plaintiffs and, if not stopped, will continue to harm Consumer Plaintiffs.  Consumer Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

399.   Consumer Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the CLRA, and these violations present a continuing risk to Consumer Plaintiffs as well as to the general public.

400.   As early as November 24, 2009, notice was sent to TMS in compliance with CAL. CIV. CODE § 1782.  On information and belief, numerous other notices have been sent, including, on or about June 4, 2010, Consumer Plaintiffs sent a notice and demand letter via certified mail to TMS's principal place of business in

- 211 -

California, thereby satisfying CAL. CIV. CODE § 1782(a).  On or about March 23, 2010, a notice and demand letter was set via certified mail to TMC's headquarters in Japan, where TMC acted with its California subsidiary, TMS, to take actions violating the CLRA, and where TMC otherwise acted in violation of that statute, thereby satisfying CAL. CIV. CODE § 1782(a).  Over thirty days have since passed without TMS or TMC taking, or agreeing to take, the appropriate corrective measures.

401.   Pursuant to CAL. CIV. CODE § 1780(a), Consumer Plaintiffs seek monetary relief against TMS and TMC measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Consumer Plaintiff and each member of the class they seek to represent.

402.   Pursuant to CAL. CIV. CODE § 1780(b), Consumer Plaintiffs seek an additional award against TMS and TMC of up to $5,000 for each Consumer Plaintiff and class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  TMS knew or should have known that its conduct was directed to one or more of the Consumer Plaintiffs who are senior citizens or disabled persons.  TMS's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more of the Consumer Plaintiffs who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or

- 212 -

disability, and each of them actually suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

403.   Consumer Plaintiffs also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Consumer Plaintiffs to cruel and unjust hardship as a result.  Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Consumer Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

404.   The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

405.   Repairs have been incomplete.  For example, Toyota documented an incident with a 2007 Avalon that "unintentionally accelerated with high rotation (7000 rpm) and smoke out from brake.  There was an eyewitness."[73]  The dealer confirmed the "high rotation and not returning to idle" and replaced the pedal and the throttle.  The dealer declined to provide a document saying UA would not recur and refused to buy back the vehicle.  Most of the Recalled Vehicles have not had their throttles replaced.

---

[73] 41241T000,

406.   Consumer Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

## COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

407.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

408.   Plaintiffs assert this claim on behalf of themselves and members of the Nationwide Consumer and Commercial Classes on behalf of all persons or entities that purchased or leased a vehicle from Toyota or a Toyota dealership.

409.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

410.   Defendants have violated the unlawful prong of section 17200 by their violations of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I by the acts and practices set forth in this Complaint.

411.   Defendants have also violated the unlawful prong because TMC and TMS have engaged in business acts or practices that are unlawful because they violate the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

412.   FMVSS 124, codified at 49 C.F.R. § 571.124, sets the standard for accelerator control systems.  Specifically, FMVSS 124 establishes requirements for the return of a vehicle's throttle to the idle position when the driver removes the actuating force from the accelerator control, or in the event of a severance or disconnection in the accelerator control system.  The purpose of FMVSS 124 is to reduce deaths and injuries resulting from engine overspeed caused by malfunctions in the accelerator control system.

413.   FMVSS 124 requires that throttles in passenger vehicles return to the idle position within certain maximum allowable times after the driver has removed the actuating force from the accelerator control:  one second for vehicles of 4,536 kilograms or less gross vehicle weight rating ("GVWR"), two seconds for vehicles of more than 4,536 kilograms GVWR, and three seconds for any vehicle that is exposed to ambient air at – 18 degrees Celsius to – 40 degrees Celsius.

414.   Defective Vehicles equipped with ETCS do not comply with FMVSS 124 because a design defect causes their throttles to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

415.   TMC and TMS each violated 49 U.S.C. § 3-112(a)(1) by manufacturing for sale, selling, offering for introduction in interstate commerce, or importing into the United States, Defective Vehicles equipped with ETCS that failed to comply with FMVSS 124.

416.   TMC and TMS each violated 49 U.S.C. § 30115(a) by certifying that Defective Vehicles equipped with ETCS complied with FMVSS 124 when, in the

- 215 -

010172-25 398181 v1

exercise of reasonable care, TMC and TMS each had reason to know that the certification was false or misleading because a design defect causes throttles in Defective Vehicles equipped with ETCS to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

417.   Defendants have violated the fraudulent prong of section 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

418.   Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanism, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease Defective Vehicles.

419.   The Named Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  As set forth in the allegations concerning each plaintiff, in purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions

- 216 -

1  of Toyota with respect of the safety and reliability of the vehicles.  Toyota's

2  representations turned out not to be true because the vehicles can unexpectedly and

3  dangerously accelerate out of the drivers' control.  Had the Named Plaintiffs known

4  this they would not have purchased or leased their Defective Vehicles and/or paid as

5  much for them.

6

7  420.  All of the wrongful conduct alleged herein occurred, and continues to

8  occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part

9  of a pattern or generalized course of conduct that is still perpetuated and repeated,

10  both in the State of California and nationwide.

11  421.  Plaintiffs request that this Court enter such orders or judgments as may

12  be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or

13  deceptive practices and to restore to Plaintiffs and members of the Class any money

14  Toyota acquired by unfair competition, including restitution and/or restitutionary

15  disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE

16  § 3345; and for such other relief set forth below.

17

18  **COUNT III**

19  **VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**
   **(CAL. BUS. & PROF. CODE § 17500, *et seq.*)**

20

21  422.  Plaintiffs reallege and incorporate by reference all paragraphs alleged

22  herein.

23

24  423.  Plaintiffs assert this claim on behalf of themselves and members of the

25  Nationwide Consumer and Commercial Classes on behalf of any person or entity

26  that purchased or leased a vehicle from Toyota or a Toyota dealership.

27

28

010172-25  398181 v1

424.   California Business and Professions Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

425.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiffs.

426.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

427.   Named Plaintiffs and members of the Classes have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  In purchasing or leasing their vehicles, the Named Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect to the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

out of the drivers' control.  Had the Named Plaintiffs known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

428.   Accordingly, the Named Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain.  One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed.  Both trade-in prices and auction prices for Subject Vehicles have declined as a result of Defendants' misconduct.  This decline in value measures the overpayment, or lost benefit of the bargain, at the time of the Named Plaintiffs' purchases.

429.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

430.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

<div align="center">

**COUNT IV**

**BREACH OF EXPRESS WARRANTY**
**(CAL. COM. CODE § 2313)**

</div>

431.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

<div align="center">- 219 -</div>

432.   This Count is asserted by the Nationwide Consumer and Commercial Classes.

433.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

434.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty that provided for the following:

> *Accelerator pedal failure, except pedal position sensor malfunction*
>
> 36 months or 36,000 miles for the Vehicles and 48 months or 50,000 miles for the Lexus vehicles from the vehicle's date-of-first-use, whichever occurs first.
>
> *Other electronic throttle control system failure including pedal position sensor malfunction*
>
> 60 months or 60,000 miles for the Vehicles and 72 months or 70,000 miles for the Lexus vehicles from the vehicle's date-of-first-use, whichever occurs first.

435.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

436.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, including that:

- 220 -

- The "by-wire' technology used in the Toyota throttles was a safety feature;

- Toyota designed their cars at the forefront of technology to enhance active safety (driving dynamics);

- The use of the electronic throttle control system results in even greater reliability and precision than systems based on hydraulic or mechanical linkages;

- Toyota uses technology to deliver a high level of safety;

- Toyota employs a revolutionary electronic control systems that boosts active safety;

- Toyota's ETCS-i helps improve performance;

- Class-leading passive safety including 5 Star Euro NCAP rating;

- Toyota's ETCS-i is at the forefront of active safety systems;

- Toyota promises advanced safety technology;

- Toyota customers have long counted on the brand for the best in performance, quality and durability;

- To build safe cars, Toyota promises that it gathers information and analyzes why accidents occur and what causes injuries, and that "Toyota analyzes data from real accidents that take place all over the world," which it uses to develop new safety technologies, testing them on actual vehicles before offering them to the public in Toyota's product line-up.  Toyota claims that this "is a perpetual cycle through which Toyota seeks to enhance safety technologies and reduce accidents continuously"; and

- 221 -

- When it comes to the well-being of Toyota drivers and their passengers, Toyota has raised the standard.

437.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Sections IV.A. and I., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

438.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

439.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and Plaintiff Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

440.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

010172-25 398181 v1

441.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles, they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiff Classes were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable pursuant to CAL. CIV. CODE § 1670.5 and/or § 1668.

442.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Consumer Plaintiffs' and the Nationwide Commercial Plaintiff Class's remedies would be insufficient to make Consumer Plaintiffs and the Nationwide Commercial Plaintiff Class whole.

443.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Classes assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Classes of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE §§ 2711 and 2608.

444.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters

- 223 -

and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

445.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Classes have been damaged in an amount to be determined at trial.

## COUNT V

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE § 2314)

446.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

447.   This Count is asserted by the Nationwide Consumer and Commercial Classes.

448.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

449.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to CAL. COM. CODE § 2314.

450.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

- 224 -

451.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

452.   Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

453.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Classes have been damaged in an amount to be proven at trial.

010172-25  398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT VI

## REVOCATION OF ACCEPTANCE
### (CAL. COM. CODE § 2608)

454.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

455.   The Nationwide Consumer and Commercial Plaintiffs assert this claim for revocation of acceptance of their vehicles.  Plaintiffs Kathleen Atwater, Dale Baldesseri, Joel and Lucy Barker, John Geddis, Susan Gonzalez, Matthew Heidenreich, John and Mary Laidlaw, Robert Navarro, Carl Nyquist, Peggie Perkin, Frank Visconi, and Carole Young demanded revocation and the demands were refused.

456.   Plaintiffs and the Classes had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

457.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

458.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

459.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

- 226 -

460.   Plaintiffs and the Classes would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Classes have not re-accepted their Defective Vehicles by retaining them.

461.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Classes.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of SUA (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

462.   Plaintiffs and the Classes provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Classes hereby demand revocation and tender their Defective Vehicles.

463.   Plaintiffs and the Classes would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Classes have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

- 227 -

464.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Classes assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Classes of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE § 2711.

465.   Consequently, Plaintiffs and Class members are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VII

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

466.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.  This Count is asserted by the Nationwide Consumer Plaintiffs and by Plaintiffs Carl Nyquist and Susan Gonzalez.  In the event California law does not apply nationwide this Count is asserted by each state class.

467.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

468.   Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

469.   Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

- 228 -

010172-25 398181 v1

470.   The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

471.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

472.   Toyota's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

473.   Toyota breached these warranties as described in more detail above, but generally by not repairing or adjusting the Defective Vehicles' materials and workmanship defects; providing Defective Vehicles not in merchantable condition and which present an unreasonable risk of sudden unintended acceleration and not fit for the ordinary purpose for which vehicles are used; providing Vehicles that were not fully operational, safe, or reliable; and not curing defects and nonconformities once they were identified.

474.   Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally,

- 229 -

privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

475.   Plaintiffs Susan Gonzalez and Carl Nyquist participated in Toyota's informal dispute resolution mechanism to completion and fully satisfied any obligations under 15 U.S.C. § 2310(a)(3), and also provided Toyota an opportunity to cure, even though no such opportunity is required in these circumstances.

476.   Plaintiffs have engaged in each of Toyota's three steps to customer satisfaction without their concerns being resolved.  Plaintiffs Kathleen Atwater, Joel and Lucy Barker, Susan Chambers, John Geddis, Joseph Hauter, Matthew Heidenreich, Thomas and Connie Kamphaus, John and Mary Laidlaw, Robert Navarro, Carl Nyquist, Peggie Perkin, Mary Ann Tucker, Elizabeth Van Zyl, Frank Visconi, Susan Gonzalez, and Carole Young have contacted their dealerships to discuss their situation with the dealership customer relations manager, without adequate resolution.  Plaintiffs Kathleen Atwater, Dale Baldesseri, Susan Chambers, Susan Gonzalez, Robert Navarro, Carl Nyquist, Peggie Perkin, Sandra Reech, Thomas and Catherine Roe, Mary Ann Tucker, and Elizabeth Van Zyl have called Toyota's Customer Experience Center for assistance in working with the dealership to find a satisfactory solution, without adequate resolution.  And Plaintiffs Susan Gonzalez and Carl Nyquist have submitted claims for free, nonbinding arbitration before the National Center for Dispute Resolution, without adequate resolution.

477.   Even if this were not the case, requiring an informal dispute settlement procedure, or affording Toyota a reasonable opportunity to cure its breach of written warranties, would be unnecessary and futile.  At the time of sale or lease of each Defective Vehicle, Toyota knew, should have known, or was reckless in not knowing

- 230 -

of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

478.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

479.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

480.   Plaintiffs seek to revoke their acceptance of the Defective Vehicles, or, in the alternative, seek all damages, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT VIII

### BREACH OF CONTRACT/COMMON LAW WARRANTY

481.   The Nationwide Consumer Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

482.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under California's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota and/or warranted the quality or nature of those services to Plaintiffs.

483.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

484.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IX

### FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

485.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

486.   This Count is asserted by the Nationwide Consumer Class and Commercial Class.

487.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

488.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of

- 232 -

Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

489.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Classes.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

490.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Classes to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

491.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Classes.

492.   Plaintiffs and the Classes were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Classes' actions were justified.  Defendants

- 233 -

were in exclusive control of the material facts and such facts were not known to the public or the Classes.

493.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the Classes sustained damage.  For those Plaintiffs and the Classes who elect to affirm the sale, these damages, pursuant to CAL. CIV. CODE § 3343, include the difference between the actual value of that which Plaintiffs and the Classes paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Classes who want to rescind the purchase, then those Plaintiffs and the Classes are entitled to restitution and consequential damages pursuant to CAL. CIV. CODE § 1692.

494.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Classes' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT X

### UNJUST ENRICHMENT
### (BASED UPON CALIFORNIA LAW)

495.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

496.   This Count is asserted by the Nationwide Consumer and Commercial Classes for restitution under California law based on Defendants' unjust enrichment.

- 234 -

497.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

498.   Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

499.   Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## ALTERNATE STATE LAW COUNTS

500.   Each of the state law counts is asserted on behalf of each state law class. So for example, the Alaska counts are asserted on behalf of the Alaska class, and the Illinois counts on behalf of the Illinois class.

## ALABAMA

## COUNT I

## VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT

## (Ala. Code § 8-19-1, *et seq.*)

501.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

502.   The conduct of Toyota, as set forth herein, constitutes unfair or deceptive acts or practices, including but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate,

- 235 -

disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

503.   Toyota's actions, as set forth above, occurred in the conduct of trade or commerce.

504.   Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

505.   Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

506.   Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

507.   Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

508.   Pursuant to ALA. CODE § 8-19-8, Plaintiffs will serve the Alabama Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

### COUNT II

### BREACH OF EXPRESS WARRANTY

### (Ala. Code § 7-2-313)

509.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

510.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

511.   In the course of selling its vehicles, Toyota expressly warranted in writing that the vehicles were covered by a Basic Warranty.

512.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the vehicles' materials and workmanship defects.

513.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

514.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

515.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

- 237 -

010172-25 398181 v1

516. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

517. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

518. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

519. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

520. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth

- 238 -

1   in ALA. CODE § 7-2-608, for a revocation of acceptance of the goods, and for a return

2   to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

3   521.   Toyota was provided notice of these issues by numerous complaints

4   filed against it, including the instant complaint, and by numerous individual letters

5   and communications sent by Plaintiffs and members of the Class before or within a

6   reasonable amount of time after Toyota issued the recall and the allegations of

7   vehicle defects became public.

8   522.   As a direct and proximate result of Toyota's breach of express

9   warranties, Plaintiffs and the Class have been damaged in an amount to be

10   determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Ala. Code § 7-2-314)

523.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

524.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

525.   A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to ALA. CODE § 7-2-314.

526.   These Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against

- 239 -

such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

527.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

528.   Plaintiffs and the Class have had sufficient dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class.  Notwithstanding this, privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

529.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

# COUNT IV

## REVOCATION OF ACCEPTANCE

### (Ala. Code § 7-2-608)

530.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

531.    Plaintiffs identified above demanded revocation and the demands were refused.

532.    Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

533.    Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

534.    There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

535.    When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

536.    Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 241 -

010172-25 398181 v1

537.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

538.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

539.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

540.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in ALA. CODE § 7-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 242 -

541.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Alabama Law)

542.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

543.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Alabama's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

544.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

545.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 243 -

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT VI**

**FRAUD BY CONCEALMENT**

**(Based On Alabama Law)**

546.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

547.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

548.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

549.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

- 244 -

550.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase the Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

551.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

552.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

553.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

554.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of

- 245 -

1    punitive damages in an amount sufficient to deter such conduct in the future, which

2    amount is to be determined according to proof.

3                                    **COUNT VII**

4                              **UNJUST ENRICHMENT**

5                              **(Based On Alabama Law)**

6

7        555.   Plaintiffs reallege and incorporate by reference all paragraphs as though

8    fully set forth herein.

9        556.   Toyota had knowledge of the safety defects in its vehicles, which it

10   failed to disclose to Plaintiffs and the Class.

11       557.   As a result of their wrongful and fraudulent acts and omissions, as set

12   forth above, pertaining to the design defect of their vehicles and the concealment of

13   the defect, Toyota charged a higher price for their vehicles than the vehicles' true

14   value and Toyota obtained monies which rightfully belong to Plaintiffs and the Class.

15       558.   Toyota appreciated, accepted and retained the non-gratuitous benefits

16   conferred by Plaintiffs and the Class, who without knowledge of the safety defects

17   paid a higher price for vehicles which actually had lower values.  It would be

18   inequitable and unjust for Toyota to retain these wrongfully obtained profits.

19       559.   Plaintiffs, therefore, are entitled to restitution and seek an order

20   establishing Toyota as constructive trustees of the profits unjustly obtained, plus

21   interest.

**ALASKA**

**COUNT I**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT**

**(Alaska Stat. § 45.50.471, *et seq.*)**

560.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

561.   The Alaska Unfair Trade Practices And Consumer Protection Act ("AUTPCPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "(8) advertising goods or services with intent not to sell them as advertised"; "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged"; and "(14) representing that an agreement confers or involves rights, remedies, or obligations which it does not confer or involve, or which are prohibited by law."  ALASKA STAT. § 45.50.471.

562.   In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in the Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in unlawful trade practices, including representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; omitting material facts in describing the Defective Vehicles; and representing that its warranties confers or involves rights, remedies, or obligations which it does not confer or involve, or which are prohibited by law.

563.   Toyota's misrepresentations and omissions described herein have the capacity or tendency to deceive.  As a result of these unlawful trade practices, Plaintiffs have suffered ascertainable loss.

564.   Plaintiffs and the Class suffered ascertainable loss caused by Toyota's failure to disclose material information.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

565.   Plaintiffs are entitled to recover the greater of three times the actual damages or $500, pursuant to § 45.50.531(a).  Attorneys' fees may also be awarded to the prevailing party pursuant to § 45.50.531(g).

010172-25 398181 v1

# COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (Alaska Stat. § 45.02.314)

566.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

567.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

568.   A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

569.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  As set forth above in detail, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

570.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

571.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

- 249 -

# COUNT III

## REVOCATION OF ACCEPTANCE

### (Alaska Stat. § 45.02.608)

572.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

573.   Plaintiffs identified above demanded revocation and the demands were refused.

574.   Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

575.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

576.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

577.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

578.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

579.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

580.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

581.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in ALASKA STAT. § 45.02.608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

582.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT IV

## UNJUST ENRICHMENT

## (Based On Alaska Law)

583.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

584.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

585.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

586.   Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

587.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

**ARIZONA**

**COUNT I**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Arizona Common Law)**

588.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.  Only Plaintiffs with physical injury to their vehicles assert this claim.

589.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

590.   A warranty that the Defective Vehicles were in merchantable condition is implied by common law in the instant transactions.

591.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

592.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

- 253 -

593.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have suffered damage to the property of their vehicles, in an amount to be proven at trial.  Alternatively, Plaintiffs and the Class seek rescission.

## COUNT II

## IN THE ALTERNATIVE, UNJUST ENRICHMENT

### (Based On Arizona Law)

594.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

595.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

596.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

597.   Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.  There is no justification for Plaintiffs' and the Class' impoverishment and Toyota's related enrichment.

598.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

# ARKANSAS

## COUNT I

## ARKANSAS PRODUCTS LIABILITY ACT

### (Ark. Code Ann. § 16-116-101, *et seq.*)

599.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

600.    Plaintiffs allege Toyota vehicles were defectively designed, manufactured, sold or otherwise placed in the stream of commerce.

601.    Toyota is strictly liable in tort for the Plaintiffs' injuries and damages and the Plaintiffs respectfully rely upon the Doctrine as set forth in RESTATEMENT, SECOND, TORTS § 402(a).

602.    Because of the negligence of the design and manufacture of the Defective Vehicles, by which Plaintiffs were injured and the failure of Toyota to warn Plaintiffs of the certain dangers concerning the operation of the Defective Vehicles which were known to Defendants but were unknown to Plaintiffs, the Defendants have committed a tort.

603.    The Defective Vehicles which caused Plaintiffs' injuries were manufactured by Toyota.

604.    At all times herein material, Defendants negligently and carelessly did certain acts and failed to do other things, including, but not limited to, inventing, developing, designing, researching, guarding, manufacturing, building, inspecting, investigating, testing, labeling, instructing, and negligently and carelessly failing to provide adequate and fair warning of the characteristics, angers and hazards associated with the operation of the vehicles in question to users of the Defective

- 255 -

Vehicles, including, but not limited to, Plaintiffs, and willfully failing to recall or otherwise cure one or more of the defects in the products involved thereby directly and proximately causing the hereinafter described injury.

605.   The Defective Vehicles were unsafe for use by reason of the fact that they were defective.  For example, the Defective Vehicles were defective in their design, guarding, development, manufacture, and lack of permanent, accurate, adequate and fair warning of the characteristics, danger and hazard to the user, prospective user and members of the general public, including, but not limited to, Plaintiffs, and because Defendants failed to recall or otherwise cure one or more defects in the vehicles involved thereby directly and proximately causing the described injuries.

606.   Defendants, and each of them, knew or reasonably should have known that the Defective Vehicles would be purchased and used without all necessary testing or inspection for defects by the Plaintiffs and the Class.

607.   Plaintiffs were not aware of those defects at any time before the incident and occurrence mentioned in this complaint, or else Plaintiffs were unable, as a practical matter, to cure that defective condition.

608.   Plaintiffs used the products in a foreseeable manner.

609.   As a proximate result of the negligence of Defendants, Plaintiffs suffered injuries and damages.

- 256 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (Ark. Code Ann. §§ 4-2-314)

610.    Plaintiffs incorporate the allegations set forth above as is fully set forth herein.

611.    In its manufacture and sale of the Defective Vehicles, Toyota impliedly warranted to Plaintiffs and the Class that its vehicles were in merchantable condition and fit for their ordinary purpose.

612.    The Defective Vehicles were defective and unfit for their ordinary use due to their tendency to accelerate suddenly and dangerously out of the driver's control and lack of a fail-safe mechanism.

613.    Under the Uniform Commercial Code there exists an implied warranty of merchantability.

614.    Toyota has breached the warranty of merchantability by having sold its automobiles with defects such that the vehicles were not fit for their ordinary purpose and Plaintiffs and the Class suffered damages as a result.

## COUNT III

## NEGLIGENCE

## (Under Arkansas Law)

615.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

616.    Plaintiffs are the owners of Toyota vehicles that were manufactured, assembled, designed, assembled, distributed and otherwise placed in the stream of commerce by Defendants.

- 257 -

617.   Toyota had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiffs.  Toyota breached its duty to Plaintiffs and the Class because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles.

618.   Toyota was negligent in its design, development, manufacture, and testing of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that they were prone to sudden and dangerous acceleration and lacked proper fail-safe mechanisms.

619.   Toyota negligently failed to adequately warn and instruct Plaintiffs and the Class of the defective nature of the Defective Vehicles, of the high degree of risk attendant to using them, given that Plaintiffs are Class members and would be ignorant of the said defective.

620.   Whereupon, the Plaintiff respectfully relies upon the RESTATEMENT, SECOND, TORTS 395.

621.   Toyota further breached its duties to Plaintiffs by supplying directly and/or through a third person to be used by such foreseeable persons such as Plaintiffs when:

a.   Toyota knew or had reason to know, that the Defective Vehicles were dangerous or were likely to be dangerous for the use for which they were supplied; and

b.   Toyota failed to exercise reasonable care to inform customers of the dangerous condition, or of the facts under which the Defective Vehicles are likely to be dangerous.

- 258 -

622.   As a result of Toyota's negligence, Plaintiffs and the Class suffered damages.

## COUNT IV

## REVOCATION OF ACCEPTANCE

## (Ark. Code Ann. § 4-2-608)

623.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

624.   Plaintiffs identified above demanded revocation and the demands were refused.

625.   Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

626.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

627.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

628.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

629.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return

- 259 -

immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

630.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

631.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

632.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

633.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in A.C.A. § 4-2-608, for a revocation of acceptance of the goods, and for a return to

- 260 -

Plaintiffs and the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under A.C.A. § 4-2-714(2)-(3).

634.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## NEGLIGENT MISREPRESENTATION/FRAUD

### (Ark. Code Ann. § 4-2-721)

635.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

636.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

637.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

638.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not

- 261 -

known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

639.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase the Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

640.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

641.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

642.   As a result of the misrepresentation concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, pursuant to A.C.A. § 4-2-72, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the

fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages pursuant to A.C.A. § 4-2-72.

643.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## UNJUST ENRICHMENT

### (Based On Arkansas Law)

644.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

645.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

646.   Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

647.   Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

**CALIFORNIA**

**COUNT I**

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES**

**(Cal. Civ. Code §§ 1793.2(D) & 1791.2)**

648.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

649.   Plaintiffs and the Class who purchased the Toyota vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791.

a.   The Toyota vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

650.   Toyota is a "manufacturer" of the Toyota vehicles within the meaning of CAL. CIV. CODE § 1791(j).

651.   Plaintiffs and the Class bought/leased new motor vehicles manufactured by Toyota.

652.   Toyota made express warranties to Plaintiffs and the Class within the meaning of CAL. CIV. CODE §§ 1791.2 and 1793.2, both in its warranty manual and advertising, as described above.

653.   Toyota's vehicles had and continue to have sudden unintended acceleration and lack of brake fail-safe mechanism defects that were and continue to be covered by Toyota's express warranties and these defects substantially impair the use, value, and safety of Toyota's vehicles to reasonable consumers like Plaintiffs and the Class.

- 264 -

654.   Plaintiffs and the Class delivered their vehicles to Toyota or its authorized repair facility for repair of the defects and/or notified Toyota in writing of the need for repair of the defects because they reasonably could not deliver the vehicles to Toyota or its authorized repair facility due to fear of unintended acceleration.

655.   Toyota and its authorized repair facilities failed and continue to fail to repair the vehicles to match Toyota's written warranties after a reasonable number of opportunities to do so.

656.   Plaintiffs and the Class gave Toyota or its authorized repair facilities at least two opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because Toyota or its authorized repair facility refused to attempt the repair.

657.   Toyota did not promptly replace or buy back the vehicles of Plaintiffs and the Class.

658.   As a result of Toyota's breach of its express warranties, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value to Plaintiffs and the Class.  Plaintiffs and the Class have been damaged as a result of the diminished value of the Defendants' products, the products' malfunctioning, and the nonuse of their vehicles.

659.   Pursuant to CAL. CIV. CODE §§ 1793.2 & 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

010172-25 398181 v1

660.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

## COUNT II

### VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Cal. Civ. Code §§ 1792 & 1791.1)

661.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

662.   Plaintiffs and the Class who purchased the Toyota vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791.

663.   The Toyota vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

664.   Toyota is a "manufacturer" of the Toyota vehicles within the meaning of CAL. CIV. CODE § 1791(j).

665.   Toyota impliedly warranted to Plaintiffs and the Class that its vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792, however, the Toyota vehicles do not have the quality that a buyer would reasonably expect.

666.   CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

- 266 -

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

667.   The Toyota vehicles would not pass without objection in the automotive trade because of the sudden acceleration and lack of a brake fail-safe mechanism defects.

668.   Because of the sudden acceleration and lack of a brake fail-safe mechanism defects, they are not safe to drive and thus not fit for ordinary purposes.

669.   The vehicles are not adequately labeled because the labeling fails to disclose the sudden acceleration and lack of a brake fail-safe mechanism defects.

670.   Toyota breached the implied warranty of merchantability by manufacturing and selling vehicles containing a sudden acceleration and lack of a brake fail-safe mechanism defects.  Furthermore, these defects have caused Plaintiffs and the Class to not receive the benefit of their bargain and have caused vehicles to depreciate in value.

671.   As a direct and proximate result of Toyota's breach of the implied warranty of merchantability, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value to Plaintiffs and the Class. Plaintiffs and the Class have been damaged as a result of the diminished value of Toyota's products, the products' malfunctioning, and the nonuse of their vehicles.

672.   Pursuant to CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their

- 267 -

1   election, the purchase price of their vehicles, or the overpayment or diminution in

2   value of their vehicles.

3       673.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the Class are entitled

4   to costs and attorneys' fees.

5                                    **COLORADO**

6                                    **COUNT I**

7   **VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**

8                          **(Col. Rev. Stat. § 6-1-101. et seq.)**

9       674.   Plaintiffs incorporate the allegations set forth above as if fully set forth

10  herein.

11      675.   Defendants are "persons" under § 6-1-102(6) of the Colorado Consumer

12  Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101 *et seq*.

13      676.   Plaintiffs are "consumers" for purposes of § 6-1-113(1)(a) of the

14  Colorado CPA who purchased or leased one or more Defective Vehicles.

15      677.   In the course of their business, Defendants both participated in

16  deceptive trade practices that violated the Colorado CPA, as described above and

17  below.  Defendants each are directly liable for these violations of law.  TMC also is

18  liable for TMS's violations of the Colorado CPA because TMS acts as TMC's

19  general agent in the United States for purposes of sales and marketing.

20      678.   As alleged above, Defendants made numerous material statements about

21  the safety and reliability of the Defective Vehicles that were either false or

22  misleading.  Each of these statements contributed to the deceptive context of

23  Defendants' unlawful advertising and representations as a whole.  Defendants also

24  failed to disclose and actively concealed the dangerous risk of throttle control failure

- 268 -

and the lack of adequate fail-safe mechanisms in the Defective Vehicles equipped
with ETCS.

679.   Defendants engaged in deceptive trade practices prohibited by the
Colorado CPA, including (1) knowingly making a false representation as to the
characteristics, uses, and benefits of the Defective Vehicles that had the capacity or
tendency to deceive Plaintiffs; (2) representing that the Defective Vehicles are of a
particular standard, quality, and grade even though Defendants knew or should have
known they are not; (3) advertising the Defective Vehicles with the intent not to sell
them as advertised; and (4) failing to disclose material information concerning the
Defective Vehicles that was known to Defendants at the time of advertisement or sale
with the intent to induce Plaintiffs to purchase or lease the Defective Vehicles.

680.   Defendants knew that the ETCS in the Defective Vehicles was
defectively designed or manufactured, would fail without warning, and was not
suitable for its intended use of regulating throttle position and vehicle speed based on
driver commands.  Defendants nevertheless failed to warn Plaintiffs about these
inherent dangers despite having a duty to do so.

681.   Defendants' practices significantly the public as actual consumers of the
Defective Vehicles, which pose an unreasonable risk of death or serious bodily injury
to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because
they are susceptible to incidents of sudden unintended acceleration.

682.   Whether or not a vehicle (a) accelerates only when commanded to do so
and (b) decelerates and stops when commanded to do so are facts that a reasonable
consumer would consider important in selecting a vehicle to purchase or lease.
When Plaintiffs bought a Toyota Vehicle for personal, family, or household

- 269 -

purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

683.   Defendants' deceptive practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of the Defective Vehicles.

684.   Plaintiffs suffered injury-in-fact to their legally protected property interests as a result of Defendants' violations of the Colorado CPA detailed above. Plaintiffs currently own or lease, or within the class period have owned or leased, the Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of the Defective Vehicles to plummet.

685.   Pursuant to § 6-1-113(2) of the Colorado CPA, Plaintiffs seek monetary relief against TMS and TMC measured as the greater of (a) the amount of actual damages sustained, (b) statutory damages in the amount of $500 for each Plaintiff, or (c) three times the amount of actual damages if Plaintiffs establish that TMS and TMC engaged in bad faith conduct.

## COUNT II

## BREACH OF EXPRESS WARRANTY

## (Col. Rev. Stat. § 4-2-313)

686.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 270 -

687.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under COL. REV. STAT. § 4-2-104.

688.   In the course of selling its vehicles, Toyota expressly warranted in writing that the vehicles were covered by a Basic Warranty.

689.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

690.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

691.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

692.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

- 271 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

693.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

694.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

695.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

696.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make them whole.

697.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in COL. REV. STAT. § 4-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under COL. REV. STAT. §§ 4-2-711 and 4-2-608.

698.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

699.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (Col. Rev. Stat. § 4-2-314)

700.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

701.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under COL. REV. STAT. § 4-2-104.

702.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to COL. REV. STAT. § 4-2-314.

- 273 -

703.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

704.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

705.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Col. Rev. Stat. § 4-2-608)**

</div>

706.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

707.   Plaintiffs identified above demanded revocation and the demands were refused.

708.   Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have

<div align="center">

- 274 -

</div>

discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

709.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

710.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

711.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

712.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

713.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

714.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs

(and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

715.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

716.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in COL. REV. STAT. § 4-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under COL. REV. STAT. § 4-2-711.

717.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25  398181 v1

**COUNT V**

**BREACH OF COMMON LAW WARRANTY**

**(Based On Colorado Law)**

718.    Plaintiffs incorporate by reference and reallege all paragraphs as though fully set forth herein.

719.    To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Uniform Commercial Code as adopted by Colorado, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

720.    Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

721.    As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT VI**

**FRAUD BY CONCEALMENT**

**(Based On Colorado Law)**

722.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 277 -

723.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles that in equity and good conscience should be disclosed.

724.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

725.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

726.   Defendants actively and knowingly concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase the Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

010172-25 398181 v1

1    727.   Defendants still have not made full and adequate disclosure and

2    continue to defraud Plaintiffs and the Class.

3    728.   Plaintiffs and the Class were unaware of these omitted material facts

4    and would not have acted as they did if they had known of the concealed and/or

5    suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were

6    in exclusive control of the material facts and such facts were not known to the public

7    or the Class.

8    729.   As a result of the concealment and/or suppression of the facts, Plaintiffs

9    and the Class sustained damage.  Plaintiffs and the Class reserve their right to elect

10   either to (a) rescind their purchase or lease of the Defective Vehicles and obtain

11   restitution (b) affirm their purchase or lease of the Defective Vehicles and recover

12   damages.

13   730.   Defendants acts were done fraudulently, maliciously, or willfully for

14   purposes of COL. REV. STAT. § 13-21-102.  Defendants' conduct warrants an

15   assessment of exemplary damages in an amount which is equal to the amount of the

16   actual damages awarded to Plaintiffs and the Class.

### COUNT VII

### UNJUST ENRICHMENT

### (Based On Colorado Law)

731.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

732.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of

- 279 -

the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

733.   Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

734.   Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## CONNECTICUT

### COUNT I

### VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT

### (Conn. Gen. Stat. § 42-110A, *et seq.*)

735.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

736.   The Connecticut Unfair Trade Practices Act ("CUTPA") provides:  "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

737.   Toyota is a person within the meaning of CUTPA.  CONN. GEN. STAT. § 42-110a(3).

738.   In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  This was a deceptive act in that Toyota represented that Defective

- 280 -

Vehicles have characteristics, uses, benefits, and qualities which they do not have; represented that Defective Vehicles are of a particular standard and quality when they are not; and advertised Defective Vehicles with the intent not to sell them as advertised. Toyota knew or should have known that its conduct violated the CUTPA.

739.   Toyota engaged in a deceptive trade practice when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale. Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

740.   Toyota's conduct was unfair because it causes substantial injury to consumers.

741.   The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class. Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

742.   Plaintiffs and the Class suffered ascertainable loss caused by Toyota's deceptive and unfair practices. Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain. The value of their Toyotas have diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

743.   Toyota engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

744.   Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

010172-25 398181 v1

745.   Pursuant to CONN. GEN. STAT. § 42-110g(c), Plaintiffs will mail a copy of the complaint to Connecticut's Attorney General.

## COUNT II

## BREACH OF CONTRACT

### (Based On Connecticut Law)

746.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

747.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Connecticut's Commercial Code, Plaintiffs plead in the alternative under common law and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

748.   Toyota breached this contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

749.   As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

010172-25  398181 v1

# COUNT III

## IN THE ALTERNATIVE, UNJUST ENRICHMENT

### (Based On Connecticut Law)

750.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

751.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

752.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for its vehicles than the vehicles' true value.  Toyota accordingly received a benefit from Plaintiffs to Plaintiffs' detriment.

753.   Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and other Class members, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

754.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## DELAWARE

## COUNT I

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

### (6 Del. Code § 2513, et seq.)

755.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 283 -

756.   The Delaware Consumer Fraud Act ("CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

757.   Toyota is a person with the meaning of 6 DEL. CODE § 2511(7).

758.   As described herein Toyota made false representations regarding the safety and reliability of its vehicles and concealed important facts regarding the tendency of its vehicles to suddenly and uncontrollably accelerate and regarding the lack of a fail-safe mechanism to override this unintended acceleration.  Toyota intended that others rely on these misrepresentations and omissions in connection with the sale and lease of its vehicles.

759.   Toyota's actions as set forth above occurred in the conduct of trade or commerce.

760.   Toyota's conduct proximately caused injuries to Plaintiffs and the Class.

761.   Plaintiffs and the Class were injured as a result of Toyota's conduct in that Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Toyota's misrepresentations and omissions.

762.   Plaintiffs are entitled to recover damages, as well as punitive damages for Toyota's gross and aggravated misconduct.

- 284 -

# COUNT II

## VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT

### (6 Del. Code § 2532, *et seq.*)

763.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

764.   Delaware's Deceptive Trade Practices Act ("DTPA") prohibits a person from engaging in a "deceptive trade practice," which includes:  "(5) Represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(7) Represent[ing] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "(9) Advertis[ing] goods or services with intent not to sell them as advertised"; or "(12) Engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

765.   Toyota is a person with the meaning of 6 Del. Code § 2531(5).

766.   In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles

- 285 -

with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

767.   Toyota's actions as set forth above occurred in the conduct of trade or commerce.

768.   Toyota's conduct proximately caused injuries to Plaintiffs and the Class.

769.   Plaintiffs and the Class were injured as a result of Toyota's conduct in that Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Toyota's misrepresentations and omissions.

770.   Plaintiffs seek injunctive relief and, if awarded damages under Delaware common law or Delaware Consumer Fraud Act, treble damages pursuant to 6 DEL. CODE § 2533(c).

771.   Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Toyota's conduct and its high net worth.

## COUNT III

## BREACH OF EXPRESS WARRANTY

### (6 Del. Code § 2-313)

772.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

773.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

774.   .      In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

- 286 -

775.   4.      Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

776.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities.

777.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

778.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

779.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants

- 287 -

have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

780. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

781. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

782. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

783. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in 6 DEL. CODE. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 288 -

784.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

785.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

### COUNT IV

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (6 Del. Code § 2-314)

786.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

787.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

788.   A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

789.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

790.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

791.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT V

## REVOCATION OF ACCEPTANCE

### (6 Del. Code § 2-608)

792.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

793.   Plaintiffs identified above demanded revocation and the demands were refused.

794.   Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

795.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

796.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

- 290 -

797.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

798.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

799.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

800.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

801.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their

- 291 -

Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

802.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in 6 DEL. CODE § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

803.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VI

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Delaware Law)

804.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

805.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Delaware's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

806.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

807.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

<div align="center">

**COUNT VII**

**IN THE ALTERNATIVE, UNJUST ENRICHMENT**

**(Based On Delaware Law)**

</div>

808.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

809.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

810.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

811.   Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and other Class members, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.  There is no justification for Plaintiffs' and Class' impoverishment and Toyota's related enrichment.

- 293 -

812.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## DISTRICT OF COLUMBIA

## COUNT I

## VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT

### (D.C. Code § 28-3901 *et seq.*)

813.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

814.   Defendants are "persons" under D.C. CODE § 28-3901(a)(1).

815.   Plaintiffs are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Defective Vehicles.

816.   Defendants both participated in unfair or deceptive acts or practices that violated the Consumer Protection Procedures Act ("CPPA"), D.C. CODE § 28-3901, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the CPPA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

817.   By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in unfair or deceptive practices prohibited by the CPPA, D.C. CODE § 28-3901, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard,

- 294 -

quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

818.   Toyota's actions as set forth above occurred in the conduct of trade or commerce.

819.   Toyota's actions affect the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

820.   Plaintiffs and the Class suffered ascertainable loss as a result of Defendant's conduct.  Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

821.   Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

822.   .     Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages. Plaintiffs further allege that Defendants are liable for punitive damages under the CPPA as Defendants acted with a state of mind evincing malice or its equivalent.

010172-25 398181 v1

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(D.C. Code § 28:2-313)**

823.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

824.   Toyota is and was at all relevant times a seller with respect to motor vehicles.

825.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

826.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

827.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

828.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A. of the MCC.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

- 296 -

829.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

830.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

831.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

832.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

833.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or

- 297 -

continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

834.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in D.C. CODE § 28:2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

835.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

836.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (D.C. Code § 28:2-314)

837.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

838.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

839.   A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

840.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

841.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

842.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT IV

### UNJUST ENRICHMENT

### (Based On District Of Columbia Law)

843.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

844.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

845.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of

- 299 -

the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

846.   Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and other Class members, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

847.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

<div align="center">

**COUNT V**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On D.C. Law)**

</div>

848.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

849.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the District of Columbia's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

850.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

010172-25  398181 v1

851.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## FLORIDA

## COUNT I

### VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT

**(Fla. Stat. § 501.201,** *et seq.***)**

852.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

853.   The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

854.   Toyota's actions as set forth above occurred in the conduct of trade or commerce.

855.   Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

- 301 -

856.   Plaintiffs and the Class were injured as a result of Defendants' conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

857.   Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

858.   Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

859.   Pursuant to FLA. STAT. § 501.201, Plaintiffs will serve the Florida Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Fla. Stat. § 672.313)

860.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

861.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

862.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

863.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

864.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

865.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

866.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

867.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

868.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

869.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the

- 303 -

warranties and were inherently defective, and Defendants wrongfully and
fraudulently misrepresented and/or concealed material facts regarding their vehicles.
Plaintiffs and the Class were therefore induced to purchase the vehicles under false
and/or fraudulent pretenses.

870.   Moreover, many of the damages flowing from the Defective Vehicles
cannot be resolved through the limited remedy of "replacement or adjustments," as
those incidental and consequential damages have already been suffered due to
Defendants' fraudulent conduct as alleged herein, and due to their failure and/or
continued failure to provide such limited remedy within a reasonable time, and any
limitation on Plaintiffs' and the Class' remedies would be insufficient to make
Plaintiffs and the Class whole.

871.   Finally, due to the Defendants' breach of warranties as set forth herein,
Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth
in FLA. STAT. § 672-608, for a revocation of acceptance of the goods, and for a return
to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

872.   Toyota was provided notice of these issues by numerous complaints
filed against it, including the instant complaint, and by numerous individual letters
and communications sent by Plaintiffs and the Class before or within a reasonable
amount of time after Toyota issued the recall and the allegations of vehicle defects
became public.

873.   As a direct and proximate result of Toyota's breach of express
warranties, Plaintiffs and the Class have been damaged in an amount to be
determined at trial.

010172-25  398181 v1

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Fla. Stat. § 672.314)**

874.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

875.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

876.   A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to FLA. STAT. § 672.316.

877.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

878.   5.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

879.   Plaintiffs and the Class have had sufficient dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class.  Notwithstanding this, privity is not required in this case

- 305 -

because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and Class' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

880.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Fla. Stat. § 672.608)**

</div>

881.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

882.   Plaintiffs identified above demanded revocation and the demands were refused.

883.   Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

010172-25 398181 v1

884. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

885. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

886. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

887. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

888. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

889. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

- 307 -

890.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

891.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in FLA. STAT. § 672.608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

892.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

## (Based On Florida Law)

893.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

894.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Florida's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct

- 308 -

defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

895.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

896.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

<div align="center">

**COUNT VI**

**FRAUD BY CONCEALMENT**

**(Based On Florida Law)**

</div>

897.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

898.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

899.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not

<div align="center">- 309 -</div>

known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

900.   .   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

901.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

902.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

903.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who

- 310 -

want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

904.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VII

## UNJUST ENRICHMENT

### (Based On Florida Law)

905.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

906.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

907.   .   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

908.   .   Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

010172-25 398181 v1

909.    Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

### GEORGIA

### COUNT I

### VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (Ga. Code Ann. § 10-1-370, *et seq.*)

910.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

911.    The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

912.    Toyota's actions as set forth above occurred in the conduct of trade or commerce.

913.    Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

- 312 -

914.   Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

915.   Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

916.   Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

917.   Pursuant to GA. CODE ANN. § 10-1-370, Plaintiffs will serve the Georgia Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

**COUNT II**

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**

**(Ga. Code Ann. § 10-1-390, *et seq.*)**

918.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

919.   The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

920.   Toyota's actions as set forth above occurred in the conduct of trade or commerce.

921.   Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing

- 313 -

Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

922.   Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

923.   Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

924.   Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

925.   Pursuant to GA. CODE ANN. § 10-1-390, Plaintiffs will serve the Georgia Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

<div align="center">

**COUNT III**

**BREACH OF EXPRESS WARRANTY**

**(Ga. Code Ann. § 11-2-313)**

</div>

926.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

927.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

928.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

929.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has

not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

930.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

931.   .     These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

932.   7.     These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

933.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

- 315 -

934.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

935.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

936.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

937.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in GA. CODE ANN. § 11-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

938.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 316 -

1   amount of time after Toyota issued the recall and the allegations of vehicle defects

2   became public.

3       939.   As a direct and proximate result of Toyota's breach of express

4   warranties, Plaintiffs and the Class have been damaged in an amount to be

5   determined at trial.

6

7                                   **COUNT IV**

8       **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

9                          **(Ga. Code Ann. § 11-2-314)**

10      940.   Plaintiffs reallege and incorporate by reference all paragraphs as though

11  fully set forth herein.

12

13      941.   Toyota is and was at all relevant times a merchant with respect to motor

14  vehicles.

15      942.   A warranty that the Defective Vehicles were in merchantable condition

16  is implied by law in the instant transactions, pursuant to GA. CODE ANN. § 11-2-314.

17      943.   These vehicles, when sold and at all times thereafter, were not in

18  merchantable condition and are not fit for the ordinary purpose for which cars are

19  used.  Specifically, the Defective Vehicles are inherently defective in that there are

20  defects in the vehicle control systems that permit sudden unintended acceleration to

21  occur; the Defective Vehicles do not have an adequate fail-safe to protect against

22  such SUA events, nor do they have a brake-override; and the ETCS system was not

23  adequately tested.

24      944.   Toyota was provided notice of these issues by numerous complaints

25  filed against it, including the instant complaint, and by numerous individual letters

26  and communications sent by Plaintiffs and the Class before or within a reasonable

27

28

                                    - 317 -

amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

945.   Plaintiffs and the Class have had sufficient dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class.  Notwithstanding this, privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

946.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

### COUNT V

### REVOCATION OF ACCEPTANCE

### (Ga. Code Ann. § 11-2-608)

947.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

948.   Plaintiffs identified above demanded revocation and the demands were refused.

- 318 -

949.    Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

950.    Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

951.    There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

952.    When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

953.    Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

954.    These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

- 319 -

955.   Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

956.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

957.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Class assert as an additional and/or alternative remedy, as set forth in GA. CODE ANN. § 11-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

958.   Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

**COUNT VI**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

959.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

960.   To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Georgia's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

961.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

962.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT VII**

**FRAUD BY CONCEALMENT**

**(Ga. Code Ann. § 51-6-2)**

963.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

964.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

- 321 -

965.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

966.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

967.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

968.   Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

969.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or

- 322 -

suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

970.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

971.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VIII

## UNJUST ENRICHMENT

### (Based On Georgia Law)

972.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

973.   Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

- 323 -

974.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

975.   Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and other Class members, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

976.   Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## HAWAII

## COUNT I

## UNFAIR COMPETITION AND PRACTICES

### (Haw. Rev. Stat. § 480, *et seq.*)

977.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

978.   Hawaii's Revised Statute § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"

979.   Toyota's conduct as set forth herein constitutes unfair methods of competition and unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480-2, because Toyota's acts and practices, including the manufacture and sale of vehicles with a sudden acceleration defect that lack brake override or other effective

- 324 -

010172-25 398181 v1

fail-safe mechanism, and Toyota's failure to adequately investigate, disclose and remedy and Toyota's misrepresentations and omissions regarding the safety and reliability of its vehicles, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Toyota's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease Defective Vehicles.

980.   Toyota's misrepresentations and omissions regarding the safety and reliability of its Defective Vehicles were material and caused Plaintiffs to purchase or lease vehicles they would not have otherwise purchased or leased, or paid as much for, had Plaintiffs known the vehicles were defective.

981.   Toyota's acts or practices as set forth above occurred in the conduct of trade or commerce.

982.   Plaintiffs and the Class have suffered injury, including the loss of money or property, as a result of Toyota's unfair methods of competition and unfair or deceptive acts or practices.

983.   In addition to damages in amounts to be proven at trial, Plaintiffs and the Class seek attorneys' fees, costs of suit and treble damages.

984.   Plaintiffs and the Class also seek injunctive relief to enjoin Toyota from continuing its unfair competition and unfair or deceptive acts or practices.

# COUNT II

## VIOLATION OF HAWAII'S UNIFORM DECEPTIVE TRADE PRACTICE ACT

### (Hawaii Rev. Stat. § 481A, *et seq.*)

985.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

986.   2.     Toyota participated in unfair or deceptive acts or practices that violated the Uniform Deceptive Trade Practice Act  ("UDAP"), HAW. REV. STAT. § 481A, *et seq.*, as described herein.

987.   By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Toyota engaged in deceptive business practices prohibited by the UDAP, HAW. REV. STAT. § 481A, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not and (3) advertising Defective Vehicles with the intent not to sell them as advertised.

988.   As alleged above, Toyota made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of Toyota's unlawful advertising and representations as a whole.

989.   5.     Toyota knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on

- 326 -

driver commands.  Toyota nevertheless failed to warn Plaintiffs about these inherent

dangers despite having a duty to do so.

990.   Toyota owed Plaintiffs a duty to disclose the defective nature of

Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS

defects, and the lack of adequate fail-safe mechanisms, because they:

a.      Possessed exclusive knowledge of the defects rendering

Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.      Intentionally concealed the hazardous situation with Defective

Vehicles through their deceptive marketing campaign and recall program that they

designed to hide the life-threatening problems from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of

Defective Vehicles generally, and ETCS in particular, while purposefully withholding

material facts from Plaintiffs that contradicted these representations.

991.   Defective Vehicles equipped with ETCS pose an unreasonable risk of

death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians,

and the public at large, because they are susceptible to incidents of sudden

unintended acceleration.

992.   Whether or not a vehicle (a) accelerates only when commanded to do so

and (b) decelerates and stops when commanded to do so are facts that a reasonable

consumer would consider important in selecting a vehicle to purchase or lease.

When Plaintiffs bought a Toyota Vehicle for personal, family, or household

purposes, they reasonably expected the vehicle would (a) not accelerate unless

commanded to do so by application of the accelerator pedal or other driver controlled

- 327 -

means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

993.   Toyota's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of the Defective Vehicles.

994.   As a result of its violations of the UDAP detailed above, Toyota caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe. ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

995.   Plaintiffs risk irreparable injury as a result of Toyota's acts and omissions in violation of the UDAP, and these violations present a continuing risk to Plaintiffs as well as to the general public.

996.   Plaintiffs seek monetary damages and an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees and any other just and proper relief available under the UDAP.

## COUNT III

## BREACH OF EXPRESS WARRANTY

### (Hawaii Rev. Stat. § 490:2-313)

997.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

998.   Toyota is and was at all relevant times a merchant with respect to motor vehicles.

- 328 -

999.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1000. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1001. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1002. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1003. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1004. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is

- 329 -

insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1005. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1006. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

1007. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1008. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in HAW. REV. STAT. § 490:2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles

- 330 -

currently owned and for such other incidental and consequential damages as allowed under Hawaii law.

1009. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1010. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Haw. Rev. Stat. § 490:2-314)

1011. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1012. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1013. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transactions.

1014. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against

such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1015. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1016. Privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

1017. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT V

## REVOCATION OF ACCEPTANCE

### (Haw. Rev. Stat. § 490:2-608)

1018. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1019. Plaintiffs identified above demanded revocation and the demands were refused.

- 332 -

1020.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1021.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1022.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1023.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1024.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1025.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

- 333 -

1026. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1027. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1028. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in HAW. REV. STAT. § 490:2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under HAW. REV. STAT. § 490:2-608.

1029. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT VI**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On Hawaii Law)**

1030. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1031. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Hawaii's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1032. 3.      Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1033. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT VII**

**UNJUST ENRICHMENT**

**(Based On Hawaii Law)**

1034. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

010172-25  398181 v1

1035.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1036.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1037.  Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## IDAHO

## COUNT I

## VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT

### (Idaho Civ. Code § 48-601, *et seq.*)

1038.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1039.  Defendants are "persons" under IDAHO CIVIL CODE § 48-602(1).

1040.  Plaintiffs are "consumers" who purchased or leased one or more Defective Vehicles.

1041.  Defendants both participated in misleading, false, or deceptive acts that violated the Idaho Consumer Protection Act ("ICPA"), IDAHO CIV. CODE § 48-601, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the ICPA because

- 336 -

TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

1042. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the ICPA, including (1) representing that Defective Vehicles have characteristics, uses, and benefits which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer.

1043. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

1044. Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

1045. Defendants each owed Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.    Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1046. Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden unintended acceleration.

1047. Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

1048. TMC's and TMS's misleading, false, or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

- 338 -

1049.  As a result of its violations of the ICPA detailed above, Defendants caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

1050.  Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the ICPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.

1051.  Plaintiffs also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1052.  The recalls and repairs instituted by Toyota have not been adequate.  Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

1053.  Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's

- 339 -

fees under IDAHO CIVIL CODE § 48-608, and any other just and proper relief available under the ICPA.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Idaho Com. Code § 28-2-313)

1054. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1055. Toyota is and was at all relevant times a merchant with respect to motor vehicles under IDAHO COM. CODE § 28-2-104.

1056. Toyota dealerships who sold Defective Vehicles to Plaintiffs and the Class acted as the agents of TMS and/or TMC. Plaintiffs and the Class therefore were in a relationship of privity with Defendants, to the extent such a relationship is required by IDAHO COM. CODE § 28-2-313.

1057. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1058. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1059. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1060. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise

- 340 -

1   heightened, superior, and state-of-the-art safety, reliability, performance standards,

2   and promote the benefits of ETCS.  These warranties were made, *inter alia*, in

3   advertisements, in Toyota's "e-brochures," and in uniform statements provided by

4   Toyota to be made by salespeople.  These affirmations and promises were part of the

5   basis of the bargain between the parties.

6

7       1061.  These additional warranties were also breached because the Defective

8   Vehicles were not fully operational, safe, or reliable (and remained so even after the

9   problems were acknowledged and a recall "fix" was announced), nor did they

10  comply with the warranties expressly made to purchasers or lessees.  Toyota did not

11  provide at the time of sale, and has not provided since then, vehicles conforming to

12  these express warranties.

13

14      1062.  Furthermore, the limited warranty of repair and/or adjustments to

15  defective parts, fails in its essential purpose because the contractual remedy is

16  insufficient to make the Plaintiffs and the Class whole and because the Defendants

17  have failed and/or have refused to adequately provide the promised remedies within

18  a reasonable time.

19

20      1063.  Accordingly, recovery by the Plaintiffs is not limited to the limited

21  warranty of repair or adjustments to parts defective in materials or workmanship, and

22  Plaintiffs seek all remedies as allowed by law.

23      1064.  Also, as alleged in more detail herein, at the time that Defendants

24  warranted and sold the vehicles they knew that the vehicles did not conform to the

25  warranties and were inherently defective, and Defendants wrongfully and

26  fraudulently misrepresented and/or concealed material facts regarding their vehicles.

27  Plaintiffs and the Class were therefore induced to purchase the vehicles under false

28

- 341 -

and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable pursuant to IDAHO COM. CODE § 28-2-302(1).

1065.  Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1066.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1067.  As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Idaho Com. Code § 28-2-314)

1068.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 342 -

1069. Toyota is and was at all relevant times a merchant with respect to motor vehicles under IDAHO COM. CODE § 28-2-104.

1070. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to IDAHO COM. CODE § 28-2-314.

1071. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1072. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1073. Plaintiffs and the Class have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class. Notwithstanding this, privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty

- 343 -

agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

1074. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Under Idaho Law)**

</div>

1075. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1076. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Idaho's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1077. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1078. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V

## FRAUD BY CONCEALMENT

### (Based On Idaho Law)

1079. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1080. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1081. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1082. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

010172-25 398181 v1

1       1083. Defendants actively concealed and/or suppressed these material facts, in
2  whole or in part, with the intent to induce Plaintiffs and the Class to purchase
3  Defective Vehicles at a higher price for the vehicles, which did not match the
4  vehicles' true value.
5
6       1084. Defendants still have not made full and adequate disclosure and
7  continue to defraud Plaintiffs and the Class.
8       1085. Plaintiffs and the Class were unaware of these omitted material facts
9  and would not have acted as they did if they had known of the concealed and/or
10  suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were
11  in exclusive control of the material facts and such facts were not known to the public
12  or the Class.
13
14      1086. As a result of the concealment and/or suppression of the facts, Plaintiffs
15  and the Class sustained damage.
16      1087. Defendants' acts were done maliciously, oppressively, deliberately, with
17  intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and
18  well-being to enrich Defendants.  Defendants' conduct warrants an assessment of
19  punitive damages in an amount sufficient to deter such conduct in the future, which
20  amount is to be determined according to proof.

21
22                               **COUNT VI**

23                          **UNJUST ENRICHMENT**

24                          **(Based On Idaho Law)**
25
26      1088. Plaintiffs reallege and incorporate by reference all paragraphs as though
27  fully set forth herein.

28

                                    - 346 -

1089.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1090.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1091.  Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## ILLINOIS

## COUNT I

## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (815 Ill. Comp. Stat. 505/1, *et seq.* and 720 Ill. Comp. Stat. 295/1A)

1092.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1093.  The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce.  Specifically, the Act prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

1094.  Defendants are "persons" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILL. COMP. STAT. 505/1(c).

- 347 -

1095. Plaintiffs are "consumers" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILL. COMP. STAT. 505/1(e).

1096. Defendants' conduct caused Plaintiffs' damages as alleged.

1097. As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the Class have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, court costs, and reasonable attorneys' fees pursuant to 815 ILL. COMP. STAT. 505/1, *et seq.*

## COUNT II

**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**

**(815 Ill. Comp. Stat. 510/1, *et. seq.* and 720 Ill. Comp. Stat. 295/1A)**

1098. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1099. 815 ILL. COMP. STAT. 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following:  "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represents that goods or services have sponsorship, approval, characteristics ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; … (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; … (9) advertises goods or services with intent not to

- 348 -

sell them as advertised; … [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

1100. Defendants are "persons" within the meaning of 815 ILL. COMP. STAT. 510/1(5).

1101. The vehicles sold to Plaintiffs were not of the particular sponsorship, approval, characteristics, ingredients, uses benefits, or qualities represented by Defendants.

1102. The vehicles sold to Plaintiffs were not of the particular standard, quality, and/or grade represented by Defendants.

1103. Defendants conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiffs.

1104. As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to proven at trial, including, but not limited to, actual and punitive damages, equitable relief and reasonable attorneys' fees.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (810 Ill. Comp. Stat. 5/2-314
### and 810 Ill. Comp. Stat. 5/2A-212)

1105. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1106. Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting

- 349 -

the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1107. Defendants breached the implied warranty that the vehicle was merchantable and safe for use as public transportation by marketing, advertising, distributing and selling vehicles with the common design and manufacturing defect, without incorporating adequate electronic or mechanical fail-safes, and while misrepresenting the dangers of such vehicles to the public.

1108. These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to the Plaintiffs.

1109. These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

<div align="center">

**COUNT IV**

**BREACH OF EXPRESS WARRANTIES**

**(810 Ill. Comp. Stat. 5/2-313)**

</div>

1110. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1111. Defendants expressly warranted – through statements and advertisements – that the vehicles were of high quality, and at a minimum, would actually work properly and safely.

1112. Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

1113. Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were

and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

## COUNT V

## NEGLIGENCE

### (Based On Illinois Law)

1114. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1115. Toyota is a manufacturer and supplier of automobiles.

1116. Defendants owed Plaintiffs a non-delegable duty to exercise ordinary and reasonable care to properly design, engineer, and manufacture the vehicles against foreseeable hazard and malfunctions including uncontrollable acceleration and lack of proper fail-safe mechanisms.

1117. Defendants owed Plaintiffs a non-delegable duty to exercise ordinary and reasonable care in designing, engineering, and manufacturing the vehicles so that they would function normally, including that they would not accelerate out of control and lack of proper fail-safe mechanisms.

1118. Defendants also owed – and owe – a continuing duty to notify Plaintiffs of the problem at issue and to repair the dangerous defects.

1119. Defendants breached these duties of reasonable care by designing, engineering and manufacturing vehicles that accelerated out of control without proper fail-safe mechanisms, and breached their continuing duty to notify Plaintiffs of these defects.

- 351 -

1120. The foreseeable hazards and malfunctions included, but are not limited to, the sudden and unanticipated and uncontrollable acceleration of these vehicles and lack of proper fail-safe mechanisms.

1121. Plaintiffs did not and could not know of the intricacies of these defects and their latent and dangerous manifestations, or the likelihood of harm there from arising in the normal use of their vehicles.

1122. At all relevant times, there existed alternative designs and engineering which were both technically and economically feasible.  Further, any alleged benefits associated with the defective designs are vastly outweighed by the real risks associated with sudden and uncontrollable acceleration.

1123. The vehicles were defective as herein alleged at the time they left Defendants' factories, and the vehicles reached Plaintiffs without substantial change in the condition in which they were sold.

1124. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages, including, but not limited to, diminution in value, return of lease payments and penalties, and injunctive relief related to future lease payments or penalties.

## COUNT VI

## STRICT PRODUCT LIABILITY (DEFECTIVE DESIGN)

### (Based On Illinois Law)

1125. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1126. Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting,

- 352 -

advertising, distributing and selling Defective Vehicles in the United States, including those owned or leased by the Plaintiffs and the Class.

1127. Defendants knew and anticipated that the vehicles owned or leased by Plaintiffs and the Class would be sold to and operated by purchasers and/or eventual owners or leasors of Defendants' vehicles, including Plaintiffs and the Class. Defendants also knew that these Defective Vehicles would reach the Plaintiffs and the Class without substantial change in their condition from the time the vehicles departed the Defendants' assembly lines.

1128. Defendants designed the Defective Vehicles defectively, causing them to fail to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

1129. Defendants had the capability to use a feasible, alternative, safer design, and failed to correct the design defects.

1130. The risks inherent in the design of Defective Vehicles outweigh significantly any benefits of such design.

1131. Plaintiffs and the Class could not have anticipated and did not know of the aforementioned defects at any time prior to recent revelations regarding the problems of the Defective Vehicles.

1132. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, diminution in value, return of lease payments and penalties, and injunctive relief related to future lease payments or penalties.

010172-25 398181 v1

1133. Plaintiffs and the Class have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

<div align="center">

**COUNT VII**

**STRICT PRODUCT LIABILITY (FAILURE TO WARN)**

**(Based on Illinois Law)**

</div>

1134. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1135. Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting, advertising, distributing and selling Defective Vehicles in the United States, including those owned or leased by the Plaintiffs and the Class.

1136. Defendants, at all times pertinent to this Complaint, knew and anticipated that the Defective Vehicles and their component parts would be purchased, leased and operated by consumers, including Plaintiffs and the Class.

1137. Defendants also knew that these Defective Vehicles would reach the Plaintiffs and the Class without substantial change in their conditions from the time that the vehicles departed the Defendants' assembly lines.

1138. Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the Defective Vehicles, defective design, manufacturing and lack of sufficient warnings which caused them to have an unreasonably dangerous propensity to sudden and unintended acceleration.

010172-25  398181 v1

1139. Defendants failed to adequately warn Plaintiffs and the Class when they became aware of the defect that caused Plaintiffs and the Class' vehicles to be prone to sudden and unintended acceleration.

1140. Defendants also failed to timely recall the vehicles or take any action to timely warn Plaintiffs or the Class of these problems and instead continue to subject Plaintiffs and the Class to harm.

1141. Defendants knew, or should have known, that these defects were not readily recognizable to an ordinary consumer and that consumers would lease, purchase and use these products without inspection.

1142. Defendants should have reasonably foreseen that the sudden and unintended defect in the Defective Vehicles would subject the Plaintiffs and the Class to harm resulting from the defect.

1143. Plaintiffs and the Class have used the Defective Vehicles for their intended purpose and in a reasonable and foreseeable manner.

1144. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VIII

## UNJUST ENRICHMENT

### (Based On Illinois Law)

1145. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

010172-25  398181 v1

1146.  Plaintiffs paid Toyota the value of vehicles that are non-defective, and in exchange, Toyota provided Plaintiffs vehicles that are, in fact, defective.

1147.  Further, Plaintiffs paid Toyota the value for vehicles that would not be compromised by substantial, invasive repairs, and in return received vehicles that require such repairs.

1148.  Further, Plaintiffs paid Toyota for vehicles they could operate, and in exchange, Toyota provided Plaintiffs vehicles that could not be normally operated because their defects posed the possibility of life-threatening injuries or death.

1149.  As such, Plaintiffs conferred a windfall upon Toyota, which knows of the windfall and has retained such benefits, which would be unjust for Toyota to retain.

1150.  As a direct and proximate result of Toyota's unjust enrichment, Plaintiffs have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through their misconduct.

## COUNT IX

## FRAUDULENT CONCEALMENT / FRAUD BY OMISSION

### (Based On Illinois Law)

1151.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1152.  Toyota intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that is highly relevant to their purchasing decision.

1153. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

1154. Defendants knew these representations were false when made.

1155. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

1156. Toyota had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden, extreme acceleration without fail-safe mechanisms because Plaintiffs relied on Toyota's material representations that the vehicles they were purchasing were safe and free from defects.

1157. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

1158. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Toyota knew or recklessly disregarded that its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009.  Toyota intentionally made the false statements in order to sell vehicles.

1159. Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its

- 357 -

vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

1160. As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1161. Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT X

## BREACH OF LEASE / CONTRACT

### (Based On Illinois Law)

1162. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1163. Plaintiffs and the Class entered into lease agreements with Toyota. Plaintiffs and the Class entered into agreements to purchase Toyota vehicles which also directly or indirectly benefited Defendants.

1164. The leases and purchase agreements provided that Plaintiffs and the Class would make payments and in return would receive a new vehicle that would operate properly.

1165. Defendants breached their agreements with Plaintiffs and the Class, because the vehicles sold or leased to Plaintiffs and the Class were defective and not of a quality that reasonably would be expected of a new automobile.

1166. Plaintiffs and the Class have fully performed their duties under the purchase and lease agreements.

- 358 -

1167. Defendants are liable for all damages suffered by Plaintiffs and the Class caused by such breaches of contract.

## INDIANA

## COUNT I

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

## (Ind. Code § 24-5-0.5-3)

1168. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1169. Indiana's Deceptive Consumer Sales Act prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

- 359 -

1170. Toyota is a person with the meaning of IND. CODE § 24-5-0.5-2(2).

1171. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS. Accordingly, Toyota engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

1172. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

1173. Toyota's conduct proximately caused injuries to Plaintiffs and the Class.

1174. Plaintiffs and the Class were injured as a result of Toyota's conduct in that Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Toyota's misrepresentations and omissions.

1175. Plaintiffs seek injunctive relief and, if awarded damages under Indiana Deceptive Consumer Protection Act, treble damages pursuant to IND. CODE § 24-5-0.5-4(a)(1).

1176. Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Toyota's conduct and its high net worth.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

## BREACH OF EXPRESS WARRANTY

## (Ind. Code § 26-1-2-313)

1177. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1178. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1179. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1180. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1181. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities.

1182. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1183. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the

- 361 -

problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1184. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1185. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1186. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles.  Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

1187. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any

- 362 -

limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1188. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in IND. CODE § 26-1-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1189. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1190. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Ind. Code § 26-1-2-314)

1191. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1192. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1193. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

- 363 -

1194. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1195. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1196. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT IV

## REVOCATION OF ACCEPTANCE

### (Ind. Code § 26-1-2-608)

1197. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1198. Plaintiffs identified above demanded revocation and the demands were refused.

1199. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have

- 364 -

discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1200.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1201.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1202.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1203.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1204.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1205.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs

(and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1206. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1207. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in IND. CODE § 26-1-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1208. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

<div align="center">

**COUNT V**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On Indiana Law)**

</div>

1209. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

<div align="center">- 366 -</div>

1210. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Indiana's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1211. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1212. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## IN THE ALTERNATIVE, UNJUST ENRICHMENT

### (Based On Indiana Law)

1213. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1214. Toyota had knowledge of the safety defects in its vehicles, which it failed to, disclose to Plaintiffs and the Class.

1215. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

010172-25 398181 v1

1216. Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.  There is no justification for Plaintiffs' and the Class' impoverishment and Toyota's related enrichment.

1217. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

<div align="center">

**COUNT VII**

**FRAUDULENT CONCEALMENT**

**(Based On Indiana Law)**

</div>

1218. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1219. Toyota intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that is highly relevant to their purchasing decision.

1220. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

1221. Defendants knew these representations were false when made.

1222. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

1223. Toyota had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms because Plaintiffs relied on Toyota's material representations that the vehicles they were purchasing were safe and free from defects.

1224. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

1225. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Toyota knew or recklessly disregarded that its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009.  Toyota intentionally made the false statements in order to sell vehicles.

1226. Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

010172-25  398181 v1

1227.  As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1228.  Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiffs and the Class are therefore entitled to an award of punitive damages.

## IOWA

## COUNT I

## VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT

### (Iowa Code § 714H.1, *et seq.*)

1229.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1230.  Defendants are "persons" under IOWA CODE § 714H.2(7).

1231.  Plaintiffs are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Defective Vehicles.

1232.  Defendants both participated in unfair or deceptive acts or practices that violated Iowa's Private Right of Action for Consumer Fraud Act ("Iowa CFA"), IOWA CODE § 714H.1, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the Iowa CFA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

- 370 -

1233. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the Iowa CFA, IOWA CODE § 714H.1, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false or deceptive to the consumer.

1234. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

1235. Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands. Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

1236. Defendants each owed Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

a. Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

- 371 -

b.      Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1237. Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden unintended acceleration.

1238. Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Plaintiffs bought a Toyota vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

1239. TMC's and TMS's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

1240. As a result of its violations of the Iowa CFA detailed above, Defendants caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or

- 372 -

leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

1241.  Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the Iowa CFA, and these violations present a continuing risk to Plaintiffs as well as to the general public.

1242.  Plaintiffs and the Class sustained damaged as a result of the Defendants' unlawful acts and are, therefore, entitled to damages and other relief as provided under Chapter 714H of the Iowa CFA.  Because Defendants' conduct was committed willfully, Plaintiffs seek treble damages as provided in IOWA CODE § 714H.5(4).

1243.  Plaintiffs also seek court costs and attorneys fees as a result of Defendant's violation of Chapter 714H as provided in IOWA CODE § 714H.5(2).

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Iowa Code § 554.2313)

1244.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1245.  Toyota is and was at all relevant times a merchant with respect to motor vehicles under IOWA CODE § 544.2104.

1246.  In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1247.  Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has

- 373 -

not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1248. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1249. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1250. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1251. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

- 374 -

1252. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable .

1253. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1254. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in IOWA CODE § 554.2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under IOWA CODE §§ 544.2711and 544.2608.

1255. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 375 -

010172-25 398181 v1

amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1256. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Iowa Code § 544.2314)

1257. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1258. Toyota is and was at all relevant times a merchant with respect to motor vehicles under IOWA COM. CODE § 544.2104.

1259. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to IOWA CODE § 544.2314.

1260. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1261. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 376 -

amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1262. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Iowa Code § 544.2608)**

</div>

1263. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1264. Plaintiffs identified above demanded revocation and the demands were refused.

1265. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1266. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1267. There has been no substantial change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1268. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

<div align="center">- 377 -</div>

1269. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1270. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1271. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1272. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

- 378 -

1273. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in IOWA CODE § 544.2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under IOWA CODE § 544.2711.

1274. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Iowa Law)

1275. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1276. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Uniform Commercial Code as adopted in Iowa, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1277. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

- 379 -

1278.  As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

### COUNT VI

### FRAUD BY CONCEALMENT

### (Based On Iowa Law)

1279.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1280.  Defendants had a duty to disclose the above-described safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1281.  In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material

safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

1282. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1283. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1284. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1285. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.

1286. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT VII**

**UNJUST ENRICHMENT**

**(Based On Iowa Law)**

1287. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1288. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1289. Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1290. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

**KANSAS**

**COUNT I**

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**

**(Kan. Stat. Ann. § 50-623, *et seq.*)**

1291. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1292. Defendants are "suppliers" under § 50-624(*l*) of the Kansas Consumer Protection Act ("Kansas CPA")

- 382 -

1293. Plaintiffs are "consumers," as defined by § 50-624(b) of the Kansas CPA, who purchased or leased one or more Defective Vehicles.

1294. Defendants both participated in deceptive acts or practices that violated the Kansas CPA, as described above and below. Defendants each are directly liable for these violations of law. TMC also is liable for TMS's violations of the CLRA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

1295. Defendants engaged in deceptive acts or practices prohibited by the Kansas CPA, including (1) representing that Defective Vehicles have characteristics, uses, and benefits that they do not have and (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are of another which differs materially from the representation. Specifically, as alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

1296. Defendants knew or had reason to know that its representations were false. Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands. Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

1297. Defendants engaged in further deceptive acts or practices prohibited by the Kansas CPA by willfully failing to disclose or willfully concealing, suppressing,

- 383 -

or omitting material facts about Defective Vehicles.  Specifically, Defendants failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS.  Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  Defendants nevertheless failed to warn Plaintiffs and the Class about these inherent dangers despite having a duty to do so.

1298.  Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

1299.  Defendants' acts or practices alleged above are unconscionable because, among other reasons, Defendants knew or had reason to know they had had made misleading statements of opinion on which Plaintiffs were likely to rely to their detriment.

1300.  Defendants' deceptive and unconscionable acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles as a result of Defendants' violations of the Kansas CPA.

- 384 -

010172-25  398181 v1

1301. Plaintiffs and the Class suffered loss as a result of Defendants' violations of the Kansas CPA detailed above.  Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

1302. Pursuant to § 50-634(b) of the Kansas CPA, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) civil penalties provided for by § 50-636 of the Kansas CPA.

1303. Plaintiffs also seek punitive damages against Defendants because they acted willfully, wantonly, fraudulently, or maliciously.  Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1304. Plaintiffs risk irreparable injury as a result of Defendants' deceptive and unconscionable acts or practices in violation of the Kansas CPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.

1305. The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

1306. Plaintiffs and the Class further seek an order enjoining Defendants' deceptive and unconscionable acts or practices, restitution, punitive damages, costs of Court, attorney's fees, and any other just and proper relief available under the Kansas CPA.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Kan. Stat. Ann. § 84-2-313)

1307. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1308. Toyota is and was at all relevant times a merchant with respect to motor vehicles under KAN. STAT. ANN. § 84-2-104.

1309. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1310. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1311. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities as set forth above.

1312. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in

- 386 -

advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

1313. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1314. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1315. Accordingly, recovery by the Plaintiffs and the Class is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs and the Class seek all remedies as allowed by law.

1316. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses. The enforcement under these circumstances of any

limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

1317. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1318. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in KAN. STAT. ANN. § 84-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under KAN. STAT. ANN. §§ 84-2-711 and 84-2-608.

1319. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1320. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

010172-25 398181 v1

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Kan. Stat. Ann. § 84-2-314)

1321. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1322. Plaintiffs are "natural persons" within the meaning of KAN. STAT. ANN. § 84-2-318.

1323. Toyota is and was at all relevant times a merchant with respect to motor vehicles under KAN. STAT. ANN. § 84-2-104.

1324. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to KAN. STAT. ANN. § 84-2-314.

1325. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1326. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1327. Privity is not required because the Defective Vehicles are inherently dangerous.

1328. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Kan. Stat. Ann. § 84-2-608)**

</div>

1329. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1330. Plaintiffs identified above demanded revocation and the demands were refused.

1331. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1332. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1333. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1334. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' and the Class' purchase price and monies paid.

1335. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1336. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1337. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1338. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

- 391 -

1339. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in KAN. STAT. ANN. § 84-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under KAN. STAT. ANN. § 84-2-711.

1340. To the extent such allegations are necessary, Plaintiffs allege that authorized Toyota dealers from whom Plaintiffs purchased defective vehicles acted as the agents of TMS and/or TMC. Plaintiffs further allege, to the extent such allegations are necessary, that Toyota's warranties failed of their essential purpose. Plaintiffs further allege, to the extent such allegations are necessary, that Toyota's warranty and the purchase contracts for Defective Vehicles were received by Plaintiffs as a single agreement.

1341. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Kansas Law)

1342. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1343. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Uniform Commercial Code as adopted in Kansas, Plaintiffs and

- 392 -

the Class plead in the alternative under common law warranty and contract law.

Toyota limited the remedies available to Plaintiffs and the Class to just repairs and

adjustments needed to correct defects in materials or workmanship of any part

supplied by Toyota, and/or warranted the quality or nature of those services to

Plaintiffs.

1344. Toyota breached this warranty or contract obligation by failing to repair

the Defective Vehicles evidencing a sudden unintended acceleration problem,

including those that were recalled, or to replace them.

1345. To the extent such allegations are necessary, Plaintiffs and the Class

allege that they relied on Toyota's common law warranties.

1346. As a direct and proximate result of Defendants' breach of contract or

common law warranty, Plaintiffs and the Class have been damaged in an amount to

be proven at trial, which shall include, but is not limited to, all compensatory

damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## FRAUD BY CONCEALMENT

### (Based On Kansas Law)

1347. Plaintiffs reallege and incorporate by reference all paragraphs as though

fully set forth herein.

1348. As set forth above, Defendants concealed and/or suppressed material

facts concerning the safety of their vehicles.

1349. Defendants had a duty to disclose these safety issues because they

consistently marketed their vehicles as safe and proclaimed that safety is one of

Toyota's highest corporate priorities.  Once Defendants made representations to the

- 393 -

public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1350.  In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

1351.  Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1352.  Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1353.  Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

- 394 -

1354.  As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of Defective Vehicles and obtain restitution (b) affirm their purchase or lease of Defective Vehicles and recover damages.

1355.  Defendants' acts were done willfully, wantonly, fraudulently, or maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# COUNT VII

## UNJUST ENRICHMENT

### (Based On Kansas Law)

1356.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1357.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1358.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

- 395 -

1359. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## KENTUCKY

## COUNT I

## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT

### (Ky. Rev. Stat. § 367.110, *et seq.*)

1360. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1361. Defendants misrepresented the safety of the Defective Vehicles after learning of their defects with the intent that Plaintiffs relied on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1362. Plaintiffs did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1363. Through those misleading and deceptive statements and false promises, Defendants violated the Kentucky Consumer Protection Act ("KCPA").

1364. The KCPA applies to Defendants' transactions with Plaintiffs because Defendants' deceptive scheme was carried out in Kentucky and affected Plaintiffs.

1365. Defendants also failed to advise NHSTA and the public about what they knew about the sudden and unintended acceleration defects in the Defective Vehicles.

1366. Plaintiffs relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Defective Vehicles.

- 396 -

1367. As a direct and proximate result of Defendants' deceptive conduct and violation of the KCPA, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT II

## BREACH OF EXPRESS WARRANTY

## (Ky. Rev. Stat. § 355.2-313)

1368. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1369. Defendants expressly warranted – through statements and advertisements described above – that the vehicles were of high quality, and at a minimum, would actually work properly and safely.

1370. Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

1371. Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

## COUNT III

## BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY

## (Ky. Rev. Stat. § 335.2-314)

1372. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1373. Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1374. As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety slow and stop the vehicle when such acceleration occurred.

1375. These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to Plaintiffs. Furthermore, because of these dangerous defects, Plaintiffs did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

1376. These dangerous defects were the direct and proximate cause of damages to the Plaintiffs and the Class.

### COUNT IV

### FRAUDULENT CONCEALMENT

### (Based On Kentucky Law)

1377. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1378. Toyota intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiff and the Class information that is highly relevant to their purchasing decision.

- 398 -

1379. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

1380. Defendants knew these representations were false when made.

1381. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe, and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

1382. Toyota had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms because Plaintiffs relied on Toyota's material representations that the vehicles they were purchasing were safe and free from defects.

1383. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

1384. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Toyota knew or recklessly disregarded that its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009. Toyota intentionally made the false statements in order to sell vehicles.

1385. Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its

vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

1386. As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1387. Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of punitive damages.

<div align="center">

**COUNT V**

**UNJUST ENRICHMENT**

**(Based On Kentucky Law)**

</div>

1388. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1389. Plaintiffs paid Toyota the value of vehicles that are non-defective, and in exchange, Toyota provided Plaintiffs vehicles that are, in fact, defective.

1390. Further, Plaintiffs paid Toyota the value for vehicles that would not be compromised by substantial, invasive repairs, and in return received vehicles that require such repairs.

1391. Further, Plaintiffs paid Toyota for vehicles they could operate, and in exchange, Toyota provided Plaintiffs vehicles that could not be normally operated because their defects posed the possibility of life-threatening injuries or death.

1392. As such, Plaintiffs conferred a windfall upon Toyota, which knows of the windfall and has retained such benefits, which would be unjust for Toyota to retain such benefits

<div align="center">- 400 -</div>

1393.  As a direct and proximate result of Toyota's unjust enrichment, Plaintiffs have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through their misconduct.

## LOUISIANA

## COUNT I

## LOUISIANA PRODUCTS LIABILITY ACT

### (La. Rev. Stat. § 9:2800.51, *et seq.*)

1394.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1395.  Plaintiffs allege that Toyota has defectively designed, manufactured, sold or otherwise placed in the stream of commerce Defective Vehicles as set forth above.

1396.  The product in question is unreasonably dangerous for the following reasons:

a.      It is unreasonably dangerous in construction or composition as provided in LA. REV. STAT. § 9:2800.55;

b.      It is unreasonably dangerous in design as provided in LA. REV. STAT. § 9:2800.56;

c.      It is unreasonably dangerous because an adequate warning about the product was not provided as required by LA. REV. STAT. § 9:2800.57; and

d.      It is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product that render it unreasonably

- 401 -

dangerous under LA. REV. STAT. § 9:2800.55, *et seq.*, that existed at the time the product left the control of the manufacturer.

1397. Toyota knew and expected for the Defective Vehicles to eventually be sold to and operated by purchasers and/or eventual owners of the Defective Vehicles, including Plaintiffs; consequently, Plaintiffs were an expected user of the product which Toyota manufactured.

1398. The Defective Vehicles reached Plaintiffs without substantial changes in their condition from time of completion of manufacture by Toyota.

1399. The defects in the Defective Vehicles could not have been contemplated by any reasonable person expected to operate the Defective Vehicles, and, therefore, presented an unreasonably dangerous situation for expected users of the Defective Vehicles even though the Defective Vehicles were operated by expected users in a reasonable manner.

1400. As a direct and proximate cause of Toyota's design, manufacture, assembly, marketing, and sales of the Defective Vehicles, Plaintiffs have sustained and will continue to sustain the loss of use of his/her vehicle, economic losses and consequential damages, and are therefore entitled to compensatory relief according to proof, and entitled to a declaratory judgment that Toyota is liable to Plaintiffs for breach of its duty to design, manufacture, assemble, market, and sell a safe product, fit for its reasonably intended use.  Plaintiffs allege that the unintended acceleration events are the type of occurrences which would not happen in the absence of a defective product.  Plaintiffs allege the application of res ipsa loquitur under Louisiana Products Liability Law.

- 402 -

# COUNT II

# REDHIBITION

## (LA. Civ. Code Art. 2520, *et seq*. and 2545)

1401. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1402. Plaintiffs allege that Toyota defectively designed, manufactured, sold or otherwise placed in the stream of commerce vehicles that are defective.

1403. Plaintiffs allege that the unintended acceleration events are the type of occurrences which would not happen in the absence of a defective product. Plaintiffs allege the application of res ipsa loquitur under Louisiana Products Liability Law.

1404. Plaintiffs allege that Defendants have known about safety hazards that result in unexpected accelerations of its vehicles for a number of years and has failed to adequately address those safety concerns.

1405. Defendants, as manufacturer of the Defective Vehicles, are responsible for damages caused by the failure of its product to conform to well-defined standards.  In particular, the vehicles contain vices or defects which rendered them useless or their use so inconvenient and unsafe that a reasonable buyer would not have purchased them.  Defendants manufactured, sold and promoted the vehicles and placed the vehicles into the stream of commerce.  Under Louisiana Law, the seller and manufacturer warrants the buyer against redhibitory defects or vices in the things sold.  LA. CODE CIV. P. Art. 2520.  The vehicles as sold and promoted by Defendants possessed redhibitory defects because they were not manufactured and marketed in accordance with industry standards and/or were unreasonably dangerous as described

- 403 -

above, which rendered the vehicles useless or their use so inconvenient and unsafe that it must be presumed that a buyer would not have bought the vehicles had he/she known of the defect.  Pursuant to LA. CODE CIV. P. Art. 2520, Plaintiffs are entitled to obtain a rescission of the sale of the subject product.

1406. The vehicles alternatively possess redhibitory defects because the vehicles were not manufactured and marketed in accordance with industry standards and/or were unreasonably dangerous as described above, which diminished the value of the vehicles so that it must be presumed that a reasonable buyer would still have bought the vehicles, but for a lesser price, had the redhibitory defects been disclosed. In this instance, Plaintiffs are entitled to a reduction of the purchase price.

1407. As the manufacturer of the vehicle, under Louisiana Law, defendants are deemed to know that the vehicle contained redhibitory defects pursuant to LA. CODE CIV. P. Art. 2545.  Toyota is liable as a bad faith seller for selling a defective product with knowledge of defects and thus is liable to Plaintiffs for the price of the subject product, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject product, and attorney's fees.

1408. Due to the defects and redhibitory vices in the Toyotas sold to Plaintiffs, they have suffered damages under Louisiana Law.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR ORDINARY USE

### (La. Civ. Code Art. 2524)

1409. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 404 -

1410. At all relevant times, Toyota marketed, sold and distributed the automobile for use by Plaintiffs, knew of the use for which the Defective Vehicles were intended, and impliedly warranted them to be fit for ordinary use.

1411. The Defective Vehicles, when sold, were defective, unmerchantable, and unfit for ordinary use.

1412. The Defective Vehicles contain vices or defects which render them either absolutely useless or render their use inconvenient, imperfect, and unsafe such that Plaintiffs would not have purchased the Defective Vehicles had they known of the vices or defects.

1413. The damages in question arose from the reasonably anticipated use of the product in question.

1414. Toyota breached the implied warranties of merchantability and fitness for ordinary use when the Defective Vehicles were sold to Plaintiffs because they have a tendancy to accelerate suddenly and dangerously out of the driver's control and lack a fail-safe mechanism to override unintended acceleration.

1415. As a direct and proximate cause of Toyota's breach of the implied warranties of merchantability and fitness for ordinary use, Plaintiffs and the Class have suffered injuries and damages.

## COUNT IV

## NEGLIGENCE

## (La. Civ. Code Art. 2315)

1416. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 405 -

1417. Toyota had a duty to Plaintiffs to provide a safe product in design and manufacture, to notify NHTSA, and to warn NHTSA of the defective nature of the Defective Vehicles.

1418. Toyota breached its duty of reasonable care to Plaintiffs by designing the Defective Vehicles in such a manner that they are prone to accelerate suddenly and dangerously out of the driver's control and lack a fail-safe mechanism to override unintended acceleration.

1419. Toyota breached its duty of reasonable care to Plaintiffs by manufacturing and/or assembling the Defective Vehicles in such a manner that they are prone accelerate suddenly and dangerously out of the driver's control and lack a fail-safe mechanism to override unintended acceleration.

1420. Toyota breached its duty of reasonable care to Plaintiffs by failing to recall the Defective Vehicles at the earliest possible date.

1421. Toyota breached its duty of reasonable care to Plaintiffs by failing to exercise due care under the circumstances.

1422. As a direct and proximate result of Toyota's negligence as set forth in the preceding paragraphs, Plaintiffs have sustained and will continue to sustain the loss of use of their vehicles, economic losses, consequential damages and other damages and are entitled to compensatory damages, and equitable and declaratory relief according to proof.

1423. Toyota's egregious misconduct alleged above warrants the imposition of punitive damages against Toyota to prevent such future behavior.

010172-25 398181 v1

# MAINE

## COUNT I

### VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT

### (Me. Rev. Stat. Ann. tit. 5 § 205-A, *et seq*.)

1424. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1425. The Maine Unfair Trade Practices Act ("UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." per ME. REV. STAT. ANN. TIT. 5 § 207.

1426. The advertising and sale of motor vehicles by Toyota constitutes "trade or commerce" within the meaning of UTPA per ME. REV. STAT. ANN. TIT. 5 § 206(3).

1427. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above. This was a deceptive act in that Toyota represented that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; represented that Defective Vehicles are of a particular standard and quality when they are not; and advertised Defective Vehicles with the intent not to sell them as advertised. Toyota knew or should have known that its conduct violated the UTPA.

1428. Toyota engaged in a deceptive trade practice when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale. Toyota deliberately withheld the information about the vehicles'

- 407 -

propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1429. The information withheld was material in that it was information that was important to consumers and likely to affect their choice of, or conduct regarding, the purchase of their cars.  Toyota's withholding of this information was likely to mislead consumers acting reasonably under the circumstances.  The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class.  Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

1430. Toyota's conduct has caused or is to cause a substantial injury that is not reasonably avoided by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition

1431. As a result of Toyota's deceptive and unfair practices, Plaintiffs and the Class have suffered loss of money or property.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyotas have diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

1432. Plaintiffs are entitled to actual damages, restitution and such other equitable relief, including an injunction, as the Court determines to be necessary and proper.

1433. Pursuant to ME. REV. STAT. ANN. TIT. 5 § 213(3), Plaintiffs will mail a copy of the complaint to Maine's Attorney General.

# COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Me. Rev. Stat. Ann. tit. 11 § 2-314)

1434. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1435. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1436. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

1437. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1438. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1439. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

# COUNT III

## REVOCATION OF ACCEPTANCE

### (Me. Rev. Stat. Ann. tit. 11 § 2-608)

1440. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1441. Plaintiffs identified above demanded revocation and the demands were refused.

1442. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1443. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1444. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1445. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1446. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 410 -

1447. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1448. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1449. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1450. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

- 411 -

**COUNT IV**

**BREACH OF CONTRACT**

**(Based On Maine Law)**

1451. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1452. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Maine's Commercial Code, Plaintiffs plead in the alternative under common law contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1453. Toyota breached this contractual obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1454. As a direct and proximate result of Defendants' breach of contract warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**

**UNJUST ENRICHMENT**

**(Based On Maine Law)**

1455. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 412 -

1456.  Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

1457.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

1458.  Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

1459.  Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

**MARYLAND**

**COUNT I**

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**

**(Md. Code Com. Law § 13-101, *et seq.*)**

1460.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1461.  Plaintiffs are persons within the meaning of the Maryland Consumer Protection Act (the "Act") for all purposes therein.

1462.  Toyota is a person within the meaning of the Act for all purposes therein.

- 413 -

1463. The false, deceptive and misleading statements and representations made by Toyota alleged above and below are Unfair and Deceptive Trade Practices within the meaning of the Act.

1464. Toyota participated in unfair or deceptive acts or practices that violated the Act, as described above and below, and those unfair and deceptive trade practices occurred or were committed in the course, vocation or occupation of Defendants' businesses.  Toyota engaged in the unfair and deceptive trade practices and each are directly liable for these violations of law.

1465. The Unfair and Deceptive Trade Practices as alleged above and below significantly impact the public as actual or potential customers of Toyota.

1466. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Toyota engaged in deceptive business practices prohibited by the Act, including, but not limited to, (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

1467. As alleged above, Toyota made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each

- 414 -

of these statements contributed to the deceptive context of Toyota's unlawful advertising and representations as a whole.

1468. Toyota's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

1469. As a direct and proximate result of their unfair and deceptive business practices, and violations of the Act detailed above, Toyota caused actual damages, injuries, and losses to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe. ETCH defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

1470. Plaintiffs are entitled to all damages permitted by M.R.S § 13-101, *et seq.*, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action.  Also, the State of Maryland is entitled to statutory penalties from defendants for each violation of the Act.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Md. Code Com. Law § 2-313)

1471. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1472. Toyota is and was at all relevant times a merchant as defined by the Uniform Commercial Code.

- 415 -

010172-25 398181 v1

1473. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1474. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1475. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1476. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS. These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

1477. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1478. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is

- 416 -

insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1479. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1480. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

1481. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1482. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MD. CODE COM. LAW § 2-608 for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently.

1483. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1484. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Md. Code Com. Law § 2-314)

1485. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1486. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1487. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transactions.

1488. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

- 418 -

1489. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1490. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT IV

## REVOCATION OF ACCEPTANCE

## (Md. Code Com. Law § 2-608)

1491. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1492. Plaintiffs identified above demanded revocation and the demands were refused.

1493. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota. On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1494. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1495. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

- 419 -

1496. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1497. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1498. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1499. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1500. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their

- 420 -

Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1501. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MD. CODE COM. LAW § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1502. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Maryland Law)

1503. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1504. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Maryland Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

- 421 -

1505. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1506. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## FRAUD BY CONCEALMENT

## (Based On Maryland Law)

1507. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1508. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1509. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1510. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not

- 422 -

known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

1511. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1512. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1513. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1514. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who

- 423 -

want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

1515. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VII

## NEGLIGENCE

### (Based On Maryland Law)

1516. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1517. Toyota had a duty to Plaintiffs and the Class to provide a safe product in design and manufacture, to notify NHTSA, and to warn NHTSA of the heightened propensity of the Defective Vehicles to unexpectedly accelerate out of the driver's control and lack a fail-safe mechanism to overcome unintended acceleration.

1518. Toyota breached its duty of reasonable care to Plaintiffs and the Class by designing the Defective Vehicles in such a manner that they have a heightened propensity to suddenly and unexpectedly accelerate out of the driver's control and lack a fail-safe mechanism to overcome unintended acceleration.

1519. Toyota breached its duty of reasonable care to Plaintiffs and the Class by manufacturing and/or assembling the Defective Vehicles in such a manner that they were prone to suddenly and unexpectedly accelerate out of the driver's control and lack a fail-safe mechanism to overcome unintended acceleration.

- 424 -

1520. Toyota breached its duty of reasonable care to Plaintiffs and the Class by failing to recall the Defective Vehicles at the earliest possible date when they knew that sudden unexpected acceleration and lack a fail-safe mechanism to overcome unintended acceleration were problems.

1521. Toyota breached its duty of reasonable care to Plaintiffs and the Class by failing to exercise due care under the circumstances.

1522. As a direct and proximate result of Toyota's negligence as set forth in the preceding paragraphs, Plaintiffs and the Class have sustained and will continue to sustain the loss of use of their vehicles, economic losses, consequential damages and other damages and are entitled to compensatory damages and equitable and declaratory relief according to proof.

1523. Plaintiffs and the Class demand judgment against Toyota for negligence as prayed below.

## COUNT VIII

## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

### (Based On Maryland Law)

1524. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1525. At all times relevant hereto, Toyota was engaged in the business of designing, manufacturing, assembling, promoting, advertising, selling, and distributing Toyota vehicles in the United States, including, but not limited to, the Defective Vehicles.

1526. Toyota knew and expected for the Defective Vehicles to eventually be sold to and operated by consumers and/or eventual owners of the Defective Vehicles,

- 425 -

including Plaintiffs and the Class.  Consequently, Plaintiffs and the Class were foreseeable users of the products which Toyota manufactured.

1527. The Defective Vehicles reached Plaintiffs and the Class without substantial change in condition from the time they were manufactured by Toyota.

1528. The propensity of the Defective Vehicles to suddenly and unexpectedly accelerate out of their driver's control without a fail-safe mechanism to overcome unintended acceleration could not have been contemplated by any reasonable person expected to operate the Defective Vehicles, and for that reason, presented an unreasonably dangerous situation for foreseeable users of the Defective Vehicles even though the Defective Vehicles were operated by foreseeable users in a reasonable manner.

1529. Toyota should have reasonably foreseen that the dangerous conditions of the Defective Vehicles suddenly and unexpectedly accelerating without a fail-safe mechanism to overcome unintended acceleration would subject Plaintiffs and the Class to harm.

1530. As a result of these defective designs, the Defective Vehicles are unreasonably dangerous.

1531. Plaintiffs and the Class have used the Defective Vehicles reasonably and as intended, to the fullest degree possible given their defective nature, and, nevertheless, have suffered damages through no fault of their own.

1532. Safer, alternative designs existed for the Defective Vehicles.

1533. As a direct and proximate result of Toyota's design, manufacture, assembly, marketing, and sales of the Defective Vehicles, Plaintiffs and the Class have sustained and will continue to sustain the loss of the use of their vehicles,

economic losses, and consequential damages, and are, therefore, entitled to compensatory relief according to proof, and entitled to a declaratory judgment that Toyota is liable to Plaintiffs and the Class for breach of its duty to design, manufacture, assemble, market, and sell a safe product, fit for its reasonably intended use.  Plaintiffs and the Class are therefore entitled to equitable relief as described below.

1534. Plaintiffs and the Class demand judgment against Toyota for design defects as prayed for below.

## COUNT IX

## STRICT PRODUCTS LIABILITY – DEFECTIVE MANUFACTURING
## (Based On Maryland Law)

1535. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1536. Toyota is the manufacturer, designer, distributor, seller, or supplier of the Defective Vehicles.

1537. The Defective Vehicles manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Toyota were defective in their manufacture and construction such that they were unreasonably dangerous, were not fit for the ordinary purposes for which they were intended, and/or did not meet the reasonable expectations of any consumer.

1538. The Defective Vehicles manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Toyota, were defective in their manufacture and construction as described at the time they left Toyota's control.

- 427 -

1539. The Defective Vehicles are unreasonably dangerous due to their defective manufacture.

1540. As a direct and proximate result of Plaintiffs' purchase and use of the Defective Vehicles as manufactured, designed, sold, supplied and introduced into the stream of commerce by Toyota, Plaintiffs and the Class suffered economic losses, and will continue to suffer such damages and economic losses in the future.

1541. Plaintiffs demand judgment against Toyota for manufacturing defects as prayed for below.

## COUNT X

### STRICT PRODUCTS LIABILITY –
### DEFECT DUE TO NONCONFORMANCE WITH REPRESENTATIONS

### (Based On Maryland Law)

1542. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1543. Toyota is the manufacturer, designer, distributor, seller, or supplier of the Defective Vehicles, and Toyota made representations regarding the character or quality of the Defective Vehicles.

1544. The Defective Vehicles manufactured and supplied by Toyota were defective in that, when they left the hands of Toyota, they did not conform to the representations made by Toyota concerning the Defective Vehicles.

1545. Plaintiffs and the Class justifiably relied upon Toyota's representations regarding the Defective Vehicles when they purchased and used the Defective Vehicles.

- 428 -

1546. As a direct and proximate result of their reliance on Toyota's representations regarding the character and quality of the Defective Vehicles, Plaintiffs and the Class suffered damages and economic losses, and will continue to suffer such damages and economic losses in the future.

1547. Plaintiffs demand judgment against Toyota for manufacturing defects as prayed for below.

## COUNT XI

## UNJUST ENRICHMENT

## (Based On Maryland Law)

1548. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1549. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1550. Defendants knowingly enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1551. Plaintiffs, therefore, are entitled to restitution and seek and order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

- 429 -

# MASSACHUSETTS

## COUNT I

### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT

#### (Chapter 93A)

1552. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1553. The conduct of Toyota as set forth herein constitutes unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles, which misrepresentations and omissions possessed the tendency to deceive.

1554. Toyota engages in the conduct of trade or commerce and the misconduct alleged herein occurred in trade or commerce.

1555. In satisfaction of MASS. GEN. LAWS CH. 93A, § 9(3), Plaintiffs have made demand on Toyota more than 30 days prior to this filing by numerous letters sent by Plaintiffs and the Class.  These letters asserted that rights of consumers as claimants had been violated, described the unfair and deceptive acts committed by Toyota, and specified the injuries that Plaintiffs and the Class have suffered and the relief they seek.  Thus, these letters satisfy section 9(3).

1556.  As a result of Defendant's unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, MASS. GEN. L. CH. 93A, Plaintiffs suffered injury as described herein.  Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

<div align="center">

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(ALM GL ch. 106, § 2-313)**

</div>

1557.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1558.  Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1559.  In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1560.  Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1561.  In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1562.  These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards,

<div align="center">- 431 -</div>

and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1563. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1564. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1565. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1566. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

- 432 -

1567. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1568. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in ALM GL ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1569. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1570. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

010172-25 398181 v1

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (ALM GL ch. 106, § 2-314)

1571. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1572. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1573. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

1574. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1575. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1576. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

# COUNT IV

## REVOCATION OF ACCEPTANCE

### (ALM GL ch. 106, § 2-608)

1577. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1578. Plaintiffs identified above demanded revocation and the demands were refused.

1579. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota. On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1580. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1581. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1582. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1583. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 435 -

1584. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1585. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1586. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1587. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in ALM GL ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 436 -

1588. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Massachusetts Law)

1589. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1590. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Massachusetts's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1591. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1592. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 437 -

1

**COUNT VI**

2

**UNJUST ENRICHMENT**

3

**(Based On Massachusetts Law)**

4

1593. Plaintiffs reallege and incorporate by reference all paragraphs as though

5

fully set forth herein.

6

7

1594. Toyota had knowledge of the safety defects in its vehicles, which it

8

failed to disclose to Plaintiffs and the Class.

9

1595. As a result of their wrongful and fraudulent acts and omissions, as set

10

forth above, pertaining to the design defect of their vehicles and the concealment of

11

the defect, Toyota charged a higher price for their vehicles than the vehicles' true

12

value and Toyota obtained monies which rightfully belong to Plaintiffs.

13

14

1596. Toyota appreciated, accepted and retained the non-gratuitous benefits

15

conferred by Plaintiffs and the Class, who without knowledge of the safety defects

16

paid a higher price for vehicles which actually had lower values. It would be

17

inequitable and unjust for Toyota to retain these wrongfully obtained profits.

18

1597. Plaintiffs, therefore, are entitled to restitution and seek an order

19

establishing Toyota as constructive trustees of the profits unjustly obtained, plus

20

interest.

21

22

**MICHIGAN**

23

**COUNT I**

24

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**

25

**(Mich. Comp. Laws § 445.901, *et seq*.)**

26

1598. Plaintiffs reallege and incorporate by reference all paragraphs as though

27

fully set forth herein.

28

- 438 -

1599. Defendants misrepresented the safety of the Defective Vehicles after learning of their defects with the intent that Plaintiffs relied on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1600. Plaintiffs did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1601. Through those misleading and deceptive statements and false promises, Defendants violated the Michigan Consumer Protection Act.

1602. The Michigan Consumer Protection Act applies to Defendants' transactions with Plaintiffs because Defendants' deceptive scheme was carried out in Michigan and affected Plaintiffs.

1603. Defendants also failed to advise NHSTA and the public about what they knew about the sudden and unintended acceleration defects in the Defective Vehicles.

1604. Plaintiffs relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1605. As a direct and proximate result of Defendants' deceptive conduct and violation of the Michigan Consumer Protection Act, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

010172-25 398181 v1

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(Mich. Comp. Laws § 440.2313)**

1606. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1607. Defendants expressly warranted – through statements and advertisements described above – that the vehicles were of high quality, and at a minimum, would actually work properly and safely.

1608. Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

1609. Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

**COUNT III**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Mich. Comp. Laws § 440.2314)**

1610. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1611. Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonably safety during normal operation, and without unduly endangering them or members of the public.

- 440 -

1612.  As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety slow and stop the vehicle when such acceleration occurred.

1613.  These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to Plaintiffs. Furthermore, because of these dangerous defects, Plaintiffs did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

1614.  These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

**MINNESOTA**

**COUNT I**

**VIOLATION OF MINNESOTA FALSE STATEMENT IN ADVERTISING STATUTE**

**(Minn. Stat. §§ 325F.67 *et seq.*)**

1615.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1616.  Defendants produced and published advertisements and deceptive and misleading statements on the safety and reliability of the Defective Vehicles, even after learning of their defects, with the intent to sell the Defective Vehicles.

1617.  Defendants continue to represent or otherwise disseminate misleading information about the defect and cause of the defect with the intent to induce the public to by the Defective Vehicles.

- 441 -

1618. Defendants concealed their deceptive practices in order to increase the sale of and profit from the Defective Vehicles.

1619. Defendants violated the Minnesota False Statements in Advertising Act, MINN. STAT. § 325F.67, *et seq.*, by publicly misrepresenting safety of the Defective Vehicles, including the cause of the sudden and unintended acceleration problem, both prior and subsequent to the various recalls.

1620. Defendants also failed to advise the NHTSA and the public about what it knew about the sudden and unintended acceleration.

1621. The Minnesota False Statements in Advertising Act applies to Plaintiffs' transactions with Defendants because Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs.

1622. As a direct and proximate result of Defendants' deceptive, unfair, and fraudulent conduct and violations of MINN. STAT. § 325F.67, *et seq.*, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT II

### VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (Minn. Stat. § 325D.43-48, *et seq.*)

1623. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein

- 442 -

1624. Defendants engaged in – and continue to engage in – conduct that violates the Minnesota Deceptive Trade Practices Act, MINN. STAT. § 325D.44, *et seq.* The violations include the following:

a.      Defendants violated MINN. STAT. § 325D.44(5) by representing the Defective Vehicles as having characteristics, uses, and benefits of safe and mechanically sound vehicles while knowing that the statements were false and the Defective Vehicles contained defects;

b.      Defendants violated MINN. STAT. § 325D.44(7) by representing the Defective Vehicles as a non-defective product of a particular standard, quality, or grade while knowing the statements were false and the Defective Vehicles contained defects;

c.      Defendants violated MINN. STAT. § 325D.44(9) by advertising, marketing, and selling the Defective Vehicles as reliable and without a known defect while knowing those claims were false; and

d.      Defendants violated MINN. STAT. § 325D.44(13) by creating a likelihood of confusion and/or misrepresenting the safety of the Defective Vehicles.

1625. Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs.

1626. Defendants also failed to advise the NHSTA and the public about what it knew about the sudden and unintended acceleration.

1627. As a direct and proximate result of Defendants' deceptive conduct and violation of MINN. STAT. § 325D.44, *et seq.*, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to

- 443 -

compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT III

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT

### (Minn. Stat. § 325F.68, *et seq.*)

1628. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1629. Defendants misrepresented the safety of the Defective Vehicles after learning of their defects with the intent that Plaintiffs relied on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1630. Plaintiffs did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

1631. Through these misleading and deceptive statements and false promises, Defendants violated MINN. STAT. § 325F.69.

1632. The Minnesota Prevention of Consumer Fraud Act applies to Defendants' transactions with Plaintiffs because Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs.

1633. Defendants also failed to advise the NHSTA and the public about what they knew about the sudden and unintended acceleration defects in the Defective Vehicles.

1634. Plaintiffs relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Defective Vehicles.

- 444 -

010172-25 398181 v1

1635. As a direct and proximate result of Defendants' deceptive conduct and violation of MINN. STAT. § 325F.69, Plaintiffs have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT IV

## FRAUDULENT MISREPRESENTATION & FRAUDULENT CONCEALMENT

## (Based On Minnesota Law)

1636. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1637. Toyota intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that is highly relevant to their purchasing decision.

1638. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

1639. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

1640. Toyota had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden, extreme acceleration

- 445 -

without adequate fail-safe mechanisms because Plaintiffs relied on Toyota's material representations that the vehicles they were purchasing were safe and free from defects.

1641. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

1642. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Toyota knew its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009. Toyota intentionally made the false statements in order to sell vehicles.

1643. Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

1644. As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

1645. Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages.

- 446 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT V**

**BREACH OF EXPRESS WARRANTY**

**(Minn. Stat. § 325G.19 Express Warranties)**

1646. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1647. Defendants are and at all relevant times were merchants as defined by the Uniform Commercial Code ("UCC").

1648. Defendants expressly warranted – through uniform statements, "e-brochures" and advertisements described above – that the vehicles were of high quality, and, at a minimum, would actually work properly and safely.  These warranties became part of the basis of the bargain.

1649. Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

1650. Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

1651. Plaintiffs were unaware of these defects and could not have reasonably discovered them when they purchased their vehicles from Toyota.

1652. Plaintiffs and the Class are entitled to damages, including the diminished value of their vehicles and the value of the non-use of the vehicles pending successful repair, in addition to any costs associated with purchasing safer vehicles, incidental an consequential damages, and all other damages allowable under the law, including such further relief as the Court deems just and proper.

- 447 -

# COUNT VI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (STRICT LIABILITY)

### (Minn. Stat. § 336.2-314 Implied Warranty; Merchantability; Usage Of Trade)

1653. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1654. Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1655. As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety systems which would prevent such acceleration or allow a driver to safely slow and stop the vehicle when such acceleration occurred.

1656. These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to the Plaintiffs. Furthermore, because of these dangerous defects, Plaintiff did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

1657. These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

- 448 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT VII**

**UNJUST ENRICHMENT**

**(Based On Minnesota Law)**

1658. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1659. Plaintiffs paid Toyota the value of vehicles that are non-defective, and in exchange, Toyota provided Plaintiffs vehicles that are, in fact, defective.

1660. Further, Plaintiffs paid Toyota the value for vehicles that would not be compromised by substantial, invasive repairs, and in return received vehicles that require such repairs.

1661. Further, Plaintiffs paid Toyota for vehicles they could operate, and in exchange, Toyota provided Plaintiffs vehicles that could not be normally operated because their defects posed the possibility of life-threatening injuries or death.

1662. As such, Plaintiffs conferred a windfall upon Toyota., which knows of the windfall and has retained such benefits, which would be unjust for Toyota to retain.

1663. As a direct and proximate result of Toyota's unjust enrichment, Plaintiffs have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through their misconduct.

# COUNT VIII

## STRICT LIABILITY (DESIGN DEFECT)

### (Based On Minnesota Law)

1664. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1665. Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting, advertising, distributing and selling Defective Vehicles in the United States, including those owned or leased by the Plaintiffs and the Class.

1666. Defendants knew and anticipated that the vehicles owned or leased by Plaintiffs and the Class would be sold to and operated by purchasers and/or eventual owners or leasors of Defendants' vehicles, including Plaintiffs and the Class. Defendants also knew that these Defective Vehicles would reach the Plaintiffs and the Class without substantial change in their condition from the time the vehicles departed the Defendants' assembly lines.

1667. Defendants designed the Defective Vehicles defectively, causing them to fail to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

1668. Defendants had the capability to use a feasible, alternative, safer design, and failed to correct the design defects.

1669. The risks inherent in the design of the Defective Vehicles outweigh significantly any benefits of such design.

- 450 -

1670. Plaintiffs and the Class could not have anticipated and did not know of the aforementioned defects at any time prior to recent revelations regarding the problems with the Defective Vehicles.

1671. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT IX

### STRICT LIABILITY (FAILURE TO WARN)

#### (Based On Minnesota Law)

1672. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1673. Defendants are and have been at all times pertinent to this Complaint, engaged in the business of designing, manufacturing, assembling, promoting, advertising, distributing and selling Defective Vehicles in the United States, including those owned or leased by the Plaintiffs and the Class.

1674. Defendants, at all times pertinent to this Complaint, knew and anticipated that the Defective Vehicles and their component parts would be purchased, leased and operated by consumers, including Plaintiffs and the Class.

1675. Defendants also knew that these Defective Vehicles would reach the Plaintiff and the Class without substantial change in their conditions from the time that the vehicles departed the Defendants' assembly lines.

1676. Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the Defective Vehicles, defective

- 451 -

design, manufacturing and lack of sufficient warnings caused them to have an
unreasonably dangerous propensity to sudden and unintended acceleration.

1677. The Defendants failed to adequately warn Plaintiffs and the Class when
they became aware of the defect that caused Plaintiffs and the Class vehicles to be
prone to sudden and unintended acceleration.

1678. Defendants also failed to timely recall the vehicles or take any action to
timely warn Plaintiffs or the Class of these problems and instead continue to subject
Plaintiffs and the Class to harm.

1679. Defendants knew, or should have known, that these defects were not
readily recognizable to an ordinary consumer and that consumers would lease,
purchase and use these products without inspection.

1680. Defendants should have reasonably foreseen that the sudden and
unintended defect in the Defective Vehicles would subject the Plaintiffs and the
Class to harm resulting from the defect.

1681. Plaintiffs and the Class have used the Defective Vehicles for their
intended purpose and in a reasonable and foreseeable manner.

1682. As a direct and proximate result of Defendants' wrongful conduct,
Plaintiffs and the Class have sustained and will continue to sustain economic losses
and other damages for which they are entitled to compensatory and equitable
damages and declaratory relief in an amount to be proven at trial.

010172-25  398181 v1

# MISSISSIPPI

## COUNT I

## MISSISSIPPI PRODUCTS LIABILITY ACT

### (Miss. Code Ann. § 11-1-63, *et seq.*)

1683. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1684. Toyota has defectively designed, manufactured, sold or otherwise placed in the stream of commerce Defective Vehicles.

1685. Toyota is strictly liable in tort for the Plaintiffs' injuries and damages and the Plaintiffs respectfully rely upon the Doctrine as set forth in RESTATEMENT, SECOND, TORTS § 402(a).

1686. Because of the negligence of the design and manufacture of the Defective Vehicle, by which Plaintiffs were injured and the failure of Toyota to warn Plaintiffs of the certain dangers concerning the operation of the Defective Vehicles which were known to Defendants but were unknown to Plaintiffs, the Defendants have committed a tort.

1687. The Defective Vehicles which caused Plaintiffs' injuries were manufactured by Toyota.

1688. At all times herein material, Defendants negligently and carelessly did certain acts and failed to do other things, including, but not limited to, inventing, developing, designing, researching, guarding, manufacturing, building, inspecting, investigating, testing, labeling, instructing, and negligently and carelessly failing to provide adequate and fair warning of the characteristics, angers and hazards associated with the operation of the vehicles in question to users of the Defective

- 453 -

Vehicles, including, but not limited to, Plaintiffs, and willfully failing to recall or otherwise cure one or more of the defects in the product involved thereby directly and proximately causing the hereinafter described injury.

1689. The Defective Vehicles were unsafe for their use by reason of the fact that they were defective.  For example, the Defective Vehicles were defective in their design, guarding, development, manufacture, and lack of permanent, accurate, adequate and fair warning of the characteristics, danger and hazard to the user, prospective user and members of the general public, including, but not limited to, Plaintiffs, and because Defendants failed to recall or otherwise cure one or more defects in the vehicles involved thereby directly and proximately causing the described injuries.

1690. Defendants, and each of them, knew or reasonably should have known that the above mentioned product would be purchased and used without all necessary testing or inspection for defects by the Plaintiffs and the Class.

1691. Plaintiffs were not aware of those defects at any time before the incident and occurrence mentioned in this complaint, or else Plaintiff was unable, as a practical matter, to cure that defective condition.

1692. Plaintiffs used the product in a foreseeable manner.

1693. As a proximate result of the negligence of Defendants, Plaintiffs suffered injuries and damages.

010172-25  398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Miss. Code Ann. §§ 75-2-314)**

1694. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1695. Toyota has defectively designed, manufactured, sold or otherwise placed in the stream of commerce defective vehicles as set forth above.

1696. Toyota impliedly warranted that the Defective Vehicles were merchantable and for the ordinary purpose for which they were designed, manufactured, and sold.

1697. The Defective Vehicles were not in merchantable condition or fit for ordinary use due to the defects described above and as a result of the breach of warranty of merchantability by Toyota, Plaintiffs sustained injuries and damages.

**COUNT III**

**NEGLIGENCE**

**(Under Mississippi Law)**

1698. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1699. Toyota has defectively designed, manufactured, sold or otherwise placed in the stream of commerce defective vehicles as set forth above.

1700. Toyota had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiff.  Toyota breached its duty to Plaintiffs and the Class because it was

- 455 -

negligent in the design, development, manufacture, and testing of the Defective Vehicles.

1701. Toyota was negligent in its design, development, manufacture, and testing of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that they were prone to sudden unintended and dangerous acceleration and lacked proper fail-safe mechanisms.

1702. Toyota negligently failed to adequately warn and instruct Plaintiffs and the Class of the defective nature of the Defective Vehicles, of the high degree of risk attendant to the using them, given that the users of the Defective Vehicles would be ignorant of the said defective.

1703. Whereupon, the Plaintiffs respectfully rely upon the RESTATEMENT, SECOND, TORTS § 395.

1704. Toyota further breached its duties to Plaintiffs by supplying directly and/or through a third person to be used by such foreseeable persons such as Plaintiffs when:

a. Toyota knew or had reason to know, that the Subject Vehicle was dangerous or was likely to be dangerous for the use for which it was supplied; and

b. Toyota failed to exercise reasonable care to inform customers of the dangerous condition, or of the facts under which the Subject Vehicle is likely to be dangerous.

1705. As a result of Toyota's negligence, Plaintiffs and the Class suffered damages.

- 456 -

# COUNT IV

## REVOCATION OF ACCEPTANCE

### (Miss. Code Ann. § 75-2-608)

1706. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1707. Plaintiffs identified above demanded revocation and the demands were refused.

1708. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1709. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1710. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1711. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1712. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 457 -

1713.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1714.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1715.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1716.  Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MISS. CODE ANN. § 75-2-602, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently

- 458 -

owned and for such other incidental and consequential damages as allowed under MISS. CODE ANN. § 75-2-602

1717. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## NEGLIGENT MISREPRESENTATION/FRAUD

### (Based On Mississippi Law)

1718. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1719. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1720. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1721. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts

- 459 -

were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

1722. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1723. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1724. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1725. As a result of the misrepresentation concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to affirm the sale, these damages, under Mississippi law, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs

and the Class are entitled to restitution and consequential damages under Mississippi law.

1726. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT VI**

**UNJUST ENRICHMENT**

**(Based On Mississippi Law)**

</div>

1727. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1728. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1729. Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1730. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

- 461 -

# MISSOURI

# COUNT I

# VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT

## (Mo. Rev. Stat. § 407.010, *et seq.*)

1731. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1732. The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

1733. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

1734. Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

1735. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

1736. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

- 462 -

1737. Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

1738. Pursuant to MO. REV. STAT. § 407.010, Plaintiffs will serve the Missouri Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT II

## BREACH OF EXPRESS WARRANTY

## (Mo. Rev. Stat. § 400.2-313)

1739. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1740. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1741. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1742. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1743. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1744. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS. These warranties were made, *inter alia*, in

- 463 -

advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

1745. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1746. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1747. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1748. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

010172-25  398181 v1

1749. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1750. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MO. REV. STAT. § 400.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1751. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1752. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

- 465 -

# COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Mo. Rev. Stat. § 400.2-314)

1753. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1754. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1755. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to MO. REV. STAT. § 400.2-314.

1756. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1757. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1758. Plaintiffs and the Class have had sufficient dealings with either the Defendants or their agents (dealerships) to establish privity of contract between

- 466 -

Plaintiffs and the Class.  Notwithstanding this, privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and the Class' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

1759. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Mo. Rev. Stat. § 400.2-608)**

</div>

1760. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1761. Plaintiffs identified above demanded revocation and the demands were refused.

1762. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

- 467 -

1763. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1764. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1765. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1766. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1767. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1768. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

- 468 -

1769. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1770. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MO. REV. STAT. § 400.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1771. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Missouri Law)

1772. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1773. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Missouri's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies

- 469 -

available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1774. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1775. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## FRAUD BY CONCEALMENT

### (Based On Missouri Law)

1776. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1777. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1778. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

- 470 -

1779. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

1780. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1781. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1782. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1783. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they

- 471 -

received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

1784. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VII

## UNJUST ENRICHMENT

## (Based On Missouri Law)

1785. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1786. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

1787. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

1788. Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects

- 472 -

paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

1789. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## MONTANA

## COUNT I

## BREACH OF EXPRESS WARRANTY

### (Mont. Code § 30-2-313)

1790. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1791. Toyota is and was at all relevant times a merchant with respect to motor vehicles under MONT. CODE. ANN. § 30-2-104.

1792. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1793. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1794. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1795. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise

- 473 -

heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1796.  These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1797.  Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1798.  Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1799.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false

- 474 -

and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable pursuant to MONT. CODE ANN. § 30-2-302.

1800. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1801. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MONT. CODE § 30-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under MONT. CODE §§ 30-2-711 and 30-2-608.

1802. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1803. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (Mont. Code § 30-2-314)

1804. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1805. Toyota is and was at all relevant times a merchant with respect to motor vehicles under MONT. CODE § 30-2-104.

1806. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to MONT. CODE § 30-2-314.

1807. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1808. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1809. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

# COUNT III

## REVOCATION OF ACCEPTANCE

### (Mont. Code § 30-2-608)

1810. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1811. Plaintiffs identified above demanded revocation and the demands were refused.

1812. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1813. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1814. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1815. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1816. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 477 -

1817. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1818. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1819. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1820. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in MONT. CODE § 30-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently

- 478 -

owned and for such other incidental and consequential damages as allowed under MONT. CODE § 30-2-711.

1821. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Montana Law)

1822. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1823. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Montana's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1824. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1825. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 479 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT V

## FRAUD BY CONCEALMENT

### (Based On Montana Law)

1826. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1827. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1828. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1829. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

- 480 -

1830. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1831. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1832. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1833. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.

1834. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT VI**

**UNJUST ENRICHMENT**

**(Based On Montana Law)**

1835. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 481 -

1836.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1837.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1838.  Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## NEBRASKA

## COUNT I

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

## (Neb. Rev. Stat. § 59-1601, *et seq.*)

1839.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1840.  The Nebraska Consumer Protection Act ("NCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

1841.  "Trade or commerce" means "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."

1842.  The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and

- 482 -

remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles, which misrepresentations and omissions possessed the tendency or capacity to mislead.

1843. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

1844. Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

1845. Plaintiffs and the Class were injured as a result of Defendants' conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

1846. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class, who are entitled to recover actual damages, as well as enhanced damages pursuant to § 59-1609.

<div align="center">

**COUNT II**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Neb. Rev. Stat. Neb. § 2-314)**

</div>

1847. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1848. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

<div align="center">- 483 -</div>

1849. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

1850. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1851. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1852. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

## REVOCATION OF ACCEPTANCE

### (Nev. Rev. Stat. NEB. § 2-608)

1853. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1854. Plaintiffs identified above demanded revocation and the demands were refused.

- 484 -

1    1855. Plaintiffs and the Class had no knowledge of such defects and

2 nonconformities, were unaware of these defects, and reasonably could not have

3 discovered them when they purchased or leased their automobiles from Toyota.  On

4 the other hand, Toyota was aware of the defects and nonconformities at the time of

5

6 sale and thereafter.

7    1856. Acceptance was reasonably induced by the difficulty of discovery of the

8 defects and nonconformities before acceptance.

9    1857. There has been no change in the condition of Plaintiffs' vehicles not

10 caused by the defects and nonconformities.

11
   1858. When Plaintiffs sought to revoke acceptance, Toyota refused to accept
12
return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies
13
14 paid.

15    1859. Plaintiffs and the Class would suffer economic hardship if they returned

16 their vehicles but did not receive the return of all payments made by them.  Because

17 Toyota is refusing to acknowledge any revocation of acceptance and return

18
immediately any payments made, Plaintiffs and the Class have not re-accepted their
19
20 Defective Vehicles by retaining them.

21    1860. These defects and nonconformities substantially impaired the value of

22 the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two

23 basic sources.  First, the Defective Vehicles fail in their essential purpose because

24 they present an unreasonably high risk of sudden unintended acceleration (a risk
25
acknowledged by Toyota's recall), rendering them unsafe in a very material way.
26
27 Second, the repair and adjust warranty has failed of its essential purpose because

28 Toyota cannot repair or adjust the Defective Vehicles.

- 485 -

1861. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1862. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1863. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in R.R.S. Neb. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1864. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

1

# COUNT IV

## IN THE ALTERNATIVE, UNJUST ENRICHMENT

### (Based On Nebraska Law)

1865. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1866. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

1867. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

1868. Toyota received and retained benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unconscionable for Toyota to retain these wrongfully obtained profits.

1869. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## NEVADA

## COUNT I

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT

### (Nev. Rev. Stat. § 598.0903, *et seq.*)

1870. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 487 -

1871. Toyota is a "person" as required under the statute.

1872. Toyota's actions as set forth above occurred in the course of business.

1873. The Nevada Deceptive Trade Practices Act, NEV. REV. STAT. § 598.0903, *et seq.*, prohibits unfair or deceptive consumer sales practices.

1874. The NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she does any of the following, including: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; " 7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1875. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in deceptive trade practices, including making false representation as to the characteristics, uses, and benefits of the Defective Vehicles; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and knowingly made numerous other false representations as further described during the fact section of this complaint.

- 488 -

1876. Toyota knowingly made false representations to consumers with the intent to induce consumers into purchasing Toyota vehicles.  Plaintiffs reasonably relied on false representations by Toyota and were induced to each purchase a Toyota vehicle, to his/her detriment.  As a result of these unlawful trade practices, Plaintiffs have suffered ascertainable loss.

1877. Plaintiffs and the Class suffered ascertainable loss caused by Toyota's false representations and failure to disclose material information.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Nev. Rev. Stat. § 104.2313)

1878. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1879. Toyota is and was at all relevant times a merchant with respect to motor vehicles under the Uniform Commercial Code.

1880. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1881. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

- 489 -

1882. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1883. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS. These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

1884. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1885. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1886. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1887. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

1888. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

1889. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

1890. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Nev. Rev. Stat. § 104.2314)**

1891. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1892. Toyota is and was at all relevant times a merchant with respect to motor vehicles under the Uniform Commercial Code.

1893. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to the Uniform Commercial Code.

1894. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1895. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

- 492 -

1896.  As a direct and proximate result of Toyota's breach of the warranties of
merchantability, Plaintiffs and the Class have been damaged in an amount to be
proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Nev. Rev. Stat. § 104.2608)**

</div>

1897.  Plaintiffs reallege and incorporate by reference all paragraphs as though
fully set forth herein.

1898.  Plaintiffs identified above demanded revocation and the demands were
refused.

1899.  Plaintiffs and the Class had no knowledge of such defects and
nonconformities, were unaware of these defects, and reasonably could not have
discovered them when they purchased or leased their automobiles from Toyota.  On
the other hand, Toyota was aware of the defects and nonconformities at the time of
sale and thereafter.

1900.  Acceptance was reasonably induced by the difficulty of discovery of the
defects and nonconformities before acceptance.

1901.  There has been no change in the condition of Plaintiffs' vehicles not
caused by the defects and nonconformities.

1902.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept
return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies
paid.

1903.  Plaintiffs and the Class would suffer economic hardship if they returned
their vehicles but did not receive the return of all payments made by them.  Because

<div align="center">- 493 -</div>

Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1904. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1905. Plaintiffs and the Class, within a reasonable amount of time, provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1906. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1907. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Nevada Law)

1908. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1909. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Nevada's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1910. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1911. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

# COUNT VI

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Based On Nevada Law)

1912. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1913. As set forth above, Plaintiffs and the Class have entered into individual sales transactions and agreements with Toyota for the purchase Toyota vehicles.

1914. Plaintiffs and the Class have fully performed their obligations with Toyota under such transactions and agreements.

1915. At all times, Toyota owed Plaintiffs and the Class a duty to exercise and act in good faith and deal fairly with them in the performance of repairs of Defective Vehicles.

1916. Toyota has breached these duties and obligations in the manner and particulars set forth above, including, but not limited to, failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1917. As a direct and proximate result of Defendants' failure to abide and comply with their obligations and duties, Plaintiffs and the Class have suffered pecuniary damages in an amount that has not yet been determined.

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# COUNT VII

## FRAUD BY CONCEALMENT

### (Based On Nevada Law)

1918. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1919. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

1920. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1921. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

- 497 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1922.  Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1923.  Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

1924.  Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

1925.  Plaintiffs and the Class would not have purchased the vehicles sold by Defendants or would have not paid as much for the vehicles purchased by Defendants had they known the full truth about the vehicles being sold by Defendants.

1926.  As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.

1927.  Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010172-25 398181 v1

**COUNT VIII**

**UNJUST ENRICHMENT**

**(Based On Nevada Law)**

1928. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1929. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

1930. Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

1931. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

**NEW HAMPSHIRE**

**COUNT I**

**VIOLATION OF N.H. CONSUMER PROTECTION ACT**

**(N.H. Rev. Stat. Ann. § 358A:1, *et seq*.)**

1932. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1933. The New Hampshire Consumer Protection Act ("CPA") prohibits a person, in the conduct of any trade or commerce, from doing any of the following: "(V) Representing that goods or services have … characteristics, … uses, benefits, or

- 499 -

quantities that they do not have; … (VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another; … and (IX) Advertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. § 358-A:2.

1934. Toyota is a person within the meaning of the CPA. *See* N.H. REV. STAT. § 358A:1(I).

1935. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above. Accordingly, Toyota engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; and advertising Defective Vehicles with the intent not to sell them as advertised. Toyota knew or should have known that its conduct violated the OUTPA.

1936. Toyota engaged in a deceptive trade practice when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale. Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1937. The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class. Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

- 500 -

1938. Toyota's failure to disclose material information has injured Plaintiffs and the Class. Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain. The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

1939. Plaintiffs are entitled to recover the greater of actual damages or $1,000 pursuant to N.H. REV. STAT. § 358-A:10. Plaintiffs are also entitled to treble damages because Toyota acted willfully in its unfair and deceptive practices.

## COUNT II

### BREACH OF EXPRESS WARRANTY

### (N.H. Rev. Stat. Ann. § 382-A:2-313)

1940. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1941. Toyota is and was at all relevant times a merchant with respect to motor vehicles under N.H. REV. STAT. § 382-A:2-313.

1942. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1943. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1944. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities.

- 501 -

1945. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS. These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

1946. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1947. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1948. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

1949. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the

warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

1950. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make whole.

1951. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in N.H. REV. STAT. §§ 382-A:2-608 and 382-A:2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under N.H. REV. STAT. §§ 382-A:2-608 and 382-A:2-711.

1952. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

- 503 -

1953.  As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (N.H. Rev. Stat. Ann. § 382-A:2-314)

1954.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1955.  Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1956.  A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

1957.  These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

1958.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

- 504 -

1959.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(N.H. Rev. Stat. Ann. § 382-A:2-608)**

</div>

1960.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1961.  Plaintiffs identified above demanded revocation and the demands were refused.

1962.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

1963.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

1964.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

1965.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

1966.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because

010172-25 398181 v1

Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

1967. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

1968. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

1969. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

1970. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth

- 506 -

in N.H. Stat. § 382-A:2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

1971. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF COMMON LAW WARRANTY

### (Based On New Hampshire Law)

1972. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1973. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under New Hampshire's Commercial Code, Plaintiffs plead in the alternative under common law contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

1974. Toyota breached this contractual obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

1975. As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which

- 507 -

shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## UNJUST ENRICHMENT

### (Based On New Hampshire Law)

1976.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1977.  Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

1978.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

1979.  Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be unconscionable for Toyota to retain these wrongfully obtained profits.

1980.  To the extent that no contract applies between the parties, Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

# NEW JERSEY

## COUNT I

### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

### (N.J. Stat. Ann. § 56:8-1, *et seq.*)

1981. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1982. The New Jersey Consumer Fraud Act ("CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. STAT. ANN. § 56:8-2.

1983. Toyota is a person within the meaning of the CFA. N.J. STAT. ANN. § 56:8-1(d).

1984. In the course of Toyota's business, it knowingly failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above. This was an unlawful practice in that Toyota represented that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; represented that Defective Vehicles are of a particular standard and quality when they are not; and advertised Defective Vehicles with the intent not to sell them as advertised. Toyota knew or should have known that its conduct violated the CFA.

- 509 -

1985. Toyota engaged in an unlawful practice under the CFA when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale. Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

1986. Toyota's unlawful practices cause substantial injury to consumers.

1987. The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class.  Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

1988. Plaintiffs and the Class suffered ascertainable loss of money or property caused by Toyota's unlawful practices.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyotas has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

1989. Plaintiffs are entitled to recover legal and/or equitable relief, treble damages, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19.

1990. Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiffs will mail a copy of the complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

# COUNT II

## BREACH OF EXPRESS WARRANTY

### (N.J. Stat. Ann. § 12A:2-313)

1991. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1992. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

1993. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

1994. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

1995. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

1996. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

1997. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

1998. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1999. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2000. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2001. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to their failure and/or continued failure to provide such limited remedy within a reasonable

time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2002. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set for in N.J. STAT. ANN. § 12A:2-608, for revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2003. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2004. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amounted to be determined at trial.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (N.J. Stat. Ann. § 12A:2-314)

2005. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2006. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2007. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2008.  These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2009.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2010.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(N.J. Stat. Ann. § 12A:2-608)**

</div>

2011.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2012.  Plaintiffs identified above demanded revocation and the demands were refused.

2013.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have

<div align="center">- 514 -</div>

discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2014.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2015.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2016.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2017.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2018.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2019.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs

- 515 -

(and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2020.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2021.  Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

### COUNT V

### BREACH OF CONTRACT

### (Based On New Jersey Law)

2022.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2023.  To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under New Jersey's Commercial Code, Plaintiffs plead in the alternative under common law contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or

- 516 -

workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2024. Toyota breached this contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2025. As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## IN THE ALTERNATIVE, UNJUST ENRICHMENT

### (Based On New Jersey Law)

2026. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2027. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2028. As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for its vehicles than the vehicles' true value.  Toyota accordingly received a benefit from Plaintiffs to Plaintiffs' detriment.

2029. Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2030. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## NEW MEXICO

## COUNT I

## BREACH OF EXPRESS WARRANTY

## (N.M. Stat. Ann. § 55-2-313)

2031. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2032. Toyota is and was at all relevant times a merchant with respect to motor vehicles under N.M. STAT. ANN. § 55-2-104.

2033. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2034. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2035. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2036. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in

- 518 -

advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2037.  These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2038.  Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2039.  Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2040.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any

limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

2041. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2042. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in N.M. STAT. ANN. § 55-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under N.M. STAT. ANN. §§ 55-2-711 and 55-2-608.

2043. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2044. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

010172-25 398181 v1

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (N.M. Stat. Ann. § 55-2-314)

2045. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2046. Toyota is and was at all relevant times a merchant with respect to motor vehicles under N.M. STAT. ANN. § 55-2-104.

2047. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to N.M. STAT. ANN. § 55-2-314.

2048. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2049. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2050.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

## REVOCATION OF ACCEPTANCE

### (N.M. Stat. Ann. § 55-2-608)

2051.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2052.  Plaintiffs identified above demanded revocation and the demands were refused.

2053.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2054.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2055.  There has been no substantial change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2056.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2057.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because

- 522 -

Toyota is refusing to acknowledge any revocation of acceptance and return

immediately any payments made, Plaintiffs and the Class have not re-accepted their

Defective Vehicles by retaining them.

2058.  These defects and nonconformities substantially impaired the value of

the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two

basic sources.  First, the Defective Vehicles fail in their essential purpose because

they present an unreasonably high risk of sudden unintended acceleration (a risk

acknowledged by Toyota's recall), rendering them unsafe in a very material way.

Second, the repair and adjust warranty has failed of its essential purpose because

Toyota cannot repair or adjust the Defective Vehicles.

2059.  Plaintiffs and the Class provided notice of their intent to seek revocation

of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs

(and many Class members) have requested that Toyota accept return of their vehicles

and return all payments made.  Plaintiffs on behalf of themselves and the Class

hereby demand revocation and tender their Defective Vehicles.

2060.  Plaintiffs and the Class would suffer economic hardship if they returned

their vehicles but did not receive the return of all payments made by them.  Because

Toyota is refusing to acknowledge any revocation of acceptance and return

immediately any payments made, Plaintiffs and the Class have not re-accepted their

Defective Vehicles by retaining them, as they must continue using them due to the

financial burden of securing alternative means of transport for an uncertain and

substantial period of time.

2061.  Finally, due to the Defendants' breach of warranties as set forth herein,

Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth

- 523 -

in N.M. STAT. ANN. § 55-2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under N.M. STAT. ANN. § 55-2-711.

2062. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

<div align="center">

**COUNT IV**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On New Mexico Laws)**

</div>

2063. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2064. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Uniform Commercial Code as adopted in New Mexico, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2065. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2066. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2067. Defendants' breaches were malicious, fraudulent, oppressive, or committed recklessly with wanton disregard for the rights of the Plaintiffs and the Class.  Accordingly, as Defendants have acted with the requisite culpable state of mind, the Plaintiffs and the Class seek exemplary damages against Defendants in an amount to be determined at trial.

## COUNT V

## FRAUD BY CONCEALMENT

## (Based On New Mexico Law)

2068. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2069. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2070. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

- 525 -

2071. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2072. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2073. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2074. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2075. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received,

together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2076.  Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT VI___**

**UNJUST ENRICHMENT**

**(Based On New Mexico Law)**

</div>

2077.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2078.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2079.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  Defendants knowingly benefited at the expense of Plaintiffs and the Class.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

- 527 -

2080. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## COUNT VII

### VIOLATIONS OF THE NEW MEXICO
### UNFAIR TRADE PRACTICES ACT

### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)

2081. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2082. Defendants' above-described acts and omissions constitute unfair or deceptive acts or practices under the New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. §§ 57-12-1, *et seq.* ("New Mexico UTPA").

2083. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the New Mexico UTPA, including (1) representing that Defective Vehicles have characteristics and benefits, which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) using exaggeration as to a material fact and by doing so deceiving or tending to deceive, (4) failing to state a material fact and by doing so deceiving or tending to deceive, and (5) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not.

2084. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

010172-25 398181 v1

Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2085.  Defendants took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs and the Class to a grossly unfair degree. Defendants' actions resulted in a gross disparity between the value received and the price paid by Plaintiffs and the Class.  Defendants' actions constitute unconscionable actions under § 57-12-2(E) of the New Mexico UTPA.

2086.  Plaintiffs and the Class sustained damages as a result of the Defendants' unlawful acts and are, therefore, entitled to damages and other relief provided for under § 57-12-10 of the New Mexico UTPA.  Because Defendants' conduct was committed willfully, Plaintiffs and the Class seek treble damages.

2087.  Plaintiffs and the Class also seek court costs and attorneys' fees under § 57-12-10(C) of the New Mexico UTPA.

<div align="center">

**COUNT VIII**

**VIOLATIONS OF THE NEW MEXICO
MOTOR VEHICLE DEALERS FRANCHISING ACT**

**(N.M. Stat. Ann. §§ 57-16-1, *et seq.*)**

</div>

2088.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2089.  As alleged above, Defendants used false, misleading, and deceptive advertising in connection with their business in violation of the New Mexico Motor Vehicle Dealers Franchising Act, N.M. STAT. ANN. §§ 57-16-1, *et seq.* ("New Mexico MVDFA").

2090. Plaintiffs and the Class sustained damages as a result of the Defendants' unlawful acts and are, therefore, entitled to damages and other relief provided for under § 57-16-13 of the New Mexico MVDFA.  Because Defendants' conduct was committed maliciously, Plaintiffs and the Class seek treble damages.

2091. Plaintiffs and the Class also seek court costs and attorneys' fees under § 57-16-13 of the New Mexico MVDFA.

<div align="center">

**NEW YORK**

**COUNT I**

**DECEPTIVE ACTS OR PRACTICES**

**(N.Y. Gen. Bus. Law § 349)**

</div>

2092. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2093. New York General Business Law ("G.B.L.") § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

2094. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts.

2095. Toyota engaged in a deceptive acts or practices when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale.  Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that

<div align="center">

- 530 -

</div>

consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2096. The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class.  Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

2097. Because Toyota's deception takes place in the context of automobile safety, that deception affects the public interest.

2098. Toyota's unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers and have a broad impact on consumers at large.

2099. Plaintiffs and the Class suffered injury caused by Toyota's failure to disclose material information.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

2100. Pursuant to G.B.L. § 349, Plaintiffs are entitled to recover the greater of actual damages or $50.  Because Toyota acted willfully or knowingly, Plaintiffs are entitled to recover three times actual damages, up to $1,000.

<div align="center">

**COUNT II**

**FALSE ADVERTISING**

**(N.Y. Gen. Bus. Law § 350)**

</div>

2101. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

<div align="center">- 531 -</div>

2102. New York G.B.L. § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce...."  False advertising includes "advertising, including labeling, of a commodity ... if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of ... representations [made] with respect to the commodity...."  N.Y. G.B.L. § 350-a.

2103. Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiffs.

2104. Defendants have violated § 350 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

2105. Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing or leasing their vehicles, the Plaintiffs and the Class relied on the misrepresentations and/or omissions of Toyota with respect to the safety and reliability of the vehicles. Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control.  Had the Plaintiffs and the Class known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

2106.  Accordingly, the Plaintiffs and the Class overpaid for their Defective Vehicles and did not receive the benefit of the bargain for their Defective Vehicles, which have also suffered a diminution in value.

2107.  Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices.  Plaintiffs and the Class are also entitled to recover their actual damages or $500, whichever is greater.  Because Toyota acted willfully or knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000.

### COUNT III

### BREACH OF EXPRESS WARRANTY

### (N.Y. U.C.C. § 2-313)

2108.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2109.  Toyota is and was at all relevant times a merchant with respect to motor vehicles under N.Y. U.C.C. § 2-313.

2110.  The vehicles sold by Toyota are "things of danger," in that they are of such a character that when used for the purpose for which they are made they are likely to be a source of danger to several or many people if not properly designed and fashioned.

2111.  In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2112.  Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has

- 533 -

not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2113. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2114. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2115. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2116. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

- 534 -

2117. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2118. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses. The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

2119. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make whole.

2120. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in N.Y. U.C.C. §§ 2-608 and 2-711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under N.Y. U.C.C. §§ 2-608 and 2-711.

2121.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2122.  As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (N.Y. U.C.C. § 2-314)

2123.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2124.  Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2125.  The vehicles sold by Toyota are "things of danger," in that they are of such a character that when used for the purpose for which they are made they are likely to be a source of danger to several or many people if not properly designed and fashioned.

2126.  A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2127.  These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are

- 536 -

defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2128. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2129. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT V**

**REVOCATION OF ACCEPTANCE**

**(N.Y. U.C.C. § 2-608)**

</div>

2130. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2131. Plaintiffs identified above demanded revocation and the demands were refused.

2132. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

<div align="center">

- 537 -

</div>

2133.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2134.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2135.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2136.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2137.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2138.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

- 538 -

2139. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2140. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in N.Y. U.C.C. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2141. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VI

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On New York Law)

2142. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2143. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under New York's Uniform Commercial Code, Plaintiffs plead in the alternative under common law contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in

- 539 -

1   materials or workmanship of any part supplied by Toyota, and/or warranted the

2   quality or nature of those services to Plaintiffs.

3       2144. Toyota breached this warranty or contract obligation by failing to repair

4   the Defective Vehicles evidencing a sudden unintended acceleration problem,

5

6   including those that were recalled, or to replace them.

7       2145. As a direct and proximate result of Defendants' breach of contract or

8   common law warranty, Plaintiffs and the Class have been damaged in an amount to

9   be proven at trial, which shall include, but is not limited to, all compensatory

10  damages, incidental and consequential damages, and other damages allowed by law.

11                            **COUNT VII**

12                       **UNJUST ENRICHMENT**

13                      **(Based On New York Law)**

14

15      2146. Plaintiffs reallege and incorporate by reference all paragraphs as though

16  fully set forth herein.

17      2147. Toyota had knowledge of the safety defects in its vehicles, which it

18  failed to disclose to Plaintiffs and the Class.

19

20      2148. As a result of its wrongful and fraudulent acts and omissions, as set

21  forth above, pertaining to the design defect of their vehicles and the concealment of

22  the defect, Toyota charged a higher price for their vehicles than the vehicles' true

23  value and Toyota obtained monies which rightfully belong to Plaintiffs.

24      2149. Toyota was thus enriched at the expense of Plaintiffs, and it would be

25  against equity and good conscience for Toyota to retain these wrongfully obtained

26  profits.

27

28

2150. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

### NORTH CAROLINA

### COUNT I

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (N.C. Gen. Stat. § 25-2-314)

2151. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2152. Toyota is and was at all relevant times a merchant with respect to motor vehicles under N.C. GEN. STAT. § 25-2-314.

2153. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to N.C. GEN. STAT. § 25-2-314.

2154. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2155. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 541 -

amount of time after Toyota issued the recall and the allegations of vehicle defects
became public.

2156. As a direct and proximate result of Toyota's breach of the warranties of
merchantability, Plaintiffs and the Class have been damaged in an amount to be
proven at trial.

<div align="center">

**COUNT II**

**FRAUD BY CONCEALMENT**

**(Based On North Carolina Law)**

</div>

2157. Plaintiffs reallege and incorporate by reference all paragraphs as though
fully set forth herein.

2158. As set forth above, Defendants concealed and/or suppressed material
facts concerning the safety of their vehicles, which they were legally obligated to
disclose.

2159. Defendants had a duty to disclose these safety issues because they
consistently marketed their vehicles as safe and proclaimed that safety is one of
Toyota's highest corporate priorities.  Once Defendants made representations to the
public about safety, Defendants were under a duty to disclose these omitted facts,
because where one does speak one must speak the whole truth and not conceal any
facts which materially qualify those facts stated.  One who volunteers information
must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2160. In addition, Defendants had a duty to disclose these omitted material
facts because they were known and/or accessible only to Defendants who have
superior knowledge and access to the facts, and Defendants knew they were not
known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts

<div align="center">- 542 -</div>

were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2161. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2162. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2163. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as it did if they had known of the concealed and/or suppressed facts. Plaintiffs and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or to Plaintiffs and the Class.

2164. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to

1    rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and

2    consequential damages.

3           2165.  Defendants' acts were done maliciously, oppressively, deliberately, with

4    intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and

5    well-being to enrich Defendants.  Defendants' conduct warrants an assessment of

6    punitive damages in an amount sufficient to deter such conduct in the future, which

7

8    amount is to be determined according to proof.

9                                  **COUNT III**

10                            **UNJUST ENRICHMENT**

11                        **(Based On North Carolina Law)**

12

13          2166.  Plaintiffs reallege and incorporate by reference all paragraphs as though

14    fully set forth herein.

15          2167.  As a result of their wrongful and fraudulent acts and omissions, as set

16    forth above, pertaining to the design defect of their vehicles and the concealment of

17    the defect, Defendants charged a higher price for their vehicles than the vehicles'

18    true value and Defendants obtained monies which rightfully belong to Plaintiffs.

19

20          2168.  Defendants knowingly enjoyed the benefit of increased financial gains,

21    to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles

22    which actually had lower values.  It would be inequitable and unjust for Defendants

23    to retain these wrongfully obtained profits.

24          2169.  Plaintiffs, therefore, are entitled to restitution and seek an order

25    establishing Toyota as constructive trustees of the profits unjustly obtained, plus

26    interest.

27

28

010172-25 398181 v1

**COUNT IV**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On North Carolina Law)**

2170. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2171. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under North Carolina's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2172. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2173. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**NORTH DAKOTA**

**COUNT I**

**BREACH OF EXPRESS WARRANTY**

**(N.D. Cent. Code. § 41-02-30)**

2174. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 545 -

2175. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2176. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2177. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2178. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2179. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2180. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

- 546 -

2181. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2182. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2183. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2184. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2185. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in N.D. CENT. CODE § 41-02-71 (2-608), for a revocation of acceptance of the goods,

- 547 -

and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2186. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2187. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (N.D. Cent. Code § 41-02-31)

2188. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2189. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2190. A warranty that the Defective Vehicles were merchantable is implied by law in the instant transactions.

2191. These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA

- 548 -

events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2192. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

### UNJUST ENRICHMENT

### (Based On North Dakota Law)

2193. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2194. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2195. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota was enriched.

2196. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Plaintiffs were impoverished.

2197. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota obtained monies which rightfully belong to Plaintiffs.

2198. No justification exists for Toyota's enrichment at the expense of Plaintiffs' impoverishment.

2199. There is an absence of an equal or better remedy at law for Toyota's actions.

## COUNT IV

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT

## (N.D. Cent. Code § 51-15-02)

2200. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2201. The conduct of Toyota as set forth herein constitutes deceptive acts or practices, fraud, and misrepresentation, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms which Toyota failed to adequately investigate, disclose and remedy, and Toyota's misrepresentations and omissions regarding the safety and reliability of its vehicles.

2202. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

2203. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2204. Further, Toyota knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, Toyota is liable to Plaintiffs and the Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.

- 550 -

# COUNT V

## REVOCATION OF ACCEPTANCE

### (N.D. Cent. Code § 41-02-71 (2-608))

2205. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2206. Plaintiffs identified above demanded revocation and the demands were refused.

2207. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota. On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2208. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2209. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2210. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2211. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 551 -

2212. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2213. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2214. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2215. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 552 -

2216. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VI

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On North Dakota Law)

2217. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2218. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under North Dakota's Century Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2219. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2220. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

010172-25  398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT VII

## FRAUD BY CONCEALMENT

### (Based On North Dakota Law)

2221. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2222. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2223. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2224. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

- 554 -

2225. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2226. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2227. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2228. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2229. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of

010172-25  398181 v1

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## OHIO

## COUNT I

## VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT

### (Ohio Rev. Code Ann. § 1345.01, *et seq*.)

2230. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2231. The Ohio Consumer Protection Act, OHIO REV. CODE § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, the Act prohibits suppliers from representing that goods have characteristics or uses or benefits which they do not have. The Act also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

2232. Defendants are "suppliers" as that term is defined in the Ohio Consumer Protection Act, OHIO REV. CODE § 1345.01(C).

2233. Plaintiffs are "consumers" as that term is defined in the Ohio Consumer Protection Act, OHIO REV. CODE § 1345.01(D).

2234. The conduct of Defendants alleged above constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE § 1345.02 because Defendants represented through advertising and other marketing communications that the vehicles were new and free from defects and could be driven safely in normal operation. Instead, the vehicles were not of the standard, quality or grade of new vehicles.

- 556 -

2235. Defendants' conduct caused Plaintiffs' damages as alleged.

2236. Plaintiff specifically does not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

2237. As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, including, but not limited to, actual and statutory damages, treble damages, court costs and reasonable attorneys fees, pursuant to OHIO REV. CODE § 1345.09, *et seq*.

## COUNT II

## VIOLATION OF OHIO DECEPTIVE TRADE PRACTICES ACT

### (Ohio Rev. Code Ann. § 4165.01, *et seq*.

2238. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2239. OHIO REV. CODE § 4165.02(A) provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; … (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … [and] (11) Advertises goods or services with intent not to sell them as advertised."

- 557 -

2240. Defendants are "persons" within the meaning of OHIO REV. CODE § 4165.01(D).

2241. The vehicles sold to Plaintiffs were not of the particular sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities represented by Defendants.

2242. The vehicles sold to Plaintiffs were not of the particular standard, quality, and/or grade represented by Defendants.

2243. Defendants made false or misleading statements of fact concerning the vehicles Plaintiffs purchased – *i.e.*, that such vehicles were suitable for ordinary use – when Defendants, in fact, knew that they were defective and not suitable for ordinary use.

2244. These statements materially influenced Plaintiffs' decision to purchase the Defective Vehicles, in that Defendants' statements caused Plaintiffs to purchase vehicles that they otherwise would not have had they known of the dangerous defect.

2245. Defendants' deceptive trade practices caused Plaintiffs' damages as alleged.

2246. Defendants conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiffs.

2247. As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, including, but not limited to, actual and punitive damages, equitable relief and reasonable attorneys' fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III

## BREACH OF EXPRESS WARRANTY

### (Ohio Rev. Code Ann. § 1302.26, *et seq*. (U.C.C. § 2-313))

2248.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2249.  Defendants expressly warranted – through statements and advertisements described above – that the vehicles were of high quality, and, at a minimum, would actually work properly and safely.

2250.  Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

2251.  Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

## COUNT IV

## OHIO BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY STRICT LIABILITY

### (Ohio Rev. Code Ann. § 1302.27 (U.C.C. § 2-314))

2252.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2253.  Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

- 559 -

2254.  As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety systems which would prevent such acceleration or allow a driver to safely slow and stop the vehicle when such acceleration occurred.

2255.  These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to the Plaintiffs.

2256.  These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

## COUNT V

## OHIO NEGLIGENT DESIGN, ENGINEERING & MANUFACTURE
### (Based On Ohio Law)

2257.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2258.  Toyota is a manufacturer and supplier of automobiles.

2259.  Defendants owed Plaintiffs a non-delegable duty to exercise ordinary and reasonable care to properly design, engineer, and manufacture the vehicles against foreseeable hazards and malfunctions including uncontrollable acceleration.

2260.  Defendants owed Plaintiffs a non-delegable duty to exercise ordinary and reasonable care in designing, engineering and manufacturing the vehicles so that they would function normally, including that they would not accelerate out of control.

- 560 -

2261. Defendants also owed – and owe – a continuing duty to notify Plaintiffs of the problem at issue and to repair the dangerous defects.

2262. Defendants breached these duties of reasonable care by designing, engineering and manufacturing vehicles that accelerated out of control, and breached their continuing duty to notify Plaintiffs of these defects.

2263. The foreseeable hazards and malfunctions include, but are not limited to, the sudden and unanticipated and uncontrollable acceleration of these vehicles.

2264. Plaintiffs did not and could not know of the intricacies of these defects and their latent and dangerous manifestations, or the likelihood of harm therefrom arising in the normal use of their vehicles.

2265. At all relevant times, there existed alternative designs and engineering which were both technically and economically feasible.  Further, any alleged benefits associated with the defective designs are vastly outweighed by the real risks associated with sudden and uncontrollable acceleration.

2266. The vehicles were defective as herein alleged at the time they left Defendants' factories, and the vehicles reached Plaintiffs without substantial change in the condition in which they were sold.

2267. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages.

2268. Accordingly, Plaintiffs are entitled to recover appropriate damages including, but not limited to, diminution of value, return of lease payments and penalties, and injunctive relief related to future lease payments or penalties.

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COUNT VI

## FRAUD & FRAUDULENT CONCEALMENT

### (Based On Ohio Law)

2269. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2270. Toyota intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that is highly relevant to their purchasing decision.

2271. Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

2272. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

2273. Toyota had a duty to disclose this material safety information.

2274. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

2275. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Toyota knew its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009.  Toyota intentionally made the false statements in order to sell vehicles.

2276.  Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

2277.  As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2278.  Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of punitive damages.

### COUNT VII

### UNJUST ENRICHMENT

### (Based On Ohio Law)

2279.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2280.  Plaintiffs paid Toyota the value of vehicles that are non-defective, and in exchange, Toyota provided Plaintiffs vehicles that are, in fact, defective.

2281.  Further, Plaintiffs paid Toyota the value for vehicles that would not be compromised by substantial, invasive repairs, and in return received vehicles that require such repairs.

2282.  Further, Plaintiffs paid Toyota for vehicles they could operate, and in exchange, Toyota provided Plaintiffs vehicles that could not be normally operated because their defects posed the possibility of life-threatening injuries or death.

- 563 -

2283.  As such, Plaintiffs conferred a windfall upon Toyota, which knows of the windfall and has retained such benefits, which would be unjust for Toyota to retain.

2284.  As a direct and proximate result of Toyota's unjust enrichment, Plaintiffs have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through their misconduct.

## OKLAHOMA

## COUNT I

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT

## (Okla. Stat. tit. 15 § 751, *et seq.*)

2285.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2286.  The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

2287.  Toyota's actions as set forth above occurred in the conduct of trade or commerce.

2288.  Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the

- 564 -

wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

2289. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

2290. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2291. Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

2292. Pursuant to OKLA. STAT. tit. 15 § 751, Plaintiffs will serve the Oklahoma Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT II

## VIOLATION OF OKLAHOMA DECEPTIVE TRADE PRACTICES ACT

### (78 Okla. Stat. Ann. § 51, *et seq.*)

2293. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2294. The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

- 565 -

2295. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

2296. Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

2297. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

2298. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2299. Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

2300. Pursuant to OKLA. STAT. tit. 78 § 51, Plaintiffs will serve the Oklahoma Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT III

## BREACH OF EXPRESS WARRANTY

## (12A Okla. Stat. Ann. § 2-313)

2301. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2302. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

- 566 -

2303. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2304. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2305. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2306. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2307. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2308. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is

- 567 -

insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2309. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2310. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2311. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2312. Finally, due to the Defendants' breach of warranties as set forth herein,

2313. Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in 12A OKLA. STAT. ANN. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 568 -

2314. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2315. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT IV

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (12A Okla. Stat. Ann. § 2-314)

2316. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2317. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2318. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to 12A OKLA. STAT. ANN. § 2-314.

2319. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against

- 569 -

1   such SUA events, nor do they have a brake-override; and the ETCS system was not

2   adequately tested.

3       2320.  Toyota was provided notice of these issues by numerous complaints

4   filed against it, including the instant complaint, and by numerous individual letters

5   and communications sent by Plaintiffs and the Class before or within a reasonable

6   amount of time after Toyota issued the recall and the allegations of vehicle defects

7

8   became public.

9       2321.  Plaintiffs and the Class have had sufficient dealings with either the

10  Defendants or their agents (dealerships) to establish privity of contract between

11  Plaintiffs and the Class.  Notwithstanding this, privity is not required in this case

12  because Plaintiffs and the Class are intended third-party beneficiaries of contracts

13  between Toyota and its dealers; specifically, they are the intended beneficiaries of

14  Toyota's implied warranties.  The dealers were not intended to be the ultimate

15  consumers of the Defective Vehicles and have no rights under the warranty

16  agreements provided with the Defective Vehicles; the warranty agreements were

17  designed for and intended to benefit the ultimate consumers only.  Finally, privity is

18  also not required because Plaintiffs' and Class members' Toyotas are dangerous

19  instrumentalities due to the aforementioned defects and nonconformities.

20

21      2322.  As a direct and proximate result of Toyota's breach of the warranties of

22  merchantability, Plaintiffs and the Class have been damaged in an amount to be

23  proven at trial.

24

25

26

27

28

010172-25  398181 v1

# COUNT V

## REVOCATION OF ACCEPTANCE

### (12A Okla. Stat. Ann. § 2-608)

2323. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2324. Plaintiffs identified above demanded revocation and the demands were refused.

2325. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2326. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2327. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2328. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2329. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 571 -

2330.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2331.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2332.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2333.  Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in 12A OKLA. STAT. ANN. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 572 -

2334. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VI

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Oklahoma Law)

2335. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2336. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Oklahoma's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2337. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2338. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# COUNT VII

## FRAUD BY CONCEALMENT

### (Based On Oklahoma Law)

2339. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2340. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2341. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2342. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2343. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2344. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2345. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2346. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2347. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of

- 575 -

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VIII

## UNJUST ENRICHMENT

### (Based On Oklahoma Law)

2348.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2349.  Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2350.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

2351.  Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2352.  Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

010172-25  398181 v1

# OREGON

# COUNT I

# VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT

## (Or. Rev. Stat. §§ 646.605, *et seq.*)

2353.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2354.  The Oregon Unfair Trade Practices Act ("OUTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; and (i) Advertis[ing] … goods or services with intent not to provide them as advertised."  OR. REV. STAT. § 646.608(1).

2355.  Toyota is a person within the meaning of OR. REV. STAT. § 646.605(4).

2356.  The Defective Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

2357.  In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; and advertising Defective Vehicles

- 577 -

with the intent not to sell them as advertised.  Toyota knew or should have known that its conduct violated the OUTPA.

2358.  As a result of these unlawful trade practices, Plaintiffs have suffered ascertainable loss.

2359.  Toyota engaged in a deceptive trade practice when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale.  Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2360.  The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class.  Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

2361.  Plaintiffs and the Class suffered ascertainable loss caused by Toyota's failure to disclose material information.  Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

2362.  Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1).  Plaintiffs are also entitled to punitive damages because Toyota engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

2363.  Pursuant to OR. REV. STAT. § 646.638(2), Plaintiffs will mail a copy of the complaint to Oregon's attorney general.

- 578 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Or. Rev. Stat. § 72.3140)

2364. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2365. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2366. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2367. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2368. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2369. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

## REVOCATION OF ACCEPTANCE

### (Or. Rev. Stat. § 72.6080)

2370.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2371.  Plaintiffs identified above demanded revocation and the demands were refused.

2372.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2373.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2374.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2375.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2376.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 580 -

2377. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2378. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2379. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2380. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in OR. REV. STAT. § 72.6080, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

010172-25 398181 v1

2381. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT IV

## FRAUD BY CONCEALMENT

### (Based On Oregon Law)

2382. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2383. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2384. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2385. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a

- 582 -

vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2386. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2387. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2388. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2389. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2390. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT V**

**UNJUST ENRICHMENT**

**(Based On Oregon Law)**

</div>

2391. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2392. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2393. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

2394. Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2395. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

010172-25 398181 v1

# PENNSYLVANIA

## COUNT I

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (73 P.S. § 201-1, *et seq.*)

2396. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2397. The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

2398. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

2399. Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

2400. Plaintiffs and the Class suffered ascertainable loss as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

- 585 -

2401. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2402. Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (13 Pa. Cons. Stat. Ann. § 2313)

2403. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2404. Toyota is and was at all relevant times a seller with respect to motor vehicles.

2405. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2406. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2407. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2408. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., of the MCC.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in

- 586 -

advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

2409. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2410. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2411. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2412. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2413. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2414. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in 13 PA. CONS. STAT. § 2608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2415. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2416. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

- 588 -

# COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (13 Pa. Cons. Stat. Ann. § 2314)

2417. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2418. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2419. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2420. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2421. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2422. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

- 589 -

**COUNT IV**

**UNJUST ENRICHMENT**

**(Based On Pennsylvania Law)**

2423. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2424. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2425. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

2426. Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2427. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

**COUNT V**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On Pennsylvania Law)**

2428. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2429. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Pennsylvania's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2430. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2431. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

### RHODE ISLAND

### COUNT I

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

### (R.I. Gen. Laws § 6-13.1, *et seq.*)

2432. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2433. Plaintiffs are persons who purchase or lease goods primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

2434. Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including:  "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. Gen. Laws § 6-13.1-1(6).

2435. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

2436. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

2437. Plaintiffs suffered ascertainable loss of money as a result of Toyota's violation of the UTPCPA.

- 592 -

2438. Plaintiffs and the Class were injured as a result of Toyota's conduct in that Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Toyota's misrepresentations and omissions.

2439. Accordingly, Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (R.I. Gen. Laws § 6A-2-314)

2440. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2441. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2442. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2443. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2444. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters

- 593 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2445. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

## REVOCATION OF ACCEPTANCE

## (R.I. Gen. Laws § 6A-2-608)

2446. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2447. Plaintiffs identified above demanded revocation and the demands were refused.

2448. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2449. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2450. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

- 594 -

2451.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2452.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2453.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2454.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2455.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their

010172-25 398181 v1

Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2456. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in R.I. GEN. LAWS § 6A-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2457. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

### COUNT IV

### UNJUST ENRICHMENT

### (Based On Rhode Island Law)

2458. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2459. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2460. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

010172-25 398181 v1

2461. Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2462. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

## SOUTH CAROLINA

## COUNT I

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (S.C. Code § 36-2-314)

2463. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2464. Toyota is and was at all relevant times a merchant with respect to motor vehicles under S.C. CODE § 36-2-314 .

2465. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to S.C. CODE § 36-2-314.

2466. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

- 597 -

2467. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2468. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT II

## UNJUST ENRICHMENT

## (Based On South Carolina Law)

2469. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2470. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2471. Defendants knowingly enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

2472. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

- 598 -

# COUNT III

## VIOLATIONS OF THE SOUTH CAROLINA
## UNFAIR TRADE PRACTICES ACT

### (S.C. Code Ann. § 39-5-10, *et seq.*)

2473. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2474. Defendants are "persons" under S.C. CODE ANN. § 39-5-10.

2475. Defendants both participated in unfair or deceptive acts or practices that violated the South Carolina Unfair Trade Practices Act (the "Act"), S.C. CODE ANN. § 39-5-10, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the Act because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

2476. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in unfair or deceptive practices prohibited by the Act, S.C. CODE ANN. § 39-5-10, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective

- 599 -

Vehicles has been supplied in accordance with a previous representation when it has not.

2477. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2478. Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

2479. Defendants each owed Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

2480. Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

2481. Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or

2482. Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2483. Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians,

and the public at large, because they are susceptible to incidents of sudden unintended acceleration.

2484. Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

2485. TMC's and TMS's unfair or deceptive trade practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

2486. As a result of its violations of the Act detailed above, Defendants caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe. ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

2487. Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the Act, and these violations present a continuing risk to Plaintiffs as well as to the general public.

2488. Pursuant to S.C. CODE ANN. § 39-5-140, Plaintiffs seek monetary relief against TMS and TMC to recover for their sustained losses.

- 601 -

2489.  Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result. Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles they repeatedly promised Plaintiffs were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

2490.  The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

2491.  Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees, and any other just and proper relief available under the Act.

### COUNT IV

### VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT

### (S.C. Code Ann. § 56-15-10, *et seq.*)

2492.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 602 -

2493. Defendants are "manufacturers" as set forth in S.C. CODE ANN. § 56-15-10, as they are engaged in the business of manufacturing or assembling new and unused motor vehicles.

2494. Defendants both participated in unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE ANN. § 56-15-30.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the Dealers Act because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

2495. Defendants have engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the Class, and to the public. Defendants have directly participated in the wrongful conduct.

2496. Defendants' bad faith and unconscionable actions include, but are not limited to:  (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

2497. Defendants have resorted to and used false and misleading advertisement in connection with their business.  As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles

- 603 -

that were either false or misleading.  Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2498. Pursuant to S.C. CODE ANN. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

2499. Plaintiffs and the Class are entitled to double the actual damages, the cost of the suit, attorney's fees pursuant to S.C. CODE ANN. § 56-15-110, and Plaintiffs also seek injunctive relief under S.C. CODE ANN. § 56-15-110.  Plaintiffs also seek treble damages because Defendants have acted maliciously.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On South Carolina Law)

2500. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2501. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under South Carolina's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2502. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2503. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## SOUTH DAKOTA

## COUNT I

## BREACH OF EXPRESS WARRANTY

### (S.D. Codified Laws § 57A-2-313)

2504. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2505. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2506. Under S.D. CODIFIED LAWS § 57A-2-318, Plaintiffs have the same standing as any direct purchaser of a vehicle from Toyota.

2507. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2508. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

- 605 -

2509. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2510. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2511. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2512. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2513. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2514.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2515.  Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2516.  Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in S.D. CODIFIED LAWS § 57A-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2517.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

- 607 -

2518.  As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (S.D. Codified Laws § 57A-2-314)

2519.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2520.  Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2521.  A warranty that the Defective Vehicles were merchantable is implied by law in the instant transactions.

2522.  Under S.D. CODIFIED LAWS § 57A-2-318, Plaintiffs have the same standing as any direct purchaser of a vehicle from Toyota.

2523.  These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2524.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

# COUNT III

## UNJUST ENRICHMENT

### (Based On South Dakota Law)

2525. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2526. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2527. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota received such higher price as a benefit.

2528. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota knew that it had received such higher price as benefit.

2529. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota was able to charge a higher price for their vehicles than the vehicles' true value, and the benefit it received as a result unjustly enriches Toyota unless and until such benefit is reimbursed to Plaintiff.

2530. No justification exists for Toyota to keep such benefit without reimbursing it to Plaintiffs.

# COUNT IV

## VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES ACT

### (S.D. Codified Laws § 37-24-6)

2531. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2532. The conduct of Toyota as set forth herein constitutes deceptive acts or practices, fraud, and misrepresentation, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms which Toyota failed to adequately investigate, disclose and remedy, and Toyota's misrepresentations and omissions regarding the safety and reliability of its vehicles.

2533. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

2534. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2535. Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs and the Class are entitled to a recovery of their actual damages suffered as a result of Toyota's acts and practices.

- 610 -

# COUNT V

## REVOCATION OF ACCEPTANCE

### (S.D. Codified Laws § 57A-2-608)

2536. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2537. Plaintiffs identified above demanded revocation and the demands were refused.

2538. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2539. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2540. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2541. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2542. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

010172-25 398181 v1

2543.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2544.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2545.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2546.  Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

- 612 -

2547.  Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VI

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On South Dakota Law)

2548.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2549.  To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under South Dakota's Codified Laws, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2550.  Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2551.  As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

010172-25 398181 v1

# TENNEESSEE

## COUNT I

### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT

### (Tenn. Code Ann. § 47-18-101, *et seq.*)

2552. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2553. Defendants misrepresented the safety of the Defective Vehicles after learning of their defects with the intent that Plaintiffs relied on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

2554. Plaintiffs did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

2555. Through these misleading and deceptive statements and false promises, Defendants violated the Tennessee Consumer Protection Act.

2556. The Tennessee Consumer Protection Act applies to Defendants' transactions with Plaintiffs because Defendants' deceptive scheme was carried out in Tennessee and affected Plaintiffs.

2557. Defendants also failed to advise the NHSTA and the public about what they knew about the sudden and unintended acceleration defects in the Defective Vehicles.

2558. Plaintiffs relied on Defendants' silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Defective Vehicles.

2559. As a direct and proximate result of Defendants' deceptive conduct and violation of the Tennessee Consumer Protection Act, Plaintiffs have sustained and

- 614 -

will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### COUNT II

### FRAUDULENT MISREPRESENTATION & FRAUDULENT CONCEALMENT

### (Based On Tennessee Law)

2560. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2561. As described above, Defendants made material omissions and affirmative misrepresentations regarding the Defective Vehicles.

2562. Defendants knew these representations were false when made.

2563. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms.

2564. Toyota had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to sudden, extreme acceleration without adequate fail-safe mechanisms because Plaintiffs relied on Toyota's representations that the vehicles they were purchasing were safe and free from defects.

2565. The aforementioned concealment was material because if it had been disclosed Plaintiffs would not have bought or leased the vehicles.

2566. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor

- 615 -

vehicle.  Toyota knew or recklessly disregarded that its representations were false because it knew that people had died in its vehicles' unintended acceleration between 2002 and 2009.  Toyota intentionally made the false statements in order to sell vehicles.

2567. Plaintiffs relied on Toyota's reputation – along with Toyota's failure to disclose the acceleration problems and Toyota's affirmative assurance that its vehicles were safe and reliable and other similar false statements – in purchasing or leasing Toyota's vehicles.

2568. As a result of their reliance, Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

2569. Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of punitive damages.

<div align="center">

**COUNT III**

**BREACH OF EXPRESS WARRANTY**

**(Tenn. Code Ann. § 47-2-313)**

</div>

2570. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2571. Defendants are and at all relevant times were sellers as defined by TENN. CODE ANN. § 47-2-103.

2572. Defendants expressly affirmed – through uniform statements, "e-brochures" and advertisements described above – that the vehicles were of high

<div align="center">

- 616 -

</div>

quality, and, at a minimum, would actually work properly and safely.  These affirmations became part of the basis of the bargain.

2573.  Defendants breached this warranty by knowingly selling to Plaintiffs vehicles with dangerous defects, and which were not of high quality.

2574.  Plaintiffs have been damaged as a direct and proximate result of the breaches by Defendants in that the Defective Vehicles purchased by Plaintiffs were and are worth far less than what the Plaintiffs paid to purchase, which was reasonably foreseeable to Defendants.

2575.  Plaintiffs were unaware of these defects and could not have reasonably discovered them when they purchased their vehicles from Toyota.

2576.  Plaintiffs and the Class are entitled to damages, including the diminished value of their vehicles and the value of the non-use of the vehicles pending successful repair, in addition to any costs associated with purchasing safer vehicles, incidental and consequential damages, and all other damages allowable under the law, including such further relief as the Court deems just and proper.

<div align="center">

**COUNT IV**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Tenn. Code Ann. § 47-2-314)**

</div>

2577.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2578.  Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

<div align="center">- 617 -</div>

2579.  As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety systems which would prevent such acceleration or allow a driver to safely slow and stop the vehicle when such acceleration occurred.

2580.  These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to the Plaintiffs. Furthermore, because of these dangerous defects, Plaintiffs did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

2581.  These dangerous defects were the direct and proximate cause of damages to the Plaintiffs.

## COUNT V

## UNJUST ENRICHMENT

### (Based On Tennessee Law)

2582.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2583.  Plaintiffs paid Toyota the value of vehicles that are non-defective, and in exchange, Toyota provided Plaintiffs vehicles that are, in fact, defective.

2584.  Further, Plaintiffs paid Toyota the value for vehicles that would not be compromised by substantial, invasive repairs, and in return received vehicles that require such repairs.

- 618 -

2585. Further, Plaintiffs paid Toyota for vehicles they could operate, and in exchange, Toyota provided Plaintiffs vehicles that could not be normally operated because their defects posed the possibility of life-threatening injuries or death.

2586. As such, Plaintiffs conferred a windfall upon Toyota, which knows of the windfall and has retained such benefits, which would be unjust for Toyota to retain.

2587. As a direct and proximate result of Toyota's unjust enrichment, Plaintiffs have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through their misconduct.

## TEXAS

## COUNT I

## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

### (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

2588. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2589. Defendants' above-described acts and omissions constitute false, misleading or deceptive acts or practices under the Texas Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41, *et seq.* ("Texas DTPA").

2590. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the Texas DTPA, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have,

- 619 -

(2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) failing to disclose information concerning Defective Vehicles with the intent to induce consumers to purchase or lease the Defective Vehicles.

2591. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2592. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

2593. In purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect of the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control. Had the Named Plaintiffs known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

2594. Defendants also breached express and implied warranties to Plaintiffs and the Class, as set out above, and are, therefore liable to Plaintiffs and the Class for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.   Defendants' actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

- 620 -

2595. Plaintiffs and the Class sustained damages as a result of the Defendants unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.  Because Defendants' conduct was committed knowingly and/or intentionally, the Plaintiffs and the Class are entitled to treble damages.

2596. For those Plaintiffs and the Class who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

2597. Plaintiffs and the Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Tex. Bus. & Com. Code § 2.313)

2598. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2599. Toyota is and was at all relevant times a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

2600. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2601. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

- 621 -

2602. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities as set forth above.

2603. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2604. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2605. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2606. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2607.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

2608.  Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2609.  Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in TEX. BUS. & COM. CODE § 2.711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under  TEX. BUS & COM. CODE §§ 2.711 and 2.608.

2610.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 623 -

amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2611. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Tex. Bus. & Com. Code § 2.314)

2612. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2613. Toyota is and was at all relevant times a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

2614. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to TEX. BUS. & COM. CODE § 2.314.

2615. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2616. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters

- 624 -

and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public

2617. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Tex. Bus. & Com. Code § 2.608)**

</div>

2618. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2619. Plaintiffs identified above demanded revocation and the demands were refused.

2620. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2621. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2622. There has been no substantial change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

010172-25 398181 v1

2623.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2624.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2625.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2626.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2627.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their

Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2628. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in TEX. BUS. & COM. CODE § 2.711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under TEX. BUS. & COM. CODE § 2.711.

2629. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Texas Law)

2630. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2631. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Texas Business and Commerce Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed

- 627 -

to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2632. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2633. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

<center>

**COUNT VI**

**FRAUD BY CONCEALMENT**

**(Based On Texas Law)**

</center>

2634. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2635. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2636. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

<center>- 628 -</center>

2637. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2638. Defendants were deliberately silent and actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2639. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2640. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were reasonable and justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2641. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.  For those Plaintiffs and the Class who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received,

together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2642.  Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

<div align="center">

**COUNT VII**

**UNJUST ENRICHMENT**

**(Based On Texas Law)**

</div>

2643.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2644.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2645.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable, unjust, and unconscionable for Defendants to retain these wrongfully obtained profits.

010172-25 398181 v1

2646. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## UTAH

## COUNT I

## BREACH OF EXPRESS WARRANTY

## (Utah Code Ann. § 70A-2-313)

2647. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2648. Toyota is and was at all relevant times a merchant as defined by the Uniform Commercial Code.

2649. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2650. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2651. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2652. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by

- 631 -

Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2653. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2654. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2655. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2656. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2657. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as

those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2658. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in U.C.A. § 70A-2-608 for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently.

2659. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2660. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Utah Code Ann. § 70A-2-314)

2661. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2662. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

- 633 -

2663.  A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transactions.

2664.  These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2665.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2666.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT III

## REVOCATION OF ACCEPTANCE

### (Utah Code Ann. § 70A-2-608)

2667.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2668.  Plaintiffs identified above demanded revocation and the demands were refused.

- 634 -

010172-25 398181 v1

2669.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2670.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2671.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2672.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2673.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2674.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2675. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2676. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2677. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in U.C.A § 70A-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2678. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT IV**

**BREACH OF CONTRACT/COMMON LAW WARRANTY**

**(Based On Utah Law)**

2679.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2680.  To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Utah Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2681.  Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2682.  As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**

**UNJUST ENRICHMENT**

**(Based On Utah Law)**

2683.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2684. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2685. Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

2686. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## VERMONT

### COUNT I

### VIOLATION OF VERMONT CONSUMER FRAUD ACT

### (Vt. Stat. Ann. tit. 9, § 2451 *et seq.*)

2687. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2688. The Vermont Consumer Fraud Act ("VCFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" Vt. Stat. Ann. tit. 9, § 2453(a).

2689. Toyota is a seller within the meaning of the VCFA.  Vt. Stat. Ann. tit. 9, § 2451(a)(c).

2690. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as

- 638 -

described above.  This was a deceptive act in that Toyota represented that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; represented that Defective Vehicles are of a particular standard and quality when they are not; and advertised Defective Vehicles with the intent not to sell them as advertised.  Toyota knew or should have known that its conduct violated the VCFA.

2691.  Toyota engaged in a deceptive trade practice under the VCFA when it failed to disclose material information concerning the Toyota vehicles which was known to Toyota at the time of the sale.  Toyota deliberately withheld the information about the vehicles' propensity for rapid, uncontrolled acceleration in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

2692.  The information withhold was material in that it was information that was important to consumers and likely to affect their choice of, or conduct regarding, the purchase of their cars.  Toyota's withholding of this information was likely to mislead consumers acting reasonably under the circumstances.  The propensity of the Toyotas for rapid, uncontrolled acceleration and their lack of a fail-safe mechanism were material to Plaintiffs and the Class.  Had Plaintiffs and the Class known that their Toyotas had these serious safety defects, they would not have purchased their Toyotas.

2693.  Toyota's conduct has caused or is to cause a substantial injury that is not reasonably avoided by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition.

2694.  Plaintiffs and the Class have suffered injury and damages as a result of Toyota's false or fraudulent representations and practices in violation of § 2453.

- 639 -

Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain.  The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

2695. Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

<div align="center">

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(Vt. Stat. Ann. tit. 9A § 2-313)**

</div>

2696. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2697. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2698. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2699. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2700. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

<div align="center">

- 640 -

</div>

2701. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2702. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2703. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2704. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2705. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the

warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2706.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the class whole.

2707.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set for in Vt. Stat. Ann. tit. 9, § 2-608, for revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2708.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2709.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amounted to be determined at trial.

- 642 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (Vt. Stat. Ann. tit. 9A §2-314)

2710.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2711.  Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2712.  A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2713.  These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2714.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2715.  As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

- 643 -

# COUNT IV

## REVOCATION OF ACCEPTANCE

### (Vt. Stat. Ann. tit. 9A §2-608)

2716. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2717. Plaintiffs identified above demanded revocation and the demands were refused.

2718. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2719. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2720. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2721. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2722. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

- 644 -

2723.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2724.  Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2725.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2726.  Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

- 645 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT V**

**BREACH OF CONTRACT**

**(Based On Vermont Law)**

2727.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2728.  To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Vermont's Commercial Code, Plaintiffs plead in the alternative under common law contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2729.  Toyota breached this contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2730.  As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT VI**

**UNJUST ENRICHMENT**

**(Based On Vermont Law)**

2731.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 646 -

2732.  Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2733.  As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for its vehicles than the vehicles' true value.  Toyota accordingly received a benefit from Plaintiffs to Plaintiffs' detriment.

2734.  Toyota appreciated, accepted and retained the benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2735.  Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

### WASHINGTON

### COUNT I

### VIOLATION OF THE CONSUMER PROTECTION ACT

### (Rev. Code Wash. Ann. §§ 19.86.010, *et seq.*)

2736.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2737.  The conduct of Toyota as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Toyota's manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanisms, which Toyota failed to adequately investigate, disclose and

- 647 -

remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

2738. Toyota's actions as set forth above occurred in the conduct of trade or commerce.

2739. Toyota's actions impact the public interest because Plaintiffs were injured in exactly the same way as millions of others purchasing and/or leasing Toyota vehicles as a result of Toyota's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Toyota's business.

2740. Plaintiffs and the Class were injured as a result of Defendant's conduct. Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.

2741. Toyota's conduct proximately caused the injuries to Plaintiffs and the Class.

2742. Toyota is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

2743. Pursuant to WASH. REV. CODE. ANN. § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Rev. Code Wash. § 62A.2-313)

2744. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 648 -

2745. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2746. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2747. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2748. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2749. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2750. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

- 649 -

2751. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2752. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2753. Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiff and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

2754. Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2755. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in REV. CODE WASH. § 62A.2-608, for a revocation of acceptance of the goods, and

- 650 -

for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2756. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2757. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

### COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Rev. Code Wash. § 62A.2-614)

2758. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2759. Toyota is and was at all relevant times a merchant with respect to motor vehicles.

2760. A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

2761. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against

- 651 -

such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2762. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2763. Privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

2764. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE**

**(Rev. Code Wash. § 62A.2-608)**

</div>

2765. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2766. Plaintiffs identified above demanded revocation and the demands were refused.

<div align="center">- 652 -</div>

2767.  Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2768.  Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2769.  There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2770.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2771.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2772.  These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

- 653 -

2773. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2774. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

2775. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in REV. CODE WASH. § 62A.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned.

2776. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

010172-25 398181 v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Washington Law)

2777. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2778. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Washington's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2779. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2780. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VI

## FRAUD BY CONCEALMENT

### (Based On Washington Law)

2781. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 655 -

2782. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2783. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2784. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2785. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2786. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages.

2787. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and

- 656 -

1   well-being to enrich Defendants. Defendants' conduct warrants an assessment of

2   punitive damages in an amount sufficient to deter such conduct in the future, which

3   amount is to be determined according to proof.

### COUNT VII

### UNJUST ENRICHMENT

### (Based On Washington Law)

2788. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2789. Toyota had knowledge of the safety defects in its vehicles, which it failed to disclose to Plaintiffs and the Class.

2790. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Toyota charged a higher price for their vehicles than the vehicles' true value and Toyota obtained monies which rightfully belong to Plaintiffs.

2791. Toyota appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Toyota to retain these wrongfully obtained profits.

2792. Plaintiffs, therefore, are entitled to restitution and seek an order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

**WEST VIRGINIA**

**COUNT I**

**VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**

**(W. Va. Code § 46A-1-101, *et seq.*)**

2793. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2794. Defendants are "persons" under W.Va. Code § 46A-1-102(31).

2795. Plaintiffs are "consumers," as defined by W.Va. Code §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective Vehicles.

2796. Defendants both participated in unfair or deceptive acts or practices that violated the Consumer Credit and Protection Act ("CCPA"), W. Va. Code § 46A-1-101, *et seq.* as described above and below. Defendants each are directly liable for these violations of law. TMC also is liable for TMS's violations of the CCPA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

2797. By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the CCPA, W. Va. Code § 46A-1-101, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a

- 658 -

transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

2798.  As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2799.  Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  Defendants nevertheless failed to warn Plaintiffs about these inherent dangers despite having a duty to do so.

2800.  Defendants each owed Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

        a.     Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

        b.     Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiffs; and/or

        c.     Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

- 659 -

2801. Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden unintended acceleration.

2802. Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

2803. TMC's and TMS's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

2804. Defendants have also engaged in business acts or practices that are unlawful because they violate the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

2805. FMVSS 124, codified at 49 C.F.R. § 571.124, sets the standard for accelerator control systems.  Specifically, FMVSS 124 establishes requirements for the return of a vehicle's throttle to the idle position when the driver removes the actuating force from the accelerator control, or in the event of a severance or disconnection in the accelerator control system. The purpose of FMVSS 124 is to

reduce deaths and injuries resulting from engine overspeed caused by malfunctions in the accelerator control system.

2806. FMVSS 124 requires that throttles in passenger vehicles return to the idle position within certain maximum allowable times after the driver has removed the actuating force from the accelerator control:  one second for vehicles of 4,536 kilograms or less gross vehicle weight rating ("GVWR"), two seconds for vehicles of more than 4,536 kilograms GVWR, and three seconds for any vehicle that is exposed to ambient air at – 18 degrees Celsius to – 40 degrees Celsius.

2807. Defective Vehicles equipped with ETCS do not comply with FMVSS 124 because a design defect causes their throttles to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

2808. Defendants each violated 49 U.S.C. § 3-112(a)(1) by manufacturing for sale, selling, offering for introduction in interstate commerce, or importing into the United States, Defective Vehicles equipped with ETCS that failed to comply with FMVSS 124.

2809. Defendants each violated 49 U.S.C. § 30115(a) by certifying that Defective Vehicles equipped with ETCS complied with FMVSS 124 when, in the exercise of reasonable care, Defendants each had reason to know that the certification was false or misleading because a design defect causes throttles in Defective Vehicles equipped with ETCS to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum

- 661 -

allowable time after the driver has removed the actuating force from the accelerator control.

2810. As a result of its violations of the CCPA detailed above, Defendants caused ascertainable loss to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

2811. Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the CCPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.

2812. On November 13, 2009, notice was sent to TMS in compliance with W. VA. CODE § 46A-6-106.  Specifically, Plaintiffs sent a notice and demand letter via certified mail to TMS's principal place of business in California, thereby satisfying W. VA. CODE § 46A-1-106(b).  On or about November 20, 2009, a notice and demand letter was set via certified mail to TMC's address in Washington, DC, where TMC acted with its United States subsidiaries to take actions violating the CCPA, and where TMC otherwise acted in violation of that statute.  Over twenty days have since passed without TMS or TMC taking, or agreeing to take, the appropriate corrective measures.

2813. Pursuant to W. VA. CODE § 46A-1-106, Plaintiffs seek monetary relief against TMS and TMC measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per

- 662 -

violation of the CCPA for each Plaintiff and each member of the Class they seek to represent.

2814. Plaintiffs also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result. Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

2815. The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

2816. Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the CCPA.

<div align="center">

**COUNT II**

**BREACH OF EXPRESS WARRANTY**

**(W. Va. Code § 46-2-313)**

</div>

2817. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

<div align="center">- 663 -</div>

2818. Toyota is and was at all relevant times a seller of motor vehicles under W. Va. Code § 46-2-313, and is also a "merchant" as the term is used in W. Va. Code § 46A-6-107.

2819. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2820. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2821. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2822. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*. Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS. These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

2823. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Toyota did not

- 664 -

1  provide at the time of sale, and has not provided since then, vehicles conforming to

2  these express warranties.

3     2824. Furthermore, the limited warranty of repair and/or adjustments to

4  defective parts, fails in its essential purpose because the contractual remedy is

5  insufficient to make the Plaintiffs and the Class whole and because the Defendants

6  have failed and/or have refused to adequately provide the promised remedies within

7  a reasonable time.

8

9     2825. Accordingly, recovery by the Plaintiffs is not limited to the limited

10  warranty of repair or adjustments to parts defective in materials or workmanship, and

11  Plaintiffs seek all remedies as allowed by law.

12

13     2826. Also, as alleged in more detail herein, at the time that Defendants

14  warranted and sold the vehicles they knew that the vehicles did not conform to the

15  warranties and were inherently defective, and Defendants wrongfully and

16  fraudulently misrepresented and/or concealed material facts regarding their vehicles.

17  Plaintiffs were therefore induced to purchase the vehicles under false and/or

18  fraudulent pretenses.  The enforcement under these circumstances of any limitations

19  whatsoever precluding the recovery of incidental and/or consequential damages is

20  unenforceable.

21

22     2827. Additionally, the enforcement under these circumstances of any

23  limitations on the recovery of incidental and/or consequential damages, or indeed

24  any limitations whatsoever on any express warranty, is unenforceable pursuant to

25  W. Va. Code § 46A-6-107 (2).

26

27     2828. Moreover, many of the damages flowing from the Defective Vehicles

28  cannot be resolved through the limited remedy of "replacement or adjustments," as

- 665 -

010172-25 398181 v1

those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2829. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in W. VA. CODE § 46A-6A-4, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under W. VA. CODE § 46A-6A-1, *et seq.*

2830. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2831. As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

### COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. Va. Code § 46-2-314)

2832. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 666 -

2833. Toyota is and was at all relevant times a seller of motor vehicles under W. VA. CODE § 46-2-314, and is also a "merchant" as the term is used in W. VA. CODE § 46A-6-107 and § 46-2-314.

2834. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to W. VA. CODE § 46-2-314.

2835. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2836. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2837. Plaintiffs and the Class have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and Toyota. Notwithstanding this, privity is not required in this case for the Plaintiffs pursuant to W. VA. CODE § 46A-6-107. Moreover, privity is not required as to any Plaintiff because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not

- 667 -

intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate users or owners only.  Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

2838. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT IV**

**REVOCATION OF ACCEPTANCE/STATUTORY CLAIM
FOR DIMINISHED VALUE**

**(W. Va. Code § 46A-6A-1, *et seq*. and W. Va. Code § 46-2-608)**

</div>

2839. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2840. Plaintiffs are "consumers," as defined by W.Va. Code §§ 46A-1-102(12), 46A-6-102(2) and 46A-6A-2 who purchased or leased one or more Defective Vehicles.

2841. Toyota is and was at all relevant times a "manufacturer" of motor vehicles under W. Va. Code § 46A-6A-2.

2842. The warranties described in Count III, above, are "manufacturer's express warrant[ies]" under W. Va. Code § 46A-6A-2.

2843. The Defective Vehicles are "motor vehicles" under W. Va. Code § 46A-6A-2.

<div align="center">

- 668 -

</div>

2844.  As set forth above, the defective vehicles do not conform to all applicable express warranties.

2845.  Toyota was provided notice of these nonconformities by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2846.  Toyota has been unable or unwilling to repair the Defective Vehicles so as to conform to the Defective Vehicles to its warranties.  Additionally, Toyota has refused to replace the Defective Vehicles with new motor vehicles which are not defective.

2847.  The nonconformities set forth above, above, substantially impair the use and market value of the Defective Vehicles, and Defective Vehicles equipped with ETCS present a condition likely to death or serious bodily injury to Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of sudden unintended acceleration, if the vehicles are driven.

2848.  As to the Defective Vehicles which were subject to one or both of the "floor mat" or "sticky pedal" recalls, Toyota had at least one opportunity to conform the Defective Vehicles to the express warranties, but failed to do so.

2849.  Pursuant to W. VA. CODE § 46A-6A-4, Plaintiffs seek:  (a) revocation of acceptance and refund of the vehicle purchase price and all fees paid, (b) in the alternative to revocation of acceptance, damages for diminished value of the Defective Vehicles, (c) damages in the amount of the cost to repair the vehicle so

- 669 -

that it conforms to the warranties, (d) damages for loss of use and annoyance and inconvenience, and (e) attorney fees.

2850. As of the time of the filing of this pleading, Toyota has been aware for nearly a year of the breach of warranty claims under this statute alleged by West Virginians who purchased or leased Defective vehicles.  Indeed, Toyota has filed a motion to dismiss the putative class action filed in the United States District Court for the Southern District of West Virginia, which alleged such claims, among other things.  Nevertheless, Toyota has never insisted, or even mentioned, in writing any "third party dispute resolution process" as contemplated by W. VA. CODE § 46A-6A-8.  As such, under W. VA. CODE § 46A-6A-8(b), even if any "qualified third party dispute resolution process" exists (which Plaintiffs deny), the Plaintiffs have not received, and could not now receive, timely notice in writing of such a procedure, and they have no obligation to submit to such a procedure before bringing a claim pursuant to W. VA. CODE § 46A-6A-4.

<div align="center">

**COUNT V**

**UNJUST ENRICHMENT**

**(Based On West Virginia Law)**

</div>

2851. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2852. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2853. Defendants knowingly enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

2854. Plaintiffs, therefore, are entitled to restitution and seek and order establishing Toyota as constructive trustees of the profits unjustly obtained, plus interest.

### COUNT VI

### BREACH OF CONTRACT/COMMON LAW WARRANTY/BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

### (Based On West Virginia Law)

2855. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2856. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under West Virginia's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2857. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2858. Moreover all contracts in West Virginia carry with them an implied duty of good faith and fair dealing.  Toyota breached that duty by failing to repair the

- 671 -

Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or the replace them, and in other ways.

2859. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**WISCONSIN**

**COUNT I**

**VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT**

**(Wisc. Stat. § 110.18)**

2860. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2861. Defendants' above-described acts and omissions constitute false, misleading or deceptive acts or practices under the Wisconsin Deceptive Trade Practices Act § 110.18 ("Wisconsin DTPA").

2862. By failing to disclose and misrepresenting the risk of throttle control failure and adequacy of fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the Wisconsin DTPA,  including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves

- 672 -

rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

2863. As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

2864. TMC's and TMS's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

2865. In purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect of the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control. Had the Plaintiffs known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

2866. Plaintiffs and the Class sustained damages as a result of the Defendants unlawful acts and are, therefore, entitled to damages and other relief provided for under § 110.18(11)(b)(2) of the Wisconsin DTPA.  Because Defendants' conduct was committed knowingly and/or intentionally, the Plaintiffs and the Class are entitled to treble damages.

2867. Plaintiffs and the Class also seek court costs and attorneys' fees under § 110.18(11)(b)(2) of the Wisconsin DTPA.

**COUNT II_**

**BREACH OF EXPRESS WARRANTY**

**(Wisc. Stat. § 402.313)**

2868.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2869.  Toyota is and was at all relevant times a merchant with respect to motor vehicles under WISC. STAT. § 402.104.

2870.  In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2871.  Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

2872.  In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2873.  These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

- 674 -

2874.  These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2875.  Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2876.  Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2877.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles.  Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

2878.  Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as

- 675 -

those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2879. Plaintiffs and the Class had sufficient direct dealings with the Defendants to establish privity of contract between Plaintiffs and the Class. Notwithstanding this, privity is not required in this case because Plaintiffs and Class are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

2880. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in WISC. STAT. § 402.608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under Wisc. Stat. §§ 402.711 and 402.608.

2881. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable

- 676 -

1   amount of time after Toyota issued the recall and the allegations of vehicle defects

2   became public.

3       2882.  As a direct and proximate result of Toyota's breach of express

4   warranties, Plaintiffs and the Class have been damaged in an amount to be

5   determined at trial.

6

7                            **COUNT III**

8                  **REVOCATION OF ACCEPTANCE**

9                    **(Wisc. Stat § 402.608)**

10      2883.  Plaintiffs reallege and incorporate by reference all paragraphs as though

11  fully set forth herein.

12      2884.  Plaintiffs identified above demanded revocation and their demands were

13  refused.

14

15      2885.  Plaintiffs and the Class had no knowledge of such defects and

16  nonconformities, were unaware of these defects, and reasonably could not have

17  discovered them when they purchased or leased their automobiles from Toyota.  On

18  the other hand, Toyota was aware of the defects and nonconformities at the time of

19  sale and thereafter.

20      2886.  Acceptance was reasonably induced by the difficulty of discovery of the

21  defects and nonconformities before acceptance.

22      2887.  There has been no change in the condition of Plaintiffs' vehicles not

23  caused by the defects and nonconformities.

24      2888.  When Plaintiffs sought to revoke acceptance, Toyota refused to accept

25  return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies

26  paid.

- 677 -

2889. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2890. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way.  Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2891. Plaintiffs and the Class provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief.  In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made.  Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2892. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

- 678 -

2893. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Class assert as an additional and/or alternative remedy, as set forth in WISC. STAT.§ 402.711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under WISC. STAT. § 402.711.

2894. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Wisconsin Law)

2895. Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

2896. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under the Uniform Commercial Code as adopted in Wisconsin, Plaintiffs plead in the alternative under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

- 679 -

010172-25 398181 v1

2897. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2898. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## FRAUD BY CONCEALMENT

### (Based On Wisconsin Law)

2899. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2900. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2901. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2902. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not

- 680 -

known to or reasonably discoverable by Plaintiffs and the Class.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2903. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2904. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2905. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2906. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.

2907. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010172-25 398181 v1

## COUNT VI

## UNJUST ENRICHMENT

### (Based On Wisconsin Law)

2908. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2909. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2910. Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

2911. Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## WYOMING

## COUNT I

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT

### (Wyo. Stat. §§ 45-12-105 *et seq.*)

2912. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2913. The Wyoming Consumer Protection Act describes that a person engages in a deceptive trade practice under this act when, in the course of his business and in connection with a consumer transaction he knowingly does one or more of the

- 682 -

following, including:  "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; and "(xv) Engages in unfair or deceptive acts or practices."  Wyo. Stat. § 45-12-105.

2914. In the course of Toyota's business, it willfully failed to disclose and actively concealed the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS as described above.  Accordingly, Toyota engaged in deceptive trade practices, including representing that Defective Vehicles are of a particular standard and grade, which they are not; representing that Defective Vehicles have been supplied with a previous representation when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; representing that its transaction involves a warranty, rights, remedies, or obligations that are false; and overall engaging in unfair and deceptive acts or practices.

2915. Toyota knowingly made false representations to consumers with the intent to induce consumers into purchasing Toyota vehicles.  Plaintiffs reasonably relied on false representations by Toyota and were induced to each purchase a Toyota vehicle, to his/her detriment.  As a result of these unlawful trade practices, Plaintiffs have suffered ascertainable loss.

- 683 -

2916. Plaintiffs and the Class suffered ascertainable loss caused by Toyota's false representations and failure to disclose material information. Plaintiffs and the Class overpaid for their vehicles and did not receive the benefit of their bargain. The value of their Toyota's has diminished now that the safety issues have come to light, and Plaintiffs and the Class own vehicles that are not safe.

2917. Toyota is a "person" as required under the statute.

2918. Toyota's actions as set forth above occurred in the course of business and in connection with a consumer transaction.

2919. As required under the Wyoming Consumer Protection Act, a notice letter was sent on behalf of the class in connection with the case: *Gureski v. Toyota Motor North America, Inc., et al.*; Case No. 10-cv-00031.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Wyo. Stat. § 34.1-2-313)

2920. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2921. Toyota is and was at all relevant times a merchant with respect to motor vehicles under the Uniform Commercial Code.

2922. In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

2923. Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota. Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

- 684 -

2924. In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, as set forth above.

2925. These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Section IV.A., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.  These warranties were made, *inter alia*, in advertisements, in Toyota's "e brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

2926. These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

2927. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2928. Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

2929.  Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiffs and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.  The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

2930.  Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Class' remedies would be insufficient to make Plaintiffs and the Class whole.

2931.  Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

2932.  As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

010172-25  398181 v1

# COUNT III

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Wyo. Stat. §§ 34.1-2-314)

2933. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2934. Toyota is and was at all relevant times a merchant with respect to motor vehicles under the Uniform Commercial Code.

2935. A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to the Uniform Commercial Code.

2936. These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

2937. Toyota was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

010172-25 398181 v1

2938. As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT IV

## REVOCATION OF ACCEPTANCE IN WHOLE OR IN PART

### (Wyo. Stat. § 34.1-2-608)

2939. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2940. Plaintiffs identified above demanded revocation and the demands were refused.

2941. Plaintiffs and the Class had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

2942. Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

2943. There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

2944. When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

2945. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because

Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

2946. These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class. This impairment stems from two basic sources. First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of sudden unintended acceleration (a risk acknowledged by Toyota's recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

2947. Plaintiffs and the Class provided, within a reasonable amount of time, notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Class hereby demand revocation and tender their Defective Vehicles.

2948. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

- 689 -

2949. Consequently, Plaintiffs and the Class are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (Based On Wyoming Law)

2950. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2951. To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under Wyoming's Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.  Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, and/or warranted the quality or nature of those services to Plaintiffs.

2952. Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2953. As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 690 -

# COUNT VI

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Based On Wyoming Law)

2954. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2955. As set forth above, Plaintiffs and the Class have entered into individual sales transactions and agreements with Toyota for the purchase Toyota vehicles.

2956. Plaintiffs and the Class have fully performed their obligations with Toyota under such transactions and agreements.

2957. At all times, Toyota owed Plaintiffs and the Class a duty to exercise and act in good faith and deal fairly with them in the performance of repairs of Defective Vehicles.

2958. Toyota has breached these duties and obligations in the manner and particulars set forth above, including, but not limited to, failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

2959. As a direct and proximate result of Defendants' failure to abide and comply with their obligations and duties, Plaintiffs and the Class have suffered pecuniary damages in an amount that has not yet been determined.

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VII

## FRAUD BY CONCEALMENT

### (Based On Wyoming Law)

2960.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2961.  As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

2962.  Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

2963.  In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

2964. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

2965. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

2966. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

2967. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage.

2968. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT VIII

### UNJUST ENRICHMENT

### (Based On Wyoming Law)

2969. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 693 -

2970.  As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendants charged a higher price for their vehicles than the vehicles' true value and Defendants obtained monies which rightfully belong to Plaintiffs.

2971.  Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values.  Plaintiffs and other class members expected to be paid back for the difference between the actual vehicle value and the amount which Plaintiffs and the Class paid due to wrongful and fraudulent acts and omissions.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

2972.  Plaintiffs, therefore, seek an order establishing Defendants as constructive trustees of the profits unjustly obtained, plus interest.

### PRAYER FOR RELIEF

(a)    Injunctive relief, restitution, statutory, and punitive damages under the CLRA;

(b)    Restitution or restitutionary disgorgement as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3343;

(c)    Injunctive relief, restitution and appropriate relief under CAL. BUS. & PROF. CODE § 17500;

(d)    For appropriate damages for breach of express and implied warranties;

(e)    For revocation of acceptance;

(f)    For damages under the Magnuson-Moss Warranty Act;

(g)    Punitive damages;

- 694 -

1     (h)    For damages as allowed by the laws of the states as alleged in the

2 alternate counts;

3     (i)    Attorneys' fees; and

4     (j)    An injunction ordering Toyota to implement an effective fail-safe

5 

6 mechanism on all vehicles with ETCS.

7 DATED:  October 27, 2010.

8 

9                   HAGENS BERMAN SOBOL SHAPIRO LLP

10                   By:_____ /s/ Steve W. Berman_____

11                     Steve W. Berman
                       1918 Eighth Avenue, Suite 3300

12                     Seattle, WA  98101
                       Telephone:  (206) 623-7292

13                     Facsimile:  (206) 623-0594

14                     Email:  steve@hbsslaw.com

15                   By:_____ /s/ Marc M. Seltzer_____

16                     Marc M. Seltzer (State Bar No. 054534)
                       SUSMAN GODFREY LLP

17                     1901 Avenue of the Stars, Suite 950

18                     Los Angeles, CA  90067-6029
                       Telephone:  (310) 789-3100

19                     Facsimile:  (310) 789-3150
                       Email:  mseltzer@susmangodfrey.com

20                   *Plaintiffs Co-Lead Counsel for Economic Loss*

21                   *Cases (Consumer)*

22 

23 

24 

25 

26 

27 

28 

By:_____/s/ Frank M. Pitre_____
     Frank M. Pitre (Cal. SBN 100077)
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  fpitre@cpmlegal.com

*Co-Lead Plaintiffs' Counsel for Economic Loss Cases (Non-Consumer)*


By:_____/s/ Richard J. Arsenault_____
     Richard J. Arsenault
Neblett, Beard & Arsenault
Post Office Box 1190
Alexandria, LA  71309-1190
Telephone:  (800) 256-1050
Facsimile:  (318) 561-2592
Email:  rarsenault@nbalawfirm.com


By:_____/s/ Benjamin L. Bailey_____
     Benjamin L. Bailey
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV  25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
Email:  bbailey@baileyglasser.com


By:_____/s/ Stanley M. Chesley_____
     Stanley M. Chesley
Waite Schneider Bayless & Chesley
1 West 4th Street
1513 4th & Vine Tower
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  stanchesley@wsbclaw.com

010172-25 398181 v1

By:_____/s/ Jayne Conroy_____
        Jayne Conroy
Hanly Conroy Bierstein Sheridan
   Fisher & Hayes LLP
112 Madison Avenue 7th Floor
New York, NY  10016
Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
Email:  jconroy@hanlyconroy.com


By:_____/s/ Michael L. Kelly_____
        Michael L. Kelly
Kirtland & Packard LLP
2361 Rosecrans Avenue 4th Floor
El Segundo, CA  90245
Telephone:  (310) 536-1000
Facsimile:  (310) 536-1001
Email:  mlk@kirtlandpackard.com


By:_____/s/ Jerome L. Ringler_____
        Jerome L. Ringler
Ringler Kearney Alvarez
633 W Fifth Street 28th Fl
Los Angeles, CA  90071
Telephone:  (213) 473-1900
Facsimile:  (213) 473-1919
Email:  jringler@rkallp.com

*Plaintiffs Lead Counsel Committee for Economic Loss Cases*


## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

010172-25 398181 v1

DATED:  October 27, 2010.

HAGENS BERMAN SOBOL SHAPIRO LLP


By:_____/s/ Steve W. Berman_____
        Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
Email:  steve@hbsslaw.com


By:_____/s/ Marc M. Seltzer_____
        Marc M. Seltzer (State Bar No. 054534)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
Email:  mseltzer@susmangodfrey.com

*Plaintiffs Co-Lead Counsel for Economic Loss Cases (Consumer)*


By:_____/s/ Frank M. Pitre_____
        Frank M. Pitre (Cal. SBN 100077)
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  fpitre@cpmlegal.com

*Co-Lead Plaintiffs' Counsel for Economic Loss Cases (Non-Consumer)*

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:_____/s/ Richard J. Arsenault_____
     Richard J. Arsenault
Neblett, Beard & Arsenault
Post Office Box 1190
Alexandria, LA  71309-1190
Telephone:  (800) 256-1050
Facsimile:  (318) 561-2592
Email:  rarsenault@nbalawfirm.com


By:_____/s/ Benjamin L. Bailey_____
     Benjamin L. Bailey
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV  25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
Email:  bbailey@baileyglasser.com


By:_____/s/ Stanley M. Chesley_____
     Stanley M. Chesley
Waite Schneider Bayless & Chesley
1 West 4th Street
1513 4th & Vine Tower
Cincinnati, OH  45202
Telephone:  (513) 621-0267
Facsimile:  (513) 621-0262
Email:  stanchesley@wsbclaw.com


By:_____/s/ Jayne Conroy_____
     Jayne Conroy
Hanly Conroy Bierstein Sheridan
    Fisher & Hayes LLP
112 Madison Avenue 7th Floor
New York, NY  10016
Telephone:  (212) 784-6400
Facsimile:  (212) 213-5949
Email:  jconroy@hanlyconroy.com

010172-25 398181 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:_____ /s/ Michael L. Kelly_____
        Michael L. Kelly
Kirtland & Packard LLP
2361 Rosecrans Avenue 4th Floor
El Segundo, CA  90245
Telephone:  (310) 536-1000
Facsimile:  (310) 536-1001
Email:  mlk@kirtlandpackard.com


By:_____ /s/ Jerome L. Ringler_____
        Jerome L. Ringler
Ringler Kearney Alvarez
633 W Fifth Street 28th Fl
Los Angeles, CA  90071
Telephone:  (213) 473-1900
Facsimile:  (213) 473-1919
Email:  jringler@rkallp.com

*Plaintiffs Lead Counsel Committee for Economic Loss Cases*

010172-25 398181 v1

1

## **PROOF OF SERVICE**

2

3        I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 27, 2010.

4

5                                            /s/ Steve W. Berman
                                             Steve W. Berman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 701 -