Monica R. Kelly (Illinois Bar ID 6225920)
*monicakelly@ribbecklaw.com*
*mervinmateo@ribbecklaw.com*
RIBBECK LAW CHARTERED
505 N. Lake Shore Drive, Suite 102
Chicago, IL 60611
Telephone: (312) 822-9999

*Lead Counsel for Foreign Economic Loss  Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) |
| | **AMENDED  FOREIGN ECONOMIC LOSS MASTER CONSOLIDATED COMPLAINT** |
| | JURY TRIAL DEMANDED |
| This Document Relates To: | |
| **FOREIGN ECONOMIC LOSS PLAINTIFFS** | |

1

**TABLE OF CONTENTS**

2

<u>PAGE</u>

3

I.     INTRODUCTION ........................................................................... 1

4

II.    JURISDICTION AND VENUE ..................................................... 13

5

III.   PARTIES ....................................................................................... 14

6

       A.   Plaintiffs ............................................................................. 14

7

       B.   Defendants .......................................................................... 45

8

IV.    FACTUAL BACKGROUND ......................................................... 49

9

       A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand ...................... 49

10

11

       B.   Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism ....................................... 63

12

13

       C.   Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002 ................... 65

14

              1.   First reports of unintended acceleration to Toyota ...................... 66

15

16

              2.   Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls ...................... 67

17

18

              3.   Unintended acceleration in Tacomas and Siennas ................... 96

19

              4.   The floor mat recall ........................................... 105

20

              5.   The sticky accelerator recall ................................ 112

21

       D.   The Internal Death by SUA Chart ...................................... 119

22

       E.   Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall Complaints ........................... 125

23

24

       F.   Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall .............................. 127

25

       G.   Toyota Identifies Many Root Causes of SUA Confirming the Need for Brake Override ............................ 132

26

27

       H.   Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers and Affirmatively Misled Consumers .............. 133

28

I.    Continuing Warranties and Misrepresentations ..................................... 137

J.    Summary of the Defects in Defective Vehicles ..................................... 138

    1.    Electronics Issues: ..................................................................... 139

    2.    Mechanical Issues: ..................................................................... 141

    3.    The lack of an appropriate fail-safe: .......................................... 142

    4.    Failure to appropriately test and validate the vehicle systems: .................................................................................. 143

K.    Toyota Belatedly Installs a Brake-Override as a "Confidence" Booster ................................................................................................ 144

L.    The Defects Causing Unintended Accelerations Have Caused Defective Vehicles' Values to Plummet .............................................. 152

V.    CLASS ALLEGATIONS ................................................................................ 154

    A.    Foreign Consumer Economic Loss Class ............................................. 154

COUNT I  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (18 U.S.C. § 1961, *et seq.*) ......... 158

    A.    THE ENTERPRISE ............................................................................. 158

    B.    PREDICATE ACTS .............................................................................. 160

    1.    Omission of Material Facts ......................................................... 160

    (a). Toyota's History of Exerting Undue Influence To Conceal Material Facts Concerning Deadly Design Flaws ................... 161

    2.    False and Misleading Statements which where Intended to be Disseminated by Interstate and Foreign Carriers of Mail and Wire Communications with Knowledge of their Falsity Concerning the Cause of SUA (18 U.S.C. §1341 AND 1343) ............................. 166

    C.    PATTERN OF RACKETEERING INJURY ........................................ 179

COUNT II  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ............................................... 180

COUNT III  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) ................................ 185

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT IV  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING
    LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*)...............................................188

COUNT V  BREACH OF EXPRESS WARRANTY
    (Cal. Com. Code § 2313).................................................................................190

COUNT VI  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (Cal. Com. Code § 2314).........................................195

COUNT VII  REVOCATION OF ACCEPTANCE (Cal. Com. Code § 2608).........196

COUNT VIII  VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
    (15 U.S.C. § 2301, *et seq.*) ..............................................................................199

COUNT IX  BREACH OF CONTRACT/COMMON LAW WARRANTY ...........201

COUNT X  FRAUD BY CONCEALMENT (Based on California Law) ................202

COUNT XI  NEGLIGENCE ..................................................................................204

COUNT XII  PRODUCT LIABILITY - DESIGN DEFECT ...................................205

COUNT XIII  UNJUST ENRICHMENT (Based Upon California Law) ................206

PRAYER FOR RELIEF ..........................................................................................208

DEMAND FOR JURY TRIAL ...............................................................................209

1    Pursuant to this Court's Amended Order No. 4 regarding the Foreign

2    Economic Loss Plaintiffs dated September 13, 2010, the Foreign Economic Loss

3    Plaintiffs file this Amended Master Consolidated Complaint.

## I.    INTRODUCTION

4

5    1.    Since 2001, Toyota Motor Corporation ("TMC"), its United States sales

6    and marketing arm, Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North

7    America, Inc. ("TMNAI"), Toyota Motor Engineering and Manufacturing North

8    America, Inc. ("TMEMNAI"), and Toyota Motor Credit Corporation ("TMCC")

9    (together, "Toyota" or "Defendants") were responsible for the manufacture, design,

10   distribution, sale and lease of tens of millions of vehicles, or parts thereof, (under the

11   Toyota, Lexus, and Scion brand names) throughout the United States and worldwide,

12   including but not limited to Mexico, China, Germany, Turkey, Jamaica, Peru, South

13   Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, Russia and Australia,

14   that use an electronic throttle control system ("ETCS" or "ETCS-i").

15   2.    ETCS vehicles operate with an electronic throttle control system that

16   severs the mechanical link between the accelerator pedal and the engine. In place of

17   the cable that connects the two components, complex computer and sensor systems

18   communicate an accelerator pedal's position to the engine throttle, telling the vehicle

19   how fast it should go. Toyota began installing these electronic control systems in

20   some Lexus models in 1998, in Camry and Prius models in 2001 and 2002, and in all

21   Toyota-made vehicles by 2006.[1]  Toyota promised that these new systems would

22   operate safely and reliably. This promise turned out to be false in several material

23   respects. In reality, Toyota concealed and did not fix a serious safety problem

24   plaguing all ETCS cars worldwide.

25

26

27

28   _____
     [1] *See* U.S. Bound Vehicle Models and MY with ETCS-i, at TOYEC-0000577.

- 1 -

3.      In press releases worldwide, website, sales literature, brochures and other consumer-oriented documents, Toyota has consistently promoted "safety" and "reliability" as top priorities in all of its vehicles and has specifically promoted ETCS.  Toyota promised that a "fundamental component of building safe cars" was testing and analyzing why accidents occur.

4.      Toyota has received tens of thousands of complaints from consumers around the world about sudden unintended acceleration ("SUA"),  including but not limited to Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, Russia, and Australia.  It also received evidence that the number of complaints of sudden unintended acceleration increased substantially in vehicles with electronic throttle controls as opposed to those with mechanical controls.  For example, on June 3, 2004, Scott Yon, an investigator in the U.S. National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI"), sent Toyota Assistant Manager of Technical and Regulatory Affairs Chris Santucci – who himself had previously worked at NHTSA – an e-mail attaching a chart showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles.

5.      Toyota also received reports of crashes and injuries that put Toyota on notice of the serious safety issues presented by SUA.  Two of the top five categories of injury claims in NHTSA's Early Warning Reporting Database involved "speed control" issues on the 2007 Lexus ES350 and Toyota Camry.  As one internal

document observed, the issues presented by a SUA-related defect are "catastrophic."[2] Despite the catastrophic nature of this defect, Toyota has concealed its existence and has failed to repair the problem.

6.     Complaint data lodged with NHTSA – assuming it has been properly and adequately disclosed by Toyota – reveals a SUA defect in vehicles with ETCS. Within the first year of changing from non-ETCS to ETCS, there was a material increase in SUA events such that Toyota knew of a safety-related defect:

| | |
|---|---|
| Lexus RX | 1.8-fold increase |
| 4Runner | 6-fold increase |
| Avalon | 2-fold increase |
| Camry | 3.7-fold increase |
| Highlander | 2.8-fold increase |
| RAV4 | 2-fold increase |
| Sienna | 2-fold increase |
| Tacoma | 14-fold increase |
| Lexus ES | 5-fold increase |

7.     On information and belief, this trend may prove to be much greater once the complaints known only to Toyota are analyzed.  Toyota has received at least 37,000 complaints, and possibly as many as 100,000 or more, involving SUA incidents.  Toyota has disclosed that at least in the following countries listed below, consumers have brought claims against Toyota entities based on SUA:

---

[2] TOY-MDLID00003908.

- Austria

- Brazil

- Canada

- Germany

- Iceland

- Ireland

- Israel

- Italy

- Kuwait

- Morocco

- Portugal

- South Korea

- Taiwan

- Turkey

- United Kingdom

Attached as Exhibit A is an enclosure letter dated May 14, 2010 provided by TMNAI to the NHTSA with a report generated from the Access database which summarizes the foreign claims against Toyota.

8.      Irrespective of whether these SUA events are caused by floor mats, pedals, an unknown failure in the ETCS, or a failure in other aspects of the electrical and mechanical systems, Toyota vehicles with ETCS are defective worldwide.

9.      This defect renders the vehicles unsafe.  For example, from 2003-2009, there were 23 claims of death or injury involving speed control on the 2005 Camry, 20 on the 2007 Camry, and 18 on the 2007 Lexus ES.

10.     Despite notice of the SUA defect in ETCS vehicles, Toyota did not disclose to consumers that its vehicles – which Toyota for years had advertised as "safe" and "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the heightened risk of unintended acceleration.   Toyota never disclosed that it had no credible or scientific explanation for SUA events in ETCS vehicles.   Rather than disclose the truth, Toyota concealed the existence of this defect.  Toyota's strategy was to "stop this from moving forward" – referring to the possibility of a public hearing before the United States Congress on SUA years before the congressional hearings in 2010.[3]

11.     By late 2009 and early 2010, as NHTSA and Toyota received more and more reports of SUA worldwide, Toyota finally admitted there might be "mechanical problems."   After years of consistently blaming such events on driver error and emphatically denying the existence of any defect, Toyota claimed that some SUA events could be explained by the entrapment of the accelerator pedal by the floor mats, or by so-called "sticky pedals."   Toyota recalled certain vehicles to address these potential problems and publicly proclaimed that these recalls resolved all concerns of SUA in Toyota vehicles.   But SUA events kept occurring, even in vehicles that did not have floor mats and vehicles that were not subject to the sticky pedal recall.

_____

[3] TOY-MDLID00050747.

- 5 -

12.    In response to a Congressional Committee's January 28, 2010 request for internal Toyota documents involving SUA complaints, Toyota provided a representative sample of reports describing calls received through the company's telephone complaint line.   To produce this sample, Toyota first identified 37,900 customer contact reports in its database as potentially related to SUA.  Toyota then randomly selected 3,430 of those complaints for review.    Toyota ultimately determined that 1,008 of those complaints were directly related to SUA and provided these 1,008 reports to the Committee. Toyota is yet to disclose the number of complaints regarding SUA worldwide.

13.    In responding to Congress, Toyota unilaterally excluded calls after October 1, 2009, calls that it claimed did not involve SUA incidents, and calls involving vehicles produced before 2001.  Toyota then acknowledged 233 reports of SUA from the random sample of 3,430 complaints Toyota produced to the Committee.  Of these 233 complaints, Toyota claimed 69 involved vehicle crashes. Toyota has provided data showing that in at least 14 other countries, consumers have filed claims against Toyota entities where they claimed to have experienced SUA.[4]

14.    These 233 incidents occurred in a broad variety of Toyota vehicles and were reported in vehicles produced in every model year from 2001 through 2010.[5] Assuming the 3,430 complaints selected by Toyota for review were in fact a random sample of the 37,900 complaints in the Toyota database, Toyota would have received

_____

[4] *See* Exhibit A.

[5] Twenty-nine percent of the complaints involved Camry models, 13% involved Lexus models, 10% involved Corollas, and 9% involved Tacoma models.  Model year 2007 vehicles were the subject of 17% of all sudden unintended acceleration complaints, and model year 2002 and 2004 vehicles were each the subject of 13% of these complaints.

an estimated 2,600 complaints of sudden unintended acceleration from Toyota and Lexus drivers between January 2000 and October 2009.  These complaints would have included an estimated 760 crashes.

15.    In the data the Committee reviewed, operators on the Toyota customer complaint line (who relied on customer reports and information from dealer inspections) identified floor mats or pedals as the cause of only 16% of the SUA incident reports.  Approximately 70% of the SUA events in Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

16.    Analyses of publicly available databases by other researchers indicate that from 1999 to the present there were more than 5,800 SUA incidents involving Toyotas that resulted in 2,166 crashes, 1,011 injuries and 78 deaths.  Internally, Toyota was tallying the deaths caused by SUA.

17.    Despite years of warnings, Toyota has still failed to properly disclose, explain or fix the underlying problem with ETCS worldwide.  This leaves millions of Toyota owners worldwide with vehicles that potentially could race out of control. Until 2009, consumers were unaware of even the potential for such events.

18.    SUA is preventable.  For example, "brake-override" systems designed to recognize an attempt by the driver to brake while at the same time requesting an open throttle have been employed in vehicles sold in the United States by other manufacturers for years.  Toyota, however, failed to incorporate a brake-override or other appropriate fail-safe mechanism.  Indeed, until late 2009, no Toyota vehicle had a "brake-override" system or other adequate fail-safe mechanical system that was sufficient to prevent SUA.  Only after extensive publicity concerning the SUA

defect in Toyota vehicles did Toyota add a brake-override as standard equipment in 2011 model-year vehicles.  Toyota has recently announced that it will provide brake-overrides to the following models:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250.  But this announcement is not an effective remedy or repair.  First, it was announced not as a safety recall but as a "confidence booster."  Most consumers did not and will not take their vehicles in for a brake-override remedy described misleadingly as a "confidence" measure.  Second, the "confidence booster" does not cover all vehicles with a SUA defect.  Third, the brake-override being offered is not as robust or effective as an override as implemented by other manufacturers.

19.    Many of the major automobile manufacturers have had a brake-override or smart pedal for years.  Not so Toyota.  Toyota recognized the need for a brake-override" as early as 2007, if not before:  when discussing the "floor mat issue," it was suggested that "a fail safe option similar to that used by other companies to prevent unintended acceleration" should be investigated.  The fail-safe referred to, used by both GM and Audi at the time, was a brake-override.  Belatedly, in 2009 Toyota engineers again addressed this issue after the well-publicized death of a police officer due to unintended acceleration.

> During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration."  I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M

that "This kind of system will be investigated by Toyota, not by Body Engineering Div."  Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008.   (The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)[6]

20.   Toyota admits that the recalls have not addressed the problem.  James Lentz, Toyota's second-highest ranking North American executive was asked:  "Do you believe that the recall on the carpet changes and the recall on the sticky pedal will solve the problem of sudden unintended acceleration?"  His reply:  "Not totally."

21.   In prepared testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives on February 24, 2010, TMC President and Chief Executive Officer Akio Toyoda admitted that Toyota's growth in recent years was "too quick" and the company's priorities of "first, safety; second, quality; third, volume" had become "confused."  Mr. Toyoda went on to apologize to American consumers:  "I regret that this has resulted in the safety issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota drivers have experienced."

22.   Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America, Inc., likewise acknowledged that Toyota had failed its customers.

---

[6] TOY-MDLID00041130T-0001.

Mr. Inaba testified in the United States Senate Sub-Committee hearings on Toyota recalls:

> In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts.  As our president, Akio Toyota, told members of Congress last week, we sincerely regret that our shortcomings have resulted in the issues associated with our recent recalls.

23.    Shinichi Sasaki, TMC's Executive Vice President admitted before Congress that Toyota "did not listen to its customers":

> How this issue came about is because there were many vehicle – excuse me – many voices were sent to us from the customers, but we really did not listen to every one of them very carefully, one by one.  We should have really listened to them carefully and rendered some technical analysis so that it would be connected to our following product improvement.  However, the quality of this work or the efficiency of our work or speed with which we worked had become sluggish, or sort [sic] failed gradually, and this has come to a much larger issue.

24.    In testifying to Congress, Toyota made no mention of instances where its own "reliable" employees replicated SUA events not caused by pedals or mats.  In one instance, a "reliable" service manager had the vehicle accelerate to 95 mph in "five to 10 seconds."   When these SUA events were replicated by Toyota

technicians; Toyota repurchased the vehicles and if possible made the vehicle owner sign a confidentiality agreement.

25.     Rather than disclose these confirmed SUA events Toyota concealed the defect.  Additionally, these confirmed SUA events revealed another aspect of the defect – the failure of the vehicle's diagnostic tools to capture the malfunction.  In other words, no diagnostic trouble code ("DTC") or fault code was triggered during these SUA events.  A properly designed and manufactured vehicle would trigger a fault when a SUA event occurs and force the vehicle into a "limp home" mode.

26.     As the long-concealed SUA defect finally began to see the light of day and the public realized that Toyota had no fail-safe mechanisms to prevent SUA, the value of Toyota cars diminished.  Many consumers sought to return their cars out of fear that SUA could occur and cause catastrophic injury or death.  One class member and SUA victim wrote:  "I drive a 4 year old and 3 year old child around and am extremely thankful they were not in the car.…  Had this happened on the freeway, we would have all been dead."  Her request for the "original purchase price of the car refunded" was rejected.[7]  Her concerns and request for revocation of her purchase is not an isolated incident.  Toyota has refused to take class members' vehicles back, and has refused to and cannot provide an adequate repair.

27.     Plaintiffs seek class action status pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of the Consumer Class of Toyota vehicle owners/lessees of all vehicles with ETCS in their respective countries, including Mexico, China,

---

[7] TOY-MDLID90011054.

Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, Russia and Australia.

28.     Toyota Motor Corporation ("TMC") does substantial business in California, and the principal offices of Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMNAI"), and Toyota Motor Credit Corporation ("TMCC") are in California, and much of the conduct that forms the basis of the complaint emanated from Toyota's headquarters in Torrance, California. Toyota Motor Engineering and Manufacturing North America, Inc. is a Kentucky corporation. Upon information and belief, Defendants are and were responsible for the manufacture, design, distribution, sale and lease of vehicles, having the same SUA defect as those Toyota vehicles sold worldwide.  The primary sale, marketing and advertising arm of Toyota is located in this District. On information and belief, the decision to withhold information from worldwide consumers, and engage in deceptive marketing was made, in part, in California.

29.     The Foreign Economic Loss Plaintiffs ("Foreign Consumer Plaintiffs") assert claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961, *et seq.*, California law under the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750; California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; California False Advertising Law, CAL. BUS. & PROF. CODE § 17500; Breach of Express Warranty, CAL. COM. CODE § 2313; Breach of Implied Warranty of Merchantability, CAL. COM. CODE § 2314; Revocation of Acceptance, CAL. COM. CODE § 2608; Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; Common Law Breach of Contract; Fraud by Concealment; Negligence; Product Liability; and Unjust Enrichment.

30.     Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and have intentionally chosen to pursue claims based on California state-law.

## II.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members nationwide and worldwide; and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

32.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over the Defendants because Defendants have sufficient minimum contacts with this State, and otherwise intentionally availed themselves of markets in this state through the promotion, marketing and sales of their products and services in this state to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

33.     In particular, Defendants marketed, advertised and sold automotive vehicles in this state having the same SUA defect as Toyota vehicles sold worldwide. The primary sale, marketing and advertising arm of Toyota is located in this District. On information and belief, the decision to withhold information from worldwide consumers, and engage in deceptive marketing was made, in part, in California.

34.     Additionally, this Court has subject matter jurisdiction pursuant to 18 U.S.C. §1961, et seq. In particular, Defendants' racketeering activity includes many acts within the last four (4) years chargeable under 18 U.S.C. §2314, which provides in pertinent part that:

1
2
3
4
5

Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; ... shall be fined under this title or imprisoned not more than ten years or both.

6
7
8
9
10
11
12

35.   Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, because defendants, as corporations, are "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced," and because Defendants conduct substantial business in this judicial district.

13

### III.   PARTIES

14

### A.   Plaintiffs

15
16
17
18
19
20
21
22
23
24
25
26

36.   Plaintiff Laura Jimenez Centeno is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico.  Ms. Centeno owns a 2007 Toyota Camry (VIN 4T1BE46K17U125520) which she purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico.   Ms. Centeno received a notice for repair[8] with regards the "accelerator pedal" of her Camry, which notice was sent out by TMS and Toyota Motor Sales de Mexico. In February 2010, Ms. Centeno experienced a SUA incident while driving on Highway 45 in Aguascalientes-Zacatecas, Mexico, close to Kilometer 20. Ms. Centeno is afraid to drive the Camry because of this SUA incident, but she is unable to sell the vehicle at its fair market value because of the SUA defect. Ms. Centeno saw advertisements for

27

---

[8] *See* Exhibit B.

28

- 14 -

Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and in Toyota's website for several years before she purchased her Toyota Camry on April 11, 2007.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to purchase her Camry.  She also reviewed the window sticker affixed to the window of her Camry. Had those advertisements, window sticker, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry, or she certainly would not have paid as much for it.

37.     Plaintiff Eliza Esquivel Lozano is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico.   Ms. Lozano owns a 2009 Toyota Corolla XLE (VIN 2T1BU42E59C071341) which she purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Ms. Lozano experienced three SUA incidents which occurred in May, September and October 2010 . All three incidents occurred on the highway while Ms. Lozano was driving where the vehicle suddenly accelerated and then gradually slowed down after a few minutes.   Ms. Lozano saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the several years before she purchased her Toyota Corolla on July 25, 2008. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were a very frequent theme across the advertisements she saw.   Those advertisements

- 15 -

about safety and reliability influenced her decision to purchase her Corolla. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla. She certainly would not have paid as much for it, but regardless of that, she wouldn't have purchased it.

38.   Plaintiff Alfredo Hernandez Barranco is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Barranco owns a 2009 Toyota Corolla CE (VIN 9BRBA42E995029298) which he purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. In January 2010, Mr. Barranco experienced a SUA incident while driving on the highway in Aguascalientes, Mexico. Mr. Barranco does not feel safe driving the Corolla because of this SUA incident, but he is unable to sell the vehicle at its fair market value because of the SUA defect.  Mr. Barranco saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and display ads while driving past the dealership for several years before he purchased his Toyota Corolla on November 14, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he does recall that safety and reliability were a consistent theme across the advertisements he saw.   Those representations about safety and/or reliability influenced his decision to purchase his Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to

overcome this, he would not have purchased his Corolla.  Mr. Barranco certainly would not have paid as much for it.

39.    Plaintiff Ernesto Reyes Diaz is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Diaz purchased a 2009 Toyota Corolla XRS AI (VIN 2T1BE40E79C001579) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. In mid December 2009, Mr. Diaz experienced a SUA incident while driving on the streets of Aguascalientes City, Mexico. Mr. Diaz does not feel safe driving the Corolla because of this SUA incident, but he is unable to sell the vehicle at its fair market value because of the SUA defect. Mr. Diaz saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Toyota Corolla on March 31, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Toyota Corolla, or he would not have paid as much for it.

40.    Plaintiff Emilio Mogollon Quintanar is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Quintanar owns a 2009 Toyota Corolla XLE AT (VIN 2T1B042EX9C032437) which he purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Mr.

Quintanar experienced four SUA incidents. The first incident occurred in January 2009 when Mr. Quintanar was driving on the highway when suddenly the accelerator pedal got stuck for a few seconds. He did not report this incident. The second incident occurred in early February 2010, when Mr. Quintanar was driving on the highway and the accelerator pedal was stuck. He applied the brake to slow down the vehicle and pulled to the side of the road. He took the car to the Toyota dealership where service personnel told him that the problem was with the mat and that they were able to fix it. The same thing happened a week later and towards the end of February 2010.  After the fourth incident, Mr. Quintanar notified his dealer again about the two incidents. Personnel from the dealership told him to wait for the formal recall notice from Toyota. When he received the recall notice for accelerator pedal, he immediately went to the dealer to have his vehicle fixed. Mr. Quintanar is afraid to drive his Corolla because of these SUA incidents.   Mr. Quintanar saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Corolla. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla XLE on April 16, 2008, he recalls that safety and reliability were a consistent theme across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Toyota Corolla XLE.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla, and he would not have paid as much for it.

41.    Plaintiff Gonzalo Oros Villalobos is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico.  Mr. Villalobos owns a 2009 Toyota Camry LE (VIN 4T1BE46K79U403680) which he purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico.  In May and June 2010, Mr. Villalobos experienced two SUA incidents while driving on the streets of Aguascalientes, Mexico. Mr. Villalobos also received a recall notice for acceleration issues from his Toyota dealership. During several years leading up to the purchase of his Toyota Camry LE in May 22, 2009, Mr. Villalobos saw advertisements for Toyota vehicles in magazines, in brochures at the dealership, and on Toyota's website.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he does recall that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and reliability influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.

42.    Plaintiff Xiaobin Wang is a resident of Shanghai, China and is a citizen of the People's Republic of China.  Mr. Wang owns a 2007 Toyota Camry (VIN: LVGBE40K27G157112) which he purchased as a new vehicle from an authorized Toyota dealership located in Shanghai, China. Mr. Wang purchased his Toyota Camry based on Toyota's reputation for safety. He received a recall notice for accelerator pedal issues from his Toyota dealer sometime in 2009. Mr. Wang saw advertisements for Toyota vehicles on television, in magazines, on billboards, in

brochures at the dealership, on the Internet, in newspapers, and on banners in front of the dealership, for several years before he purchased his Camry in 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he does recall that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  Mr. Wang certainly would not have paid as much for it.

43.    Plaintiff Dawei Li is a resident of Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China. Mr. Li owns a 2008 Toyota Camry (VIN: LVGBE40K08G283874) which he purchased as a new vehicle from an authorized Toyota dealership located in Anhui Province, China. He purchased his Toyota based on its reputation for safety. Mr. Li received a mobile text message from his Toyota dealer informing him that his vehicle was part of the recall for accelerator pedal issues. He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet, several years before he purchased his Toyota Camry in 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the

driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.

44.     Plaintiff Guicai Liu is a resident of  Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China. He owns a 2010 Toyota RAV4 (VIN: LFMKV30F7A0026027) which he purchased as a new vehicle from an authorized Toyota dealership located in Anhui Province, China. Mr. Liu purchased his RAV4 based on Toyota's reputation for safety. During the years before he purchased his Toyota RAV4 in 2010, Mr. Liu saw advertisements for Toyota vehicles on television, in magazines, and on billboards.  Furthermore, during the years before he purchased his Toyota RAV4, he viewed the news regularly on television, in magazines, and on the Internet.  Had these advertisements, news reports, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, Mr. Liu probably would not have purchased his RAV4. He certainly would not have paid as much for it.

45.     Plaintiff Zhijie Deng Davis is a resident of Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China. Mr. Deng owns a 2010 Toyota RAV4 (VIN: LFMJW30F5A0061688) which he purchased as a new vehicle from an authorized Toyota dealership located in Fuyang City, Anhui Province, China.  Mr. Deng purchased his Toyota based on its reputation for safety. Mr. Deng saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several months, if not years, before he purchased his RAV4 in 2010.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his RAV4,

- 21 -

1   he does recall that safety and reliability were consistent themes across the

2   advertisements he saw.  Those representations about safety and reliability influenced

3   his decision to purchase his RAV4.  Had those advertisements or any other materials

4   disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the

5   driver's control and lacked a fail-safe mechanism to overcome this, he would not

6   have purchased his RAV4.  He certainly would not have paid as much for it.

7

8       46.    Plaintiff Lianfang Wang is a resident of Fuyang City, Anhui Province,

9   China and is a citizen of the People's Republic of China. Mrs. Wang owns a 2010

10  Toyota RAV4 (VIN: LFMKV30F190023166) and purchased it as a new vehicle

11  from an authorized Toyota dealership located in Fuyang City, Anhui Province,

12  China. Mrs. Wang purchased her RAV4 based on Toyota's reputation for safety.

13  Mrs. Wang received a mobile text message from her Toyota dealer informing her

14  that her RAV4 was part of the recall for accelerator pedal issues. Mrs. Wang saw

15  advertisements for Toyota vehicles on television and in brochures at the dealership

16  during the period before she purchased her RAV4 in 2010. She also reviewed the

17  window sticker and warranty information.  Although she does not recall the specifics

18  of the many RAV4 advertisements she saw before she purchased her RAV4, she

19  does recall that safety was a consistent theme across the advertisements she saw.

20  Those representations about safety influenced her decision to purchase the RAV4.

21  Had those advertisements, window sticker, warranty information, or any other

22  materials disclosed that RAV4 vehicles could accelerate suddenly and dangerously

23  out of the driver's control and lacked a fail-safe mechanism to overcome this, she

24  would not have purchased the RAV4. She certainly would not have paid as much for

25  it.

47.    Plaintiff Lin Zhang is a resident of Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China.  Fuyang Longyuan Construction Supervision Co., Ltd., the company which employs Mr. Zhang and where he is the company's legal representative, owns a 2010 Toyota Camry (VIN: LVGBH40K0AG381199) and purchased it as a new vehicle for Mr.Zhang's official company use from an authorized Toyota dealership located in Fuyang Development Zone, Anhui Province, China. Mr. Zhang and his company purchased the Camry based on Toyota's reputation for safety. Mr. Zhang received a mobile text message from his Toyota dealer informing him that the Camry was part of the recall for accelerator pedal issues. Mr. Zhang and his company saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before they purchased the Camry in 2010. Although they do not recall the specifics of the many Toyota advertisements they saw before the Camry was purchase, they do recall that safety and reliability were a consistent theme across the advertisements they saw.  Those representations about safety and reliability influenced their decision to purchase the Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they would not have purchased the Camry.  They certainly would not have paid as much for it.

48.    Plaintiff Yiqin Zhang is a resident of Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China. Ms. Zhang owns a 2010 Toyota Corolla (VIN: LFMARE2C0A0251968) which she purchased as a new vehicle from an authorized Toyota dealership located in Fuyang City, Anhui

Province, China.  Ms. Zhang received a mobile text message from her Toyota dealer informing her that her vehicle was part of the recall for accelerator pedal issues. On October 7, 2010, Ms. Zhang experienced a SUA incident while she was driving with her father-in-law and sister-in-law on Huoqui Expressway in in Lian Yungang, China. Ms. Zhang does not feel safe in driving her Corolla because of this SUA incident. Ms. Zhang saw advertisements for Toyota vehicles on television for several years before she purchased her Corolla in 2010.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it.

49.     Plaintiff Lin Yang is a resident of Chengguan Town, Linquan County, Anhui Province, China and is a citizen of the People's Republic of China. Mr. Yang owns a 2008 Toyota Corolla (VIN: LFMAP22C280061197) which he purchased as a new vehicle from an authorized Toyota dealership located in Fuyang City, Anhui Province, China. Mr. Yang received a mobile text message from his Toyota dealer informing him that his vehicle was part of the recall for accelerator pedal issues. Sometime in 2009, Mr. Yang experienced a SUA incident while driving on a local road in his town. Mr. Yang does not feel safe in driving his Corolla because of this SUA incident.  Mr. Yang saw advertisements for Toyota vehicles on television, in

1   magazines, on billboards, in brochures at the dealership, and on the Internet for

2   several years before he purchased his Corolla in 2008. Although he does not recall

3   the specifics of the many Toyota advertisements he saw before he purchased his

4   Corolla, he does recall that safety and/or reliability were consistent themes across the

5   advertisements he saw.   Those representations about safety and/or reliability

6   influenced his decision to purchase his Corolla.  Had those advertisements or any

7   other materials disclosed that Toyota vehicles could accelerate suddenly and

8   dangerously out of the driver's control and lacked a fail-safe mechanism to

9   overcome this, he would not have purchased his Corolla.  He certainly would not

10  have paid as much for it.

11      50.   Plaintiff Cheng Li Zhang is a resident of Chengguan Town, Linquan

12  County, Anhui Province, China and is a citizen of the People's Republic of China.

13  Mr. Zhang owns a 2008 Toyota Camry (VIN: LVGBH40K38G072899) which he

14  purchased as a new vehicle from an authorized Toyota dealership located in Hefei

15  City, Anhui Province, China. He received a mobile text message from his Toyota

16  dealer informing him that his vehicle was part of the recall for accelerator pedal

17  issues. Mr. Zhang saw advertisements for Toyota vehicles on television, in

18  magazines, on billboards, in brochures at the dealership, and on the Internet for

19  several years before he purchased his Camry in 2008. Although he does not recall the

20  specifics of the many Toyota advertisements he saw before he purchased his Camry,

21  he does recall that safety and reliability were a consistent theme across the

22  advertisements he saw.  Those representations about safety and reliability influenced

23  his decision to purchase his Camry.  Had those advertisements or any other materials

24  disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the

driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  He certainly would not have paid as much for it.

51.     Plaintiff Wei Guo is a resident of Chengguan Town, Linquan County, Anhui Province, China and is a citizen of the People's Republic of China. Linquan County Hongda Credit Guarantee Co., Ltd., the company which employs Mr. Guo and where he is the company's legal representative, owns a 2010 Toyota Camry (VIN: LVGBH40K1AG387836) and purchased it as a new vehicle for Mr.Guo's official company use from an authorized Toyota dealership located in Fuyang Development Zone, Anhui Province, China. Mr. Guo and his company purchased the Camry based on Toyota's reputation for safety. Mr. Guo received a mobile text message from his Toyota dealer informing him that the Camry was part of the recall for accelerator pedal issues. Mr. Zhang and his company saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before they purchased the Camry in 2010. They also reviewed the window sticker.  Although they do not recall the specifics of the many Toyota advertisements they saw before purchasing the Camry, they do recall that reliability was a consistent theme across the advertisements they saw.  Those representations about reliability influenced their decision to purchase the Camry.  Had those advertisements, window sticker, or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, they probably would not have purchased the Camry.  They certainly would not have paid as much for it.

52.     Plaintiff Yilong Liu is a resident of Chengguan Town, Linquan County, Anhui Province, China and is a citizen of the People's Republic of China. Mr. Liu

- 26 -

owns a 2007 Toyota Camry (VIN: LVGBE40K47G146483) which he purchased as a new vehicle from an authorized Toyota dealership located in Hefei City, Anhui Province, China.  Mr. Liu received a mobile text message from his Toyota dealer informing him that his vehicle was part of the recall for accelerator pedal issues. Mr. Liu saw advertisements for Toyota vehicles on television, in magazines, in brochures at the dealership, and on the Internet for several years before he purchased his Camry in 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he recalls that safety and reliability were a consistent theme across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Toyota Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry, and he would not have paid as much for it.

53.     Plaintiff Hu Jin is a resident of Hefei City, Anhui Province, China and is a citizen of the People's Republic of China. Mr. Jin owns a 2009 Toyota Camry (VIN: LVGBH40K29G323364) which he purchased as a new vehicle from an authorized Toyota dealership located in Tanshan City, Hebei Province, China. He does not feel safe driving the car.  Mr. Jin saw advertisements for Toyota vehicles on television, in magazines, on billboards, and in brochures at the dealership for several years before he purchased her Camry in 2009.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Camry, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced

his decision to purchase his Toyota Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Camry.  He certainly would not have paid as much for it.

54.    Plaintiff Gabriel Zieme-Diedrich is a resident of Nennhausen, Germany and is a citizen of Germany.  Mrs. Zieme-Diedrich drives a 2009 Toyota Auris (VIN: SB1KE56EX0E012559) which she leases as a new vehicle from an authorized Toyota dealership located in Rathenow, Germany. In March 2010, Mrs. Zieme-Diedrich received a notice from her Toyota dealer informing her that her vehicle was part of the recall for accelerator pedal issues. Mrs. Zieme-Diedrich paid more for her lease than she would have otherwise agreed to pay had she known of the defect. Mrs. Zieme-Diedrich paid for a good vehicle, her Toyota, that has failed of its essential purpose. She saw advertisements for Toyota vehicles on television, in newspapers, in magazines, in brochures at the dealership, and on the Internet, for several years before she leased her Toyota Auris on November 6, 2009.  Although Mrs. Zieme-Diedrich does not recall the specifics of the many Toyota advertisements she saw before she leased her Auris, she does recall that safety and reliability were a consistent theme across the advertisements she saw.  Those representations about safety and reliability influenced her decision to lease her Auris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have leased her Auris, and/or paid as much for it.

55. Plaintiff Hatice Hulya Yigit is a resident of Istanbul, Turkey and is a citizen of Turkey. Ms. Yigit owns a 2008 Toyota Auris 1.6 MM (VIN NMTKV56EX0R020830) which she purchased as a new vehicle from an authorized Toyota dealership located in Istanbul, Turkey. Her Auris was included in the "accelerator pedal" recall. She purchased  her Auris based on its reputation for safety. Ms. Yigit saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the many years before she purchased her Auris on December 6, 2007. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Auris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Auris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Auris.  She certainly would not have paid as much for it.

56. Plaintiff Paul Anthony Banton is a resident of Kingston, Jamaica and is a citizen of Jamaica.   Mr. Banton owns a 2007 Toyota Tacoma (VIN: 3TMJU62N07M044494) which he purchased as a new vehicle from an authorized Toyota dealership located in Riversdale, Georgia.  He purchased his Toyota based on its reputation for safety.  Mr. Banton's Tacoma was one of the vehicles included  in the "floor mat" recall. He saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several not years before he purchased his Tacoma on March 4, 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he

purchased his Tacoma, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Tacoma.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Tacoma.  He certainly would not have paid as much for it.

57.    Plaintiff Augusto Panez is a resident of Lima, Peru and is a citizen of Peru.  Mr. Panez owns a 2008 Toyota Corolla (VIN: 9BRBC41E495001789) which he purchased as a new vehicle from an authorized Toyota dealership located in Lima, Peru.  He purchased his Toyota based on its reputation for safety.  Mr. Panez saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before he purchased his Corolla in 2008. Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Panez purchased his Toyota Corolla.  He also reviewed the window stickers on the vehicles and their warranty information. Had these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla or paid as much for it.

58.    Plaintiff Catherine De Bruin is a resident of Kempton Park, South Africa and is a citizen of South Africa. Ms. De Bruin owns a 2006 Toyota Corolla (VIN: AHT53ZEC003074866) which she purchased from an authorized Toyota dealership located in Four Ways, South Africa on June 2008.  A few months after

purchasing her Corolla, Ms. De Bruin experienced her first SUA incident while driving on the local road of her city. A year later, she experienced her second SUA incident while she was driving with her daughter. Ms. De Bruin took her Corolla to her Toyota dealer to whom she reported the incident, and then the dealership performed service repairs on the Corolla. Ms. De Bruin does not feel safe in driving her Corolla. She saw advertisements for Toyota Corolla vehicles generally in the media during the period before she purchased her Corolla.  Although she does not recall the specifics of the many Corolla advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were a consistent theme across the advertisements she saw.   Those representations about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements, window sticker, warranty information, or any other materials disclosed that Corolla vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla. She certainly would not have paid as much for it.

59.    Plaintiff Mostfa Fahmy is a resident of Giza, Egypt and is a citizen of Egypt. Mr. Fahmy owns a 2009 Toyota Corolla which he purchased as a new vehicle from an authorized Toyota dealership located in Egypt on March 2009. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall.  Mr. Fahmy saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before he purchased his Corolla in 2009.  Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Fahmy purchased his Toyota Corolla.   He also reviewed the window stickers on the vehicles and their warranty information. Had

these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla or paid as much for it.

60.    Plaintiff Sisiliana Ridwan is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Ridwan owns a 2009 Toyota Camry (VIN MR053BK4099006869) which she purchased as a new vehicle from an authorized Toyota dealership located in Jakarta, Indonesia. Ms. Ridwan purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Ridwan saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Camry on December 15, 2009.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and/or reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it.

61.    Plaintiff Nani Indriyastuti is a resident of Jakarta, Indonesia and is a citizen of Indonesia. Ms. Indriyastuti owns a 2007 Toyota Yaris (VIN MR054HY9174611610) which she purchased as a new vehicle from an authorized

Toyota dealership located in Jakarta, Indonesia. Ms. Indriyastuti purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Indriyastuti saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris on April 3, 2007.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and/or reliability influenced her decision to purchase her Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris.  She certainly would not have paid as much for it.

62.    Plaintiff Melati Indrayani is a resident of Jakarta, Indonesia and is a citizen of Indonesia. Ms. Indrayani owns a 2006 Toyota Yaris (VIN MR054HY9164604253) which she purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Ms. Indrayani purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Indrayani saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety

- 33 -

and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Yaris. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris. She certainly would not have paid as much for it.

63. Plaintiff Jasni is a resident of Jakarta, Indonesia and is a citizen of Indonesia. Ms. Jasni owns a 2008 Toyota Yaris (VIN MR054HY9184622555) which she purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Ms. Jasni purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Jasni saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Yaris. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris. She certainly would not have paid as much for it.

64. Plaintiff Ananda is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Anada owns a 2008 Toyota Yaris (VIN MR054HY9184621617)

which she purchased as a new vehicle from an authorized Toyota dealership located in Garot, Subroro, Indonesia. Ms. Ananda purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Ananda saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris on May 3, 2008.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris.  She certainly would not have paid as much for it.

65.     Plaintiff Chairul Lubis is a resident of Medan, Indonesia and is a citizen of Indonesia. Mr. Lubis owns a 2008 Toyota Yaris (VIN MR054HY9184633418) which he purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Mr. Lubis purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Lubis saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Yaris on February 19, 2009.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were

consistent themes across the advertisements he saw.  Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it.

66.     Plaintiff Edward Syahputra is a resident of Medan, Indonesia and is a citizen of Indonesia. Mr. Syahputra owns a 2009 Toyota Yaris (VIN MR054HY9194634054) which he purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Mr. Syahputra purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Syahputra saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Yaris on May 27, 2009.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it.

67.     Plaintiff Herbert Sihite is a resident of Medan, Indonesia and is a citizen of Indonesia. Mr. Sihite owns a 2007 Toyota Yaris (VIN MR054HY9174611845)

which he purchased as a new vehicle from an authorized Toyota dealership located in Medan, Indonesia. Mr. Sihite purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Sihite saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Yaris on May 19, 2007.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it.

68.     Plaintiff Martha Siregar is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Siregar owns a 2009 Toyota Yaris (VIN MR054HY9194638053) which she purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Ms. Siregar purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Siregar saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris on October 30, 2009.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she

recalls that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and/or reliability influenced her decision to purchase her Yaris.   Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris.  She certainly would not have paid as much for it.

69.    Plaintiff Pangihutan Simanjuntak is a resident of Deli Serdang, Indonesia and is a citizen of Indonesia. Mr. Simanjuntak owns a 2009 Toyota Yaris (VIN MR054HY9194634353) which he purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Mr. Simanjuntak purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Simanjuntak saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Yaris on June 17, 2009.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were consistent themes across the advertisements he saw.   Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it.

70.     Plaintiff Tetti Suriati is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Suriati owns a 2007 Toyota Yaris (VIN MR054HY9174615320) which she purchased as a new vehicle from an authorized Toyota dealership located in Medan, Indonesia. Ms. Suriati purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Suriati saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Yaris on November 12, 2007.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris.  She certainly would not have paid as much for it.

71.     Plaintiffs Trimurti Jazanul is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Jazanul owns a 2009 Toyota Yaris (VIN MR054HY9194635297) which she purchased as a new vehicle from an authorized Toyota dealership located in Indonesia. Ms. Jazanul purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Jazanul saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she

purchased her Yaris on August 4, 2009.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris.  She certainly would not have paid as much for it.

72.    Plaintiff Mariam Ibrahim is a resident of Kuala Lumpur, Malaysia and is a citizen of Malaysia. Ms. Ibrahim owns a 2009 Toyota Camry (VIN MR053BK4007036405) which she purchased as a new vehicle from an authorized Toyota dealership located in Malaysia. Ms. Ibrahim purchased her Toyota based on its reputation for safety. After the recall announcement by Toyota, she believes that the value of her vehicle was greatly diminished because of the recall. Ms. Ibrahim saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Camry.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Camry.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it.

73.   Plaintiff Francis Joseph Coronel is a resident of Makati City, Phillipines and is a citizen of the Philippines. Mr. Coronel owns a 2009 Toyota Altis (VIN MR053ZEE106118954) which he purchased as a new vehicle from an authorized Toyota dealership located in Makati, Philippines. Mr. Coronel purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Coronel saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Altis on November 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Altis, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Altis.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Altis.  He certainly would not have paid as much for it.

74.   Plaintiff Gustavo Lopez is a resident of Zona 14, Guatemala and is a citizen of Guatemala. Mr. Lopez owns a 2009 Toyota Yaris (VIN JTDKW923895103119) which he purchased as a new vehicle from an authorized Toyota dealership located in Zona 9, Guatemala. Mr. Lopez purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall. Mr. Lopez saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before

he purchased his Yaris on July 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it.

75.    Plaintiff Natalia Komarova  is a resident of Ufa, Russia and is a citizen of the Russian Federation. Ms. Komarova owns a 2007 Toyota Yaris (VIN VNKKL98310A208781) which she purchased as a new vehicle from an authorized Toyota  dealership located in Ufa, Russia. She purchased her Toyota based on its reputation for safety. In June 2009, Ms. Komarova experienced a SUA incident while driving with her friend on Communistic Street, Ufa, Russia. Ms. Komarova reported the incident to her Toyota dealer, but the dealership refused to repair her vehicle. She does not feel safe driving her Yaris because of this SUA incident. Ms. Komarova saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before she purchased her Yaris on August 13, 2007.  Based on these misrepresentations as to the safety of Toyota vehicles, Ms. Komarova purchased her Toyota Yaris.  She also reviewed the window stickers on the vehicles and their warranty information. Had these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and

lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris or paid as much for it.

76.     Plaintiff Igoshin Vladimir Vladimirovich   is a resident of Moscow, Russia and is a citizen of the Russian Federation. Mr. Vladimirovich owns a 2008 Toyota Corolla (VIN JTNBV58E50JO50356) which he purchased as a new vehicle from an authorized Toyota  dealership located in Moscow, Russia. He purchased his Toyota based on its reputation for safety. Sometime in 2009, Mr. Vladimirovich experienced a SUA incident while driving on the streets of Moscow, Russia. He does not feel safe driving his Corolla because of this SUA incident. Mr. Vladimirovich saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before he purchased his Corolla on November 7, 2008.  Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Vladimirovich purchased his Toyota Corolla.  He also reviewed the window stickers on the vehicles and their warranty information. Had these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla or paid as much for it.

77.     Plaintiff Valerii Kolganov is a resident of Russia and is a citizen of the Russian Federation. Mr. Kolganov owns a 2007 Toyota Auris (VIN SB1KV56E60F059419) which he purchased from an authorized Toyota dealership located in Russia. Mr. Kolganov purchased his Toyota based on its reputation for safety. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall.  Mr. Kolganov saw

advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before he purchased his Auris in 2007. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Auris, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Auris. Had those advertisements or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this, he would not have purchased his Auris. He certainly would not have paid as much for it.

78.    Plaintiff Susan Ong  is a resident of Caroline Springs, Australia and is a citizen of the Philippines. Mrs. Ong owns a 2010 Toyota Yaris (VIN JTDKW923005148817) which she purchased as a new vehicle from an authorized Toyota  dealership located in Victoria, Australia. She purchased her Toyota based on its reputation for safety. Sometime in early 2010, Mrs. Ong's husband experienced a SUA incident while driving on the streets of Caroline Springs, Australia. Based on this SUA incident, Mrs. Ong and her husband does not feel safe driving her Yaris. Mrs. Ong saw advertisements misrepresenting the safety of Toyota vehicles on television in magazines and on billboards for years before she purchased her Yaris on May 6, 2010.  Based on these misrepresentations as to the safety of Toyota vehicles, Mrs. Ong purchased her Toyota Yaris.  She also reviewed the window stickers on the vehicles and their warranty information. Had these advertisements, window stickers, warranty information or any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and

- 44 -

lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris or paid as much for it.

79.    Each of the Consumer Plaintiffs have purchased or leased a car with a defect and in a transaction where Toyota did not disclose material facts related to a vehicle's essential purpose – safe transportation.  As a result, each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect.

**B.    Defendants**

80.    Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation.  TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc., Toyota Motor North America, Inc., Toyota Motor Engineering and Manufacturing North America, Inc., and Toyota Motor Credit Corporation. TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota, Lexus and Scion automobiles in California and multiple other locations in the United States and worldwide.

81.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in California.  TMS is Toyota's U.S. sales and marketing arm, which oversees sales and other operations in 49 states.  TMS distributes Toyota, Lexus and Scion vehicles and sells these vehicles through its network of dealers. Money received from the purchase of a Toyota vehicle from a dealer flows from the dealer to TMS.  Money received by the dealer from a purchaser can be traced to TMS and TMC.

82.     TMS and TMC sell Toyota vehicles through a network of dealers who are the agents of TMS and TMC.

83.     At all times herein mentioned, Defendant Toyota Motor North America, Inc. ("TMNAI") was and is a California corporation and a resident and corporate citizen of California.

84.     At all times herein mentioned, Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TMEMNAI") was and is a Kentucky corporation and a resident and corporate citizen of Kentucky.

85.     At all times herein mentioned, Defendant Toyota Motor Credit Corporation   ("TMCC") was and is California corporation and a resident and corporate citizen of California.

86.     Defendants, and each of them, are sued as participants and as aiders and abettors herein. At all relevant times, each defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the other defendants. There is a unity of interest and ownership between the Defendants listed above, such that the acts of one are for the benefit and can be imputed as the acts of the others.

87.     Defendants  are collectively referred to in this complaint as "Toyota" or the "Toyota Defendants" or "Defendants" unless identified as TMS, TMC, TMNAI, TMEMNAI or TMCC.

88.     As used in this complaint, "Toyota Vehicles", "Defective Vehicles" or "Subject Vehicles" refers to the following models that have ETCS:

**Toyota Vehicles**

2001 – 2010        4Runner

| | | |
|---|---|---|
| 1 | 2005 – 2010 | Avalon |
| 2 | 2002 – 2010 | Camry |
| 3 | 2007 – 2010 | Camry HV |
| 4 | | |
| | 2003 – 2005 | Celica (2ZZ-GE Engine) |
| 5 | | |
| 6 | 2005 – 2010 | Corolla (1ZZ-FE, 2AZ-FE, 2ZR-FE) |
| 7 | 2007 – 2010 | FJ Cruiser |
| 8 | 2004 – 2010 | Highlander |
| 9 | 2006 – 2010 | Highlander HV |
| 10 | 1998 – 2010 | Land Cruiser |
| 11 | | |
| | 2005 – 2010 | Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD)) |
| 12 | | |
| 13 | 2001 – 2010 | Prius |
| 14 | 2004 – 2010 | Rav4 |
| 15 | 2001 – 2010 | Sequoia |
| 16 | 2004 – 2010 | Sienna |
| 17 | 2002 – 2008 | Solara |
| 18 | | |
| | 2003 – 2004 | Tacoma (5VZ-FE except Sport Model) |
| 19 | | |
| 20 | 2005 – 2010 | Tacoma |
| 21 | 2000 – 2010 | Tundra (not including the 2000-2002 with 5VZ-FE) |
| 22 | 2009 – 2010 | Venza |
| 23 | 2004 – 2010 | Yaris |
| 24 | 2005 – 2009 | AYGO |
| 25 | | |
| | 2008 – 2009 | iQ |
| 26 | | |
| 27 | 2008 – 2009 | Avensus |
| 28 | 2006 – 2010 | Auris |

| | | |
|---|---|---|
| 1 | 2009 – 2010 | Verso |
| 2 | 2007 – 2010 | Radford |
| 3 | **<u>Lexus Vehicles</u>** | |
| 4 | | |
| 5 | 2002 – 2003 | ES300 |
| 6 | 2004 – 2006 | ES330 |
| 7 | 2007 – 2010 | ES350 |
| 8 | 1998 – 2006 | GS300 |
| 9 | 2007 – 2010 | GS350 |
| 10 | 1998 – 2000 | GS400 |
| 11 | | |
| 12 | 2001 – 2007 | GS430 |
| 13 | 2007 – 2010 | GS450h |
| 14 | 2008 – 2010 | GS460 |
| 15 | 2003 – 2009 | GX470 |
| 16 | 2010 | HS250h |
| 17 | 2008 – 2010 | IS F |
| 18 | | |
| 19 | 2006 – 2010 | IS250 |
| 20 | 2010 | IS250c |
| 21 | 2001 – 2005 | IS300 |
| 22 | 2006 – 2010 | IS350 |
| 23 | 2010 | IS350c |
| 24 | 1999 – 2000 | IS400 |
| 25 | 1998 | LS400 |
| 26 | 2001 – 2006 | LS430 |
| 27 | 2007 – 2010 | LS460 |
| 28 | | |

- 48 -

| | | |
|---|---|---|
| 2008 – 2010 | LS600h | |
| 1998 – 2007 | LX470 | |
| 2008 – 2010 | LX570 | |
| 2004 – 2006 | RX330 | |
| 2007 – 2010 | RX350 | |
| 2006 – 2008 | RX400h | |
| 2010 | RX450h | |
| 1998 – 2000 | SC300 | |
| 1998 – 2000 | SC400 | |
| 2002 – 2010 | SC430 | |

**Scion Vehicles**

| | |
|---|---|
| 2005 – 2010 | Scion tC |
| 2008 – 2010 | Scion xB |
| 2008 – 2010 | Scion xD |

Plaintiffs reserve the right to amend the foregoing definition of Subject Vehicles to include any additional Toyotas (or other Toyota brands).

## IV.   FACTUAL BACKGROUND

### A.   Toyota's Marketing Campaigns Promise Safety and Lead to Consumer Trust in the Toyota Brand

89.   Toyota has consistently marketed its vehicles worldwide as "safe" and proclaimed that safety is one of its "highest corporate priorities."  It has promoted ETCS as providing "stable vehicle control."  Examples of such representations follow.

90.     Toyota's 1996 Annual Report explained that safety always has been a top priority in each phase of Toyota's research and development.  But translating that effort into "overall safety gains" required an "integrated methodology that unifies evaluation criteria for safety throughout development organization."   In a 1996 brochure entitled "Toyota and Automotive Safety," Toyota again stated, "[a]t Toyota, we feel that building safe automobiles is the most important thing we can do."  Toyota explained this focus on safety is part of its broad philosophy:

> The more indispensable automobiles become, the greater
> they affect society in terms of safety and the environment.
> We at Toyota are fully aware of our responsibilities in this
> regard.   We do our utmost to minimize our products'
> environmental impact and work hard to ensure overall
> safety.  This means identifying the causes of any problems,
> devising workable remedies, and then putting those
> remedies into action.

91.     Toyota's safety promises included its new electronic throttle control system that it began to implement in the late 1990s.  When Toyota began installing ETCS in the 1998 Lexus, it announced ETCS as one of the latest developments:

> The intelligent electric throttle control system (ETCS-i)
> gives improved acceleration control under all driving
> conditions.   It provides excellent response and stable
> vehicle control, especially when the road is slippery.
> Using ETCS-i the throttle valve opening is controlled by a
> throttle actuator which is a small electric motor.   Under

normal road conditions the throttle opens in direct proportion to the accelerator providing maximum response and performance.

However, under slippery road conditions and with the snow mode selected the actuator slows the throttle opening relative to the accelerator to suppress sudden engine output and provide improved acceleration control.

The ETCS-i is controlled by the engine management computer and communicates with the intelligent automatic gear shift and the traction control systems.

The release claimed "[t]he safety and security of driver and passenger has always been an absolute priority for Lexus."

92.    The Toyota Camry, in which some of the earliest deadly sudden acceleration accidents occurred, was marketed by Toyota as a high quality and safe family vehicle.  According to a Toyota press release:

The fifth-generation Toyota Camry, introduced for 2002, has become the platinum standard in midsize family sedans by offering more of everything sedan buyers want – room, comfort, performance, *safety and value – along with award-winning Toyota quality*.  "Camry has come to define what a family sedan should be," said Don Esmond, Toyota Division senior vice president and general manager.  "It's [sic] continuing success in the U.S. stems from the

combination of truly unbeatable quality, comfort and value that it provides."  [Emphasis added.]

93.   TMS touted safety as a key feature of Lexus vehicles in a 2002 press kit:

Raising the Standards on Standard Safety Features.

**The Lexus Commitment to Safety**

Lexus designs all its new vehicles to provide customers with advanced safety engineering and technology.  Lexus also recognizes the driver's responsibility to operate a vehicle in as safe a manner as possible, and the company has been at the forefront of technology that enhances both passive safety (occupant protection in a collision) and active safety (driving dynamics).

Road-Reading Throttle Control:   Seeking to enhance driving smoothness at every level, Lexus equipped the LS 430 with a system called Intuitive Powertrain Control. Working with the electronic throttle control (drive by wire), the system helps to smooth out acceleration from a standing start by very slightly delaying throttle opening when the driver steps on the accelerator pedal.

94.   TMC highlighted safety as a key quality in a 2003 brochure:

**Toyota Next Generation Technology**

We are stepping up our safety technology development to ensure that customers can enjoy their vehicles in safety.  In

- 52 -

1  addition to "passive" safety technology, Toyota is

2  energetically developing "active" safety systems that

3  prevent collisions.  We are working particularly hard to

4  develop advanced safety systems based on our key

5  peripheral monitoring technologies.

6

7      95.    In a press kit regarding the 2003 Prius, Toyota proclaimed its bold use

8  of more "drive by wire" (electronic rather than mechanical features), including a

9  drive-by-wire throttle:

10         Many of the new technologies used in the Prius – some

11         unique to the car and world firsts – have been made

12         possible by Toyota's bold move to redefine the vehicle's

13         power train and electrical architecture.  The higher voltages

14         created by the batteries and converter have enabled

15         Toyota's engineers to equip the Prius with a far larger suite

16         of 'drive-by wire' technologies than has previously been

17         seen in any production car.  Throttle, transmission and

18         braking is [sic] all electronically controlled and free of the

19         traditional mechanical linkages.

20

21

22     96.    The same brochure lists the new electronic throttle as a safety feature of

23  the car:  "Safety … First car in the world to use 'by-wire' technology for throttle,

24  brakes and gearshift simultaneously."   The brochure describes Toyota's "radical"

25  and "futuristic" adoption of more electronically controlled features in the Prius

26  because of their increased reliability, including:

27

28

By suppressing mechanical and hydraulic links and replacing them with electric and electronic connections it's possible to achieve shorter activation times.  In addition, the communication between all these systems will be faster.   "By-wire" also brings advantages in weight reduction and saves precious space that can be used to house other systems…

"By-wire" technology was originally developed for the aerospace industry, where certain mechanisms had to be activated without any hydraulic or mechanical link.   The only way to achieve this was through an electronic connection and electric activation.  This technology not only saves weight and space, but also provides a more immediate action than hydraulic or mechanical links, with even higher reliability.

For this reason, Prius uses more "by-wire" technology than any other car on the road today.  Throttle, brakes, shift lever, Traction Control and Vehicle Stability Control Plus use this technology to improve their operation or even to provide improved ergonomics.

97.     In an advertisement appearing in the June 2003 issue of GOOD HOUSEKEEPING, Toyota promised the Sienna had "more safety."

98.     In a 2004 press release introducing the new Prius, TMS claimed:

- 54 -

1
2
3
4
5
6
7
8

Designed to easily accommodate a small family, the 2004 Prius is also designed to provide the level of safety a family car buyer demands.  Passive safety features include front seatbelts with pre-tensioners and force limiters, 3-point seatbelts for all rear seating positions and two-step dual front airbags (SRS), with driver and passenger side and curtain airbags available as an option.

9
10
11
12
13
14
15
16
17
18
19

Prius also features a high level of dynamic control, with some features that are not yet available in other midsize cars.  The standard anti-lock brake system (ABS) integrates Brake Assist and Electronic Brake Distribution features, which can help apply maximum braking pressure in an emergency stop.   Vehicle Stability Control (VSC) is available as an option.  The new Hill Acceleration Control helps the driver maintain better control on ascents and descents.

20
21
22
23
24
25
26

The new Prius uses an electronically controlled "throttle-by-wire" throttle, which provides greater precision than a conventional cable-type throttle setup.  A new by-wire shift control replaces the traditional gearshift lever and allows tap-of-the-finger shifting using a small joystick mounted on the dash.

27
28

99.   This general promise of safety and specific promise that the new electronic components being installed in Defective Vehicles are more reliable than their mechanical predecessors is a repeated theme in Toyota marketing:

- 2004 Toyota 4Runner press release:  "It features a new linkless electronic throttle control system with intelligence (ETCS-i) that helps improve performance and increase fuel economy…*The 4Runner utilizes the latest technology to deliver a high level of occupant safety.*"  [Emphasis added.]

- August 2004 Lexus Press Kit:  "Technical innovation is a key element of Lexus's all-around excellence, *delivering real benefits to owners in terms of safety*, performance, comfort and convenience."  [Emphasis added.]

- November 2004 GOOD HOUSEKEEPING:  "Your destination should always be safety.  And Toyota SUV's raise the standard…."

- In GOOD HOUSEKEEPING's November 2004 issue and elsewhere:  "Safety First to Last," an advertisement for RAV4, Sequoia and Land Cruiser.

- 2005 Press Release regarding Toyota SUVs:  "'Toyota customers have long counted on the brand for the best in performance, quality and durability,' said [Don] Esmond [senior vice president and

general manager, Toyota Division].  '*They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs.*'"   [Emphasis added.]

- In GOOD HOUSEKEEPING's May 2001 issue:  "Happy Mother's Day from the people obsessed with safety," an advertisement for the Sienna.

- In GOOD HOUSEKEEPING's March 2001 issue, Special Advertising Section:  "Serious about safety.  Camry utilizes the latest technology to ensure you and yours arrive at your destination safe and sound."  Also, "Value and safety.  Part of the Corolla equation has always been high value and high safety."

100.   These proclamations of "safety" and "reliability" were false and misleading because they failed to disclose the dangerous SUA defect and fail-safe mechanism defects.  Toyota knew or should have known these representations were false and misleading because, as discussed in detail below, Toyota knew there was a significant increase in SUA events in vehicles with electronic throttle controls over vehicles with mechanical throttle controls.

101.   In 2004, TMS issued a brochure that discussed the safety features of the Sienna:

A safe place for your children to grow up.  Sienna has a proud safety heritage, boasting some of the very best scores in its class on government and insurance industry crash

tests.   We've equipped the 2004 Sienna with even more safety features.  [Lists the safety features.]

102.   In 2004, TMS issued a press kit noting that its RAV4 had enhanced safety features:

The second-generation model, designed in Southern California by Toyota's Calty Design Research and introduced for the 2001 model year, increased Toyota's share of this growing segment.   The 2004 revision is designed to strengthen the brand's position in the segment that it created, and to give the customer even greater value and enhanced standard safety features.

"Toyota invented the formula for this segment, and for 2004 we're perfecting it with more of what everyone who buys a small SUV wants – more power, more safety features, more style and more value," said Don Esmond, Toyota Division senior vice president and general manager. "What's more RAV4 still holds the ultimate advantage with Toyota quality."

103.   In a 2005 press release, TMS boasted about its safety in its RAV4, 4Runner, Land Cruiser and Sequoia SUVs:

"Toyota offers one of the widest selections of SUVs on the market, and we equip every model with the same level of advanced safety technology," said Don Esmond, senior vice president and general manager, Toyota Division.  "By

- 58 -

making this technology standard on all our SUV models,
Toyota provides the customer with peace of mind when
purchasing and when driving."

….

"Toyota customers have long counted on the brand for the
best in performance, quality and durability,' said Esmond.
'They can take comfort knowing that driving safety is just
as high a priority in our full line of SUVs."

104.   A 2006 brochure devoted entirely to Toyota's safety efforts
acknowledged Toyota's responsibility as a vehicle manufacturer for the safety of its
vehicles.  The brochure stated that "Toyota is working to reduce traffic accidents,
deaths and injuries" because accidents "have an enormous economic impact:  lost
productivity, medical bills and compensation for victims, physical losses of vehicles
and structures and institutional costs (insurance management, police, trial costs,
etc.)."  The brochure then explained how Toyota pursues what it refers to as "real
safety":

A fundamental component of building safe cars is
gathering information and analyzing why accidents occur
and what causes injuries.  Toyota analyzes data from real
accidents that take place all over the world.  By analyzing
accident data and using simulation, Toyota develops new
safety technologies, testing them on actual vehicles before
being offered to the public in our product line-up.  This is a

perpetual cycle through which Toyota seeks to enhance safety technologies and reduce accidents continuously.

These same messages were echoed in safety brochures used by TMS in 2007. These statements were false and misleading because Toyota had not performed the tests necessary to diagnose, identify and fix the defect causing SUA.

105. In the 2007 "Camry Owners Warranty Manual," Toyota represented that it builds "vehicles of the highest quality" and "reliability":

At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability.

Our excellent warranty coverage is evidence that we stand behind the quality of our vehicles. We're confident – as you should be – that your Toyota will provide you with many years of enjoyable driving.

*    *    *

Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind throughout their ownership experience.

106. This warranty language appears in identical text for all Toyota models. The foregoing language was false and misleading because in fact Toyota vehicles were not of the highest quality and reliability but instead were unsafe and unreliable

due to the SUA defect and the failure to have an adequate brake-override and other fail-safe mechanisms.

107.   In September 2009, Toyota announced a new marketing campaign that highlights six claims that Toyota has achieved through its philosophy of *kaizen*, or "constant improvement."  Included in the six claims are "Dependability," "Quality," "Reliability" and "Safety."

108.   A 2010 video of Toyota's Star Safety System includes the following description of Toyota's standard for vehicle control safety:

> If a stereo system comes standard on an SUV, shouldn't a safety system?  Introducing Toyota's Star Safety System TM, a combination of five safety features that comes standard with every one of Toyota's five SUVs:  Vehicle Stability Control, Traction Control, Anti-lock Brakes, Electronic Brake-force Distribution, and Brake Assist.  All designed for one purpose:  to help keep the driver in control of the vehicle at all times.  Because when it comes to the well-being of you and your passengers, Toyota has raised the standard.

The video is misleading as it does not mention the vehicle recalls, the unintended acceleration defect or the lack of a fail-safe mechanism to override unintended acceleration.  Written advertisements also made representations about the Star Safety System as part of an accident avoidance system that "keeps you in control and out of harm's way."  Toyota knew these representations were false due to the deaths and crashes it was aware of due to SUA and lack of a fail-safe.

109.    In a video released in February 2010, Toyota states:

> For over 50 years providing you with a safe, reliable and high quality vehicles has been our first priority.  In recent days, our company hasn't been living up to the standards that you have come to expect from us or that we expect from ourselves.  That's why 172,000 Toyota and dealership employees are dedicated to making things right.  We have a fix for our recalls.  We stopped production so we could focus on our customers' cars, first.  Our technicians are making repairs.  We're working around the clock to ensure we build vehicles of the highest quality, to restore your faith in our company.

The commercial does not mention that the recalls do not explain even a majority of the reports of unintended acceleration.

110.    These claims of safety were intended to and did cause individuals to trust the safety of Defective Vehicles and purchase them.  As stated in a 1998 Corolla brochure, "Toyota is now one of the most trusted names in the automotive world – one of the few things you can really depend on."  As stated in a 2004 Lexus LS brochure, "[t]he value of owning a Lexus involves much more than just its purchase price.  It also includes our well-earned reputation for vehicle dependability, projected low repair costs and high retained value.  In addition to such intangibles as outstanding customer satisfaction, unparalleled quality, peace of mind and loyalty."

Even Toyota's logo of three overlapping ovals is meant to convey a trust between the customer and Toyota.[9]

111. Despite Toyota's proclamations of safety and severe testing regimes, it was also growing rapidly, adding new technology to its vehicles and increasingly unable to live up to its promises.

**B.      Toyota's Electronic Throttle Control System and Its Limited Fail-Safe Mechanism**

112. Toyota calls its electronic throttle control system the ETCS-intelligent, or ETCS-i. ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle. Toyota began installing ETCS-i in models of the 1998 Lexus. This ETCS included a mechanical link that shut off the throttle.

113. In 2001, Toyota began producing the substantially redesigned 2002 Camry. It was the first Toyota to be equipped with linkless ETCS-i, which was one of several new or revised vehicle systems (including transmission and braking systems) introduced for 2002 Toyota Camrys, Solaras and the Lexus ES300 line. Linkless ETCS-i did not have a mechanical link to shut the throttle.

114. Toyota's earlier ETCS-i equipped vehicles retained a mechanical system that would close the throttle if the electronic system failed. However, Toyota had phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002 Camry. Toyota knew other manufacturers continued to use a manual fail-safe

---

[9] *See* http://www2.toyota.co.jp/en/vision/traditions/nov_dec_04.html.

mechanism.  For example, Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied.[10]

115.   In order to address potential malfunctions of the ETCS-i – in other words, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies.   The fail-safe strategies are:

    a.   If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

    b.   The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

    c.   The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

    d.   If one or both throttle position sensors fail, or the throttle itself is not responding properly to the accelerator pedal but the throttle itself is not physically stuck, the throttle should close but will provide minimal acceleration.

116.   As explained herein, Toyota knew no later than 2002 that these fail-safes were insufficient to prevent SUA events in its vehicles and that additional fail-

---

[10] TOY-MDLID00041130T-0001.

safes were necessary.  Toyota did not, however, move to address these issues by installing additional fail-safes.

117.  Toyota had several options.  For example, Toyota could have installed a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing SUA.  Or, Toyota could have employed a hardware-redundant, fault tolerant solution (BMW's approach).  Or, Toyota could have provided an override of the engine control module, such as a key switch to physically remove the power to the Engine Control Module ("ECM").  Or, Toyota could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system.  Toyota did none of these things.

118.  In 2007, recognizing the risks of unintended acceleration, "TMS suggested that there should be 'a fail safe option similar to that used by other companies to prevent unintended acceleration.'"[11]  Toyota did not act on this suggestion until 2010.

**C.    Toyota Receives Complaints and Is Investigated for Unintended Accelerations Beginning in 2002**

119.  Toyota had advance notice of a defect and safety risks involving SUA in ETCS-i equipped vehicles as early as 2002.  Toyota hid this notice from the public through calculated manipulation of information supplied to NHTSA during its various investigations of SUA incidents.  Toyota exploited strategic relationships with current and former NHTSA employees and negotiated "deals that limited the nature and scope of NHTSA's investigations."  Toyota knew that these limited

---

[11] TOY-MDLID00041130T-0001.

investigations were unlikely to reveal a defect in the ETCS and did everything it could to keep it that way.

### 1.     First reports of unintended acceleration to Toyota

120.   On February 2, 2002, Toyota received its first consumer complaint of a 2002 Camry engine surging when the brakes were depressed.  Toyota received ten other similar complaints before August 2002.

121.   In March 2002, TMS asked TMC to investigate the root cause of the surging.  On May 20, 2002, internal records reported that the "root cause of the 'surging' condition remains unknown" and "[n]o known remedy exists for the 'surging' condition at this time."[12]

122.   In response to a NHTSA investigation into similar incidents, Toyota issued at least three "Technical Service Bulletins" related to SUA.  On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38-42 MPH with lock-up (L/U) 'ON.'"  Toyota advised that the cars' ECM calibration had been revised to correct the problem.  Yet, on December 23, 2002, Toyota released another bulletin noting that 2002 and 2003 Camrys, produced at Toyota Motor Manufacturing of Kentucky ("TMMK"), "may exhibit a triple shock (shudder) during the shift under 'light throttle' acceleration."  The bulletin advised dealers to follow the repair procedure in the bulletin to rectify the situation.  Less than nine months later, Toyota released a nearly identical advisory notice on May 16, 2003, which stated that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-

---

[12] TOY-MDLID00062906.

42 mph with lock-up (L/U) 'ON.'"  Again, Toyota claimed the ECM calibration had

been revised to correct this condition.  Toyota did not disclose the existence of these

technical service bulletins to consumers, or the fact that Toyota could not solve the

problem.

123.   On August 31, 2002, Toyota recorded its first warranty claim to correct

a throttle problem on a 2002 Camry.  Customer warranty claims are handled by the

TMS Claims Department in Torrance, California.[13]

124.   On April 17, 2003, Peter Boddaert of Braintree, Massachusetts, filed with

NHTSA a report of SUA involving his 1999 Lexus.  In response, NHTSA opened

Defect Petition DP03-003.  Mr. Boddaert petitioned the agency to analyze 1997-2000

Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in

sudden, unexpected excessive acceleration even though there is no pressure applied to

the accelerator pedal."  In his petition, Mr. Boddaert noted that 271 other complaints

about these vehicles had been lodged on NHTSA's website, 36 of which involved

problems with "vehicle speed control."  Of those 36 complaints, several involved

collisions, including one in which a Lexus had "collided with five other cars in the

space of ½ mile before it could be stopped."

### 2.   Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota's with mechanical throttle controls

125.   On January 15, 2004, Carol Mathews asked NHTSA to investigate 2002

and 2003 Lexus ES300s, "alleging that [her] throttle control system malfunctioned

on several occasions, one of which resulted in a crash."  On March 3, 2004,

NHTSA's ODI opened a Preliminary Evaluation (PE04-021).  NHTSA documents

---

[13] *See* TOY-MDLID00023851.

describe the problem to be investigated as: "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge." The investigation was initially expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES300 vehicles. ODI had received 37 complaints and reports of 30 crashes resulting in five injuries.

126.   Mr. Scott Yon was the designated investigator.  He would remain NHTSA's principal investigator on many subsequent SUA-related investigations and developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

127.   The NHTSA investigation described the defect allegations as:

> Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system function was reportedly normal.[14]

128.   On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota employee in Technical and Regulatory Affairs, an e-mail showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles:

> From:        Yon, Scott

---

[14] TOY-MDLID00041712.

1   Sent:        Thursday, June 03, 2004  9:15 AM

2   To:          Chris Santucci (Toyota.com)

3   Subject:     For review

4
5   Categories:  PE04021-ToyotaThrottleControl

6   Attachments: CamryVSCTrend-200402.pdf

7   See attached.  Give me a call, when you have time; I want

8   to discuss the submission and the attached.

9   Scott

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



129. Motor vehicle manufacturers frequently re-design their vehicles, as when Toyota implemented ETCS. But having taken that step, Toyota should have monitored NHTSA's consumer safety database for indications of changing patterns in the complaints by model that signaled the need to review the safety of ETCS and the need to implement a robust fail-safe, including, but not limited to, an effective brake-override.

130. Publicly available consumer complaints which exclude the 37,000 complaints Toyota has yet to reveal, show a pronounced increase in SUA complaints from Toyota Camry owners after Toyota introduced ETCS-i in that vehicle. Through April 30, 2003, more than 9% of all complaints for Camrys equipped with ETCS-i related to SUA, while only 5% of all complaints (41 of 810) for Camrys without ETCS-i related to SUA. This difference is statistically significant based on Fisher's two-tailed exact test, $p = 0.0369$. The twin Lexus ES model showed a very similar pattern of SUA complaints.

131. The Toyota Tacoma pickup also showed a marked increase in SUA complaints after Toyota introduced ETCS-i in this model. By the end of January 2007, nearly 5% of all complaints (12 of 241) for Tacomas equipped with ETCS-i related to SUA (12 of 241) while only 2% of all complaints (9 of 449) for Tacomas without ETCS-i. This difference is statistically significant based on Fisher's two-tailed exact test, $p = 0.0368$.

132. A similarly striking trend occurs in several other models: Lexus ES (5-fold increase), Lexus RX (1.8-fold increase), 4Runner (6-fold increase), Avalon (2-fold increase), Camry (3.7-fold increase), Highlander (2.8-fold increase), and Tacoma (14-fold increase).

133.   State Farm observed the same trend in Toyota Camrys and Corollas, as reflected in the chart below (which State Farm provided to Congress):



134.   This statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that there was a defect in its vehicles with ETCS that could cause SUA.

135.   Toyota's complaint database was not the only source of information available to Toyota.  Internally, as early as May 5, 2003, in secret "Field Technical Reports" Toyota was documenting "sudden acceleration against our intention," as an

"extremely serious problem for customers."[15]   A technician reported a SUA incident and stated "we found mis-synchronism between engines speed and throttle position movement."   The probable cause was unknown but "[e]ven after replacement of those parts, this problem remains."   The author requested immediate action due to the "extremely dangerous problem" and "we are also much afraid of frequency of this problem in near future."

136.   At the outset of its 2004 investigation into SUA in Toyota vehicles, NHTSA asked Toyota for information on similar incidents.  The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, California.  The scope of NHTSA's information request became the subject of negotiations between Messrs. Tinto and Santucci of Toyota and NHTSA representatives.   Ultimately, NHTSA agreed to exclude, certain highly relevant categories of incidents from its investigation.

137.   In response to NHTSA's information request, Toyota denied that a defect existed, stated that there was no defect trend and that its electronic control system could not fail in ways its engineers had not already perceived.   Toyota reported 123 complaints that it said "may relate to the alleged defect."   But Toyota excluded from its response the following relevant categories of complaints, among others:

_____

[15] TOY-MDLID00087951-52.

- 72 -

(1)    An incident alleging uncontrollable acceleration that

occurred for a long duration;

(2)    An incident in which the customer alleged that he

could not control a vehicle by applying the brake; and

(3)    An incident alleging unintended acceleration

occurred when moving the shift lever to the reverse or the

drive position.

138.   The Toyota Defendants thus concealed from NHTSA and the public

relevant customer complaints.

139.   NHTSA closed the investigation without testing of the integrity of the

ETCS-i, without reviewing any records of Toyota's test reports concerning the

ETCS-i, and without reviewing whether the braking system was effective in an open-

throttle condition.  Toyota itself did not have the capability of fully modeling, testing

or validating the safety of ETCS-i because of its failure to implement standard design

platforms, its failure to develop and/or conduct meaningful ECM test procedures,

and its failure to exercise appropriate control over third-party subsystem designs.

140.   While Toyota denied any SUA defect, independent experts concluded

otherwise.  In May 2004, a Forensic Technologist and MSME examined a vehicle in

New Jersey that had experienced a SUA event.  The report was forwarded to Toyota

on January 13, 2005.  It concluded that the vehicle's ETCS was not operating

correctly.[16]  This report was not provided to NHTSA.

---

[16] TOY-MDLID90064979.

1
2
3
4

141.   Internally, Toyota was replicating the SUA defect; "was able to duplicate customer complaints … engine speed remains at 5,000 rpm."   In these cases it was often secretly replacing throttle bodies.

5
6

142.   On July 8, 2005, Mr. Jordan Ziprin of Phoenix, Arizona, filed a formal request for a defect investigation into unintended acceleration in the 2002 Toyota.

7
8
9
10

143.   On August 5, 2005, NHTSA opened Defect Petition DP05-002 to investigate Mr. Ziprin's claims.   Scott Yon again was assigned as NHTSA's investigator.   The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES models.   The Opening Resume stated, in part:

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

> The Petitioner owns a 2002 Camry and states that in July 2005 the vehicle accelerated without application of the throttle pedal while reversing out of a driveway; the acceleration caused a loss of vehicle control and subsequent crash….   The Petitioner states a similar throttle control incident occurred in April 2002 and additionally cites other ODI reports which also allege loss of throttle control and or uncontrollable acceleration.   The Petitioner discusses NHTSA investigation PE04-021, which involved the Camry and ES models, and makes a request for certain information.   ODI will evaluate the petition and other pertinent information.

26
27
28

144.   After receiving the petition and reviewing the underlying complaints, Toyota did not launch its own investigation or identify any new tests that it would perform to check for a defect in the ETCS.   Instead, Toyota's formal responses to

NHTSA's investigation recommend NHTSA deny the petition based only on the information Toyota had previously provided "as well as the lack of evidence supporting concurrent failure of the vehicle braking systems."  After explaining how the electronic throttle system and its fail-safes were designed to operate, Toyota concluded:

> [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota believes this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls.  Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls.  Toyota has not found any evidence on the subject vehicles of brake failure, let alone brake failure concurrent with ETC failure.

*See* Toyota's Response re DP05-002, dated November 15, 2005.

145.   This response of "no evidence" ignores and concealed the spike in SUA events that occur within one year of a vehicle switching to ETCS, a trend known to Toyota.

146.   Mr. Yon, who is not an electrical engineer or expert in electronic control systems, inspected Mr. Ziprin's vehicle and found no evidence of a system malfunction.  Mr. Ziprin directed to NHTSA's attention some 1,172 Vehicle Owner Questionnaire reports, from which ODI identified 432 reports that alleged an "abnormal throttle control event."  The 432 reports involved 2002 to 2005 Camry,

Solara and Lexus ES models (all equipped with ETCS).  Toyota had knowledge of the 432 reports.

147.  Upon learning of the denial, Mr. Ziprin, who had conducted considerable research into the issues set forth in his petition and filed his findings with the agency, reacted with an angry letter to NHTSA dated January 5, 2006, and accused the agency of bias:

> Frankly, I anticipated that decision from the very first time I was in contact with Mr. Scott Yon, the assigned investigator.  He made statements during our first telephone conversation which tended to establish that the purpose of his inquiry was to establish a basis to dismiss the petition based upon NHTSA policy rather than to deal with and examine all of the facts and circumstances involved.  When Mr. Yon subsequently visited Phoenix, he told me quite clearly and emphatically that it was NHTSA's firm policy not to investigate safety issues regarding hesitations in acceleration by vehicles.

148.  On September 14, 2006, ODI opened Defect Petition DP06-003 in response to a request from William Jeffers III for an investigation of 2002-2006 Camry and Camry Solara vehicles for incidents relating to vehicle surging.  Scott Yon was again assigned to investigate.  According to the petition, Mr. Jeffers owned a 2006 Camry and previously owned a model-year 2003 Camry.  He alleged that both vehicles exhibited "engine surging," which he described as a short duration (one- to two-second) increase in engine speed occurring while the accelerator pedal is not

depressed.   For his 2006 vehicle, the petitioner estimated that six to eight surge incidents, of varying magnitude, occurred over the course of 10,000 miles and nearly seven months of ownership.  In the last and most alarming instance, Mr. Jeffers noted that the malfunction indication lamp was illuminated during and after this incident.

149.   Toyota received a fax from NHTSA on September 15, 2006, stating that it had agreed to open the defect petition.   In internal e-mails, Chris Santucci expressed skepticism of Mr. Jeffers' account of the unintended acceleration and hope that NHTSA would not ask Toyota to provide any additional data as part of the investigation:

> Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner.  Hopefully, they will not grant the petition and open another investigation.[17]

150.   Although Mr. Jeffers reported that the brake system was effective at overcoming the engine surge, he informed NHTSA of his concerns that this might not always be the case.  NHTSA summarized in its ODI Closing Resume:  "[H]e is concerned about reports filed with NHTSA alleging uncontrolled surging in MY 2002 to 2006 Camry vehicles bringing those vehicles to a high rate of speed (in some cases, purportedly, with the brakes applied)."

151.   While NHTSA's investigation was ongoing, two other related events occurred.  First, on February 5, 2007, a fatal crash occurred in San Luis Obispo, California, involving a 2005 Camry that suddenly accelerated in a restaurant parking

---

[17] TOY-MDLID00044092.

lot, went through a guard rail and over a cliff into the Pacific Ocean.  Second, on March 14, 2007, TMS President James Lentz received a letter at his office in Torrance from a consumer explaining a SUA event in a 2003 Toyota Camry.[18]  The writer insisted he was pressing the brake, and not the accelerator, when the event occurred.  Further, the writer believed that the vehicle's electronic throttle caused the event.

152.   After the cursory evaluation of Mr. Jeffers' claims, NHTSA denied the petition and stated it found no evidence of a defect.

153.   Toyota never fully disclosed to the regulators the actual numbers of customer reports of unintended acceleration events in the various Toyota models under investigation that the company had received.  In fact, Toyota disclosed that it had received only 1,008 such complaints.  Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received *37,900* complaints potentially relating to sudden acceleration in Defective Vehicles from January 1, 2000, through January 27, 2010.

154.   One of Toyota's strategies in responding to SUA complaints has been to blame any report of SUA on driver error.  Toyota failed to disclose that its own technicians often replicated SUA events without driver error.  The following is an example:

**Condition Description**

Customer states while at a stop the engine started to rev

and tried to take off.  Customer turned off vehicle and

---

[18] TOY-MDLID90045217.

restarted.  Vehicle continue to rev when running.  Turning vehicle off 3rd time and restarted vehicle operated normally after third start.

**Diagnostic Steps**

- Technician who was inspecting the vehicle had driven it approximately 10-12 minutes.

- 7-8 minutes into the drive the technician was sitting at a stop light.  When the stop light changed the tech started to lightly accelerate.

- After traveling 20-30 feet the vehicle exhibited a slight hesitation *then began to accelerate on its own*.

- Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence.

- Vehicle traveling 9-10 mph at time of occurrence. Approximate maximum speed reached was 20 mph prior to accelerator pedal release / brake application.

- Estimated throttle position at the time of the occurrence was 15-20 percent.[19]  [Emphasis added.]

155.   Upon the technicians replicating a SUA event, Toyota decided it was in the customer's "interest" for Toyota to buy back the vehicle, meaning in reality that Toyota decided to remove this vehicle from the market since it was experiencing SUA incidents that could not be blamed on the driver.  And, to further conceal the

---

[19] TOY-MDLID00075242.

defect Toyota required as a condition of the vehicle repurchase that the owner sign a confidentiality agreement and agree not to sue.  This confirmation of a clear SUA event not reported to NHTSA and was concealed.

156.   In a Field Technical Report dated April 18, 2006, involving a 2007 Camry, a technician confirmed the "Vehicle Lunges forward":

Condition Description

Vehicle lunges forward when coming to a stop

Diagnostic Steps:

- Drove vehicle at 55mph, got vehicle to go into 5th gear, when slowing down and coming to stop, right at 5 mph the vehicle would lunge forward

- Drove vehicle in 4th gear, and when coming to a stop, once the vehicle reached 5mph, vehicle would lunge forward

- Drove vehicle in 3rd gear, and when coming to a stop, when the vehicle reached 5mph, vehicle would lunge forward

- Each of these test were complete with the A/C on and off, no change

Probable Cause

1    Unknown[20]

2    157.   "Lunging" apparently was a problem service managers were aware of:

3          From: Mike Robinson/=Mobile/Toyota.

4          Sent: 5/25/2007 5:15 PM.

5          To:    Gordon Rush/=Lexus/Toyota@Toyota.

6          Cc;    Gary_Heine@Toyota.com.

7

8          Bcc:

9          Subject:  Avalon Drivability Customer Verbatim

10         Information - Updated.

11

12

13         Gordon, can you please review the below comments and let

14         me know if this is the type of information you are looking

15         for?  I have added some PQS data verbatims as well, but

16         was unsure if they would be suitable for your purposes.

17

18                               ***

19

20

21         "(I) Have recently purchased a 2006 Avalon LTD and have

22         experienced the hesitation problem.   The situation is

23         dangerous ... not so much the hesitation as the lunge after

24         the hesitation.   Toyota had better get going quick as I

25         predict this will result in numerous accidents and possible

26

27   _____

28     [20] TOY-MDLID00065813

- 81 -

deaths.  I have talked with my service manager and he said,

"they all do it"

Regards,

Mike

Mike Robinson

Technical Supervisor

Quality Assurance Powertrain Group

Toyota/Lexus Product Quality & Service Support

Office:  (310) 468-2411

158.   On another occasion in October 2007, a Field Technical Report confirmed a case of SUA in an ES330.[21]

159.   In a Dealership Report in 2005, on a 2005 Sequoia, the dealer verified two separate SUA incidents and identified the probable cause as a "software issue of the engine control unit."

160.   In December 2003, in a secret Field Technical Report, a technician verified a surge event during "cold engine operation" even where the scan tool showed no DTC.

161.   In a series of Field Technical Reports from 2006-2010 involving Toyota Camrys, technicians from Hong Kong confirmed UA events and that these events were not caused by pedal or floor mats.  The UA events were duplicated without triggering a DTC.  These technicians strongly urged TMS to investigate since the problem was highly dangerous and the incidents were stacking up.  In many of these

---

[21] TOY-MDLID00075600.

1    instances, the report noted that "no effective rectification can be done at this

2    moment" and that the exact cause was "unknown."  These reports "strongly request

3    TMS to investigate this case a top priority."[22]

4

5        162.    In an Intra-Company Communication, between Toyota Motor North

6    America, Inc. and TMS, the company confirmed a SUA event and that floor mats

7    were not the issue:

8            **<u>Introduction</u>**

9            The purpose of this document is to provide a summary of a

10           Go-and-See related to a customer's claim of Cruise Control

11           Malfunction in a 2009 Tacoma vehicle.

12

13           **<u>Customer Observed Condition</u>**

14           Customer alleges that he experienced the following:

15           Vehicle: 2009 Tacoma with 2,387 Miles (at time of

16           incident)

17           1.  Vehicle was traveling at a steady 60 MPH Speed on the

18               Freeway, with cruise control engaged

19

20           2.  As he reached a slight incline, he started to approach a

21               slower vehicle in the lane in front of him

22           3.  He applied pressure to the accelerator (25% - 30%

23               throttle angle) and increased speed to 75 MPH to pass

24               the other vehicle

25

26

27    _____

      [22] TOY-MDL-88641.

28

4. Once he passed the slower vehicle, he returned to the right hand lane and released the accelerator (expecting the vehicle to return to the previously set speed)

5. After releasing the accelerator pedal, the vehicle continued to accelerate

6. He stepped on the brakes and the vehicle acceleration did not stop

7. Customer cycled the key to the "OFF" position and slowed to a stop using the brakes

8. After sitting for a couple of minutes on the side of the road he restarted the engine and it operated normally and took it to the dealership

**Dealer Investigation**

Upon arrival at the dealership the Following was performed / found:

1. Inspected Floor Mats and found them properly secured, with no signs of witness marks upon them

2. No Present, Pending or History of any DTC's in the ECM (also confirmed at TMS by MILi)

3. Engine connections were secure and showed no damage

4. The vehicle was driven for 361 miles, at which time an abnormal condition *was duplicated* (an account of this condition can be found on Page 2.)

**Requests**

- Vehicle repurchase has been agreed upon, please evaluate vehicle upon receipt

**Service Manager Observed Condition:**

On 7/19/09, one of the dealership's Service Managers drove the vehicle and observed the following:

1. Vehicle was being driven on the Freeway with the Cruise Control engaged at a 70 MPH Target Speed on Flat Terrain

2. The Service Manager depressed the accelerator pedal slightly (less than 10% throttle input)

3. As the vehicle reached what was estimated as 71 MPH, it downshifted abruptly and accelerated at what was perceived as a high throttle angle

4. As there was no traffic in front of him, the Service Manager removed his foot from the accelerator immediately upon the downshift and moved it completely away from the pedal area

5. The vehicle continued to accelerate at what felt like an estimated at a 70% throttle input with no pedal contact from the driver

6. Within 300 feet of the initial acceleration, the vehicle had reached 95 MPH. The estimated time to reach this speed from 71 MPH was "between 5 and 10 Seconds"

7.  The driver then applied the brake pedal and the acceleration stopped

NTF Techstream Data

• As the Service Manager who experienced the condition above is considered to be trustworthy and reliable, the vehicle will be repurchased for further investigation under SETR 9J467

163.   On March 20, 2007, a truck owned by the service manager at Cedar Rapids Toyota experienced a SUA event and confirmed it was not caused due to floor mats.  The throttle pedal assembly was replaced.

164.   On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES350 vehicles, opened PE07-016.  The principal investigator was again Scott Yon.  The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal."

165.   Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES350 owners "reminding them not to install all weather mats on top of existing mats."[23]  NHTSA did not agree, due to "too many complaints on this one vehicle to drop the issue" and because the results "of a stuck throttle are catastrophic."

166.   On April 5, 2007, ODI sent its Information Request to Toyota, describing its purpose as being "to investigate incidents of *vehicle runaway* due to interference

---

[23] TOY-MDLID00003908.

between the Lexus accessory floor mat (all-weather floor mat) and the accelerator pedal" in 2007 Lexus ES350 vehicles.   (Emphasis added.)   The request further described "[a]llegations of A) excessive engine speed and or power output without the driver pressing on the accelerator pedal or B) the engine speed and or power output failing to decrease when the accelerator pedal was no longer being depressed or, C) the subject component interfering with the operation of the throttle pedal."

167.   During this inquiry, Toyota was careful to eliminate any hint that a much broader issue was at stake – namely, SUA.  Telling a consumer of a SUA defect is far more serious than being told of a possible "mat" problem.  In describing the NHTSA investigation TMS eliminated reference to throttle control problems and changed the description to a "floor mat" problem:[24]

> Sorry we had a last minute change to the Q&A.  Please utilize this revised version of the Statement and Q&A.  The issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding *unintended throttle control* in the subject vehicles.
>
> [New]
>
> NHTSA received five consumer complaints where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

---

[24] TOY-MDLID00000566.

* * *

George Morino

National Manager

Quality Compliance Department

Product Quality and Service Support

Toyota Motor Sales, U.S.A., Inc.

Tel. 310-468-3392

Fax 310-468-3399  [Emphasis added.]

168.    Culling any reference to vehicle speed control has been a standard tactic at Toyota.  In 2005, in connection with the IS 250 All Weather Drive investigation, TMC removed any reference to speed control in letters sent to owners:  "They pulled out the 'vehicle speed control' part.  NHTSA may come back, but TMC wanted to try."[25]

169.    Another tactic TMC has used with NHTSA to keep the SUA defect a secret has been to keep NHTSA away from employees who had knowledge of ECU failures.  In 2007, while preparing for a meeting with NHTSA, Toyota plotted to keep away from the meeting the "engineer who knows the failure":

> [I]f the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU.  (I want to avoid such situations).[26]

170.    Toyota kept documents and informed personnel away from NHTSA despite the fact it knew the results of a "stuck throttle are 'catastrophic.'"[27]

---

[25] TOY-MDLID00002896.

[26] TOY-MDLID00075574.

171.   While this investigation was pending, a SUA victim sent Toyota employees a video of his SUA event that showed the brake lights were on while the car was accelerating – conclusive proof that the incident could not be chalked up to "driver error."  As usual, Toyota found nothing wrong with the car.  The SUA victim informed the Toyota specialist of other instances that needed investigation:

> One just occurred last Friday, June 15, when this person pulled into a parking lot with very few vehicles, he applied the brakes and the Tacoma just kept going, he wasn't about to collide so, he let off the brake and re-applied the brake and the vehicle stopped.  The vehicle is a 2004 Tacoma, purchased new by this person.  The other incident involves a 2006 Tacoma where all of sudden at a stop the tachometer shot up to approximately 6,000 or 6,800 RPM's with his *right* foot off the accelerator and the *right* foot on the brake.[28]

All of these incidents were concealed from NHTSA and the public.

172.   On August 8, 2007, ODI upgraded the preliminary evaluation to investigate unintended accelerations in a target population of 98,454 2007 Lexus ES350s.  The Opening Resume for EA07010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries.  Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then

---

[27] TOY-MDLID00003908.

[28] TOY-MDLID00206917.

experienced unwanted acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle. In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

173. While Toyota was pointing the finger at floor mats it was investigating UA events that it knew were not caused by floor mats, including an event where the service manager at Cedar Rapids Toyota confirmed the UA was not caused by the mat. Toyota replaced the throttle pedal assembly.

174. Despite having received a number of complaints of unintended acceleration that could not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of any intent to study the electronic throttle control system employed. Toyota did not study the ETCS system either.

175. In internal e-mails between Toyota employees including Chris Santucci and Chris Tinto exchanged in August 2007, Santucci stated that NHTSA investigators had discussed with him fail-safe mechanisms used by other vehicle manufacturers to protect against unintended acceleration. The fail-safes that NHTSA regulators discussed with him included "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied." Mr. Santucci also noted, "Jeff [Quandt, Chief, Vehicle Controls Division, Office of Defects Investigation]

mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly." Despite the growing number of SUA complaints starting from 2002, Toyota did not use the fail-safe mechanisms used by other manufacturers to protect against unintended acceleration.

176. While Toyota was attempting to deflect this inquiry, it was aware that the root cause of SUA was not often traceable: "[O]ne big problem is that no codes are thrown in the ECU, so the allege [sic] failure (as far as we know) can not be documented or replicated." The implications were "[t]he service tech therefore can't fix anything, and has no evidence that any problem exists."[29] Toyota would later claim the lack of a diagnostic code indicated that there was no SUA problem.

177. On August 30, 2007, ODI filed a memo about the inspection of a Lexus ES350 that had experienced SUA, and ODI conducted a telephone interview with the owners. An inspection of the vehicle found all-weather mats installed at all four seating positions. The driver's side all weather mat was found to be installed by itself; it was not on top of another floor mat. While the installed mat was found to be unsecured by the retention hooks, the mat did not interfere with the accelerator pedal in the position in which it was originally inspected.

178. While this investigation was ongoing, a woman named Jean Bookout was involved in a fatal crash in Oklahoma due to the unintended acceleration of a 2005 Camry. On September 20, 2007, Ms. Bookout and her best friend, Barbara Schwarz, were exiting Interstate Highway 69 in Oklahoma in a 2005 Camry. As Bookout drove, she realized that she could not stop her car. She pulled the parking

---

[29] TOY-MDLID00050747.

brake and pushed the brake pedal, leaving a 100-foot skid mark from the right rear tire, and a 50-foot skid mark from the left.  As Bookout later stated, "I did everything I could to stop the car."[30]   The Camry, however, continued speeding down a ramp, across another road and finally slamming into an embankment.  Schwarz was killed; Bookout spent a month in a coma and awoke permanently disfigured and disabled.

179.   On September 26, 2007, Toyota issued a recall of 55,000 Lexus/Toyota optional All-Weather Floor Mats.  All owners of 2007 and early 2008 model year Lexus ES350 and Toyota Camry vehicles were to be notified of the safety campaign and the timing when the replacement mats would become available.   Once the replacement mats were available, a second owner notification would be sent to notify owners to return their mats for the driver's seating position to any Lexus/Toyota dealer for an exchange.   Toyota also stopped the sale of the Toyota/Lexus All-Weather Floor Mat designed specifically for 2007 and early 2008 model year Camry and ES350 Lexus vehicles.

180.   Internally, Toyota executives were pleased that NHTSA had limited the ES350 issue to "floor mat issues" as opposed to SUA:[31]

> Of note, NHTSA was beginning to look at vehicle design
> parameters as being a culprit, focusing on the accelerator
> pedal geometry coupled with the push button "off" switch.
> We estimate that had the agency instead pushed hard for
> recall of the throttle pedal assembly (for instance), we

---

[30] Los Angeles Times, *Runaway Toyota Cases Ignored*, November 8, 2009.
[31] TOY-MDLID00004973.

would be looking at upwards of $100M + in unnecessary

cost.

181.   Other top level Toyota officials were incredulous with the news that NHTSA had limited the issue to floor mats.  Irv Miller of TMS observed when he learned of the recall:  "Yea I know, but floor mats!"[32]

182.   NHTSA remained concerned that a "serious issue" remains and that a factor other than mats was causing SUA events.  NHTSA was considering an announcement that would instruct vehicle owners how to turn off the vehicle in the event of a SUA event.[33]   NHTSA also expressed concern that other vehicles, including Prius, Camry and Avalon maybe subject to floor mat jamming and pedal design issues.[34]  Toyota did not disclose these concerns and took no action to remedy these defects.  Years later, in 2010, Toyota recalled the ES 350, Camry and Avalon, due to a defect in the shape of the floor surface and the lack of adequate space between the accelerated pedal and the floor.[35]

183.   On other occasions Toyota was able to keep NHTSA away from the truth regarding SUA events by negotiating what terms it would use to search for relevant complaints.  An example occurred in September 2007 when the company searched for incidents regarding "mats" as opposed to "surging."   A search for

---

[32] TOY-MDLID00000601.

[33] TOY-MDLID00011140.

[34] TOY-MDLID00011139.

[35] TOY-MDLID00200832.

surging on just the Camry in 2004 revealed "60,000 complaints."  Surging may be related to SUA, but Toyota never revealed the 60,000 surging complaints.[36]

184.  In 2008, Toyota knew that it had received a "huge number of complaints" alleging forms of UA Toyota labeled as "surge," or "lunge" or "lurch" if it searched for UA events just on the Camry:

> Let's discuss the response with George sometime on 10/13.
> We just started to gather the field information in order to update it requested in Q2, 3, 4 of IR for PE07-016.
> However, I'm very concerned about how many customer complaints will be extracted from CAN2000 by keyword search which we usually do.  Because NHTSA expanded the scope of the subject vehicles to 2007-2009MY ES and "CAMRY."  As you know, Camry has had an issue on the 6 speed automatic transmission and there may be a huge number of complaints alleging the surge or lunch or lurch and we usually include those words for the keyword search.  If this is the case, it will take long time to complete.[37]

185.  Throughout Toyota's consideration of SUA incidents, the "global ramifications" of a vehicle defect was a motivating factor.  Thus, for example, in September 2009, Toyota executives indicated TMC would not easily budge from its "no defect" position:

---

[36] TOY-MDLID00083551.
[37] TOY-MDLID0012726.

> TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications.   In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.[38]

186.   As described herein, this "no defect" position and the worry of "global ramifications" ultimately caused Toyota to offer fail-safe mechanisms such as a brake-override as a "confidence" booster as opposed to a "safety recall."

187.   In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating."   The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."   Of course "mediation" is not the equivalent of meeting the pledge of "safety" first that Toyota had repeatedly promised vehicle owners.

188.   An internal PowerPoint addressing "Key Safety Issues" contains the following:

- "Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.

---

[38] TOY-MDLID00075713.

- Recurring issue, PL/Design Implications.[39]

189.   The footnote to the slide has an entry stating "[f]laws in Toyota Regulatory and Defect Process."[40]

190.   Toyota was also pleased that the floor mat issue was limited to All Weather Floor Mats as opposed to floor mats in all vehicles.  Internally it recognized that "floor mat interference is possible in any vehicle with any combination of floor mats."  Despite this admission, no broader floor mat recall or effort to implement a brake-override took place.[41]

191.   No broader floor mat recall was implemented despite evidence that Prius, Camry and Avalon models were sensitive to floor mat interference and that the problem was not limited to after market mats.[42]

### 3.   Unintended acceleration in Tacomas and Siennas

192.   Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of SUA in Tacomas in late 2007.   On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration."[43]   Toyota internal e-mails also indicate that they were finding Internet blog posts regarding SUA events in Tacomas in November 2007.[44]

---

[39] TOY-MDLID00052959.

[40] *Id*. at 52963.

[41] TOY-MDLID00002839.

[42] TOY-MDLID00021197.

[43] TOY-MDLID00028006.

[44] TOY-MDLID00012135.

193.   Toyota received a report in 2006 that a 2006 Tacoma "suddenly accelerated out of control:

> Mr. _____ has reported that his 2006 Toyota Tacoma suddenly accelerated out of control into a telephone pole as he was backing on 10/21/06.
>
> After the truck collided with the pole he shifted into Drive and the truck accelerated at a high rate into a parked vehicle and a trailer, pushing the trailer into another parked vehicle.[45]

194.   An insurance investigator interviewed the mechanic who was a witness:

> Mr. _____ observed the 2006 Toyota Tacoma as it backed into the telephone pole.  He said that the engine was racing and after the collision with the pole, the vehicle lunged forward colliding with another vehicle and the box trailer.  The vehicle became pinned under the front of the box trailer which prevented it from traveling any further.
>
> Mr. _____ said that he ran to the truck and assisted the driver, Mr. _____, out of it.

---

[45] TOY-MDLID00206868.

1    I asked Mr. _____ as to how the engine

2    stopped racing.   He said that the engine was still

3    racing/idling high at approximately 2500 - 3000 RPM's

4    after Mr. _____ exited the vehicle and while he was

5    standing in the parking lot, Mr. _____ said

6    that he reached in and turned the ignition key off to stop

7    the engine.   Later, a police officer shifted the transmission

8    into park.

9

10

11   Mr. _____ offered to testify as to what he

12   witnessed in court if necessary.   Because he is a mechanic,

13   I believe that he would be a formidable witness.

14

15                              * * *

16   The most significant observation was made by the eye

17   witness, Mechanic _____ who witnessed the

18   incident and aided Mr. _____ from the truck.   He

19   states that the engine was still racing at 2500-3000 RPM

20   after Mr. _____ exited the vehicle.   The Toyota

21   was only brought under control when _____ reached

22   in and shut the engine off with the ignition key.

23

24

25

26

27

28

As, _____ is employed by the City Tire as a mechanic his estimate of the engine RPM's is rather credible and consistent with Mr. _____'s report.[46]

195.   On January 10, 2008, William Kronholm of Helena, Montana, filed a request for a defect investigation into unintended acceleration in 2006 Toyota Tacoma pickup trucks.   Kronholm reported experiencing two SUA incidents and investigated the NHTSA complaint database for light truck fleets for model years 2006 and 2007.   Under the category "vehicle speed control," Mr. Kronholm found 32 complaints of sudden unintended acceleration involving Tacomas, whereas the most reported for any other manufacturer's trucks was one incident.   Scott Yon was again ODI's principal investigator.

196.   Internally, Toyota was diligently working hard to "write a letter for the committee to try to stop this from moving forward – we need to keep this within NHTSA rather than have it expand to a hearing."[47]

197.   In NHTSA's February 8, 2008 information request to Toyota, it defined the defect as:

> [A]llegations or complaints that the accelerator and or cruise control system operated improperly, malfunctioned, failed, or operated in an unsafe manner, including but not limited to, allegations that the engine speed (power output) increased without driver application of the accelerator pedal (including allegations that may be related to cycling

---

[46] 46 TOY-MDLID00206876-6880.

[47] TOY-MDLID00050749.

- 99 -

of the air conditioning compressor clutch or other so called 'normal' idle speed/engine control functions), or allegations that the engine speed (power output) failed to return to an idle state after the operator released the accelerator pedal (including allegations that may be related to engine speeds experienced between gear shifts on manual transmission vehicles at road speeds) or allegations that the cruise control system caused the engine speed (power output) to change in an unsafe manner.

198.   While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004 Toyota Siennas.  PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal.  Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration.

199.   Five years earlier, in April 2003, Toyota had experienced an unintended acceleration event during testing of a 2004 Sienna.  This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

200.   On April 18, 2008, Toyota filed its first response in DP0-8001, reporting a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

201.   On April 25, 2008, Toyota filed its second response in the Tacoma investigation, outlining its investigation into the problem and analyzing the consumer complaints submitted to Toyota and to NHTSA that could be related to alleged unintended acceleration.  In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the subject vehicles, much less a safety-related defect.

202.   Toyota disputed the assertion in the petition that the 32 complaints in the NHTSA database "in and of themselves justify opening an investigation." Toyota claimed that the Tacoma had been the subject of extensive media coverage related to the possibility of sudden acceleration.  In addition, Toyota claimed that there had been a high level of internal activity on this subject (as far back as early 2007) including reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

203.   On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Siennas, followed by a second response on June 25, 2008.  Toyota stated that complaints about unintended accelerations in Siennas took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver.  Toyota also said that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem.  Toyota did not disclose that it considered and knew it needed to incorporate a brake-override and other fail-safe mechanisms that were not in Toyota vehicles to address this problem.

204.   On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

The complaints fell into three groups.   A majority of the
complaints may have involved the Tacoma's throttle
control system.   Some complaints did not involve a failure
of the throttle control system.   For the remaining reports,
although there may have been an issue with the throttle
control system as one possible explanation, we have been
unable to determine a cause related to throttle control or
any underlying cause that gave rise to the complaint.   For
those vehicles where the throttle control system did not
perform as the owner believes it should have, the
information suggesting a possible defect related to motor
vehicle safety is quite limited.   Additional investigation is
unlikely to result in a finding that a defect related to motor
vehicle safety exists or a NHTSA order for the notification
and remedy of a safety-related defect as requested by the
petitioner. Therefore, in view of the need to allocate and
prioritize NHTSA's limited resources to best accomplish
the agency's safety mission, the petition is denied.

205.   On October 15, 2008, Toyota made a confidential PowerPoint
presentation to ODI regarding unintended acceleration and trim interference in 2004
Siennas as part of EA08-014.   Toyota demonstrated how an unrestrained early
design-level trim panel interacted with the accelerator after pedal depression.  Toyota

also advised that the company was conducting a field survey to examine panel retention and that preliminarily one vehicle had been identified with a concern.

206.   On January 26, 2009, ODI closed EA08-014, regarding SUA involving 2004 early-production Siennas, after Toyota agreed to recall subject vehicles built between January 10, 2003, and June 11, 2003.  Toyota then issued Recall 09V023 for 26,501 model year 2004 Siennas.  Toyota did not describe this as a defect, but called the actions a "safety improvement campaign" that was not being conducted under the Safety Act.  Toyota's recall instructed dealers to replace the original floor carpet cover with the newer-design floor carpet (and retention clip) at no charge to the owner.   The repair was expected to reduce the potential for trim panel interference with the accelerator pedal should the retaining clips become missing because of improper service or other reasons.  Dealers were to replace the retention clip and floor carpet cover at no charge.

207.   On March 19, 2009, Mr. Jeffrey Pepski of Plymouth, Minnesota filed a detailed defect petition, asking NHTSA to re-open its sudden unintended acceleration investigation into Lexus vehicles.   Mr. Pepski was the owner of a 2007 Lexus ES350.  He experienced a sudden unintended acceleration event while driving at high speed, in which the vehicle accelerated to 80 mph.  Mr. Pepski tried pumping and pulling up the accelerator with his foot to no avail.  He explained the electronics of the accelerator, brake pedals and throttle systems, and charged that the Lexus ES350 vehicles violate several federal motor vehicle safety standards regarding brake and throttle systems.   He also disputed some of the statements from previous investigations that drivers could easily stop the vehicle by depressing the ignition

1   button for three seconds.  He maintained that the owner's manual indicates that this

2   would lock the steering wheel and move it forward.

3       208.  On April 8, 2009, ODI issued an Opening Resume for DP09-001 in

4   response to Mr. Pepski's petition.  ODI characterized it as requesting "an additional

5   investigation into the unwanted and unintended acceleration of MY 2007 Lexus

6   ES350 as the initial investigation (PE7-016) was too narrow in scope and did not

7   adequately address all complaints made to the NHTSA with respect to vehicle speed

8   control concerns."    Additionally, according to ODI, the petitioner requested an

9   "investigation of MY 2002-2003 Lexus ES300 for 'longer duration incidents

10   involving uncontrollable acceleration where brake pedal application allegedly had no

11   effect' that were determined not to be within the scope of Investigation PE04021."

12       209.  On May 14, 2009, Toyota's Christopher Tinto filed a direct response to

13   Mr. Pepski's petition in DP09-001.  Mr. Tinto dismissed all of the issues Mr. Pepski

14   raised in his petition and claimed there was no basis for an investigation.  Mr. Tinto

15   stated that when Lexus inspected Mr. Pepski's vehicle, it found that the floor mat

16   was unsecured and blamed the event on pedal entrapment.  Mr. Tinto maintained that

17   Toyota's electronic throttle and brakes systems were in compliance with all

18   applicable federal motor vehicle safety standards, and that Mr. Pepski had

19   misinterpreted the warnings in the owner's manual about steering wheel lockup

20   when the ignition is in the "Off" mode.

21       210.  Toyota knew that NHTSA inspected Pepski's car and "did not see

22   clearly the witness marks of the carpeted floor mat in the forward unhooked

23   position" and instead "suspect[ed]" this was the case.  Santucci made it clear that

- 104 -

NHTSA wanted Toyota to blame this on a floor mat issue, because if Toyota did not do so, NHTSA would have to ask "for non-floormat reports":

> So they should ask us for non-floormat related reports, right?  But they are concerned that if they ask for these other reports, *they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them*.  Does that make sense?  I think it is good news for Toyota.[48]  [Emphasis added.]

211.  What was good news for Toyota, *i.e.*, NHTSA avoiding inquiry into non-floor-mat issues, was bad news for consumers who continued to purchase and drive vehicles subject to a hidden SUA defect.

212.  On October 29, 2009, NHTSA denied the Pepski petition.  Once again, ODI issued its denial without requiring Toyota fully to disclose the actual numbers of customer reports of sudden unintended acceleration events in the Toyota models under investigation it received.

**4.    The floor mat recall**

213.  In August 2009, Officer Mark Saylor, a 19-year veteran of the California Highway Patrol, his wife, thirteen-year-old daughter and his brother-in-law, Chris Lastrella, were driving in a 2009 Lexus ES350 loaned to them from the dealership while Officer Saylor's Lexus was being repaired.   Witnesses later reported that Officer Saylor had pulled onto the shoulder going roughly 25-45 mph

---

[48] TOY-MDLID00052918.

and appeared to have some engine difficulty.  Witnesses reported that Officer Saylor turned on his emergency lights.  Shortly thereafter the Lexus's speed accelerated to over 100 mph.  Chris Lastrella called 911 from the vehicle and reported that the accelerator was stuck and "we're in trouble."  He then repeated:  "We're approaching the intersection.  We're approaching the intersection.  We're approaching the intersection."  Others in the car could be heard saying "hold on" and "pray."  The Lexus then crashed into the back of an SUV and continued through a fence, crashing head first into an embankment, becoming airborne, rolling over, bursting into flames and coming to rest in a dry riverbed.  All four members of the Saylor family were killed by extensive blunt force injuries.

214.  When officers inspected the vehicle, the all weather floor mat was melted to the accelerator pedal and unsecured by the retaining clips.  It was also the incorrect all weather floor mat for that Lexus model.  When officers tested the pedal clearance using the same model of Lexus and the same mismatched floor mat, they observed that the pedal could easily become stuck under its edge.

215.  Officers investigating the Saylor tragedy also learned that a similar complaint of unintended acceleration had been made about the vehicle involved in the Saylor crash only days before it was loaned to Officer Saylor.  The San Diego County Sheriffs' report chronicles the prior complaint as follows:

> [Frank Bernard] was on the Poway Road on-ramp to Interstate 15 North.  As he was merging onto the freeway, he saw a truck nearby and accelerated 'briskly' to get in front of it.  Witness Bernard got onto the freeway, and once

1    in front of the truck, let his foot off the accelerator. [The

2    Lexus] kept accelerating on its own, to about 80-85 MPH.

3

4    Witness Bernard stopped on the brakes and tried to lift up

5    on the accelerator with his right foot.  He was attempting to

6    access the shoulder of the freeway, and still applying the

7

8    brakes, was able to slow [the Lexus] to about 50-60 MPH.

9    While he was slowing, he pushed the ignition button 'a few

10   times' and was not able to turn the engine off.  He also

11   'popped the throttle' with his foot to see if he could get it to

12   clear itself.    None of this worked.    [The Lexus] kept

13   moving at an uncontrolled and high rate of speed.

14

15

16   Witness Bernard kept on the brakes, slowing [the Lexus] to

17   25-30 MPH and pulled over to the shoulder.  He was able

18   to then place [the Lexus] into neutral with the gear shift.

19   When he did this, the engine made a very loud whining,

20   racing sound.   Witness Bernard was able to stop [the

21   Lexus].

22

23

24   Witness Bernard looked down at his feet and saw the

25   accelerator was stuck underneath the floor mat.  He was

26

27

28

1  able to pull it up with his foot, and said he had to apply a

2  significant amount of pressure to do so.[49]

3  216.  Mr. Bernard told a receptionist at the dealership of the unintended

4  acceleration and that it was due to the floor mat.

5  217.  The San Diego County Sheriff's Report concludes that the Saylor crash

6  was likely caused by the mismatched floor mat and the following "associated"

7  factors:

> The vehicle was not equipped with a key that would
> otherwise allow for manual emergency shut off.  The push
> button ignition feature had no emergency instantaneous
> shut capability.
>
> As evidenced in the inspection of [the Lexus], the brakes
> most likely failed due to over burdened, excessive, and
> prolonged application at high speed.[50]

218.  The report also notes that additional electrical, mechanical or computer

generated factors could have played a role in the unintended acceleration.

219.  Following the widespread publicity surrounding the four-fatality Saylor

crash near San Diego, Toyota issued a "Safety Advisory," saying that the company

had "taken a closer look" at the potential for the accelerator to get "stuck in the full

open position" *due to interfering floor mats*.  The advisory stated that the company

---

[49] TOY-MDLID000091970 at 9193.

[50] *Id*. at 9197.

would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in all, to address the issue – the largest recall in Toyota's history and the sixth largest in the United States.  According to Senator Waxman, Toyota's advisory is dangerously misleading, for the following reasons, among others:

> By suggesting that only a trapped floor mat can cause a loss of throttle and braking control, it lulls owners of models with no driver's side floor mat into believing there is no possibility of a potentially catastrophic loss of throttle and braking control.  According to documents supplied by Toyota to the Committee on Energy and Commerce of the U.S. House of Representatives, fewer than 16% of sudden, unintended acceleration events reported by customers involved floor mats and/or "sticky pedals."

> The advisory also misleads owners with a driver's-side floor mat into believing that, in the event of a sustained near-wide-open throttle malfunction, the first response should be to visually determine if the floor mat is interfering with the accelerator pedal.

220.  On September 29, 2009, the same day that TMC recalled 3.4 million vehicles in the United States because of possible floor mat entrapment, Toyota Motor Europe issued a Technical Information ("TI") to Toyota distributors in Austria, Belgium, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland,

Turkey, Portugal, Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United Kingdom, Georgia, Kazakhstan, and Romania identifying a production improvement and repair procedure to address complaints by customers in those countries of sticky accelerator pedals, sudden RPM increase and/or sudden acceleration – but nothing similar was issued to warn United States distributors.

221.   Despite its claimed extensive investigation into the sticky pedal phenomenon, and its efforts to remedy the sticky pedal defect for overseas consumers, TMC continued to conceal information from United States consumers regarding potential causes for sudden unintended acceleration events.   On September 29, 2009, TMC issued a Consumer Safety Advisory claiming that the sudden acceleration problem was caused by floor mats without mention of the sticking accelerator pedal defect it knew about since July 6, 2006, at the latest, and had confirmed no later than June 2009.

222.   Contemporaneously with the floor mat recall, Toyota made media statements inaccurately stating that NHTSA had determined that no defect exists in vehicles wherein the driver's side floor mat is compatible with the vehicle and is properly secured.   For example, a November 2, 2009 press release issued from Torrance, CA announced:

> Toyota Motor Sales … today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position.   The letter, in compliance with the National

Traffic and Motor Vehicle Safety Act and reviewed by the National Highway Traffic Safety Administration … also confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.

223.   On November 4, 2009, NHTSA issued a press release to correct this misleading and inaccurate information.   NHTSA clarified that it told Toyota and consumers that "removing the recalled floor mats is the most immediate way to address the safety risk and avoid the possibility of the accelerator becoming stuck." NHTSA reiterated that the floor mat recall was simply an interim measure, and did not correct the underlying defect.

224.   Despite initiating its plan to repair defective accelerator pedals for overseas consumers, Toyota's misinformation to United States consumers continued. TMC posted the following response to a question posed by the LOS ANGELES TIMES:

Q2: Toyota has conducted numerous recalls related to sudden acceleration over the past decade in the U.S. and Canada, including two previous floor mat recalls. But the problem has continued.   Does this mean that the previous recalls were not successful in eliminating the problems and if so, why not?   In particular, why wasn't the 2007 recall of Lexus ES and Camry floor mats effective in preventing catastrophic accidents such as the Saylor case?

A.   Toyota has conducted two all-weather floor mat (AWFM) recalls after receiving reports that if the floor mat (either by itself, or if it is placed on top of an existing carpeted floor mat) is not secured by the retaining hooks, the mat can move forward and interfere with the accelerator pedal returning to the idle position.  If the mat is properly secured, it will not interfere with the accelerator pedal.

As reported in the law enforcement investigation, the floor mat in the Saylor accident was not only improperly secured, it was incompatible and incorrect for the vehicle.  The recall recently announced addresses the fact that incompatible floor mats, or multiple floor mats could be installed and that the remedy must address that possibility.

225.   When Transportation Secretary Ray LaHood testified before the House Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials chose to meet directly with Toyota executives in Japan to discuss safety issues because NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

**5.    The sticky accelerator recall**

226.   On or about October 13, 2009, TMC issued an Intra-Company Communication ("ICC") to Toyota personnel in Japan and in the United States concerning a Toyota Corolla sold in Missouri that was the subject of a sticky

- 112 -

accelerator pedal complaint.  The ICC noted that sticky pedal was identified on or about September 24, 2009, five days prior to Toyota's floor mat advisory to United States consumers (and the sticky pedal TI to European consumers also issued on the same day).  The ICC further documented that Toyota recovered the accelerator pedal and installed it on a 2010 Corolla fleet vehicle, that Toyota verified the sticking accelerator pedal, and that the subject accelerator pedal was then handed over Customer Quality Engineering – Los Angeles for further analysis on or about October 5, 2009.

227.   On or about October 22, 2009, through October 28, 2009, Toyota issued three Field Technical Reports ("FTRs") concerning sticky accelerator pedals in Corollas sold in the United States and conducted a parts recovery.

228.   On January 16, 2010, Katsuhiko Koganei (a.k.a. "Kogi"), TMS Executive Coordinator – Corporate Communications, sent an e-mail to Mike Michels at Toyota, stating "we should not mention about the mechanical failures of acc. [sic] pedal, because we have not clarified the real cause of the sticking accelerator pedal formally, and the remedy for the matter has not been confirmed."

229.   The e-mail came three days before a meeting scheduled with (among others) Toyota's two lead North American executives, James Lentz (Torrance, CA) and Yoshimi Inaba (New York, NY), and NHTSA.  It was copied to at least 15 other Toyota Executives, including Irv Miller (Torrance, CA), TMS Group Vice President, Environmental and Public Affairs.

230.   On January 16, 2010, Irv Miller sent an e-mail to Koganei stating:

I hate to break this to you but WE HAVE A tendency for

MECHANICAL failure in accelerator pedals of a certain

manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options.

We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business.[51]

231.  The foregoing mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

232.  Secretly while it was interacting with NHTSA on these issues, Toyota was investigating SUA events observed by its own employees in Toyota vehicles they were driving:

Jason,

Here is the summary of events.

Went across Buffalo Bridge, stopped & turned left on 35.

Went across bridge and started up the hill.

Briefly accelerated at W.O.T. for down shift.

Let off throttle & vehicle continued to accelerate.

Depressed brake (thinking something was wrong with cruise control)

---

[51] TOY-MDLID00027481.

- 114 -

No change vehicle continued to accelerate.

Depressed brake peddle hard, vehicle continued to pull.

Shifted to Neutral and engine reved to rev limiter.

Not for certain what occurred to get the throttle back to

normal condition, but I did move my foot around the

accelerator & brake peddle after the vehicle was in Neutral

& acceleration stopped.

David Kovich

Customer Quality Engineering (CQE-CIN), Quality

Division

233.   On January 21, 2010, Toyota notified NHTSA that it was submitting a "Defect Information Report" concerning a recall of eight models due to a "defect [that] exists in the accelerator pedal assembly which may result in the accelerator pedal becoming harder to depress, slower to return, or, in the worst case, mechanically stuck . . . .".[52]  Toyota issued this Defect Report despite indicating that the percentage of vehicles estimated to experience malfunction was "unknown," meaning that Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle.

234.   On or about January 19, 2010, Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC.  In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents.  Toyota did not issue any safety

---

[52] TOY-MDLID00041350.

advisories to United States consumers regarding the sticking pedal issue until January 21, 2010, when it issued the sticky pedal recall.   The recall involved approximately 2.3 million Defective Vehicles.

235.   On or about January 26, 2010, Toyota announced in a press release issued from Torrance, California that it was voluntarily suspending sales of eight models involved in the January 21, 2010 recall for sticking accelerator pedals, including its top selling Camry and Corolla models.   Group Vice President and Toyota Division General Manager Bob Carter made clear that "[t]his action is necessary until a remedy is finalized."   Toyota further announced that due to the sales suspension, Toyota was expected to stop producing vehicles on several North American production lines.   Toyota did not resume sales of these vehicles until February 5, 2010.

236.   While Toyota executives were claiming the defect was due to pedal entrapment dealers believed otherwise:[53]

> I'm afraid that many of us in the dealer body feel embarrassed and not a little ashamed regarding a perception that we may have been used to faithfully endorse the (apparently inaccurate) party line that the only customer concerns have been as a result of pedal entrapment.  While I'm sure that this was never Toyota's intent, there is a palpable feeling somewhere between disappointment and betrayal at the retail level.  As you

---

[53] TOY-MDLID00015943.

- 116 -

know, this would be best addressed by a prompt, effective cure for customer concerns.

The other thought is that it was not the Watergate break-in that brought down President Nixon; it was the aftermath. Please help us with your endorsement that all communications be frank, complete, and 100% accurate.

237.   Toyota continued to receive reports from qualified engineers opining the abnormalities in the ECTS.  For example, on January 28, 2009 a Professional Engineer examined a 4Runner that:[54]

According to the driver of the vehicle, she had driven the 4Runner earlier in the day of the incident.  She stated that when she started the vehicle, placed the gear selector lever in the reverse and depressed the accelerator pedal, the vehicle accelerated rearward in an uncontrolled manner. The vehicle traveled down her driveway, crossed a road, struck a stump and entered a stream.  The vehicle came to rest on its driver side.  She exited the vehicle through the sun roof.  She stated that she had never had any drivability issues with the 4Runner.

238.   The report concluded:

---

[54] TOY-MDLID90053224.

Based on the foregoing observations and analysis, the following are my opinions, to a reasonable degree of engineering certainty, regarding the condition and operation of the Toyota 4Runner.

* * *

Third, the voltages associated with the throttle position sensor malfunction detection (w/ pedal depressed) and the accelerator pedal position sensor for engine control (w/ pedal depressed) were not within specifications. The voltage deviations indicate that the electronic throttle control system featured abnormalities. The inability to start the vehicle precluded testing the functional operation of the system.

239. Toyota was careful to make certain it would be difficult to discover what it knew about the SUA defect, which models were effected and which managers were involved. Employees were instructed to disguise emails:

- When you send a mail to somebody outside the company, drop cc to your boss.[]

  Check the subject/text/attachment(*)

  *Any emails from Quality Control Department are basically "confidential."

- Put "Secret" and "Don't forward" in the beginning of every email (including reply and forward.) []

- Do not include both project code and car names. []

- 118 -

- Attached documents (prepared by your department or other department) should be classified. []

- When you reply to emails, generally delete the tracking record and attachment. []

masato_kosugi@mta.mx.toyota.co.jp on 1/26/2010 20:13:39

240.   On or about April 5, 2010, NHTSA announced that it was seeking a $16.375 million civil penalty from TMC due to the Toyota Defendants' failure to appropriately inform NHTSA with regard to a potential defect in its vehicles stemming from TMC's knowledge of the sticking pedal defect.   This sanction presented the largest financial penalty ever imposed on an automaker by the United States Government and was the largest fine permitted by law.   Transportation Secretary Ray LaHood stated, "[b]y failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

241.   On or about April 19, 2010, TMC agreed to pay NHTSA's record $16.375 million fine, and avoided any official findings of fact by NHTSA.   TMC admits that it "could have done a better job of sharing relevant information within our [Toyota's] global operations and outside the company …"

**D.   The Internal Death by SUA Chart**

242.   Throughout the years Toyota received reports covering various Toyota models detailing incidents involving deaths due to SUA.  Belatedly, in February 10, 2010, Toyota assembled these into what is in effect an internal death by SUA chart:

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| SIENNA | 2007 | 20070811 | ON AUGUST 11, 2007, MY FAMILY EXPERIENCED A HEAD ON COLLISION. WE WERE DRIVING A 2007 TOYOTA SIENNA. MY HUSBAND WAS DRIVING AND DIED AT THE SCENE. THE INVESTIGATION NEVER FOUND ANY REASON FOR THE CAUSE OF THE ACCIDENT. MY HUSBAND CROSSED THE CENTER LINE WHILE GOING ROUND A SLIGHT CURVE. HE WAS 47, POOR WEATHER WAS NOT ISSUE. IF THE ACCELERATOR ON THE SIENNA MALFUNCTIONED AND DID NOT RESPOND, THAT COULD DEFINITELY BE A FACTOR. OUR VAN HAD LESS THAN 3000 MILES ON IT. WE PURCHASED IN MAY 11, 2007. THE AUTOPSY FOR MY HUSBAND CAME BACK NEGATIVE FOR ANY MEDICAL CONDITION CONCERN. PLEASE INVESTIGATE OUR ACCIDENT REPORT AND BE SURE THE SAFETY AND RELIABILITY OF SIENNAS IS SOUND. |
| GX470 | 2003 | 20090206 | I WAS TRAVELING WEST ON A TWO LANE PAVED ROAD (SUTTON ROAD) NEAR SUTTON SCHOOL. WEATHER WAS SNOWING AND ROAD CONDITIONS SLIPPERY WHEN MY ACCERERATOR FAILED TO RETURN TO IDLE POSITION. I APPLIED BRAKES AS I WAS APPROACHING A VEHICLE IN FRONT OF ME TRAVELING IN THE SAME DIRECTION. THE ELECTRONIC STABILITY CONTROL FAILED TO MAINTAIN STRAIGHT DIRECTION AS PER DESIGN INTENT AND MANUALS. FRONT BEGAN SLIDING TO LEFT AND REAR OF VEHICLE BEGAN SLIDING TO RIGHT. I NCREASED BRAKE PRESSURE AND STEERED INTO TH SKID , TO THE RIGHT. I WAS ABLE TO MISS THE CONTACT WITH ANY OTHER VEHICLES AND OR DAMAGE ANY PROPERTY , BUT DID END UP SLIDING INTO A DITCH OFF OF THE ROAD. WITH THE IMPACT RESULTING IN THE DEATH OF MY SERVICE DOG . AS I AM HANDICAPPED. NO DAMAGE TO MY VEHICLE , BUT NO I AM VIRTUALLY IMMOBILE WITH THE LOSS IF MY DEAR SERVICE DOG. |
| PRIUS | 2005 | 20091022 | OUR SON WAS KILLED ON OCT 22ND IN A SINGLE CAR CRASH WHILE DRIVING A 2005 TOYOTA PRIUS( THE POLICE REPORT STATES THAT HE LOST CONTROL, JUMPED THE CURB AND DIED IN THE ENSUING CRASH) WHILE NEGOTIATING A CURVE WHILE ATTEMPTING TO ENTER THE FREEWAY IN TUCSON AZ. WE STRONGLY BELIEVE THAT THIS MAY HAVE BEEN CAUSED BY SUDDEN ACCELERATION AND OR BREAK PROBLEMS. I KNOW THIS IS AN OLDER MODEL, BUT IN LIGHT OF TOYOTA'S LIES AND COVERUPS TIME WILL ONLY TELL. |
| SCION TC | 2007 | 20090811 | 2007 SCIION TC SET ON CRUISE AT 70 MPH CRASHED INTO GUARDRAIL ON HIGHWAY. MY SON WAS DRIVING AND HE DOES NOT REMEMBER THE CAUSE OF THE ACCIDENT BUT STATE POLICE ACCIDENT RECONSTRUCTION CLAIM CAR HIT THE GUARDRAIL AT A SPEED IN EXCESS OF 100 MPH UPON CRASH. CRASH SEVERLY INJURED MY SON AND KILLED HIS CHILDHOOD FRIEND. TWO THINGS ARE KNOWN FOR CERTAIN, DRIVER CLAIMS CAR WAS ON CRUISE AND ACCIDENT REPORT STATES SPEED OVER 100 MPH. THE CRASHES ON THESE CARS ARE OVERLOOKED BECAUSE MOSTLY TEENAGERS AND YOUNG ADULTS ARE BUYING THEM AND OFFICIALS AND INSURANCE COMPANIES BLAME ACCIDENTS ON DRIVER INEXERPERIENCE. |
| 4RUNNER | 1992 | 19920303 | A 1992 TOYOTA 4-RUNNER WAS PURCHASED AND WE ONLY HAD IT FOR TWO WEEKS. THE TRUCK WAS DRIVEN TO WEST VIRGINIA. THE NEXT DAY THE TRUCK SUDDENLY ACCELERATED AT A HIGH SPEED AND WHEN THE BRAKES WERE APPLIED IT WOULD NOT STOP. IT CRASHED AND FLIPPED OVER. MY HUSBAND DIED IN THAT TRUCK. THERE WAS A LAW SUITE BUT IT NEVER WENT TO COURT AFTER FIVE YEARS. MY LAWYERS GAVE UP. TOYOTA NEVER SETTLED WITH ME AND ONLY SAID IT WAS DRIVER ERROR. THE ENGINEER WHO WAS ON THE CASE SAID THERE WAS A DESIGN DEFECT BUT THEY COULD NOT PROVE IT. SEE ALSO ODI 10121117 *DSY *TR |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| HIGHLANDER | 2008 | 20091130 | TL* THE CONTACT'S SISTER OWNS A 2008 TOYOTA HIGHLANDER. THE CONTACT'S SISTER WAS DRIVING AND THE VEHICLE ACCELERATED ACROSS THE INTERSTATE, HIT AN EMBANKMENT AND THEN WAS HIT BY A TRUCK. THE VEHICLE BURNED AND THE DRIVER WAS KILLED AS A RESULT OF THE ACCIDENT. THE VEHICLE WAS DESTROYED BUT THERE WAS NO INVESTIGATION INTO THE CAUSE FOR THE ACCIDENT. THE CONTACT CALLED THE MANUFACTURER BUT WAS NOT ABLE TO GET IN TOUCH WITH ANY REPRESENTATIVES. THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 33,000. |
| TACOMA | 2008 | 20100126 | TOYOTA TACOMA 2008  PLEASE STUDY THIS ACCIDENT. IT MAY RELATE TO THE GAS PEDAL, SO LET TOYOTA KNOW TO RECALL THIS MODEL TOO SO TO PREVENT AN ANOTHER FATAL ACCIDENT LIKE MY  BROTHER HAD. *TR |
| SOLARA | 2004 | 20090928 | ON SEPTEMBER 28, 2009 MY MOTHER WAS DRIVING HER 2004 TOYOTA SOLARA AND HAD AN ACCIDENT. THE CAR JUMPED THE CURB, HIT A TREE, A LAMP POST, AND CRASHED INTO A STONE SIGN. SHE WAS TAKEN TO THE HOSPITAL WHERE THEY FOUND A LARGE BRUISE ON HER ARM. THE DOCTORS SENT HER FOR A SCAN RIGHT AWAY, BUT SHE HAD A STROKE AND NEVER RECOVERED. SHE DIED FOUR DAYS LATER. I REALIZE THAT THE CURRENT TOYOTA ACCELERATOR RECALL DOES NOT INVOLVE THE SOLARA AT THIS TIME, BUT OUR FAMILY IS NOW SUSPICIOUS. A CAUSE OF MY MOTHER'S ACCIDENT HAS NOT BE DETERMINED. SHE DIED BEFORE THE POLICE WERE ABLE TO ASK HER ABOUT THE ACCIDENT. THE CAR IS STILL SMASHED UP AND HAS NOT BEEN REPAIRED. SHOULD WE INVESTIGATE THIS MATTER FURTHER?  TW* |
| HIGHLANDER | 2005 | 20091013 | TOYOTA HIGHLANDER 2005. PETERBORO , NH. 11 AM. DRIVER WAS REPORTED TO PASS VEHICLE ON RIGHT IN BREAK DOWN LANE, THEN TRIED TO PASS ANOTHER CAR  BY GOING INTO LEFT LANE AND HIT ONCOMING VEHICLE. FOUR PEOPLE KILLED. DRIVER WAS VERY EXPERIENCED --EXCELLENT SAFETY RECORD. I HAD BEEN IN HIS CAR WITH HIM HUNDREDS OF TIMES. VERY SAFE DRIVER --NO COWBOY.   BELIEVE CAR HAD UNCONTROLLED ACCELERATION.  *CN |
| CAMRY | 2007 | 20080412 | TL* THE CONTACT OWNED A 2007 TOYOTA CAMRY LE. WHILE DRIVING THE ACCELERATOR PEDAL BECAME ENTRAPPED BY THE FLOOR-MAT.  AS A CONSEQUENCE HE CRASHED INTO ANOTHER VEHICLE.  THE DRIVER OF THE OTHER VEHICLE WAS KILLED. BOTH VEHICLES CAUGHT ON FIRE. THE FAILURE AND CURRENT MILEAGES WERE UNKNOWN. THE VEHICLE IDENTIFICATION NUMBER WAS UNAVAILABLE. |
| IS250 | 2006 | 20090410 | TL* THE CONTACT OWNS A 2006 LEXUS IS250.  WHILE DRIVING THE VEHICLE RAPIDLY INCREASED ITS SPEED UP TO 90 MPH . HE ATTEMPTED TO REMOVE THE FLOOR- MAT FROM UNDER THE ACCELERATOR PEDAL. HOWEVER, THE VEHICLE VEERED OFF OF THE ROAD AND THEN INTO A DITCH.  WHEN THE VEHICLE ROLLED OVER, ONE OCCUPANT WAS EJECTED FROM THE FRONT SEAT; SINCE HE WAS NOT WEARING A SEAT BELT. THE OTHER THREE PASSENGERS HAD BRUISES LACERATIONS, AND WERE HOSPITALIZED.  THE VEHICLE WAS COMPLETELY DESTROYED. A POLICE REPORT WAS AVAILABLE. THE FAILURE MILEAGE WAS 24,000. |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| AVALON | 2001 | 20070409 | LET ME EXPLAIN FIRST, I CAN'T SUBSTANTIATE THE CLAIM I AM MAKING ABOUT THE POSSIBLE CAUSE OF THE ACCIDENT THAT KILLED MY WIFE WHEN DRIVING A 2001 TOYOTA AVALON.  THE REASON THE ACCIDENT OCCURRED IS THAT SHE DID NOT STOP AT AN INTERSECTION CONTROLLED WITH A STOP SIGN. THE ACCIDENT OCCURRED IN CALLAHAN COUNTY, TEXAS AT THE INTERSECTION OF FM 1750 AND HIGHWAY 36 ON APRIL 9, 2007 AT APPROXIMATELY 8:30PM.  SHE DROVE UNDER THE TRAILER OF AN 18 WHEELER, WAS KILLED INSTANTLY AND DRAGGED UNDER THE TRAILER FOR 800 TO 900 FIT.  IT TOOK THE ABILENE FIRE DEPARTMENTS EXPERTISE TO REMOVE HER BODY FROM THE WRECKAGE. THE LOCAL VOLUNTEER FIRE DEPARTMENTS DID NOT WANT TO ATTEMPT IT.  THERE WERE NO SKID MARKS.  SHE HAD DRIVEN THIS ROUTE COUNTLESS TIMES AND WAS AWARE OF THE STOP SIGN.  I CHECKED CELL PHONE RECORDS AND THERE WAS NO EVIDENCE THAT SHE COULD HAVE BEEN ON THE PHONE.  ADMITTEDLY SHE WAS UPSET.  SHE WAS DRIVING FROM ABILENE TO MEXIA, TEXAS TO BE WITH HER ELDERLY MOTHER WHO WAS IN A DIABETIC COMA WHEN SHE LAST SPOKE TO SOMEONE.  HOWEVER RAY ANN WAS A GOOD DRIVER.  I CAN'T BELIEVE THAT SHE WAS SO DISTRACTED TO ALLOW THIS TO HAPPEN. IN LIGHT OF THE RECENT RECALL BY TOYOTA, I BELIEVE THAT HER AVALON SUDDENLY ACCELERATED OUT OF CONTROL.  NO SKID MARKS WERE AT THE SCENE ONLY CUTOUTS IN THE PAYMENT THAT WERE CAUSED BY HER CAR AS IT WENT UNDER THE TRAILER.  WHY NO SKID MARKS?  AS SHOWN ON CONSUMER REPORT INTERNET VIDEO, THE BRAKES ARE NOT ABLE TO SLOW THE CAR DOWN AS IT IS ACCELERATING AND SKID MARKS WOULD NOT HAVE BEEN POSSIBLE. THERE IS NO OTHER EXPLANATION IN MY MIND AS TO HOW RAY ANN COULD HAVE MISSED THE STOP SIGN.  THE CAR WAS OUT OF HER CONTROL AND IT KILLED HER.  IF YOU WOULD LIKE TO HAVE THE VIN, PLEASE CONTACT ME.  I WILL PULL IT OUT OF THE RECORDS I HAVE.  THANK YOU FOR YOUR CONSIDERATION AND ANY RESPONSE.  THIS IS SUCH A TRAGEDY THAT UNTIL THE RECALL LEFT ME WITHOUT ANY EXPLANATION THAT WAS BELIEVABLE.  I NOW BELIEVE I KNOW WHAT HAPPENED. *TR |
| CAMRY | 2005 | 20090804 | TL* THE DRIVER OWNS A 2005 TOYOTA CAMRY.  HER SON IN LAW,  WHILE DRIVING, WAS KILLED IN A VEHICLE CRASH. THE POLICE REPORT STATES THAT THE VEHICLE WAS SPEEDING AND THAT THE DRIVER COULD NOT CONTROL THE VEHICLE. SHE FILED A COMPLAINT WITH TOYOTA MANUFACTURER REGARDING UNINTENDED VEHICLE ACCELERATION. THE FAILURE MILEAGE WAS 45,000.  THE VIN NUMBER WAS UNKNOWN. |
| CAMRY | 2007 | 20090527 | HIGH SPEED COLLISION INVOLVING A 2007 TOYOTA CAMRY.    DRIVER WAS FAMILIAR WITH ROAD AND WAS NOT KNOWN TO DRIVE AGGRESSIVELY OR SIGNIFICANTLY ABOVE SPEED LIMIT. TOXICOLOGY REPORTS CAME BACK NEGATIVE. DRIVER HAD BIPOLAR DISORDER AND WAS DRIVING SELF TO HOSPITAL, BUT THERE WAS NO INDICATION AT ALL OF SUICIDAL BEHAVIOR/INTENT.   POLICE REPORT PUT RATE OF SPEED AT TIME OF COLLISION AT  LEAST 85 MPH. CONVERSATIONS WITH INVESTIGATORS INDICATE THAT SEVERITY OF COLLISION INDICATES SPEED MAY HAVE BEEN 100MPH. POSTED SPEED WAS APPROXIMATELY 40MPH. *TR |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| ES350 | 2009 | 20090828 | ON AUGUST 28, 2009, FOUR OCCUPANTS OF A 2009 LEXUS ES350 TRAGICALLY AND UNNECESSARILY DIED IN SANTEE, CALIFORNIA IN SAN DIEGO COUNTY FOLLOWING A HIGH SPEED LOSS OF CONTROL AND ROLLOVER EVENT.  THE VEHICLE IN QUESTION WAS A LOANER CAR FROM BOB BAKER LEXUS IN EL CAJON, CALIFORNIA.  DRIVER OF THE VEHICLE, 45, A 19 YEAR VETERAN OF THE CALIFORNIA HIGHWAY PATROL.  THE DRIVER HAD OBTAINED THE VEHICLE THAT DAY AFTER DROPPING OFF HIS LEXUS FOR SERVICE. WITNESSES REPORT THAT THE OFFICER WAS MANEUVERING THE LEXUS IN AND OUT OF TRAFFIC AT HIGH RATES OF SPEED ON STATE ROUTE 125, HONKING HIS HORN WITH THE HAZARD LIGHTS ON, PRIOR TO THE HIGHWAY ENDING AT AN INTERSECTION.     THE OFFICER ATTEMPTED TO NEGOTIATE A TURN BUT COULD NOT AVOID STRIKING ANOTHER VEHICLE AND LOSING CONTROL BECAUSE OF HIS HIGH RATE OF SPEED.  THE VEHICLE LOST CONTROL, ROLLED SEVERAL TIMES, AND CAUGHT FIRE.  ALL FOUR OCCUPANTS ARE REPORTED TO HAVE DIED ALMOST IMMEDIATELY.   PRIOR TO ENTERING THE INTERSECTION, AN OCCUPANT OF THE VEHICLE CALLED 911 EMERGENCY TO REPORT THAT THE ACCELERATOR WAS STUCK.  HE REPORTED THAT THE VEHICLE WAS TRAVELING 120 MILES PER HOUR AND THAT THEY WERE APPROACHING AN INTERSECTION.  OCCUPANTS ARE HEARD TELLING EACH OTHER TO PRAY BEFORE A WOMAN SCREAMS AND THE CALL SUDDENLY ENDS.   THE OFFICER(DRIVER OF THE VEHICLE, HIS WIFE , 45, AND THEIR 14 YEAR OLD DAUGHTER  ALL DIED IN THE CRASH.  THE WIFE'S BROTHER, 38, ALSO DIED.   ON BEHALF OF THE SURVIVING FAMILY MEMBERS OF THE DECEDENTS, WE RESPECTFULLY REQUEST YOU TO INVESTIGATE WHY THIS LEXUS VEHICLE'S ACCELERATOR MALFUNCTIONED, AND WHY A HIGHLY-TRAINED OFFICER AND DRIVER LIKE THE OFFICER WAS UNABLE TO RE-GAIN CONTROL OF THE LEXUS VEHICLE AT ISSUE OR OTHERWISE AVOID CATASTROPHE. WE CURRENTLY ARE AWAITING ADDITIONAL FACTS SURROUNDING THE INCIDENT, AND THE MALFUNCTION OF THE LEXUS, BUT WILL SUPPLEMENT THIS COMPLAINT UPON RECEIPT. *TR UPDATED 12/01/09 *BF  UPDATED 12/01/09 |
| ES330 | 2006 | 20080826 | TL*THE CONTACT OWNS A 2006 LEXUS ES330.  WHILE MERGING INTO THE RIGHT LANE AT APPROXIMATELY 25 MPH, THE VEHICLE SUDDENLY ACCELERATED.  THE CONTACT WAS UNABLE TO BRAKE AND STRUCK A PEDESTRIAN.  THE PEDESTRIAN DIED DUE TO INJURIES.  THE CONTACT ALSO REAR ENDED TWO OTHER VEHICLES AND DROVE THROUGH A FENCE.  THE VEHICLE CAME TO A STOP WHEN IT CRASHED INTO A GUARD RAIL.  THE MANUFACTURER STATED THAT THE CAUSE OF THE FAILURE COULD HAVE BEEN THE FLOORMAT.  THE INSURANCE COMPANY CLAIMED THAT THE VEHICLE WAS DESTROYED.  THE CONTACT RECEIVED INJURIES TO HER BACK, NECK, AND LEG.  TWO OTHERS WERE ALSO INJURED.  STATE POLICE REPORT NUMBER 5271887 WAS FILED.  THE FAILURE AND CURRENT MILEAGES WERE 26,286. UPDATED 10/01/08. *LJ  THE MANUFACTURER STATED THE FLOOR MATS MAY HAVE BECOME STUCK UNDER THE ACCELERATOR WHICH CAUSED THE VEHICLE TO ACCELERATE OUT OF CONTROL. UPDATED 10/08/08. *JB |
| TUNDRA | 2007 | 20080220 | TL*THE CONTACT OWNED A 2007 TOYOTA TUNDRA. WHILE THE CONTACT'S HUSBAND WAS DRIVING AT AN UNKNOWN SPEED, THE VEHICLE ACCELERATED BETWEEN APPROXIMATELY 80-100 MPH,  CRASHED INTO A TREE AND THE DRIVER WAS KILLED.  THE VEHICLE WAS DESTROYED.  THE CONTACT BELIEVED THAT THE CRASH WAS RELATED TO THE RECALL ABOUT THE AFTERMARKET ALL WEATHER FLOOR MATS BECOMING STUCK AND CAUSING THE VEHICLE TO ACCELERATE.   A POLICE REPORT WAS FILED.  THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 35,000.  UPDATED 03-11-08 *BF |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| CAMRY | 2004 | 20040314 | MY MOTHER AND FRIEND STARTED OUT FOR CHURCH, THE FRIEND HAD COME TO PICK HER UP WHEN THE 2004 TOYOTA CAMRY WITH LESS THAN 3000 MILES ON IT WAS HAVING DIFFICULTY SHIFTING INTO REVERSE, THEN WHEN SHE SHIFTED INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY EST SPEED ON 80 - 92 MILE A HOUR IN LESS THAN 250 FT WHEN THE CAR HIT A MOBILE HOME. THEY HIT SO HARD IT MOVED DOUBLE WIDE ALMOST A FOOT. KILLING MY MOTHER THE PASSENGER AND INJURY TO HER FRIEND THE DRIVER. NO AIR BAG DEPLOYED AND WHEN TOYOTA WAS CONTACTED THEY REFUSED TO SPECK TO US.  ATTORNEYS HAVE SAID THAT TOYOTA IS SO BIG, NOT COST AFFECTIVE....SO I WATCH AND IN TWO YEARS THERE ARE MANY MANY MORE NOW....HOW MANY MORE HAVE TO DIE BEFORE SOMETHING IS DONE.  SEE ALSO 10074472. *DSY  *NM |
| AVALON | 2003 | 20041109 | MY MOTHER-IN-LAW WHO ALWAYS WORE HER SEAT BELT WAS DRIVING HOME AT NIGHT AND SOMEHOW RAN OFF THE ROAD HIT A LITTLE CHERRY TREE AND WAS THROWN FROM HER CAR & KILLED HER. THE SIDE NOR THE FRONT AIR BAGS WENT OFF. AND APPARENTLY THE SEAT BELTS FAILED TOO. THE HIGHWAY PARTROL CAN'T FIGURE OUT WHAT HAPPENED.*AK |
| CAMRY | 2003 | 20040315 | WHILE IN A PARKING LOT AND BACKING OUT OF A PARKING SPACE VEHICLE ACCELERATED SUDDENLY HITTING A PEDESTRIAN.  *AK  ONE PERSON WAS INJURED AND ONE PERSON WAS KILLED IN THIS ACCIDENT.  THE CONSUMER REFUSED TO DRIVE THE VEHICLE AFTER THIS INCIDENT AND RETURNED THE VEHICLE TO THE DEALER.  *NM |
| CAMRY | 2004 | 20040314 | DIFFICULTY SHIFTING FROM PARK TO REVERSE, THEN UPON SHIFTING INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY, WOULD NOT STOP, COLLIDED WITH A MOBILE HOME, AIR BAGS DID NOT DEPLOY, RESULTING IN THE DEATH OF ONE PASSENGER AND INJURY OF DRIVER  *LA  SEE ALSO VOQ 10171110. *DSY. |
| CAMRY | 2002 | 20030904 | MAKIA CAFUA, DRIVING HER 2002 TOYOTA CAMRY, VIN 4TIE32K92U636868, WAS ENTERING I-93 AT EXIT 39 AT 5:30 IN THE MORNING WHEN HER CAR SUDDENLY SHOT ACROSS THREE LANES OF TRAVEL AND WAS HIT, BROAD SIDE, BY ANOTHER VEHICLE TRAVELING IN THE HIGH SPEED (3RD) LANE. TRAFFIC AT THE TIME OF THE ACCIDENT WAS LIGHT.  IT IS BELIEVED THAT THE CAMRY EXPERIENCED AN UN-COMMANDED ACCELERATION CAUSING MRS. CAFUA TO LOSE CONTROL RESULTING IN THE ACCIDENT AND HER DEATH.  THE CAMRY HAS BEEN STORED SINCE THE ACCIDENT AND NO CHANGES HAVE BEEN MADE TO ITS POST ACCIDENT CONDITION. VEHICLE IS AVAILABLE FOR INPECTION/TESTING BY NHTSA. *AK |
| CAMRY | 2002 | 20040122 | WITNESSES SAW MY PARENTS VEHICLE (A 2002 TOYOTA CAMRY) COMING TO A STOP AND THEN SUDDENLY ACCELERATE.*AK |
| CAMRY | 2003 | 20040316 | WHEN COMING OUT OF A PARKING LOT ACCELERATOR  STUCK, CAUSING THE VEHICLE TO ACCELERATE OUT OF CONTROL.  VEHICLE GRAZED ANOTHER VEHICLE, WENT ACROSS A STREET, GRAZED A BUILDING, AND DROVE STRAIGHT INTO ANOTHER BUILDING.  DRIVER WAS CONSCIOUS WHEN PARAMEDIC ARRIVED.  THEY  FOUND THE DRIVER WITH BOTH FEET STILL ON THE BRAKE PEDAL.  DRIVER WAS TRANSPORTED TO THE HOSPITAL, AND LATER DIED DUE TO FATAL INJURIES FROM THE CRASH.  THE INSURANCE COMPANY  PRESERVED THE VEHICLE AS EVIDENCE.  THE POLICE REPORT STATED THE CRASH WAS DUE TO A MECHANICAL DEFECT. *AK  *NM |

[55]

243.   The gravity of the SUA defect and Toyota's knowledge of the defect is evident from the descriptions provided by vehicle owners.  Attached as Exhibit C is a

---

[55] TOY-MDLID00017271

summary of customer SUA complaints described by Toyota as complaints taken just
from the Field Reports database where the floor mat or pedal was not implicated.

**E.     Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall
Complaints**

244.   Toyota and NHTSA continued to receive complaints of unintended
acceleration by vehicles not involved in the recalls or by vehicles which have
participated in the recalls and been "fixed."

245.   On February 22, 2010, Toyota conducted a "webinar" purporting to
address the various safety concerns plaguing Toyota and Lexus vehicles.   While
Toyota had previously claimed that the braking problems in the Prius and Lexus ES
250h were unrelated to the unintended acceleration problem, in the webinar Toyota
admitted they were linked by suggesting that the ETCS-i system facilitates electronic
braking control (among the other "advantages" Toyota touted in regard to the
ETCS-i system).

246.   On March 2, 2010, TMC Executive Vice President, Takeshi
Uchiyamada, Executive Vice President, submitted prepared testimony to the Senate
Committee on Commerce, Science and Transportation.   Mr. Uchiyamada's
testimony purported that the ETCS-i system is tested "extensively both in the design
phase and after it is developed to ensure that there is no possibility of 'sudden
unintended acceleration.'"   In reality, Toyota relies heavily upon its component
suppliers to perform such testing.   Toyota's suppliers typically complete Toyota's
parts level testing independently.   Toyota performance standards apply only to Tier 1
suppliers.   Toyota does not have any clearly written rules or regulations about who
must conform to Toyota's standards below its Tier 1 suppliers.   For instance, while

1   Toyota may impose testing standards on CTS, the supplier of the sticky accelerator

2   pedals at issue, when questioned before Congress, Toyota engineers could not testify

3   that Toyota imposed similar controls on the manufacturers of the sensors and circuit

4   board that CTS utilizes in its pedal.   Moreover, Toyota's engineers admitted that

5   "there is no particular or special testing that would directly prove that there is no

6   unintended acceleration."

7

8         247.   On March 5, 2010, Congressmen Henry A. Waxman and Bart T.

9   Stupak, Chairmen of the House Subcommittee on Oversight and Investigation, wrote

10  a letter to James E. Lentz, President and Chief Operations Officer of Toyota Motor

11  Sales U.S.A., Inc., stating, among other things:

12

13              We do not understand the basis for Toyota's repeated

14              assertions that it is "confident" there are no electronic

15              defects contributing to incidents of sudden acceleration.

16              We wrote you on February 2, 1010, to request "all analyses

17              or documents that substantiate" Toyota's claim that

18              electronic malfunctions are not causing sudden unintended

19              acceleration.   The documents that Toyota provided in

20              response to this request did not provide convincing

21              substantiation.   We explained our concerns about the

22              failure of Toyota to substantiate its assertions in our letter

23              to you in February 22, 2010.

24

25

26              After we sent our letter on February 22, Toyota provided a

27              few additional documents to the Committee early in the

28

- 126 -

morning on the day of the hearing. Several of these documents were written in Japanese. While some of these documents appear to contain preliminary fault analyses that could be used in planning a rigorous study of potential cause of sudden unintended acceleration, not one of them suggested that such a rigorous study had taken place. As we explained in our February 22 letter, the only document Toyota has provided to the Committee that claims to study the phenomenon of sudden unintended acceleration in a comprehensive way, is an interim report from the consulting firm Exponent, Inc. This report has serious deficiencies, as we explained in our February 22 letter.

248.   Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements. For example, when asked why Toyota believed there were no problems with the ETCS-i, its technical analysis manager testified falsely, "[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

**F.     Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall**

249.   Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations:

- 127 -

First, the documents appear to show that Toyota consistently dismissed the possibility that electronic failures could be responsible for incidents of sudden unintended acceleration. Since 2001, when Toyota first began installing electronic throttle controls on vehicles, Toyota has received thousands of consumer complaints of sudden unintended acceleration. In June 2004, the National Highway Traffic Safety Administration (NHTSA) sent Toyota a chart showing that Toyota Camrys with electronic throttle controls had over 400% more 'vehicle speed' complaints than Camrys with manual controls. Yet, despite these warnings, Toyota appears to have conducted no systematic investigation into whether electronic defects could lead to sudden unintended acceleration.

250.  This concern is significant because it appears from 2004 to 2009; Toyota was selling cars without knowledge of what caused the defect or disclosure of the defect.

251.  Next, the Committee rejected tests submitted by Toyota that were conducted at the request of Toyota's litigation counsel, Bowman and Brooke, LLP:

Second, the one report that Toyota has produced that purports to test and analyze potential electronic causes of sudden unintended acceleration was initiated just two months ago and appears to have serious flaws. This report was prepared for Toyota by the consulting firm Exponent,

Inc. at the request of Toyota's defense counsel, Bowman and Brooke, LLP.   Michael Pecht, a professor of mechanical engineering at the University of Maryland, and director of the University's Center for Advanced Life Cycle Engineering (CALCE), told the Committee that Exponent 'did not conduct a fault tree analysis, a failure modes and effects analysis … or provide any other scientific or rigorous study to describe all the various potential ways in which a sudden acceleration event could be trigger' 'only to have focused on some simple and obvious failure causes'; used 'extremely small sample sizes'; and as a result produced a report that "I would not consider … of value … in getting to the root causes of sudden acceleration in Defective Vehicles.'

252.   Again, the concern over the Exponent Bowman and Brooke report highlights (a) that Toyota had no credible prior report or analysis of SUA; (b) that Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's inability to understand the basis for the defect; and (d) its failure to provide a fail-safe to prevent unintended acceleration.

253.   The Committee then addressed Toyota's lack of truthfulness in its statements and rejected the notion that floor mats or pedals were the sole cause of the problem:

Third, Toyota's public statements about the adequacy of its recent recalls appear to be misleading.   In a February 1,

- 129 -

2010, appearance on the *Today* show, you stated that Toyota has "studied the events of unintended acceleration, and [it] is quite clear that it has come down to two different issues," entrapment of accelerator pedals in floor mats and sticky accelerator pedals.  In an appearance the same day on CNBC you repeated this claim and reported that Toyota is "very confident that the fix in place is going to stop what's going on."

The documents provided to the Committee appear to undermine these public claims.  We wrote to you on February 2, 2010, to request any analyses by Toyota that show sticky pedals can cause sudden unintended acceleration.  Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "typically … does not translate into a sudden, high-speed acceleration event." Moreover, our review of the consumer complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved

vehicles that are not subject to the 2009 and 2010 floor mat

and "sticky pedal" recalls.

254. Toyota's denials of an ETCS defect persisted even when independent professional engineers concluded in February 2009, that a SUA incident in Tennessee was caused by deviations with ETCS.[56]

255. One reason why Toyota lacks sufficient test data on the reliability of ETCS, and had to rely on a report belatedly ginned up by Exponent Bowman & Brooke, is the overall slip at Toyota in its attention to quality control.  Toyota has sacrificed safety for speed.

256. In the last ten years, the culture has changed.  Now, as acknowledged by Toyota, the emphasis is on fast production.  While production and production goals have increased, the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

257. The result has been a significant increase in quality control problems per vehicle.  Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are overlooked. Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a recall.  Quality control employees are given goals that set an upper limit on the number of defects they are to report.

---

[56] TOY-MDLID90053223.

### G.  Toyota Identifies Many Root Causes of SUA Confirming the Need for Brake Override

258.  Toyota received numerous Field Technical Reports ("FTR") where SUA events were confirmed and where the cause was not a mat or "sticky" pedal. For example, on December 9, 2009, a FTR was issued concerning a 2009 Camry. The customer reported RPM surge of up to 1200 RPM.  The FTR confirmed the UA event and the condition could be replicated.  To fix the problem in this instance Toyota replaced the "Head SUB-ASSY, Cylinder."

259.  In May 2005, a customer complained that after releasing the throttle engine speed remained at 5,000 RPM.  A dealer could not replicate the problem but when the dealer reinstalled the throttle body he replicated the condition and confirmed it was not caused by a floor mat.  Toyota replaced the throttle (Part 222102 1020).[57]

260.  A customer driving a 2008 Corolla reported the engine accelerated up to 60 mph.  On inspection the "condition was duplicated" without triggering a DTC Code.  Toyota replaced the ECU.  (Part #8966102M92.)

261.  In 2007, after a SUA event that caused the vehicle to accelerate up to 70 mph, the dealer found a faulty pedal sensor.  Case 200704030437.

262.  On December 12, 2008, an Early Warning Report was generated by Toyota de Brasil regarding a Corolla.  The report noted that this is a, "new Corolla which presented a spontaneous engine speed acceleration.  This is the first case and it is a dangerous problem because it can cause a serious accident, putting the life of the

---

[57] TOY-MDLID002444.

customer and other people at risk."  The report noted that "this incident resulted in a

light collision."  The dealer confirmed this was not a carpet or floor mat problem.

263.   In one FTR Toyota found the SUA was caused by the accelerator pedal

position sensor and despite engine idles at 4000 RPM there are no "diagnostic

trouble codes."

264.   Toyota recognized that SUA can be triggered by a malfunction from

many different failures.  In a 2004 "check sheet" it identified that the accelerator

pedal, cable, cruise control, air valve, throttle body, accelerator and throttle sensor,

EFI computer, wire harness and cruise control all were possible factors.

## H.   Toyota Uniformly Rejected Claims, Made No Disclosures to Consumers and Affirmatively Misled Consumers

265.   When a customer reports a SUA event, Toyota uniformly rejects any

claim of any defect and fails to disclose the existence of hundreds if not thousands of

similar SUA claims.

266.   Typical of such a response is the following letter sent from TMS'

California offices:

Re:    Date of Loss:    February 2, 2009

Vehicle:    2007 Lexus ES 350

VIN:    …

Dear _____:

This letter is in response to your communication with

Lexus Customer Satisfaction.  Toyota Motor Sales, USA,

Inc. ("TMS") has reviewed your claim and conducted a technical inspection of your vehicle.

You reported that while driving the vehicle on the interstate it accelerated on its own and you were unable to stop it for nearly two miles when it finally slowed after a concerted effort on your part.  You believe that this was due to a defect in your vehicle.

The inspection of your vehicle revealed no evidence of any vehicle defects or malfunction.  The throttle assembly and accelerator pedal were operating as designed, with no binding or sticking of any of the components.  The brakes showed signs of excessive wear which is consistent with what you described happened to you.

The inspection also revealed that the floor mat was in a position where it could interfere with the operation and travel of the accelerator pedal.  When the vehicle was taken in to the dealership, the floor mat retaining clips were not properly secured which allowed the floor mat to move out of position.  While we understand that you feel the floor mat was not the problem, the evidence revealed during our inspection showed otherwise.

1

2
          We are very sorry about to learn of this unfortunate

3

4
          incident, however, our inspection of your vehicle found

5
          that the incident was not due to any sort of manufacturing

6
          or design defect, and we are unable to offer additional

7
          assistance.

8

9
          Thank you for allowing us the opportunity to address your

10
          concerns.

11

12

13
          Very truly yours,

14

15
          Troy Higa

16
          Claims Administrator[58]

17
      267.   One 2007 Lexus ES350 owner reported that she had a SUA event that

18
was not caused by floor mats (as there was no floor mat on the drivers' side) and it

19
was not caused by pressing the gas instead of the brake.  In a detailed e-mail to

20
Toyota in October 2009, she described how she had dropped her daughter off one

21
evening, just as she normally did five times a week.  As usual, she backed into the

22
neighbor's driveway.  Her daughter and her son-in-law were watching her.  Her

23
friend was in the passenger seat.  All of a sudden the Lexus began to race out of

24

25

26

27
        [58] TOY-MDLID00199764.

28

control.  She tried unsuccessfully to brake, but the car kept accelerating until it reached speeds up to 90 miles an hour.

268.   The Lexus hit several curbs, cracking and lifting the concrete.  It was travelling so fast that the passenger side door flew open and smashed against the front of the car.  She told Toyota that the only thing that saved their lives was a concrete wall into which the car smashed and finally came to a halt.

269.   The driver insisted that she was healthy and active, had good reflexes and that she did not wear glasses or contacts.  She then directly asked Toyota a number of questions like how she could have kept her foot on the accelerator pedal as she and her passenger were thrown about the interior of the car, only being held in place by the seat belts and how could she have accelerated enough in a small parking turn about to reach a speed that the car broke concrete.

270.   Toyota responded to this customer by claiming the vehicle was "in proper working order free of any type of mechanical defect."[59]   Toyota failed to address the points raised by the SUA victim or to interview witnesses to verify her account.

271.   Even where a consumer had a professional engineer conclude that the ETCS system was at fault, Toyota through a TMS claims manager in Torrance, California, informed the consumer "there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the

---

[59] TOY-MDLID90011084.

brake/acceleration or electrical systems."[60]  It was Toyota's standard practice to issue uniform denials like that above from its claims manager in Torrance.

272.   Such letters of denial were sent despite instances where police officers found "physical evidence at the scene suggesting that vehicle #1 was continually accelerating throughout the incident."  The officer in this incident noted the impact caused the driver to "shift violently in her seat.  This officer feels it is unlikely she would have been able to manually accelerate throughout the event."[61]

273.   To make matters worse a TMS manager from Torrance falsely stated on repeated occasions that "the brakes will always override the throttle."[62]  This was a flat-out lie as Toyota did not have a brake-override until 2010, and in most vehicles, there is no such override.

## I.   Continuing Warranties and Misrepresentations

274.   On November 25, 2009, Toyota falsely represented and warranted that floor mats were the cause of SUA.  In print media and in statements made to Toyota dealers for dissemination to new vehicle buyers, Toyota falsely represented that "Toyota vehicles are among the safest on the road today," that there was no problem with ETCS and that ETCS has been "evaluated numerous times."

275.   On November 2, 2009, Toyota announced that "no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured."[63]  Toyota further represented and warranted falsely that:

---

[60] TOY-MDLID90054928.

[61] TOY-MDLID90053562.

[62] TOY-MDLID90059533.

[63] TOY-MDLID00008630.

The question of unintended acceleration involving Toyota and Lexus vehicles has been repeatedly and thoroughly investigated by NHTSA, without any finding of defect other than the risk from an unsecured or incompatible driver's floor mat;

Toyota takes public safety seriously. We believe our vehicles are among the safest on the road. Our engineers are working hard to develop an effective remedy that can help prevent floor mat interference with the pedal. As soon as it is ready, we will notify owners of the relevant models to bring their vehicle to a dealer for the necessary modification at no charge.

**J.   Summary of the Defects in Defective Vehicles**

276.   Vehicles with ETCS manufactured, marketed, sold and/or distributed by Toyota and its affiliated companies suffer from the same overarching defect, in that, they are vulnerable to incidents of sudden unintended acceleration ("SUA"), including surges, lurching, revving engines, and other instances of unintended acceleration captured as part of the more than 39,000 complaints to NHTSA and the 100,000 complaints received by Toyota. Regardless of the many root causes which create this overarching defect, an effective brake-override system would serve as a fail-safe design feature to prevent and/or minimize the risk of injury, harm or damage to Toyota vehicle owners or their occupants from SUA events.

277.   In addition to the lack of an effective brake-override system, there are other specific defects in the Subject Vehicles that cause and/or contribute to the

overarching defect of SUA, including, but not limited to, defective pedals and poorly designed floor mats, and there are design defects in the Subject Vehicles that caused, contributed to, and/or failed to prevent SUA events, including the following:  (1) an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including SUA; (2) the ETCS and its components are highly susceptible to malfunction caused by various electronic failures, including, but not limited to, short circuits, software glitches, and electromagnetic interference from sources outside the vehicle; and (3) there was a failure to warn consumers as to how to properly push and hold buttons of shift into neutral in order to stop SUA events once the aforementioned defects had set the SUA events in motion.

278.   These defects are further set forth below:

**1.   Electronics Issues:**

Defects in the Subject Vehicles' electronic system which can and sometimes do cause SUA include, but are not limited to:

a.   The unwarranted and improper safety-critical reliance on electronic engine control and braking systems, including, but not limited to, the ETCS, which lacks a hardware redundant fault tolerant design;

b.   Unwarranted and improper safety-critical reliance on analog sensor inputs from two similar analog sensors in A) the throttle body assembly, and B) the accelerator pedal assembly, which are subject to failure in various modes;

c.   Unwarranted and improper safety-critical reliance on software running in a single CPU within the vehicle electronic system, which is subject to failure in various modes;

d. Unwarranted and improper safety-critical reliance on individual hardware components used in the vehicle electronic system;

e. The susceptibility of the ETCS-i (particularly the wiring harnesses connected to the accelerator pedal position sensors and the throttle position sensors) to currents generated by radio frequency (RF) interference, combined with an improper system for detecting and filtering RF currents;

f. The susceptibility of the ETCS-i (particularly the accelerator pedal position sensors) to drops in supply voltage which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

g. The susceptibility of the ETCS-i (particularly the wiring harnesses) to various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

h. The failure to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

i. The safety critical reliance on a purported fault detection system that does not always generate and/or recognize faults in the vehicle electronic system as they occur;

j. The inability of the software running within the ETCS-i to properly self-calibrate when certain changes are detected;

k.      The failure to design and include an appropriate EDR system which properly records the position of the accelerator, brake, and throttle assembly in order to allow proper examination of SUA events; and

l.      The failure to include properly redundant systems with the ability to cross-check bus reported accelerator and throttle positions with "actual sensor data."

## 2.      Mechanical Issues:

Upon information and belief, certain mechanical defects in the Subject Vehicles which can and sometimes do cause SUA include, but are not limited to:

a.      The propensity for mechanical involvement and interference between the accelerator pedal and the Subject Vehicles' floor mats which can cause the pedal to become stuck and remain depressed, keeping the throttle open despite the operator's application of the brake pedal, resulting in unintended acceleration;

b.      Mechanical resistance that can cause the accelerator pedal to become stuck in a fully or partially depressed position and to fail to return to its idle position (referred by Toyota as a "sticky pedal"), resulting in unintended acceleration;

c.      Floor mat interference in all Toyota vehicles, recognized as early as 2000 when Toyota recalled 1999-2000 model years Lexus LS 200 for SUA-floor mat issues in the UK and again in 2007 when internally Toyota recognized floor mats could be an issue in all vehicles[64];

---

[64] TOY-MDLID00002839.

- 141 -

d.      Mechanical resistance which can cause the throttle body or throttle plate to become stuck in a fully or partially open position resulting in unintended acceleration; and

e.      The gap between pedals is 20mm smaller on certain models including but not limited to the RAV4 and Venza models, which contributed to UA.[65]

### 3.      The lack of an appropriate fail-safe:

Toyota was aware the SUA events were caused by any of the above in a given Defective Vehicle, but Toyota could not predict which of the faults listed above caused a SUA event in any given vehicle.  Toyota could not identify the root cause of most SUA events.  This made it critically important for Toyota to have an adequate fail-safe.  The Defective Toyotas did not have an adequate fail-safe due to:

a.      The unwarranted and improper reliance on safety-critical but untested or improperly tested "failsafe strategies" ostensibly designed to detect faults in the vehicle electronic systems and prevent those faults from causing SUA.  These "failsafe strategies" can and sometimes do fail to recognize fault conditions which, if left unchecked, result in unintended acceleration and record no direct evidence of the fault that initially triggered the unintended acceleration event;

b.      The lack of a proper "brake-override system" or other "fail-safe" logic that would close the throttle while allowing the brakes to be applied in the event the vehicles' electronic systems received commands to open the throttle and apply the brakes simultaneously;

---

[65] 41201T000.

c.    The lack of a hardware-redundant fault tolerant electronic engine control and braking system such as those employed by other vehicle manufacturers;

d.    The lack of enough memory in the computer systems of certain models to accommodate a brake-override system;

e.    The lack of a proper ignition shut off in the event of a SUA event. NHTSA identified this as a problem as early as August 2007 when it notified Toyota that it was considering requiring a public service announcement to inform the public "how to shut off the vehicle with the push button start," meaning consumers did not understand that it takes three seconds for the shut off to occur. Toyota was not only aware of the problem it also failed to implement a kill switch;

f.    The lack of a proper fault detection system that would recognize a SUA event, or surge, or rpm run up beyond the maximum design tolerance and respond by shutting down the throttle; and

g.    The lack of an appropriate layout in the transmission system. In many of the vehicles the shift system is confusing and results in drivers experiencing an SUA event mistakenly placing the transmission in "D" when they thought they were placing the transmission in "N."

**4.    Failure to appropriately test and validate the vehicle systems:**

a.    An inability to identify the root cause for SUA. As alleged above, Toyota has been aware since 2002 that its vehicles with ETCS have the potential for SUA or "surging" at a rate that exceeds that in manually controlled vehicles. Toyota has been unable to find the root cause of the problem. In a 2002 Toyota Field Technical Report, Toyota acknowledged that "[t]he root cause for 'surging' remains unknown" and thus "[n]o known remedy exists for the 'surging'

condition at this time."[66]  In 2010, Toyota still had not tested its ETCS, as it had to hire Exponent to answer Congress' inquiry over what proof Toyota had to show its ETCS did not cause SUA.  Congressman Waxman observed:

> The results of our investigation raise serious questions. Toyota has repeatedly told the public that it has conducted extensive testing of its vehicles for electronic defects.  We can find no basis for these assertions.  Toyota's assertions may be good public relations, but they don't appear to be true.

b.     The faults and defects in Toyota's safety critical vehicle electronic systems described above show that Toyota has not properly tested or validated these systems individually or as a whole; and

c.     Moreover, Toyota has failed to verify that all electronic vehicle systems capable of requesting torque are robust enough, and contain sufficient redundancies to prevent SUA events.

## K.     Toyota Belatedly Installs a Brake-Override as a "Confidence" Booster

279.   Toyota began facing complaints of runaway cars years ago, but the company did not install "brake-override" systems in those vehicles, even as several other automakers deployed the technology to address such malfunctions.

280.   The brake-override systems allow a driver to stop a car with the footbrake even if the accelerator is depressed and the vehicle is running at full

---

[66] TOY-MDLID00062906.

throttle.   The systems are an outgrowth of new electronics in cars, specifically in engine control.

281.   "If the brake and the accelerator are in an argument, the brake wins," a spokesman at Chrysler said in describing the systems, which it began installing in 2003.

282.   Shockingly, given the potential gravity of SUA events, internal documents reveal Toyota knew it needed a brake-override years earlier:[67]

>    **Subject**:      Important information:  America ES350
>                       article…addition #2
>
>    **From**:  Koji Sakakibara@toyota.com
>
>    **Date**:  Tue. 1 Sep 2009 16.16.01 -0700
>
>    **To**:      yoshioka@mail.tec.toyota.cojp. Shunsuka Noguchi
>
>                 syun@nano.tec.toyota.cojp.
>
>                 rkitsura@mail.tec.toyota.coj.
>
>                 Kako kako@email.tec.toyota.cojp>
>
>    cc:      Kato  maktoh@mail.tec.toyota.cojp,
>
>                 Hirokazu.Sakamoto@toyota.com,
>
>                 Koji_Takara@toyota.com,
>
>                 Keiichi_Fukushima@toyota.com,
>
>                 washino@mail.tec.toyota.cojp,
>
>                 jamagush@earth.tec.toyota.cojp, r-
>
>                 Kawamu@earth.tec.toyota.cojp,

---

[67] TOY-MDLID00041130T-0001.

y_yamai@email.tec.toyota.cjp.  Kanamori

kanamori@earth.tec.toyota.cojp,

ssakamt@earth.tec.toyota.cojp,

joji@giga.tec.toyota.cojp

To all concerned staff,

Thank you for your continued business.  I am Sakakibara from TEC-2Gr, COE-LA.

- The following information has been received from TMS-POSS Public Affairs Group regarding the above (America ES350 article…addition #2).  (Please see photos at the bottom of this mail.)

- During the floor mat sticking issue of 2007, TMS suggested that there should be "*a fail safe option similar to that used by other companies to prevent unintended acceleration.*"  *I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div." Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was*

- 146 -

*invited in 2008.  (The NHTSA knows that Audi as adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)*

=>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop."  I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assy [sic] structure is the cause, how to secure the floor mats, the timing for introducing shape improvements).

- Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died."  TMS-POSS Public Affairs Group thinks that "the NHTSA and USA public already hold very harsh opinions in regards to Toyota."  (As I think you know, in some cases in the USA "killing a police officer means the death penalty.")

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External

Relations Dept. to Body Engineering Div.," the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues." [Emphasis added.]

283. Volkswagen, Audi, BMW and Mercedes-Benz also install such systems in at least some of their cars, some as far back as 10 years ago. Nissan has been using brake-override since 2004. Infiniti also has such a system. General Motors installs brake-override in all of its cars in which it is possible for the engine at full throttle to overwhelm the brakes.

284. It is estimated that it would cost $1 million in development costs – typically less than $1 per vehicle – to add such a system.

285. On December 5, 2010, TMS announced it will install brake-overrides in 2011 vehicles.

286. On February 22, 2010, TMC announced that it would install a brake-override system on an expanded range of customers' vehicles to provide an additional "measure of confidence." According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

287. The following models are eligible for the brake-override "confidence" upgrade: 2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250 models.

288. "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have

for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when SUA complaints were received. Lentz did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

289.   Importantly, the brake-override was not announced as a "Safety Recall." Rather, it was implemented to boost consumer "confidence."  And the confidence booster is not being installed in all models with the SUA defect, such as the 2002-2006 Camrys.

290.   In view of the propensity of UA Toyota's vehicles to suddenly accelerate out of the drivers' control, each vehicle was defective for failure to have an appropriate fail safe.   Toyota identified each of these fail safes yet failed to implement them in a timely fashion as reflected in an internal "Privileged and Confidential" e-mail:

> Push Button Ignition
>
> One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion.   NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion.   In addition, the ES350 owners manual is unclear (see attached letter re: Pepski Petition).   NHTSA has surveyed ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality.   The Toyota

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Smart Key System requires the operator to hold the ignition button for 3 seconds to shut off the engine when the vehicle is in motion. When the vehicle is stopped, a momentary press of the ignition button shuts off the engine. NHTSA has reports that some owners tried tapping the ignition button to shut it off instead of holding it for three seconds. While they do not believe this is the correct method, they have been working with the SAE to develop a standard for keyless ignition systems. But it is important to note that they think it is one of the attributes that may lead to the occurrence of the long-duration, high speed events.

Sequential Shift Transmission

Another way to stop a runaway vehicle is by placing the transmission in Neutral. NHTSA is concerned that the layout of the Sequential Shift Transmission may confuse the operator (especially in a panic situation) because the "N" is adjacent to the "+." To the left of the D position is a gated area where the shift lever can be pushed forward to upshift, and pulled back for a downshift. The N position is above the D position. In such a layout, the "+" and the "N" are very close to the same longitudinal position, with the "+" closer to the driver. If, NHTSA supposes, the transmission was in the Sequential Shift mode, the driver could confuse

the upshift position for the neutral position. They believe that in a panic situation, there is a chance this could occur.

Braking Effectiveness

With an accelerator pedal stuck at wide open throttle, NHTSA agrees that one forceful application of the brake pedal can safely stop the vehicle. However, in many reports and inspections they have found brakes burned or brake pads completely depleted after the event. NHTSA understands that with the engine at wide open throttle, vacuum is not being supplied to the brake booster. This means that the power braking system has potentially two or three applications left before the vacuum assist is depleted. They believe that in the long duration events, the brake booster is being depleted by the driver. They think that the driver that initially experiences the event recognizes the vehicle is accelerating and presses the brakes. The vehicle slows, so the driver releases the brakes and the vehicle accelerates again. They repeat this process and before they realize, the power assist is lost and the vehicle becomes more difficult to stop. The driver applies the brake pedal with a lot of force, and this can result in severe damage to the braking system, and/or a brake fire.

291.   In a January 22, 2010 internal email, Toyota Canada, admitted that due to the UA issues created by floor mats and gas pedals there was "logic" in that a "brake over-ride would be effective in any failures to prevent accidents.  TC wanted us to employ it as soon as possible."

**L.     The Defects Causing Unintended Accelerations Have Caused Defective Vehicles' Values to Plummet**

292.   A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of an uncontrollable and possibly life-threatening SUA event.   All purchasers of the Defective Vehicles overpaid for their cars.  As news of the SUA defect hit the press, the value of Toyota vehicles have materially diminished.   Some class members attempted to return their vehicles due to the fear of a SUA event.   Toyota has uniformly refused to refund the price of a vehicle a Plaintiff or class member sought to return.

293.   The economic loss suffered by class members is revealed by the following few examples.  From the start of the spring market through the summer of 2009, the 2007 Toyota Camry LE and the 2007 Nissan Altima stayed consistent with each other, depreciating $438 and $295 respectively through these five months (April 09-Aug 09).   As news of the Camry recall started to spread, however, the Camry took a nose dive, losing nearly 2.5 times the loss in value of its competitor, the 2007 Nissan Altima.   More staggering is that the Camry lost $400 in value from January-April 2010 when almost every used vehicle historically gains significant value during these months.   By March 2010, the delta between the Nissan and the Camry was over $1,200.

294.   From April 2009 through September 2009, the Corolla increased in value over its competitor, the Nissan and the Sentra by $210.  However, as the storm clouds started to gather over the rest of the Toyota line, the trend reversed.  During the next seven months, the Sentra only dropped $174 in value, while the Corolla dropped $839.  This is a difference of $665.  The change in this trend resulted in an $875 negative swing for the Corolla versus the Sentra in a year's time, a decrease in value for the Corolla of almost four times that of the Sentra.

295.   From April 2009 through August 2009, the Toyota RAV4 increased in value over its competitor the Honda CRV by $472.  But as the Toyota problems continued, this trend also reversed.  During the next eight months, the CRV dropped $1,273 in value, while the RAV4 dropped $2,206.  This is a net difference of $933.  The change in this trend resulted in a $1,405 negative swing for the RAV4 versus the CRV in a year's time.

296.   Purchasers and lessees paid more for the car, through a higher purchase price or higher lease payments, than they would have had the defects and non-conformities been disclosed.  In addition to being tied to a defective vehicle and having paid a higher rate than would have been the case if the defects were disclosed, lessees can, in some cases, end up paying for the difference in projected residual value and actual or realized value (*e.g.*, early termination clauses; open-end leases) at the end of their leases.  In these situations, lessees must come out of pocket to pay for the diminution in value caused by the partial disclosure of the SUA and brake-override defects to terminate their leases.

## V.    CLASS ALLEGATIONS

### A.    Foreign Consumer Economic Loss Class

297.   Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Foreign Consumer Class initially defined as follows:

> All individuals or entities in Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala and Russia who purchased, own or lease a Toyota vehicle equipped with ETCS.

Plaintiffs reserve the right to modify the Class definition as discovery and/or further investigation so warrant.

298.   Excluded from the Foreign Consumer Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries arising from a SUA incident.

299.   The Foreign Consumer Class pursues claims for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961, *et seq.;* Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.*; violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.*; breach of express

warranty under CAL. COM. CODE § 2313; breach of implied warranty of merchantability under CAL. COM. CODE § 2314; revocation of acceptance under CAL. COM. CODE § 2608; violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*.; breach of the California common law of contract and warranty; breach of duty of care; and violation of the California common law of unjust enrichment or restitution.

300.   Pursuant to Rule 23(a)(1), the Foreign Consumer Class is so numerous that joinder of all members is impracticable.   Due to the nature of the trade and commerce involved, the members of the Foreign Consumer Class are geographically dispersed throughout the world and joinder of all Foreign Consumer Class members would be impracticable.   While the exact number of Foreign Consumer Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are, at least, millions of members of the Foreign Consumer Class.

301.   Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other members of the Foreign Consumer Class.   Plaintiffs and other class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of Defective Vehicles.   Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.   Plaintiffs and class members purchased or leased Toyotas that they would not have purchased or leased at all, or for as much as they paid, had they known the truth regarding a SUA defect.   Plaintiffs and the members of the Foreign Consumer Class have all sustained injury in that they overpaid for Toyotas due to Defendants' wrongful conduct.

302.   Pursuant to Rule 23(a)(4) and (g)(1), Plaintiffs will fairly and adequately protect the interests of the members of the Foreign Consumer Class and have retained counsel competent and experienced in class action and consumer fraud litigation.

303.   Pursuant to Rules 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Foreign Consumer Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.   In particular, Toyota has failed to properly repair Subject Vehicles and has failed to adequately implement a brake-override repair.

304.   Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Foreign Consumer Class and predominate over any questions solely affecting individual members thereof.   Among the common questions of law and fact are as follows:

a.   Whether Toyota violated 18 U.S.C. §1962(a), (b), (c) and/or (d) through a pattern of racketeering activity designed to deceive and defraud consumers worldwide, including the class, and to conceal serious and dangerous defects of Toyota Vehicles from consumers worldwide, including the class;

b.   Whether Toyota had knowledge of the defects prior to its issuance of the current safety recalls;

c.   Whether Toyota concealed defects affecting Defective Vehicles;

d.   Whether Toyota misrepresented the safety of the automotive vehicles at issue;

e.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the CLRA;

f.      Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

g.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

h.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

i.      Whether Toyota's business practices, including the manufacture and sale of vehicles with an unintended acceleration defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

j.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

k.      Whether Toyota breached its express warranties regarding the safety and quality of its vehicles;

l.      Whether Toyota breached the implied warranty of merchantability because its vehicles were not fit for their ordinary purpose due to their sudden acceleration defect;

m.      Whether Toyota acted negligently;

n.      Whether Toyota was unjustly enriched at the expense of Plaintiffs and the Foreign Consumer Class;

o.      Whether Plaintiffs and class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief; and

p.      The amount and nature of such relief to be awarded to Plaintiffs and the Foreign Consumer Class.

305.   Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Foreign Consumer Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

## COUNT I

## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT
## (18 U.S.C. §1961, *et seq.*)

### A. THE ENTERPRISE

306.   Since at least 2004, Defendants, its worldwide affiliates, and their spokespersons, have associated-in-fact to conduct certain aspects of Toyota's "marketing, advertising, promotion and sales and leasing" activities ("misleading marketing enterprise") by means of false statements and omissions of material facts

to sell and lease certain vehicles known to defendants to be unreasonably dangerous and defective through a pattern of racketeering activity in violation of 18 U.S.C. §§1341 (mail fraud); 1343 (wire fraud); laundering and transmitting sales and lease proceeds by violating 1956 (laundering of monetary instruments) and 2314 (transferring in interstate or foreign commerce sums of $5,000 or more with knowledge that said sums have been taken by fraud).

307.   Toyota's "misleading marketing enterprise" as set forth in the preceding paragraph constitutes an "enterprise" as that term is defined in 18 U.S.C. §1961(4).

308.   Toyota's "misleading marketing enterprise" has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants have engaged since at least 2007.

309.   Defendants, their subsidiaries and worldwide affiliates are ongoing organizations which engage in, and the activities of which affect interstate and foreign commerce.

310.   Each defendant associated with the enterprise.

311.   Each defendant intended that the enterprise transmit false and misleading information as set forth herein to Plaintiffs, members of the proposed Class, government investigators, and worldwide consumers through means of domestic and international mail and wire carriers.

312.   Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity indictable under 18 U.S.C. §§1341, 1343, 1956 and 2314.

313.   Defendants are "persons" as defined by 18 U.S.C. §1961(3) and have: (1) derived income directly or indirectly from a pattern of racketeering activity in violation of 18 U.S.C. §1962(a); (2) through a pattern of racketeering activity have maintained, directly or indirectly, an interest in and control of the Toyota marketing

enterprise which is engaged in and the activities of which affect interstate or foreign commerce in violation of 18 U.S.C. §1962(b); (3) conducted or participated, directly or indirectly in the conduct of the Toyota marketing enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c); and (4) conspired with each other, subsidiaries, affiliates and spokespersons to violate 18 U.S.C. §§1962(a),(b) and (c).

## B. PREDICATE ACTS

### 1.    OMISSIONS OF MATERIAL FACTS

314.   Toyota has generated a worldwide reputation for quality and safety which is the center piece of Toyota's marketing enterprise to increase sales of Toyota vehicles. Toyota's marketing enterprise touts its safety awards, including an award in 2008 from the Insurance Institute for Highway Safety (hereinafter "IIHS") naming the Toyota Tundra and the Toyota Highlander as their "Top Safety Picks." Toyota did not disclose at the time the defects and design flaws with its vehicles that could lead to SUA.

315.   Toyota was aware that the defect with certain vehicles posed a potentially dire safety risk to Plaintiffs and members of the Class. Rather than notify consumers of the defect and attendant safety risk, Toyota opted to conceal the existence of the defect for an unreasonable period of time, even after being contacted by consumers who experienced the problem. Toyota was in the exclusive possession of this information, which was material to Plaintiffs and Class members, and Toyota had a duty, under all circumstances, to disclose the defect and associated safety hazards to Plaintiffs and Class members.

316.   Instead of warning consumers that Toyota vehicles may experience a SUA event and providing instructions in the event a SUA occurred, Toyota vehicle owners, like Plaintiffs, were provided a Warranty and Maintenance Guide which states, *inter alia:*

> At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability.... Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind....

**(a)     Toyota's History of Exerting Undue Influence To Conceal Material Facts Concerning Deadly Design Flaws**

317.   According to Reuters, Christopher Tinto, vice president of regulatory affairs in Toyota's Washington, D.C. office, left NHTSA in 1994 and joined Toyota. Christopher Santucci, who now works for Tinto, did the same in 2003. These two individuals may have exerted influence over the former regulatory agency they worked in to stall or otherwise misdirect investigation into complaints to conceal material defects.

318.   From 2003 to 2009, NHTSA opened eight investigations of SUA involving Toyota vehicles. Of those, three resulted in floor mat recalls, and five were closed. According to court papers and other documents, Tinto and Santucci worked with NHTSA on Toyota's responses to the consumer complaints.

319.   The first investigation of SUA events involved 2002 and 2003 Toyota Camrys and Solaras, and a lawsuit filed on behalf of a Michigan woman who was killed in an April 2008 accident. The lawsuit blamed a defect in the electronic throttle control system for the fatal accident. According to Reuters, Santucci testified

in a deposition for that lawsuit that Toyota and NHTSA discussed limiting an investigation of SUA to incidents lasting less than a second.

320.   The Reuters report went on to say that twenty days after starting its probe – and after talking with Tinto – NHTSA decided not to investigate "longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect." The decision was made to limit the cases to eliminate instances in which a driver may have used the wrong pedal.

321.   The second NHTSA investigation, which occurred in 2005, was prompted by a consumer complaint of two instances of sudden acceleration in a 2002 Camry, one of which involved a crash. The vehicle owner who filed the petition with NHTSA also cited eight complaints from other drivers about similar episodes with other Toyota vehicles. According to Reuters, Toyota itself said dealer representatives investigated 59 of 100 vehicles whose owners complained.

322.   In November of that year, Tinto wrote to NHTSA that no evidence of a system or component failure was found and the vehicles were operating as designed. Based on the representations and statement of Tinto, NHTSA ended that probe in January, 2006, citing lack of evidence of a problem and the agency's need to allocate "limited resources" to other investigations.

323.   The third case, which started with a consumer complaint made in August, 2006, again involved the Camry, model years 2002 to 2006. The Camry owner who made the complaint to NHTSA blamed the throttle actuator or controller. According to Reuters, NHTSA also noted 3,546 cases where Toyota had replaced throttle actuators under warranty terms. Tinto wrote to the agency that Toyota had not found a defect with the throttle actuator, but did find evidence that returned actuators had corroded due to water intrusion. According to Tinto, intrusion was usually caused by drivers going through a flooded road or similar circumstances. NHTSA decided not to pursue the probe, saying it was "not warranted."

324.   The final investigation, in 2008, involved 2006-2007 Toyota Tacoma pickup trucks. According to Reuters, the consumer who made the initial complaint reported two incidents of unintended acceleration in his 2006 Tacoma and pointed to 32 similar complaints in the NHTSA database. A memo from Tinto also said that Toyota had received similar complaints involving more than 400 Tacomas, model years 2004 to 2009. Of those reports, 49 involved crashes.

325.   Reuters discovered that Tinto wrote a letter to NHTSA stating that he felt the complaints didn't warrant NHTSA investigation and that he believed that media attention played a major role in the filing of these complaints. NHTSA closed that investigation in August, 2008, saying it was unable to find any underlying cause for the issue.

326.   Toyota continues to take actions to "shut-down" any material disclosures that its electronic accelerator system is defective, as revealed in an *Associated Press* article published in *The San Diego Union-Tribune,* on July 11, 2010, entitled, "A 'startling discovery' leads to fall out for school:"

> CARBONDALE, Ill – It's the kind of publicity any university might dream about: **An instructor uncovers a possible flaw that's causing some of the world's most popular cars to accelerate suddenly. His ground breaking work attracts interest from Congress and reporters worldwide.**
>
> But as Southern Illinois University's David Gilbert sought to show that electronics might be to blame for the problem in Toyotas, the world's largest automaker tried to cast doubt on his findings. One Toyota employee even

questioned whether he should be employed by the school, which has long been a recipient of company donations.

Electronic messages obtained by The Associated Press show the automaker grew increasingly frustrated with Gilbert's work and made its displeasure clear to his bosses at the 20,000-student school. "It did kind of catch us off-guard," university spokesman Rod Sievers said.

So did the fallout. Two Toyota employees quickly resigned from an advisory board of the school's auto-technology program and the company withdrew offers to fund two springbreak internships.

"**I didn't really set out to take on Toyota. I set out to tell the truth, and I felt very strongly about that,**" said Gilbert, **who was among the first to suggest that electronics, not sticky gas pedals or badly designed floor mats, caused the acceleration** that required the Japanese automaker to recall millions of vehicles.

Toyota insists its relationship with the school remains "strong," and company officials say they have no plans to stop contributing to SIU. They also say the two Toyota representatives who stepped down from the advisory board did so merely to avoid any appearance that the

company was exerting influence over Gilbert's testimony.

**Driven by his own curiosity, Gilbert in January found he could manipulate the electronics in a Toyota Avalon to re-create the acceleration without triggering any trouble codes in the vehicle's computer. Such codes send the vehicle's computer into a fail-safe mode that allows the brake to override the gas.**

**Gilbert said he reported his "startling discovery" to Toyota, and the automaker "listened attentively."** But Gilbert said he never heard back from the company, which has steadfastly maintained the problems were mechanical, not electronic.

**A short time later, Mark Thompson – identifying himself as an SIU alumnus and, without elaboration, a Toyota Motor Sales employee – voiced in an e-mail to the university's then-chancellor, Sam Goldman, his "great concern and disappointment" about Gilbert. Thompson said he was "deeply disturbed" by what he called Gilbert's false accusations about the automaker.**

Thompson reminded Goldman that he and Toyota regularly contributed to the university – including a $100,000 check to the auto-tech program in late 2008 – and "due to the outstanding reputation your automotive technology program has, we donate much more than money," including cars. [Emphasis added].

**2.     FALSE AND MISLEADING STATEMENTS WHICH WERE AND WERE INTENDED TO BE DISSEMINATED BY INTERSTATE AND FOREIGN CARRIERS OF MAIL AND WIRE COMMUNICATIONS WITH KNOWLEDGE OF THEIR FALSITY CONCERNING THE CAUSES OF SUA (18 U.S.C. §1341 AND 1343)**

327.   Driver complaints resulted in at least eight separate investigations into Toyota vehicles by NHTSA. In response to the complaints and investigations, Toyota issued six minor recalls to fix various problems related to its acceleration system, but defendants blamed human error for the problems.

328.   Toyota intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential consumers and owners that the electronic throttle control system in its vehicles may contribute to a SUA event. In a June 19, 2004, letter to NHTSA, Toyota falsely stated that its ETC system contained a built in redundancy to prevent acceleration and that in the event of sudden acceleration the "vehicle brakes would have restrained vehicle motion." Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience SUA and that applications of the brakes have failed to restrain vehicle motion.

329.   Defendants intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential customers and owners that Toyota's vehicles were subject to SUA. In a November 15, 2005, letter to NHTSA,

Toyota falsely denied that its vehicles could ever experience SUA. According to Toyota, SUA cannot occur "without the driver applying the accelerator pedal because of ... several detection systems ..." Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience sudden unintended acceleration without application of the accelerator pedal.

330.    In March of 2007, Toyota identified problems with the accelerator pedals in the Tundra pickup. According to Toyota, it determined the problem was caused by the material in the accelerators' friction lever and made a change. Toyota falsely claimed that this was a drivability issue and not a safety issue.

331.    Similar issues arose with the Toyota Tacoma. Toyota denied that there was any problem with the acceleration system. An April 7, 2008, article in the *Detroit Free Press* entitled, "Toyota Pickup Probe Pushed; Sudden Accelerations Claims Hard to Pin Down," states:

> Toyota spokesman Bill Kwong says the company has found no problems with the Tacoma that would explain the complaints. "We don't feel it's an issue with the vehicle," he said. Regulators "get sudden acceleration complaints from consumers for various manufacturers. ... and in most cases they have found it's a misapplication of the pedals by the driver."

332.    Toyota further claimed that there were no flaws in its trucks' design and the reports of sudden acceleration were "inspired by publicity." As reported in an article in the *Detroit Free Press* on June 10, 2008, entitled, "Toyota Denies Tacoma is Defective; Media Inspired Acceleration Claims, It Says:"

1
2
3
4
5
6
7

> Some 431 customers from around the country have reported unintended or sudden acceleration in their Toyota Tacoma pickups, resulting in 51 crashes and 12 injuries, but the automaker said there are no flaws in the trucks and that many reports were "**inspired by publicity."** [Emphasis added].

8      333.   Toyota went on to blame "extensive media coverage" for spurring
9  additional reports of problems with Toyota which would explain why no other
10  pickup has similar complaints:

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

> Toyota believes that it is likely that many of the consumer complaints about the general issue of unwanted acceleration ... **as well as many of the complaints about this subject that have been received by Toyota,** were inspired by publicity," Toyota said in a letter to the NHTSA released Thursday. But even taking them at face value, it is clear that the majority of the complaints are related to *minor drivability issues and are **not indicative of a safety-related defect.*** * * * Toyota spokesman Bill Kwong said tests by the automaker and the NHTSA revealed no problems that would explain the complaints. He said the problems were not as prevalent as the number of complaints suggested, saying the NHTSA asked for any cases where engine idle speed increased. "We remain confident in the safety of the vehicles," Kwong said. [Emphasis added].

28

1

2      334.   In December 2008, a similar issue arose in Europe in the right-hand

3  drive versions of Toyota's Aygo and Yaris models. After an investigation, Toyota

4  allegedly found that condensation from heaters caused increased friction in the

5  accelerator pedal, making it stick. In mid-August 2009, Toyota made a design

6  change in its European cars which lengthened the arm of the friction lever and

7  changed its materials on all vehicles being produced in Europe. Despite the fact that

8  the same material used in manufacturing of gas pedals in Europe -- the material that

9  allegedly caused the sudden acceleration problems in Europe – was the same

10  material used in the United States, Toyota did not make the change to vehicles sold

11  in the United States.

12      335.   On April 23, 2009, *Westword* published an article entitled, "The Prius

13  can take owners on a wild ride." The article discussed several incidents involving

14  situations where Prius drivers experienced SUA. When asked for a response, Toyota

15  denied any problems with its accelerators:

16

17              Toyota responded to the acceleration problem in 2007 by

18              recalling "*faulty floor mats*" that the company said could

19              cause the gas pedal to stick. Another explanation from

20              Toyota is *simple driver error.* "You get these customers

21              that say, 'I stood on the brake with all my might and the

22              car just kept on accelerating.' **They're not stepping on**

23              **the brake,"** says corporate Toyota spokesman Bill

24              Kwong. "People are so under stress right now, people

25              have so much on their minds. With pagers and cell

26              phones and IM, people are just so busy with kids and

27              family and boyfriends and girlfriends. So you're driving

28

1    along, and the next thing you know, you're two miles

2    down the road and you don't remember driving, because

3    you're thinking about something else." [Emphasis

4    added].

5

6    336.   On September 14, 2009, Toyota issued a press release entitled, "Lexus

7    ES 350 Accident Investigation," which stated *inter alia*:

8

9    On August 28th, 2009, California Highway Patrol Officer

10    Mark Saylor and three members of his family tragically

11    lost their lives on a highway near San Diego California,

12    while driving a 2009 ES350 loaned to them by a local

13    Lexus dealer. Our deepest sympathies go out to the

14    friends and family of Mark, Cleofe, Mahala, and Cleofe's

15    brother Chris Lastrella. Preliminary information from law

16    enforcement investigators indicates that **the cause may**

17    **have been an all-weather floor mat** from a different

18    Lexus model which, if installed incorrectly in the ES350,

19    could cause it to interfere with the accelerator pedal.

20

21    All-weather floor mats are installed by dealers or

22    customers as an accessory item. Driver's floor mat

23    interference with the accelerator pedal is possible in any

24    vehicle make with any combination of floor mats when

25    the floor mat is not properly secured or if it is not the

26    factory designed floor mat for the vehicle.

27

28

1
2
3
4
5
6
7
8
9
10
11
12

> Toyota Motor Sales, USA, Inc. takes public safety very seriously and will fully cooperate with any investigation. We believe our vehicles to be among the safest on the road today. **We are instructing all of our Lexus and Toyota dealers** to immediately inspect their new, used, and loaner fleet vehicles and we urge all other automakers, dealers, vehicle owners, and the independent service and car wash industries to assure that any floor mat, whether factory or aftermarket, is correct for the vehicle and properly installed and secured [Emphasis added].

13
14
15
16
17

337.   In a press release issued after the September 29, 2009, recall, Toyota unequivocally and falsely stated, "no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured." Toyota repeated such assurances in subsequent months, stating that the faulty floor mats were the only cause of SUA in Toyota vehicles.

18
19
20
21
22
23
24

338.   On November 2, 2009, Robert S. Carter, Group Vice President and Toyota Division General Manager of Toyota USA appeared on a conference call with the media at Thomson Reuters Autos Summit where he unequivocally denied all problems with Toyota vehicles, claiming that all incidents of sudden unintended acceleration could be traced to floor mats and denying any other problems with Toyota vehicles:

25
26
27
28

> [CARTER]: *There has been speculation and theories that there are some concerns with our fuel delivery systems, our braking systems, our throttle systems. I will*

1          *tell you there is absolutely no evidence to support any of*

2          *that.*

3

4          In fact, last week NHTSA just closed another

5          investigation of a vehicle that was looked at, and again

6          they concluded that the source was an incompatible floor

7          mat or a floor mat that was not attached properly. So our

8          position is this. Until we thoroughly review this and work

9          with NHTSA, is to tell consumers that this potential

10         exists; if there is any concern, remove the floor mat.

11

12         At the same time, if it is a properly designed floor mat for

13         the vehicle and it is attached on the hooks that come from

14         the factory, there is no concern, there is no evidence of

15         any accelerator pedal interference. If consumers would

16         like to keep the floor mat installed, we are suggesting

17         four things. One, make sure it is a compatible mat. Two,

18         make sure that it is hooked properly to the floor. Three,

19         that floormats are designed to fit in the car. Don't reverse

20         the floormat and expose the rubber side. And then the

21         fourth is, in many inclement areas such as Detroit, some

22         consumers will keep their carpet and floormats in their

23         car and place a rubber mat on top and stack the mats. We

24         highly recommend against that. * * *

25

26

27

28

1   [MEDIA]: But at the moment, though, as this moves to

2   recall, I guess what you said will happen. ***The locus is***

3   ***just the floormat, floormat design, nothing beyond that?***

4

5   [CARTER]:   ***Absolutely.   Absolutely.   There   is   no***

6   ***evidence that goes beyond that.*** [Emphasis added].

7

8       339.   On November 2, 2009, Toyota issued a press release entitled, "Toyota

9   Begins Interim Notification to Owners Regarding Future Voluntary Safety Recall

10  Related to Floor Mats," which states in part:

11

12  Toyota   Motor   Sales   (TMS),   U.S.A.,   Inc.,   today

13  announced that it has begun mailing letters to owners of

14  certain Toyota and Lexus models regarding the potential

15  for an unsecured or incompatible driver's floor mat to

16  interfere with the accelerator pedal and cause it to get

17  stuck in the wide-open position.

18

19  The letter, in compliance with National Traffic and

20  Motor Vehicle Safety Act and reviewed by the [NHTSA]

21  also confirms that **no defect exists in vehicles in which**

22  **the driver's floor mat is compatible with the vehicle**

23  **and properly secured.** * * *

24

25  This is the sixth time in the past six years that NHTSA

26  has undertaken such an exhaustive review of allegations

27  of unintended acceleration on Toyota and Lexus vehicles

28

1   and the sixth time the agency has found **no vehicle based**
2   **cause for the unwanted acceleration allegations. The**
3   **question of unintended acceleration involving Toyota**
4   **and Lexus vehicles has been repeatedly and**
5   **thoroughly investigated by NHTSA, without any**
6   **finding of defect other than the risk from an**
7   **unsecured or incompatible driver's floor mat,** said
8   Bob Daly, TMS senior vice president. * * *

10   340.   In a highly unusual move, NHTSA publicly reprimanded Toyota for
11   statements made by the Company in its October 30th notification letter to owners.
12   On November 4, 2009, an *Associated Press* article entitled, "Govt Criticizes Toyota
13   Press Release on Floor Mats," states in part:

15   **Toyota Motor Corp. released misleading information**
16   **about an investigation into problems with stuck gas**
17   **pedals** that led to a massive Toyota recall, the
18   government said Wednesday, stressing the issue is still
19   under review by federal safety regulators. The National
20   Highway Traffic Safety Administration said it was still
21   investigating the case and meeting with Toyota to hear
22   about the company's plan to redesign the vehicles and fix
23   "this very dangerous problem." * * * Toyota said in a
24   statement on Monday that NHTSA had confirmed " that
25   *no defect exists* in vehicles in which the driver's floor
26   mat is compatible with the vehicle and properly secured."

- 174 -

**But NHTSA said that was inaccurate and the government was investigating possible causes of the acceleration problem. Removing the floor mats was "simply an interim measure" and "does not correct the underlying defect in the vehicles involving the potential for entrapment of the accelerator by floor mats,** which is related to accelerator and floor pan design." "**The matter is not closed until Toyota has effectively addressed the defect by providing a suitable vehicle based solution,"** NHTSA said in the statement, which the department said was issued *to correct "inaccurate and misleading information" from the automaker.* * * *

341.    On November 25, 2009, without admitting fault or any design defects, Toyota issued a press release entitled, "Toyota Announces Details of Remedy to Address Potential Accelerator Pedal Entrapment," which states in part:

... In addition, as a separate measure independent of the vehicle based remedy, Toyota **will install a brake override system onto the involved [vehicles] as an extra measure of confidence. This system cuts engine power in case of simultaneous application of both the accelerator and brake pedals.** Toyota is in the process of completing development of these actions for the ES 350, Camry, and Avalon and will start notifying owners of the involved vehicles via first-class mail by the end of the year. The remedy process regarding the other five

models will occur on a rolling schedule during 2010.

[Emphasis added].

342.   The *International Herald Tribune* reported that on November 25, 2009, Toyota spokesman, Irving Miller, stated on a conference call that, "We are very confident that we have addressed this issue [referring to the sudden unintended acceleration problems]. Mr. Miller went on to say, "We can come up with **no indication whatsoever that there is a throttle or electronic control system malfunction."**

343.   On November 29, 2009, *The New York Times* reported that Irving Miller stated that Toyota would begin shortening its vehicles' existing gas pedals by about three-quarters of an inch and would start equipping its vehicles with smart gas pedals, even though smart gas pedals have been used for years by European automakers like BMW, Audi and Volkswagen. Irving Miller, Toyota's spokesman stated that Toyota was confident that these steps would solve the SUA problem. According to Mr. Miller, "We have come to the conclusion this is pedal misapplication or pedal entrapment." Mr. Miller went on to say, "We continue to find no reason to believe that there is a problem with the electronic control systems."

344.   On December 9, 2009, Mr. Miller submitted a letter to the *Los Angeles Times* vigorously challenging a December 5, 2009 editorial that questioned Toyota's ETCS and ETCS-i system. The *Los Angeles Times* noted that incidents of sudden unintended acceleration grew exponentially after the introduction of Toyota's electronic throttle control system. Mr. Miller's letter emphatically denied that there was any problem with the electronic throttle control system.

345.   On December 23, 2009, the *Los Angeles Times* released another story accusing Toyota of hiding the defects and design flaws in its vehicles for years. According to the *Los Angeles Times,* Toyota destroyed documents and hid testing

1    results from American consumers, as well as paying cash settlements to people who

2    say their vehicles have raced out of control and caused serious accidents. According

3    to the news story, a computerized search of NHTSA records had issued eight

4    previous recalls related to **SUA** – more than any other automaker. The *Los Angeles*

5    *Times* news report found that Toyota had been allowing sudden acceleration

6    problems to fester for nearly a decade, since the introduction of the electronic throttle

7    controls system in the early 2000's.

8        346.   Mr. Miller, Toyota's spokesman, responded with a press release

9    entitled, "Setting the Record Straight." The press release stated:

10
11            Today the *Los Angeles Times* published an article that

12            wrongly and unfairly attacks Toyota's integrity and

13            reputation. While outraged by the Times' attack, we were

14            not totally surprised. The tone of the article was

15            foreshadowed by the phrasing of a lengthy list of detailed

16            questions that the Times emailed to us recently. The

17            questions were couched in accusatory terms. Despite the

18            tone, we answered each of the many questions and sent

19            them to the Times. Needless to say, we were

20            disappointed by the article and much of what was used

21            [sic] was distorted. Toyota has a well-earned reputation

22            for integrity and we will vigorously defend it.

23
24        347.   On December 26, 2009, four people were killed in an accident involving

25    a Toyota Avalon. At the time, a problem with the accelerator pedal was the

26    suspected cause for the crash. However, it was determined that the floor mats could

27    not have caused the accident as the mats were in the trunk at the time of the crash.

28

1    This caused Toyota to change its story. On January 21, 2010, Toyota released a
2    statement saying:

4              Toyota has investigated *isolated reports* of sticking
5              accelerator pedal mechanisms in certain vehicles without
6              the presence of floor mats. *There is a possibility* that
7              **certain accelerator pedal mechanisms may, in rare**
8              **instances, mechanically stick in a partially depressed**
9              **position or return slowly to the idle position.**
10             [Emphasis added].

12   A vehicle with the throttle stuck in a partially depressed position can lead to
13   accidents which can kill or maim not only the drivers and passengers of the defective
14   vehicles, but others whom the vehicles might run into. This is a serious design flaw
15   and defect that poses serious risk to not only consumers but also the public as a
16   whole worldwide.

17        348.   A January 25, 2010 *USA Today* article revealed that Toyota knew that
18   there were problems with accelerator-pedal assemblies from one of its Canadian
19   suppliers since 2009 but decided that it did not warrant a recall at that time.
20   However, Toyota announced the January 2010 recall because the defect trend had
21   picked up. John Hanson, Toyota's U.S. safety spokesperson stated, "The quickness
22   that this all came together is one reason why I don't have numbers of complaints."
23   Mr. Hanson further stated, "And why we don't have a fix."

24        349.   During a Congressional hearing on January 27, 2010, Toyota officials
25   stated that they first learned of "sticking pedals" in England and Ireland in the spring
26   of 2009. But Toyota acknowledged that it had received reports in England and
27   Ireland as early as December 2008.

28

## C. PATTERN OF RACKETEERING INJURY

350. As a result, and by reason of the foregoing pattern of racketeering activity, false statements of material facts and omissions of material facts, the Plaintiffs and the proposed Class members have sustained injury to their property, to wit:

A.   Toyota was in the exclusive possession of the information set forth *supra,* which was material to Plaintiffs and Class members and Toyota had a duty, under all the circumstances, to disclose the defects and associated safety hazards to Plaintiffs and prospective Class members;

B.   Plaintiffs and prospective Class members reasonably expected that the subject vehicles would not contain a serious safety defect that could, *inter alia,* result in putting the occupants at risk of serious bodily injury or death;

C.   As a result of the lack of safety systems, there is no mechanical or electronic failsafe mechanism to allow Plaintiffs and the prospective Class members to stop their Toyota recalled vehicles in the event the computerized "drive-by-wire" acceleration systems malfunction and engage in uncontrolled acceleration, putting the occupants at risk of serious bodily injury or death;

D.   As a result of the defect plaguing the Toyota recalled vehicles, Plaintiffs and the prospective Class members overpaid

for their vehicles because their value is and will remain diminished;

E.     Given the widespread publicity associated with the recall, Plaintiffs and other prospective Class members who purchased a recalled Toyota vehicle have suffered injury in fact or otherwise been damaged because the resale and fair market values of the recalled Toyota vehicles are and will remain substantially depreciated;

F.     Prospective Class members who leased a recalled Toyota vehicle have been injured because they must continue to pay for leasing the subject unsafe vehicle or pay a penalty to break the lease prematurely.

351.   Plaintiffs and the prospective Class members are therefore entitled to recover treble damages and the costs of their suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

**COUNT II**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, *et seq.*)**

352.   The Foreign Consumer Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

353.   Defendants are "persons" under CAL. CIV. CODE § 1761(c).

354.   Consumer Plaintiffs are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

355.   Consumer Plaintiffs attach as Exhibit A an affidavit that shows venue in this District is proper, to the extent such an affidavit is required by CAL. CIV. CODE § 1780(d).

356.   Defendants participated in unfair or deceptive acts or practices that violated the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the CLRA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

357.   By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Defective Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq.*, including (1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

358.   As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

359.   Defendants knew that the ETCS in Defective Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.  Defendants nevertheless failed to warn Consumer Plaintiffs about these inherent dangers despite having a duty to do so.

360.   Defendants each owed Consumer Plaintiffs a duty to disclose the defective nature of Defective Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

a.   Possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Defective Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Consumer Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of Defective Vehicles generally, and ETCS in particular, while purposefully withholding material facts from Consumer Plaintiffs that contradicted these representations.

361.   Defective Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to Consumer Plaintiffs, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of SUA.

362.   Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease. When Consumer Plaintiffs bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

363.   TMC's and TMS's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Consumer Plaintiffs, about the true safety and reliability of Defective Vehicles.

364.   As a result of its violations of the CLRA detailed above, Defendants caused actual damage to Consumer Plaintiffs and, if not stopped, will continue to harm Consumer Plaintiffs.  Consumer Plaintiffs currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  ETCS defects and the resulting unintended acceleration incidents have caused the value of Defective Vehicles to plummet.

365.   Consumer Plaintiffs risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the CLRA, and these violations present a continuing risk to Consumer Plaintiffs as well as to the general public.

366.   Pursuant to CAL. CIV. CODE § 1780(a), Consumer Plaintiffs seek monetary relief against TMS and TMC measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of

- 183 -

$1,000 for each Consumer Plaintiff and each member of the class they seek to represent.

367.   Consumer Plaintiffs also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Consumer Plaintiffs to cruel and unjust hardship as a result.  Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Consumer Plaintiffs were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

368.   The recalls and repairs instituted by Toyota have not been adequate. Defective Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Defective Vehicles, including the 2002-2007 Camry.

369.   Repairs have been incomplete.  For example, Toyota documented an incident with a 2007 Avalon that "unintentionally accelerated with high rotation (7000 rpm) and smoke out from brake.  There was an eyewitness."[68]   The dealer confirmed the "high rotation and not returning to idle" and replaced the pedal and the throttle.  The dealer declined to provide a document saying UA would not recur and refused to buy back the vehicle.  Most of the Recalled Vehicles have not had their throttles replaced.

---

[68] 41241T000,

370.   Consumer Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

## COUNT III

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

371.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

372.   Plaintiffs assert this claim on behalf of themselves and members of the Foreign Consumer Class on behalf of all persons or entities that purchased or leased a vehicle from Toyota or a Toyota dealership.

373.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

374.   Defendants have violated the unlawful prong of section 17200 by their violations of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I by the acts and practices set forth in this Complaint.

375.   Defendants have also violated the unlawful prong because Defendants have engaged in business acts or practices that are unlawful because they violate the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

376.   FMVSS 124, codified at 49 C.F.R. § 571.124, sets the standard for accelerator control systems.  Specifically, FMVSS 124 establishes requirements for the return of a vehicle's throttle to the idle position when the driver removes the actuating force from the accelerator control, or in the event of a severance or disconnection in the accelerator control system.  The purpose of FMVSS 124 is to reduce deaths and injuries resulting from engine overspeed caused by malfunctions in the accelerator control system.

377.   FMVSS 124 requires that throttles in passenger vehicles return to the idle position within certain maximum allowable times after the driver has removed the actuating force from the accelerator control:  one second for vehicles of 4,536 kilograms or less gross vehicle weight rating ("GVWR"), two seconds for vehicles of more than 4,536 kilograms GVWR, and three seconds for any vehicle that is exposed to ambient air at – 18 degrees Celsius to – 40 degrees Celsius.

378.   Defective Vehicles equipped with ETCS do not comply with FMVSS 124 because a design defect causes their throttles to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

379.   Defendants each violated 49 U.S.C. § 3-112(a)(1) by manufacturing for sale, selling, offering for introduction in interstate commerce, or importing into the United States, Defective Vehicles equipped with ETCS that failed to comply with FMVSS 124.

380.   Defendants each violated 49 U.S.C.  § 30115(a) by certifying that Defective Vehicles equipped with ETCS complied with FMVSS 124 when, in the

exercise of reasonable care, Defendants each had reason to know that the certification was false or misleading because a design defect causes throttles in Defective Vehicles equipped with ETCS to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

381.   Defendants have violated the fraudulent prong of section 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

382.   Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanism, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease Defective Vehicles.

383.   The Named Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  As set forth in the allegations concerning each plaintiff, in purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions

of Toyota with respect of the safety and reliability of the vehicles. Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control. Had the Named Plaintiffs known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

384. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California, nationwide and worldwide.

385. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief set forth below.

## COUNT IV

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *et seq.*)

386. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

387. Plaintiffs assert this claim on behalf of themselves and members of the Foreign Consumer Class on behalf of any person or entity that purchased or leased a vehicle from Toyota or a Toyota dealership.

388.   California Business and Professions Code § 17500 states:   "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

389.   Defendants caused to be made or disseminated through California, the United States and other parts of the world, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiffs.

390.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

391.   Named Plaintiffs and members of the Classes have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.   In purchasing or leasing their vehicles, the Named Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect to the safety and reliability of the vehicles.   Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate

out of the drivers' control.  Had the Named Plaintiffs known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

392.   Accordingly, the Named Plaintiffs overpaid for their Defective Vehicles and did not receive the benefit of their bargain.  One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed.  Both trade-in prices and auction prices for Subject Vehicles have declined as a result of Defendants' misconduct.  This decline in value measures the overpayment, or lost benefit of the bargain, at the time of the Named Plaintiffs' purchases.

393.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California, nationwide and other parts of the world.

394.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT V

### BREACH OF EXPRESS WARRANTY
### (CAL. COM. CODE § 2313)

395.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

396.   This Count is asserted by the Foreign Consumer Class.

397.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

398.   In the course of selling its vehicles, Toyota expressly warranted in writing that the Vehicles were covered by a Basic Warranty that provided for the following:

> *Accelerator pedal failure, except pedal position sensor malfunction*
>
> 36 months or 36,000 miles for the Vehicles and 48 months or 50,000 miles for the Lexus vehicles from the vehicle's date-of-first-use, whichever occurs first.
>
> *Other electronic throttle control system failure including pedal position sensor malfunction*
>
> 60 months or 60,000 miles for the Vehicles and 72 months or 70,000 miles for the Lexus vehicles from the vehicle's date-of-first-use, whichever occurs first.

399.   Toyota breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Toyota.  Toyota has not repaired or adjusted, and has been unable to repair or adjust, the Vehicles' materials and workmanship defects.

400.   In addition to this Basic Warranty, Toyota expressly warranted several attributes, characteristics and qualities, including that:

- The "by-wire' technology used in the Toyota throttles was a safety feature;

- Toyota designed their cars at the forefront of technology to enhance active safety (driving dynamics);

- The use of the electronic throttle control system results in even greater reliability and precision than systems based on hydraulic or mechanical linkages;

- Toyota uses technology to deliver a high level of safety;

- Toyota employs a revolutionary electronic control systems that boosts active safety;

- Toyota's ETCS-i helps improve performance;

- Class-leading passive safety including 5 Star Euro NCAP rating;

- Toyota's ETCS-i is at the forefront of active safety systems;

- Toyota promises advanced safety technology;

- Toyota customers have long counted on the brand for the best in performance, quality and durability;

- To build safe cars, Toyota promises that it gathers information and analyzes why accidents occur and what causes injuries, and that "Toyota analyzes data from real accidents that take place all over the world," which it uses to develop new safety technologies, testing them on actual vehicles before offering them to the public in Toyota's product line-up.  Toyota claims that this "is a perpetual cycle through which Toyota seeks to enhance safety technologies and reduce accidents continuously"; and

- When it comes to the well-being of Toyota drivers and their passengers, Toyota has raised the standard.

401.   These warranties are only a sampling of the numerous warranties that Toyota made relating to safety, reliability and operation, which are more fully outlined in Sections IV.A. and I., *supra*.  Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promote the benefits of ETCS.   These warranties were made, *inter alia*, in advertisements, in Toyota's "e-brochures," and in uniform statements provided by Toyota to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between the parties.

402.   These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees.  Toyota did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

403.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and Plaintiff Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

404.   Accordingly, recovery by the Plaintiffs is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

405.   Also, as alleged in more detail herein, at the time that Defendants warranted and sold the vehicles, they knew that the vehicles did not conform to the

- 193 -

warranties and were inherently defective, and Defendants wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiff Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses. The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable pursuant to CAL. CIV. CODE § 1670.5 and/or § 1668.

406.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendants' fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Foreign Consumer Plaintiffs' remedies would be insufficient to make Plaintiffs whole.

407.   Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Class assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE §§ 2711 and 2608.

408.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

409.   As a direct and proximate result of Toyota's breach of express warranties, Plaintiffs and the Classes have been damaged in an amount to be determined at trial.

## COUNT VI

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE § 2314)

410.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

411.   This Count is asserted by the Foreign Consumer Class.

412.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under CAL. COM. CODE § 2104.

413.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to CAL. COM. CODE § 2314.

414.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Defective Vehicles are inherently defective in that there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the Defective Vehicles do not have an adequate fail-safe to protect against such SUA events, nor do they have a brake-override; and the ETCS system was not adequately tested.

415.   Toyota was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and members of the Class before or within a

reasonable amount of time after Toyota issued the recall and the allegations of vehicle defects became public.

416.   Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.   Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.   The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

417.   As a direct and proximate result of Toyota's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT VII

### REVOCATION OF ACCEPTANCE
### (CAL. COM. CODE § 2608)

418.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

419.   The Foreign Consumer Plaintiffs assert this claim for revocation of acceptance of their vehicles.  Plaintiffs demanded revocation and the demands were refused.

420.   Plaintiffs and the Classes had no knowledge of such defects and nonconformities, were unaware of these defects, and reasonably could not have discovered them when they purchased or leased their automobiles from Toyota.  On the other hand, Toyota was aware of the defects and nonconformities at the time of sale and thereafter.

421.   Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

422.   There has been no change in the condition of Plaintiffs' vehicles not caused by the defects and nonconformities.

423.   When Plaintiffs sought to revoke acceptance, Toyota refused to accept return of the Defective Vehicles and to refund Plaintiffs' purchase price and monies paid.

424.   Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

425.   These defects and nonconformities substantially impaired the value of the Defective Vehicles to Plaintiffs and the Class.  This impairment stems from two basic sources.  First, the Defective Vehicles fail in their essential purpose because they present an unreasonably high risk of SUA (a risk acknowledged by Toyota's

recall), rendering them unsafe in a very material way. Second, the repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles.

426. Plaintiffs and the Classes provided notice of their intent to seek revocation of acceptance by a class-action lawsuit seeking such relief. In addition, Plaintiffs (and many Class members) have requested that Toyota accept return of their vehicles and return all payments made. Plaintiffs on behalf of themselves and the Classes hereby demand revocation and tender their Defective Vehicles.

427. Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them. Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them, as they must continue using them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

428. Finally, due to the Defendants' breach of warranties as set forth herein, Plaintiffs and the Plaintiff Class assert as an additional and/or alternative remedy, as set forth in CAL. COM. CODE § 2711, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Plaintiff Class of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed under CAL. COM. CODE § 2711.

429. Consequently, Plaintiffs and Class members are entitled to revoke their acceptances, receive all payments made to Toyota, and to all incidental and

consequential damages, including the costs associated with purchasing safer vehicles, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT VIII

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

430.   Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.  This Count is asserted by the Foreign Consumer Plaintiffs.

431.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

432.   Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

433.   Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

434.   The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

435.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

436.   Toyota's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

437.   Toyota breached these warranties as described in more detail above, but generally by not repairing or adjusting the Defective Vehicles' materials and workmanship defects; providing Defective Vehicles not in merchantable condition

and which present an unreasonable risk of sudden unintended acceleration and not fit for the ordinary purpose for which vehicles are used; providing Vehicles that were not fully operational, safe, or reliable; and not curing defects and nonconformities once they were identified.

438.  Plaintiffs and Class members have had sufficient direct dealings with either the Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and Class members' Toyotas are dangerous instrumentalities due to the aforementioned defects and nonconformities.

439.  Plaintiffs Susan Gonzalez and Carl Nyquist participated in Toyota's informal dispute resolution mechanism to completion and fully satisfied any obligations under 15 U.S.C. § 2310(a)(3), and also provided Toyota an opportunity to cure, even though no such opportunity is required in these circumstances.

440.  In this case, requiring an informal dispute settlement procedure, or affording Toyota a reasonable opportunity to cure its breach of written warranties, would be unnecessary and futile.  At the time of sale or lease of each Defective Vehicle, Toyota knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as

warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

441.  Plaintiffs and the Class would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class have not re-accepted their Defective Vehicles by retaining them.

442.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

443.  Plaintiffs seek to revoke their acceptance of the Defective Vehicles, or, in the alternative, seek all damages, including diminution in value of their vehicles, in an amount to be proven at trial.

COUNT IX

BREACH OF CONTRACT/COMMON LAW WARRANTY

444.  The Foreign Consumer Plaintiffs incorporate by reference and reallege all paragraphs alleged herein.

445.  To the extent Toyota's repair or adjust commitment is deemed not to be a warranty under California's Commercial Code, Plaintiffs plead in the alternative

- 201 -

under common law warranty and contract law. Toyota limited the remedies available to Plaintiffs and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota and/or warranted the quality or nature of those services to Plaintiffs.

446.   Toyota breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing a sudden unintended acceleration problem, including those that were recalled, or to replace them.

447.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT X

### FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

448.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

449.   This Count is asserted by the Foreign Consumer Class.

450.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

451.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any

facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

452. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

453. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

454. Defendants still have not made full and adequate disclosure and continue to defraud Plaintiffs and the Class.

455. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Classes' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

456. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage. For those Plaintiffs and the Class who elect to

affirm the sale, these damages, pursuant to CAL. CIV. CODE § 3343, include the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those Plaintiffs and the Class who want to rescind the purchase, then those Plaintiffs and the Class are entitled to restitution and consequential damages pursuant to CAL. CIV. CODE § 1692.

457.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XI

## NEGLIGENCE

458.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

459.   This Count is asserted by the Foreign Consumer Class.

460.   Defendants had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably safe for their intended uses. Defendants had a duty to adequately test its vehicles' safety before selling millions to consumers worldwide. Defendants particularly had a duty to test vehicles for acceleration system problems once Defendants were on notice that its vehicles had a propensity to suddenly

accelerate which can cause and has caused bodily injury, death, and property damage. Moreover, Defendants had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

461.   At all times relevant, Defendants sold, marketed, advertised, distributed, and otherwise placed Toyota Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public.

462.   Defendants were negligent, and breached the duty owed to the Plaintiffs and the Class.

463.   As direct and proximate causes of the breach, Plaintiffs and the Class have been damaged including, but not limited to, the financial loss of owning or leasing the Toyota Vehicles that are unsafe as well as being subject to potential risk of injury.

## COUNT XII

## PRODUCTS LIABILITY – DESIGN DEFECT

464.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

465.   This Count is asserted by the Foreign Consumer Class.

466.   Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Toyota Vehicles and its component parts and constituents, which was intended by the Defendants, and each of them, to be used as a passenger vehicle and for other related activities.

467.   Defendants, and each of them, knew that said vehicle was to be purchased and used without inspection for defects by Plaintiffs and the Class.

468.   The Toyota Vehicles were unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to possible serious injuries.

469.   Defendants designed the Toyota Vehicles defectively, causing it to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

470.   The risks inherent in the design of the Toyota Vehicles outweigh significantly any benefits of such design.

471.   Plaintiffs and the Class were not aware of the aforementioned defects at any time prior to recent revelations regarding problems with Toyota Vehicles.

472.   As a legal and proximate result of the aforementioned defects of the Toyota vehicles, Plaintiffs and the Class have suffered damages including, but not limited to, the financial loss of owning or leasing the Toyota Vehicles that are unsafe as well as being subject to potential risk of injury.

## COUNT XIII

### UNJUST ENRICHMENT
### (BASED UPON CALIFORNIA LAW)

473.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

474.   This Count is asserted by the Foreign Consumer Class for restitution under California law based on Defendants' unjust enrichment.

475.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of

the defect, Defendants charged a higher price for their vehicles than the vehicles'
true value and Defendants obtained monies which rightfully belong to Plaintiffs.

476.   Defendants enjoyed the benefit of increased financial gains, to the
detriment of Plaintiffs and other Class members, who paid a higher price for vehicles
which actually had lower values.  It would be inequitable and unjust for Defendants
to retain these wrongfully obtained profits.

477. Plaintiffs, therefore, seek an order establishing Defendants as
constructive trustees of the profits unjustly obtained, plus interest.

**PRAYER FOR RELIEF**

(a)     Injunctive relief, restitution, statutory, and punitive damages under the CLRA;

(b)     Restitution or restitutionary disgorgement as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3343;

(c)     Injunctive relief, restitution and appropriate relief under CAL. BUS. & PROF. CODE § 17500;

(d)     For appropriate damages for breach of express and implied warranties;

(e)     For revocation of acceptance;

(f)     For damages under the Magnuson-Moss Warranty Act;

(g)     For damages for negligent conduct;

(h)     Punitive damages;

(i)     Attorneys' fees; and

(j)     An injunction ordering Toyota to implement an effective fail-safe mechanism on all vehicles with ETCS.


DATED:  November 1, 2010.

RIBBECK LAW CHARTERED

By:_____/s/ Monica R. Kelly_____
          Monica R. Kelly (Illinois Bar ID 6225920)
          *monicakelly@ribbecklaw.com*
          *mervinmateo@ribbecklaw.com*
          RIBBECK LAW CHARTERED
          505 N. Lake Shore Drive, Suite 102
          Chicago, IL 60611
          Telephone:  (312) 822-9999

          *Lead Counsel for Foreign Economic Loss
          Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED:  November 1, 2010.

RIBBECK LAW CHARTERED

By:_____/s/ Monica R. Kelly_____
Monica R. Kelly (Illinois Bar ID 6225920)
monicakelly@ribbecklaw.com
mervinmateo@ribbecklaw.com
RIBBECK LAW CHARTERED
505 N. Lake Shore Drive, Suite 102
Chicago, IL 60611
Telephone:  (312) 822-9999

*Lead Counsel for Foreign Economic Loss Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PROOF OF SERVICE**

     I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 1, 2010.

/s/ Monica R. Kelly
Monica R. Kelly
