Terrence E. McCartney, Esq.
Rheingold, Valet, Rheingold,
Shkolnik & McCartney LLP
113 East 37th Street
New York, NY 10016
Phone: (212)684-1880
Fax: (212) 689-8156
tmccartney@rheingoldlaw.com

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:    Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation | Case No. 8:10-ML-2151 JVS ✓ (FMOx)<br><br>8:10-CV-1918 JVS (FMOx) |
| This documents relates to: CATHERINE LEBSON v. TOYOTA MOTOR SALES USA, INC., TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., and TOYOTA MOTOR CORPORATION. | **Amended Complaint for Damages**<br><br>**Jury Trial Demanded**<br><br>ECF Case |

Plaintiff, CATHERINE LEBSON, by and through her attorneys, Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP, states as follows:

## PARTIES

1.    Plaintiff CATHERINE LEBSON, at all times mentioned, was and is a resident of Rockland County, New York.

2.    Defendant, TOYOTA MOTOR SALES USA, INC. ("TMS"), at all times mentioned, was and is a California corporation, organized

and existing under the laws of the State of California,
maintaining corporate offices in California but having sufficient
contacts with the state of New York to give this court
jurisdiction.

3.   Defendant TOYOTA MOTOR NORTH AMERICA, INC. ("TMA") was
and is a California corporation, organized and existing under the
laws of the State of California, maintaining corporate offices in
California but having sufficient contacts with the state of New
York to give this court jurisdiction.

4.   Defendant, TOYOTA MOTOR ENGINEERING & MANUFACTURING
NORTH AMERICA, INC. ("TEMA"), at all times mentioned, was and is
a Kentucky corporation, maintaining corporate offices in Kentucky
but having sufficient contacts with the state of New York to give
this court jurisdiction.

5.   Defendant TOYOTA MOTOR CORPORATION ("TMC"), at all
times mentioned, was and is a foreign corporation maintaining
corporate offices in Japan but having sufficient contacts with
the state of New York to give this court jurisdiction.

6.   Defendants TMS, TMA, TEMA and TMC are collectively
referred to herein as "the Toyota Defendants" and "Toyota."  The
Toyota Defendants designed, engineered, developed, manufactured,
assembled, equipped, tested or failed to test, inspected or
failed to inspect, repaired, retrofit or failed to retrofit,
failed to recall, labeled, advertised, promoted, marketed,

2

supplied, distributed, wholesaled, and sold Toyota vehicles, including the vehicle operated by the plaintiff.

## JURISDICTION AND VENUE

7.    The Toyota Defendants, directly and by and through their agents, avail themselves of the privilege of conducting business activities and transactions in New York, deriving significant income from such business, in the County of New York, by placing their products into the stream of commerce with the expectation that they will be purchased and used by consumers in New York, thus having sufficient contacts with the State of New York, in the Southern District of New York, to give this court jurisdiction.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

9.    This Court has diversity jurisdiction by virtue of 28 U.S.C. § 1332.

10.    This Court has venue pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

11.    On or about February 23, 2005, Plaintiff purchased, from Prestige Toyota in Ramsey, New Jersey, a 2005 Toyota Camry, VIN 4T1BE32KX5U534208 ("the subject vehicle"), which was made in Georgetown, Kentucky by the Toyota Defendants.

3

12.   When Plaintiff purchased the subject vehicle it was equipped with an Electronic Throttle Control System ("ETCS-i"). Unlike traditional throttle control systems, where a mechanical throttle linkage physically connects the accelerator pedal assembly to the engine throttle control assembly, the ETCS-i system in the subject vehicle was controlled by electronic signals sent from the accelerator pedal to the engine throttle.

13.   On or about August 20, 2007, at or about 4:57 p.m., Plaintiff Catherine Lebson, driving the subject vehicle, began to pull away from the drive-up window at the CVS drug store located at the Indian Rock Shopping Center in the town of Montebello in Rockland County, New York.  When Plaintiff depressed the accelerator pedal slightly to move the vehicle forward, it suddenly and unexpectedly accelerated forward at a high speed. The vehicle initially struck a curb and then hit another car that was parked in the parking lot.  When the police arrived they told her to turn off her car but later asked her to turn it on again and to back up her vehicle.  When she did that, the vehicle then suddenly and unexpectedly accelerated backwards at a high speed, damaging yet another vehicle.

14.   Despite the fact that Plaintiff was wearing her seat belt, she suffered injuries, including but not limited to multiple lacerations, bruising on the left side of her chest and post-traumatic stress disorder.

4

15.  Toyota misleadingly promised safety and trust, while at
the same time purposely concealed evidence of electronic defects
in its vehicles from the American public, and hid its own
knowledge of an alarming number of incidents of sudden unintended
acceleration ("SUA"), deaths and injuries.

16.  Toyota vehicles with ETCS-i manufactured between 2002
and 2010 were defective in design due to an inadequate fault
detection system.  This fault detection system was not robust
enough to anticipate foreseeable serious unwanted outcomes
including SUA.  Additionally, the ETCS-i systems and their
various components were defectively designed and manufactured in
that they were highly susceptible to malfunction caused by
various electronic failures, including but not limited to short
circuits and electromagnetic interference.

17.  Further, the absence of a brake override system by
itself renders the vehicles defective and unreasonably dangerous,
and the vehicles do not perform as safely as an ordinary consumer
would expect, and the danger is magnified even more by the
susceptibility of Toyota vehicles and their electronic throttle
control systems to electronic-related and/or mechanical-related
computer/software/hardware glitches.  Despite the feasibility and
availability of a "brake override system" whereby driver brake
application will immediately stop any unintended acceleration,
and despite the fact that Toyota's internal documents show that

5

Toyota was aware that the vehicles were defective and presented
an unreasonable risk of serious injury or death in the absence of
a such a system, Toyota negligently and recklessly failed to
install a brake override system in its vehicles.

    18.   Though Toyota vehicles did have floor mat and sticky
pedal problems, a far greater number of vehicles were and are
affected by the design and manufacturing defects described
herein.   Toyota used these floor mat and sticky pedal problems
to downplay and divert attention away from the major design
defects and safety problems with ETCS-i which included the need
for a brake override on the Toyota vehicles.   Instead of
telling the consuming public the truth about its SUA problems
and electronic/software/hardware defects, Toyota highlighted
and promoted the floor mat and pedal recalls as a "smoke
screen" while at the same time misleadingly characterizing the
"reflashing" of the computer software on the recalled vehicles
as a "confidence" boost, rather than acknowledging the serious
safety issues and defects that it was intended to remedy, which
were the defects in the ETCS-i and the lack of brake override.

    19.   From 1998 through 2010 Toyota continuously and
consistently promised safety for their Toyota/Lexus/Scion
vehicles, and repeatedly promised a brand of "trust" to
prospective purchasers of their vehicles.   From 2002 to 2010
Toyota continuously denied any problems with the electronic

6

throttle control systems on their vehicles, while during that
same time period, Toyota received thousands of reports of
unintended acceleration, surging and/or speed control problems
with Toyota/Lexus/Scion vehicles.

20.    In fact, Toyota was forced to disclose to Congress
37,900 complaints of such reported events. A Toyota random
sample of 3,430 such events showed that 1,008 involved
unintended acceleration events, including 233 which resulted in
crashes.  For the entire 37,900 reported events, this would
translate to 2,600 unintended acceleration events with 760
crashes.

21.    From 2002 to 2010 Toyota knew or should have known
that the state of the art in the automotive industry for
electronic throttle control systems included the installation
of a brake override system.  Toyota's own documents show that
as early as 2007, Toyota knew that unintended acceleration
events were preventable by installing a brake override system
in their vehicles.  With a brake override system, if an SUA
event occurs, drivers can override the unwanted acceleration or
surging by simply placing their foot on the brake.

22.    Toyota Manager Koji Sakakibara stated in a document
dated September 1, 2009 that "during the floor mat sticking
issue in 2007 TMS suggested that there should be 'a fail safe
option similar to that used by other companies to prevent

7

unintended acceleration.'"  In fact, the Toyota Acelerator Pedal Project General Manager "said this kind of system will be investigated by Toyota, not by Body Engineering Div." and that "Information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA...in 2008."

23.  Instead of installing a brake override system in 2007 or 2008, Toyota waited until the media and the public heard about the August 2009 unintended acceleration crash in San Diego involving a Lexus vehicle, which killed a CHP officer and three other family members.

24.  Even in late 2009 and early 2010 when Toyota announced a recall involving a brake override, Toyota purposely hid the fact that this redesign was safety related.  Instead, Toyota labeled their recalls "floor mat" and "sticky pedal" recalls with a "throw-in" at the end of the recall about an "override" reflash of the software in the recalled vehicles for consumer confidence purposes.

25. An inventory of statements from Toyota leadership at the highest levels clearly shows that Toyota knows and has known its vehicles present an extreme danger, in that they are susceptible to SUA as a result of defects in their design and manufacture, and confirms that Toyota has acted carelessly and recklessly in addressing this grave danger presented by the defects in their vehicles:

8

- Koji Sakakibara, the TEMA manager, knew in 2007 of the need for a brake override to stop SUA;

- Toyota Motor Corporation's CEO, Akio Toyoda, acknowledged that Toyota had grown "too quick," that their "priorities became confused" and that their rapid growth "resulted in the safety issues described in the recalls we face today";

- Toyota Motor Sales President, James Lentz, admitted that the floor mat pedal recall does "not totally solve" the unintended acceleration problem and that a "brake override system" was the manner in which Toyota was solving the SUA problem starting with 2011 model year vehicles;

- Toyota North America's President, Yoshimi Inaba, conceded that "Toyota has not lived up to its high standards"; and

- Toyota Motor Corporation's Executive Vice President, Shinichi Sasaki concluded that Toyota did not listen to "many voices" of unintended acceleration.

26. As a result of Toyota's marketing campaigns, and the guise of safety created by Toyota, numerous consumers purchased and drove Toyota vehicles, including Plaintiff.

27. Plaintiff, when she purchased her vehicle, was unaware of the vehicle's hidden and potentially lethal defects, of which Toyota was or should have been aware.

## TIMELINE OF KEY EVENTS REGARDING TOYOTA VEHICLES AND SUA

28.   Toyota has been receiving evidence for many years, from a variety of sources, which established that there are serious safety defects in Toyota vehicles, including an alarming increase in the number of complaints, injuries, and deaths, which Toyota knew or should have known were likely caused by SUA.

29.   In the late 1990's, Toyota began to replace its mechanical throttle linkage with a computer-controlled accelerator or "fly-by-wire" system.   From 1998 to 2001, Toyota kept the mechanical throttle system in place as a redundant "fail safe" back-up to the new electronic throttle control systems.   Eventually, Toyota discontinued the mechanical throttle systems and changed to a fully computer-controlled accelerator system.   Complex computer and sensor systems now communicate the accelerator pedal position to the engine control module which in turn interprets the signal to determine the amount of engine torque needed.

30.   In 2003, Toyota sold 6,780,000 vehicles and overtook Ford Motor Company in annual sales to become second in the United States behind only General Motors.

31.   In February 2003, NHTSA conducted its first of many investigations regarding speed control problems in Toyota vehicles.   The first two involved the Camry and Solara models.

10

32.   In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model.   Toyota blamed a "faulty trim panel clip," deemed it an isolated incident, and did not make such information available to NHTSA until five years later in response to a blanket information request by the agency.

33.   In July 2003, NHTSA opened the first probe of sudden acceleration complaints in Lexus sedans at the request of an owner.

34.   In March 2004, NHTSA opened a wider probe into Lexus sedans after another complaint regarding sudden acceleration. NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models.   Toyota succeeded in narrowing the investigation to 11 incidents involving 5 crashes.

35.   In July 2004, NHTSA closed its investigation of the Lexus sudden acceleration complaints without finding a defect. Citing a lack of resources, NHTSA turned down two more requests from consumers to investigate the problem.

36.   In 2005, the auto part supplier CTS began making pedal assemblies for Toyota.

37.   In August 2005, NHTSA conducted an evaluation of the Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

38.   In November 2005, Toyota wrote NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

39.   In 2006, Toyota passed General Motors as the number one brand of cars sold in the United States with 8,800,000 vehicles sold.

40.   In January 2006, NHTSA opened a second investigation of Toyota Camry models and received questionnaires from Camry owners, who reported hundreds of problems with acceleration and braking.   After communicating with Toyota, NHTSA closed the investigation without finding a defect and stated the claims were of "ambiguous significance."

41.   In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

42.   In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles. Toyota represented to NHTSA that there was no abnormality in the throttle control system and blamed water damage.   NHTSA closed this investigation without finding a defect, citing "the need to best allocate limited administrative resources."

43.   In March 2007, NHTSA launched a probe into the floor mats of Lexus models.   Toyota responded by claiming the "issue

12

is not a safety concern." NHTSA also preliminarily reviewed the 2007 Lexus ES for unwanted acceleration due to floor mat interference, but closed the investigation seven months later.

44. In August 2007, NHTSA upgraded its investigation to "engineering analysis," which means the agency would test Toyota vehicles rather than merely review complaints.

45. In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to suspected floor mats that purportedly interfered with the accelerator pedal.

46. In January 2008, NHTSA launched a probe into sudden unintended acceleration in Tacoma pickups after receiving notice of potentially 478 incidents with the 2004-2008 models. In response, Toyota told NHTSA they could not find enough evidence to support allegations and that an investigation was not warranted.

47. In August 2008, NHTSA closed its investigation of the Tacoma without finding a defect, despite hundreds of complaints. This was the eighth investigation of Toyota vehicles since 2003. As of that time, there were over 2,600 complaints made regarding "run away" Toyota vehicles.

48. In April 2009, NHTSA received another petition for an investigation of throttle-control problems in Toyota vehicles unrelated to floor mat issues.

49. On August 28, 2009, California Highway Patrol officer

13

Mark Saylor and his family were killed when his Toyota vehicle (Lexus ES350) accelerated out of control to over 100 mph. A 911 call by a passenger said the car had "no brakes."

50.   In September 2009, NHTSA told Toyota to expect wider recalls of floor mats. Toyota warned consumers to remove floor mats because of a supposed potential to jam the accelerator pedal, purportedly causing SUA.

51.   In October 2009:

- Toyota received reports in the United States and Canada that pedals were sticking in certain models.

- Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

- Akio Toyoda, president of the Japanese parent corporation TMC, issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern. I can't begin to express my remorse."

- The Los Angeles Times published the first of many stories concerning claims of sudden unintended acceleration in Toyota vehicles, including nine NHTSA investigations that included five deaths and hundreds of complaints filed with the

14

federal government.  Toyota then sent letters to consumers regarding the unintended acceleration issue, claiming "no defect exists."

52.  In November 2009:

- Toyota expanded the floor mat recall by over a million vehicles.

- NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect."

- Toyota then publicly apologized for its inaccurate press release.

- Toyota issued another press release denying media reports that a problem existed with the electronic throttle system.

- The Los Angeles Times wrote another article stating that Toyota ignored over 1,200 complaints of sudden unintended acceleration over the preceding eight years.

- Toyota announced a preliminary fix for the "floor mat problem" by cutting off part of the gas pedal and expanded the total number of Toyota vehicles subject to recall to 4.2 million.

- Toyota instructed dealers to remove the gas pedal and shorten it so it would not interfere with floor mats.

15

53.   In December 2009:

•     NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning.

•     NHTSA opened an investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

54.   In January 2010:

•     Toyota announced a brake override software "fix" would be applied to its vehicles globally by 2011.

•     Toyota told NHTSA it may have "an issue" with sticking accelerator pedals.

•     NHTSA told Toyota it must conduct a recall.

•     Toyota issued a recall for sticking accelerator pedals affecting 2.3 million vehicles.

•     Toyota then expanded the pedal recall to include another 1.1 million vehicles.

•     U.S. Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.

•     Toyota told NHTSA it had a fix for the sticky-pedal problem, as well as a permanent fix for the mat problem.

55.   On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating

that preventing the sale of the vehicles was "necessary until a remedy is finalized." Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

56. In February 2010:

• Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.

• Kelly Blue Book said affected Toyota models were devalued as much as 5%.

• Edmunds stated the average devaluation was between 4%-8%.

• Toyota admitted to a brake software problem in 2010 Prius Hybrids.

• Toyota recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty brakes (437,000 vehicles worldwide).

57. Toyota admits that the recalls have not addressed the problem. Indeed, James Lentz, Toyota's second-highest ranking North American executive who works out of the Torrance, CA headquarters of TMS, in response to the question, "[d]o you believe that the recall on the carpet changes and the recall on the sticky pedal will solve the problem of sudden unintended acceleration," answered "not totally." In addition, over 70%

17

of unintended acceleration events have occurred in vehicles not
covered by the recalls.

58.  Akio Toyoda, President and CEO of TMC, in his
prepared testimony before the U.S. House of Representatives
Committee on Oversight and Government Reform on February 24,
2010, admitted that Toyota's growth in recent years was "too
quick" and the company's priorities of "first, safety; second,
quality; third, volume" had become "confused."  Mr. Toyoda went
on to apologize to American consumers, "I regret that this has
resulted in the safety issues described in the recalls we face
today, and I am deeply sorry for any accidents that Toyota
drivers have experienced."

59.  On March 4, 2010, U.S. Representatives Henry Waxman
and Bart Stupak wrote in a letter to Toyota: "We do not
understand the basis for Toyota's repeated assertions that it
is 'confident' there are no electronic defects contributing to
incidents of sudden unintended acceleration . . . There's a
Glitch . . . You really don't know when it's going to occur and
that's the uncertainty which should cause safety concerns."

60.  On March 5, 2010, new data released showed that more
than 60 drivers have complained of sudden unintended acceleration
incidents despite the fact that their cars were repaired by TMC
in the current recalls.  The figures released by NHTSA
significantly increased the total number of complaints involving

18

repaired vehicles.  The new complaints alleged several accidents and at least three injuries resulting from runaway unintended acceleration despite the vehicles' modifications at Toyota dealerships designed to resolve the issue.

61.  As of March 6, 2010, the number of deaths attributed to possible SUA in Toyota cars had risen to 58.  The Detroit Free Press reported that the number of complaints to U.S. auto safety regulators related to SUA had grown to 3,300.

62.  As of March 2010, Toyota reported more than $200 billion in worldwide sales for the fiscal year that ended in March 2010.

63.  Yoshimi Inaba, President and Chief Executive Officer of TMA, likewise acknowledged that Toyota had failed its customers.  Mr. Inaba testified in the Senate Sub-Committee hearings on Toyota recalls:

> "In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts.  As our president, Akio Toyoda, told members of Congress last week, we sincerely regret our shortcomings have resulted in the issues associated with our recent recalls."

64.  Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before Congress that Toyota "did not listen to its consumers:

"How this issue came about is because there were
many vehicle - excuse me - many voices were sent
to us from the customers, but we really did not
listen to every one of them very carefully, one
by one.  We should have really listened to them
carefully and rendered some technical analysis so
that it would be connected to our following
product improvement.  However, the quality of
this work or the efficiency of our work or speed
with which we worked had become sluggish, or sort
[sic] failed gradually, and this has come to a
much larger issue."

65.   On April 5, 2010, NHTSA informed Toyota in a letter
that it was imposing a $16.375 million fine for hiding safety
defects related to sudden acceleration in 2.3 million vehicles.
NHTSA imposed the record fine after finding that Toyota had
failed to notify NHTSA for at least four months after learning
that the accelerator pedals in some of its vehicles could stick
and cause sudden unintended acceleration.  Under federal law,
automakers are required to disclose defects to NHTSA within five
business days.  In its April 5 letter, NHTSA cited how Toyota had
sent instructions to its European operations in September 2009
which explained how to fix accelerator pedals that could stick,
yet decided against similarly notifying U.S. dealers and
government regulators.  The NHTSA letter indicated that Toyota

may have known about the Defects for at least three years.

66.  On April 19, 2010, Toyota agreed to pay the $16.375 million fine imposed by NHTSA.  On April 19, 2010, Secretary Ray LaHood released a statement saying, "By failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

67.  Since 2001, and likely earlier, many people have been injured or have died in accidents relating to the Defects.  While the exact injury and death toll is unknown, due to Toyota's campaign of concealment and suppression, as alleged herein, numerous other drivers and passengers of Toyota vehicles have died or suffered serious injuries and property damage.

68.  Against this backdrop of fraud and concealment, Toyota has, for decades, touted its reputation for safety and reliability, and known that people bought its vehicles because of that reputation, and yet purposefully chose to conceal and suppress the existence and nature of its SUA problem.  Instead of disclosing the truth about the dangerous propensity of Toyota vehicles to suddenly and unintentionally accelerate, consumers were given assurances that their vehicles were safe and defect free.  For example, consumers were given a Warranty and a Maintenance Guide that states:

"At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and

something you depend on every day. That's why we're

dedicated to building **products of the highest quality and

reliability. . . . . . Our** goal is for every Toyota customer to

enjoy **outstanding quality, dependability and peace of mind** .

. . (Emphasis added).

69.   After more than eight years of suppression and

concealment of the existence and nature of the SUA problem,

presumably because it could no longer conceal the rising injury

and death toll, in September, 2009, Toyota admitted there was a

defect in its vehicles that causes sudden unintended

acceleration.  However, Toyota's belated admission only concedes

that some of its models have had sudden unintended acceleration

and resulting crashes, and Toyota continues its plan and scheme

of concealment by denying the existence of the SUA problem in

numerous models which also have suffered sudden unintended

acceleration.  For example, Toyota claims the SUA problem does

"not exist in vehicles in which the driver's side floor mat is

compatible with the vehicle and properly secured."  Toyota knows,

and knew, this was false because Toyota was fully aware that

unintended acceleration had occurred on numerous occasions when

there were no floor mats in the involved vehicles.

70.   Even though Toyota has made a limited admission of a

defect in a limited number of its models, Toyota continues to

manufacture and sell even those models without making the changes

it announced in the October 30, 2009 "Interim Notice," and
without installing a "smart pedal" it promised in that notice.
While it has commenced making the repairs it claims are needed to
correct the acceleration problem in some of its vehicles, it
still has not adequately admitted the full extent of the SUA
problem.  Moreover, there have been scores of reports that the
recall repairs that Toyota claims will fix the problem have not
in fact done so, and that SUA problems persist even after those
so-called repairs have been made.  Upon information and belief,
the reason the recall repairs have not worked is because the
problem is not limited to the causes publicly identified by
Toyota.

71.  As a direct and proximate result of defects in the
subject Camry and the wrongful conduct, acts, omissions, and
fraudulent misrepresentations of the Defendants, Plaintiff
suffered significant harm, conscious pain and suffering, physical
injury and bodily impairment resulting permanent physical
deficits, permanent impairment and other sequelae likely to
continue manifesting in the future.

72.  As a further direct and proximate result of defects in
the subject Camry and the wrongful conduct, acts, omissions, and
fraudulent misrepresentations of the Defendants, Plaintiff has
also incurred medical expenses and other economic harm including
loss of earnings, and lost earning capacity, and will continue to

incur expenses and loss of earnings in the future, as a direct and proximate result of the injuries alleged herein as a result of the use of the subject Camry.

73.   As a further direct and proximate result of defects in the Subject Camry and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of the Defendants, Plaintiff has required medical treatment, and will continue to require reasonable and necessary health care, attention and services, and Plaintiff has incurred, and continues to incur, medical, incidental and service expenses pertaining to the injuries.

74.   The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, wilful and malicious and were done with a conscious disregard for the rights of the Plaintiff and users of Toyota vehicles and for the primary purpose of increasing Defendants' profits from their sale and distribution.  Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.  Prior to the manufacturing, sale and distribution of Toyota vehicles with ETCS-i, including the subject 2005 Camry, Defendants and each of them knew that said products were in a defective condition as previously described herein and knew that those who purchased, leased and/or were passengers in said vehicles would experience

24

and did experience severe physical, mental, and emotional injuries. Further, Defendants and each of them through their officers, directors, managers, and agents, had knowledge that said vehicles presented a substantial and unreasonable risk of harm to the public, and as such, were unreasonably subjected to risk of injury or death. Despite such knowledge, Defendants, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in the product and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects. Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of said vehicles knowing persons would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits. Defendants' conduct was fraudulent, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with wilful and conscious disregard for the safety of Plaintiff, entitling her to punitive damages.

### FIRST CAUSE OF ACTION - STRICT PRODUCT LIABILITY

75.   Plaintiff repeats each and every allegation contained in the prior paragraphs of this complaint.

76.   Defendants designed, engineered, developed,

25

manufactured, assembled, equipped, tested or failed to test,
inspected or failed to inspect, repaired, retrofit or failed to
retrofit, failed to recall, labeled, advertised, promoted,
marketed, supplied, distributed, wholesaled, and sold the subject
vehicle and its component parts, intended to be used as a
passenger vehicle.

77.  The subject vehicle was defective and unreasonably
dangerous at the time the defendants placed it into the stream of
commerce in that it had a propensity to suddenly, unexpectedly
and unintendedly accelerate.

78.  The risks inherent in the design and manufacture of the
subject vehicle outweigh significantly any benefits of such
design and manufacture in that reasonably safe and alternative
designs were available and feasible.

79.  Defendants knew or should have known of the substantial
dangers involved in the reasonably foreseeable use of the subject
vehicle and its component parts whose defective design,
manufacturing and lack of sufficient warnings caused it to have
an unreasonably dangerous propensity to suddenly, unexpectedly
and unintendedly accelerate, thereby causing injury.

80.  Defendants did not properly warn users of the subject
vehicle from the possibly dangerous results of its defective
design and manufacture.

81.  The defects in the subject vehicle were a proximate

26

cause of the injuries suffered by Plaintiff.

82.  By engaging in said conduct, Defendants are strictly liable to Plaintiff.

83.  The conduct of the Defendants was so wilful, wanton, malicious, reckless and in such disregard for the consequences as to reveal a conscious indifference to the clear risk of death or serious bodily injury and merits the imposition of punitive damages.

SECOND CAUSE OF ACTION-<br>BREACH OF EXPRESS WARRANTIES AND<br>THE IMPLIED WARRANTY OF MERCHANTABILITY

84.  Plaintiffs repeat each and every allegation contained in the prior paragraphs of this complaint.

85.  At all relevant times, prior to the subject incident the defendants represented that the subject vehicle was safe for use.

86.  Specifically, the defendants impliedly warranted:

a. the subject vehicle was of a merchantable quality comparable to that generally acceptable in the automobile industry;

b. the subject vehicle was adequately labeled.

87.  Members of the consuming public, including consumers such as the plaintiffs, were intended third-party beneficiaries of the implied warranty of merchantability.

88.  Those representations were false and each of the

defendants breached said warranties.

89.   As a direct and proximate result of these false representations and breaches of warranties, plaintiffs suffered injuries for which the defendants are liable.

### THIRD CAUSE OF ACTION - NEGLIGENCE

90.   Plaintiff repeats each and every allegation contained in the prior paragraphs of this complaint.

91.   The Defendants were negligent in designing, manufacturing, assembling, inspecting, testing, labeling, monitoring, promoting, distributing and selling the subject vehicle and its component parts.

92.   As a proximate result of the foregoing, Plaintiff was injured, including, but not limited to, conscious pain and suffering.

93.   The Defendants are therefore liable to Plaintiff.

94.   The conduct of the Defendants was so willful, wanton, malicious, reckless and in such disregard for the consequences as to reveal a conscious indifference to the clear risk of death or serious bodily injury and merits the imposition of punitive damages.

### FOURTH CAUSE OF ACTION - FRAUD/MISREPRESENTATION

95.   Plaintiff repeats each and every allegation contained in the prior paragraphs of this complaint.

96.   Throughout the relevant time period, Defendants knew

that the subject vehicle was defective in that these vehicles have an unreasonably dangerous propensity to suddenly accelerate and thereby injure the user of these vehicles and others, including Plaintiff.

97.   Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the subject vehicle because:

(1) Defendants were in a superior position to know the true state of the facts about the hidden defect in the subject vehicle, and that the defect was latent;

(2) Defendants made partial disclosures about the safety and quality of the subject vehicle while not revealing their true defective nature; and

(3) Defendants fraudulently and affirmatively concealed the defective nature of the subject vehicle from Plaintiff.

98.   The facts concealed and/or not disclosed by Defendants were material facts that a reasonable person, such as Plaintiff, would have considered to be important in deciding whether or not to purchase and or operate the subject vehicle.

99.   Defendants intentionally concealed and failed to disclose the true nature of the problems with the subject vehicle, and based on this false sense of safety, induced the plaintiff to purchase the subject vehicle.

100. Defendants have not adequately notified past purchasers, such as Plaintiff, or warned future purchasers of the

defect and have not taken appropriate action to recall, buy back or retrofit their defective products.

~~101. As a direct and proximate cause of defendants~~ misconduct, Plaintiff has suffered actual damages.

### ADDITIONAL ALLEGATIONS REGARDING CLAIM FOR PUNITIVE DAMAGES

102. Plaintiff repeats each and every allegation contained in the prior paragraphs of this complaint.

103. At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that the subject vehicle was defective and dangerous.

104. At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that numerous people had been injured or killed by these vehicles, as well as other Toyota trucks and cars with similar SUA defects.

105. The Toyota Defendants designed, engineered, developed, manufactured, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle, and its component parts, a product which said defendants knew to be dangerous and unsafe for its intended purpose as a passenger vehicle.

106. At all times herein mentioned, the Defendants knew, or should have known, that the subject vehicle, and its component

30

parts, was defectively designed and manufactured, that it had extremely dangerous properties and defects, that these defects could cause serious injuries and damage to users of said product, thereby threatening the life and health of the users and that these defects had caused serious injuries and damage to other users of these vehicles.

107. Despite having this actual knowledge, Defendants intentionally suppressed the aforementioned complaints of other users, and other important information, in order to keep such knowledge from the general public, including Plaintiff. Defendants also failed to take any steps to warn Plaintiff or other members of the general public of the dangers of using the subject vehicle and properly investigate complaints.

108. As a legal and proximate result of the said defects and the acts and conduct of Defendants, Plaintiff sustained the injuries and damages described herein.

109. The conduct and acts of Defendants in allowing their dangerous product to be used by members of the general public and in suppressing crucial safety information, constitute fraud and malice and demonstrates a conscious disregard for the safety of Plaintiff and others.

110. Plaintiff is therefore entitled to exemplary or punitive damages, which would serve to punish the defendants and deter wrongful conduct in the future.

31

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally:

a. Compensatory damages on each Cause of Action in an amount according to proof at the time of trial;

b. Punitive damages on each Cause of Action in an amount to according to proof at the time of trial;

c. All together with any interests, pre and post judgment, costs and disbursements;

d. such other and further relief as this Court deems just and proper.

The exact nature and extent of Plaintiffs' damages have not yet been calculated, and Plaintiff will seek leave of Court to amend this complaint to conform to proof at the time of trial.

Dated:    New York, NY
          January 21, 2011

Terrence E. McCartney (TM 9831)
Rheingold, Valet & Rheingold,
Shkolnik & McCartney LLP
Attorneys for Plaintiffs
113 East 37th Street
New York, New York  10016
Phone: (212) 684-1880
Fax: (212) 689-8156
tmccartney@rheingoldlaw.com

32