1   from worldwide consumers and engage in deceptive marketing was made in part, in

2   California, as the ACFPC shows.

3       A complaint is not deficient where it states supporting facts with respect to the

4   allegations against each of the defendants. *Sollberger v. Wachovia Securities*, 2010

5   WL 2674456 at 4 (Cal. June 30, 2010).  Here, although defendants point to specific

6   VIN numbers that begin with certain digits that connotate the place of manufacture

7   (i.e. MR for Thailand), they do not address the deceptive practices that defendants

8

9   engaged in that reached the foreign market.   That is TEMA's manufacturing

10  operations directly impact the operations of Thailand, China, Brazil, South Africa

11  and Turkey as they touted safe products for the manufacture of their cars. Foreign

12  plaintiffs relied on the assertion that Toyota, a known named brand name across the

13

14  world, created presumably safe vehicles. Importantly, there is unity of interest and

15  ownership between the defendants such that the acts of one are for the benefit of

16  others. Toyotas safety promises have spanned over a decade. Their promises of

17  safety began as early as 1990 and continued despite thousands of complaints of

18  acceleration.

19      Defendants' question of "What do the advertisements viewed by Foreign

20  Plaintiffs in their home countries (presumably in their own native languages) have to

21  do with the US marketing allegations that are wrapped into ACFPC?" can be readily

22  answered.  (Defendant's Motion to Dismiss at p. 11)  The advertising and marketing

23  mounted by U.S. Toyota defendants has been in place for years, not merely a few

- 10 -

months.  As illustrated in the ACFPC, the marketing in 1990 focused on the safety

and reliability of Toyota vehicles. This marketing spanned the country and entered

the foreign market.  Such commercials and advertisements created and shot in the

U.S. play with regularity in foreign countries.  Significantly, many of these

commercials are dubbed with subtitles or translated for a foreign viewer.

In fact, it is unbelievable that U.S. Toyota Defendants now purport to be

unaccountable to the vast market they tapped into for over a decade.  For instance,

their logo on the Lexus of three overlapping ovals, is meant to convey a trust

between the customer and Toyota.  (¶ 110 of ACFPC)   This logo marketing

transcends language barriers and easily carries to the foreign market where Toyota

admittedly targeted a portion of their business.  Their assurance of safety was heard

by foreign plaintiffs and was a significant factor in purchasing the product.

The thrust of Defendants' statements over the years of advertising and

marketing is that Toyota vehicles are safe.  This claim transcends the VIN numbers

of where it was manufactured and applies to both global and domestic consumers.

More specifically, their statements convey that Defendants' use of advanced

technology in their vehicles, including ETCS, enhances safety.  Foreign plaintiffs'

allegations, if proven, represent the antithesis of these statements: ETCS   had

resulted in dangerous SUA events.  Nevertheless, each of the foreign plaintiffs have

stated that their primary basis for purchasing their vehicles, regardless of where they

were manufactured or where the cars were leased or sold, was Toyota's insistence

that they were safe.  They saw this sentiment reflected in their respective countries on advertisements, television, in magazines, on billboards, in brochures at the dealership in their respective countries, and on the Internet. (¶¶ 36-78)

Along that vein, their allegation that the foreign plaintiffs "misstate the contents of the documents referenced in the complaint" in order to implicate U.S. Defendants also misses its mark. (Defendants' Motion to Dismiss, p. 13)  When read in its entirety, the ACFPC shows that in a series of Field Technical Reports from 2006 – 2010, a four year period, technicians from Hong King confirmed UA events. (¶ 161) The technicians urged TMS to further investigate the problems since they were highly dangerous and the numerous instances were stacking up.  Whether the report went directly to Japan begs the question of whether the deceptive and fraudulent marketing and advertising practices began with the U.S. Toyota Defendants. As the next several paragraphs exhibit, there was intra-communication between TMNAI and TMS where the SUA events and the floor mat sticking issues were confirmed.  The next several paragraphs show that these claims were then substantiated through Customer Observed Condition, Dealer Investigation and Service Manager Observed Condition. (¶ 162 – 165)

Combined with the statistical data from the NHTSA, the facts alleged in the ACFPC create more than a strong inference that U.S. Toyota Defendants are liable for foreign plaintiffs' significant losses due to the untruths, omissions and, at times, flat out lies generated by Toyota regarding its safety, the standards employed to

guarantee that safety and the product they manufacture, sell and lease. The claims of safety were intended to and did cause individuals to trust the safety of defective vehicles, including foreign plaintiffs, and to purchase them. Thus, U.S. Toyota Defendants' claims should be rejected as foreign plaintiffs have pleaded plausible, factual allegations upon which relief can, and should, be granted.

C. **FOREIGN PLAINTIFFS HAVE ESTABLISHED ECONOMIC LOSS SUFFERED AND CAUSED BY TOYOTA DEFENDANTS**

Foreign plaintiffs attribute incidents of SUA to a number of specified electronic or mechanical issues, including the ETCS, floor mat interference and sticky pedals. The SUA incidents are due to the failure to develop and implement the appropriate fail-safe method and/or the failure to test and validate vehicle systems properly.

As a result of publicity regarding the SUA defect, despite Toyota's attempt to remedy the problem by adding a brake override system as a confidence booster, the value of Toyota cars has diminished. Contrary to U.S. Toyota Defendants' assertion, the ACFPC shows, consistent with *Twombly* and *Iqbal* that the claims of economic loss suggest more than a possibility that the foreign plaintiffs will be able to prove the claims. The inquiry into plausibility is not an all-encompassing examination, at this stage of the pleadings. It is, rather, an inquiry into the believability of the plaintiff's complaint as a whole and will usually only involve a single element of a claim that a plaintiff has directly alleged. *See Wright v. General Mills Inc.,* 2009 WL

3247148 (S.D. Cal. Sept. 30, 2009).  Point in fact, this can be seen in *Twombly* and *Iqbal*, where the Supreme Court employed the plausibility inquiry only as it related to a single element in each case – an agreement in *Twombly* and discriminatory intent in *Iqbal*.  As convenient shorthand, Defendant does not address this analysis but merely adopts vague language from each of these cases. (Defense Motion to Dismiss, p. 14)

Taking the allegations in the ACFPC as true, every Toyota vehicle with ETCS is defective and has a statistically significant propensity for SUA. If a defect causes SUA to manifest itself in a small percentage of Toyota vehicles, it naturally follows that consumers would be less likely to buy or use those vehicles.  All else being equal, prices typically decrease when demand decreases.  Foreign plaintiffs, in this case, contracted for safe vehicles that start and stop when the accelerator is applied and the brake pedals are applied. They received, instead, defective vehicles subject to dangerous SUA events.  In other words, the vehicles sometimes do not start or stop as promised.  Foreign plaintiffs did not receive the benefit of the bargain under this structure.  Further, each of the foreign plaintiffs stated that they would not have paid as much for a vehicle touted as being extremely safe had they known of the defects.

Toyota Defendants' assertion that the foreign plaintiffs fail to properly allege facts showing economic loss does not suffice. As the ACFPC shows, the value of their vehicles has diminished, as one would expect, when the benefit of the bargain is not met. Consequently, this argument should fail.

**D.   THE CALIFORNIA CONSUMER FRAUD CLAIMS SUFFICIENTLY
SATISFY THE PLEADING STANDARD OF FEDERAL RULE OF
CIVIL PROCEDURE 9(b)**

Fed. R. Civ. P. 9(b) requires that circumstances constituting fraud be pleaded with a degree of specificity. That is, a plaintiff "must set forth *more* than the neutral facts necessary to identify the transaction." *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir. 1997) (emphasis in original). Fraud claims must be accompanied by the "who, what, when, where, and how" of the fraudulent conduct charged. *Id.* A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989).

To be sure, the complaint must allege "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained. *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 746 (8th Cir.2002). This higher degree of notice "is intended to enable the defendant to respond specifically and quickly. *Id.*

Here, it is a stretch for Toyota Defendants to claim that they are unaware of the time, place and contents of the false representations. The ACFPC is replete with instances of fabrication and deceit generated by Toyota. To that extent each of the above standards have been met. Toyota Defendants admit that the who and the what has been fully stated in the complaint, but argues that the "where" and "when" are missing. However, the ACFPC shows that various brochures and press releases

touting Toyota safety standards and reliability were released between 2001 –2004. Each of the foreign plaintiffs have averred that they purchased their Toyota based on its reputation and safety. Each of the foreign plaintiffs was aware of Toyota's marketing and purchased their respective vehicles based on the representation they made. In fact, they saw advertisements on television, magazines, billboards, brochures and at the dealerships. (¶ 72-86 of ACFPC)

Importantly, allegations of representations from product labels and statements that, had consumers not been deceived by the labels, they would not have purchased the product, are sufficient to plead under Rule 9(b). *Von Koenig*, 713 F. Supp. 2d at 1077-78. Here, foreign plaintiffs have alleged the "who" (Toyota), the "what" (representations that Toyota vehicles are safe); the "where" and "when" (representations were allegedly made in magazine advertisements, press kits, and brochures), and the "why" (Toyota vehicles have a defect that causes SUA). Thus, the FAL, CLRA, and UCL (fraud theory) allegations are properly pleaded under Rule 9(b).

Accordingly, these claims have been sufficiently pleaded. Defendants' argument to the contrary should be rejected.

## II. FOREIGN PLAINTIFFS HAVE SUFFICIENTLY PLEADED FACTS TO STATE THEIR RICO CLAIMS BASED ON FRAUD   (RESPONSE TO TOYOTA DEFENDANTS' ARGUMENTS A, B AND C)

U.S. Toyota Defendants next claim that the RICO claims in the ACFPC are not based on any AMCC provisions, that foreign plaintiffs engaged in improper

- 16 -

group pleading and that foreign plaintiffs have failed to establish proximate cause. These arguments are addressed together.

To the contrary, the victims of the RICO conspiracy are individuals and entities who purchased, leased, or otherwise acquired vehicles from Defendants various Toyota vehicles. Each of these vehicles, as illustrated in the ACFPC, had a product defect causing a heightened risk or potential of SUA. Toyota not only knew about this product defect or flaw, but continued to advertise, market and sell the vehicles without warning them of the potential dangers. Such deceptive actions resulted in foreign plaintiffs and the class being injured in their business or property. The alleged victims are identified and discussed beginning at ¶36 through ¶79 of the ACFPC and include citizens of Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, and Russia. The class of victims which these individuals seek to represent is defined in ¶297 as "All individuals or entities in Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala and Russia who purchased, own or lease a Toyota vehicle equipped with ETCS." *See also* ¶298 (describing those persons excluded from the putative class).

Each of the foreign plaintiffs have purchased or leased a car with a defect and in a transaction- including purchase or lease- where Toyota did not disclose material facts related to a vehicle's essential purpose - safe transportation. As a result, each foreign plaintiff did not receive the benefit of their bargain and/or overpaid for their

- 17 -

1   vehicles, made lease payments that were too high and/or sold their vehicles at a loss
2   when the public gained partial awareness of the defect.
3
4       Foreign plaintiffs describe how the Defendants' scheme injured them in the
5   ACFPC. Specifically, foreign plaintiffs and other class members received the same
6   standardized misrepresentations, warranties, and nondisclosures about the safety and
7   quality of Defective Vehicles as did domestic consumer plaintiffs.   For example,
8   foreign plaintiff  Eliza Esquivel Lozano, a resident of Mexico, saw advertisements
9   for Toyota vehicles on television, in magazines, on billboards, in brochures at the
10
11  dealership and on the internet several *years* before she made the decision to purchase
12  her Toyota Camry.  (¶ 37)  The safety of the vehicle was one of the overriding
13  factors that weighed in favor of a Toyota vehicle versus a different car.   This is but
14  one of many examples enumerated in the ACFPC.
15
16      Likewise, the foreign plaintiffs have all specifically stated that they would not
17  have purchased the vehicles had they not believed them to be safer than other
18  vehicles. (Defendants Motion to Dismiss, Argument C) It is a well settled principle
19  that when facts permit the inference that the plaintiff was directly harmed by the
20  conduct of the defendants, as in this case, a RICO claim must stand. *Holmes v.*
21  *Securities Investor Protection Corp*, 503 U.S. 258 (1992).  As defendants admit, the
22  design change in some of the Toyota European Vehicles was not implemented across
23  the board with all vehicles, despite the fact that the problem was endemic with all
24  vehicles worldwide. (¶ 335-339)
25
26
27
28

Toyota's misrepresentations were made pursuant to a standardized policy and procedure implemented by Toyota.  Foreign plaintiffs and class members purchased or leased or otherwise acquired Toyotas that they would not have purchased or leased at all, or for as much as they paid, had they known the truth regarding a SUA defect. (¶ 220-280 of ACFPC)  Had foreign plaintiff's known of the defective mechanical and electrical problems of the Toyota's they would have abstained from purchasing, leasing or otherwise acquiring the Toyotas. (¶ 75-86 of ACFPC) Foreign plaintiffs all sustained injury in that they purchased Toyota's based on the false representations made by the U.S. Toyota Defendants. The RICO allegations have been sufficiently pleaded under Rule 9(b).

## III. THE CLAIMS RAISED IN THE AMENDED CONSOLIDATED FOREIGN PLAINTIFFS' COMPLAINT APPLY TO EXTRATERRITORIAL ACTIONS

### A. RICO EXTRATERRITORIALITY

Defendants maintain that RICO should not apply pursuant to the recent Supreme Court decision in *Morrison*.  A brief review of *Morrison* and its progeny is helpful to understand that this is precisely the type of situation where RICO does apply.  In June 2010, the Supreme Court issued a decision in *Morrison v. National Australia Bank*, 120 S. Ct. 2896 (2010). *Morrison* involved foreign Plaintiffs, Australian shareholders, suing the National Australian Bank and several U.S. corporations for securities fraud under the Securities Exchange Act. Notably, before *Morrison*, the lower courts followed the conduct and effects test developed by

- 19 -

1   the 2nd Appellate Circuit to determine when foreign Plaintiffs may sue under the

2   Securities and Exchange Act. However, *Morrison* rejected this test and found that

3
    unless Congress expresses an affirmative intent for a statute to have an
4
5   extraterritorial effect, there is a presumption that the statute only applies to domestic

6   matters. *See Id.* at 2877-78.

7
        While the *Morrison* decision involved a review of the Securities and Exchange
8
9   Act, without any reference to RICO, the 2nd Circuit courts have used

10  the *Morrison* approach in examining the extraterritorial reach of RICO.   For
11
    example, in *Norex Petroleum Ltd. v. Access Industries, Inc.*, the plaintiff sued
12
13  defendants under RICO alleging "a massive racketeering scheme to take over a

14  substantial portion of the Russian oil industry." The defendants filed a motion to
15
16  dismiss on the basis that the "principal actions and events underlying the

17  claim occurred outside of the United States." 2010 WL 4968691 (2nd Cir. Dec. 8,

18
    2010). The Court applied the *Morrison* presumption against extraterritoriality;
19
20  finding that RICO is silent as to extraterritorial application and, therefore, is

21  presumed not to apply to foreign events and actions. The plaintiffs

22
    in *Norex* responded by pointing to the definitions section of RICO which includes
23
24  the following language, "any enterprise which is engaged in, or that activities of

25  which affect, interstate or foreign commerce." However, the court noted that

26
    *Morrison* also rejected that argument, finding that broad language in the definition of
27
28  commerce does not give a statute extraterritorial reach.

- 20 -

In *Cedeno v. Intech Group, Inc.*, the plaintiffs sought damages from Venezuelan government officials and their collaborators who used U.S. banks to "hold, move and conceal the fruits of fraud, extortion, and private abuse of public authority." 733 F. Supp. 2d 471 (S.D.N.Y. 2010). The court cited *Morrison*, finding that the Supreme Court rejected the previous "effects test" and "conduct test" in favor of the presumption against extraterritoriality. The key difference between *Cedeno* and *Norex* is that the court in *Cedeno* made more of *Morrison*'s "focus" analysis, i.e. that courts must look to "the 'focus' of congressional concern" to determine whether or not Congress intended to grant a statute extraterritorial reach. The court determined that the focus of RICO is not in the punishment of multiple criminal acts, but in the way a pattern of racketeering activity affects a corporation. Because, in *Cedeno*, the enterprises and the "impact of the predicate activity" were foreign, the court found that RICO would not apply.

Applying the above cases to the present situation, the pattern of racketeering began, at least, in 1990, when Toyota started its aggressive campaign to promote, advertise and sell Toyota's worldwide on the basis of their safety. That activity, unlike in *Cedeno*, was an enterprise whose impact was both foreign and domestic. That racketeering activity continued when Toyota deliberately concealed the SUA defect. They engaged in the sale, marketing and advertising, making a conscious decision to withhold information from worldwide consumers as well as domestic consumers. The focus of RICO is in the way a pattern of racketeering activity affects

a corporation. *Cedeno*, 733 F. Supp. 2d 471 (S.D.N.Y. 2010). In this case, the foreign plaintiffs have plead sufficient facts alleging that they were harmed by the conduct that occurred in California – namely, the false advertising that began in California, the intentional deceit regarding the number of consumer complaints and accidents and the spurious assurances that the defect was attributable to driver, rather than a defect in the product. Consequently, because Congress intended for RICO to have extraterritorial application, and because the unique activity in this case involves an ongoing racketeering enterprise, defendants' argument fails.

Once again, Defendants ignore the fraudulent conduct of the U.S. Toyota Defendants that led to the distribution, sale and lease of vehicles in other countries. In reality, Toyota actively concealed and did not fix serious safety problems plaguing all ETCS cars worldwide. This deceit originated, continued and was nurtured by the U.S. Toyota Defendants. Contrary to U.S Toyota Defendants' assertions, the key transactions forming the bases for their claims arose out of the U.S., i.e. the investigation into the SUA defects, the response to the acceleration problem, reprimands by the NHTSA for concealing defects, remedies fashioned to address the consumer complaints, response to allegations of covering up the severity of the incidents and revelation of serious defects. (¶ 338-349)

A factor consistently avoided by Toyota Defendants is that it received tens of thousands of complaints from consumers around the world, including foreign plaintiffs. They continued to receive reports of crashes and injuries, which placed

- 22 -

1   them on notice that a serious defect existed. Their response to these defects? Conceal

2   and continue to market worldwide.  To that extent, foreign plaintiffs have established

3   a clear nexus between California, where the subterfuge originated and continued, and

4

5   the conduct and transactions that gave rise to foreign plaintiffs' claims.

6   **B.    MAGNUSON-MOSS WARRANTY ACT**

7        U.S. Toyota Defendants further maintain that the Magnuson-Moss Warranty

8   Act precludes extraterritorial application. The Magnuson-Moss Warranty Act is the

9

10  federal law that governs consumer product warranties. Passed by Congress in 1975,

11  the Act requires manufacturers and sellers of consumer products to provide

12

13  consumers with detailed information about warranty coverage. In addition, it affects

14  both the rights of consumers and the obligations of warrantors under written

15

16  warranties. *See Clemens v. Daimler Chrysler Corp.*, 534 F. 3d 1017, 1022 (9th Cir.

17  2008).  It does not, however, contain explicit language regarding extraterritorial

18  application.  Defendants claim that the claims brought under the Consumer Legal

19

20  Remedies Act ("CLRA"), Unfair Competition Law ("UCL") and False Advertising

21  Law ("FAL") must be dismissed since, according to defendants, California statutes

22  do not apply to extraterritorial actions.  (Defendants' Motion to Dismiss, p. 22)

23

24       Foreign plaintiffs base their express warranty claims not only on the written

25  manufacturer's warranty but also upon numerous statements made by Defendants in

26  the marketing of Toyota vehicles. To create a warranty, representations regarding a

27

28  product must be specific and unequivocal. *See Johnson v. Mitsubishi Digital Elecs.*

- 23 -

*Am., Inc.*, 578 F. Supp. 2d 1229, 1236 (C.D. Cal. 2008) (stating that to create an express warranty, the seller must make representations or promises with sufficient specificity); *Keith v. Buchanan*, 173 Cal. App. 3d 13, 21 (1985) (setting forth factors to consider regarding whether a statement creates a warranty, including amount of specificity and lack of equivocalness)  Here, Toyota made both express and implied warranties. It now seeks to avoid any liability by claiming that the California Consumer Statutes and the Magnuson-Moss Warranty Act do not apply to extraterritorial claims.

Nevertheless, as the ACFPC shows, the foreign plaintiffs have plead sufficient facts alleging that they were harmed by the conduct that occurred in California- namely the subterfuge, lies and misconceptions that were generated regarding the safety of Toyota vehicles. (See ¶ 35-78) Specifically, each of the foreign plaintiffs purchased or leased a car with a defect and in a transaction where Toyota did not disclose material facts related to the vehicle's essential purpose – safe transportation.    These foreign plaintiffs relied on the marketing, brochures and advertising that started in California to purchase their vehicles. The cases relied upon by Defendant all involve non-California residents that could not bring claims under UCL or FAL since the conduct occurred entirely outside the United States. *See Churchill Village, LLC v. General Electric Company*, 169 F. Supp. 2d 1119 (N.D. Cal. 2000); *Norwest Mortgage, Inc v. Superior Court*, 72 Cal. App. 4th 214 (Cal.