1  Steve W. Berman
   *steve@hbsslaw.com*
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
3  Seattle, WA  98101
   Telephone:  (206) 268-9320
4  Facsimile:   (206) 623-0594

5  Marc M. Seltzer, Bar No. 054534
   *mseltzer@susmangodfrey.com*
6  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
7  Los Angeles, CA  90067-6029
   Telephone:  (310) 789-3102
8  Facsimile:   (310) 789-3006

9  Co-Lead Counsel for Consumer Economic Loss Plaintiffs

10 Frank M. Pitre, Bar No. 100077
   *fpitre@cpmlegal.com*
11 COTCHETT, PITRE & MCCARTHY
   840 Malcolm Road, Suite 200
12 Burlingame, CA  94010
   Telephone:  (650) 697-6000
13 Facsimile:   (650) 697-0577

14 Lead Counsel for Non-Consumer Economic Loss Plaintiffs

15

16               UNITED STATES DISTRICT COURT

17               CENTRAL DISTRICT OF CALIFORIA

18                    SOUTHERN DIVISION

19 | IN RE: TOYOTA MOTOR CORP. | Case No.:  8:10ML2151 JVS (FMOx) |
20 | UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | **CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW** |
21 | | |
22 | This documents relates to: | |
   | | Date:        May 16, 2011 |
23 | ECONOMIC LOSS ACTIONS | Time:        3:00 p.m. |
   | | Location:    Courtroom 10C |
24

25

26

27

28

*Public Redacted Version*

# **Table of Contents**

I.      Introduction ................................................................................................1

II.     Standard of Review ....................................................................................3

III.    Statement of Facts ......................................................................................5

        A.      Toyota's Operations in California ....................................................5

        B.      The Fraud Emanated from California.................................................7

                1.      The Deceptive Marketing Communications at Issue Were
                        Developed, Approved, and Disseminated from California. ...........7

                2.      From California, TMS Taught Sales Consultants How to
                        Reinforce the Deceptive Marketing Communications. ................11

                3.      Toyota Received Notice of SUA Problems in California. ...........13

                4.      Defendants' Acts of Concealment Occurred California..............15

        C.      In California, Toyota Rejected Claims by Class
                Members Who Experienced SUA.....................................................16

        D.      In California, Toyota Decided What to Disclose to NHTSA. .............17

        E.      In California, Toyota Evaluated ETCS and Brake-Override Systems
                for the American Market.................................................................18

IV.     Nationwide Application of California Law Is Constitutional in this Case....19

V.      Toyota Cannot Carry Its Heavy Burden of
        Demonstrating that Foreign Law Should Apply. ..........................................22

        A.      Toyota Cannot Show Material Conflicts of Law................................23

        B.      California Has Strong Interests In Deterring
                Unlawful Business Practices of a Resident
                Corporation and Compensating Those Harmed
                by Activities Emanating from California............................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   Toyota Cannot Show a True Conflict Between the Law
of California and States Whose Only Expressed Interest
Is Protecting Consumers. ..................................................................27

D.   Toyota Cannot Carry Its Burden of Establishing That
Any Foreign State's Interests Trump California's
Substantial Interests. .......................................................................28

1.   California's Interests Would Be Most Impaired
Given Its Deep Commitment to Its Consumer
Protection Laws. ........................................................29

2.   Applying California Law Will Maximize the
Attainment of Underlying Purpose by All
Concerned Jurisdictions. ............................................30

3.   California's Special Interest in Regulating
Conduct Within Its Borders Makes Its Interests
Paramount to Other States' Interests. .........................31

VI.   Conclusion ..................................................................................35

1

# **Table of Authorities**

2

## **Cases**

3

*Abogados v. AT&T, Inc.*,
    223 F.3d 932 (9th Cir. 2000) ................................................................ 31

4

5

*Allstate Ins. Co. v. Hague*,
    449 U.S. 302, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981) .................... 19, 20

6

7

*Barquis v. Merchants Collection Ass'n*,
    7 Cal. 3d 94, 101 Cal. Rptr. 745 (1972) ............................................. 29

8

*Chavez v. Blue Sky Natural Beverage Co.*,
    2010 U.S. Dist. Lexis 60554 (N.D. Cal. Jun. 18, 2010) ..................... 21

9

10

*Church v. Consol. Freightways, Inc.*,
    1992 U.S. Dist. Lexis 18234 (N.D. Cal. Sept. 15, 1992) ................... 30

11

12

*Church v. Consolidated Freightways, Inc.*,
    1992 U.S. Dist. LEXIS 18234 (N.D. Cal. Sept. 17, 1992) .............. 22, 31

13

*Clothesrigger, Inc. v. GTE Corp.*,
    191 Cal. App. 3d 605, 236 Cal. Rptr. 605 (1987) .............................. 22

14

15

*Colorado Casualty Ins. Co. v. Candelaria Corp.*,
    2010 U.S. Dist. Lexis 3136 (C.D. Cal. Mar. 31, 2010) ...................... 27

16

17

*Columbia Casualty Co. v. Gordon Trucking, Inc.*,
    2010 U.S. Dist. Lexis 131616 (N.D. Cal. Dec. 13, 2010) ................... 31

18

19

*Consumer Advocates v. Echostar Satellite Corp.*,
    113 Cal. App. 4th 1351, 8 Cal. Rptr. 3d 22 (2003) ........................... 29

20

*Diamond Multimedia Sys., Inc. v. Superior Court*,
    19 Cal. 4th 1036, 80 Cal. Rptr. 2d 828 (1999), *cert. denied*, 527
    U.S. 1003 (1999) ............................................................................... 25

21

22

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) ............................................................. 27

23

24

*Estrella v. Freedom Financial Network, LLC*,
    2010 U.S. Dist. Lexis 61236 (N.D. Cal. Jun. 2, 2010) .................. 25, 26

25

26

*Ferens v. John Deere Co.*,
    494 U.S. 516, 110 S. Ct. 1274, 108 L. Ed. 2d 443 (1990) ................... 3

27

28

*Hayward v. Ventura Volvo*,
    108 Cal. App. 4th 509, 133 Cal. Rptr. 2d 514 (2003) ................................... 29

*Hurtado v. Superior Court*,
    11 Cal. 3d 574, 114 Cal. Rptr. 106 (1974) .............................................. 25

*In re Activision Sec. Litig.*,
    621 F. Supp. 415 (N.D. Cal. 1985) ................................................... 34, 35

*In re Mattel, Inc.*,
    588 F. Supp. 2d 1111 (C.D. Cal. 2008) ................................................... 22

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    257 F.R.D. 46 (D.N.J. 2009) ............................................................ 32

*In re NVIDIA GPU Litig.*,
    2009 U.S. Dist. Lexis 108500 (N.D. Cal. Nov. 19, 2009) ..................... 34, 35

*In re Pizza Time Theatre Sec. Litig.*,
    112 F.R.D. 15 (N.D. Cal. 1986) ....................................................... 30

*In re Seagate Tech. Sec. Litig.*,
    115 F.R.D. 264 (N.D. Cal. 1987) ...................................................... 31

*In re Title U.S.A. Ins. Corp. in Liquidation*,
    36 Cal. App. 4th 363, 42 Cal. Rptr. 2d 498 (1995) ................................. 27

*In re Tobacco II Cases*,
    46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009) ...................................... 29

*Intervention, Inc. v. Avanir Pharamaceuticals*,
    No. A114812, 2007 Cal. App. Unpub. LEXIS 2092 (Cal. Ct. App.
    March 15, 2007) ......................................................................... 22

*Kearney v. Salomon Smith Barney, Inc.*,
    39 Cal. 4th 95, 107, 45 Cal. Rptr. 3d 730 (2006) ............................ 4, 28, 29

*Keilholtz v. Lennox Hearth Prods. Inc.*,
    289 F.R.D. 330 (N.D. Cal. 2010) ................................................... 4, 24

*Kelly v. Microsoft Corp.*,
    251 F.R.D. 544 (W.D. Wash. 2008) .................................................. 19

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941) ............................... 3

*Kwikset Corp. v. Superior Court,*
  51 Cal. 4th 310, 2011 Cal. Lexis 532 (2011) ..................................................29

*Mazza v. American Honda Motor Co.,*
  254 F.R.D. 610 (C.D. Cal. 2008) .......................................................21, 23, 24

*McCann v. Foster Wheeler LLC,*
  48 Cal. 4th 68, 105 Cal. Rptr. 3d 378 (2010).............................................33, 34

*Menagerie Productions v. Citysearch,*
  2009 U.S. Dist. Lexis 108768 (C.D. Cal. Nov. 9, 2009)...........................24, 25

*Norwest Mortgage, Inc. v Superior Court,*
  72 Cal. App. 4th 214, 225 (1999)................................................................27

*Offshore Rental Co. v. Continental Oil Co.,*
  22 Cal.3d 157 (1978)....................................................................................28

*Parkinson v. Hyundai Motor America,*
  258 F.R.D. 580 (C.D. Cal. 2008) .............................................................21, 35

*Pecover v. Electronic Arts Inc.,*
  2010 U.S. Dist. Lexis 140632 (N.D. Cal. Dec. 21, 2010)...........................4, 26

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) ...................19, 20, 24

*Pokorny v. Quixtar, Inc.,*
  601 F.3d 987 (9th Cir. 2010) ..........................................................................4

*Rasidescu v. Midland Credit Mgmt., Inc.,*
  496 F. Supp. 2d 1155 (N.D. Cal. 2007).............................................................4

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.,*
  2008 U.S. Dist. Lexis 95083 (C.D. Cal. Nov. 13, 2008)................................24

*Van Dusen v. Barrack,*
  376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964) ...................................3

*Washington Mutual Bank v. Superior Court,*
  24 Cal.4th 906, 103 Cal. Rptr. 2d 320 (2001)................................................3

*Wershba v. Apple Computer, Inc.,*
  91 Cal. App. 4th 224, 110 Cal. Rptr. 2d 145 (2001) ......................................20

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

1

**Statutes**

2  49 C.F.R. § 579.21 ................................................................................ 17

3  49 U.S.C. § 30166(m) ........................................................................... 17

4
   Cal. Bus. & Prof. Code § 17500 ........................................................... 26
5
   Cal. Civ. Code § 1760 ........................................................................... 26
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

Certain Economic Loss Plaintiffs hereby respectfully request that the Court select California substantive law to govern all claims against Defendants Toyota Motor Corporation ("TMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (together, "Toyota" or "Defendants"), which plaintiffs assert on behalf of themselves and the nationwide Classes they seek to represent.[1]

## I.   **Introduction**

Toyota has conceded, as it must, that "the choice of law rules applicable to each plaintiff must be applied to the claims of that plaintiff," Doc. 325-1 at 3 n.1, which necessarily means that California's choice-of-law rules apply to plaintiffs who filed suit in California.  The issue presented by this motion is whether the Court properly may apply California law to the state-law claims of non-resident plaintiffs and class members.

From the time Toyota vehicles first reached American shores through today, no State has figured more prominently in Toyota's national marketing and sales activities than the State of California, which has been the headquarters of Toyota's marketing and sales operations in the United States since 1957.  The claims asserted in this economic loss litigation arise primarily from those activities.

Toyota systematically bombarded American consumers with advertising and marketing communications that touted the safety and reliability of Toyota vehicles. Plaintiffs allege that those communications were false and misleading.  Those communications are at the center of this litigation.  They were authored and disseminated throughout the nation by TMS, a California corporation, from its headquarters in Torrance, California.  TMS also takes title to and is the reseller of all Toyota vehicles sold in the United States.  Thus, all of the vehicles at issue in this litigation were placed into the American stream of commerce by TMS.  That

---

[1] All of the moving plaintiffs first appeared in this litigation in complaints filed in California.   The moving consumer and non-consumer plaintiffs are listed in Table 1, attached hereto.

1

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

stream—and the deluge of false and misleading communications that sustains it—emanate from Torrance.  TMC is a Japanese company that sells and markets its vehicles through TMS, its wholly-owned indirect subsidiary.  TMC is alleged to be responsible for the actions of TMS. *See, e.g.*, SAMCC ¶ 421 (Doc. 620).

Those facts, standing alone, justify plaintiffs' invocation of California law on behalf of the nationwide class.  Toyota's relationships with California are, however, not limited to these facts but rather range across a wide array of activities taking place in California.  California is where Toyota created training materials used to teach salesmen to emphasize the safety and reliability of the Toyota products they were selling.  California is where Toyota was put on notice of the sudden unintended acceleration ("SUA") problem.  California is where Toyota took steps to conceal that problem.  California is where Toyota rejected claims made by SUA victims.  California is where Toyota made decisions about what SUA incidents to report to NHTSA and how to describe them.  California is where Toyota evaluated and tuned its electronic throttle control system ("ETCS") and new brake-override system for the American market.  The record leaves no doubt that major aspects of the alleged conduct that gives rise to plaintiffs' claims took place in California.  This certainly is true for all of plaintiffs' claims that arise from false and misleading marketing communications, which were authored by TMS and emanated from its headquarters in Torrance, California.

Because Torrance, California is the epicenter for conduct giving rise to plaintiffs' claims, the United States Constitution's modest limitations on choice of law are easily met in this case.  Consequently, California law presumptively applies.  To rebut that presumption, Toyota must persuade the Court that other U.S. jurisdictions have a legitimate interest that is paramount to California's substantial interest in regulating the conduct of a California corporation that took place within its borders.  Because Toyota cannot make that showing, any conflicts of law that might exist are legally irrelevant.

It is therefore respectfully submitted that the Court should select California substantive law to govern the claims of class members nationwide.

## II.    Standard of Review

Because all of the moving plaintiffs (including those who reside out of state) first appeared in complaints filed in California, the Court must apply the same choice-of-law rules that a California state court would apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); *Van Dusen v. Barrack*, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516, 110 S. Ct. 1274, 108 L. Ed. 2d 443 (1990). California state courts apply California's "governmental interest" analysis to multi-state class actions. *See Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 919–21, 103 Cal. Rptr. 2d 320 (2001). Accordingly, California's choice-of-law rules and its governmental interest analysis govern this motion.[2]

Before engaging in that analysis, the Court must first determine whether the application of California law to the claims of class members nationwide satisfies constitutional requirements. In that respect, plaintiffs bear the initial burden of showing that California "has a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests, in order to ensure that the choice of the forum's law is not

---

[2] Toyota repeatedly has argued that because this is an MDL proceeding, the choice-of-law rules of all transferor states should apply. *See, e.g.*, Doc. 520 at 3, 9–11. Toyota is wrong because this motion is brought only by plaintiffs who originally filed suit in California. Only California's choice-of-law rules apply to them because the Court must apply the law of the forum in which <u>the moving plaintiffs</u> first filed suit in deciding this motion. *See In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 142 (E.D. La. 2002) ("[T]he Court looks to the specific action brought before the Court for class certification, namely the Indiana complaint, to determine which state's choice-of-law rules apply."); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006) ("[T]he Court will once again look to the specific action brought before it for class certification—the New Jersey complaint—and will apply New Jersey's choice-of-law rules . . . ."). For additional points and authorities on this subject, we respectfully refer the Court to briefing Plaintiffs submitted earlier in this litigation. *See* Doc. 320.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

arbitrary or unfair." *Washington Mutual*, 24 Cal. 4th at 921.[3]   As discussed in section IV below, that burden is minimal and easily satisfied in this case. Therefore, California law presumptively applies. *See Keilholtz v. Lennox Hearth Prods. Inc.,* 289 F.R.D. 330, 340 (N.D. Cal. 2010); *Pecover v. Electronic Arts Inc*., 2010 U.S. Dist. Lexis 140632, \*53 (N.D. Cal. Dec. 21, 2010); *Rasidescu v. Midland Credit Mgmt., Inc.*, 496 F. Supp. 2d 1155, 1159 (N.D. Cal. 2007)*.*

To rebut that presumption, Toyota bears the burden of showing that "foreign law, rather than California law, should apply to class claims" under California's governmental interest analysis. *Washington Mutual*, 24 Cal. 4th at 921.   That analysis has three steps.

Step 1:  "the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107, 45 Cal. Rptr. 3d 730 (2006).

Step 2:  "if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* at 107–08 (emphasis added). A "true conflict" exists only when another jurisdiction has "a legitimate interest in the application of its law to the circumstances of this case." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010).  If Toyota fails to demonstrate a true conflict, then the Court "may properly find California law applicable without proceeding to the third step of the analysis." *Id.*

Step 3:  "if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more

---

[3] Unless indicated, case citations do not include internal citations or quotations.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

impaired if its policy were subordinated to the policy of the other state." *Kearney*, 39 Cal. 4th at 108 (emphasis added).

In sum, any conflicts of law that might exist are not dispositive.  So long as due process is satisfied, then—despite any conflicts that might exist—the Court can and should apply California law unless Toyota shows that other jurisdictions have a legitimate interest that is paramount to California's substantial interest in having its law applied to this case.  Toyota cannot make that showing.

## III.   Statement of Facts

### A.   Toyota's Operations in California

Toyota entered the United States auto market when two Toyota Crowns arrived in Los Angeles in August 1957.  Ex. A at 166.  Two months later, TMC founded TMS as its "sales and marketing arm for Toyota products in the United States, excluding Hawaii."  *Id.*; Ex. B at 37:6–12, 222:21–24.

TMS has been incorporated under California law and headquartered in what is now the Central District of California throughout its 53-year existence.  Ex. C at 2; Ex. D, Nos. 1–2.  Its first offices were in Beverly Hills, but were later moved to Hollywood.  Ex. A at 166, 168.  After explosive growth in the 1960s, TMS built a new head office building in Torrance in 1967.  *Id.* at 210–11.[4]  To this day, the Torrance campus is the national headquarters for TMS's operations across the United States.[5]

TMS's "nerve center" is in California.  All officers of TMS have offices in Torrance, and in the last 13 years, only three have had a home address outside of California while serving as a TMS officer.  *See* Ex. C at 3; Ex. 43; Ex. B at 293:11–

---

[4] With that growth, TMS became the first foreign automaker in the U.S. to carry out "systematic television advertising campaigns."  Ex. A at 210–11.  One of its early slogans was "Toyota: We're quality oriented."  *Id.* at 211.

[5] The Torrance campus now consists of 13 buildings.  Ex. F at 75:18–76:17.  As of March 31, 2010, TMS's California facilities covered 880,000 square meters (~217 acres), most of which is owned by TMC or its subsidiaries.  Ex. 84 at 50.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

19; Ex. E at 5.   TMC also has a significant management presence in Torrance. Numerous Japanese "coordinators" and executive managers come from TMC in Japan to fulfill senior roles at TMS.   Ex. 42; Ex. B at 31:21–32:13, 237:7–238:11, 240:23–242:2, 252:23–253:6.

From 1998 to the present:

- TMS employed 3–4,000 "associates" in California—more than all other U.S. jurisdictions combined.  *See* Ex. G, attach. A; *see also* Ex. D, No. 18.

- TMC, through NUMMI, manufactured ███████ Toyota Corollas and ██████ Toyota Tacomas in Fremont, California.  Ex. H at 4–5 (filed under seal).  Most if not all of these vehicles were equipped with ETCS.  Ex. I, Nos. 98–100; Ex. 1.[6]

- More Toyota, Lexus, and Scion vehicles entered the U.S. at ports of entry in California (Long Beach and Benicia) than ports of entry in any other U.S. jurisdiction.  Ex. J at 2–3 & attach. A.

- California is home to more authorized Toyota, Lexus, and Scion dealerships than any other U.S. jurisdiction.  Ex. D, Nos. 74–79; Ex. J at 3 & attach. B.

- California consumers purchased or leased more new and pre-owned ETCS-equipped vehicles than consumers in any other U.S. jurisdiction.  Ex. K at 2–3, 12–126; Ex. L at 4–5 & attachs. B–C (filed under seal).

---

[6] In 1984, TMC and GM entered into a joint venture known as New United Motor Manufacturing, Inc. ("NUMMI") to manufacture automobiles in Fremont, California.  Ex. I, No. 102. Although NUMMI was Toyota's first U.S. plant for assembling finished vehicles, Toyota had already been manufacturing component parts in California since 1974 when it established TABC, Inc., its first North American manufacturing plant, in Long Beach.  Ex. D, Nos. 47, 49.  TABC is a California corporation.  *Id.*, No. 46.  It currently produces sheet metal components, steering columns, coated catalytic substrates, and weld sub-assemblies for Toyota's manufacturing facilities.  *Id.*, No. 50.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

- In particular, California consumers purchased or leased ▉▉▉ new and used MY2002–2010 Toyota Camrys, which represents 17% of all such vehicles purchased or leased in the U.S.—far more than any other U.S. jurisdiction. Ex. K at 2–3, 20–21; Ex. L at 4–5 & attach. C (filed under seal).
- TMS paid over $437 million in taxes to the California Franchise Tax Board, which presumably derived from revenues from the sale and lease of vehicles nationwide. Ex. D, No. 7.
- NUMMI received over $10 million from California's Employment Training Panel, making it one of the largest single recipients of such grants in California history. Ex. M at 9.[7]

**B.     The Fraud Emanated from California.**

   **1.     The Deceptive Marketing Communications at Issue Were Developed, Approved, and Disseminated from California.**

Plaintiffs intend to prove at trial that despite notice of the SUA problem (discussed in section III(B)(3) below), TMC, acting through TMS, continued to devise and execute nationwide advertising campaigns and other marketing efforts that touted the safety, reliability, and resale value of its vehicles. *See, e.g.*, Ex. N at 298:25–299:17 (reliability has been a consistent theme in Toyota advertising).

The false and misleading statements that give rise to plaintiffs' claims consist primarily of marketing communications disseminated nationwide, including sales brochures and advertisements in print, broadcast, and online media. Take, for example, the sales brochure for the 2002 Camry, a model purchased or leased by over 375,000 class members. Ex. K at 20–21 (filed under seal). The brochure

---

[7] In addition, major infrastructure improvements have been performed "explicitly for" NUMMI "and to meet its needs." Ex. M at 9. For example, the Port of Oakland was dredged in the late 1990s to accommodate cargo ships that service NUMMI at a cost of $410 million. *Id.*

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

touted the Camry's "incredible dependability and safety features galore." Ex. 228 at 233; Ex. O at 98:12–2.[8]   That brochure, and dozens like it, were statements authored by TMS and distributed by TMS to consumers nationwide.   Ex. P at 83:19–21, 87:2–5, 87:25–88:2, 89:9–19 (referring to Ex. 226 and Ex. 227) (filed under seal).[9]   Similarly, from its offices in Torrance, TMS gave final approval to the dissemination of print advertisements that emphasized the safety of Toyota products.   Exs. 70–74; Ex. O at 109:07–21; Ex. P at 91:13–92:4 (filed under seal). In fact, no national advertisement promoting the sale or lease of Toyota, Lexus, or Scion vehicles in the United States is publicly disseminated until TMS gives the green light.   Ex. P at 94:1–5 (filed under seal).[10]

The fact that the sales brochures and advertisements were statements by TMS, on behalf of itself and TMC, that emanated from California probably is the single most important fact for purposes of this motion.   But by no means does California's connection to the alleged wrongdoing stop there.   California was not just the place where the false and misleading statements originated; it was the breeding ground for those statements, from conception to execution.

The marketing departments for the Toyota, Lexus, and Scion divisions of TMS have been located in Torrance throughout the Class Period.   Exs. 67–69; Ex.

---

[8] Although a few mock-ups of sales brochures happened to be included in Toyota's production pursuant to Order No. 3, Toyota still has not produced any marketing communications in response to Plaintiffs' specific requests for those documents and the Court's Order requiring their production.   *See* Order No. 11 at 4 (Doc. 620) ("Production of sales and marketing documents shall commence on a rolling basis in Phase II and shall be completed in Phase III.").

[9] The fact that TMS authored the marketing communications at issue is confirmed by the fact that TMS copyrighted the materials in its name.   *See* Exs. 70–74; Ex. 226 at 272810; Ex. 227 at 272866; Ex. 228 at 244.   Copyright "vests initially in the author or authors of the work."   17 U.S.C. § 201(a).

[10] Advertising campaigns are approved for dissemination by the TMS Group Vice President for the Toyota division, and individual advertisements are approved by the TMS Vice President for marketing and the manager of the marketing communications group.   Ex. P at 96:4–97:19 (filed under seal); *see also* Ex. 43.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

O at 38:9–23, 40:3–14, 42:25–43:13, 47:23–48:11, 49:23–50:19; Ex. N at 179:19–25.   Those departments are responsible for Toyota's "Tier One" (*i.e.*, national) sales-oriented marketing in the United States.  Ex. O at 25:23–26:10, 27:23–28:8. [11] Their role is to create "images" for Toyota, Lexus, and Scion vehicles in order to support TMC's sales objectives in the United States.  *Id.* at 27:3–17.

Within the Toyota division's marketing department, the members of the marketing communications group depicted on Exhibit 67 are responsible for advertising the Toyota brand.  Ex. O at 8:7–9.  Specifically, that group is responsible for developing marketing strategies, as well as producing and placing national advertising in various media channels.  *Id.* at 7:8–22; Ex. N at 69:18–73:9. Since 2004, it has been the "hub" of the marketing effort for the Toyota division. Ex. O at 7:17, 10:9–19.[12]

The marketing communications group works with the Toyota division's product marketing teams, which also are based in Torrance.[13]   Those teams are responsible for prioritizing vehicle's features into "key selling points."  Ex. 225 at 19 (filed under seal); Ex. P at 77:11–79:20, 81:11–15 (filed under seal).   For

---

[11] Tier One national advertising is supplemented by regional and local advertising. TMS has an active role in influencing the content of those ads, which are subject to the Toyota Dealer Advertising Covenant ("TDAC").  Ex. N at 242:3–243:2; Ex. Q at 84891 ("███████████████████████████████████████████████████████████████████████████████████.") (filed under seal).  The record shows that most, if not all, regional and local advertising focuses on price, special offers, and clearance events such as "Toyotathons."  *See* Ex. Q at 84896–926 (filed under seal); Ex. O at 149:19–153:10.

[12] The marketing departments for the Lexus and Scion divisions are organized somewhat differently, but perform the same functions as the Toyota division's marketing department.  Ex. O at 44:8–50:24; Exs. 68–69.

[13] There are two product marketing teams: one for SUVs and trucks, and one for cars and minivans.  Those groups currently are managed by Kevin Higgins and Rick LoFaso, respectively.  Ex. N at 54:16–55:3; Ex. O at 44:16–24.  Messrs. Higgins and LoFaso are based in Torrance.  *See* Ex. B at 293:11–19; Ex. 43.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

example, key selling points for the 2006 Camry included safety and "QDR"—quality, dependability, and reliability. Ex. 225 at 19; Ex. R at 92:24–93:7.

The marketing effort is also informed by market research, including consumer surveys, focus groups, and clinic research. Ex. N at 82:24–90:10. The 12–15 person team responsible for market research is based in Torrance. *Id.* at 96:3–20. It has always operated out of Torrance. Ex. O at 53:12–19.

The marketing communications group is responsible for managing the advertising agencies that support TMS's Tier One advertising for the Toyota brand. Ex. O at 19:2–13, 57:2–12. Toyota's longtime advertising agency "of record," *i.e.*, lead advertising agency, for the Toyota division has been Saatchi & Saatchi Los Angeles ("Saatchi LA"), also located in Torrance. Ex. N at 151:6–11, 152:13–16, 153:25–154:10; Ex. O at 70:7–13.[14]   Toyota is its exclusive client.   Ex. N at 154:14–17.[15]   The advertising agencies for the Lexus and Scion divisions also are concentrated in California.   Team One, a Saatchi affiliate that is located in El Segundo, has been the Lexus division's agency of record since the Lexus brand was formed. Ex. N at 46:7–16, 149:23–150:7. The Scion division's agency of record is ATTIK. *Id.* at 176:1–5. TMS's main contact with ATTIK is at its offices in San Francisco. Ex. O at 72:2–8.

The enormity of the Toyota marketing machine and the extent to which its wheels turn in California are reflected in the sums TMS pays its ad agencies. During the Class Period, TMS paid its advertising agencies more than ███████

---

[14] "Agency of record" is a term of art that refers to the "main ad agency" with "core responsibility." Ex. N at 176:6–19.

[15] In addition to Saatchi LA, three other advertising agencies serve the Toyota division. Ex. N at 151:12–152:12; Ex. W at 54:8–20. The day-to-day work of two of those agencies (Conill and interTrend) takes place in Los Angeles and Long Beach, respectively. Ex. O at 70:22–71:10. Only one of them (Burrell) is outside California; even so, it typically works with TMS associates located in Torrance. Ex. N 187:7–17; Ex. O at 50:3–7, 54:21–55:5. Burrell's work is demographically focused, Ex. N at 151:12–21, and relatively insignificant as compared to the work of Saatchi LA, as reflected in the amounts TMS pays to its California agencies.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

Of that amount, at least ▮▮▮▮▮—around 92%—went toward the services of agencies located in California.  *See* Ex. K at 3–9 (filed under seal); Ex. GG at 8–9.

Indeed, virtually every relevant step of the advertising process—competitive analysis, market research, setting objectives, conceptual development and approval of ad campaigns, production of specific advertisements, review and approval of specific advertising elements, and placement in media channels—occurs in California.  Ex. N at 157:14–166:22; Ex. O at 104:15–106:8.

### 2. From California, TMS Taught Sales Consultants How to Reinforce the Deceptive Marketing Communications.

Sales consultants at Toyota, Lexus, and Scion dealerships receive training through the University of Toyota (or "U of T"), which has been a department at TMS since 1998 or 1999.  Ex. R at 14:6–11, 31:10–13.  It occupies the Plaza Building on 190th Street in Torrance, but also has offices elsewhere on the TMS campus.  *Id.* at 32:20–33:12, 41:3–10.  Within U of T, primary responsibility for training sales consultants falls to "Lexus College" and the Toyota and Scion Dealer Education Groups.  *Id.* at 35:12–24, 36:24–37:11.[16]  Throughout U of T's existence, approximately 50 people working in those three groups have been dedicated to dealer education.  *Id.* at 39:5–40:13, 41:11–18.

U of T provides courses regarding the Toyota vehicle lineup, how to present product features, and other core skills for sales consultants.  *Id.* at 41:19–42:22.  "Core" courses focus on the primary selling features of Toyota vehicles and which

---

[16]  In addition to U of T, dealerships receive training materials from TMS's used vehicle, fleet, customer retention, and marketing departments, all of which are located in Torrance.  Ex. R at 14:23–21:4, 22:8–18, 23:20–31:9.  For example, the used vehicle department provides information to sales consultants to "help" customers "understand" that Toyota vehicles are a "better value" than the competition.  *Id.* at 24:8–23.  In addition to the sales brochures discussed above, the TMS marketing department provides dealerships showroom display materials, banners, and other "things that help the customer make an informed purchase decision."  *Id.* at 26:6–10.  It also educates TMS's regional offices (who in turn educate dealerships) about the details of upcoming advertising campaigns—again, to help consumers "make informed decisions."  *Id.* at 26:10–27:3, 29:6–30:15.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

include competitive comparisons of safety features. *Id.* at 43:14–44:3, 47:5–48:3.

U of T tracks course completion for purposes of its "certification program." Ex. 248; Ex. R at 50:25–54:1. In order to become certified, TMS requires sales consultants to complete certain courses offered by U of T. Ex. Y at 61:14–62:11. Every certified sales consultant has taken a course developed by U of T that addresses the safety features of Toyota and Lexus vehicles. *Id.* at 91:15–92:13. One such required course is "Why Buy a Toyota" (or, for Lexus consultants, "Why Buy a Lexus"), which was developed by U of T in Torrance. *Id.* at 74:14–75:14, 81:9–12, 84:15–85:4.[17] It covers the features of Toyota's "Star Safety System," which are "among the most important features that . . . a customer would want to know about." *Id.* at 79:1–80:19. The "Why Buy" course also addresses "QDR"—quality, dependability, and reliability. *Id.* at 92:4–93:16.[18]

U of T offers other courses and training materials that address safety and QDR through websites that can be accessed directly by sales consultants. *Id.* at 87:22–88:19, 93:21–96:2; Ex. 249. In addition, U of T publishes "Edge," which compares Toyota vehicles with the competition in terms of safety and QDR "if there is a story there." Ex. R at 126:7–128:9.[19] Edge is effective. According to one

---

[17] TMS offers incentives for sales consultants to become certified. Certified sales consultants are eligible to be "recognized" by the TMS marketing department. Ex. R at 54:13–59:8. Recognition allows sales consultants to designate themselves as being more successful than sales consultants who are not recognized; they also receive plaques, special business cards, monetary rewards of up to $500, and trips to destinations such as Hawaii and the Bahamas. *Id.* at 64:9–70:10, 72:7–74:13.

[18] Why Buy is not the only course sales consultants must complete to become certified. They also must complete product-specific courses that "cover all the primary reasons a customer would buy a product," including safety and QDR. Ex. R at 85:5–86–8, 93:22–94:6. Some product-specific courses also address resale value. *Id.* at 109:3–110:17.

[19] U of T also distributes a newsletter called the "Hot Sheet," which "helps sales consultants understand the product so they can sell cars and truck." Ex. R at 98:12–102:6; *see also* Ex. S at 106:6–107:12 (filed under seal); Ex. 250 (Hot Sheet) (filed under seal).

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

California sales consultant:

> There was a survey not long ago that concluded that price isn't No. 1 on the customer's list, it's No. 4. . . .  That's why, to get off price, I ask questions to find out what matters most to my customers.  For some it's performance.  For some it's safety.  For some it's reliability.  Then I push those hot buttons by using things like evidence manuals, the demonstration drive and Toyota publications such as *Edge* that have a lot of good competitive comparisons.  For example, if you have a father who's concerned about the safety of his family, you focus on crash tests, structural integrity, crumple zones, things like that.

Ex. 252 at 15.[20]

### 3.    Toyota Received Notice of SUA Problems in California.

In his prepared testimony before Congress on February 24, 2010, TMC President Akio Toyoda attributed the SUA recalls in part to the fact that Toyota's "basic stance to listen to customers' voices" had "weakened somewhat" and, as a result, "what we lacked was the customers' perspective."  Ex. T at 2.  That failure to listen to the "customer voice" began in California.

At least 8,754 Toyota drivers reported SUA incidents to Toyota.[21]  As explained below, these complaints ultimately were received by TMS in Torrance.  Plaintiffs intend to prove at trial that a clear message emerged from that process: Toyota vehicles had an unacceptably dangerous propensity to accelerate out of

---

[20]  Exhibit 252 is an issue of "Toyota Today," which is published by TMS's corporate communications department.  Ex. R at 120:2–121:2.  Its editorial staff is based in Torrance.  *Id.* at 123:5–124:5.

[21]  That figure is based on consumer complaints that Toyota determined were SUA-related.  Those complaints were produced to NHTSA and, pursuant to Order No. 3, to MDL plaintiffs in the form of three Microsoft Access databases.  These three databases, which include SUA complaints relating to floor mats, "sticky" pedals, and other potential causes, include 8,754 distinct consumer complaints.  Plaintiffs reserve the right to supplement the record with the databases in the event Toyota disputes this figure.

13

1   control without being commanded to do so.

2       Customers' voices reached TMS directly through its customer relations

3   department, which is located in Torrance.  That department manages the "Customer

4   Experience Center," a telephone call center located on TMS's south campus with a

5   staff of well over 100 people that receive calls and correspondence from customers

6   who have complaints.  Ex. B at 268:20–269:9; Ex. F at 37:2–38:14, 75:11–13,

7   186:25–187:6.  The Customer Experience Center has been contacted by thousands

8   of Toyota customers who experienced SUA.

9       Customers' voices also made their way to TMS through warranty claims

10  processed by TMS's Warranty Operations department, which has been located in

11  California throughout the Class Period.  Ex. U, No.14.  Warranty claims include

12  information about the condition that prompted the customer's request and the

13  dealer's assessment of the cause.  Ex. V at 45:16–46:10.

14      Customer complaints and warranty claims data are made available to TMS's

15  Product Quality and Service Support ("PQSS") group, located in the Toyota

16  Quality Center on 190th Street in Torrance.  Ex. F at 69:24–70:24, 75:9–11, 84:11–

17  20; Ex. 50.  Before Toyota formed the so-called "SMART Team" in 2010, SUA

18  complaints received by Customer Relations went to PQSS's powertrain group.  Ex.

19  F at 69:24–70:21, 106:17–107:13; Ex. 49.  PQSS analyzes the data to monitor

20  trends and look for product problems.  Ex. FH at 81:17–83:22; *see also* Ex. V at

21  113:17–22, 135:15–136:11 (PQSS analyzes warranty data).

22      In addition to data analysis, PQSS engineers go to dealerships to inspect

23  vehicles when, for example, there is a new issue that PQSS wants to know more

24  about but cannot duplicate.  Ex. F at 84:12–85:16.  PQSS also distills reports of

25  product quality issues into "market impact summaries" which summarize the

26  number of contacts TMS has received on a particular issue.  *Id.* at 90:1–19; *see also*

27  *id.* at 91:16–18 (this process has been in place since at least 2001 or 2002).

28

### 4. Defendants' Acts of Concealment Occurred California.

Although Toyota turned a deaf ear to customers' voices, NHTSA sometimes was forced to pay attention if enough consumers complained loudly enough. Each time, Toyota blamed drivers and floor mats, doing everything possible to divert attention from other possible causes of SUA, including concealing the existence of complaints that could not be chalked up to driver error or floor mats.

For example, in 2005, Toyota recalled certain Lexus IS 250s to remedy inadequate clearance between the pedal linkage and a plastic pad embedded in the vehicle's carpet. TMS Quality Compliance Manager George Morino drafted a letter to IS 250 owners regarding the recall, and sent it to a "liaison group" at TMC for review. Ex. 205; *see also* Ex. W at 112:10–19 (TMS prepares owner letters and a liaison group at TMC confirms the content).[22] The draft letter stated that the "condition may interfere with the accelerator pedal returning to the idle position, thereby causing temporary loss of <u>vehicle speed control</u>." Ex. 205 (emphasis added). The liaison group requested that the letter omit reference to "loss of vehicle speed control" and instead refer to "driver distraction." Ex. 206; Ex. W at 106:15–112:19, 115:11–116:2, 117:3–8. Mr. Morino ultimately disseminated a version of the letter that did not mention "vehicle speed control." *See* Ex. X; *see also* Ex. 208 (related letter to dealers that does not mention "vehicle speed control").

A more disturbing act of concealment occurred in 2007 after NHTSA opened an investigation into all-weather floor mats in MY2007 Lexus ES 350s. After NHTSA opened the investigation, Toyota discovered that it had received 38 consumer complaints of SUA in ES 350s. Some of those 38 complaints alleged floor mat interference, but some did not. Ex. Z at 10. For purposes of responding

---

[22] Mr. Morino's position is within PQSS. Ex. 49; Ex. F at 131:3–132:6. He is responsible for implementing recalls and special service campaigns. Ex. Y at 244:12–20. Mr. Morino has resided and worked in California the entire time he has been in that position. Ex. D, No. 111.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

to inquiries regarding the investigation, Mr. Morino and his team drafted a "Q&A,"
which noted the 38 consumer complaints.  *Id.* at 6.  TMC's Mitch Kato recognized
that, as drafted, the Q&A misleadingly suggested that all 38 of the complaints
alleged floor mat interference when in fact that was not true.  *Id.* at 4385.  Rather
than disclose that some of the 38 consumer complaints received by Toyota did not
allege floor mat interference—and therefore could have involved other causes of
SUA—Mr. Morino's team revised the Q&A to state that the complaints "may"
relate to the floor mat issue being investigated by NHTSA.  *Id.* at 20.  They then
congratulated themselves after a "Q&A based response" to a media inquiry
succeeded in deflecting scrutiny.  *Id.* at 15.[23]

## C.    In California, Toyota Rejected Claims by Class Members Who Experienced SUA.

While the marketing department and PQSS departments were were engaged
in preparing and disseminating false and misleading statements about Toyota
vehicles, TMS's California-based legal department was busy wrongfully rejecting
claims made by thousands of class members who had experienced SUA.

Naturally, class members across the United States who experienced SUA
believed there was a problem and asked Toyota to inspect their vehicles and solve
the problem.  Such claims were referred to TMS's legal department, which has
always been located in Torrance.  *See* Ex. AA at 12; Ex. O at 66:22–24.

Time after time, those claims were resolved the same way:  Toyota denied
the problem by way of letters from TMS claims managers who maintain offices at

---

[23] TMS's corporate communications department also took steps to conceal the SUA
problem.   In 2008, facing publicity regarding SUA in Tacomas, TMS Vice
President for Corporate Communications Irv Miller realized that Toyota's response
would require "some creativity."  Ex. EE.  Communications manager Mike Michels
retained an outside consultant to prepare a video that purportedly would
demonstrate that "you cannot override the brakes with the throttle."  *Id.*  By this
time, Toyota was aware of at least one SUA death incident in which the California
Highway Patrol had confirmed that the brakes had been applied for an extended
period of time but failed to overcome the throttle.  Ex. FF.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

1   19001 South Western Avenue in Torrance.  Many of those letters stated that SUA

2   could not possibly occur unless there was "a simultaneous failure of two totally

3   independent systems, namely the brake and the throttle systems," which is

4   "virtually impossible."  *See, e.g.*, Ex. AA at 16, 33.  Toyota's inspection of class

5   members' vehicles conveniently confirmed that both of these systems were

6   "functioning properly."  *Id.* at 36; *see also* SAMCC ¶¶ 329–39 (Doc. 580).

7   **D.   In California, Toyota Decided What to Disclose to NHTSA.**

8   Plaintiffs allege that Toyota violated the early warning requirements of the

9   TREAD Act, as implemented by NHTSA.  *See* 49 C.F.R. § 579.21, *promulgated*

10  *pursuant to* 49 U.S.C. § 30166(m).  NHTSA rules require large auto manufacturers

11  to file quarterly "early warning reports" ("EWRs") with detailed information about

12  incidents involving injury or death where it is alleged that the injury or death was

13  caused by a possible defect in the manufacturer's vehicle.  *Id.* § 579.21(b)(1).  For

14  each incident, the manufacturer must identify "each system or component of the

15  vehicle that allegedly contributed to the incident" using codes prescribed by

16  NHTSA, including a code for "vehicle speed control."  *Id.* § 579.21(b)(2).

17  TMS employees and contractors in Torrance determine what information to

18  report to NHTSA regarding death and injury incidents.  Ex. 232, ¶ 2; Ex. BB at

19  56:6–59.  Those individuals are trained by the TMS legal department in Torrance.

20  Ex. BB at 64:19–65:13, 71:15–72:12.  The incidents are entered into a database

21  maintained by the TMS legal department, which has its own set of codes.  *Id.* at

22  63:11–24.  TMS developed a system for correlating those codes with EWR codes.

23  *Id.* at 70:25–71:9, 72:14–73:13.  This process yields a draft EWR that is sent to

24  TMC for "review and further processing," which simply involves TMC "mak[ing]

25  sure it looks appropriate" and occasionally consulting with the TMS legal

26  department "if they see something unusual" or something is missing from a

27  "clerical" perspective.  Ex. 232, ¶ 3, Ex. BB at 76:23–78:4, 81:8–22, 88:3–8.  TMC

28  consults with TMS before making any changes, but there is no evidence that a

17

1  coding change has ever been made. Ex. BB at 80:15–81:7, 83:16–85:18.[24]

2  **E.      In California, Toyota Evaluated ETCS and Brake-Override**
3  **        Systems for the American Market.**

4      Toyota Technical Center, U.S.A., Inc. ("TTC-USA") is TMC's research and

5  development arm in the United States.[25]   TTC-USA has operations in Gardena,

6  California ("TTC-CA" or "TTC-LA").   Among other things, TTC-CA has a drive

7  train group that evaluates "driveability" from the standpoint of American

8  customers. Ex. CC at 50:19–20, 51:9–16.   The purpose of these evaluations is to

9  "tune" vehicles to the preferences of American drivers. *Id.* at 52:8–53:16.   This

10 includes evaluating the "force-stroke" of the accelerator pedal as it relates to the

11 electronic throttle. *Id.* at 55:17–56:17.   This is a function of algorithms in the

12 engine control module ("ECM"), the brain of ETCS. *Id.* at 104:10–106:20.

13     In fact, in the early 2000 timeframe, TTC-CA studied the ETCS in Toyota

14 vehicles and benchmarked fail-safe mechanisms in competitors' electronic throttle

15 control systems. *Id.* at 74:7–75:22, 76:20–78:5, 81:22–83:16.   And, in a very real

16 sense, TTC-CA has never stopped evaluating ETCS because, when studying

17 driveability, "you can't really not evaluate the ETCS-i since it is a – it's a function

18 that you have to evaluate as well.   So during any driveability evaluations, ETCS-i

19

20 ───────────────
   [24] Under NHTSA rules, Toyota also must report the number of property damage
21 claims and consumer complaints it has received and to code them using the coding
   scheme described above, which includes a code for "vehicle speed control." *Id.*
22 § 579.21(c).   TMS has primary responsibility for receiving and coding these claims.
   Property damage claims are handled the same way as incidents involving injury or
23 death, as described above.   Ex. 232, ¶¶2–3; Ex. BB at 73:17–75:23.   Consumer
   complaints are received by the TMS customer relations department, which codes
24 them and enters them into a database.   Ex. BB at 24:25–25:22, 29:7–20.   TMS
   developed a system for correlating the codes in the customer relations database with
25 EWR codes. *Id.* at 51:12–56:4.

26 [25] TTC-USA was a California corporation from its founding in 1977 until April 1,
   2006.   Ex. CC at 19:5–14.   During that time period, TTC-USA was jointly owned
27 by TMC (80%) and TMS (10%) and two unaffiliated companies (10%). *Id.* at
   28:4–10.   It is still controlled by TMC through subsidiaries. *Id.* at 30:3–9.
28

1    evaluations would be ongoing as well." *Id.* at 77:20–25.[26]

2       TTC-CA's activities are not limited to evaluation.  Indeed, in March 2009,

3 TTC-CA made very specific recommendations to TMC for tuning the Camry's

4 brake-override system after evaluating the effectiveness of its software logic.  *See*

5 Ex. 242 (filed under seal); Ex. DD at 91:14–97:10 (filed under seal).  By that point,

6 TTC-CA had already begun benchmarking and evaluating brake-override systems

7 in competitors' vehicles.  Ex. CC at 102:7–16, 112:23–114:20.  All of this occurred

8 in California.  *Id.* at 120:3–24.  The lack of an adequate brake-override system is a

9 common defect at issue in this case.[27]

10 **IV.    Nationwide Application of California Law Is Constitutional in this Case.**

11       The United States Constitution imposes only "modest" limits on the

12 application of forum law.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105

13 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) (citing *Allstate Ins. Co. v. Hague*, 449 U.S.

14 302, 312–13, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981)); *see also Kelly v. Microsoft*

15 *Corp.*, 251 F.R.D. 544, 550 (W.D. Wash. 2008) (recognizing that the limits are

16 "modest").

17       In *Phillips Petroleum Co. v. Shutts*, the Supreme Court recognized that a

18 single state's law may constitutionally be applied to a nationwide class in two

19 circumstances.  First, if there is no material conflict between the forum state's law

20 and the law of other potentially interested jurisdictions, then there is no

21

22 [26] *See also* Ex. CC at 77:8–12 ("So I would argue that, you know, over the last ten
23 years or so, whenever ETCS-i first got applied on to Toyota vehicles, that TTC-LA
has been in some aspects evaluating ETCS-i.").

24 [27] TMC's 30(b)(6) witness was unprepared to answer questions about certain TTC-
CA activities that plainly were within the scope of the noticed topic.  *See* Ex. 237.
25 Nevertheless, he couldn't deny that TTC-CA (1) employs engine calibration
engineers who diagnose engine control system problems and develop calibration or
26 software logic countermeasures and (2) has recommended modifications to the
software logic of the ECM, the brain of ETCS.  Ex. 240; Ex. CC at 67:4–70:6,
27 62:3–64:22.  Nor could he deny that the ETCS system was modified or tuned as a
result of TTC-CA's testing.  Ex. CC at 78:12–23.
28

19

1  constitutional problem. *See id*. at 816 ("There can be no injury in applying Kansas

2  law if it is not in conflict with that of any other jurisdiction connected to this suit.").

3       Second, <u>even if</u> there is a material conflict of law, application of a single

4  state's law to a nationwide class is constitutionally permissible when that state has

5  "'a significant contact or significant aggregation of contacts, creating state interests,

6  such that the application of its law is neither arbitrary or fundamentally unfair.'"

7  *Id*. at 818–19 (quoting *Allstate*, 449 U.S. at 312–13 (1981)).

8       That this requirement is constitutional in nature does not mean it is difficult

9  to satisfy.  In *Allstate Insurance Co. v. Hague*, the Supreme Court upheld the

10  application of forum law to claims which had only modest connections to the

11  forum.  The plaintiff in *Allstate* sought to apply Minnesota law to claims against her

12  deceased husband's insurance company, based on an accident in Wisconsin in

13  which her late husband was killed.  449 U.S. at 320.  The insurance policies were

14  issued in Wisconsin, the accident occurred in Wisconsin, and, at the time of the

15  accident, both the plaintiff and her husband were Wisconsin residents.  *Id*. at 313–

16  20.  The only connections to Minnesota were that (1) plaintiff had moved to

17  Minnesota before filing suit, (2) her deceased husband had worked in Minnesota

18  and had commuted from Wisconsin to Minnesota for work (although he was not

19  commuting at the time of the accident), and (3) Allstate was present in and doing

20  business in Minnesota.  *Id*. at 313–20.  Despite the overwhelming contacts with

21  Wisconsin and the relatively minimal contacts with Minnesota, the Supreme Court

22  held that Minnesota law could be constitutionally applied to plaintiff's claims.  *Id*.

23  at 320.  *Allstate* demonstrates the very modest restrictions the constitution places on

24  the application of a forum state's law.

25       Based on this minimal standard, California courts and district courts in the

26  Ninth Circuit have held that California law can be applied to a nationwide class

27  when a defendant is based in California and some or all of the challenged conduct

28  takes place within or emanates from California.  *See Wershba v. Apple Computer,*

20

*Inc.*, 91 Cal. App. 4th 224, 243, 110 Cal. Rptr. 2d 145 (2001) (citing California cases that "hold that a California court may properly apply the [UCL and CLRA] to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California"); *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 597–98 (C.D. Cal. 2008) (Stotler, J.) (holding that California's UCL and CLRA could be applied to nationwide class claims against the defendant, which was headquartered in California, because "many of the alleged wrongful acts emanated from . . . California."); *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610, 620, 625 (C.D. Cal. 2008) (Fairbank, J.) (applying California's UCL, CLRA and unjust enrichment law to nationwide class claims against a California corporation with its principal place of business in Torrance, California because "[d]efendant's allegedly deceptive practices originated in, or emanated from, California.").[28]

Plaintiffs' claims against TMS certainly meet this test.   TMS is headquartered in Torrance, California.  And, as detailed in section III above, much, if not all, of the wrongful conduct giving rise to plaintiffs' claims against TMS occurred in or emanated from California.  This includes the deceptive marketing communications, notice and concealment of the broader SUA problem, and decisions about which SUA incidents to report to NHTSA and how to characterize them.  As detailed in section V(B) below, California certainly has a strong interest in regulating misleading marketing campaigns and unfair business practices which emanate from within its borders.

Although defendant TMC is based in Japan, it also has significant contacts with California, such that California law can be constitutionally applied to the

---

[28]  *See also Chavez v. Blue Sky Natural Beverage Co.*, 2010 U.S. Dist. Lexis 60554, *40 (N.D. Cal. Jun. 18, 2010) (Walker, J.) (applying California's CLRA, UCL, and fraud law to claims of nationwide class where "Defendants are headquartered in California and their misconduct allegedly originated in California").

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

claims against it.  TMC marketed and sold all of the vehicles at issue in this case through TMS, its wholly-owned, California-based sales and marketing arm in the United States, which took title to all Subject Vehicles that were distributed in the continental United States.  Ex. D, No. 96.  TMC may plainly be held liable for the conduct of the subsidiary that it condoned.

When a non-resident defendant, like TMC, engages in or directs wrongful conduct in California, California law may be constitutionally applied, especially when it does so in conjunction with a California-based defendant.  *See, e.g.*, *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612–13, 236 Cal. Rptr. 605 (1987) (applying California law to California and non-California defendants based on California conduct); *Intervention, Inc. v. Avanir Pharamaceuticals*, No. A114812, 2007 Cal. App. Unpub. LEXIS 2092, *7–11 (Cal. Ct. App. March 15, 2007) (applying California law to California and Pennsylvania defendants where they "jointly agreed upon a marketing plan" and "[m]any of [the] representations, which are the centerpiece of the class claims of false advertising, emanated from California"); *Church v. Consolidated Freightways, Inc.*, 1992 U.S. Dist. LEXIS 18234, *15–16 (N.D. Cal. Sept. 17, 1992) (applying California law when many, but not all, of the defendants resided in or conducted business in California and certain of the alleged misrepresentations emanated from California).  *Cf. In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (finding sufficient California contacts by non-California defendant, Fisher Price, to apply California's UCL to non-California plaintiffs).

## V.     Toyota Cannot Carry Its Heavy Burden of Demonstrating that Foreign Law Should Apply.

As explained in section II above, because the nationwide application of California law is constitutional in this case, California law presumptively applies. The burden shifts to Toyota to show that (1) the applicable rule of law in each potentially concerned jurisdiction <u>materially</u> differs from California law, (2) each

22

1   other jurisdiction has an interest in having its laws applied to this case, thereby

2   creating a "true conflict"; and (3) those jurisdictions' interests would be more

3   impaired than California's interests if their law is not applied in this case.  Toyota

4   cannot carry that substantial burden.

5          **A.    Toyota Cannot Show Material Conflicts of Law.**

6         Plaintiffs need not demonstrate the absence of conflicts of law; the burden is

7   on Toyota.   Accordingly, this submission does not survey non-California

8   counterparts to the California claims plaintiffs have asserted.  We do, however,

9   invite the Court's attention to cases in which defendants tried but failed to

10  demonstrate material conflicts.   These decisions underscore the significance of

11  Toyota's burden at the first step of the governmental interest analysis.

12        In certifying a nationwide class of car owners and lessees pursuing CLRA,

13  UCL, and FAL claims based on Honda's omissions with respect to its Collision

14  Mitigation Braking System, this Court, in *Mazza v. American Honda Motor Co.*,

15  *supra*, 254 F.R.D. at 621, found that Honda did not carry its burden with respect to

16  the first (or any) step of the "government interests" test.   Honda argued that the

17  UCL differed from the consumer protection statutes of other states based on

18  varying reliance requirements, forms of relief, necessity of showing scienter, pre-

19  filing notice requirements, and statute of limitations.   This Court held that these

20  differences were immaterial:   "Although Defendant has pointed out variations

21  between California law and the relevant law in the other jurisdictions, the Court

22  finds that Defendant has not met its burden of showing that the differences between

23  California law and the law of other jurisdictions are material."  *Id.* at 622 (emphasis

24  in original).   For example, "a CLRA violation, which serves as a predicate UCL

25  violation under the UCL's unlawful prong, provides for each of the remedies that

26  Defendant contends would be unavailable with the application of California law to

27  a nationwide class."  *Id*.

28

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

Similarly, in certifying a nationwide class of consumers pursuing CLRA and UCL claims based on misrepresentations and omissions in the sale of glass-enclosed gas fireplaces, the court in *Keilholtz v. Lennox Hearth Products Inc.*, 2010 U.S. Dist. Lexis 14553 (N.D. Cal. Feb. 16, 2010), found that the defendants failed to carry their "substantial" burden at the first step of the governmental interest test. "Defendants argue that the consumer protection statutes of the non-forum states are different from those of California and they attach an appendix which catalogues state-by-state variations involving reliance, scienter, damages and other elements necessary to Plaintiffs' claims." *Id.* at *27. But "Defendants have not met their burden of showing that the differences between California law and that of the other jurisdictions are material." Like this Court in *Mazza*, the court in *Keilholtz* rejected the argument that California consumer protection laws do not afford the same remedies as the laws of other jurisdictions because "a CLRA violation, which serves as a predicate to a UCL violation under the UCL's unlawful prong, provides for each of the remedies that Defendants contend would be unavailable with the application of California law to a nationwide class." *Id.* at *28. [29]

---

[29] Although some courts have found material differences between the law of fraud and warranty in California and those in other states, they ultimately found that the defendants failed to carry their burden at Step 3 of the governmental interest test. *See* sections V(D)(2)–(3) below (discussing *In re Seagate*, *In re Activision*, and *In re NVIDIA*). In *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 U.S. Dist. Lexis 95083 (C.D. Cal. Nov. 13, 2008), this Court noted that there are material conflicts between the California law of unjust enrichment and fraud and the laws of other states. In *Rivera*, however, the Court did not conduct a governmental interest analysis. It was unnecessary to do so because, unlike this case, there was no showing that California had significant contacts with the claims of non-resident class members for purposes of *Shutts*. *Id.* at *2. Moreover, plaintiffs did not dispute there were differences in the relevant laws. Instead, plaintiffs argued that the differences were not material because the differences "can be managed with appropriate subclasses and jury instructions" without providing the Court "with sufficient details regarding these subclasses and instructions." *Id.* at *2–3. As explained in sections III–IV above, in this case, plaintiffs have carried their burden of showing that federal constitutional requirements are satisfied, which shifts the burden to Toyota to rebut the presumption that California law applies.

And again in *Menagerie Productions v. Citysearch*, 2009 U.S. Dist. Lexis 108768 (C.D. Cal. Nov. 9, 2009) (Snyder, J.), this Court determined that "California's UCL can be applied to the nationwide class, as Citysearch has not shown that any differences between California law and the law of other jurisdictions are material." *Id*. at *52 (certifying a nationwide class of pay-per-click advertisers pursuing UCL claims against the defendant website for failing to detect and prevent "click fraud"); *see also Estrella v. Freedom Financial Network, LLC*, 2010 U.S. Dist. Lexis 61236, *20 (N.D. Cal. Jun. 2, 2010) (Illston, J.) (applying UCL nationwide "because defendants have failed to point to any actual conflict in another state's unfair competition law"). Because Toyota cannot show that material conflicts of law exist, it fails Step 1 of the governmental interest analysis.

> **B.    California Has Strong Interests In Deterring Unlawful Business Practices of a Resident Corporation and Compensating Those Harmed by Activities Emanating from California.**

State and federal courts have recognized California's strong interests in regulating the conduct of resident businesses and compensating plaintiffs—including out-of-state plaintiffs—injured by activities emanating from within the state. The California Supreme Court has articulated California's "clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and throughout the country." *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1063, 80 Cal. Rptr. 2d 828 (1999), *cert. denied*, 527 U.S. 1003 (1999). "California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." *Id*. at 1064. The California Supreme Court has specifically acknowledged "the importance of extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California." *Id*. at 1064–65 (citing *Clothesrigger*, 191 Cal. App. 3d at 615); *see also Hurtado v. Superior Court*, 11 Cal. 3d 574, 584, 114 Cal. Rptr. 106 (1974) ("[W]hen the defendant is a

25

resident of California and tortious conduct giving rise to the [out-of-state plaintiff's claim] occurs here, California's deterrent policy of full compensation is clearly advanced by application of its own law.").

District courts in this Circuit have identified California's interests in deterring deceptive conduct emanating from within its borders and compensating all those injured by activities emanating from California.  For example, in *Pecover v. Electronic Arts Inc*., 2010 U.S. Dist. Lexis 140632 (N.D. Cal. Dec. 21, 2010) (Walker, J.), the court certified a nationwide class of consumers pursuing UCL claims based on the defendant's anticompetitive conduct in the sale of football-based interactive video games.  In applying the second step of the governmental interest test, the district court determined that California courts "have recognized California's interest in entertaining claims by nonresident plaintiffs against resident defendants."  *Id*. at *55.  "California, for purposes of its UCL, has a clear and substantial interest in preventing fraudulent business practices in this state and a legitimate and compelling interest in preserving a business climate free of deceptive practices."  *Id*. at *56.  "For this reason, the state has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California."  *Id*.; *see also* CAL. CIV. CODE § 1760 (underlying purpose of CLRA is to "protect consumers against unfair and deceptive business practices"); CAL. BUS. & PROF. CODE § 17500 (FAL expressly applies to claims of non-residents deceived by representations "disseminated from this state before the public in any state").

Likewise, in *Estrella v. Freedom Financial Network, LLC*, *supra*, 2010 U.S. Dist. Lexis 61236, the court certified a nationwide class of consumers pursuing UCL claims based on the defendants' false advertising of its debt reduction program.  In applying the second step of the governmental interest test, the court stated that "California has a clear and substantial interest in preventing fraudulent business practices in this state and a legitimate and compelling interest in

26

preserving a business climate free of fraud and deceptive practices, and for that reason has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California." *Id*. at *20 (quoting *Norwest Mortgage, Inc. v Superior Court*, 72 Cal. App. 4th 214, 225 (1999); *see also Colorado Casualty Ins. Co. v. Candelaria Corp*., 2010 U.S. Dist. Lexis 3136, *20 (C.D. Cal. Mar. 31, 2010) (Phillips, J.) (describing California's "clear interest" in applying its law "to culpable conduct within its borders" and "punishing wrongdoers and deterring malicious conduct within its borders").

### C. Toyota Cannot Show a True Conflict Between the Law of California and States Whose Only Expressed Interest Is Protecting Consumers.

Where the interests of the forum and foreign states are the same, *i.e.*, to protect consumers, there is no "true conflict" for purposes of step two of the governmental interest test, *Kearney*, 39 Cal. 4th at 107–08, because applying California law will advance the judicially recognized common interest of each state's statute, *see, e.g.*, *In re Title U.S.A. Ins. Corp. in Liquidation*, 36 Cal. App. 4th 363, 372–73, 42 Cal. Rptr. 2d 498 (1995) (applying California law where "there is no conflict in the policies behind each state's law" because "we are confronted with similar statutory schemes designed to further the same state interest").

Similarly, there is no true conflict and "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery." *Wershba*, 91 Cal. App. 4th at 243; *see also Hurtado*, 11 Cal. 3d at 580 ("Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied."); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1006–07 (9th Cir. 2001) (applying California law where foreign state "had no interest in limiting the extent of relief that its residents could obtain for a wrongful act against them in

27

California"); *Menagerie Productions*, 2009 U.S. Dist. Lexis 108768, at *52 ("California's UCL can be applied to the nationwide class, as Citysearch has not shown that . . . other states have an interest in applying their laws in this case.").

For example, the court in *Mazza* determined that Honda had not established a true conflict because it had "not identified a state with an interest in <u>denying</u> its citizens recovery under California's potentially more comprehensive consumer protection laws, nor has Defendant identified prospective class members who will be less protected under California law than under their own states' consumer protection statutes." 254 F.R.D. at 623 (emphasis in original); *see also Parkinson*, 258 F.R.D. at 598 (because "California's consumer protection laws are among the strongest in the country . . . the Court does not find a conflict between California's consumer protection laws and the applicable laws of the non-forum states").

Thus, even if Toyota were to establish material differences between California and other states' laws, it will still fail at Step 2 unless it can show that each foreign jurisdiction has an "interest in the application of its own law under the circumstances of the particular case" so as to create a true conflict with California's interests in deterring deceptive conduct emanating from within its borders and compensating all those injured by that conduct. *Kearney*, 39 Cal. 4th at 107–08; *see also Offshore Rental Co. v. Continental Oil Co.*, 22 Cal. 3d 157, 163 (1978) ("Only if each of the states involved has a legitimate but conflicting interest in applying its own law will we be confronted with a 'true conflicts' case.").

**D.      Toyota Cannot Carry Its Burden of Establishing That Any Foreign State's Interests Trump California's Substantial Interests.**

Even if the Court were to conclude that material differences between the laws of California and foreign states create a "true conflict," the third step of the governmental interest test, *i.e.*, the comparative impairment analysis, requires application of California law because California's interests would be most impaired were its law not applied. *Kearney*, 39 Cal. 4th at 108; *Offshore Rental*, 22 Cal. 3d

28

1    at 164–65 ("The comparative interest approach to the resolution of such conflict

2    seeks to determine which state's interest would be more impaired if its policy were

3    subordinated to the policy of the other state.").

4              **1.     California's Interests Would Be Most Impaired Given Its**

5              **Deep Commitment to Its Consumer Protection Laws.**

6              An important consideration in the comparative interest inquiry is how

7    "strongly held" the state's interest is and "the current status of a statute," because a

8    statute "infrequently enforced or interpreted . . . should have limited application in a

9    conflicts case."  *Offshore Rental*, 22 Cal. 3d at 165–66.  California's consumer

10   protection laws have been consistently and frequently applied to protect consumers

11   and deter deceptive conduct.  In two recent decisions, the California Supreme Court

12   explicitly reiterated these purposes with respect to the UCL.  *See Kwikset Corp. v.*

13   *Superior Court*, 51 Cal. 4th 310, 2011 Cal. Lexis 532, *12 (2011) ("Its purpose is to

14   protect both consumers and competitors by promoting fair competition in

15   commercial markets for goods and services."); *In re Tobacco II Cases*, 46 Cal. 4th

16   298, 312, 93 Cal. Rptr. 3d 559 (2009) (describing UCL's "goal of deterring unfair

17   business practices" and "protecting the general public against unscrupulous

18   business practices").  This "clear design to protect consumers" goes back decades.

19   *See, e.g.*, *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 110, 101 Cal. Rptr.

20   745 (1972).

21             As for the CLRA, California courts have echoed the legislature's intent that

22   the Act be liberally construed to "to protect consumers against unfair and deceptive

23   business practices."  *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.

24   App. 4th 1351, 1360, 8 Cal. Rptr. 3d 22 (2003); *accord Hayward v. Ventura Volvo*,

25   108 Cal. App. 4th 509, 513, 133 Cal. Rptr. 2d 514 (2003).

26             Thus, California's commitment to its consumer protection laws is robust, and

27   "California must be viewed as having a strong and continuing interest in the[ir] full

28   and vigorous application."  *Kearney*, 39 Cal. 4th at 125.

**2.     Applying California Law Will Maximize the Attainment of Underlying Purpose by All Concerned Jurisdictions.**

"Another chief criterion in the comparative impairment analysis is the maximum attainment of underlying purpose by all governmental entities." *Offshore Rental*, 22 Cal. 3d at 166.  Because California's interest in protecting consumers injured both inside and outside of its borders by deceptive practices emanating from California aligns with foreign states' interests in protecting their resident consumers, as discussed above in section V(C), application of California consumer protection statutes achieves maximum attainment of underlying purpose by all of the states.

For example, in *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15 (N.D. Cal. 1986),[30] the court certified a multi-state class of shareholders suing under the California common law of fraud in connection with a debenture offering.  The court assumed arguendo that defendants satisfied Steps 1 and 2, and then determined that they had failed to carry their burden with respect to Step 3.  The district court explained that the claims were "complex and expensive to litigate" so that it was "highly unlikely that any plaintiff will bring an individual suit in California or any other interested jurisdiction."  *Id*. at 20.  Against that backdrop, the court determined that the "defendants cannot show that any jurisdiction has a greater interest in applying its own law than in assuring the maintenance of a class action." *Id*.  It concluded: "the maximum attainment of the underlying purposes of all the states will be achieved best by certifying the class."  *Id*.

Similarly, in *Church v. Consolidated Freightways, Inc*., 1992 U.S. Dist. Lexis 18234 (N.D. Cal. Sept. 15, 1992), the court certified a nationwide class of employees suing under the California common law of fraud for their employer's

---

[30]  *Pizza Time* was criticized on other grounds by *Washington Mutual*, 24 Cal. 4th at 921, n.8, to the extent it suggested that choice-of-law disputes need not be resolved at the time of class certification.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

misleading recommendation that they participate in its tender offer to acquire a subsidiary. "Having reviewed the exhaustive briefing on the laws of various jurisdictions," the Court was "not entirely convinced that defendants have met their substantial burden of establishing a true conflict of law regarding the deceit claims." *Id*. at *13. But "even assuming a true conflict," defendants have not met their burden because "California has a strong interest in preventing fraud by corporations residing and conducting business in California" and ["e]ach jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's law than not litigated or compensated at all." *Id*. at *13–14; *see also In re Seagate Tech. Sec. Litig*., 115 F.R.D. 264, 271 (N.D. Cal. 1987) ("foreign states will generally have a greater interest in having the injuries of its citizens compensated under another state's law than not at all").

> **3.      California's Special Interest in Regulating Conduct Within Its Borders Makes Its Interests Paramount to Other States' Interests.**

In performing the comparative impairment analysis, courts "consider each jurisdiction's <u>relevant</u> contacts." *Columbia Casualty Co. v. Gordon Trucking, Inc*., 2010 U.S. Dist. Lexis 131616, *20 (N.D. Cal. Dec. 13, 2010) (emphasis added); *see also Abogados v. AT&T, Inc*., 223 F.3d 932, 936 (9th Cir. 2000) ("a company's contacts with a state that are not significantly related to the cause of action at issue are an insufficient basis for the application of that state's law"). Consideration of those contacts makes clear that California has more and greater interests in having its laws applied in this case.

To begin with, as explained in section III(A) above, TMS is a California company through and through. It has been incorporated and headquartered in California for more than five decades. During the Class Period, TMS paid over $437 million in taxes to the California Franchise Tax Board, which presumably derived from revenues from the sale and lease of vehicles nationwide. Ex. D,

31

No. 7. California has a superior interest in regulating the conduct that contributes so substantially to its public coffer. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 59 (D.N.J. 2009) ("The revenue received by the company was subject to New Jersey taxes, giving that state and economic stake in the outcome of this litigation beyond those of others . . . ."). No other state shares that interest— certainly, at least, not anywhere close to the magnitude of California's interest.

Further, as explained in section III(B)(1) above, Toyota's misrepresentations and omissions regarding the safety and reliability of its vehicles emanated from Torrance. These misrepresentations and omissions form the core of plaintiffs' CLRA, UCL, FAL, fraud, and advertisement-based warranty claims. California's weighty interest in deterring and remedying that conduct would be most impaired if those laws were not applied. With respect to the claims for breach of implied warranty and express warranty (based on Toyota's written warranty), California's contacts are stronger than any other state because TMS's customer relations, warranty operations, and product quality departments were put on notice of the SUA problem in California and rejected SUA claims from California. *See* section III(C) above. No U.S. jurisdiction has greater ties to this conduct than California.[31]

Indeed, the California Supreme Court recently explained that "when the law of the other state limits or denies liability for the conduct engaged in by the defendant <u>in its territory</u>, that state's interest is predominant," but "in other instances in which a defendant is responsible . . . through its conduct <u>in California</u>, this general principle would allocate to <u>California</u> the predominant interest in

---

[31] Plaintiffs are mindful of the Court's comments at the January 14, 2011, hearing where the Court noted the possibility that California law might apply to a nationwide class as to the certain claims, but not as to others, Ex. HH at 99:25– 100:8, and posed the question of "whether there is some subset of California claims that could be tried on a national basis." *Id.* at 100:15–17. Although, as set forth in this brief, Plaintiffs believe California law should govern all of their state-law claims, should the Court, for example, find that only certain claims can be litigated under California law on behalf of the proposed nationwide class, Plaintiffs will address any remaining choice of law issues at the class certification stage.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

regulating the conduct." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 101, 105 Cal. Rptr. 3d 378 (2010) (emphasis in original). In other words, the greater the contacts with the forum state, the more impaired its interests will be if its laws are not applied.[32]

In *McCann*, the California Supreme Court held that Oklahoma law would be more impaired where California's contact to the claim was limited to the fortuity of the plaintiff having moved here many years after his exposure to asbestos in Oklahoma. In this case, by contrast, California's contacts arise from Toyota choosing California as the headquarters to oversee its sales and marketing in California and the rest of the United States. *McCann* explained that because "a commercial entity protected by the Oklahoma statute of repose has no way of knowing or controlling where a potential plaintiff may move in the future, subjecting a defendant to a different rule of law based upon the law of the state to which a potential plaintiff ultimately may move would significantly undermine Oklahoma's interest in establishing a reliable rule of law governing a business's potential liability for conduct undertaken in Oklahoma." *Id.* at 98.

Conversely, in certifying a nationwide class in *Parkinson*, the court rejected defendant's argument that "California does not have a greater interest than other states in applying its law." 258 F.R.D at 598. The court explained that the plaintiffs "allege that the wrongful acts underlying those claims emanated from

---

[32] In *McCann*, the plaintiff was exposed to asbestos at an Oklahoma oil refinery while working in Oklahoma. 48 Cal. 4th at 74. The New York defendant had designed, manufactured, and provided advice regarding the installation of a boiler at the refinery. *Id.* Eighteen years later, the plaintiff moved to California, and forty-four years after the alleged exposure, he brought suit in California state court. *Id.* The court held that Oklahoma law, rather than California law, should apply. *Id.* at 76. In conducting the governmental interest analysis, the court determined there was a material difference between California and Oklahoma's statutes of limitations and that Oklahoma had expressed an interest in "providing a measure of security for building professionals" in making improvement to real property within the state. *Id.* at 91. The court stated that Oklahoma's expressed interest in the application of a statute limiting liability for specified commercial activity carried on within the state applied to out-of-state companies doing business within the state. *Id.* at 93.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

defendant's California headquarters."  And it determined that Hyundai "does not adequately rebut plaintiffs' showing that the representations or omissions made regarding the [vehicle] emanated from California."  *Id.*  Accordingly, the court held that Hyundai "does not meet its burden under California's governmental interest test with respect to plaintiffs' CLRA and UCL claims."  *Id.* at 598.[33]

Likewise, in *In re Activision Sec. Litig.*, 621 F. Supp. 415 (N.D. Cal. 1985), the district court certified a nationwide class of shareholders where California had a greater interest in application of its common law of fraud based on conduct emanating from the state.  "Despite defendants' showing that material differences may indeed exist between California [fraud] law and the law of other states," defendants failed to overcome their substantial burden of showing "that the interest of other states in having their laws followed in this case is greater than California's interest in applying its own laws" where "Activision's principal place of business is in California, the issuance emanated from California, and the purchaser's acceptances were directed at California."  *Id.* at 430–31 (emphasis added).

Similarly, in *In re NVIDIA GPU Litig.*, 2009 U.S. Dist. Lexis 108500 (N.D. Cal. Nov. 19, 2009), the court determined that "California's interest would be more impaired if its [implied warranty] law is not applied because Plaintiffs allege that the circumstances giving rise to Plaintiffs' and Class members' allegations occurred in the State of California and Defendant is located in California."  *Id.* at *20.  Thus,

---

[33] On the other hand, the court concluded that California does not have a greater interest than other states in applying its express warranty law because "denials of warranty coverage might accurately be described as occurring in the state where repair was sought."  *Parkinson*, 258 F.R.D. at 598.  The circumstances here are different from *Parkinson* because ultimately TMS and TMC decide whether to pay warranty claims, and dealerships are not authorized to perform substantial warranty repairs without obtaining the approval of TMS.  Ex. V at 27:5–28:14, 32:22–33:21, 35:17–36:18, 46:14–48:13.   No state has a greater connection with that conduct than California.  Further, in *Parkinson* the express warranty claim was based solely on Hyundai's written warranty, whereas the express warranty claims here are based also on Toyota's marketing communications, which emanated from California.

34

the court held that "California law governs Plaintiffs' claims for breach of the implied warranty of merchantability." *Id.* at *21.

Like the defendants' conduct in *Parkinson*, *In re Activision*, and *In re NVIDIA*, Toyota's wrongful conduct within and emanating from California compels application of California law.   Not only was Toyota's deceptive advertising campaign conceived, developed, approved, produced, and disseminated from California, but TMS's customer relations, warranty operations, and product quality departments were also put on notice of the SUA defect in California.  No state has an interest superior to California in regulating this conduct.  "Thus, it seems clear that if California law were not applied its interests would be more impaired." *Pecover*, 2010 U.S. Dist. Lexis 140632, at *60.

In sum, Toyota cannot carry its burden on the third step of the governmental interest test given California's deep commitment to its consumer protection laws, the shared interest of foreign states in protecting consumers, and Toyota's extensive injury-producing conduct in California.   As stated in *Pecover*, 2010 U.S. Dist. Lexis 140632, at *60, "[a]pplying the laws of foreign states will not vindicate California's legitimate interests in deterring harmful conduct within its borders, whereas applying California law to nonresident plaintiffs will vindicate foreign states' interests in compensating their residents."

## VI.   <u>Conclusion</u>

It is respectfully submitted that the Court should grant Certain Economic Loss Plaintiffs' Motion for the Application of California Law and select the substantive law of California to govern the claims of Plaintiffs and the nationwide Classes they seek to represent.

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*

1

2    Dated:  March 4, 2011                Respectfully submitted,

3

                                  By:    /s/ Steve W. Berman

4

5                              STEVE W. BERMAN (WA SBN 12536)
**HAGENS BERMAN SOBOL SHAPIRO LLP**

6                              1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

7                              Telephone:  (206) 268-9320
Facsimile:   (206) 623-0594

8                              Email:  steve@hbsslaw.com

9

                                    By:    /s/ Marc M. Seltzer

10

11                              MARC M. SELTZER (CA SBN 054534)
**SUSMAN GODFREY L.L.P.**

12                              1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067

13                              Telephone:  (310) 789-3102
Facsimile:   (310) 789-3006

14                              Email:  mseltzer@susmangodfrey.com

15                                  By:    /s/ Frank M. Pitre

16                              FRANK M. PITRE (CA SBN 100077)
**COTCHETT, PITRE & MCCARTHY**

17                              840 Malcolm Road, Suite 200
Burlingame, CA 94010

18                              Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

19                              Email:  fpitre@cpmlegal.com

20                              ***Co-Lead Counsel for***

21                              ***Economic Loss Plaintiffs***

22

23

24

25

26

27

28

CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW
*Public Redacted Version*