1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8

9                                           | Case No. 8:10ML 02151 JVS (FMOx)

10   IN RE: Toyota Motor Corp.
     Unintended Acceleration Marketing,
11   Sales Practices, and Products Liability | ORDER GRANTING
     Litigation                              | DEFENDANTS' MOTIONS TO
12                                           | DISMISS

13   This document relates to:

14   All Foreign Plaintiffs' Economic Loss
     Cases.
15

16

17

18

19

20

21

22

23

24

25

Table of Contents

I.    Factual Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.    Similarity of the AFELMCC to the MCC . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Allegations Regarding Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Allegations Regarding Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      D.    RICO Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   Article III Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  Judicial Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   TMCC's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    Rule 19:  Necessary and Indispensable Parties . . . . . . . . . . . . . . . . . . . 17
      A.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    Rule 19(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.    Rule 19(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.    Necessary Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            2.    Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            3.    Indispensable Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                  a.    Prejudice to Absent and Existing Parties . . . . . . . . . . . 26

                        i.    Absent Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                        ii.   Existing Parties . . . . . . . . . . . . . . . . . . . . . . . . . 28

                  b.    Lessening Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                  c.    Adequacy of Judgment . . . . . . . . . . . . . . . . . . . . . . . . . 29

                  d.    Adequate Remedy for Plaintiff . . . . . . . . . . . . . . . . . . 30

      C.    Conclusion as to Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

VI.   Standard for Dismissal Pursuant to Rule 12(b)(6)  . . . . . . . . . . . . . . . . . . 31

VII.   General Sufficiency of Plaintiffs' Allegations  . . . . . . . . . . . . . . . . . . . . . . 32

VIII.   Extraterritorial Application of Federal and State Statutes  . . . . . . . . . . . . . 37
   A.   RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      1.   Summary of Parties' Contentions . . . . . . . . . . . . . . . . . . . . . . . 38
      2.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   B.   MMA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      1.   Summary of Parties' Contentions . . . . . . . . . . . . . . . . . . . . . . . 43
      2.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   C.   California's CLRA, UCL, and FAL  . . . . . . . . . . . . . . . . . . . . . . . . . 44
      1.   Summary of Parties' Contentions . . . . . . . . . . . . . . . . . . . . . . . 44
      2.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
         a.   CLRA and UCL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
         b.   FAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

IX.   RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   A.   Elements and Pleading Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 50
   B.   Section 1962(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
   C.   Section 1962(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   D.   Section 1962(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
   E.   Section 1962(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
   F.   Disposition of RICO Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

X.   California Consumer Fraud Claims and Fraudulent Concealment  . . . . . . . 60
   A.   CLRA, UCL, and FAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
   B.   Fraudulent Concealment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

XI.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Currently before the Court are two Motions to Dismiss claims brought by a putative class of foreign Plaintiffs.

This action arises out of Plaintiffs' purchase of vehicles designed, manufactured, distributed, marketed, sold, and leased by Defendants Toyota Motor Corporation dba Toyota Motor North America, Inc. ("TMC"), and its subsidiaries, Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMNAI"), Toyota Motor Engineering and Manufacturing North America, Inc. ("TMEMNAI"), and Toyota Motor Credit Corporation ("TMCC") (collectively, "Toyota" or "the Toyota Defendants").[1]

A putative class of foreign Plaintiffs[2] seeks damages for diminution in the

---

[1] One of the Motions to Dismiss is brought by TMCC; TMCC is generally referred to herein individually.

The second Motion to Dismiss is brought by the remaining Toyota Defendants. An argument raised by all the Toyota Defendants is that Plaintiffs fail to state a claim because their factual allegations fail to differentiate among the various entities and instead make collective allegations against all the Toyota Defendants. Thus, the Court's references to the Toyota Defendants collectively, to subsets thereof, or to a specific entity individually, where relevant to the analyses set forth herein, are purposeful. The Court has endeavored to be as specific and precise as possible. Specifically, the Court uses "the U.S. Toyota Defendants" or "the domestic Toyota Defendants" to refer to TMS, TMNAI, and TMEMNAI collectively. Elsewhere, the Court discusses certain unnamed foreign Toyota entities, and there, the Court finds it necessary to refer to "the named Toyota Defendants" to differentiate between the named parties and certain unnamed foreign entities.

[2] The Court considered Motions to Dismiss and Strike directed toward similar claims asserted by a putative class of domestic Plaintiffs in the Economic

1

market value of their vehicles in light of acknowledged and/or perceived defects in those vehicles. The operative Complaint addressed herein is the Amended Foreign Economic Loss Master Consolidated Complaint ("AFELMCC") (Docket No. 449). In the AFELMCC, Plaintiffs assert claims under federal law and California law.[3] Specifically, the AFELMCC asserts claims for (1) Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"); (2) Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA"); (3) Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL"); (4) Violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq. ("FAL"); (5) Breach of Express Warranty, Cal. Com. Code § 2313; (6) Breach of the Implied Warranty of Merchantability, Cal. Com. Code § 2314; (7) Revocation of Acceptance, Cal. Com. Code § 2608; (8) Violations of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301, et seq. ("MMA"); (9) Breach of Contract/Common Law Warranty; (10) Fraud by Concealment; (11) Negligence; (12) Products Liability/Design Defect; and (13) Unjust Enrichment.

        In two separate Motions to Dismiss, the Toyota Defendants have moved (1) pursuant to Fed. R. Civ. P. 12(b)(7), to dismiss for failure to join parties under

_____

Loss Master Consolidated Complaint ("MCC") (Docket No. 263), granting in part and denying in part those Motions. (See Nov. 30, 2010 Order (Docket No. 510).) The Court's reference to "Plaintiffs" herein should be understood as referring only to the foreign Plaintiffs who assert economic loss claims, except where, in context, the reference clearly denotes another group of Plaintiffs.

    [3] The issue of choice of law is reserved for another day. (See Defs.' Mem. of Points and Authorities (Docket No. 663) (hereinafter "Defs.' Mem.") at 5.)

Fed. R. Civ. P. 19, and (2) pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted.  (See Docket Nos. 657, 659, 661, 663, 664.)  Plaintiffs have filed a joint Opposition thereto, and the Toyota Defendants have filed Reply briefs.  (See Docket Nos. 805 (Opposition), 906 (TMCC Reply), 935 (Reply of other Toyota Defendants).)

For purposes of this Order, the Court discusses all the issues even though some individual issues may be dispositive.  As set forth herein, the Court grants the separate Motion to Dismiss of TMCC, dismissing all claims asserted against it with prejudice.

Also as set forth herein, the Motion to Dismiss filed by the remaining Toyota Defendants is also granted, on multiple grounds:

- Because the foreign Plaintiffs have failed to set forth factual allegations establishing Article III standing, the Court concludes it lacks subject-matter jurisdiction;

- Because the Court lacks personal jurisdiction over certain indispensable parties, the AFELMCC must be dismissed pursuant to Rule 19 of the Federal Rules of Civil Procedure;

- Because judicially noticed materials establish Plaintiffs cannot plead plausible claims against the U.S. Toyota Defendants on the basis of manufacture, sale, or lease of the allegedly defective vehicles, the

Court concludes certain contract- and warranty-based claims must be dismissed;

- Because there is no cause of action for unjust enrichment under California law, the claim for unjust enrichment must be dismissed;

- Because the allegations in the AFELMCC fail to satisfy the requirements for extraterritorial application of certain federal and state statutes, those claims must be dismissed; and

- Because plaintiffs have failed to set forth factual allegations that satisfy the pleading-with-particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure, Plaintiffs' RICO claims, state common-law fraud claim, and state statutory claims must be dismissed.

I.    <u>Factual Allegations</u>[4]

    A.    <u>Similarity of the AFELMCC to the MCC</u>

    Upon examination, it is evident that the AFELMCC adopts the vast majority

of the allegations set forth in the MCC, and the foreign Plaintiffs are proceeding on

the same legal theories as the domestic Plaintiffs did in the MCC.  Thus, the

AFELMCC reflects pages upon pages of factual allegations that set forth verbatim

factual allegations found in the MCC.  (<u>See generally</u> Gilford Decl. at Ex. A

("redlined" comparison of the complaints).)  Certain portions have been modified,

such as the AFELMCC's substitution of allegations about the foreign Plaintiffs for

the MCC's allegations regarding the domestic Plaintiffs.  (<u>Compare</u> ¶¶ 36-78 <u>with</u>

MCC ¶¶ 32-69.)[5]  Certain additions have been made to the AFELMCC to reflect

certain international aspects of the foreign Plaintiffs' allegations.  (<u>See, e.g.</u>, ¶¶ 2-5,

8, 13 (adding "worldwide" or "around the world" to the allegations), ¶ 7 (setting

forth a list of foreign countries in which Toyota has been sued for events of sudden

unintended acceleration ("SUA")).)  Other additions have been made to reflect

additional claims made by the foreign Plaintiffs, most notably the RICO claim not

---

    [4] As it must, in considering whether the AFELMCC states a claim upon
which relief can be granted, the Court accepts as true the factual allegations set
forth by Plaintiffs.  The Court notes that, in some instances, Plaintiffs have referred
to specific documents in support of their factual allegations.  These documents are
not appended to the AFELMCC and, with one exception discussed elsewhere in
this Order, have not been filed with the Court.  As a result, subject to that one
exception, these documents have not been examined by the Court, and the Court
expresses no opinion regarding whether they support the allegations made in the
AFELMCC.

    [5] Unless otherwise designated, all paragraph references in this Order refer to
the AFELMCC.

asserted by the domestic Plaintiffs.  (See ¶¶ 306-51.)

Upon examination, it is clear that the Court's synthesis of the factual allegations set forth in its November 30, 2010 Order (Docket No. 510 at 2:16 through 11:2) is applicable without modification to the AFELMCC.[6]  Additionally, the foreign Plaintiffs set forth the factual allegations described below, which include the naming of additional Defendants, allegations regarding the international aspects of the core factual allegations, allegations related to the differences in the putative classes of Plaintiffs, and allegations upon which Plaintiffs' RICO claims are based.

B.     Allegations Regarding Defendants

Plaintiffs name three additional Defendants, TMNAI, TMEMNAI, and TMCC, that are not named as Defendants in the domestic Plaintiffs' current operative complaint.[7]  (Compare ¶ 1 with Second Amended Economic Loss Master Consolidated Complaint ("SAELMCC") ¶¶ 133-34.)  According to the allegations of the AFELMCC, all the Toyota Defendants collectively "were responsible for the manufacture, design, distribution, sale and lease of tens of millions of vehicles, or

_____

[6]  In the interest of brevity, the Court does not set forth the full text of those factual allegations here.  Nor has the Court updated the citations to the record with the paragraph numbers found in the AFELMCC.

[7]  The foreign Plaintiffs allege that TMC "does substantial business in California," that TMS, TMNAI, and TMCC "are in California," and that TMEMNAI "is a Kentucky Corporation" that is "a resident" of Kentucky.  (¶¶ 28, 84.)

parts thereof, (under the Toyota, Lexus, and Scion brand names) throughout the United States and worldwide, including but not limited to Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, Russia and Australia, that use an electronic throttle control system ("ETCS" or "ETCS-i")."  (¶ 1.)

TMS is identified as "Toyota's U.S. sales and marketing arm, which oversees sales and other operations in 49 states."  (¶ 81.)  "The decision to withhold information from worldwide consumers . . . was made, in part, in California" and "much of the conduct that forms the basis of the complaint emanated from Toyota's headquarters in Torrance, California."  (¶ 28.)  "[E]ach defendant was and is an agent of each of the remaining Defendants," "[e]ach defendant ratified and/or authorized the wrongful acts of each of the other defendants," and in light of "a unity of interests and ownership [among] the Defendants . . . the acts of one are for the benefit [of] and can be imputed as the acts of the others."[8]  (¶ 86.)

---

[8]  This portion of the AFELMCC is a legal conclusion rather than a factual allegation.  As discussed in more detail below, in accordance with the Rule 12(b)(6) standard, the Court does not necessarily accept legal conclusions that are impermissibly couched as factual allegations.  See Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Nevertheless, the Court quotes this portion of the AFELMCC to give context to Plaintiffs' legal theories.

C.    Allegations Regarding Plaintiffs

The named Plaintiffs include Plaintiffs (1) from Mexico, China, Germany, Turkey, Jamaica, Peru, South Africa, Egypt, Indonesia, Malaysia, the Philippines, Guatemala, Russia, and Australia; (2) who drive various year models of the Camry, the Corolla, the RAV4, the Auris, the Tacoma, the Yaris, and the Altis; (3) who bought their vehicles based on Toyota's advertisements regarding safety, information in dealer brochures, information in the vehicles' warranties, and information found on Toyota's website regarding safety; and (4) who received recall notices, who had sticky pedal incidents, and who experienced events of SUA.  (See ¶¶ 36-78.)  Plaintiffs allege that they purchased or leased vehicles that are defective and that they therefore did not receive the benefit of their bargain and/or they overpaid for their vehicles.  (¶ 79.)

D.    RICO Allegations[9]

Plaintiffs allege an "associated-in-fact" RICO enterprise consisting of the Toyota Defendants, other unnamed worldwide affiliates, and Defendants' "spokespersons."  (¶ 306.)  The enterprise conducted "Toyota's 'marketing, advertising, promotion and sales and leasing' activities . . . by means of false statements and omissions" regarding the safety of their vehicles.  (Id.)  Plaintiffs allege a pattern of racketeering activity that includes mail fraud, wire fraud, money

_____

[9]  As with the allegations regarding agency, supra, in accordance with the Rule 12(b)(6) standard, the Court does not accept legal conclusions that are impermissibly couched as factual allegations.

laundering, and transfer of large sums of fraudulently obtained funds in interstate or foreign commerce.  (Id.)

Plaintiffs detail the alleged fraud as based on Toyota's marketing campaigns, its failure to remedy safety risks after becoming aware of multiple incidents of SUA, and its reassurance in its Warranty and Maintenance Guide regarding its commitment to safety.  (See ¶¶ 314-16.)  Plaintiffs also allege that two of Toyota's executives in charge of regulatory affairs, who are former employees of the National Highway Traffic Safety Administration ("NHTSA"), made statements designed to "stall or otherwise misdirect [NHTSA's] investigation[s]" into incidents of SUA.  (¶ 317; see ¶¶ 318-25.)  Plaintiffs make allegations regarding the falsity of Toyota's mailings to NHTSA in connection with NHTSA's investigations into incidents of SUA, including Toyota's position that SUA cannot occur in the absence of a driver engaging the accelerator pedal.  (¶¶ 327-29.)  Similarly, Plaintiffs contend certain statements made by Toyota to the press, denying any safety concerns with its vehicles, constitute predicate acts of racketeering activity.   (¶¶ 331-39, 342, 344, 346-47.)

II.    Article III Standing

"Federal courts are required sua sponte to examine jurisdictional issues such as standing."  Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 954 (9th Cir. 2011) (examining issue of standing even though defendant "failed to move to dismiss under Federal Rule of Civil Procedure 12(b)(1)) (internal quotation marks and citation omitted).  Standing under Article III requires three elements.  First,

Plaintiffs must suffer an "injury in fact," which means that there must be a concrete and particularized "invasion of a legally protected interest" that is actual or imminent. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Second, Plaintiffs must allege a causal connection between the injury and the conduct complained of, which means that the injury must be "fairly traceable" to Defendants' actions.  Id.  Third, Plaintiffs must show that a favorable decision will likely redress the injury.  Id. at 561.  Although Plaintiffs bear the burden of establishing standing, "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage.  Id.

The factual allegations set forth in the AFELMCC do not expressly specify that they are based on market conditions and effects within the United States, but it appears in context that they are — certainly that was the Court's assumption when it considered arguments regarding the injury-in-fact requirement of standing in connection with the MCC.  (See ¶¶ 292-96; Nov. 30, 2010 Order (Docket No. 510) at 16-17 .)  As applied to the foreign Plaintiffs, these allegations regarding market effects within the United States are insufficient to confer an injury-in-fact.[10]  At a minimum, the foreign Plaintiffs must allege publicity regarding SUA incidents in the relevant secondary market for their vehicles, i.e., in their home countries.  From there, it is reasonable to infer that the adverse publicity led to decreased demand,

---

[10]  The Toyota Defendants argue that, for this reason, the foreign Plaintiffs fail to state a claim:  by merely copying the domestic Plaintiffs' factual allegations, which, in turn, are measured by market conditions within the United States, the foreign Plaintiffs fail to allege facts showing an economic loss.  (See Defs.' Mem. at 4, 14.)  While the Toyota Defendants' arguments are well-taken, the Court discerns a more fundamental problem with the foreign Plaintiffs' allegations.

which, in turn, led to a drop in resale value.  (<u>See id.</u>)[11]  But the AFELMCC does not do that.

Additionally, as discussed at length previously by the Court in connection with the MCC, there must be specific allegations that each lead Plaintiff suffered some loss.  (<u>Compare</u> Nov. 30, 2010 Order (Docket No. 510) at 24-25 (examples of factual allegations made by Plaintiffs who establish standing for each of the Plaintiffs discussed) <u>with</u> <u>id.</u> at 26-27 (examples of factual allegations that fail to establish standing for each of the Plaintiffs discussed).)

Because Plaintiffs have failed to set forth factual allegations establishing Article III standing, the AFELMCC is dismissed in its entirety.

---

[11]  <u>Twombly</u> strongly suggests, if it does not indeed compel, courts take into account basic economic principles, where applicable, in analyzing the plausibility of a claim.  <u>See</u> 550 U.S. at 567-69.  <u>Twombly</u> itself rejected the plausibility of an antitrust claim based on a far more complex economic principle than the basic rules of supply and demand upon which the Court here relies.  <u>Id.</u>  There, the Supreme Court held that an antitrust claim was not plausible where economic behavior in a market formerly dominated by "Government-sanctioned monopolists" was explained by the ease with which would-be competitors could accept the lucrative profits the former structure automatically conferred upon them.  <u>Id.</u> at 568.  Rather, in the Supreme Court's assessment, it was likely that those would-be competitors recognized the risk one encounters when one "lives by the sword," providing them with the incentive to "sit tight," expect their peers to do the same, and profit in ways that subjected them to less risk.  (<u>Id.</u> at 568-69.)

III.    Judicial Notice

TMCC asks that the Court take judicial notice of its March 31, 2010, Form
10-K Filing with the United States Securities and Exchange Commission ("SEC").
(See TMCC Request for Judicial Notice ("RJN") (Docket No. 661).)  Specifically,
TMCC asks the Court to judicially notice the nature of its business, which is
generally limited to providing financing for vehicle loans, leases, and insurance
products.  (See TMCC RJN Ex. A at 4, 6, 11, & 75.)

The remaining Toyota Defendants ask that the Court take judicial notice of
certain documents regarding the worldwide standardization of Vehicle
Identification Numbers ("VINs") by the International Organization for
Standardization ("ISO").  (See Defs.' RJN at 2 (Docket No. 663-2).)  These
documents identify a standardized system for assigning VINs that designate, *inter
alia*, the place the vehicle was manufactured.  (See id. Ex. 1 at v; Ex. 2 at v.)

Additionally, the remaining Toyota Defendants ask that the Court take
judicial notice of a Field Technical Report which was produced in discovery and
which the Toyota Defendants contend is incorporated by reference in the
AFELMCC.  (See Defs.' RJN at 2 & Ex. 3; ¶¶ 161 & n.22.).)  Specifically,
Plaintiffs allege the following:

In a series of Field Technical Reports from 2006-2010
involving Toyota Camrys, technicians from Hong Kong confirmed
UA events and that these events were not caused by pedal or floor

1    mats.  The UA events were duplicated without triggering a DTC

2    [diagnostic trouble code].[12]  These technicians strongly urged TMS to

3    investigate since the problem was highly dangerous and the incidents

4    were stacking up.  In many of these instances, the report noted that

5    "no effective rectification can be done at this moment" and that the

6    exact cause was "unknown."  These reports "strongly request TMS to

7    investigate this case a top priority."

8

9    (¶ 161.)  For support, Plaintiffs cite a document that is identified by Bates number,

10   but do not attach it to the AFELMCC.  (See id. at n.22 (identifying a document

11   designated "TOY-MDL-88641").)[13]

12   _____

13   [12]  The significance of the diagnostic trouble code is explained elsewhere in
     the AFELMCC:

14

15                    [The Toyota technician-]confirmed SUA events
                 revealed another aspect of the defect — the failure of the
16               vehicle's diagnostic tools to capture the malfunction.  In
                 other words, no diagnostic trouble code ("DTC") or fault
17               code was triggered during these SUA events.  A properly
                 designed and manufactured vehicle would trigger a fault
18               when a SUA event occurs and force the vehicle into a
                 "limp home" mode.
19

20   ¶ 25.

21   [13]  The Toyota Defendants ask that the Court take judicial notice of this
     document in furtherance of an argument that Plaintiffs misrepresented the
22   contents of the Field Technical Report as being sent to TMS (in the United States)
     to investigate rather than being sent to TMC (in Japan).  (See Defs.' Mem. at 13;
23   Reply at 6.)  The AFELMCC, in quoting the Field Technical Report, indeed
     incorrectly refers to "TMS" rather than "TMC."  (Compare ¶ 161 (quoting the
24   Report as stating "we strongly request TMS to investigate this case a top priority"
25

13

Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). An adjudicative fact may be judicially noticed if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Generally, courts may take judicial notice of public documents. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001). This general principle has been applied to permit courts to judicially notice SEC filings. <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (noting that SEC filings are properly subject to judicial notice). Additionally, courts may take judicial notice of documents incorporated by reference in the operative complaint. <u>See, e.g.</u>, <u>al-Kidd v. Ashcroft</u>, 580 F.3d 949, 954 n.6 (9th Cir. 2009).

---

and citing Bates No. TOY-MDL-88641) <u>with</u> Defs.' RJN Ex. 3 at 33 (document bearing Bates No. TOY-MDLID00088641, stating "we strongly request TMC to investigate this case in top priority").) Although the Court does not view this discrepancy as anything more than a mere drafting error, which is found in the SAELMCC as well as the AFELMCC (<u>compare</u> ¶ 161 <u>with</u> SAELMCC ¶ 214), all parties (and the Court) should continue to take care to be as precise and accurate as possible.

Nevertheless, although viewing the reference to TMS as a mere drafting error, the Court notes that the reference is repeated in the Opposition, after Plaintiffs were alerted of the inaccuracy, in connection with a discussion ostensibly meant to address the Toyota Defendants' argument regarding the purposeful nature of the misstatement. (<u>See</u> Opp'n at 12 ("The technicians urged TMS to further investigate the problems since they were highly dangerous and the numerous instances were stacking up.").) This is of obvious concern.

Plaintiffs do not voice any objection to the Toyota Defendants' requests.

Because the materials proffered by the Toyota Defendants embrace proper subjects of judicial notice, the Court takes judicial notice of them and considers them in connection with the pending motions.  See Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988) ("In addition to the complaint, it is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.").

IV.   TMCC's Motion

Plaintiffs filed one Opposition to the two Motions to Dismiss.  A review of that Opposition reveals that Plaintiffs have failed to respond to the substance of TMCC's arguments regarding the plausibility of the claims asserted against it. TMCC contends that because the judicially noticed materials establish its business is limited to providing financing and insurance, claims asserted against it based on the design, manufacture, sale, and marketing of allegedly defective vehicles are not plausible.

No Plaintiff alleges he or she obtained a loan, lease, or insurance through TMCC.  To the contrary, the AFELMCC is completely devoid of any substantive factual allegation addressed specifically to TMCC.  TMCC's publicly filed SEC statement evidences operations that are wholly incompatible with the theories of liability set forth in the AFELMCC based on the design, manufacture, sale, and marketing of allegedly defective vehicles.  (See TMCC RJN Ex. A at 4, 5, 11.)

TMCC's public financial statements do not reveal any income, assets, equity, or cash flow items that are incompatible with their stated operations; indeed, those items are indicative of operations that are incompatible with Plaintiffs' allegations. (See TMCC RJN Ex. A at 75-78 (showing income, assets, changes to shareholder equity, and cash flow items associated with marketable securities, investments, receivables, and leasehold investments).)

Illustrating that the application of the "plausibility" requirement must be undertaken in a context-specific manner, Twombly, an antitrust case, focused on certain behavior, that although consistent with an anti-competitive conspiracy, was nevertheless plausibly explained by free market behavior. See Twombly, 550 U.S. at 567 ("Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing."). In contrast, Iqbal, in which Bivens claims were asserted against high-ranking government officials, focused on likely law-enforcement objectives, concluding certain legitimate objectives were the only plausible conclusion that could be drawn from the plaintiff's factual allegations against them. Iqbal, 129 S. Ct. at 1952. Here, too, the Court must make that context-specific inquiry, with the benefit of the judicially noticeable SEC 10-K filing.

The question the Court must answer is whether Plaintiffs' claim against the entity that deals solely with the financing component of a substantial portion of Toyota and Lexus vehicles may be subject to liability under Plaintiffs' theories. A claim is "facial[ly] plausib[le]" where a plaintiff sets forth factual allegations that

"allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.  As to TMCC, in light of the comprehensive judicially noticed materials which establish the nature of TMCC's business, the Court, in the absence of argument to the contrary from Plaintiffs, must conclude that the AFELMCC does not set forth a plausible claim against TMCC.

TMCC's Motion to Dismiss is granted; the claims against TMCC are dismissed with prejudice.

V.      Rule 19:  Necessary and Indispensable Parties

The Toyota Defendants argue that the AFELMCC should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join necessary and indispensable parties, as required by Rule 19.  (Defs.' Mem. at 27.)

A.      Legal Standard

1.      Rule 19(a)

Under Rule 19, if joinder will not destroy subject-matter jurisdiction, an absent person must be joined if (a) the Court cannot afford complete relief among the existing parties without that person, or (b) that person has an interest in the litigation, and proceeding without that person would impair their ability to protect the interest, or cause an existing party to incur double or inconsistent obligations because of the interest. Fed. R. Civ. P. 19(a)(1).  If an entity's presence is critical

to the disposition of important issues in the case, and/or its evidence will either support the complaint or bolster the defense, it is a necessary party.  <u>Freeman v. NW. Acceptance Corp.</u>, 754 F.2d 553, 559 (5th Cir. 1985).

The term "complete relief" in Rule 19(a) refers to relief between the named parties, not as between a named party and an absent person sought to be joined. <u>Perrian v. O'Grady</u>, 958 F.2d 192, 196 (7th Cir. 1992).  However, courts must also consider how effective a judgment for either party would be at resolving the controversy.  <u>Evergreen Park Nursing & Convalescent Home, Inc. v. Am. Equitable Assurance Co.</u>, 417 F.2d 1113, 1115 (7th Cir. 1969).

The goal of Rule 19(a)(1) is to protect the interests of the parties by affording complete adjudication of the dispute.  Judicial economy is aided by avoiding repeated lawsuits concerning the same subject matter.  <u>Schutten v. Shell Oil Co.</u>, 421 F.2d 869 (5th Cir. 1970)

        2.    <u>Rule 19(b)</u>

If a person who is required to be joined, if feasible, cannot be joined, the Court must determine whether, "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). To make this determination, the Court should consider:  (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping the relief, or other measures;

1   (3) whether a judgment rendered in the person's absence would be adequate; and

2   (4) whether the plaintiff would have an adequate remedy if the action were

3   dismissed for nonjoinder.  Id.

4

5   "Whether a person is 'indispensable,' that is, whether a particular lawsuit

6   must be dismissed in the absence of that person, can only be determined in the

7   context of particular litigation."  Provident Tradesmens Bank & Trust Co. v.

8   Patterson, 390 U.S. 102, 118 (1968).

9

10      B.      Discussion

11

12      Plaintiffs assert claims against Toyota for the "the manufacture, design,

13  distribution, sale and lease of tens of millions of vehicles, or parts thereof,"

14  throughout the United States and worldwide.  (¶ 1.)  As an initial matter, Plaintiffs

15  recognize that TMC is the parent corporation of the other Toyota entities who

16  design, manufacture, market, distribute, and sell Toyota and Lexus vehicles

17  worldwide.  (¶ 80.)  Plaintiffs allege that Toyota, through marketing and

18  advertising worldwide, promised that cars with ETCS would be safe and reliable,

19  and at the same time concealed a serious safety problem.  (¶¶ 2-3.)  Plaintiffs

20  further allege that the named Toyota Defendants "are and were responsible for the

21  manufacture, design, distribution, sale and lease of vehicles, having the same SUA

22  defect as those Toyota vehicles sold worldwide."  (¶¶ 28, 33.)  The decision to

23  withhold information from consumers worldwide was made, in part, in California.

24  (Id.)

25

1        1.    <u>Necessary Parties</u>

2

3        Toyota argues that the foreign entities who manufactured, distributed,

4   advertised, repaired, sold and/or leased Plaintiffs' vehicles must be joined as

5   necessary parties.  (Defs.' Mem. at 27.)

6

7        Whether the foreign entities are necessary depends on whether they were

8   active participants in the alleged wrongful conduct, or whether the conduct

9   complained of was solely that of the parent company, TMC, and the other named

10  Toyota entities.  <u>Haas v. Jefferson Nat'l Bank of Miami Beach</u>, 442 F.2d 394, 398

11  (5th Cir. 1971); <u>see also</u> <u>Polanco v. H.B. Fuller Co.</u>, 941 F. Supp. 1512, 1520-22

12  (D. Minn. 1996) (when a plaintiff seeks to hold a parent company liable for the

13  conduct of a foreign subsidiary, the subsidiary is a necessary and indispensable

14  party); <u>cf.</u> <u>Dernick v. Bralorne Res. Ltd.</u>, 639 F.2d 196, 199 (5th Cir. 1981)

15  (however, where the parent is the principal actor, the subsidiary is not necessary

16  and indispensable).

17

18       Here, Plaintiffs seek to hold the Toyota Defendants liable for alleged

19  economic loss suffered as a result of the propensity of Toyota vehicles to

20  experience SUA, a defect the Toyota Defendants allegedly knew about, but hid

21  from consumers.  Plaintiffs' allegations target Toyota entities allegedly responsible

22  for "the manufacture, design, distribution, sale and lease" of Plaintiffs' vehicles.

23  (¶ 1.)

24

25       A review of the record makes clear that the U.S. Toyota Defendants did not

manufacture or distribute Plaintiffs' foreign vehicles.[14]  (See Gilford Decl. ¶¶ 5, 9-12; Defs.' RJN Ex. 1 at v; Ex. 2 at v.)  The record suggests that the domestic Toyota Defendants also may not be responsible for design, as this responsibility falls to TMC, the parent corporation.  (Gilford Decl. ¶ 4.)  Further, there are no allegations in the AFELMCC suggesting that the domestic Toyota Defendants performed repairs on Plaintiffs' foreign vehicles.  There is some question as to whether the domestic Toyota Defendants were responsible for advertising viewed by Plaintiffs, (compare id. ¶ 3 (domestic entities not responsible for marketing foreign-made vehicles) with Opp'n at 7, 11 (belated allegation that U.S. advertising reached foreign Plaintiffs)), but resolution of this issue is not dispositive of the Rule 19 analysis.

Plaintiffs assert various causes of action implicating the vehicle manufacturer and designer (e.g., tort-based claims including products liability) and the vehicle distributor and seller/lessor (e.g., contract-based claims including warranty claims).  Tellingly, Plaintiffs do not allege that any of the named Toyota entities manufactured, distributed, and/or sold (or leased) their vehicles.  Instead, they allege that the named Defendants "manufacture, design, distribut[e], [sell] and lease [] vehicles, having the same SUA defect as those Toyota vehicles sold

---

[14]  To the extent that vehicles owned by putative members of the foreign class were manufactured in the United States (e.g., Plaintiffs Banton, Centeno and Villalobos), these Plaintiffs fall into the definition of the putative class set forth by the "domestic" economic loss Plaintiffs.  (See Defs.' Mem. at 8 n.3; SAELMCC ¶ 397 (defining the "Nationwide Consumer Class" as "[a]ll individuals or entities who purchased, owned or lease a Toyota vehicle manufactured, designed, or sold in the United States with ETCS.").)   As such, they are not properly named in the AFELMCC.

worldwide." (¶ 28 (emphasis added).)  At best, Plaintiffs' allegations regarding

deceptive marketing practices may pertain to the named Toyota Defendants, but

some of these factual allegations do not appear in the AFELMCC, and were instead

raised for the first time in the Opposition.

Plaintiffs argue that they are not attempting to hold the present Toyota

Defendants liable for the conduct of foreign subsidiaries.  (Opp'n at 33-34.)

However, because Plaintiffs' claims implicate the entities responsible for the

design, manufacture, distribution, and/or sale (or lease) of their vehicles, the Court

finds that the foreign entities who undertook these activities with respect to

Plaintiffs' vehicles are necessary to afford complete relief.  Fed. R. Civ. P.

19(a)(1); Freeman, 754 F.2d at 559; see also Polanco, 941 F. Supp. at 1521

(required joinder of a foreign manufacturer in a product liability action brought

against domestic parent; manufacturer has "distinct and strong interest in legal

determinations regarding the safety of its products.").  If Plaintiffs prevail, they

cannot obtain complete relief against the named Toyota Defendants, including

TMC, because their claims seek to hold the Toyota Defendants liable, in part, for

the actions of unnamed subsidiaries and/or sister companies.  Likewise, if the

Toyota Defendants prevail, they cannot be afforded complete relief because

foreign Plaintiffs unhappy with the result could turn around and sue the absent

Toyota entities in their home countries.

Although Plaintiffs do not argue that it is unnecessary to join the unnamed

foreign entities because they may be joint tortfeasors, the Court is mindful of the

general rule that joint tortfeasors are permissive, rather than necessary, parties.

Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7 (1990).  Even if the unnamed foreign

entities are found to be joint tortfeasors, an exception to this rule exists when the

absent party is more than a key witness, but also an active participant in the

allegations that are critical to the disposition of the litigation.  Laker Airways, Inc.

v. British Airways, PLC, 182 F.3d 843, 848 (11th Cir. 1999).  As discussed above,

this criterion is met.  The unnamed entities were actively involved in the conduct

giving rise to the allegations at the heart of the AFELMCC.


     Because TMC is not liable for its foreign subsidiaries' actions, and the other

named Toyota Defendants are not liable for their sister companies' actions, absent

an agency or alter ego relationship,[15] the Court cannot afford complete relief to

Plaintiffs in the absence of the unnamed foreign entities.  See Schroeter GMBH &

KO., KG. v. Crawford & Co., No. 09-946, 2009 WL 1408100, at *4 (E.D. Pa. May

19, 2009).


     Moreover, the unnamed foreign entities have an interest in the litigation

because each respective entity's liability will necessarily be at issue.  Plaintiffs

seek an injunction ordering Toyota to implement an ETCS fail-safe, which would

also necessarily impact the unnamed manufacturing entities.  A judgment entered

---

[15]  The AFELMCC sets forth no factual allegations that might support the
conclusion that the named Toyota Defendants share a principal/agent relationship
with the absent foreign entities — the AFELMCC fails to mention the existence of
the foreign Toyota entities, or their involvement in the alleged conduct (e.g.,
manufacturing, distribution).  As discussed more fully below, the only reference to
an agency relationship pertains to the named Toyota Defendants only, see ¶ 86, and
is "a legal conclusion couched as a factual allegation," which the Court disregards.
Iqbal, 129 S. Ct. at 1949-50 (quoting Twombly, 550 U.S. at 555).

against the named Toyota Defendants might have a preclusive effect on the unnamed foreign entities and weaken their bargaining position and/or impair their ability to protect their own interests in any current and future litigation.  (See, e.g., ¶ 7 (ongoing litigation in 15 countries); Opp'n at 33 (possible future litigation against foreign manufacturers and dealerships).)  Fed. R. Civ. P. 19(a)(1); Dou Yee Enters. (S) PTE, Ltd. v. Advantek, Inc., 149 F.R.D. 185, 189 (D. Minn. 1993) (citing Acton Co., Inc. v. Bachman Foods, Inc., 668 F.2d 76, 78 (1st Cir. 1982) (even where domestic plaintiff and foreign subsidiary appear closely aligned, there is no evidence that U.S. counsel can adequately protect the foreign entity's interests)).

### 2.   Feasibility

"If an absentee is a necessary party under Rule 19(a), the second stage is for the court to determine whether it is feasible to order that the absentee be joined. Rule 19(a) sets forth three circumstances in which joinder is not feasible: when venue is improper, when the absentee is not subject to personal jurisdiction, and when joinder would destroy subject matter jurisdiction."  E.E.O.C. v. Peabody Western Coal Co., 400 F.3d 774, 779 (9th Cir. 2005).

There is nothing in the record to suggest that the Court has personal jurisdiction over the unnamed foreign entities.  In fact, these entities appear to be foreign corporations lacking contacts with the United States.  Thus, joinder is not feasible.

1              3.     Indispensable Parties

2

3          Under Rule 19(b), it is still possible "for the case to proceed without the

4   joinder of the so-called 'necessary' absentee[s]."  Peabody Western, 400 F.3d at

5   779 (emphasis added).  This is because parties are indispensable under Rule 19(b)

6   only if they are "'persons who not only have an interest in the controversy, but an

7   interest of such a nature that a final decree cannot be made without either affecting

8   that interest, or leaving the controversy in such a condition that its final termination

9   may be wholly inconsistent with equity and good conscience.'"  Id. at 780 (quoting

10  Shields v. Barrow, 58 U.S. 130, 139, 17 How. 130 (1854) (emphasis added)).

11

12         Whether "in equity an good conscience the action should be dismissed"

13  based on the absence of an indispensable party is "always a matter of judgment"

14  that courts should approach with flexibility and on a case-by-case basis.  Haas, 442

15  F.2d at 398 & n.5 (citing Provident, 390 U.S. at 118).

16

17             a.     Prejudice to Absent and Existing Parties

18

19         The Toyota Defendants argue that the unnamed foreign entities could be

20  prejudiced if the action goes forward without them because those entities will be

21  unable to mount their own defense.  (Defs.' Mem. at 28; Reply at 17-18.)

22  Similarly, the named Toyota Defendants will be prejudiced in their defense

23  because they will not be able to obtain pretrial discovery and critical evidence

24  without the presence of the foreign parties.  (Defs.' Mem. at 28; Reply at 18.)

25

Plaintiffs counter that no prejudice to the named Toyota Defendants or the

absent parties has been shown.  (Opp'n at 32.)  Plaintiffs contend that they may

initiate other actions against the foreign manufacturers and dealerships without

prejudice to the named Toyota Defendants or the unnamed parties.  (Id. at 33

(suggesting that Plaintiffs are not seeking to hold the named Toyota Defendants

liable for the actions of their subsidiaries and/or sister corporations).)


                              i.      Absent Parties


Just as the foreign subsidiary in Polanco would be prejudiced by the inability

to defend its product safety and marketing methods, and may be subject to liability

in a suit against its parent corporation, the Court finds that the unnamed foreign

entities here would be prejudiced by the denial of an opportunity to defend their

product safety and marketing practices.  Polanco, 941 F. Supp. at 1523; see also

Bailey v. Toyota Motor Corp., No. IP01-1456-C-T/K, 2003 WL 23142185, at *9

(S.D. Ind. Oct. 31, 2003) (finding prejudice resulting from the possibility of

contradictory conclusions by different courts).  Even though a finding by this

Court that the unnamed entities' products are defective and/or unsafe would not be

binding on the unnamed foreign entities, a judgment against TMC and/or the

domestic Toyota defendants regarding the safety of the vehicles identified in

Plaintiffs' complaint speaks "directly and adversely to the quality of [the unnamed

entitites'] products."  Polanco, 941 F. Supp. at 1521.


That the unnamed foreign entities may be subsidiaries of TMC and/or sister

companies or affiliates of the remaining named Toyota Defendants, which is not

clear from the record, nor discussed in either party's brief, does not change the analysis at this point. Despite the "obvious community of interest," id. at 1522, the various Toyota entities may have in arguing that the ETCS is not defective, those interests may diverge at trial. For example, because the named Toyota entities cannot be held liable for the acts of their subsidiaries, sister companies, and/or affiliates, absent an agency relationship, they may attempt to show that the absent entities are responsible for the allegedly defective design. See id. On the other hand, if the absent entities were fully represented, they may want to ascribe blame to TMC and/or the other named defendants in order to deflect liability from themselves. See Gay v. Avco Fin. Servs., Inc., 769 F. Supp. 51, 57 (D.P.R. 1991) (real danger where parent may shield itself by shifting blame to absent subsidiaries, and then in a later action, the subsidiaries are deprived of their best defense that it was the parent who acted wrongly). Because the interests of the absent parties may not be adequately protected by the named defendants, there is no mitigation of prejudice. See Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc., 142 F.3d 1266, 1272 (Fed. Cir. 1998) (prejudice can be mitigated where the interests of the absent party are protected by named defendants).

Similar to Gay, where the case was dismissed because the complaint failed to name foreign subsidiaries who were likely responsible for the alleged conduct, the Court sees the likelihood here of "multiple litigation, and of factfinding hamstringed by the absence of centrally implicated actors in the drama." 769 F. Supp at 57.

ii.   Existing Parties

27

The Court finds the named Toyota defendants' argument that they will be unable to obtain pretrial discovery in South Africa insufficient to demonstrate prejudice under Rule 19(b).  "Rule 19 does not list the need to obtain evidence from an entity or individual as a factor bearing upon whether or not a party is necessary or indispensable to a just adjudication."[16]  Johnson v. Smithsonian Inst., 189 F.3d 180, 188 (2d Cir. 1999) (internal quotation and alteration omitted).  However, the Court is mindful that a "defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another."  Provident, 390 U.S. at 110.  Because inconsistent outcomes and assignment of liability pose concerns based on the current record, the interests of the named defendants should not be ignored.

### b.     Lessening Prejudice

The Court conceives of no solution to lessen prejudice in the absence of the unnamed foreign entities, and the parties have not suggested one.

---

[16] Although access to evidence is not a consideration under Rule 19(b), the Court notes the practical difficulties of defending against liability by proving a negative (i.e., proving that defective products, if any, are the responsibility of the absent foreign entities).  Cf. United States v. Cortez-Rivera, 454 F.3d 1038, 1042 (9th Cir. 2006) ("For this reason, fairness and common sense often counsel against requiring a party to prove a negative fact, and favor, instead, placing the burden of coming forward with evidence on the party with superior access to the affirmative information.")

c.      Adequacy of Judgment


The Supreme Court has interpreted this factor to refer to the interests of

courts and the public "in settling disputes in wholes, whenever possible."

Provident, 390 U.S. at 111.


Dismissal of this action would not allow the dispute to be settled as a whole.

Rather, Plaintiffs would have to file individual suits in each jurisdiction in order

for relevant courts to exercise personal jurisdiction over all unnamed foreign

entities.  While this outcome suggests that a judgment of dismissal is inadequate,

the alternative, going forward without joinder, produces the same result.  Namely,

if this case proceeds, in order for Plaintiffs to obtain complete relief over the

vehicle manufacturers, for example, individual suits in the relevant foreign

jurisdictions must be initiated.  As discussed above, in the absence of agency

relationships, Plaintiffs may not hold TMC and/or the other named Toyota

Defendants liable for the conduct of their subsidiaries or sister companies,

respectively.  Thus, because no forum will provide complete relief in a single

action, this factor is neutral.


d.      Adequate Remedy for Plaintiff


Plaintiffs will have an adequate remedy if the action is dismissed because, as

they have already recognized, they could file suit in their respective home

countries.[17]  Taking the allegations in the AFELMCC as true, presumably the relevant foreign countries would have jurisdiction over the domestic Toyota Defendants based on their contacts with the foreign Plaintiffs in foreign jurisdictions.

### C.    Conclusion as to Joinder

Because Plaintiffs' allegations implicate myriad unnamed foreign entities, those entities are necessary parties under Rule 19(a).[18]  It is not feasible to join these entities because the Court lacks personal jurisdiction over them.  Because this dispute cannot be adjudicated in equity and good conscience without the unnamed foreign entities, the AFELMCC must be dismissed on this basis alone.

### VI.    Standard for Dismissal Pursuant to Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S.

---

[17]  Although the Court has not yet fully considered the matter, preliminarily, it appears to the Court that, as the Toyota Defendants have demonstrated in their forum non conveniens motion, the named foreign Plaintiffs likely have a remedy in each of the affected foreign jurisdictions.  (Docket No. 776 at 9-28.)

[18]  This conclusion applies with equal force to Plaintiffs' RICO claim, in which Plaintiffs allege involvement of the unnamed foreign entities.  ( ¶ 306.)  See Knipe v. Washington Square Capital, 116 F.3d 484, 1997 WL 341818, at *1-2 (9th Cir. June 19, 1997) (unpublished) (district court properly dismissed RICO claim, and also dismissed complaint under Rule 19 for failure to join necessary and indispensable party).

544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that

"allow[] the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged."  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949, 173

L. Ed. 2d 868 (2009).

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow

a two-pronged approach.  First, the Court must accept all well-pleaded factual

allegations as true, but "[t]hread-bare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."  Iqbal, 129 S. Ct. at

1949.  Nor must the Court "accept as true a legal conclusion couched as a factual

allegation."  Id. at 1949-50 (quoting Twombly, 550 U.S. at 555).  Second,

assuming the veracity of well-pleaded factual allegations, the Court must

"determine whether they plausibly give rise to an entitlement to relief."  Id. at

1950.  This determination is context-specific, requiring the Court to draw on its

experience and common sense; there is no plausibility "where the well-pleaded

facts do not permit the court to infer more than the mere possibility of

misconduct."  Id.

In addition to the factual allegations set forth in the complaint, courts may

consider documents referenced in the complaint, upon which the complaint

necessarily relies, and the authenticity of which no party questions.  Parrino v.

FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998) ("We therefore hold that a district

court ruling on a motion to dismiss may consider a document the authenticity of

which is not contested, and upon which the plaintiff's complaint necessarily

relies."); United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a

document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").  Moreover, as noted previously, courts may also consider judicially noticed materials. Mir, 844 F.2d at 649.

VII.   General Sufficiency of Plaintiffs' Allegations

The remaining Toyota Defendants challenge the sufficiency of Plaintiffs' allegations on general grounds applicable to more than one cause of action. Specifically, the Toyota Defendants contend that Plaintiffs' claims are either deficiently pled or are, as pled, implausible within the meaning of Twombly and Iqbal.

The Toyota Defendants correctly contend, as noted by the Court in connection with the factual allegations set forth in the AFELMCC, that the AFELMCC reflects pages upon pages of factual allegations that set forth verbatim factual allegations found in the domestic Plaintiffs' MCC.  (See Defs.' Mem. at 3-5.)  The foreign Plaintiffs acknowledge this factual overlap, but appear to contend that the basic factual allegations underlying their claims are essentially the same as the factual allegations underlying the claims of the domestic Plaintiffs.  (See Opp'n at 7.)  Briefly stated, both sets of Plaintiffs allege that the Toyota Defendants designed, manufactured, marketed, and sold (or leased) vehicles that they eventually realized were defective, and that rather than disclosing and remedying that defect, the Toyota Defendants instead engaged in a cover-up of the vehicles' defect(s).  The essence of the Toyota Defendants' sufficiency-of-pleading

challenge is that the foreign Plaintiffs have not "includ[ed] any additional facts in

their complaint that could support their contention that the U.S. Toyota Defendants

are somehow liable for transactions and events that took place outside of the

United States."  (See Defs.' Mem. at 8.)


First, the Toyota Defendants take issue with Plaintiffs' failure to

differentiate among them.  To be sure, Plaintiffs have named five legally separate

and distinct, albeit related, corporate entities as Defendants in this action, and

factual allegations differentiating among these five entities are scant.  Generally,

Plaintiffs do not allege that any particular Defendant engaged in any particular

action; to the contrary, the AFELMCC instead alleges that collectively, all five of

the Toyota Defendants, were "responsible for the manufacture, design, distribution,

sale and lease" of allegedly defective vehicles sold not only in the United States

but also throughout fourteen specified foreign countries.  (¶ 1.)[19]

---

[19] That is not to say there is no differentiation of the Toyota Defendants.
Some factual allegations do focus on a particular Defendant.  (See e.g., ¶¶ 21, 23
(referencing testimony before Congress of TMC officers); ¶ 22 (testimony of
TMNAI officer); ¶ 93, 98, 101-03 (referring to TMS press releases); ¶ 94 (referring
to a TMC press release); ¶ 121 ("TMS asked TMC to investigate").)  These
allegations, however, are the exception, not the rule.  (See ¶¶ 89-92, 95-97, 99-
100, 104-05, 107-10 (allegations regarding statements made by "Toyota"); ¶¶ 112-
18 (collective allegations regarding defects); ¶¶ 119-20, 122-23 ("Toyota" received
complaints).)  Indeed, despite the fact that the foreign Plaintiffs added TMNAI as a
Defendant, the sole substantive allegation against TMNAI individually is that it
provided a report to NHTSA that "summarizes the foreign claims against Toyota".
(¶ 8.)  Moreover, although the foreign Plaintiffs added TMEMNAI and TMCC as
Defendants, they set forth no substantive factual allegations against those two
entities individually.

The explanation, perhaps, may be found in legal conclusions set forth by Plaintiff in the AFELMCC at ¶ 86:

"[E]ach defendant was and is an agent of each of the remaining Defendants," that "[e]ach defendant ratified and/or authorized the wrongful acts of each of the other defendants," and that in light of "a united of interests and ownership [among] the Defendants . . . the acts of one are for the benefit [of] and can be imputed as the acts of the others."

(Id.; accord Opp'n at 10 ("Importantly, there is unity of interest and ownership [among] the defendants such that the acts of one are for the benefit of others.").) Plaintiffs may not rest on legal conclusions regarding agency that are cast as factual allegations. Iqbal, 129 S. Ct. at 1949. Notwithstanding any requirement under Rule 11 of the Federal Rules of Civil Procedure,[20] these boilerplate cross-authority/cross-agency/ratification allegations run afoul of Twombly and Iqbal, and thus, the Court strikes paragraph 86 of the AFELMCC.

This is not to say that Plaintiffs may not make the same allegations against all Defendants.  Rather, it is to say that if Plaintiffs do so, that action must be by conscious choice and with specific purpose, and Plaintiffs' allegations must be

---

[20]  Rule 11(b)(3) requires that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3).

1   supportable by something more than mere conclusory allegations of mutual and

2   overlapping agencies pursuant to which Defendants at all time acted.

3

4       Next, the Toyota Defendants contend, and Plaintiffs effectively concede, that

5   the VINs set forth in the AFELMCC establish that the vehicles purchased by

6   Plaintiffs were not manufactured in the United States.  (See Defs.' Mem. at 10-11;

7   Defs.' RJN Ex. 1 at 1 (establishing that a portion of all VINs shall designate the

8   country of manufacture); id. Ex. 2 at 1, 4 (assigning codes to specific countries);

9   Opp'n at 10.)  By the same token, the Toyota Defendants correctly point out that

10  Plaintiffs themselves identify the countries in which their vehicles were purchased,

11  and with three exceptions, none of those vehicles were purchased in the United

12  States.  (See ¶¶ 36-78.)

13

14      Where the vehicles were not manufactured in the United States and were not

15  sold (or leased) in the United States, claims based on manufacture or sale (or lease)

16  of the allegedly defective vehicles against the U.S. Toyota Defendants, when the

17  mutual agency allegations are stripped from the AFELMCC, become implausible.

18  Thus, to the extent a claim set forth in the AFELMCC is asserted against a U.S.

19  Toyota Defendant and is premised on the manufacturing or sale (or lease) of a

20  vehicle, it is implausible.  These claims include a substantial portion of the foreign

21  Plaintiffs' contract- and warranty- related claims, i.e., their fifth through ninth

22  causes of action (claims for breach of express warranty, breach of implied warranty

23  of merchantability, revocation, violations of the MMA, and breach of

24  contract/common law warranty), which are dismissed with prejudice as to the U.S.

25  Toyota Defendants to the extent that they are premised on the sale (or lease) of an

allegedly defective vehicle.[21]

In sum, the Court strikes paragraph 86 of the AFELMCC as improper legal conclusions, merely couched as factual allegations, and unsupported by the "factual content" required by Iqbal.  129 S. Ct. at 1949.  Moreover, for the reasons set forth above, the Court dismisses with prejudice the fifth through ninth causes of action as to the U.S. Toyota Defendants to the extent that they are premised on the sale (or lease) of an allegedly defective vehicle.  Also, for the reasons set forth infra, the thirteenth cause of action (unjust enrichment) is dismissed with prejudice as to all Defendants.[22]

VIII.   Extraterritorial Application of Federal and State Statutes

The Toyota Defendants argue that Plaintiffs' claims under RICO, MMA, and

_____

[21]  The Court's tentative Order dismissed with prejudice (as to the U.S. Toyota Defendants) the entirety of these claims.  However, at the hearing, Plaintiffs' counsel, in seeking leave to replead claims against TEMA, suggested that these claims could be based on the sale of parts manufactured in the United States by the U.S. Toyota Defendants but incorporated into allegedly defective vehicles assembled elsewhere.  Therefore, the Court affords leave to replead these claims in part, subject to the offer of proof requirements set forth supra section XI.

[22]  As explained in a previous Order of the Court in connection with claims asserted by the domestic Plaintiffs, the foreign Plaintiffs' quasi-contractual claim for unjust enrichment may not be maintained against any Defendant.  (See Nov. 30, 2010 Order (Docket No. 510) at 87-89, 103 (dismissing unjust enrichment claim with prejudice because such a claim is not recognized as an independent cause of action under California law).)  It is dismissed with prejudice for the reasons stated therein.

California's CLRA, UCL, and FAL must be dismissed because the statutes do not
apply extraterritorially.  Plaintiffs respond that the fraudulent conduct giving rise to
Plaintiffs' claims originated in California and/or was furthered by actions taken by
the U.S. Toyota Defendants, and thus their claims are properly pled under each of
these federal and state statutes.

The Court addresses the extraterritorial application of RICO, MMA, and the
California statutes to Plaintiffs' claims below.[23]

A.      RICO Claims

1.      Summary of Parties' Contentions

Toyota argues that Plaintiffs' RICO claims must be dismissed because the
marketing, purchase, sale, or lease of Toyota vehicles by Plaintiffs, and the alleged
harm stemming from those transactions, took place outside the United States.
(Defs.' Mem. at 19-20.)  RICO is silent as to its extraterritorial application, and
thus under the analysis articulated in Morrison v. Nat'l Australia Bank Ltd., __
U.S. __, 130 S. Ct. 2869 (2010), RICO has no application to claims involving
conduct or events that occurred outside the United States.  (Defs.' Mem. at 20
(citing Norex Petrol. Ltd. v. Access Indus., Inc., 631 F.3d 29, 32-33 (2d Cir. 2010)
& Cedeno v. Intech Group, Inc., 733 F. Supp. 2d 471, 473-74 (S.D.N.Y. 2010)).

---

[23]  The Court consider the substantive aspects of these claims in Sections IX
and X.A.

Because the key transactions forming the bases for Plaintiffs' claims all arose or occurred extraterritorially, and because merely alleging some domestic conduct cannot support extraterritorial application of RICO, Toyota contends that Plaintiffs' RICO claims must be dismissed.  (Defs.' Mem. at 22; Reply at 11.)

Plaintiffs counter that "Congress intended for RICO to have extraterritorial application." (Opp'n at 22.)   Plaintiffs allege that they were "harmed by the conduct that occurred in California — namely, the false advertising that began in California, the intentional deceit regarding the number of consumer complaints and the accidents and the spurious assurances that the defect was attributable to the driver, rather than a defect in the product." (Id..)  Put differently, Toyota's fraudulent conduct "that led to the distribution, sale and lease of vehicles in other countries . . . originated, continued and was nurtured by the U.S. Toyota Defendants." (Id.)  Thus, contrary to Toyota's position, "the key transactions forming the bases for [Plaintiffs'] claims arose out of the U.S., i.e., the investigation into the SUA defects, the response to the acceleration problem, reprimands by NHTSA for concealing defects, remedies fashioned to address the consumer complaints, response to allegations covering up the severity of the incidents and revelation of serious defects." (Id.)  Toyota received thousands of complaints from consumers worldwide, including those in foreign countries, but continued to conceal defects and market their products worldwide.  (Id. at 22-23.) Accordingly, Plaintiffs submit that their RICO claims are properly pled.

1        2.   <u>Discussion</u>

2

3        The analysis of RICO's extraterritorial application begins with the Supreme

4   Court's decision in <u>Morrison</u>, which decided "whether § 10(b) of the Securities

5   Exchange Act of 1934 provides a cause of action to foreign Plaintiffs suing foreign

6   and American defendants for misconduct in connection with securities traded on

7   foreign exchanges."  130  S. Ct. at 2869, 2875.  <u>Morrison</u> held that § 10(b) did not

8   provide a cause of action because it applies only to "transactions in securities listed

9   on domestic exchanges . . . and domestic transactions in other securities."  <u>Id.</u> at

10  2884.

11

12       In reaching its decision, the Court made clear that courts must presume that a

13  statute does not apply extraterritorially unless Congress clearly expressed its

14  affirmative intention to give the statute extraterritorial effect:  "When a statute

15  gives no clear indication of an extraterritorial application, it has none."  <u>Id.</u> at

16  2877-78.  Since there was "no affirmative indication in the Exchange Act that

17  § 10(b) applies extraterritorially," the Court concluded that it did not.  <u>Id.</u> at 2883.

18  In this case, there can be no dispute that RICO is silent as to its extraterritorial

19  application.  <u>Poulos v. Caesars World, Inc.</u>, 379 F.3d 654, 663 (9th Cir. 2004)

20  ("RICO itself is silent as to its extraterritorial application."); <u>Norex Petrol.</u>,  631

21  F.3d at 32-33 (same).  Accordingly, and contrary to Plaintiffs' unsupported

22  contention that "Congress intended for RICO to have extraterritorial application"

23  (<u>id.</u>), the Court concludes that RICO <u>does not</u> apply extraterritorially.  <u>Norex</u>

24  <u>Petrol.</u>,  631 F.3d at 32-33.

25

39

1    Plaintiffs attempt to evade this extraterritorial limitation by arguing that the

2 "key transactions" giving rise to their claims originated in the United States.

3 Morrison acknowledged that the presumption against extraterritorial application of

4 a statute was not always dispositive.  130 S. Ct. at 2884.  The Morrison plaintiffs,

5 for example, contended that they sought no more than domestic application of

6 § 10(b) because the corporate defendant and its senior executives "engaged in

7 deceptive conduct manipulating [corporate defendant's] financial models" and

8 "made misleading public statements" domestically — that is, in Florida.  Id. at

9 2883-84.  However, the Court cautioned that "the presumption against

10 extraterritorial application would be a craven watchdog indeed if it retreated to its

11 kennel whenever some domestic activity is involved in the case" because "it is a

12 rare case of prohibited extraterritorial application that lacks all contact with the

13 territory of the United States."  Id. at 2884 (emphasis in original).  The Court held

14 that "the place where the deception originated," even if in the United States, did

15 not alter the Court's analysis because "the focus of the Exchange Act is . . . upon

16 purchases and sales of securities in the United States."  Id. (emphasis added).

17 Because the securities in question were not listed on "a domestic exchange, and all

18 aspects of the purchases complained of by [plaintiffs] who still have live claims

19 occurred outside the United States," the Court held that plaintiffs failed to state a

20 claim.  Id. at 2888.

21

22    It is unclear how Morrison's logic, which evaluates the "focus" of the

23 relevant statute, precisely translates to RICO.  See id. at 2888 (Breyer, J.,

24 concurring) (noting that while § 10(b) does not cover the fraudulent activity

25 alleged in Morrison, other "state law or other federal fraud statutes, see, e.g., 18

1   U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), may apply"); <u>European Cmty. v.</u>

2   <u>RJR Nabisco, Inc.</u>, No. 02-CV-5771 (NGG)(VVP), 2011 WL 843957, at *4

3   (E.D.N.Y. March 8, 2011) (stating that the "focus [of a statute] is not necessarily

4   the 'bad act,' or the actus reus, prohibited by the statute," but "[r]ather . . . 'the

5   object[ ] of the statute's solicitude,' the activities 'the statute seeks to regulate

6   [and] parties or prospective parties to those [activities] that the statute seeks

7   protect.'") (quoting <u>Morrison</u>, 130 S. Ct. at 2881).  The Court agrees in principle

8   that "the focus of RICO is on the enterprise as the recipient of, or cover for, a

9   pattern of criminal activity." <u>Cedeno</u>, 733 F. Supp. 2d at 474; <u>European Cmty.</u>,

10  2011 WL 843957, at *4 (concluding that "it is the 'enterprise' that is the object of

11  the statute's solicitude, and the 'focus' of the statute.").  Thus, the outer boundaries

12  of RICO's application under <u>Morrison</u> are not hard to discern.  <u>See</u> <u>Cedeno</u>, 733 F.

13  Supp. 2d at 474 (dismissing RICO claim against persons and entities associated

14  with the government of Venezuela because "the alleged enterprise and the impact

15  of the predicate activity upon it are entirely foreign"); <u>Norex Petrol.</u>,  631 F.3d at

16  31, 33 (dismissing RICO claim alleging a "widespread racketeering and money

17  laundering scheme with the goal of seizing control over most of the Russian oil

18  industry" because "[t]he slim contacts with the United States alleged by [plaintiff]

19  are insufficient to support extraterritorial application of the RICO statute").  What

20  is less clear, however, is RICO's application to an allegedly domestic enterprise

21  whose effects are felt outside the United States.  <u>Compare</u> <u>European Cmty.</u>, 2011

22  WL 843957, at *4 (applying nerve center test that looks to the "brains" of the

23  enterprise to determine its location), <u>with</u> <u>United States v. Philip Morris USA, Inc.</u>,

24  __ F. Supp. 2d __, 2011 WL 1113270, at *4-5 (D.D.C. March 28, 2011)

25  (evaluating the conduct of a RICO defendant, including where its activities and

1    statements took place, to determine RICO liability).

2

3        While the Toyota Defendants argue that RICO's application is precluded

4    because the marketing, purchase, sale, or lease of Toyota vehicles by Plaintiffs, and

5    the alleged harm stemming from those transactions, took place outside the United

6    States, these transactions are not necessarily dispositive as long as the enterprise,

7    which engaged in a pattern of racketeering activity, operated domestically.  In

8    other words, were foreign Plaintiffs to bring a RICO claim against an alleged

9    enterprise operating in the United States, consisting largely of domestic "persons,"

10   engaging in a pattern of racketeering activity in the United States, and damaging

11   Plaintiffs abroad, these foreign Plaintiffs might well state a claim consistent with

12   Morrison's holding.  However, given the inadequacies of the AFELMCC identified

13   herein, particularly those concerning Plaintiffs' RICO claims, the Court cannot

14   conclude that Plaintiffs' RICO claims match the hypothetical previously described.

15

16       Accordingly, Plaintiffs' RICO claims are dismissed.

17

18   B.    MMA

19

20       1.    Summary of Parties' Contentions

21

22       The Toyota Defendants argue that Plaintiffs' MMA claims must be

23   dismissed because the statute does not contain explicit language regarding its

24   extraterritorial application.  (Defs.' Mem. at 22.)  Plaintiffs oppose on the grounds

25   that Toyota made both express and implied warranties, and Plaintiffs "relied on the

marketing, brochures and advertising that started in California to purchase their vehicles." (Opp'n at 24.)

2.   Discussion

The parties agree that the MMA does not contain explicit language regarding its extraterritorial application, (Defs.' Mem. at 22; Opp'n at 23), and the Court concludes that the MMA does not apply extraterritorially. Morrison, 130 S. Ct. at 2877-78. Moreover, as indicated previously, the Court has dismissed all domestic Toyota Defendants with respect to Plaintiffs' warranty claims — implied or otherwise — leaving only TMC as a remaining Defendant. Morrison undoubtedly bars application of the MMA based on warranty claims asserted by foreign plaintiffs against foreign defendants. See id.

Accordingly, Plaintiffs' MMA claims are dismissed.

C.   California's CLRA, UCL, and FAL

1.   Summary of Parties' Contentions

The Toyota Defendants argue that Plaintiffs' CLRA, UCL, and FAL claims must be dismissed because the California statutes do not have an extraterritorial reach. (Defs.' Mem. at 22.) That is, they argue that neither the CLRA, the UCL, nor the FAL apply to provide relief for non-California residents for conduct occurring outside of California. (Id.) The Toyota Defendants claim that the

AFELMCC alleges the "key transactions and events forming the basis for

Plaintiffs' claims occurred not only outside of California, but outside of the United

States." (Id. at 23.)  The Toyota Defendants argue, for example, that Plaintiffs

allege the cars were owned or leased outside of California, in Plaintiffs'

"respective countries" (¶ 27); the alleged SUA incidents occurred outside of the

United States (¶¶ 36-55; 57-78); and Plaintiffs saw advertisements, most likely

outside of the United States. (Defs.' Mem. at 23.)   They also argue that Plaintiffs'

allegations cannot establish the "constitutionally-mandated 'significant contact'

with California" that is required to maintain an action under the California

consumer protection statutes.  (Id. at 23 (citing Tidenberg v. Bidz.com, Inc., No.

CV 08-5553 PSG (FMOx), 2009 WL 605249, at *4 (C.D. Cal. March 4, 2009)).)[24]


      Plaintiffs argue that the foreign Plaintiffs "relied on marketing, brochures,

and advertising that started in California to purchase their vehicles."  (Opp'n at

24.)  However, the AFELMCC does not set forth factual allegations to support this

claim, and Plaintiffs have not set forth specific citations or further argument in

their Opposition brief.

_____

[24]  The Court notes that Plaintiffs here have alleged more than the plaintiff
alleged in Tidenberg.  In that case, the plaintiff alleged only that the defendant's
principal place of business was in California, but she did not allege the injury took
place in California or that defendants' unlawful conduct occurred in California.
Tidenberg, 2009 WL 605249, at *5.  Here, Plaintiffs have alleged that "much of
the conduct that forms the basis of the complaint emanated from Toyota's
headquarters in Torrance, California."  (¶ 28.)  However, as shown below,
Plaintiffs have not sufficiently connected this allegation with advertising or
marketing conduct in California that caused injuries in their respective countries.

2. <u>Discussion</u>

Plaintiffs have not set forth factual allegations showing that the Toyota Defendants' activities in California are connected with the advertising and marketing efforts that are allegedly responsible for foreign Plaintiffs' injuries.  One allegation in the AFELMCC, which is identical to the language in the MCC, is that California is the situs for "much of the conduct that forms the basis of the complaint."  (<u>Compare</u> MCC ¶ 28 <u>with</u> ¶ 33.)  The problem with Plaintiffs' allegation is that it does not establish <u>who</u> developed, designed, or disseminated advertising to each of the Plaintiffs' home countries.  Moreover, Plaintiffs' allegations that Defendants "marketed, advertised and sold automotive vehicles in this state having the same SUA defect as Toyota vehicles sold worldwide" and that "[t]he primary sale, marketing and advertising arm of Toyota is located in this District" (¶ 33) fail to connect a specific Defendant or Defendants with marketing or advertising practices overseas.  With these examples as a backdrop of the general deficiencies contained in the AFELMCC, the Court now turns to Plaintiffs' CLRA, UCL, and FAL claims.

a.    <u>CLRA and UCL</u>

State statutory remedies under the CLRA and UCL may be available to non-California residents <u>if</u> those persons are harmed by wrongful conduct occurring in California.  <u>Wershaba v. Apple Computer, Inc.</u>, 91 Cal. App. 4th 224, 242 (2001) (affirming certification of nationwide class where out-of-state class members were deceived by representations "disseminated from" California); <u>Norwest Mortg., Inc.</u>

45

v. Superior Court, 72 Cal. App. 4th 214, 224-25 (1999) (vacating trial court's order granting class certification to non-California residents for conduct that occurred outside of California).  As the California Court of Appeal noted in Norwest Mortgage, the insurance company's headquarters and principal place of operations were outside of California, and therefore California had no interest in regulating conduct unconnected to California.  Id. at 223-25.  Moreover, the court found that "the UCL contains no express declaration that it was designed or intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California."  Id. at 222.  Importantly, these cases did not address whether the state laws protected plaintiffs who are neither residents of California, nor residents of the United States.[25]

The Toyota Defendants cite to Norwest Mortgage, Tidenberg, and Churchill Village, LLC v. Gen. Elec. Co., 169 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2000), for the proposition that non-California residents cannot bring UCL or FAL claims where conduct or injuries do not occur in California.  (Defs.' Mem. at 23-24.)  In Norwest Mortgage, the court held that conduct between non-California residents

---

[25] The Court finds a corollary with respect to the extraterritorial reach of federal legislation, noting that the Supreme Court has declined to apply a federal statute abroad unless Congress explicitly intends such a result.  See EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (overruled by statute on other grounds).  Here, there is no indication the California Legislature intended for either the UCL or the CLRA to apply to residents of other countries whose only connection to California is purchasing a vehicle in reliance on representations that may have disseminated from California.  Moreover, the Court fails to see how California would have an interest in preventing fraudulent practices where a plaintiff living overseas cannot allege a connection between their harm and corporate actions in California.

1   occurring outside of California by defendants with headquarters outside of

2   California could not form the basis of an actionable UCL claim.  Norwest Mortg.,

3   72 Cal. App. 4th at 218.  In Tidenberg, the court found that the plaintiff had not

4   alleged "significant contact" with California and the plaintiff lacked standing to

5   bring UCL and FAL claims.  Tidenberg, 2009 WL 605249, at *5.  In Churchill

6   Village, the court held that a defendant's in-state sales in California were

7   insufficient to establish a nexus with California to support a UCL claim.  The

8   Toyota Defendants argue that none of the Plaintiffs have pled sufficient facts that

9   they were harmed by conduct occurring in California.  (Defs.' Mem. at 23.)

10

11       Plaintiffs argue that these cases are inapposite because the conduct "occurred

12  entirely outside [California]."  (Opp'n at 24.)  Plaintiffs argue that the "unique

13  situation in this case is that the history of deception promulgated by Toyota spans

14  local, domestic and foreign plaintiffs, unlike in Churchill [Village], Norwest

15  [Mortgage], and Tidenberg."  (Id.)  However, Plaintiffs have not alleged facts to

16  support this argument in their AFELMCC.  They have alleged only that "the

17  decision to . . . engage in deceptive marketing was made, in part, in California."

18  (¶ 28.)  The Court agrees that in theory a foreign plaintiff could state a CLRA or

19  UCL claim based on California conduct having effects outside California.

20

21       However, the Court finds that Plaintiffs' allegations are insufficient to

22  distinguish the case from Norwest, in which no conduct occurred in California,[26]

23  _____

24       [26]  Although the Toyota Defendants have significant connections with
    California, Plaintiffs have not alleged that marketing decisions about the
25  representations each Plaintiff saw in his or her home country were made in

and Tidenberg and Churchill, in which some conduct occurred in California (but
what occurred was nonetheless insufficient to support a UCL claim).[27]  In
determining whether the UCL and CLRA apply to non-California residents, courts
consider where the defendant does business, whether the defendant's principal
offices are located in California, where class members are located, and the location
from which advertising and other promotional literature decisions were made.
Wershaba, 91 Cal. App. 4th at 241-42 (citing Clothesrigger, Inc. v. GTE Corp.,
191 Cal. App. 3d 605, 613 (1987)).  Here, Plaintiffs have not alleged with
sufficient detail that the point of dissemination from which advertising and
promotional literature that they saw or could have seen is California.  Accordingly,
Plaintiffs' claims under the UCL and CLRA are dismissed because these California
statutes cannot provide relief for non-California residents who cannot allege a
sufficient connection to California.

b.    FAL

Courts have recognized that the FAL is limited to application in California.
See, e.g., Churchill Village., 169 F. Supp. 2d at 1127.  The FAL prohibits false or
misleading statements "made or disseminated before the public in this state" and

_____

California.

[27]  CLRA claims were not asserted in these cases, but the Court sees no
reason not to apply their analysis to the CLRA claim alleged here.  Chavez v. Blue
Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010) (California
consumer protection laws, including CLRA, apply to nonresident plaintiffs who
establish significant contacts between California and the claims asserted).

"from this state before the public in any state ."  Cal. Bus. & Prof. Code § 17500.
The Court sees no reason to extend the protection of the FAL beyond the plain
meaning of the statute to cover statements that are not made "before the public of
this state" and are not sufficiently alleged to be "from this state."  Plaintiffs cannot
recover on an FAL claim because they are not California residents.  Accordingly,
the Court dismisses this claim as well.[28]

IX.   RICO Claims

        The Toyota Defendants argue that Plaintiffs have failed to state a claim for
violation of RICO.  For the following reasons, the Court agrees.

        A.     Elements and Pleading Requirements

        "The elements of a civil RICO claim are as follows: '(1) conduct (2) of an
enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate
acts') (5) causing injury to plaintiff's 'business or property.'"  Living Designs, Inc.
v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quoting
Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996)).  An "enterprise" is defined

---

        [28]   During the hearing, the Court stated that Plaintiffs could replead, if they
so chose, the factual allegations supporting this claim, and they are free to replead
their advertising-based claims under the UCL and CLRA.  However, upon further
reflection, the Court has determined that the scope of the FAL statute simply does
not allow non-California residents to recover for statements that were not made or
disseminated before the public in California.  Thus, this claim is dismissed with
prejudice.

1   to include "any individual, partnership, corporation, association, or other legal

2   entity, and any union or group of individuals associated in fact although not a legal

3   entity." 18 U.S.C. § 1961(4). Racketeering activity is any act indictable under any

4   of the statutory provisions listed in 18 U.S.C. § 1961(1). A "pattern of

5   racketeering activity" requires the commission of at least two such acts within a

6   ten-year period. 18 U.S.C. § 1961(5).

7

8   Plaintiffs allege that "Defendants, [their] worldwide affiliates, and their

9   salespersons" comprise the RICO enterprise. (¶ 306.) Plaintiffs allege that the

10  Toyota Defendants have engaged in the following predicate acts of racketeering

11  activity: mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18

12  U.S.C. § 1343, laundering of monetary instruments in violation of 18 U.S.C.

13  § 1956, and interstate transportation of more than $5,000 knowing the same to

14  have been taken by fraud in violation of 18 U.S.C. § 2314. (¶ 306.) These

15  predicate acts are grounded in fraud. Accordingly, the pleading requirements of

16  Rule 9(b) apply to the alleged predicate acts. See Edwards v. Marin Park, Inc., 356

17  F.3d 1058, 1065-66 (9th Cir. 2004) (Rule 9(b) "applies to civil RICO fraud

18  claims.") (citing Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1392 (9th

19  Cir. 1989)); In re All Terrain Vehicle Litig., 771 F. Supp. 1057, 1059-60 (C.D. Cal.

20  1991) (applying 9(b) to predicate acts of mail fraud, wire fraud, and interstate

21  transportation of stolen property); Best Deals on TV, Inc. v. Naveed, No. C 07-

22  1610 SBA, 2007 WL 2825652, at *7 (N.D. Cal. Sept. 26, 2007) ("Most courts have

23  held that allegations of money laundering must satisfy 9(b)'s requirements because

24  money laundering involves an element of fraud.") (citations omitted); Spitzer v.

25  Abdelhak, No. CIV. A. 98-6475, 1999 WL 1204352, at *5 (E.D. Pa. Dec. 15,

50

1   1999) (applying Rule 9(b) where the alleged predicate acts were mail fraud, wire

2   fraud, money laundering, and interstate transportation of fraudulently obtained

3   money because "[a]ll of these predicate acts contain an element of fraud").

4

5        Under Rule 9(b), "[a]verments of fraud must be accompanied by the who,

6   what, when, where, and how of the misconduct charged." <u>Vess v. Ciba Geigy</u>

7   <u>Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks

8   omitted).  In the context of RICO, Rule 9(b) requires that the Plaintiffs "detail with

9   particularity the time, place, and manner of each act of fraud, plus the role of each

10  defendant in each scheme." <u>Lancaster Cmty. Hosp. v. Antelope Valley Hosp.</u>

11  <u>Dist.</u>, 940 F.2d 397, 405 (9th Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  A plaintiff

12  may not simply lump together multiple defendants without specifying the role of

13  each defendant in the fraud. <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764 (9th Cir.

14  2007).

15

16       Plaintiffs fail to allege the "where" and "who" of the predicate acts with the

17  requisite particularity.  Although Plaintiffs include allegations regarding where

18  each Plaintiff lives and where each Plaintiff purchased or leased his or her vehicle,

19  Plaintiffs do not allege where they were exposed to the alleged misrepresentations.

20  Moreover, the allegations of racketeering activity repeatedly ascribe conduct to

21  "Toyota" or "Defendants" generally.  (<u>See, e.g.</u>, ¶¶ 314-15, 326-37, 339, 341, 345,

22  348-50.)  Plaintiffs lump all of the Defendants together instead of "attribut[ing]

23  specific conduct to individual defendants." <u>Moore v. Kayport Package Express,</u>

24  <u>Inc.</u>, 885 F.2d 531, 541 (9th Cir.1989).  The allegations fail to inform each of the

25  five Toyota Defendants of its particular role in the predicate acts.  Accordingly, the

AFELMCC fails to state a claim for RICO violation against the Toyota Defendants because it does not "reasonably notify the defendants of their purported role in the scheme," which is "perhaps the most basic consideration underlying Rule 9(b)." Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir. 1994) (internal quotation marks and citations omitted).

Accordingly, the Court finds that the Plaintiffs have failed to state a claim for violation of RICO because they have not adequately alleged predicate acts of racketeering activity.  Although this deficiency provides an independent basis for dismissing Plaintiffs' RICO claim, the Court notes that additional deficiencies exist with respect to Plaintiffs' allegations under each of the subsections of § 1962.

B.     Section 1962(a)

Section 1962(a) makes it "unlawful for any person who has received any income derived . . . from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest . . . any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of" an enterprise.  18 U.S.C. § 1962(a).

"A plaintiff must show that the defendant's RICO violation was not only a 'but for' cause of his injury, but that it was a proximate cause as well." Oki Semiconductor Co. v. Wells Fargo Bank, N.A., 298 F.3d 768, 773 (9th Cir. 2002) (citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268-69 (1992)).  To adequately allege proximate cause, a "'plaintiff seeking civil damages for violation

of § 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income.'" Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1149 (9th Cir. 2008) (quoting Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co., 981 F.2d 429, 437 (9th Cir. 1992)).  Alleging that a defendant reinvested "proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation." Id. (citations omitted).  Otherwise, "'almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.'" Westways World Travel v. AMR Corp., 182 F. Supp. 2d 952, 960 (C.D. Cal. 2001) (quoting Brittingham v. Mobil Corp., 943 F.2d 297, 305 (3d Cir. 1991), overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258 (3d Cir. 1995)). The Ninth Circuit therefore has held that Plaintiffs must allege an injury that is "separate and distinct from the injury flowing from the predicate act" in order to plead a violation of § 1962(a). Sybersound Records, 517 F.3d at 1149.


The only injury asserted by Plaintiffs is the economic loss associated with the decreased value of their vehicles.[29] (See ¶ 350.)  This alleged economic loss is the same injury that Plaintiffs assert has flowed from the Toyota Defendants'

---

[29] In their Opposition, Plaintiffs suggest that they also have alleged physical injury resulting from the defects, (Opp'n at 28), but they ignore the fact that their class is not defined to cover personal injury (¶¶ 297-98), and that nowhere in the AFELMCC do Plaintiffs allege that they sustained physical injuries as a result of the Toyota Defendants' allegedly fraudulent conduct, let alone as a result of the use or investment of racketeering proceeds.  But more importantly, RICO only covers harm to "business or property." 28 U.S.C. § 1964(c); Living Designs, 431 F.3d at 361.

predicate acts.  (Id.)  Plaintiffs have not alleged that they sustained any other injury

that was caused by any of the Defendants' alleged use or investment of

racketeering income.  Thus, Plaintiffs have not alleged any injury that is "separate

and distinct" from the economic loss that Plaintiffs allege flowed from the

predicate acts themselves.  Sybersound Records, 517 F.3d at 1149.


            Accordingly, Plaintiffs have not stated a claim for violation of § 1962(a).


      C.      Section 1962(b)


      Section 1962(b) makes it unlawful "to acquire or maintain . . . any interest in

or control of" an enterprise "through a pattern of racketeering activity or through

collection of an unlawful debt."  18 U.S.C. § 1962(b).  To state a claim under this

subsection, a plaintiff must allege "1) the defendant's activity led to its control or

acquisition over a RICO enterprise, and 2) an injury to plaintiff resulting from

defendant's control or acquisition of a RICO enterprise."  Wagh v. Metris Direct,

Inc., 363 F.3d 821, 830 (9th Cir. 2003) (internal quotation marks and citation

omitted).


      The Toyota Defendants argue that Plaintiffs have failed to state a claim for

violation of this subsection because Plaintiffs have not alleged that the Toyota

Defendants' racketeering activity led to their acquisition of control of an

enterprise.[30]  (Defs.' Mem. at 25; Reply at 14-15.)  Plaintiffs respond that the

Toyota Defendants' "act of omitting and giving false statements shows [Toyota's]

control and acquisition over a RICO enterprise."  (Opp'n at 28-29.)  Plaintiffs'

argument is inapposite.  Alleging that the Toyota Defendants possessed control of

the alleged enterprise such that they were able to make the false statements and

omissions does not adequately allege violation of § 1962(b).  Rather, Plaintiffs

would have to allege that the Toyota Defendants acquired or maintained an interest

in or control of the enterprise through their predicate acts.  Because Plaintiffs have

not alleged that Defendants' predicate acts led to their acquisition or maintenance

of an interest in or control of the RICO enterprise, they have not adequately alleged

a violation of § 1962(b).


    Moreover, as with § 1962(a), Plaintiffs seeking civil damages for violation

of § 1962(b) must allege proximate causation.  Oki Semiconductor, 298 F.3d at

773.  To adequately allege proximate causation under § 1962(b), a plaintiff must

allege an "injury from the defendant's acquisition or control of an interest in a

RICO enterprise" separate from an injury flowing from the racketeering activity

─────────────────

    [30]  In making this argument, the Toyota Defendants inaccurately assert that
U.S. Concord, Inc. v. Harris Graphics Corp., 757 F. Supp. 1053, 1060 n.12 (N.D.
Cal. 1991), stands for the proposition that "the necessary pleading requirement for
subsection (b) is the averment of an injury that arises when a Defendant wrongfully
acquires control of an enterprise."  (Reply at 14, emphasis added.)   Instead, U.S.
Concord observed that an adequate injury may arise where a defendant "acquire[s]
or maintain[s] an interest in or control of an enterprise."  Id. at 1160 (emphasis
added).  The example in footnote 12 of U.S. Concord that the Toyota Defendants
rely on for their assertion is merely illustrative.  Id. at 1160, n.12.  Nonetheless, as
explained below, Plaintiffs have not adequately alleged a violation or proximately
caused injury under this subsection.

1    itself.  U.S. Concord, 757 F. Supp. at 1060.  Plaintiffs have not alleged any injury

2    other than the alleged economic loss flowing from the racketeering activity.

3    Therefore, Plaintiffs have failed to state a claim for violation of § 1962(b) because

4    they have not alleged an injury separate and distinct from the injury flowing from

5    the predicate acts.  See OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp.

6    2d 357, 372 (S.D.N.Y. 2005) ("[T]o state a claim under Section 1962(b), a plaintiff

7    must allege that he suffered an injury resulting from the defendant's acquisition or

8    maintenance of its interest, (i.e., an acquisition or maintenance injury), as distinct

9    from an injury caused by the predicate acts alone.") (internal quotations and

10   citations omitted).

11

12          Accordingly, Plaintiffs have not stated a claim under § 1962(b).

13

14          D.      Section 1962(c)

15

16          Section 1962(c) makes it "unlawful for any person employed by or

17   associated with any enterprise . . . to conduct or participate . . . in the conduct of

18   such enterprise's affairs through a pattern of racketeering activity or collection of

19   unlawful debt." 18 U.S.C. § 1962(c).  "[T]o establish liability under § 1962(c) one

20   must allege and prove the existence of two distinct entities: (a) a 'person'; and (2)

21   an 'enterprise' that is not simply the same 'person' referred to by a different

22   name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).  This

23   requirement that the RICO enterprise be distinct from the RICO person is often

24   called the "distinctness requirement."  See id. at 162.

25

In Cedric Kushner Promotions, the Supreme Court held that the distinctness requirement was satisfied where the RICO person was an individual and the RICO enterprise was his wholly owned corporation. Id. at 166. The Court explained that "[t]he corporate owner/employee, a natural person, [was] distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." Id. at 163. However, the Court distinguished that case from cases where the corporate entity is both the "person" and the "enterprise," such as in Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339 (2nd Cir. 1994), where the "corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" Cedric Kushner Promotions, 533 U.S. at 164. Although the Supreme Court "did not consider the merits of such cases," the Court "note[d] their distinction from the facts presented in Cedric Kushner Promotions. Id. at 164.

The instant case is much more similar to Riverwoods Chappaqua than Cedric Kushner Promotions. Plaintiffs in the instant case allege that the corporate family of Toyota Defendants constitute both the "person" and the "enterprise" for the purpose of RICO. Although Plaintiffs identify conduct committed by certain individual employees, none of the employees are named as defendants. Nor have Plaintiffs alleged all of the elements of fraud, such as intent to deceive, with respect to those individuals. Accordingly, Plaintiffs have not alleged that those individuals committed any of the predicate acts of racketeering. Instead, Plaintiffs explicitly allege that the Toyota "Defendants are 'persons' as defined by 18 U.S.C. § 1961(3)," (¶ 313), and the Toyota "Defendants, [their] worldwide affiliates, and their salespersons" constitute the "enterprise." (¶ 306.) Plaintiffs therefore have

1  not satisfied the distinctness requirement.  See Living Designs, 431 F.3d at 361

2  (observing that, where "the 'person' alleged was [the corporate defendant] . . . if

3  the 'enterprise' consisted only of [the corporate defendant] and its employees, the

4  pleading would fail for lack of distinctiveness") (citing Cedric Kushner

5  Promotions, 533 U.S. at 164); Fogie v. THORN Americas, Inc., 190 F.3d 889, 897

6  (8th Cir. 1999) (finding distinctness requirement not met where the plaintiffs

7  alleged "that the RICO enterprise consist[ed] solely of wholly owned, related

8  business entities, and that some of the wholly owned subsidiaries conducted the

9  racketeering activities for the enterprise"); Ice Cream Distrib. of Evansville, LLC

10  v. Dreyer's Grand Ice Cream, Inc., No. 09-5815 CW, 2010 WL 3619884, at *5

11  (N.D. Cal. Sept. 10, 2010) (citations omitted) ("[A] § 1962(c) claim [cannot] be

12  based on a RICO enterprise comprised of a corporation, a wholly-owned subsidiary

13  and an employee of that corporate family if these entities were also plead as the

14  RICO persons.").

15

16       This conclusion comports with the purpose of RICO.  As the Supreme Court

17  observed in Cedric Kushner Promotions, insofar as RICO seeks "to prevent a

18  person from using a corporation for criminal purposes, . . . the person and the tool[]

19  are different entities, not the same."  533 U.S. at 162.  Here, Plaintiffs allege that

20  the person and the tool are the same entities and, therefore, Plaintiffs have not met

21  the distinctness requirement.

22

23       Accordingly, Plaintiffs have not stated a claim under § 1962(c).

24

25

1    E.      Section 1962(d)

2

3        Section 1962(d) prohibits any person from conspiring to violate any of the

4    aforementioned subsections.  Because Plaintiffs have failed to state a claim under

5    subsections (a), (b), or (c), their claim under subsection (d) likewise fails.  Turner

6    v. Cook, 362 F.3d 1219, 1231 n.17 (9th Cir. 2004); Religious Tech. Ctr. v.

7    Wollersheim, 971 F.2d 364, 367 n.8 (9th Cir. 1992).

8

9    F.      Disposition of RICO Claims

10

11       For these reasons, Plaintiffs' claim for violation of RICO is dismissed. The

12   Court grants Plaintiffs leave to replead the RICO claim as asserted under § 1962(c)

13   and § 1962(d) (to the extent it is premised on a § 1962(c) violation), but dismisses

14   with prejudice the RICO claim as asserted under § 1962(a), (b), and (d) (to the

15   extent it is premised on § 1692(a) or (b)).

16

17   X.   California Consumer Fraud Claims and Fraudulent Concealment

18

19       The parties do not dispute that Plaintiffs' consumer and common law fraud

20   claims must satisfy the heightened pleading requirement under Federal Rule of

21   Civil Procedure 9(b).  (Defs.' Mem. at 14; Opp'n at 15.)  That is, Plaintiffs must

22   allege the "who, what, when, where, and how" of the fraudulent conduct charged.

23   Vess, 317 F.3d at 1106.  As Plaintiffs argue, a pleading is sufficient under Rule

24   9(b) if it identifies the circumstances constituting fraud so that a defendant can

25   prepare an adequate answer from the allegations.  (Opp'n at 15 (citing Moore, 885

59

F.2d at 540).)  While statements of the time, place, and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient.  <u>Moore</u>, 885 F.2d at 540.

A.    <u>CLRA, UCL, and FAL</u>

The Toyota Defendants argue that Plaintiffs have not established where and when the Toyota Defendants distributed marketing materials outside the United States or made representations Plaintiffs saw.  (Defs.' Mem. at 15.)  The Toyota Defendants also argue that Plaintiffs have not alleged who made the representations, what the representations were, and how they were made.  The "who" cannot be satisfied by undifferentiated allegations attributed to the Toyota Defendants as a group.  <u>Swartz</u>, 476 F.3d at 764 ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'requires plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'").  Although there is an issue here as to whether the applicable consumer statutes have extraterritorial application, even if they did, the Court finds that Plaintiffs have not pled these claims with a sufficient degree of particularity to meet the requirements under 9(b).

As an example of the pleading deficiencies, the Court uses the first two parties listed in the AFELMCC, Laura Jimenez Centeno and Eliza Esquivel Lozano, both residents of Mexico.  They allege they "saw advertisements for Toyota vehicles on television, in magazines, on billboards, in brochures at the

dealership, and [on] Toyota's website for several years" before 2007 and 2008,

respectively, when they purchased their Toyota vehicles.  (¶¶ 36-37.)  Both

Plaintiffs allege that "safety and reliability were consistent themes" across the

advertisements they saw.  (Id.)  These allegations appear to be repeated for every

party listed as a plaintiff in this section, with some differences in the length of time

a plaintiff saw the advertisements (¶ 45 (alleging plaintiff saw advertisement

"months" before purchase, instead of years)); whether a plaintiff saw

advertisements on the Internet (¶ 57; ¶ 58 (no allegations of type of media through

which advertisements were disseminated)); and whether a plaintiff saw

advertisements that discussed only the safety of the vehicles (as opposed to safety

and reliability) (¶ 59).  Missing from the allegations about each Plaintiff, however,

is a connection between the representations each Plaintiff alleges he or she saw,

and the Toyota Defendants' marketing practices in the United States.  (Defs.'

Mem. at 11.)


          Plaintiffs allege what the representations were (claims about safety and

reliability); when the representations were made (several years before the purchase

of the vehicles); and how they were made (television, magazines, billboards,

brochures, and websites).  However, the allegations do not state who made the

representations or where the Plaintiffs saw them.  Allegations about "Toyota

advertisements," without particularity, are insufficient to establish who made

which statements.  Plaintiffs do not allege a connection between specific Toyota

Defendants and advertisements disseminated outside of the United States.

Moreover, Plaintiffs do not allege where they saw the representations — whether

in their home countries or elsewhere.[31]  Failing to plead the "who" and "where" requirements of <u>Vess</u> necessarily means that Plaintiffs have not met the pleading requirements under Rule 9(b).  Thus, even if the California state statutes had an extraterritorial reach such that Plaintiffs could recover on any of their consumer law claims, the allegations in the AFELMCC are insufficient to meet the pleading standard under Rule 9(b).

## B.   Fraudulent Concealment

The Toyota Defendants raise the same arguments recited above in support of their argument that Plaintiffs' fraudulent concealment claim under California law is deficient under Rule 9(b).  (Defs. Mem. at 15.)  They also argue with respect to the fraudulent concealment claim that Plaintiffs fail to allege specific facts regarding each Toyota Defendant's knowledge of, and concealment of, purported defects of vehicles marketed to or purchased by foreign Plaintiffs.  (<u>Id.</u>)

A fraud by omission or fraud by concealment claim "can succeed without the same level of specificity required by a normal fraud claim."  <u>Baggett v. Hewlett-Packard Co.</u>, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007).  However, fraud by concealment is actionable only if the defendant had a duty to disclose the concealed fact.  <u>Id.</u> at 1267.

_____

[31]  At least one putative Plaintiff, Paul Anthony Banton of Jamaica, could have seen advertisements in the United States and in his home country, but he is not properly included in the foreign class because his vehicle was manufactured in the United States.  <u>See supra</u> note 14.

Plaintiffs sufficiently allege a duty to disclose because they claim that Toyota had exclusive knowledge of material facts, actively concealed material facts, and made partial representations and suppressed other material facts. (¶¶ 451-52.)  See Baggett, 582 F. Supp. 2d at 1267-68.  Plaintiffs also sufficiently allege justifiable reliance, stating that representations regarding safety and reliability influenced their purchasing decisions, and that they would not have purchased a Toyota, or paid as much for it, had they known of the defect, (¶¶ 36-79), as well as resulting damages (see, e.g., id.; ¶¶ 45, 292, 456).

Plaintiffs' remaining allegations are sufficient to plead the "what" (concealment of an SUA defect (¶¶ 5, 10, 17, 25, 100, 135, 167, 222-23, 274, 452-53)), the "why" (to induce customers to purchase Toyota cars at the prices sold (¶ 453 )), and the "how" (instead of telling consumers and the government about SUA problems, the problems were concealed so as not to disrupt Toyota's business (¶¶ 10, 24, 119, 140, 145, 153, 155, 168-70, 183, 196, 211)).  Baggett, 582 F. Supp. 2d at 1265.

However, as with their consumer fraud claims, Plaintiffs fail to allege the "who" and the "where."  As the Court explained above, general allegations about statements, or omissions, by "Toyota" are insufficient to establish which Defendant made which statements and/or omissions.  Plaintiffs also fail to plead facts supporting the contention that the Toyota Defendants fraudulently concealed facts from foreign Plaintiffs; namely, specific facts alleging the "where" are wholly wanting.  Although nearly identical allegations may have sufficed in the domestic Plaintiffs' complaint, the issue of "where" was not present.  Here, Plaintiffs name

63

several domestic Toyota Defendants, as well as TMC, but fail to explain how the Defendants interacted with foreign Plaintiffs such that Toyota's alleged fraudulent omissions reached and impacted foreign Plaintiffs.

Thus, Plaintiffs' fraudulent concealment claim is insufficiently pled under Rule 9(b).

XI.   <u>Conclusion</u>

As set forth more fully herein, the Court dismisses the AFELMCC in its entirety on the bases of standing, improper joinder, the failure to plead certain claims sufficiently, and the failure to establish that certain statutes may be applied extraterritorially.  Moreover, for the reasons set forth more fully herein, the Court dismisses <u>with</u> prejudice certain claims set forth in the AFELMCC.  Those claims are:

- All claims asserted against TMCC;
- Plaintiffs' first cause of action (RICO) to the extent the claim is based on § 1962(a), (b), and (d) (to the extent it is premised on § 1692(a) or (b);
- Plaintiffs' fourth cause of action (FAL), as to all the Toyota Defendants;
- Plaintiffs' fifth through ninth causes of action (claims for breach of express warranty, breach of implied warranty of merchantability, revocation, violations of the MMA, and breach of contract/common law warranty) as to the U.S. Toyota Defendants to the extent that they

are premised on the sale (or lease) of an allegedly defective vehicle;
and

•       Plaintiffs' thirteenth cause of action for unjust enrichment as to all the
        Toyota Defendants.

The Court grants Plaintiffs 60 days leave to replead those claims and issues
that have been dismissed without prejudice.

Although granting leave to replead, the Court, at the hearing, accepted the
suggestion of the Toyota Defendants that certain issues be subject to an offer of
proof.  Accordingly, the grant of leave to replead is subject to a requirement that
Plaintiffs make an offer of proof as to a number of outstanding issues. Specifically,
within 20 days of the entry of this Order, Plaintiffs shall file an offer of proof as to
the following issues:

•       How Plaintiffs would resolve the current joinder pleading defects;

•       How Plaintiffs would tie the actions of the U.S. Toyota Defendants
        and TMC to any manufacturing claim in the various countries where
        the vehicles were manufactured; and

•       How, in light of the foregoing requirement regarding manufacturing
        claim(s), Plaintiffs plan to replead claims against TEMA.

The Toyota Defendant may file a response thereto within 10 days of filing.

**IT IS SO ORDERED.**

DATED:  April 8, 2011

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE