# EXHIBIT F – John Lang Deposition Transcript and Exhibits

# EXHIBIT Q

# In Re:

*Toyota Motor Corp (Unintended Acceleration)*

---

*John Lang*
*September 28, 2010*

---

## GOLKOW TECHNOLOGIES, INC.

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File jl092810.txt

Min-U-Script®

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


IN RE: TOYOTA MOTOR     : CASE NO.
CORP. UNINTENDED        : 8:10ML2151 JVS
ACCELERATION,           : (FMOx)
MARKETING, SALES        :
PRACTICES, AND          :
PRODUCTS LIABILITY      :
LITIGATION              :


- - -

SEPTEMBER 28, 2010

- - -

Videotape deposition of JOHN LANG held in the offices

of JAMS, 500 N. State College Boulevard, 14th Floor,

Orange, California, commencing at 9:12 A.M., on the

above date before Pamela Cotten, CSR, RDR, Certified

Realtime Reporter, Certificate No. 4497.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

002942

John Lang

2

1    A P P E A R A N C E S :

2

3            ROBINSON, CALCAGNIE & ROBINSON, INC.
             BY:  MARK P. ROBINSON, JR., ESQ.
4            7th Floor
             620 Newport Center Drive
5            Newport Beach, California  92660
             mrobinson@rcrlaw.net
6            (949) 720-1288
             Counsel for the Plaintiffs
7

8            SUSMAN GODFREY, L.L.P.
             BY:  ROBERT S. SAFI, ESQ.
9            Suite 5100
             1000 Louisiana Street
10           Houston, Texas  77002
             rsafi@susmangodfrey.com
11           (713) 653-7850
             Counsel for the Plaintiffs
12

13           KIRTLAND & PACKARD LLP
             BY:  ROBERT M. CHURELLA, ESQ.
14           Fourth Floor
             2361 Rosecrans Avenue
15           El Segundo, California  90245
             rmc@KirtlandPackard.com
16           (310) 536-1000
             Counsel for the Plaintiffs
17

18

19

20

21

22

23

24

25

002943

John Lang

3

1    A P P E A R A N C E S:   (CONTINUED)

2

3

4         RINGLER KEARNEY ALVAREZ LLP
          BY:   PAUL G. SZUMIAK, ESQ.
5         28th Floor
          633 W. Fifth Street
6         Los Angeles, California   90071
          jringler@rkallp.com
7         (213) 473-1900
          Counsel for Deluxe Holdings
8

9         BOWMAN AND BROOKE LLP
          BY:   H. FRANKLIN HOSTETLER, III, ESQ.
10        Suite 700
          879 West 190th Street
11        Gardena, California   90248
          frank.hostetler@bowmanandbrooke.com
12        (310) 768-3068
          Counsel for the Toyota Defendants
13

14        ALSTON & BIRD LLP
          BY:   LISA M. GILFORD, ESQ.
15        16th Floor
          333 South Hope Street
16        Los Angeles, California   90071
          lisa.gilford@alston.com
17        (213) 576-1000
          Counsel for the Toyota Defendants
18

19        SHEPPARD MULLIN RICHTER & HAMPTON LLP
          BY:   ANNA S. McLEAN, ESQ.
20        Four Embarcadero Center
          17th Floor
21        San Francisco, California   94111
          amclean@sheppardmullin.com
22        (415) 434-9100
          Counsel for Toyota Financial Services
23

24

25

002944

John Lang

4

1    A P P E A R A N C E S:   (CONTINUED)

2

3

4            WILLIS DEPASQUALE, LLP
             BY:   SHANE M. BIORNSTAD, ESQ.
5            Suite 550
             725 W. Town and Country Road
6            Orange, California  92868
             (714) 544-6000
7            Counsel for Bob Baker Lexus in the Saylor
             Case
8

9            STEVENSON & MURRAY
             BY:   JEREMY R. NEWELL, ESQ.
10           Suite 750
             24 Greenway Plaza
11           Houston, Texas  77046
             jnewell@johnstevensonlaw.com
12           (713) 622-3223
             Counsel for Plaintiff Scott Johnson in Texas
13

14

15   ALSO PRESENT:

16           MS. ALLISON SHUE, ESQ., Managing Counsel
             Toyota Motor Sales, U.S.A., Inc.
17
             MS. DIANA FOLIA, Paralegal
18           Robinson, Calcagnie & Robinson

19
             MS. CHRISTY McCAVERTY, Videographer
20
             EVAN J. WOLFE
21           Precision Trial Solutions

22

23

24

25

John Lang

5

I N D E X

Witness:  JOHN LANG

Examination:                                              Page

    BY MR. ROBINSON                                      9

    BY MR. SAFI                            114, 166, 170

    BY MR. CHURELLA                                    142

    BY MS. GILFORD                                     168

    BY MR. HOSTETLER                                   173

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 88 | Toyota Motors Sales Organizational Chart, One Page | 58 |
| Exhibit 89 | Document Titled "Warranty Publications Document Retention," Two Pages | 67 |
| Exhibit 90 | Document re T Codes Starting with a Page Titled "Maintenance Section, Opcode Prefixes: 001, 002, 004, 005, 011, 014, 016, 017, 019, 023, 024, 031, 032, 042, 043, 044, 046, 053, 064, 067, 088," Revised August 2009, 16 Pages | 70 |
| Exhibit 91 | Document Titled "Copy of tblWarrantyData.xlsx," Four Pages | 75 |

002946

John Lang

6

```
 1                    E X H I B I T S
                         (Continued)
 2

 3

 4      Number              Description                Page

 5    Exhibit 92    Document Titled "Toyota            78
                    Statement Regarding Safety
 6                  Recalls and Technical Service
                    Bulletins," One Page
 7
      Exhibit 93    Marked under separate
 8                  confidential cover

 9
      Exhibit 94    Printout from Excel Titled         89
10                  "Accelerator Pedal Warranty
                    Study,"  Seven Pages
11
      Exhibit 95    Marked under separate
12                  confidential cover

13
      Exhibit 96    Plaintiff's Notice of Video        108
14                  Deposition of Toyota 30(b)(6)
                    Witness, September 28, 2010
15
      Exhibit 97    1/22/08 E-mail with                145
16                  Attachment to George Morino
                    from Andrew Kemp,
17                  Subject: All Weather Floor
                    Mats
18                  Bates Nos. TOY-MDLID00006114
                    - 116
19

20

21                INFORMATION REQUESTED

22              Page            Line

23              125              21

24

25
```

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

002947

John Lang

7

1        ORANGE, CALIFORNIA - TUESDAY, SEPTEMBER 28, 2010

2                        9:12 A.M.

3

4        VIDEO OPERATOR McCAVERTY:  Good morning.  We are

5    now on the record.  My name is Christi McCaverty.  I am

6    a videographer for Golkow Technologies, Inc., One

7    Liberty Place, 1650 Market Street, 51st Street -- I'm

8    sorry, 51st floor, Philadelphia, Pennsylvania, 19103.

9    Today's date is September 28th, 2010, and the time is

10   9:12 A.M.

11           This video deposition is being held at 500

12   North State College Boulevard on the 14th floor in the

13   city of Orange, California, in the matter of In Re

14   Toyota Motor Corp. Unintended Acceleration, Marketing,

15   Sales Practices, and Product Liability Litigation for

16   the United States District Court, Central District of

17   California.  The deponent is John Lang.

18           Will counsel and those present please identify

19   themselves.

20       MR. ROBINSON:  Mark Robinson for plaintiff.

21       MR. CHURELLA:  Robert Churella for the MDL economic

22   loss plaintiffs.

23       MR. SAFI:  Rob Safi for the MDL economic loss

24   plaintiffs.

25       MR. SZUMIAK:  Paul Szumiak for the economic loss

John Lang

8

1    plaintiffs.

2         MR. NEWELL:   I'm Jeremy Newell for one of the

3    plaintiffs in Texas named Scott Johnson.

4         MR. BIORNSTAD:   Shane Biornstad for Bob Baker

5    Lexus.

6         MS. McLEAN:   Anna McLean of Sheppard Mullin for

7    Toyota Financial Services.

8         MS. SHUE:   Allison Shue, managing counsel, Toyota

9    Motor Sales, U.S.A.

10        MR. HOSTETLER:   Frank Hostetler, Bowman and Brooke,

11   for the Toyota defendants.

12        MS. GILFORD:   Lisa Gilford of Alston & Bird for the

13   Toyota defendants.

14        VIDEO OPERATOR McCAVERTY:   The court reporter is

15   Pamela Cotten, and she will now swear in the witness.

16

17                    JOHN LANG,

18   called as a witness, and having been first duly sworn

19   by the Certified Shorthand Reporter, was examined and

20   testified as follows:

21

22        VIDEO OPERATOR McCAVERTY:   Thank you, please

23   proceed.

24   ///

25   ///

John Lang

9

```
1                      EXAMINATION
2   BY MR. ROBINSON:
3       Q    Good morning, --
4       A    Good morning.
5       Q    -- Mr. Lang.  Do you want to actually state
6   your full name for the record.
7       A    John Warren Lang.
8       Q    And what is your business address, Mr. Lang?
9       A    19001 South Western Avenue, Torrance,
10  California.
11      Q    And what is your place of business?
12      A    What do you mean by place of business?
13      Q    Do you work for a company?
14      A    Yes, I do.
15      Q    What company?
16      A    TMS.
17      Q    And what is your position at T -- Toyota Motor
18  Sales; is that right?
19      A    That's correct.
20      Q    What is your position at Toyota Motor Sales?
21      A    National Warranty Operations Manager.
22      Q    And what generally are your duties as National
23  Warranty Operations Manager?
24      A    I have several functions.  Our main function
25  is to -- is to act as a payment center to pay claims
```

John Lang

10

1    for Toyota dealers and Lexus dealers and Scion dealers.

2    The other areas, we pay the claims to the dealers once

3    they are submitted to us, and then our second area is

4    to recover the monies from our parent company and other

5    plants and in some cases local suppliers from which we

6    source parts to -- directly to TMS, and the third area

7    is warranty -- we work on warranty publications and

8    policy recommendations to our parent company, and then

9    the final area is the audit function.  We audit the

10   dealers.

11       Q    You understand that you have been produced as

12   a person most knowledgeable about several topics for

13   this deposition.  Do you understand that?

14       A    Yes.

15       Q    But would it be fair to say that whether it be

16   a topic concerning unintended acceleration or the

17   Toyota Motor Sales practices, et cetera, that you are

18   going to focus mainly on warranty issues?

19       A    That's correct.

20       Q    Okay.  Let me go through each of the -- strike

21   that.

22            Let me just get some more information on your

23   background.  So why don't you give us a thumbnail

24   sketch of your educational background --

25       A    Okay.

John Lang

11

1     Q   -- and give us the years involved.

2     A   Okay.  I have a bachelor's degree in geography

3  from Indiana University, graduated in 1975.  I have a

4  master's degree from Indiana University in student

5  personnel administration and graduated in 1977, and

6  then I also have a master's degree in economics,

7  finance, and statistics from Oregon State University,

8  and I believe that was 1981.

9     Q   Okay.  Can you give us a thumbnail sketch of

10  your work history.

11     MS. GILFORD:  At TMS, Counsel?

12     THE WITNESS:  At TMS?

13  BY MR. ROBINSON:

14     Q   Well, just talk about your work history from,

15  say, '70 -- 1975 forward.

16     A   From 1975?  Well, I was a college student in

17  1975.  I was in grad school, --

18     Q   Okay.

19     A   -- and I worked as a resident assistant in the

20  residence halls at Indiana University.

21     Q   Okay.  Then what?

22     A   And then -- and then in 1977 I graduated from

23  student personnel administration, I became a residence

24  hall director at Bemidji State University.

25     (Off-the-record discussion.)

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

John Lang

12

1          MR. ROBINSON:   Okay.   Can we read the last answer
2     back, please.
3                (Last answer read.)
4     BY MR. ROBINSON:
5          Q     How long did you work there?
6          A     Two years.
7          Q     What did you do there?
8          A     I was a residence hall director, so I managed
9     about 600 students, or tried to.
10         Q     You tried to manage.   Then what did you do?
11         A     Then moved to Oregon and enrolled in a degree
12    program in economics, finance, and statistics from
13    Oregon State University.
14         Q     Okay.   Did you work during that period?
15         A     Yes.   I had an assistanceship, and I managed
16    the outdoor recreation center and I also did TA work
17    and graded papers for one of my finance professors.
18         Q     Okay.   And then you graduated from Oregon
19    State in 1981; is that right?
20         A     That's correct.
21         Q     Then what did you do?
22         A     Then I went to work for Toyota.
23         Q     What was your first position at Toyota?
24         A     I was a management trainee in the warranty
25    department for a period of about one or two months.

John Lang

13

1      Q     And where was that at?

2      A     It was in Torrance, California.

3      Q     Now, will you give us sort of an outline of

4   your progression through Toyota starting with those

5   one or two months --

6      A     Oh, sure.

7      Q     -- of warranty training.

8      A     Okay.  So I -- in 1981 I came to Torrance,

9   California, and I was a management trainee, and so I

10  spent about a month or two in warranty, and then I

11  spent about a month at TMS in customer relations, and

12  then from there I transferred to the Portland region I

13  think in January -- well, in January of 1982, I

14  believe, or December of 1982.  I can't recall exactly.

15  Then I went to work as a management trainee in our

16  Portland regional office, and I worked in

17  merchandising, customer relations, distribution, and

18  about three months later I was promoted to district

19  parts manager.

20     Q     Which district?

21     A     District 3.  It would have been Eugene,

22  Oregon, district.

23     Q     Okay.  Go right ahead.

24     A     And I did that job for about a year, year and

25  a half.

John Lang

14

1      Q     So what year did you complete that job as a
2    district parts manager?
3      A     That would have been from 1980 -- sometime in
4    1982 to about 1980 -- sometime in 1983.
5      Q     Okay.
6      A     And from there I then transferred to TMS in
7    Torrance, California, and I was a marketing
8    administrator for sheet metal promotion in the parts
9    department.
10     Q     Sheet metal promotion?
11     A     Yeah.  Body parts.
12     Q     What does that mean, "sheet metal promotion"?
13     A     Well, marketing and -- we have competition
14   from the aftermarket producers for body components, and
15   so that was at the beginning of that where the
16   Taiwanese sheet metal manufacturers --
17     Q     Oh.
18     A     -- started producing those products.
19     Q     Okay.
20     A     So my job was to try to understand that market
21   and then produce a marketing plan.
22     Q     Okay.  Then what did you do?
23     A     I think I did that for about a year, and then
24   I became the parts pricing supervisor for, oh, probably
25   two years.

John Lang

15

1    Q    So that took you to -- what -- about '86?

2    A    Yeah, I think '85 or '86, and then I

3    transferred to the market representation department.

4    Q    What was that department?

5    A    That's the franchise department, I guess it's

6    where we renew franchise agreements.

7    Q    What do you mean when you say "we renew

8    franchise agreements"?

9    A    Well, dealers have -- when we have a dealer

10   sign up as a dealer, okay, we award them a franchise.

11   We have -- typically a standard agreement is six years,

12   it is a renewable franchise agreement, and some of the

13   agreements are for one years, they could be two years,

14   it depends on if there's some deficiencies at the

15   dealership that need to be remedied, so we will give

16   them a shorter agreement.  We also have where we have

17   buy-sell -- what we call buy-sells where there's a

18   transfer of ownership, and so my job was to review the

19   dealer pro forma statements and make sure that

20   financially they met all the working capital

21   requirements and that the balance sheet and everything,

22   income projections, were accurate.

23   Q    Okay.  Did you do anything else --

24   A    I worked --

25   Q    -- in that department?

John Lang

16

1      A      In that job?

2      Q      Yeah.

3      A      Yeah.  I also had a special assignment.  We

4  had our first public -- limited partner public

5  ownership initiative.  Our dealer decided he wanted to

6  go public, and we had never done that before, so my job

7  was to work with the dealer's LP partner, which was

8  Smith Barney, in a public offering, so I had to review

9  all the documents and make sure that they -- that the

10  dealer met all of our requirements.

11      Q      So just -- what -- to what year did this

12  assignment take you through?

13      A      To about 1988.

14      Q      So I'm just looking here.  You're parts --

15  strike that.

16            You are in merchandising in Portland; right?

17      A      Yes.

18      Q      You are a district parts manager in Eugene;

19  right?

20      A      Yes.

21      Q      You are a marketing administrator for sheet

22  metal promotions; correct?

23      A      Yes.

24      Q      You are a parts pricing supervisor?

25      A      Yes.

John Lang

17

```
 1        Q     And then you are a market franchise person
 2   working with dealers; right?
 3        A     Yes.
 4        Q     And then you have a special assignment where
 5   you are actually working on the limited partnerships as
 6   well?
 7        A     Yes.
 8        Q     Okay.  And that takes us through 1988?
 9        A     (Nods head.)
10        Q     Now -- okay.  Then what did you do next at
11   Toyota Motor Sales?
12        A     Then I was promoted to a manager in charge of
13   market research.
14        Q     What did that entail?
15        A     I did market research on service and parts
16   issues.  I also did some market research on vehicles.
17   We did market research to look at what -- what should
18   the Avalon design be, so we did some studies on that.
19   We did wheel studies, you know, appeal studies.
20        Q     Did you say wheel studies?
21        A     Wheels, like on the vehicle.
22        Q     When you say studies, are these like --
23        A     Well, it would be research where we would have
24   focus groups or we would bring in a clinic, we would
25   call them clinics, and we would have potential
```

John Lang

18

1   customers look at our wheels versus the competition

2   and -- to determine if ours were appealing to the

3   customer or not.

4       Q    Would your research entail interviewing people

5   from various parts of the country?

6       A    Yes.  Yeah.  We would set up focus groups

7   across the country.

8       Q    You would have to travel around the country?

9       A    Yes.

10      Q    Approximately how long did you do that?

11      A    I did that for about two -- two years.

12      Q    To 1990?

13      A    Yes.

14      Q    When you say "wheel studies," you wanted

15  to see what wheels people liked the looks of, or what

16  was --

17      A    Yes.

18      Q    Okay.  And when you say you survey parts, I

19  mean, just as an example, how would you focus group

20  parts?

21      A    Oh, with research?

22      Q    Yes.

23      A    We studied the J.D. Power results.

24      Q    So that you would just analyze the results

25  of --

John Lang

19

1       A    We would look at the results and then we would

2    write up an analysis of what the results were, where

3    our deficiencies were as a company.

4       MS. GILFORD:  Just for the record, make sure you

5    let him finish his question before you begin so that

6    she can accurately take it down.

7       THE WITNESS:  Oh, okay.

8       MS. GILFORD:  It makes it very hard if people are

9    talking over each other --

10      THE WITNESS:  All right.

11      MS. GILFORD:  -- for her to type up the record.

12   Thank you.

13   BY MR. ROBINSON:

14      Q    So, service, what type of focus or marketing

15   research did you do with regard to service?

16      A    We were interested in customer retention.  We

17   wanted to find out how likely customers were to return

18   to a dealership over time.  So we would do studies to

19   look at our retention rate by age of ownership of the

20   vehicle, so on what percentage of the customers come in

21   during the first year of ownership versus the fifth or

22   the sixth year.

23      Q    Okay.  Same question for market research re

24   vehicles.  What type of research?

25      A    We -- the one study that I worked on with one

John Lang

20

1    of my associates was the Avalon project.  Before we

2    launched the Avalon, there were a number of issues from

3    a design standpoint that needed to be decided upon, so

4    we looked at -- we had three different designs in terms

5    of, you know, does it have a sloping rear, you know,

6    area, or does it have a high deck, does -- what about

7    customer comfort, how much head room should there be.

8    So the designs -- I don't recall exactly what they

9    looked like, but the designs would indicate one might

10   look very sleek, but it probably wouldn't have been

11   very comfortable, and then we looked at issues like

12   should we put in a bench seat and be like a Buick, or

13   should it be more of a cockpit style.  So those were

14   the type of issues that we would address in either a

15   clinic or a focus group environment.

16       Q    At Indiana U did you have any studies that

17   involved any aspect of vehicles or automobile engines,

18   mechanics, --

19       A    No.

20       Q    -- et cetera?  Okay.

21            The -- so now it takes us to about 1990.  Then

22   what did you do next?

23       A    Then I was promoted to a different manager

24   position in the service department.  I was responsible

25   for the finances of the entire -- what was the service

John Lang

21

1    group at that time.  So we did the budgets, managed the

2    budgets, reporting of the budget results.  I was also

3    responsible for writing board of director speeches.  I

4    would write executive speeches for the service

5    department, you know, VP and -- what else did we do?

6    Oh.  And then we had reports, various service reports,

7    service management.  They weren't technical in nature,

8    they were more of, like, sales type of reports that we

9    would send out to our regional offices.

10        Q    What was the purpose of those reports?

11        A    We were measuring retention or sales

12   penetration, I can't -- that's -- it is very vague, to

13   tell you the truth.  I can't recall what the reports --

14   in detail what we sent out.

15        Q    Okay.  When you say you were analyzing the

16   finances of the entire service group, what did that

17   entail?

18        A    Each -- under our vice president at the time,

19   we had probably 15 different departments, and so each

20   of those departments would have a budget, and within

21   that department they had various accounts, and so our

22   job was to basically take all of those budgets and then

23   put them together in one budget so -- culminate them

24   into one budget, and then for purposes of budgeting,

25   you know, how much money can we afford this year for

John Lang

22

1    these projects, then we would work to basically, you

2    know, you have your initial requests that everybody

3    wants a lot of money, and then we would come back and

4    say, well, we only have this much money in our total

5    budget, now we got to trim some things, change some

6    things, change priorities, and so we would direct that

7    kind of activity, and then we would report back on

8    whether or not we were meeting our budget objectives or

9    not.

10       Q    Okay.  When you say under the vice president,

11   would that be some vice president that's in charge of

12   service?

13       A    He was the vice president in charge of

14   service, that's correct.

15       Q    Who was that?

16       A    It was Richard Gallio at the time.

17       Q    Is he still with Toyota Motor Sales?

18       A    No.  He is retired.

19       Q    Who has that position today if there is a

20   similar position?

21       A    It is really not a similar position.  We have

22   reorganized many times over the years.

23       Q    Is there one person, though, at TMS that is a

24   DVP or some top management person that relates to

25   service?

John Lang

23

1      A     I would say probably -- we have an

2   organization called TCS, which is Toyota Customer

3   Services.

4      Q     Right.

5      A     And that group includes service, but it also

6   includes parts.  It includes customer relations, dealer

7   operations, which is part of the department that I'm

8   engaged in, and then there's also an accessories

9   department.  So it is quite different, but that person

10   is Fletcher Davidson, so he is the group VP in charge

11   of that group.

12      Q     And when you say you were also involved in

13   dealer operations, do you actually interact with Bob

14   Waltz as well?

15      A     At one point he was my boss, in 1999.

16      Q     Okay.  We will get there.

17      A     Yeah.

18      Q     So then how long were you in management in the

19   service function here that you have talked about?

20      A     I believe it was about two years.

21      Q     In '92?

22      A     Yeah.  It would have been from approximately

23   1990 to 1992.

24      Q     Okay.  What did you do, then, in '92?

25      A     Then I went to parts marketing where for about

John Lang

24

1    a year I was responsible for marketing remanufactured

2    products, brake pads, alternators, starters, any

3    fast-moving components.

4         Q    What do you mean by "fast-moving components"?

5         A    Oil filters, spark plugs, all of those types

6    of parts that are used in the maintenance process that

7    we sell to dealers directly for their service business

8    or that are sold -- that dealers sell to the

9    aftermarket.

10        Q    When you say "remanufactured products," so you

11   have -- strike that.

12            Do you still have a division or section that

13   relates to that or does work on remanufactured, for

14   example, brake pads, et cetera?

15        A    Well, brake pads aren't remanufactured.

16        Q    Okay.

17        A    They are original.  There are still -- we

18   still have a few products that are remanufactured.  We

19   have some transmissions and starters and alternators.

20        Q    Anything else?

21        A    I think there's a remanufactured brake

22   caliper.  Oh, A.C. compressors.

23        Q    Okay.

24        A    And then there's also remanufactured rack and

25   pinion steering units.

John Lang

25

1     Q   So then what did you do after you were in

2  parts marketing?

3     A   Then I went to the warranty department in

4  1993.

5     Q   And what was your first position in the

6  warranty department?

7     A   I managed a portion of the warranty department

8  at that point.  I was in charge of audit.  I had -- we

9  were liaison on -- we don't look at the parts, but we

10  have a parts return -- warranty parts program, return

11  program, where the computer selects what parts need to

12  be returned for warranty claim for inspection.  Our

13  role in that was basically to be a liaison with the

14  dealer and our field organization if there were any

15  disputes about whether or not a dealer actually did

16  return a part.  If they don't return the part, then

17  they are debited for the claim.

18     Q   Typically what happens -- I mean -- so let me

19  just take you through the process.

20          So the dealer -- strike that.

21          Is this a similar process that still goes on

22  today that you just described?

23     A   Yeah.  There is a parts return -- warranty

24  parts return program, but the warranty department we

25  don't -- we don't manage it.  It is managed by PQSS.

John Lang

26

1    Q    That's Mr. Waltz's department?

2    A    Yeah.  The only area we get into is if -- the

3    money disputes because we basically just handle the

4    money issues.

5    Q    Just one question about that.  Maybe you could

6    give me an understanding of, let's say, the dealer

7    wants to replace a part on a vehicle.  Do they have the

8    right to replace the part without contacting Toyota

9    Motor Sales?

10    A    That would depend on the set of circumstances.

11    Q    What do you mean by that?

12    A    In the -- in the ordinary case of what I would

13    consider to be a, quote, "normal" warranty claim, low

14    dollar component, they have to make that decision.  We

15    can't micro-manage that.

16    Q    What would be low dollar?

17    A    Well, if you had a $200 claim or a $500 claim,

18    that's considered low dollar.  We have certain

19    requirements where if the -- if it is a major

20    component with a high dollar cost.

21    Q    Like what?  Give me an example.

22    A    All right.  If there were some kind of major

23    engine repair, transmission replacement, then

24    there's -- the district service and parts manager has

25    to authorize the replacement of that part.

002967

John Lang

27

1      Q      And so there's a district service manager for

2   each region or --

3      A      For each -- well --

4      Q      District?

5      A      For each district, that's correct.

6      Q      How many such district parts managers are

7   there?

8      A      In the Toyota organization, I'm not sure

9   exactly, but I would say somewhere between 75 and 80.

10     Q      What about on the Lexus?

11     A      On the Lexus, there's probably 20 to 25.

12     Q      Scion?

13     A      Scion rep, you know, I don't know exactly

14  how -- I think the Toyota person handles it.

15     Q      Okay.  So what you did starting in '93 at the

16  warranty department is you performed audits?  Is that

17  right?

18     A      I had an audit supervisor that was responsible

19  for conducting audits.  I didn't --

20     Q      What were the audits concerning?

21     A      We would look at outlier expenses.  So

22  statistically if a dealer's cost for repair was greater

23  than another dealer, then that would send up a red

24  flag, and then we would -- the region is responsible

25  for first attempt to figure out what is happening and

John Lang

28

1   then to repair the situation.

2        Q    So you weren't auditing every dealer?

3        A    No.

4        Q    I mean you were just auditing outliers?

5        A    We are only statistical analysis to determine

6   who is an outlier.

7        Q    And then you were involved in the parts return

8   program?

9        A    Well, --

10       Q    What would that involve?

11       A    That was only just the money issue, the

12  liaison.  We weren't actually inspecting parts or, you

13  know what would be technical.

14       Q    When you say "money issue," what do you mean?

15       A    Well, there's always disputes if a dealer

16  says I returned the part, and so -- but we don't have a

17  record.  Somebody may have made a mistake in the

18  check-in and they didn't check the part in properly

19  and the dealer didn't get credit for returning the

20  part.  So those are the kind of gray areas that we

21  would get engaged in and say, okay, can you show me

22  your shipping statement that show -- your UPS statement

23  that said you shipped the part, and if they did we say,

24  okay, well, we won't debit you for that.

25       Q    So, you know, I'm jumping ahead, but let's say

John Lang

29

1    the last five or ten years, let's say a dealer replaces

2    a part and it is an acceptable level, under $500 we'll

3    say, hypothetically, and they claim that they sent it

4    to TMS.  Where do they typically send it at TMS?

5        A    At PQSS they have a group that looks at the

6    parts, and then they send their parts to various

7    companies for inspection.

8        Q    Okay.  So, for example, if it is a Denso part,

9    is that part then sent to Denso?

10       A    I don't know what they do.

11       Q    Okay.  Well, I guess my question is when PQSS

12   gets a part, what do they do with it?

13       MS. GILFORD:  Counsel, it lacks foundation.  He is

14   not here as a PQSS witness.

15       MR. ROBINSON:  I understand.

16   BY MR. ROBINSON:

17       Q    I just want to generally understand what you

18   know.

19       MS. GILFORD:  Well, it is outside the scope of his

20   deposition.

21       MR. ROBINSON:  Well --

22       MS. GILFORD:  If he has some personal information,

23   he can testify personally.

24   BY MR. ROBINSON:

25       Q    Okay.  Go right ahead.

John Lang

30

1     MS. GILFORD:  But he is not a corporate witness on

2  that issue.

3     MR. ROBINSON:  I understand.

4     MS. GILFORD:  You have already had a corporate

5  witness on that issue.

6     MR. ROBINSON:  Well, maybe we didn't get enough

7  here.  If he can --

8     MS. GILFORD:  You asked the questions.

9  BY MR. ROBINSON:

10     Q    Okay.  Go right ahead.

11     A    From what my understanding is, they may send

12  the parts to various locations, at any of the plants,

13  to TMC.  I'm not really engaged in that either.

14     Q    Okay.  Okay.  That's what you mean.  And it

15  could go to a vendor as well?

16     MS. GILFORD:  Same objections, --

17     THE WITNESS:  I don't know.

18     MS. GILFORD:  -- Counsel.

19  BY MR. ROBINSON:

20     Q    Okay.  Now, you said the computer selects

21  parts to be returned.  What do you mean by that?

22     A    We don't manage that function.  That's managed

23  by PQSS.

24     Q    But when you say computer, what computer?

25     A    It is a PQSS program.

John Lang

1      Q    So the PQSS program will note parts that are

2    to be returned or -- when you say the word "select," I

3    don't know what you mean by "select."

4      A    PQSS gets a file of our warranty claims every

5    day, and then they decide what they want.  If they want

6    to look at parts, which parts to look at.

7      Q    Okay.  We are going to come back to your

8    warranty claims, but.  So you also said that you

9    were involved in '93 in warranty parts return as

10   well?

11     A    Well, only the aspect that I've already

12   explained.

13     Q    Okay.  How long did you do that job?

14     A    I can't recall exactly.  Maybe two or three

15   years.

16     Q    So to '96 or so?

17     A    Yes.

18     Q    And then what did you do?

19     A    Then I had responsibility -- I believe the

20   next job I was responsible for the warranty systems for

21   about a year.

22     Q    Okay.  What is warranty systems?

23     A    The warranty system is a claim payment system.

24   So basically the dealer submits a claim to us, we pay

25   the dealer, we collect the money from whomever is

John Lang

32

1    responsible for that -- for that vehicle.

2        Q    So, I mean, if a supplier was responsible for

3    making a part that was defective in some way or -- you

4    would then go to that supplier and collect?

5        A    No.  No.  Well -- no, not at all.

6        Q    What do you mean by that statement, then,

7    about your job is to collect?

8        A    Well, we simply just send the claims to our --

9    to TMC, and then they pay us.

10       Q    So TMC pays TMS?

11       A    That's correct.  Well, it depends.  It has

12   changed over the years, so what year are we talking

13   about?

14       Q    Well, let's talk about today.

15       A    Okay.  The claims go from our -- our site and

16   they go directly to TMC.  TMC judges it.  If the claim

17   is a TMC-produced vehicle in Japan, then the claim

18   stays with them and they pay us directly.  If it is a

19   vehicle produced by TEMA for United States consumption,

20   then TMC judges the claim, but then the bill gets sent

21   to TEMA and then TEMA pays us.

22       Q    Okay.  And, once again, I mean do you ever

23   send these bills to suppliers --

24       A    The only --

25       Q    -- of parts?

John Lang

33

1          A      The only case for suppliers would be local

2     suppliers that our accessories group is responsible for

3     developing, and so we will send claims to those

4     suppliers.

5          MS. GILFORD:   Just to be clear, Counsel, by "you"

6     do you mean TMS?

7          MR. ROBINSON:   TMS.

8          MS. GILFORD:   Okay.

9     BY MR. ROBINSON:

10         Q      To your knowledge, is there any situation

11    where TMS would send a part payment request to a

12    supplier?

13         MS. GILFORD:   Other than the example he just talked

14    about?

15    BY MR. ROBINSON:

16         Q      I want to -- any examples that you can think

17    of where TMS would, for example, get a Denso or some

18    other supplier to pay on a claim like this.

19         A      If it is a locally procured part, from

20    whatever manufacturer, then we would send that claim

21    directly to -- to that supplier in the U.S. if they

22    built a part for us that was -- that was something that

23    was developed as an accessory or whatnot.

24         Q      Are there records kept for those requests?

25         A      It is just a claim -- it is like any other

John Lang

34

1   claim.  It is just in our system.

2        Q    So when you say "your system," would your

3   system have information, number one, regarding --

4   strike that.

5             When you say "your system," we are talking

6   today the warranty system; right?

7        A    Yes.

8        Q    And would the warranty system have information

9   that came from the dealer regarding payment -- their

10  request for payment for the part?

11       A    Okay.  Can you repeat the question.  I'm not

12  sure if I understand it.

13       Q    Yeah.  I'm trying to see what you -- what the

14  system -- and I assume by system you mean a computer

15  system.

16       A    That's correct.

17       Q    Okay.  What -- is there -- which system is

18  that that contains the warranty information?

19       MS. GILFORD:  For TMS?

20       MR. ROBINSON:  For TMS, right.

21       THE WITNESS:  For TMS.  Okay.  The TMS warranty

22  system is called CPS.

23  BY MR. ROBINSON:

24       Q    What does CPS stand for?

25       A    Claim processing system.

John Lang

35

1    Q    And is that a database or --

2    A    It is a system -- it is a little complicated,

3    which I don't understand all of the aspects of it, but

4    it is basically a computer system that enables us to

5    pay a dealer claim and then also to send a bill to the

6    appropriate party.

7    Q    Sometimes you send it to TMC?

8    A    That's correct.

9    Q    Sometimes if it is made in the U.S. you send

10   it to TEMA?

11   A    If -- for manufacturer claims, we send all of

12   the claims to TMC for judgment.

13   Q    I see.  And then does TMC then report back to

14   you what their judgment was on a particular claim?

15   A    We get pretty much a bulk or a -- we send

16   claims every day to TMC, so we get a daily statement

17   as to how much we collected from -- from TMC.  So it

18   is just an accounting transaction.

19   Q    Have you been over to visit TMC?

20   A    Yes.

21   Q    How many times?

22   A    In what capacity?

23   Q    In any capacity.

24   A    Oh, I don't know.  Probably six or seven

25   times.

John Lang

36

1    Q    When was the last time you went over there?

2    A    I believe it was 2007 or 2008.

3    Q    What did you go over to TMC for at that time?

4    A    We had some policy issues on compliance with

5    state laws of reimbursement levels that we needed to

6    pay.

7    Q    And what -- and you needed a face-to-face

8    meeting for that?

9    A    Yes.

10   Q    Why?

11   A    It was a -- it was a financial decision that

12   needed to be made, and we wanted to talk to the

13   deciding party, which is TMC.  TMC makes all the

14   decisions on those issues.

15   Q    You couldn't do that by e-mail or letter?

16   A    Sometimes we meet to talk.  It is easier that

17   way.

18   Q    Okay.  Just generally, what were your other

19   visits to TMC about?

20   A    One visit was when I was in parts, we

21   negotiated parts pricing every year, and so typically I

22   would go to Japan and negotiate, you know, what price

23   levels for what parts with them because they control

24   the prices on everything.

25   Q    What year was that?

002977

John Lang

37

1          A    That would probably have been 1983, '84, '85.

2    I can't remember.

3          Q    What other times did you go there?

4          A    I went there for -- I think it was two or

5    three weeks in 19 -- probably 1988.

6          Q    What was that about?

7          A    I did a used car market study, and so I was

8    working with the TMS or TMC research department.

9          Q    And so were you involved in help -- watching

10   or helping them with that research?

11         A    Yes.

12         Q    What did you do?

13         A    We were trying -- I think what TMC wanted to

14   know was how does the used car market work in the U.S.

15   because the market is different in Japan.

16         Q    What's different?

17         A    Typically used car buyer -- people do not, at

18   the time at least, I think it has changed, but people

19   were keeping cars four or five years at the most, and

20   then they would replace it with a new vehicle.

21         Q    Where is that?  Here?

22         A    In Japan.

23         Q    Oh, Japan.

24         A    That's Japan.  I think that has changed over

25   time, but at the time that was their market.  That was

John Lang

38

1    what they were used to, and they said, well, how does

2    the U.S. used car market work, and it is completely

3    different in terms of --

4         Q    What happens here?

5         A    Well, typically two things that they were

6    interested in.  First of all, how long do people keep

7    cars, when do they trade them, where -- and then we

8    were looking at what they call inflow/outflow

9    analysis which is to look at where do new car buyers

10   come from.  How many of them buy new; how many people

11   buy used cars.  They were just looking at the whole

12   market.  The used car market is usually two to three

13   times bigger than the new car market, and you can't

14   survive in the new car market unless there's a used car

15   market.  So that was their interest was really to just

16   try to understand the whole inflow/outflow replacement

17   cycles and so forth.

18        Q    Okay.  What other visits did you have?

19        A    The other visits that I've had over the years

20   were warranty policy meetings with TMC.

21        Q    What did those involve?

22        A    What our job is is to -- at TMS -- is to

23   recommend policies for TMC approval.  So we can't just

24   implement a policy.  So in 1998 we implemented some

25   policies, and so I went over to discuss with them.  We

John Lang

39

1  had a loaner car policy that we wanted to provide a

2  free loaner for any customer that's over -- that has a

3  repair that lasts overnight, so we worked on that.  We

4  worked on a policy for NTF, or no trouble found, to

5  enable to pay the dealer.  If a customer comes in and

6  has a complaint and the dealer can't find anything, we

7  want to -- we still want to encourage the dealer to

8  inspect the vehicle and to at least give us a report on

9  what they found, and then they submit a warranty claim

10  for that.  So those are the types of issues that we

11  would deal with.

12      Q    Okay.  Let me ask you this.  Have you ever had

13  your deposition taken before?

14      A    Once.

15      Q    When was that?

16      A    I don't recall the exact date.  It has

17  probably been probably eight years ago.

18      Q    What was that about?

19      A    It was a human relations or HR issue,

20  employment issue.

21      Q    Didn't have anything to do with unintended

22  acceleration?

23      A    No.

24      Q    So we talked about the 1996 through

25  about 1990 -- what? -- '99 you worked in warranty

John Lang

40

1    systems?

2        A    I only did that for about a year.

3        Q    Okay.  Then what did you do?

4        A    Then I worked for about a year, year and a

5    half, in charge of the warranty accounting and

6    finance -- warranty policy, the publications.

7        Q    What did that involve?

8        A    The -- basically we just have budgets within

9    the warranty department that we managed, and so that

10   was just one aspect of it.  And then the other areas

11   were, again, policy.  I don't think I had processing

12   responsibility or audit at that time.  I think it was

13   just the budgets and publications and -- what was the

14   other area?

15       Q    You said publications, policy, finance.

16       A    Policy and publications, I think that was it.

17       Q    Okay.  What did you do from 2000 on?

18       A    In 1999 -- sometime in 1999 I was promoted to

19   National Warranty Operations Manager.

20       Q    What are your duties?

21       A    I was responsible for processing for audit,

22   policy, publications, budget, and interacting with our

23   finance and accounting department on just receivables

24   and that sort of thing.

25       Q    So how long did you do that?

John Lang

41

1      A     Till today.  So the same job.

2      Q     So in the last year, why don't you just give

3   us an overview of some of your responsibilities.

4      A     In the last year?

5      Q     Yes.  That you have been involved in.

6      A     I'm trying to think where I could start.  We

7   have had a number of initiatives from a systems

8   standpoint that we were working on, so I've been

9   working on planning for that.

10     Q     Like what?

11     A     We are developing more sophisticated reporting

12  for dealer audits, so we're trying to develop a new

13  audit program.

14     Q     Why?  Is that -- what's the goal?

15     A     We just need to be more efficient in

16  discovering issues so we can act on it more quickly.

17     Q     Like what kind of issues?

18     A     Well, if the dealer has high expense, we want

19  to be able to go in and do more of a preventive type of

20  activities rather than auditing and taking money back.

21     Q     Okay.  What else have you been doing?

22     A     We were working on another program -- just

23  general, in that same vein, we have been working on a

24  lot of reporting.  I need to have more database

25  reporting where we use VRIO type of analysis for our

John Lang

42

1    accounting and finance resolving.  You know, we have

2    connectivity, you know, issues where we send a claim,

3    we collect the money, and we got to make sure that the

4    two match, and so we want to have some better reporting

5    in that area.

6             Another area would be we -- trying to -- the

7    warranty system, or the CPS system, is more than just

8    warranty claims.  So we process lots of different types

9    of claims for the company.

10       Q    Like what?

11       A    Well, we are working on a program with fleet

12   management companies where if -- PP & H, for example,

13   is a major fleet buyer of vehicles, and what they do is

14   they go back and lease those vehicles back to

15   companies, and from our marketing -- our service

16   marketing department is interested in trying to get

17   those customers to come in and have their service done

18   with a Toyota dealer.  So we are working on a payment

19   system to be able to basically give a discounted rate

20   to the fleet management companies, and they pay for it,

21   and it is all included in the price that they offer as

22   a fleet management company.  So it's just another way

23   to pay claims.

24       Q    The CPS system, that is really a TMS system?

25       A    That's our system.  That's correct.

002983

John Lang

43

1      Q    What other systems are you aware of for TEMA

2  or TMA or TMC that relate to warranty claims?

3      MS. GILFORD:  Are you talking about computer

4  systems?

5      MR. ROBINSON:  Yes.  Databases or computer systems.

6      THE WITNESS:  Well, the entire warranty system is

7  basically a huge payment system, and so I've already

8  mentioned that we -- when we pay the dealer, then my

9  job is to collect from the manufacturer.  So all of

10  those claims go to TMC, and then so they have a

11  system -- a judgment system where they judge the claim

12  determining who is responsible, whether it is them or

13  whether it is TEMA.

14  BY MR. ROBINSON:

15      Q    What is that called?

16      A    I don't know what they call it.  It is just a

17  warranty system.

18      Q    But you get -- you have access to their

19  judgment; right?

20      A    Not access to their judgment.

21      Q    Well, you get notified?

22      A    Well, we --

23      Q    Right?

24      A    I think the proper way to describe it would be

25  that we send a file with claims on a daily basis to

John Lang

44

1    TMC, and then there's a payment file that comes back to

2    say what claims were paid.

3        Q    I mean is that just a communication, or

4    is there a database where this payment file for

5    TMC --

6        A    It would be --

7        Q    -- is located?

8        A    Well, there would be -- there's our database,

9    and they must have a database, but the actual

10   transaction itself is just simply a file transfer.

11       Q    What about at TEMA, any type of warranty

12   system that you know that is associated with TEMA?

13       A    I'm not really familiar with how that piece

14   works.  All I know is that the bill is sent to TEMA,

15   and then we get paid by TEMA.

16       Q    You know, what information is included in the

17   claims that you submit on a daily basis to TMC so that

18   they can judge?

19       A    So they can judge?  Well, the first thing is

20   there's the dealer code and there's the VIN number, so

21   there has to be a valid VIN number, or vehicle

22   description number, and then there will be labor,

23   parts.  There will be a code for whether or not -- what

24   the actual part that needed to be replaced, all the

25   replacement parts will be listed.  It will show what

John Lang

45

1    the dealer interpreted the original cause of the

2    failure that caused the warranty claim.  There will be

3    a -- there's a bunch of other fields.  I'm trying to

4    think.  There will be a T code which will describe,

5    again, what the dealer interpreted the reason why the

6    event occurred.  Then there will be -- I need to kind

7    of think through the claim.  There may be --

8         Q    What about dealer comments or dealer --

9         A    Right. Yes. Thank you for that. There will be

10   text field, basically condition, cause, relief fields.

11        Q    Would there be comments from TMS that would be

12   beyond what is said in the dealer comments?

13        A    No.

14        Q    What -- what would TMS do with the claim that

15   comes from a dealer, say?

16        A    I'm sorry?

17        MS. GILFORD:  What would his department do?

18   BY MR. ROBINSON:

19        Q    Yes.  What would your department do?

20        A    Well, when the claim comes to us, about 90% of

21   the claims we never see that go through judgment.  We

22   have a judgment and editing cycle that we take the

23   claims through if they meet all the criteria.

24        Q    At TMS?

25        A    At TMS.

John Lang

46

```
 1        Q     Who runs that?
 2        A     That's part of our responsibility.
 3        Q     So you are in charge of that?
 4        A     Okay.  Can you be more specific when you say
 5    "in charge," of what?
 6        Q     Well, this judgment system at TMS.
 7        A     There's also a national manager for warranty
 8    systems.
 9        Q     Who is that?
10        A     His name is Dale Pettit.
11        Q     What does he do?
12        A     He is in charge of being a liaison with our IT
13    department to make sure that basically the system is
14    running properly, and he is also in charge of new --
15    whenever we have any enhancements or changes or we
16    have -- you know, we need to fix something, you know,
17    his group is in charge of putting the specs together to
18    give to IT.
19        Q     So what -- when you say IT department, are you
20    talking about additions or deletions in what is
21    inputted or outputted into the system or, you know,
22    what is the IT department's involvement?
23        A     If we're -- if we're developing some new
24    system, then they are involved in it.  So any time we
25    want to improve or enhance the system, its capability,
```

002987

John Lang

47

1   then what -- what Dale's group would do would define

2   what it is they want, and then the IT department's job

3   is actually to -- to actually do -- physically do the

4   programming.

5       Q   Okay.  Going back to this TMS judgment system,

6   who -- strike that.

7           What is involved in TMS judging a claim?

8       A   We have certain criteria that we look at.

9   There's a general or basic judgment which says is

10  the -- is the VIN number valid.  So we have some checks

11  in the system to determine if the dealer inputted the

12  correct VIN number.  Then we will look to see is the

13  vehicle in warranty or not, and then we will look at --

14      Q   What is a, you know, typical warranty for,

15  say, Toyota vehicles in the U.S.?

16      A   So what is the policy?  Is that what you are

17  asking?

18      Q   Yes.  Yes.

19      A   It is dependent upon the vehicle, but the

20  basic warranty is three years, 36,000 miles, and then

21  there's a powertrain warranty, which is five years,

22  60,000 miles.  And then there's emissions requirements

23  that are federally and state mandated, which vary from,

24  you know, from time to time.

25      Q   Like what length of time?

John Lang

48

1      A    The longest -- let's see.  There -- it is very

2    complicated, and I don't remember all of it, but there

3    is like -- they have, like, a defect policy which is 24

4    months that's both federal -- that's EPA and I think

5    the State also has the same thing, and then there's

6    also just a general emissions policy which is 7/70 in

7    California but 8/80 in -- for federally mandated.

8      Q    So what does that mean, 7/70 and 8/80?

9      A    Seven years, 70,000 miles.

10     Q    Okay.

11     A    Eight years is 80,000 miles.

12     Q    Okay.  Even though you might have a vehicle

13   warranty period of three years, do you receive claims

14   for payments from dealers that are for work done on

15   vehicles that are older than three years?

16     A    Yes, because we have longer warranties.

17     Q    Okay.  So if someone were going to go look at

18   your warranty system database at TMS, how far back

19   would information on various vehicles in that system go

20   back?

21     MS. GILFORD:  Are you talking about the retention

22   period?

23     MR. ROBINSON:  Yes.  Retention.

24     THE WITNESS:  We have -- most records will go back

25   15 years.  We may have some claims that are older

John Lang

49

1    because of service part claims -- or VINs that are in

2    the system that are older than 15 years.

3    BY MR. ROBINSON:

4         Q    Do you know how many VIN numbers or vehicles

5    are in the database?

6         A    I'm not sure exactly.

7         Q    Approximately?  Within a range.

8         A    I've never calculated it, so.

9         Q    Are we talking millions?

10        A    I think it would be -- if you look 15 years

11   and you looked at how many sales that we sold during

12   those years, it is probably -- that would be the size.

13             Well, excuse me.  Can I rephrase that?

14        Q    Yes.  Go ahead.

15        A    Because when you say -- if the -- is the

16   question how many claims do we have in the system?  Is

17   that correct?

18        Q    Let's break it down.  How many claims in the

19   system?

20        A    Well, that I can't -- the answer I gave you is

21   not correct because that's how many vehicles we sold.

22   We would only have the number of claims in the system

23   for that period of time, but I don't really know what

24   the answer is.  I've never -- I've never been asked to

25   produce that or calculate it.

002990

John Lang

50

1          Q    You understand that one of the topics for this

2     deposition is the identity, nature, location, retention

3     of documents related to information Toyota has received

4     about speed control surge, SUA events, in Toyota and

5     Lexus vehicles, specifically for your group,

6     warranty-related records or documents?

7               Do you understand that?

8          A    Yes.

9          Q    Okay.   Would you generally describe where the

10    Toyota and Lexus vehicle documents that are part of

11    your system that relate to speed control, surge, and

12    SUA events are located?

13         A    Well, --

14         MS. GILFORD:  Objection.   Counsel, it is vague.

15         MR. ROBINSON:  Do you --

16         MS. GILFORD:  Can you repeat your question.

17         MR. ROBINSON:  You can --

18         MS. GILFORD:  Please repeat the question.

19    BY MR. ROBINSON:

20         Q    Yeah.   Well, let me put it this way.   Why

21    don't you identify the documents that are in your

22    warranty system that relate to speed control, surge,

23    SUA events in Toyota and Lexus vehicles?

24         A    Well, --

25         MS. GILFORD:  Objection.   Assumes facts.   And by

002991

John Lang

51

```
1      "you," do you mean TMS exclusively?

2          MR. ROBINSON:  TMS.

3          THE WITNESS:  I think all I can answer is I can

4      tell you where our claims reside.  I don't know

5      specifically what's inside of -- you know, what the

6      specific claims are.

7      BY MR. ROBINSON:

8          Q    Okay.  Why don't you define the word "claims."

9          A    Okay.  A claim is a record of receipt of a

10     bill from a dealer and payment of that bill to the

11     dealer and then also recovery of the claim from the

12     manufacturer.

13         Q    So where would the claims for UA or surge

14     or unintended acceleration, speed control issues,

15     reside?

16         MS. GILFORD:  Objection.  Assumes facts and lacks

17     foundation.

18     BY MR. ROBINSON:

19         Q    Go ahead.

20         A    I can answer the question where would our

21     warranty claim data be, and the answer is it is in our

22     CPS system.

23         Q    So if I wanted to get all claims in that

24     system, how would I -- strike that.

25              If you wanted to have all documents that
```

002992

John Lang

52

1    include all claims that relate to speed control, surge,

2    or SUA events in Toyota or Lexus vehicles, how would

3    you search your system?

4        A    I typically wouldn't search for that data.

5    That data would be searched by PQSS.

6        Q    But it is in your system?

7        A    Well, we send claims -- our system is more

8    geared toward paying claims, not towards going in and

9    doing deep-dive analysis on claims and so forth.  So we

10   send that information to PQSS on a daily basis, and

11   then they have tools that can dive into those areas.

12       Q    Do you understand how their tools dive in?

13       A    I'm vaguely familiar with they have a system

14   where they can -- they have search capability for that.

15       Q    I mean let me ask you.  Would I be able to --

16   to go into your system, your warranty system, your CPS

17   system, and look for any claims that relate to engine

18   control units or ECUs on Toyota vehicles or Lexus

19   vehicles?

20       A    So the answer -- would you be able to do that?

21   That's what you are asking me, and --

22       Q    Let me --

23       A    -- I don't think you would be able to.

24       Q    I'm going to rephrase it.  I'm going to

25   rephrase it.

John Lang

53

1      A    Okay.

2      Q    If you wanted to get that information, would

3  you be able to get all claims that relate to the engine

4  control unit on Toyota or Lexus vehicles in your

5  system?

6      A    I personally wouldn't be able to, because I'm

7  not a COBOL or SQL programmer, but --

8      Q    Okay.

9      A    -- if someone were to give us some criteria, I

10 could send a request maybe to our IT department to

11 search for it, but that's not something that we

12 normally do in our daily business.

13     Q    You say your IT department, the IT department

14 people that work with --

15     A    At TMS.

16     Q    Okay.  And what -- can you give me an example

17 of a type of input that you need to give to the IT to

18 get information such as we have asked for here that

19 relate to speed control, surge, or sudden acceleration

20 events on Toyota or Lexus vehicles?

21     A    You know, I'm not a very technical person, so

22 if you wanted to do that, you would probably go to PQSS

23 to get the criteria to how to do the search because

24 that's not within the realm of what we typically do.

25     Q    Is there a person in PQSS that you dealt with

John Lang

54

1    that would be the person who would understand the

2    computer language to get such information?

3        A    It would -- I'm not aware of any specific

4    person, but it would be under Bob Waltz's area.

5        Q    Are you able to describe the different fields

6    in this warranty system database?

7        MS. GILFORD:  Other than what he has already

8    described for you?

9        MR. ROBINSON:  He hasn't described all the fields.

10        MS. GILFORD:  He went through a long list of them,

11    Counsel.

12    BY MR. ROBINSON:

13        Q    Maybe you can do that as completely as you can

14    from your --

15        A    From my memory.

16        Q    Yeah.

17        A    Okay.  The first field that I recall would

18    be -- we would be given a dealer code.

19        Q    Okay.

20        A    It would have to be a legitimate dealer code.

21            There would be a repair order number which is

22    a document -- that's the dealer's document number.

23    There would be a claim number that would be assigned to

24    it.

25            There would be the labor hour -- or there

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

002995

John Lang

55

1    would be usually a main operation code which would have

2    time -- the labor hours associated with it, and then

3    there would be -- that would calculate an amount to be

4    paid for labor based on the dealer's labor rate.

5             There would be a field that said what the

6    dealer described as what he thought the failure was --

7    failed part or -- in that case.

8             There would be replacement parts.  If there

9    were parts necessary for the repair, there would be

10   replacement parts.

11            There would be quantity of replacement parts,

12   and then there would be a calculation to determine the

13   price and the markup that the dealer would receive for

14   that part, and then --

15            (Conversation between Mr. Safi and

16        Mr. Robinson out of hearing of the reporter.)

17        MR. ROBINSON:  I'll take him through that.

18        THE WITNESS:  And then there would be a final part

19   amount on the claim.  There -- there's also --

20   BY MR. ROBINSON:

21        Q    What's a final part amount?

22        A    Final -- total amount.

23        Q    Okay.

24        A    If there was a sublet on the claim, then

25   that -- that amount would be on the claim.

John Lang

56

1     Q    What do you mean by "sublet"?

2     A    A sublet is a repair or service that the

3 dealer, in most cases, did not do.  So let's say that

4 there was a tear in the upholstery and it needed to be

5 restitched.  The dealer doesn't have the tools and

6 equipment to do that job, so they would take it to an

7 upholstery shop and then the upholstery shop would

8 repair it, and then the dealer would then have a bill

9 for that and then would place that amount that they

10 paid on the claim.

11    Q    Do you believe, since you manage this

12 department, that there would be an ability to search

13 search the warranty system database, the CPS data-

14 base, for changes or claims that -- strike that --

15 for claims that related to engine control units?

16    MS. GILFORD:  Objection, Counsel.  You have already

17 asked and answered that question.

18 BY MR. ROBINSON:

19    Q    Do you believe that?

20    A    I'm sorry, can you restate the question?

21    Q    Yeah.  In other words, if -- if someone who

22 understood the IT aspects of your warranty system and

23 the CPS database wanted to search for engine control

24 unit claims, would that information be able to be

25 gleaned or gathered?

John Lang

57

1      MS. GILFORD:  Calls for speculation.  Lacks

2   foundation.

3   BY MR. ROBINSON:

4      Q    Go ahead.

5      A    The -- if someone were to give us the

6   criteria, it could either be searched -- it could be

7   searched -- primarily it would be searched in PQSS's

8   database.  If we had to write a program and someone

9   were to give us that information, we could probably

10  search that data and get --

11     Q    Same question for accelerator position

12  sensor-related claims.

13     A    Again, I wouldn't know how to begin to do

14  that.  Somebody would have to give us information.

15     Q    The same for throttle body assembly claims?

16     A    My answer would be the same.

17     Q    And would it be the same for mass air flow

18  sensors, heated oxygen sensors, air-fuel ratio sensors,

19  idle air control -- or idle air control valve

20  assemblies, vapor pressure sensors, engine coolant

21  temperature sensors, cruise control switch assemblies,

22  et cetera?

23     A    My answer would be the same.

24     MS. GILFORD:  Mark, if we are at a breaking point

25  sometime soon, can we have a brief break?

John Lang

58

1     MR. ROBINSON:  Yeah.  We can break right now if you

2  would like.  Okay.  Go ahead.  What do you want to do?

3     MS. GILFORD:  I just need 10 minutes for a personal

4  break.

5     MR. ROBINSON:  Let's go ten minutes.  Okay.  Cool.

6     VIDEO OPERATOR McCAVERTY:  It is 10:20 A.M.  We are

7  off the record.

8           (Recess taken.)

9     VIDEO OPERATOR McCAVERTY:  It is 10:45 A.M.  We are

10 back on the record.

11          (Record read as follows

12          "Question:  And would it be the

13      same for mass air flow sensors, heated

14      oxygen sensors, air fuel ratio sensors,

15      idle air control -- or idle air control

16      valve assemblies, vapor pressure

17      sensors, engine coolant, and cruise

18      control" --)

19     MR. ROBINSON:  Okay.  I understand.  Thanks.  Too

20 much information.

21          (The document referred to below was

22      marked Lang Exhibit 88 for

23      identification and is attached hereto.)

24 BY MR. ROBINSON:

25     Q    Okay.  Let's go to Exhibit Number 88 if we

John Lang

59

1    could.  So what does Exhibit 88 show?

2        A    This is an organizational chart for my

3    corporate manager's direct reports.

4        Q    Okay.  So Gregory Kitzens is your corporate

5    manager?

6        A    That's correct.

7        Q    Strike that.

8             What is -- what does this -- this Exhibit 88

9    depict?  Is this something to do with warranty?

10       A    I report to Mr. Kitzens.  These are his direct

11   reports and managers.

12       Q    And what is his title?

13       A    Corporate Manager, Dealer Operations.

14       Q    And what does Dealer Operations include?

15       A    Specifically as it pertains to his job?

16       Q    Yes.

17       A    Okay.  Well, it includes warranty, which

18   includes both Dale Pettit, the system side, and then my

19   payment side.  In addition, he is in charge of parts

20   pricing, so he has a national manager reporting to him

21   for that, and also for strategic planning, he has

22   another national manager reporting to him for that.

23       Q    So who does he report to?

24       A    Dave Camden.

25       Q    What is Dave Camden's title?

John Lang

60

1    A    Vice President of Dealer Operations.

2    Q    And what is meant by Dealer Operations?

3    A    Our particular department interfaces with our

4    field organization for business-related activities,

5    sales and marketing of parts and service.

6    Q    Who is Dave Camden's supervisor?

7    A    Fletcher Davidson.

8    Q    Now, how does Bob Waltz's department, the

9    PQSS department, fit on this diagram vis-a-vis

10   Fletcher Davidson and Dave Camden?

11   A    Bob Waltz reports to Fletcher Davidson.

12   Q    Okay.  And then so underneath -- directly

13   underneath Greg Kitzens -- strike that.

14        What is Greg Kitzens, what does he do with

15   your operations, National Warranty Operations

16   Department?

17   A    He is basically just my manager that sets

18   direction, and we develop strategy and address any

19   issues that come our way.  Every day it varies.

20   Q    Okay.  Earlier I think you said that Dale

21   Pettit is sort of your liaison for IT?

22   A    Yes.

23   Q    What -- what does Dale Pettit do as National

24   Warranty Systems Manager?

25   A    He is responsible for basically making sure

003001

John Lang

61

1    that the trains run on time, that the system works,

2    that we pay dealers.  If we have any issues where today

3    a claim works and it goes through the system, but

4    tomorrow maybe somebody made a change in the program

5    and now it doesn't work, so we got to go back in, and

6    then his group will help work with the IT department to

7    discover what the error is and make the programming

8    change.

9         Q    And when you use the word "systems," are they

10   the CTS system, or what systems are we talking about?

11        A    That's CPS.

12        Q    CPS, I'm sorry.  The CPS system?

13        A    Yes.

14        Q    And any other systems that he is in charge of

15   besides CPS?

16        A    No.

17        Q    And then who does he interact with regarding

18   IT issues?

19        A    Well, he -- there's, like, a national manager

20   for IT that we work with.

21        Q    Who is that?

22        A    She is new.  Mylene is her first name.

23        Q    Mylene?

24        A    Yeah.

25        Q    How do you spell Mylene?

John Lang

62

```
 1        A      M-y-l-e-n-e.  Oh.  Mayers, M-y-e-r-s.

 2        Q      So if he has an IT problem, he would go to

 3   Mylene Mayers?

 4        A      Or her staff.

 5        Q      Okay.  And does she look at various IT systems

 6   which includes the CPS, or just CPS?

 7        A      CPS is just one of her responsibilities.

 8        Q      What are some of the other systems that she is

 9   involved with?

10        A      There's some minor programs that Dealer

11   Operations has related to parts inventory.

12        Q      What would those be?

13        A      We had a -- they developed a stocking guide

14   program for the dealers to determine what their optimal

15   stocking -- parts stocking level should be.

16        Q      Anything else besides the CPS and the --

17        A      I think she also is in charge of customer

18   relations systems.

19        Q      And what is the difference between what's

20   in your system, the CPS system, and what's in the

21   customer relations system?

22        A      The customer relations system is a contact --

23   call center, contact center.

24        Q      That's the 800 hotline?

25        A      Yes.
```

003003

John Lang

63

1    Q    And so she interacts with that system as well?

2    A    That's correct.

3    Q    And -- okay.  What does Patricia Koerner do?

4    A    Patricia?

5    Q    Yes.

6    A    She is the national manager for parts pricing.

7    Q    You have some involvement with parts pricing

8    as well; right?

9    A    I used to, but I don't now.

10   Q    Okay.  What do you do with regard to warranty

11   claims that come in on a daily basis yourself?

12   A    What do I do?

13   Q    Yes.

14   A    On a daily basis --

15   Q    Yes.

16   A    -- with warranty claims?

17   Q    Yes.

18   A    Not much.

19   Q    Okay.  What do you do with your time, say,

20   during the week of -- any given week regarding warranty

21   claims?

22   A    If we have an issue where we are having

23   difficulty of dealers understanding how to submit a

24   claim for a specific type of claim, whether it be a

25   recall or whatever, then I may get engaged to try to do

003004

John Lang

64

1    root cause like how can we make this easier for the
2    dealers.
3         Q    Have you talked to dealers?
4         A    Very seldom.
5         Q    So how do you go about making it easier for
6    the dealers?
7         A    Well, we would talk to our field organization.
8    We have offices across the country that we would
9    interact with our field organization with.
10        Q    So you have a warranty field operation?
11        A    No.
12        Q    What field operation?
13        A    Excuse me.  We do.  We have two.  We have
14   private distributors.  We have Southeast Toyota and we
15   have Gulf States Toyota, and each of those private
16   companies, which we do not own, have a warranty
17   manager.
18        Q    So but for the Toyota and Lexus dealerships
19   that do not include the ones under Southeast State
20   or Gulf State groups, are you the person that would
21   interact with the dealers?
22        A    No.  I'm not the person.  They would -- we
23   have staff in the regions that have multiple
24   responsibilities to liaison with the field
25   organization.

003005

John Lang

65

1      Q    And --

2      A    With the dealers' reps.

3      Q    And do you interact with that staff?

4      A    I typically interact with people that are on

5   my level which would -- you know, but that's really the

6   extent of it.

7      Q    Well, for example --

8      A    There's a -- in every regional office that

9   Toyota owns, we have what's called a customer services

10  operations manager, I believe, that's at my level, and

11  so if there's any issues or concerns about dealer

12  payment, then they will call me and say, you know, I'm

13  having trouble getting the dealers paid on these

14  claims, can you look at your process and make it

15  easier, what can we do to simplify it.

16     Q    Okay.  Now, I'm looking underneath you.  You

17  have looks like Diane Lotzer, Charles Gilmore, and

18  Bruce Zellmer; is that right?

19     A    That's correct.

20     Q    What do they do?

21     A    Ms. Lotzer is responsible for -- she is, like

22  the finance and recovery manager, so she handles -- she

23  interacts on a daily basis with our accounting

24  department to make sure that our receivables are -- and

25  payables are correct, and then she is also responsible

John Lang

66

1    for making sure that we recover the money back from our

2    manufacturers when we submit claims to them.

3         Q    What about Mr. Gilmore?

4         A    Mr. Gilmore is in charge of claim processing,

5    so his job is to basically ensure that the claims are

6    paid on time, that we are in compliance with all state

7    laws in terms of timeliness of paying claims, and he is

8    also responsible for publications and policy.

9         Q    What about Mr. Zellmer?

10        A    Mr. Zellmer is our field -- he is the one that

11   has daily contact with our field operations, and so

12   he -- his job is the audit function and dealer support.

13        Q    Okay.  What about the three people underneath

14   Patricia Koerner, are they all involved in, really,

15   pricing issues?

16        A    No.

17        Q    Okay.  Explain.

18        A    John McDaniel is the budget administrator, so

19   he handles -- oversees and reviews the budget for the

20   entire Dealer Operations department.

21        Q    Okay.  What about Michael Buffalin, what does

22   he do?

23        A    He is in charge of strategic planning,

24   research.  He has a minor role in export development,

25   exporting parts to other distributors around the world.

John Lang

67

1     Q    Is he involved in warranty claims at all?

2     A    No.

3     Q    So the only two departments that are involved

4   with warranty claims on this Exhibit 88 are Pettit's

5   department and your department?

6     A    That's correct.

7          (The document referred to below was

8     marked Lang Exhibit 89 for

9     identification and is attached hereto.)

10  BY MR. ROBINSON:

11     Q    Let's look at Exhibit 89.  Would you describe

12  what Exhibit 89 is?

13     A    This is a list of publications that we

14  produce, and the retention period and then where we

15  store that information.

16     Q    So if I wanted to know about your warranty

17  policy and procedures at Toyota, going back 20 years, I

18  could do that by getting these warranty policy and

19  procedures manuals for the various periods listed here?

20     A    We have copies retained since -- we have hard

21  copies retained since 1994 to 1997, and it appears as

22  if there's a gap, and I'm not sure why, between '98 and

23  2000.

24     Q    Now, do dealers have all these publications as

25  well?

John Lang

68

1    A    These documents were initially published in

2    hard copy form, and then since 2005 it is all online,

3    so the dealers wouldn't have a book.  It is just

4    online.

5        Q    And the same thing for the warranty flat rate

6    manual, it is kept online?

7        A    The flat rate manual, if the dealer wants, we

8    still print a few copies and they can order it.

9        Q    And what is -- what rate?  What does flat rate

10   mean?

11       A    Flat rate is basically a book that contains

12   operation codes that dealers use in the submission of a

13   warranty claim, and those operation codes have a time

14   associated with them which is the basis from which the

15   dealer is paid.

16       Q    Do -- so there is -- there's rates as to

17   service as well -- strike that.

18            When I look -- when I look at, for example,

19   page 1 of '89, Warranty and Maintenance Service Guide,

20   does that give rates for what dealers are paid?

21       A    No.

22       Q    Okay.  Where would I get information regarding

23   the cost of -- authorized cost of certain types of

24   service done by dealers on warranty items?

25       A    That's a pretty vague question.  Can you be

John Lang

69

1    more specific?

2       Q    Yeah.  In other words, when there's

3    warranty work done, do the dealers get compensated for

4    the warranty work?

5       A    Yes.

6       Q    And is there any publication on a yearly basis

7    that Toyota Motor Sales puts out or Toyota Motor Corp.

8    puts out regarding the payment authorized for certain

9    types of service?

10      A    Not that I'm aware of.

11      Q    How do you judge or evaluate the time put in

12   for a particular service on a particular part or

13   replacement of a part, et cetera?

14      A    I'm still not understanding your question.

15      Q    Well, is there some sort of policy or

16   document that tells the dealers how much time would

17   be authorized to replace a particular part?

18      A    Well, the -- it is not based necessarily --

19   the flat rate manual would tell the dealer how much a

20   particular repair pays, and so that -- whatever that

21   repair is, if it includes replacing parts, if it

22   doesn't include replacing parts, it may be an

23   adjustment or something, so that that time is provided

24   by TMC.  We don't -- I'm not involved in the

25   development of those times if that's what you are

003010

John Lang

70

1    asking.

2        Q    Well, does it -- does that rate include

3    compensation to the dealers for their mechanics' time,

4    the technicians' time in replacing a part, for example?

5        A    I think I previously stated that that's what

6    the flat rate manual does is it tells the technician

7    and the dealer the amount of time that we will pay

8    based on that repair.

9        Q    Thank you.

10            (The document referred to below was

11       marked Lang Exhibit 90 for

12       identification and is attached hereto.)

13   BY MR. ROBINSON:

14       Q    Let's go to Exhibit Number 90.  What is

15   Exhibit 90?

16       A    These are T codes, and this was --

17       Q    What's a T code?

18       A    A T code is a code that TMC requires on a

19   claim.

20       Q    What is -- is there any meaning to the word --

21   to the letter "T"?  Does it stand for trouble?

22       A    I think it is trouble.

23       Q    Okay.  Do you know -- have you heard "T code

24   99"?

25       A    Yes, there is.

John Lang

71

1     Q    What is T code 99?

2     A    It would be others.

3     Q    What would that include?

4     A    If there's a code that's not available or

5 doesn't describe the condition that the technician

6 observed with the vehicle, then they would use 99.

7     Q    I'm looking here.  I see there is a T code on

8 number 3 for surge.  Do you see that?

9     A    Yes.

10    Q    Is there a T code for unwanted acceleration?

11    A    I don't know.

12    Q    Can you go through Exhibit 90 and see if

13 there's any T code for unwanted acceleration?

14    MS. GILFORD:  I'm just going to object, Counsel.

15 This is outside the scope of his particular field of

16 expertise.  He is here to talk about the location and

17 retention, identity, and nature of documents relating

18 to the warranty records.  He has explained what his

19 particular job is with respect to warranty claims.  He

20 is not a technician.  He doesn't have automotive

21 expertise.

22    MR. ROBINSON:  Well, I'm just -- he brought this

23 document here, and it is Exhibit Number 90.  We have

24 marked it.  I just am asking him on this document that

25 he brought here, is there any T code for unwanted

72

1    acceleration.  If he knows.

2        MS. GILFORD:  If you want him -- well, he has

3    already answered that question.  I let him answer that

4    question, but I mean if you want him to read through

5    every T code on 16 pages --

6    BY MR. ROBINSON:

7        Q   Let's just look at page 1.  Is there any

8    T code for unwanted acceleration?

9        A   I don't see one on page 1.

10       MS. GILFORD:  You are asking for those exact words?

11    BY MR. ROBINSON:

12      Q   Let me ask you this.  Is this a document that

13    you brought with you today?

14      A   Yes.

15      Q   Where did you get this document?

16      A   It is from our flat rate manual.

17      Q   So this is a document that's in your

18    department there?

19      A   It is a document that TMC produces that we

20    print copies from.

21      Q   And what was your purpose in bringing this

22    document?  Was it to show us something about the

23    warranty department?

24      A   I -- I -- in preparing for the deposition, I

25    needed to become familiar with the fields that are on a

003013

John Lang

73

1    warranty claim, and this is one of them.  I just

2    decided I needed to look at this just to familiarize

3    myself with it.  I'm not very familiar with it.

4         Q    What else did you do to prepare for this

5    deposition today?

6         A    I met with our attorneys.

7         Q    What else did you do?

8         A    That's pretty much it.  We just met and they

9    asked me questions.

10         Q    Okay.  You reviewed this document; right?

11         A    Yes.

12         Q    Exhibit Number 90.  Did you review Exhibit

13    Number 89?

14         A    Yes.

15         Q    Did you review Exhibit Number 88?

16         A    Yes.

17         Q    Did you review any other documents to prepare

18    for the deposition today?

19         A    There was one document that they showed me

20    information about a claim, and that's it.

21         Q    What, like an FTR.

22         A    No.

23         Q    What type of claim document are you talking

24    about?

25         A    It was just -- it wasn't any document that's

John Lang

74

1    produced in my department, so I'm not really familiar

2    with it, but it just had claim information or claim

3    fields on it.

4         Q    And what department did it come from?

5         A    I don't know.

6         Q    Did it have claims of alleged unintended

7    acceleration on it?

8         A    I don't know what the contents of it were.

9         Q    Is the document here?

10   MS. GILFORD:  No, Counsel.  He wasn't familiar with

11   it, so he didn't -- it wasn't from his department.

12   BY MR. ROBINSON:

13        Q    Do you remember what was on that document?

14        A    There was just a series of fields for a claim.

15        Q    You have no idea where that came from, that

16   document?

17        A    No.

18        Q    Was it from Customer Relations?

19   MS. GILFORD:  He doesn't know, Counsel.

20   THE WITNESS:  I don't know.

21   MS. GILFORD:  He's already testified to that.

22   BY MR. ROBINSON:

23        Q    If you go to page 11 of Exhibit Number 90, do

24   you see anything -- strike that.

25             Do you see any code on Exhibit Number 90,

John Lang

75

1    page 11, that is a code for sudden acceleration or

2    unwanted acceleration?

3        MS. GILFORD:  I'm just going to object as vague.

4    Are you asking him to look for the words "unwanted

5    acceleration"?

6        MR. ROBINSON:  Or anything that comes close to

7    those words, yes.

8        THE WITNESS:  I'm not a technician or an expert in

9    systems, but I can tell you if those exact words exist

10   or not on this list if you want.

11           I don't see the words "unintended

12   acceleration" on this list.

13           (The document referred to below was

14       marked Lang Exhibit 91 for

15       identification and is attached hereto.)

16   BY MR. ROBINSON:

17

John Lang



John Lang

77



John Lang

78



13          (The document referred to below was

14     marked Lang Exhibit 92 for

15     identification and is attached hereto.)

16          MR. ROBINSON:  Okay.  Let's go to the next exhibit

17     here.  Let's go to Number 10.

18     BY MR. ROBINSON:

19          Q    Let me show you Exhibit Number 92.  Do you see

20     on Exhibit 92 where it says, "Toyota, like other

21     automobile manufacturers, actively and continuously

22     monitors field information related" --

23          MS. GILFORD:  Let him have a chance to look at the

24     document, Counsel.

25     ///

John Lang

79

1    BY MR. ROBINSON:

2         Q     -- "related to our vehicles."  After you

3    review the document, I'm asking you is that true.

4         MS. GILFORD:  I'm going to object as outside of the

5    scope of his deposition, and we have already produced a

6    witness on the analysis of field performance documents.

7         MR. SAFI:  Was that witness designated for Topic

8    Number 7?

9         MS. GILFORD:  No.  He was designated for the topic

10   of analyzing field performance documents, and he

11   clearly, very clearly, testified as to what that means,

12   and that included warranty claims.

13        MR. ROBINSON:  Well, I'm asking him, from his

14   knowledge as to warranty claims, to answer the

15   question.

16        MS. GILFORD:  He can answer in his personal

17   capacity, but it is not binding on the company because

18   it is outside of the scope of his categories.

19        MR. ROBINSON:  I disagree, but go ahead.

20        THE WITNESS:  There are other departments like PQSS

21   that monitor warranty claims.

22   BY MR. ROBINSON:

23        Q     Are you -- strike that.

24             Is your department involved in any safety

25   recalls?

John Lang

80

1     A    When you say "involved," what do you mean?

2     Q    In any way.

3     A    Our department is responsible for putting in

4  the coding so the dealers can get paid.

5     Q    So you -- strike that.

6     Who do you -- who informs you of a safety

7  recall so that you can put the coding in so the dealers

8  can get paid?

9     A    It is PQSS and TMC.

10    MR. ROBINSON:  Okay.  Let's go on to 13.

11       (Whereupon, the following testimony related

12     to Exhibit 93 was held under separate confidential

13     cover.)

14

15

16

17

18

19

20

21

22

23

24

25

003021

John Lang

89

1          (The document referred to below was

2      marked Lang Exhibit 94 for

3      identification and is attached hereto.)

4   BY MR. ROBINSON:



John Lang

90



003023

John Lang

91



003024

John Lang

92



```
 4          (Whereupon, the following testimony related
 5     to Exhibit 95 was held under separate confidential
 6     cover.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

003025

John Lang

1     Q   Nobody on Exhibit 88 does those types of

2  analyses looking for condition, cause, remedy and

3  numbers of warranty claims of the same reported

4  symptom?

5     A   No.

6     Q   Okay.  What is -- strike that.

7          Is the warranty parts recovery system separate

8  from the warranty system?

9     A   Yes.

10     Q   Okay.  Would you explain the difference?

11     A   The warranty parts recovery system is managed

12  by PQSS, so we send claim data daily to them, and then

13  they determine using their programs what parts they

14  want to look at.

15     MR. ROBINSON:  Do you want to change the tape right

16  now?

17     VIDEO OPERATOR McCAVERTY:  I've got a minute left.

18     MR. ROBINSON:  Let's change.

19     VIDEO OPERATOR McCAVERTY:  11:35 A.M.  End of disk

20  1 in the videotaped deposition of John Lang.  We are

21  off the record.

22          (Recess taken to change videotape.)

23     VIDEO OPERATOR McCAVERTY:  This is the beginning of

24  Disk 2 at 11:37 A.M.  We are back on the record.

25  BY MR. ROBINSON:

John Lang

101

1      Q   Okay.  So just to be clear here, the system --

2  the warranty system that we have talked about is called

3  CPS?

4      A   That's correct.

5      Q   And I want to understand what CPS includes.

6  Does PQSS extract the data for warranty parts recovery

7  from your CPS system?

8      A   No.

9      Q   So the warranty parts recovery system is a

10  separate system?

11      A   That's correct.

12      Q   What about parts retention and storage

13  information?  Is that part of your system?

14      A   I'm not sure what you mean by that.

15      Q   Well, as I understand it, to ensure that parts

16  removed for warranty are available when requested,

17  somewhere at TMS they keep information regarding parts

18  that have been removed.  Is that really what PQSS is

19  doing with warranty parts recovery system?

20      A   You are -- I'm still confused by your

21  question.  Can you break it up into parts?

22      Q   Okay.  Let me ask this.  What is the Daily

23  Warranty Parts Recovery Summary?

24      A   I'm sorry, the daily parts --

25      Q   Daily Warranty Parts Recovery Summary.

John Lang

102

1      A    I'm sorry, what was the last word?   I

2  couldn't --

3      Q    Summary.

4      A    Summary?

5      Q    Or Daily Warranty Parts Scrap Report.

6      A    That would be a report that would be sent out

7  to the dealer to tell them what parts that they would

8  need to send to TMS.

9      Q    Who sends that out?

10     A    That's PQSS.

11     Q    And when those parts come back, do they go to

12 the parts recovery center?

13     A    Some do, yes.

14     Q    Where do the others go?

15     A    Some go directly to the manufacturer.

16     Q    To TMC?

17     A    To -- typically to TEMA.

18     Q    To TEMA?

19     A    TEMA.

20     Q    Even if the vehicle is manufactured in Japan?

21     A    No.   TEMA would only receive parts for what

22 they manufacture.

23     Q    Would any parts be shipped to Japan?

24     A    Yes.

25     Q    Parts on the vehicles that they manufacture?

003028

John Lang

103

1      A     Yes.

2      Q     And what is the purpose of shipping the parts

3    to Japan?

4      MS. GILFORD:  I'm just going to object as outside

5    the scope of his deposition.

6      MR. ROBINSON:  We don't have much scope yet, so if

7    you can answer, please.

8      MS. GILFORD:  These three categories are the scope

9    of his deposition.

10     MR. ROBINSON:  Not much.

11   BY MR. ROBINSON:

12     Q     Go ahead.

13     A     I am assuming they analyze the parts.  I've

14   never been engaged in that activity.

15     Q     Does Toyota maintain a database or online

16   computer system for its parts recovery centers?

17     A     I'm not sure how to answer that.  Can you

18   rephrase the question.

19     Q     Yeah.  Is there -- are there parts recovery

20   centers that are part of TMS?

21     A     There's one parts recovery center.

22     Q     Where is that?

23     A     It is in Torrance.

24     Q     Where?

25     A     It is near our headquarters in an industrial

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

003029

John Lang

104

1    area.

2         Q    How would you describe that building?   Is

3    there a name on it?

4         A    I don't recall if there's a name on it.

5         Q    Is it called a parts recovery center?

6         A    Yes.

7         Q    And what is the name of the system or database

8    that lists the information relating to the parts and

9    the parts recovery center?

10        A    I don't know.

11        Q    Do you know who is responsible for the

12   maintenance of the parts recovery center database?

13        A    No, I don't.

14        Q    Do you know how many fields it contains?

15        A    No, I don't.

16        Q    Do you know how many years of information are

17   maintained in the parts recovery system database?

18        A    I don't know.

19        Q    Do you know if there's parts recovery centers

20   in Japan?

21        A    I think there is.

22        Q    How many?

23        A    I don't know.

24        Q    Are there parts recovery centers in other

25   parts of the U.S. besides the one in Torrance?

John Lang

105

1      A      Yes.

2      Q      Where?

3      A      There's one in TEMA.

4      Q      In Kentucky?

5      A      Yes.

6      Q      Do you know what that's called?

7      A      No, I don't.

8      Q      Is there -- is there any process -- strike

9   that.

10           You know, in the last, say, two years, there's

11   been some focus on unintended acceleration --

12   correct? -- at Toyota?

13     A      I don't know what you mean by "focus."

14     Q      Up until about two or three years ago, had you

15   heard very much about unintended alleged acceleration

16   on Toyota vehicles?

17     A      I'm not engaged in any technical aspects.

18   That's not my focus of my job or my attention.

19     Q      So you haven't heard anything about unintended

20   acceleration being claimed or alleged on Toyota

21   vehicles?

22     A      I know what I saw in the news and that's about

23   it.

24     Q      So you are not even -- you have got nothing to

25   do with any warranty claims that relate to unintended

John Lang

106

1    acceleration?

2        MS. GILFORD:  Objection, Counsel.  He has already

3    testified that he and his department handle warranty

4    claims or process warranty claims for TMS.

5    ///

6    BY MR. ROBINSON:

7        Q    Okay.  Are you going to adopt her answer, or

8    are you going to give it your own?

9        A    We're --

10       MS. GILFORD:  Objection.  Argumentative.

11           Repeat the question.

12       MR. ROBINSON:  I would say your objection was

13   argumentative.

14           Can you read the question back, please.

15           (Record read as follows:

16           "Question:  So you are not even --

17       you have got nothing to do with any

18       warranty claims that relate to

19       unintended acceleration?")

20       THE WITNESS:  And the answer is no.

21   BY MR. ROBINSON:

22       Q    You don't?

23       A    (Shakes head.)

24       Q    You do not.

25       A    (Shakes head.)

John Lang

1     Q   The answer -- I didn't want to have a double

2   negative.  In other words, you are not involved with

3   warranty claims for acceleration problems?

4     A   What do you mean by "involved"?

5     Q   Any of your time focused on any unintended

6   acceleration claims?

7     A   No.

8     Q   Do you know how a returned part that's

9   retrieved from a warranty repair is used for evaluation

10   of quality assurance?

11     A   No, I don't.

12     Q   Do you know what the quality assurance

13   processes and procedures in place at Toyota Motor Sales

14   are about?

15     A   No.

16     Q   Are there guidelines or manuals about quality

17   assurance process practices and procedures --

18     MS. GILFORD:  Counsel, I'm just --

19   BY MR. ROBINSON:

20     Q   -- that you are aware of?

21     MS. GILFORD:  I'm just going to object.  You have

22   already taken the deposition of the V.P. who is in

23   charge of PQSS.  That person, that testimony, has

24   already been made available to you, and this is simply

25   outside of the scope of Mr. Lang's deposition.  I'm

John Lang

108

1    going to let him answer as to his personal knowledge,

2    but you're walking down a path that you have already

3    went down with the appropriate witness.

4         MR. ROBINSON:  I'm going to mark -- I'm going to

5    mark Exhibit Number 96.  I need a sticky, I guess.

6              (The document referred to below was

7         marked Lang Exhibit 96 for

8         identification and is attached hereto.)

9    BY MR. ROBINSON:

10        Q    Here is Exhibit 96, sir.  There you go.

11             Do you understand that you have been produced

12   as a person that is supposed to be the most

13   knowledgeable at Toyota concerning the following:

14   Number 7, the identity, nature, location -- do you have

15   a copy -- do you want a copy of this?  Strike that.

16   Put one up on the screen.

17        MR. SAFI:  Yeah.

18   BY MR. ROBINSON:

19        Q    Looking at Number 7, you are the person most

20   knowledgeable about "the identity, nature, location,

21   retention of documents related to information Toyota

22   has received about speed control, surge, and sudden...

23   acceleration events in Toyota and Lexus vehicles

24   including specifically warranty, records, customer

25   complaints, claims, and lawsuits ('Field Performance

John Lang

109

1    Documents')."  Is that correct?

2        MS. GILFORD:  Objection.  Counsel, he has already

3    testified as to those aspects of his job with respect

4    to the warranty claims his department receives.  I mean

5    you can answer the question, but I object that it

6    misstates his testimony and it is argumentative.

7    BY MR. ROBINSON:

8        Q    Well, what part of Number 7 are you the person

9    most knowledgeable at Toyota about?

10       MS. GILFORD:  Counsel, we have gone round and round

11   on this.  He is here to talk about warranty claims, --

12       MR. ROBINSON:  I would like him to answer the

13   question.

14           Can you read the question back, please.

15       MS. GILFORD:  -- where that data is located, the

16   identity, nature, location, and retention of the

17   warranty claim documents.  He has talked about that.

18   He has told you where they are, what they are, how long

19   they keep them.  You are just badgering the witness

20   right now.

21       MR. SAFI:  So we're clear, I think -- is he here

22   just for warranty or is he also here for records,

23   customer complaints, claims, and lawsuits, or is it

24   just warranty?

25       MS. GILFORD:  Well, I think that's a comma in the

John Lang

110

1    middle of the warranty records.  He is here for

2    warranty, as we have made very, very clear prior to the

3    deposition and in the crafting of the deposition

4    notice.  We have produced Robert Landis on the claims

5    and lawsuits, and we will be producing a witness --

6    another witness on customer complaints, and we have

7    made that clear.

8          These are your categories that you drafted.

9    They lumped a bunch of different operational functions

10   into one category, and we are producing different

11   witnesses because we have to produce different

12   witnesses.  He is here on the warranty records.

13       MR. ROBINSON:  Let's talk about this.

14   BY MR. ROBINSON:

15       Q    What specific information do you have on any

16   warranty records at Toyota that deal with speed

17   control, surge, and sudden acceleration events in

18   Toyota and Lexus vehicles?

19       MS. GILFORD:  Other than what he has already

20   testified to?

21       MR. ROBINSON:  I haven't heard much, but go ahead.

22       THE WITNESS:  I -- the only thing I'm aware of is

23   that we have warranty records.  What's in those

24   warranty records and what's, you know, what type of

25   claims, I don't have knowledge to that because that's

John Lang

111

1   not part of my responsibilities.  My responsibilities,

2   I'm a bank to the dealers.  I pay the dealer, and I get

3   paid back from the manufacturer.  So I don't dive into

4   the claims to know what's there.  I just know where the

5   claims are held, where the system is.

6   BY MR. ROBINSON:

7       Q    Who would be the most knowledgeable person

8   that works in your warranty department about speed

9   control, surge, and SUA events as found in the warranty

10  records?

11      MS. GILFORD:  Objection.  Counsel, as you well

12  know, he produced a witness for PQSS who receives the

13  warranty data and does that kind of analysis.  You are

14  assuming facts --

15  BY MR. ROBINSON:

16      Q    Go ahead.

17      MS. GILFORD:  -- and misstating his testimony.

18  BY MR. ROBINSON:

19      Q    You can answer.

20      MS. GILFORD:  Asking -- calling for speculation and

21  it lacks foundation.

22      THE WITNESS:  I don't think there's anyone in my

23  department that could provide that kind of information.

24  BY MR. ROBINSON:

25      Q    Do you know how a returned part that's

John Lang

112

1  retrieved from a warranty repair is used for technical
2  research at Toyota?
3       A    I'm not involved in that.  I don't know.
4       Q    Do you know how a returned part retrieved from
5  a warranty repair is used for vendor follow-up?
6       A    No, I don't.
7       Q    Do you know what the vendor follow-up
8  processes and procedures are in place at Toyota Motor
9  Sales for returned parts that are part of a warranty
10 repair?
11      A    I'm sorry, can you rephrase the question,
12 repeat the question.
13      Q    Yes.  Do you know what the vendor follow-up
14 processes are for returned parts that are retrieved
15 from a warranty repair?
16      A    No.
17      Q    Is your warranty system, the CPS system,
18 capable of searching warranty claims for unintended
19 acceleration, high idle, surge, or lunge complaints?
20      A    We don't have a search mechanism built into
21 it.  That's why we provide the data to PQSS on a daily
22 basis.  That's their position to do that.
23      Q    Now, you do have a field for part numbers;
24 right?
25      A    A field for part numbers on the claim are you

John Lang

113

1    referring to?

2         Q    On the claim, right.

3         A    Yes.

4         Q    And that's something that's entered into your

5    database?

6         A    Yes.

7         Q    But there's nothing entered into your database

8    for such things as high idle, surge, lunge complaints,

9    except for a possible description by the customer or

10   the dealer; right?

11        A    I'm not really sure.

12        MR. ROBINSON:  Okay.  I think I'm done with what I

13   can do here.  Is this a good time to take a lunch break

14   maybe, and we will come back and we will talk among

15   ourselves.

16        VIDEO OPERATOR McCAVERTY:  It is 11:53 A.M.  We are

17   off the record.

18

19            (Lunch recess taken.)

20

21            (Mr. Robinson, Mr. Newell, Mr. Szumiak,

22        and Ms. Folia are no longer present.)

23        VIDEO OPERATOR McCAVERTY:  It is 12:53 P.M.  We are

24   back on the record.

25

003039

John Lang

114

EXAMINATION

BY MR. SAFI:

    Q    Mr. Lang, my name is Rob Safi, and I represent
some of the plaintiffs in this litigation.  I only have
not very many questions, and then I'm going to pass it
to Mr. Churella here, but I want to go back and hit
two things in a little more detail that you and
Mr. Robinson discussed this morning.

         First of all, let's talk about the CPS
database.

    A    Okay.

    Q    My understanding of your testimony was that
that database in the first instance is maintained by
your department or the warranty department that --
could we put Exhibit 88 back up, please.

         Let me ask you this, who maintains in terms
of -- if there were a custodian of that database?

    A    It would be Mr. Pettit and IT combined.

    Q    Okay.  And I understood your testimony to be
that other -- PQSS may tap into that data resource,
TEMA may tap into that data resource?

    A    That's not correct.

    Q    Okay.  Could you clarify that in terms of what
other departments within TMS or other Toyota entities
tap into CPS as a source of information.

003040

John Lang

115

1      A    Okay.  When -- when you say the word "tap in,"

2   to me that implies that somebody has access to that

3   system, and that's not a correct statement.

4      Q    Okay.

5      A    So the -- what I've already testified today is

6   that we provide a feed of warranty data on a daily

7   basis to PQSS, and then we also give abbreviated claim

8   information to our C.R. department that they use when

9   customers call so they can pull that information, and

10  then when we sent -- we sent claims to TMC for judgment

11  purposes and apportionment purposes, and then from

12  there TMC shares the data with TEMA, so TEMA doesn't

13  have direct assess to our system.

14     Q    Okay.  You said you provide a feed to PQSS on

15  a daily basis?

16     A    That's correct.

17     Q    What format does the feed -- in what format is

18  that?  What do you provide to PQSS?

19     A    We provide --

20     Q    And by "you" I mean the warranty -- you or

21  Mr. Pettit or IT.

22     A    Well, the system --

23     Q    The system.

24     A    -- is automatically programmed to provide all

25  of the claim data.  It gives, like, a duplicate of all

John Lang

116

1        the claim data that we processed and paid claims for on

2        that given day, and so all of that claim data, all the

3        fields in our warranty claim then is passed on to PQS's

4        database.

5            Q    And they have -- PQSS has a software platform

6        for reading that data?

7            A    Yeah.  It is probably a flat file at some

8        point -- the data feed, and then they have their own

9        programming capability.

10           Q    Do you know for a fact that they are

11       programming -- or their -- the software platform that

12       they view the data are -- is different from the CPS,

13       whatever software is used in your department, for

14       purposes of working with the CPS data?

15           MS. GILFORD:  Can you repeat that question, please.

16               (Record read as follows:

17               "Question:  Do you know for a fact

18           that they are programming -- or that --

19           the software platform that they view the

20           data are -- is different from the CPS,

21           whatever software is used in your

22           department, for purposes of working the

23           CPS data?")

24           MR. SAFI:  So let's try that again and withdraw and

25       make a nicer question out of that.

John Lang

117

BY MR. SAFI:

1
2    Q   Okay.  Do you know whether the software

3   platform that PQSS uses to -- that it loads the data

4   onto, does it differ from the software that runs the

5   CPS database --

6    A   I --

7    Q   -- the kind you're in?

8    A   I don't really know.

9    Q   Okay.  And when you said a "flat file" -- a

10  minute ago you said it probably is sent as a flat file.

11  What did you mean by that?

12    A   A flat file is just rows and columns of data.

13    Q   Okay.  Like a tab delimited text file type

14  thing, just raw data?  Is that what you mean?

15    A   Yes.

16    Q   Okay.  And then you mentioned the CR

17  department.

18    A   Yes.

19    Q   And that's customer relations?

20    A   That's right.

21    Q   And I believe you testified that the warranty

22  department provides abbreviated claim information to

23  the customer relations department?

24    A   That's correct.

25    Q   And in what way is it abbreviated?

John Lang

118

1          A     They have their own system -- call center

2     system where they -- when they take a call from a

3     customer, if we know who the owner of that vehicle is,

4     the history of the vehicle, and so they -- we provide a

5     file to them of all of the claims that we have in the

6     system, so in the event that a customer calls and they

7     are -- and the call rep is given a VIN number for that

8     vehicle, they would plug that VIN number into their

9     system and they would see all the information about the

10    customer and then they would have some -- a little bit

11    of warranty history, has there ever been a problem with

12    the vehicle.  It is used to help the call center rep

13    understand the customer's situation.

14         Q     So that the rep can understand --

15         A     Uh-huh.

16         Q     -- can know whether or not the customer has

17    made a warranty claim on the vehicle before?

18         A     Or the dealer submitted a claim.

19         Q     Okay.  And, again, is that -- to your

20    understanding, is that the only reason why the

21    abbreviated claim information is provided to the

22    customer relations department?

23         A     That's -- to my understanding, yes.

24         Q     The feed that is -- going back to PQSS for a

25    moment.  The feed that's provided to PQSS, is that --

John Lang

119

1   that's all -- I mean that's all the data that's in CPS,
2   it is not limited to certain fields; is it?  I mean
3   does the feed include all data within the CPS system?
4        A    No.
5        Q    Okay.  What data are not included or which
6   data are included, whichever -- answer that however you
7   want to answer that.
8        A    Well, it would not include recovery claim
9   information, it wouldn't include edits, or it wouldn't
10  include -- not a trail of how many times a claim came
11  through our system, so it would only pertain to the
12  actual fields that the dealer inputs on a claim.
13       Q    But it would include all those fields?
14       A    To my knowledge, yes.
15       Q    Okay.  How about the feed to -- well, how -- I
16  don't know if it is a feed, so let's back up.
17            How is claim information -- what format and by
18  what means is claim information transmitted to TMC from
19  the CPS database?
20       A    We have a -- it is an electronic file that's
21  sent to TMC on a daily basis.  It is -- I mean, I don't
22  know.  There's a lot of detail to it, but I guess in
23  summary, there -- it is a flat file that's segmented
24  by -- it has different segments or root segments, and
25  it is basically just row and column of data, and then

John Lang

120

1    that data then connects with their system and it is

2    transferred into their system.

3        Q    And -- okay.  Is it -- how does it differ from

4    what's provided to PQSS, the information that -- the

5    feed that's provided to TMC?

6        A    The feed that's provided to TMC is financially

7    based.  It is about getting the money --

8        Q    Uh-huh.

9        A    -- and basically making us whole.  The feed to

10   PQSS is strictly just all of the claim fields.  There's

11   additional financial fields that are sent to TMC.

12       Q    But, to your knowledge, all of the what you

13   just referred to as the claim fields that the dealer

14   fills out, they are all transmitted to TMC.  Is that

15   right?

16       A    That's correct.

17       Q    And do you know anything about the platform

18   that TMC uses to load the data that's provided to it by

19   TMS with respect to claims?

20       A    No, I don't.

21       Q    Do you know who the person at TMS -- TMC most

22   knowledgeable about that would be?

23       A    Probably Eiji Sawa.

24       Q    Can you spell --

25       A    His last name is S-a-w-a.

003046

John Lang

121

1      Q     And E-G was just the initials?

2      A     Eiji is his -- no.  E is -- Eiji is his name,

3   first name.

4      Q     Okay.

5      A     It is E-i-j-i.

6      Q     Do you know what Mr. Sawa's position is?

7      A     He is the general manager of the warranty

8   department at TMC for overseas service.

9      Q     Okay.  Similar question for PQSS in terms of

10   the platform, how it -- who would be most knowledgeable

11   about, you know, what that -- happens with the data

12   that's fed from your department and how it is loaded

13   into whatever system PQSS has for working with the

14   data?  Do you know who the person most knowledgeable

15   about that would be?

16      A     I believe it would be Tom Trisdale.

17      Q     Could you spell Mr. Trisdale's name.

18      A     It is T-r-i-s-d-a-l-e.

19      Q     And do you know what his position is?

20      A     He's -- I don't know the exact title.  He is

21   a manager at PQSS.

22      Q     Are there any other -- besides PQSS and TMC

23   and Customer Relations, are there any other divisions

24   of TMS or Toyota entities that are provided output from

25   the CPS system?

John Lang

122

1      A    Not that I can think of.

2      Q    Could you put 88 up, and let's go over to

3  Mr. Pettit on the left.

4        I would like a little more detail, if you

5  don't mind, in addition to what you testified about

6  this morning, in terms of what Mr. Pettit and his team

7  are responsible for.

8      A    Who do you want me to start with?

9      Q    Well, maybe let's start at just the general --

10  of the warranty systems department generally, what its

11  function is.  I mean I think I understood your

12  testimony earlier to be they are responsible for

13  maintaining and improving the system that you work with

14  on a daily basis for paying claims and getting

15  reimbursed for warranty claims.  Is that basically

16  right?

17      A    That's -- that's a pretty good description.

18      Q    Could you elaborate on that?

19      A    As I mentioned before, you know, our position

20  in the warranty department is we are responsible for

21  paying claims and basically we are part of a pipeline

22  of information that flows from the dealer to -- to our

23  plants and to our parent company, and in that job

24  warranty claims sometimes they are not all the same,

25  you know, we may have a recall, so we have to set up

John Lang

123

1    the codes for a recall.  Those are -- every time we

2    have a recall, it is a new -- new programming that has

3    to be done for that.  So Mr. Pettit and his group would

4    be responsible for making sure that all the coding is

5    in correctly and that the -- and basically that we make

6    sure that we are sending the claim to the correct

7    party, whether it be TMC or, you know.  So that -- that

8    whole pipeline of information has to be made sure that

9    it is accurate and coded correctly for payment.

10       Q    What I really want to understand is try to get

11   more information from you about who the right person --

12   because I don't think it is Mr. Pettit based on what

13   you said -- who the right person is to talk to about

14   working with the CPS data, searching the CPS data,

15   manipulating the CPS data.

16       A    Well, we don't really do that in our -- our

17   world.  We give the data to PQSS, and then they analyze

18   it, so.

19       Q    But someone -- I mean CPS -- there is a CPS

20   database; right?

21       A    There's the system and the claims that reside

22   in that system.

23       Q    Okay.  What kind -- what is it -- what

24   software programming is it based on?  What database,

25   architecture, and language?  Do you know?

003049

John Lang

124

1       A       I'm not really an expert in that area.

2       Q       Well, just generally what you know about it.

3       A       I'm not really sure.  It is a realtime system.

4       Q       You mentioned COBOL earlier and SQL.

5       A       Yeah.  It is a newer system.  It is realtime.

6    I believe Java programming, but I don't really know all

7    the ins and outs of how they put it together.

8       Q       Who put it together?

9       A       Well, Mr. Pettit provided design requirements,

10   and then our IT department actually was responsible for

11   doing the programming.

12      Q       Okay.  Have you ever worked with your -- by

13   IT, you mean just TMS IT?

14      A       That's correct.

15      Q       Is there anyone in TMS's IT department that

16   is -- well, that is responsible for the warranty

17   department as a client so to speak?

18      A       Well, I mentioned the national manager, Mylene

19   Mayers.

20      Q       Correct.  And you mentioned she is new in that

21   position.

22      A       She is new in the position.

23      Q       Who preceded her -- her title is sort of

24   manager of IT?

25      A       I don't know.

John Lang

125

1      Q     Okay.

2      A     It is national manager.

3      Q     Who preceded her as national IT manager?

4      A     We didn't have a national before that.

5      Q     Okay.  How -- who -- how was it before then?

6      A     There was a manager that was a liaison to

7   Mr. Pettit.

8      Q     Who was that person?

9      A     I'm sorry, I can't think of his name right

10   now.

11      Q     Is he still employed by TMS?

12      A     Yes.

13      Q     Still in IT?

14      A     Yes.

15      Q     If -- can we leave a blank in the transcript

16   so that if Mr. Lang recalls the name, when you review

17   your deposition transcript later --

18      A     Okay.

19      Q     -- you can just fill it in for us?

20      A     Sure.

21            (Information Requested:_____

22   _____.)

23   BY MR. SAFI:

24      Q     How long was what's his name in that position?

25   If you know.  I mean to the best of your knowledge.

John Lang

126

1      MS. GILFORD:  You can refer to him as Ms. Myers' --

2      MR. SAFI:  Predecessor, yes.  Pardon me.

3      THE WITNESS:  Oh, gosh.  He was probably there for

4    maybe two years.

5    ///

6    BY MR. SAFI:

7      Q    Okay.  And do you know who preceded him in

8    that position?

9      A    I can't remember.  There was a long, you know,

10   transition of different people in and out of there, and

11   I don't recall.

12     Q    How far back in time does the CPS database go?

13     A    To 2005.

14     Q    Okay.  And what database or information system

15   was there before 2005 for maintaining the types of

16   information that are currently contained in the CPS

17   database?

18     A    That was -- we referred to it as the Legacy

19   system.

20     Q    And does it have a name?

21     A    That's it.  The Legacy system.

22     Q    What was it called before it was the Legacy

23   system?

24     A    I don't think it ever had a name.

25     Q    Okay.

John Lang

127

1      A     It was just warranty system or we always

2   called it Legacy.

3      Q     Can the Legacy system still be accessed?

4      A     Yes.

5      Q     And in terms of the fields for claim

6   information provided -- before we dig in, what time

7   span does the Legacy system encompass?

8      A     From 1981 until -- it is still currently being

9   used for some of our other purposes.

10      Q     1981 till when?

11      A     Till the present.  It is still being used.

12      Q     Oh, I see.  But until 2005 -- okay.  What

13   purpose is it still being used for?

14      A     We provide a platform for our Transportation

15   Services department to -- to process their

16   transportation claims through it, in the system, and

17   the --

18      Q     What's -- that's, like, logistics for

19   delivering vehicles or what?

20      A     That's correct.

21      Q     Okay.  So that's -- it just has -- that Legacy

22   system, is that the only function that it currently

23   performs aside from being a repository?

24      A     We also -- we also handle some of our port

25   facilities, and then the GST and SET ports, which are

John Lang

128

1    separate facilities from our own, they also use the

2    Legacy systems to support claims to us.

3        Q    Warranty claims?

4        A    In some occasion warranty claims.  In other

5    cases it might be port modification claims.

6        Q    So the Legacy system was bigger than warranty

7    claims; is that right?

8        A    Yes.

9        Q    Okay.  But it was used for warranty claims

10   from at least 1995 to 2005; is that right?

11       A    No.  From 1981 --

12       Q    Right.  1981 till 2005 or so when CPS was

13   implemented?

14       A    No.  We used the Legacy system for our private

15   distributors up until 2007.

16       Q    Okay.  And that was for Gulf States and

17   Southeast, they could continue to submit warranty

18   claims, and those claims continued to be processed

19   through the Legacy system --

20       A    That's correct.

21       Q    -- until 2007?

22            Okay.  But so for -- putting Gulf States and

23   Southeast to the side, what you are referring to is the

24   Legacy system was the system for processing claims from

25   dealerships and getting -- paying those and getting

003054

John Lang

129

1   reimbursed for those up until 2005 or so when CPS was

2   implemented?

3        A    For the TMS dealers.

4        Q    For TMS dealers.  Okay.

5             And so now in the Legacy system, who is the

6   person, to your knowledge, who is most familiar with

7   the nuts and bolts of the Legacy system, especially the

8   warranty -- the warranty claims facet of the Legacy

9   system?

10       A    Mr. Pettit.

11       Q    Okay.  In -- okay.  In terms of the coding?

12       A    In terms of coding, there's very few people

13  left that understand it.

14       Q    Okay.

15       A    It is very old.

16       Q    Have you ever had an instance or do you know

17  of an instance, maybe it wasn't your instance, where a

18  query or some kind of search needed to be constructed

19  to retrieve information from the Legacy database with

20  respect to warranty claims?

21       A    Well, we retrieve information for financial

22  purposes from time to time.  That's part of our

23  responsibility is to analyze the financial aspects,

24  making sure that we are collecting the money that --

25  from the manufacturers that -- and then we also collect

John Lang

130

1   money from our local suppliers for locally supplied

2   accessories, so we have financial reports that we pull

3   that kind of data.  That's the kind of analysis we do.

4       Q    Why would there be a need in 2010, for in-

5   stance, to go back and pull financial data from 2005 in

6   terms of payment or reimbursement of warranty claims?

7       A    Not going back that -- that old.  More in

8   current -- we would be looking at current claims.

9       Q    Right.  And so that's -- my question pertains

10  to the Legacy system in terms of going back and

11  retrieving data --

12      A    Oh.

13      Q    -- from the Legacy system.  Who is the person

14  most knowledgeable about -- if you said I need -- if

15  you had an issue where I need to go and get whatever

16  information about, you know, whatever fields for

17  warranty claims out of the Legacy system, who would you

18  go talk to?

19      A    For what purposes would I be looking?

20      Q    Well, let's say you wanted to go pull what you

21  refer to as the claim information that dealers

22  prepared.  You wanted to get all that.  Let's say

23  that's your purpose.

24      A    Then I would go to Mr. Pettit and his staff.

25      Q    Okay.  And they would be able to deal with

003056

John Lang

131

1    that issue, or would they then --
2         A    Well, they would send a ticket to our vendor
3    in our IT department to have them program.
4         Q    Who is the vendor?
5         A    Cognizant.
6         Q    Okay.  That's a third party?
7         A    Yes.
8         Q    Okay.  And what is their function, they --
9         A    They actually -- they actually do the coding
10   on programming and maintain the system.
11        Q    The Legacy system?
12        A    They are responsible for maintaining the
13   Legacy system and CPS.
14        Q    And CPS?
15        A    That's correct.
16        Q    Did they build CPS?
17        A    No.
18        Q    Who built CPS?
19        A    Our IT department and contractors.
20        Q    Who are the contractors?
21        A    They were independent contractors.  I'm not
22   really familiar if they were with any particular
23   company or not.
24        Q    Your testimony is you don't know, you can't
25   identify them?

John Lang

132

1          A     No.

2          Q     Who on Mr. Pettit's staff -- let's go back to

3     the hypothetical I had a moment ago.  You needed to

4     retrieve claim -- what I'm calling claim information

5     from the Legacy database.  Is there someone in

6     particular that reports to Mr. Pettit that you would

7     be -- own that problem?

8          A     Mr. Chan.

9          Q     And, again, I'll go back because I don't think

10     we were on the same page a little while ago.  Have you

11     ever had an instance where you needed or someone on

12     your staff, someone within the warranty department,

13     needed to go back and for whatever reason look back at

14     data contained in the Legacy system?  That's my

15     question.

16         A     In what time frame are you referring to?

17         Q     Well, since the implementation of CPS.

18         A     I can't recall if we have done that or not.

19         Q     Okay.  But if you needed to do that, you would

20     go to Mr. Chan.

21         A     That's correct.

22         Q     What else does Mr. Chan do?

23         A     He is responsible for basically watching over

24     the system.  He works with Dale's team if we have

25     enhancements, the -- once the enhancement is in place,

John Lang

133

1    then he will work to make sure everything is still

2    functioning okay.  They also do QA work where, you

3    know, whenever there's an enhancement, then there's a

4    process that the IT department will go through where in

5    a programming world somebody has to put a storyboard

6    together, then there's another group that actually does

7    the programming, and then there's user acceptance

8    testing, and so that's where we would be involved.

9    There's also a QA process where the programmers and

10   other programming staff will do that work.  So Mr. Chan

11   will be engaged in that process to make sure that

12   whatever we ask that they program, at least it meets

13   our requirements.

14        Q    Does he do the storyboarding you referred to?

15        A    No, he does not.

16        Q    Who does that?

17        A    Mr. Lu.

18        MR. BIORNSTAD:  Did he say Mr. Lu?

19   BY MR. SAFI:

20        Q    Could you describe that storyboard process in

21   a little more detail.

22        A    If we -- we have a new concept or some element

23   that we are being required to program into the system,

24   and so my understanding of the storyboard, not that I

25   look at these things every day, is I guess what you --

003059

John Lang

134

1   it would almost be like when a movie production person

2   will put together a storyboard to film.  If you have

3   ever seen those, it is similar to that, but what they

4   are trying to do is just identify what is it, what's

5   the purpose, what -- what are the requirements, what do

6   you need to have done, how should it be done, you know.

7   I'm not an IT person, so we're really kind of outside

8   of my area of expertise.

9        Q    I understand.  And then from Mr. Lu it goes

10   from IT or the third-party vendor?

11        A    It will go to a combination of -- a small

12   staff of our own IT department and then working

13   together with the Cognizant group to implement the

14   change.

15        Q    Again, I'm asking all these questions just

16   because my sense is that the CPS database is a --

17   involves terabytes of data, and we are going to need

18   to figure out how to get what we want out of there.

19   That's the reason I'm asking you these questions, just

20   so you know.  I don't want to waste people's time here,

21   but with that in mind are there any other people you

22   can think of that would be able to inform that process

23   of taking out a particular claim, you know, excising

24   claim information or constructing queries to retrieve

25   information out of the CPS database?

John Lang

135

```
1        A    The -- well, again, we provide data to PQSS.

2    They have the query tools to do queries.  We don't do

3    queries.

4        Q    Okay.  How about with the Legacy database?

5    Would PQSS have those -- was PQSS in existence

6    performing the function it does today back when the

7    Legacy system was used for processing warranty claims?

8        A    Yes.

9        Q    Okay.  And did PQSS during that time period

10   perform analytics on warranty claim information?

11       A    Yes.

12       Q    Do you know who in the -- on the PQSS side

13   would -- is the person most knowledgeable with respect

14   to constructing queries and that kind of thing with

15   which to analyze and manipulate the CPS data?

16       A    Well, I think I've already testified I think

17   it would be Mr. Trisdale.

18       Q    Okay.  Okay.  And do you know who preceded

19   Mr. Trisdale?  Would -- this is my question.  Would

20   Mr. Trisdale be knowledgeable about that process with

21   respect to the Legacy system?

22       A    I don't know.

23       Q    Okay.  Can you think of anyone else that would

24   have knowledge about how to query or manipulate

25   warranty claim information on a Legacy database?
```

John Lang

136

1      A    No, I can't.

2      Q    Do you know who could answer that question for

3    me?

4      A    Mr. Waltz.

5      Q    Would there be someone a little closer to that

6    process than Mr. Waltz that could answer that question?

7      A    I don't work daily with that staff, so I don't

8    really know. I just know Bob so that's who I can refer.

9      Q    Aside from the feeds to PQSS and TMC and

10   Customer Relations, are there any other derivatives or

11   other iterations that you know of data in the CPS

12   database?

13     A    That -- derivations that TMS provides?  Is

14   that what you are saying?

15     Q    Or that TMS creates even.

16     A    No, I'm not aware of any.

17     Q    You talked about the flat fee, and

18   Mr. Churella may ask about this, but I do have one

19   question.  Is it the flat fee manual?

20     A    The flat rate manual?

21     Q    Flat rate manual.

22     A    Yes.

23     Q    Are you involved in the process of determining

24   what -- and I know the word "involved" is kind of not

25   perfectly clear as you have pointed out a couple times

003062

John Lang

137

1   today.  I mean do you have -- are you familiar with the
2   process of how those rates are set?
3        A    TMC does them.  I'm not familiar with it.
4        Q    And you mentioned, like, on one of your trips
5   to Japan, you were involved in negotiating prices for
6   parts I think you said
7        A    Yes.
8        Q    Is there a similar negotiation that takes
9   place with respect to here is how much time and the
10  rate at which it should be paid with respect to labor
11  or service separate and apart from just how much a part
12  should be priced at?
13       MR. HOSTETLER:  I think that's a compound question.
14  You are asking about the time aspect of it or the cost
15  aspect of it or both?
16       MR. SAFI:  Well, how much you should pay, which is
17  a function of the rate times the time.
18       THE WITNESS:  The labor time?  In the flat rate
19  manual, is that what you are referring to?
20       MR. SAFI:  Well, let's start there.
21       THE WITNESS:  Okay.  That's all done by TMC.  I
22  don't have any involvement.
23  BY MR. SAFI:
24       Q    Does anyone from TMS have any input on
25  that process?

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

003063

John Lang

138

1    A    Not in the flat rate manual that I'm aware

2    of.

3         Q    Okay.  How about is there anything besides the

4    flat rate manual?  I know you and Mr. Robinson kind of

5    went round and round on this.  Is there anything

6    besides the flat rate manual that establishes -- let's

7    back up.

8              Let's -- I think very early in your testimony

9    you talked about how TMS asks dealers to -- even if

10   they can't -- even if there isn't a part that needs to

11   be replaced or -- they still want dealers to check out

12   a problem, and TMS will pay them for that -- performing

13   that service.

14        A    Yes.

15        Q    Okay.  Could you describe -- are there -- is

16   there any protocol, are there any guidelines in terms

17   of what particular types of services TMS wants dealers

18   to perform in that regard?

19        A    So is -- your question is regarding no trouble

20   found?  Is that what you are asking?

21        Q    Is that what you were testifying about

22   earlier?

23        A    Yes.

24        Q    Okay.  So my question is about no -- what does

25   "no trouble found" mean?

John Lang

139

1      A    That means that a customer -- if a customer

2    comes into the dealership and says I've got a situation

3    that's occurring, and maybe it is an intermittent

4    condition, and so we allow the dealer to go ahead and

5    investigate that.  We want them to investigate it, and

6    so the dealer may or may not find a problem with a

7    vehicle.  So when they -- if it's -- let's say it is an

8    electronic issue or something, they will hook up a scan

9    tool to the vehicle and they will have time invested in

10   investigating if there's any problem, and if they

11   confirm -- if there's no problem found, they still have

12   the ability to collect from TMS and TMC to pay for that

13   investigation.

14     Q    Okay.  And so is there any other documents,

15   manuals, any type of guidelines or protocols that are

16   disseminated to dealers in terms of, you know, for

17   example, you mentioned the electronic -- in the

18   electronic issue, that says, look, if there's -- there

19   seems to be an electronic issue, you know, diagnose it

20   how -- this far, guidelines for how far you go when no

21   trouble is found?  Does that question make sense to

22   you?

23     A    Not really.

24     Q    Well, are there any documents that provide

25   guidance to dealers and their service departments for

003065

John Lang

140

1    how to proceed when there's no trouble found?

2         MS. GILFORD:   I'm just going to object as outside

3    the scope of his deposition.   You are really getting

4    into how dealers are -- or dealer service technicians

5    perform their job duties, and that's obviously not

6    Mr. Lang's area.   I'll let him answer to the extent he

7    can.

8         THE WITNESS:   I'm sorry, can you repeat the

9    question again.

10        MR. SAFI:   Could you repeat the question, please.

11   BY MR. SAFI:

12        Q    Let's back up.   You are responsible for

13   warranty publications I think you testified about, you

14   said earlier?

15        A    Yes.

16        Q    Okay.   And so are there any warranty

17   publications that you are responsible for that provide

18   guidance to dealers about how to proceed when there's

19   no trouble found?

20        A    There's a process or procedure for how to

21   submit the claim in the warranty procedures and policy

22   manual.

23        Q    Okay.   And does that part of the warranty

24   policies and procedures manual describe -- get down to

25   a level of detail about particular types of issues,

003066

John Lang

141

1    like electronic, so forth and so on?

2        A    No, it does not.

3        Q    Is -- does the manner in which those no

4    trouble found claim submissions are made differ

5    depending on the nature of the condition?

6        A    We just basically provide a dealer an

7    opportunity in the operation code to say if you didn't

8    have a problem but you investigated it, use this

9    operation code.  So the manual simply describes the

10   process on how to submit a claim.

11       Q    And so that process is the same regardless of

12   whatever condition it is --

13       A    Yes.

14       Q    -- that the dealer couldn't get down to the

15   bottom of; is that right?

16       A    That's correct.

17       MR. SAFI:  We can take a break.  I'm done with my

18   questions.  I'm going to pass to Mr. Churella here.  Go

19   off the record.

20       VIDEO OPERATOR McCAVERTY:  It is 1:30 P.M.  We are

21   off the record.

22            (Off-the-record discussion.)

23       VIDEO OPERATOR McCAVERTY:  It is 1:31 P.M.  We are

24   back on the record.

25

John Lang

142

1                          EXAMINATION

2     BY MR. CHURELLA:

3         Q    Good afternoon, Mr. Lang.  My name is Robert

4     Churella, and I represent the economic loss plaintiffs

5     in this litigation.

6              I have first a couple follow-up questions

7     for what you were just asked.

8              In terms of warranty claims, you testified

9     earlier that there is an audit function for dealers to

10    make sure that they actually did the work that was

11    performed.  Is that correct?

12        A    I'm not sure that's an accurate statement.

13        Q    Okay.  Well, what kind of audit function is

14    there?

15        A    Okay.  We -- we measure statistically a

16    dealer's claim submissions to us, and we look for any

17    outlier conditions which could be higher than normal

18    cost for vehicle repair or it could be high use of a

19    particular operation code relative to other dealers in

20    the surrounding area, and then we -- if we see any

21    abnormality, then we ask our regional offices to

22    investigate.

23        Q    Okay.  Is there any function that would fall

24    within your area that would be triggered if it turned

25    out that a dealer had made a warranty claim and that

John Lang

143

1    the work turned out to not actually have been

2    performed?

3        A    Yeah.   We would be involved in any of those

4    situations if they occurred.

5        Q    Okay.   Are you aware of any such situations

6    that have occurred involving the work that was done

7    concerning modification of the accelerator pedals in

8    terms of the recall that was done for the sudden

9    acceleration or the recall that was done for the

10   accelerator pedal modifications in the last two years?

11       MS. GILFORD:   Can you repeat the question, please.

12       MR. CHURELLA:   That was a terrible question.

13       MS. GILFORD:   Okay.

14       MR. CHURELLA:   Let me rephrase it.

15   BY MR. CHURELLA:

16       Q    Okay.   Are you aware of any instances where

17   there has been any instance of a dealer that was found

18   not to have performed a recall -- a modification that

19   was required under the recall for the modification of

20   the accelerator pedals under the recall that Toyota had

21   required?

22       A    So, if I understand your question to be

23   correct, --

24       Q    Right.

25       A    -- what you are asking is have I ever had a

John Lang

144

1    situation where I found where a dealer claimed they did

2    the recall but did not.

3        Q    Correct.

4        A    Is that correct?  Okay.  I've not seen any

5    cases like that.

6        Q    And if such a situation had occurred, should

7    you have been aware of it?

8        A    I would hope that I would have been aware of

9    it, yes.

10       Q    Were you involved in setting up any special

11   warranty procedures in terms of reimbursing dealers for

12   the work they did in terms of that recall procedure for

13   modification of the accelerator pedals?

14       A    Yes.

15       Q    What procedure was set up?

16       A    We had to basically input into our system all

17   of the operation codes applicable to the various

18   repairs that the dealers were to perform so that the

19   dealers could get paid for them.

20       Q    Okay.  Was there a similar procedure that was

21   put into effect for anything involving the all-weather

22   floor mats?

23       A    Yes.  There was.

24       Q    Okay.  Did any of those procedures involve

25   reimbursing dealerships outside of the United States?

003070

John Lang

145

1     A    Yes.

2          (The document referred to below was

3     marked Lang Exhibit 97 for

4     identification and is attached hereto.)

5     ///

6     BY MR. CHURELLA:



003071

John Lang



GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

003072

John Lang

147



18          MR. CHURELLA:  Counsel, is Mr. Lang also the

19    designee on Topic 13?

20          MS. GILFORD:  He is.

21    BY MR. CHURELLA:

22          Q    Okay.  Mr. Lang, have you seen the deposition

23    notice for today's deposition?

24          A    Yes, I have.

25          Q    And that was marked, I believe, as Exhibit 96

John Lang

148

1    to the deposition?

2        A    I don't recall the number, but.

3        Q    Could you put it up on the Elmo, please.

4    Okay.   Topic 13 requests that you be prepared to

5    testify as to the location and retention of exemplars

6    of any and all sales brochures, user manuals,

7    instructions of any kind, and any other documentation

8    that may have accompanied Toyota vehicles.

9             Do you see that?

10       A    Yes.

11       Q    When was the first time you were told that you

12   would be testifying on that topic?

13       A    I don't know.  Maybe a month ago.

14       Q    Okay.  You were asked by Mr. Robinson earlier

15   today what preparations you had undertaken to testify

16   today, and that was, I believe, in connection with a

17   different topic.  Have you -- did you do any other

18   preparation in order to testify on Topic Number 13?

19       A    On 13, I -- per the document retention, we

20   produced this information.

21       Q    Okay.  You are referring --

22       A    To Exhibit 89.

23       Q    Exhibit 89.

24       A    Yes.

25       Q    That's the warranty publications document

John Lang

149

1    retention?

2        A    That's correct.

3        Q    Okay.  Did you do any research concerning

4    sales brochures?

5        A    No, I did not.

6        Q    Do you have any knowledge of sales brochures

7    that were prepared or distributed in connection with

8    any Toyota vehicles?

9        A    No, I don't.

10       Q    Did you do any research or review concerning

11   users manuals that were distributed with any Toyota

12   vehicles?

13       A    When you say user manual, what do you mean?

14       Q    I mean something that goes with the vehicle to

15   the user as to how to use the vehicle.

16       A    There's an owner's manual that goes with the

17   vehicle, yes.

18       Q    Okay.  But did you do any research into

19   that -- into the distribution of those manuals, owner's

20   manuals?

21       A    I already understood that process, so I didn't

22   have to do any research.

23       Q    Okay.  How about any kind of instructions

24   other than the owner's manual that would go along with

25   the vehicle?

John Lang

150

1     A    There is -- in some cases where we have

2  navigation systems in our vehicles, there's a

3  navigation manual that's provided.

4     Q    Okay.  And you provided us with the list of

5  warranty documents.  Some of those go to the owner; is

6  that correct?

7     A    That's correct.

8     Q    Which of those go to the owner?

9     A    If you refer to Document 89, starting from

10  the -- going down the top of the page, the second to

11  the last, Warranty Maintenance and Service Guide,

12  formerly known as the Owner's Warranty Information.

13  And then the second would be the tire warranty

14  statements, and that's -- from our department, those

15  are the documents that are provided.

16     Q    Okay.  Let me start first with a -- well, let

17  me ask first.  Are there any written document retention

18  policies which would refer to copies of those documents

19  being retained by Toyota or any of its entities?

20     A    There is a records retention policy that

21  Toyota has established.  I don't have a copy of it with

22  me.

23     Q    Do you know how long any of those particular

24  categories of documents are required to be retained?

25     A    My understanding was seven years.

003076

John Lang

151

1      Q    Okay.  I note that on the Exhibit 89 you

2  provided, the Warranty Policy & Procedures Manual for

3  Toyota, you have hard copies from 1994 to 1997, then

4  there's a three-year gap from -- in 2002 -- or

5  2000-2002, and then another three-year gap in 2005 to

6  present.  Was there a seven-year document retention

7  policy for those documents?

8      A    I believe so, yes.

9      Q    Well, can you explain why there are no

10 documents for 2003 and 2004?

11     A    No, I can't.

12     Q    Who at Toyota is responsible for enforcing the

13 document retention policy?

14     A    I don't really know.

15     Q    Okay.  On Exhibit 89 you state that at least

16 for the Warranty Policy & Procedures Manual that, for

17 the hard copies, they are stored in the warranty

18 department library?

19     A    That's correct.

20     Q    Do you know if copies are stored at any other

21 location?

22     A    They are stored electronically, and that's on

23 our hard drive in our warranty department.

24     Q    Well, that -- according to Exhibit 89, that's

25 from 2005 to present; correct?

John Lang

152

1        A       That's correct.  I'm sorry.

2        Q       Okay.  What I'm asking about is are any other

3   hard copies stored at any other location.

4        A       Not that I'm aware of.

5        Q       Okay.  Do you know if anybody has done a

6   survey or sent any bullet memorandum around to Toyota

7   to see if anybody else in Toyota has copies of the

8   missing two years' worth of manuals or three years'

9   worth of manuals, however many there are?

10       A       No, I have not.

11       Q       Okay.  Would copies of the warranty policy and

12  procedures manuals have been distributed to the

13  dealerships?

14       A       They were up until we went to an electronic

15  form.

16       Q       Okay.  Would copies of those documents also

17  have been sent back to Toyota -- was Motor Sales the

18  Japanese parent company?

19       A       You mean TMC?

20       Q       TMC.  Yes.

21       A       I don't believe so.

22       Q       Has anybody inquired of TMC whether they have

23  copies of those manuals?

24       A       No, not that I'm aware.

25       Q       Okay.  For Lexus, you have hard copies

003078

John Lang

153

1    retained from 1993 to 1995, then again there's a gap

2    till 1998 to 1999, a gap, 2001 to 2002, and then

3    another gap -- and then electronic records from 2005 to

4    present.  Again, do you have any explanation as to why

5    there's a gap from 2002 to 2005?

6         A    No, I don't.

7         MS. GILFORD:  Counsel, just to step in here, I

8    believe it is because there are different models

9    encompassed within the Lexus line.

10        MR. CHURELLA:  Okay.  Well --

11        MS. GILFORD:  Not every model was built in 1993,

12   for example.

13        MR. CHURELLA:  Well, I'm just asking about the gap

14   from 2002 to 2005.

15        MS. GILFORD:  Okay.

16        MR. CHURELLA:  There are --

17        MS. GILFORD:  Well, what I'm explaining is that

18   there's -- I don't think there's a gap.  I think what

19   this reflects is models that started in 2001 are kept,

20   and then from 2001 or whenever they started to 2005 and

21   then they became electronic.

22        MR. SAFI:  Are you saying they -- I don't

23   understand.

24        MS. GILFORD:  On certain -- on certain models.

25        MR. CHURELLA:  Well, are you telling me that there

John Lang

154

1    were no new Lexus models between 2002 and 2005?

2        MS. GILFORD:  No.

3        MR. CHURELLA:  Or no changes in the Warranty Policy

4    & Procedures Manual during those three years?

5        MS. GILFORD:  If there were Lexus models introduced

6    in 2001, obviously we wouldn't have records for them

7    prior to that is what I'm saying.  I believe that's

8    what this reflects.  I'm trying to clear that up and

9    not testify here, but I believe that that's what this

10   is reflecting.

11       MR. SAFI:  I don't understand.

12       MR. CHURELLA:  I don't either.

13       MS. GILFORD:  Why don't --

14       MR. CHURELLA:  To me this looks like there's --

15       MS. GILFORD:  Why don't we meet and confer on a

16   break because I don't want to -- you know, I'm really

17   trying to clarify things.  I'm trying to be helpful and

18   not confuse the issue, --

19       MR. CHURELLA:  Okay.

20       MS. GILFORD:  -- and we can double-check what I'm

21   telling you, and why don't we do that at a break.

22       MR. CHURELLA:  Okay.

23   BY MR. CHURELLA:

24       Q    What is the Warranty Pocket Handbook?

25       A    We provide -- the Warranty Procedures Manual

003080

John Lang

155

1    is very large, a lot of paper, so for the dealers we

2    provide a pocket handbook, for the ASMs and the service

3    manager, so that it is more of an abbreviated book that

4    explains warranty entitlement by model year.

5         Q    Okay.  Then you said the

6    Warranty Maintenance/Service Guide is the document

7    that's actually provided to the purchaser, lessor, or

8    whoever actually obtains the vehicle.  Is that correct?

9         A    The Warranty Maintenance and Service Guide, is

10   that what you --

11        Q    Yes.

12        A    Yes.

13        Q    And the Tire Warranty Statements are produced

14   by the tire companies?

15        A    That's correct.

16        Q    And you have already described what the

17   Warranty Flat Rate Manual is.  Okay.  Other than the

18   documents that are described on this document as being

19   stored in the warranty department library, what other

20   documents are kept in the warranty department library?

21        A    To my knowledge, this is it.

22        Q    Who generates the Warranty Policy & Procedures

23   Manual, what department?  Is it the one you head, or is

24   it generated somewhere else?

25        A    We generate it, and it is based upon the

003081

John Lang

156

1   general policies and procedures that TMC provides, and
2   then we interpret it and put it in a book that's
3   meaningful to the dealers.
4       Q    Okay.  Does TMC have a right to approve it
5   before you send it out or implement it?
6       A    On this particular publication, they don't
7   review it before we send it out.
8       Q    Okay.  Who generates the Warranty Pocket
9   Handbook?
10      A    My department does.
11      Q    Okay.  And who generates the Warranty and
12  Maintenance/Service Guide?
13      A    My department handles a portion of it.  I'll
14  give you clarification.  The Warranty Maintenance and
15  Service Guide is a relatively new document where we
16  merged the services in that.  Before that it was the
17  owner's warranty information.  My involvement and my
18  department's involvement is only to do with the
19  warranty information, not the maintenance information.
20      Q    Okay.  So that document also includes the
21  service information for the owner or the operator of
22  the vehicle?
23      A    The service information as it regards to when
24  maintenance is supposed to be performed.
25      Q    Okay.  Does it also include the information to

John Lang

157

1    the operator of the vehicle about how to operate the

2    various controls in the vehicle and stuff like that?

3        A    No.

4        Q    Is there another document that does that?

5        A    Yes.

6        Q    And what document is that?

7        A    That's the owner's manual.

8        Q    Okay.  And who generates that document?

9        A    TMC.

10       Q    And do you know who maintains copies of that

11   document?

12       A    I know for a fact that under -- if you look at

13   the org. chart in Exhibit 88 there's a gentleman by the

14   name of Randy Upright, and his department is

15   responsible for distributing this owner's manual to our

16   port operations to be inserted in the vehicles, and so

17   they have copies of all those documents either

18   electronic or paper going back to at least ten years.

19       Q    Okay.  You said, I guess, distributed to your

20   port operations?

21       A    To our port operations and to our GST and SET

22   port operations, which are independent of TMS.

23       Q    Okay.  How about the vehicles that are

24   manufactured by TEMI?  How do they get these documents?

25       A    By who?

John Lang

158

1        Q    TEMI.  The Tennessee company, Tennessee

2    manufacturer.

3        MR. SAFI:  TEMA.

4        MR. CHURELLA:  Oh, T-E-M-A.  Excuse me.

5        MS. GILFORD:  In Kentucky.  TEMA.

6        THE WITNESS:  TEMA doesn't manufacture vehicles.

7        MS. GILFORD:  TEMA.

8        THE WITNESS:  You said T-E-M-A?

9    BY MR. CHURELLA:

10       Q    TEMA.  The company in Kentucky that

11   manufacturers cars.

12       MR. HOSTETLER:  Assembly plant?

13       MR. CHURELLA:  Assembly plant, yes.

14       THE WITNESS:  Are you -- well, we have more than

15   one assembly plant.

16       MR. CHURELLA:  Okay.

17       THE WITNESS:  So I'm a little confused.

18       MR. CHURELLA:  Okay.

19       MS. GILFORD:  Why don't --

20       MR. CHURELLA:  Why don't we try to clarify this.

21   My apologies.  I'm new to this.

22       THE WITNESS:  Okay.

23   BY MR. CHURELLA:

24       Q    There are cars that are manufactured in Japan

25   that come in through ports; correct?

John Lang

159

1      A    That's correct.

2      Q    And then there are cars that are manufactured

3  in the United States.

4      A    That's correct.

5      Q    Okay.  What I'm trying to find out is how do

6  the documents get to the cars that are manufactured in

7  the United States?

8      A    Through our port operations, or GST and SET

9  port operations, actually is -- has the job to insert

10  the correct manual in the correct vehicle.

11     Q    Okay.  Is there also information that is

12  distributed to the users of the vehicles concerning

13  accessories that may be installed in the vehicles?

14     A    Yes.

15     Q    And what information is that?

16     A    It depends on the vehicle and the accessory,

17  but as I mentioned before the most common one is

18  navigation systems.  There may be, if -- I'm trying to

19  think of any other accessories.  That's the main one I

20  can think of off the top of my head.

21     Q    Okay.  How about an accessory such as an

22  all-weather floor mat?

23     A    I'm not aware yes or no.  I'm not sure.

24     Q    Okay.  Is there information that is

25  distributed to the Toyota dealers about the

003085

John Lang

160

```
1    installation of Toyota accessories in vehicles?

2         A    I don't -- I don't know the answer to that.

3         Q    Do you know if there was any specific

4    information that was distributed to dealers about the

5    operation of the ETCS-I system on the vehicles when it

6    first came out?

7         A    I'm not aware.  I'm not familiar with that

8    area.

9         Q    Are you aware if there were any information

10   that was prepared for purchasers of Toyota vehicles

11   equipped with that system when it came out about

12   how to operate it?

13        MS. GILFORD:  I'm just going to object, Counsel,

14   this is way outside of the scope of his deposition.

15   Category 13 is the location and retention of exemplars

16   of certain types of documents.

17        MR. CHURELLA:  We are trying to find out if there

18   were any such documents before I can find out whether

19   there are exemplars of them that exist.

20        MS. GILFORD:  Well, these are foundational depos.

21   I mean the purpose of this is to identify what's out

22   there, where they are, and how long they are kept, not

23   the substance of them.

24        MR. CHURELLA:  Well, I'm --

25        MS. GILFORD:  You are asking very technical
```

003086

John Lang

161

1    questions.  It is just outside the scope.  I'll give

2    you some leeway to the extent he has personal knowledge

3    on this, but it is outside the scope of this category.

4        MR. CHURELLA:  Well, Counsel, if I can't find out

5    what kind of documents exist, I don't know how I can

6    find out if exemplars of them --

7        MS. GILFORD:  He just told you what the owner's

8    manual.

9        MR. SAFI:  My understanding is Ms. Gilford is going

10   to allow him to answer based on his personal knowledge.

11   BY MR. CHURELLA:

12       Q    Do you know of any such documents?

13       A    No, I don't.

14       Q    Do you know of any kind of materials that were

15   prepared for distribution to purchasers of Toyota ve-

16   hicles concerning the resale value of Toyota vehicles?

17       MS. GILFORD:  Same objections.  That's way outside

18   the scope.

19       THE WITNESS:  I'm not aware of any.

20   BY MR. CHURELLA:

21       Q    Do you have any knowledge of the distribution

22   of any kind of service bulletins to Toyota dealers or

23   purchasers of Toyota vehicles?

24       MS. GILFORD:  Same objection, Counsel.  This is

25   outside the scope.  We already had a witness testify

003087

John Lang

162

1    about communications with dealers.

2          THE WITNESS:   Can you rephrase the question.

3          MR. CHURELLA:   Can you reread it.

4          THE WITNESS:   Reread.

5                (Pending question read.)

6          THE WITNESS:   I'm not really aware of how -- other

7    than -- I know that dealers get service bulletins, but

8    I'm not responsible for that area.

9    BY MR. CHURELLA:

10         Q    Okay.  Let me go back to these warranty

11   documents.  You said that electronic copies are -- of

12   the current documents are stored -- or copies of

13   current documents are stored electronically and that

14   some of the hard copies are stored in the warranty

15   department library.  Who printed the hard copies?  Was

16   there an outside printer who printed them?

17         A    Yes.  We had an outside printer.

18         Q    Do you know who that printer was?

19         A    It varied over the years.  I don't recall.

20         Q    Are there any records that would identify that

21   printer?

22         A    I'm not -- there may be.  I don't know.

23         Q    Do you know if any of the printers that

24   maintained electronic masters of their print -- of the

25   printing programs that were used to generate these

003088

John Lang

163

1    documents?

2         A    I'm not sure what they keep.

3         Q    I asked you about documents going to dealers

4    when you have fleet sales, like to a rental car company

5    or somebody like that.  How are those handled?  Do

6    those go through dealers, or are those done through a

7    separate program?

8         A    I'm not sure if I understand your question.

9    What documents are you referring to?

10        Q    Things like operator's manuals and warranty

11   books or things.  Do those go directly to the

12   operator -- do those go with the vehicle to whoever

13   they are going to or --

14        A    Yes.  The ports -- as I described earlier,

15   when a vehicle is getting ready to be distributed to

16   the dealer or a fleet customer, the proper materials

17   are inserted into the glove box at that point.

18        Q    Okay.  I believe you testified earlier today

19   that there was some kind of program to try to have

20   fleet operators have the service done through

21   dealerships; is that correct?

22        A    Yes.

23        Q    Okay.  Do some of the large operators do their

24   own service, the large fleet operators?

25        A    I don't know.

John Lang

164

1    Q    Do you get warranty claims directly from large

2    fleet operators?

3    A    From -- from the major rental car companies,

4    and that's it.

5    Q    Are they handled any differently than warranty

6    claims from dealers?

7    A    They are basically handled through the Legacy

8    system, but other than that they are paid and evaluated

9    the same as a dealer claim.

10    Q    So if we were looking for particular warranty

11    claims from, say, Hertz or somebody like that in the

12    last two years, we would be looking in the warranty --

13    in the Legacy system instead of the current system?

14    A    If you wanted to find that information, you

15    would probably go to PQSS and they could figure it out,

16    but the data will still -- the claim data will still

17    reside in our system -- in one of our systems.

18    Q    Okay.  But you don't know which one?

19    A    Well, if it's fleet it is still going to --

20    they are still on the Legacy system, so it would be the

21    Legacy system that we would have to probe in.

22    Q    Okay.

23    MR. SAFI:  Can we go off the record a minute and

24    address --

25    MS. GILFORD:  Uh-huh.

John Lang

165

1          MR. SAFI:  -- the issue that came up.

2          VIDEO OPERATOR McCAVERTY:  It is 2:05 P.M.  This

3     concludes Disk 2.  We are off the record.

4               (Recess taken.)

5          VIDEO OPERATOR McCAVERTY:  This is the beginning of

6     Tape 3 in the videotaped deposition of John Lang at

7     2:23 P.M.  We are back on the record.

8     BY MR. CHURELLA:

9          Q    Okay.  I believe that before we went off you

10    were going to check on some information concerning the

11    potential gap in some records and as to whether there

12    was a gap, and I think while we were off the record

13    your counsel said you've called back to Toyota and you

14    have clarification on that?

15         A    That's correct.

16         Q    Can you tell me what the information is?

17         A    When I talked -- I asked my staff to prepare

18    this document and tell me what's in the library.  So

19    they did a physical check of the library to see -- to

20    document every document that we had and what years and

21    so forth, and they said they didn't see anything for

22    '03 and '04, and that means that either somebody has

23    checked it out and we don't know whom, or there may be

24    another copy in the warranty department somewhere, or

25    possibly -- we moved about that time, and something

John Lang

166

1    could have inadvertently got thrown away during our

2    move.  We moved the entire department over to a new

3    building, and so there was a lot of boxes and a lot of

4    things getting moved, and so it may have gotten

5    misplaced in that process.

6        Q    Okay.  You had indicated to me just before we

7    broke that warranty claims for the fleet operators are

8    handled by the Legacy system currently.  Is that

9    correct?

10       A    That's correct.

11       Q    Are there any other warranty claims that are

12   currently handled by the Legacy system?

13       A    The last one would be our Mexico claims are

14   handled by the Legacy system.

15       MR. CHURELLA:  I have no further questions.

16       MR. SAFI:  Just a couple more.

17

18                    FURTHER EXAMINATION

19   BY MR. SAFI:

20       Q    Why are some warranty claims handled through

21   the Legacy system and not CPS?

22       A    CPS is a new system that we introduced in

23   2005.  We were replacing a 30-year-old Legacy system,

24   and it is very, very complex with a lot of dependencies

25   on other, you know, databases for validation purposes,

John Lang

167

1  so we have had a lot of users on it over the years, and
2  so it has just taken that much time to migrate various
3  parties from the Legacy system to the new CPS system.
4       Q    Is there a feed from the Legacy system to
5  PQSS?
6       A    Yes.
7       Q    And in terms of the people who would be most
8  knowledgeable about how -- dealing with the Legacy
9  system, are those names of people any different with
10  respect to warranty claims from fleet operators than
11  the people you already -- the names you already
12  provided to me in terms of who you would go to to
13  troubleshoot or to, you know, query the Legacy system?
14       A    I -- can you rephrase the question, please.
15       Q    Yeah.  If I want to talk to someone about
16  querying the Legacy system for fleet operators, would I
17  need to talk to someone besides the people you already
18  identified for me earlier?
19       A    I think if you wanted to query the Legacy
20  system or claims that are in Legacy, we provide all of
21  the information to PQSS the same way we do with CPS
22  data, and so the query job is most efficiently done by
23  PQSS because they actually have physical query tools.
24  We don't necessarily have that, so we have to write
25  programs if we were to do that.

John Lang

168

1     Q    And Mr. Tilsdale --

2     A    Trisdale is --

3     Q    He would be the person?

4     A    I think he would probably be most appropriate

5 from the systems understanding.

6     MR. SAFI:  Great.  I think the plaintiffs are done,

7 so.

8     MS. GILFORD:  Okay.  I have a few questions.

9     MR. SAFI:  Okay.

10

11                    EXAMINATION

12 BY MS. GILFORD:

13    Q    You mentioned that TMS processes the warranty

14 claims from Mexico.  Is TMS the warrantor for vehicles

15 sold in Mexico?

16    A    No.

17    Q    Who is the warrantor for vehicles sold in

18 Mexico?

19    A    Toyota de Mexico.

20    Q    Does TMS handle warranty claims for the entire

21 United States?

22    A    No.

23    Q    What do you handle?

24    A    We handle claims directly for our own

25 TMS-owned distributors.  The claims are processed for

003094

John Lang

169

1    the private distributors through the private

2    distributors SET and GST.  We pay the private

3    distributors the dealer -- the private distributors pay

4    their dealers, and then lastly claims from Hawaii are

5    processed independent of TMS.  Those claims are handled

6    by an independent company called Servco Pacific, and

7    Servco Pacific sends their claims directly to TMC for

8    payment.

9        Q    Okay.  I believe you testified before about

10    GST and SET's warranty departments.  Does Servco also

11    have a warranty department?

12        A    Yes, they do.

13        Q    Do you know who is in charge of the Servco

14    warranty department?

15        A    Thor Toma.

16        Q    And just to be clear, Servco's warranty claims

17    go directly to TMC?

18        A    That's correct.

19        Q    Is TMS the warrantor for vehicles bought and

20    sold in Hawaii?

21        A    No.

22        Q    Is that Servco?

23        A    Yes.

24        Q    Does TMS process warranty claims for Puerto

25    Rico?

John Lang

170

1      A     No, we do not.

2      Q     Who processes warranty claims for Puerto Rico?

3      A     The warranty department at Puerto Rico.

4      Q     What entity, Toyota or independent, houses the

5    warranty department at Puerto Rico?

6      A     It's the Toyota de Puerto Rico.

7      Q     I take it that's a Toyota entity?

8      A     That's correct.

9      Q     And those claims go directly to TMC?

10     A     That's correct.

11     Q     Is Toyota de Puerto Rico the warrantor for

12   vehicles bought and sold in Puerto Rico?

13     A     I believe so.

14     MS. GILFORD:  I have nothing further.

15     MR. SAFI:  Okay.  A little bit of follow-up here.

16

17                    FURTHER EXAMINATION

18   BY MR. SAFI:

19     Q     Let's talk about GST and SET for a minute.

20   Their warranty claims are processed through TMS.

21     A     That's correct.

22     Q     And are they processed through the CPS system?

23     A     Yes.  They are now.

24     Q     And when did that -- as of when were warranty

25   claims from GST and SET processed through -- when did

003096

John Lang

171

1    they start being processed through the CPS system?

2        A    I believe we finished both distributors by

3    around 2007.

4        Q    Okay.  And -- oh.  Okay.  And before that they

5    were processed through the Legacy system?

6        A    That's correct.

7        Q    Okay.  And is there anything different other

8    than the fact that TMS is dealing with a third-party

9    distributor as opposed to a TMS-controlled or owned

10   distributor?  Is there anything different about how the

11   warranty claims are processed -- let me ask this.  Is

12   there anything different about the warranty claim

13   information that's provided to TMS so that those claims

14   can be processed?

15       A    No.  It is consistent with our requirements.

16       Q    Surf Coast, is that entity owned by TMC?

17       A    No, it is not.

18       Q    Is it affiliated with Toyota or TMC in any way

19   you know of?

20       A    No.  It is an independent distributor.

21       Q    Okay.  To your knowledge, does TMC or any

22   Toyota entity own any -- have any equity or ownership

23   interest in Surf Coast?

24       A    No, they do not.

25       Q    Are you familiar with whatever database Surf

John Lang

172

1    Coast uses to administer warranty claims?

2         A    No, I'm not.

3         MR. HOSTETLER:  It is Servco.

4         MR. SAFI:  Oh, it is Servco?

5         MR. HOSTETLER:  S-e-r-v-c-o.

6         MR. CHURELLA:  I'm looking at the rough.  It is

7    Hawaii, and it is Surf Coast.

8         MS. GILFORD:  Surf Coast.  Why not?

9         MR. SAFI:  It's Servco?

10        MR. HOSTETLER:  I don't want to institutionalize.

11        MR. SAFI:  Yeah.

12        MR. HOSTETLER:  I believe it's S-e-r-v -- Servco.

13   S-e-r-v-c-o.

14        THE WITNESS:  That's correct.

15        MR. HOSTETLER:  Servco.

16   BY MR. SAFI:

17        Q    And Servco has been responsible for

18   administering -- I say administering, processing,

19   paying, seeking reimbursement from TMC for warranty

20   claims since when?

21        A    Since the inception of the distributorship.

22        Q    Is your testimony that Toyota de Puerto Rico

23   doesn't deal with TMS at all with respect to warranty

24   claims?

25        A    That's correct.

John Lang

173

1      Q     It deals directly with TMC?

2      A     Yes.

3      Q     All right.  Okay.

4      MR. HOSTETLER:  I have one quick follow-up

5  question.

6      MR. SAFI:  Ahh.

7

8                     EXAMINATION

9  BY MR. HOSTETLER:

10     Q     Mr. Lang, there was a question raised earlier

11  today about how the dealers get paid, and there was a

12  reference to the flat rate manual.  If one wanted to

13  know how the dealers get paid, could you explain how

14  that happens in terms of rate and the hours for each

15  condition repaired or each repair performed?

16     A     Yes.  The flat rate manual provides a

17  reference for the dealer to tell them for a specific

18  repair how many hours they will get reimbursed for that

19  claim.  And then our system will take the number of

20  hours from the flat rate manual for that particular

21  repair, operation code, and then will multiply that

22  times whatever the dealer established labor rate in

23  that community is.  All the dealer labor rates are

24  different.  None are the same.  It is all based on

25  market conditions.  And so from there the mathematics

003099

John Lang

174

1   are completed, and that's how we determine from a labor

2   perspective how much to pay the dealer on a specific

3   claim.

4        Q    So just to confirm, you would need to know

5   what the labor rate is for that particular dealer and

6   then what the hour or time allowed in the flat rate

7   manual is, and the product of those two is what the

8   dealer gets paid?

9        A    That's correct.

10       MR. HOSTETLER:  That's all I have.  Thanks.

11       MR. SAFI:  Thank you very much.

12       THE WITNESS:  Thank you.

13       VIDEO OPERATOR McCAVERTY:  This is the end of Disk

14   3 of 3 and concludes today's deposition with John Lang

15   at 2:34 P.M.  We are off the record.

16       (The deposition proceeding concluded at 2:34 P.M.)

17

18

19                        --ooOoo--

20

21

22

23

24

25

John Lang

175

```
1
2
3                        CERTIFICATE
4                            OF
5               CERTIFIED SHORTHAND REPORTER
6
7            The undersigned Certified Shorthand Reporter
     of the State of California does hereby certify:
8            That the foregoing proceeding was taken before
     me at the time and place therein set forth, at which
9    time the witness was duly sworn by me;
             That the testimony of the witness and all
10   objections made at the time of the examination were
     recorded stenographically by me and were thereafter
11   transcribed, said transcript being a true and correct
     copy of my shorthand notes thereof;
12           That the dismantling of the original
     transcript will void the reporter's certificate.
13
14           In witness thereof, I have subscribed my name
15   this date:_____.
16
17
18           _____
19           PAMELA COTTEN, CSR, RDR
             Certificate No. 4497
20           Certified Realtime Reporter
21
22           (The foregoing certification of
     this transcript does not apply to any
23   reproduction of the same by any means,
     unless under the direct control and/or
24   supervision of the certifying reporter.)
25
```

John Lang

176

INSTRUCTIONS TO WITNESS

1

2

3          Please read your deposition over carefully and

4    make any necessary corrections.  You should state the

5    reason in the appropriate space on the errata sheet for

6    any corrections that are made.

7          After doing so, please sign the errata sheet

8    and date it.

9          You are signing same subject to the changes

10   you have noted on the errata sheet, which will be

11   attached to your deposition.

12          It is imperative that you return the

13   original errata sheet to the deposing attorney within

14   thirty (30) days of receipt of the deposition

15   transcript by you.  If you fail to do so, the

16   deposition transcript may be deemed to be accurate and

17   may be used in court.

18

19

20

21

22

23

24

25

003102

John Lang

177

1                    - - - - -

2              E R R A T A

3                    - - - - -

4   PAGE  LINE   CHANGE

5   _____ _____   _____

6     REASON:      _____

7   _____ _____   _____

8     REASON:      _____

9   _____ _____   _____

10    REASON:      _____

11  _____ _____   _____

12    REASON:      _____

13  _____ _____   _____

14    REASON:      _____

15  _____ _____   _____

16    REASON:      _____

17  _____ _____   _____

18    REASON:      _____

19  _____ _____   _____

20    REASON:      _____

21  _____ _____   _____

22    REASON:      _____

23  _____ _____   _____

24    REASON:      _____

25

003103

John Lang

178

ACKNOWLEDGMENT OF DEPONENT

1

2

3          I,_____, do hereby

4    certify that I have read the foregoing pages, and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded, except

7    for the corrections or changes in form or substance, if

8    any, noted in the attached Errata Sheet.

9

10

11    _____

12    JOHN LANG                        DATE

13

14    Subscribed and sworn to
      before me this

15
          _____day of_____,20___.

16
      My commission expires:_____

17

18    _____

19    Notary Public

20

21

22

23

24

25

003104

# DEPOSITION OF JOHN LANG

# HIGHLY CONFIDENTIAL SECTION

# [Pages 003105 - 003122 Filed Under Seal]

John Lang

Page 177

| | | |
|---|---|---|
| 1 | | - - - - - |
| 2 | | E R R A T A |
| 3 | | - - - - - |
| 4 | PAGE   LINE | CHANGE |
| 5 | _12_  _15_ | · assistantship · |
| 6 | REASON: | Spelling error |
| 7 | _41_  _25_ | BRiO · |
| 8 | REASON: | Spelling error |
| 9 | _45_  ___ | relief S.B. remedy. |
| 10 | REASON: | incorrect word. |
| 11 | _46_  _10_ | Pettit → Pettitt - P/s change all Spelling |
| 12 | REASON: | |
| 13 | _171_  _25_ | SURF COAST |
| 14 | REASON: | Should be SERVCO |
| 15 | ___  ___ | |
| 16 | REASON: | |
| 17 | ___  ___ | |
| 18 | REASON: | |
| 19 | ___  ___ | |
| 20 | REASON: | |
| 21 | ___  ___ | |
| 22 | REASON: | |
| 23 | ___  ___ | |
| 24 | REASON: | |
| 25 | | |

003123

John Lang

Page 178

1    ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4    certify that I have read the foregoing pages, and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded, except

7    for the corrections or changes in form or substance, if

8    any, noted in the attached Errata Sheet.

9

10

11   _____        11-9-2010

12   JOHN LANG                       DATE

13

14   Subscribed and sworn to

     before me this

15

     _9th_ day of _November_ ,20_10_.

16

     My commission expires: _9/14/11_

17

18   _____

     Notary Public

19

20

21

22

23

24

25

Golkow Technologies, Inc. - 1.877.370.DEPS

ROBYN A. BROWN
Commission # 1761904
Notary Public - California
Los Angeles County
My Comm. Expires Sep 14, 2011

003124



## Warranty Publications Document Retention

| Document/Publication | Division | Retention Period | Where Document is Stored | Comments |
|---|---|---|---|---|
| Weekly Warranty News (formally WWNU - Weekly Warranty News Update) | Toyota (including Scion) & Lexus | Electronic Warranty News retained from 1998-present. | Warranty Department Share Drive | |
| Warranty Policy & Procedures Manual | Toyota (including Scion) | Hard copies retained from 1994-1997 & 2000-2002.<br><br>Electronic copies retained from 2005-present. | Hard copies stored in the Warranty Department Library<br><br>Electronic copies stored on the Warranty Department Share Drive | |
| | Lexus | Hard copies retained from 1993-1995, 1998-1999 & 2001-2002.<br><br>Electronic copies retained from 2005-present. | Hard copies stored in the Warranty Department Library<br><br>Electronic copies stored on the Warranty Department Share Drive | |
| Warranty Pocket Handbook | Toyota (including Scion) & Lexus | Electronic copies retained from 2006-2010. | N/A | Note: Contains same information as the Warranty Policy & Procedures Manual |
| Warranty & Maintenance/Service Guide (formerly Owners Warranty Information) | Toyota, Scion & Lexus | Hard copies since 1996<br><br>Electronic copies since 2002 | Hard copies stored in the Warranty Department Library.<br><br>Electronic copies stored on the Warranty Department Share Drive. | |
| Tire Warranty Statements | Toyota, Scion & Lexus | Not retained by Warranty Department. Retained by individual tire manufacturers. | N/A | |

Lang

EXHIBIT NO. 84
9/28/10   PJ

## Warranty Publications Document Retention

| Document/Publication | Division | Retention Period | Where Document is Stored | Comments |
|---|---|---|---|---|
| Warranty Flat Rate Manual | Toyota | Microfiche copies retained from 1973-1979 & 1981-1994.<br><br>Hard copies retained from 1989-present.<br><br>Electronic copies retained from 2005-present. | Microfiche & hard copies stored in the Warranty Department Library.<br><br>Electronic copies stored on the Warranty Share Drive. | |
| | Lexus | Hard copies retained from 1993-1995, 1998-1999 & 2001-2002.<br><br>Electronic copies retained from 2005-present. | Hard copies stored in the Warranty Department Library.<br><br>Electronic copies stored on the Warranty Share Drive. | |
| | Scion | Hard copies retained from 2004-present.<br><br>Electronic copies retained from 2004-present. | Hard copies stored in the Warranty Department Library.<br><br>Electronic copies stored on the Warranty Share Drive. | |

C:\DOCUME~1\gilmorc\LOCALS~1\Temp\notesE1EF34\Publications Retention.doc

# DEPOSITION OF JOHN LANG

# EXHIBITS 90 and 91

# [Pages 003128 - 003147 Filed Under Seal]

TOYOTA
USA NEWSROOM

# Toyota Statement Regarding Safety Recalls and Technical Service Bulletins

Toyota, like other automobile manufacturers, actively and continuously monitors field information related to our vehicles. Our engineers and specialists look for data and trends that may indicate a vehicle performance issue. If Toyota determines that a defect exists and decides that the defect is "related to motor vehicle safety," per the Safety Act, the company will conduct a safety recall.

In addition, for issues that are not "safety-related defects," the company may decide to address a condition found in the field to enhance customer satisfaction. Although safety is Toyota's primary concern, customer satisfaction will continue to be a centerpiece of our actions. Sometimes the company may address such issues through a Special Service Campaign (SSC), under which vehicle owners are provided a free repair. In other cases, the company may issue a Technical Service Bulletin (TSB), which is a communication between Toyota and its dealerships that can serve as an update to Toyota publications, describe parts updates, or relay enhanced or new service procedures. Service procedures may explain diagnostic steps, implementation of recommended updates, or how to perform certain repairs. A TSB is not a recall or a Special Service Campaign. If the cost of a TSB service or repair is eligible for warranty coverage, it will be specified in the TSB. In general, the vehicle must be within the original warranty parameters and exhibit the concerns referenced in the TSB. A TSB does not extend the vehicle warranty.

Toyota makes all available TSBs accessible to the public by subscribing to our Technical Information System. Toyota also submits copies of TSBs monthly to the National Highway Traffic Safety Administration (NHTSA), and most of those TSBs are summarized on the NHTSA website for anyone to review.

Toyota and Lexus combined rank sixth in terms of the lowest number of recalls initiated since 1990, with less than 20 percent of the number undertaken by the company at the top of the list, according to the web site mycarstats.com

In the interest of continuous improvement, we've launched a top-to-bottom review of all our operations, led by our President Akio Toyoda, to ensure that we not only meet but exceed the high safety standards that have defined our company. We are making fundamental changes in the way our company operates in order to ensure that Toyota sets an even higher standard for vehicle safety and reliability, responsiveness to customers and transparency with regulators.

©2010 Toyota Motors Sales, U.S.A., Inc.          TOYOTA | SCION | LEXUS          All information applies to U.S. vehicles only



003148

# DEPOSITION OF JOHN LANG

# EXHIBITS 93 through 95

# [Pages 003149 - 003190 Filed Under Seal]

1   Elizabeth J. Cabraser, Bar No. 083151
2   *ecabraser@lchb.com*
    LIEFF CABRASER HEIMANN &
3     BERNSTEIN, LLP
    275 Battery Street, 29th Floor
4   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
5   Facsimile:  (415) 956-1008

6   Mark P. Robinson, Jr., Bar No. 054426     Marc M. Seltzer, Bar No. 054534
    *mrobinson@rcrlaw.net*               *mseltzer@susmangodfrey.com*
7   ROBINSON, CALCAGNIE &       SUSMAN GODFREY L.L.P.
    ROBINSON                      1901 Avenue of the Stars, Suite 950
8   620 Newport Center Drive, 7th Floor   Los Angeles, CA  90067-6029
    Newport Beach, CA 92660        Telephone:  (310) 789-3102
9   Telephone:  (949) 720-1288      Facsimile:   (310) 789-3006
    Facsimile:  (949) 720-1292
10
    Plaintiffs' Co-Lead Counsel for
11   Personal Injury/Wrongful Death Cases   Frank M. Pitre, Bar No. 100077
                                    *fpitre@cpmlegal.com*
12   Steve W. Berman (*pro hac vice*)     COTCHETT, PITRE &
    *steve@hbsslaw.com*                MCCARTHY
13   HAGENS BERMAN SOBOL     840 Malcolm Road, Suite 200
    SHAPIRO LLP               Burlingame, CA 94010
14   1918 Eighth Avenue, Suite 3300    Telephone:  (650) 697-6000
    Seattle, WA 98101            Facsimile:  (650) 697-0577
15   Telephone:  (206) 268-9320
    Facsimile:   (206) 623-0594
16                              Plaintiffs' Co-Lead Counsel for
                             Economic Loss Cases

17               UNITED STATES DISTRICT COURT
18
19              CENTRAL DISTRICT OF CALIFORNIA
20
21   IN RE: TOYOTA MOTOR CORP.     **Case No. 8:10ML2151 JVS (FMOx)**
    UNINTENDED ACCELERATION
22   MARKETING, SALES PRACTICES,   **PLAINTIFFS' NOTICE OF VIDEO**
    AND PRODUCTS LIABILITY     **DEPOSITION OF TOYOTA 30(b)(6)**
23   LITIGATION                   **WITNESS**
24   **This Document Relates To:**
25                        Date:   September 28, 2010
    ALL CASES              Time:   9:00 a.m.
26                       Place:   JAMS
27                             500 N. State College Blvd.
                            14th Floor
28                             Orange, CA  92868

Lang
EXHIBIT NO. 96
9/28/10 - p. 92

003191

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

    **PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil Procedure and the Court's Order No. 5, Plaintiffs by and through their counsel of record, will take the limited, foundational deposition of the Toyota defendants ("Toyota Defendants") in the above action, on September 28, 2010, commencing at 9:00 a.m., at JAMS, 500 N. State College Blvd., 14th Floor, Orange, California 92868. The deposition shall be taken stenographically and shall be conducted under the supervision of an officer who is authorized to administer an oath.

    The deposition, subject to the time limitations set forth in Order No. 5 (Dkt. No. 249) and Amendment to Order No. 5 (Dkt. No. 292), if not completed on the noticed date, shall be continued, if necessary, from day to day thereafter, excluding weekends and holidays, until completed, unless counsel for the noticing party wishes the deposition to be completed at a later date, in which case a mutually agreeable date shall be selected between counsel for the parties.

    **PLEASE TAKE FURTHER NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), the Toyota Defendants must designate and produce at the deposition one or more "officers, directors, or managing agents, or other persons who consent to testify," who possess sufficient knowledge to testify as to foundational matters regarding the following categories in Order No. 5: Phase I Discovery Plan, Docket No. 249:

7. The identity, nature, location and retention of documents related to information Toyota has received about speed control, surge, and SUA events in Toyota and Lexus vehicles, including specifically warranty, records, customer complaints, claims and lawsuits ("Field Performance Documents").

13. The location and retention of exemplars of any and all sales brochures, user manuals, instructions of any kind and any other documentation that may have accompanied Toyota vehicles.

17. The identity, nature, location and retention of any and all documents that refer or relate to any vehicle warranty materials and advertising of the Toyota

003192

1    Defendants regarding the quality, reliability or safety of any Toyota vehicles
2    manufactured and sold from 1998 to the present.

4        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Rule 30(b)(3) of the
5    Federal Rules of Civil Procedure, Plaintiff intends to utilize a stenographic method of
6    recording which permits the "real time" instant visual display of testimony.

8        **PLEASE TAKE FURTHER NOTICE** that, in addition to recording the
9    deposition by the stenographic method, the deposition may also be taken by means of
10   videotape recording pursuant to Rule 30(b)(3) of the Federal Rules of Civil Procedure.
11   Plaintiffs reserve the right to use at the trial of this action the videotape recording of the
12   deposition of the deponent.

14       **PLEASE TAKE FURTHER NOTICE** that pursuant to the attached Order No. 7
15   (Dkt. No. 293), a plaintiff in any related state court proceeding may cross-notice this
16   deposition.  Any such cross-notice must be served within five (5) days after notice of this
17   deposition is served in order to be effective and the cross-notice must specifically identify
18   the subject matter topics being cross-noticed. If such a party cross-notices the deposition,
19   it shall provide the notice to Federal -- State Liaison Counsel by e-mail or facsimile on
20   the same day the notice is served on the deponent.

22   Dated:  September 21, 2010          Respectfully submitted,

23                                       By: _____/s/_____
24                                            Mark P. Robinson, Jr.
                                          ROBINSON, CALCAGNIE & ROBINSON
25                                        620 Newport Center Drive, 7th Floor
                                          Newport Beach, CA  92660
26                                        Telephone:  (949) 720-1288
                                          Facsimile:  (949) 720-1292
27                                        Email:     mrobinson@rcrlaw.net

28

2
PLAINTIFFS' NOTICE OF TOYOTA 30(B)(6) DEPOSITION

003193

# DEPOSITION OF JOHN LANG

# EXHIBIT 97

# [Pages 003194 – 003196 Filed Under Seal]