# EXHIBITS II

# REDACTED MEMO. OF POINTS AND AUTH. IN SUPPORT OF (1) TOYOTA'S RESPONSE TO CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR  THE APP. OF CA LAW AND (2) TOYOTA'S CROSS-MOTION FOR CHOICE OF LAW DETERMINATION

CARI K. DAWSON (GA SBN 213490)
Email:  cari.dawson@alston.com
**ALSTON + BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Telephone:  (404) 881-7766
Facsimile:   (404) 253-8567

LISA GILFORD (CA SBN 171641)
Email:  lisa.gilford@alston.com
**ALSTON + BIRD LLP**
333 South Hope Street, 16th Floor
Los Angeles, CA 90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

*Lead Defense Counsel for Economic Loss Cases*

VINCENT GALVIN, JR. (CA SBN 104448)
Email:
   vincent.galvinjr@bowmanandbrooke.com
**BOWMAN AND BROOKE**
1741 Technology Drive, Suite 200
San Jose, CA 95110
Telephone: (408) 279-5393
Facsimile:   (408) 279-5845

JOEL SMITH (SC SBN 5266)
Email:  joel.smith@bowmanandbrooke.com
**BOWMAN AND BROOKE**
1441 Main Street, Suite 1200
Columbia, SC 29201
Telephone: (803) 726-7420
Facsimile:   (803) 726-7421

*Lead Defense Counsel for Personal Injury/Wrongful Death Cases*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This documents relates to:<br><br>**ALL ECONOMIC LOSS CASES** | Case No.: 8:10ML2151 JVS (FMOx)<br><br>REDACTED (PREVIOUSLY FILED UNDER SEAL) TOYOTA'S MEMORANDUM OF POINTS AND AUTHORITIES (1) IN RESPONSE TO CERTAIN ECONOMIC LOSS PLAINTIFFS' MOTION FOR THE APPLICATION OF CALIFORNIA LAW AND (2) IN SUPPORT OF TOYOTA'S CROSS-MOTION FOR CHOICE-OF-LAW DETERMINATION AS TO ALL ECONOMIC LOSS CASES AND PLAINTIFFS BEFORE THIS COURT<br><br>Date:            May 16, 2011<br>Time:           3:00 pm<br>Location:      Court Room 10C<br>Judicial Officer:  Hon. James V. Selna |

# **TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF FACTS ............................................................. 5

    A.   The Key Events Related To The Purchase, Ownership, And Resale Of The Subject Vehicles Occurred In All 52 Jurisdictions ...................................... 6

    B.   Toyota's Organizational Structure Emanates From Japan With Major Operations Spread Across North America ........................................................ 7

    C.   The Design And Development Of The Subject Vehicles And Subject Components Occurred Outside Of California ..................................................... 9

    D.   The Subject Vehicles And Subject Components Were Predominantly Produced And Manufactured Outside Of California .......................................... 9

    E.   The Testing Of The Subject Vehicles Relevant To This Case Occurred Under The Direction Of TMC In Japan......................................................... 11

    F.   Marketing And Advertising Relevant To Plaintiffs' Claims Was Created And Distributed Locally .......................................................................... 12

    G.   The Subject Vehicles Were Marketed And Sold At Independent Dealerships In Each State And Jurisdiction Across The Country .................... 13

    H.   The Relevant Decision-Making Concerning Toyota's UA Recalls Emanated From Japan............................................................................... 13

III.  ARGUMENT AND CITATIONS OF AUTHORITY ............................................. 14

    A.   Binding Supreme Court Precedent Requires This Court To Analyze Each Individual Case Within the MDL Under The Choice-Of-Law Rules Of The Various Transferor Courts.................................................. 14

        1.   The Rules for Treating Cases Consolidated for Pre-Trial Treatment In an MDL Are Clear: Transfer Is For Convenience and Efficiency – It Does Not Change the Parties' Rights ..................... 14

        2.   Filing a Master Complaint Does Not Alter These Rules....................... 15

            a.   Supreme Court Precedent Requires The Court To Conduct A Complete Choice-Of-Law Determination ............................... 17

            b.   Plaintiffs Cannot Circumvent These Rules By "Moving" For An Incomplete Choice-Of-Law Determination ................... 18

B.  Under The Choice-of-Law Rules of Each of the Transferor Courts, California Law Does Not Supersede Every Other State's Laws ...................... 20

   1.  This Court's Choice-of-Law Analysis is a Two-Step Process ............. 21

   2.  Step 1:  There Are Material Outcome-Determinative Differences Between The Various State Laws That Potentially Apply ................... 22

      a.  Class Members' Claims, Absent A Manifested Defect, Would Be Rejected In Many Jurisdictions ................................. 22

      b.  Many Jurisdictions Would Dismiss Claims For Breach Of Implied Warranty For Lack Of Privity ....................................... 25

      c.  There Are Material Variations In The Consumer Protection Laws Of The Various States ..................................... 27

      d.  There Are Material Variations In The Warranty Laws Of The Various States ................................................................ 28

      e.  Plaintiffs Have Alleged Claims In The Alternative Under Other States' Laws That Do Not Exist In California ................ 29

      f.  These Differences Cannot Be Ignored Simply For The Sake Of Ease And Efficiency ....................................................... 29

   3.  Step 2:  Under The Choice-of-Law Frameworks Of The 41 Transferor Jurisdictions, The Law Of All 52 Jurisdictions Apply ........ 31

      a.  The Transferor Jurisdictions That Use The *Lex Loci* Tests Would Apply The Law Of 52 Jurisdictions ............................. 32

      b.  The Transferor Jurisdictions That Use Some Variation Of The "Most Significant Relationship" Test Would Apply The Law Of 52 Jurisdictions ....................................................... 35

      c.  The Transferor Jurisdictions That Use Any Of The Other Approaches Would Apply The Law Of 52 Jurisdictions ........... 41

         (1)  Lex fori ........................................................................... 41

         (2)  The "Leflar" Factors........................................................ 42

         (3)  Variations of Interest Analysis ........................................ 43

C.  Even With Respect To The California-Filed Class Actions, The Laws Of 52 Jurisdictions Will Apply Rather Than Solely California Law ............... 45

   1.  California Law Cannot Constitutionally Apply To The Entire

ii

Putative Nationwide Class ............................................................ 45

2.   Even If The Court Could Apply Its Law Without Violating The Constitution, Under California's Choice-of-Law Test, The Laws Of 52 Jurisdictions Apply To This Nationwide Class .......................... 50

a.   There Is No Presumption Of California Law Given The Interests Of 52 Jurisdictions In This Case ................................. 50

b.   California's Governmental Interest Analysis Results In The Application Of The Laws Of All 52 Jurisdictions ............. 51

(1)   There Are Material Differences In The Laws Of The Potentially Concerned Jurisdictions ........................ 51

(2)   States Other Than California Have Significant Interests In This Litigation ............................................. 51

(3)   Other States' Interests Would Be "More Impaired" If California Law Applied ............................................. 57

IV.   CONCLUSION .................................................................................... 60

1

## **TABLE OF AUTHORITIES**

2

3                                                              **Page(s)**

**FEDERAL CASES**

4

5 *Abogados v. AT&T, Inc.,*
    223 F.3d 932 (9th Cir. 2000) ......................................................... 72

6 *Agostino v. Quest Diagnostics,*
7     256 F.R.D. 437 (D.N.J. 2009) ................................................. 45, 49

8 *Allstate Ins. Co. v. Hague,*
9     449 U.S. 302 (1981)............................................................ 55, 56, 61

10 *Arabian v. Sony Elecs., Inc.,*
    No. 05-CV-1741, 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ........................ 57
11

12 *Barbara's Sales, Inc. v. Intel Corp.,*
    879 N.E.2d 910 (Ill. 2007)....................................... 43, 45, 46, 47
13

14 *Bergeron v. Philip Morris Inc.,*
    100 F. Supp. 2d 164 (E.D.N.Y. 2000) ......................................... 53
15

16 *BMW of N. Am. v. Gore,*
    517 U.S. 559 ................................................................. 2, 34, 68

17 *Briehl v. Gen. Motors Corp.,*
18     172 F.3d 623 (8th Cir. 1999) ......................................... 29, 30, 31

19 *Byers v. Lincoln Elec. Co.,*
20     607 F. Supp. 2d 840, 846 (N.D. Ohio 2009) ............................... 56, 58

21 *Carlson v. Gen. Motors Corp.,*
    883 F.2d 287 (4th Cir. 1989) ........................................................ 29
22

23 *Chin v. Chrysler Corp.,*
    182 F.R.D. 448 (D.N.J. 1998) ........................................ 31, 33, 37
24

25 *Chisholm v. House,*
    183 F.2d 698 (10th Cir. 1950) ...................................................... 72
26

27 *Churchill Vill. LLC v Gen. Elec. Co.,*
    169 F. Supp. 2d 1119 (N.D. Cal. 2000).......................................... 59

28

iv

*Clark v. Experian Info. Solutions, Inc.*,
   No. 03 C 7882, 2005 WL 1027125 (N.D. Ill. Apr. 26, 2005) ............................ 73

*Clay v. Am. Tobacco Co.*,
   188 F.R.D. 483 (S.D. Ill. 1999) ........................................................................ 37

*Cole v. General Motors Corp.*,
   484 F.3d 717 (5th Cir. 2007) .......................................................... 30, 31, 32, 33

*David v. Am. Suzuki Motor Corp.*,
   629 F. Supp. 2d 1309 (S.D. Fla. 2009) ............................................................ 41

*Elving v. Nintendo of Am., Inc.*,
   696 F. Supp. 2d 1207 (D. Colo. 2010) ............................................................ 61

*Estrella v. Freedom Fin. Network, LLC*,
   No. C 09-03156 SI, 2010 WL 2231790 (N.D. Cal. Jun. 2, 2010) ..................... 65

*Feinstein v. Firestone Tire & Rubber Co.*,
   535 F. Supp. 595 (S.D.N.Y. 1982) .................................................................. 33

*Ferens v. John Deere Co.*,
   494 U.S. 516, 110 S. Ct. 1274, 1080 L. Ed. 2d 443 (1990) ........................ 17, 19

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
   414 F.3d 325 (2d Cir. 2005) ............................................................................ 64

*Fogarty v. Toyota Motor N. Am., Inc., et al.*,
   No. 8:10-cv-00598 (E.D.N.Y.) ......................................................................... 54

*Geddes v. United Fin. Grp.*,
   559 F.2d 557 (9th Cir. 1977) ........................................................................... 19

*Guaranty Trust Co. v. York*,
   326 U.S. 99 (1945) ............................................................................................ 2

*Hulsen v. Toyota Motor Corp., et al.*,
   No. 8:10-cv-00588 (W.D. Mo. Feb. 10, 2010) ................................................ 47

*Imaging Fin. Servs. v. Lettergraphics/Detroit, Inc.*,
   No. 97-1930, 1999 WL 115473 (6th Cir. Feb. 9, 1999) .................................... 50

*In re Bankers Trust Co.*,
   752 F.2d 874 (3d Cir. 1984) ............................................................................ 64

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Baycol Prods. Litig.*,
 218 F.R.D. 197 (D. Minn. 2003) ...................................................................33

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
 288 F.3d 1012 (7th Cir. 2002) ..............................................................passim

*In re Charles Schwab Corp. Sec. Litig*,
 264 F.R.D. 531 (N.D. Cal. 2009) ...............................................................70

*In re Computer Memories Sec. Litig.*,
 111 F.R.D. 675 (N.D. Cal. 1986) ...............................................................63

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
 251 F.R.D. 689 (N.D. Ga. 2008) .........................................................passim

*In re DirecTV Early Cancellation Fee Litig.*,
 No. SACV 08-0741 AG, 2009 WL 2912656 (C.D. Cal. Sep. 9, 2009) .............71

*In re DirecTV Early Cancellation Litig.*,
 738 F. Supp. 2d 1062 (C.D. Cal. 2010) ........................................................2

*In re Equity Funding Corp. of Am. Sec. Litig.*,
 416 F. Supp. 161 (C.D. Cal. 1976) ..............................................................19

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
 177 F.R.D. 360 (E.D. La. 1997) ...............................................28, 33, 60, 66

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
 174 F.R.D. 332 (D.N.J. 1997) ............................................................passim

*In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*,
 241 F.R.D. 305 (S.D. Ill. 2007) .............................................................36, 37

*In re Grand Theft Auto Video Game Consumer Litig.*,
 251 F.R.D. 139 (S.D.N.Y. 2008) ........................................................passim

*In re Graphics Processing Units Antitrust Litig.*,
 527 F. Supp. 2d 1011 (N.D. Cal. 2007).......................................................58

*In re Hitachi Television Optical Block*,
 2011 WL 9403 (S.D. Cal. Jan. 3, 2011) ...............................................passim

*In re HP Ink Jet Printer Litig.*,
 No. C 05-3580, 2008 WL 2949265 (N.D. Cal. Jul. 25, 2008) ...............35, 69

*In re Mercedes-Benz Tele Aid Contract Litig.*
    257 F.R.D. 46, 55-56 (D.N.J. 2009). ................................................20, 24, 25

*In re Nucorp Energy Sec. Litig.,*
    772 F.2d 1486 (9th Cir. 1985) ................................................2, 18

*In re OnStar Contract Litig.,*
    No. 2:07-MDL-01867, 2010 WL 3516691 (E.D. Mich. Aug. 25, 2010)....passim

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    230 F.R.D. 61 (D. Mass. 2005) ................................................45

*In re Prempro,*
    230 F.R.D. 555 (E.D. Ark. 2005) ................................................35, 36

*In re Propulsid Products Liability Litigation,*
    208 F.R.D. 133 (E.D. La. 2002) ................................................23, 24

*In re Rezulin Prods. Liab. Litig.,*
    210 F.R.D. 61 (S.D.N.Y. 2002) ................................................35, 53

*In re Rezulin Prods. Liab. Litig.,*
    390 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................20

*In re Rhone-Poulenc Rorer Inc.,*
    51 F.3d 1293 (7th Cir. 1995) ................................................37

*In re School Asbestos Litig.,*
    789 F.2d 996 (3d Cir. 1986) ................................................68

*In re St. Jude Med., Inc.,*
    425 F.3d 1116 (8th Cir. 2005) ................................................35

*In re Vioxx Products Liability Litigation,*
    239 F.R.D. 450 (E.D. La. 2006) ................................................23, 24, 72

*In re Wells Fargo Loan Processor Overtime Pay Litig.,*
    No. C-07-01841, 2008 WL 2397424 (N.D. Cal. June 10, 2008) ................................................19

*In re Wirebound Boxes Antitrust Litig.,*
    128 F.R.D. 262 (D. Minn. 1989) ................................................19

*Kakani v. Oracle Corp.,*
    No. C 06-06493, 2007 WL 1793774 (N.D. Cal. June 19, 2007) ................................................41, 42

*Keilholtz v. Lennox Hearth Prods., Inc.,*
    268 F.R.D. 330 (N.D. Cal. 2010) ........................................................65

*Lantz v. Am. Honda Motor Co., Inc.,*
    No. 06 C 5932, 2007 WL 142614 (N.D. Ill. May, 14, 2007)...........26, 43, 49, 72

*LeJeuene v. Bliss-Salem, Inc.,*
    85 F.3d 1069 (3d Cir. 1994) ..............................................................67

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998).....................................................................3, 23, 24

*Liew v. Official Receiver & Liquidator,*
    685 F.2d 1192 (9th Cir. 1982) ...........................................................63

*Lyon v. Caterpillar, Inc.,*
    194 F.R.D. 206 (E.D. Pa. 2000) .............................................35, 53, 71

*Mazza v. Am. Honda Motor Co.,*
    254 F.R.D. 610 (C.D. Cal. 2008).............................................59, 65

*McGhee v. Arabian Am. Oil Co.,*
    871 F.2d 1412 (9th Cir. 1989) ...........................................................58

*Menagerie Prods. v. Citysearch,*
    No. CV 08-4263 CAS (FMO), 2009 WL 3770668 (C.D. Cal. Nov. 9, 2008)...65

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC,*
    404 F. Supp. 2d 1214 (E.D. Cal. 2005) ...........................................58

*Parkinson v. Hyundai Motor Am.,*
    258 F.R.D. 580 (C.D. Cal. 2008)......................................................59

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) ...........................passim

*Powers v. Lycoming Engines,*
    Nos. 06-2993, 06-4228, 2011 WL 504786 (E.D. Pa. Feb. 9, 2011)...................33

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.,*
    No. 07-1306, 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) ....................35, 56

*Sarviss v. Gen. Dynamics Info. Tech., Inc.,*
    663 F. Supp. 2d 883 (C.D. Cal. 2009)...............................................69

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008) ...................................................................35

*Simon v. Philip Morris, Inc.*,
    124 F. Supp. 2d 46 (E.D.N.Y. 2000)..........................................................64

*Sky Techs. Partners, LLC v. Midwest Research Inst.*,
    125 F. Supp. 2d 286 (S.D. Ohio 2000).......................................................44

*Smith v. Robbins*,
    528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) ...................................67

*Spence v. Glock*,
    227 F.3d 308 (5th Cir. 2000) .............................................................26, 43, 46, 66

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) ...................................67

*Tanner v. Jupiter Realty Corp.*,
    433 F.3d 913 (7th Cir. 2006) ......................................................................43

*Thompson v. Jiffy Lube Int'l, Inc.*,
    250 F.R.D. 607 (D. Kan. 2008) ...........................................................36, 41

*Tidenberg v. Bidz.com, Inc.*,
    No. CV-08-5553, 2009 WL 605249 (C.D. Cal. Mar. 4, 2009) ...........................61

*Tidwell v. Thor Indus.*,
    05-CV-2088, 2007 U.S. Dist. Lexis 21819 (S.D. Cal. Mar. 26, 2007)..............59

*True v. ConAgra Foods, Inc.*,
    No. 07-00770-CV-W-DW, 2011 WL 176037 (W.D. Mo. Jan. 4, 2011) .....33, 47

*Turner v. Murphy Oil USA, Inc.*,
    No. 05-4206, 2005 U.S. Dist. LEXIS 45123 (E.D. La. 2005) ...........................19

*Utility Consumers' Action Network v. Sprint Solutions, Inc.*,
    259 F.R.D. 484 (S.D. Cal. 2009)...........................................................55, 62

*Van Dusen v. Barrack*,
    376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964) ...............................passim

*Vulcan Golf, LLC v. Google Inc.*,
    254 F.R.D. 521 (N.D. Ill. 2008) ...................................................................36

LEGAL02/32550530v1          TOYOTA'S BRIEF REGARDING CHOICE OF LAW

*Walsh v. Ford Motor Co.,*
   807 F.2d 1000 (D.C. Cir. 1986)..................................................................36

**OTHER CASES**

*Beech Aircraft Corp. v. Super. Ct.,*
   61 Cal. App. 3d 501, 132 Cal. Rptr. 541 (1976) ................................58

*City of San Jose v. Superior Court,*
   12 Cal. 3d 447, 115 Cal. Rptr. 797, 525 P.2d 701 (1974)....................23

*Discover Bank v. Super. Ct.,*
   134 Cal. App. 4th 886, 36 Cal. Rptr. 3d 456 (Cal. App. 2005)...........70

*Frank v. DaimlerChrysler Corp.,*
   741 N.Y.S.2d 9, 292 A.D.2d 118 (N.Y. App. Div. 2002)..............4, 29

*Ganey v. Kawasaki Motors Corp., U.S.A.,*
   366 Ark. 238, 234 S.W.3d 838 (2006) ................................................51

*Hubbard Mfg. Co. v. Greeson,*
   515 N.E.2d 1071 (Ind. 1987)..............................................................41

*In re Cordis Corp. Pacemaker Prod. Liab. Litig.,*
   No. MDL 850, C-3-86-543, 1992 WL 754061 ..............................20, 59

*In re Digitek,*
   No. 2:08-md-01968, 2010 WL 2102330 (S.D.W.Va. May 25, 2010) ........passim

*In re Sigg Switz. (USA), Inc. Aluminum Bottles Mktg. & Sales Practices Litig.,*
   No. 10-MD-2137, 2011 WL 64289 (W.D. Ky. Jan. 7, 2011) ....................passim

*J.P. Morgan & Co., Inc. v. Superior Court,*
   113 Cal. App. 4th 195, 6 Cal. Rptr. 3d 214 (2003) ............................72

*McCann v. Foster Wheeler LLC,*
   48 Cal. 4th 68, 105 Cal. Rptr. 3d 378 (2010) ................................67, 69

*Norwest Mortg., Inc. v. Super. Ct.,*
   72 Cal. App. 4th 214, 85 Cal. Rptr. 2d 18 (1999) ....................56, 57, 72

*Offshore Rental Co. v. Cont'l Oil, Co.,*
   22 Cal. 3d 157, 148 Cal. Rptr. 867 (1978) ........................................70

x

*Olmstead v. Super. Ct.,*
    No. B158511, 2002 WL 31082063 (Cal. App. 2d Sept. 18, 2002)....................60

*Ortega v. Yokohama Corp. of N. Am.,*
    07C-06-1050JRJ, 2010 WL 1534044 (Del. Super. Mar. 31, 2010)...................71

*Osborne v. Subaru of Am., Inc.,*
    198 Cal. App. 3d 646, 243 Cal. Rptr. 815 (1988) ............................33, 35, 56, 61

*Schubert v. Target Stores, Inc.,*
    360 Ark. 404, 201 S.W.3d 917 (2005) .................................................................51

*State ex rel. Chemtall Inc. v. Madden,*
    216 W. Va. 443, 607 S.E.2d 772 (2004) .............................................................39

*Tracker Marine, L.P. v. Ogle,*
    108 S.W.3d 349 (Tex. App. 2003) ..............................................................35, 74

*Wallis v. Ford Motor Co.,*
    362 Ark. 317, 208 S.W.3d 153 (2005) ...............................................................29

*Wash. Mut. Bank, FA v. Super. Ct.,*
    24 Cal. 4th 906, 103 Cal. Rptr. 2d 320 (2001) ...........................................passim

*Wershba v. Apple Computer, Inc.,*
    91 Cal. App. 4th 224, 110 Cal. Rptr. 2d 145 (2001) .........................................59

*Ziegelmann v. DaimlerChrysler Corp.,*
    2002 N.D. 134, 649 N.W.2d 556 (2002) ...........................................................29


**FEDERAL STATUTES**

28 U.S.C. § 1404............................................................................................................17

28 U.S.C. § 1407.....................................................................................................passim

28 U.S.C. § 1407(a) ......................................................................................................17

**OTHER STATUTES**

California Civil Code § 1782 ........................................................................ 34

Conflicts of Law § 145 ................................................................................ 43

Conflicts of Law § 148(1) ...................................................................... 43, 45

Conflicts of Law § 148(2)(a)-(f) ................................................................. 44

Conflicts of Law § 188 ................................................................................ 43

Conflicts of Law § 188(3) ............................................................................ 44

Uniform Commercial Code .......................................................................... 36


**RULES**

Rule 12 .......................................................................................................... 4


**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment ................................................................................ 67


**OTHER AUTHORITIES**

Scott Fruehwald, *Individual Justice in Mass Tort Litigation: Judge Jack B. Weinstein on Choice of Law in Mass Tort Cases*, 31 Hofstra L. Rev. 323, 346-47 (2002) ............................................................................................ 25

Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 579 (1996) ............................................................................. 1, 25, 74

Linda Silberman, *The Role of Choice of Law in National Class Actions*, 156 U. Pa. L. Rev. 2001, 2034 (2008) .......................................................... 22

Restatement (First) of Conflict of Laws § 377 .......................................... 39

Restatement (Second) of Conflict of Laws § 148 ...................................... 45

Restatement (Second) of Conflict of Laws § 6(2)(a)-(g) ........................... 43

Restatement (Second) of Conflict of Laws § 6(2)(d) ...............................................48

Restatement (Second) of Conflicts of Laws § 188(2) ...............................................44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEGAL02/32550530v1

## I.     **INTRODUCTION**

Plaintiffs' Motion[1] should be denied for three key reasons. First, the Court would have to ignore clear Supreme Court precedent and violate principles of federalism to grant Plaintiffs the relief they seek.    Second, there are material, outcome-determinative differences in the various state laws that affect the substantive rights and defenses of the parties. Third, although the MDL process is designed to create certain procedural efficiencies, those efficiencies are absolutely constrained by the substantive rights of the parties and binding legal precedent, and these legal constraints form a line that cannot be crossed.

Plaintiffs' Motion is foremost an assault on the principles of federalism and state sovereignty.  Our federalism is not a vacuum to be filled by California.  It is a deliberate form of democracy that respects the rights of the citizens of separate sovereign states to design and enforce laws of their own choosing and define the substantive rights of their citizens, limited not by sister states, but only by the Constitution and the powers delegated to the United States. *BMW of N. Am. v. Gore*, 517 U.S. 559, 571, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) ("[I]t is clear that no single State could . . . impose its own policy choice on neighboring States" but rather states are "constrained by the need to respect the interests of other States.").  While every state has enacted laws to protect its citizens, "[they] need not, and in fact do not, provide such protection in a uniform matter." *Id.* at 569.  Instead, each state makes judgments about the trade-offs between the level of consumer protection and other state interests, resulting in "a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States." *Id.* at 570.  Where states may disagree about how best to accomplish a policy goal, "the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v.*

---

[1] Certain Economic Loss Plaintiffs' Motion for the Application of California Law, [Dkt. 810] (hereinafter referred to as the "Motion").

1

1  *Lopez*, 514 U.S. 549, 581, 115 S. Ct. 1624, 141 L. Ed. 2d 626 (1995) (Kennedy, J.,

2  concurring); *see also McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 91-92, 105 Cal.

3  Rptr. 3d 378 (2010) (recognizing that states adopt rules of law that reflect their own

4  effort to strike balances in protecting customers and attracting business based on their

5  own state's interests and policies).

6      Choice-of-law is an integral part of litigants' substantive rights.   Procedural

7  maneuvering, under the guise of simplicity or expediency, cannot circumvent

8  unambiguous Supreme Court precedent.  Following the Supreme Court's decisions in

9  *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L.

10  Ed. 1477 (1941) and *Van Dusen v. Barrack*, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d

11  945 (1964), countless courts have repeatedly rejected altering litigants' substantive

12  rights by virtue of an MDL and have held that in the context of an MDL proceeding

13  under 28 U.S.C. § 1407, transferor courts are *required* to apply the choice-of-law rules

14  of *all* of the transferor jurisdictions.  Efficiency is not more important than applying

15  the proper law.

16      In sum, "[d]ifferences across states may be costly for courts and litigants alike,

17  but they are a fundamental aspect of our federal republic and must not be overridden

18  in a quest to clear the queue in court. . . .  Tempting as it is to alter doctrine in order to

19  facilitate class treatment, judges must resist so that all parties' legal rights may be

20  respected." *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012,

21  1020-21 (7th Cir. 2002) (citations omitted) (citing, *inter alia*, Larry Kramer, *Choice of*

22  *Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 579 (1996)); *In re Nucorp Energy*

23  *Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir. 1985) (holding that the MDL court must

24  apply the choice-of-law rules of the state where the claims were originally filed before

25  they were transferred to California by the JPML).  Plaintiffs' Motion asks this Court

26  to do precisely what the Seventh Circuit warned against.  It is a clear attempt to trump

27  the Parties' and sovereign states' substantive rights in favor of Plaintiffs' counsel's

28  preferred state consumer laws and, ultimately, their desire to certify a nationwide

1    class.

2       Filed on behalf of a "certain" 67 handpicked named plaintiffs, the Motion

3    gerrymanders the choice-of-law process so that the interests of these handpicked few

4    govern the rights of all.  Of the 205 economic loss cases currently in this MDL, 148

5    were filed outside of California—all of which are ignored by Plaintiffs' Motion.

6    Plaintiffs' proposal would use the happenstance of transfer and consolidation into this

7    Court[2] to violate the Supreme Court's clear admonition: "the accident of a suit by a

8    non-resident litigant in a federal court instead of in a State court a block away, should

9    not lead to a substantially different result." *Van Dusen*, 376 U.S. at 638 (quotation

10   omitted).    Although Plaintiffs would seek to obscure it, the choice-of-law

11   determination directly affects every state's policy interest, and cannot be viewed

12   myopically through a California-centric lens. *See Gore*, 517 U.S. at 571-72 ("[O]ne

13   State's power to impose burdens on the interstate market for automobiles is not only

14   subordinate to the federal power over interstate commerce, but is also constrained by

15   the need to respect the interests of other States.") (citations omitted).

16      The proper question to be answered by this Court is not whether California

17   substantive law merely satisfies minimal constitutional safeguards.    Rather, the

18   question before this MDL Court is – after fully and properly considering the

19   applicable choice-of-law rules of all of the transferor courts including the other 130

20   class actions filed outside California – had the cases not been transferred, would the

21   courts in all those other states have applied California law.    Merely asking the

22   question makes the answer obvious: of course not.    Plaintiffs are attempting to

23   (mis)lead this MDL Court into pursuing administrative convenience at the expense of

24   parties' substantive rights and the interests of every state other than California.

25      Here, the Court must ask what, if any, contact does California have with

26   individual plaintiffs' claims of defect related to the engineering, design, development,

27

28   _____

[2] Responding Plaintiffs in the JPML sought transfer and consolidation in Florida,
Kentucky, Minnesota, Mississippi, New Jersey, New York, Ohio, Pennsylvania,
South Carolina, West Virginia, and Wyoming.

1   testing, or evaluation of the Subject Vehicles?   The answer is none: no salient

2   development, design, engineering, testing, or evaluation was performed in California

3   by TMS.   Decisions about U.S. recalls, quality concerns, and warranty claims were

4   centered in Japan.   The vast majority of the Subject Vehicles and relevant components

5   were manufactured in Japan and states other than California.   Even with respect to

6   what Plaintiffs say is the most relevant fact—the source of advertising—a substantial

7   portion of advertising was in fact conceived, produced, and disseminated *locally*, not

8   from California.   Plaintiffs' testimony contradicts the allegations in the complaint that

9   national advertising is the source of information relied upon in purchasing their

10  vehicles.   "The state in which each claimant was injured has an overriding interest in

11  having its laws applied to redress any wrong done. . . . To ignore the place of injury, a

12  vital consideration to both the injured party and the state within which he or she lives,

13  would set aside decades of precedent on the proper application of choice-of-law

14  principles." *In re Digitek Prods. Liab. Litig.*, No. 2:08-md-1968, 2010 WL 2102330,

15  at *10 & n.6 (S.D. W. Va. May 25, 2010).   California's tenuous contacts to vehicle

16  purchases by class members in 51 different jurisdictions[3] across the United States

17  cannot trump those jurisdictions' own interests in governing consumer transactions

18  within their own borders.[4]   A just analysis, even under California's own choice-of-law

19  rules, should yield that result.

20      Application of the various states' choice-of-law rules concerning claims over

21  individual consumer transactions that occurred within their borders, against a foreign

22  parent corporation and a U.S. subsidiary corporation, will unquestionably result in a

23  determination that California substantive law cannot and should not universally apply

---

[3] These 51 jurisdictions include the 49 states other than California, the District of Columbia, and Puerto Rico.
[4] As one illustration of the real and tangible interests of the other states, many states are pursuing investigations of Toyota relating to unintended acceleration under their own laws pursuant to the same consumer protection laws that Plaintiffs are seeking to have California trump in this litigation. (*See* Declaration of Stephen E. Merrill, Mar. 30, 2011 ("Merrill Decl.") at ¶ 4).

1   to the claims of the putative class members in this MDL.[5]

2   **II.   STATEMENT OF FACTS**

3       The facts underscore the extensive interests that all 52 jurisdictions have in this

4   litigation.[6]   To state the obvious, every claim in this MDL relates to a Subject Vehicle,

5   its purchase, and its driver(s).   To disregard the vehicles, the purchases, and the

6   drivers, or to suggest that facts related to TMS are the facts that are most important as

7   it relates to choice-of-law, is to ignore longstanding legal precedent.   *See*

8   *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628

9   (1985); *In re St. Jude Med., Inc.*, 425 F.3d 1116 (8th Cir. 2005).   Plaintiffs purchased,

10   drove, and maintained their vehicles in all 52 jurisdictions.   Alleged SUA events, the

11   subsequent repairs and recalls, and any purported economic injury also occurred in all

12   these jurisdictions.   Further, Toyota's own activities were national and international in

13   scope and were by no means limited to California.   The facts indisputably demonstrate

14   the connection of all 52 jurisdictions to the claims at issue.

15       To avoid this common-sense result, Plaintiffs have focused disproportionately

16   on TMS, and even more narrowly, on certain functions that TMS performs.   Many of

17   these functions are not performed independently, exclusively, or even at all by TMS

18   (or in California for that matter).   Regardless, it is indisputable that TMC in Japan

19   employs its substantial engineering and technical resources to develop, design,

20   engineer, and test the very aspects of the Subject Vehicles that Plaintiffs have put at

21   issue.   Accordingly, the principal source of engineering and technical information

22   used by TMS in its advertising, training, and investigation of customer complaints

23   regarding ETCS and alleged unintended acceleration was TMC in Japan.

24

25   [5] To ensure a proper choice-of-law analysis rather than one dictated by Plaintiffs'
improper tactics, contemporaneously with its filing of this memorandum, Toyota has
26   filed its "Notice of Cross Motion and Cross Motion for Choice-of-Law Determination
as to All Other Economic Loss Matters Before This Court," which formally brings the
27   underlying cases before this Court for a choice-of-law determination.
[6] Toyota notes that the evidentiary record on choice-of-law related facts will be more
28   complete at the class certification stage and further demonstrate the interests of all the
jurisdictions.

1    Plaintiffs devote a substantial portion of their Second Amended Economic Loss

2    Master Consolidated Complaint [Dkt. 580] ("SAMCC") to describing the engineering

3    and design of the Subject Vehicles, identifying alleged defects, and making the

4    conclusory allegation that "the defects causing unintended acceleration have caused

5    defective vehicles' values to plummet." (SAMCC, *passim*). The claims in this MDL,

6    sounding in both contract and tort, all stem from the Subject Vehicles' alleged defects.

7    Yet, Plaintiffs are remarkably silent about these issues in their Motion. In so doing,

8    they have ignored the record the Parties developed in Phase I discovery and choice-of-

9    law discovery, which demonstrates a substantial nexus between putative class

10   members' claims and Japan and all of the U.S. jurisdictions. Plaintiffs simply cannot

11   predetermine the substantive rights of the Parties to this litigation by telling only a

12   fraction of the story.

13   **A.**     **The Key Events Related To The Purchase, Ownership, And Resale**

14            **Of The Subject Vehicles Occurred In All 52 Jurisdictions**

15   Plaintiffs purchased their Subject Vehicles in all 52 U.S. jurisdictions. Almost

16   all Named Plaintiffs purchased their vehicles at local dealerships, many citing their

17   personal relationships with their dealerships as a motivating factor in purchasing their

18   Subject Vehicles. (Declaration of Cari Dawson, Mar. 31, 2011 ("Dawson Decl."), at

19   Ex. AA, 47:25-48:17; 51:19-23; Ex. FF, 60:20-61:19).

20   There are 1,233 Toyota dealerships in the United States, of which

21   approximately 1,100 are located outside California. (Dawson Decl. at Ex. K, 120:4-

22   14, 122:13-20; *see also* Declaration of Ernest Bastien, Mar. 29, 2011

23   ("Bastien Decl."), at ¶ 12). Toyota dealerships are managed independently by the

24   particular dealer, not by TMS. (Dawson Decl. at Ex. K, 119:5-120:14). Of the 1,233

25   Toyota dealerships, TMS currently maintains an equity ownership interest in only one,

26   and it is run independently. (Dawson Decl. at Ex. K, 120:4-25, 198:20-199:7).

27   Of the 66 Named Plaintiffs who live outside of California and submitted

28   stipulations, only one claims to have regularly used his vehicle in California.

6

1   (Dawson Decl. at Ex. LL.1-76, ¶ 22 (only non-California Plaintiffs)).  None of these

2   Plaintiffs alleges that he or she ever experienced SUA in a Subject Vehicle while in

3   California.  (Dawson Decl. at Ex. A; Ex. LL.1-76, ¶ 44).  None alleges that he or she

4   sold, traded in, or attempted to sell a Subject Vehicle in California.  (Dawson Decl. at

5   Ex. A).  In short, from purchase to resale, none of the events relevant to the non-

6   California Plaintiffs' ownership of their vehicles had anything to do with California.

7       Plaintiffs also received notice that local law governed the purchase of the

8   Subject Vehicles.  Their warranty booklets read: "These warranties give you specific

9   legal rights.  You may have other rights that *vary from state to state*."  (Declaration of

10  John Lang, Mar. 29, 2011 ("Lang Decl."), at Ex. A, 8 (emphasis added)).  The

11  warranty booklets also state that their limitations on the duration of the implied

12  warranty of merchantability does not apply in some states: "Some states do not allow

13  restrictions on how long an implied warranty lasts, so this *limitation may not apply to

14  you*."  (Lang Decl. at ¶ 10 (emphasis added)).  Furthermore, the Subject Vehicles

15  came with Owners' Warranty Rights Notification booklets that described the lemon

16  laws from all 52 jurisdictions to inform customers of their rights.  (Lang Decl. at ¶ 11,

17  Ex. B).  Finally, many Named Plaintiffs executed purchase, lease, and/or finance

18  agreements with choice-of-law provisions stating that the contract is governed by the

19  law of the plaintiff's state of residence.  (Dawson Decl. at Ex. A; Ex. NN).

20      Not surprisingly then, most non-California Plaintiffs filed underlying suits in

21  their home state seeking the application of home state law.  (Dawson Decl. at Ex. A).

22  These Plaintiffs acknowledged in their underlying lawsuits that their claims were

23  governed by the laws of the place where the key events relating to the purchase,

24  ownership, and resale of their vehicles occurred.  (*See* Dawson Decl. at Ex. A).

**B.   Toyota's Organizational Structure Emanates From Japan With Major Operations Spread Across North America**

27      While TMS, a single U.S. subsidiary that is one of two named defendants, is

28  based in California, it has operations in other U.S. jurisdictions.  (*See* Bastien Decl. at

7

4; *see also* Declaration of Doug Stevens, March 23, 2011 ("Stevens Decl."), at ¶¶ 8-10).   The other named defendant and the head of the Toyota corporate structure is TMC, which is headquartered in Japan and does not directly employ any people in the United States.   (Dawson Decl. at Ex. KK.1, No. 3; Declaration of Tsutomu Miyazaki, Mar. 23, 2011, ("Miyazaki Decl.") at ¶¶ 6, 10; *see also* Declaration of Kojiro Tanaka, Mar. 29, 2011, ("Tanaka Decl.") at ¶¶ 7-8). TMC has overall responsibility for design, development, engineering, and testing of the Subject Vehicles, including the ETCS-i and failsafe mechanisms at issue in this litigation.   (Miyazaki Decl. at ¶ 6; Tanaka Decl. at ¶ 7; Declaration of Takashi Nakanishi, Mar. 24, 2011 ("Nakanishi Decl."), at ¶ 8; Declaration of Masanori Hirose, Mar. 18, 2011 ("Hirose Decl."), at ¶ 4).

Toyota Motor North America, Inc. ("TMA") is headquartered in New York, with offices in Washington, D.C. and Florida.   It is the holding company for Toyota's U.S. sales and manufacturing companies, including TMS.   (Dawson Decl. at Ex. T, 28:20-29:3,   29:5-17,   31:21-32:16).   TMA's   functions   include   corporate communications and advertising, investor relations, government and regulatory affairs, and market research.   (*Id.*).   In addition, TMA coordinates the corporate planning and business activities of Toyota companies in North America. (*Id.*).

Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), which is headquartered in Erlanger, Kentucky, serves as the headquarters for Toyota's North American engineering and manufacturing operations.   (Declaration of Maninderjit Bansi, Mar. 25, 2011 ("Bansi Decl."), at ¶¶ 1, 5; Dawson Decl. at Ex. K, 142:25-143:2, 143:22-144:1).   Aside from TMC, TEMA is the entity most responsible for Toyota's engineering, design, development, R&D, and manufacturing operations in North America. (*Id.*).

TEMA owns and oversees the operations of several U.S. parts and vehicle manufacturing plants, or North American Manufacturing Companies ("NAMCs").   (Bansi Decl. at ¶ 6).   These U.S. manufacturing plants are located in Kentucky, Indiana, Texas, Alabama, West Virginia, Missouri, California, and Mississippi. (*Id.*).

8

1    As just one example, Toyota Motor Manufacturing Kentucky, Inc. ("TMMK")

2    manufactures vehicles in Georgetown, Kentucky, and Toyota has invested more than

3    $5.6 billion into this one entity alone—a substantially larger amount than Toyota has

4    invested into TMS in California. (*Id.* at ¶¶ 3, 6; Bastien Decl. at ¶ 12). In addition to

5    these NAMCs, TEMA has manufacturing operations in Canada and Mexico. (Bansi

6    Decl. at ¶¶ 3, 6).

7    **C.    The Design And Development Of The Subject Vehicles And Subject**

8    **Components Occurred Outside Of California**

9    Although their theory is not clear, Plaintiffs continue to allege potential

10   "[d]efects in the Subject Vehicles' electronics system," including the design of the

11   ETCS, as well as defects related to "mechanical issues." (SAMCC at ¶ 350). Not

12   surprisingly, the design and development of the Subject Vehicles and Subject

13   Components did not occur in California.

14   As with all aspects of the Subject Vehicles, TMC maintained overall

15   responsibility for design and development of the ETCS at its Japanese headquarters.

16   (Miyazaki Decl. at ¶ 6; Dawson Decl. at Ex. R.1, 32:6-33:2, ex. 129; Ex. R.2, 207:21-

17   208:17). The design and development for the Subject Vehicles' electronic control

18   modules ("ECMs"), a significant component of the ETCS, was centered at TMC's

19   headquarters in Japan. (Miyazaki Decl. at ¶¶ 12-13, 15). Similarly, the design of the

20   various accelerator pedals for the Subject Vehicles' ETCS were finalized, reviewed,

21   and approved under the strict supervision of TMC officials in Japan. (Miyazaki Decl.

22   at ¶ 14; Dawson Decl. at Ex. W, 65:20-23). Significantly, TMC in Japan is the final

23   authority and decision-maker responsible for the development, design, engineering,

24   testing and evaluation of the ETCS. (Miyazaki Decl. at ¶ 6).

25   **D.    The Subject Vehicles And Subject Components Were Predominantly**

26   **Produced And Manufactured Outside Of California**

27   The manufacturing activities relevant to this case also occurred almost entirely

28   outside of California. (*See* Bansi Decl. at ¶ 5). In fact, TMS has nothing to do with

9

1   manufacturing the Subject Vehicles or ETCS components; TMC and TEMA are

2   solely responsible for the manufacturing of the Subject Vehicles and procurement of

3   ETCS subject components through a network of manufacturing plants in Japan and

4   North America. (*Id.*; Declaration of Robert A. Young, Mar. 24, 2011 ("Young Decl."),

5   at ¶ 4).

6        None of the relevant ETCS components, which Plaintiffs allege are the source

7   of the SUA issues, are manufactured in California. (Young Decl. at ¶ 4). TMC in

8   Japan is ultimately responsible for overseeing the design, manufacture, and supply of

9   ETCS component parts for Subject Vehicles (*See* Miyazaki Decl. ¶¶ 9-14), while

10  TEMA, from its Kentucky headquarters, assists in procuring ETCS components for

11  manufacturing operations in North America. (Dawson Decl. at Ex. W, 27:17-30:25).

12       TMC collaborated with certain suppliers who, under the direction of TMC in

13  Japan, assisted in designing various ETCS component parts. (Miyazaki Decl. at

14  ¶ 14). ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████ (Dawson Decl. at

17  Ex. KK.2, no. 5; Miyazaki Decl. at ¶ 14). T████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ██████████████████████████████████████ (Dawson Decl. at Ex.

23  KK.2, no. 5; Miyazaki Decl. at ¶ 14; Young Decl. at ¶ 4). ████████████████

24  ████████████████████████████████████████████ (Dawson Decl.

25  at Ex. KK.2, no. 5; Miyazaki Decl. at ¶¶ 13-14). Delphi Electronics and Safety in

26  Troy, Michigan also supplies certain ETCS component parts. (Young Decl. at ¶ 4).

27

28

1
2

**E.**     **The Testing Of The Subject Vehicles Relevant To This Case**
         **Occurred Under The Direction Of TMC**

3      ETCS testing is managed exclusively from TMC's Japanese offices.

4 (Nakanishi Decl. at ¶ 8).  While Plaintiffs attempt to convince the Court that TMC

5 "modifie[s] or tune[s]" the ETCS of the Subject Vehicles as a result of testing

6 conducted by Toyota Technical Center ("TTC"), which has offices in both California

7 and Michigan[7] (Pls. Br. at n.27), TMC in Japan has overall responsibility for testing

8 the ETCS system and for improving or updating ETCS-i.  (*See* Nakanishi Decl. at ¶¶

9 8-15; Miyazaki Decl. at ¶ 18).

10      TTC does "evaluate" Subject Vehicles in California, but the evaluation is

11 focused on American driver preferences.  Results are forwarded to TMC in Japan for

12 analysis and any subsequent response. (Miyazaki Decl. at ¶¶ 17-19). ██████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████ (Miyazaki Decl. at ¶¶ 17-19).  All component level testing

17 regarding ETCS is conducted under the oversight, supervision and approval of TMC

18 in Japan, primarily by TMC suppliers in Japan.  (Nakanishi Decl. at ¶¶ 9, 10).  No

19 such testing occurs in California.  (Nakanishi Decl. at ¶ 10).  Vehicle level testing

20 likewise is done under the oversight, supervision and approval of TMC in Japan,

21 primarily by TMC or by a TMC subsidiary in Japan, though certain vehicle level

22 testing is outsourced to TEMA and performed in Canada as well as in several states in

23 the U.S. (*Id.* at ¶¶ 11, 12).

24

25

26

27

28

---

[7] TTC is headquartered in Ann Arbor, Michigan. ████████████████████
████████████████████████ (Dawson Decl. at Ex. K, 98:13-100:10). As with TTC's office in California, much of the testing of Subject Vehicles or ETCS in Michigan is done under the direction of TMC in Japan. (*See* Nakanishi Decl. at ¶ 8).

11

**F.    Marketing And Advertising Relevant To Plaintiffs' Claims Was Created And Distributed Locally**

The advertisements that appear in different media, such as television, print, radio, billboards, or direct mail, are often, particularly in certain geographic areas, the product of private, independent distributors located outside of California such as Southeast Toyota ("SET"), Gulf States Toyota ("GST"), Servco, and Toyota de Puerto Rico,[8] who are responsible for advertising in their geographic areas and use their own advertising agencies without TMS's supervision. (Dawson Decl. at Ex. HH, 20:14-21:12, 110:22-114:14; Declaration of Steve Appelbaum, Mar. 29, 2011 ("Appelbaum Decl."), at ¶¶ 4-5).    Additionally, 22 nationwide Toyota Dealer Associations ("TDAs")[9] and the more than 1,000 independent dealerships throughout the country develop and produce their own advertising. (Dawson Decl. at Ex. HH, 28:8-29:9; Appelbaum Decl. at ¶¶ 3, 6; Declaration of Eugene Bennett Tsai, Mar. 28, 2011 ("Tsai Decl."), at ¶¶ 7-8).[10]   These entities are free to determine their own advertising messages and TMS does not require approval of this advertising before it runs. (Dawson Decl. at Ex. HH, 28:8-29:9; Appelbaum Decl. at ¶¶ 4-6; Tsai Decl. at ¶ 6).

Accordingly, Plaintiffs were exposed to a mixture of TMS advertising, distributor advertising, local TDA advertising, and local independent dealership advertising in many markets, which was developed in a variety of locations other than California. (*See generally* Appelbaum Decl.; Tsai Decl.)    Virtually all the non-California Named Plaintiffs admit that they only viewed Toyota advertising in their home states. (Dawson Decl. at Exs. A, LL.1 -76, ¶ 2 (non-California Plaintiffs)).

The content and theme of some of TMS advertisements are influenced by

---

[8] For further information about the independent distributors, see the Declaration of Ernest Bastien.
[9] For further information about Toyota Dealer Associations, see the Declaration of Steve Appelbaum.
[10] For additional information regarding the relationship between TMS and the TDAs with respect to advertising, see the Declaration of Eugene Bennett Tsai.

12

Toyota entities outside of California. TMC and TEMA are "stakeholders" in TMS advertising, and are responsible for providing some of the content for TMS's advertising materials (Dawson Decl. at Ex. HH, 100:15-104:10; Ex. L, 106:12-116:4, 188:20-191:9, 193:8-198:11). TMA, which is not headquartered in California, is also largely responsible for brand and corporate, broad-scope advertising that is typically more aimed at public awareness about Toyota and its corporate responsibility. (*See* Dawson Decl. at Ex. HH, 35:21-36:22, 130:9-131:4).[11] Individual dealers across the country also have input into TMS advertising through the Dealer Ad Council. (Dawson Decl. at Ex. HH, 133:22-135:14).

## G.   The Subject Vehicles Were Marketed And Sold At Independent Dealerships In Each State And Jurisdiction Across The Country

The sale of a consumer product, in this case a Subject Vehicle, is an activity that is conducted at a local level in thousands of locations across the country. TMS does not sell vehicles to consumers. (Bastien Decl. at ¶ 5). Of the 15,859,831 new Subject Vehicles sold to non-fleet purchasers through November 20, 2010, at least 12,834,597, or roughly 81%, were sold in states other than California. (Dawson Decl. at Exs. KK.5, no. 6, ex. A; KK.7, no. 6, ex. B; KK.8, no. 6, ex. A). For fleet sales, which affect many of the non-consumer that Plaintiffs purport to represent, over 94% of Toyota sales and over 90% of Scion sales took place outside of California. (*Id.*).

## H.   The Relevant Decision-Making Concerning Toyota's UA Recalls Emanated From Japan

The decision to recall vehicles in North America related to SUA events was made from TMC's headquarters in Japan. (Declaration of Hajime Kitamura, Mar. 29, 2011 ("Kitamura Decl."), at ¶¶ 12, 21). While it is accurate that TMS's warranty operations and customer complaint departments are located in California (Pls. Br. at 14), these departments collected and relayed the information they received to TMC in

---

[11] Named Plaintiffs, such as Alyson Oliver, indicated that the strength of Toyota's corporate brand played a part in their decision to purchase a Toyota Vehicle. (*See* Dawson Decl. at Ex. DD, 75:1-4).

13

1   Japan.   (Kitamura Decl. at ¶ 12).   TMC officials in Japan were responsible for

2   decisions on how to respond to the information, whether and how to report that

3   information to NHTSA, and what kind of corrective action, if any, was appropriate to

4   remedy an issue. (*Id.* at ¶¶ 12, 21).   And it was TMA in D.C., not TMS, that served in

5   a liaison role to actually provide the final information to NHTSA.   (*Id.* at ¶ 21; *see*

6   *also* Dawson Decl. at Ex. T, 149:20-150:9).

7   Similarly, Plaintiffs greatly exaggerate the role that TMS's Product Quality and

8   Service Support ("PQ&SS") group played in the events that gave rise to this litigation.

9   (*See* Pls. Br. at 14).   While PQ&SS engineers did inspect vehicles and summarized

10   their findings, they were not decision-makers, theirs was merely a supporting role;

11   they sent findings to the appropriate TMC officials who decided how to respond.

12   (Declaration of Robert Waltz, Mar. 29, 2011 ("Waltz Decl."), at ¶ 5).

13   **III.   ARGUMENT AND CITATIONS OF AUTHORITY**

14       A.   **Binding Supreme Court Precedent Requires This Court To Analyze**

15           **Each Individual Case Within the MDL Under The Choice-Of-Law**

16           **Rules Of The Transferor Court**

17           *1.   The Rules for Treating Cases Consolidated for Pre-Trial*

18           *Treatment In an MDL Are Clear: Transfer Is For Convenience*

19           *and Efficiency – It Does Not Change the Parties' Rights*

20   In *Klaxon*, the Supreme Court held that choice-of-law rules constitute

21   substantive law for purposes of the *Erie* doctrine.   313 U.S. at 496.   Based on this

22   precedent, the Supreme Court in *Van Dusen* held that because choice-of-law rules are

23   substantive in nature, when a case is transferred under 28 U.S.C. § 1404, the

24   transferee court *must* apply the choice-of-law rules that would have been applied by

25   the transferor court. *Van Dusen*, 376 U.S. at 638.

26   The procedural efficiencies of an MDL are not intended to alter the substantive

27   rights of parties, and, in fact, are constrained by those substantive rights.   Because

28   choice-of-law is not a matter of procedure, but is substantive, MDL courts must

14

1  "ensure that the 'accident' of [multidistrict litigation] does not enable a party to utilize

2  a transfer to achieve a result in federal court which could not have been achieved in

3  the courts of the State where the action was filed." *Van Dusen*, 376 U.S. at 638.

4  "Whatever lack of uniformity this may produce . . . is attributable to our federal

5  system, which leaves to a state . . . the right to pursue local policies diverging from

6  those of its neighbors. It is not for the federal courts to thwart such local policies by

7  enforcing an independent 'general law' of conflict of laws." *Klaxon*, 313 U.S. at 496.

8      Indeed, in adherence to *Klaxon* and *Van Dusen*, MDL courts have recognized

9  that they are *required* to apply the choice-of-law rules of *all* of the transferor states.

10  *See, e.g., In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir. 1985); *In re*

11  *Sigg Switz. (USA), Inc. Aluminum Bottles Mktg. & Sales Practices Litig.*, No. 3:10-

12  md-2137, 2011 WL 64289, at *4 (W.D. Ky. Jan. 7, 2011); *In re ConAgra Peanut*

13  *Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 693 (N.D. Ga. 2008); *In re Grand Theft*

14  *Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008); *In re Ford*

15  *Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997).

16      On this point, then, there can be no dispute: Supreme Court precedent

17  mandates that this Court consider the choice-of-law rules of each of the 41 transferor

18  courts in deciding what law applies to the actions filed in those jurisdictions.

19          **2.    *Filing a Master Complaint Does Not Alter These Rules***

20      Against this black-letter law, Plaintiffs' suggestion that the Court should

21  disregard *Van Dusen* because "[s]uch a complex choice-of-law analysis would burden

22  the Court and potentially complicate class certification for no good reason" is

23  remarkable. (*See* Pls. Statement Regarding the Effect of the FACC [Dkt. 306], at 4-

24  5). Plaintiffs' lawless contention, if followed, would result in a radical departure from

25  Supreme Court precedent.

26      "Consolidation is a procedural device designed to promote judicial economy. It

27  does not result in merger of the actions nor does it change the rights of the parties."

28  *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. 3:07-md-1841, 2008 WL

1  2397424, at *4 (N.D. Cal. June 10, 2008) (internal quotations and citations omitted);

2  *see also Geddes v. United Fin. Grp.*, 559 F.2d 557, 561 (9th Cir. 1977). As a result,

3  use of a consolidated complaint is generally deemed to be merely "a procedural

4  device" or "administrative tool." *See, e.g., Turner v. Murphy Oil USA, Inc.*, No. 2:05-

5  cv-4206, 2005 U.S. Dist. LEXIS 45123, at *4-7 (E.D. La. Dec. 29, 2005); *In re*

6  *Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 262, 264 (D. Minn. 1989); *In re Equity*

7  *Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 176 (C.D. Cal. 1976).

8      A master consolidated complaint does not and cannot change the choice-of-law

9  rules.[12] *In re Sigg Switz.*, 2011 WL 64289, at *4 (holding that the choice-of-law rules

10  of Kentucky, Minnesota, and California should be applied and that "[t]he consolidated

11  complaint was largely filed for the organizational benefit of the Court and the

12  parties"); *In re ConAgra*, 251 F.R.D. at 693 (rejecting plaintiffs' argument that the

13  court should apply only Georgia's choice-of-law rules because the master complaint is

14  "the operative pleading for purposes of the movants' motion for class certification"

15  and "all the proposed class representatives filed their original complaints in Georgia");

16  *In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 330 n.62 (S.D.N.Y. 2005)

17  (holding that a consolidated complaint should be viewed "as a series of separate

18  actions initially filed in the respective districts, in which case the choice of law rules

19  of [those districts] would be applied").

20      In other words, litigants' substantive rights cannot be overturned in the pursuit

21  of efficiency. *See In re Bridgestone/Firestone*, 288 F.3d at 1020; *In re Ford Ignition*

22  *Switch*, 174 F.R.D. at 348 ("While it might be desirable, for the sake of efficiency, to

23  settle upon one state . . . and apply its law in lieu of the other 49 jurisdictions, due

24  process requires individual consideration of the choice of law issues raised by each

25

26

---

27  [12] A consolidated complaint can only properly "change" choice-of-law rules when agreed to by the parties. *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55-56 (D.N.J. 2009). Here, however, the parties expressly stated that the

28  consolidated complaint should *not* be viewed as a waiver of the appropriate choice-of-law to be applied. *See, e.g.*, Def. Prop. Ord. Re: the Effect of MCC [Dkt. 319-1], at 2.

class member's case . . . .").[13]   Plaintiffs admit that consolidation should not change substantive rights,[14] but nonetheless ask this Court to ignore and subvert the substantive rights of all litigants in contravention of Supreme Court precedent.[15]

The black letter law prevents this Court from giving priority to one of the underlying actions in the hopes that a favorable choice-of-law ruling will induce Defendants to settle on terms different from what would happen if the Court treated all the actions as equal. *See In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1297-99 (7th Cir. 1995) (decertifying class where district court's "innovative procedure for streamlining the adjudication . . . far exceed[ed] the permissible bounds of discretion in the management of federal litigation" and noting the "intense pressure to settle" that the district court's procedure might produce).   "Altering the substantive law to accommodate procedure would be to confuse the means with the ends--to sacrifice the goal for the going. [The law governing choice-of-law] may not be disregarded merely because it may hinder the prosecution of a multi-state or nationwide class action or result in the exclusion of nonresident consumers from a California-based class action." *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 918, 103 Cal. Rptr. 2d 320 (2001)).   "A change of venue . . . should be, with respect to state law, but a change of courtrooms." *Van Dusen*, 376 U.S. at 639.   Toyota's substantive due process rights may not be stripped by procedural ploys.

   a. **Supreme Court Precedent Requires The Court To Conduct A Complete Choice-Of-Law Determination**

Plaintiffs' Motion should be denied in light of *Lexecon Inc. v. Milberg Weiss*

---

[13] *See also* Linda Silberman, *The Role of Choice of Law in National Class Actions*, 156 U. Pa. L. Rev. 2001, 2034 (2008) ("[C]ourts should avoid manipulating choice of law principles to ensure aggregation.").

[14] Pls. Brief re: Proposed Order Regarding the Effect of the MCC [Dkt. 320], at 1 ("[P]laintiffs have a right – rooted in federalism and *Erie* – to have their claims governed by the same law that would apply in the absence of MDL consolidation.").

[15] For example, many claims asserted might well fail if the appropriate law is applied. (*See, e.g.*, Dawson Decl. at Exs. D, E, F, G, H, I, and J (showing material variations in state laws)).   Yet, under Plaintiffs' framework, consumers located in states that would reject their claims would be able proceed against Toyota based upon the "accident" of § 1407 transfer. *See Van Dusen*, 376 U.S. at 638.

1   *Bershad Hynes & Lerach*, 523 U.S. 26, 118 S. Ct. 956, 140 L. Ed. 2d 62 (1998).  As

2   Plaintiffs have acknowledged, "limitations on consolidation are especially important

3   in the MDL context because an MDL transferee court lacks authority to assign a

4   transferred case to itself for trial." Pls.' Statement Regarding the Effect of the FACC

5   [Dkt. 306], at 2 (citing *Lexecon*, 523 U.S. at 28).   Upon completion of pretrial

6   proceedings, the Court must remand the individual cases for trial to the transferor

7   courts. *Lexecon*, 523 U.S. at 35.  Plaintiffs' manipulation of the choice-of-law process

8   is a transparent effort to circumvent and subvert what the Supreme Court in *Lexecon*

9   held is required by § 1407, and to find a way effectively to permit the transferee court

10  to dispose of all actions as if filed in the transferee court.

11          **b.     Plaintiffs     Cannot     Circumvent     These     Rules     By**

12                  **"Moving"     For     An     Incomplete     Choice-Of-Law**

13                  **Determination**

14          To support their plan to artificially narrow the choice-of-law analysis, Plaintiffs

15  rely upon *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133 (E.D. La.

16  2002).[16]  But this unusual decision is readily distinguishable.  As an initial matter, the

17  issue presented in this case – whether Plaintiffs can self-select a subset of class

18  representatives to move for the proper choice-of-law to be applied to the SAMCC –

19  was neither presented nor analyzed in *Propulsid*.  Instead, the *Propulsid* court focused

20  on whether it should apply the choice-of-law rules of Louisiana (the transferee court)

21  based on the existence of a master complaint or apply the choice-of-law rules of

22  Indiana (a transferor state) to an underlying Indiana action.  *Id.* at 140-42.  Faced with

23  these two options,[17] the *Propulsid* court correctly noted that the Master Complaint

24  could not control the choice-of-law determination.  *Id.*  Despite the questionable

25

26  [16] Plaintiffs also cite a second decision from that court: *In re Vioxx Products Liability
    Litigation*, 239 F.R.D. 450, 455 (E.D. La. 2006), where the parties <u>agreed</u> that the
27  court should apply New Jersey choice-of-law rules.  There is no such agreement here.
    [17] The court *did not address* and apparently did not consider the propriety of applying
28  the laws of all the other MDL transferor court states—neither party to the litigation
    raised it.

18

1  outcome, the *Propulsid* court was concerned that a decision to apply Louisiana
2  choice-of-law rules to actions filed in other jurisdictions would "circumvent the
3  remand requirement of 28 U.S.C. § 1407 by substituting itself for all individual
4  actions filed in the MDL and thereby frustrate the intended effect of that statute as
5  recognized in the Supreme Court's decision in *Lexecon*." *Id.* at 141-42. But that is
6  exactly what Plaintiffs ask the Court to do in this case – apply California choice-of-
7  law rules to all cases in this litigation in violation of *Lexecon*. Indeed, this was
8  precisely the reason that the *ConAgra* court rejected the approach in *Propulsid*. 251
9  F.R.D. at 694.

10  While Plaintiffs' maneuvering here is novel, courts have consistently rejected
11  litigants' creative attempts to narrow the scope of the choice-of-law analysis in light
12  of *Klaxon* and *Van Dusen*. For example, in *In re Mercedes-Benz*, 257 F.R.D. at 55-
13  56, ten separate cases were consolidated from six different states into an MDL.
14  Recognizing that application of all six states' laws would be an impediment to class
15  certification, plaintiffs attempted to narrow the scope of the choice-of-law analysis by
16  arguing that only the law of the MDL court should apply because "each plaintiff
17  joined in filing a Consolidated Class Action Complaint." *Id.* Bound by *Klaxon* and
18  *Van Dusen*, the court summarily rejected plaintiffs' argument, holding that it "must
19  complete a separate choice of law analysis for *each* of the ten proceedings that make
20  up" the MDL. *Id.* at 56 (emphasis added). The court reached the same result in *In re*
21  *Sigg Switzerland*, where plaintiffs similarly argued that the law of the MDL court
22  should apply. 2011 WL 64289, at *4. Citing *Klaxon*, the court held that: "These
23  actions were originally filed in Kentucky, Minnesota and California. Given the
24  [Supreme Court precedent], each of those states' choice-of-law provisions will apply
25  to the claims filed in those states." *Id.* These courts are not alone. *See, e.g., In re*
26  *ConAgra*, 251 F.R.D. at 693 ("[A]ll states in which the transferor court of an
27  individual action sits are considered forum states, and an independent choice of law
28  determination is necessary for the states of all transferor courts."). This Court must

1   likewise consider all the transferred matters before it.

2        Furthermore, an overwhelming majority of scholarly articles examining *Klaxon*

3   and *Van Dusen* conclude that adherence to Supreme Court precedent results in a

4   determination that numerous states' laws apply to state-law claims within an MDL

5   with multiple transferor forum. *See, e.g.*, Larry Kramer, *Choice of Law in Complex*

6   *Litigation*, 71 N.Y.U. L. Rev. 547, 589 (1996) (arguing that choice-of-law is "an

7   integral part of parties' substantive rights" and that courts have "no [] business

8   modifying choice-of-law rules to make consolidated treatment easier."); Scott

9   Fruehwald, *Individual Justice in Mass Tort Litigation: Judge Jack B. Weinstein on*

10  *Choice of Law in Mass Tort Cases*, 31 Hofstra L. Rev. 323, 346 (2002) ("The fact that

11  several states' laws might apply, making maintenance of a class action difficult, is

12  irrelevant. Efficiency is not more important than applying the proper law."). If

13  *Klaxon* and *Van Dusen* can be avoided as easily as Plaintiffs claim, then Plaintiffs

14  have found a silver bullet that has eluded an entire generation of legal scholars.

15        Thinking about this case from a different perspective highlights the absurdity of

16  Plaintiffs' position. If this MDL had been transferred to, say, West Virginia instead of

17  California, it is ludicrous to think that a West Virginia court would entertain the

18  notion that California's choice-of-law rules should apply to all of the transferred

19  cases. Plaintiffs' gamesmanship would be viewed for what it actually is – an attempt

20  to circumvent the black letter law of the Supreme Court. The Court's duty to apply

21  the choice-of-law rules of *all* of the transferor jurisdictions does not change simply

22  because Plaintiffs have deliberately omitted certain plaintiffs from the pleadings to

23  gain a tactical advantage.

24        Finally, in order to ensure that a choice-of-law determination is made for all

25  Economic Loss cases before this Court, Toyota cross-moves seeking choice-of-law

26  determinations with respect to all Economic Loss actions in the MDL.

27  **B.**    **Under The Choice-Of-Law Rules Of Each Of The Transferor Courts,**

28        **California Law Does Not Supersede Every Other State's Laws**

1    Under a proper choice-of-law determination, the court must treat each of the
2    transferred actions as if it were a court of that jurisdiction with respect to choice-of-
3    law.   To the extent Plaintiffs seek to have California law apply, Plaintiffs are the
4    proponent of foreign law and it is their obligation to show that California law applies
5    under the applicable choice-of-law test.[18]   *See, e.g., Spence v. Glock*, 227 F.3d 308,
6    312-14, 316 (5th Cir. 2000) (reversing district court and decertifying class because
7    plaintiffs failed to present a sufficient choice-of-law analysis); *Lantz v. Am. Honda*
8    *Motor Co., Inc.*, No. 1:06-cv-5932, 2007 WL 1424614, at *6 (N.D. Ill. May 14, 2007)
9    (holding that "Plaintiffs have failed to demonstrate that California law should apply"
10   under Illinois' choice-of-law test).  In any event, as demonstrated by Toyota below, a
11   proper choice-of-law analysis conducted by each of the 41 transferor jurisdictions
12   would result in the application of the laws of 52 jurisdictions.

13        *1.*      ***This Court's Choice-Of-Law Analysis Is A Two-Step Process***

14        *Step 1*:  Identify and analyze the substance of the potentially applicable laws
15   and determine if there are material differences among the laws of the various states.
16   *See In re Digitek*, 2010 WL 2102330, at *6 (explaining steps to choice-of-law analysis
17   in MDL case involving cases transferred from four different jurisdictions and a
18   nationwide putative class).  This step involves a threshold identification of the
19   potentially applicable jurisdictions, and then an analysis of the substantive laws of
20   these jurisdictions to determine if the laws materially vary as to the claims at issue.
21   *Id.*  If no differences exist, then there is no need to conduct a choice-of-law analysis,
22   and the court can just apply a single set of laws, *i.e.*, forum law.  *Id.*  If, however, there
23   are material differences, the analysis proceeds to Step Two.  *Id.*

24        *Step 2*:  Identify the transferor jurisdictions and apply the conflict-of-law rules
25   of each of the transferor jurisdictions to determine the applicable law.  *Id.* at *9.  In
26   doing so, the court has to analyze, on a claim-by-claim basis, what law would be

27
28   [18] If Plaintiffs elect to present argument on the application of the choice-of-law rules of the transferor courts in their reply brief, Toyota will seek to respond to such arguments in a reply in support of its cross-motion.

applied to the class as to each of the alleged claims. *Id.; see also Shutts*, 472 U.S. at 821-22 (explaining that the choice-of-law analysis focuses on the claims of each member of the putative class and each claims' contacts with each of the 50 states).

### 2.   Step 1:   There Are Material Outcome-Determinative Differences Between The Various State Laws That Potentially Apply

Because Plaintiffs' nationwide class action includes Toyota customers who reside in and purchased Subject Vehicles in all 52 jurisdictions, it potentially implicates the laws of 52 jurisdictions. *See id.* at *6.[19]   Thus, in Step 1, this Court is required to evaluate the substantive laws of all 52 jurisdictions and consider if there are material differences as to Plaintiffs' claims.   Here, there are material differences.

In arguing exclusively under California's choice-of-law rules, Plaintiffs omit a full analysis and claim that they "need not demonstrate the absence of conflicts of law; the burden is on Toyota." (Pls. Br. at 23).   Plaintiffs are wrong.[20]   Regardless, Toyota undertakes the analysis below and attaches appendices, *see* Dawson Decl. at Exs. D, E, F, G, H, I, and J, which survey the various states' law and address additional material variations relevant to each claim asserted by Plaintiffs.

### a.   Class Members' Claims, Absent A Manifested Defect, Would Be Rejected In Many Jurisdictions

The first material difference in the substantive laws of the states is apparent and could not be more outcome-determinative.   The vast majority of Plaintiffs' putative class consists of Toyota owners and lessees from across the country who have never experienced any malfunction and continue to drive their vehicles.   Under the laws of

---

[19] This is an initial threshold observation in the choice-of-law analysis and is evident simply from the fact that the putative class consists of consumers residing in each U.S. jurisdiction, where they were exposed to advertising, purchased or leased their Subject Vehicles, and allegedly suffered their economic losses.   *See, e.g., In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 369 (E.D. La. 1997).

[20] Plaintiffs' explicit refusal to address variations in laws on their claims is particularly troublesome given that courts typically require plaintiffs, as the class-action proponent, to accompany a motion for certification of a nationwide class with a comprehensive survey of the laws of the potentially applicable jurisdictions, when they consider choice-of-law at that stage. *See In re Digitek*, 2010 WL 2102330, at *7.

22

1   many states, the consumer fraud and warranty claims of such individuals would be
2   dismissed for lack of injury. It is difficult to envision a more material distinction.

3       In a prior order, this Court discussed several cases that dismissed similar
4   economic loss claims involving no manifestation of a defect where the plaintiffs
5   sought recovery for alleged diminished value resulting from an allegedly undisclosed
6   defect. *See* MTD Order, Dkt. 510, at 17-18. In dismissing consumer fraud and
7   warranty claims under state law, those courts rejected the very "benefit-of-the-
8   bargain" argument Plaintiffs propound here. *See, e.g., Briehl v. Gen. Motors Corp.*,
9   172 F.3d 623 (8th Cir. 1999) (Mississippi, New York, Pennsylvania and Texas law);
10  *Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 157-59 (Ark. 2005) (Arkansas law);
11  *Ziegelmann v. DaimlerChrysler Corp.*, 649 N.W.2d 556, 560-65 (N.D. 2002)
12  (North Dakota law); *see also Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 123-
13  25 (N.Y. App. Div. 2002) (New York law); *Carlson v. Gen. Motors Corp.*, 883 F.2d
14  287, 297 (4th Cir. 1989) (South Carolina law). Thus, the claims of Plaintiffs such as
15  Alexander Farrugia of New York, Richard Swalm of South Carolina, and many others
16  like them, would be dismissed if the applicable law is that of the state where they
17  purchased their vehicles or where they reside because they (and a large segment of the
18  putative class) have no legally cognizable damages under those laws.

19      Other courts have recognized the significance of this material difference in the
20  law. In the MDL case of *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
21  288 F.3d 1012 (7th Cir. 2002), the Seventh Circuit reversed the district court's
22  certification of a nationwide class of buyers and lessees of Ford Explorers equipped
23  with tires that had an abnormal failure rate. Like here, the class brought *consumer*
24  *fraud and warranty claims* and sought recovery for diminished value caused by the
25  claimed defect. *Id.* at 1014-1015. Judge Easterbrook recognized that the class
26  members who had not experienced any problems with their vehicles would appear to
27  lack any cognizable injury to recover under the laws of a majority of states:

28      No injury, no tort, is an ingredient of every state's law. . . . Plaintiffs

1    describe the injury as financial rather than physical and seek to move the
2    suit out of the tort domain and into that of contract (the vehicle was not
3    the flawless one described and thus is not merchantable, a warranty
4    theory) and consumer fraud (on the theory that selling products with
5    undisclosed attributes, and thus worth less than represented, is
6    fraudulent). It is not clear that this maneuver actually moves the locus
7    from tort to contract. If tort law fully compensates those who are
8    physically injured, then any recoveries by those whose products function
9    properly mean excess compensation. *As a result, most states would not*
10   *entertain the sort of theory that plaintiffs press.*

11   *Id.* at 1017 (citing cases including *Briehl*) (emphasis added).

12   Similarly, the Fifth Circuit in *Cole v. General Motors Corp.*, 484 F.3d 717 (5th
13   Cir. 2007), reversed class certification in an economic loss automobile defect case
14   because plaintiffs' nationwide class included those who sought recovery for
15   unmanifested defects. Plaintiffs "did not address variations in state law regarding
16   recovery for an unmanifested product defect. The vast majority of the members of
17   this class never experienced any manifestation of the alleged defect. But many
18   jurisdictions do not permit the recovery of economic loss in vehicle defect cases
19   where the vehicle has performed satisfactorily and has never manifested the alleged
20   defect." *Id.* at 728-29. Just like in this case:

21   Plaintiffs attempt to sidestep this glaring obstacle by distinguishing their
22   claim as one brought under a contract theory (for breach of warranty)
23   instead of products liability. This maneuver does not escape the reality
24   that some jurisdictions require that the alleged defect manifest itself
25   regardless of whether the claim is brought under contract or tort.

26   *Id.* at 729 (citing *Briehl*, 172 F.3d at 628).

27   Similarly, plaintiffs in *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998),
28   brought a nationwide putative class action alleging fraud and warranty claims and

24

1   seeking economic loss damages for all owners and lessees of certain 1989 to 1993
2   Chrysler automobiles equipped with an anti-lock brake system that plaintiffs alleged
3   was defective because of a seal leak that could lead to eventual failure of the braking
4   system. *Id.* at 451. In addressing choice-of-law in the context of class certification
5   (and ultimately denying the motion), the court recognized that "there are substantial
6   variations in state law concerning the claims of those Plaintiffs who have not suffered
7   any problems with their ABS systems." *Id.* at 460. The Court referred to such
8   variations as "important" because "[i]n most jurisdictions, the courts recognize that
9   unless a product actually manifests the alleged defect, no cause of action for breach of
10  express or implied warranty or fraud is actionable." *Id.* This is the state of the law
11  and Toyota has prepared a survey of the 52 jurisdictions on this issue: the
12  Manifestation of a Defect State Law Variations Chart. (Dawson Decl. at Ex. D).

13      Plaintiffs cannot ignore these material variations highlighted in analogous
14  economic loss/diminished value automobile defect cases, including several federal
15  circuit court opinions, that summarily reject consumer fraud and warranty claims
16  where the vehicles have operated free of defect.

17          **b.**   **Many Jurisdictions Would Dismiss Claims For Breach**
18                    **Of Implied Warranty For Lack Of Privity**

19      Another material, outcome-determinative variation concerns vertical privity,
20  which is still recognized by some states on implied warranty claims. The vast
21  majority of Plaintiffs and class members indisputably obtained their Subject Vehicles
22  from independent dealerships. In several states, these Plaintiffs would possess no
23  claim for breach of implied warranty given a lack of vertical privity with Toyota.

24      Although California is among the jurisdictions that still adhere to the privity
25  rule, this Court permitted Plaintiffs' claim for breach of implied warranty under
26  California law to survive a motion to dismiss based on a third-party beneficiary
27  exception. (*See* MTD Order at 64-69). Although not apparent from prior cases
28  applying California law, other states have adopted such a theory. (Dawson Decl. at

Ex. G (discussing variations in state implied warranty laws)). In material contrast, under the law of several states such as Arizona, Connecticut, Florida, Idaho, Iowa, Kansas, Kentucky, New York, North Carolina, Ohio, Oregon, Vermont, and Wisconsin, there is no recognized third-party beneficiary status and Plaintiffs' implied warranty claims would be dismissed for lack of privity. (Dawson Decl. at Ex. G).

Courts considering nationwide class actions involving claims for breach of implied warranty routinely point to the privity rule as a material variation in the laws of the various states. For example, the Fifth Circuit in *Cole*, in reversing class certification, criticized Plaintiffs for "fail[ing] to 'extensively analyze' the variations in the law of the fifty-one jurisdictions concerning the requirement of privity of contract," just as they had failed to analyze the manifestation issue. 484 F.3d at 727. The court then explained that "[t]here is a 'sharp split of authority' as to whether a purchaser may recover economic loss from a remote manufacturer when there is no privity of contract between the parties. . . . The requirement of privity is more strictly enforced in claims involving implied warranties than those involving express warranties." *Id.* at 727-28. "[A] significant number of jurisdictions require vertical privity in an implied warranty action for direct economic loss." *Id.* at 728.

Courts in other analogous economic loss automobile defect cases have routinely reached similar conclusions, finding material variations in state privity rules. *See, e.g., Chin*, 182 F.R.D. at 460; *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 369 (E.D. La. 1997); *In re Ford Ignition Switch*, 174 F.R.D. at 346; *Osborne v. Subaru of Am., Inc.*, 198 Cal. App. 3d 646, 656, 243 Cal. Rptr. 815 (1988); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 605 & n.13 (S.D.N.Y. 1982); *see also Powers v. Lycoming Engines*, Nos. 2:06-cv-2993, 2:06-cv-4228, 2011 WL 504786, at *13 (E.D. Pa. Feb. 9, 2011); *In re Hitachi Television Optical Block Cases*, No. 3:08-cv-1746, 2011 WL 9403, at *6 (S.D. Cal. Jan. 3, 2011); *True v. ConAgra Foods, Inc.*, No. 4:07-cv-770, 2011 WL 176037, at *9 (W.D. Mo. Jan. 4, 2011); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 161

1    (S.D.N.Y. 2008); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 214 (D. Minn. 2003).

2         Again, this potentially outcome determinative variation in state law underscores

3    the material differences that would result via application of all the jurisdictions' laws.

4         **c.    There Are Material Variations In The Consumer**

5              **Protection Laws Of The Various States**

6         "State consumer-protection laws vary considerably, and courts must respect

7    these differences rather than apply one state's law to sales in other states with different

8    rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018 (citing *Gore*, 517 U.S. at

9    568-73).   To illustrate those differences, Toyota attaches the Consumer Protection

10   State Law Variations Chart (Dawson Decl. at Ex. E), a detailed chart of the consumer

11   protection laws of the various states.   Material variations among the states include:

12   (1) whether actual reliance is required or whether it can be presumed (some states may

13   presume reliance, but many other states do not) (*see* Dawson Decl. at Ex. E), (2)

14   whether a class action may be brought under the consumer protection statutes (*see*

15   *id.*), (3) the length of the statutes of limitation and the determination of when a claim

16   accrues and tolling provisions (statute periods range from 1 to 6 years with different

17   accrual and tolling rules) (*see id.*),[21] (4) whether proof of scienter is required for a

18   violation (while scienter is not required for a UCL, FAL, or CLRA claim, the

19   consumer protection statutes of most states do require some form of scienter, whether

20   knowledge, intent or willfulness) (*see id.*), (5) whether pre-suit notice is required (*see*

21   *id.*),[22] and (6) variations as to the available remedies, including whether punitive

22   damages are permitted (some states prohibit punitive damages under their consumer

23   protection statutes, while other states, including California, permit them in amounts

24   within the discretion of the fact-finder, or according to multipliers) (*see id.*).

25   ────────────────

26   [21] The California CLRA and FAL have 3-year statutes of limitations and the UCL has a 4-year statute.   This is a material difference, given that the application of California law would prevent the timely claims of some, and revive time-barred claims of others.

27   [22] California requires that consumers provide 30 days pre-suit notice for damages actions under the CLRA.   Cal. Civil Code § 1782.   Although some states likewise

28   require that notice be provided prior to filing suit, other jurisdictions do not. (Dawson Decl. at Ex. E (showing states' pre-suit notice requirements)).

1    Courts have routinely and without any difficulty recognized that the consumer

2    protection statutes vary in material ways. *See, e.g.*, *In re Hitachi*, 2011 WL 9403, at

3    *6 ("[T]here are material conflicts between California's consumer protection laws and

4    the consumer protection laws of the other forty-nine states."); *In re HP Ink Jet Printer*

5    *Litig.*, No. 5:05-cv-3580, 2008 WL 2949265, at *7 (N.D. Cal. Jul. 25, 2008) (denying

6    certification of nationwide class and explaining variations in state consumer protection

7    laws make class unmanageable); *In re Grand Theft Auto*, 251 F.R.D. at 147; *Siegel v.*

8    *Shell Oil Co.*, 256 F.R.D. 580, 583-85 (N.D. Ill. 2008), *aff'd*, 612 F.3d 932 (7th Cir.

9    2010); *In re Prempro*, 230 F.R.D. 555, 564 (E.D. Ark. 2005); *In re St. Jude Med.,*

10   *Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005); *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d

11   349, 352-55 (Tex. App. 2003); *In re Rezulin*, 210 F.R.D. at 71; *Lyon v. Caterpillar,*

12   *Inc.*, 194 F.R.D. 206, 219-221 (E.D. Pa. 2000); *Osborne*, 198 Cal. App. 3d at 662-64.

13   *See also Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, No. 8:07-cv-1306,

14   2008 WL 4906433, at *2 (C.D. Cal. Nov. 13, 2008) (Selna, J.) (concluding that there

15   are material conflicts between California law and other states as to fraud law and

16   pointing to the differences in scienter for fraud).   It is beyond dispute that the

17   consumer protection statutes differ in material ways.[23]

18          d.      **There Are Material Variations In The Warranty Laws**

19                  **Of The Various States**

20          There are also material differences among the states with respect to the question

21   of whether reliance is required for a claim of breach of express warranty. *See In re*

22   *Hitachi*, 2011 WL 9403, at *6 (explaining that there are at least three approaches to

23   the question of reliance for express warranty claims including jurisdictions that do not

24   require it, jurisdictions that require specific reliance, and jurisdictions that hold that a

25   seller's affirmations and promises create a rebuttable presumption of reliance); *see*

26   _____

27   [23] Toyota additionally notes that a small minority of jurisdictions apply the economic loss doctrine, usually reserved for claims in the nature of negligence and strict liability, to all tort claims even those sounding in fraud.  In those jurisdictions, no

28   fraud or consumer fraud claims could be asserted for the purely economic loss alleged in this case.  (Dawson Decl. at Ex. H).

*also In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 319-21 (S.D. Ill. 2007); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016-17 (D.C. Cir. 1986) (rejecting plaintiffs' argument that differences in states' warranty laws are not material and explaining that "The Uniform Commercial Code is not uniform"). (*See also* Dawson Decl. at Ex. F (outlining variations in state express warranty laws)).

**e.** **Plaintiffs Have Alleged Claims In The Alternative Under Other States' Laws That Do Not Exist In California**

Additional examples of material variations are tacitly conceded in the alternative claims alleged in Plaintiffs' Second Amended Class Action Complaint. For example, Plaintiffs allege negligence and strict liability claims under the laws of Arkansas, SAMCC ¶¶ 635, 651, Illinois, SAMCC ¶¶ 1550, 1161, Louisiana, SAMCC ¶¶ 1430, 1452, Maryland, SAMCC ¶¶ 1552, 1560, 1571, 1578, Minnesota, SAMCC ¶¶ 1700, 1708, Mississippi, SAMCC ¶¶ 1719, 1734, and Ohio, SAMCC ¶ 2293. Plaintiffs apparently hold that the economic loss doctrine will not bar negligence or strict liability claims in those states, thus highlighting another material difference.

Additionally, while this Court has dismissed Plaintiffs' unjust enrichment claims under California law, courts have recognized that unjust enrichment law varies significantly among the states. *See Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 532-33 (N.D. Ill. 2008) (holding that differences in state law on unjust enrichment precluded certification of nationwide class); *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 625-26 (D. Kan. 2008); *In re Prempro*, 230 F.R.D. 555, 563 (E.D. Ark. 2005); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500-02 (S.D. Ill. 1999). (*See* Dawson Decl. at Ex. I (outlining variations in state unjust enrichment laws)).

**f.** **These Differences Cannot Be Ignored Simply For The Sake Of Ease And Efficiency**

Plaintiffs have shirked their responsibility to address any of these variations in the law, preferring only to cite to four California district court decisions where the

1    courts conducted incomplete analyses, apparently because the defendants in those
2    cases failed to proffer a sufficient showing of material differences in the laws. (*See*
3    Pls. Br. at 23-25).[24]   It is hardly a convincing foundation for Plaintiffs' assertion.
4    First, none of those four cases address the manifestation issue or the privity rule,
5    which no doubt constitute material, outcome-determinative differences of law in this
6    case.   Second, the only language from these cases that Plaintiffs quote to support a
7    lack of material difference in the consumer protection laws is the dubious and
8    incomplete statement from *Mazza* (re-quoted in *Keilholtz*) that "a CLRA violation,
9    which serves as a predicate to a UCL violation under the UCL's 'unlawful' prong,
10   provides for each of the remedies that Defendant contends would be unavailable with
11   the application of California law to a nationwide class." *Mazza*, 254 F.R.D. at 622.
12   Certainly, any reasoning in *Mazza* (then repeated and relied upon in *Keilholtz*) about
13   what remedies are provided under the California CLRA says nothing about the fact
14   that certain claims would not exist under the laws of many states.[25]

15        A searching analysis of the law does not allow for a conclusion either that the
16   state laws in question contain no material difference or that they can be blithely
17   overcome by sprinkling California's CLRA/UCL over them.   Such an analysis would
18   be against the great weight of authority—especially from jurisdictions outside of
19   California—the very transferor jurisdictions that an MDL court is bound to consider.

20        While it may be desirable, for the sake of efficiency, to settle upon one

21        state-like Michigan or New Jersey-and apply its law in lieu of the other

22        49 jurisdictions, due process requires individual consideration of the

---

24   [24] The cases are *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008);
     *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330 (N.D. Cal. 2010); *Menagerie*
25   *Prods. v. Citysearch*, No. 2:08-cv-4263, 2009 WL 3770668 (C.D. Cal. Nov. 9, 2008);
     and *Estrella v. Freedom Fin. Network, LLC*, No. 3:09-cv-3156, 2010 WL 2231790
26   (N.D. Cal. Jun. 2, 2010).
     [25] Additionally, none of these cases Plaintiffs rely on are MDL cases, and therefore,
27   even if they were on point and persuasive, they exclusively address California's test.
     *Menagerie* and *Estrella* are further distinguishable because both cases involved
28   defendants who were arguing against applying California law in the face of their own
     contracts with plaintiffs containing choice-of-law clauses selecting California law.

choice of law issues raised by each class member's case before certification. Since the laws of each of the fifty states vary on important issues that are relevant to plaintiffs' causes of action and defendants' defenses, the court cannot conclude that there would be no conflict in applying the law of a single jurisdiction, whether it be Michigan, or New Jersey, as the plaintiffs suggest.

*In re Ford Ignition Switch,* 174 F.R.D. at 348.

Quoting Justice Holmes, Judge Posner observed that "'[t]he common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified.' The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch." *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1301 (7th Cir. 1995), (quoting *S. Pac. Co., v. Jensen,* 244 U.S. 205, 222, 37 S. Ct. 524, 531, 61 L. Ed. 1086 (1917) (Holmes, J., dissenting). Legal "nuance can be important," as Judge Posner ultimately concluded, because it "could make a big difference in . . . liability." *Id.* at 1300-02. It is the differences in how the laws are applied and interpreted by each state. Plaintiffs cannot brush aside these material, outcome-determinative differences simply by suggesting that the elements of a particular claim are the same across multiple jurisdictions. As Judge Posner put it, absent observing those differences "one begins to wonder why this country bothers with different state legal systems." *Id.* at 1301.[26] Courts are not free to disrespect the sovereignty of the several states by ignoring or subsuming their laws when they complicate a private class action analysis.

Because there are material differences in the potentially applicable laws, this Court proceeds to Step Two in its choice-of-law analysis.

### 3. Step 2: Under The Choice-of-Law Frameworks Of The 41

---

[26] *See also In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.,* 241 F.R.D. 305, 322 (S.D. Ill. 2007) ("[I]t is not this Court's prerogative to elide important differences in the laws of the several states in order to speed the progress of a case to class certification."); *Chin,* 182 F.R.D. at 457 (refusing to ignore material differences in the laws and simply settle upon one state "for the sake of efficiency").

LEGAL02/32550530v1    TOYOTA'S BRIEF REGARDING CHOICE OF LAW

*Transferor Jurisdictions, The Law Of All 52 Jurisdictions Apply*

In Step Two, this Court identifies the transferor jurisdictions and then applies the conflict-of-law rules of each of those transferor jurisdictions to determine the applicable law.  This analysis focuses on each member of the putative class' claims and contacts with the relevant states under the transferor courts' choice-of-law rules. *See In re Digitek*, 2010 WL 2102330, at *6-9; *see also Shutts*, 472 U.S. at 821-22. Though it is Plaintiffs' burden to provide this "extensive" analysis, *see, e.g., Spence*, 227 F.3d at 312-13, Toyota has attached a Choice-of-Law Rules Chart, which analyzes the choice-of-law rules applied in each of the 41 transferor jurisdictions. (Dawson Decl. at Ex. B).   The Choice-of-Law Rules Chart demonstrates that California law would not be applied in every transferor court – instead the laws of all 52 jurisdictions will be applied.

Given space limitations, to properly analyze, and yet still remain faithful to the law, the transferor jurisdictions are discussed in groups based on the choice-of-law methodology used by the particular jurisdiction.  Toyota's groupings are meant to assist the Court with its analysis and provide the analytical framework for the rules detailed in the Choice-of-Law Rules Chart. (Dawson Decl. at Ex. B).

The 41 transferor jurisdictions can generally be classified into one of three categories: The first category is made up of jurisdictions that apply the traditional *lex loci* tests of the Restatement (First) of Conflict of Laws.  The second category of jurisdictions applies a variation of the "most significant relationship" test of the Restatement (Second) of Conflict of Laws.  The third category includes all remaining jurisdictions, which apply one of several other approaches including *lex fori*, the "Leflar Factors," and variations of interest analysis.

a.   **The Transferor Jurisdictions That Use The *Lex Loci* Tests Will Apply The Law Of 52 Jurisdictions**

The choice-of-law analysis is straightforward, and the result is certain for the transferor jurisdictions that apply the traditional *lex loci* choice-of-law test: *These*

32

1    *transferor courts will apply the laws of all 52 jurisdictions.* (Dawson Decl. at Ex. B

2    (detailing the specific choice-of-law factors to be applied in each *lex loci* jurisdiction

3    and demonstrating that Court should apply law of all 52 U.S. jurisdictions)).

4         Under *lex loci delicti*, or "the law of the place of the tort," *In re ConAgra*, 251

5    F.R.D. at 695, the applicable law to be applied is that of "the state where the last event

6    necessary to make an actor liable for an alleged tort takes place," Restatement (First)

7    of Conflict of Laws § 377. In the vast majority of cases, the applicable law is the

8    jurisdiction of the plaintiff's injury. *See, e.g.*, *In re ConAgra*, 251 F.R.D. at 695

9    ("Under [*lex loci delicti*], the place of the tort is generally the place where the injury

10   was suffered."); *State ex rel. Chemtall Inc. v. Madden*, 607 S.E.2d 772, 779-80 (W.V.

11   2004) (applying *lex loci delicti* and concluding that the laws of the states where

12   plaintiffs were allegedly exposed to toxic substance applied).

13        Strikingly similar cases make clear that in an economic loss case premised on

14   the purchase of an allegedly defective product, the place of the tort is the jurisdiction

15   where a plaintiff purchases or resells the allegedly defective product. For example, in

16   *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1020, owners of allegedly defective tires

17   and automobiles filed nationwide class actions against the manufacturers; the owners

18   sought to recover purely economic loss based on "the *risk* of failure, which may be

19   reflected in diminished resale value of the vehicles and perhaps in mental stress." *Id.*

20   at 1015. The MDL judge applied Indiana's choice-of-law rules and concluded that the

21   defendants' conduct and their principal places of business dictated the application of

22   Tennessee and Michigan law and certified nationwide classes. *Id.* On appeal to the

23   Seventh Circuit, Judge Easterbrook criticized the district court's result-oriented

24   analysis, pointing out that "Indiana is a *lex loci delicti* state: in all but exceptional

25   cases it applies the law of the place where harm occurred." *Id.* at 1016 ("The *lex loci*

26   *delicti* principle points to the places of . . . injur[y], not the defendants' corporate

27   headquarters, as the source of law."). Noting that the classes included "only those

28   consumers whose loss (if any) [was] financial rather than physical," the Seventh

1   Circuit concluded that any financial loss "was suffered in the places where the
2   vehicles and tires were purchased at excessive prices or resold at depressed prices."
3   *Id.*   As a result, because "th[e] injuries occurred in all 50 states, the District of
4   Columbia, Puerto Rico, and U.S. territories such as Guam," the Seventh Circuit
5   reversed the MDL judge's decision, and decertified the classes. *Id.* at 1016, 1021.[27]

6       In contract actions, transferor jurisdictions adhering to the traditional approach
7   apply *lex loci contractus*, or the law of the place "where the contract was executed."
8   *See, e.g., David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1315-17 (S.D. Fla.
9   2009) (applying under *lex loci contractus* the law of the state where plaintiffs
10  purchased the allegedly defective motorcycles, and rejecting plaintiffs' request to
11  apply California law because defendant's headquarters was in California); *see also
12  Jiffy Lube*, 250 F.R.D. at 627 (noting that "insofar as contractual disputes are
13  concerned, Kansas courts have traditionally applied the doctrine of *lex loci contractus*
14  (the law of the place where the contract was made)"). Thus, claims sounding in
15  contract are equally governed by the law of the place of purchase.

16      In each and every one of the 52 U.S. jurisdictions, there are numerous potential
17  class members who purchased their vehicles in that state, reside in that state, and
18  allegedly suffered their economic injuries in that state.[28] (Dawson Decl. at Ex. A).
19  Accordingly, for each of the cases transferred from jurisdictions applying
20  *lex loc delicti* for tort-based claims and *lex loci contractus* for contract-based claims,
21  the Court should apply the law of all 52 jurisdictions.[29]

---

[27] Because Indiana applies *lex loci delicti* unless it "bears little connection to the legal action" or is an "insignificant contact," *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073-74 (Ind. 1987), Indiana is considered a "modified" *lex loci delicti* jurisdiction. Nevertheless, given Plaintiffs' purely economic loss claims, it is clear that *lex loci deliciti* would apply. *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1016.
[28] *See generally Kakani v. Oracle Corp.*, No. 3:06-cv-6493, 2007 WL 1793774, at *8 (N.D. Cal. June 19, 2007) ("As to *each* absent class member, a choice-of-law analysis must be done.").
[29] Ten transferor courts would apply *lex loci delicti* to Plaintiffs' tort-based claims and nine would apply *lex loci contractus* to Plaintiffs' contract-based claims. (Dawson Decl. at Ex. B (detailing the choice-of-law tests for each transferor court and listing the transferred cases from each jurisdiction)). There are a total of 32 economic loss class action cases in the MDL transferred from these jurisdictions. (*Id.*).

34

b.    **The Transferor Jurisdictions That Use Some Variation Of The "Most Significant Relationship" Test Will Apply The Law Of 52 Jurisdictions**

Several transferor courts apply some variation of the Restatement (Second) of Conflict of Law's "most significant relationship" test for the claims asserted in this case.[30]    These jurisdictions apply specific presumptions and weigh various considerations to determine which state has the "most significant relationship" or the most "intimate" or "significant" contacts.   While this analysis differs from the traditional *lex loci* analysis, the result is the same: *These transferor courts will apply the laws of all 52 jurisdictions.* (Dawson Decl. at Ex. B).[31]

Determining which state has the most significant relationship begins with applying specific presumptions to each particular cause of action. *In re Grand Theft Auto*, 251 F.R.D. at 151; *see also Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 922 (Ill. 2007) ("[A] court should begin a choice-of-law analysis by ascertaining whether a specific presumptive rule applies to the conflict."). Unless "some other state has a more significant relationship," these presumptions dictate the jurisdiction with the most significant relationship. *In re Grand Theft Auto*, 251 F.R.D. at 151.

For tort-based claims, courts generally presume that the law of the place of injury will apply, except where the place of injury is "fortuitous or bears little relation to the occurrence and the particular issue," which "cannot be said to be true" in an economic loss case, where the place of injury is the place of purchase. *Spence*, 227 F.3d at 315 (citing Second Restatement § 145 cmt. e); *see also True v. ConAgra Foods, Inc.*, No. 4:07-cv-770, 2011 WL 176037, at *8 (W.D. Mo. Jan. 4, 2011) (holding that because consumer class plaintiffs failed to defeat presumption, law

---

[30] Fifteen transferor jurisdictions would apply a variation of the Second Restatement's test to all of Plaintiffs' claims.  In addition, 4 jurisdictions would follow the approach for Plaintiffs' tort claims, and 8 for their contract claims.  (Dawson Decl. at Ex. B) (chart discussing and analyzing each jurisdiction).  There are 96 economic loss class action cases in the MDL transferred from these jurisdictions.  (*Id.*).
[31] The Second Restatement's "most significant relationship" test is a paradigm for these jurisdictional approaches.

1   where each member resides and purchased products would apply).

2       For fraud-based claims, which generally sound in tort, a presumption applies in

3   favor of the state where "a prospective plaintiff acted in reliance on a defendant's

4   fraud." *Agostino v. Quest Diagnostics*, 256 F.R.D. 437, 462-63 (D.N.J. 2009); *see

5   also In re Grand Theft Auto*, 251 F.R.D. at 151 (noting that if alleged

6   misrepresentations of the defendant were "received and relied upon" in the same state,

7   that state's substantive law is presumed to apply per Second Restatement § 148(1)).[32]

8       The presumption for fraud-based claims focuses on the plaintiff's location:

9   "[t]he domicil, residence and place of business of the *plaintiff* are more important than

10  the similar contacts on the part of the defendant." Second Restatement § 148 cmt. i

11  (emphasis added). This principle is widely recognized by the jurisdictions applying

12  the most significant relationship test. *E.g., In re Pharm. Indus. Average Wholesale

13  Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) ("[W]hile it is tempting to apply the

14  consumer protection laws of the states where defendants have their principal places of

15  business to promote uniform results and the ease of managing a class, under the

16  [Second] Restatement, the laws of the home states of the consumers govern."); *see

17  also Clark v. Experian Info. Solutions, Inc.*, No. 1:03-cv-7882, 2005 WL 1027125, at

18  *5 & n.7 (N.D. Ill. Apr. 26, 2005) (holding that law of plaintiff's residence applied

19  rather than law of California, the location of defendants' principal places of business,

20  and explaining that under Second Restatement, "[t]he plaintiff's domicil or residence,

21  if he is a natural person . . . are contacts of substantial significance when the loss is

22  pecuniary in its nature").

23      Lastly, for contract-based claims, if the place of negotiation and the place of

24  performance occur in the same jurisdiction, that jurisdiction's laws presumptively

25  apply. *In re Grand Theft Auto*, 251 F.R.D. at 151 (applying law where each member

26

27  [32] The Second Restatement provides a presumption that the law where the false representation was made, received, and relied upon will apply. Restatement (Second) of Conflicts § 148(1). However, as shown above, courts applying the Second

28  Restatement do not require that all three acts occur in the same state for the presumption to apply.

36

1  purchased explicit video game under Illinois' Second Restatement approach because

2  "the state of purchase . . . is the situs of the contracting, negotiation, and performance

3  of the sales contract") (citing Second Restatement § 188(3) ("If the place of

4  negotiating the contract and the place of performance are in the same state, the local

5  law of this state will usually be applied")).

6      These presumptions reveal the tentative jurisdiction with the most significant

7  relationship for each claim by each plaintiff. Here, all of these presumptions point to

8  the laws of the U.S. jurisdictions where the class members reside and where the

9  vehicles were purchased, and not to the application of California law to the entire

10  nationwide class. As to Plaintiffs' consumer protection and fraud claims, Plaintiffs

11  purchased (and resold) their vehicles in all 52 U.S. jurisdictions and likewise received

12  and relied upon the allegedly fraudulent representations in all 52 U.S. jurisdictions.

13  (*See, e.g.*, Dawson Decl. at Exs. A, LL.1-76). Every named Plaintiff who provided

14  choice-of-law stipulations admit that any alleged economic loss was suffered in their

15  state of residence. *Id.* Regarding Plaintiffs' warranty claims, any negotiations took

16  place when Plaintiffs purchased their vehicles at local dealerships in all 52 U.S.

17  jurisdictions. *Id.* Warranty service is also performed at these dealerships. *See* Lang

18  Decl. at Ex. A (example of Toyota's warranties). *Under this test, there is a clear and*

19  *unmistakable presumption that the law of all 52 jurisdictions will apply.*

20      This result governs unless "some other state has a more significant relationship

21  to the occurrence and the parties, with respect to the particular issue in question." *In*

22  *re Grand Theft Auto*, 251 F.R.D. at 151 (citing Second Restatement § 148(1)); *see*

23  *also* Second Restatement §§ 145, 188(3). To determine whether some other state has

24  a more significant relationship, two additional steps are necessary. First, for each

25  particular claim, the court must weigh separately enumerated factors to determine

26  which other jurisdictions have relevant contacts and therefore must be considered.

27  *See In re Digitek*, 2010 WL 2102330, at *9; Second Restatement §§ 145(2)(a)-(d),

28  148(2)(a)-(f), 188(2)(a)-(e) (specifying the contacts applicable to tort, fraud, and

1   contract actions, respectively). Second, after identifying these jurisdictions, the court

2   must then look to (1) the forum state's statutory directive on choice-of-law, or (2) in

3   the absence of a statute, seven general choice-of-law principles,[33] and determine

4   whether these factors rebut the initial presumption. *See In re OnStar Contract Litig.*,

5   No. 2:07-md-1867, 2010 WL 3516691, at *9-10 (E.D. Mich. Aug. 25, 2010).

6        For tort-based claims, four factors are considered to determine the jurisdictions

7   with relevant contacts: (1) "where the injury occurred," (2) "where the injury-causing

8   conduct occurred," (3) "the domicile of the parties," and (4) "where the relationship of

9   the parties is centered." *Lantz*, 2007 WL 1424614, at *4 (quoting *Tanner v. Jupiter*

10   *Realty Corp.*, 433 F.3d 913, 916 (7th Cir. 2006)).

11        Similar factors are considered for fraud and misrepresentation claims: (1) "the

12   place, or places, where the plaintiff acted in reliance upon the defendant's

13   representations," (2) "the place where the plaintiff received the representations," (3)

14   "the place where the defendant made the representations," (4) "the domicile,

15   residence, nationality, place of incorporation and place of business of the parties," (5)

16   "the place where a tangible thing which is the subject of the transaction between the

17   parties was situated at the time," and (6), "the place where the plaintiff is to render

18   performance under a contract which he has been induced to enter by the false

19   representations of the defendant." Restatement (Second) § 148(2)(a)-(f).

20        Lastly, for contract-based claims, five contacts are relevant: (1) "place of the

21   contracting," (2) "place of negotiation of the contract," (3) "place of performance," (4)

22   "location of the subject matter of the contract," and (5) "domicile, residence,

23   nationality, place of incorporation and place of business of the parties."[34]  Second

24

25   [33] These principles include the needs of the interstate and international systems, the
forum's relevant policies, the relevant policies and interests of other states, the

26   protection of expectations, the policies of the particular field of law, certainty,
predictability, and uniformity of result, and ease in the determination and application

27   of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2)(a)-(g).
[34] For contract claims, these five contacts are only relevant in the absence of a choice-

28   of-law agreement by the parties, which governs if effective.  *See* Second Restatement
§§ 188(2), 187.  Of course, no choice-of-law provision dictates only California law.
In fact, certain Plaintiffs' purchase agreements invoke the application of another

1   Restatement § 188(2)(a)-(e); *see also Sky Techs. Partners, LLC v. Midwest Research*

2   *Inst.*, 125 F. Supp. 2d 286, 294 (S.D. Ohio 2000).

3        Rather than pointing to a more significant relationship, the claim-specific

4   contacts set out in sections 145(2)(a)-(d), 148(2)(a)-(f), and 188(2)(a)-(e) of the

5   Second Restatement *confirm the presumption that the law of all 52 jurisdictions must*

6   *be applied*. As courts have consistently recognized, the needs of the interstate and

7   international systems, *i.e.* interstate comity, "clearly favor the application of the law of

8   each prospective class member's state of residence." *Agostino*, 256 F.R.D. at 463.

9   Because every jurisdiction "has a significant interest in protecting its consumers . . .

10  and in delineating the scope of recovery for its own citizens under its own laws," the

11  policies and interests of the relevant jurisdictions likewise dictate the application of

12  the law of all 52 U.S. jurisdictions. *See In re OnStar*, 2010 WL 3516691, at *10.

13       The protection of justified expectations requires the same result. Multiple

14  named Plaintiffs brought underlying claims that asserted the law of their state of

15  residence. (*See, e.g.*, Dawson Decl. at Ex. CC, 81:1-83:7; *see also* Dawson Decl. at

16  Ex. A). The warranty booklets provided to each class member informed them that

17  their legal rights under the warranty would be governed by their own state's laws.

18  (Lang Decl. at Exs. A, B). A number of the named Plaintiffs testified that they were

19  unaware that Toyota had *any* presence in California when they purchased their

20  vehicles. (Dawson Decl. at Ex. FF, 181:16-182:7; Ex. DD, 95:8-95:13). The vast

21  majority of Plaintiffs signed purchase, lease, and/or finance agreements with choice-

22  of-law provisions stating that the contract is governed by the law of the plaintiff's

23  state of residence. (Dawson Decl. at Exs. A, NN). Thus, Plaintiffs' own expectations

24  confirm the presumption that the law of all 52 jurisdictions must be applied.

25       In other nationwide class actions involving claims of economic loss premised

26  on the purchase of an allegedly defective product, courts using the Second

27  Restatement's most significant relationship test have stated that a defendant's

28

state's law. (*See, e.g.*, Dawson Decl. at Ex. NN, PNSKE-FRRGA-00000044-45).

1   principal place of business location does not outweigh the claim-specific presumptions

2   that would apply the laws where the products were purchased and plaintiffs reside.

3       For example, in *Barbara's Sales, Inc.*, a nationwide class of Intel "Pentium 4"

4   purchasers asserted consumer fraud claims. Applying the Second Restatement test,

5   the appellate court determined that California law should apply based on California

6   being the location of the defendant's headquarters, its corporate marketing groups, its

7   billion-dollar advertising campaigns, and where the product was designed and tested.

8   879 N.E.2d at 914-15, 917. On appeal, the Illinois Supreme Court criticized the lower

9   court's concern for "one forum with one result," stating that "[t]his declaration

10   completely ignores the distinct interests of the differing states embodied in our

11   federalist system and constitutional precedent." *Id.* at 921-22. Instead, the court

12   emphasized the presumptions of the Second Restatement and reversed. *Id.* at 920-25.

13   "[W]hen a plaintiff purchases goods in the plaintiff's home state based on

14   representations received in the plaintiffs' home state, the law of that home state-not

15   the defendant's principal place of business-will usually govern." *Id.* at 924.

16       Similarly, in *In re OnStar*, 2010 WL 3516691, at *1-2, 9-10, the court rejected

17   the application of Michigan law to the nationwide class and held that because class

18   members purchased their vehicles in their home states, received and read the allegedly

19   fraudulent information in their home states, and were exposed to representations by

20   dealers in their home states, "[t]he [section 6] factors [of the Second Restatement] do

21   not rebut the presumption" in favor of applying the law of each class member's home

22   state. *See also Lantz*, 2007 WL 1424614, at *4-5 (holding that domicile of California

23   motorcycle manufacturer "is the least significant factor" and does not overcome

24   presumptions favoring the laws where each class member purchased and used the

25   motorcycles or received and acted upon the allegedly fraudulent representations).

26       Notwithstanding TMS's presence in California, it remains undeniable that any

27   alleged misrepresentations were received by the class members in all 52 U.S.

28   jurisdictions, where the class members reside and where they purchased and leased

1    their vehicles.  Simply put, no facts in this case can rebut the presumptions that favor

2    the law of all 52 U.S. jurisdictions.

3        **c.    The Transferor Jurisdictions That Use Any Of The**

4            **Other    Approaches    Will    Apply    The    Law    Of    52**

5            **Jurisdictions**

6        The remaining choice-of-law approaches of the transferor jurisdictions include

7    (1) a modified *lex fori* test, (2) the application of the "Leflar factors," or (3) variations

8    of interest analysis.  These jurisdictions apply a variety of different tests unique to

9    each jurisdiction, but the result here is the same.  (Dawson Decl. at Ex. B).

10            **(1)    Lex fori**

11       While no transferor court continues to apply a "traditional" *lex fori* test, in

12   which the court would apply the "laws of the forum,"[35] Michigan[36] and Kentucky[37]

13   both apply modified *lex fori* tests for tort claims.  Under Michigan's test tort claims,

14   such as fraud and misrepresentation, are determined under Michigan law "'absent a

15   rational reason-such as another state's interest-to apply other law.'"  *In re OnStar*,

16   2010 WL 3516691, at *11 (citation omitted).  If another state has such an interest,

17   courts must weigh both states' interests under the tort law factors of the Second

18   Restatement and determine whether Michigan's interests mandate that its law be

19   applied.  *In re OnStar*, 2010 WL 3516691, at *11.  Similarly, under Kentucky's

20   choice-of-law test, "courts apply Kentucky law if there are 'any significant contacts'

21   with Kentucky." *In re Sigg Switz.*, 2011 WL 64289, at *7 (citation omitted).

22       Despite the deference to forum law under the Michigan and Kentucky tests,

23   neither state would exclusively apply their law to Plaintiffs' claims in this case.  *See*

24   *id.* at *1, *7 (declining to apply Kentucky law in nationwide class action involving

25

26   [35] A true "*lex fori*" approach to a nationwide class action would raise significant constitutional issues. *See Shutts*, 472 U.S. at 821-22.

27   [36] Michigan is the transferor jurisdiction for 2 economic loss class action cases. (Dawson Decl. at Ex. B).

28   [37] Kentucky is the transferor jurisdiction for 6 economic loss class action cases. (Dawson Decl. at Ex. B).

1    consumer fraud and warranty claims because certain plaintiffs who purchased product

2    outside of Kentucky lacked any significant contacts); *In re OnStar*, 2010

3    WL 3516691, at *11 (applying law of place of injury to class action claims against

4    non-resident defendant where plaintiffs purchased or leased vehicles outside of

5    Michigan). Rather, for the class members who do not reside and did not purchase

6    their vehicles in these states, significant contacts with the forum do not exist and the

7    court would apply home state law to their claims on the theory that the home state has

8    the most significant interests. *See id.* at *11-12; *see also In re Digitek*, 2010 WL

9    2102330, at *11-12. Thus, for the same reasons that apply under the Second

10   Restatement, *see supra* Part III.B.3.b., *both states will apply the law of all 52 U.S.*

11   *jurisdictions to Plaintiffs' tort claims.* (*See* Dawson Decl. at Ex. B).

### (2)    The "Leflar" Factors

13   Minnesota,[38] Arkansas[39] (tort claims), and North Dakota[40] (contract claims),

14   apply the "Leflar factors," or "better rule of law" test, which requires the balancing of

15   five factors: (1) predictability of results; (2) maintenance of interstate and

16   international order; (3) simplification of the judicial task; (4) advancement of the

17   forum's governmental interest; and (5) application of the "better rule of law." *In re*

18   *Sigg Switz.*, 2011 WL 64289, at *5 (citation omitted).[41]

19   Applying the "Leflar" factors to Plaintiffs' claims again results in the same

20   outcome: *These transferor courts will apply the laws of all 52 U.S. jurisdictions.*

21   (Dawson Decl. at Ex. B). Indeed, under the first factor, Plaintiffs purchased vehicles

22   in all 52 U.S. jurisdictions and would reasonably expect the law of these jurisdictions

23

---

24   [38] Minnesota is the transferor jurisdiction for six economic loss class action cases. (Dawson Decl. at Ex. B).

25   [39] Arkansas is the transferor jurisdiction for four economic loss class action cases. (Dawson Decl. at Ex. B).

26   [40] North Dakota is the transferor jurisdiction for one economic loss class action case. (Dawson Decl. at Ex. B).

27   [41] In Arkansas, courts first apply *lex loci delicti* to determine which jurisdiction has the most significant relationship to the conduct and the parties, only thereafter

28   applying the "Leflar" factors to "soften [its] formulaic application." *Ganey v. Kawasaki Motors Corp., U.S.A.*, 366 Ark. 238, 251, 234 S.W.3d 838, 847 (2006)).

42

1   to apply.   (*See, e.g.,* Dawson Decl. at Ex. A).   Their expectations provide

2   predictability. *See In re Grand Theft Auto*, 251 F.R.D. at 152; *see also In re Sigg*

3   *Switz.*, 2011 WL 64289, at *5 (noting that "SIGG could predict it would be held to the

4   laws of the states in which it does business").   The second factor, meant to prevent

5   forum shopping or the infringing of another state's sovereignty, likewise weighs in

6   favor of applying the law of the jurisdiction where Plaintiffs purchased their vehicles.

7   *See In re Sigg Switz.*, 2011 WL 64289, at *5 ("Application of a state's law where the

8   purchase was not made or the product was not used, would impede a state's ability to

9   protect its own citizens as consumers.").   For the third factor, while the application of

10   a single jurisdiction's law would simplify the judicial task, this factor is not afforded

11   much weight in tort claims, or where the other factors dictate the application of the

12   law of the plaintiffs' home states. *See id.*   On the other hand, the fourth factor again

13   weighs in favor of applying the law of Plaintiffs' home states because, while

14   Minnesota, Arkansas, and North Dakota each have strong governmental interests

15   concerning their own citizens, the same cannot be said for the vast majority of

16   Plaintiffs who would be considered out-of-state consumers. (*See* Dawson Decl. at Ex.

17   B).   Lastly, the fifth factor is insignificant in this case; three of the first four Leflar

18   factors dictate the same result, and the "better rule of law" factor "is only considered if

19   the other factors do not provide clear guidance on choice of law." *Id.* at *6.

20        It is again clear under Minnesota, Arkansas, and North Dakota's use of the

21   "Leflar" factors, all consumers' jurisdictions' laws apply. *Id.* at *5-6 (determining in

22   case where plaintiffs alleged excessive purchase prices that the "Leflar" factors

23   required the application of the law of plaintiffs' residences, where plaintiffs "bought . .

24   . used . . . and probably acquired the knowledge that led to the purchase"); *In re*

25   *Grand Theft Auto*, 251 F.R.D. at 152. (*See also* Dawson Decl. at Ex. B).

26                    **(3)    Variations Of Interest Analysis**

27        Although unique in some respects, the remaining jurisdictions generally apply

28   flexible tests, often an "interest analysis," which are often similar to and rely upon the

43

1   same factors and presumptions of the Second Restatement's test. (*See* Dawson Decl.

2   at Ex. B). For example, New York's interest analysis test[42] "giv[es] controlling effect

3   to the law of the jurisdiction which, because of its relationship or contact with the

4   occurrence or the parties has the greatest concern with the specific issue raised in the

5   litigation." *In re OnStar*, 2010 WL 3516691, at *10 (internal quotation marks and

6   citation omitted). "With respect to plaintiffs' claims for consumer fraud, which sound

7   largely in tort, the Court must determine which jurisdiction has the greatest interest in

8   this litigation." *In re Grand Theft Auto*, 251 F.R.D. at 148. The jurisdictions where

9   the tort occurred has the greatest concern, and in consumer sale and product cases, that

10  has meant the place of injury (except where parties are from same jurisdiction and it is

11  not the place of injury). *See, e.g., In re OnStar*, 2010 WL 3516691, at *10 ("For

12  actions sounding in fraud and deceit, the substantive law of the state in which the

13  injury is suffered, rather than the state where the fraudulent conduct was initiated,

14  usually governs."); *see also In re Rezulin*, 210 F.R.D. at 64, 70-71 (holding that under

15  New York choice-of-law analysis, the interests of defendants' home state in

16  maintaining accountability of its corporate citizens does not outweigh the interest of

17  "every other state in ensuring that its own citizens are compensated for their injuries,

18  that the standards it sets for product sales within its borders are complied with and that

19  the rules it establishes to govern . . . conduct are upheld.").

20      Other jurisdictions have reached the same conclusion. *See, e.g., Lyon v.*

21  *Caterpillar, Inc.*, 194 F.R.D. 206, 211-18 (E.D. Pa. 2000) (denying certification of

22  nationwide class because under Pennsylvania's interest analysis, "putative class

23  members' residence [where they purchased boats with engines that consumed more

24  fuel than represented by defendant] is a contact of greater significance than

25  defendant's principal place of business [where defendant designed and manufactured

26  engine, handled warranty claims, and made alleged misrepresentations]"); *In re*

27

28  [42] New York is the transferor jurisdiction for 12 economic loss class action cases.
    (Dawson Decl. at Ex. B).

1   *Digitek*, 2010 WL 2102330, at *10 n.6 (applying New Jersey's interest analysis) ("To

2   ignore the place of injury, a vital consideration to both the injured party and the state

3   within which he or she lives, would set aside decades of precedent on the proper

4   application of choice-of-law principles.").[43] (*See also* Dawson Decl. at Ex. B).

5       As under the other tests, *the law of all 52 jurisdictions will be applied* under

6   interest tests like those of New York and New Jersey. Under the choice-of-law tests

7   of each of the transferor jurisdictions, the ultimate conclusion is that the substantive

8   law of 52 jurisdictions applies in the nationwide class actions before this MDL Court.

9   *See Digitek*, 2010 WL 2102330, at *12. (*See also* Dawson Decl. at Ex. B).[44]

10      **C.**   **Even With Respect To The California-Filed Class Actions, The Laws**

11          **Of 52 Jurisdictions Will Apply Rather Than Solely California Law**

12         *1.*   *California Law Cannot Constitutionally Apply To The Entire*

13            *Putative Nationwide Class*

14       To impose one state's laws on a nationwide class, the Due Process Clause

15   mandates that either (1) the chosen state's law not "conflict[] in any material way with

16   any other law which could apply," or (2) the chosen state "have a significant contact

17   or significant aggregation of contacts creating state interests, such that choice of its

18   law is neither arbitrary nor fundamentally unfair." *Shutts*, 472 U.S. at 816, 818

19   (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13, 101 S. Ct. 633, 66 L. Ed.

20   2d 521 (1981)). As shown above, *see supra* Part III.B.1, there are significant and

21   material conflicts of law. (*See also* Dawson Decl. at Exs. D, E, F, G, H, I and J).

22       Because of these conflicts, Plaintiffs bear the burden of demonstrating that

23   sufficient contacts between the *claims* and *California* exist. *Wash. Mut.*, 24 Cal. 4th at

24   921. Although Plaintiffs characterize this burden as "minimal," the law is clear: due

---

[43] Like Plaintiffs here, Judge Goodwin noted that the plaintiffs in that MDL focused "too heavily on the defendants' wrongdoing and practically ignore[d] the choice-of-law impact of the location where the class members were harmed." *Id.* at *7 n.2.

[44] Five transferor jurisdictions (including California) apply a variation of interest analysis. Also, New York applies an interest analysis for torts, while North Carolina applies one for warranty claims. Oregon applies a statutory-based approach for both. (Dawson Decl. at Ex. B (chart discussing and analyzing each jurisdiction)).

45

1    process requires "*significant*" contacts between California and "the claims asserted by
2    *each* member of the plaintiff class" against *each defendant*. *Shutts*, 472 U.S. at 818,
3    821-22 (emphasis added) (quoting *Allstate*, 449 U.S. at 312-13); *In re Hitachi*, 2011
4    WL 9403, at *10 (same); *see also Byers v. Lincoln Elec. Co.*, 607 F. Supp. 2d 840,
5    846 (N.D. Ohio 2009) (analyzing claims against defendants separately); *Norwest*
6    *Mortg., Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 226-27, 85 Cal. Rptr. 2d 18 (1999)
7    (engaging in separate *Shutts* analysis for differing categories of class members).

8        The contacts sufficient merely to establish personal jurisdiction are not
9    sufficient to satisfy *Shutts*:

10       The issue of personal jurisdiction over plaintiffs in a class action is
11       entirely distinct from the question of the constitutional limitations on
12       choice of law; the latter calculus is not altered by the fact that it may
13       be . . . more burdensome to comply with the constitutional
14       limitations because of the large number of transactions which the
15       State proposes to adjudicate and which have little connection with
16       the forum.

17   *Id.* at 821. Non-California residents' claims do not satisfy the burden.

18       Focusing on the non-California putative class members' claims against TMC
19   highlights Plaintiffs' due process problem. As discussed above, *see supra* Part II.F,
20   non-California putative class members have virtually no connection at all to
21   California, but instead reviewed and relied upon the allegedly deceptive
22   advertisements, and purchased, drove, serviced, and potentially sold their vehicles in
23   their states of residence, not California. (Dawson Decl. at Ex. A).   TMC was
24   responsible for the design, development, and manufacturing related to the Subject
25   Vehicles and the relevant components in Japan, not California. (Miyazaki Decl. at
26   ¶ 6). TMC's decision-making concerning recalls and warranty approvals were made
27   in Japan. (Kitamura Decl. at ¶¶ 12, 21). Any content TMC provided for certain
28   advertising messages came from Japan, not California. (Dawson Decl. at Ex. HH,

1  100:15-104:10).  TMC does not directly employ any people in the United States.
2  (Dawson Decl. at Ex. KK.1, No. 3; Miyazaki Decl. at ¶ 6; Tanaka Decl. at ¶¶ 7-8).
3  Because all of TMC's allegedly wrongful conduct occurred outside of California,
4  California does not have sufficient contacts to the non-Californians' claims.[45]  *See*
5  *Norwest Mortg.*, 72 Cal. App. 4th at 226 (*Shutts* is not satisfied with respect to claims
6  involving "injuries suffered by non-California residents, caused by conduct occurring
7  outside of [California] by actors headquartered and operating outside of California.").

8      The only contact that Plaintiffs point to between TMC and California is the
9  existence of a subsidiary in California, which is clearly not sufficient to impose
10  California law on claims by non-Californians against TMC.  *See In re Hitachi*, 2011
11  WL 9403 at *7-10 (noting in suit against Japanese parent and Californian subsidiary,
12  the fact that the American entity was responsible for coordinating marketing, was
13  insufficient to satisfy *Shutts* where design was in Japan and manufacturing in
14  Mexico).  Plaintiffs provide absolutely no basis for disregarding the separate corporate
15  identities of TMS and TMC and Plaintiffs' bootstrapping argument flies in the face of
16  the requirement that a separate analysis be conducted for each defendant.  *See, e.g.*,
17  *Byers*, 607 F. Supp. 2d at 846 ("[E]ven if choice-of-law principles suggest that the law
18  of (say) Ohio should apply to Byers' claims against a majority of defendants, this
19  Court cannot apply Ohio law to a particular defendant if there is no significant
20  relationship at all between that defendant and Ohio.").[46]

21      Even if it were permissible to conflate TMC's and TMS's contacts with
22  California when evaluating the constitutionality of imposing California law, Plaintiffs
23  also fail to meet their burden to demonstrate sufficient contacts between California

---

[45] Additionally, *Shutts* instructs that "[w]hen considering fairness in this context, an important element is the expectation of the parties." *Shutts*, 472 U.S. at 822 (citing *Allstate*, 449 U.S. at 333).  As discussed above, the evidence makes clear that the parties expected the law of the state of purchase to govern any disputes.
[46] *See also McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989) ("If distinct claims for relief implicate different alignments of interests among the relevant jurisdictions, separate applications of a governmental interest analysis are required."); *Beech Aircraft Corp. v. Super. Ct.*, 61 Cal. App. 3d 501, 518-19, 132 Cal. Rptr. 541, 550 (1976) (same).

and non-Californian's claims against TMS. The fact that TMS is headquartered in California is not constitutionally sufficient to impose California law on a nationwide class. *See, e.g., Elving v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1212 (D. Colo. 2010) (rejecting plaintiffs' request that court "indulge in a presumption that the location of a company's corporate headquarters is sufficient to subject all manufacturing, design, etc. defects . . . to the law of the state where the headquarters are located"); *Tidenberg v. Bidz.com, Inc.*, No. 2:08-cv-5553, 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009) (holding that defendant's California headquarters were insufficient to impose California law on a nationwide class based upon a presumption "that any false and misleading statements emanated from California [by virtue of the corporate headquarters being located there]").

In addition, Plaintiffs must demonstrate significant contacts with the claims of *each* class member. "[T]he corporate presence of [TMS in California] does not amount to a contact with the claims of the individual class members." *In re Hitachi*, 2011 WL 9403 at *9. Accordingly, assuming that the advertisements and marketing forming the basis of each individual class members' claims actually emanated from California, the *Shutts* inquiry might be satisfied. But Plaintiffs' unsupported allegations, many of which are contradicted by the evidence elicited during the choice-of-law discovery phase, are insufficient to meet their burden. *See, e.g., In re Hitachi*, 2011 WL 9403 at *10 ("Plaintiffs allege the misrepresentations occurred in California, but they fail to submit any evidence to support this allegation.").

Toyota advertisements—including television, print, radio, billboards, and direct mail—are created, produced, and distributed locally by independent distributors, dealer associations, or dealerships located outside of California without approval from TMS. (Tsai Decl. at ¶ 7; Appelbaum Decl. at ¶¶ 3, 6; Dawson Decl. at Ex. HH, 20:14-21:12, 28:8-29:9, 110:22-114:14). Given that substantial marketing activities, design and manufacturing, and alleged injuries occurred outside of California,[47] it follows

---

[47] *See, e.g., In re Bridgestone/Firestone*, 288 F.3d at 1016 ("Financial loss (if any, a

1  that most non-resident's claims against TMS would fail to satisfy *Shutts. See, e.g., In*

2  *re Ford Bronco II*, 177 F.R.D. at 371 (finding application of Michigan law to

3  nationwide class unconstitutional, despite defendant's corporate presence in Michigan,

4  because manufacturing, manifestation of alleged defect, purchases, and fraud occurred

5  throughout the 50 states); *see also Olmstead v. Super. Ct.*, No. 4:02-cv-B158511,

6  2002 WL 31082063, at *5 (Cal. Ct. App. Sept. 18, 2002). The evidence decidedly

7  demonstrates that many class members lack the requisite contact with California.

8      For example, Lucy Barker, a Washington resident who purchased her vehicle in

9  Washington, testified that she did not rely on *any* advertising before purchasing her

10  Toyota vehicle. (*See, e.g.*, Dawson Decl. at Exs. A, C. Given that Ms. Barker

11  purchased her vehicle in Washington and did not rely upon any advertising issued by

12  TMS, her individual claims cannot satisfy *Shutts*. Plaintiff Carole Young, an Ohio

13  resident, provides another example. Ms. Young testified that the only advertisement

14  that she specifically recalls relying upon was a billboard ad issued by a local

15  dealership. (*See, e.g.*, Dawson Decl. at Exs. A, C). Again, plaintiffs have failed to

16  demonstrate that Ms. Young relied upon advertising emanating from California or that

17  her claims have any significant connection with California. Additionally, certain class

18  representatives, including Alexander Farrugia (a New York resident) and

19  Carole Fisher (a Nevada resident), have admitted that they do not know whether they

20  relied upon advertisements issued by TMS or advertisements issued by local

21  distributors or dealers. (*See, e.g.*, Dawson Decl. at Ex. A). Given that a significant

22  portion of Toyota advertising was the product of local distributors, dealer associations,

23  or dealerships located outside of California and which was created without input or

24  approval from TMS,[48] Plaintiffs have failed to meet their burden.

25

26  qualification we will not repeat) was suffered in the places where the vehicles and
tires were purchased at excessive prices or resold at depressed prices. Those injuries

27  occurred in all 50 states, the District of Columbia, Puerto Rico, and U.S. territories
such as Guam.").

28  [48] Tsai Decl. at ¶ 7; Appelbaum Decl. at ¶¶ 3, 6; Dawson Decl. at Ex. HH, 20:14-
21:12, 28:8-29:9, 110:22-114:14).

49

1    Because "a California court's adjudication of non-residents' claims that lack a

2    nexus with California raises significant due process problems," the claims of non-

3    Californians who did not rely upon advertisements or marketing emanating from

4    California and whose claims lack any significant contacts with California cannot

5    constitutionally proceed under California law. *Arabian v. Sony Elecs., Inc.*, No. 3:05-

6    cv-1741, 2007 WL 627977, at \*9 (S.D. Cal. Feb. 22, 2007); *Meridian Project Sys.,*

7    *Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005).

        2.    **Even If The Court Could Apply Its Law Without Violating The**

                **Constitution, Under California's Choice-of-Law Test, The Laws**

                **Of 52 Jurisdictions Apply To This Nationwide Class**

            a.    **There Is No Presumption Of California Law Given The**

                **Interests Of 52 Jurisdictions In This Case**

13    Plaintiffs overstate the burden the law places on Toyota to rebut the application

14    of California law under California's governmental interest analysis test. Plaintiffs

15    suggest that merely establishing the constitutionality of applying California law to the

16    nationwide class propels them into a presumption that California substantive law will

17    apply, without any citation of authority. (*See* Pls. Br. at 2, 4, 22, 24 n.29). While

18    there are California cases stating that the forum law[49] will presumptively apply under

19    California's choice-of-law analysis, other cases make clear that such a presumption

20    ceases to exist as soon as Toyota shows that another state has *any* interest in the

21    litigation. *See In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 685 (N.D. Cal.

22    1986) ("Once a 'true conflict' has been shown, *i.e.*, that the law of California and that

23    of another state materially differ and both states have interests in having their own law

24    applied, there is no presumption that California law will apply."); *see also Liew v.*

25    *Official Receiver & Liquidator*, 685 F.2d 1192, 1196 n.7 (9th Cir. 1982). A

26    presumption exists only absent a showing that another jurisdiction has an interest.

---

[49] It must be noted that California is not the forum for the vast majority of cases before
this MDL. *See supra* Part III.B.2.

1   Because Toyota has shown that all 52 jurisdictions have an interest in having
2   their laws applied in this litigation, *see infra* Part III.C.2.b., any initial presumption in
3   this case disappears and this Court must analyze each state's governmental interests
4   on absolutely equal footing.

### b.   California's Governmental Interest Analysis Results In The Application Of The Laws Of All 52 Jurisdictions

7   California applies "a three-step 'governmental interest analysis' to address
8   conflict of laws claims and ascertain the most appropriate law applicable to the
9   issues." *Wash. Mut.*, 24 Cal. 4th at 919. The first step considers whether "the
10   applicable rule of law in each potentially concerned state . . . materially differs from
11   the law of California." *Id.* at 919. The second step consists of the court determining
12   "what interest, if any, each state has in having its own law applied to the case." *Id.* at
13   920. If there is an interest, the court proceeds to the final step, the "comparative
14   impairment" analysis, where the court selects the law to apply by identifying "the state
15   whose interests would be 'more impaired' if its laws were not applied." *Id.*

### (1)   There Are Material Differences In The Laws Of The Potentially Concerned Jurisdictions

18   Unless "the relevant laws of each state are identical," the court determines
19   whether the laws of the potentially concerned jurisdictions materially differ, *id.*, i.e.,
20   have "a significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. v.*
21   *Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005); *In re Bankers*
22   *Trust Co.*, 752 F.2d 874, 882 (3d Cir. 1984). As explained above, *supra* Part III.B.1.,
23   there are numerous material, outcome-determinative differences in the relevant laws.

### (2)   States Other Than California Have Significant Interests In This Litigation

26   When the relevant state laws materially differ, the trial court must "determine
27   what interest, if any, each state has in having its own law applied to the case." *Wash.*
28   *Mut.*, 24 Cal. 4th at 920. Plaintiffs ask this Court to overlook other states' interests

1  because California's consumer protection laws are allegedly more favorable to

2  Plaintiffs. California's test, however, does not allow this Court to conclude that no

3  other state has an interest simply because California's laws are allegedly more

4  consumer friendly. By any measure, all states have an interest not only in protecting

5  consumers from in-state injuries caused by foreign corporations but also in delineating

6  the scope of recovery under their laws according to their often "different conceptions

7  of what adequate compensation is." *Spence,* 227 F.3d at 314.

8      Plaintiffs' attempt to dismiss other states' interests has been squarely rejected

9  by the California Supreme Court. In *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68,

10  91-92, 105 Cal. Rptr. 3d 378 (2010), the California Supreme Court reversed the Court

11  of Appeals, which had applied California law instead of Oklahoma law, reasoning that

12  Oklahoma did not have any significant interest in applying its "business friendly" law.

13  The California Supreme Court explained:

14      When a state adopts a rule of law limiting liability for commercial

15      activity conducted within the state in order to provide what the state

16      perceives is fair treatment to, and an appropriate incentive for, business

17      enterprises, we believe that the state ordinarily has an interest in having

18      that policy of limited liability applied to out-of-state companies that

19      conduct business in the state, as well as to businesses incorporated or

20      headquartered within the state. A state has a legitimate interest in

21      attracting out-of-state companies to do business within the state, both to

22      obtain tax and other revenue that such businesses may generate for the

23      state, and to advance the opportunity of state residents to obtain

24      employment and the products and services offered by out-of-state

25      companies. In the absence of any explicit indication that a jurisdiction's

26      "business friendly" statute or rule of law is intended to apply only to

27      businesses incorporated or headquartered in that jurisdiction (or that have

28      some other designated relationship with the state-for example, to those

52

1  entities licensed by the state), as a practical and realistic matter the state's

2  interest in having that law applied to the activities of out-of-state

3  companies within the jurisdiction is equal to its interest in the application

4  of the law to comparable activities engaged in by local businesses

5  situated within the jurisdiction.

6  *Id.*   Whatever support Plaintiffs get from distinguishing the facts of *McCann* with

7  respect to California's interest in this case (Pls. Br. at 33 & n. 32, *i.e.*, fortuity of the

8  plaintiff having moved to "California"), this effort does *nothing* to undercut the fact

9  that the other jurisdictions have very real and legitimate interests in applying their

10  laws to their consumers – *even if* those laws are more "business-friendly" than

11  California law and *even if* the defendant is an out-of-state company.[50]

12  A class action choice-of-law analysis that describes one state's law related to

13  consumer or business interests as paramount and superior to other states' laws does

14  violence to the carefully crafted policy judgments of the other states.  As an MDL

15  court in *In re Ford Bronco II* aptly observed:

16  Even assuming Michigan has the most consumer-friendly laws,

17  plaintiffs' cryptic argument that any state whose consumer laws are more

18  rigorous than Michigan's must surrender to the application of Michigan

19  law overlooks the fact that there might be important policy reasons

20  behind a state's adoption of more restrictive consumer-oriented laws, and

21  that application of Michigan law might actually impair these states'

22  policies.  It is simply incorrect to assume that the overriding interest in all

23  consumer-oriented cases is protection of the consumer.  The policies of

24  each state with contacts must be examined.

25  177 F.R.D. at 371; *see also In re Ford Ignition Switch*, 174 F.R.D. at 348 ("Each

26

27  [50] That states require out-of-state corporations to register to do business further shows their interests in regulating corporations' conduct within the state.  *See generally Schultz v. Hinshaw*, 514 P.2d 277 (Ariz. App. 1973) (explaining that statutory

28  registration requirements for out-of-state corporations were enacted for the protection of the citizens of Arizona and as a means of assuring responsibility and fair dealing).

plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws."). Numerous courts have recognized state interests in protecting both consumers and businesses in adopting their relevant tort laws and consumer protection statutes. *See LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1072 (3d Cir. 1996) ("A state's interest in enforcing its tort law is not constrained to protecting residents from harm or suit . . . . A state could have a host of reasons for limiting liability, including encouraging economic activity in the state . . . and lowering costs to consumers.");[51] *In re Grand Theft Auto*, 251 F.R.D. at 147-54; *see generally Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 487 (S.D. Cal. 2009) (finding material conflicts between the UCL and CLRA and other states' consumer protection laws and explaining that if "California's consumer protection laws are among the strongest in the country . . . it seems unfair to apply those laws across the country in jurisdictions less concerned with consumer protection").

Moreover, regardless of the policy considerations, to hold one state's law as superior to all others—as Plaintiffs suggest—because of a determination that its policies are somehow "better," would be a gross abrogation of fundamental principles of federalism. *See Smith v. Robbins*, 528 U.S. 259, 273, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (noting Supreme Court's "established practice, rooted in federalism, of allowing the States wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy," even in constitutional matters). The Supreme Court has recognized that, as a "basic principle of federalism[,] each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). While

---

[51] Thus, putting aside that Plaintiffs and the authority they rely upon are flatly wrong to discount a state's interest if its laws are not as plaintiff-friendly as California, Plaintiffs are conflating being plaintiff and plaintiffs' counsel-friendly with being protective of consumers. Such a short-sighted view ignores the effect on the price of goods and availability of jobs that result from laws that attract industry and commerce.

1   every state has enacted laws to protect its citizens, "states need not, and in fact do not,

2   provide such protection in a uniform matter." *BMW v. Gore*, 517 U.S. at 568-73.

3       Regarding the issues here, each state has decided whether to open its own

4   investigation into these allegations.   Twenty-eight states, through their attorneys

5   general, are currently pursuing their own investigations of Toyota under their own

6   consumer protection laws – the very same laws Plaintiffs seek to have this Court

7   trump in favor of California law. (*See* Merrill Decl. at ¶ 4 (attaching subpoenas and

8   civil investigatory demands issued by states attorneys general pursuant to the very

9   same consumer protection laws that Plaintiffs allege in the alternative in their

10  SAMCC, Dkt. 580)).  Plaintiffs' attempt to gloss over all the other states' legislatively

11  and judicially pronounced policies governing consumer transactions in deference to

12  California's alone will only result in a decision of judicial convenience in violation of

13  both the parties' and the states' substantive rights.

14      Plaintiffs' inaccurate policy assertions notwithstanding,[52] "the dictates of state

15  law may not be buried under the vast expanse of a federal class action.  The parties'

16  rights under state substantive law must be respected, and if that is not possible in a

17  class action, then that procedure may not be used." *In re School Asbestos Litig.*, 789

18  F.2d 996, 1007 (3d Cir. 1986). *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815,

19  845, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999) (rules of procedure like class

20  certification shall not abridge, enlarge, or modify any substantive right); *In re*

21  *Bridgestone/Firestone, Inc.*, 288 F.3d at 1020.

22      In fact, the California Supreme Court has recognized that California has no

23  legitimate interest in imposing its own sense of justice nationwide:   "California

24  decisions have adopted a restrained view of the scope or reach of California law with

25  regard to the imposition of liability for conduct that occurs in another jurisdiction and

26  that would not subject the defendant to liability under the law of the other

27

28  ───────────────────
[52] *See* Pls. Br. at 30 ("[A]pplication of California consumer protection statutes
achieves maximum attainment of underlying purpose by all of the states.").

55

jurisdiction." *McCann*, 48 Cal. 4th at 99. California's interest in enforcing its own consumer protection model therefore ends at the California border. *See Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 897 (C.D. Cal. 2009) ("Although a state may have the power to legislate . . . its citizens with regard to transactions occurring beyond its boundaries, the presumption is that it did not intend to give its statutes any extraterritorial effect."). Multiple California courts have declined to apply California consumer protection laws to nationwide classes despite the fact that California's laws might provide a consumer with greater protections. *See, e.g., In re Hitachi*, 2011 WL 9403; *In re HP Inkjet Printer*, 2008 WL 2949265.

Plaintiffs' authority that is cited to deny these other states' interests provide only a superficial and cursory analysis of the issue, completely ignoring the well-established deference to states that might choose to make consumer protection laws more business-friendly. In *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008), the court applied California law because it "afford[s] greater protection to consumers." The Northern District of California reached the same, oversimplified conclusion in *Keilholtz v. Lennox Prods. Inc.*, 268 F.R.D. 330 (N.D. Cal. 2010). And in *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 623 (C.D. Cal. 2008), the Court applied California law because "California's consumer protection statutes are among the strongest in the country." In promoting this argument, Plaintiffs' result-oriented approach ignores deliberate policy choices by states across the country, which the California Supreme Court recently acknowledged in *McCann*.

Each of the 52 jurisdictions, including California, has an interest in applying its own laws to consumers and transactions within its borders. California, however, does not have a sufficient connection to, or interest in, the claims of non-Californians, particularly with regard to the claims against TMC. This Court should therefore conclude that a false conflict exists as to those claims and, at Step 2 of California's governmental interest analysis, conclude that the laws of all 52 jurisdictions apply. Even if the Court finds California has some interest in applying its laws to non-

56

1   Californians, it is beyond any serious dispute that all jurisdictions have an interest in

2   having their laws apply, which moves the analysis into Step 3.

**(3)   Other States' Interests Would Be "More Impaired" If California Law Applied**

5   Under the third and final step in the choice-of-law analysis, commonly referred

6   to as the "comparative impairment" analysis, the court seeks to identify "which state's

7   interest would be more impaired if its policy were subordinated to the policy of the

8   other state." *Offshore Rental Co. v. Cont'l Oil, Co.*, 22 Cal. 3d 157, 164-65, 148

9   Cal. Rptr. 867, 872 (1978).   This "does not involve the court in 'weighing' the

10  conflicting governmental interests 'in the sense of determining which conflicting law

11  manifest[s] the 'better' or the 'worthier' social policy on the specific issue." *Id.* at 165

12  (internal citations omitted).   Instead, this analysis usually favors the application of

13  home states' laws in consumer fraud cases. *See, e.g., In re Charles Schwab Corp. Sec.*

14  *Litig*, 264 F.R.D. 531, 537-38 (N.D. Cal. 2009) (refusing to apply California law to

15  non-California class members because "[s]tates have an interest in deciding the

16  contours of their own [laws]."); *Discover Bank v. Super. Ct.*, 134 Cal. App. 4th 886,

17  895, 36 Cal. Rptr. 3d 456, 462 (2005) ("California has no greater interest in protecting

18  other states' consumers than other states have in protecting California's.").   Here,

19  California's interest in regulating unlawful conduct within its borders is fully served

20  by allowing California residents to sue California corporations under California law.

21  Plaintiffs would have the Court believe that California interests are more

22  impaired simply because one of the defendants is headquartered in California.   On the

23  contrary, courts often hold that the location of a corporate defendant's headquarters

24  does not displace the interests of home states in the litigation. *Ortega v. Yokohama*

25  *Corp. of N. Am.*, 7:06-cv-105, 2010 WL 1534044, at *3 (Del. Super. Ct. Mar. 31,

26  2010) ("While Defendants' 'marketing headquarters' may very well be located in

27  California, '*the jurisdiction where a product is marketed*' is to be considered, not the

28  location of a company's marketing headquarters or the state in which marketing

57

1    decisions take place."); *see also Lyon,* 194 F.R.D. at 217 (rejecting claim that Illinois

2    law should apply because the common misrepresentations all originated from

3    defendant's management in Illinois); *In re Ford Ignition Switch,* 174 F.R.D. at 348-

4    49; *In re DirecTV Early Cancellation Fee Litig.,* No. 8:08-cv-741, 2009 WL 2912656,

5    at *5 (C.D. Cal. Sep. 9, 2009).   To conclude otherwise, would run afoul of the

6    federalism principles that form the basis of our legal system.

7         Evaluating claims by nonresidents against TMS and TMC highlights

8    California's lessened interest.  As to TMS, the design, manufacture, advertisement,

9    and purchase was not focused in California and should be judged by consumers' home

10   states laws. *See In re Vioxx Prods. Liab. Litig.,* 239 F.R.D. 450, 456 (E.D. La. 2006)

11   ("[E]ach plaintiff's home jurisdiction has a stronger interest in deterring foreign

12   corporations from personally injuring its citizens and ensuring that its citizens are

13   compensated than New Jersey does in deterring its corporate citizens' wrongdoing.");

14   *see also Abogados v. AT&T, Inc.,* 223 F.3d 932, 935 (9th Cir. 2000) ("Although the

15   situs of the injury is no longer the sole consideration in California choice-of-law

16   analysis, California courts have held that, 'with respect to regulating or affecting

17   conduct within its borders, the *place of the wrong* has the predominant interest.'")

18   (emphasis added) (internal citation omitted); *Lantz,* 2007 WL 1424614, at *5-6

19   (refusing to apply California law to nationwide class against California defendant

20   where plaintiffs received and acted on representations in non-California states).

21        At bottom, Plaintiffs cannot escape the fact that statements about Toyota's

22   safety and reliability—no matter who made them—were not fraudulent absent

23   showing there was in fact an underlying defect in the Subject Vehicles.   Whether

24   Plaintiffs choose to rely on technical evidence or evidence of consumer complaints to

25   advance their unfounded theory that some unknown defect remains, it is beyond

26   dispute that such a claim is dependent upon a defect in the vehicle. The development,

27   design, testing and manufacturing of Subject Vehicles was centered in Japan and any

28   number of non-California states. (Miyazaki Decl. ¶¶ 9-19; Nakanishi Decl. ¶¶ 8-15;

58

1   Bansi Decl. at ¶¶ 3, 6).   Similarly, analysis and decision-making regarding quality
2   issues and safety raised by consumer complaints filtered in from across the United
3   States (where purported class members reside) and collected, in part, in California,
4   were made primarily in Japan. (Kitamura Decl. ¶ 10; Waltz Decl. ¶¶ 5-8).   TMC and
5   TEMA employees in Japan and throughout the United States provided technical
6   information relating to the Subject Vehicles to TMS, and independent third parties
7   (*e.g.*, JD Power and Associates) provided accolades relating to the safety of the
8   Subject Vehicles to TMS, both of which TMS incorporated into some of its
9   advertising. (Dawson Decl. at Ex. L, 197:15-24, 288:11-291:12, 316:6-14, 332:4-15;
10  Ex. HH, 33:4-33:15, 102:15-18, 127:10-127:25, 46:18-23).   And certainly every
11  jurisdiction has a substantial interest in regulating advertising to its own consumers.

12         As to TMC, there is a larger point that Plaintiffs have completely ignored:   How
13  can California possibly have a substantial interest (or even a constitutionally
14  cognizable one) in, for example, claims by a Massachusetts consumer against TMC, a
15  Japanese corporation?   California courts have clearly indicated that they do not.   *See,*
16  *e.g., J.P. Morgan & Co., Inc. v. Super. Ct.*, 113 Cal. App. 4th 195, 222, 6 Cal. Rptr.
17  3d 214, 234 (2003) (California courts have no "special obligation to undertake [a]
18  nationwide class action" against a defendant who is not headquartered in California);
19  *Norwest Mortg., Inc.*, 72 Cal. App. 4th at 222 (holding that the UCL was not
20  "intended to regulate claims of nonresidents arising from conduct occurring entirely
21  outside of California").   The Seventh Circuit contemplated this exact situation in
22  *Bridgestone/Firestone* and scoffed at the notion of applying one state's laws to a
23  nationwide class action against a foreign corporation:

24         We do not for a second suppose that Indiana would apply Michigan law
25         to an auto sale if Michigan permitted auto companies to conceal defects
26         from customers; nor do we think it likely that Indiana would apply
27         Korean law (no matter *what* Korean law on the subject may provide) to
28         claims of deceit in the sale of Hyundai automobiles, in Indiana, to

1   residents of Indiana, or French law to the sale of cars equipped with

2   Michelin tires. Indiana has consistently said that sales of products in

3   Indiana must conform to Indiana's consumer-protection laws and its rules

4   of contract law.

5   *In re Bridgestone/Firestone*, 288 F.3d at 1018.

6   Contrary to Plaintiffs' assertions, California's interest in applying its laws to a

7   nationwide class merely because one of the defendants is headquartered in California

8   cannot possibly override other states' substantial interests in regulating the conduct of

9   consumer transactions affecting their citizens.  A court should not apply California

10  law simply "because it is presumably more beneficial to" the Plaintiffs.  *Clark v.*

11  *Experian Info. Solutions, Inc.*, No. 1:03-cv-7882, 2005 WL 1027125, at *5 (N.D. Ill.

12  Apr. 26, 2005).  Courts and legislatures across the country have been carefully

13  crafting their consumer protection laws for years, and the important differences in

14  these laws cannot be disregarded.  As the Texas Court of Appeals aptly noted:

15  When states adopt differing attempts to strike a fair balance between the

16  interests of manufacturers and consumers, our job is not to decide which

17  policy overrides the other. . . . It is hard to see how the interests of each

18  state could be met any better than by allowing each to apply its own laws.

19  *Tracker Marine*, 108 S.W.3d at 349.  In sum, even under California's governmental

20  interest analysis, this Court should conclude that the laws of 52 jurisdictions apply.

21  **IV.   CONCLUSION**

22  Neither efficiency nor convenience is more important than adhering to the law.

23  "Courts have no more business modifying choice-of-law rules to make consolidated

24  treatment easier than they do rewriting state law respecting negligence or strict

25  liability for this purpose.  Indeed, the one is just a covert way of doing the other."

26  Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 589

27  (1996).  Accordingly, Toyota respectfully requests that this Court deny the "Certain

28  Economic Loss Plaintiffs' Motions for the Application of California Law."

Respectfully submitted, this 1st day of April, 2011.

Dated: April 1, 2011

Respectfully submitted,
By: /s/ Cari K. Dawson

CARI K. DAWSON (GA SBN 213490)
Email: cari.dawson@alston.com
**ALSTON + BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309

LISA GILFORD (CA SBN 171641)
Email: lisa.gilford@alston.com
**ALSTON + BIRD LLP**
333 South Hope Street, 16th Floor
Los Angeles, CA 90071

***Co-Lead Defense Counsel for Economic Loss Cases***

VINCENT GALVIN, JR. (CA SBN 104448)
E-mail: vincent.galvinjr@bowmanandbrooke.com
**BOWMAN AND BROOKE**
1741 Technology Drive, Suite 200
San Jose, CA 95110

JOEL SMITH (SC SBN 5266)
E-mail: joel.smith@bowmanandbrooke.com
**BOWMAN AND BROOKE**
1441 Main Street, Suite 1200
Columbia, SC 29201

***Lead Defense Counsel for Personal Injury/Wrongful Death Cases***

LEGAL02/32550530v1       TOYOTA'S BRIEF REGARDING CHOICE OF LAW