LEWIS S. EIDSON (FBN: 151088)
CURTIS B. MINER (FBN: 885681)
COLSON HICKS EIDSON
255 Alhambra Circle, PH
Coral Gables, FL 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
Mike@colson.com
Curt@colson.com

Attorneys for Plaintiffs

**FILED**

APR 2 5 2011

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY_____ DEPUTY

*Nunc Pro Tunc To*
*April 19, 2011*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

IN RE: TOYOTA MOTOR CORP.
UNINTENDED ACCELERATION
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

*********************************

FRED MILLER and MYRNA MILLER,

Plaintiffs,

vs.

TOYOTA MOTOR NORTH AMERICA,
INC.; TOYOTA MOTOR
ENGINEERING & MANUFACTURING
NORTH AMERICA, INC.; TOYOTA
MOTOR SALES, U.S.A., INC.; and
TOYOTA MOTOR CORPORATION

Defendants.

8:10ML2151 JVS (FMOx)

MDL 2151

Honorable James V. Selna

*********************************

Case No. **8:11-cv-00195 JVS (FMOx)**

**AMENDED COMPLAINT FOR DAMAGES**

1. Fraudulent Concealment
2. Products Liability: Design/Manufacturing Defect
3. Products Liability: Failure to Warn
4. Negligence
5. Breach of Implied Warranty of Merchantability
6. Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

**DEMAND FOR JURY TRIAL**

Complaint Filed:  **January 4, 2011**
Trial Date:  **None Set**

# TABLE OF CONTENTS

PAGE

I.     INTRODUCTION.................................................................................1

II.    JURISDICTION AND VENUE ........................................................4

III.   PARTIES............................................................................................5

IV.    FACTUAL BACKGROUND ............................................................6

V.     COMMON ALLEGATIONS ............................................................7

       A.    Summary of the Defects ........................................................7

       B.    Timeline of Key Events regarding Toyota Vehicles .............8

             i.     Toyota's ETCS-i System...............................................8

             ii.    NHTSA Investigates UA in Toyota Vehicles in the
                    Midst of Toyota's Climb to #1 Vehicle Manufacturer
                    in the United States...................................................10

       C.    Toyota Sacrificed Quality while Maintaining Image of Safety
             and Reliability..........................................................................20

VI.    FRAUDULENT CONCEALMENT, TOLLING OF
       STATUTE OF LIMITATIONS AND ESTOPPEL............................21

VII.   FIRST CAUSE OF ACTION ..........................................................57

VIII.  SECOND CAUSE OF ACTION .....................................................59

IX.    THIRD CAUSE OF ACTION .........................................................60

X.     FOURTH CAUSE OF ACTION .....................................................62

XI.    FIFTH CAUSE OF ACTION ..........................................................64

XII.   SIXTH CAUSE OF ACTION............................................................. 65

PRAYER FOR RELIEF ..........................................................................66

DEMAND FOR TRIAL BY JURY .........................................................68

i

Plaintiffs FRED MILLER and MYRNA MILLER (hereafter "Plaintiffs"), bring this amended complaint herein against Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Corporation, (hereinafter referred to collectively as "Toyota") and allege as follows:

## INTRODUCTION

1.    Toyota misleadingly promised safety and trust, while at the same time purposely concealed evidence of electronic defects in its vehicles from the American public, and hid its own knowledge of an alarming number of incidents of unintended accelerations, deaths and injuries.

2.    Despite the feasibility and availability of a "brake override system" whereby driver brake application will immediately stop any unintended acceleration ("UA"), and despite the fact that Toyota's internal documents show that Toyota was aware that UA incidents were occurring and presented an unreasonable risk of serious injury or death, Toyota recklessly failed to install brake overrides in its vehicles.

3.    Even in late 2009 and early 2010 when Toyota announced recalls involving a brake override system, Toyota purposely hid the fact that this redesign was safety-related and critical to preventing UA. Instead, Toyota claimed that the brake override system was being added as an "extra measure of confidence" for Toyota owners.

4.    When pressed to explain and implement solutions to UA, Toyota issued recalls to address alleged mechanical issues, such as defective floor mats and sticky accelerator pedals. While these problems undoubtedly posed real dangers for some drivers, a far greater number of vehicles were affected by the ETCS design defects described herein. Indeed, the "sticky pedal" and "floor mat" recalls have failed to adequately address the UA problem. Drivers continue to report UA incidents in vehicles that were not part of the recalls. Likewise, even among vehicles that were recalled and repaired, drivers continue to report experiences of UA.

1

5.    Toyota effectively used these "floor mat" and "sticky pedal" problems to downplay and divert attention away from the major design defects and safety problems with the ETCS, including the need for a brake override system.  Rather than revealing the truth about its UA electronic/software/hardware defects, Toyota highlighted and promoted the floor mat and pedal recalls as a "smoke screen," while at the same time misleadingly characterizing the "reflashing" of the computer software to allow for brake override as merely a "confidence" boost.

6.    The absence of a brake override system by itself renders the vehicles defective and unreasonably dangerous, and the vehicles do not perform as safely as an ordinary consumer would expect, but the danger is magnified even more by the susceptibility of Toyota vehicles and their electronic throttle control systems to electronic-related and/or mechanical-related computer/software/hardware glitches.

7.    In an effort to keep the electronic issue from going public, Toyota actually hired several NHTSA employees with very strong relationships with their previous co-employees at NHTSA.  Two such employees are Christopher Tinto and Christopher Santucci.  Toyota internal documents reveal that over the past eight years, relevant information and categories of unintended acceleration incidents were excluded from Toyota's reporting and/or warning of these events to the consuming public.

8.    From 1998 through 2010 Toyota continuously and consistently promised safety for their Toyota/Lexus/Scion vehicles, and repeatedly promised a brand of "trust" to prospective purchasers of their vehicles. From 2002 to 2010 Toyota continuously denied any problems with their throttle control systems on their vehicles, while during that same time period 2010 Toyota received thousands of reports of unintended acceleration, surging and/or speed control problems with Toyota/Lexus/Scion vehicles.

9.    In fact, Toyota was forced to disclose to Congress 37,900 complaints of such reported events.

2

10.    From 2002 to 2010 Toyota knew and/or should have known that the state of the art in the automotive industry for electronic throttle control systems included the installation of a brake override system. Toyota's own documents show that Toyota knew that unintended acceleration events were preventable by installing a brake override system in their vehicles. With a brake override system, when an unintended acceleration event begins to occur, drivers can override the acceleration or surging by placing their foot on the brake.

11.    Toyota manager Koji Sakakibara stated in a document dated September 1, 2009, that "during the floormat sticking issue in 2007 TMS suggested that there should be failsafe option similar to that used by other companies to prevent unintended acceleration." In fact, "Mr M. said this kind of system will be investigated by Toyota, not by body engineering division.... Information concerning the sequential inclusion of a failsafe system would be given by Toyota to NHTSA when Toyota was invited in 2008." (See Exhibit 1, TOY-MDLID00041130T-0001)

12.    Instead of installing a brake override system earlier, Toyota waited until the media and the public heard about the August 2009 unintended acceleration crash in San Diego involving a Lexus vehicle, which killed a CHP officer and three other family members.

13.    Even in late 2009 and early 2010 when Toyota announced a recall involving a brake override, Toyota purposely hid the fact that this redesign was safety related. Instead, Toyota labelled their recalls "floor mat" and "sticky pedal" recalls with a "throw-in" at the end of the recall about an "override" reflash of the software in the recalled vehicles for consumer confidence purposes.

14.    An inventory of statements from Toyota leadership at the highest levels clearly shows that Toyota knows and has known its vehicles present an extreme danger, in that they are subject to unintended acceleration as a result of defects in their design and manufacture, and confirms that Toyota designed and manufactured defective vehicles and also that Toyota has acted carelessly and in conscious disregard

3

for the safety of the public in addressing this grave danger presented by the defects in their vehicles:

- • Koji Sakakibara, the TEMA manager, knew in 2007 of the need for a brake override;

- • Toyota Motor Corporation's CEO, Akio Toyoda, acknowledged that Toyota had grown "too quick";

- • Toyota Motor Sales President, James Lentz, admitted that the floor mat pedal recall does "not totally solve" the unintended acceleration problem;

- • Toyota North America's President, Yoshimi Inaba, conceded that "Toyota has not lived up to its high standards"; and

- • Toyota Motor Corporation's Executive Vice President, Shinichi Sasaki concluded that Toyota did not listen to "many voices" of unintended acceleration.

15. Toyota promised trust and safety, but delivered neither. Rather than recalling the problematic vehicles and implementing a feasible and readily available brake override system, Toyota hid the problem and proposed inadequate and misleading solutions. Toyota's actions have resulted in preventable UA incidents, leading to numerous fatalities and injuries, including those suffered by Plaintiffs.

## I. JURISDICTION AND VENUE

16. This Court has federal question jurisdiction in this civil action pursuant to 28 U.S.C. § 1331.

17. This Court has subject matter jurisdiction over claims specified in this Complaint pursuant to 15 U.S.C. § 2310(d).

18. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19. Venue is proper in this District under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District.

AMENDED COMPLAINT FOR DAMAGES

## II.    PARTIES

20.    Plaintiffs Fred Miller and Myrna are, and at all times relevant herein were, residents of Miami Dade County, State of Florida.

21.    Defendant Toyota Motor North America, Inc. ("TMA") was and is a California corporation authorized to do business under the laws of the State of California, and, at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Los Orange, State of California, with its principal place of business located at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles, California.

22.    Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is a Kentucky corporation authorized to do business under the laws of the States of California and Florida, and at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Orange, State of California, with its principal place of business located at 25 Atlantic Avenue, in the City of Erlanger, in the State of Kentucky.

23.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") was and is a California corporation authorized to do business under the laws of the State of California, and, at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Orange, State of California, with its principal place of business located at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles.

24.    Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation with its principal place of business located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-3571, Japan. At all times herein mentioned, defendant Toyota Motor Corporation was and is authorized to do business within the State of California, and was and is engaged in the business of deriving profit from designing, manufacturing, warning, advertising, promoting and importing Toyota automobiles for sale within the County of Orange, State of California.

5

25. Defendants TMA, TEMA, TMS, and TMC will be referred to herein collectively as "Toyota" or "Defendants."

26. Plaintiffs are informed and believe, and thereupon allege, that at all times relevant and mentioned herein, Defendants, and each of them, were at all times material hereto acting within the authorized course, scope and purpose of said agency and employment and that all of said acts were subsequently performed with the knowledge, acquiescence, ratification and consent of the respective principals, and the benefits thereof accepted by said principals.

### III.   FACTUAL BACKGROUND

27. On October 27, 2010, Plaintiff Fred Miller was driving his 2004 Lexus ES-330, bearing VIN number JTHBA30G340003175 (hereinafter referred to as the "Subject Vehicle"), in an intended and foreseeable manner, pulling into their assigned parking spot in the 1st floor parking garage of the Hamptons West Apt Building. Plaintiff Myrna Miller occupied the front passenger seat. The Subject Vehicle owned and operated by Plaintiffs was designed, manufactured, equipped, warranted, promoted, advertised, warned, distributed and sold by Toyota.

28. On October 27, 2010, despite being operated by Plaintiff Fred Miller in a foreseeable and intended manner, the Subject Vehicle suddenly and unexpectedly accelerated. In an effort to control the sudden acceleration of the Subject Vehicle, Plaintiff Fred Miller attempted various actions, which included stepping on the brake pedal. Despite Plaintiff Fred Miller's efforts to slow and stop the vehicle by application of the brakes, the braking system of the Subject Vehicle failed to operate as intended, and failed to adequately slow or stop the Subject Vehicle prior to impact. As a result, the vehicle accelerated, causing it to run over the parking curb, then sideswipe a parked vehicle and continue southbound in the parking garage until it struck the south wall of the garage.

29. Plaintiffs were hospitalized for their injuries sustained as a result of the accident, and their medical bills to date exceed $50,000.00.

AMENDED COMPLAINT FOR DAMAGES

30. The aforesaid events and resulting injuries and damages to Plaintiffs were caused by the Subject Vehicle, including its design, failure to warn, manufacture, marketing, service, inspection, distribution, and sale. At no time prior to the Subject Vehicle's sudden and unexpected acceleration on October 27, 2010 did Toyota provide any warning regarding the dangerous propensities within the Subject Vehicle. At no time prior to the Subject Vehicle's sudden and unexpected acceleration on October 27, 2010, did the Subject Vehicle include a brake override or fail-safe device to impede or stop the sudden, unexpected acceleration of the Subject Vehicle, although such a feasible alternate design was available and had been used by other prominent manufacturers.

## IV.    COMMON ALLEGATIONS

### A.    Summary of the Defects.

31. Since 1998, Toyota has manufactured and sold millions of vehicles (under the Toyota, Lexus, and Scion brand names) throughout the United States and worldwide that use an electronic throttle control system ("ETCS" or "ETCS-i").

32. Vehicles with ETCS manufactured, marketed, sold and/or distributed by Toyota and its affiliated companies suffer from the same overarching defect, in that, they are vulnerable to UA incidents, including surges, lurching, revving engines, and other instances of unintended acceleration captured as part of the thousands of complaints to NHTSA and the more than 37,900 complaints received by Toyota. Regardless of the many root causes, an effective brake-override system would serve as a fail-safe design feature to prevent and/or minimize the risk of injury, harm or damage to Toyota vehicle owners or their occupants from UA events.

33. In addition to the lack of an effective brake-override system, there are other defects in the Vehicles that cause and/or contribute to the overarching defect of UA, including, but not limited to, defective pedals and poorly designed floor mats, and there are design defects in Toyota vehicles that caused, contributed to, and/or failed to prevent UA events, including the following: (1) an inadequate fault detection system

7

1  that is not robust enough to anticipate foreseeable unwanted outcomes, including UA;
2  (2) the ETCS and its components are highly susceptible to malfunction caused by
3  various electronic failures, including, but not limited to, short circuits, software
4  glitches, and electromagnetic interference from sources outside the vehicle; and (3)
5  there was a failure to warn consumers as to how to properly push and hold buttons or
6  shift into neutral in order to stop UA events once the aforementioned defects had set
7  the UA events in motion.

8      34.    In addition, the braking system in the Subject Vehicle, in conjunction with
9  the ETCS and its components, was defective in that the risk of danger inherent in the
10  design of the braking system outweighs the benefits of such design, and the subject
11  braking system failed to perform as safely as an ordinary consumer would expect when
12  used in an intended or reasonably foreseeable manner, in that it failed to adequately
13  stop or slow the Subject Vehicle during the subject incident. Additionally, the braking
14  system and its component parts deviate from the manufacturer's design and
15  specifications, and from other typical units of the same product line, thereby reducing
16  the effectiveness of the brakes and their ability to safely slow the Subject Vehicle
17  during the subject incident. The aforementioned defects created a substantial danger
18  which was unknown to Plaintiffs and the public in general, and would not be
19  recognized by the ordinary user, and said Defendants failed to give adequate warning
20  of such danger.

21      **B.     Timeline of Key Events regarding Toyota Vehicles.**

22      35.    Toyota has been receiving evidence for many years, from a variety of
23  sources, which established there are serious safety defects in its vehicles, including an
24  alarming increase in the number of complaints, injuries, and deaths, which Toyota
25  knew or should have known were likely caused by said defects.

26      **i.     Toyota's ETCS-i System.**

27      36.    In the late 1990's, Toyota began to replace its mechanical throttle linkage
28  with a computer-controlled accelerator system or fly-by-wire system.    Eventually,

8

Toyota discontinued the mechanical linkage in throttle systems and changed to a computer-controlled accelerator system.

37.    Toyota calls its electronic throttle control system the ETCS-intelligent, or ETCS-i. ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle. Toyota began installing ETCS-i in models of the 1998 Lexus. This ETCS included a mechanical link that shut off the throttle.

38.    Toyota's earlier ETCS-i equipped vehicles retained a mechanical system that would close the throttle if the electronic system failed. However, Toyota had phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002 Camry. Toyota knew other manufacturers continued to use a manual fail-safe mechanism. For example, Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied.

39.    Toyota's ETCS-i also does not contain a key safety feature included in the Bosch state-of the art system.   The Bosch ETCS requires that a spring test be conducted on the spring contained within the throttle unit.  The spring test ensures that the spring remains in working order by confirming the internal return of the spring with every ignition cycle.  Toyota's ETCS-i does not employ a similar spring test.

40.    In order to address potential malfunctions of the ETCS-i – in other words, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies. The fail-safe strategies are:

      a.    If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

AMENDED COMPLAINT FOR DAMAGES

b. The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

c. The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

d. If one or both throttle position sensors fail, or the throttle itself is not responding properly to the accelerator pedal but the throttle itself is not physically stuck, the throttle should close but will provide minimal acceleration.

41. Toyota knew no later than 2002 that these fail-safes were insufficient to prevent UA events in its vehicles and that additional fail-safes were necessary. Toyota did not, however, move to address these issues by installing additional fail-safes.

42. Toyota had several options. For example, Toyota could have installed a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing UA. Or, Toyota could have employed a hardware-redundant, fault tolerant solution (BMW's approach). Or, Toyota could have provided an override of the engine control module, such as a key switch to physically remove the power to the Engine Control Module ("ECM"). Or, Toyota could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system. Toyota did none of these things.

**ii.    NHTSA Investigates UA in Toyota Vehicles in the Midst Toyota's Climb to #1 Vehicle Manufacturer in the United States**

43. In 2003, Toyota sold 6,780,000 vehicles and overtook Ford Motor Company in annual sales to become second in the United States behind only General Motors.

44. In February 2003, NHTSA conducted its first of many investigations regarding speed control problems in Toyota vehicles. The first two involved the Camry and Solara models.

AMENDED COMPLAINT FOR DAMAGES

45.    In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Vehicle model. Toyota blamed a "faulty trim panel clip," deemed it an isolated incident, and did not make such information available to NHTSA until 5 years later in response to a blanket information request by the agency.

46.    In July 2003, NHTSA opened the first probe of UA complaints in Lexus sedans at the request of an owner.

47.    In March 2004, NHTSA opened a wider probe into Lexus sedans after another complaint regarding sudden acceleration. NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models. Toyota succeeded in narrowing the investigation to 11 incidents involving 5 crashes.

48.    In July 2004, NHTSA closed its investigation of the Lexus sudden acceleration complaints without finding a defect. Citing a lack of resources, NHTSA turned down two more requests from consumers to investigate the problem.

49.    In 2005, the auto part supplier CTS began making pedal assemblies for Toyota.

50.    In August 2005, NHTSA conducted an evaluation of the Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

51.    In November 2005, Toyota wrote NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

52.    In 2006, Toyota passed General Motors as the number one brand of cars sold in the United States, with 8,800,000 vehicles sold.

53.    In January 2006, NHTSA opened a second investigation of Toyota Camry models and received questionnaires from Camry owners, who reported hundreds of problems with acceleration and braking. After communicating with Toyota, NHTSA

11

closed the investigation without finding a defect and stated the claims were of "ambiguous significance."

54.    In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

55.    In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles. Toyota represented to NHTSA that there was no abnormality in the throttle control system and blamed water damage. NHTSA closed this investigation without finding a defect, citing "the need to best allocate limited administrative resources."

56.    In March 2007, NHTSA launched a probe into the floor mats of Lexus models. Toyota responded by claiming the "issue is not a safety concern." NHTSA also preliminarily reviewed the 2007 Lexus ES for unwanted acceleration due to floor mat interference, but closed the investigation seven months later.

57.    In August 2007, NHTSA upgraded its investigation to "engineering analysis," which means the agency would test Toyota vehicles rather than merely review complaints.

58.    In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to suspected floor mats that purportedly interfered with the accelerator pedal.

59.    In January 2008, NHTSA launched a probe into sudden unintended acceleration with Tacoma pickups after receiving notice of potentially 478 incidents with 2004-2008 models. In response, Toyota told NHTSA they could not find enough evidence to support allegations and that an investigation was not warranted.

60.    In August 2008, NHTSA closed its investigation of the Tacoma without finding a defect, despite hundreds of complaints. This was the eighth investigation of Toyota vehicles since 2003. As of that time, there were over 2,600 complaints made regarding "run away" Toyota vehicles.

61.    In February 2009, Toyota continued to deny that there was any defect in the ETCS, even when independent professional engineers concluded that a UA incident in Tennessee was caused by deviations with the vehicle's ETCS.

62.    In April 2009, NHTSA received another petition for an investigation of throttle-control problems in Toyota vehicles unrelated to floor mat issues.

63.    On August 28, 2009, California Highway Patrol officer Mark Saylor and his family were killed when his Toyota vehicle (Lexus ES350) accelerated out of control to over 100 mph. A 911 call by a passenger said the car had "no brakes."

64.    In September 2009, NHTSA told Toyota to expect wider recalls of floor mats. Toyota warned consumers to remove floor mats because of a supposed potential to jam the accelerator, purportedly causing sudden unintended acceleration.

65.    In October 2009:

- Toyota received reports in the United States and Canada that pedals were sticking in certain models.

- Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

- Akio Toyoda, president of the Japanese parent corporation, issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern. I can't begin to express my remorse."

- The Los Angeles Times published the first of many stories concerning claims of sudden unintended acceleration in Toyota vehicles, including nine NHTSA investigations that included five deaths and hundreds of complaints filed with the federal government. Toyota then sent letters

AMENDED COMPLAINT FOR DAMAGES

to consumers regarding the unintended acceleration issue, claiming "no defect exists."

66.    In November 2009:

- Toyota expanded the floor mat recall by over a million vehicles.
- NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect."
- Toyota then publicly apologized for its inaccurate press release.
- Toyota issued another press release denying media reports that a problem existed with the electronic throttle system.
- The Los Angeles Times wrote another article stating that Toyota ignored over 1,200 complaints of sudden unintended acceleration over the preceding eight years.
- Toyota announced a preliminary fix for the "floor mat problem" by cutting off part of the gas pedal and expanded the total number of Toyota vehicles subject to recall to 4.2 million.
- Toyota instructed dealers to remove the gas pedal and shorten it so it would not interfere with floor mats.

67.    In December 2009:

- NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning.
- NHTSA opened an investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

68.    In January 2010:

- Toyota announced a brake override software "fix" would be applied to its vehicles globally by 2011.

14

AMENDED COMPLAINT FOR DAMAGES

- Toyota told NHTSA it may have "an issue" with sticking accelerator pedals.
- NHTSA told Toyota it must conduct a recall.
- Toyota issued a recall for sticking accelerator pedals affecting 2.3 million vehicles.
- Toyota then expanded the pedal recall to include another 1.1 million vehicles.
- United States Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.
- Toyota told NHTSA it had a fix for the sticky-pedal problem, as well as a permanent fix for the mat problem.

69.    On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized." Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

70.    In February 2010:

- Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.
- Kelly Blue Book said affected Toyota models were devalued as much as 5%.
- Edmunds stated the average devaluation was between 4%-8%.
- Toyota admitted to a brake software problem in 2010 Prius Hybrids.
- Toyota recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty brakes (437,000 vehicles worldwide).

71.    Akio Toyoda, President and CEO of Toyota Motor Corporation, in his prepared testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives on February 24, 2010, admitted that Toyota's growth in

15

recent years was "too quick" and the company's priorities of "first, safety; second, quality; third, volume" had become "confused."  Mr. Toyoda went on to apologize to American consumers, "I regret that this has resulted in the safety issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota drivers have experienced."

72.    On March 4, 2010, United States Representatives Henry Waxman and Bart Stupak wrote in a letter to Toyota: "We do not understand the basis for Toyota's repeated assertions that it is 'confident' there are no electronic defects contributing to incidents of sudden unintended acceleration . . . There's a Glitch . . . You really don't know when it's going to occur and that's the uncertainty which should cause safety concerns."

73.    On March 5, 2010, new data released showed that more than 60 drivers have complained of sudden unintended acceleration incidents despite the fact that their cars were repaired by Toyota Motor Corp. in the current recalls.  The figures released by NHTSA significantly increased the total number of complaints involving repaired vehicles.  The new complaints alleged several accidents and at least three injuries resulting from runaway unintended acceleration despite the vehicles' modifications at Toyota dealerships designed to resolve the issue.

74.    As of March 6, 2010, the number of deaths attributed to possible sudden unintended acceleration in Toyota cars had risen to 58.  The Detroit Free Press reported that the number of complaints to U.S. auto safety regulators related to sudden unintended acceleration also had grown to 3,300.

75.    Analyses of publicly available databases by other researchers indicate that from 1999 to the present there have been more than 5,800 UA incidents involving Toyotas that have resulted in 2,166 crashes, 1,011 injuries and 78 deaths.  Internally, Toyota was tallying the deaths caused by UA.

76.    As of March 2010, Toyota reported more than $200 billion in worldwide sales for the fiscal year that ended in March 2010.

AMENDED COMPLAINT FOR DAMAGES

77.    Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America, Inc. likewise acknowledged that Toyota had failed its customers. Mr. Inaba testified in the Senate Sub-Committee hearings on Toyota recalls:

> In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts. As our president, Akio Toyoda, told members of Congress last week, we sincerely regret our shortcomings have resulted in the issues associated with our recent recalls.

78.    Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before Congress that Toyota "did not listen to its consumers":

> How this issue came about is because there were many vehicle – excuse me – many voices were sent to us from the customers, but we really did not listen to every one of them very carefully, one by one. We should have really listened to them carefully and rendered some technical analysis so that it would be connected to our following product improvement. However, the quality of this work or the efficiency of our work or speed with which we worked had become sluggish, or sort [sic] failed gradually, and this has come to a much larger issue.

79.    On April 5, 2010, NHTSA informed Toyota in a letter that it was imposing a $16.375 million fine for hiding safety defects related to sudden acceleration in 2.3 million vehicles. NHTSA imposed the record fine after finding that Toyota had failed to notify the National Highway Traffic Safety Administration for at least four months after learning that the accelerator pedals in some of its vehicles could stick and cause sudden unintended acceleration.    Under federal law, automakers are required to disclose defects to NHTSA within five business days. In its April 5 letter, NHTSA cited how Toyota had sent instructions to its European operations in September 2009

which explained how to fix accelerator pedals that could stick, yet decided against similarly notifying U.S. dealers and government regulators. The NHTSA letter indicated that Toyota may have known about the Defects for at least three years.

80.    On April 19, 2010, Toyota agreed to pay the $16.375 million fine imposed by NHTSA. On April 19, 2010, NHTSA Secretary Ray LaHood released a statement saying, "By failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

81.    Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations:

> First, the documents appear to show that Toyota consistently dismissed the possibility that electronic failures could be responsible for incidents of sudden unintended acceleration. Since 2001, when Toyota first began installing electronic throttle controls on vehicles, Toyota has received thousands of consumer complaints of sudden unintended acceleration. In June 2004, the National Highway Traffic Safety Administration (NHTSA) sent Toyota a chart showing that Toyota Camrys with electronic throttle controls had over 400% more 'vehicle speed' complaints than Camrys with manual controls. Yet, despite these warnings, Toyota appears to have conducted no systematic investigation into whether electronic defects could lead to sudden unintended acceleration.

82.    This concern is significant because it appears that from 2004 to 2009, Toyota was selling cars without knowledge of what caused the defect or disclosure of the defect.

83.    Next, the Committee rejected tests submitted by Toyota that were conducted at the request of Toyota's litigation counsel, Bowman and Brooke, LLP:

AMENDED COMPLAINT FOR DAMAGES

Second, the one report that Toyota has produced that purports to test and analyze potential electronic causes of sudden unintended acceleration was initiated just two months ago and appears to have serious flaws. This report was prepared for Toyota by the consulting firm Exponent, Inc. at the request of Toyota's defense counsel, Bowman and Brooke, LLP. Michael Pecht, a professor of mechanical engineering at the University of Maryland, and director of the University's Center for Advanced Life Cycle Engineering (CALCE), told the Committee that Exponent 'did not conduct a fault tree analysis, a failure modes and effects analysis ... or provide any other scientific or rigorous study to describe all the various potential ways in which a sudden acceleration event could be trigger' 'only to have focused on some simple and obvious failure causes'; used 'extremely small sample sizes'; and as a result produced a report that "I would not consider ... of value ... in getting to the root causes of sudden acceleration in Defective Vehicles.'

84.    Again, the concern over the Exponent Bowman and Brooke report highlights: (a) that Toyota had no credible prior report or analysis of UA; (b) that Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's inability to understand the basis for the defect; and (d) its failure to provide a fail-safe to prevent unintended acceleration.

85.    The Committee then addressed Toyota's lack of truthfulness in its statements and rejected the notion that floor mats or pedals were the sole cause of the problem:

Third, Toyota's public statements about the adequacy of its recent recalls appear to be misleading. In a February 1, 2010,

19

appearance on the Today show, you stated that Toyota has "studied the events of unintended acceleration, and [it] is quite clear that it has come down to two different issues," entrapment of accelerator pedals in floor mats and sticky accelerator pedals. In an appearance the same day on CNBC you repeated this claim and reported that Toyota is "very confident that the fix in place is going to stop what's going on." The documents provided to the Committee appear to undermine these public claims. We wrote to you on February 2, 2010, to request any analyses by Toyota that show sticky pedals can cause sudden unintended acceleration. Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "typically ... does not translate into a sudden, high-speed acceleration event." Moreover, our review of the consumer complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

C.   **Toyota Sacrificed Quality while Maintaining Image of Safety and Reliability.**

86.   One reason why Toyota lacks sufficient test data on the reliability of ETCS, and had to rely on a belated report by Exponent and Bowman & Brooke, is the overall slip at Toyota in its attention to quality control. Toyota has sacrificed safety for speed.

AMENDED COMPLAINT FOR DAMAGES

87.    In the last ten years, the culture has changed. Now, as acknowledged by Toyota, the emphasis is on fast production. While production and production goals have increased, the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

88.    The result has been a significant increase in quality control problems per vehicle. Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are overlooked. Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a recall. Quality control employees are given goals that set an upper limit on the number of defects they are to report.

## VI.  FRAUDULENT CONCEALMENT, TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL

89.    After more than eight years of suppression and concealment of the existence and nature of the defects, presumably because it could no longer conceal the rising injury and death toll, in September, 2009, Toyota admitted there was a defect in its vehicles that causes sudden unintended acceleration.  However, Toyota's belated admission only concedes that some of its models have had sudden unintended acceleration and resulting crashes, and Toyota continues its plan and scheme of concealment by denying the existence of the defects in numerous models which also have suffered sudden unintended acceleration.  For example, Toyota claims the defects do "not exist in vehicles in which the driver's side floor mat is compatible with the vehicle and properly secured."  Toyota knows, and knew, this was false because Toyota was fully aware that unintended acceleration had occurred on numerous occasions when there were no floor mats in the involved vehicles.

AMENDED COMPLAINT FOR DAMAGES

90.    As a direct and proximate result of defects in the Subject Vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment resulting permanent physical deficits, permanent impairment and other sequelae likely to continue manifesting in the future.

91.    As a further direct and proximate result of defects in the Subject Vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs have also incurred medical expenses and other economic harm including loss of earnings, and lost earning capacity, and will continue to incur expenses and loss of earnings in the future, as a direct and proximate result of the injuries alleged herein as a result of the use of the Subject Vehicle.

92.    As a further direct and proximate result of defects in the Subject Vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs have required medical treatment, and will continue to require reasonable and necessary health care, attention and services, and Plaintiffs have incurred, and continues to incur, medical, incidental, and service expenses pertaining to the injuries.

93.    The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, wilful and malicious and were done with a conscious disregard for the rights of the Plaintiffs and users of Toyota's vehicles and for the primary purpose of increasing Defendants' profits from their sale and distribution.  Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.  Prior to the manufacturing, sale and distribution of the vehicles, Defendants and each of them knew that said vehicles were in a defective condition as previously described herein and knew that those who purchased, leased and/or were passengers in said vehicles would experience and did experience severe physical, mental, and emotional injuries.  Further, Defendants and

AMENDED COMPLAINT FOR DAMAGES

each of them through their officers, directors, managers, and agents, had knowledge that the vehicles presented a substantial and unreasonable risk of harm to the public, and as such, were unreasonably subjected to risk of injury or death. Despite such knowledge, Defendants, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known Defects in the product and failed to warn the public, including Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in said vehicles.    Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of the vehicles knowing persons would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits. Defendants' conduct was fraudulent, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with wilful and conscious disregard for the safety of Plaintiffs, entitling Plaintiffs to exemplary damages.

94.    Any applicable statutes of limitation have been equitably tolled by Toyota's affirmative acts of fraud, fraudulent concealment; suppression and denial of the true facts regarding the existence of the defective acceleration control and throttle system in its vehicles.    Since as early as 2001, Toyota knew of the defects and concealed and suppressed these facts. However, despite Toyota's exclusive knowledge of the defects, Toyota continued to make statements touting the reliability and safety of its vehicles, and withheld information regarding the dangerous defects that Toyota knew had caused and were likely to cause further serious injuries and deaths.

95.    At all times relevant, Toyota has had exclusive knowledge of the dangerously defective nature of the acceleration control and throttle system within its vehicles and continued to conceal these facts from Plaintiffs, the public, and NHTSA.

AMENDED COMPLAINT FOR DAMAGES

96.    The following timeline of documents and events demonstrates Toyota's awareness and concealment of the defective nature of the acceleration control and throttle system:

97.    In February 2002, Toyota received its first consumer complaint relating to engine surging when the brakes were depressed.    Ten other similar complaints were received by Toyota by August 2002.    TMC investigated the root cause of the surging, and a May 20, 2002, internal record reported that the "root cause of the surging condition remains unknown" and "no known remedy exists for the surging condition at this time."

98.    In response to a NHTSA investigation on similar incidents, Toyota issued at least three "Technical Service Bulletins" related to the issue of unintended acceleration.    On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38–42 MPH with lock-up (L/U) 'ON.'"    Toyota advised that the cars' Engine Control Module (ECM) calibration had been revised to correct the problem.    Yet, on December 23, 2002, Toyota released another bulletin noting that certain 2002 and 2003 Camrys "may exhibit a triple shock (shudder) during the shift under 'light throttle' acceleration."    The bulletin advised dealers to follow the repair procedure in the bulletin to rectify the situation.    Less than nine months later, Toyota released a nearly identical advisory notice on May 16, 2003 which cited that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-42 mph with lock-up (L/U) 'ON.'"    Again, Toyota claimed the ECM calibration had been revised to correct this condition.    The existence of these technical service bulletins was not disclosed to consumers.

99.    On April 25, 2003, NHTSA issued Defect Petition DP03 003.    The petitioner requested that the agency to conduct an analysis of 1997 through 2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the

24

accelerator pedal," and noted 271 other complaints he found on the NHTSA website about these vehicles. Thirty-six of the complaints referred specifically to unintended acceleration and described several crashes.

100. In January 2004, another consumer filed a petition with NHTSA, requesting an investigation of 2002 and 2003 Lexus ES 300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash." On March 3, 2004, Office of Defects Investigation ("ODI") opened a Preliminary Evaluation. NHTSA documents describe the problem to be investigated as: "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge." The investigation was expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES 300 vehicles. ODI had received 37 complaints and reports of 30 crashes resulting in five injuries. Mr. Scott Yon was the designated investigator. He would remain NHTSA's principal investigator on many subsequent investigations and developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

101. The NHTSA investigation specifically described the defect alleged by vehicle owners, in part, as:

> Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system functioned normally.

102. On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota employee in Technical and Regulatory Affairs, an email showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles. (See Exhibit 2). This statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that

AMENDED COMPLAINT FOR DAMAGES

1  there was a defect in its vehicles with electronic throttle controls that could potentially
2  cause unintended accelerations.

3       103.  In a June 19, 2004 letter to NHTSA, Toyota falsely stated that its ETCS
4  contained a built-in redundancy to prevent acceleration, and that in the event of sudden
5  acceleration the "vehicle brakes would have restrained vehicle motion."   Toyota
6  continued to maintain this position for years, even though it knew that Toyota-
7  manufactured vehicles can and do experience sudden unintended acceleration and that
8  application of the brakes has failed to restrain vehicle motion.

9       104.  Motor vehicle manufacturers frequently re-design their vehicles, as when
10  Toyota implemented ETCS. But having taken that step, Toyota should have monitored
11  NHTSA's consumer safety database for indications of changing patterns in the
12  complaints by model that signaled the need to review the safety of ETCS and the need
13  to implement a robust fail-safe, including, but not limited to, an effective brake-
14  override.

15       105.  At the outset of its 2004 investigation, NHTSA asked Toyota for
16  information on similar incidents including the number of complaints, field reports,
17  crash reports, property damage claims and lawsuits. The decision on how to respond to
18  NHTSA emanated from a group of Toyota employees, including Christopher Tinto and
19  Christopher Santucci in Washington, D.C., as well as others from the Product Quality
20  and Service Support group in Torrance, CA.   The scope of NHTSA's information
21  request became the subject of negotiations between Christopher Tinto and Christopher
22  Santucci of Toyota and NHTSA representatives, with the result that certain relevant
23  categories of incidents were excluded from Toyota's reporting of events.

24       106.  In its response to NHTSA's information request, Toyota denied that a
25  defect existed, stated that there was no defect trend and that its electronic control
26  system could not fail in ways its engineers had not already perceived.  Toyota reported
27  123 complaints that it said "may relate to the alleged defect."  But Toyota excluded
28  from its response the following relevant categories of complaints, among others:

AMENDED COMPLAINT FOR DAMAGES

      (1)    an incident alleging uncontrollable acceleration that occurred for a long duration;

      (2)    an incident in which the customer alleged that he could not control a vehicle by applying the brake; and

      (3)    an incident alleging unintended acceleration occurred when moving the shift lever to the reverse or the drive position.

107. The Toyota Defendants thus concealed from NHTSA and the public relevant customer complaints.

108. NHTSA closed the investigation without testing of the integrity of the ETCS-i, without reviewing any records of Toyota's test reports concerning the ETCS-i, and without reviewing whether the braking system was effective in an open- throttle condition. Toyota itself did not have the capability of fully modeling, testing or validating the safety of ETCS-i because of its failure to implement standard design platforms, its failure to develop and/or conduct meaningful ECM test procedures, and its failure to exercise appropriate control over third-party subsystem designs.

109. While Toyota continued to claim that there was no unintended acceleration defect, other independent experts concluded otherwise. In May 2004, a Forensic Technologist and MSME examined a vehicle in New Jersey that had experienced a UA event. The report was forwarded to Toyota on January 13, 2005. It concluded that the vehicle's ETCS was not operating correctly. Upon information and belief, this report was not provided to NHTSA.

110. In August 2005, NHTSA opened Defect Petition DP05-002 to investigate a consumer's claims relating to unintended acceleration in the 2002 Camry. Scott Yon again was assigned as NHTSA's investigator. The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES models. After receiving the petition and reviewing the underlying complaints, Toyota did not launch its own investigation or identify any new tests that it would perform to check for a defect in the ETCS. Instead, in a November 15, 2005 letter to NHTSA, Toyota recommended NHTSA deny the

27

petition based only on the information Toyota had previously provided "as well as the lack of evidence supporting concurrent failure of the vehicle braking systems." After explaining how the electronic throttle system and its fail-safes were designed to operate, Toyota concluded:

> [T]here is no factor or trend indicating that a vehicle or component defect exists. Toyota believes that this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls. Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls. Toyota has not found any evidence on the vehicles of brake failure, let alone brake failure concurrent with ETC failure.

111. This response of "no evidence" ignores and concealed the spike in UA events that occur within one year of a vehicle switching to ETCS, a trend known to Toyota.

112. On September 22, 2005, Carol Hargrave of TMS' Customer Relations Department wrote the following in a letter to a concerned Lexus owner who had complained to Toyota about her experiences of unintended acceleration:

> It is our understanding that you reported that you stepped on the brake pedal and the vehicle accelerated and that this has happened several other times.

> As you are aware your vehicle was inspected in regards to your concerns with the brakes and unintended acceleration. **Your concerns could not be duplicated.** The throttle body was inspected and there was no binding and the cable operated freely. The vehicle was test driven and the brakes were

AMENDED COMPLAINT FOR DAMAGES

functioning properly. There were no codes to indicate any type
of failure of the system.

**It is virtually impossible for this type of incident to happen.**
The brakes and the throttle are two totally separate systems and
both would have to fail at exactly the same time. The brakes
will always over ride the throttle." (Emphasis added).

113. In December 2005, in connection with the IS 250 All Weather Drive
investigation, Toyota removed any reference to speed control in letters sent to owners,
as evidenced by an email drafted by George Marino: "They pulled out the 'vehicle
speed control' part. NHTSA may come back, but TMC wanted to try." (See Exhibit 3,
TOY-MDLID00002896; TOY-MDLID00002900).

114. In September 2006, ODI opened Defect Petition DP06-003 in order to
investigate incidents relating to vehicle surging in 2002-2006 Camry and Camry Solara
vehicles. Instead of expressing willingness to investigate the issue, in internal emails
Chris Santucci expressed skepticism of the Petitioner's account of the unintended
acceleration and hope that NHTSA would not ask Toyota to provide any additional
data as part of the investigation: "Hopefully, this is just an exercise that NHTSA needs
to go through to meet its obligations to the petitioner. Hopefully, they will not grant
the petition and open another investigation." (See Exhibit 4, TOY-MDLID00044092).

115. In a February 27, 2007 email sent by Michiteru Kato to Christopher
Santucci, Mr. Kato decided against sending his most knowledgeable ECU engineer to
an ECU demonstration being conducted for NHTSA, in order to avoid questions
regarding ECU failures: "...I thought that 3 guys from TMS is too many (two at most),
and if the engineer who knows the failures well attends the meeting, NHTSA will ask a
bunch of questions about the ECU. (I want to avoid such situation)." (See Exhibit 5,
TOY-MDLID00075574).

116. On March 29, 2007, ODI, apparently prompted by customer complaints of
unwanted acceleration in 2007 Lexus ES 350 vehicles, opened PE07-016.    The

AMENDED COMPLAINT FOR DAMAGES

principal investigator was again Scott Yon. The stated "Problem Description" in the
Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal."
Toyota attempted to prevent the opening of the investigation by offering to send a letter
to 2007 ES 350 owners "reminding them not to install all weather mats on top of
existing mats." As evidenced by an email from Chris Tinto, NHTSA did not agree:
"NHTSA feels that they have too many complaints on this one vehicle to drop the
issue; The results of a stuck throttle are 'catastrophic.'" (See Exhibit 6, TOY-
MDLID00003908).

117. In an email dated April 2, 2007, George Morino urged others within
Toyota to re-frame the investigation as an "All Weather Floor Mat issue," and carefully
eliminated reference to the much broader and more alarming issue of unintended
acceleration:

> Sorry we had a last minute change to the Q&A. Please utilize
> this revised version of the Statement and Q&A. The issue has
> been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding
> unintended throttle control in the vehicles.
>
> [New]
>
> NHTSA received five consumer where the All Weather Floor
> Mat may have interfered with the accelerator pedal operation.

(See Exhibit 7, TOY-MDLID00000566).

118. Despite the growing number of UA complaints, Toyota had knowledge of
fail-safe mechanisms that protect against unintended acceleration, but failed to employ
them. In August 2007, in internal emails entitled "UPDATE on ES 350 investigation,"
Chris Santucci stated that NHTSA investigators had discussed with him fail-safe
mechanisms used by other vehicle manufacturers to protect against unintended

AMENDED COMPLAINT FOR DAMAGES

1  acceleration, including "[u]sing ETC to shut down throttle control" and "cutting off the
2  throttle when the brakes are applied." Mr. Santucci also noted, "Jeff [Quandt, Chief,
3  Vehicle Controls Division, Office of Defects Investigation] mentioned that another
4  manufacturer allows the engine to be shut off if you press the ignition button
5  repeatedly." (See Exhibit 8, TOY-MDLID00000295)

6      119.  On August 8, 2007, ODI upgraded PE07-016 to engineering analysis
7  EA07-010, intending to investigate unintended accelerations in a target population of
8  98,454 2007 Lexus ES 350s. The Opening Resume for EA07010 states, in part, as
9  follows:

10          [T]he agency has 40 complaints; eight crashes and 12 injuries.
11          Complainants interviewed by ODI stated that they applied the
12          throttle pedal to accelerate the vehicle then experienced
13          unwanted acceleration after release. Subsequent (and
14          sometimes repeated) applications of the brake pedal reduced
15          acceleration but did not stop the vehicle. In some incidents
16          drivers traveled significant distances (miles) at high vehicle
17          speeds (greater than 90 mph) before the vehicle stopped (ODI
18          notes that multiple brake applications with the throttle in an
19          open position can deplete the brake system's power [vacuum]
20          assist reserve resulting in diminished braking).

21      120.  In September 2007 Toyota acknowledged internally that that "floor mat
22  interference is possible in **any vehicle with any combination of floor mats.**"
23  (Emphasis added). Despite this admission, no broader recall or effort to implement a
24  brake override took place. (See Exhibit 9, TOY-MDLID00002839).

25      121.  At the same time Toyota was pointing the finger at floor mats, it was
26  investigating UA events that it knew were not caused by floor mats, including an event
27  where the service manager at Cedar Rapids Toyota confirmed the UA was not caused
28  by the mat. Toyota replaced the throttle pedal assembly.

122. Despite having received a number of complaints of unintended acceleration that could not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of any intent to study the electronic throttle control system employed. Toyota did not study the ETCS system either.

123. In September 2007, Toyota successfully limited a UA investigation by negotiating what terms it would use to search for relevant complaints. When the company searched for incidents, it used the term "mats" as opposed to "surging." A search for surging on just the Camry in 2004 revealed "60,000 complaints." Surging may be related to UA, but Toyota never revealed the 60,000 surging complaints.

124. A September 14, 2007 email from Chris Tinto demonstrates that internally, Toyota executives were pleased that NHTSA had limited the ES350 unintended acceleration issue to a "floor mat" recall, and that this limitation saved the company "upwards of one hundred million dollars:"

> Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off" switch. We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

(See Exhibit 10, TOY-MDLID00004972)

125. Toyota also knew at this time that the root cause of sudden unintended acceleration was not often traceable, as demonstrated by Chris Tinto's email dated October 19, 2007: "[O]ne big problem is that no codes are thrown in the ECU so the allege [sic] failure (as far as we know) can not be documented or replicated." The implications were that "the service tech therefore can't fix anything, and has no evidence that any problem exists." (See Exhibit 11, TOY-MDLID00050747)

126. This same email chain also discloses the fact that it was Toyota's intention in 2007 to "stop this from moving forward;" a reference to the possibility of a public

32

AMENDED COMPLAINT FOR DAMAGES

hearing before Congress on unintended acceleration years before the congressional hearings actually occurred in 2010. (See Exhibit 11)

127. In late 2007, Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of UA in Tacomas. On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration." Toyota internal e-mails also indicate that they were finding Internet blog posts regarding UA events in Tacomas in November 2007.

128. While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004 Toyota Vehicles. PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal. Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration. Five years earlier, in April 2003, Toyota had experienced a UA event during testing of a 2004 Vehicle. This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

129. In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating." The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

130. In another internal PowerPoint Toyota addresses "Key Safety Issues" including the following:

- 'Sudden Acceleration' on ES/Camry, Tacoma, LS, etc.
- Recurring issue, PL/Design Implications.

33

1   (Emphasis added). (See Exhibit 12, TOY-MDLID00052956).

2       131. Also in 2008, Toyota knew that it had received a "huge number of
3   complaints" alleging forms of UA Toyota labeled as "surge," or "lunge" or "lurch" if it
4   searched for UA events just on the Camry:

5           Let's discuss the response with George sometime on 10/13. We
6           just started to gather the field information in order to update it
7           requested in Q2, 3, 4 of IR for PE07-016. However, I'm very
8           concerned about how many customer complaints will be
9           extracted from CAN2000 by keyword search which we usually
10          do. Because NHTSA expanded the scope of the vehicles to
11          2007-2009MY ES and "CAMRY." As you know, Camry has
12          had an issue on the 6 speed automatic transmission and there
13          may be a huge number of complaints alleging the surge or lunch
14          or lurch and we usually include those words for the keyword
15          search. If this is the case, it will take long time to complete.

16      132. On April 18, 2008, Toyota filed its first response in DP0-800 1, reporting
17  a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

18      133. On April 25, 2008, Toyota filed its second response in the Tacoma
19  investigation, outlining its investigation into the problem and analyzing the consumer
20  complaints submitted to Toyota and to NHTSA that could be related to alleged
21  unintended acceleration. In Toyota's view, neither the consumer complaints nor the
22  field study indicated the existence of any defect in the vehicles, much less a safety-
23  related defect.

24      134. Toyota disputed the assertion in the petition that the 32 complaints in the
25  NHTSA database "in and of themselves justify opening an investigation." Toyota
26  claimed that the Tacoma had been the subject of extensive media coverage related to
27  the possibility of sudden acceleration. In addition, Toyota claimed that there had been a
28  high level of internal activity on this subject (as far back as early 2007) including

34

reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

135. On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Vehicles, followed by a second response on June 25, 2008. Toyota stated that complaints about unintended accelerations in Vehicles took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver. Toyota also said that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem. Toyota did not disclose that it had considered and had the ability to incorporate brake-override and other fail-safe mechanisms that would address this problem.

136. On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

> The complaints fell into three groups. A majority of the complaints may have involved the Tacoma's throttle control system. Some complaints did not involve a failure of the throttle control system. For the remaining reports, although there may have been an issue with the throttle control system as one possible explanation, we have been unable to determine a cause related to throttle control or any underlying cause that gave rise to the complaint. For those vehicles where the throttle control system did not perform as the owner believes it should have, the information suggesting a possible defect related to motor vehicle safety is quite limited. Additional investigation is unlikely to result in a finding that a defect related to motor vehicle safety exists or a NHTSA order for the notification and remedy of a safety-related defect as requested by the petitioner. Therefore, in

AMENDED COMPLAINT FOR DAMAGES

1      view of the need to allocate and prioritize NHTSA's limited

2      resources to best accomplish the agency's safety mission, the

3      petition is denied.

4   137. On October 15, 2008, Toyota created a confidential PowerPoint

5 presentation to ODI regarding unintended acceleration and trim interference in 2004

6 Vehicles as part of EA08-014. Toyota demonstrated how an unrestrained early design-

7 level trim panel interacted with the accelerator after pedal depression. Toyota also

8 advised that the company was conducting a field survey to examine panel retention and

9 that preliminarily one vehicle had been identified with a concern.

10   138. On December 12, 2008, in a Field Technical Report confirmed an incident

11 of unintended acceleration stating that: "After traveling 20-30 feet the vehicle

12 exhibited a slight hesitation then began to accelerate on its own. Engine speed was

13 estimated to have gone from 1500 rpm to 5500 rpm at the time of the

14 occurrence...Probable Cause =Unknown."

15   139. On January 26, 2009, ODI closed EA08-014 after Toyota agreed to recall

16 vehicles built between January 10, 2003, and June 11, 2003. Toyota then issued Recall

17 09V023 for 26,501 model year 2004 Vehicles. Toyota did not describe this as a defect,

18 but called the actions a "safety improvement campaign" that was not being conducted

19 under the Safety Act. Toyota's recall instructed dealers to replace the original floor

20 carpet cover with the newer-design floor carpet (and retention clip) at no charge to the

21 owner. The repair was expected to reduce the potential for trim panel interference with

22 the accelerator pedal should the retaining clips become missing because of improper

23 service or other reasons. Dealers were to replace the retention clip and floor carpet

24 cover at no charge.

25   140. Toyota continued to receive reports from qualified engineers opining the

26 abnormalities in the ECTS. For example, on January 28, 2009 a Professional Engineer

27 examined a 4Runner that:

28

AMENDED COMPLAINT FOR DAMAGES

1   According to the driver of the vehicle, she had driven the
2   4Runner earlier in the day of the incident. She stated that when
3   she started the vehicle, placed the gear selector lever in the
4   reverse and depressed the accelerator pedal, the vehicle
5   accelerated rearward in an uncontrolled manner. The vehicle
6   traveled down her driveway, crossed a road, struck a stump and
7   entered a stream. The vehicle came to rest on its driver side. She
8   exited the vehicle through the sun roof. She stated that she had
9   never had any drivability issues with the 4Runner.

10  The report concluded:

11  Based on the foregoing observations and analysis, the following
12  are my opinions, to a reasonable degree of engineering certainty,
13  regarding the condition and operation of the Toyota 4Runner.
14  * * *

15  Third, the voltages associated with the throttle position sensor
16  malfunction detection (w/ pedal depressed) and the accelerator
17  pedal position sensor for engine control (w/ pedal depressed)
18  were not within specifications. The voltage deviations indicate
19  that the electronic throttle control system featured abnormalities.
20  The inability to start the vehicle precluded testing the functional
21  operation of the system.

22  141.   In a Case Detail Report dated February 6, 2009 a consumer reported: "We
23  just got a 2008 LE 4Cyl with the 5spd auto. Only had it two weeks. When driving 35-
24  45mph, the tranny will shift up into 5th gear and then basically STAY there. As we
25  approach a slight upward grade, the tachometer is stuck at 1200 RPM and the whole
26  car shudders and vibrates as the engine "lugs" down. We find ourselves constantly
27  playing with the gas pedal in order to FORCE the tranny to downshift. Took it to
28  dealer. They......experienced same thing. They said it was 'Normal for this model - at

this time.' They quietly told me they are getting other complaints and look forward to Toyota releasing new programming for the ECU." Rather than provide an appropriate repair at this time, Toyota often blamed these types of reports of sudden unintended acceleration on the driver.

142. Toyota never fully disclosed to the regulators the actual numbers of customer reports of unintended acceleration events in the various Toyota models under investigation that the company had received. In fact, Toyota disclosed that it had received only 1,008 such complaints. Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received 37,900 complaints potentially relating to sudden acceleration in Defective Vehicles from January 1, 2000, through January 27, 2010.

143. In a May 5, 2009 email sent to Takeharu Nishida, Chris Santucci discusses information to be requested by NHTSA in relation to another defect petition. Rather than providing all relevant documentation to assist in the investigation, Mr. Santucci expresses his pleasure over the fact that NHTSA will not be requesting inexplicable reports related to throttle issues: "They [NHTSA] are struggling with sending an IR letter, because they shouldn't ask us about floormat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floormat-related. So they should ask us for non-floormat related reports, right? But they are concerned that if they ask for other reports, they will have many reports that just cannot be explained. And since they do not think that they can explain them, they don't really want them. Does that make sense? I think it is good news for Toyota." (See Exhibit 13, TOY-MDLID00052918).

144. What was good news for Toyota, i.e., NHTSA avoiding inquiry into non-floor-mat issues, was bad news for consumers who continued to purchase and drive vehicles subject to a hidden UA defect.

145. In a power point presentation dated July 6, 2009, Toyota's lead executive in American Operations, Yoshi Inaba, describes as a "win" the fact that Toyota saved

38

1   $100 million dollars by negotiating an "equipment" recall instead of some other
2   alternative safety measure to address the sudden acceleration issue: "Wins for Toyota –
3   Safety Group ... Negotiated 'equipment' recall on Camry/ES re: SA, saved $100M+, w/
4   no defect found." Toyota knew that it had saved millions of dollars through concealing
5   the known potential for unintended accelerations in its vehicles.

6      146. NHTSA remained concerned that a "serious issue" remains and that a
7   factor other than mats was causing UA events. NHTSA was considering an
8   announcement that would instruct vehicle owners how to turn off the vehicle in the
9   event of a UA event.  NHTSA also expressed concern that other vehicles, including
10  Prius, Camry and Avalon may be subject to floor mat jamming and pedal design issues.
11  Toyota did not disclose these concerns and took no action to remedy these defects.
12  Years later, in 2010, Toyota recalled the ES 350, Camry and Avalon, due to a defect in
13  the shape of the floor surface and the lack of adequate space between the accelerated
14  pedal and the floor.

15     147. In August 2009, the Saylor accident involving a 2009 Lexus ES350
16  occurred in San Diego, California. When officers inspected the vehicle, the all weather
17  floor mat was melted to the accelerator pedal and unsecured by the retaining clips. It
18  was also the incorrect all weather floor mat for that Lexus model. When officers tested
19  the pedal clearance using the same model of Lexus and the same mismatched floor
20  mat, they observed that the pedal could easily become stuck under its edge.

21     148. The San Diego County Sherriff's Report concludes that the Saylor crash
22  was likely caused by the mismatched floor mat and the following "associated" factors:

23              The vehicle was not equipped with a key that would otherwise
24              allow for manual emergency shut off. The push button ignition
25              feature had no emergency instantaneous shut capability.  As
26              evidenced in the inspection of [the Lexus], the brakes most
27              likely failed due to over burdened, excessive, and prolonged
28              application at high speed.

AMENDED COMPLAINT FOR DAMAGES

149.  The report also notes that additional electrical, mechanical or computer generated factors could have played a role in the unintended acceleration.

150.  Following the widespread publicity surrounding the four-fatality Saylor crash near San Diego, Toyota issued a "Safety Advisory," saying that the company had "taken a closer look" at the potential for the accelerator to get "stuck in the full open position" due to interfering floor mats. The advisory stated that the company would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in all, to address the issue – the largest recall in Toyota's history and the sixth largest in the United States. According to Senator Waxman, Toyota's advisory is dangerously misleading, for the following reasons, among others:

> By suggesting that only a trapped floor mat can cause a loss of throttle and braking control, it lulls owners of models with no driver's side floor mat into believing there is no possibility of a potentially catastrophic loss of throttle and braking control. According to documents supplied by Toyota to the Committee on Energy and Commerce of the U.S. House of Representatives, fewer than 16% of sudden, unintended acceleration events reported by customers involved floor mats and/or "sticky pedals."

> The advisory also misleads owners with a driver's-side floor mat into believing that, in the event of a sustained near-wide-open throttle malfunction, the first response should be to visually determine if the floor mat is interfering with the accelerator pedal.

151.  In a September 1, 2009 email "[t]o all concerned staff," Koji Sakakibara's evidences the fact that Toyota was aware of the unintended acceleration problem back in 2007 but opted not to develop additional safety measures at that time:

> To all concerned staff,

40

The following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.) Within America, there are 196 articles on Google News, so the mass media is interested.

**- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration".** I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008. **(The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.**

==>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assy structure is the cause, how to secure the floor mats, the timing for introducing shape improvements). - Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)

AMENDED COMPLAINT FOR DAMAGES

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues.

Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

(Emphasis added). (See Exhibit 1).

152. On September 25, 2009, Mr. Santucci explains to other Toyota employees in a "privileged and confidential" email what NHTSA had come to believe to be the underlying defect in Toyota vehicles: "What they are purporting to be unsafe is the vehicle's response to a trapped accelerator pedal (difficulty shutting off the engine, shifting to neutral, etc.). In addition, they believe our system is not state of the art in safety technology. As they have told us, other manufacturers have ECT systems in production that shut off the throttle if the brakes and gas are applied simultaneously." (See Exhibit 14, TOY-MDLID00025099).

153. Also in September 2009, another Toyota internal document demonstrates how "global ramifications," rather than safety dictated Toyota's position with respect to "vehicle defect:"

TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications. In addition, since no one of any rank (VP or higher) at TMS has communicated the

42

1                    significance and impact of this issue, TMC may feel that we can

2                    weather an investigation and additional media coverage.

3  On September 29, 2009, the same day that TMC recalled 3.4 million vehicles in the

4 United States because of possible floor mat entrapment, Toyota Motor Europe issued a

5 Technical Information ("TI") to Toyota distributors in Austria, Belgium, Cyprus, the

6 Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Holland,

7 Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland, Turkey, Portugal,

8 Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United Kingdom, Georgia,

9 Kazakhstan, and Romania identifying a production improvement and repair procedure

10 to address complaints by customers in those countries of sticky accelerator pedals,

11 sudden RPM increase and/or sudden acceleration – but nothing similar was issued to

12 warn United States distributors.

13       154. Despite its claimed extensive investigation into the sticky pedal

14 phenomenon, and its efforts to remedy the sticky pedal defect for overseas consumers,

15 TMC continued to conceal information from United States consumers regarding

16 potential causes for sudden unintended acceleration events. On September 29, 2009,

17 TMC issued a Consumer Safety Advisory claiming that the sudden acceleration

18 problem was caused by floor mats without mention of the sticking accelerator pedal

19 defect it knew about since July 6, 2006, at the latest, and had confirmed no later than

20 June 2009.

21       155. Contemporaneously with the floor mat recall, Toyota made media

22 statements inaccurately stating that NHTSA had determined that no defect exists in

23 vehicles wherein the driver's side floor mat is compatible with the vehicle and is

24 properly secured. For example, a November 2, 2009 press release issued from

25 Torrance, CA announced:

26                    Toyota Motor Sales ... today announced that it has begun

27                    mailing letters to owners of certain Toyota and Lexus models

28                    regarding the potential for an unsecured or incompatible driver's

AMENDED COMPLAINT FOR DAMAGES

floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position. The letter, in compliance with the National Traffic and Motor Vehicle Safety Act and reviewed by the National Highway Traffic Safety Administration ... also confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.

156. On November 4, 2009, NHTSA issued a press release to correct this misleading and inaccurate information. NHTSA clarified that it told Toyota and consumers that "removing the recalled floor mats is the most immediate way to address the safety risk and avoid the possibility of the accelerator becoming stuck." NHTSA reiterated that the floor mat recall was simply an interim measure, and did not correct the underlying defect.

157. Despite initiating its plan to repair defective accelerator pedals for overseas consumers, Toyota's misinformation to United States consumers continued.

158. TMC posted the following response to a question posed by the Los Angeles Times:

Q2: Toyota has conducted numerous recalls related to sudden acceleration over the past decade in the U.S. and Canada, including two previous floor mat recalls. But the problem has continued. Does this mean that the previous recalls were not successful in eliminating the problems and if so, why not? In particular, why wasn't the 2007 recall of Lexus ES and Camry floor mats effective in preventing catastrophic accidents such as the Saylor case?

A. Toyota has conducted two all-weather floor mat (AWFM) recalls after receiving reports that if the floor mat (either by itself, or if it is placed on top of an existing carpeted floor mat)

44

1                     is not secured by the retaining hooks, the mat can move forward

2                     and interfere with the accelerator pedal returning to the idle

3                     position. If the mat is properly secured, it will not interfere with

4                     the accelerator pedal.

5      159. As reported in the law enforcement investigation, the floor mat in the

6 Saylor accident was not only improperly secured, it was incompatible and incorrect for

7 the vehicle. The recall recently announced addresses the fact that incompatible floor

8 mats, or multiple floor mats could be installed and that the remedy must address that

9 possibility.

10     160. When Transportation Secretary Ray LaHood testified before the House

11 Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials

12 chose to meet directly with Toyota executives in Japan to discuss safety issues because

13 NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

14     161. In early 2010, Toyota's internal documents and emails discuss "phase 1 of

15 Safety Recall 90L...Potential Floor Mat Interference with Accelerator Pedal."

16 Although not implied by the name, this recall included the installation of new brake

17 override software in 2007-2010 Camry and Camry Hybrid vehicles to provide

18 customers with "an extra measure of confidence." (See Exhibit 15, TOY-

19 MDLID00000384) Given Toyota's knowledge of the prevalence of unintended

20 acceleration events and the importance of this safety issue, rather than merely installing

21 the software in non-hybrid Camry vehicles, Toyota should have issued a separate

22 "brake override system installation" recall and included additional vehicle models.

23     162. In view of the propensity of Toyota's vehicles to suddenly accelerate out

24 of the drivers' control, the vehicles are defective for failure to have an appropriate fail-

25 safe. Toyota identified each of these fail-safes yet failed to implement them in a timely

26 fashion as reflected in an internal "Privileged and Confidential" e-mail:

27                     Push Button Ignition

28

AMENDED COMPLAINT FOR DAMAGES

One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion. NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion. In addition, the ES350 owners manual is unclear (see attached letter re: Pepski Petition). NHTSA has surveyed ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality. The Toyota Smart Key System requires the operator to hold the ignition button for 3 seconds to shut off the engine when the vehicle is in motion. When the vehicle is stopped, a momentary press of the ignition button shuts off the engine. NHTSA has reports that some owners tried tapping the ignition button to shut it off instead of holding it for three seconds. While they do not believe this is the correct method, they have been working with the SAE to develop a standard for keyless ignition systems. But it is important to note that they think it is one of the attributes that may lead to the occurrence of the long-duration, high speed events.

Sequential Shift Transmission

Another way to stop a runaway vehicle is by placing the transmission in Neutral. NHTSA is concerned that the layout of the Sequential Shift Transmission my confuse the operator (especially in a panic situation) because the "N" is adjacent to the "+." To the left of the D position is a gated area where the shift lever can be pushed forward to upshift, and pulled back for a downshift. The N position is above the D position. In such a layout, the "+" and the "N" are very close to the same longitudinal position, with the "+" closer to the driver. If,

1      NHTSA supposes, the transmission was in the Sequential Shift
2      mode, the driver could confuse the upshift position for the
3      neutral position. They believe that in a panic situation, there is a
4      chance this could occur.

5      Braking Effectiveness

6      With an accelerator pedal stuck at wide open throttle, NHTSA
7      agrees that one forceful application of the brake pedal can safely
8      stop the vehicle. However, in many reports and inspections they
9      have found brakes burned or brake pads completely depleted
10     after the event. NHTSA understands that with the engine at wide
11     open throttle, vacuum is not being supplied to the brake booster.
12     This means that the power braking system has potentially two or
13     three applications left before the vacuum assist is depleted. They
14     believe that in the long duration events, the brake booster is
15     being depleted by the driver. They think that the driver that
16     initially experiences the event recognizes the vehicle is
17     accelerating and presses the brakes. The vehicle slows, so the
18     driver releases the brakes and the vehicle accelerates again.
19     They repeat this process and before they realize, the power assist
20     is lost and the vehicle becomes more difficult to stop. The driver
21     applies the brake pedal with a lot of force, and this can result in
22     severe damage to the braking system, and/or a brake fire.

23     163. A January 8, 2010 email demonstrates that the new brake override
24  software had not been emphasized internally, nor was it well understood by TMS
25  employees in early 2010: "As discussed previously, there is almost no information –
26  certainly no general understanding – about the brake override system within TMS at
27  this time." (See Exhibit 16, TOY-MDLID00015526)

28

AMENDED COMPLAINT FOR DAMAGES

164.   On January 16, 2010, in an email to Katsuhiko Koganei, Irv Miller admits Toyota has been concealing defects from its customers and that the time has come for the company to come clean: "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options...We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business."    (See Exhibit 17, TOY-MDLID00027481)    This mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

165.   On or about January 19, 2010, Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC. In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents. Toyota did not issue any safety advisories to United States consumers regarding the sticking pedal issue until January 21, 2010, when it issued the sticky pedal recall. The recall involved approximately 2.3 million defective vehicles.

166.   On January 21, 2010, Toyota notified NHTSA that it was submitting a "Defect Information Report" concerning a recall of eight models due to a "defect [that] exists in the accelerator pedal assembly which may result in the accelerator pedal becoming harder to depress, slower to return, or, in the worst case, mechanically stuck . . . ."   Toyota issued this Defect Report despite indicating that the percentage of vehicles estimated to experience malfunction was "unknown," meaning that Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle.

167.   In a January 22, 2010 internal email, Toyota Canada admitted that due to the UA issues created by floor mats and gas pedals, there was "logic" in that a "brake

48

1    over-ride would be effective in any failures to prevent accidents. TC wanted us to

2    employ it as soon as possible."

3        168.  On or about January 26, 2010, Toyota announced in a press release issued

4    from Torrance, California that it was voluntarily suspending sales of eight models

5    involved in the January 21, 2010 recall for sticking accelerator pedals, including its top

6    selling Camry and Corolla models. Group Vice President and Toyota Division General

7    Manager Bob Carter made clear that "[t]his action is necessary until a remedy is

8    finalized." Toyota further announced that due to the sales suspension, Toyota was

9    expected to stop producing vehicles on several North American production lines.

10   Toyota did not resume sales of these vehicles until February 5, 2010.

11       169.  Toyota was careful to make certain it would be difficult to discover what it

12   knew about the UA defect, which models were affected and which managers were

13   involved. Employees were instructed to disguise emails:

14           •      When you send a mail to somebody outside the company,

15                 drop cc to your boss.[]

16                 Check the subject/text/attachment(*)

17                 *Any emails from Quality Control Department are basically

18                 "confidential."

19           •      Put "Secret" and "Don't forward" in the beginning of

20                 every email (including reply and forward.) []

21           •      Do not include both project code and car names. []

22           •      Attached documents (prepared by your department or

23                 other department) should be classified. []

24           •      When you reply to emails, generally delete the tracking

25                 record and attachment. [] masato_kosugi@mta.mx.toyota.co.jp

26                 on 1/26/2010

27       170.  While Toyota executives were claiming the defect was due to pedal

28   entrapment, dealers believed otherwise:

> I'm afraid that many of us in the dealer body feel embarrassed and not a little ashamed regarding a perception that we may have been used to faithfully endorse the (apparently inaccurate) party line that the only customer concerns have been as a result of pedal entrapment. While I'm sure that this was never Toyota's intent, there is a palpable feeling somewhere between disappointment and betrayal at the retail level. As you know, this would be best addressed by a prompt, effective cure for customer concerns. The other thought is that it was not the Watergate break-in that brought down President Nixon; it was the aftermath. Please help us with your endorsement that all communications be frank, complete, and 100% accurate.

171. On February 22, 2010, TMC announced that it would install a brake-override system on an expanded range of customers' vehicles to provide an additional "measure of confidence." According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

172. "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when UA complaints were received. Lentz did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

173. Importantly, the brake-override was not announced as a "Safety Recall." Rather, it was implemented to boost consumer "confidence." And the confidence

1  booster is not being installed in all models with the UA defect, such as the 2002- 2006
2  Camrys.

3      174.  On March 2, 2010, TMC Executive Vice President, Takeshi Uchiyamada,
4  Executive Vice President, submitted prepared testimony to the Senate Committee on
5  Commerce, Science and Transportation. Mr. Uchiyamada's testimony purported that
6  the ETCS-i system is tested "extensively both in the design phase and after it is
7  developed to ensure that there is no possibility of 'sudden unintended acceleration.'" In
8  reality, Toyota relies heavily upon its component suppliers to perform such testing.
9  Toyota's suppliers typically complete Toyota's parts level testing independently.
10  Toyota performance standards apply only to Tier 1 suppliers. Toyota does not have any
11  clearly written rules or regulations about who must conform to Toyota's standards
12  below its Tier 1 suppliers. For instance, while Toyota may impose testing standards on
13  CTS, the supplier of the sticky accelerator pedals at issue, when questioned before
14  Congress, Toyota engineers could not testify that Toyota imposed similar controls on
15  the manufacturers of the sensors and circuit board that CTS utilizes in its pedal.
16  Moreover, Toyota's engineers admitted that "there is no particular or special testing
17  that would directly prove that there is no unintended acceleration."

18      175.  On March 5, 2010, Congressmen Henry A. Waxman and Bart T. Stupak,
19  Chairmen of the House Subcommittee on Oversight and Investigation, wrote a letter to
20  James E. Lentz, President and Chief Operations Officer of Toyota Motor Sales U.S.A.,
21  Inc., stating, among other things:

22          We do not understand the basis for Toyota's repeated assertions
23          that it is "confident" there are no electronic defects contributing
24          to incidents of sudden acceleration.  We wrote you on February
25          2, 1010, to request "all analyses or documents that substantiate"
26          Toyota's claim that electronic malfunctions are not causing
27          sudden unintended acceleration. The documents that Toyota
28          provided in response to this request did not provide convincing

AMENDED COMPLAINT FOR DAMAGES

substantiation. We explained our concerns about the failure of Toyota to substantiate its assertions in our letter to you in February 22, 2010.

After we sent our letter on February 22, Toyota provided a few additional documents to the Committee early in the morning on the day of the hearing. Several of these documents were written in Japanese. While some of these documents appear to contain preliminary fault analyses that could be used in planning a rigorous study of potential cause of sudden unintended acceleration, not one of them suggested that such a rigorous study had taken place. As we explained in our February 22 letter, the only document Toyota has provided to the Committee that claims to study the phenomenon of sudden unintended acceleration in a comprehensive way, is an interim report from the consulting firm Exponent, Inc. This report has serious deficiencies, as we explained in our February 22 letter.

176.   Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements. For example, when asked why Toyota believed there were no problems with the ETCS-i, its technical analysis manager testified falsely, "[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

177.   Toyota's purported floor mat and sticky pedal "fixes" have not addressed the root cause of unintended acceleration.   Despite the flurry of media attention, NHTSA activity and congressional scrutiny, Toyota has still not adequately addressed the root cause of UA.

AMENDED COMPLAINT FOR DAMAGES

178.   While sticky pedals and floor mats likely did contribute to some UA incidents, Toyota used these issues as a smoke screen to hide the electronic defects in their vehicles.

179.   Toyota never made any significant changes to improve the acceleration system and the ETCS, despite the availability of safe and inexpensive alternative designs and feasible modifications.   Rather, Toyota has repeatedly stated to consumers, the media, its dealers, and Congress, that its vehicles' electronic acceleration systems are not the cause of UA incidents.

180.   Despite Toyota's public position, evidence continues to mount that the recalls focused on limited mechanical issues are inadequate to prevent UA, and that the vehicles' electronics cannot be ruled out as a likely cause of the incidents.

181.   As The New York Times reported on March 2, 2010, "an analysis of government documents shows that many Toyota Camrys built before 2007, which were not subject to recalls, have been linked to a comparable number of speed-control problems as recalled Camrys."   A study of Japan's government records revealed a similar finding.   As a result, the U.S. Department of Transportation has included pre-2007 Camrys in their broader investigation of the role that ETCS may be playing in these incidents.

182.   Further, affected vehicles that have been recalled and repaired continue to suffer UA incidents.   On March 4, 2010, just months after Toyota issued two independent recalls related to UA, NHTSA revealed that it had received over 60 UA complaints in Toyota vehicles that had been repaired pursuant to the recalls.   As The Los Angeles Times reported, the complaints included several crashes and at least three injuries.   On March 17, 2010, the Associated Press reported that the number of post-recall incidents had reached over 100.

183.   The Camry findings and the post-recall incidents greatly undermine Toyota's public position, and confirm that the ETCS is the likely source of UA.

AMENDED COMPLAINT FOR DAMAGES

184.   Indeed, Toyota admits that the recalls have not addressed the UA problem. When questioned before a Congressional panel, Toyota's top U.S. sales executive, James Lentz, admitted that Toyota could not rule out electronics problems, and that the two recalls would "not totally" solve the problem.  Among other potential causes, Mr. Lentz identified software problems, faulty cruise control, and engine revs caused by engaging the air conditioner.

185.   Additionally, numerous independent experts have spoken out in recent months to challenge Toyota's inexplicable confidence in its electronic systems.

186.   For example, David M. Cummings, executive vice president of the Kelly Technology Group in Santa Barbara, California, has 30 years' experience in building computer systems embedded inside other devices, including nine years as a consultant for the Jet Propulsion Laboratory where he worked on the Mars Pathfinder spacecraft. In an opinion piece in The Los Angeles Times on March 12, 2010, Mr. Cummings dismissed Toyota's repeated statements that its electronics could not be faulted, and explained that there are "software bugs" that simply cannot be reproduced in a laboratory test environment.

187.   Toyota knows, or should know, that its electronics are not infallible. Indeed, software problems have arisen in other Toyota vehicles.  On February 8, 2010, Toyota announced a voluntary safety recall on some of its models to update software in the vehicle's anti-lock brake system (ABS), in response to braking problems experienced by drivers.  This recall involves approximately 133,000 Model Year 2010 Prius vehicles and 14,550 Model Year 2010 Lexus HS 250h vehicles.

188.   More generally, over the last two decades, various Toyota and Lexus vehicles have been recalled due to electronics and software defects that led to engine surging, engine racing, and unintended engagement of headlights and taillights, according to a Los Angeles Times, February 14, 2010 article.  As far back as 2003, Toyota had to "recalibrate" the Electronic Control Modules in certain 2003 Camrys due to engine "surging."

AMENDED COMPLAINT FOR DAMAGES

189.    On March 3, 2010, Toyota produced a "Brake Override System" pamphlet demonstrating how their new vehicles are being manufactured with a safety system that will combat the effects of a defective electronic control throttle system. The pamphlet indicates that "the Brake Override System operates when the following conditions are met: 1. The throttle opening is greater than 1/3; 2. Vehicle speed is above 5 mph; and 3. Brakes are applied firmly." (See Exhibit 18)

190.    Toyota continues today to maintain the position that the brake override system is being installed in its vehicles not as a safety measure, but only in order to provide "an extra measure of confidence" to its customers. Indeed, Toyota utilizes this tag line as a means to evade the very important question of why Toyota has waited this long to install brake override systems in their vehicles, while other manufacturers have utilized similar technology to ensure the safety of their vehicles since 2001. An example of this practice can be seen in a memo entitled "Accelerator Pedal Entrapment 'Need to Know' for Toyota Associates:"

> Q7A: Other manufacturers use a system similar to the brake override system, why didn't Toyota?
>
> A7A: The brake override system is being introduced to provide an extra measure of confidence to our customers. This system is being introduced for all Toyota vehicles globally starting in 2010 and will be standard equipment for all 2011 model year vehicles.

(See Exhibit 19, TOY-MDLID00056582)

191.    As another example, Masanori Hirose, an engineer from TMC who has been involved in the design and development of the brake override system, has testified that the brake override system is not being added as a failsafe system, but is "for extra confidence of our customers." Mr. Hirose also admits, however, that the Bosch brake override system used in the 2001 Yaris, which is "more or less the same" as the Toyota brake override system, would have been able to detect a floor mat entrapping the pedal.

192.  Plaintiffs were, at all times relevant, ignorant of the existence of the defects described herein and, knowing this, Toyota continued to broadly disseminate statements about the safety and reliability of its vehicles, while denying the existence of the defects.  For example, on September 29, 2009, Toyota issued a press release entitled "Toyota Lexus Consumer Safety Advisory: Potential Floor Mat Interference with accelerator Pedal," stating in part:   "Toyota Motor Sales, USA, Inc. takes public safety very seriously.  It believes its vehicles to be among the safest on the road today."

193.  Toyota's fraudulent concealment scheme includes, but is not limited to, intentionally covering up and refusing to publicly disclose critical internal memoranda, design plans, studies, Notices of Action, Problem Detail Reports and other reports of failure and injury.  Through such acts of fraudulent concealment, Toyota was able to actively conceal from the public for years the truth about the existence of the dangerously defective acceleration control and throttle system in its vehicles, thereby tolling the running of any applicable statute of limitations.

194.  Plaintiffs filed this lawsuit within two years of the subject incident, and within two years of first suspecting that defects in the Subject Vehicle were a cause of Plaintiffs' injuries and damages.

195.  Toyota is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the dangerously defective acceleration control and throttle system on its vehicles.  Toyota was, at all times relevant, aware of the nature and existence of the defects in its vehicles, but at all times has continued to manufacture, certify, market, advertise, distribute, and sell its vehicles without revealing the true facts concerning the defects, in order to sell Toyota and Lexus cars, to avoid bad publicity, and to avoid expensive recall processes.  The true facts about its vehicles continue to be concealed from the public, including Plaintiffs.

196.  Through such acts of fraudulent concealment, Toyota has successfully concealed from the public facts necessary to support the claims herein.  Plaintiffs were

and continue to be prevented from knowing and having knowledge of such unlawful, unfair, fraudulent, and deceptive conduct, or of facts that might have led to the discovery thereof. Despite the exercise of due diligence, Plaintiffs failed to uncover the existence of the violations alleged herein until within two (2) years of the filing this complaint.

197. Particularly given Toyota's past and continuing denials of, and concealment of, the existence of any defect in the acceleration control and throttle system, and Toyota's repeated past and continuing assertions that unintended acceleration episodes were due to other causes, Plaintiffs were not placed on inquiry notice regarding the Defects in the acceleration control and throttle system until, at the earliest, February, 2010. It was in February, 2010 that Toyota stated publicly, in connection with Congressional hearings, that it does not, in fact, know the cause of the unintended acceleration problem in the majority of cases (contrary to its repeated past claims about floor mats, sticking pedals, etc.). Toyota has continued to deny, and to conceal, that there is any flaw or defect in the acceleration control and throttle system itself. Toyota's April 19, 2010 agreement to pay NHTSA's $16.4 million fine constitutes an acknowledgement that Toyota engaged in a pattern and practice of concealing the true problems which resulted in unintended acceleration in its cars, the full extent of which will only become known through further governmental investigation and litigation.

## VII.  **FIRST CAUSE OF ACTION**

### (Fraudulent Concealment)

198. Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation and statement contained in the foregoing paragraphs.

199. As alleged herein, Toyota knew, as early as 2001 that certain of the vehicles it designed, manufactured, marketed, distributed, sold or leased were defective in that these vehicles have an unreasonably dangerous propensity to suddenly accelerate and thereby injure the users of these vehicles and others.

200. Defendants fraudulently concealed from and/or failed to disclose to Plaintiffs the true defective nature of the Subject Vehicle.

201. At all times relevant, Toyota had exclusive and superior knowledge of the defects and concealed, suppressed and failed to disclose the true facts to Plaintiffs who, at all times relevant, were ignorant and unaware of the existence and nature of the defects. Toyota therefore had a duty to disclose the nature and existence of the defects before and after the vehicle was purchased. Had Toyota disclosed the whole truth about the existence and nature of the defects, Plaintiff Lynda Bisseger would not have purchased the Subject Vehicle.

202. As alleged herein, Toyota made repeated statements to Plaintiffs, touting the safety and reliability of its vehicles. An example, among many, some of which have already been exemplified herein, is the uniform written statements contained in the Toyota Warranty and a Maintenance Guides that accompanied the sale or lease of each of its vehicles. They uniformly stated:

> At Toyota, our top priority is always our customers. We know
> your Toyota is an important part of your life and something you
> depend on every day. That's why we're dedicated to building
> **products of the highest quality and reliability**. . . Our goal is
> for every Toyota customer to enjoy **outstanding quality,**
> **dependability and peace of mind** . . . (Emphasis added).

This statement was only partially true, and hardly at all with respect to uncontrolled acceleration. This partially true statement created a duty for Toyota to disclose the whole truth that, in fact, its vehicles were dangerously defective as a result of the sudden uncontrollable acceleration defects alleged herein.

203. Whether a car or truck contains a known defect that has resulted in crashes, deaths and injuries, is critically important information for consumers and families alike, when choosing to purchase or lease a vehicle. The omitted information, as alleged herein, was objectively material to both the decision as to whether to

1  purchase the Subject Vehicle and whether to drive the Subject Vehicle on the day of
2  the crash.

3      204.  At all times relevant, Defendants, and each of them, intentionally
4  concealed and suppressed the nature and extent of the defects with the intent to defraud
5  Plaintiffs.

6      205.  Plaintiffs were at all times relevant, unaware and ignorant of the nature
7  and existence of the defects in its vehicles.

8      206.  At all times relevant, Toyota purposefully and intentionally devised its
9  scheme of concealment and suppression of the true facts concerning the existence and
10  nature of the defects.  Plaintiffs are not asserting a claim based upon fraud on NHTSA
11  or any federal agency, but rather, upon concealment and suppression of material facts
12  from the public, including Plaintiffs, and misrepresentations which were made to the
13  public, including Plaintiffs.

14      207.  As a direct and proximate result of defects in the Subject Vehicle and the
15  wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants,
16  Plaintiffs suffered the injuries and damages as alleged herein.

17      208.  Plaintiffs are entitled to damages in an amount to be proven at trial,
18  together with interest thereon and costs.

19      209.  WHEREFORE, Plaintiffs pray for judgment against Defendants, and each
20  of them, as hereinafter set forth.

21              **VIII. <u>SECOND CAUSE OF ACTION</u>**

22       **(Strict Products Liability – Design and Manufacturing Defects)**

23      210.  Plaintiffs incorporate by reference, as though fully set forth herein, each
24  and every allegation and statement contained in the foregoing paragraphs.

25      211.  Defendants, and each of them, designed, engineered, developed,
26  manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or
27  failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled,
28  advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Subject

AMENDED COMPLAINT FOR DAMAGES

Vehicle and its component parts and constituents, which was intended by the Defendants, and each of them, to be used as a passenger vehicle and for other related activities.

212. Defendants, and each of them, knew that said vehicle was to be purchased and used without inspection for defects by Plaintiffs and the general public.

213. The Subject Vehicle was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to serious injuries.

214. Defendants designed the Subject Vehicle defectively, causing it to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

215. Defendants designed and manufactured the braking system of the Subject Vehicle defectively, causing it to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

216. The risks inherent in the design of the Subject Vehicle outweigh significantly any benefits of such design.

217. As a legal and proximate result of the aforementioned defects of the Subject Vehicle, Plaintiffs sustained the injuries and damages set forth herein while using the Subject Vehicle in a reasonably foreseeable manner.

218. Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

219. WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

## IX.    **THIRD CAUSE OF ACTION**

### (Strict Products Liability - Failure to Warn)

220. Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation and statement contained in the foregoing paragraphs.

221.   Defendants, and each of them, knew that the Subject Vehicle, and its component parts, would be purchased and used without inspection for defects in the design of the vehicle.

222.   The Subject Vehicle was defective when it left the control of each of these Defendants.

223.   At the time of the Subject Vehicle's design, manufacture, and sale, and continuing up to the time of Plaintiffs' injuries, Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of these vehicles, whose defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden unintended acceleration and brake failure, and thereby cause injuries.

224.   Defendants knew that these substantial dangers are not readily recognizable to an ordinary consumer and that consumers would purchase and use these products without inspection.

225.   At all relevant times, Defendants failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including Plaintiffs, of the defects, which Defendants knew, or in the exercise of reasonable care should have known, to have existed in the Subject Vehicle, and its component parts.

226.   At the time of Plaintiffs' injuries, the Subject Vehicle was being used in the manner intended by Defendants and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

227.   Plaintiffs' damages were the legal and proximate result of Defendants' failure to provide adequate warnings.  Defendants owed Plaintiffs a duty in designing, manufacturing, warning about, and distributing the Subject Vehicle.

228.   Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

229.   WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

AMENDED COMPLAINT FOR DAMAGES

## X.    **FOURTH CAUSE OF ACTION**

### (Negligence)

230.  Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

231.  At all times herein relevant, Defendants were and are engaged in the business of, including but not limited to, selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, providing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying, warnings and placing into the stream of commerce the Subject Vehicle.

232.  Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, had a legal duty to conform their conduct in accordance with the law and that of a reasonable person, which includes adequately and properly managing and operating their business and their manufacturing, design, warning, distribution, and retail operations; adequately and properly training and supervising their employees and agents, including their designers, inspectors, quality control agents and other manufacturing, testing, distribution and delivery personnel; properly designing, manufacturing, warnings, inspecting, servicing, and distributing the Subject Vehicle; and acting without negligence, conscious disregard, despicable or other wrongful conduct.

233.  Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject Vehicle was defectively designed and inherently dangerous due to its propensity to suddenly accelerate, lose control, for its brakes to fail, and to cause injuries.

234.  Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject

AMENDED COMPLAINT FOR DAMAGES

Vehicle was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

235. Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, failed to exercise ordinary care and breached their duty by, among other things:

a.     Failure to use due care in the manufacture, distribution, design, sale, testing, and servicing of the Subject Vehicle and its component parts in order to avoid the aforementioned risks to individuals;

b.     Failure to provide adequate warning of the UA or brake system problems, and their propensity to cause and/or contribute to an accident;

c.     Failure to incorporate within the vehicle and its design reasonable safeguards and protections against sudden acceleration and the consequences thereof;

d.     Failure to incorporate within the vehicle and its design reasonable safeguards and protections against brake system problems and the consequences thereof;

e.     Failure to make timely correction to the design of the Subject Vehicle to correct the sudden acceleration and brake system problems;

f.     Failure to adequately identify and mitigate the hazards associated with UA and brake system failure in accordance with good engineering practices; and,

g.     Were otherwise careless or negligent.

236. As a direct and proximate result of defects in the Subject Vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered the injuries and damages as alleged herein.

237. Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

238. WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

## XI.    FIFTH CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability)

239. Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

240. Prior to the time of the subject incident, the Defendants impliedly warranted to members of the general public, including Plaintiffs, that the Subject Vehicle was of merchantable quality.

241. Members of the consuming public, including consumers such as Plaintiffs were intended third-party beneficiaries of the implied warranty of merchantability.

242. Plaintiffs relied on the skill and judgment of Defendants in the selection, purchase and use of the Subject Vehicle as a safe and reliable means for transportation.

243. The Subject Vehicle was not of merchantable quality as warranted by Defendants, in that it was defectively designed, thereby dangerously exposing the users of said vehicle and those around it to serious injury.

244. After Plaintiffs received the injuries complained of herein, notice was given by Plaintiffs to Defendants, by filing this lawsuit in the time and in the manner and in the form prescribed by law, of the breach of said implied warranty.

245. As a legal and proximate result of the breach of said implied warranty, Plaintiffs sustained the damages herein set forth.

246. Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

247. WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

AMENDED COMPLAINT FOR DAMAGES

## XII.  SIXTH CAUSE OF ACTION

### (Magnuson Moss Warranty Act, 15 U.S.C. § 2301 et seq. )

248.  Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

249.  This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, et seq. by virtue of 15 U.S.C. § 2310(d).

250.  Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

251.  Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

252.  The Subject Vehicle is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

253.  U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

254.  Toyota's implied warranties are covered under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

255.  Toyota breached these implied warranties by, among other things, providing the Subject Vehicle: a) that was not of merchantable quality; b) that presented an unreasonable risk of unintended acceleration; c) that was not fit for the ordinary purpose for which vehicles are used; and, d) that was not fully operational, safe, or reliable.

256.  Privity is not required in this case because Plaintiffs are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealer was not intended to be the ultimate consumer of, nor a passenger in, the Subject Vehicle and has no rights under the warranty agreements provided with the Subject Vehicle; the warranty agreements were designed for and intended to benefit the ultimate consumers and passengers only.

257.    Requiring an informal dispute settlement procedure, or affording Toyota a reasonable opportunity to cure its breach of warranties, would be unnecessary and futile. At the time of sale or lease of the Subject Vehicle, Defendants knew, should have known, or were reckless in not knowing, of its misrepresentations concerning the Subject Vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure and/or afford Toyota a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

258.    As a result of Toyota's breach of implied warranties, Plaintiffs suffered economic losses, including medical expenses, loss of earnings and other economic damages and losses.

259.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, calculated based on the economic damages, consequential, and incidental damages, and the punitive damages sought by Plaintiffs.

260.    Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

261.    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, as follows:

1.    Past and future general damages, in an amount which will conform to proof at time of trial;

2.    Past and future economic and special damages according to proof at the time of trial;

AMENDED COMPLAINT FOR DAMAGES

1

## DEMAND FOR TRIAL BY JURY

2

3          Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal

4  Rules of Civil Procedure.

5

6  Dated: April 22, 2011                    COLSON HICKS EIDSON

7

8                                   By:     _____
                                            LEWIS S. EIDSON
9                                           CURTIS B. MINER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR DAMAGES

3.    Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.    Medical and related care expenses, past and future, according to proof at the time of trial;

5.    Punitive or exemplary damages according to proof at the time of trial;

6.    For costs of suit incurred herein;

7.    For pre-judgment interest as provided by law; and

8.    For such other and further relief as the Court may deem just and proper.


Dated: April 22, 2011                    COLSON HICKS EIDSON

By: _____
LEWIS S. EIDSON
CURTIS B. MINER

67

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint for Damages

was served on the following by U.S. Mail on 18th of April 2011:

Robert L. Blank, Esq.
Rumberger Kirk & Caldwell PA
100 N Tampa Street Suite 2000
PO Box 3390
Tampa, FL 33601-3390

LEWIS S. EIDSON

Subject: Important Information: America ES350 article...addition #2
From: Koji_Sakakibara@toyota.com
Date: Tue, 1 Sep 2008 16:31:01 -0700
To: yoshioka@ms.tl.tsc.toyota.co.jp, Shunsuke Noguchi <syun@nms.tsc.toyota.co.jp>, nkitzuru@ms.tl.tsc.toyota.co.jp, Koha    kaka@ms.tl.tsc.toyota.co.jp>
CC: Kota    <mkitoh@mail.tsc.toyota.co.jp>, Hirokazu_Sakamoto@toyota.com, Koji_Takara@toyota.com, Katichi_Fukushima@toyota.com, washiho@ms.tl.tsc.toyota.co.jp, yamaguch@earth.tsc.toyota.co.jp, r-kawamu@earth.tsc.toyota.co.jp, y-yamai@ms.tl.tsc.toyota.co.jp, Newcal    3anemori@earth.tsc.toyota.co.jp, sakano@earth.tsc.toyota.co.jp, yoji@gyu.tsc.toyota.co.jp

To all concerned staff,
Thank you for your continued business. I am Sakakibara from TEC-2Gr, COE-LA.
- The following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.)
Within America, there are 100 articles on Google News, so the share media is interested.
- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration". I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2006. (The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)
→In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively that (investigate issues such as whether the accelerator assy structure is the cause, how to secure the floor mats, the timing for introducing shape improvements).
- Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)
- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div., "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues".
Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

If you have any question, please feel free to contact me.

Thank you for your support and cooperation.

Sincerely yours,
K Sakakibara

Note : Please do not disclose this message above to 3rd parties as it would contain some confidential items.

──────────────────────────────────
Koji Sakakibara  榊原 幸二
Manager
TEMA COE-LA Technical Group #1
19001 South Western Avenue, Mail Drop S-205
Torrance, CA  90501-1196
Phone : 310-468-9378
Fax : 310-468-9311
Cell : 310-782-5552
E-Mail: koji_sakakibara@toyota.com
──────────────────────────────────
──── Forwarded by Koji Sakakibara/TEMA/Toyota on 09/01/2008 02:57 PM ────

George Newton/TMS/Toyota                    To: Koji Sakakibara/TEMA/Toyota of Toyota
                                             cc:
09/01/2008 12:54 PM                          Subject: ES 350 News Story...

Sakakibara-san:

You may have already heard about this, but FYI...

http://www.latimesnewsdirect.com/stories/2008/xxx/31/governor-stuck-driver-crash/

This news article on a google news search...

Exhibit 1

1 / 3

UNCERTIFIED CONVENIENCE TRANSLATION

2010年2月18日 22時13分 17秒版

TOY-MDLID00041130T-0001

ura@mailtec.toyota.co.jp. Kako          kako@emailtec.toyota.co.jp>
Koji_Takara@toyota.com, Keiichi_Fukushima@toyota.com, washino@mailtec.toyota.co.jp, yamaguch@earth.tec.toyota.co.jp, arth.tec.toyota.co.jp>, ssakami@earth.tec.toyota.co.jp, yoji@giga.tec.toyota.co.jp

g the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.)

option similar to that used by other companies to prevent unintended accelerator". I remember being told by the accelerator vestigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a

1 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act se, how to secure the floor mats, the timing for introducing shape improvements).
is entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold illing a police officer means the death penalty".)
e of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, " the sues".

g the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager ssible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)



UNCERTIFIED CONVENIENCE TRANSLATION

TOY-MDLID00041130T-0002



George Marine
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

UNCERTIFIED CONVENIENCE TRANSLATION

TOY-MDLID00041130T-0003

| | |
|---|---|
| **From:** | Yon, Scott |
| **Sent:** | Thursday, June 03, 2004 9:15 AM |
| **To:** | Chris Santucci (███████████toyota.com) |
| **Subject:** | For review |
| **Categories:** | PE04021-ToyotaThrottleControl |
| **Attachments:** | CamryVSCTrend-200402.pdf |

See attached. Give me a call when you have time; I want to discuss the submission and the attached.

Scott

D. Scott Yon
U.S. Department of Transportation
National Highway Traffic Safety Administration
Office of Defects Investigation

400 7th Street S.W.
Washington, DC
20590

---

The information contained in this e-mail message has been sent from a federal agency. It may be privileged, confidential, and/or protected from disclosure. If you are not the intended recipient, any further disclosure or use, dissemination, distribution, or copying this message or any attachment is strictly prohibited. If you think that you have received this e-mail message in error, please delete it and notify the sender.

Exhibit 2



Feb 2004 VOQs: MY >1994, Make = Toyota, Model = Camry, Comp Desc like "Vehicle Speed%". Populations from EWR submission tables.

|      |     | Camry VOQs | CamPopEWR | Camry/YIS/100k |
|------|-----|-----------|-----------|----------------|
| 1995 | MTC | 10        | 314066    | 0.35           |
| 1996 | MTC | 22        | 344599    | 0.80           |
| 1997 | MTC | 12        | 367762    | 0.47           |
| 1998 | MTC | 36        | 404850    | 0.44           |
| 1999 | MTC | 19        | 435654    | 0.87           |
| 2000 | MTC | 25        | 396646    | 1.58           |
| 2001 | MTC | 15        | 312208    | 0.58           |
| 2002 | ETC | 32        | 436142    | 3.69           |
| 2003 | ETC | 14        | 396691    | 3.58           |
| 2004 | ETC | 0         |           |                |

Avg Rate/YIS/100k

|     |      |
|-----|------|
| MTC | 0.86 |
| ETC | 3.64 |

Camry VSC

| | |
|---|---|
| From: | George Morino-TMS/Toyota |
| To: [ ] | Kathy Wachs/-Lexus/Toyota@Toyota |
| Cc: [ ] | Stefan_Brand@toyota.com;Mark_kubota@toyota.com;kirk_forsht@toyota.com |
| Bcc: [ ] | dave_zellers@toyota.com |
| Subject: | CONFIDENTIAL - IS 250 AWD Draft Owner Letter and Q&A |

Sent: 12/6/2005 9:21 PM

Kathy:

Approved by TMC.

They pulled out the "vehicle speed control" part. NHTSA may come back, but TMC wanted to try.

George Morino
Quality Compliance Manager
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.



**Exhibit 3**

Early 2006 Model Year IS 250 AWD - Accelerator Pedal Assembly
Safety Recall Notice

**DRAFT**

Dear IS 250 Owner:

Lexus is dedicated to the "Passionate Pursuit of Perfection."

This notice is being sent to you in accordance with the requirements of the National Traffic and Motor
Vehicle Safety Act. Lexus has decided that a defect, which relates to motor vehicle safety, exists in
certain early 2006 model year IS 250 All Wheel Drive (AWD) vehicles.

## What is the condition?

In certain early 2006 Model Year Lexus IS 250 AWD vehicles there is a possibility that the accelerator
pedal may temporarily become stuck in the partially depressed position due to inadequate clearance
between the accelerator pedal linkage and a plastic pad embedded into the vehicle's carpet. This
condition may interfere with the accelerator pedal returning to the idle position. In the worst case, this
may increase the possibility of a crash.

## What will Lexus do?

Any Lexus dealer will replace the accelerator pedal assembly with an improved one and modify the
vehicle carpet at NO CHARGE to you.

## What should you do?

Please contact any authorized Lexus dealer to schedule an appointment to have this service
performed on your vehicle.

The labor time for this repair will take approximately __ hours. However, depending upon the dealer's
work schedule, it may be necessary to make your vehicle available for a longer period of time.

**Please present this notice to the dealer when you bring the vehicle in for your service
appointment.**

If you no longer own the vehicle, please indicate so on the enclosed postage-paid form, providing us
with the name and address of the new owner if possible.

## What if you have other questions?

Please contact any Lexus dealer or call the Lexus Customer Assistance Center at 1-800-255-3987.

If you believe that the dealer or Lexus has failed or is unable to remedy the defect within a reasonable
time, you may submit a complaint to the Administrator, National Highway Traffic Safety Administration,
400 Seventh Street S.W., Washington, D.C. 20590, or call the toll free Auto Safety Hot Line at 1-888-
327-4236 (TTY: 1-800-424-9153), or go to http://www.safercar.gov.

If you are a vehicle lessor, Federal law requires that any vehicle lessor receiving this recall notice must
forward a copy of this notice to the lessee within ten days.

We have sent this notice in the interest of your continued satisfaction with our products, and we sincerely
regret any inconveniences this condition may have caused you.

Thank you for driving a Lexus.

Sincerely,

LEXUS DIVISION
TOYOTA MOTOR SALES, U.S.A., INC.

TOY-MDLID00002898



Special Service Campaign (SSC) Q&A
Early 2006 Model Year IS 250 AWD Accelerator Pedal

**Q1:**   *What is the condition?*
A1:   In certain early 2006 Model Year Lexus IS 250 AWD vehicles there is a possibility that the accelerator pedal may temporarily become stuck in the partially depressed position due to inadequate clearance between the accelerator pedal linkage and a plastic pad embedded into the vehicle's carpet.  This condition may interfere with the accelerator pedal returning to the idle position.  In the worst case, this may increase the possibility of a crash.

**Q2:**   *What is the cause of this condition?*
A2:   This condition is caused by tolerance variations between the accelerator pedal linkage and a plastic pad embedded into the vehicle's carpet.

**Q3:**   *Are there any warnings that this condition exists?*
A3:   No, there are no warnings that this condition will occur.

**Q4:**   *Which and how many vehicles are involved?*
A4:   Certain early 2006 Model Year IS 250 AWD vehicles are involved. There are approximately 3,500 IS 250 AWD vehicles involved in the U.S.

**Q5:**   *What is the production period of the affected vehicles?*
A5:   The affected Lexus IS 250 AWD vehicles were produced from August, 2005 to mid-December, 2005.

**Q6:**   *Are there any other Toyota or Lexus vehicles involved?*
A6:   No, this condition only affects certain early 2006 Model Year Lexus IS 250 AWD vehicles only. Rear wheel drive IS 250 and IS 350 vehicles are *not* involved.

**Q7:**   *How many incidents of this condition have been reported?*
A7:   There have been two cases reported for this condition in the affected vehicles.

**Q8:**   *Have there been any accidents reported?*
A8:   There have been no reported cases of accidents related to this condition.

**Q9:**   *What is Toyota going to do?*
A9:   Owners of the involved vehicles will receive a Special Service Campaign notification by first class mail beginning in late-December, 2005.  Lexus dealers will replace the accelerator pedal assembly and modify the vehicle's carpet at NO CHARGE to the vehicle owners.

**Q10:**   *How long will the repair take?*
A10:   The repair will take approximately ___ hours.  However, depending upon the dealer's work schedule, it may be necessary to make the vehicle available for a longer period of time.

**Q11:**   *What should an owner do if they experience the condition?*
A11:   Owners are requested to contact their local Lexus dealer for diagnosis and repair.

TOY-MDLID00002899

From: George Morino/=TMS/Toyota
To: Yasuhiro Morozumi/=HINPO/TMC@@TMCJ
cc: Michihito Tamkawa/=HINPO/TMC@@TMC0,Stefan_Brand@toyota.com,Mark_kabel@toyota.com,kirk_inishi@toyota.com,juichi_kobayashi@toyota.com,Morisshi Yoshizumi/=HINPO/TMC@@TMC0@TMC@TMC E/Michiteru Kato/=HINPO/TMC@@TMC0@TMC E/Hajime Kitamura/=HINPO/TMC@@TMC0
Sent: 1/26/2005 9:49 PM
Subject: CONFIDENTIAL-'05 250-AWD Brake Owner Letter and Q&A

URGENT! IMMEDIATE RESPONSE REQUIRED!

Hello Morozumi-san:

We greatly appreciate all of your outstanding support in pushing this issue forward.

On behalf of TMC, TMS has drafted the Owner Letter and Q&A for this potential issue. We understand this is TMC's responsibility, but to expedite this issue, we have written the two documents. Please forgive our forwardness.
We need your help in approving these documents today. Based upon these documents the DRAFT Area and Dealer Notification Letters will be written.

We are also awaiting the following from TMC:
Technical Instructions
Sample Parts to validate the Technical Instructions
Warranty Operation Codes
VIN list
Dimensions of the parts and packaging
Parts shipping schedule

Please send a response to these six items listed above tonight. We really need them to begin set-up in the Warranty System, Data System, plan for packaging and manpower requirements for shipping the parts to dealers, etc.

Thank you for your assistance in this matter.

George Morino
Quality Compliance Manager
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

TOY-MDLID00002900

Early 2006 Model Year IS 250 AWD - Accelerator Pedal Assembly
Safety Recall Notice

**DRAFT**

Dear IS 250 Owner:

Lexus is dedicated to the "Passionate Pursuit of Perfection."

This notice is being sent to you in accordance with the requirements of the National Traffic and Motor
Vehicle Safety Act. Lexus has decided that a defect, which relates to motor vehicle safety, exists in
certain early 2006 model year IS 250 All Wheel Drive (AWD) vehicles.

## What is the condition?

In certain early 2006 Model Year Lexus IS 250 AWD vehicles there is a possibility that the accelerator
pedal may temporarily become stuck in the partially depressed position due to inadequate clearance
between the accelerator pedal linkage and a plastic pad embedded into the vehicle's carpet. This
condition may interfere with the accelerator pedal returning to the idle position, thereby causing
temporary loss of vehicle speed control. In the worst case, this may increase the possibility of a crash.

## What will Lexus do?

Any Lexus dealer will replace the accelerator pedal assembly with an improved one at NO COST to
you.

## What should you do?

Please contact any authorized Lexus dealer to schedule an appointment to have the accelerator pedal
assembly replaced.

The labor time for this repair will take approximately __ hour. However, depending upon the dealer's
work schedule, it may be necessary to make your vehicle available for a longer period of time.

Please present this notice to the dealer when you bring the vehicle in for your service
appointment.

If you no longer own the vehicle, please indicate so on the enclosed postage-paid form, providing us
with the name and address of the new owner if possible.

## What if you have other questions?

Please contact any Lexus dealer or call the Lexus Customer Assistance Center at 1-800-255-3987.

If you believe that the dealer or Lexus has failed or is unable to remedy the defect within a reasonable
time, you may submit a complaint to the Administrator, National Highway Traffic Safety Administration,
400 Seventh Street S.W., Washington, D.C. 20590, or call the toll free Auto Safety Hot Line at 1-888-
327-4236 (TTY: 1-800-424-9153), or go to http://www.safercar.gov.

If you are a vehicle lessor, Federal law requires that any vehicle lessor receiving this recall notice must
forward a copy of this notice to the lessee within ten days.

We have sent this notice in the interest of your continued satisfaction with our products, and we sincerely
regret any inconveniences this condition may have caused you.

Thank you for driving a Lexus.

Sincerely,

LEXUS DIVISION
TOYOTA MOTOR SALES, U.S.A., INC.

TOY-MDLID00002902



Special Service Campaign (SSC) Q&A
Early 2006 Model Year IS 250 AWD Accelerator Pedal

**Q1:** *What is the condition?*
**A1:** In certain early 2006 Model Year Lexus IS 250 All Wheel Drive (AWD) vehicles there is a
possibility that the accelerator pedal may temporarily become stuck in the partially depressed
position due to inadequate clearance between the accelerator pedal linkage and a plastic pad
embedded into the vehicle's carpet. This condition may interfere with the accelerator pedal
returning to the idle position, thereby causing temporary loss of vehicle speed control. In the
worst case, this may increase the possibility of a crash.

**Q2:** *What is the cause of this condition?*
**A2:** This condition is caused by tolerance variations between the accelerator pedal linkage and a
plastic pad embedded into the vehicle's carpet.

**Q3:** *Are there any warnings that this condition exists?*
**A3:** No, there are no warnings that this condition will occur.

**Q4:** *Which and how many vehicles are involved?*
**A4:** Certain early 2006 Model Year IS 250 AWD vehicles are involved. There are approximately 3,500
IS 250 AWD vehicles involved in the U.S.

**Q5:** *What is the production period of the affected vehicles?*
**A5:** The affected Lexus IS 250 AWD vehicles were produced from August, 2005 to mid-December,
2005.

**Q6:** *Are there any other Toyota or Lexus vehicles involved?*
**A6:** No, this condition only affects certain early 2006 Model Year Lexus IS 250 AWD vehicles only.
Rear wheel drive IS 250 vehicles are *not* involved.

**Q7:** *How many incidents of this condition have been reported?*
**A7:** There have been two cases reported for this condition in the affected vehicles.

**Q8:** *Have there been any accidents reported?*
**A8:** There have been no reported cases of accidents related to this condition.

**Q9:** *What is Toyota going to do?*
**A9:** Owners of the involved vehicles will receive a Special Service Campaign notification by first class
mail beginning in late-December, 2005. Lexus dealers will replace the accelerator pedal
assembly at NO COST to the vehicle owners.

**Q10:** *How long will the repair take?*
**A10:** The repair will take approximately ___ hours. However, depending upon the dealer's work
schedule, it may be necessary to make the vehicle available for a longer period of time.

**Q11:** *What should an owner do if they experience the condition?*
**A11:** Owners are requested to contact their local Lexus dealer for diagnosis and repair.

TOY-MDLID00002903

| From: | Chris Santucci/=WDC/Toyota_NY | Sent: 9/18/2006 1:26 PM |
|---|---|---|
| To: [ ] | Michiteru Kato/=HINPO/TMC0@TMC0 | |
| Cc: [ ] | Tatsuya Ito/=HINPO/TMC0@TMC0;Christopher Tinto/=WDC/Toyota_NY@Toyota_NY;Kevin Ro/=WDC/Toyota_NY@Toyota_NY;Kenji Ogata/=WDC/Toyota_NY@Toyota_NY | |
| Bcc: [ ] | George Morino/=TMS/Toyota | |
| Subject: | Defect Petition - Camry/Solara Engine Surge | |

Mitch,

I spoke with the investigator about the DP. It sounds like the he will only follow up with the petitioner, probably visit him and check the vehicle. The petitioner told him that at one point the vehicle surged to 3000 rpms with it in gear, stopped, and with his foot on the brake. I believe this is impossible given the stall speed of the torque converter, and the investigator agreed that this was probably incorrect. Anyway, he will probably not ask us for any data on this one, but he promised to send us the VIN of the petitioner's vehicle. More to follow.

Regards,

Chris Santucci - Safety Engineer
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Phone (202) 463-6856 Fax: (202) 463-8513
email: Chris_Santucci@tma.toyota.com

---

Mitch,

Today TMA received a fax from NHTSA informing us that they have agreed to consider a petition to open a defect petition on the 2002-2006 Toyota Camry and Solara for engine surge. Attached is a copy of the petition. While NHTSA has investigated these vehicles before, (see PE04-021) TMA demonstrated the maximum surge that could be caused by the electronic throttle control system during operation. I was under the impression that NHTSA realized that, even in the worst case, surge was minimal and always controllable by the brakes. I will speak with NHTSA on Monday to gather their impressions. Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation. More details to follow...

Regards,

Chris Santucci - Safety Engineer
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Phone (202) 463-6856 Fax: (202) 463-8513
email: Chris_Santucci@tma.toyota.com

**Exhibit 4**

TOY-MDLID00044092

From:    Christopher Tinto/WDC/Toyota_NY    Sent 2/27/2007 6:08 AM
To: [ ]    chris santucci
Cc: [ ]
Bcc: [ ]
Subject    Re: Demonstration

Hey - when you get time to nail it down - please fill me in on the demo plans (location, etc.) + any plans with Mitch...

Thanks
Chris


Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824 Fax: (202) 463-8513
email: Chris_Tinto@tma.toyota.com




Michiteru Kato/HINPO/TMC0@TMC0
02/27/2007 07:27 AM
To Chris Santucci/WDC/Toyota_NY@TOYOTA_NY@TOYOTA@TMCE
cc Christopher Tinto/WDC/Toyota_NY@TOYOTA_NY, Kevin Ro/WDC/Toyota_NY@TOYOTA_NY, Hisaaki
Kato/WDC/Toyota_NY@Toyota_NY@TOYOTA@TMCE, Hajime Kitamura/HINPO/TMC0@TMC0, Shinichiro
Ogata/HINPO/TMC0@TMC0, Takezo Oba/HINPO/TMC0@TMC0, Seiko Takeuchi/HINPO/TMC0@TMC0
Subject Re: Demonstration



Chris,

Thank you for fixing the date for the demonstration. I talked to the travel agency today and asked her to finalize my trip to DC(flight and hotel). As planed, I will leave Japan on 3/4(Sun) and arrive in DC on the same day, and leave DC on 3/9(Thu).
I will bring an engineer of a design department, who knows EPS system well, for the demonstration and technical meeting. His name is Mr. Iwasaki. I think he may speak English well because he has been in the U.S. for 2 or 3 years to get a master degree 10 years ago.
I wondered whether it's better to ask another engineer, who is in charge of the EPS ECU, to attend the meeting, because he knows the ECU failures well. However, I thought that 3 guys from TMC is too many (two at most), and if the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU.(I want to avoid such situation.) Also considering the purpose of the technical meeting and demonstration, I think the EPS system engineer is the best to attend it this time.

Currently Mr. Iwasaki is preparing the technical presentation material, which includes the explanation of the outline of the EPS system(each related component) and the each fail-safe mode. Probably I will be able to sent that material to you for your advance review by Thursday. Let's discuss the detail of the contents in the pre-meeting and modify it if necessary.

And as I told you, I sent you a sample of the EPS ECU, special ECU and three samples of the EPS motor shaft by FedEx today and they will reach you in the morning of Wednesday. Please treat the special ECU carefully. Do not drop/disassemble it. Please have it sit in your cabinet. In addition, if you touch the motor shaft by naked hands, there

Exhibit 5

TOY-MDLID00075574

Is a possibility that the shaft may corrode, because the shafts do not have an anticorrosive treatment.

If you have any concerns, let me know.

Best regards,

Mitch

宛先: Michiteru Kato/HINPO/TMC0/TMC0@TMCE@TOYOTA
cc:
件名: Re: Demonstration

Fixed for March 7.

I am looking for an area to test.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip

| From: | Christopher Tinto/=WDC/Toyota_NY | Sent 3/28/2007 10:17 AM. |
|---|---|---|
| To: [ ] | Michiteru Kato/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Cc: [ ] | Shinichiro Ogata/=HINPO/TMC0@TMC0;Takezo Oba/=HINPO/TMC0@TMC0;George Morino/=TMS/Toyota@TOYOTA;chris santucci;Kevin Ro/=WDC/Toyota_NY@Toyota_NY Hisaaki Kato/=WDC/Toyota_NY@Toyota_NY. | |
| Bcc: [ ] | Jim Press/=Exec/=TMS/Toyota@TOYOTA;jo.cooper;anita_schneider@tma.toyota.com. | |
| Subject: | URGENT*****ES350 ISSUE*********** | |

Further to my earlier email, I spoke to Demeter about our proposal. As I noted, they have decided to open a PE on the floor mat issue, regardless of whether we send a letter or not.

Although I noted that our proposal was basically a 'recall', and that a PE would result in little else as far as what Toyota could do, Demeter noted that the reasons for opening were as follows:

NHTSA feels that they have too many complaints on this one vehicle to drop the issue;
The results of a stuck throttle are 'catastrophic';
And therefore, they want to ask Toyota for its data on complaints, etc.,
NHTSA may also go out with its own "owner survey" or "dealer survey" to try to get a better feel for the magnitude of the problem.

Nonetheless, I would recommend that we go ahead with the letter mailing campaign as planned and get in front of this issue.

Please let us know if we have any questions.

Best Regards,
Chris


Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824 Fax: (202) 463-8513
email: Chris_Tinto@tma.toyota.com


----- Forwarded by Christopher Tinto/WDC/Toyota_NY on 03/28/2007 11:44 AM -----

Christopher Tinto/WDC/Toyota_NY
03/27/2007 02:24 PM
To Mitch Kato
cc Shinichiro Ogata/HINPO/TMC0@TMC0, Takezo Oba/HINPO/TMC0@TMC0, George
Morino/TMS/Toyota@TOYOTA, chris santucci, Kevin Ro/WDC/Toyota_NY@Toyota_NY, Hisaaki
Kato/WDC/Toyota_NY@Toyota_NY
Subject Fw: URGENT*****ES350 ISSUE***********


I spoke to NHTSA management today (K. Demeter) about a potential compromise on the ES350 floor mat issue.
In lieu of a Part 573 safety recall, I offered the following:
Toyota will send a letter to all 2007MY ES350 owners reminding them not to install all weather mats on top of existing mats;
In addition, we will enclose a caution label advising owners of the same, and ask owners to affix the label on the flat surface on the backside of the mat;
We will also alert dealers of the issue, and remind them not to install mats on top of existing mats;

**Exhibit 6**

TOY-MDLID00003908

If the owners want to have the dealer affix the label to the mat, Toyota will offer that they bring their vehicles to the dealer to ask them to do it, free of charge.

However, we will NOT file a 573 (i.e. this is not a safety recall), because a) this is an 'aftermarket' install b) there is no design or manufacturing defect in the mat or vehicle, and c) the issue really boils down to improper installation of the mats by the owner or the dealer (but I noted that Toyota has no evidence that dealers are actually doing this.)

Ms. Demeter said that there is precedent in NHTSA's history for safety recalls in this area, but understood our idea - she pledged that they would discuss it internally and get back to me with a response to our proposal in a few days. She also insured me that NHTSA would not open a formal PE until she gets back to me.

I will keep everyone informed.

Regards,
Chris

TOY-MDLID00003909

| From: | George Morino/=TMS/Toyota | Sent:4/2/2007 7:59 AM |
|---|---|---|
| To: [ ] | Chuck Yaeger,Denise Jacobson/=Lexus/Toyota@Toyota | |
| Cc: [ ] | Kirk Forsht/=TMS/Toyota | |
| Bcc: [ ] | george_morino@toyota.com | |
| Subject: | (REVISED) ES 350 NHTSA Preliminary Evaluation Q&A | |

Chuck and Denise:

Sorry we had a last minute change to the Q&A. Please utilize this revised version of the Statement and Q&A. The issue has been posted on the NHTSA website.

Sorry!

[Old]
NHTSA has received five consumer complaints regarding unintended throttle control in the subject vehicles.

[New]
NHTSA received five consumer where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

[Changed Version]
Statement:
On March 29, 2007, the National Highway Traffic Safety Administration ("NHTSA") opened an investigation called a Preliminary Evaluation on certain 2007 model year Lexus ES 350 vehicles. NHTSA is concerned that if the Lexus All Weather Floor Mat is installed on top of the existing Lexus Carpeted Floor Mats, the All Weather Floor Mats would not be secured by the retaining hooks (clips) and may slip forward interfering with the accelerator pedal. NHTSA has received five consumer complaints where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

A Preliminary Evaluation is an early-stage inquiry to determine if further analysis (an Engineering Analysis) is warranted; this is not a recall. Lexus is currently cooperating fully with the agency in its efforts to investigate the allegations.

Q2: What prompted NHTSA to investigate these issues?
A2: NHTSA received five consumer where the All Weather Floor Mat may have interfered with the accelerator pedal operation. Based upon consumer interviews, the agency believes that the accessory Lexus All Weather Floor Mat, if not properly installed, may interfere with the accelerator pedal on certain 2007 model year Lexus ES 350 vehicles.

George Morino
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

**Exhibit 7**

TOY-MDLID00000566

Fukunori Ito/E/TMC0@TMC0    To  William de Manincor/TMS/Toyota@Toyota@TMCE
08/27/2007 02:24 AM        cc  Yutaka Atsumi/E/TMC0@TMC0, Hiroyuki Okawa/O/TMC0,
Kota Funato/E/TMC0@TMC0, Jim
Wimmer/TMS/Toyota@Toyota@TMCE, Michael
Collinsworth/TMS/Toyota@TOYOTA@TMCE, Shigeyuki
Tomizuka/TMS/Toyota@Toyota@TMCE,
Kenzo_Nishiwaki@toyota.com
        bcc

      Subject  Fw: URGENT UPDATE on ES350 Investigation

Hello Bill-san

CADD have received a information of update on ES350 investigation to Engineering Analysis by JCQE.

I just inform you of e-mail that Mr. santucci and Mr. Tinto, TMA send JCQE below.

After their meeting, TMA will inform NHTSA concern and request.

I suppose all of you should make additional investigation and report.

Best Regards,

*****************************************
  Frank <Fukunori> Ito Quality Group
  TMC CADD Engineering Administration Dept
  Tel 0561-74-4665 Ext. 8-41-4665
  Fax 0561-74-4966 Ext. 8-41-4966
  【E-Mail】Fukunori_Ito@mail.toyota.co.jp
*****************************************


Christopher Tinto@TOYOTA_NY
2007/08/24 07:08

宛先: George Morino, dave_zellers@toyota.com, Kirk Forsht,
    shinichiro_ogata@mail.toyota.co.jp, Takezo
    Oba/HINPO/TMC0@TMC0@TMCE@TOYOTA, Shinichiro Ogata/HINPO/TMC0@TMC0
cc:  Hisaaki Kato/WDC/Toyota_NY@Toyota_NY, chris santucci, Kevin
    Ro/WDC/Toyota_NY@Toyota_NY
件名: URGENT UPDATE on ES350 Investigation

FYI - I received a call from the head of NHTSA Enforcement today.
Basically, there were some internal NHTSA briefings today regarding the
ES350 floor mat/throttle sticking issue -- including Toyota's actions to
date, NHTSA internal investigation and analysis, complaints, etc. -- and
apparently NHTSA management has decided to demand further action from
Toyota.  They are requesting a meeting ASAP to discuss their investigation
and their ideas for further action.

Upon further discussion, Dan Smith explained the following:

  They claim that this remains a serious issue, even subsequent to our
  mailings to Lexus owners;
  They recognize that this is a misuse issue (stacked mats), however, they
  believe that something about the throttle pedal or floorpan design lends
  itself to easier jamming than other models produced in the past;
  They also believe that the Prius, Camry and Avalon may also be prone to

**Exhibit 8**

TOY-MDLID00000295

being overly sensitive to floor mat jamming and claim to have some
evidence of such;
They claim that jamming can occur with Toyota mats or aftermarket mats;
They claim that the issue is further complicated by the fact that NHTSA
believes that customers do not know how to shut off the car when in
motion (i.e. hold the start button for 3 seconds).

NHTSA said that they feel that this is so important/urgent that they are
considering a NHTSA public service announcement, informing the public to
insure they install the mats correctly (i.e. proper clip use, and no
stacking) as well as how to shut off the vehicle with the push button
start.

In response, I proposed to NHTSA that we first have an informal meeting
with their engineers, to get a 'download' of the information they have, as
well as their analysis of pedal geometry, etc. I explained that in fact,
all of these theories about design issues (vs. mat placement) are
completely new to Toyota, and therefore a meeting of senior management
would be essentially fruitless and premature at this point, as we can not
possibly provide any meaningful feedback to their demands until we have a
better understanding of what they think the issues may be. Afterwards, we
can digest the information, and set up some follow up meetings with NHTSA
to discuss potential next steps, if any are deemed necessary.

Regarding their consideration of a NHTSA public safety announcement , they
agreed to send a draft to us prior to its issuance. At this point, no
decisions are made, but this remains an option for them, based on what
Toyota is or is not willing to do.

Therefore, TMA's game plan is as follows:

1) TMA will contact NHTSA engineers for further background tomorrow.

2) TMA will set up a meeting between our guys in DC (i.e. Santucci and Ro)
and NHTSA engineers (Quandt and Yon) for sometime late next week,
preferably in the TMA-DC offices. Our plan is that no senior staff or
attorneys will be present. However, if they insist on a larger meeting, we
will have Erika Jones (outside counsel) attend on our behalf.   I will not
attend, to insure that NHTSA does not try to negotiate any next steps at
this phase.

3) TMA will forward all information from this meeting to TMC for
consideration and comments.

4) Depending on feedback from TMC, and NHTSA's sense of urgency, we will
shoot for a larger meeting between NHTSA and Toyota (TMA, TMC engineers,
and TMS) for the second or third week of September.

We will keep everyone informed as things progress.

Best Regards,
Chris


Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South

Washington, DC 20005

----- Forwarded by Christopher Tinto/WDC/Toyota_NY on 08/23/2007 04:16 PM
-----

|  |  |  |
|---|---|---|
| Chris Santucci/WDC/Toyota_NY | | |
| 08/23/2007 04:08 PM | To | Christopher Tinto/WDC/Toyota_NY@Toyota_NY, jiyunji_ogata@mail.toyota.co.jp, Michiteru Kato/HINPO/TMC0@TMC0@TMCE@TOYOTA |
| | cc | George Morino/W, dave_zellers@toyota.com, Kirk Forsht/M, shinichiro_ogata@mail.toyota.co.jp, Kevin Ro/WDC/Toyota_NY@Toyota_NY, Akira Kanatani/WDC/Toyota_NY@Toyota_NY, Hisaaki Kato/WDC/Toyota_NY@Toyota_NY, Takezo Oba/HINPO/TMC0@TMC0@TMCE@TOYOTA |
| | Subject | UPDATE on ES350 Investigation |

Yesterday I went to NHTSA to deliver 2 sets of floor mats and 10 copies of
the owner notification letters. The mats were of the latest design, which
included the packaging and warning text enhancements. I met with Scott Yon
and Jeff Quandt (ODI) and went through the larger text in the mat, the
changes to the packaging, and the tag that is attached to the grommet hole.
In addition, I explained the owner letter and the warning sticker for their
benefit. Finally, I mentioned that Toyota would be rolling out TSB's that
specifically explain the installation of the mat to be used with the
Pre-Delivery Instructions (PDI) for all our vehicles over the next few
years. Scott and Jeff were in a hurry, but we had some time to speak about
the matter.

Jeff mentioned that the new size text on the mat was very readable. He was
pleased in that regard. They mentioned two points:

> Using ETC to shut down throttle control when the brakes are applied
> Multiple tap of the ignition button for engine stop

They mentioned that another manufacturer (VW) is cutting off the throttle
when the brakes are applied. Scott mentioned that it had some specific
conditions, but did not elaborate. Jeff mentioned that another
manufacturer allows the engine to be shut off if you rapidly press the
ignition button repeatedly.

I don't believe that these functionalities are things they want Toyota to
implement, there are no requirements to do so. I mentioned that I would

TOY-MDLID00000297

relay this information when I returned. They were in a hurry, so I neglected to ask about the survey information. Another investigator offered to show me around the new building. I ran into a lot of different investigators and ODI staff and when asked why I was there, when I told them for the ES350 floormats, they either laughed or rolled their eyes in disbelief. I maintained that Toyota was serious about the issue and had already carried out some efforts on preventing occurrences.

Today I called Scott to follow up on the survey information. He had not followed up on his end to release the data, so we will still have to wait for it. But what I found was that most of the 35 cases they had extracted from the survey were double stacked mats. They also have 6 complaints on 07 Camry, 6 complaints on 05-07 Avalon, and 6 complaints on 04-07 Prius. He also mentioned that some of these complaints were on vehicles using non-Toyota floor mats.

However, I learned today that based on their briefing, NHTSA is very serious and "wants Toyota to do something." I pointed out all the things we have done again, and when I got to the TSB part, he didn't remember me telling him about it yesterday. He told me that he would mention it to the people involved in the briefing by email.

He is concerned that the issue will compound once vehicles change hands or mats are removed for cleaning and clips are lost/broken. I told him that we have been producing mats for quite some time, and that we have been using clips for quite some time, and it hasn't been an issue. But he believes that the accelerator pedal is of a new design that can easily be trapped by a loose floor mat.

I will update you on further developments as they occur, however, it appears that NHTSA is very serious about this issue and is unfortunately overlooking our efforts to date in favor of a "vehicle issue."

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856  Cell (202) 651-1581 Fax (202) 463-8513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip

---

Today I spoke to NHTSA about the ES350 investigation. Earlier this week I had contacted them to get details on the survey that was mentioned in the resume. They were too busy earlier, so today they called me back to discuss.

As Chris mentioned, the agency upgraded because of the number of incidents, and the severity of the incidents. So first, we discussed the survey. I asked for a copy, and they said they want to discuss it with me first over the phone, but they cannot promise when we will get a copy. Apparently VRTC sent over 2000 survey letters to all registered owners of the ES350 in the state of Ohio. They received over 600 responses. Of those 600, around 480 indicated that they had the all weather mat. Of those 480, 35 described some sort of issue with the all weather mat. These issues were limited to double stacked or loose single mats, however, they indicated that some of the issues described may be related to hesitation/sluggishness

TOY-MDLID00000298

(driveability concerns).

After discussing the survey, they stated to talk about next steps and
issuing an IR letter. Peer vehicles were mentioned, and I agreed that a
peer analysis would be a good piece of information for an EA. They
mentioned a recent crash of a 2007 Camry in California that involved a
fatality. They indicated that preliminary reports from the police lead
them to believe that more than one floormat was in the driver footwell.
They also mention the Prius and a couple similar (non-fatal) incidents as
well.

I told them that obtaining additional data on ES350's may not be useful at
this time. Since we conducted our mailing and implemented the
countermeasures, and we believe they have been effective in reducing
occurrences, perhaps waiting to collect ES350 data would be beneficial.
From this, they mentioned their need to move quickly. They told me that
they are having an internal briefing (most likely with
Medford/Smith/DeMeter) about this investigation about what to do. I told
them that what they are describing sounds like an upgrade meeting, and they
fell silent. Then Jeff Quandt mentioned that they aren't sure that they
want to spend a whole year investigating this issue.

They also mentioned that they did not have a set of countermeasured mats.
At this point, I promised that we would provide them with new mats and
owner notification letters, so that they can show at their briefing all of
the efforts Toyota has made to reduce misuse of the floor mats. I told
them that I believe we have done a lot to prevent this from happening, and
most likely, what we have done already has had a significant impact. My
hope is that giving them a fresh supply of this material will have a
positive effect at their briefing (if they bring them along, of course).

So I would like to get a couple of sets of mats and owner
letters/stickers/envelopes etc (TMS-help please) and drop them off with
NHTSA next week. Their briefing is next Thursday. Hopefully when I meet
up with them, I can get the survey information. Let me know what you
think. If you have any concerns about my proposal, let me know as soon as
possible.

If NHTSA doesn't want to spend a year on this, then that means they want to
speed up the process and possibly issue a recall request letter right away.
Without seeing exactly want the survey results are, I think it is premature
of NHTSA. They really don't have enough data to take that next step to
request a recall. Plus, given our actions to date, if that's what comes
out of the briefing (i.e. issue a recall request letter) I'd be surprised.
However, if that is what they are going to decide, then trying to get the
physical manifestations of our actions (i.e. the new mats, the letters,
warning labels, etc.) into that meeting might just tell them that they
already have what they need to close this investigation. I would even
venture a guess that some members of NHTSA management (like Chief Counsel)
are not aware of our mailing, and perhaps that is why we are at an EA
today. Just my thoughts.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856   Cell (202) 651-1581 Fax (202) 463-9513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.

.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip

FYI - I just received a "heads up" call from NHTSA regarding the agency's intention to upgrade the Preliminary investigation (PE07-016) into the Lexus ES350 All Weather Floor Mats to an Engineering Analysis (EA).

After reviewing Toyota's submission of June 11, as well as its own independent testing and field evaluation of incidents, the agency believes that it should upgrade based on the severity of the incidents (i.e. some high-speed, wide-open-throttle complaints), coupled with its latest count of 40 complaints, 8 crashes and 12 injuries.

Although NHTSA recognizes the efforts we have already made to alert dealers and owners of the potential interference issue (when the mats are incorrectly stacked), NHTSA also believes the design of the floor mat itself (weight, cut, fit) lends itself to causing unintended pedal application even when the mat is not stacked.   In further conversation, although the agency can not legally 'prescribe' a fix, they felt that slightly modifying the existing mat may help alleviate the problem.

I expressed our appreciation for the heads up, as well as encouraged future close dialogue to attempt to come to a mutually acceptable solution.

We will forward the resume as soon as it becomes available, and at that time we will also try to find out when this is likely to become public, to gauge timing constraints for Q&A preparation.

Best Regards,
Chris


Chris Tinto
*********************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

| | |
|---|---|
| From: | George Morino - TMS/Toyota | Sent: 9/13/2007 11:28 AM |
| To: [ ] | Christopher Tinto/=WDC/Toyota_NY@TOYOTA_NY;csantucci@tma.toyota.com |
| Cc: [ ] | Kirk Forsht/=TMS/Toyota;Michiteru Kato/=HINPO/TMCO@TMCO |
| Bcc [ ] | |
| Subject: | CONFIDENTIAL - DRAFT Documents |

Hi Chris and Chris:

We greatly appreciate your hard work in dealing with these issues. Mitch requested that I have you review the DRAFT Owner Letter and Press Release prior to us taking it further within TMS. Please don't share these documents with any other party yet.

[DRAFT Owner Letter (Lexus version)]

The Camry letter would basically be the same with the exception of the vehicle brand/name (picture of the mat will also say Camry) and the following additional bullet point in the "What if you experience accelerator pedal interference prior to your appointment?" section:
In a traditional key ignition vehicle, if you can safely stop the vehicle, turn the ignition key to the ACC position. Again, by turning the key to the ACC position, you will lose both power brake assist and power steering. Do not remove the key from the ignition. If you remove the key from the ignition, the steering wheel will lock.

[DRAFT Press Release]

I thought about including the following paragraph in the Press Release, but then it starts to sound like something is wrong with the vehicle and we are trying to hide it. It begs the question, "why don't you fix something in all the vehicles so it can't happen with any mat?" therefore I didn't include it. What do you think?

If the 2007 through early 2008 model year Camry or ES 350 vehicle does not have the Toyota or Lexus All Weather Floor Mat, it is NOT involved in this recall. However, during our investigation, it was noted that floor mat interference is possible in any vehicle with any combination of floor mats. Therefore, if non-Lexus floor mats are utilized, please owners are requested to make sure they are also properly secured using the appropriate retention device and not place them on top of another floor mat.

We also didn't include the START/STOP button procedures in the Press Release. A person hearing what to do on news radio, a spouse communicating to spouse that they saw something on the news, running to the get a paper and pencil to write down the information just lends itself to mass confusion. Instead, we are preparing to quickly begin mailing the owner letter (within one week) of x-day. We felt an owner letter is something the customer can refer to and keep.

A slightly earlier version of both DRAFT Owner Letter and was already reviewed with TMS Legal. We need to run the Press Release by Corporate Communications after you have an opportunity to comment and as we get closer to x-day.

We greatly appreciate your assistance.

George Morino
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

**Exhibit 9**

TOY-MDLID00002839

| From: | Christopher Tinto/=WDC/Toyota_NY | Sent 9/15/2007 10:26 AM |
| To: [ ] | Jo Cooper/=WDC/Toyota_NY@Toyota_NY | |
| Cc: [ ] | | |
| Bcc: [ ] | | |
| Subject: | Re: ES350 recall/NHTSA meeting | |

U da best ma'am.

Thanks

Chris

--------------------------------
Chris Tinto
Vice President, Toyota Motor North America Inc
Sent from Wireless hand held

From: Jo Cooper
Sent: 09/15/2007 07:16 PM
To: Christopher Tinto
Subject: Fw: ES350 recall/NHTSA meeting

Fyi...

Have a good weekend! Jo
--------------------------------
Josephine S. Cooper
Group Vice President
TOYOTA MOTOR NORTH AMERICA
(202) 468-1990

From: Jo Cooper
Sent: 09/15/2007 07:15 PM
To: Jim Lentz; Don Esmond; Bob Carter; Dave Illingworth
Cc: Shigeru Hayakawa; Shinichi Goto
Subject: Fw: ES350 recall/NHTSA meeting

Gentlemen:

thought you would be interested in the outcome--and the avoidance of much bigger issues (and costs). The TMA
and TMS team did a good job...

Best regards, Jo
--------------------------------
Josephine S. Cooper
Group Vice President
TOYOTA MOTOR NORTH AMERICA
(202) 468-1990

From: Christopher Tinto
Sent: 09/14/2007 04:40 PM
To: Jo Cooper

**Exhibit 10**

TOY-MDLID00004972

Subject: ES350 recall/NHTSA meeting (Revised - IGNORE PREVIOUS VERSION)

Jo:

I just wanted to fill you in on the NHTSA meeting and negotiations yesterday regarding the ES350 floor mat issue. Working with TMC QD and TMS service, we were able to put together enough material in the short time allotted by the agency to convince NHTSA to accept our proposal.

In a nutshell - we will 'recall' the '07 ES and Camry floor mat, however, we will NOT declare that a 'safety defect' exist in either the vehicles or the mat, for the purposes of the required notification to the agency (under Part 573). (Of course, the owner letter will say that a defect WAS found in the mat, to insure that owners pay attention to the notice and secure the mats correctly - the language of which is required by law). Customers will be notified that they should correctly install the mats to insure no interference with the throttle until Toyota is ready to provide replacement mats.

We believe that this remedy is a reasonable response on Toyota's part, given that the cause of the problem is that the mats are being improperly installed (i.e. double stacked) and left unsecured, contrary to their intended design. We also believe that there is nothing unique about Prius, Avalon, and IS250/350 (i.e. NHTSA's other interest) vs. other make/models on the road, and therefore no field action is required.

Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button 'off' switch. We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

Please let me know if you have any questions.

Best Regards,
Chris

PS - Special thanks should be noted for the TMS-service guys, as they did the lions share of the work at the last minute, providing enough good information to convince the agency that this issue is NOT unique to Toyota products.

Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

TOY-MDLID00004973

| From: | Mark Johnson/=WDC/Toyota_NY | Sent: 10/19/2007 12:15 PM |
|---|---|---|
| To: | Christopher Tinto/=WDC/Toyota_NY@Toyota_NY | |
| Cc: | Chris Santucci=WDC/Toyota_NY@Toyota_NY | |
| Bcc: | | |
| Subject: | Re: URGENT Fw: Committee Letter | |

Great. I will draft it on Monday

From: Christopher Tinto
Sent: 10/19/2007 03:00 PM
To: Mark Johnson
Cc: Chris Santucci
Subject: Re: URGENT Fw: Committee Letter

I think if we couple it with the attached TMS Q&A it can work. Basically, its all we know right now.

1) We are aware of it
2) We are looking into it
3) NHTSA is investigating, and NHTSA is testing, NHTSA has sent us a letter
4) This 'sounds' like sudden accel, which NHTSA has found time and time again typically is pedal misap (we wont say this overtly, as to not blame consumers) - but one big problem is that no codes are thrown in the ECU, so the alleged failure (as far as we know) can not be documented or replicated. The service tech therefore cant 'fix' anything, and has no evidence that any problem exists.
5) It is too soon to tell what is going on here.

After you chew on it a bit, lets regroup and see what holes we need to fill in...

THANKS SIR

Best Regards,
Chris


Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com




Mark Johnson/WDC/Toyota_NY
10/19/2007 02:52 PM
To Christopher Tinto/WDC/Toyota_NY@Toyota_NY
cc
Subject Re: URGENT Fw: Committee Letter

Exhibit 11

TOY-MDLID00050747

Works for my purposes. But - does it get enough of our message out for your purposes if she releases this to the media or do you think we need more info?

----- Original Message ------

From: Christopher Tinto
Sent: 10/19/2007 02:36 PM
To: Chris Santucci
Cc: Christopher Tinto; Jo Cooper; Kevin Ro; Mark Johnson
Subject: Re: URGENT Fw: Committee Letter

Chris :

Thanks for this veryquick response - I appreciate it.

Mark - will this work for your purposes? Can you draft something to go back to your folks on the Hill if/when needed?

Best Regards,
Chris .

Chris Tinto
********************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

Chris Santucci/WDC/Toyota_NY
10/19/2007 02:14 PM
To Christopher Tinto/WDC/Toyota_NY@Toyota_NY
cc Chris_Tinto@tma.toyota.com, Jo Cooper/WDC/Toyota_NY@Toyota_NY, Kevin
Ro/WDC/Toyota_NY@Toyota_NY, Mark Johnson
Subject Re: URGENT Fw: Committee Letter

Chris,

Attached is the Q&A dated October 3 from TMS on this issue. Since the time this Q&A was approved by TMS, I contacted NHTSA and obtained 19 owner complaint reports from NHTSA on the Tacoma. The complaint reports mention engine surge and vehicle lurch, etc. There are some low speed crashes alleged. TMC and TMS are looking into them as we speak.

NHTSA has been reviewing the complaints in their own database, as well as some owner forums on the internet. They have not opened a defect investigation. The Office of Defects Investigation (ODI) did ask the Office of Vehicle Safety Compliance (OVSC) to confirm the compliance of the 2007 MY Tacoma with FMVSS 124, as you noted. As

TOY-MDLID00050748

such, NHTSA issued a standard compliance IR (Information Request) to us on September 26, which I just received a draft response this morning from TMC-QD. Our response is due October 23. I also spoke with Harry Thompson at OVSC (he's the responsible branch chief) about this letter and they have purchased a vehicle (a 2WD V6) that will be tested at VRTC after we respond to the IR. TMS is aware of the issue and media inquiries can be directed to Corporate Communications if needed.
[attachment "2007 Tacoma Throttle Control System Q&A 10-03-07 v3.doc" deleted by Mark Johnson/WDC/Toyota_NY]

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip

Christopher Tinto/WDC/Toyota_NY
10/19/2007 01:45 PM
To chris santucci
cc Kevin Ro/WDC/Toyota_NY@Toyota_NY, Chris_Tinto@tma.toyota.com, Mark Johnson, jo cooper
Subject URGENT Fw: Committee Letter

Chris :

See below. Please give me a one paragraph write up on what is going on for this issue with NHTSA. (i.e. what the complaint/allegation is, note that NHTSA is doing a compliance investigation into 124 , note that we got a letter and are cooperating, NHTSA bought a truck, TMC is looking into it, etc. Whatever you can think of, please add it...

Also, was there a Q&A on this issue out of TMS?

Mark will write a letter up for the committee to try to stop this from moving forward - We need to keep this within NHTSA rather than have it expand to a hearing.

Thanks - I need this NO LATER than Monday 12:00 OK?

Best Regards,
Chris

Chris Tinto
**************************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

TOY-MDLID00050749

----- Forwarded by Christopher Tinto/WDC/Toyota_NY on 10/19/2007 01:40 PM -----

Mark Johnson/WDC/Toyota_NY
10/19/2007 10:55 AM
To ctinto@tma.toyota.com
cc Jo Cooper/WDC/Toyota_NY@Toyota_NY, Anna Schneider/WDC/Toyota_NY, Charlie Ing/WDC/Toyota_NY
Subject Fw: Committee Letter

Chris, I got a heads up from a friend of mine in Rep. Blackburn's office about a letter his boss sent to the Energy and Commerce Committee asking for an investigation into sudden acceleration on the 2007 Tacoma. Apparently, a local news station in Nashville (see the links below) has been doing a story on this and interviewed Rep. Blackburn and asked her about the issue. She was on the spot and said she would look into it, thus the attached letter. Do you have any information I can provide her or any recommendations on how to proceed?

Thanks,

Mark
----- Forwarded by Mark Johnson/WDC/Toyota_NY on 10/19/2007 10:50 AM -----
"Louer, Greg" <Greg.Louer@mail.house.gov>
10/19/2007 10:19 AM

To <mark_johnson@tma.toyota.com>
cc "Brophy, Steve" <Steve.Brophy@mail.house.gov>
Subject Committee Letter

Mark,

Thanks for taking the call this morning, and if you have any questions just let me know.

Best regards,

- Greg L.

http://www.wsmv.com/iteam/14295351/detail.html

http://www.wsmv.com/iteam/14304072/detail.html

Greg Louer
Office of Rep. Marsha Blackburn
509 Cannon House Office Building
202-225-2811 (Voice)
202-225-3004 (Fax)
greg.louer@mail.house.gov
[attachment "10-18-2007_Letter_Toyota Safety Issue_version two.doc" deleted by Mark Johnson/WDC/Toyota_NY]

TOY-MDLID00050750



# TRA Safety - Current Responsibilities

1. **Monitor and Affect Regulation & Legislation**
   - NHTSA, Congress, OMB, FCC, etc.
   - Alliance SPC & WGs Policy; Public/Docket comments
   - Meetings with Gov't agencies/Hill

2. **Vehicle Defect/Compliance and 3rd Party Crash Testing**
   - Coordinate Responses/Negotiations on NHTSA Investigations/Recalls/EWR with Gov't /test labs
   - NCAP Consumer Info / IIHS testing; Attend Tests, Provide Data and Analysis

3. **Manage/Coordinate/Expand TMC Safety Research w/Outside Entities**
   - Universities/Labs (VT, UVa, etc.); CIREN Trauma Center
   - GM/CAT Cooperative Project (Safety); ACAT/NHTSA
   - Sponsorship of Crash Safety Conferences /Safety Initiatives

4. **ITS/VII activities  (Regulatory/legislative implications)**
   - Privacy/Policy issues; TMC/TTC coordination
   - ITS America/World Congress; VII Executive Leadership Team; VII-C issues

5. **Support PR Activity to Enhance Toyota's Image w/ Government/Public**
   - Work with TMS PR; Media interviews/ background
   - Affiliate Technical briefings

6. **Monitor Market Trends Related to Safety**
   - Competitors, media, NGOs

1

**Exhibit 12**

TOY-MDLID00052956




# Key Safety Issues

- U.S. DOT/NHTSA under Obama Administration not industry-friendly



  OEMs anticipate a more challenging regulatory and enforcement environment, with potential for revisiting key regulatory proposals

- NHTSA's new, more aggressive management includes more attorneys at the agency, even in the leadership of Rulemaking and Enforcement



  The new regime has less understanding of engineering issues and are primarily focused on legal issues

2



# Key Safety Issues




## Impact on "Quality"

- Number of UIO (units in operation) increasing

- NHTSA is testing more vehicles under NCAP

- Nov 2000 "TREAD Act" requires new, more intensive, and regular reporting

  - A 5-day notification is required when recall determinations are made
  - New strong civil and criminal penalties were implemented
    - e.g. Ford/Firestone/rollover issue

- NHTSA is more sensitive to public/congressional criticism



Resulting in more Investigations, and more forced recalls

3

TOY-MDLID00052958



# Key Safety Issues





Right obliqu e

Full frontal

Left oblique

- **FMVSS 305 Compliance/Hybrid Sales**
  - Compliance Concerns/Sales Impact

- **New NCAP Test Protocol**
  
  - Lower Safety Ratings Affect Sales – Tundra Case

- **"Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.**
  - Recurring issue, PL/Design implications

- **Cargo Carrying Capacity/FMVSS 110 Compliance**
  - Flaws in Toyota Regulatory and Defect Process

- **Prius Headlamps Investigation - Class Action**

  

- **"Quiet Cars" (Hybrids, EVs, FCHVs)**
  - NFB/Congressional/NHTSA/SAE activity

- **Kids in Cars**
  - BTSI, Power Windows, Rear Visibility Standards



4

TOY-MDLID00052959



# Key Safety Issues

## Challenges

- Expectations are rapidly rising for more Toyota leadership

- Detroit 3 unable to carry the burden on safety initiatives/regulatory work

  - Bankruptcy, conflicting interest with US gov't
  - Alliance is a difficult working atmosphere
  - Toyota resources challenged

## Recommendations

- Need improved process and tighter framework for decisions

  - Need better streamlining and faster decisions
  - Need much more support within Toyota for quality-related issues
    - Need more legal tie-in

- Regular communication with top levels of TMC

- Need to speak out more independently when appropriate for company

5

TOY-MDLID00052960

# Slide Notes

### Slide 1:

Monitor and Affect Regulatory and Legislative Movement

NHTSA., OMB, Congress, etc.

Act Through Alliance, Toyota independently

Technical Meetings with Automakers

Comments, Private mtgs, Industry

Vehicle Defect/Non Compliance Issues

NCAP consumer information/IIHS/3rd party testing

Attend tests, Provide data and analysis

Negotiation with stakeholders/Gov't/test labs

Manage/Coordination TMC safety research w/ Outside entities

Universities/Labs, etc.

Monitor market trends related to safety

Competitors, media, NGOs

Support PR activity to enhance Toyota's image w/Gov't/public

Work with TMS PR

Improved understanding amongst affiliates/technical briefings

Media interviews/background

### Slide 2:

U.S. DOT/NHTSA under Obama Administration

Not industry friendly

Aligned with the safety advocate community

TOY-MDLID00052961

## Slide Notes

OEMs anticipate a more challenging regulatory and enforcement environment, with potential for revisiting key regulatory proposals

NHTSA's new, more aggressive management includes more attorneys at the agency, even in the leadership of Rulemaking and Enforcement

The new regime has less understanding of engineering issues and are primarily focused on legal issues

Slide 3:

On "Quality" (i.e. Defects, Compliance, NCAP testing)

Number of UIO (units in operation) is increasing rapidly (i.e. increased exposure for defects/quality issues)

NHTSA is testing more vehicles under NCAP

Nov 2000 "TREAD Act" requires new, more intensive, and regular reporting of warranty, field reports, customer complaints, death and injury claims, etc.

A 5 day notification is required when recall determinations are made

New strong civil and criminal penalties were implemented for knowingly hiding a defect/recall, or less-than-timely reporting

e.g. Ford/Firestone/rollover issue

NHTSA is more sensitive to public/congressional criticism (now that all the tools have been granted to them by Congress)

Resulting in more Investigations, and more forced Recalls - even those that historically were not deemed "safety" in nature

Slide 4:

TOY-MDLID00052962

## Slide Notes

FMVSS 305 Compliance/Hybrid Sales

Serious Compliance Concerns

Potential Sales Impact

New NCAP Test Protocol

Lower Safety Ratings Potentially Affect Sales

Tundra Case

"Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.

Recurring Issue

PL Implications/TMC design

Cargo Carrying Capacity/FMVSS 110 Compliance

Flaws in Toyota Regulatory and Defect Process

Prius Headlamps Investigation

Class Action Implications

"Quiet Cars" (Hybrids, EVs, FCHVs)

NFB/Congressional/NHTSA/SAE activity

Roof Crush

Phase-in costly and difficult, Longer model life

Kids in Cars

BTSI, Power Windows, Rear Visibility Standards (cameras)

Slide 5:

Expectations are rapidly rising from NHTSA, Alliance, and the Public for more participation and leadership

Toyota's leadership is not only welcomed, it is expected

No longer bit player/importer

The Detroit 3 are unable to carry the burden on safety initiatives/regulatory work

Severely limited budgets, reduced manpower, bankruptcy

TOY-MDLID00052963

## Slide Notes

US Gov't controls large portion of GM, DCX -- conflicting interest

Alliance is a difficult working atmosphere

Toyota resources challenged

Increasing need for informal outside Alliances (e.g. GM CAT)

Therefore, TMA prioritized key issues with TMC to insure focus and coordination

Better focused research/participation in key initiatives with full TMC support

Agreement on relative importance of issues


Recommendations

Process and tighter framework for getting decisions

need better streamlining and decision makers

Need much more support within Toyota for quality-related issues

Toyota needs to major on the majors

Regular communication with top levels of TMC

E.g. sudden accel, defect issues

Need to speak out more independently

Should embrace safety as a core value vs. model by model

Safety seminar

Sustainability seminar



Tighter coordination with TTC, TEMA, TMS;  Regular Reporting

TOY-MDLID00052964

| From: | Chris Santucci=WDC/Toyota_NY | Sent:5/5/2009 12:50 PM |
|---|---|---|
| To: [ ] | Takeharu Nishida/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Cc: [ ] | Christopher Tinto/=WDC/Toyota_NY@Toyota_NY;Jyunji Ogata/=HINPO/TMC0@TMC0 Michiteru Kato/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Bcc: [ ] | | |
| Subject: | Re:Defect Petition. | |

Nishida-san,

For background, NHTSA did inspect the petitioner's vehicle. While they did not see clearly the witness marks of the carpeted floor mat on the carpet in the forward, unhooked position, they do suspect that the floormat was responsible for the petitioner's issue.

I have discussed our rebuttal with them, and they are welcoming of such a letter. They are struggling with sending an IR letter, because they shouldn't ask us about floormat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floormat-related. So they should ask us for non-floormat related reports, right? But they are concerned that if they ask for these other reports, they will have many reports that just cannot be explained. And since they do not think that they can explain them, they don't really want them. Does that make sense? I think it is good news for Toyota.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

---

Nishida-san,

Here is the draft rebuttal to the Defect Petition. Let me know what you think.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

Exhibit 13

TOY-MDLID00052918



宛先:    Takeharu Nishida/HINPO/TMCO@TMCO, Jyunji Ogata/HINPO/TMCO@TMCO, Morikazu Tsuji, Shinji
        Miyamoto/HINPO/TMCO@TMCO

cc:     "Jones, Erika Z." <EJones@mayerbrown.com>, otinto@tma.toyota.com, Eric Taira/TMS/Toyota@Toyota,
        George Morino/TMS/Toyota@Toyota, Alicia McAndrews, Webster Burns, KWeinstein@mayerbrown.com,
        martha_voss@tma.toyota.com, Jo Cooper/WDC/Toyota_NY@Toyota_NY

件名:    URGENT:;Privileged and Confidential – Discussion with NHTSA Regarding ES350-UPDATE

## PRIVILEGED AND CONFIDENTIAL

UPDATE:

Today I spoke with ODI's Office Director about the issue. Here are the key points of our discussion:

NHTSA has decided that waiting until September 30 to discuss ES350 is not acceptable. As of today, NHTSA is prepared to open one of the largest investigations ever in their history. Subject to the investigation potentially will be 3.8 million Toyota vehicles. The opening resume has been drafted, but they are going to brief the Secretary of Transportation (Sec. Ray LaHood) before releasing it to the public. The only time that I am aware in recent history that they briefed the secretary before a Preliminary Evaluation was with Firestone Tires. We can expect this to be the big news story on Monday, and it could potentially be conveyed by some as the next Firestone Tire.

I have only minimal details, but the investigation will most likely include all model years of the current generations of the Camry, ES, Avalon, IS, Tundra, and Tacoma. 2004 – 2009 Prius will be included and possibly the 2010. They have grouped these vehicles by the accelerator pedal design. They may potentially drop Tundra and Tacoma from the investigation, however, because of some slight differences in the pedal design.

In general, NHTSA is concerned about the use of rigid, top hinged accelerator pedals in these vehicles with limited clearance to the vehicle floor. The investigation will most likely focus on these types of vehicles having a susceptibility to being trapped by unsecured floormats. Please note that while we are not the only manufacturer to utilize this design, NHTSA does not have as many complaints on other manufacturer vehicles as they do on Toyota vehicles.

From NHTSA's standpoint, it is no longer a matter of pedal entrapment by a floormat. It is how the vehicle responds to a pedal entrapment. Having long duration, high speed events occur as a result of pedal entrapment poses an unreasonable risk to safety for them. For this reason, it is important to recognize that regardless of our opinion on the cause of pedal entrapment (double stacked mats, wrong mats, unsecured, etc), to NHTSA, this is a vehicle concern. What they are purporting to be unsafe is the vehicle's response to a trapped accelerator pedal (difficulty shutting off the engine, shifting to neutral, etc.). In addition, they believe our system is not state of the art in safety technology. As they have told us, other manufacturers have ECT systems in production that shut off the throttle if the brakes and gas are applied simultaneously.

In addition to the investigation, they are considering releasing another consumer advisory about Toyota vehicles and pedal entrapment. The link below is a reminder of their previously released advisory on the ES350 and other Toyota vehicles:

http://www.nhtsa.gov/portal/site/nhtsa/template.MAXIMIZE/menuitem.f2217bee37fb302f6d7c121046108a0
c/?javax.portlet.tpst=1e51531b2220b0f8ea1420104610 8a0c_ws_MX&javax.portlet.prp_1e51531b2220b0f8ea14
201046108a0c_viewID=detail_view&itemID=1bf2bafceb315110VgnVCM1000002fd17898RCRD&pressReleaseY
earSelect=2007

Instead of the 30th, TMA has been requested to be at DOT headquarters tomorrow morning by the acting Administrator of NHTSA. Myself and counsel are planning to be there at 11:45am. NHTSA requested this meeting to be face to face, because they are so serious about this issue and that it cannot wait until next week. We are to go there and listen to their concerns in person. After our meeting, they will brief the Secretary.

TMA would like to formulate some statement on behalf of Toyota for our meeting. Of course we should tell NHTSA that we will fully cooperate with their investigation. But if TMC can commit to some as of yet undetermined action, such information will be relayed directly to the Secretary of Transportation and will likely be well received. NHTSA is serious and will move quickly, potentially going directly to a recall request letter or initial determination. They may use this opportunity to show the public (and their critics) how quickly they can get a safety recall initiated. Please be prepared to discuss this issue at our videoconference tomorrow.

Regards,

**Exhibit 14**

TOY-MDLID00025099



宛先:     Takeharu Nishida/HINPO/TMC0@TMC0, Jyunji Ogata/HINPO/TMC0@TMC0, Morikazu Tsuji, Shinji
           Miyamoto/HINPO/TMC0@TMC0
cc:     "Jones, Erika Z." <EJones@mayerbrown.com>, ctinto@tms.toyota.com, Eric Taira/TMS/Toyota@Toyota,
           George Morino/TMS/Toyota@Toyota, Alicia McAndrews, Webster Burns, KWeinstein@mayerbrown.com,
           martha_voss@tma.toyota.com, Jo Cooper/WDC/Toyota_NY@Toyota_NY, Bob Daly/TMS/Toyota@Toyota
件名:     URGENT:Privileged and Confidntial – Meeting with NHTSA Regarding ES350

## PRIVILEGED AND CONFIDENTIAL
ACTION REQUESTED:
TMC should decide by close of business Monday Japan if they can authorize TMA to commit to NHTSA
a filing of a DIR within one week – either with or without a defect determination

Today TMA and counsel met with NHTSA's Office of Defects Investigation. The following people were in
attendance:

NHTSA
ODI
Office Director Kathy DeMeter
Division Chiefs Jeff Quandt and Scott Yon
Investigator Steve McHenry
Associate Administrator for Enforcement Dan Smith
Ron Medford Acting Administrator
Lloyd Guerci Office of Chief Counsel

TMA
Jo Cooper and Chris Santucci
Ken Weinstein Counsel Mayer-Brown

Dan Smith opened the meeting and provided some background on the past investigations. He stated that
the past was of too limited a perspective. Today, NHTSA has a much broader perspective on the issue.
They desire a solution that addresses the issue of high speed "runaway vehicle" events. They did
recognize our efforts in the floormat recall, and did comment appreciatively.

They stated that they do not want any more of these events to occur. They are focusing on the floorpan
and pedal geometry, and we believe that they have done much work to study our vehicles. They are not
convinced that this is a keyless ignition problem only and therefore are not currently proposing to limit their
investigation to those vehicles; they will include keyed vehicles in the scope.

That scope is currently as I wrote before:

        All model years of the current generations of the Camry, ES, Avalon, IS, Tundra, Tacoma plus the
2004 – 2009 Prius.

            They did mention that they are looking at the 2007 Highlander, but have not made a
decision to include it in the scope.

At this point TMA informed them of the commitment to conduct some field action by Toyota. We explained
that we do not know the timing and could not offer the details, but reaffirmed our commitment to develop
the best solution for the field vehicles. We also informed them, in general terms, of our intention to adopt a
throttle control strategy. We informed them that we are advancing our efforts to implement the strategy as
well. Finally we informed them of efforts to improve clearance to the vehicle floor and the accelerator
pedal in our designs. All of this information was well received and NHTSA felt that we have not been sitting
idle as these events have transpired.

We had extensive discussion about the contents of an advisory. In addition, we discussed
joint/separate/concurrent announcements. In the end, we received good feed back from NHTSA about the
contents of the advisory. The key aspects are to keep the advisory simple. NHTSA thinks the first point of
the advisory should be to emphasize the risk associated with a floormat. They feel consumers do not see
the risk, and might disregard the notice. Foremost, they would like the risk for pedal entrapment highlighted
prominently.

Second, they think the advisory should say to be safe, do not use a floormat in the driver footwell. They
agree that this could be misconstrued as only Toyota floormats, and could make the matter worse by
sending consumers to the aftermarket for floormats. But in the end, they feel the advisory should include a
recommendation to not use a floormat.

TOY-MDLID00025100

Third, they think the advisory should include what to do in the event of pedal entrapment:
1. grasp the floormat and pull up and back to free the accelerator pedal.
2. If the floormat cannot be freed, brake firmly – do not pump the brakes
3. Shut off the engine

TMS–PQSS will send out a draft advisory with the specific language proposed in the follow-up meeting with TMS.

While we could not get agreement to do a joint advisory, NHTSA would like to review our draft and asked to see it this weekend. TMA will send the draft via email to NHTSA when it is available.

Finally, we discussed the opening of the investigation. NHTSA recognized our concerns of looking reactive and expressed their openness to not "embarrassing" Toyota. However, they firmly noted that the only way to get them not to open the investigation would be by delivering a commitment to filing a compliant Part 573 notification (DIR) by Monday morning. We had some discussion over the scope and they reiterated the full scope as before.

<u>Request to TMC:</u>
NHTSA expects a response on Monday morning as to what TMC is willing to do to carry out the comment to conduct a field action.

As we noted, NHTSA appreciated the commitment from TMC to conduct a field action. However, at this point, they informed us that the only way to prevent them from opening an investigation is to provide a commitment to file a DIR this Monday morning. The actual DIR filing could occur as late as 1 week, or the following Monday. Therefore, TMC must decide if they would like TMA to negotiate this commitment. Here are our suggestions:

Option 1 – Negotiate with NHTSA for a Part 573 filing on the full scope of vehicles but with no defect determination. We cannot guarantee no investigation, but it is possible they could accept it.

Option 2 – Fully comply with NHTSA and on Monday morning inform them of our intention to file a DIR within 1 week. This will guarantee no investigation and Toyota owns the issue in the media.

Please advise by close of business Monday in Japan. Otherwise, we anticipate news of the investigation to be public at the earliest Monday afternoon.

Regards,

Chris Santucci – Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .plf, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

_____

<u>PRIVILEGED AND CONFIDENTIAL</u>

UPDATE:

Today I spoke with ODI's Office Director about the issue. Here are the key points of our discussion:

NHTSA has decided that waiting until September 30 to discuss ES350 is not acceptable. As of today, NHTSA is prepared to open one of the largest investigations ever in their history. Subject to the investigation potentially will be 3.8 million Toyota vehicles. The opening resume has been drafted, but they are going to brief the Secretary of Transportation (Sec. Ray LaHood) before releasing it to the public. The only time that I am aware in recent history that they briefed the secretary before a Preliminary Evaluation was with Firestone Tires. We can expect this to be the big news story on Monday, and it could potentially be conveyed by some as the next Firestone Tire.

I have only minimal details, but the investigation will most likely include all model years of the current generations of the Camry, ES, Avalon, IS, Tundra, and Tacoma. 2004 – 2009 Prius will be included and possibly the 2010. They have grouped these vehicles by the accelerator pedal design. They may potentially drop Tundra and Tacoma from the investigation, however, because of some slight differences in the pedal design.

In general, NHTSA is concerned about the use of rigid, top hinged accelerator pedals in these vehicles with

TOY-MDLID00025101

limited clearance to the vehicle floor. The investigation will most likely focus on these types of vehicles having a susceptibility to being trapped by unsecured floormats. Please note that while we are not the only manufacturer to utilize this design, NHTSA does not have as many complaints on other manufacturer vehicles as they do on Toyota vehicles.

From NHTSA's standpoint, it is no longer a matter of pedal entrapment by a floormat. It is how the vehicle responds to a pedal entrapment. Having long duration, high speed events occur as a result of pedal entrapment poses an unreasonable risk to safety for them. For this reason, it is important to recognize that regardless of our opinion on the cause of pedal entrapment (double stacked mats, wrong mats, unsecured, etc), to NHTSA, this is a vehicle concern. What they are purporting to be unsafe is the vehicle's response to a trapped accelerator pedal (difficulty shutting off the engine, shifting to neutral, etc.). In addition, they believe our system is not state of the art in safety technology. As they have told us, other manufacturers have ECT systems in production that shut off the throttle if the brakes and gas are applied simultaneously.

In addition to the investigation, they are considering releasing another consumer advisory about Toyota vehicles and pedal entrapment. The link below is a reminder of their previously released advisory on the ES350 and other Toyota vehicles:

http://www.nhtsa.gov/portal/site/nhtsa/template.MAXIMIZE/menuitem.f2217bee37fb302f6d7o121046108a0 c/?javax.portlet.tpst=1e51531b2220b0f8ea1420104610&a0c_ws_MX&javax.portlet.prp_1e51531b2220b0f8ea14 201046108a0c_viewID=detail_view&itemID=1bf2bafceb315110VgnVCM1000002fd17898RCRD&pressReleaseY earSelect=2007

Instead of the 30th, TMA has been requested to be at DOT headquarters tomorrow morning by the acting Administrator of NHTSA. Myself and counsel are planning to be there at 11:45am. NHTSA requested this meeting to be face to face, because they are so serious about this issue and feel it cannot wait until next week. We are to go there and listen to their concerns in person. After our meeting, they will brief the Secretary.

TMA would like to formulate some statement on behalf of Toyota for our meeting. Of course we should tell NHTSA that we will fully cooperate with their investigation. But if TMC can commit to some as of yet undetermined action, such information will be relayed directly to the Secretary of Transportation and will likely be well received. NHTSA is serious and will move quickly, potentially going directly to a recall request letter or initial determination. They may use this opportunity to show the public (and their critics) how quickly they can get a safety recall initiated. Please be prepared to discuss this issue at our videoconference tomorrow.

Regards,

Chris Santucci – Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856  Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

---

## PRIVILEGED AND CONFIDENTIAL

Today I spoke with NHTSA regarding the ES350 and pedal entrapment due to floormats. As you recall, Toyota issued a recall for All Weather Floormats in September of 2007. Since that time, NHTSA has informed us that they have continued to receive reports of long-duration, high speed events involving the Lexus ES350, as well as the Lexus IS, Toyota Camry, Prius, Tacoma, and Tundra. In most of the ES350 cases, NHTSA believes the event was related to accelerator pedal entrapment by one of the following concerns:

- Unretained floormats – All Weather, Carpeted, Toyota, or aftermarket
- Upside down floormats
- Double stacked floormats
- Passenger mats in the driver footwell
- Incorrect floormat for the ES350, i.e., a floormat for another model

It is not possible for the correct Toyota floormat to interfere with the accelerator pedal when properly secured to the vehicle carpet by the retention clips. NHTSA noted that the source of the "floormat error" has been attributed to Dealers (at time of delivery, vehicle service, or in a service loaner vehicle), independent Car Washes, and the actual Consumers themselves. The pedal entrapment events have

TOY-MDLID00025102

resulted (in some instances) long-duration, high speed events wherein the driver is unable to free the stuck accelerator pedal (or is unaware that the pedal is stuck).

Once a floormat error occurs, there are several ways to stop the vehicle from accelerating out of control and/or resulting in a crash:

- Manual removal of the floormat by the driver or passenger
- Applying the brakes forcefully
- Shutting off the engine
- Placing the transmission in Neutral

At the time of the recall of the ES350 and Camry All Weather Floormat, Toyota did not determine that a safety defect exists with regards to the floormat, but agreed to conduct a recall and adhere to Parts 573 and 577 voluntarily to resolve NHTSA's concerns in their (at the time) open defect investigation, EA07-017. Owners were notified of this campaign, AWFMs were recovered and replaced with a design that was intended to be less likely to interfere with the accelerator pedal if unsecured. Prior to this action, Toyota had voluntarily notified owners of ES350 vehicles to ensure the floormats are properly being utilized.

In my discussion today, NHTSA informed me that they do not believe that the action to recall AWFMs by Toyota has been effective in reducing the occurrence of long-duration, high speed events related to accelerator pedal entrapment. Since the recall, they continue to receive reports, including a recent report in San Diego that involved 4 fatalities. They believe that these events will continue to occur and that the most effective way to address them is by addressing the vehicle itself. NHTSA was very clear in our discussion today that they believe the vehicle must be countermeasured. This afternoon they will meet to discuss opening another formal investigation into the ES350, and potentially all Toyota vehicles which include a top-hinged, rigid pedal-design accelerator.

NHTSA has been very active in studying the issue. They have called and spoken to many consumers, and continue to do so. They have inspected many vehicles. They have even gone so far as to replace the ES350's rigid accelerator pedal with a hinged pedal and developed a design that they believe will prevent entrapment. But that is not the only direction they have gone. They have surveyed owners of ES350 on the push button ignition system. At core, they believe that there is something unique about the combination of the accelerator pedal design, the push button ignition, and the gated transmission shift pattern with sequential shift. Here are their thoughts as relayed to me:

<u>Accelerator Pedal Design</u>
According to NHTSA, being a rigid piece from the top mounted hinge to the footpad, with no clearance to the vehicle carpet at wide open throttle lends itself to be trapped, if the lip of a floormat comes in contact with the footpad. This is the "recall condition" and the illustration of this condition is in the Part 577 notification and Dealer bulletins. NHTSA believes this is very dangerous, because the pedal becomes entrapped at wide open throttle (or very close). NHTSA has spoken to aftermarket floormat companies, and one company informed them that for this style of accelerator pedal, they will not leave a cutout under the pedal. Instead, they will put as much floormat material under the pedal (and up the firewall) to prevent the lip from trapping the pedal. NHTSA is surveying other vehicles that use this pedal design, and to determine if they also have reports of pedal entrapment.

<u>Push Button Ignition</u>
One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion. NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion. In addition, the ES350 owners manual is unclear (see attached letter re:Pepski Petition). NHTSA has surveyed ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality. The Toyota Smart Key System requires the operator to hold the ignition button for 3 seconds to shut off the engine when the vehicle is in motion. When the vehicle is stopped, a momentary press of the ignition button shuts off the engine. NHTSA has reports that some owners tried tapping the ignition button to shut it off instead of holding it for three seconds. While they do not believe this is the correct method, they have been working with the SAE to develop a standard for keyless ignition systems. But it is important to note that they think it is one of the attributes that may lead to the occurrence of the long-duration, high speed events.

<u>Sequential Shift Transmission</u>
Another way to stop a runaway vehicle is by placing the transmission in Neutral. NHTSA is concerned that the layout of the Sequential Shift Transmission my confuse the operator (especially in a panic situation) because the "N" is adjacent to the "+." To the left of the D position is a gated area where the shift lever can be pushed forward to upshift, and pulled back for a downshift. The N position is above the D position. In such a layout, the "+" and the "N" are very close to the same longitudinal position, with the "+" closer to the driver. If, NHTSA supposes, the transmission was in the Sequential Shift mode, the driver could confuse the upshift position for the neutral position. They believe that in a panic situation, there is a chance this could occur.

<u>Braking Effectiveness</u>

TOY-MDLID00025103

With an accelerator pedal stuck at wide open throttle, NHTSA agrees that one forceful application of the brake pedal can safely stop the vehicle. However, in many reports and inspections they have found brakes burned or brake pads completely depleted after the event. NHTSA understands that with the engine at wide open throttle, vacuum is not being supplied to the brake booster. This means that the power braking system has potentially two or three applications left before the vacuum assist is depleted. They believe that in the long duration events, the brake booster is being depleted by the driver. They think that the driver that initially experiences the event recognizes the vehicle is accelerating and presses the brakes. The vehicle slows, so the driver releases the brakes and the vehicle accelerates again. They repeat this process and before they realize, the power assist is lost and the vehicle becomes more difficult to stop. The driver applies the brake pedal with a lot of force, and this can result in severe damage to the braking system, and/or a brake fire.

As we have informed TMC in the past, NHTSA is very interested in Electronic Throttle Control strategies that reduce throttle opening if there is simultaneous application of the vehicle service brakes. We also understand that TMC is adopting such control strategies in future production. This message is being sent to assist TMC in recognizing the urgency and seriousness that NHTSA has conveyed to TMA today about the current production ES350.

In the past, TMC informed TMA that due to memory limitations of the subject ES350, there is not enough space to adopt a throttle control strategy for field vehicles. We are asking that you revisit this activity to confirm, or seek an alternative solution that would address NHTSA's concerns. We discussed the recent action by TMS to inform dealers about floormats. NHTSA told me today that they do not feel it is enough. They still expect to receive reports, regardless of TMS's actions. They believe the best way to address the issue is by countermeasuring the vehicle. In my opinion, the best solution is to adopt the throttle control strategy that is planned for future models. But some other examples could be to modify the accelerator pedal design (as NHTSA has done) or possibly changing the keyless ignition system to require pressing the button for 3 seconds at all times (addressing any confusion of how to shut off the vehicle). Or simply to tell NHTSA that we will determine the best solution (as is the Toyota way) as soon as we can. They would like to discuss this issue and hear Toyota's opinion on September 30 when we meet with them to discuss the Tundra issue. Please review this information and be prepared to address NHTSA's concerns at this meeting. TMA will assist in any way necessary to communicate Toyota's position to the agency and resolve the issue.

Regards,

Chris Santucci – Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856  Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

TOY-MDLID00025104

| From: | Wayne Hutchinson/=TMS/Toyota | Sent:2/2/2010 3:59 PM |
| To: [ ] | ADP_Boston_Service; ADP_CAT_Service; ADP_Los_Angeles_Service; ADP_San_Francisco_Service; ADP_Portland_Service; ADP_Denver_Service; ADP_New_York_Service; ADP_Chicago_Service; ADP_Cincinnati_Service; ADP_Kansas_City_Service; Betty Tooson/=Lexus/Toyota@Toyota | |
| Cc: [ ] | | |
| Bcc: [ ] | George Morino/=TMS/Toyota | |
| Subject: | Safety Recall (Special Service Campaign) - 90L Phase 1 Certain 2007 – 2010 Model Year Camry and Camry Hybrid Vehicles Potential Floor Mat Interference with Accelerator Pedal Vehicles Equipped with Accelerator Pedals Manufactured by Denso Corporation (SM). | |

Toyota will initiate phase 1 of Safety Recall 90L - Certain 2007 - 2010 model year Camry and Camry Hybrid Vehicles
- Potential Floor Mat Interference with Accelerator Pedal - Vehicles Equipped with Accelerator Pedal Manufactured
by Denso Corporation.

Condition
As communicated last Fall, the defect is the potential for an unsecured or incompatible driver's floor mat to interfere
with the accelerator pedal and cause it to get stuck in the wide open position. A stuck open accelerator pedal may
result in very high vehicle speeds and make it difficult to stop the vehicle, which could cause a crash, serious injury
or death. Toyota has determined that this defect does not exist in vehicles in which the driver's side floor mat is
compatible with the vehicle and properly secured.

Remedy:
To make it less likely that an unsecured or incompatible driver's floor mat can interfere with the accelerator pedal,
dealerships will be requested to do the following:
Modify both the rigid plastic accelerator pedal and the floor surface in the driver's foot-well. (On February 1, 2010, a
dealer kit containing an accelerator template and gauge, an orbital sander and a reciprocating saw will be sent to
each dealer via overnight air. The campaign tool kit will be marked with a florescent (green, orange, yellow, pink)
label.)
If the vehicle is equipped with a set of optional genuine Toyota All Weather Floor Mats (AWFM), it must be inspected
to determine if the AWFM set is of an older design. If it is, the older design AWFMs for the driver and the front seat
passenger positions will be replaced with newly designed mats.
As an additional measure independent of the vehicle-based recall remedy, a newly designed override system will be
installed on non-hybrid Camry vehicles to provide an extra measure of confidence. This system will cut engine power
in case of simultaneous application of both accelerator and brake pedals at certain speeds and driving conditions.
The Camry Hybrid already contains a fuel supply cut feature for Hybrid motor protection that achieves a similar result
as the override system newly designed for the non-hybrid models.

Involved Vehicles:
There are approximately 787,000* Toyota 2007 – 2010 model year Camry and Camry Hybrid vehicles involved in the
U.S.
The following SSC 90L Summary Reports will be provided shortly:
The number of involved vehicles in your dealership's primary marketing area for this phase.
The suggested initial parts order quantities for this phase.
A VIN List containing vehicles in dealer stock.
*NOTE: Due to the number of vehicles involved in the first phase of this campaign, the VINs will be loaded into TIS
and the Warranty System in 2 groups over two days. Group 1 will include all affected Camry and Camry Hybrid
vehicles produced up to December 31, 2009. Group 2 will include all affected Camry and Camry Hybrid vehicles
produced from January 1, 2010, to the production change.

Please refer to the attached Region-PD Notification for additional information.

(We are currently working on several different SSCs and ask for your patience in allowing a few extra days for hard
copies to arrive at each Dealer.)

[Dealer Notification, Owner Letter and TI]


[Dealer Daily Message]


(Q&A will be provided shortly. We apologize for the inconvenience.)

**Exhibit 15**

TOY-MDLID00000384

Owner Notification
Owner notifications will begin in mid-February, 2010.

Thank you for your continued support,

Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

TOY-MDLID00000385

| From: | Glen Baker/Lexus/Toyota | | Sent:1/8/2010 9:45 AM |
|---|---|---|---|
| To: [ ] | Brian Lyons/=TMS/Toyota@Toyota | | |
| Cc: [ ] | George Morino/=TMS/Toyota@Toyota;Marlon Sakima/=TMS/Toyota@Toyota;David Weigand/=Scion/Toyota@Toyota;Renee Williams/=Scion/Toyota@Toyota;Rochelle Harma/=TMS/Toyota@Toyota;Bob Ehrman/=TMS/Toyota@Toyota;Michelle_Drapeau@Toyota.com; | | |
| Bcc: [ ] | | | |
| Subject: | Re: Brake Override | | |

Thanks Brian for the additional confirmation. No problem waiting for George's video and dealer repair instructions. Our priority before the big customer mailings is a preview of the customer stuff in the public domain. I think if we have the newest Q&A plus videos (and/or animations) being shown to the media or on Toyota.com, we'll be fine. Have a good one!
G

Brian Lyons/TMS/Toyota
01/08/2010 08:40 AM
To Glen Baker/Lexus/Toyota@Toyota
cc George Morino/TMS/Toyota@Toyota
Subject Re: Brake Override

Good morning, PQ&SS is developing a video to help train the technicians etc... The video is probably too much for the reps, although the written repair instructions would be appropriate. Let's wait until PQ&SS finalizes the repair instructions. BR

Brian R. Lyons
Safety and Quality Communications Manager
Toyota Motor Sales, U.S.A., Inc.
Office: 310.468-2552
Fax: 310 381-5450
Cell: 310 418-8819

Glen Baker/Lexus/Toyota
01/08/2010 08:33 AM
To Paul Williamsen/TMS/Toyota@Toyota
cc Bill Bergen/Mobile/Toyota@Toyota, Bob B Allan/TMS/Toyota@Toyota, Bob Waltz/TMS/Toyota@Toyota, Brian Lyons/TMS/Toyota@Toyota, Dave Zellers/TMS/Toyota@Toyota, David Weigand/Scion/Toyota@Toyota, Denise Jacobson/Lexus/Toyota@Toyota, Gary E Smith/TMS/Toyota@Toyota, George Wilson/TMS/Toyota@Toyota, Jim Anderson/TMS/Toyota@Toyota, Mamie Warrick/TMS/Toyota@Toyota, Marlon Sakima/TMS/Toyota@Toyota, Michelle Drapeau/TMS/Toyota@Toyota, Nancy Fein/TMS/Toyota@Toyota, "Robin LeFevre" <Robin_LeFevre@lexus.com>, Rochelle Harma/TMS/Toyota@Toyota, Ron Broughman/TMS/Toyota@Toyota, Ron Kato/TMS/Toyota@Toyota, Todd Ferguson/TMS/Toyota@Toyota
Subject Re: Brake Override

No worries Paul... With the speed of this project it seems like we're all farming with similar seed-stock these days. Appreciate the clarification on video vs. animation plus the other follow-ups with Marlon this morning.
Thanks!
G

**Exhibit 16**

TOY-MDLID00015526

Paul Williamsen/TMS/Toyota
01/07/2010 08:47 PM
To Glen Baker/Lexus/Toyota@Toyota
cc Bill Bergen/Mobile/Toyota@Toyota, "Robin LeFevre" <Robin_LeFevre@lexus.com>, Jim
Anderson/TMS/Toyota@Toyota, George Wilson/TMS/Toyota@Toyota, Ron Broughman/TMS/Toyota@Toyota,
Mamie Warrick/TMS/Toyota@Toyota, Bob Waltz/TMS/Toyota@Toyota, Brian Lyons/TMS/Toyota@Toyota, Bob B
Allan/TMS/Toyota@Toyota, Ron Kato/TMS/Toyota@Toyota, Gary E Smith/TMS/Toyota@Toyota, Todd
Ferguson/TMS/Toyota@Toyota, Dave Zellers/TMS/Toyota@Toyota, Nancy Fein/TMS/Toyota@Toyota, Marion
Sakima/TMS/Toyota@Toyota, Denise Jacobson/Lexus/Toyota@Toyota, Rochelle Harma/TMS/Toyota@Toyota,
David Weigand/Scion/Toyota@Toyota, Michelle Drapeau/TMS/Toyota@Toyota
Subject Brake Override

Glen,

I may have sown some seed of confusion on this topic; I'm sorry.

The Lexus College of the University of Toyota is producing a web animation (not a video) for Corporate
Communications on the throttle control system.

Once we have script approval from TMC we will finalize this content and will certainly share it with you for the call
centers at the same time as we share it with customers and dealers.

There is no plan that I'm aware of to produce any media, content, video, or training about either the ECM reflash
process or the new brake override software.

As discussed previously, there is almost no information - certainly no general understanding - about the brake
override system within TMS at this time.

If, in the future, it would be helpful for the UoT to develop some information, content, or training on the reflash
process or the brake override system, of course we'd be happy to discuss that.

Understanding and communicating about the brake override system may in fact require an at-the-wheel ride & drive:
once someone can learn more about how it works we'll be in a better position to asses the need and determine the
ideal media.

thanks,.

Paul

Paul M. Williamsen
ãƒ□ãƒ¼ãƒ«ã€€M. ã‚¦ã‚£ãƒªã‚¢ãƒ ã‚»ãƒ³

National Manager, Lexus College
University of Toyota
Lexus, a division of Toyota Motor Sales, USA, Inc.

ofc: 310-468-4951
cell: 310-489-2998
mailto:Paul_Williamsen@Lexus.com

----- Original Message -----
From: Glen Baker
Sent: 01/07/2010 07:14 PM PST
To: Paul Williamsen

TOY-MDLID00015527

Cc: Bill Bergen; "Robin LeFevre" <Robin_LeFevre@lexus.com>; Jim Anderson; George Wilson; Ron Broughman;
Mamie Warrick; Bob Waltz; Brian Lyons; Bob Allan; Ron Kato; Gary Smith; Todd Ferguson; Dave Zellers; Nancy
Fein; Marion Sakima; Denise Jacobson; Rochelle Harma; David Weigand; Michelle Drapeau
Subject: Re: Marion's Brake Override question
Paul,
Fyi we're finalizing our training agenda, timeline, and so on now. Shortly, we'll be coordinating with Gary Smith and
maybe Ron Broughman / Bill Bergen for our needs and I don't anticipate needing to involve you.
Just to clairify, we have no need of any vehicles in our training of the reps. We do however need to see any public
domain materials, especially the reflash videos, as they inpact other set-up areas like call routing or complaint
escallations for Lexus and Toyota.
(If rep questions get "deep", our tech team/ PQSS can handle after training using the video 1:1).
Any help getting only a few people here quick access to the video would be appreciated Paul!
Thanks
G


----- Original Message -----
From: Paul Williamsen
Sent: 01/07/2010 03:10 PM PST
To: Marion Sakima; Glen Baker; Denise Jacobson
Cc: Bill Bergen; "Robin LeFevre" <Robin_LeFevre@lexus.com>; Jim Anderson; George Wilson; Ron Broughman;
Mamie Warrick; <mamie.warrick@gmail.com>; Bob Waltz; Brian Lyons; Bob Allan; Ron Kato
Subject: Brake Override
Marion,

Explaining and demonstrating the new brake override feature for the field and for the call-centers is an urgent need
and a high priority.

This was discussed recently among the broad team supporting the floor mat SSCs, but at the moment there are no
concrete plans for how or what to do.

At this time there is a very small number - perhaps as few as one - vehicles at TMS that have the new software
installed. There is a correspondingly small number of people who are familiar enough with the operation of the
system to be able to describe its operation in terms that will be useful to field reps and the call centers.

Finally, there is no information on how best to demonstrate it: this is a feature, similar to pre-collision, which is
designed so that most drivers will rarely experience it under normal driving conditions. So we need to learn what
combination of abnormal conditions will allow us to safely demonstrate it on the road or on-camera.

I believe Glen Baker has agreed to coordinate on this topic so that as more experience and knowledge become
available, they can be shared most effectively with the field organization and with the call centers.

thanks,

Paul M. Williamsen
ãƒ□ãƒ¼ãƒ«ã€€M. ã‚¦ã‚£ãƒªã‚¢ãƒ ã‚»ãƒ³

National Manager, Lexus College
University of Toyota
Lexus, a division of Toyota Motor Sales, USA, Inc.

ofc: 310-468-4951
cell: 310-489-2998
Paul_Williamsen@Lexus.com

----- Forwarded by Ron Kato/TMS/Toyota on 01/07/2010 01:58 PM -----

Marion Sakima/TMS/Toyota
01/07/2010 02:00 PM
To Ron Kato/TMS/Toyota@Toyota
Subject Region & Field 90L Training

TOY-MDLID00015528

Hello, I have a question. On Tuesday, during the Region & Field 90L Training presentation over at the SDC, I believe I heard mention that there was a video or other graphic presentation for the brake override system that will occur in the vehicles as a result of the ECU reflash. Did I hear correctly?

I hoping the answer is yes. If so, what format is this demo in? how long is it, and would it be available to us in Customer Relations to show to our representatives?

Thank you.

We are working on getting a formal 90L training program together for our representatives.

Marlon R. Sakima | Operations Support Admin.
Toyota Customer Experience | Toyota Motor Sales USA
Office: 310-468-2832 | Fax: 310-381-5888
mailto:Marlon_Sakima@toyota.com

TOY-MDLID00015529

| From: | Katsuhiko Koganei/=TMS/Toyota | Sent: 1/16/2010 7:57 PM |
|---|---|---|
| To:[ ] | Irv Miller/=Exec/=TMS/Toyota@Toyota;mike_michels@toyota.com;hiro_fukui@toyota.com | |
| Cc:[ ] | | |
| Bcc:[ ] | | |
| Subject: | Re: Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story | |

Irv san, thank you for your message, and I understand our status. Kogi@BB

From: Irv Miller
Sent: 01/16/2010 07:05 PM PST
To: Katsuhiko Koganei
Cc: Mike Michels
Subject: Re: Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story
Kogi,

I hate to break this to you but WE HAVE A tendency for MECHANICAL failure in
accelerator pedals of a certain manufacturer on certain models. We are not
protecting our customers by keeping this quiet. The time to hide on this one is over.
We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC
for meetings with NHTSA to discuss options.

We better just hope that they can get NHTSA to work with us in coming with a workable
solution that does not put us out of business.

Irv Miller
Group Vice President, Environmental and Public Affairs
Toyota Motor Sales, Inc
19001 S. Western Ave.
Torrance, CA 90509

Katsuhiko Koganei/TMS/Toyota
01/16/2010 11:55 AM
To Mike Michels/TMS/Toyota@Toyota
cc masami_doi@mail.toyota.co.jp, keisuke_kirimoto@mail.toyota.co.jp, amiko_tomita@mail.toyota.co.jp, Akiko
Kita/E/TMC0@TMC0@TMCE, John Hanson/TMS/Toyota@Toyota, Brian Lyons/TMS/Toyota@Toyota, Hiroshi
Yoshihashi/TMS/Toyota@Toyota, Hiro Fukui/TMS/Toyota@Toyota, Ryo
Sakai/Admin/Avalon/Toyota_NY@TOYOTA_NY, Sumio Ohtsuji/WDC/Toyota_NY@Toyota_NY, Iwao
Kimura/Admin/Avalon/Toyota_NY@Toyota_NY, wtCocpkc41@ezweb.ne.jp, wtCocpkc110@docomo.ne.jp,
yfb22060@nifty.com, 1028m.doi@ezweb.ne.jp, Irv Miller/Exec/TMS/Toyota@Toyota
Subject Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story

Dear Mike-san,

Thank you for your hard work while under this sunny weather...

Now I talked with you on the phone, we should not mention about the mechanical failures of acc. pedal,
because we have not clarified the real cause of the sticking acc pedal formally, and the remedy for the
matter has not been confirmed. I talked over this matter with Ryo-san, KC Kirimoto-san, and Doi-san,
and all of them are concerned about the comment with mechanical failures might raise another uneasiness
of customers.

Exhibit 17

TOY-MDLID00027481

(See the attached file. Red hilighted parts should be removed , I think.)

[attachment "Post ABC release 1-15 Kogi suggest.doc" deleted by Katsuhiko Koganei/TMS/Toyota]

Anyway, if you know further new information about this matter, following the conference call done between TMS PQSS, TMA (W.DC) and TMC JCQE, please update the information over this matter.

Especially, before the conference call of tomorrow (7PM at PST), I think we need to have consensus within TMS, (and also within TMA CC and TMC-PR, if possible).

So I would appreciate if you sent the newly drafted statement, and Q&A to the all CC members.

Now I myself is staying in Torrance (for some preparations of the movement to the new house)
I can have some meetings with you over this matter anytime, so do not hesitate to ask me to meet at TMS office.


Katsuhiko Koganei (Kogi)

Executive Coordinator
Corporate Communications

Toyota Motor Sales U.S.A. Inc.,

Tel +1-310-468-4725
Mobile +1-310-941-6946
e-mail Katsuhiko_Koganei@toyota.com



Ryo_Sakai@tma.toyota.com
01/16/2010 09:07 AM
To "Iwao Kimura" <IKimura@tma.toyota.com>, "Katsuhiko Koganei" <Katsuhiko_Koganei@toyota.com>
cc
Subject Fw: Draft statement to respond to ABC News story



I'm forwarding you this since you were not on the distibution.


----- Original Message -----
From: Mike Michels
Sent: 01/15/2010 06:37 PM PST
To: Gary Smith; Rick LoFaso; Webster Burns; Steve Haag; Dave Zellers;
Nancy Fein; Jane Beseda; Ko Igarashi; Shinji Yamaguchi
Cc: Charley Roberts; Ron Kirkpatrick; Christopher Reynolds; Bob Waltz;
Jim Wiseman; Ryo Sakai; Jo Cooper; Christopher Tinto; Sumio Ohtsuji; Martha
Voss; Cindy Knight; ejones@mayerbrown.com; Christopher Reynolds;
Masami_Doi@mail.toyota.co.jp; keisuke_kirimoto@mail.toyota.co.jp; Hiro
Fukui; mgross@rlmnet.com; Alicia McAndrews; Brian Lyons; Irv Miller; John
Hanson; Jim Wiseman
Subject: Draft statement to respond to ABC News story
REDACTED - PRIVILEGE

TOY-MDLID00027482

REDACTED - PRIVILEGE

Mike Michels
Vice President, Communications
Toyota Motor Sales USA, Inc.
19001 S.Western Ave.
Torrance, CA 90509
Phone: 310 468 7730
Mobile: 310 200 4968
Fax: 310 381 4500
mike_michels@toyota.com
[attachment "Post ABC release 1-15 6pm.doc" deleted by Katsuhiko Koganei/TMS/Toyota]

TOY-MDLID00027483

 **TOYOTA**

# Brake Override System

## Overview

Independent of the recall remedy, Toyota has developed a Brake Override System to provide an extra measure of owner confidence. Although an owner might never experience its operation, this braking system enhancement will automatically reduce engine power when the brake pedal and accelerator pedal are applied simultaneously under certain driving conditions.

The Brake Override System operates when these conditions are met:

1. The throttle opening is greater than 1/3
2. Vehicle speed is above 5 mph
3. Brakes are applied firmly



Please note: In order to activate the Brake Override System, the accelerator pedal must be pressed before the brake pedal.

2nd   1st



Brake Override System

**Additional Details:**

- During greater accelerator pedal application, the Brake Override System activates with any brake pedal pressure.
- Brake Override System activation is cancelled when the brake pedal is released.
- When the Brake Override System is active at part throttle, changes in the accelerator pedal position may cancel activation.
- To allow the vehicle to start on a hill without rolling backwards, the Brake Override System will not activate if the brake is applied prior to pressing the accelerator pedal.

- The Brake Override System is not active in 4WD vehicles while driving in low range.
- **Note to Hybrid owners:** The Toyota Hybrid System achieves a result similar to the Brake Override System by reducing power if the brakes are applied while the accelerator pedal is depressed.

**Exhibit 18**

# Brake Override System



This Brake Override System underscores Toyota's commitment to building safe and reliable vehicles, as we have for 50 years, and to ensure that our customers have complete confidence in the cars and trucks they drive.

**Brake Override Process Flow**

Throttle Open
Over 1/3
↓ Yes

Brake Applied
Firmly
↓ Yes

Both Pedals Pressed
for 1/2 second or more
↓ Yes

Brake Override
Judgement On
↓ Yes

Speed over 5 MPH
↓ Yes

Brake Override On
Reduce Engine Power

Additional Accelerator Application — Yes

Release Brake — Yes

Cancel Brake Override
(Normal brake and throttle operation restored)

TOYOTA

**Accelerator Pedal Entrapment "Need to Know" for Toyota Associates**

On Nov. 25, Toyota announced details of its remedy to address acceleration pedal entrapment. Numerous investigations into this issue have determined one consistent trend, an unsecured and/or incompatible floor mat. Here is what you need to know.

Q1:     Are Toyota vehicles safe?
A1:     Toyota vehicles are among the safest on the road today. The safety of our owners and the public is our utmost concern and we have and will continue to take appropriate measures to address any defect trends that are identified.

Q2:     What is the objective of the remedy?
A2:     To increase the space between the accelerator pedal and the floor to help avoid entrapment of an accelerator pedal by an unsecured and/or incompatible floor mat.

Q3:     The media—quoting independent experts—has stated that there is a problem with Toyota's electronic throttle control system. Is there?
A3:     The electronic throttle control system has been evaluated numerous times. We are convinced that no software programming or electromagnetic interference problem exists.

Q4:     The media has stated "When asked to submit its own complaint data to the NHTSA, Toyota eliminated reports claiming that sudden acceleration occurred for "a long duration," or more than a few seconds." Is this true?
A4:     Toyota has always been fully cooperative with NHTSA investigations involving unintended acceleration and has submitted all information requested. Agreements were reached with NHTSA during the course of NHTSA's investigations into "sudden acceleration" involving the 2002-2006 Camry, ES and Solara to eliminate those complaints that did not meet NHTSA's definition of "sudden acceleration" in the context of the pending investigations.

Q5:     What does reshape the accelerator pedal and in some cases the floor mean?
A5:     Starting in January, dealers will remove approximately ¾ of an inch from the downward facing portion of the accelerator pedal and increase the radius of the corners. On the Camry, Avalon, and ES350, a piece of Styrofoam padding under the carpeting in the will be replaced with a thinner piece. The objective is to increase the clearance between the downward facing edge of the accelerator pedal and the floor.
    Q5A:     Why are only the ES350, Camry and Avalon floor surfaces being modified?
    A5A:     Each vehicle is different and the configurations are being evaluated case-by-case. In the case of the ES, Camry and Avalon, they share the same platform.

Q6:     Why will the front passenger-side all-weather floor mat be replaced?
A6:     Since there's a possibility that a vehicle owner might place the passenger-side floor mat on the driver's side.

Q:7     What does the brake override system do?

**Exhibit 19**

TOY-MDLID00056582

A7:    If both the accelerator pedal and the brake pedal are depressed simultaneously, the brake override system will reduce engine power and give priority to the braking system.

    Q7A:    Other manufacturers use a system similar to the brake override system, why didn't Toyota?

    A7A:    The brake override system is being introduced to provide an extra measure of confidence to our customers. This system is being introduced for all Toyota vehicles globally starting in 2010 and will be standard equipment for all 2011 model year vehicles.

    Q7B:    Is Toyota implementing the brake override system because there's an ECU defect?

    A7B:    No, Toyota is convinced that no defect exists in the ECU that could cause sudden uncontrolled acceleration and the remedy being announced today will address the root cause of pedal entrapment, which is entrapment of the accelerator pedal and/or by an unsecured and/or incompatible floor mat.

Q8:    Will Toyota undertake this remedy in other countries?

A8:    Since this remedy involves all-weather floor mat sold in the US, we are not undertaking this remedy in other countries. In Canada, vehicle usage is similar to the U.S. and the market of vehicles and various products in the two countries are tied together. Toyota Canada Inc. (TCI) has indicated it would conduct the same safety campaign as in the U.S.

**Other significant information regarding Toyota Motor Sales, USA, Inc.**

- Toyota is rated the highest in dependability among all automakers based on AutoPacific New Vehicle Satisfaction Survey.

- Ten Toyota, Lexus and Scion vehicles topped their segments in J.D. Power's Vehicle Dependability Study.

- Toyota has won more Total Quality Awards[TM] than any other automaker based on Strategic Vision's 2001-2009 New Vehicle Experience Study.

- Toyota and Lexus took the top spot in 10 out of 19 segments in the J.D. Power's Initial Quality Survey: Toyota 4Runner, Sienna, Tundra, Yaris, and Lexus RX, Lexus GS, GX, IS, LS and LX.

- 80% of Toyotas sold in the last 20 years are still on the road today based on R.L. Polk & Co. U.S. Vehicles in Operation 1989-2009.

- Toyota was first in five of the 10 vehicle categories in *Consumer Reports'* annual rankings, the most of any automaker: Toyota Highlander, Prius, RAV4 and Sienna, and Lexus LS 460.

NTK acclerator pedal v6.1.doc