UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation<br><br>This document relates to:<br><br>All Plaintiffs' Economic Loss Cases. | Case No. 8:10ML 02151 JVS (FMOx)<br><br>ORDER GRANTING IN PART AND DENYING IN PART THE TOYOTA DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED ECONOMIC LOSS MASTER CONSOLIDATED COMPLAINT; ORDER GRANTING IN PART AND DENYING PART MOTION TO STRIKE; ORDER DENYING REQUEST FOR JUDICIAL NOTICE |

1

# Table of Contents

2

I.    Factual Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Request for Judicial Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  Article III Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      A.    Summary of Parties' Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.    Plaintiffs Establish an Economic Loss by Plausibly Alleging a Safety Defect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

              2.    The Economic Loss Ensuing from the Safety Defect Is Actual or Imminent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

              3.    All Lead Plaintiffs Do Not Establish Standing Based on a Credible Threat of Future Harm . . . . . . . . . . . . . . . . . . . . . . . 25

      C.    Conclusion as to Article III Standing . . . . . . . . . . . . . . . . . . . . . . . 27

IV.  Standing to Assert UCL, FAL, and CLRA Claims . . . . . . . . . . . . . . . . . . . 27
      A.    UCL and FAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

              1.    Plaintiffs Allege a Money or Property Loss . . . . . . . . . . . . . . 29

              2.    Plaintiffs Allege Actual Reliance . . . . . . . . . . . . . . . . . . . . . . . 30

      B.    CLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.    Rule 12(b)(6) and Rule 12(f) Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      A.    Motion to Dismiss Pursuant to Rule 12(b)(6) . . . . . . . . . . . . . . . . 33

      B.    Motion to Strike Pursuant to Rule 12(f) . . . . . . . . . . . . . . . . . . . . 34

VI.  Plaintiffs' CLRA, UCL, and FAL Claims (First, Second, and Third Causes of Action) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VII. Express and Implied Warranties (Fourth and Fifth Causes of Action) . . . . 42
      A.    Express Written Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i

B.     Implied Warranty  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

C.     Ruling Regarding Warranty Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . 49

VIII.  Revocation of Acceptance (Sixth Cause of Action)  . . . . . . . . . . . . . . . . . . 50

IX.    Breach of Contract/Common Law Warranty (Eighth Cause of Action) . . . 51

X.     Unjust Enrichment (Tenth Cause of Action)  . . . . . . . . . . . . . . . . . . . . . . . 51

XI.    Auto Lenders Liquidation Center, Inc.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XII.   Availability of Injunctive Relief, Restitution and/or Restitutionary
       Disgorgement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

XIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Presently before the Court are Defendants' Motion to Dismiss and Motion to Strike portions of the Second Amended Economic Loss Master Consolidated Complaint (hereinafter referred to, for the sake of simplicity, as "the Complaint"),[1] as well as a related Request for Judicial Notice ("RJN").  (See Docket Nos. 580 (current operative Complaint on behalf of the domestic economic loss Plaintiffs), 734 (Notice of Motion to Dismiss), 735 (Notice of Motion to Strike), 736 (Memorandum of Points and Authorities in Support of both Motions) (hereinafter "Defs.' Mem."), 738 (Request for Judicial Notice).)  Previously, on November 30, 2010, the Court issued its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and Motion to Strike the Master Consolidated Complaint ("MCC").  (See Docket No. 510.)  The Court granted leave to amend certain claims, id., and on January 10, 2011, Plaintiffs filed the Complaint, which the current Motions address.  The Court considers the sufficiency of those amended allegations in light of the legal principles set forth at length in the Court's November 30, 2010 Order.

At the outset, the Court's consideration of the issues presented by the present Motions is limited to those issues that are supported by the parties' arguments. The Court notes that in many instances, some of which are specifically referenced in this Order, see e.g., infra section VII.B, the bases for dismissal set forth in the Notice of Motion to Dismiss are far more numerous than those supported by legal argument and citation to the record in the Memorandum in Support of the Motions.

---

[1]  Unless otherwise indicated, all paragraph references herein are to the Complaint.

1

The same is also true of the Notice of Motion to Strike.  (<u>Compare, e.g.</u>, Notice of

Motion to Strike at 2-3 (moving to strike a number of allegations related to

damages available under the Consumer Legal Remedies Act, Cal. Civ. Code

§§ 1750, <u>et seq.</u> ("CLRA") <u>with</u> Defs.' Mem. at 20-22 (limiting the discussion

regarding Plaintiffs' CLRA claim to those allegations related to the Transportation

Recall Enhancement, Accountability, and Documentation Act, 49 U.S.C.

§§ 30101-30170 ("TREAD Act")).)  To the extent the Toyota Defendants' briefing

does not focus on these issues, the Court does not considered them.  Neither does

the Court consider arguments raised for the first time in the Reply.  <u>See, e.g.</u>, <u>infra</u>

n.24; <u>Zumani v. Carnes</u>, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court

need not consider arguments raised for the first time in a reply brief.").  Finally, the

Court declines the invitation, set forth in the Memorandum in Support of the

Motions, to consider anew all the issues set forth in the Motions to Dismiss and

Strike the MCC.  (<u>See</u> Defs.' Mem. at 3 n.3 & 22 (asking that the Court "[d]ismiss

all claims as described in Toyota's prior motion to dismiss and strike briefing (Dkt.

Nos. 332 and 450)").)  In a 104-page Order, the Court previously ruled on these

Motions.  In litigation this complex, the parties must, at all times, precisely and

concisely define the issues before the Court at any proceeding.


This action arises out of Plaintiffs' purchase of vehicles designed,

manufactured, distributed, marketed, and sold by Defendants Toyota Motor

Corporation dba Toyota Motor North America, Inc. ("TMC"), and its subsidiary,

Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "the Toyota

Defendants").[2]  Putative classes of domestic Plaintiffs[3] seek damages for diminution in the market value of their vehicles in light of defects in those vehicles which lead to incidents of sudden, unintended acceleration ("SUA").[4]

I.    Factual Allegations

The factual allegations underlying Plaintiffs' claims are set forth at length in the Court's November 30, 2010 Order.  The Court reiterates those allegations in this Order only to the extent necessary to give context to the Court's legal analyses. Below, the Court notes significant amendments to the allegations found in

---

[2]  TMC is a Japanese corporation and is the parent corporation of TMS, which handles sales and marketing in the United States.  (¶¶ 133-34).  The Complaint makes allegations as to the Toyota Defendants collectively, and at times individually.  The Court makes such distinctions only when material to the issues presented in the instant motions.

[3]  Claims by a putative class of foreign Plaintiffs were asserted in a separate consolidated complaint.  (See Court's Sept. 13, 2010 Order at 3-4 (Docket No. 341) (appointing Monica R. Kelly as lead counsel for the foreign economic loss Plaintiffs and ordering the filing of a consolidated complaint on behalf of the foreign Plaintiffs).)  On April 8, 2011, the Court dismissed the foreign Plaintiffs' claims, but the Court granted leave to amend certain claims, in some instances subjecting any proposed amendments to offers of proof.  (See Court's April 8, 2011 Order at 64-66 (Docket No. 1237).)

Herein, the Court's reference to "Plaintiffs" generally refers to the domestic Plaintiffs collectively, except when, in context, it clearly refers to a subset of domestic Plaintiffs.  See e.g., infra n.4.

[4]  In addition to the putative class of individuals, a small number of business entities — such as an auto dealership and a car rental business — are Plaintiffs as well.  (¶¶ 71-86).  The Court refers to these business entities as the non-consumer Plaintiffs.

3

Plaintiffs' previous Complaints.

Specifically, Plaintiffs[5] make additional allegations as follows:

• Each Plaintiff (including the non-consumer Plaintiffs) was exposed to Toyota advertising regarding the reliability and safety of Toyota vehicles; this exposure influenced each Plaintiff's decision to buy a Toyota vehicle, and if the SUA defect had been disclosed to them, each Plaintiff would not have purchased a Toyota vehicle and/or would have paid less for the vehicle.  (See ¶¶ 34-64, 66-69, ¶ 71 (G&M Motors), ¶ 74 (Green Spot Motors), ¶ 76 (Auto Lenders Liquidation Center, Inc.), ¶ 85 (Deluxe Holdings Inc.).)[6]

• Internal Toyota documents evidence specific examples of SUA events and Toyota's knowledge thereof.  (¶ 209 (Field Technical Report

---

[5]  Because the Court has not yet resolved the pending choice-of-law issue, the Court does not herein consider allegations by Plaintiffs designated as "Consumer Plaintiffs in the Event California Law Does Not Apply."  (¶¶ 87-131; cf. Defs.' Mem. at 3 n.4.)

[6]  Some allegations regarding the effect of the failure to disclose the SUA defect are more equivocal than others.  (Compare, e.g., ¶ 42 (alleging that had the advertising disclosed the SUA defect, Plaintiff Chambers "probably would not have purchased her Camry," but she "certainly would not have paid as much for it") with ¶ 43 (Plaintiff Davis "would not have purchased his Camry") and ¶ 65 (noting that Plaintiff Tucker "cannot speculate as to what she would have done had she been in possession of . . . information [about the SUA defect], but she would have based her decision on her analysis of the risk, her ability to pay, and alternatives in the market").)

4

dated April 18, 2006, reporting technician-confirmed SUA event),
¶ 210 (vehicle "lunges" known to service manager as a common
problem), ¶ 214 (Field Technical Reports from 2006-2010 confirmed
SUA events that did not generate a "diagnostic trouble code"), ¶ 215
(service manager test drive resulted in SUA event unrelated to floor
mat or sticky pedal), ¶ 216 (service manager's Toyota vehicle
experienced SUA event unrelated to floor mats), ¶ 224 (video
showing vehicle accelerating while brake lights are on), ¶ 237
(concerns regarding the length a computer search would take to
complete using certain keywords, "lunge," "surge," and "lurch," to
extract complaints regarding the Camry), ¶ 247 (customer report of
SUA event), ¶ 248 (insurance investigator's report of mechanic-
witness to SUA event), ¶ 276 (floor mat recall "was part of Toyota's
strategy to focus the cause of SUA on mats and away from other
defects"), ¶ 283 (similar), ¶ 296 (investigation in SUA event
experienced by Toyota employee), ¶ 297 (report from dealer regarding
customer concerns), ¶¶ 298-99 (report by "Professional Engineer" that
set forth opinion regarding, *inter alia*, a "throttle position sensor
malfunction"), ¶ 300 (January 26, 2010 Field Technical Report in
which Toyota technician experienced SUA event while test driving
vehicle), ¶ 301 (cause of SUA event in vehicle referenced in ¶ 300
was classified as "unknown" and Toyota repurchased the vehicle);
¶ 302 (similar); ¶¶ 322-27 (more examples in 2005-2009) & ¶ 347
(more examples).)

1

2    •    Toyota directed its employees to limit information in emails in a

3         manner designed to "make it difficult to discover what it knew about

4         the SUA defect, which models were effected[,] and which managers

5         were involved."  (¶ 303.)

6

7    •    In February 2010, Toyota compiled information in its possession into

8         chart format reflecting models, years, and "fail dates," for apparent

9         SUA events involving fatalities.  (¶¶ 305-06.)

10

11   •    Toyota falsely attributed all SUA events to the issues addressed by the

12        floor mat recall.  (¶ 234 (doubt expressed by TMS executive regarding

13        Toyota's communications with the National Highway Traffic Safety

14        Administration ("NHTSA") attributing all SUA events to floor mat

15        entrapment), ¶ 235 (similar doubt expressed by NHTSA), ¶ 244

16        (evidence that not all SUA events are attributable to floor mat

17        entrapment), ¶ 245 (Toyota paid fine in excess of $16 million to

18        NHTSA regarding floor mat recall), ¶ 276 (recall "was part of

19        Toyota's strategy to focus the cause of SUA on mats and away from

20        other defects"), ¶ 283 (similar).)

21

22   •    Toyota attributed other SUA events to the issues addressed by the

23        "sticky pedal" recall.  (¶ 283 (characterizing the sticky pedal recall as

24        "illustrative of Toyota's concealment of material facts relating to SUA

25

defects"), ¶¶ 284-89 (attempts at engineering solutions to sticky pedal issue in United States and other countries), ¶ 293 (Toyota's delay in disclosing sticky pedal issue to NHTSA), ¶ 295 (Toyota's earlier sticky pedal recall in Europe).)

- Toyota continued to attribute SUA events to issues addressed by the floor mat and sticky pedal recalls even after Toyota continued to receive reports of SUA events after those recalls. (¶ 312 (setting forth examples and alleging "Reports of SUA events occurring after vehicles have received a pedal and mat fix contradict Toyota's claim that the recalls have fixed the SUA defect issues").)

- Toyota made specific warranties and continuing misrepresentations that the vehicles were free of defects and that floor mats were the cause of the SUA events. (¶ 342 ("[o]n November 25, 2009," Toyota both "falsely represented and warranted that floor mats were the cause of SUA"), id. (Toyota falsely represented "that there was no problem with [the electronic throttle control system, or "ETCS"] and that ETCS has been 'evaluated numerous times'"), ¶ 343 (Toyota falsely represented and warranted that "no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured").)

- There is an "an overarching defect" in all the vehicles, which may be

the result of "many root causes," but which could be ameliorated by a fail-safe design feature such as "an effective brake-override system" or "ignition kill switch."  (¶¶ 348-49, ¶ 350 (adding, as "mechanical issues," a smaller gap between accelerator pedal and brake pedal on certain models, and corrosion or carbon build up resulting in a "stuck" throttle body and SUA), id. (adding to "lack of an appropriate fail-safe" the lack of computer memory to accommodate a brake-override system, the lack of a fault detection system that would, in certain instances, shut down the throttle, and the lack of an appropriate layout in transmission system (causing some drivers who thought they were shifting into "neutral" to shift or remain in "drive").)

- Toyota tasked one of its employees with the "homework" of finding out which manufacturers have such fail-safe systems in place. (¶ 354.)

- Toyota recognized such systems were desirable.  (¶ 355 (TMS asking TMC for override software, which TMC "rejected"), ¶ 357 (emails recognizing that certain SUA events "could be prevented by implementation of a 'control system'" such as a "brake override or fail-safe"), ¶ 358 (Toyota understood a brake-override system would also help by closing a throttle valve that restores a "vacuum assist" brake booster that can be lost during "a long[-]term SUA event" leading to a loss in brake power), ¶ 366 (email regarding three

potential fail-safe mechanisms), ¶ 367 (email acknowledging brake override likely to prevent SUA events created by floor mats and sticky pedals).)

- • Additional measures reflected the diminution in value of their vehicles.  (¶¶ 372-77 (Kelley Blue Book and NADA Used Car Guide Values lowered the values of Toyota vehicles subject to recalls based on growing inventory and decreased demand).)

As in their previous Complaints, Plaintiffs have asserted the following claims under federal law and California law:  (1) Violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA"); (2) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL"); (3) Violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq. ("FAL"); (4) Breach of Express Warranty, Cal. Com. Code § 2313; (5) Breach of the Implied Warranty of Merchantability, Cal. Com. Code § 2314; (6) Revocation of Acceptance, Cal. Com. Code § 2608; (7) Violation of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301, et seq. ("MMA"); (8) Breach of Contract/Common Law Warranty; (9) Fraud by Concealment; and (10) Unjust Enrichment.

1  II.      Request for Judicial Notice

2

3          In addition to the pleadings before the Court, the Toyota Defendants ask the

4  Court to take judicial notice, "as background material," of two publicly available

5  documents issued by federal agencies that have investigated SUA events and

6  Toyota's ETCS, as well as a related agency press release.  See RJN (Docket No.

7  738) at 2 & Exs. 1-3; Fed. R. Evid. 201(b)-(d) (providing for judicial notice of a

8  fact "not subject to reasonable dispute . . . that . . . is either (1) generally known

9  within the territorial jurisdiction of the trial court or (2) capable of accurate and

10  ready determination by resort to sources whose accuracy cannot reasonably be

11  questioned.").  Specifically, the Toyota Defendants request judicial notice of (1)

12  the Executive Summary and Findings of the NHTSA Report entitled, "Technical

13  Assessment of Toyota Electronic Throttle Control (ETC) Systems," (2) the

14  Executive Summary and Findings of the National Aeronautics and Space

15  Administration ("NASA") Report entitled, "Technical Support to the National

16  Highway Traffic Safety Administration (NHTSA) on the Reported Toyota Motor

17  Corporation (TMC Unintended Acceleration (UA) Investigation," and (3) a

18  NHTSA press release dated February 8, 2011.

19

20          The Court denies the request for judicial notice.  The materials filed by the

21  Toyota Defendants go far beyond mere "background material" and instead

22  implicate the key disputed factual allegations at issue in this action; as such, they

23  are materials that are clearly "subject to reasonable dispute" and thus are not

24  proper subjects of judicial notice.  See Fed. R. Evid. 201(b); Suzuki Motor Corp. v.

25

1  Consumers Union of U.S., Inc., 330 F.3d 1110, 1137 (9th Cir. 2003) (impliedly

2  rejecting the proposition that conclusive weight should be given to conclusions

3  drawn by NHTSA regarding vehicle rollover incidents); Pina v. Henderson, 752

4  F.2d 47, 50 (2d Cir. 1985) ("The more critical an issue is to the ultimate

5  disposition of the case, the less appropriate judicial notice becomes. . . .  A court

6  should not go outside the record to supply a fact that is an essential part of a party's

7  case unless the fact is clearly beyond dispute.") (internal citations omitted), cited

8  with approval in Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1267

9  (9th Cir. 2001).

10

11  III.    Article III Standing

12

13         In the Court's November 30, 2010 Order, the Court held that economic loss

14  injuries consisting of overpayment, loss in value, or loss in usefulness were

15  sufficient to confer standing.  (Docket No. 510 at 15-16.)  In reaching this

16  conclusion, the Court recognized that the inquiry into whether Plaintiffs

17  sufficiently allege an "injury in fact" for standing purposes is conceptually distinct

18  from whether "damages" are sufficiently alleged under a particular theory of

19  liability.  See, e.g., Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir.

20  2009) ("It is crucial . . . not to conflate Article III's requirement of injury in fact

21  with a plaintiff's potential causes of action, for the concepts are not coextensive.");

22  Cole v. General Motors Corp., 484 F.3d 717, 722-23 (5th Cir. 2007) ("Whether

23  recovery for such a claim is permitted under governing law is a separate question;

24  it is sufficient for standing purposes that the plaintiffs seek recovery for an

25

1   economic harm that they allege they have suffered."); <u>Denney v. Deutsche Bank</u>

2   <u>AG</u>, 443 F.3d 253, 264-65 (2d Cir. 2006) ("[A]n injury-in-fact differs from a 'legal

3   interest'; an injury-in-fact need not be capable of sustaining a valid cause of action

4   under applicable tort law.").  Because several lead Plaintiffs alleged facts

5   establishing overpayment, loss in value, or loss in usefulness, they satisfied Article

6   III's injury-in-fact requirement.  (Docket No. 510 at 24-25.)

7

8   However, the Court also determined that some lead Plaintiffs failed to

9   adequately allege a loss.  (<u>Id.</u> at 26-28.)  For example, the MCC contained the

10  following allegation regarding Plaintiff Ebony Brown: "Plaintiff Ebony Brown is a

11  resident and citizen of Illinois.  She owns a 2009 Toyota Camry."  (MCC ¶ 38.)

12  While the MCC contained general class allegations that Plaintiffs overpaid for their

13  vehicles, made lease payments that were too high, or sold their vehicles at a loss,

14  and the Court accepted in principle that these allegations were sufficient to confer

15  standing for the putative class, the Court held that lead Plaintiffs such as Ms.

16  Brown, seeking to proceed as such, were required to allege specific facts to support

17  a cognizable injury under Article III.  (Docket No. 510 at 27-28.)

18

19  In the Complaint, Ms. Brown amends her allegations as follows:

20

21          Plaintiff Ebony Brown is a resident and citizen of

22          Illinois.  She owns a 2009 Toyota Camry.  Ms. Brown

23          saw advertisements for Toyota vehicles on television, in

24          magazines, on billboards, in brochures at the dealership,

25

1           on the Internet, in newspapers, and on banners in front of

2           the dealership, during the two years before she purchased

3           her Camry on July 26, 2008.  Although she does not

4           recall the specifics of the many Toyota advertisements

5           she saw before she purchased her Camry, she does recall

6           that safety and reliability were a consistent theme across

7           the advertisements she saw.  Those representations about

8           safety and reliability influenced her decision to purchase

9           her Camry.  <u>Had those advertisements or any other

10          materials disclosed that Toyota vehicles could accelerate

11          suddenly and dangerously out of the driver's control and

12          lacked a fail-safe mechanism to overcome this, she would

13          not have purchased her Camry.  She certainly would not

14          have paid as much for it.</u>

15

16   (¶ 40 (emphasis added).)  The amended allegations of the other lead Plaintiffs

17   previously dismissed in the November 30, 2010 Order closely track Ms. Brown's

18   amended allegations.

19

20          Toyota contends that these amended allegations, including those of Ms.

21   Brown, again fail to satisfy Article III's injury-in-fact requirement.

22

23

24

25

1        A.    <u>Summary of Parties' Positions</u>

2

3        Toyota argues that several Plaintiffs offer "bare and conclusory allegations

4 of economic injury that do not constitute sufficient factual allegations as to their

5 own economic loss," and thus should be dismissed for lack of subject matter

6 jurisdiction under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

7 Procedure.  (Defs.' Mem. at 14.)  Specifically, Toyota objects to the repeated use

8 of the emphasized language contained in Ms. Brown's allegations, <u>supra</u>, because

9 this "boilerplate overpayment language is nothing more than a bare conclusion,"

10 which is plainly deficient under <u>Twombly</u> and <u>Iqbal</u>.  (Defs.' Mem. at 17-18 (citing

11 <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, __ U.S.

12 __, 129 S. Ct. 1937 (2009)); Defs.' Reply at 10 ("It is difficult to comprehend how

13 copying and pasting general allegations across numerous Plaintiffs could possibly

14 constitute a specific allegation of injury for each such Plaintiff.").)

15

16        Additionally, Toyota argues that any injury resulting in loss or overpayment

17 that is tied to a "market effect" must occur at the time of purchase, but that

18 Plaintiffs "failed to provide any factual allegations as to how the general 'market

19 effect' actually resulted in them overpaying for *their vehicle*[*s*]."  (Defs.' Mem. at

20 18 (emphasis in original).)  For example, Toyota notes that "Plaintiffs allege that

21 the 2007 Toyota Camry reduced in value $400 from January-April 2010," but Ms.

22 Brown "owns a 2009 Toyota Camry and has not alleged that she tried to sell — let

23 alone sold — her vehicle at a loss, nor does she allege that the vehicle has reduced

24 in value ***now*** should she attempt to sell it now."  (Reply at 15 (emphasis in

25

original).)  "General allegations of an alleged — and temporary, past — reduction in value simply do not relate to the value of Ms. Brown's individual vehicle." (Defs. Reply at 15.)  To the extent that Plaintiffs rely on recalls of Toyota vehicles to support their "market effect theory," Toyota submits that "the mere fact of a recall cannot create an inference that *all* Subject Vehicles reduced in value and cannot serve as a stand-in for a true factual allegation of economic injury for each named Plaintiff."  (Reply at 15 (emphasis in original); Defs.' Mem. at 18 ("[A]lleging a loss of value solely on the fact of the Toyota UA recalls is not only a bare legal conclusion unworthy of any deference, but one that requires a leap of logic.").)  If standing required only that an automobile manufacturer issued a recall to satisfy an injury in fact, "virtually every vehicle owner in the United States would be entitled to sue his or her automobile manufacturer."  (Defs.' Mem. at 19.)

Plaintiffs respond that each Plaintiff individually alleges that he or she overpaid for his or her vehicle, and these allegations establish an injury in fact. (Opp'n at 7.)  The amended allegations address the flaw previously identified in the Court's November 30, 2010 Order, which stated that general allegations of economic harm "could not be construed to have been pleaded personally by each named plaintiff."  (Opp'n at 7.)  Moreover, each Plaintiff identifies "the basis for that alleged overpayment — a vehicle with defects affecting the driver's ability to maintain speed control is not worth as much as a vehicle that is safe and reliable." (Opp'n at 7.)  For example, "Ms. Brown alleges she was personally exposed to advertisements that emphasized safety, explains that those motivated her to purchase her vehicle, and then concludes that she personally would not have

1   purchased her vehicle or paid as much for it had she known the truth about the

2   defects." (Opp'n at 9.)  In Plaintiffs' view, "[t]his precise type of pleading was

3   approved in Kwikset."  (Opp'n at 9 (citing Kwikset Corp. v. Superior Court, 51

4   Cal. 4th 310, 325 (2011).)

5

6           Plaintiffs' rely on Kwikset to rebut several of Toyota's other arguments

7   concerning standing.  Just as the California Supreme Court in Kwikset held that

8   locks that were falsely advertised as being made in the United States were worth

9   less to a consumer even if the locks were fully functional, so too have Plaintiffs

10  alleged here that the alleged safety defects make Plaintiffs' vehicles worth less

11  even if SUA has not yet occurred.  (Opp'n at 9.)  Plaintiffs' personal allegations of

12  overpayment are substantiated by specific allegations of diminution of value, and

13  "repeated recalls involving the most significant of safety concerns in millions of

14  vehicles have driven down resale values and auction prices" and is "absolutely

15  pertinent to 'market effect.'"  (Opp'n at 9-10.)  Toyota's insistence that Plaintiffs

16  provide "proof-positive causation allegations [between the market effect of the

17  SUA defect and their alleged injuries] is inappropriate at the pleadings stage,"

18  because "threats or potential of injury" suffice — the "injury itself need be nothing

19  more than a trifle."  (Opp'n at 10-11 (citing Nat'l Wildlife Fed'n v. Burford, 871

20  F.2d 849, 855 (9th Cir. 1989).)

21

22

23

24

25

B.    <u>Discussion</u>

It is well settled that "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  Moreover, on a motion to dismiss, courts must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  <u>Id.</u> (quoting <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 889 (1990)).  Here, every Plaintiff alleges that his or her Toyota vehicle contains a defect; namely, the vehicles "accelerate suddenly and dangerously out of the driver's control and lack[] a fail-safe mechanism to overcome this."  (¶¶ 36-69.) Virtually every Plaintiff alleges that he or she would probably not have purchased or leased his or her Toyota vehicle had the defect been known at the time of purchase, but certainly would not have paid as much for it.[7]  Taking these allegations as true, as the Court must at the pleading stage, they establish an economic loss.  Plaintiffs bargained for safe, defect-free vehicles, but instead received unsafe, defective vehicles.  A vehicle with a defect is worth less than one without a defect.  The overpayment for the defective, unsafe vehicle constitutes the economic-loss injury that is sufficient to confer standing.

_____

[7]  The Complaint alleges that Plaintiff Mary Ann Tucker "cannot speculate" as to what she would have done had she known of the defect, but that "she would have based her decision on her analysis of the risk, her ability to pay, and the alternatives in the market."  (¶ 65.)  Ms. Tucker also alleges that she sold her Camry at a loss, which the Court previously held to be sufficient to confer standing.  (Docket No. 510 at 25.)

17

1.   <u>Plaintiffs Establish an Economic Loss by Plausibly Alleging a Safety Defect</u>

Toyota argues that Plaintiffs' repeated use of the same "overpayment language is nothing more than a bare conclusion," which is deficient under <u>Twombly</u> and <u>Iqbal</u>.  The primary focus of <u>Twombly</u> and <u>Iqbal</u>, however, is on the pleading as a whole:  does the pleading allege enough facts to plausibly infer that the pleader is entitled to relief?  Pleadings containing conclusory claims — "labels and conclusions" and "formulaic recitation of the elements of a cause of action" — are insufficient.  <u>Iqbal</u>, 129 S. Ct. at 1949 (citing <u>Twombly</u>, 550 U.S. at 555, 557) (internal quotation marks omitted); <u>see also</u> <u>Chapman v. Pier 1 Imports (U.S.) Inc.</u>, 631 F.3d 939, 955 & n.9 (9th Cir. 2011) (denying standing for ADA claim in which plaintiff never specifically alleged what architectural barriers denied him "full and equal" access and how his disability was affected by them).  Moreover, a plausible injury cannot be alleged when a pleader is silent about "harm to its particular interests."  <u>City of Kansas City, Mo. v. Yarco Co.</u>, 625 F.3d 1038, 1040 (8th Cir. 2010) ("Though the burden of showing injury at the pleading stage is low, the pleader must say something.").  Thus, were Plaintiffs to offer conclusory allegations about the safety defect such that the Court could not discern a defect (other than the label attached to it), or if Plaintiffs' allegations about the alleged defect were implausible, or even if Plaintiffs' allegations were predicated solely on the harm experienced by other Toyota owners, Plaintiffs' ability to allege an injury for standing purposes might be fatally undermined.  However, once the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses

1    resulting from the defect are readily established:  defective cars are simply not

2    worth as much.

3

4         As discussed in the Court's November 30, 2010 Order, and further discussed

5    herein, Plaintiffs' allegations about the safety defect are neither conclusory nor

6    implausible.  Nineteen of the thirty-four lead Plaintiffs[8] allege that they

7    experienced the safety defect.  For example:

8

9    •    Plaintiff Maureen Fitzgerald experienced the SUA defect twice

10         in her 2009 Toyota Corolla LE.  First, when she test drove the

11         Corolla with the salesman, it accelerated at the corner to turn

12         into a busy four-lane road.  She slammed on the brakes and

13         remarked that everything felt too "loose," but the salesman told

14         her that she just had to "get used to it."  Second, on October 6,

15         2010, having had the pedal-recall repair performed on her

16         Corolla, the car suddenly accelerated and did not respond when

17         she applied the brake.  She swerved into a parking space to

18         avoid hitting a pedestrian and another car, and hit the

19         handicapped bar — nearly launching her dog through the

20         windshield.  (¶ 47.)

21

22    •    Plaintiff Matthew Heidenreich experienced three SUA incidents

23

─────────────────

24    [8] This number includes only consumer Plaintiffs in the event California law

25    applies.  The Court counts married couples as a single lead Plaintiff.

in his leased 2010 Toyota Corolla.  First, on March 5, 2010, the car engine revved twice to 3000 RPM on its own while parked at a bank drive-through.  Second, on April 1, 2010, after putting the car in park at the post office, the engine revved while he was out of the car.  Third, on April 28, 2010, after backing the car out of the garage, the car idled at about 2000 RPM.  He turned the engine off and back on.  The tachometer redlined for three separate starts, and the engine "sounded like it was going to explode."  (¶ 53.)

- Plaintiff Carl Nyquist twice observed his 2006 Toyota Avalon increase idle speed to redline by itself while parked, even though he did not apply his foot to the accelerator. Additionally, while  driving on the interstate with his wife at approximately 75 mph, the Avalon accelerated to 90 mph.  He turned the car off and slowed to 75 mph, but then turned the car back on and it again accelerated to 90 mph.  After turning the car off and on again, the Avalon accelerated normally.  (¶ 58.)

- Plaintiff Peggie Perkin was involved in a collision as a result of SUA in her 2005 Lexus ES 330.  On May 24, 2010, she was driving between 5 and 10 mph in a parking lot when the engine revved and the car suddenly accelerated rapidly to 35 mph despite application of the brakes.  She made a 90-degree turn to

avoid a collision with vehicles and pedestrians, hit three cars, and then stopped. She tried to turn off the car with such force that the key broke. (¶ 59.)

- Plaintiff Barbara J. Saunders experienced collisions as a result of SUA in her 2006 Toyota Avalon and 2009 Toyota Matrix. On May 3, 2008, the Avalon suddenly accelerated, causing her to lose control of her vehicle and skid into a guardrail and concrete divider. On February 2, 2009, the Matrix suddenly accelerated, causing her to rear-end a pick-up truck. On March 11, 2010, she experienced a second SUA incident in her Matrix. (¶ 63.)

When read as a whole, the specific allegations of Plaintiffs Fitzgerald, Heidenreich, Nyquist, Perkin, and Saunders, as well as those of the other fourteen lead Plaintiffs who experienced SUA,[9] combined with the detailed allegations concerning SUA and its possible causes (see, e.g., ¶¶ 173-341, 348-367), plausibly establish a safety defect. Braden, 588 F.3d at 594 ("[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.") While Toyota also takes issue with Plaintiffs' general allegations that they "overpaid" for their allegedly defective vehicles, general factual allegations of injury (i.e., the overpayment) suffice at the pleadings stage because courts must "presum[e] that general allegations embrace those specific

_____

[9] (See ¶¶ 39, 41, 42, 44, 52, 54, 55, 60-62, 64, 66, 67, 69.)

1   facts that are necessary to support the claim." Lujan, 504 U.S. at 560.  Because

2   every lead Plaintiff alleges a safety defect, and defective cars are not worth as

3   much as defect-free cars, Plaintiffs plausibly establish an economic loss.[10]

4

5              2.       The Economic Loss Ensuing from the Safety Defect Is Actual

6                       or Imminent

7

8            Toyota also argues that any injury resulting in loss or overpayment that is

9   tied to a "market effect" must occur at the time of purchase, but that Plaintiffs

10   "failed to provide any factual allegations as to how the general 'market effect'

11   _____

12          [10]   Plaintiffs rely on Kwikset for the proposition that an injury in fact is
satisfied when plaintiffs plead that they would not have bought a product but for
13   defendants' misrepresentation.  51 Cal. 4th at 325.  In Kwikset, plaintiffs thought
they were purchasing one type of product, a lock "Made in U.S.A.," but later
14   discovered that the lock "contained foreign-made parts or involved foreign
manufacture."  Id. at 316-17.  Defendants argued that plaintiffs did not suffer an
15   economic loss (i.e., a money or property damage) because the consumers received
16   a fully functioning lock and thus received the benefit of their bargain.  In rejecting
defendant's argument, the California Supreme Court recognized that the accuracy
17   of labels can affect the economic value of a product.  Setting aside differences
18   between federal standing requirements and statutory standing requirements under
California law, the Court agrees that Kwikset has some persuasive value:  it is
19   plausible that consumers suffer an economic loss by purchasing a product that is
20   different from the advertised product.  Although there are meaningful differences
between Kwikset and this case, see infra at n.11, at the end of the day both sets of
21   plaintiffs plausibly allege an injury because they did not receive the product that
22   they bargained for — a lock "Made in U.S.A." or a defect-free Toyota vehicle.
Toyota distinguishes Kwikset, in part, by contending that the issue here is whether
23   Plaintiffs adequately pled personal factual allegations necessary to support
standing under Article III.  As discussed herein, the Court holds that Plaintiffs
24   satisfy Article III by plausibly establishing a safety defect — a defect now alleged
25   by all Plaintiffs.

1   actually resulted in them overpaying for their vehicle." (Defs.' Mem. at 18

2   (emphasis omitted).)  But this argument succeeds only if one assumes that a

3   plaintiff who has not <u>experienced</u> a safety defect <u>does not have</u> a safety defect.  If

4   the Court accepts the allegations that all Toyota vehicles had the safety defect at

5   the time of purchase, and the defects were not subsequently remedied through

6   recalls, all Plaintiffs suffered an economic loss at the time of purchase because they

7   received a defective vehicle.  The fact that Plaintiffs discovered this defect after the

8   time of purchase is of no moment.  The economic loss was present from the

9   beginning.

10

11        The Court has also considered a variation of Toyota's argument that would

12  require more detailed factual allegations tied to a market effect from those

13  Plaintiffs who have not experienced a safety defect.  This line of reasoning begins

14  with the proposition that buyers' remorse is insufficient to confer standing.  Merely

15  alleging that a car is an overpriced "lemon" is insufficient when there are no

16  allegations of a "malfunction" (as opposed to allegations of a "defect").  After all,

17  if Plaintiffs do not allege that they experienced a safety defect, do not allege that

18  they tried to sell or trade in the vehicle at a loss, and do not allege that they have

19  stopped using the vehicle owing to the safety defect, how plausible are allegations

20  of "overpayment, loss in value, or loss of usefulness"?[11]  Under this logic,

21  _____

22        [11]  This question reveals one difference between the economic loss in

23  <u>Kwikset</u> and the loss alleged in this case.  In <u>Kwikset</u>, plaintiffs essentially argued
    that they were duped into buying a different type of lock:  they thought they bought

24  a lock made in the U.S.A. (Lock X), but instead bought a lock that was not
    completely made in the U.S.A. ( Lock Y).  In the <u>Kwikset</u>-type of allegation, the

25  overpayment injury does not depend on how the product functions because

allegations of overpayment would be plausible only if Plaintiffs presented an additional, objective basis to substantiate their allegations of overpayment.  For example, the Court previously held the following allegation sufficiently alleges a cognizable loss under Article III:

> Plaintiff Richard Benjamin is a resident and citizen of Missouri.  He owns a 2007 Toyota Sienna.  Mr. Benjamin began investigating a trade of his 2007 Sienna for a 2011 Sienna just before the recalls were made public.  He has seen the trade-in value drop $2,000 since the recalls according to KELLEY BLUE BOOK, NADA GUIDE, and Edmunds.com.

(MCC ¶ 35; Docket No. 510 at 24.)  Although Mr. Benjamin did not state that he experienced a safety defect, he plausibly established an economic loss by alleging that he saw the trade-in value of his 2007 Toyota Sienna drop according to various sources "once the recalls were made public."  In essence, Mr. Benjamin alleged an objective basis to substantiate his overpayment injury based on the market effect of

─────────────────────

"labels" and "brands" have independent economic value.  Here, however, Plaintiffs do not allege that they were duped into buying a different "type" of vehicle (i.e., they do not allege that they thought they bought a Toyota vehicle (Car X), but instead bought a non-Toyota vehicle (Car Y)), but rather that they were duped into buying a "defective" vehicle (i.e., they thought they bought a safe Toyota vehicle (Car X), but instead bought a defective Toyota vehicle (Car X')).  When the economic loss is predicated solely on how a product functions, and the product has not malfunctioned, the Court agrees that something more is required than simply alleging an overpayment for a "defective" product.  As explained, infra, that "something more" could be allegations based on market forces.  It could also be based on sufficiently detailed, non-conclusory allegations of the product defect.

1   the safety defect.  (See Docket No. 510 at 16.)

2

3       While factual allegations tying an economic loss to a "market effect" are

4   sufficient to establish an injury for standing purposes, they are not indispensable —

5   even for those Plaintiffs who have not experienced the safety defect.[12]  As long as

6   Plaintiffs do not simply allege that their Toyota vehicles are "defective," but rather

7   offer detailed, non-conclusory factual allegations of the product defect, the

8   economic loss injury flows from the plausibly alleged defect at the pleadings stage.

9

10          3.      All Lead Plaintiffs Do Not Establish Standing Based on a

11                  Credible Threat of Future Harm

12

13      In the Complaint, Plaintiffs allege:

14

15      Each of the plaintiffs who still own their vehicles face an increased

16      risk of future harm that would not be present if defendants had not

17      designed, manufactured and sold vehicles that had an unacceptable

18      increased propensity for SUA and which lack an adequate override/

19      fail-safe mechanism.

20

21   (¶ 428.)  Based on this allegation, Plaintiffs argue that all lead Plaintiffs have

22

23

24   ───────────────────

      [12] Although not relevant here, this proposition is supported by the fact that

25   not all products have an aftermarket.  See Kwikset, 51 Cal. 4th at 332-34.

standing based on a credible threat of future harm.[13]  (See Docket No. 510 at 14 n.9.)  The Court disagrees.  Some lead Plaintiffs likely allege sufficient facts to support standing on this basis.  For example:

- Plaintiff Dale Baldisseri alleges that he "and his wife are afraid to drive the Camry because of its SUA defect, so the vehicle has remained parked since December 2009."  (¶ 35.)

- Plaintiff Connie A. Kamphaus alleges that she and her husband "put the 2010 Camry in storage because they were afraid to drive it, and they had to purchase a replacement vehicle." (¶ 54.)

- Plaintiffs John and Mary Ann Laidlaw "were afraid to drive the vehicle" and "surrendered the vehicle by leaving it in the dealer's lot."  (¶ 56.)

Plaintiffs Baldisseri, Kamphaus, and Laidlaw not only allege that they were afraid to drive their Toyota vehicles, but also allege that they stopped driving them as a result of this fear.  These allegations provide a factual basis to support a credible

---

[13] Plaintiffs made this argument at the April 29, 2011 hearing, but did not explicitly make it in their Opposition.  Although the Court concludes that all lead Plaintiffs have standing based on the economic losses associated with the alleged safety defect, the Court addresses this argument to make clear that it does not accept this proffered basis for standing.

1   threat of future harm for these Plaintiffs.  However, as discussed in the November

2   30, 2010 Order, general allegations of an "increased risk of future harm" are

3   insufficient for other lead Plaintiffs seeking to proceed as such.  (Docket 510 at 27-

4   28.)

5

6           C.      Conclusion as to Article III Standing

7

8           Accordingly, for the foregoing reasons, Plaintiffs sufficiently allege an

9   injury in fact to satisfy Article III standing.  Plaintiffs bargained for safe, defect-

10  free vehicles, but instead received unsafe, defective vehicles.  The overpayment for

11  the defective, unsafe vehicle constitutes an economic-loss injury that is sufficient

12  to confer standing.

13

14  IV.     Standing to Assert UCL, FAL, and CLRA Claims

15

16          In its Motion, Toyota alleges that "*none* of the 50 named Plaintiffs have

17  standing to bring the CLRA, UCL, and FAL statutory claims (Counts I-III),

18  because they fail to sufficiently plead reliance and actual causation."  (Notice of

19  Motion to Dismiss at 2 (emphasis in the original).)  However, Toyota has not

20  provided any legal argument or citation to the record in its Memorandum to

21  support this position.  Given that the Court previously did not reach these issues,

22  but instead expressly noted that "the AMCC makes significant changes to the

23  named Plaintiffs' allegations with respect to actual reliance, which may moot

24  Toyota's concerns," (Docket No. 510 at 31 & n.16), Toyota's failure to support its

25

Motion with legal argument is inexplicable.[14]  On this basis alone, the challenges to Plaintiffs' standing under the UCL, FAL, and CLRA fails.  See Local Rule 7-12 ("The failure to file any required paper, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion.")

Additionally, the Court independently determines that Plaintiffs satisfy the standing requirements under the UCL, FAL, and CLRA.

---

[14]  Indeed, Toyota's statements regarding this issue are internally inconsistent.  As noted above, although raising the issue of standing to assert UCL, FAL, and CLRA claims in its Notice of Motion, Toyota fails to support its position in its Memorandum of Points and Authorities.  Notwithstanding this omission, and presumably in response to the Notice of Motion, Plaintiffs understandably support their own position on the issue.  (See Opp'n at 2-4.)  Thereafter, in the Reply, Toyota criticizes Plaintiffs for "devot[ing] an entire section to arguing" against a position it has not taken, only to again contend (in the same document), again unsupported by legal argument or citation to authority, that Plaintiffs have failed to allege injury pursuant to their UCL, FAL, and CLRA claims.  (Compare Reply at 11 ("Nowhere in Toyota's Motion, however, does it raise the injury-in-fact issue under California law or what is required to sufficiently allege a claim under California procedural law.") with id. at 11 n.3 ("Plaintiffs likely fail to allege injury under the California statutes as well, but Toyota does not raise that issue here.").)  At the April 29, 2011 hearing, Toyota clarified that its intent was to preserve in its Motion its prior position on these issues for appeal.  Had there been minor, non-material changes to the Complaint, or no changes at all, Toyota's position would be sensible.  However, the Court does not find that the changes to the Complaint were immaterial with respect to standing under the UCL, FAL, and CLRA.

A.    <u>UCL and FAL</u>

1.    <u>Plaintiffs Allege a Money or Property Loss</u>

The UCL and FAL provide a private right of action only if Plaintiffs have "suffered injury in fact and [have] lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204; <u>Clayworth v. Pfizer, Inc.</u>, 49 Cal. 4th 758, 788 (2010).  "[P]laintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have 'lost money or property' within the meaning of Proposition 64 and have standing to sue."  <u>Kwikset</u>, 51 Cal. 4th at 317; <u>see also</u> <u>Clayworth</u>, 49 Cal. 4th at 788 (holding that overcharges paid as a result of a price-fixing conspiracy were sufficient to support UCL standing); <u>Von Koenig v. Snapple Beverage Corp.</u>, 713 F. Supp. 2d 1066, 1078 (E.D. Cal. 2010) (holding that the plaintiffs sufficiently alleged injury under the UCL, FAL, and CLRA by asserting that the product they received was worth less than what they paid for it owing to defendants' misleading labels).

Here, all Plaintiffs allege that they relied on Toyota's representations about safety and reliability when purchasing their Toyota vehicles.  (<u>See</u> ¶¶ 34-69.)  All allege that they would have made a different purchasing decision had it been disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this.  (<u>See id.</u>) Because Plaintiffs allege that they would have made a different purchasing

decision but for Toyota's misrepresentations, Plaintiffs have lost "money or property" within the meaning of the UCL and FAL.  Kwikset, 51 Cal. 4th at 317.

2.      Plaintiffs Allege Actual Reliance

When claims are based on fraudulent or unlawful conduct, Plaintiffs "must plead and prove actual reliance to satisfy the standing requirement" of the UCL and FAL.  In re Tobacco II Cases, 46 Cal. 4th 298, 328 (2009); Hale v. Sharp Healthcare, 183 Cal. App. 4th 1373, 1385 (2010) (concluding that the reasoning of Tobacco II applies to the "unlawful" prong of the UCL when the predicate unlawful conduct is misrepresentation).  Reliance is established by pleading that "the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct" but for defendants' misrepresentations or omissions.  Tobacco II Cases, 46 Cal. 4th at 326 (quoting Mirkin v. Wasserman, 5 Cal. 4th 1082, 1110-11 (1993)).  Plaintiffs are not required to plead that the fraudulent conduct was the only, predominant, or even decisive factor in influencing their conduct, but they must plead that it "played a substantial part, and so had been a substantial factor" in influencing the decision.  Id. (quoting Engalla v. Permanente Med. Group, Inc., 15 Cal. 4th 951, 976-77 (1997)).

A presumption of reliance "arises wherever there is a showing that a misrepresentation was material."  In re Tobacco II, 46 Cal. 4th at 327 (quoting Engalla, 15 Cal. 4th at 976-77).  "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in

1   determining his choice of action in the transaction in question.'" Id. (quoting

2   Engalla, 15 Cal. 4th at 976-77).  When "misrepresentations and false statements

3   were part of an extensive and long-term advertising campaign," Plaintiffs need not

4   "demonstrate individualized reliance on specific misrepresentations or false

5   statements." Id.

6

7       Here, all Plaintiffs allege that they saw advertisements for Toyota vehicles

8   on television, in the news, on billboards, in brochures at the dealership, on the

9   Internet, and/or on banners in front of the dealership that touted the safety and

10  reliability of the vehicles.  (See ¶¶ 34-69.)  All allege that they would have made a

11  different purchasing decision had it been disclosed that Toyota vehicles could

12  accelerate suddenly and dangerously out of the driver's control and lacked a

13  fail-safe mechanism to overcome this.  (See id.)  Because Plaintiffs allege that they

14  would have made a different purchasing decision but for Toyota's

15  misrepresentations, Plaintiffs satisfy the actual reliance requirement under the UCL

16  and FAL.

17

18      Furthermore, actual reliance may be presumed because the alleged SUA

19  defect is material.  As discussed more fully in the Court's November 30, 2010

20  Order, the propensity of a vehicle to accelerate suddenly and dangerously out of

21  control is material to a reasonable person, which satisfies the causation requirement

22  under the UCL and FAL.[15]  (Docket No. 510 at 42, 81-86.)

23

24      [15]  In the previous round of briefing for the MCC, Toyota argued that "a
    presumption of reliance is limited to securities fraud claims and, even then,
25  confined to claims alleging fraudulent omissions." (Docket No. 450 at 8.)  Toyota

1    Accordingly, Plaintiffs satisfy the standing requirements under the UCL and

2    FAL.

3

4    **B.**    CLRA

5

6    Under the CLRA, consumers must allege that they suffered damages "as a

7    result of the use or employment by any person of a method, act, or practice

8    declared to be unlawful" pursuant to the statute.  Cal. Civ. Code § 1780.  "An

9    inference of reliance would arise as to the entire class" as long as "material

10   misrepresentations were made to the class members."  Mass. Mutual Life Ins. Co.

11   v. Superior Court, 97 Cal. App. 4th 1282, 1292 (2002).  "Materiality of the alleged

12   misrepresentation generally is judged by a reasonable man standard," meaning that

13   "a misrepresentation is deemed material if 'a reasonable man' would attach

14   importance to its existence or nonexistence in determining his choice of action in

15   the transaction in question."  In re Steroid Hormone Prod. Cases, 181 Cal. App. 4th

16   145, 157 (2010) (quoting Engalla, 15 Cal. 4th at 977) (internal quotation marks

17   omitted).

18   _____

19   cited Poulos v. Caesars World, Inc., 379 F.3d 654, 666-67 (9th Cir. 2004), and
     Gartin v. S & M NuTec LLC, 245 F.R.D. 429, 438 (C.D. Cal. 2007), to support

20   this proposition.  Poulos discussed a "presumption of reliance" in the context of
     civil RICO claims.  379 F.3d at 666-67.  Whether the plaintiffs in Poulos were

21   entitled to a "presumption of reliance" in a civil RICO action has little bearing on
     whether Plaintiffs here are entitled to a presumption under the UCL and FAL.  As

22   to Gartin, the court discussed a "presumption of reliance" in the context of
     common law fraud — not as it relates to standing under the UCL or FAL.  245

23   F.R.D. at 438.  Moreover, Gartin was decided two years before the California

24   Supreme Court stated that a presumption of reliance arises as long as the
     misrepresentation was material.  In re Tobacco II, 46 Cal. 4th at 327.

25

32

Here, as discussed supra, Plaintiffs sufficiently allege a material misrepresentation:  the propensity of a vehicle to accelerate suddenly and dangerously out of control is material to a reasonable person.  (See also Docket No. 510 at 42, 81-86.)  This satisfies the actual causation and reliance requirements for purposes of the CLRA.

Accordingly, Plaintiffs satisfy the standing requirements under the CLRA.

V.      Rule 12(b)(6) and Rule 12(f) Standards

A.      Motion to Dismiss Pursuant to Rule 12(b)(6)

In addition to challenging Plaintiffs' standing to assert their claims, Toyota moves to dismiss all claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Pursuant to Rule 12(b)(6), a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach.  First, the Court must accept all well-pleaded factual allegations as true, but "[t]hread-bare recitals of the elements of a cause of action,

1   supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at

2   1949.  Nor must the Court "'accept as true a legal conclusion couched as a factual

3   allegation.'"  Id. at 1949-50 (quoting Twombly, 550 U.S. at 555).  Second,

4   assuming the veracity of well-pleaded factual allegations, the Court must

5   "determine whether they plausibly give rise to an entitlement to relief."  Id. at

6   1950.  This determination is context-specific, requiring the Court to draw on its

7   experience and common sense; there is no plausibility "where the well-pleaded

8   facts do not permit the court to infer more than the mere possibility of

9   misconduct."  Id.

10

11          B.       Motion to Strike Pursuant to Rule 12(f)

12

13          Under Rule 12(f), a party may move to strike from a pleading an insufficient

14   defense or any redundant, immaterial, impertinent, or scandalous matter.  Fed. R.

15   Civ. P. 12(f).  The grounds for a motion to strike must appear on the face of the

16   pleading under attack, or from matters which the Court may take judicial notice.

17   SEC v. Sands, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995).  The essential function

18   of a Rule 12(f) motion is to "avoid the expenditure of time and money that must

19   arise from litigating spurious issues by dispensing with those issues prior to trial."

20   Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993);  Sidney-Vinstein v.

21   A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983).  Where a party moves to

22   strike a prayer for damages on the basis that the damages sought are precluded as a

23   matter of law, the request is more appropriately examined as a motion to dismiss.

24   See Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974-75 (9th Cir. 2010)

25

1 ("We therefore hold that Rule 12(f) does not authorize district courts to strike

2 claims for damages on the ground that such claims are precluded as a matter of

3 law.").

4

5 VI.   Plaintiffs' CLRA, UCL, and FAL Claims (First, Second, and Third Causes

6        of Action)

7

8        Toyota argues that the CLRA claim should be dismissed because Plaintiffs

9 have failed to "sufficiently plead a duty to disclose material facts under the CLRA"

10 and because "Plaintiffs fail to satisfy the heightened pleading requirements for Fed.

11 R. Civ. P. 9(b)."  (Notice of Motion to Dismiss at 3.)  Toyota also seeks to dismiss

12 the FAL claim because Plaintiffs "fail to sufficiently allege any representations or

13 omissions that are likely to deceive as a matter of law" and because it believes that

14 Plaintiffs have failed to satisfy the heightened pleading requirements of Rule 9(b).

15 (Id.)  The Court has already made a determination about the pleading requirements

16 of 9(b), finding that the fraud allegations "are properly pled under Rule 9(b)."

17 (Docket No. 510 at 39.)  Nothing in the Complaint disturbs this finding.

18

19        To the extent Toyota seeks to dismiss these two claims because Plaintiffs fail

20 to plead a duty to disclose material facts, representations or omissions, they have

21 not supported these specific arguments in their Memorandum.  (Docket No. 736.)

22 Therefore, Toyota's Motion to Dismiss on this point is denied.  More importantly,

23 however, the Court has already determined that Plaintiffs allege viable claims

24 under the CLRA and the FAL.  (Docket No. 510 at 39-43, 47-49.)

25

The thrust of Toyota's present argument, therefore, lies with its Motion to Strike, in which Toyota asks the Court to strike two references to the TREAD Act, which is part of Plaintiffs' first cause of action for violations of the CLRA.[16] Toyota moves to strike the following:  " . . . and by selling vehicles while violating the TREAD Act . . . ." and ". . . selling vehicles in violation of the TREAD Act." (¶ 422.)  Toyota also provides notice that it seeks to strike other parts of the Complaint, such as requests for damages and punitive damages pursuant to the CLRA claim,[17] but the Court does not address such issues since they are not addressed in the Memorandum.

The TREAD Act was enacted in 2000.  The Act creates "early warning reporting requirements," in which automobile manufacturers must submit various

---

[16]  The TREAD Act forms a viable basis for recovery under the "unlawful" prong of the UCL (see ¶ 449), and neither party contests this. (Defs.' Mem. at 20-22 (no reference to TREAD Act as basis for contesting the UCL claim); Opp'n at 20 (TREAD Act violations "independently relevant to this litigation for purposes of [P]laintiffs' UCL claim"); Reply at 16 ("Toyota is only seeking to strike the TREAD Act allegations from Plaintiffs' CLRA claim.").)

[17]  Toyota moves to strike statutory damages provisions under the CLRA in paragraphs 433 and 434, and punitive damages in paragraphs 437 and 438. (Notice of Motion to Strike at 2-3.)  Additionally, Toyota moves to strike language from paragraphs 442, 450, and 451, addressing violations under the UCL.  (Id. at 3.)  As noted previously, the Court declines to rule on this request because Toyota has not provided argument to support its motion to strike as to these paragraphs.  What is more, these appear to be identical to the requests the Court denied in its last order. (Compare Docket No. 328 at 1-2, with Docket No. 735 at 2-3;  see also Docket No. 510 at 49-50.)

types of data[18] to NHTSA.  See, e.g., 49 U.S.C. § 30166(m); id. at (m)(3)(A).

Specifically, automobile manufacturers must submit, within five days of initiating

a foreign recall on equipment identical or substantially similar to a motor vehicle

or motor vehicle equipment offered for sale in the United States, a report to

---

[18] Section 30166(m)(3)(A) provides:

As part of the final rule promulgated under paragraph (1), the Secretary shall require manufacturers of motor vehicles and motor vehicle equipment to report, periodically or upon request by the Secretary, information which is received by the manufacturer derived from foreign and domestic sources to the extent that such information may assist in the identification of defects related to motor vehicle safety in motor vehicles and motor vehicle equipment in the United States and which concerns . . . (i) data on claims submitted to the manufacturer for serious injuries (including death) and aggregate statistical data on property damage from alleged defects in a motor vehicle or in motor vehicle equipment; or (ii) customer satisfaction campaigns, consumer advisories, recalls, or other activity involving the repair or replacement of motor vehicles or items of motor vehicle equipment.

Id.

Section 30166(m)(3)(C) provides:

The manufacturer of a motor vehicle or motor vehicle equipment shall report to the Secretary, in such manner as the Secretary establishes by regulation, all incidents of which the manufacturer receives actual notice which involve fatalities or serious injuries which are alleged or proven to have been caused by a possible defect in such manufacturer's motor vehicle or motor vehicle equipment in the United States, or in a foreign country when the possible defect is in a motor vehicle or motor vehicle equipment that is identical or substantially similar to a motor vehicle or motor vehicle equipment offered for sale in the United States.

Id.

37

NHTSA.  49 U.S.C. § 30166(*l*)(1).[19]

Plaintiffs allege that on September 29, 2009, Toyota issued to distributors in thirty-one European countries a Technical Instruction ("TI"), identifying "a production improvement and repair procedure to address complaints by customers in those countries of sticky accelerator pedals, sudden engine RPM increases and/or sudden vehicle acceleration.  No disclosure of this TI was made to consumers or regulators in the U.S." (¶ 288.)  Plaintiffs allege that on January 19, 2010, "two days before initiating its safety-related recall on the sticky pedal issue," Toyota met with NHTSA, at NHTSA's request, to "describe and discuss the sticky pedal phenomenon in Europe and the United States.  Toyota continued to sell vehicles containing a safety-related defect between initiation of its European action on September 29, 2009, and its stop sale order issued in the United States on January 26, 2010." (¶ 293.)  Plaintiffs allege that "[b]y failing to disclose and actively concealing the SUA defect and the lack of adequate fail-safe mechanisms . . . and by selling vehicles while violating the TREAD Act," Toyota engaged in deceptive business practices prohibited by the CLRA including "selling vehicles in violation of the TREAD Act." (¶ 422.)

---

[19]  Section 30166(*l*)(1) provides:

Not later than 5 working days after determining to conduct a safety recall or other safety campaign in a foreign country on a motor vehicle or motor vehicle equipment that is identical or substantially similar to a motor vehicle or motor vehicle equipment offered for sale in the United States, the manufacturer shall report the determination to the Secretary.

Id.

Toyota argues that the TREAD Act allegations are "wholly immaterial and
unnecessary" and should be stricken.  (Defs.' Mem. at 21.)  Toyota argues that
only active misrepresentations can give rise to a CLRA claim, and here, Plaintiffs
do not allege "that Toyota made any misrepresentations to consumers with respect
to the TREAD Act."  (Defs.' Mem. at 21.)  Toyota argues that Plaintiffs must
allege "when, where or how TREAD Act regulations were communicated to
consumers in connection with the sale of Toyota vehicles," and that Plaintiffs "are
required to allege a deceptive or misleading representation to consumers regarding
relevant TREAD Act standards" in order to "deem[ ] pertinent or material" the
TREAD Act allegations to the CLRA claim.  (Defs.' Mem. at 21-22; see also
Reply at 17-18.[20])  Toyota also argues that Plaintiffs cannot bring a CLRA claim
on the basis of the TREAD Act because the Act requires the manufacturer make
disclosures to NHTSA, not the public, and therefore the public cannot be misled by
disclosures to NHTSA.  (Reply at 18.)  Toyota argues that the TREAD Act does
not impose a duty on Toyota to "disclose information to the public that could form
the basis of a CLRA claim."  (Id. at 19.)

Plaintiffs argue that the TREAD Act violations are actionable under a theory
of fraudulent omission.  (Opp'n at 21.)  They also argue that Toyota "had a duty to
disclose its violations of the TREAD Act to consumers while selling and

---

[20]  Notwithstanding Toyota's discussion of Daugherty v. Am. Honda Motor
Co., 144 Cal. App. 4th 824, 835 (2006), and Bardin v. DaimlerChyrsler Corp., 136
Cal. App. 4th 1255, 1276 (2006) (discussed in Reply at 17-18), the Court holds, as
it has before, that a fraudulent omission is a basis for a CLRA claim.  (Docket No.
510 at 43.)

advertising defective vehicles." (Id.)  Plaintiffs contend that they have alleged

materiality already, and that violations of the TREAD Act — "a nondisclosure

about safety considerations of consumer products" — are material.  (Id. at 22.)

During the hearing, counsel for Toyota argued that whether Toyota issued a recall

in Europe would not be material to consumers.  The Court disagrees, noting, as

Plaintiffs did in their Opposition, "[t]he fact that Toyota was in violation of federal

law for failure to report safety-related information would be material to a

reasonable consumer."  (Opp'n to Motion to Strike at 1.)  Toyota's approach to the

CLRA is simply too narrow; the Court sees no reason not to allow allegations

regarding the TREAD Act to be part of a CLRA claim, especially when Toyota has

not shown that this language is redundant, immaterial, impertinent or scandalous.

Toyota did not take up this argument during the hearing, instead arguing that the

CLRA does not "borrow" causes of action from other statutes as the UCL does.

This argument is unavailing, as Plaintiffs have alleged a violation of the CLRA

based on a duty to disclose material information.  The fact that Toyota had a duty

to disclose to NHTSA rather than consumers does not exonerate the statutory duty

to disclose material facts to consumers.


        Plaintiffs also argue that Toyota had a duty to disclose its "non-compliance"

because it had exclusive knowledge about whether it had complied with the statute;

it "actively concealed its non-compliance from the public and from NHTSA"; and

it made representations about product safety "while failing to disclose that it was

violating the TREAD Act."  (Id. at 22.)  The Court agrees.  The TREAD Act

protects consumers through NHTSA, and allegations that Toyota did not comply

with the reporting requirements support the contention that Toyota did not comply with another consumer protection statute, the CLRA.

As this Court has already recognized, Plaintiffs allege a CLRA claim based on fraudulent omissions.  Here, they simply add an additional basis for their claim, violations of the TREAD Act.  Toyota has not shown that the phrases it wishes to strike are redundant, immaterial, impertinent, or scandalous, nor has Toyota shown how it will be prejudiced by the inclusion of the TREAD Act in the CLRA claim, because evidence of violations will be relevant under the UCL.  (Opp'n to Motion to Strike at 1.)

Accordingly, the Court finds that Toyota has not established that Plaintiffs' references to the TREAD Act in the CLRA claim should be stricken.  The Court has already ruled on the other requests to strike the damages claims.  Moreover, Toyota has also failed to show that the CLRA claim or the FAL claim should be dismissed.   Therefore, the Motion to Dismiss the CLRA and FAL claims and the Motion to Strike the CLRA claims and other language in the Notice of Motion are denied.

VII.   Express and Implied Warranties (Fourth and Fifth Causes of Action)

A.    Express Written Warranty

In its November 30, 2010 Order, the Court made a number of rulings

41

regarding Plaintiffs' express warranty claims, which consist of two separate and distinct types of claims: one based on the express written warranty and another based on express statements made by the Toyota Defendants in advertising and marketing  materials.

In the Court's November 30, 2010 Order, the Court dismissed with prejudice as outside the scope of the written warranty all claims based on design defects rather than defects in materials and workmanship.[21]  (Id. at 57-59.)

The Court also held that those claims based on defects in materials and workmanship could be asserted by Plaintiffs who sought repairs pursuant to the recalls or SUA-related issues during the warranty period (id. at 51), but expressly rejected the argument that the latent nature of the alleged defect excused compliance with a contractual requirement that repair be sought during the warranty period (id. at 52-55).

In repleading this claim, Plaintiffs appear to seek partial clarification or

---

[21]  In its November 30, 2010 Order, the Court rejected the notion that Plaintiffs failed to allege defects in materials and workmanship, id. at 59, and the Court rejects a similar argument raised by the Toyota Defendants here.  (See Defs.' Mem. at 7-9; cf. ¶ 350(1)(h) (referring to "the failure to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle"), ¶ 475 (newly pled allegations that "defendants failed to assemble and manufacture the ETCS-i in such a way as to prevent SUA events").)

42

partial reconsideration of the Court's ruling.  Specifically, Plaintiffs make allegations that are contrary to the Court's ruling dismissing with prejudice certain breach of express written warranty claims by repleading claims by Plaintiffs "who neither sought repairs pursuant to the recalls nor sought repairs for SUA-related issues" (id. at 55), and by adding allegations that the seeking of repairs would have been futile.  (See ¶¶ 472, 478 (noting the futility of presenting a vehicle for repair in light of allegations that "the repairs Toyota offers do not fix all causes of SUA or prevent SUA"), 473 (pedal recall and brake-override "confidence booster" excluded many models).)

Seeking repair under the express written warranty is a contractual obligation.  (See Docket 510 at 51.)  Plaintiffs' argument that the futility of seeking a repair should excuse their nonperformance of this obligation implicates the latent nature of the alleged defect(s).  Certainly, the existence of a latent defect (which by definition is difficult or impossible to ascertain) is far more susceptible to being overlooked or being denied than is a non-latent defect.  Thus, it is the latency of the alleged defect(s) that leads to the alleged futility.  The Court has already discussed at length why, under California law, the latency of a defect in an automobile does not excuse compliance with the contractual obligation to present the vehicle for repair under an express written warranty.  (See Docket No. 510 at 52-55.)  The Court declines to revisit this holding; futility arising from the latent nature of the alleged defect(s) does not excuse compliance with the requirement that repair of a vehicle be sought within the warranty period.

The parties' arguments, however, demonstrate that points of clarification are in order.  First, it appears to the Court that its definition of "recalls" should include the "confidence booster," in light of allegations tending to suggest the brake-override "confidence booster" was a lukewarm response to SUA-related events requiring a more aggressive response, such as a full-scale safety recall. (See ¶¶ 17, 239, 351-367.)  Thus, Plaintiffs who sought adjustment of their vehicles and/or installation of the "confidence booster" fall within the broad category of "Plaintiffs who . . . sought repairs pursuant to the recalls."[22]  (Docket No. 510 at 55.) Therefore, Plaintiffs may assert claims based on the express written warranty if they sought out the "confidence booster" during the warranty period.

Next, the Court disagrees that Plaintiffs who contacted Toyota dealers to the dealer replacement or repurchase of the vehicle fall into either category of Plaintiffs entitled to assert a breach of express written warranty claim.  Although this argument is not without appeal (in that these Plaintiffs are essentially requesting the ultimate repair — a completely defect-free vehicle), see Opp'n at 14-15, it must be viewed in the context of the specific contractual obligation at issue.  Replacement or repurchase of the vehicle is not a remedy permitted by the relevant express written warranty. (See Docket No. 510 at 51.)  Rather, the only remedy under the express written warranty is "repair or adjustment."  Id.  The

_____

[22]  Those Plaintiffs also fall into the more general category of Plaintiffs who "sought repairs for SUA-related issues."  (Docket No. 510 at 55.)  Although the brake-override confidence booster was not designated by Toyota as a "repair," it would undoubtably fall into the broader category of an "adjustment."  (See id. at 51 (quoting the remedy provision of the warranty: "[t]he performance of repairs and adjustments is the exclusive remedy under these warranties.") (emphasis added).)

1  claims for breach of the express written warranty made by Plaintiffs who sought

2  only replacement or repurchase of their vehicles are dismissed with prejudice.

3

4      Plaintiffs seek clarification whether certain Plaintiffs (i.e., Rocco and Bridie

5  Doino, Barry and Vicki Karlin, and Barbara Saunders (¶¶ 44, 55, 63)) are excused

6  from presenting their vehicles for repair or adjustments because their vehicles were

7  "totaled in SUA-related incidents."  (See Opp'n at 15.[23])  In Plaintiffs' view, these

8  occurrences rendered performance impossible and therefore excused their

9  performance.  Id.  In response, Defendants merely note that these Plaintiffs, like

10  those who sought replacement or refund, failed to "seek repair" as required by the

11  terms of the warranty.  (Reply at 4.)

12

13      California law has long recognized that impossibility of performance will

14  excuse a party's performance under a contract.  Mineral Park Land Co. v. Howard,

15  172 Cal. 289, 291 (1916) (recognizing that impossibility, but not mere difficulty,

16  excuses a party's performance).  However, even accepting Plaintiffs' argument,

17  their view overlooks the inescapable conclusion that Toyota's performance under

18  the warranty, which is limited to "repair or adjustment" is, as applied to a totaled

19  vehicle, likewise impossible, excusing Toyota's performance as well.  Thus,

20  _____

21     [23]  Plaintiffs do not define the description of "totaled" in either the

22  Complaint or the Opposition, but the Toyota Defendants do not raise any concerns regarding the lack of clarity.  In this context, it appears that Plaintiffs allege vehicle

23  damage beyond repair or, at the very least, costs of repair exceeding vehicle book value.  (See 18 Oxford English Dictionary 287 (2d ed. 1989 (reprinted 2001))

24  (defining "total" as a verb meaning "[t]o damage beyond repair (esp. a motor

25  vehicle, in an accident)").)

applying the doctrine advocated by Plaintiffs, because of the exclusive remedy of "repair or adjustment," Plaintiffs who have totaled their vehicles — which by definition cannot be repaired — have no claim under the express written warranty.

This conclusion is further compelled by the fundamental reason that the express written warranties (filed by Toyota in connection with the previous Motion to Dismiss) reveal that there is no warranty coverage for totaled vehicles. Specifically, the exemplar warranties set forth provisions explicitly excluding coverage for losses such as those incurred by these Plaintiffs.  Toyota's warranties exclude coverage for "any vehicle that has ever been . . . declared a 'total loss' or equivalent by a financial institution or insurer, such as by payment for a claim in lieu of repairs because the cost of repairs exceeded the cash value of the vehicle." (Gilford Decl. Ex. B at 26 (2010 Camry Warranty) (Docket No. 330-2 at 17); id. at 109 (2007 LEXUS Warranty) (Docket No. 330-3 at 23) (identical provision); id. at 183 (2002 Toyota Owner's Warranty Information) (Docket No 330-4 at 14) (identical provision); see also Gilford Decl. ¶ 3 (representing Ex. B as "exemplary of Plaintiffs' warranties").)  Plaintiffs who totaled their vehicles have no claim for breach of express written warranty, and those claims are dismissed with prejudice.

Thus, applying the Court's previous rulings, as well as the ones set forth herein, the following Plaintiffs' claims based on the breach of express written warranty remain viable: Consumer Plaintiffs Fitzgerald (¶ 47), Heidenrich (¶ 53), Kamphaus (¶ 54), Perkins (¶ 59), and non-consumer Plaintiff Auto Lenders Liquidation Center, Inc. ("Auto Lenders") (¶ 84).  (See Berman Decl. (Docket No.

46

871-2), Ex. B at 1.)

Finally, it bears reiteration that the Court has made separate rulings regarding the two types of express warranty claims:  The first type of claim is based on the express written warranties covering the vehicles, and the second type of claim is based on statements made by Toyota regarding the safety and performance of their vehicles.  (Compare Docket 510 at 50-61 with id. at 61-64.) The present Order does not meant in any way to disturb that distinction.[24]

In the related Motion to Strike, the Toyota Defendants move to strike a number of allegations, including language regarding the scope of the remedies available for breach of express warranty and Toyota's knowledge of the alleged defects.  (See Notice of Motion to Strike at 4-5 (moving to strike ¶¶ 474, 476, 477, 481 (related to scope of remedies), ¶¶ 475, 480 (related to Toyota's knowledge)).) The Court has dismissed with prejudice Plaintiffs' revocation claim and therefore strikes the reference to remedies available for revocation of acceptance (¶ 477). The remainder of the Motion to Strike the above-referenced paragraphs is not supported by argument in the Memorandum in Support; thus, the Court otherwise denies the Motion to Strike.

_____

[24]  Toyota's moving papers do not address the pleading sufficiency of the second type of express warranty claim.  The Court declines to consider the arguments raised for the first time in the Reply. (See Reply at 6 (contending that Plaintiffs fail to adequately allege exposure to Toyota's advertisements); but see Notice of Motion to Dismiss (Docket No. 734) at 4-5 (referring to the argument).)

B.    <u>Implied Warranty</u>

In its November 30, 2010 Order, the Court denied the Motion to Dismiss the implied warranty claims.

Although stopping short of filing a Motion for Reconsideration under this Court's Local Rules, <u>see</u> L.R. 7-18(b), and without much elaboration, Toyota "requests" that the Court "reexamine" Plaintiffs' implied warranty claims in light of a recently decided Central District case, <u>Webb v. Carter's, Inc.</u>, __F.R.D.__, No. CV 08-7367 GAF, 2011 WL 343961, at *8 (C.D. Cal., Feb. 3, 2011).  (Defs.' Mem. at 9 n.7.)  In <u>Webb</u>, the court relied on <u>Hicks v. Kaufman & Broad Home Corp.</u>, 89 Cal. App. 4th 908 (2001), for the proposition that "a plaintiff can recover for breach of an implied warranty only if the product 'contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product.'"  <u>Webb</u>, 2011 WL 343961, at *8 (quoting <u>Hicks</u>, 89 Cal. App. 4th. at 918).  <u>Webb</u> does not represent new legal authority justifying reconsideration under L.R. 1-18(b).  Instead, it merely applies a ten-year old California Court of Appeal decision that this Court also relied upon in its November 30, 2010 Order.  The Court declines Toyota's "request."

Moreover, although purporting to move to dismiss the implied warranty claim for, <u>inter alia</u>, lack of privity and sufficiency of allegations regarding vehicle malfunction, Toyota discusses the sufficiency of the implied warranty claim in its Memorandum only insofar as the claim applies to two non-consumer Plaintiffs.

(<u>Compare</u> Notice of Motion to Dismiss (Docket No. 734) at 5 <u>with</u> Defs.' Mem. at 11-13, 23; <u>see also</u> <u>id.</u> at 9 n.7 (discussed <u>supra</u>).)  As noted at the outset of this Order, the Court declines to undertake a broader analysis of the implied warranty claim unguided by the moving parties' arguments.

### C.   Ruling Regarding Warranty Claims

Thus, subject to the clarifications set forth above, the Court grants in part and denies in part the Motion to Dismiss as to the warranty claims.

The Court strikes ¶ 477 of the Complaint, but denies the remainder of the Motion to Strike regarding the express warranty claims.

## VIII.   Revocation of Acceptance (Sixth Cause of Action)

In the November 30, 2010 Order, the Court held that Plaintiffs may not revoke acceptance against a non-seller manufacturer.[25]  (Docket No. 510 at 71.) However, the Court dismissed the claim without prejudice to allow Plaintiffs to replead, if they so chose, that the relevant express written warranty "fail[s] of its essential purpose" within the meaning of Cal Com. Code § 2719.  (Docket No. 510

---

[25]  Although dismissing the claim as to the majority of the Plaintiffs, the Court permitted those non-consumer Plaintiffs who alleged they directly purchased their vehicles from the manufacturer (the "direct purchasers") to maintain this claim.  In the Opposition to the present Motion to Dismiss, Plaintiffs acknowledge that they no longer allege any Plaintiff is a direct purchaser.  (Opp'n at 23.)

at 74-75 & n.24.)  Plaintiffs responded by pleading in the Complaint that the revocation claim "is asserted to preserve the Count for appeal and Plaintiffs and the Class understand the claim is dismissed."  (¶ 490.)

Thus, based on this repleading, despite some suggestion to the contrary elsewhere in the record before the Court,[26] the Court treats the Complaint as indicating an intent on the part of Plaintiffs to forego a claim based on a theory that the warranties' exclusive or limited remedies fail of their essential purpose within the meaning of section 2-719 of the Uniform Commercial Code (Cal. Com. Code § 2719).

The Court grants the Motion to Dismiss as to this claim.  The revocation claim, Plaintiffs' sixth cause of action, is dismissed with prejudice as to all Plaintiffs.

---

[26]  See, e.g., ¶ 472 ("[T]he limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and Plaintiff Class whole and because the Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time."); ¶ 497 ("[T]he repair and adjust warranty has failed of its essential purpose because Toyota cannot repair or adjust the Defective Vehicles."); Opp'n to Mot. to Strike (Docket No. 872) at 3 ("Moreover, the damages limitation in . . . Toyota's Warranty Manual is not enforceable because it fails its essential purpose because Toyota has failed to adequately repair any vehicles.").

IX.    <u>Breach of Contract/Common Law Warranty (Eighth Cause of Action)</u>

The Toyota Defendants move to strike all language setting forth the eighth cause of action.  The Court previously denied the Motion to Dismiss an identical claim set forth in the MCC.  (Docket No. 510 at 71 (noting that this claim was properly pled in the alternative).)  Moreover, Defendants present no legal argument in support of unrelated portion of their Motion to Strike, which the Court now denies.

X.    <u>Unjust Enrichment (Tenth Cause of Action)</u>

In its November 30, 2010 Order, the Court dismissed Plaintiffs' claim for unjust enrichment with prejudice because unjust enrichment is not a cause of action in California.  (Docket 510 at 87-88, 103.)  Plaintiffs expressly state they re-assert the unjust enrichment claim merely to preserve it for appeal.  (¶ 532.)  For the reasons set forth in the November 30, 2010 Order, the Court again dismisses this claim with prejudice.

XI.    <u>Auto Lenders Liquidation Center, Inc.</u>

With the amendments set forth in the Complaint, Plaintiffs have added a new non-consumer Plaintiff.  (<u>See</u> ¶¶ 76-84.)  Auto Lenders is described as "a residual value insurer, guarantor and lease maturity vehicle liquidator," as well as the operator of "five New Jersey retail automobile dealerships and service centers."

(¶ 76.)

Auto Lenders insured the residual value of a fleet of vehicles leased by non-party Hann Financial Service Corporation ("Hann"), including vehicles alleged in the Complaint to be affected by the SUA defect(s).  (Id.)  Auto Lenders saw Toyota's advertising regarding safety and reliability, and was influenced by those advertisements to insure the residual values of the Hann fleet of vehicles.  (Id.) Had Auto Lenders been aware of the alleged defect(s), it either would not have insured those values or would have guaranteed residual values at a lower amount.  (Id.)

As part of its contractual arrangement with Hann, Auto Lenders takes possession and ownership of vehicles for "reconditioning and sale."  (¶ 78.)

Before September 2009, Toyota vehicles had "predictably and consistently maintained resale value," which changed when the SUA tendency became publicly known.  (¶ 79.)  On September 1, 2009, Auto Lenders had approximately 5,800 Toyota and Lexus vehicles "in inventory."  (¶ 80.)  Over the next year, Auto Lenders sold approximately 1,700 Toyota vehicles, and estimates its losses (as measured between predicted value and sales revenue) at approximately $5.5 million.  (¶ 82.)  During the same period, Auto Lenders sold approximately 900 Lexus vehicles, and estimates its losses at approximately $5.9 million.  (¶ 83.) Transportation of vehicles subject to recalls cost Auto Lenders $80 per vehicle for a total of approximately $43,000. (¶ 84.)

Although Toyota contends that the warranty claims of Auto Lenders should be dismissed with prejudice because it "does not allege to have ever purchased or leased a Toyota vehicle at issue in this case," the allegations set forth in the Complaint foreclose this argument.  (See Defs.' Mem. at 13; cf. ¶ 78.)  The Court denies the Motion to Dismiss the warranty claims of Auto Lenders.  The Court's warranty rulings set forth in the November 30, 2010 Order apply to this new party.

XII.   Availability of Injunctive Relief, Restitution and/or Restitutionary Disgorgement

The Toyota Defendants move to strike Plaintiffs' request for an injunction requiring implementation of a fail-safe mechanism and Plaintiffs' prayer for restitution and/or restitutionary disgorgement, but have not addressed these issues in their briefing.  (Compare Notice of Motion to Strike at 6 with Defs.' Mem.) Furthermore, the Court previously denied Toyota's motion to strike these requests for relief.  (Docket No. 510 at 88-101.)  The Court denies the current Motion to Strike the prayer for restitution and/or restitutionary disgorgement for the reasons set forth therein.

XIII.  Conclusion

The Court grants in part and denies in part the Motions to Dismiss and to Strike.  To the extent not expressly granted, the Motions are denied.

53

1    The Court denies the Request for Judicial Notice.

2

3    **IT IS SO ORDERED.**

4

5    Dated: May 13, 2011

6

7                                                  _____
                                                   JAMES V. SELNA
8                                                  UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25