1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Monica R. Kelly (Illinois Bar ID 6225920)
*monicakelly@ribbecklaw.com*
*mervinmateo@ribbecklaw.com*
RIBBECK LAW CHARTERED
505 N. Lake Shore Drive, Suite 102
Chicago, IL 60611
Telephone: (312) 822-9999

*Lead Counsel for Foreign Economic
Loss  Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) |
| | **SECOND AMENDED  FOREIGN ECONOMIC LOSS MASTER CONSOLIDATED COMPLAINT** |
| | <u>JURY TRIAL DEMANDED</u> |
| This Document Relates To: **FOREIGN ECONOMIC LOSS PLAINTIFFS** | |

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................... 6

III.    PARTIES ........................................................................................ 8

         A.      Plaintiffs ............................................................................... 8

                  1.      North American Plaintiffs.............................................. 8

                  2.      Plaintiffs from Around the World ..................................13

         B.      Defendants ...........................................................................25

IV.     FACTUAL BACKGROUND ..........................................................27

         A.      Toyota's Corporate Hierarchy Respecting Its Business Operations,
                  Design and Marketing of Toyota Vehicles ...........................................27

         B.      Toyota's Defective Design of Toyota Vehicles.............................30

                  1.      "The Toyota Way"...............................................................30

                  2.      Toyota's Electronic Throttle Control System ("ETCS") and its
                          Limited Fail-Safe Mechanism.........................................35

                  3.      Summary of the Defects in Toyota Vehicles.....................39

                           a.      Electronic issues.............................................40

                           b.      Mechanical issues............................................41

                           c.      The lack of an appropriate fail-safe........................42

                           d.      Failure to appropriately test and validate the vehicle
                                    systems.............................................................44

                  4.      Toyota Halts Assembly of Toyota Vehicles due to the
                          Unavailability of parts from Japan causing a suspension of
                          production in North America and the World ...................45

                  5.      Toyota Receives Complaints and is Investigated for Sudden
                          Unintended Accelerations ("SUA") Beginning in 2002.......49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.   First reports of unintended acceleration to Toyota…..50

b.   Reports of SUA in Toyotas with ETCS are 400% higher
than in Toyota vehicles with mechanical throttle
controls…………………………………………………52

c.   Consumer complaints, NHTSA investigations and inquiries
by Congress……………………………………………..56

    i.   Specific accounts of SUA in Tacomas and
Siennas……………………………………………82

d.   Toyota secretly conducted its own tests of SUA……….89

6.   Recalls of Toyota Vehicles………………………………….98

a.   The floor mat recall…………………………………..98

b.   The sticky accelerator recall………………………….105

7.   Toyota considered "fixing" SUA, yet deliberately chose to carve
out Mexico and the World for cost reasons…………………116

8.   The Internal Death by SUA Chart…………………………117

9.   Toyota continues to deny electronic throttle defect despite post-
recall complaints……………………………………………122

10.  Toyota identifies many root causes of SUA confirming the need
for brake override…………………………………………126

a.   Toyota uniformly rejected claims, made no disclosures to
consumers, and affirmatively misled consumers…….128

b.   Toyota belatedly installs a brake-override as a "confidence"
booster……………………………………………….133

11.  Toyota Failed to Timely Notify the Public About, and to Remedy,
Its Defective Vehicles …………………………………..141

C.   Toyota's Unfair and Deceptive Marketing of the Safety and Reliability
of Toyota Vehicles……………………………………………142

D.   Damages …………………………………………………..155

1.   Over 70% of Unintended Acceleration Events are in Vehicles not Covered by the Recall……………………………………..……155

2.   The Toyota North American Quality Advisory Panel………..159

3.   The Defects Causing Unintended Accelerations Have Caused Toyota Vehicles' Values to Plummet …………………………163

V.   CLASS ALLEGATIONS..................................................................... 168

A.   Foreign Consumer Economic Loss Class ..................................... 168

COUNT I  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (18 U.S.C. § 1961, *et seq*.) ......... 173

A.   The "Misleading Marketing Enterprise".................................... 173

B.   Predicate Acts........................................................................ 177

1.   Omissions of Material Fact……………………………………….……177

a. Toyota's History of Exerting Undue Influence To Conceal Material Facts Concerning Deadly Design Flaws ...............................................178

2.   False and Misleading Statements which Were and Were Intended to be Disseminated by Interstate and Foreign Carriers of Mail and Wire Communications with Knowledge of their Falsity Concerning the Cause of SUA (18 U.S.C. §1341 AND 1343)……………………………………..183

C.   Pattern of Racketeering Injury ................................................ 195

COUNT II  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq*.) ....................................... 196

COUNT III  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq*.)................................ 202

COUNT IV  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq*.)................................ 206

COUNT V  FRAUD BY CONCEALMENT (Based on California Law) ................ 208

COUNT VI  NEGLIGENCE ................................................................. 211

COUNT VII  PRODUCT LIABILITY - DESIGN DEFECT ................................. 212

PRAYER FOR RELIEF ................................................................................214

DEMAND FOR JURY TRIAL .....................................................................215

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to this Court's Order dated April 8, 2011, the Foreign Economic Loss Plaintiffs ("Plaintiffs" or "FELPs") hereby file this Second Amended Master Consolidated Complaint ("SAMCC").

## I.   INTRODUCTION

1.      This action arises out of the purchase of certain vehicles designed, marketed, and sold by Defendant Toyota Motor Corporation ("TMC").  TMC's North American-based subsidiary, Toyota Motor North America, Inc. ("TMA"), is a holding company responsible for, *inter alia*, TMC's North American-based design and marketing operations.  These functions are conducted through two (2) companies, Toyota Motor Engineering and Manufacturing North America, Inc. ("TEMA"), and (2) Toyota Motor Sales, U.S.A., Inc. ("TMS").  TEMA is principally responsible for implementing TMC's design decisions and TMS is principally responsible for implementing TMC's core marketing and sales message throughout North America and the world.

2.      Since 2001, TMC, TMA, TEMA and TMS (collectively, "Toyota" or "Defendants")  were responsible for the design, marketing, sale and lease of tens of millions of vehicles, or parts thereof, under the Toyota brand name (hereinafter "Toyota Vehicles") purchased by FELPs and members of the Class (and/or Sub-Classes) throughout North America and the world, including, but not limited to, Canada, the United States and Mexico (hereinafter referred to as "North

America"),[1] as well as Australia, China, Egypt, Germany, Guatemala, Indonesia, Malaysia, Peru, Philippines, Russia, South Africa, Turkey (hereinafter referred to collectively as the "World"). All "Toyota Vehicles" purchased or leased by Plaintiffs and the FELP Class use an electronic throttle control system ("ETCS" or "ETCS-i") which Plaintiffs contend was defective and unreasonably dangerous throughout the Class period.

3. As used in this complaint, "Toyota Vehicles," "Defective Vehicles," or "Subject Vehicles" include, but are not limited to, the following models that are designed, marketed, sold and/or leased under the Toyota brand name throughout North America and the World, and have ETCS or ETCS-i: 4Runner, Avalon, Camry, Camry HV, Celica (2ZZ-GE Engine), Corolla (1ZZ-FE, 2AZ-FE, 2ZR-FE), FJ Cruiser, Highlander, Highlander HV, Land Cruiser, Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD)), Prius, Rav4, Sequoia, Sienna, Solara, Tacoma (5VZ-FE except Sport Model), Tacoma, Tundra (not including the 2000-2002 with 5VZ-FE), Venza, Yaris, AYGO, iQ, Avensis, Auris, Altis, Verso and Radford.

4. The ETCS in Plaintiffs' Toyota Vehicles severs the mechanical link between the accelerator pedal and the engine. In place of the cable that connects the two components, complex computer and sensor systems communicate an accelerator pedal's position to the engine throttle, telling the vehicle how fast it should go.

---

[1] References herein to "North America" are not intended to include claims on behalf of domestic purchasers, whose claims are being pursued separately in this MDL.

Toyota began installing these electronic control systems in some Lexus models in 1998, in Toyota Camry and Prius models in 2001 and 2002, and in all Toyota Vehicles by 2006.[2]  TMC, individually and by and through its subsidiary companies TMA, TEMA and TMS, promised consumers like FELPs and the Class that these new systems would operate safely and reliably.  This promise turned out to be false in several material respects.  Toyota failed to fix a serious safety problem plaguing all Toyota Vehicles with ETCS worldwide, and it concealed and suppressed the truth about such defect, causing FELPs and the Class to continue to rely upon Toyota's marketing and sales message of safety and reliability to their detriment.

5.     For instance, in statements disseminated worldwide by TMC and TMS, in marketing and sales materials, and press releases, issued through newspapers, magazines, sales literature, brochures and other consumer-oriented documents, as well as through internet websites, banner advertisements and other web-based platforms, TMC and TMS have consistently promoted "safety" and "reliability" as top priorities in all Toyota Vehicles, including specifically the alleged safety and dependability of ETCS.  Toyota promised that a "fundamental component of building safe cars" was testing and analyzing why accidents occur.

6.     Toyota has received tens of thousands of complaints from consumers throughout North America and the World about a phenomenon known as "sudden

---

[2] *See* U.S. Bound Vehicle Models and MY with ETCS-i, at TOYEC-0000577.

unintended acceleration" (or "SUA").  It was aware that the number of complaints of sudden unintended acceleration increased substantially in Toyota Vehicles with ETCS, as opposed to vehicles with mechanical controls.  For example, on June 3, 2004, Scott Yon, an investigator in the U.S. National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI"), sent Toyota Assistant Manager of Technical and Regulatory Affairs Chris Santucci – who himself had previously worked at NHTSA – an e-mail attaching a chart showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles.

7.      Toyota also received reports of crashes and injuries that put Toyota on notice of the serious safety issues presented by SUA.  For instance, two of the top five categories of injury claims in NHTSA's Early Warning Reporting Database involved "speed control" issues on the 2007 Lexus ES350 and Toyota Camry.  As one internal Toyota document observed, the issues presented by a SUA-related defect are "catastrophic."[3]  Despite the catastrophic nature of this defect, Toyota has failed to repair the problem and has continued to conceal its existence from FELPs and the Class.

8.      However, just last week, it was revealed publicly that a 7-member panel created by Toyota found that Toyota was slow to discover the defects in its

---

[3] TOY-MDLID00003908

- 4 -

vehicles because it viewed complaints made to the company and/or to federal regulators about SUA skeptically and defensively.  A report issued by the panel said that Toyota failed to apply the principles of its manufacturing process, known as "the Toyota Way" and built around the concept of detecting and responding to problems quickly, to evaluate criticism from external sources.  The report further stated that Toyota treated safety differently than other manufacturers, by lumping it into the larger issue of "quality" and making it part of everyone's responsibility rather than specific executives and employees.  Among the top recommendations made by this panel is for Toyota to decentralize its corporate structure and break down the "silos" within its organization that "hindered information sharing and contributed to miscommunication."  The report concluded that "Toyota has erred too much on the side of global centralization and needs to shift the balance somewhat toward greater local authority and control."

9.      Plaintiffs seek class action status pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of two Consumer Sub-Classes of Toyota Vehicle owners/lessees of all Toyota Vehicles with ETCS in their respective countries in North America and the World.

10.      Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961, *et seq.*, California law under the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750; California Unfair Competition Law,

CAL. BUS. & PROF. CODE § 17200; California False Advertising Law, CAL. BUS. & PROF. CODE § 17500; Fraud by Concealment; Negligence; and Product Liability.

11.     Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and have intentionally chosen to pursue claims based on California state-law.    Plaintiffs also expressly disavow any claim for manufacturing defects (to the extent any exist), as well as any claim relating to the contract of sale or warranties (express or implied).

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members nationwide and worldwide; and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

13.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over the Defendants because Defendants have sufficient minimum contacts with this State, and otherwise intentionally availed themselves of markets in this state through the promotion, marketing and sales of their products and services in this state to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     In particular, Defendants marketed, advertised and sold automotive vehicles in this state having the same SUA defect as Toyota Vehicles sold worldwide.  The primary sale, marketing and advertising arm of Toyota – TMS – is located in this District.   On information and belief, the decision to withhold information from worldwide consumers, and to engage in deceptive marketing, was made, in part, in California.

15.     Toyota Motor Corporation ("TMC") does substantial business in California, and the principal offices of Toyota Motor Sales, U.S.A., Inc. ("TMS") and Toyota Motor North America, Inc. ("TMA") are in California.  Further, much of the conduct that forms the basis of this complaint emanated from Toyota's headquarters in Torrance, California.   Upon information and belief, these Defendants are and were responsible for the marketing of Toyota Vehicles having the same SUA defect as those Toyota Vehicles sold worldwide to FELPs.   On further information and belief, the decision to withhold information from worldwide consumers, and to engage in deceptive marketing was made, at least in part, in California.

16.     Additionally, this Court has subject matter jurisdiction pursuant to 18 U.S.C. §1961, *et seq*. In particular, Defendants' racketeering activity includes many acts within the last four (4) years chargeable under 18 U.S.C. §2314, which provides in pertinent part that:

- 7 -

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; ... shall be fined under this title or imprisoned not more than ten years or both.

17.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, because Defendants, as corporations, are "deemed to reside in any judicial district in which [they are] subject to personal jurisdiction at the time the action is commenced," and because Defendants conduct substantial business in this judicial district.

## III.   PARTIES

### A.   Plaintiffs

#### 1.   North American Plaintiffs

18.     Plaintiff Eliza Esquivel Lozano is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico.   Ms. Lozano owns a 2009 Toyota Corolla XLE (VIN 2T1BU42E59C071341) which she purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. The VIN of Ms. Lozano's Corolla begins with the digit "2", indicating that her vehicle was manufactured in Canada. Ms. Lozano experienced three SUA incidents which occurred in May, September and October 2010. All three incidents occurred on the highway while Ms. Lozano was driving and the vehicle suddenly accelerated but then gradually slowed down after a few minutes.   Ms. Lozano saw

advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers, and on the Internet during the several years before she purchased her Toyota Corolla on or about July 25, 2008. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were very frequent themes across the advertisements she saw. Those advertisements about safety and reliability influenced her decision to purchase her Corolla. Had those advertisements and any other materials she saw disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla. She certainly would not have paid as much for it as she did.

19.     Plaintiff Alfredo Hernandez Barranco is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Barranco owns a 2009 Toyota Corolla CE (VIN 9BRBA42E995029298) which he purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. The VIN of Mr. Barranco's Corolla begins with the digits "9B", indicating that his vehicle was manufactured in Brazil. In January 2010, Mr. Barranco experienced a SUA incident while driving on the highway in Aguascalientes, Mexico. Mr. Barranco does not feel safe driving the Corolla because of this SUA incident, but he is unable to sell the vehicle at its fair market value because of the SUA defect.

Mr. Barranco saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and display ads while driving past the dealership for several years before he purchased his Toyota Corolla on November 14, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he does recall that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and/or reliability influenced his decision to purchase his Corolla.  Had those advertisements and any other materials he saw disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla.  Mr. Barranco certainly would not have paid as much for it as he did.

20.     Plaintiff Ernesto Reyes Diaz is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Diaz purchased a 2009 Toyota Corolla XRS AI (VIN 2T1BE40E79C001579) as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Mr. Diaz's Corolla was manufactured in Canada, because its VIN begins with the digit "2." In mid December 2009, Mr. Diaz experienced a SUA incident while driving on the streets of Aguascalientes City, Mexico. Mr. Diaz does not feel safe driving the Corolla because of this SUA incident, but he is unable to sell the vehicle at its fair market value because of the SUA defect. Mr. Diaz saw advertisements for and

representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for several years before he purchased his Toyota Corolla on March 31, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he recalls that safety and reliability were consistent themes across the advertisements he saw.   Those representations about safety and reliability influenced his decision to purchase his Corolla.  Had those advertisements and any other materials he saw disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Toyota Corolla. Certainly he would not have paid as much for it as he did.

21.     Plaintiff Emilio Mogollon Quintanar is a resident of Aguascalientes, Mexico and is a citizen of the Republic of Mexico. Mr. Quintanar owns a 2009 Toyota Corolla XLE AT (VIN 2T1B042EX9C032437) which he purchased as a new vehicle from an authorized Toyota dealership located in Aguascalientes, Mexico. Mr. Quintanar's Corolla was manufactured in Canada because its VIN begins with the digit "2." Mr. Quintanar experienced four SUA incidents. The first incident occurred in January 2009 when Mr. Quintanar was driving on the highway and suddenly the accelerator pedal got stuck for a few seconds. He did not report this incident. The second incident occurred in early February 2010, when Mr. Quintanar was driving on the highway and the accelerator pedal was stuck. He

applied the brake to slow down the vehicle and pulled to the side of the road. He took the car to the Toyota dealership where service personnel told him that the problem was with the floor mat and that they were able to fix it. The same thing happened a week later and towards the end of February 2010.  After the fourth incident, Mr. Quintanar notified his dealer again about the two incidents. Personnel from the dealership told him to wait for the formal recall notice from Toyota. When he received a recall notice for the accelerator pedal, he immediately went to the dealer to have his vehicle fixed. Mr. Quintanar is afraid to drive his Corolla because of these SUA incidents.   Mr. Quintanar saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for several years before he purchased his Corolla. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla XLE on April 16, 2008, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Those representations about safety and reliability influenced his decision to purchase his Toyota Corolla XLE.   Had those advertisements and any other materials he saw disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla. Certainly he would not have paid as much for it as he did.

22.     Plaintiff Ivy Jacqueline Morante Lama is a resident of Calgary, Canada and is a citizen of Canada.  Ms. Lama owns a 2007 Toyota Corolla CE (VIN 2T1BR32E27C81771) which she purchased as a new vehicle from an authorized Toyota dealership located in Calgary, Canada. The VIN of Ms. Lozano's Corolla begins with the digit "2", indicating that her vehicle was manufactured in Canada. Ms. Lama saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers, and on the Internet during the several years before she purchased her Toyota Corolla in June 2007.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were very frequent themes across the advertisements she saw.  Those advertisements about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements and any other materials she saw disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it as she did.

### 2.     Plaintiffs From Around the World

23.     Plaintiff Yiqin Zhang is a resident of Fuyang City, Anhui Province, China and is a citizen of the People's Republic of China. Ms. Zhang owns a 2010 Toyota Corolla (VIN: LFMARE2C0A0251968) which she purchased as a new

vehicle from an authorized Toyota dealership located in Fuyang City, Anhui Province, China.   The VIN of Ms. Zhang's Corolla begins with the digit "L", indicating that her vehicle was manufactured in China. Ms. Zhang received a mobile text message from her Toyota dealer informing her that her vehicle was part of the recall for accelerator pedal issues. On October 7, 2010, Ms. Zhang experienced a SUA incident while she was driving with her father-in-law and sister-in-law on Huoqui Expressway in Lian Yungang, China. Ms. Zhang does not feel safe in driving her Corolla because of this SUA incident. Ms. Zhang saw advertisements for and representations about Toyota vehicles on television for several years before she purchased her Corolla in 2010.   Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and reliability influenced her decision to purchase her Corolla.   Had those advertisements and any other materials she saw disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla. She certainly would not have paid as much for it as she did.

24.       Plaintiff Gabriel Zieme-Diedrich is a resident of Nennhausen, Germany and is a citizen of Germany.  Mrs. Zieme-Diedrich drives a 2009 Toyota Auris (VIN: SB1KE56EX0E012559) which she leases as a new vehicle from an

authorized Toyota dealership located in Rathenow, Germany. The VIN of Mrs. Zieme-Diedrich's Auris begins with the digits "SB", indicating that her vehicle was manufactured in the United Kingdom. In March 2010, Mrs. Zieme-Diedrich received a notice from her Toyota dealer informing her that her vehicle was part of the recall for accelerator pedal issues. Mrs. Zieme-Diedrich paid more for her lease than she would have otherwise agreed to pay had she known of the defect. Mrs. Zieme-Diedrich paid for a good vehicle, her Toyota, that has failed of its essential purpose. She saw advertisements for and representations about Toyota Vehicles on television, in newspapers, in magazines, in brochures at the dealership, window stickers and on the Internet, for several years before she leased her Toyota Auris on November 6, 2009.  Although Mrs. Zieme-Diedrich does not recall the specifics of the many Toyota advertisements she saw before she leased her Auris, she does recall that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and reliability influenced her decision to lease her Auris.  Had those advertisements and any other materials she saw disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have leased her Auris, and/or she would not have paid as much for it as she did.

25.     Plaintiff Hatice Hulya Yigit is a resident of Istanbul, Turkey and is a citizen of Turkey. Ms. Yigit owns a 2008 Toyota Auris 1.6 MM (VIN NMTKV56EX0R020830) which she purchased as a new vehicle from an

authorized Toyota dealership located in Istanbul, Turkey. The VIN of Ms. Yigit's Auris begins with the digits "NM", indicating that her vehicle was manufactured in Turkey.  Her Auris was included in the "accelerator pedal" recall. She purchased her Auris based on its reputation for safety. Ms. Yigit saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet during the many years before she purchased her Auris on December 6, 2007.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Auris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and reliability influenced her decision to purchase her Auris.  Had those advertisements and any other materials disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Auris.  She certainly would not have paid as much for it as she did.

26.     Plaintiff Mario Zapata Garcia Rosell is a resident of Lima, Peru and is a citizen of Peru.   Mr. Rosell owns a 2008 Toyota Corolla (VIN: JTDBZ41E99J031822) which he purchased as a new vehicle from an authorized Toyota dealership located in Lima, Peru.  The VIN of Mr. Rosell's Corolla begins with the digit "J", indicating that his vehicle was manufactured in Japan. He purchased his Toyota based on its reputation for safety.   Mr. Rosell saw

advertisements for and representations about Toyota Vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for years before he purchased his Corolla in 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Toyota Corolla, he recalls that safety and reliability were consistent themes across the advertisements he saw.  Had those advertisements and any other materials disclosed that Toyota Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla.  He certainly would not have paid as much for it as he did.

27.     Plaintiff Catherine De Bruin is a resident of Kempton Park, South Africa and is a citizen of South Africa. Ms. De Bruin owns a 2006 Toyota Corolla (VIN: AHT53ZEC003074866) which she purchased from an authorized Toyota dealership located in Four Ways, South Africa on June 2008.  The VIN of Ms. De Bruin's Corolla begins with the digits "AH", indicating that her vehicle was manufactured in South Africa. A few months after purchasing her Corolla, Ms. De Bruin experienced her first SUA incident while driving on the local road of her city. A year later, she experienced her second SUA incident while she was driving with her daughter. Ms. De Bruin took her Corolla to her Toyota dealer to whom she reported the incident, and then the dealership performed service repairs on the Corolla. Ms. De Bruin does not feel safe in driving her Corolla. Ms. De Bruin saw

- 17 -

advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet before she purchased her Corolla.  Although she does not recall the specifics of the many advertisements she saw before she purchased her Corolla, she does recall that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and reliability influenced her decision to purchase her Corolla.  Had those advertisements and any other materials disclosed that Corolla vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Corolla.  She certainly would not have paid as much for it as she did.

28.     Plaintiff Mostfa Fahmy is a resident of Giza, Egypt and is a citizen of Egypt. Mr. Fahmy owns a 2009 Toyota Corolla which he purchased as a new vehicle from an authorized Toyota dealership located in Egypt in March 2009. After the recall announcement by Toyota, he believes that the value of his vehicle was greatly diminished because of the recall.  Mr. Fahmy saw advertisements for and representations about Toyota Vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for years before he purchased his Corolla in 2009.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Toyota Corolla, he recalls that safety and reliability were consistent themes across

- 18 -

the advertisements he saw.  Based on these misrepresentations as to the safety of Toyota vehicles, Mr. Fahmy purchased his Toyota Corolla.  Had these advertisements and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla. He certainly would not have paid as much for it as he did.

29.     Plaintiff Sisiliana Ridwan is a resident of Medan, Indonesia and is a citizen of Indonesia. Ms. Ridwan owns a 2009 Toyota Camry (VIN MR053BK4099006869) which she purchased as a new vehicle from an authorized Toyota dealership located in Jakarta, Indonesia. The VIN of Ms. Ridwan's Camry begins with the digits "MR", indicating that her vehicle was manufactured in Thailand. Ms. Ridwan purchased her Toyota based in part on its reputation for safety as reported by Toyota.   Ms. Ridwan saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for several years before she purchased her Camry on December 15, 2009.  Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw.   Those representations about safety and/or reliability influenced her decision to purchase her Camry.   Had those advertisements and any other materials disclosed that Toyota vehicles could

- 19 -

accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it as she did.

30.    Plaintiff Mariam Ibrahim is a resident of Kuala Lumpur, Malaysia and is a citizen of Malaysia. Ms. Ibrahim owns a 2009 Toyota Camry (VIN MR053BK4007036405) which she purchased as a new vehicle from an authorized Toyota dealership located in Malaysia. The VIN of Ms. Ibrahim's Camry begins with the digits "MR", indicating that her vehicle was manufactured in Thailand. Ms. Ibrahim purchased her Toyota based in part on its reputation for safety as reported by Toyota. Ms. Ibrahim saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet for several years before she purchased her Camry. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Camry, she recalls that safety and reliability were consistent themes across the advertisements she saw.  Those representations about safety and/or reliability influenced her decision to purchase her Camry.  Had those advertisements and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Camry.  She certainly would not have paid as much for it as she did.

31.     Plaintiff Francis Joseph Coronel is a resident of Makati City, Philippines and is a citizen of the Philippines. Mr. Coronel owns a 2009 Toyota Altis (VIN MR053ZEE106118954) which he purchased as a new vehicle from an authorized Toyota dealership located in Makati, Philippines. The VIN of Mr. Coronel's Altis begins with the digits "MR", indicating that his vehicle was manufactured in Thailand. Mr. Coronel purchased his Toyota based in part on its reputation for safety as reported by Toyota.  Mr. Coronel saw advertisements for and representations about Toyota Vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for several years before he purchased his Altis on November 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Altis, he recalls that safety and reliability were consistent themes across the advertisements he saw.   Those representations about safety and/or reliability influenced his decision to purchase his Altis.  Had those advertisements and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Altis.  He certainly would not have paid as much for it as he did.

32.     Plaintiff Gustavo Lopez is a resident of Zona 14, Guatemala and is a citizen of Guatemala.  Mr. Lopez owns a 2009 Toyota Yaris (VIN JTDKW923895103119) which he purchased as a new vehicle from an authorized

Toyota dealership located in Zona 9, Guatemala. The VIN of Mr. Lopez's Yaris begins with the digit "J", indicating that his vehicle was manufactured in Japan. Mr. Lopez purchased his Toyota based in part on its reputation for safety as reported by Toyota. Mr. Lopez saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for several years before he purchased his Yaris on July 2008.  Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Yaris, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations about safety and/or reliability influenced his decision to purchase his Yaris.  Had those advertisements and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Yaris.  He certainly would not have paid as much for it as he did.

33.    Plaintiff Igoshin Vladimir Vladimirovich is a resident of Moscow, Russia and is a citizen of the Russian Federation. Mr. Vladimirovich owns a 2008 Toyota Corolla (VIN JTNBV58E50JO50356) which he purchased as a new vehicle from an authorized Toyota dealership located in Moscow, Russia. The VIN of Mr. Vladimirovich's Corolla begins with the digit "J", indicating that his vehicle was manufactured in Japan. He purchased his Toyota based in part on its reputation for safety as reported by Toyota. Sometime in 2009, Mr. Vladimirovich experienced a

SUA incident while driving on the streets of Moscow, Russia. He does not feel safe driving his Corolla because of this SUA incident. Mr. Vladimirovich saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for years before he purchased his Corolla on November 7, 2008. Although he does not recall the specifics of the many Toyota advertisements he saw before he purchased his Corolla, he recalls that safety and reliability were consistent themes across the advertisements he saw. Those representations as to the safety and/or reliability of Toyota vehicles influenced his decision to purchase his Toyota Corolla.  Had these advertisements, window stickers, warranty information and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, he would not have purchased his Corolla. He certainly would not have paid as much for it as he did.

34.      Plaintiff Susan Ong is a resident of Caroline Springs, Australia and is a citizen of the Philippines. Mrs. Ong owns a 2010 Toyota Yaris (VIN JTDKW923005148817) which she purchased as a new vehicle from an authorized Toyota dealership located in Victoria, Australia. The VIN of Ms. Ong's Yaris begins with the digit "J", indicating that her vehicle was manufactured in Japan. She purchased her Toyota based in part on its reputation for safety as reported by Toyota. Sometime in early 2010, Mrs. Ong's husband experienced a SUA incident

while driving on the streets of Caroline Springs, Australia. Based on this SUA incident, Mrs. Ong and her husband do not feel safe driving her Yaris. Mrs. Ong saw advertisements for and representations about Toyota vehicles on television, in magazines, on billboards, in brochures at the dealership, window stickers and on the Internet for years before she purchased her Yaris on May 6, 2010. Although she does not recall the specifics of the many Toyota advertisements she saw before she purchased her Yaris, she recalls that safety and reliability were consistent themes across the advertisements she saw. Those representations about safety and/or reliability influenced her decision to purchase her Toyota Yaris. Had these advertisements, window stickers, warranty information and any other materials disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked a fail-safe mechanism to overcome this, she would not have purchased her Yaris. She certainly would not have paid as much for it as she did.

35.       Each of the Plaintiffs have purchased or leased a Toyota vehicle with a design defect for which TMC is responsible and in a transaction where Toyota did not disclose material facts related to a vehicle's essential purpose – safe transportation – either individually, or by and through TMA, TEMA and/or TMS. As a result, each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect. As

described more fully below, and as will be proven at trial, the value of each of the Toyota Vehicles of FELPs and the Class has diminished as a result of the design defect and unfair and deceptive acts and practices of Defendants as alleged herein.

B.    **Defendants**

36.    Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation.  TMC is the parent corporation of Toyota Motor North America, Inc. ("TMA"), Toyota Motor Engineering and Manufacturing North America, Inc. ("TEMA"), and Toyota Motor Sales, U.S.A., Inc. ("TMS").  TMC, through its various entities (including TMA, TEMA and TMS), designs, markets, and sells Toyota automobiles in North America and throughout the world.

37.    At all times material hereto, Defendant Toyota Motor North America, Inc. ("TMA") was and is a California corporation and a resident and corporate citizen of California.

38.    At all times material hereto, Defendant Toyota Motor Engineering and Manufacturing North America, Inc. ("TEMA") was and is a Kentucky corporation and a resident and corporate citizen of Kentucky.

39.    Defendants, and each of them, are sued as participants in a scheme and conspiracy, and as aiders and abettors herein. At all times material hereto, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts and omissions alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each

of the other Defendants. There is a unity of interest and ownership between the Defendants listed above, such that the acts of one are for the benefit and can be imputed as the acts of the others.

40.     Defendants are collectively referred to in this Complaint as "Toyota" or the "Toyota Defendants" or "Defendants" unless identified as TMC, TMA, TEMA and/or TMS, individually or in combination.

41.     As used in this Complaint, "Toyota Vehicles", "Defective Vehicles" or "Subject Vehicles" refers to the following models (and model years) that are alleged to have ETCS:

**Toyota Vehicles**

2001 – 2010     4Runner

2005 – 2010     Avalon

2002 – 2010     Camry

2007 – 2010     Camry HV

2003 – 2005     Celica (2ZZ-GE Engine)

2005 – 2010     Corolla (1ZZ-FE, 2AZ-FE, 2ZR-FE)

2007 – 2010     FJ Cruiser

2004 – 2010     Highlander

2006 – 2010     Highlander HV

1998 – 2010     Land Cruiser

2005 – 2010     Matrix (2AZ-FE, 2ZR-FE, 1ZZ-FE (Not 4WD))

| | |
|---|---|
| 2001 – 2010 | Prius |
| 2004 – 2010 | Rav4 |
| 2001 – 2010 | Sequoia |
| 2004 – 2010 | Sienna |
| 2002 – 2008 | Solara |
| 2003 – 2004 | Tacoma (5VZ-FE except Sport Model) |
| 2005 – 2010 | Tacoma |
| 2000 – 2010 | Tundra (not including the 2000-2002 with 5VZ-FE) |
| 2009 – 2010 | Venza |
| 2004 – 2010 | Yaris |
| 2005 – 2009 | AYGO |
| 2008 – 2009 | iQ |
| 2008 – 2009 | Avensus |
| 2006 – 2010 | Auris |
| 2009 – 2010 | Verso |
| 2007 – 2010 | Radford |

42.     Plaintiffs reserve the right to amend the foregoing definition of Toyota Vehicles to include any additional Toyotas (or other Toyota brands).

IV.   <strong>FACTUAL BACKGROUND</strong>

**A. Toyota's Corporate Hierarchy Respecting Its Business Operations, Design and Marketing of Toyota Vehicles.**

43.     TMC is the parent corporation of multiple Toyota wholly-owned subsidiary companies.

44.     TMC, as the ultimate parent corporation of multiple Toyota wholly-owned subsidiary companies, designs and markets Toyota automobiles throughout North America and the World.  As discussed herein, while the names of certain Toyota Vehicles differs around the world, and certain features may also differ, the features at issue in this lawsuit – most notably the defective ETCS and the unfair and deceptive acts and practices respecting, *inter alia*, representations of safety and reliability – are the same.

45.     Subsidiary companies of TMC include TMA, TEMA, and TMS.

46.     The following chart illustrates the hierarchy described above:



47.     At all times material to this action, TMA has been a wholly-owned subsidiary of TMC.

48.     TMA is the holding company for all of TMC's North American operations, covering sales, engineering, and manufacturing subsidiaries, and

overseeing functions related to government and regulatory affairs, marketing and advertising, and corporate communications.

49.     TMA, in turn, has been a holding company responsible for Defendants TEMA and TMS.

50.     Through TMA, which is the holding company of TEMA, TMC is responsible for the defective design of the vehicle parts used to manufacture the vehicles purchased by the Foreign Plaintiffs in the various countries in which they reside.

51.     TEMA was established in 2006.  With direct guidance from TMC via TMA, TEMA is responsible for Toyota's engineering, design, research and development, and manufacturing activities in Canada and Mexico, in addition to the United States.

52.     As part of that responsibility, TEMA operates 13 parts and vehicle manufacturing plants across North America, with a 14th plant currently under construction in Mississippi.

53.     Specifically, TEMA operates Toyota Motor Manufacturing Canada, Inc., which is located in Canada (hereinafter "TMMC"), and Toyota Motor Manufacturing de Baja California, S. de R.L. de C.V., which is located in Mexico (hereinafter "TMMBC"), both countries in which certain Foreign Plaintiffs reside.

54.     According to Toyota's website, "Toyota vehicles and components are built using U.S. and globally secured parts." The ETCS at issue is both designed

and constructed in Japan by TMC. Thus, the ETCS is a "globally sourced part" everywhere in the world outside Japan, including North America and the World.

55.      TMS is incorporated and headquartered in California.

56.      TMS is Toyota's U.S. sales and marketing arm.

57.      TMS is principally responsible for implementing TMC's core marketing and sale message throughout North America.  That same message is disseminated throughout the World via international media, including newspapers, magazines, television and the internet.

58.      Upon information and belief, Foreign Plaintiffs allege that TMS develops Toyota's television campaigns and other marketing materials, and supervises Toyota marketing to ensure that a uniform image and message is presented.

**B.     Toyota's Defective Design of Toyota Vehicles**

**1.      "The Toyota Way"**

59.      In 2001, TMC defined its values and business methods vis-a-vis "The Toyota Way" in order to operate as a truly global company, and to ensure a common corporate culture.

60.      "The Toyota Way," that is, universal corporate culture to ensure the same procedures are employed throughout the world, including the countries in which the Foreign Plaintiffs reside, is the "backbone of all Toyota operations".

61.     To promote sharing and integration of "The Toyota Way," Toyota established the "Toyota Institute" in January 2002 as an internal human resources development organization.

62.     Since 2003, TMC's overseas affiliates in the United States, Europe, Asia, Africa, and Australia have established their own human resources training organizations modeled after the Toyota Institute to ensure a global, common corporate culture throughout Toyota.

63.     TEMA is principally responsible for implementing TMC's design decisions encapsulated in, "the Toyota Way", including, *inter alia*, its defective design decisions concerning the ETCS in the Toyota Vehicles manufactured in North America (and then exported to other countries).

64.     TMC strives for consistent design of Toyota Vehicles to ensure that Toyota Vehicles are manufactured the same way in each country per the design specifications and quality standards of TMC.

65.     The ETCS and brake override systems were designed and developed in Japan by TMC.

66.     TMC in Japan is responsible for the design, development, engineering, and testing of the ETCS.

67.     The designs from TMC in Japan are directly transferred to Toyota's manufacturing subsidiaries and affiliates, like TEMA in North America. There is no entity like TEMA in the other countries of The World, so TMC designs are

transferred directly by TMC to its wholly-owned manufacturing subsidiaries in foreign countries. TEMA, its subsidiaries in North America, and the subsidiaries of TMC in other countries all adhere to TMC's design specifications via "The Toyota Way".

68.     TMC believed so much in consistent design and manufacture of its Toyota Vehicles in each and every country that it chose to create the Global Production Center ("GPC") in Japan to pull "The Toyota Way" through one center that would "spread the word" throughout the world, including all of the countries in which the Foreign Plaintiffs reside.

69.     The GPC was established to ensure consistent globalization and localization of TMC, including consistent design, development and production of its products, thereby also resulting in consistent defects.

70.     The GPC, centered in Japan but carried through to TEMA in North America and other TMC subsidiaries in the World, is responsible for teaching plant personnel globally how to prepare for the production of redesigned and different vehicle models.

71.     Traditionally, when production is switched to the design of a new model of Toyota vehicle, a number of employees from Japan would be dispatched to overseas bases, including those facilities located in Canada and Mexico, as well as the United States.

72.     Members from all of TMC's overseas affiliates periodically gather at the GPC to refine the design drawings for Toyota Vehicles and to confirm feasibility of implementation.

73.     To ensure that the design and manufacture of TMC's vehicles are consistent, and to provide quality assurance across the globe, new GPC offices were built in the United States, the United Kingdom, and Thailand in 2006.

74.     Whoever manufactured any allegedly defective Toyota Vehicle did so pursuant to a defective design created, supplied and controlled by TMC pursuant to "The Toyota Way."

75.     "The Toyota Way" is manifested in Toyota's consistent moniker "Made by Toyota." See Ex. A hereto.

76.     TMC does not put the label "Made in the USA" or "Made in Japan" on its products; instead it opts for one label for all: "Made by Toyota." *Id.*

77.     As TMC's current website touts, "[n]o matter where Toyota vehicles are made, they must have the same high level of quality" as any vehicle made in Japan.

78.     While Toyota sought to globalize the production of its vehicles over the years, TMC has always maintained control over design and quality assurance.

79.     Globalization of "The Toyota Way" was further achieved by TMC "spread(ing) the 'Toyota Way'…by educating people."   *Id.*   TMC accomplished this by creating the Global Production Center (GPC) in 2003. The GPC is located

in Toyota City, Japan. *Id.* The GPC establishes "best practices" to be implemented in the production of all Toyota Vehicles worldwide. The GPC promulgates these "best practices" for all manufacturing entities. *See* "Role of the Global Production Center (GPC) fostering globally capable personnel" at Ex. B hereto.

80.     As the TMC website explains:

> [One] purpose of the GPC is teaching plant personnel how to prepare for the production of redesigned and different vehicle models. Traditionally, when production switched to a new model, a number of employees from Japan would be dispatched to overseas bases. *Now, members from all of the overseas affiliates gather at the GPC to refine the design drawings* and confirm feasibility of implementation.

*Id.* (Emphasis added)

81.     The Toyota Vehicle designs were created by TMC and provided by TMC to all fabricators, regardless of whether the manufacturers were owned by Toyota or not.

82.     Toyota's website lists Toyota's worldwide manufacturing operations, consisting of "51 overseas manufacturing companies in 26 countries and regions." *See* Ex. C  hereto. U.S. plaintiffs have sued none of these entities, even though at least 5 Toyota vehicle models sold in the United States are actually manufactured outside the United States.

83.     For instance, since 1988, Toyota Corolla, Matrix, RX350 and RAV4 models have been manufactured by Canada-based TMMC. Since September 2004, Tacoma model trucks have been manufactured by Mexico-based TMMBC.

84.     Since 2007, Toyota has contracted with Subaru for the manufacture of Camry vehicles at a Subaru plant in Indiana owned by Subaru of Indiana Automotive, Inc. ("SIA"). *Id.*

85.     All relevant manufacturers simply followed "The Toyota Way," and properly implemented the design specifications and training provided by TMC, either directly or by and through TMC's wholly-owned subsidiaries, such as TMA and/or TEMA.

86.     The unlawful conduct concerning the defective design of Subject Toyota Vehicles was solely that of TMC.

87.     TMC controls the design of its vehicles, and upon information and belief, Foreign Plaintiffs allege that TMC controls decisions of safety.

88.     The subsidiary manufacturers and Subaru do not change TMC's design of the vehicles or "determine the content" of the manufacture of same.

89.     Whoever manufactured the Toyota Vehicles of FELPs did so pursuant to a design created and provided by TMC in accordance with "The Toyota Way".

**2.      Toyota's Electronic Throttle Control System ("ETCS") and its Limited Fail-Safe Mechanism.**

90.     Toyota calls its electronic throttle control system the ETCS-intelligent, or ETCS-i.

91.     ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle.

92.     Toyota began installing ETCS-i in models of the 1998 Lexus.

93.     The 1998 Lexus ETCS included a mechanical link that shut off the throttle.

94.     In 2001, Toyota began producing the substantially redesigned 2002 Camry.

95.     The 2002 Camry was the first Toyota vehicle to be equipped with linkless ETCS-i, which was one of several new or revised vehicle systems (including transmission and braking systems) introduced for 2002 Toyota Camrys, Solaras and the Lexus ES300 line.

96.     Linkless ETCS-i did not have a mechanical link to shut the throttle.

97.     Toyota's earlier ETCS-i equipped vehicles retained a mechanical system that would close the throttle if the electronic system failed.

98.     However, Toyota had phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002 Camry.

99.     Toyota knew other manufacturers continued to use a manual fail-safe mechanism.

100.     Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied.[4]

101.     In order to address potential malfunctions of the ETCS-i – that is, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies.

102.     The fail-safe strategies are:

    a.     If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

    b.     The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

    c.     The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

    d.     If one or both throttle position sensors fail, or the throttle itself is not responding properly to the accelerator pedal but the throttle itself is not physically stuck, the throttle should close but will provide minimal acceleration.

103.     As explained herein, Toyota knew no later than 2002 that these fail-safes were insufficient to prevent SUA events in its vehicles and that additional fail-safes were necessary.

_____

[4] TOY-MDLID00041130T-0001.

104.     Toyota did not, however, move to address these issues by installing additional fail-safes.

105.     Toyota had several options, including installing a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing SUA.

106.     Toyota also could have employed a hardware-redundant, fault tolerant solution, as was the approach of BMW.

107.     Toyota also could have provided an override of the engine control module, such as a key switch to physically remove the power to the Engine Control Module ("ECM").

108.     Toyota also could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system.

109.     Toyota did not utilize any of the aforementioned fail-safe options.

110.     In 2007, recognizing the risks of unintended acceleration, "TMS suggested that there should be 'a fail safe option similar to that used by other companies to prevent unintended acceleration.'"[5]

111.     Toyota did not act on the suggestion made by TMS until 2010, at least three (3) years later.

---

[5] TOY-MDLID00041130T-0001.

### 3.    Summary of the Defects in Toyota Vehicles

112.    Vehicles with ETCS manufactured, marketed, sold and/or distributed by Toyota and its affiliated companies suffer from the same overarching defect: they are vulnerable to incidents of sudden unintended acceleration ("SUA"), including surges, lurching, revving engines, and other instances of unintended acceleration captured as part of the more than 39,000 complaints to NHTSA and the 100,000 complaints received by Toyota.

113.    Regardless of the many root causes which create this overarching defect, an effective brake-override system would serve as a fail-safe design feature to prevent and/or minimize the risk of injury, harm or damage to Toyota Vehicle owners or their occupants from SUA events.

114.    In addition to the lack of an effective brake-override system, there are other specific defects in the Toyota Vehicles that cause and/or contribute to the overarching defect of SUA, including, but not limited to, defective pedals and poorly designed floor mats, and there are design defects in the Toyota Vehicles that caused, contributed to, and/or failed to prevent SUA events, including the following:

> (1) an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including SUA;

> (2) the ETCS and its components are highly susceptible to malfunction caused by various electronic failures, including, but not limited to, short circuits, software glitches, and

electromagnetic interference from sources outside the vehicle; and

(3) there was a failure to warn consumers as to how to properly push and hold buttons of shift into neutral in order to stop SUA events once the aforementioned defects had set the SUA events in motion.

115.    These defects are further set forth below:

### a.  Electronics issues

116.    Upon information and belief, certain defects in the Subject Toyota Vehicles' electronic system which can and sometimes do cause SUA include, but are not limited to:

i.    The unwarranted and improper safety-critical reliance on electronic engine control and braking systems, including, but not limited to, the ETCS, which lacks a hardware redundant fault tolerant design;

ii.    Unwarranted and improper safety-critical reliance on analog sensor inputs from two similar analog sensors in A) the throttle body assembly, and B) the accelerator pedal assembly, which are subject to failure in various modes;

iii.    Unwarranted and improper safety-critical reliance on software running in a single CPU within the vehicle electronic system, which is subject to failure in various modes;

iv.    Unwarranted and improper safety-critical reliance on individual hardware components used in the vehicle electronic system;

v.    The susceptibility of the ETCS-i (particularly the wiring harnesses connected to the accelerator pedal position sensors and the throttle position sensors) to currents generated by radio frequency (RF) interference, combined with an improper system for detecting and filtering RF currents;

vi.    The susceptibility of the ETCS-i (particularly the accelerator pedal position sensors) to drops in supply voltage which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

vii.    The susceptibility of the ETCS-i (particularly the wiring harnesses) to various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

viii.    The failure to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle;

ix.    The safety critical reliance on a purported fault detection system that does not always generate and/or recognize faults in the vehicle electronic system as they occur;

x.    The inability of the software running within the ETCS-i to properly self-calibrate when certain changes are detected;

xi.    The failure to design and include an appropriate EDR system which properly records the position of the accelerator, brake, and throttle assembly in order to allow proper examination of SUA events; and

xii.    The failure to include properly redundant systems with the ability to cross-check bus reported accelerator and throttle positions with "actual sensor data."

**b.  Mechanical issues**

117.    Upon information and belief, certain mechanical defects in the Subject Toyota Vehicles which can and sometimes do cause SUA include, but are not limited to:

i.    The propensity for mechanical involvement and interference between the accelerator pedal and the Subject Vehicles' floor mats which can cause the pedal to become stuck and remain depressed, keeping the throttle open despite the operator's application of the brake pedal, resulting in unintended acceleration;

ii.    Mechanical resistance that can cause the accelerator pedal to become stuck in a fully or partially depressed position and to fail to return to its idle position (referred by Toyota as a "sticky pedal"), resulting in unintended acceleration;

iii.    Floor mat interference in all Toyota vehicles, recognized as early as 2000 when Toyota recalled 1999-2000 model years Lexus LS 200 for SUA-floor mat issues in the UK and again in 2007 when internally Toyota recognized floor mats could be an issue in all vehicles[6];

iv.    Mechanical resistance which can cause the throttle body or throttle plate to become stuck in a fully or partially open position resulting in unintended acceleration;

v.    The gap between pedals is 20mm smaller on certain models including but not limited to the RAV4 and Venza models, which contributed to UA; and

vi.    Corrosion or carbon build up that leads to a stuck throttle body resulting in SUA. [7]

**c.   The lack of an appropriate fail-safe**

118.    Toyota was aware the SUA events were caused by any of the above electronic or mechanical issues in a given defective Toyota Vehicle, but Toyota could not predict which of the faults listed above caused a SUA event in any given vehicle.

---

[6] TOY-MDLID00002839.

[7] 41201T000.

119.      Toyota could not identify the root cause of most SUA events.

120.      Toyota's failure to identify the root cause of most SUA events made it critically important for Toyota to have an adequate fail-safe.

121.      The defective Toyota Vehicles did not have an adequate fail-safe due to:

i.      The unwarranted and improper reliance on safety-critical but untested or improperly tested "failsafe strategies" ostensibly designed to detect faults in the vehicle electronic systems and prevent those faults from causing SUA.  These "failsafe strategies" can and sometimes do fail to recognize fault conditions which, if left unchecked, result in unintended acceleration and record no direct evidence of the fault that initially triggered the unintended acceleration event;

ii.      The lack of a proper "brake-override system" or other "fail-safe" logic that would close the throttle while allowing the brakes to be applied in the event the vehicles' electronic systems received commands to open the throttle and apply the brakes simultaneously;

iii.      The lack of a hardware-redundant fault tolerant electronic engine control and braking system such as those employed by other vehicle manufacturers;

iv.      The lack of enough memory in the computer systems of certain models to accommodate a brake-override system;

v.      The lack of a proper ignition shut off in the event of a SUA event.  NHTSA identified this as a problem as early as August 2007 when it notified Toyota that it was considering requiring a public service announcement to inform the public "how to shut off the vehicle with the push button start," meaning consumers did not understand that it takes three seconds for the shut off to occur.  Toyota was not only aware of the problem it also failed to implement a kill switch;

vi.   The lack of a proper fault detection system that would recognize a SUA event, or surge, or rpm run up beyond the maximum design tolerance and respond by shutting down the throttle; and

vii.   The lack of an appropriate layout in the transmission system.   In many of the vehicles the shift system is confusing and results in drivers experiencing an SUA event mistakenly placing the transmission in "D" when they thought they were placing the transmission in "N."

### d.  Failure to appropriately test and validate the vehicle systems

122.   As alleged above, Toyota has been aware since 2002 that its vehicles with ETCS have the potential for SUA or "surging" at a rate that exceeds that in manually controlled vehicles.

123.   Toyota has been unable to find the root cause of the problem.

124.   In a 2002 Toyota Field Technical Report, Toyota acknowledged that "[t]he root cause for 'surging' remains unknown" and thus "[n]o known remedy exists for the 'surging' condition at this time."[8]

125.   As of 2010, Toyota still had not tested its ETCS, as it had to hire Exponent to answer Congress' inquiry over what proof Toyota had to show its ETCS did not cause SUA.  Congressman Waxman observed:

The results of our investigation raise serious questions. Toyota has repeatedly told the public that it has conducted extensive testing of its vehicles for electronic defects.   We can find no basis for these assertions.

---

[8] TOY-MDLID00062906.

> Toyota's assertions may be good public relations, but they don't appear to be true.

126.    The faults and defects in Toyota's safety critical vehicle electronic systems described above show that Toyota has not properly tested or validated these systems individually or as a whole.

127.    Moreover, Toyota has failed to verify that all electronic vehicle systems capable of requesting torque are robust enough, and contain sufficient redundancies to prevent SUA events.

### 4.    TMC halts assembly of Toyota Vehicles due to the unavailability of parts from Japan causing a suspension of production in North America and the World

128.    On March 11, 2011, Japan was hit by a deadly earthquake which spawned a ferocious tsunami killing hundreds of people and affecting millions of households and businesses.

129.    TMC was one such company seriously affected by the earthquake and tsunami.

130.    On March 12, 2011, as a direct result of the earthquake and tsunami, TMC announced that it decided to "suspend production at all Toyota Motor Corporation plants, as well as at all subsidiary vehicle-manufacturing plants (e.g. Central Motors, Kanto Auto)" on March 14, 2011.[9]

---

[9] *See* "Production on Monday, March 14th" available at http://www2.toyota.co.jp/en/announcement/110312_3.html.

131.    On March 16, 2011, TMC decided to continue its domestic vehicle-production stoppage until the end of March 22, [10] but it resumed the production of parts for overseas production on March 21 in order to keep production lines moving overseas.[11]

132.    On March 28, 2011, TMC resumed its vehicle production at the Tsutsumi Plant and at Toyota Motor Kyushu, and on April 6, 2011, TMC released a statement dispelling reports that it has decided to halt ongoing vehicle production in North America.[12]

133.    On April 8, 2011, TMC announced that it was "adjusting North American production due to parts availability following the March 11 Japan earthquake." *See* Article entitled, "Toyota Adjusting North American Production" at Ex. "F" hereto.

134.    A spokesman for TEMA is quoted as saying, "[t]he situation in Japan affects many automakers and many other industries.   Extraordinary efforts are underway to help suppliers recover.... *We are slowing down to conserve parts* yet maintain production as much as possible."  (Emphasis added).

---

[10] *See* "Regarding  Post-earthquake Production" available at
http://www2.toyota.co.jp/en/announcement/110316_1.html.

[11] *See* "Japan Earthquake and Production Halt" at
http://www2.toyota.co.jp/en/announcement/110322_1.html.

[12] *See* "Japan Earthquake and Production" available at
http://www2.toyota.co.jp/en/announcement/110406_2.pdf.

135.     The April 8, 2011 TMC press release has been followed by similar announcements explaining that the slowdown in the manufacture of Toyota vehicles is occurring worldwide, demonstrating the impact TMC's manufacture of core parts, like the ETCS and brake override systems at issue in this case.

136.     For example, TMC announced that it will resume vehicle production at all its Japanese vehicle-production facilities from April 18 to April 27 with production volume expected to be at approximately fifty percent of its normal production level.[13]

137.     In a subsequent announcement on April 15, 2011, TMC stated that its vehicle production from May 10 to June 3 will also proceed at approximately fifty percent of its normal production.[14]

138.     TMC stopped not only the production of its vehicles at all its North American vehicle-production plants, but also the production of engine and parts at all its North American engine and parts plants on April 15, 18, 21, 22 and 25.[15]

139.     On April 20, 2011, TMC announced further adjustments, declaring that production at its North American plants will be suspended on Mondays and Fridays from April 26 to June 3, and that production on Tuesdays through

---

[13] *See* "Japan Earthquake and Production" available at http://www2.toyota.co.jp/en/announcement/110408_1.pdf.

[14] *See* "Japan Earthquake and Production in Japan" available at http://www2.toyota.co.jp/en/news/11/04/0415_2.html.

[15] *See* "Toyota's North American Production" available at http://www2.toyota.co.jp/en/news/11/04/0409.html.

Thursdays will be at approximately fifty percent of its normal production.[16]    In

Canada, production was suspended starting May 23, while in the United States, the

suspension started on May 30.[17]

140.    On April 13, 2011, in order to manage its available parts supply, TMC

decided to suspend the production of five European plants, three of which are

vehicle-production plants and the remaining two being engine plants, for several

days in late April and early May, with these plants running at reduced volume

thereafter due to parts supply difficulties. [18]

141.    On April 20, 2011, due to parts supply difficulties, TMC decided that

its vehicle production in China will only be at thirty to fifty percent of its normal

production level from April 21 through June 3.[19]

142.    On May 11, 2011, TMC announced that its operations not only in

Japan but also on a global basis is expected to normalize in stages starting in June,

---

[16] *See* "Toyota's Production in North America" available at
http://www2.toyota.co.jp/en/news/11/04/0420_1.pdf.
    [17] *Id.*

[18] The plants affected were Toyota Motor Manufacturing (UK) Ltd. (TMUK),
Toyota Motor Manufacturing Turkey, Inc., Toyota Motor Manufacturing France
S.A.S., Toyota Motor Industries Poland Sp. Zo.o. and TMUK Engine Plant. *See*
"Japan Earthquake and Effect on Production in Europe" available at
http://www2.toyota.co.jp/en/announcement/110413_1.html.

[19] *See* "Japan Earthquake Effect on Production in China" available at
http://www2.toyota.co.jp/en/news/11/04/0420_2.pdf.

and that in June, production is expected to be at approximately seventy percent of normal production depending on the region and model of the vehicle.[20]

143.    TMC further stated that it is "carefully monitoring the situation in each region and for each vehicle model and is every day working its hardest to identify every way to restore production as much as possible."[21]

144.    TMC's halt of production of vehicles and vehicle parts in Japan as a result of the earthquake and tsunami, and its decision to sustain similar slowdowns or production stoppages in North America and the World, demonstrates the control that TMC has on the manufacture of vehicles and the manufacture of core vehicle parts, like the ETCS and brake override systems used in Toyota vehicles purchased by the Plaintiffs and the Class, and which parts are at issue in this case.

145.    Such decisions regarding production, and the related press releases and announcements regarding same, underscore the fact that TMC is the key defendant in this lawsuit, as the principal designer and supplier of core parts needed to construct Toyota Vehicles "The Toyota Way."

        5.    **Toyota Receives Complaints and is Investigated for Sudden Unintended Accelerations ("SUA") Beginning in 2002**

146.    Toyota had notice of a defect and safety risks involving SUA in ETCS-i equipped vehicles as early as 2002.

---

[20] *See* "Toyota's Future Production as of May 11, 2011" available at http://www2.toyota.co.jp/en/news/11/05/0511_5.pdf.

[21] *Id.*

147.     Toyota hid this information and their knowledge of the defect and safety risks from the public through calculated manipulation of information supplied to NHTSA during its various investigations of SUA incidents.

148.     Toyota exploited strategic relationships with current and former NHTSA employees and negotiated "deals that limited the nature and scope of NHTSA's investigations."

149.     Toyota knew that these limited investigations were unlikely to reveal a defect in the ETCS and did everything it could to keep it that way.

### a.  First reports of unintended acceleration to Toyota

150.     On or about February 2, 2002, Toyota received its first consumer complaint of a 2002 Camry engine surging when the brakes were depressed.

151.     Toyota received ten other similar complaints before August 2002.

152.     In March 2002, TMS asked TMC to investigate the root cause of the surging.

153.     On May 20, 2002, internal records reported that the "root cause of the 'surging' condition remains unknown" and "[n]o known remedy exists for the 'surging' condition at this time."[22]

154.     In response to a NHTSA investigation into similar incidents, Toyota issued at least three "Technical Service Bulletins" related to SUA.

---

[22] TOY-MDLID00062906.

155.    On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38-42 MPH with lock-up (L/U) 'ON.'"

156.    Toyota advised that the cars' ECM calibration had been revised to correct the problem.

157.    Yet, on December 23, 2002, Toyota released another bulletin noting that 2002 and 2003 Camrys, produced at Toyota Motor Manufacturing of Kentucky ("TMMK"), "may exhibit a triple shock (shudder) during the shift under 'light throttle' acceleration."

158.    The December 23, 2002 bulletin advised dealers to follow the repair procedure therein to rectify the situation.

159.    Less than nine months after the first such bulletin, Toyota released a third nearly identical advisory notice on May 16, 2003, which stated that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-42 mph with lock-up (L/U) 'ON.'"

160.    Again, Toyota claimed the ECM calibration had been revised to correct this condition.

161.    Toyota did not disclose the existence of these technical service bulletins to consumers, including any FELPs, or the fact that Toyota could not solve the problem.

162.    On August 31, 2002, Toyota recorded its first warranty claim to correct a throttle problem on a 2002 Camry.

163.    Customer warranty claims for Toyota Vehicles sold in the United States are handled by the TMS Claims Department in Torrance, California.[23]

164.    On April 17, 2003, consumer Peter Boddaert of Braintree, Massachusetts, filed with NHTSA a report of SUA involving his 1999 Lexus.

165.    In response to Mr. Boddaert's report of SUA, NHTSA opened Defect Petition DP03-003.

166.    Mr. Boddaert petitioned the agency to analyze 1997-2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal."

167.    In his petition, Mr. Boddaert noted that 271 other complaints about these vehicles had been lodged on NHTSA's website, 36 of which involved problems with "vehicle speed control."

168.    Of those 36 complaints of problems with "vehicle speed control," several involved collisions, including one in which a Lexus had "collided with five other cars in the space of ½ mile before it could be stopped."

**b. Reports of SUA in Toyotas with ETCS are 400% higher than in Toyota vehicles with mechanical throttle controls**

[23] *See* TOY-MDLID00023851.

169.     On January 15, 2004, Carol Mathews asked NHTSA to investigate 2002 and 2003 Lexus ES300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash."

170.     In response, on March 3, 2004, NHTSA's ODI opened a Preliminary Evaluation (PE04-021).

171.     NHTSA documents describe the problem to be investigated as: "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge."

172.     The investigation was initially expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES300 vehicles.

173.     ODI had received 37 complaints and reports of 30 crashes resulting in five injuries.

174.     Mr. Scott Yon was the designated investigator, and remained NHTSA's principal investigator on many subsequent SUA-related investigations.

175.     During the course of these investigations, Mr. Yon developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

176.     The NHTSA investigation described the defect allegations as:

> Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to

control or stop the vehicle and where the brake system function was reportedly normal.[24]

177.     On June 3, 2004, Mr. Yon sent an email to Christopher Santucci, a Toyota employee in Technical and Regulatory Affairs, which showed a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles:

    From:         Yon, Scott
    Sent:         Thursday, June 03, 2004  9:15 AM
    To:           Chris Santucci (Toyota.com)
    Subject:      For review
    Categories:   PE04021-ToyotaThrottleControl
    Attachments:  CamryVSCTrend-200402.pdf


    See attached.  Give me a call, when you have time; I want
    to discuss the submission and the attached.
    Scott

_____
[24] TOY-MDLID00041712.

- 54 -

Feb 2004 VOQs:  MY >1994, Make = Toyota, Model = Camry, Comp Desc like "Vehicle Speed%".  Populations from EWR submission tables.

| | | Camry VOQs | CamPopEWR | Camry/YIS/100k | | | |
|---|---|---|---|---|---|---|---|
| 1995 | MTC | 10 | 314066 | 0.35 | | | |
| 1996 | MTC | 22 | 344599 | 0.80 | | | |
| 1997 | MTC | 12 | 365752 | 0.47 | | | |
| 1998 | MTC | 35 | 404850 | 1.44 | | | |
| 1999 | MTC | 19 | 435654 | 0.87 | | | |
| 2000 | MTC | 25 | 396646 | 1.58 | | Avg Rate/YIS/100k | |
| 2001 | MTC | 5 | 312208 | 0.53 | | 0.86 | MTC |
| 2002 | ETC | 32 | 433112 | 3.69 | | | |
| 2003 | ETC | 14 | 390691 | 3.58 | | 3.64 | ETC |
| 2004 | ETC | 0 | ?? | | | | |



178.      Motor vehicle manufacturers frequently re-design their vehicles, as when Toyota implemented ETCS.

179.      Once Toyota implemented ETCS, Toyota should have monitored NHTSA's consumer safety database for indications of changing patterns in the complaints by model that signaled the need to review the safety of ETCS and the need to implement a robust fail-safe, including, but not limited to, an effective brake-override.

### c. Consumer complaints, NHTSA investigations, and inquiries by Congress

180.    Publicly available consumer complaints, which exclude the 37,000 complaints Toyota has yet to reveal, show a pronounced increase in SUA complaints from Toyota Camry owners after Toyota introduced ETCS-i in that vehicle.   As stated previously, Camrys have been manufactured by Subaru since April 2007, via a production contract with TMC.

181.    Through April 30, 2003, more than 9% of all complaints for Camrys equipped with ETCS-i were related to SUA, while only 5% of all complaints (41 of 810) for Camrys without ETCS-i related to SUA.

182.    This difference in amount of complaints related to SUA is statistically significant based on Fisher's two-tailed exact test, $p = 0.0369$.

183.    The twin Lexus ES model showed a very similar pattern of SUA complaints as to Camrys equipped with ETCS-i.

184.    The Toyota Tacoma pickup – manufactured at TMMBC in Mexico – also showed a marked increase in SUA complaints after Toyota introduced ETCS-i in this model.

185.    By the end of January 2007, nearly 5% of all complaints (12 of 241) for Tacomas equipped with ETCS-i were related to SUA (12 of 241) while only 2% of all complaints (9 of 449) for Tacomas without ETCS-i related to SUA.

186.     This difference in the amount of complaints related to SUA is statistically significant based on Fisher's two-tailed exact test, $p = 0.0368$.

187.     A similarly striking trend occurred in several other models:  Lexus ES (5-fold increase), Lexus RX (1.8-fold increase), 4Runner (6-fold increase), Avalon (2-fold increase), Camry (3.7-fold increase), Highlander (2.8-fold increase), and Tacoma (14-fold increase).

188.     State Farm observed the same trend in Toyota Camrys and Corollas, as reflected in the chart below (which State Farm provided to Congress):



189.     This statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that there was a defect in its vehicles with ETCS that could cause SUA.

190.     Toyota's complaint database was not the only source of information available to Toyota.

191.     Internally, as early as May 5, 2003, in secret "Field Technical Reports," Toyota was documenting "sudden acceleration against our intention," as an "extremely serious problem for customers."[25]

192.     A technician reported a SUA incident and stated, "we found mis-synchronism between engines speed and throttle position movement."   The probable cause was unknown but "[e]ven after replacement of those parts, this problem remains."   The author requested immediate action due to the "extremely dangerous problem" and "we are also much afraid of frequency of this problem in near future."

193.     At the outset of its 2004 investigation into SUA in Toyota vehicles, NHTSA asked Toyota for information on similar incidents.

194.     The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in

---

[25] TOY-MDLID00087951-52.

Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, California.

195.     The scope of NHTSA's information request became the subject of negotiations between Messrs. Tinto and Santucci of Toyota and NHTSA representatives.

196.     Ultimately, NHTSA agreed to exclude certain highly relevant categories of incidents from its investigation.

197.     In response to NHTSA's information request, Toyota denied that a defect existed, stating that there was no defect trend and that its electronic control system could not fail in ways its engineers had not already perceived.

198.     Toyota reported 123 complaints that it said "may relate to the alleged defect."   However, Toyota excluded from its response the following relevant categories of complaints, among others:

(1)     An incident alleging uncontrollable acceleration that occurred for a long duration;

(2)     An incident in which the customer alleged that he could not control a vehicle by applying the brake; and

(3)     An incident alleging unintended acceleration occurred when moving the shift lever to the reverse or the drive position.

199.     As a result of the omission of such categories of complaints, Toyota not only concealed from NHTSA and the public relevant customer complaints, but also their knowledge of such defects.

200.     NHTSA closed the investigation without testing the integrity of the ETCS-i, without reviewing any records of Toyota's test reports concerning the ETCS-i, and without reviewing whether the braking system was effective in an open-throttle condition.

201.     Toyota itself did not have the capability of fully modeling, testing or validating the safety of ETCS-i because of its failure to implement standard design platforms, its failure to develop and/or conduct meaningful ECM test procedures, and its failure to exercise appropriate control over third-party subsystem designs.

202.     While Toyota denied any SUA defect during the NHTSA investigation, independent experts concluded otherwise.

203.     In May 2004, a Forensic Technologist and MSME examined a vehicle in New Jersey that had experienced a SUA event, and the report was forwarded to Toyota on January 13, 2005.

204.     The Forensic Technologist's report concluded that the vehicle's ETCS was not operating correctly.[26]  Toyota did not provide this report to NHTSA.

---

[26] TOY-MDLID90064979.

205.     Internally, Toyota was replicating the SUA defect, and "was able to duplicate customer complaints … engine speed remains at 5,000 rpm."   In such instances, Toyota was often secretly replacing throttle bodies.

206.     On July 8, 2005, Mr. Jordan Ziprin of Phoenix, Arizona, filed a formal request for a defect investigation into unintended acceleration in 2002 Toyotas.

207.     On August 5, 2005, NHTSA opened Defect Petition DP05-002 to investigate Mr. Ziprin's claims.

208.     Mr. Scott Yon was again assigned as NHTSA's investigator.

209.     The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES models.  The Opening Resume stated, in part:

> The Petitioner owns a 2002 Camry and states that in July 2005 the vehicle accelerated without application of the throttle pedal while reversing out of a driveway; the acceleration caused a loss of vehicle control and subsequent crash.…   The Petitioner states a similar throttle control incident occurred in April 2002 and additionally cites other ODI reports which also allege loss of throttle control and or uncontrollable acceleration.  The Petitioner discusses NHTSA investigation PE04-021, which involved the Camry and ES models, and makes a request for certain information.  ODI will evaluate the petition and other pertinent information.

210.     After receiving the petition and reviewing the underlying complaints, Toyota did not launch its own investigation nor did Toyota identify any new tests that it would perform to check for a defect in the ETCS.

211.     Instead, Toyota's formal responses to NHTSA's investigation recommended that NHTSA deny the petition based only on the information Toyota had previously provided, "as well as the lack of evidence supporting concurrent failure of the vehicle braking systems."

212.     After explaining how the electronic throttle system and its fail-safes were designed to operate, Toyota concluded in its formal response that:

> [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota believes this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls.  Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls.  Toyota has not found any evidence on the subject vehicles of brake failure, let alone brake failure concurrent with ETC failure.

See Toyota's Response re DP05-002, dated November 15, 2005.

213.     This response of "no evidence" ignored and concealed the spike in SUA events that occurred within one year of a vehicle switching to ETCS, a trend well known to Toyota.

214.     Mr. Yon is not an electrical engineer or expert in electronic control systems, yet he inspected Mr. Ziprin's vehicle allegedly finding no evidence of a system malfunction.

215.     Mr. Ziprin directed to NHTSA's attention some 1,172 Vehicle Owner Questionnaire reports, from which ODI identified 432 reports that alleged an "abnormal throttle control event."

216.     The 432 reports involved 2002 to 2005 Camry, Solara and Lexus ES models (all equipped with ETCS).

217.     Toyota had knowledge of the 432 reports.

218.     Upon learning of the denial of a system malfunction, Mr. Ziprin, who had conducted considerable research into the issues set forth in his petition and filed his findings with the agency, reacted with an angry letter to NHTSA dated January 5, 2006, and accused the agency of bias:

> Frankly, I anticipated that decision from the very first time I was in contact with Mr. Scott Yon, the assigned investigator.   He made statements during our first telephone conversation which tended to establish that the purpose of his inquiry was to establish a basis to dismiss the petition based upon NHTSA policy rather than to deal with and examine all of the facts and circumstances involved.  When Mr. Yon subsequently visited Phoenix, he told me quite clearly and emphatically that it was NHTSA's firm policy not to investigate safety issues regarding hesitations in acceleration by vehicles.

219.     On September 14, 2006, ODI opened Defect Petition DP06-003 in response to a request from William Jeffers III for an investigation of 2002-2006 Camry and Camry Solara Toyota Vehicles for incidents relating to vehicle surging.

220.     Mr. Scott Yon was again assigned to investigate.

- 63 -

221.    According to the petition, Mr. Jeffers owned a 2006 Camry and previously owned a model-year 2003 Camry.

222.    Mr. Jeffers alleged that both vehicles exhibited "engine surging," which he described as a short duration (one- to two-second) increase in engine speed occurring while the accelerator pedal is not depressed.

223.    Mr. Jeffers estimated that six to eight surge incidents of varying magnitude occurred over the course of 10,000 miles and nearly seven months of ownership of his 2006 Camry.

224.    In the last and most alarming instance, Mr. Jeffers noted that the malfunction indication lamp was illuminated during and after this incident.

225.    Toyota received a fax from NHTSA on September 15, 2006, stating that it had agreed to open the defect petition.

226.    In internal e-mails, Chris Santucci expressed skepticism of Mr. Jeffers' account of the unintended acceleration and hoped that NHTSA would not ask Toyota to provide any additional data as part of the investigation:

> Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation.[27]

---

[27] TOY-MDLID00044092.

227.    Although Mr. Jeffers reported that the brake system was effective at overcoming the engine surge, he informed NHTSA of his concerns that this might not always be the case.

228.    NHTSA summarized in its ODI Closing Resume:  "[H]e is concerned about reports filed with NHTSA alleging uncontrolled surging in MY 2002 to 2006 Camry vehicles bringing those vehicles to a high rate of speed (in some cases, purportedly, with the brakes applied)."

229.    While NHTSA's investigation was ongoing, two other related events occurred.

230.    First, on February 5, 2007, a fatal crash occurred in San Luis Obispo, California, involving a 2005 Camry that suddenly accelerated in a restaurant parking lot, then went through a guard rail and over a cliff into the Pacific Ocean.

231.    Second, on March 14, 2007, TMS President James Lentz received a letter at his office in Torrance from a consumer explaining a SUA event in a 2003 Toyota Camry.[28]

232.    The writer insisted he was pressing the brake, and not the accelerator, when the event occurred.

233.    Further, the writer believed that the vehicle's electronic throttle caused the event.

---

[28] TOY-MDLID90045217.

234.     After the cursory evaluation of Mr. Jeffers' claims, NHTSA denied the petition and stated it found no evidence of a defect.

235.     Toyota never fully disclosed to the regulators the actual numbers of customer reports of unintended acceleration events in the various Toyota models under investigation that the company had received.

236.     In fact, Toyota disclosed that it had received only 1,008 such complaints.

237.     Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received *37,900* complaints potentially relating to sudden acceleration in Toyota Vehicles from January 1, 2000, through January 27, 2010.

238.     One of Toyota's strategies in responding to SUA complaints has been to blame any report of SUA on driver error.

239.     On March 20, 2007, a truck owned by the service manager at Cedar Rapids Toyota experienced a SUA event and confirmed it was not caused due to floor mats.  The throttle pedal assembly was replaced.

240.     On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES350 vehicles, NHTSA opened PE07-016.

241.     The principal investigator was again Mr. Scott Yon.

242.     The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal."

243.     Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES350 owners "reminding them not to install all weather mats on top of existing mats."[29]

244.     NHTSA did not agree, due to "too many complaints on this one vehicle to drop the issue" and because the results "of a stuck throttle are catastrophic."

245.     On April 5, 2007, ODI sent its Information Request to Toyota, describing its purpose as being "to investigate incidents of *vehicle runaway* due to interference between the Lexus accessory floor mat (all-weather floor mat) and the accelerator pedal" in 2007 Lexus ES350 vehicles.  (Emphasis added.)

246.     The request further described "[a]llegations of A) excessive engine speed and or power output without the driver pressing on the accelerator pedal or B) the engine speed and or power output failing to decrease when the accelerator pedal was no longer being depressed or, C) the subject component interfering with the operation of the throttle pedal."

247.     During this inquiry, Toyota was careful to eliminate any hint that a much broader issue was at stake – namely, SUA – presumably because disclosing a

---

[29] TOY-MDLID00003908.

SUA defect would be far more alarming and a more serious concern to a customer than being told of a possible "floor mat" problem.

248.     In describing the NHTSA investigation, TMS eliminated reference to throttle control problems and changed the description to a "floor mat" problem:[30]

> Sorry we had a last minute change to the Q&A.  Please utilize this revised version of the Statement and Q&A.  The issue has been posted on the NHTSA website.
> Sorry!
>
> [Old]
> NHTSA has received five consumer complaints regarding *unintended throttle control* in the subject vehicles.
>
> [New]
> NHTSA received five consumer complaints where the All Weather Floor Mat may have interfered with the accelerator pedal operation.
>
> * * *
>
> George Morino
> National Manager
> Quality Compliance Department
> Product Quality and Service Support
> Toyota Motor Sales, U.S.A., Inc.
> Tel. 310-468-3392
> Fax 310-468-3399  [Emphasis added.]

249.     Culling any reference to vehicle speed control has been a standard tactic at Toyota.

250.     In 2005, in connection with the IS 250 All Weather Drive investigation, TMC removed any reference to speed control in letters sent to

_____
[30] TOY-MDLID00000566.

- 68 -

owners:  "They pulled out the 'vehicle speed control' part.  NHTSA may come back, but TMC wanted to try."[31]

251.     Another tactic TMC has used with NHTSA to keep the SUA defect a secret from consumers, like FELPs, has been to keep NHTSA away from employees who had knowledge of ECU failures.

252.     In 2007, while preparing for a meeting with NHTSA, Toyota plotted to keep away from the meeting the "engineer who knows the failure": [I]f the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU.  (I want to avoid such situations).[32]

253.     Toyota withheld documents and kept knowledgeable personnel and employees away from NHTSA despite the fact it knew the results of a "stuck throttle are 'catastrophic.'"[33]

254.     While this investigation was pending, a SUA victim sent Toyota employees a video of his SUA event that showed the brake lights were on while the car was accelerating – conclusive proof that the incident could not be chalked up to "driver error."

255.     As usual, Toyota found nothing wrong with the car.

---

[31] TOY-MDLID00002896.

[32] TOY-MDLID00075574.

[33] TOY-MDLID00003908.

256.     The SUA victim informed the Toyota specialist of other instances that needed investigation:

> One just occurred last Friday, June 15, when this person pulled into a parking lot with very few vehicles, he applied the brakes and the Tacoma just kept going, he wasn't about to collide so, he let off the brake and re-applied the brake and the vehicle stopped.  The vehicle is a 2004 Tacoma, purchased new by this person.  The other incident involves a 2006 Tacoma where all of sudden at a stop the tachometer shot up to approximately 6,000 or 6,800 RPM's with his *right* foot off the accelerator and the *right* foot on the brake.[34]

257.     All of these incidents were concealed from NHTSA and the public by Toyota.

258.     On August 8, 2007, ODI upgraded the preliminary evaluation to investigate unintended accelerations in a target population of 98,454 2007 Lexus ES350s.  The Opening Resume for EA07010 states, in part, as follows:

259.     [T]he agency has 40 complaints; eight crashes and 12 injuries. Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then experienced unwanted acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle.   In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an

---

[34]TOY-MDLID00206917.

open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

260.    While Toyota was pointing the finger at floor mats, it was investigating SUA events that it knew were not caused by floor mats, including an event where the service manager at Cedar Rapids Toyota confirmed the SUA was not caused by the mat.  Toyota replaced the throttle pedal assembly in that case.

261.    Despite having received a number of complaints of unintended acceleration that could not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of any intent to study the electronic throttle control system employed.

262.    Toyota did not study the ETCS system either.

263.    In internal e-mails between Toyota employees, including Chris Santucci and Chris Tinto, exchanged in August 2007, Santucci stated that NHTSA investigators had discussed with him fail-safe mechanisms used by other vehicle manufacturers to protect against unintended acceleration.

264.    The fail-safes that NHTSA regulators discussed with him included "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied."

265.     Mr. Santucci also noted, "Jeff [Quandt, Chief, Vehicle Controls Division, Office of Defects Investigation] mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly."

266.     Despite the growing number of SUA complaints starting from 2002, Toyota did not use the fail-safe mechanisms used by other manufacturers to protect against unintended acceleration.

267.     While Toyota was attempting to deflect this inquiry, it was aware that the root cause of SUA was not often traceable:  "[O]ne big problem is that no codes are thrown in the ECU, so the allege [sic] failure (as far as we know) can not be documented or replicated."   The implications were "[t]he service tech therefore can't fix anything, and has no evidence that any problem exists."[35]

268.     Toyota later claimed that the lack of a diagnostic code indicated that there was no SUA problem.

269.     On August 30, 2007, ODI filed a memo about the inspection of a Lexus ES350 that had experienced SUA, and ODI conducted a telephone interview with the owners.

270.     An inspection of the vehicle found all-weather mats installed at all four seating positions.

_____

[35] TOY-MDLID00050747.

271.     The driver's side all weather mat was found to be installed by itself; it was not on top of another floor mat.

272.     While the installed mat was found to be unsecured by the retention hooks, the mat did not interfere with the accelerator pedal in the position in which it was originally inspected.

273.     While this investigation was ongoing, a woman named Jean Bookout was involved in a fatal crash in Oklahoma due to the unintended acceleration of a 2005 Camry.

274.     On September 20, 2007, Ms. Bookout and her best friend, Barbara Schwarz, were exiting Interstate Highway 69 in Oklahoma in a 2005 Camry.

275.     As Ms. Bookout drove, she realized that she could not stop her car.

276.     Ms. Bookout pulled the parking brake and pushed the brake pedal, leaving a 100-foot skid mark from the right rear tire, and a 50-foot skid mark from the left.  As Ms. Bookout later stated, "I did everything I could to stop the car."[36]

277.     Despite Ms. Bookout's efforts to stop her Toyota vehicle, the Camry continued speeding down a ramp, across another road and finally slammed into an embankment.

278.     Ms. Schwarz was killed as a result of the defect in Ms. Bookout's Camry.

---

[36] Los Angeles Times, *Runaway Toyota Cases Ignored*, November 8, 2009.

279.    Ms. Bookout spent a month in a coma as a result of the defect, and awoke permanently disfigured and disabled.

280.    On September 26, 2007, Toyota issued a recall of 55,000 Lexus/Toyota optional All-Weather Floor Mats.

281.    All owners of 2007 and early 2008 model year Lexus ES350 and Toyota Camry vehicles were to be notified of the safety campaign and the timing when the replacement mats would become available.

282.    Once the replacement mats were available, a second owner notification would be sent to notify owners to return their mats for the driver's seating position to any Lexus/Toyota dealer for an exchange.

283.    Toyota also stopped the sale of the Toyota/Lexus All-Weather Floor Mat designed specifically for 2007 and early 2008 model year Camry and ES350 Lexus vehicles.

284.    Internally, Toyota executives were pleased that NHTSA had limited the ES350 issue to "floor mat issues" as opposed to SUA:[37]

> Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off" switch.  We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

---

[37] TOY-MDLID00004973.

285.     Other top level Toyota officials were incredulous with the news that NHTSA had limited the issue to floor mats.  Irv Miller of TMS observed when he learned of the recall:  "Yea I know, but floor mats!"[38]

286.     NHTSA remained concerned that a "serious issue" remains and that a factor other than mats was causing SUA events.

287.     NHTSA was considering an announcement that would instruct vehicle owners how to turn off the vehicle in the event of a SUA event.[39]

288.     NHTSA also expressed concern that other vehicles, including Prius, Camry and Avalon maybe subject to floor mat jamming and pedal design issues.[40]

289.     Toyota did not disclose these concerns and took no action to remedy these defects.

290.     On March 19, 2009, Mr. Jeffrey Pepski of Plymouth, Minnesota filed a detailed defect petition, asking NHTSA to re-open its sudden unintended acceleration investigation into Lexus vehicles.

291.     Mr. Pepski was the owner of a 2007 Lexus ES350.

292.     Mr. Pepski experienced a sudden unintended acceleration event while driving at high speed, in which the vehicle accelerated to 80 mph.

---

[38] TOY-MDLID00000601.

[39] TOY-MDLID00011140.

[40] TOY-MDLID00011139.

293.     Mr. Pepski tried pumping and pulling up the accelerator with his foot to no avail.

294.     Mr. Pepski explained the electronics of the accelerator, brake pedals and throttle systems, and charged that the Lexus ES350 vehicles violate several federal motor vehicle safety standards regarding brake and throttle systems.

295.     Mr. Pepski also disputed some of the statements from previous investigations that drivers could easily stop the vehicle by depressing the ignition button for three seconds.

296.     Mr. Pepski maintained that the owner's manual indicates that this would lock the steering wheel and move it forward.

297.     On April 8, 2009, ODI issued an Opening Resume for DP09-001 in response to Mr. Pepski's petition.

298.     ODI characterized it as a request for "an additional investigation into the unwanted and unintended acceleration of MY 2007 Lexus ES350 as the initial investigation (PE7-016) was too narrow in scope and did not adequately address all complaints made to the NHTSA with respect to vehicle speed control concerns."

299.     Additionally, according to ODI, the petitioner requested an "investigation of MY 2002-2003 Lexus ES300 for 'longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect' that were determined not to be within the scope of Investigation PE04021."

300.     On May 14, 2009, Toyota's Christopher Tinto filed a direct response to Mr. Pepski's petition in DP09-001.

301.     Mr. Tinto dismissed all of the issues Mr. Pepski raised in his petition and claimed there was no basis for an investigation.

302.     Mr. Tinto stated that when Lexus inspected Mr. Pepski's vehicle, it found that the floor mat was unsecured and blamed the event on pedal entrapment.

303.     Mr. Tinto maintained that Toyota's electronic throttle and brakes systems were in compliance with all applicable federal motor vehicle safety standards, and that Mr. Pepski had misinterpreted the warnings in the owner's manual about steering wheel lockup when the ignition is in the "Off" mode.

304.     Toyota knew that NHTSA inspected Mr. Pepski's car and "did not see clearly the witness marks of the carpeted floor mat in the forward unhooked position" and instead "suspect[ed]" this was the case.

305.     Mr. Santucci made it clear that NHTSA wanted Toyota to blame this defect on a floor mat issue, because if Toyota did not do so, NHTSA would have to ask "for non-floormat reports":

> So they should ask us for non-floormat related reports, right?  But they are concerned that if they ask for these other reports, *they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them*.  Does that make sense?  I think it is good news for Toyota.[41] [Emphasis added.]

---

[41] TOY-MDLID00052918.

- 77 -

306.     Good news for Toyota, *i.e.*, NHTSA avoiding inquiry into non-floor-mat issues, was bad news for consumers like FELPs who continued to purchase and drive vehicles subject to a hidden SUA defect.

307.     On October 29, 2009, NHTSA denied Mr. Pepski's petition.

308.     Once again, ODI issued its denial without requiring Toyota fully to disclose the actual numbers of customer reports of sudden unintended acceleration events in the Toyota models under investigation it received.

309.     In 2010, Toyota recalled the ES 350, Camry and Avalon, due to a defect in the shape of the floor surface and the lack of adequate space between the accelerated pedal and the floor.[42]

310.     Throughout all of these investigations into the defects noted by customers regarding SUA and the defects with Toyota Vehicles, Toyota routinely was able to keep NHTSA (and consumers) away from the truth about SUA events by negotiating what terms it would use to search for relevant complaints.

311.     An example occurred in September 2007 when the company searched for incidents regarding "mats" as opposed to "surging."

312.     A search on just the Camry in 2004 for surging, which may be related to SUA, revealed "60,000 complaints."  Toyota never revealed the 60,000 surging complaints to NHTSA.[43]

---

[42] TOY-MDLID00200832.

[43] TOY-MDLID00083551.

- 78 -

313.     In 2008, Toyota knew that it had received a "huge number of complaints" alleging various forms of UA, with such UA labeled as "surge," or "lunge" or "lurch", and it searched for UA events just on the Camry:

> Let's discuss the response with George sometime on 10/13. We just started to gather the field information in order to update it requested in Q2, 3, 4 of IR for PE07-016. However, I'm very concerned about how many customer complaints will be extracted from CAN2000 by keyword search which we usually do. Because NHTSA expanded the scope of the subject vehicles to 2007-2009MY ES and "CAMRY." As you know, Camry has had an issue on the 6 speed automatic transmission and there may be a huge number of complaints alleging the surge or lunch or lurch and we usually include those words for the keyword search. If this is the case, it will take long time to complete.[44]

314.     Throughout Toyota's consideration of SUA incidents, the "global ramifications" of a vehicle defect was a motivating factor. Thus, for example, in September 2009, Toyota executives indicated TMC would not easily budge from its "no defect" position:

> TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications. In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.[45]

---

[44] TOY-MDLID0012726.

[45] TOY-MDLID00075713.

315.     As described herein, this "no defect" position and the worry of "global ramifications" ultimately caused Toyota to offer fail-safe mechanisms such as a brake-override as a "confidence" booster as opposed to a "safety recall."

316.     As described herein, however, this concern about "global ramifications" also caused Toyota to make different decisions about North America and the World to the detriment of FELPs, as opposed to "domestic" purchasers of Toyota Vehicles.

317.     In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating."

318.     The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

319.     "Mediation" is not the equivalent of meeting the pledge of "safety" first that Toyota had repeatedly promised vehicle owners. "Mediation" is not "The Toyota Way."

320.     An internal PowerPoint addressing "Key Safety Issues" contains the following:

- "Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.

- Recurring issue, PL/Design Implications.[46]

321.     The footnote to the slide has an entry stating "[f]laws in Toyota Regulatory and Defect Process."[47]

322.     Toyota was also pleased that the floor mat issue was limited to All Weather Floor Mats as opposed to floor mats in all vehicles.

323.     Internally it recognized that "floor mat interference is possible in any vehicle with any combination of floor mats." [48]

324.     Despite this admission, no broader floor mat recall or effort to implement a brake-override took place.

325.     No broader floor mat recall was implemented despite evidence that Prius, Camry and Avalon models were sensitive to floor mat interference and that the problem was not limited to after-market mats.[49]

326.     Toyota had knowledge many years prior to December 2010 of floor mat entrapment as one of the causes of SUA in all Toyota models and failed to properly notify NHTSA and consumers of the defect.  Thus the floor mat issue presents a window into how Toyota improperly addressed SUA overall – by denying the existence of a problem, seeking to minimize any "fix" of the problem,

---

[46] TOY-MDLID00052959.

[47] *Id.* at 52963.

[48] TOY-MDLID00002839.

[49] TOY-MDLID00021197.

and concealing from NHTSA and the public the truth about the problem – simply save money for Toyota.

327.     On December 20, 2010, Toyota agreed to pay a fine of $16, 375,000 to NHTSA due to the floor mat recall.

### i.     Specific accounts of SUA in Tacomas and Siennas

328.     Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of SUA in Tacomas in late 2007.  These Tacomas were manufactured in Mexico by TMMBC.

329.     On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration." [50]

330.     Toyota internal e-mails also indicate that they were finding Internet blog posts regarding SUA events in Tacomas in November 2007. [51]

331.     Toyota received a report in 2006 that a 2006 Tacoma "suddenly accelerated out of control:

> Mr. _____ has reported that his 2006 Toyota Tacoma suddenly accelerated out of control into a telephone pole as he was backing on 10/21/06.
>
> After the truck collided with the pole he shifted into Drive and the truck accelerated at a high rate into a

---

[50] TOY-MDLID00028006.

[51] TOY-MDLID00012135.

parked vehicle and a trailer, pushing the trailer into another parked vehicle.[52]

332.    An insurance investigator interviewed the mechanic who was a witness:

> Mr. _____ observed the 2006 Toyota Tacoma as it backed into the telephone pole.  He said that the engine was racing and after the collision with the pole, the vehicle lunged forward colliding with another vehicle and the box trailer.  The vehicle became pinned under the front of the box trailer which prevented it from traveling any further.
>
> Mr. _____ said that he ran to the truck and assisted the driver, Mr. _____, out of it.
>
> I asked Mr. _____ as to how the engine stopped racing.  He said that the engine was still racing/idling high at approximately 2500 - 3000 RPM's after Mr. _____ exited the vehicle and while he was standing in the parking lot, Mr. _____ said that he reached in and turned the ignition key off to stop the engine.  Later, a police officer shifted the transmission into park.
>
> Mr. _____ offered to testify as to what he witnessed in court if necessary.  Because he is a mechanic, I believe that he would be a formidable witness.
>
> * * *
>
> The most significant observation was made by the eye witness, Mechanic _____ who witnessed the incident and aided Mr. _____ from the truck.  He states that the engine was still racing at 2500-3000 RPM after Mr. _____ exited the vehicle.  The Toyota was only brought under control when _____ reached in and shut the engine off with the ignition key.

---

[52] TOY-MDLID00206868.

As, _____ is employed by the City Tire as a mechanic his estimate of the engine RPM's is rather credible and consistent with Mr. _____'s report.[53]

333.    In 2007, a Field Technical Report involving a Tundra, confirmed a racing idle with unknown cause.

334.    In October 2007, a "Toyota Master Technician" experienced an UA event due to "sticky pedal operation."  This cause was also "unknown."

335.    On January 10, 2008, William Kronholm of Helena, Montana, filed a request for a defect investigation into unintended acceleration in 2006 Toyota Tacoma pickup trucks.

336.    Mr. Kronholm reported experiencing two SUA incidents and investigated the NHTSA complaint database for light truck fleets for model years 2006 and 2007.

337.    Under the category "vehicle speed control," Mr. Kronholm found 32 complaints of sudden unintended acceleration involving Tacomas, whereas the most reported for any other manufacturer's trucks was one incident.

338.    Mr. Scott Yon was again ODI's principal investigator.

339.    Internally, Toyota was diligently working hard to "write a letter for the committee to try to stop this from moving forward – we need to keep this within NHTSA rather than have it expand to a hearing."[54]

---

[53] TOY-MDLID00206876-6880.

340.     In NHTSA's February 8, 2008 information request to Toyota, it defined the defect as:

341.     [A]llegations or complaints that the accelerator and or cruise control system operated improperly, malfunctioned, failed, or operated in an unsafe manner, including but not limited to, allegations that the engine speed (power output) increased without driver application of the accelerator pedal (including allegations that may be related to cycling of the air conditioning compressor clutch or other so called 'normal' idle speed/engine control functions), or allegations that the engine speed (power output) failed to return to an idle state after the operator released the accelerator pedal (including allegations that may be related to engine speeds experienced between gear shifts on manual transmission vehicles at road speeds) or allegations that the cruise control system caused the engine speed (power output) to change in an unsafe manner.

342.     While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004 Toyota Siennas.

343.     PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal.

---

[54] TOY-MDLID00050749.

344.     Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration.

345.     Five years earlier, in April 2003, Toyota had experienced an unintended acceleration event during testing of a 2004 Sienna.

346.     This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

347.     On April 18, 2008, Toyota filed its first response in DP0-8001, reporting a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

348.     On April 25, 2008, Toyota filed its second response in the Tacoma investigation, outlining its investigation into the problem and analyzing the consumer complaints submitted to Toyota and to NHTSA that could be related to alleged unintended acceleration.

349.     In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the Toyota Vehicles, much less a safety-related defect.

350.     Toyota disputed the assertion in the petition that the 32 complaints in the NHTSA database "in and of themselves justify opening an investigation."

351.    Toyota claimed that the Tacoma had been the subject of extensive media coverage related to the possibility of sudden acceleration.

352.    In addition, Toyota claimed that there had been a high level of internal activity on this subject (as far back as early 2007) including reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

353.    On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Siennas, followed by a second response on June 25, 2008.

354.    Toyota stated that complaints about unintended accelerations in Siennas took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver.

355.    Toyota also stated that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem.

356.    Toyota did not disclose that it considered incorporating a necessary brake-override and other fail-safe mechanisms that were not in Toyota Vehicles already to address this problem.

357.    On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

The complaints fell into three groups. A majority of the complaints may have involved the Tacoma's throttle control system. Some complaints did not involve a failure of the throttle control system. For the remaining reports, although there may have been an issue with the throttle control system as one possible explanation, we have been unable to determine a cause related to throttle control or any underlying cause that gave rise to the complaint. For those vehicles where the throttle control system did not perform as the owner believes it should have, the information suggesting a possible defect related to motor vehicle safety is quite limited. Additional investigation is unlikely to result in a finding that a defect related to motor vehicle safety exists or a NHTSA order for the notification and remedy of a safety-related defect as requested by the petitioner. Therefore, in view of the need to allocate and prioritize NHTSA's limited resources to best accomplish the agency's safety mission, the petition is denied.

358. On October 15, 2008, Toyota made a confidential PowerPoint presentation to ODI regarding unintended acceleration and trim interference in 2004 Siennas as part of EA08-014.

359. Toyota demonstrated how an unrestrained early design-level trim panel interacted with the accelerator after pedal depression.

360. Toyota also advised that the company was conducting a field survey to examine panel retention and that preliminarily one vehicle had been identified with a concern.

361. On January 26, 2009, ODI closed EA08-014, regarding SUA involving 2004 early-production Siennas, after Toyota agreed to recall Toyota Vehicles built between January 10, 2003, and June 11, 2003.

362.     Toyota then issued Recall 09V023 for 26,501 model year 2004 Siennas.

363.     Toyota did not describe this as a defect, but called the actions a "safety improvement campaign" that was not being conducted under the Safety Act.

364.     Toyota's recall instructed dealers to replace the original floor carpet cover with the newer-design floor carpet (and retention clip).

365.     The repair was expected to reduce the potential for trim panel interference with the accelerator pedal should the retaining clips become missing because of improper service or other reasons.

366.     Dealers were to replace the retention clip and floor carpet cover at no charge to the owner.

### d.  Toyota secretly conducted its own tests of SUA

367.     Toyota failed to disclose that its own technicians often replicated SUA events without driver error.  The following is an example:

**Condition Description**

Customer states while at a stop the engine started to rev and tried to take off.  Customer turned off vehicle and restarted.  Vehicle continue to rev when running. Turning vehicle off 3rd time and restarted vehicle operated normally after third start.

**Diagnostic Steps**

- Technician who was inspecting the vehicle had driven it approximately 10-12 minutes.

- 7-8 minutes into the drive the technician was sitting at a stop light. When the stop light changed the tech started to lightly accelerate.

- After traveling 20-30 feet the vehicle exhibited a slight hesitation *then began to accelerate on its own*.

- Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence.

- Vehicle traveling 9-10 mph at time of occurrence. Approximate maximum speed reached was 20 mph prior to accelerator pedal release / brake application.

- Estimated throttle position at the time of the occurrence was 15-20 percent.[55]  [Emphasis added.]

368.    Upon Toyota's technicians replicating a SUA event, Toyota decided it was in the customer's "interest" for Toyota to buy back the vehicle, meaning in reality that Toyota decided to remove this vehicle from the market since it was experiencing SUA incidents that could not be blamed on the driver.

369.    To further conceal the defect, Toyota required that the owner sign a confidentiality agreement and agree not to sue as a condition of the vehicle repurchase.

---

[55] TOY-MDLID00075242.

370.     This confirmation of a SUA event by Toyota's technicians was not reported to NHTSA and was deliberately concealed from NHTSA and the public (including FELPs).

371.     In December 2003, in a secret Field Technical Report, a technician verified a surge event during "cold engine operation" even where the scan tool showed no DTC.

372.     In a Dealership Report in 2005, on a 2005 Sequoia, the dealer verified two separate SUA incidents and identified the probable cause as a "software issue of the engine control unit."

373.     In a Field Technical Report dated April 18, 2006, involving a 2007 Camry, a technician confirmed the "Vehicle lunges forward":

**Condition Description**

Vehicle lunges forward when coming to a stop

**Diagnostic Steps**

- Drove vehicle at 55mph, got vehicle to go into 5th gear, when slowing down and coming to stop, right at 5 mph the vehicle would lunge forward

- Drove vehicle in 4th gear, and when coming to a stop, once the vehicle reached 5mph, vehicle would lunge forward

- Drove vehicle in 3rd gear, and when coming to a stop, when the vehicle reached 5mph, vehicle would lunge forward

- Each of these test were complete with the A/C on and off, no change

**Probable Cause**

Unknown[56]

374.    "Lunging" apparently was a problem Toyota service managers were aware of:

From: Mike Robinson/=Mobile/Toyota.
Sent: 5/25/2007 5:15 PM.
To:    Gordon Rush/=Lexus/Toyota@Toyota.
Cc;    Gary_Heine@Toyota.com.
Bcc:
Subject:  Avalon Drivability Customer Verbatim Information - Updated.

Gordon, can you please review the below comments and let me know if this is the type of information you are looking for?  I have added some PQS data verbatims as well, but was unsure if they would be suitable for your purposes.

***

"(I) Have recently purchased a 2006 Avalon LTD and have experienced the hesitation problem.  The situation is dangerous ... not so much the hesitation as the lunge after the hesitation.  Toyota had better get going quick as I predict this will result in numerous accidents and possible deaths.  I have talked with my service manager and he said, "they all do it"

Regards,
Mike

---

[56] TOY-MDLID00065813

Mike Robinson
Technical Supervisor
Quality Assurance Powertrain Group
Toyota/Lexus Product Quality & Service Support
Office:  (310) 468-2411

375.     Secret replication of SUA by Toyota also occurred with a 2007 Camry.

376.     The owner reported that with the foot off the pedal the RPM went up to 5,000 and the speed increased to 60-62 mph.

377.     Using a similar vehicle, the Toyota team replicated an increase in rpm and vehicle speed with "no" pedal application.

378.     Though the team apparently blamed this on a "downhill condition," a vehicle should not have increased romp due to going downhill. [57]

379.     Toyota was careful to make certain it would be difficult to discover what it knew about the SUA defect, which models were affected, and which managers were involved.

380.     On another occasion in October 2007, a Field Technical Report confirmed a case of SUA in an ES330.[58]

---

[57] TOY-MDLID00079756.

[58] TOY-MDLID00075600.

381.    In a series of Field Technical Reports from 2006-2010 involving Toyota Camrys, Toyota technicians from Hong Kong confirmed UA events and that these events were not caused by pedal or floor mats. [59]

382.    The UA events were duplicated without triggering a DTC.

383.    The Toyota technicians strongly urged TMS to investigate these UA events since the problem was highly dangerous and the incidents were stacking up.

384.    In many of these instances, the report noted that "no effective rectification can be done at this moment" and that the exact cause was "unknown."

385.    These reports by the Toyota technicians "strongly request TMS to investigate this case as a top priority."

386.    In an Intra-Company Communication between TMA and TMS, the company confirmed a SUA event and that floor mats were not the issue:

**Introduction**

The purpose of this document is to provide a summary of a Go-and-See related to a customer's claim of Cruise Control Malfunction in a 2009 Tacoma vehicle.

**Customer Observed Condition**

Customer alleges that he experienced the following:
Vehicle: 2009 Tacoma with 2,387 Miles (at time of incident)

1.  Vehicle was traveling at a steady 60 MPH Speed on the Freeway, with cruise control engaged

---

[59] TOY-MDL-88641.

2. As he reached a slight incline, he started to approach a slower vehicle in the lane in front of him

3. He applied pressure to the accelerator (25% - 30% throttle angle) and increased speed to 75 MPH to pass the other vehicle

4. Once he passed the slower vehicle, he returned to the right hand lane and released the accelerator (expecting the vehicle to return to the previously set speed)

5. After releasing the accelerator pedal, the vehicle continued to accelerate

6. He stepped on the brakes and the vehicle acceleration did not stop

7. Customer cycled the key to the "OFF" position and slowed to a stop using the brakes

8. After sitting for a couple of minutes on the side of the road he restarted the engine and it operated normally and took it to the dealership

**<u>Dealer Investigation</u>**

Upon arrival at the dealership the following was performed / found:

1. Inspected Floor Mats and found them properly secured, with no signs of witness marks upon them

2. No Present, Pending or History of any DTC's in the ECM (also confirmed at TMS by MILi)

3. Engine connections were secure and showed no damage

4. The vehicle was driven for 361 miles, at which time an abnormal condition *was duplicated* (an account of this condition can be found on Page 2.)

**Requests**

• Vehicle repurchase has been agreed upon, please evaluate vehicle upon receipt

**Service Manager Observed Condition:**

On 7/19/09, one of the dealership's Service Managers drove the vehicle and observed the following:

1. Vehicle was being driven on the Freeway with the Cruise Control engaged at a 70 MPH Target Speed on Flat Terrain

2. The Service Manager depressed the accelerator pedal slightly (less than 10% throttle input)

3. As the vehicle reached what was estimated as 71 MPH, it downshifted abruptly and accelerated at what was perceived as a high throttle angle

4. As there was no traffic in front of him, the Service Manager removed his foot from the accelerator immediately upon the downshift and moved it completely away from the pedal area

5. The vehicle continued to accelerate at what felt like an estimated at a 70% throttle input with no pedal contact from the driver

6. Within 300 feet of the initial acceleration, the vehicle had reached 95 MPH. The estimated time to reach this speed from 71 MPH was "between 5 and 10 Seconds"

7. The driver then applied the brake pedal and the acceleration stopped

NTF Techstream Data

- As the Service Manager who experienced the condition above is considered to be trustworthy and reliable, the vehicle will be repurchased for further investigation under SETR 9J467

387.    On January 26, 2010, a Field Technical Report involving a 2009 Corolla confirmed a customer complaint that the vehicle "tried to take off":

- Technician who was inspecting the vehicle had driven it approximately 10-12 minutes.

- 7-8 minutes into the drive the technician was sitting at a stop light. When the stop light changed the tech stated to lightly accelerate.

- After traveling 20-300 feet the vehicle exhibited a slight hesitation then began to accelerate on its own.

- Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence.

- Vehicle traveling 9-10 mph at time of occurrence.  Approximately maximum speed reached was 20 mph prior to accelerator pedal release/ brake application.

- Estimated throttle position at the time of the occurrence was 15-20 percent.

- No accessories were on at the time of the occurrence.

- DTC U0100 was set in memory, but the technician cleared the DTC prior to duplication and the DTC did not return following duplication.

- The technician experienced a problem with the scan tool loosing communication with the car at the time of the occurrence.  The scan tool in use was a newer unit to the dealer.  It is unknown if this was related to the vehicle concern or solely a scan tool concern.

388.    The FTR concluded the cause was "unknown," hence, neither the mat nor the pedal recalls would be effective and Toyota repurchased the vehicle.

389.    Although the technician duplicated the condition, the "national" and regional offices of Toyota were supposedly unable to do so.

390.    Toyota continued to sell vehicles containing a safety related defect between the initiation of its European action on September 29, 2009 and its stop sale order issued in the United States on January 26, 2010.

391.    Toyota failed to disclose to NHTSA or to the public that its own technicians conducted tests of Toyota Vehicles and replicated SUA events without driver error.

**6.    Recalls of Toyota Vehicles**

**a.    The floor mat recall**

392.    In August 2009, Officer Mark Saylor, a 19-year veteran of the California Highway Patrol, his wife, thirteen-year-old daughter and his brother-in-law, Chris Lastrella, were driving in a 2009 Lexus ES350 loaned to them from the dealership while Officer Saylor's Lexus was being repaired.

393.    Witnesses later reported that Officer Saylor had pulled onto the shoulder going roughly 25-45 mph and appeared to have some engine difficulty.

394.    Witnesses also reported that Officer Saylor turned on his emergency lights.

395.    Shortly thereafter, the Lexus's speed accelerated to over 100 mph.

396.     Chris Lastrella called 911 from the vehicle and reported that the accelerator was stuck and "we're in trouble."

397.     Mr. Lastrella then repeated:   "We're approaching the intersection. We're approaching the intersection.  We're approaching the intersection."

398.     Others in the car could be heard saying "hold on" and "pray."

399.     The Lexus then crashed into the back of an SUV and continued through a fence, crashing head first into an embankment, becoming airborne, rolling over, bursting into flames and coming to rest in a dry riverbed.

400.     All four members of the Saylor family were killed by extensive blunt force injuries.

401.     When officers inspected the vehicle, the all weather floor mat was melted to the accelerator pedal and unsecured by the retaining clips.

402.     It was also the incorrect all weather floor mat for that Lexus model.

403.     When officers tested the pedal clearance using the same model of Lexus and the same mismatched floor mat, they observed that the pedal could easily become stuck under its edge.

404.     Officers investigating the Saylor tragedy also learned that a similar complaint of unintended acceleration had been made about the vehicle involved in the Saylor crash only days before it was loaned to Officer Saylor.

405.     The San Diego County Sheriffs' report chronicles the prior complaint as follows:

[Frank Bernard] was on the Poway Road on-ramp to Interstate 15 North. As he was merging onto the freeway, he saw a truck nearby and accelerated 'briskly' to get in front of it. Witness Bernard got onto the freeway, and once in front of the truck, let his foot off the accelerator. [The Lexus] kept accelerating on its own, to about 80-85 MPH.

Witness Bernard stopped on the brakes and tried to lift up on the accelerator with his right foot. He was attempting to access the shoulder of the freeway, and still applying the brakes, was able to slow [the Lexus] to about 50-60 MPH. While he was slowing, he pushed the ignition button 'a few times' and was not able to turn the engine off. He also 'popped the throttle' with his foot to see if he could get it to clear itself. None of this worked. [The Lexus] kept moving at an uncontrolled and high rate of speed.

Witness Bernard kept on the brakes, slowing [the Lexus] to 25-30 MPH and pulled over to the shoulder. He was able to then place [the Lexus] into neutral with the gear shift. When he did this, the engine made a very loud whining, racing sound. Witness Bernard was able to stop [the Lexus].

Witness Bernard looked down at his feet and saw the accelerator was stuck underneath the floor mat. He was able to pull it up with his foot, and said he had to apply a significant amount of pressure to do so.[60]

406.     Mr. Bernard told a receptionist at the dealership of the unintended acceleration and that it was due to the floor mat.

---

[60] TOY-MDLID000091970 at 9193.

407.    The San Diego County Sherriff's Report concludes that the Saylor crash was likely caused by the mismatched floor mat and the following "associated" factors:

> The vehicle was not equipped with a key that would otherwise allow for manual emergency shut off.  The push button ignition feature had no emergency instantaneous shut capability.

> As evidenced in the inspection of [the Lexus], the brakes most likely failed due to over burdened, excessive, and prolonged application at high speed.[61]

408.    The report also notes that additional electrical, mechanical or computer generated factors could have played a role in the unintended acceleration.

409.    Following the widespread publicity surrounding the four-fatality Saylor crash near San Diego, Toyota issued a "Safety Advisory," saying that the company had "taken a closer look" at the potential for the accelerator to get "stuck in the full open position" *due to interfering floor mats*.

410.    The advisory stated that the company would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in all, to address the issue – the largest recall in Toyota's history and the sixth largest in the United States.

411.    According to Senator Waxman, Toyota's advisory is dangerously misleading, for the following reasons, among others:

---

[61] *Id*. at 9197.

- 101 -

By suggesting that only a trapped floor mat can cause a loss of throttle and braking control, it lulls owners of models with no driver's side floor mat into believing there is no possibility of a potentially catastrophic loss of throttle and braking control.  According to documents supplied by Toyota to the Committee on Energy and Commerce of the U.S. House of Representatives, fewer than 16% of sudden, unintended acceleration events reported by customers involved floor mats and/or "sticky pedals."

The advisory also misleads owners with a driver's-side floor mat into believing that, in the event of a sustained near-wide-open throttle malfunction, the first response should be to visually determine if the floor mat is interfering with the accelerator pedal.

412.   The floor mat recall was part of Toyota's strategy to focus the cause of SUA on mats and away from other defects.

413.   As set forth below, Toyota knew of other causes related to SUA.

414.   On September 29, 2009, the same day that TMC recalled 3.4 million vehicles in the United States because of possible floor mat entrapment, Toyota Motor Europe issued a Technical Information ("TI") to Toyota distributors in Austria, Belgium, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland, Turkey, Portugal, Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United Kingdom, Georgia, Kazakhstan, and Romania identifying a production improvement and repair procedure to address complaints by customers in those

countries of sticky accelerator pedals, sudden RPM increase and/or sudden acceleration – but nothing similar was issued to warn North American distributors.

415.     Despite its claimed extensive investigation into the sticky pedal phenomenon, and its efforts to remedy the sticky pedal defect for certain overseas consumers, TMC continued to conceal information from North American consumers, and FELPs in other countries in the World, regarding potential causes for sudden unintended acceleration events.

416.     On September 29, 2009, TMC issued a Consumer Safety Advisory claiming that the sudden acceleration problem was caused by floor mats without mention of the sticking accelerator pedal defect it knew about since July 6, 2006, at the latest, and had confirmed no later than June 2009.

417.     Contemporaneously with the floor mat recall, Toyota made media statements inaccurately stating that NHTSA had determined that no defect exists in vehicles wherein the driver's side floor mat is compatible with the vehicle and is properly secured.

418.     For example, a November 2, 2009 press release issued from Torrance, CA announced:

> Toyota Motor Sales … today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position.   The letter, in compliance with the National Traffic and Motor Vehicle Safety Act and

reviewed by the National Highway Traffic Safety Administration … also confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.

419.     On November 4, 2009, NHTSA issued a press release to correct this misleading and inaccurate information.

420.     NHTSA clarified that it told Toyota and consumers that "removing the recalled floor mats is the most immediate way to address the safety risk and avoid the possibility of the accelerator becoming stuck."

421.     NHTSA reiterated that the floor mat recall was simply an interim measure, and did not correct the underlying defect.

422.     Despite initiating its plan to repair defective accelerator pedals for certain overseas consumers, Toyota's misinformation to North American consumers and other FELPs in the World continued.

423.     TMC posted the following response to a question posed by the LOS ANGELES TIMES:

> Q2: Toyota has conducted numerous recalls related to sudden acceleration over the past decade in the U.S. and Canada, including two previous floor mat recalls.  But the problem has continued.  Does this mean that the previous recalls were not successful in eliminating the problems and if so, why not?  In particular, why wasn't the 2007 recall of Lexus ES and Camry floor mats effective in preventing catastrophic accidents such as the Saylor case?

A. Toyota has conducted two all-weather floor mat (AWFM) recalls after receiving reports that if the floor mat (either by itself, or if it is placed on top of an existing carpeted floor mat) is not secured by the retaining hooks, the mat can move forward and interfere with the accelerator pedal returning to the idle position.  If the mat is properly secured, it will not interfere with the accelerator pedal.

As reported in the law enforcement investigation, the floor mat in the Saylor accident was not only improperly secured, it was incompatible and incorrect for the vehicle.  The recall recently announced addresses the fact that incompatible floor mats, or multiple floor mats could be installed and that the remedy must address that possibility.

424.    When Transportation Secretary Ray LaHood testified before the House Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials chose to meet directly with Toyota executives in Japan to discuss safety issues because NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

b.    **The sticky accelerator recall**

425.    The sticky pedal recall is illustrative of Toyota's concealment of material facts and deception relating to SUA defects.

426.    Toyota received a Field Technical Report ("FTR") in July 2006 from a US-based owner of a Toyota Avalon regarding a sticking accelerator pedal.

427.     Toyota began receiving FTRs in 2007 concerning US-based claims of accelerator pedals in Tundra vehicles and other Toyota models that were slow to return to the idle position when released by the driver of the vehicle.

428.     The FTRs submitted to Toyota in 2007 included claims of pedals that got stuck in a depressed position and were slow to return to idle.

429.     In January 2008, Toyota allegedly determined that the friction lever component of accelerator pedals manufactured using a plastic material identified as "PA46" could cause the accelerator pedal to be slow to return to idle in high humidity and temperature environments.

430.     In January 2008, Toyota issued an Engineering Change Instruction to CTS Corporation ("CTS") to change the composition of the type of plastic used for the Tundra friction lever from PA46 to PPS.

431.     Toyota also received four FTRs from the European market in 2008.

432.     While Toyota executives were claiming the defect was due to pedal entrapment dealers believed otherwise:[62]

> I'm afraid that many of us in the dealer body feel embarrassed and not a little ashamed regarding a perception that we may have been used to faithfully endorse the (apparently inaccurate) party line that the only customer concerns have been as a result of pedal entrapment.  While I'm sure that this was never Toyota's intent, there is a palpable feeling somewhere between disappointment and betrayal at the retail level.  As you

---

[62] TOY-MDLID00015943.

know, this would be best addressed by a prompt, effective cure for customer concerns.

The other thought is that it was not the Watergate break-in that brought down President Nixon; it was the aftermath. Please help us with your endorsement that all communications be frank, complete, and 100% accurate.

433.     Toyota continued to receive reports from qualified engineers opining about the abnormalities in the ECTS.

434.     For example, on January 28, 2009 a Professional Engineer examined a 4Runner that:[63]

According to the driver of the vehicle, she had driven the 4Runner earlier in the day of the incident. She stated that when she started the vehicle, placed the gear selector lever in the reverse and depressed the accelerator pedal, the vehicle accelerated rearward in an uncontrolled manner. The vehicle traveled down her driveway, crossed a road, struck a stump and entered a stream. The vehicle came to rest on its driver side. She exited the vehicle through the sun roof. She stated that she had never had any drivability issues with the 4Runner.

The report concluded:

Based on the foregoing observations and analysis, the following are my opinions, to a reasonable degree of engineering certainty, regarding the condition and operation of the Toyota 4Runner.

* * *

Third, the voltages associated with the throttle position sensor malfunction detection (w/ pedal depressed) and the accelerator pedal position sensor for engine control (w/

_____

[63] TOY-MDLID90053224.

pedal depressed) were not within specifications. The voltage deviations indicate that the electronic throttle control system featured abnormalities. The inability to start the vehicle precluded testing the functional operation of the system.

435. After receiving more complaints and conducting further studies, by June 2009, Toyota had determined that the issue of sticking accelerator pedals was not alleviated by changing the friction lever material to PPS, yet did not disclose this information.

436. Toyota and CTS reviewed possible countermeasures and "settled" on a second change to the composition of the friction lever (from PPS to POM) and lengthening the friction lever.

437. In May 2009, Toyota developed Engineering Change Instructions regarding sticking accelerator pedals on right-hand drive Argo and Yaris vehicles in the United Kingdom (U.K.).

438. No disclosure of this issue was made to prior purchasers.

439. On June 15, 2009, Toyota initiated a Technical Instruction to Toyota distributors in the U.K. and Ireland in a temporary field fix involving replacement of the CTS pedal with a field-modified Denso pedal as advised in the Technical Instruction.

440. In July 2009, Toyota decided to implement a rolling design change for CTS pedals starting with right-hand-side drive vehicles in Europe, and stated that it

- 108 -

planned to "commonize the friction lever in pedals used in other markets, including the United States."

441.     As previously noted, on September 29, 2009, Toyota issued a Technical Instruction to Toyota distributors in 31 European countries, including Austria, Belgium, Cyprus, the Czech Republic, Denmark, Estonia,  Finland, France, Germany, Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland, Turkey, Portugal, Russia, Slovenia,  Spain, Sweden, Switzerland, Ukraine, the U.K., Georgia, Kazakhstan, and Romania.

442.     The Technical Instruction identified a production improvement and repair procedure to address complaints by customers in those countries of sticky accelerator pedals, sudden engine RPM increases and/or sudden vehicle acceleration.

443.     No disclosure of this TI was made to consumers or regulators in North America or other countries of the World.

444.     Also in September 2009, Toyota confirmed that a sticky accelerator complaint originating from a Toyota Matrix owner in Arizona was caused by the same phenomenon as the sticky accelerator pedals on the Yaris and Argo vehicles in the U.K.

445.     Toyota continued to receive FTRs regarding sticking accelerator pedals from its customers in the United States throughout the remainder of 2009.

446.     Among other things, on September 29, 2009, Toyota initiated action regarding European Toyota vehicles equipped with CTS accelerator pedals manufactured from PA46 and/or PPS plastic.

447.     Toyota knew or should have known at all relevant times that a significant number of its vehicles sold in the United States (approximately 2.3 million vehicles) were equipped with the same or materially similar CTS accelerator pedals.

448.     Toyota also knew or should have known at all relevant times that Toyota Vehicles sold in Canada and Mexico, as well as other countries of the World, were equipped with the same materially similar CTS accelerator pedals.

449.     Nonetheless, Toyota failed to take any action to remedy the issue in the United States until January 21, 2010 – a delay of almost four months.  It is unclear what action, if any, Toyota has taken in Canada, Mexico, or non-European countries of the World.

450.     On October 7, 2009, a staff member of TMC's Product Planning and Management Division ("PPM") sent a staff member at TEMA's PPM a copy of an Engineering Change Instruction that described the design change (longer friction level, POM material) for the accelerator pedal of a RAV4 manufactured in Ontario, Canada by TMMC.

451.     This change was the same as that implemented in Europe.

452.     However, on October 21, 2009, a member of the TMC PPM inexplicably instructed a member of the TEMA PPM ***not*** to implement this Engineering Change Instruction.

453.     Furthermore, in November 2009, Toyota provided NHTSA with FTRs regarding sticking accelerator pedals on vehicles in the United States but not with information regarding Toyota's extensive testing and determinations regarding the cause of the sticking accelerator pedals or an explanation of the significance of the FTRs.

454.     On or about October 13, 2009, TMC issued an Intra-Company Communication ("ICC") to Toyota personnel in Japan and in the United States concerning a Toyota Corolla sold in Missouri that was the subject of a sticky accelerator pedal complaint.

455.     The ICC noted that sticky pedal was identified on or about September 24, 2009, five days prior to Toyota's floor mat advisory to United States consumers (and the sticky pedal TI to European consumers also issued on the same day).

456.     The ICC further documented that Toyota recovered the accelerator pedal and installed it on a 2010 Corolla fleet vehicle, that Toyota verified the sticking accelerator pedal, and that the subject accelerator pedal was then handed over to Customer Quality Engineering in Los Angeles for further analysis on or about October 5, 2009.

457.     Between October 22, 2009 through October 28, 2009, Toyota issued three Field Technical Reports ("FTRs") concerning sticky accelerator pedals in Corollas sold in the United States and conducted a parts recovery.

458.     On January 16, 2010, Katsuhiko Koganei (a.k.a. "Kogi"), TMS Executive Coordinator – Corporate Communications, sent an e-mail to Mike Michels at Toyota, stating "we should not mention about the mechanical failures of acc. [sic] pedal, because we have not clarified the real cause of the sticking accelerator pedal formally, and the remedy for the matter has not been confirmed."

459.     The email was sent three days before a meeting scheduled with (among others) Toyota's two lead North American Executives, James Lentz (Torrance, CA) and Yoshimi Inaba (New York, NY), and NHTSA.

460.     The email was copied to at least 15 other Toyota Executives, including Irv Miller (Torrance, CA), TMS group Vice President, Environmental and Public Affairs.

461.     On January 16, 2010, Irv Miller sent an e-mail to Mr. Koganei stating:

> I hate to break this to you but WE HAVE A tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options.

> We better just hope that they can get NHTSA to work
> with us in coming with a workable solution that does not
> put us out of business.[64]

462.     It was not until January 19, 2010, two days before initiating its safety-related recall on the sticky pedal issue, that Toyota met with NHTSA, at NHTSA's request, to describe and discuss the sticky pedal phenomenon in Europe and the United States.

463.     Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC.

464.     In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents.

465.     Secretly while it was interacting with NHTSA on these issues, Toyota was investigating SUA events observed by its own employees in Toyota vehicles they were driving:

> Jason,
>
> Here is the summary of events.
>
> Went across Buffalo Bridge, stopped & turned left on 35.
> Went across bridge and started up the hill.
> Briefly accelerated at W.O.T. for down shift.
> Let off throttle & vehicle continued to accelerate.
> Depressed brake (thinking something was wrong with
> cruise control)
> No change vehicle continued to accelerate.

---

[64] TOY-MDLID00027481.

- 113 -

> Depressed brake peddle hard, vehicle continued to pull.
> Shifted to Neutral and engine reved to rev limiter.
> Not for certain what occurred to get the throttle back to
> normal condition, but I did move my foot around the
> accelerator & brake peddle after the vehicle was in
> Neutral & acceleration stopped.
>
> David Kovich
> Customer Quality Engineering (CQE-CIN), Quality
> Division

466.     On January 21, 2010, Toyota notified NHTSA that it was submitting a "Defect Information Report" concerning a recall of eight models due to a "defect [that] exists in the accelerator pedal assembly which may result in the accelerator pedal becoming harder to depress, slower to return, or, in the worst case, mechanically stuck . . . .".[65]

467.     Toyota issued this Defect Report despite indicating that the percentage of vehicles estimated to experience malfunction was "unknown," meaning that Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle.

468.     Toyota did not issue any safety advisories to North American consumers or other FELPs in the World regarding the sticking pedal issue until, at the earliest, January 21, 2010, when it issued the sticky pedal recall in the United States.

---

[65] TOY-MDLID00041350.

469.     The recall involved approximately 2.3 million Toyota Vehicles in the U.S.

470.     On or about January 26, 2010, Toyota announced in a press release issued from Torrance, California that it was voluntarily suspending sales of eight models involved in the January 21, 2010 recall for sticking accelerator pedals, including its top selling Camry and Corolla models.

471.     Group Vice President and Toyota Division General Manager Bob Carter made clear that "[t]his action is necessary until a remedy is finalized."

472.     Toyota further announced that due to the sales suspension, Toyota was expected to stop producing vehicles on several North American production lines. Toyota did not resume sales of these vehicles until February 5, 2010.

473.     The foregoing mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

474.     On or about April 5, 2010, NHTSA announced that it was seeking a $16.375 million civil penalty from TMC due to the Toyota Defendants' failure to appropriately inform NHTSA with regard to a potential defect in its vehicles stemming from TMC's knowledge of the sticking pedal defect.

475.     This sanction presented the largest financial penalty ever imposed on an automaker by the United States Government and was the largest fine permitted by law.

476.     Transportation Secretary Ray LaHood stated, "[b]y failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

477.     On or about April 19, 2010, TMC agreed to pay NHTSA's record $16.375 million fine, and avoided any official findings of fact by NHTSA.

478.     TMC admits that it "could have done a better job of sharing relevant information within our [Toyota's] global operations and outside the company …"

### 7.     Toyota considered "fixing" SUA, yet deliberately chose to carve out Mexico and the World for cost reasons

479.     As evidenced by Toyota's prepared document entitled "Philosophy on application of accelerator pedals and floor mats, whose design has been changed for vehicles delivered in the U.S., to vehicles delivered in other countries," TMC planned to "change the design of the mass production vehicles delivered in North America."   It decided, however, not to incorporate the same design change elsewhere in Mexico or the World because there are fewer sales outside of the United States and Canada, thus "the risk will be minimized." [66]

480.     Though TMC recognized that there was a need to "change" the design of certain Toyota Vehicles' accelerator pedals, its fear that customers may "misunderstand that Toyota accepts these vehicles as defective products" and other financial concerns kept TMC from being honest with customers outside of the

[66] TOY-MDLID00137610T

United States and Canada, from disclosing the truth, and from fixing such customers accelerator pedals to ensure their safety.

### 8. The Internal Death by SUA Chart

481.     Throughout the years, Toyota received reports covering various Toyota models detailing incidents involving deaths due to SUA.

482.     Belatedly, on February 10, 2010, Toyota assembled these into what is in effect an internal death by SUA chart[67] as follows:

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| SIENNA | 2007 | 20070811 | ON AUGUST 11, 2007,  MY FAMILY EXPERIENCED A HEAD ON COLLISION.  WE WERE DRIVING A 2007 TOYOTA SIENNA.  MY HUSBAND WAS DRIVING AND DIED AT THE SCENE.  THE INVESTIGATION NEVER FOUND ANY REASON FOR THE CAUSE OF THE ACCIDENT.  MY HUSBAND CROSSED THE CENTER LINE WHILE GOING ROUND A SLIGHT CURVE.  HE WAS 47,  POOR WEATHER WAS NOT ISSUE.  IF THE ACCELERATOR ON THE SIENNA MALFUNCTIONED AND DID NOT RESPOND,  THAT COULD DEFINITELY BE A FACTOR.  OUR VAN HAD LESS THAN 3000 MILES ON IT.  WE PURCHASED IN MAY 11, 2007.  THE AUTOPSY FOR MY HUSBAND CAME BACK NEGATIVE FOR ANY MEDICAL CONDITION CONCERN.  PLEASE INVESTIGATE OUR ACCIDENT REPORT AND BE SURE THE SAFETY AND RELIABILITY OF SIENNAS IS SOUND. |
| GX470 | 2003 | 20090206 | I WAS TRAVELING WEST  ON A TWO LANE PAVED ROAD (SUTTON ROAD) NEAR SUTTON SCHOOL.  WEATHER WAS SNOWING AND ROAD CONDITIONS SLIPPERY WHEN MY ACCERERATOR FAILED TO RETURN TO IDLE POSITION.  I APPLIED BRAKES AS I WAS APPROACHING A VEHICLE IN FRONT OF ME TRAVELING IN THE SAME DIRECTION.  THE ELECTRONIC STABILITY CONTROL FAILED TO MAINTAIN STRAIGHT DIRECTION AS PER DESIGN INTENT AND MANUALS.  FRONT BEGAN SLIDING TO LEFT AND REAR OF VEHICLE BEGAN SLIDING TO RIGHT.   I INCREASED BRAKE PRESSURE AND STEERED INTO TH SKID , TO THE RIGHT.  I WAS ABLE TO MISS THE CONTACT WITH ANY OTHER VEHICLES AND OR DAMAGE ANY PROPERTY , BUT DID END UP SLIDING INTO A DITCH OFF OF THE ROAD. WITH THE IMPACT RESULTING IN THE DEATH OF MY SERVICE DOG . AS I AM HANDICAPPED.  NO DAMAGE TO MY VEHICLE , BUT NO I AM VIRTUALLY IMMOBILE WITH THE LOSS IF MY DEAR SERVICE DOG. |
| PRIUS | 2005 | 20091022 | OUR  SON WAS KILLED ON OCT 22ND IN A SINGLE CAR CRASH WHILE DRIVING A 2005 TOYOTA PRIUS( THE POLICE REPORT STATES THAT HE LOST CONTROL, JUMPED THE CURB AND DIED IN THE ENSUING CRASH) WHILE NEGOTIATING A CURVE WHILE ATTEMPTING TO ENTER THE FREEWAY IN TUCSON AZ. WE STRONGLY BELIEVE THAT THIS MAY HAVE BEEN CAUSED BY SUDDEN ACCELERATION AND OR BREAK PROBLEMS. I KNOW THIS IS AN OLDER MODEL, BUT IN LIGHT OF TOYOTA'S LIES AND COVERUPS TIME WILL ONLY TELL. |

---

[67] TOY-MDLID00017271

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| SCION TC | 2007 | 20090811 | 2007 SCIION TC SET ON CRUISE AT 70 MPH CRASHED INTO GUARDRAIL ON HIGHWAY. MY SON WAS DRIVING AND HE DOES NOT REMEMBER THE CAUSE OF THE ACCIDENT BUT STATE POLICE ACCIDENT RECONSTRUCTION CLAIM CAR HIT THE GUARDRAIL AT A SPEED IN EXCESS OF 100 MPH UPON CRASH. CRASH SEVERLY INJURED MY SON AND KILLED HIS CHILDHOOD FRIEND. TWO THINGS ARE KNOWN FOR CERTAIN, DRIVER CLAIMS CAR WAS ON CRUISE AND ACCIDENT REPORT STATES SPEED OVER 100 MPH.  THE CRASHES ON THESE CARS ARE OVERLOOKED BECAUSE MOSTLY TEENAGERS AND YOUNG ADULTS ARE BUYING THEM AND OFFICIALS AND INSURANCE COMPANIES BLAME ACCIDENTS ON DRIVER INEXERPERIENCE. |
| 4RUNNER | 1992 | 19920303 | A 1992 TOYOTA 4-RUNNER WAS PURCHASED AND WE ONLY HAD IT FOR TWO WEEKS.  THE TRUCK WAS DRIVEN TO WEST VIRGINIA.  THE NEXT DAY THE TRUCK SUDDENLY ACCELERATED AT A HIGH SPEED AND WHEN THE BRAKES WERE APPLIED IT WOULD NOT STOP.  IT CRASHED AND FLIPPED OVER.  MY HUSBAND DIED IN THAT TRUCK.  THERE WAS A LAW SUITE BUT IT NEVER WENT TO COURT AFTER FIVE YEARS.  MY LAWYERS GAVE UP.  TOYOTA NEVER SETTLED WITH ME AND ONLY SAID IT WAS DRIVER ERROR.  THE ENGINEER WHO WAS ON THE CASE SAID THERE WAS A DESIGN DEFECT BUT THEY COULD NOT PROVE IT.  SEE ALSO ODI 10121117 *DSY *TR |
| HIGHLANDER | 2008 | 20091130 | TL* THE CONTACT'S SISTER OWNS A 2008 TOYOTA HIGHLANDER. THE CONTACT'S SISTER WAS DRIVING AND THE VEHICLE ACCELERATED ACROSS THE INTERSTATE, HIT AN EMBANKMENT AND THEN WAS HIT BY A TRUCK. THE VEHICLE BURNED AND THE DRIVER WAS KILLED AS A RESULT OF THE ACCIDENT. THE VEHICLE WAS DESTROYED BUT THERE WAS NO INVESTIGATION INTO THE CAUSE FOR THE ACCIDENT. THE CONTACT CALLED THE MANUFACTURER BUT WAS NOT ABLE TO GET IN TOUCH WITH ANY REPRESENTATIVES. THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 33,000. |
| TACOMA | 2008 | 20100126 | TOYOTA TACOMA 2008  PLEASE STUDY THIS ACCIDENT. IT MAY RELATE TO THE GAS PEDAL, SO LET TOYOTA KNOW TO RECALL THIS MODEL TOO SO TO PREVENT AN ANOTHER FATAL ACCIDENT LIKE MY BROTHER HAD. *TR |
| SOLARA | 2004 | 20090928 | ON SEPTEMBER 28, 2009 MY MOTHER WAS DRIVING HER 2004 TOYOTA SOLARA AND HAD AN ACCIDENT. THE CAR JUMPED THE CURB, HIT A TREE, A LAMP POST, AND CRASHED INTO A STONE SIGN. SHE WAS TAKEN TO THE HOSPITAL WHERE THEY FOUND A LARGE BRUISE ON HER ARM. THE DOCTORS SENT HER FOR A SCAN RIGHT AWAY, BUT SHE HAD A STROKE AND NEVER RECOVERED. SHE DIED FOUR DAYS LATER. I REALIZE THAT THE CURRENT TOYOTA ACCELERATOR RECALL DOES NOT INVOLVE THE SOLARA AT THIS TIME, BUT OUR FAMILY IS NOW SUSPICIOUS. A CAUSE OF MY MOTHER'S ACCIDENT HAS NOT BE DETERMINED. SHE DIED BEFORE THE POLICE WERE ABLE TO ASK HER ABOUT THE ACCIDENT. THE CAR IS STILL SMASHED UP AND HAS NOT BEEN REPAIRED. SHOULD WE INVESTIGATE THIS MATTER FURTHER? TW* |
| HIGHLANDER | 2005 | 20091013 | TOYOTA HIGHLANDER 2005. PETERBORO , NH. 11 AM. DRIVER WAS REPORTED TO PASS VEHICLE ON RIGHT IN BREAK DOWN LANE, THEN TRIED TO PASS ANOTHER CAR  BY GOING INTO LEFT LANE AND HIT ONCOMING VEHICLE. FOUR PEOPLE KILLED. DRIVER WAS VERY EXPERIENCED --EXCELLENT SAFETY RECORD. I HAD BEEN IN HIS CAR WITH HIM HUNDREDS OF TIMES. VERY SAFE DRIVER --NO COWBOY.   BELIEVE CAR HAD UNCONTROLLED ACCELERATION.  *CN |
| CAMRY | 2007 | 20080412 | TL* THE CONTACT OWNED A 2007 TOYOTA CAMRY LE. WHILE DRIVING THE ACCELERATOR PEDAL BECAME ENTRAPPED BY THE FLOOR-MAT.  AS A CONSEQUENCE HE CRASHED INTO ANOTHER VEHICLE.  THE DRIVER OF THE OTHER VEHICLE WAS KILLED. BOTH VEHICLES CAUGHT ON FIRE. THE FAILURE AND CURRENT MILEAGES WERE UNKNOWN. THE VEHICLE IDENTIFICATION NUMBER WAS UNAVAILABLE. |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| IS250 | 2006 | 20090410 | TL* THE CONTACT OWNS A 2006 LEXUS IS250.  WHILE DRIVING THE VEHICLE RAPIDLY INCREASED ITS SPEED UP TO 90 MPH . HE ATTEMPTED TO REMOVE THE FLOOR- MAT FROM UNDER THE ACCELERATOR PEDAL. HOWEVER, THE VEHICLE VEERED OFF OF THE ROAD AND THEN INTO A DITCH.  WHEN THE VEHICLE ROLLED OVER, ONE OCCUPANT WAS EJECTED FROM THE FRONT SEAT; SINCE HE WAS NOT WEARING A SEAT BELT. THE OTHER THREE PASSENGERS HAD BRUISES LACERATIONS, AND WERE HOSPITALIZED.  THE VEHICLE WAS COMPLETELY DESTROYED. A POLICE REPORT WAS AVAILABLE. THE FAILURE MILEAGE WAS 24,000. |
| AVALON | 2001 | 20070409 | LET ME EXPLAIN FIRST, I CAN'T SUBSTANTIATE THE CLAIM I AM MAKING ABOUT THE POSSIBLE CAUSE OF THE ACCIDENT THAT KILLED MY WIFE WHEN DRIVING A 2001 TOYOTA AVALON.  THE REASON THE ACCIDENT OCCURRED IS THAT SHE DID NOT STOP AT AN INTERSECTION CONTROLLED WITH A STOP SIGN. THE ACCIDENT OCCURRED IN CALLAHAN COUNTY, TEXAS AT THE INTERSECTION OF FM 1750 AND HIGHWAY 36 ON APRIL 9, 2007 AT APPROXIMATELY 8:30PM. SHE DROVE UNDER THE TRAILER OF AN 18 WHEELER, WAS KILLED INSTANTLY AND DRAGGED UNDER THE TRAILER FOR 800 TO 900 FIT.  IT TOOK THE ABILENE FIRE DEPARTMENTS EXPERTISE TO REMOVE HER BODY FROM THE WRECKAGE. THE LOCAL VOLUNTEER FIRE DEPARTMENTS DID NOT WANT TO ATTEMPT IT.  THERE WERE NO SKID MARKS.  SHE HAD DRIVEN THIS ROUTE COUNTLESS TIMES AND WAS AWARE OF THE STOP SIGN.  I CHECKED CELL PHONE RECORDS AND THERE WAS NO EVIDENCE THAT SHE COULD HAVE BEEN ON THE PHONE.  ADMITTEDLY SHE WAS UPSET.  SHE WAS DRIVING FROM ABILENE TO MEXIA, TEXAS TO BE WITH HER ELDERLY MOTHER WHO WAS IN A DIABETIC COMA WHEN SHE LAST SPOKE TO SOMEONE.  HOWEVER RAY ANN WAS A GOOD DRIVER. I CAN'T BELIEVE THAT SHE WAS SO DISTRACTED TO ALLOW THIS TO HAPPEN. IN LIGHT OF THE RECENT RECALL BY TOYOTA, I BELIEVE THAT HER AVALON SUDDENLY ACCELERATED OUT OF CONTROL.  NO SKID MARKS WERE AT THE SCENE ONLY CUTOUTS IN THE PAYMENT THAT WERE CAUSED BY HER CAR AS IT WENT UNDER THE TRAILER.  WHY NO SKID MARKS?  AS SHOWN ON CONSUMER REPORT INTERNET VIDEO, THE BRAKES ARE NOT ABLE TO SLOW THE CAR DOWN AS IT IS ACCELERATING AND SKID MARKS WOULD NOT HAVE BEEN POSSIBLE. THERE IS NO OTHER EXPLANATION IN MY MIND AS TO HOW RAY ANN COULD HAVE MISSED THE STOP SIGN.  THE CAR WAS OUT OF HER CONTROL AND IT KILLED HER.  IF YOU WOULD LIKE TO HAVE THE VIN, PLEASE CONTACT ME.  I WILL PULL IT OUT OF THE RECORDS I HAVE.  THANK YOU FOR YOUR CONSIDERATION AND ANY RESPONSE.  THIS IS SUCH A TRAGEDY THAT UNTIL THE RECALL LEFT ME WITHOUT ANY EXPLANATION THAT WAS BELIEVABLE.  I NOW BELIEVE I KNOW WHAT HAPPENED. *TR |
| CAMRY | 2005 | 20090804 | TL* THE DRIVER OWNS A 2005 TOYOTA CAMRY.  HER SON IN LAW,  WHILE DRIVING, WAS KILLED IN A VEHICLE CRASH. THE POLICE REPORT STATES THAT THE VEHICLE WAS SPEEDING AND THAT THE DRIVER COULD NOT CONTROL THE VEHICLE. SHE FILED A COMPLAINT WITH TOYOTA MANUFACTURER REGARDING UNINTENDED VEHICLE ACCELERATION. THE FAILURE MILEAGE WAS 45,000.  THE VIN NUMBER WAS UNKNOWN. |
| CAMRY | 2007 | 20090527 | HIGH SPEED COLLISION INVOLVING A 2007 TOYOTA CAMRY.    DRIVER WAS FAMILIAR WITH ROAD AND WAS NOT KNOWN TO DRIVE AGGRESSIVELY OR SIGNIFICANTLY ABOVE SPEED LIMIT. TOXICOLOGY REPORTS CAME BACK NEGATIVE. DRIVER HAD BIPOLAR DISORDER AND WAS DRIVING SELF TO HOSPITAL, BUT THERE WAS NO INDICATION AT ALL OF SUICIDAL BEHAVIOR/INTENT.   POLICE REPORT PUT RATE OF SPEED AT TIME OF COLLISION AT  LEAST 85 MPH. CONVERSATIONS WITH INVESTIGATORS INDICATE THAT SEVERITY OF COLLISION INDICATES SPEED MAY HAVE BEEN 100MPH. POSTED SPEED WAS APPROXIMATELY 40MPH. *TR |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| ES350 | 2009 | 20090828 | ON AUGUST 28, 2009, FOUR OCCUPANTS OF A 2009 LEXUS ES350 TRAGICALLY AND UNNECESSARILY DIED IN SANTEE, CALIFORNIA IN SAN DIEGO COUNTY FOLLOWING A HIGH SPEED LOSS OF CONTROL AND ROLLOVER EVENT.  THE VEHICLE IN QUESTION WAS A LOANER CAR FROM BOB BAKER LEXUS IN EL CAJON, CALIFORNIA.  DRIVER OF THE VEHICLE, 45, A 19 YEAR VETERAN OF THE CALIFORNIA HIGHWAY PATROL.  THE DRIVER HAD OBTAINED THE VEHICLE THAT DAY AFTER DROPPING OFF HIS LEXUS FOR SERVICE. WITNESSES REPORT THAT THE OFFICER WAS MANEUVERING THE LEXUS IN AND OUT OF TRAFFIC AT HIGH RATES OF SPEED ON STATE ROUTE 125, HONKING HIS HORN WITH THE HAZARD LIGHTS ON, PRIOR TO THE HIGHWAY ENDING AT AN INTERSECTION.     THE OFFICER ATTEMPTED TO NEGOTIATE A TURN BUT COULD NOT AVOID STRIKING ANOTHER VEHICLE AND LOSING CONTROL BECAUSE OF HIS HIGH RATE OF SPEED.  THE VEHICLE LOST CONTROL, ROLLED SEVERAL TIMES, AND CAUGHT FIRE.  ALL FOUR OCCUPANTS ARE REPORTED TO HAVE DIED ALMOST IMMEDIATELY.   PRIOR TO ENTERING THE INTERSECTION, AN OCCUPANT OF THE VEHICLE CALLED 911 EMERGENCY TO REPORT THAT THE ACCELERATOR WAS STUCK.  HE REPORTED THAT THE VEHICLE WAS TRAVELING 120 MILES PER HOUR AND THAT THEY WERE APPROACHING AN INTERSECTION.  OCCUPANTS ARE HEARD TELLING EACH OTHER TO PRAY BEFORE A WOMAN SCREAMS AND THE CALL SUDDENLY ENDS.   THE OFFICER(DRIVER OF THE VEHICLE, HIS WIFE , 45, AND THEIR 14 YEAR OLD DAUGHTER  ALL DIED IN THE CRASH.  THE WIFE'S BROTHER, 38, ALSO DIED.   ON BEHALF OF THE SURVIVING FAMILY MEMBERS OF THE DECEDENTS, WE RESPECTFULLY REQUEST YOU TO INVESTIGATE WHY THIS LEXUS VEHICLE'S ACCELERATOR MALFUNCTIONED, AND WHY A HIGHLY-TRAINED OFFICER AND DRIVER LIKE THE OFFICER WAS UNABLE TO RE-GAIN CONTROL OF THE LEXUS VEHICLE AT ISSUE OR OTHERWISE AVOID CATASTROPHE.  WE CURRENTLY ARE AWAITING ADDITIONAL FACTS SURROUNDING THE INCIDENT, AND THE MALFUNCTION OF THE LEXUS, BUT WILL SUPPLEMENT THIS COMPLAINT UPON RECEIPT. *TR UPDATED 12/01/09 *BF  UPDATED 12/01/09 |
| ES330 | 2006 | 20080826 | TL*THE CONTACT OWNS A 2006 LEXUS ES330.  WHILE MERGING INTO THE RIGHT LANE AT APPROXIMATELY 25 MPH, THE VEHICLE SUDDENLY ACCELERATED.  THE CONTACT WAS UNABLE TO BRAKE AND STRUCK A PEDESTRIAN.  THE PEDESTRIAN DIED DUE TO INJURIES.  THE CONTACT ALSO REAR ENDED TWO OTHER VEHICLES AND DROVE THROUGH A FENCE.  THE VEHICLE CAME TO A STOP WHEN IT CRASHED INTO A GUARD RAIL.  THE MANUFACTURER STATED THAT THE CAUSE OF THE FAILURE COULD HAVE BEEN THE FLOORMAT.  THE INSURANCE COMPANY CLAIMED THAT THE VEHICLE WAS DESTROYED.  THE CONTACT RECEIVED INJURIES TO HER BACK, NECK, AND LEG.  TWO OTHERS WERE ALSO INJURED.  STATE POLICE REPORT NUMBER 5271887 WAS FILED.  THE FAILURE AND CURRENT MILEAGES WERE 26,286. UPDATED 10/01/08. *LJ  THE MANUFACTURER STATED THE FLOOR MATS MAY HAVE BECOME STUCK UNDER THE ACCELERATOR WHICH CAUSED THE VEHICLE TO ACCELERATE OUT OF CONTROL. UPDATED 10/08/08. *JB |
| TUNDRA | 2007 | 20080220 | TL*THE CONTACT OWNED A 2007 TOYOTA TUNDRA. WHILE THE CONTACT'S HUSBAND WAS DRIVING AT AN UNKNOWN SPEED, THE VEHICLE ACCELERATED BETWEEN APPROXIMATELY 80-100 MPH,  CRASHED INTO A TREE AND THE DRIVER WAS KILLED.  THE VEHICLE WAS DESTROYED.  THE CONTACT BELIEVED THAT THE CRASH WAS RELATED TO THE RECALL ABOUT THE AFTERMARKET ALL WEATHER FLOOR MATS BECOMING STUCK AND CAUSING THE VEHICLE TO ACCELERATE.   A POLICE REPORT WAS FILED.  THE CURRENT AND FAILURE MILEAGES WERE APPROXIMATELY 35,000. UPDATED 03-11-08 *BF |

| MODELTXT | YEARTXT | FAILDATE | CDESCR |
|---|---|---|---|
| CAMRY | 2004 | 20040314 | MY MOTHER AND FRIEND STARTED OUT FOR CHURCH, THE FRIEND HAD COME TO PICK HER UP WHEN THE 2004 TOYOTA CAMRY WITH LESS THAN 3000 MILES ON IT WAS HAVING DIFFICULTY SHIFTING INTO REVERSE, THEN WHEN SHE SHIFTED INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY EST SPEED ON 80 - 92 MILE A HOUR IN LESS THAN 250 FT WHEN THE CAR HIT A MOBILE HOME. THEY HIT SO HARD IT MOVED DOUBLE WIDE ALMOST A FOOT. KILLING MY MOTHER THE PASSENGER AND INJURY TO HER FRIEND THE DRIVER. NO AIR BAG DEPLOYED AND WHEN TOYOTA WAS CONTACTED THEY REFUSED TO SPECK TO US.  ATTORNEYS HAVE SAID THAT TOYOTA IS SO BIG, NOT COST AFFECTIVE....SO I WATCH AND IN TWO YEARS THERE ARE MANY MANY MORE NOW....HOW MANY MORE HAVE TO DIE BEFORE SOMETHING IS DONE.  SEE ALSO 10074472. *DSY *NM |
| AVALON | 2003 | 20041109 | MY MOTHER-IN-LAW WHO ALWAYS WORE HER SEAT BELT WAS DRIVING HOME AT NIGHT AND SOMEHOW RAN OFF THE ROAD HIT A LITTLE CHERRY TREE AND WAS THROWN FROM HER CAR & KILLED HER. THE SIDE NOR THE FRONT AIR BAGS WENT OFF. AND APPARENTLY THE SEAT BELTS FAILED TOO. THE HIGHWAY PARTROL CAN'T FIGURE OUT WHAT HAPPENED.*AK |
| CAMRY | 2003 | 20040315 | WHILE IN A PARKING LOT AND BACKING OUT OF A PARKING SPACE VEHICLE ACCELERATED SUDDENLY HITTING A PEDESTRIAN. *AK  ONE PERSON WAS INJURED AND ONE PERSON WAS KILLED IN THIS ACCIDENT.  THE CONSUMER REFUSED TO DRIVE THE VEHICLE AFTER THIS INCIDENT AND RETURNED THE VEHICLE TO THE DEALER.  *NM |
| CAMRY | 2004 | 20040314 | DIFFICULTY SHIFTING FROM PARK TO REVERSE, THEN UPON SHIFTING INTO DRIVE THE CAR ACCELERATED UNCONTROLLABLY, WOULD NOT STOP, COLLIDED WITH A MOBILE HOME, AIR BAGS DID NOT DEPLOY, RESULTING IN THE DEATH OF ONE PASSENGER AND INJURY OF DRIVER  *LA  SEE ALSO VOQ 10171110. *DSY. |
| CAMRY | 2002 | 20030904 | MAKIA CAFUA, DRIVING HER 2002 TOYOTA CAMRY, VIN 4TIE32K92U636868, WAS ENTERING I-93 AT EXIT 39 AT 5:30 IN THE MORNING WHEN HER CAR SUDDENLY SHOT ACROSS THREE LANES OF TRAVEL AND WAS HIT, BROAD SIDE, BY ANOTHER VEHICLE TRAVELING IN THE HIGH SPEED (3RD) LANE. TRAFFIC AT THE TIME OF THE ACCIDENT WAS LIGHT.  IT IS BELIEVED THAT THE CAMRY EXPERIENCED AN UN-COMMANDED ACCELERATION CAUSING MRS. CAFUA TO LOSE CONTROL RESULTING IN THE ACCIDENT AND HER DEATH.  THE CAMRY HAS BEEN STORED SINCE THE ACCIDENT AND NO CHANGES HAVE BEEN MADE TO ITS POST ACCIDENT CONDITION. VEHICLE IS AVAILABLE FOR INPECTION/TESTING BY NHTSA. *AK |
| CAMRY | 2002 | 20040122 | WITNESSES SAW MY PARENTS VEHICLE (A 2002 TOYOTA CAMRY) COMING TO A STOP AND THEN SUDDENLY ACCELERATE.*AK |
| CAMRY | 2003 | 20040316 | WHEN COMING OUT OF A PARKING LOT ACCELERATOR  STUCK, CAUSING THE VEHICLE TO ACCELERATE OUT OF CONTROL.  VEHICLE GRAZED ANOTHER VEHICLE, WENT ACROSS A STREET, GRAZED A BUILDING, AND DROVE STRAIGHT INTO ANOTHER BUILDING.  DRIVER WAS CONSCIOUS WHEN PARAMEDIC ARRIVED.  THEY  FOUND THE DRIVER WITH BOTH FEET STILL ON THE BRAKE PEDAL.  DRIVER WAS TRANSPORTED TO THE HOSPITAL, AND LATER DIED DUE TO FATAL INJURIES FROM THE CRASH.  THE INSURANCE COMPANY  PRESERVED THE VEHICLE AS EVIDENCE.  THE POLICE REPORT STATED THE CRASH WAS DUE TO A MECHANICAL DEFECT. *AK  *NM |

483.     The gravity of the SUA defect and Toyota's knowledge of the defect is evident from the descriptions provided by vehicle owners.

- 121 -

9.      **Toyota Continues to Deny Electronic Throttle Defect Despite Post-Recall Complaints**

484.      Toyota and NHTSA continued to receive complaints of unintended acceleration by vehicles not involved in the recalls or by vehicles which have participated in the recalls and were "fixed."

485.      On February 22, 2010, Toyota conducted a "webinar" purporting to address the various safety concerns plaguing Toyota and Lexus vehicles.

486.      While Toyota had previously claimed that the braking problems in the Prius and Lexus ES 250h were unrelated to the unintended acceleration problem, in the webinar, Toyota admitted they were linked by suggesting that the ETCS-i system facilitates electronic braking control (among the other "advantages" Toyota touted in regard to the ETCS-i system).

487.      On March 2, 2010, TMC Executive Vice President, Takeshi Uchiyamada, Executive Vice President, submitted prepared testimony to the Senate Committee on Commerce, Science and Transportation.

488.      Mr. Uchiyamada's testimony purported that the ETCS-i system is tested "extensively both in the design phase and after it is developed to ensure that there is no possibility of 'sudden unintended acceleration.'"

489.      In reality, Toyota relies heavily upon its component suppliers to perform such testing.

490.     Toyota's suppliers typically complete Toyota's parts level testing independently.

491.     Toyota performance standards apply only to Tier 1 suppliers.

492.     Toyota does not have any clearly written rules or regulations about who must conform to Toyota's standards below its Tier 1 suppliers.

493.     For instance, while Toyota may impose testing standards on CTS (the supplier of the sticky accelerator pedals at issue), when questioned before Congress, Toyota engineers could not affirmatively testify as to whether Toyota imposed similar controls on the manufacturers of the sensors and circuit board that CTS utilizes in its pedal.

494.     Moreover, Toyota's engineers admitted that "there is no particular or special testing that would directly prove that there is no unintended acceleration."

495.     On March 5, 2010, Congressmen Henry A. Waxman and Bart T. Stupak, Chairmen of the House Subcommittee on Oversight and Investigation, wrote a letter to James E. Lentz, President and Chief Operations Officer of Toyota Motor Sales U.S.A., Inc., stating, among other things:

> We do not understand the basis for Toyota's repeated assertions that it is "confident" there are no electronic defects contributing to incidents of sudden acceleration. We wrote you on February 2, 1010, to request "all analyses or documents that substantiate" Toyota's claim that electronic malfunctions are not causing sudden unintended acceleration. The documents that Toyota provided in response to this request did not provide convincing substantiation. We explained our concerns

about the failure of Toyota to substantiate its assertions in our letter to you in February 22, 2010.

After we sent our letter on February 22, Toyota provided a few additional documents to the Committee early in the morning on the day of the hearing.   Several of these documents were written in Japanese.   While some of these documents appear to contain preliminary fault analyses that could be used in planning a rigorous study of potential cause of sudden unintended acceleration, not one of them suggested that such a rigorous study had taken place.   As we explained in our February 22 letter, the only document Toyota has provided to the Committee that claims to study the phenomenon of sudden unintended acceleration in a comprehensive way, is an interim report from the consulting firm Exponent, Inc. This report has serious deficiencies, as we explained in our February 22 letter.

496.    Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements.

497.    For example, when asked why Toyota believed there were no problems with the ETCS-i, its technical analysis manager testified falsely that "[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

498.     Reports of SUA events occurring after vehicles have received a pedal and floor mat fix contradict Toyota's claim that the recalls have fixed the SUA defect issues:

> The contact owns a 2009 Toyota Camry, while the contact was attempting to stop the vehicle traveling at a low speed, the vehicle felt as if it was still accelerating once the brakes were applied. The vehicle was taken to the dealership where the contact was informed that the vehicle was performing normally.  *One day prior to the recent failure, the contact had taken her vehicle to the dealership where both NHTSA recalls,* 10v017000, and 09v388000, vehicle speed control, accelerator pedal were performed on her vehicle.  The current failure mileages were 26000.

> The contact owns a 2007 Toyota Camry.  While the contact was driving 30 mph the vehicle *suddenly began to accelerate causing the vehicle to crash in to a ditch,* the vehicle was still accelerating while it was stuck in the ditch which caused the front end of the vehicle to catch on fire.  No one was injured during the incident.  A police report was filed. Four days prior to the recent incident the contact had taken the vehicle to the dealership *and the NHTSA campaign ID number, 09v388000 and 10v017000 were performed* on the vehicle.  The current and failure mileages were 26000.

> 2007 Toyota Camry Le continues to have runaway unintended acceleration despite the vehicle undergoing a series of modifications at a Toyota dealership in Auburn, CA.  *It has happened prior to being fixed and has happened once since being fixed.*

> I drive a 2007 Toyota Camry *this is one of the safety recall cars.*  I had been having issues with acceleration before the recall, then got the recall fixed on February 21st.  I had a few small issues these past few weeks with it suddenly accelerated but this morning the way to work I was driving on the 101 in Phoenix heading to work when my Camry suddenly started accelerating this time it was not a small issue but it accelerated to almost 80 mph I was driving around 65 mph when it suddenly started.  I got the car slowed down and pulled over to the side of the road to catch my breath because I was very scared.  I then made it the rest of my way to work which was about 8 miles.  I drive

50 miles each way to work every day, I drop my husband off at work, I drop my 17 month old daughter off at daycare and this to me is unacceptable. As of today do not trust this car to drive anywhere. Something needs to be done about this immediately, can you please help in making that happen.

The contact owns a 2007 Toyota Avalon. *She states that she received a recall notice for the repair for the accelerator pedal. She stated that after the repair was performed she was at a stop when the vehicle accelerated on its own when this occurred* she then put it in neutral and stopped the vehicle. The vehicle was then towed to the dealer where they stated that they are still trying to figure what went wrong. The vehicle is still at the dealer for diagnosis. The failure and current mileages was 23800.cv

*2007Toyota Camry recalled had the new parts installed @ dealership. After which I experienced the accelerator sticking and not slowing down without pressure to brakes.* Returned to the dealership and they said they couldn't duplicate the problem, found no fault codes and rechecked the fixes they had previously installed. The problem still remains, the car doesn't decelerate when you let off the accelerator and in fat had an instance of it speeding up and decelerating freely on its own. The dealership informed me there is nothing they can do as their computers didn't find anything wrong but as the owner of this vehicle there is clearly something wrong with it that I do not feel safe driving this vehicle.

(Emphasis added)

### 10. Toyota Identifies Many Root Causes of SUA Confirming the Need for Brake Override

499. Toyota received numerous Field Technical Reports ("FTR") where SUA events were confirmed and where the cause was not a floor mat or "sticky" pedal.

500. In a 2004 "check sheet," Toyota identified that the accelerator pedal, cable, cruise control, air valve, throttle body, accelerator and throttle sensor, EFI

computer, wire harness and cruise control all were possible factors, or root causes, of SUA.

501.     In May 2005, a customer complained that after releasing the throttle engine speed remained at 5,000 RPM.

502.     A dealer could not replicate the problem, but when the dealer reinstalled the throttle body, he replicated the condition and confirmed it was not caused by a floor mat.

503.     Toyota replaced the throttle (Part 222102 1020).[68]

504.     A customer driving a 2008 Corolla reported the engine accelerated up to 60 mph.

505.     On inspection, the "condition was duplicated" without triggering a DTC Code.

506.     Toyota replaced the ECU.  (Part #8966102M92.)

507.     In 2007, after a SUA event that caused the vehicle to accelerate up to 70 mph, the dealer found a faulty pedal sensor.  Case 200704030437.

508.     On December 12, 2008, an Early Warning Report was generated by Toyota de Brasil regarding a Corolla.

509.     The report noted that this is a "new Corolla which presented a spontaneous engine speed acceleration.  This is the first case and it is a dangerous

_____

[68] TOY-MDLID002444.

problem because it can cause a serious accident, putting the life of the customer and other people at risk."

510.    The report noted that "this incident resulted in a light collision."

511.    The dealer confirmed this was not a carpet or floor mat problem.

512.    On December 9, 2009, a FTR was issued concerning a 2009 Camry.

513.    The customer reported RPM surge of up to 1200 RPM.

514.    The FTR confirmed the UA event and the condition could be replicated.

515.    To fix the problem in this instance, Toyota replaced the "Head SUB-ASSY, Cylinder."

516.    In one FTR, Toyota found the SUA was caused by the accelerator pedal position sensor and despite engine idles at 4000 RPM there are no "diagnostic trouble codes."

517.    Toyota recognized that SUA can be triggered by a malfunction from many different failures.

### a.    Toyota uniformly rejected claims, made no disclosures to consumers, and affirmatively misled consumers

518.    When a customer reports a SUA event, Toyota uniformly rejects any claim of any defect and fails to disclose the existence of hundreds, if not thousands, of similar SUA claims.

519.      Typical of such a response is the following letter sent from TMS' California offices:

Re:   Date of Loss:      February 2, 2009
      Vehicle:          2007 Lexus ES 350
      VIN:              …

Dear _____:

This letter is in response to your communication with Lexus Customer Satisfaction.  Toyota Motor Sales, USA, Inc. ("TMS") has reviewed your claim and conducted a technical inspection of your vehicle.

You reported that while driving the vehicle on the interstate it accelerated on its own and you were unable to stop it for nearly two miles when it finally slowed after a concerted effort on your part.  You believe that this was due to a defect in your vehicle.

The inspection of your vehicle revealed no evidence of any vehicle defects or malfunction.  The throttle assembly and accelerator pedal were operating as designed, with no binding or sticking of any of the components.  The brakes showed signs of excessive wear which is consistent with what you described happened to you.

The inspection also revealed that the floor mat was in a position where it could interfere with the operation and travel of the accelerator pedal.  When the vehicle was taken in to the dealership, the floor mat retaining clips were not properly secured which allowed the floor mat to move out of position.  While we understand that you feel the floor mat was not the problem, the evidence revealed during our inspection showed otherwise.

We are very sorry about to learn of this unfortunate incident, however, our inspection of your vehicle found that the incident was not due to any sort of manufacturing

- 129 -

or design defect, and we are unable to offer additional assistance.

Thank you for allowing us the opportunity to address your concerns.

Very truly yours,

Troy Higa
Claims Administrator[69]

520.    One 2007 Lexus ES350 owner reported that she had a SUA event that was not caused by floor mats (as there was no floor mat on the driver's side) and it was not caused by pressing the gas instead of the brake.

521.    In a detailed e-mail to Toyota in October 2009, she described how she had dropped her daughter off one evening, just as she normally did five times a week.

522.    As usual, she backed into the neighbor's driveway.  Her daughter and her son-in-law were watching her.  Her friend was in the passenger seat.

523.    All of a sudden the Lexus began to race out of control.

524.    She tried unsuccessfully to brake, but the car kept accelerating until it reached speeds up to 90 miles an hour.

525.    The Lexus hit several curbs, cracking and lifting the concrete.

526.    It was travelling so fast that the passenger side door flew open and smashed against the front of the car.

---

[69] TOY-MDLID00199764.

527.     She told Toyota that the only thing that saved their lives was a concrete wall into which the car smashed and finally came to a halt.

528.     The driver insisted that she was healthy and active, had good reflexes and that she did not wear glasses or contacts.

529.     She asked Toyota a number of questions, for instance, how could she have kept her foot on the accelerator pedal as she and her passenger were thrown about the interior of the car, only being held in place by the seat belts, and how could she have accelerated enough in a small parking turn-about to reach a speed such that the car broke concrete.

530.     Toyota responded to this customer by claiming the vehicle was "in proper working order free of any type of mechanical defect."[70]

531.     Toyota failed to address the points raised by the SUA victim or to interview witnesses to verify her account.

532.     Even where a consumer had a professional engineer conclude that the ETCS system was at fault, Toyota, through a TMS claims manager in Torrance, California, informed the consumer "there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the brake/acceleration or electrical systems."[71]

---

[70] TOY-MDLID90011084.

[71] TOY-MDLID90054928.

533.     It was Toyota's standard practice to issue uniform denials like that above from its claims manager in Torrance.

534.     Such letters of denial were sent despite instances where police officers found "physical evidence at the scene suggesting that vehicle #1 was continually accelerating throughout the incident." [72]

535.     The officer in this incident noted the impact caused the driver to "shift violently in her seat.  This officer feels it is unlikely she would have been able to manually accelerate throughout the event."

536.     Furthermore, a TMS manager from Torrance falsely stated on repeated occasions that "the brakes will always override the throttle."[73]

537.     This statement plainly was a lie as Toyota did not have a brake-override until 2010, and in most vehicles, there is no such override.

538.     In a direct attempt to forever shield consumers or any investigators from uncovering the truth, and to ensure no disclosures were made to the public, employees were specifically instructed to disguise emails:

- When you send a mail to somebody outside the company, drop cc to your boss.[]

    Check the subject/text/attachment(*)

---

[72] TOY-MDLID90053562.

[73] TOY-MDLID90059533.

- 132 -

> \*Any emails from Quality Control Department are basically "confidential."

- Put "Secret" and "Don't forward" in the beginning of every email (including reply and forward.) []

- Do not include both project code and car names. []

- Attached documents (prepared by your department or other department) should be classified. []

- When you reply to emails, generally delete the tracking record and attachment. []

masato_kosugi@mta.mx.toyota.co.jp   on 1/26/2010 20:13:39

539.     Toyota had no intention of disclosing defects of its vehicles to the public and continuously took affirmative steps to mislead and deceive consumers, and to conceal the truth from them.

### b.     Toyota belatedly installs a brake-override as a "confidence" booster

540.     Toyota began facing complaints of runaway cars almost ten years ago, but the company did not install "brake-override" systems in those vehicles, even as several other automakers deployed the technology to address such malfunctions.

541.     The brake-override systems allow a driver to stop a car with the footbrake even if the accelerator is depressed and the vehicle is running at full throttle.

542.     The systems are an outgrowth of new electronics in cars, specifically in engine control.

543.     "If the brake and the accelerator are in an argument, the brake wins," a spokesman at Chrysler said in describing the systems, which it began installing in 2003.

544.     In 2008, in a "Secret" "Don't' Forward" email, one TMC executive informed Tinto that he had been given "homework: to know "which competitor[s] vehicles actually have a throttle control system which can prevent the unwanted acceleration caused by simultaneous application on both the accel and brake pedal.

545.     By January 29, 2010, TMS had concluded that a brake-override was needed, but had not been approved by TMC.

> "We have officially asked TMC for brake over-ride software as part of this campaign but have been rejected. We continue to push. What are your views." "We would also like the software but time is really the issue." "We are 100% with you on the over ride software…we need to strategize how best to approach this with TMC. I have been turned down twice this [sic] week.  I will send you their response saying that because this pedal sticking issue is not at Wide Open Position the software would not detect the accel!! If this is the case they need to revisit their programmars!!"

546.     Given the potential gravity of SUA events, internal documents[74] reveal Toyota knew it needed a brake-override years earlier:

---

[74] TOY-MDLID00041130T-0001.

1
2
3
4
5
6
7
8
9
10
11
12
13

**Subject**:      Important information:  America ES350 article…addition #2

**From**:  Koji Sakakibara@toyota.com

**Date**:  Tue. 1 Sep 2009 16.16.01 -0700

    **To**:      yoshioka@mail.tec.toyota.cojp.  Shunsuka Noguchi syun@nano.tec.toyota.cojp.
rkitsura@mail.tec.toyota.coj.
Kako kako@email.tec.toyota.cojp>

    cc:      Kato  maktoh@mail.tec.toyota.cojp,
Hirokazu.Sakamoto@toyota.com,
Koji_Takara@toyota.com,
Keiichi_Fukushima@toyota.com,
washino@mail.tec.toyota.cojp,
jamagush@earth.tec.toyota.cojp, r-
Kawamu@earth.tec.toyota.cojp,
y_yamai@email.tec.toyota.cjp.  Kanamori
kanamori@earth.tec.toyota.cojp,
ssakamt@earth.tec.toyota.cojp,
joji@giga.tec.toyota.cojp

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

To all concerned staff,

Thank you for your continued business.  I am Sakakibara from TEC-2Gr, COE-LA.

- The following information has been received from TMS-POSS Public Affairs Group regarding the above (America ES350 article…addition #2).  (Please see photos at the bottom of this mail.)

- During the floor mat sticking issue of 2007, TMS suggested that there should be "*a fail safe option similar to that used by other companies to prevent unintended acceleration.*"  I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "*This kind of system will be investigated by Toyota, not by Body Engineering Div.*"  *Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008.  (The NHTSA knows that Audi as adopted a system that closes the throttle when the*

*brakes are applied and that GM will also introduce such a system.)*

=>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop." I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assy [sic] structure is the cause, how to secure the floor mats, the timing for introducing shape improvements).

- Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died." TMS-POSS Public Affairs Group thinks that "the NHTSA and USA public already hold very harsh opinions in regards to Toyota." (As I think you know, in some cases in the USA "killing a police officer means the death penalty.")

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div.," the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues."

[Emphasis added.]

547.    Toyota's frequent response to a claim of SUA is driver error.

548.    However, by September 2008, internally in a "Secret" "Don't Forward" email, Toyota was acknowledging that based on a survey of UA events in the past, a certain number of SUA events could be presented by implementation of a "control system," *i.e.*, brake-override or fail-safe.

549.     The importance of a brake-override is magnified due to the fact Toyota knew, from customer complaints, that in a long term SUA event, vacuum assist is not supplied to the brake booster which results in a loss of braking power.

550.     Many of the vehicles experiencing long term SUA are found to have brakes burned or brake pads "complete depleted."

551.     However, with a brake-override the throttle valve closes restoring vacuum assist and braking is not lost or severely diminished, a dramatic and perhaps lifesaving difference.

552.     Volkswagen, Audi, BMW and Mercedes-Benz also install such systems in at least some of their cars, some as far back as 10 years ago.

553.     Nissan has been using brake-override since 2004.

554.     Infiniti also has such a system.

555.     General Motors installs brake-override in all of its cars in which it is possible for the engine at full throttle to overwhelm the brakes.

556.     It is estimated that it would cost $1 million in development costs – typically less than $1 per vehicle – to add such a system.

557.     On December 5, 2010, TMS announced it would install brake-overrides in 2011 vehicles.

558.     On February 22, 2010, TMC announced that it would install a brake-override system on an expanded range of customers' vehicles to provide an additional "measure of confidence."

559.     According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

560.     The following models are eligible for the brake-override "confidence" upgrade:  2005-2010 Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES350, 2006-2010 IS 350 and 2006-2010 IS 250 models.

561.      "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS.

562.     However, Mr. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when SUA complaints were first received.

563.     Mr. Lentz also did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

564.     Importantly, the brake-override was not announced as a "Safety Recall."

565.     Rather, it was implemented to boost consumer "confidence."

566.     This so-called confidence booster is not being installed in all models with the SUA defect, such as the 2002-2006 Camrys, Corollas, and several other models owned by FELPs.

567.     In view of the propensity of Toyota Vehicles to suddenly accelerate out of the driver's control, each vehicle was defective for, *inter alia*, failure to have an appropriate fail safe.

568.     Toyota identified each of these fail safes yet failed to implement them in a timely fashion as reflected in an internal "Privileged and Confidential" e-mail:

> Push Button Ignition
>
> One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion. NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion. In addition, the ES350 owners manual is unclear (see attached letter re: Pepski Petition). NHTSA has surveyed ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality. The Toyota Smart Key System requires the operator to hold the ignition button for 3 seconds to shut off the engine when the vehicle is in motion. When the vehicle is stopped, a momentary press of the ignition button shuts off the engine. NHTSA has reports that some owners tried tapping the ignition button to shut it off instead of holding it for three seconds. While they do not believe this is the correct method, they have been working with the SAE to develop a standard for keyless ignition systems. But it is important to note that they think it is one of the attributes that may lead to the occurrence of the long-duration, high speed events.
>
> Sequential Shift Transmission

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Another way to stop a runaway vehicle is by placing the transmission in Neutral.  NHTSA is concerned that the layout of the Sequential Shift Transmission may confuse the operator (especially in a panic situation) because the "N" is adjacent to the "+." To the left of the D position is a gated area where the shift lever can be pushed forward to upshift, and pulled back for a downshift.  The N position is above the D position. In such a layout, the "+" and the "N" are very close to the same longitudinal position, with the "+" closer to the driver.  If, NHTSA supposes, the transmission was in the Sequential Shift mode, the driver could confuse the upshift position for the neutral position.  They believe that in a panic situation, there is a chance this could occur.

Braking Effectiveness

With an accelerator pedal stuck at wide open throttle, NHTSA agrees that one forceful application of the brake pedal can safely stop the vehicle.  However, in many reports and inspections they have found brakes burned or brake pads completely depleted after the event.  NHTSA understands that with the engine at wide open throttle, vacuum is not being supplied to the brake booster.  This means that the power braking system has potentially two or three applications left before the vacuum assist is depleted.  They believe that in the long duration events, the brake booster is being depleted by the driver.  They think that the driver that initially experiences the event recognizes the vehicle is accelerating and presses the brakes.  The vehicle slows, so the driver releases the brakes and the vehicle accelerates again.  They repeat this process and before they realize, the power assist is lost and the vehicle becomes more difficult to stop.  The driver applies the brake pedal with a lot of force, and this can result in severe damage to the braking system, and/or a brake fire.

569.      In a January 22, 2010 internal email, Toyota Canada, admitted that due to the UA issues created by floor mats and gas pedals there was "logic" in that a "brake over-ride would be effective in any failures to prevent accidents.   TC wanted us to employ it as soon as possible."

### 11.   Toyota Failed to Timely Notify the Public About, and to Remedy, Its Defective Vehicles

570.      When a motor vehicle manufacturer learns that its vehicles contain a defect and decides in good faith that the defect relates to motor vehicle safety, it is required to notify NHTSA and the owners, purchasers, and dealers of the vehicle of the safety related defect.  49 U.S.C. § 30118(c).

571.      A manufacturer must adhere to these duties to notify and remedy such defects whether it actually determined, or it should have determined, that its vehicles are defective and the defect is safety-related.

572.      Notification required under § 30118 must be given within a reasonable time after the manufacturer first decides that a safety-related defect or noncompliance exists under section § 30118(c).  49 U.S.C. § 30119(c)(2).

573.      Under applicable regulations, the manufacturer must notify NHTSA within five business days of making a safety-related defect determination.     49 U.S.C. § 573.6(a), (b).

574.      Violations of 49 U.S.C. § 30119 subject the manufacturer to civil penalties.   49 U.S.C. § 30165(a).

- 141 -

575.     Toyota's initiation of the sticky pedal recall was untimely under the Safety Act.

### C.     Toyota's Unfair and Deceptive Marketing of the Safety and Reliability of Toyota Vehicles

576.     TMC's core marketing and sale message, "Made by TOYOTA," has been implemented by TMS throughout North America, and by TMC and its other TMC subsidiaries throughout the world. The "Made by TOYOTA" message has been intended by Toyota to be synonymous to safe and reliable vehicles.

577.     Toyota, through its "Made by TOYOTA" message, has consistently marketed and advertised its vehicles worldwide as "safe" and has proclaimed that safety is one of its "highest corporate priorities."   It has promoted ETCS as providing "stable vehicle control."  Examples of such representations follow.

578.     Toyota's 1996 Annual Report explained that safety always has been a top priority in each phase of Toyota's research and development.  But translating that effort into "overall safety gains" required an "integrated methodology that unifies evaluation criteria for safety throughout development organization."

579.     In a 1996 brochure entitled "Toyota and Automotive Safety," Toyota again stated, "[a]t Toyota, we feel that building safe automobiles is the most important thing we can do."  Toyota explained this focus on safety is part of its broad philosophy:

> The more indispensable automobiles become, the greater they affect society in terms of safety and the environment.

> We at Toyota are fully aware of our responsibilities in this regard. We do our utmost to minimize our products' environmental impact and work hard to ensure overall safety. This means identifying the causes of any problems, devising workable remedies, and then putting those remedies into action.

580. Toyota's safety promises included its new electronic throttle control system that it began to implement in the late 1990s.

581. When Toyota began installing ETCS in the 1998 Lexus, it announced ETCS as one of the latest developments:

> The intelligent electric throttle control system (ETCS-i) gives improved acceleration control under all driving conditions. It provides excellent response and stable vehicle control, especially when the road is slippery.
> Using ETCS-i the throttle valve opening is controlled by a throttle actuator which is a small electric motor. Under normal road conditions the throttle opens in direct proportion to the accelerator providing maximum response and performance.
> However, under slippery road conditions and with the snow mode selected the actuator slows the throttle opening relative to the accelerator to suppress sudden engine output and provide improved acceleration control.
> The ETCS-i is controlled by the engine management computer and communicates with the intelligent automatic gear shift and the traction control systems.

The release claimed "[t]he safety and security of driver and passenger has always been an absolute priority for Lexus."

582. The Toyota Camry, in which some of the earliest deadly SUA accidents occurred, was marketed by Toyota as a high quality and safe family vehicle. According to a Toyota press release:

The fifth-generation Toyota Camry, introduced for 2002, has become the platinum standard in midsize family sedans by offering more of everything sedan buyers want – room, comfort, performance, *safety and value – along with award-winning Toyota quality*.  "Camry has come to define what a family sedan should be," said Don Esmond, Toyota Division senior vice president and general manager.  "It's [sic] continuing success in the U.S. stems from the combination of truly unbeatable quality, comfort and value that it provides."  [Emphasis added.]

583.    TMC highlighted safety as a key quality in a 2003 brochure:

**Toyota Next Generation Technology**
We are stepping up our safety technology development to ensure that customers can enjoy their vehicles in safety.
In addition to "passive" safety technology, Toyota is energetically developing "active" safety systems that prevent collisions.  We are working particularly hard to develop advanced safety systems based on our key peripheral monitoring technologies.

584.    In a press kit regarding the 2003 Prius, Toyota proclaimed its bold use of more "drive by wire" (electronic rather than mechanical features), including a drive-by-wire throttle:

Many of the new technologies used in the Prius – some unique to the car and world firsts – have been made possible by Toyota's bold move to redefine the vehicle's power train and electrical architecture.  The higher voltages created by the batteries and converter have enabled Toyota's engineers to equip the Prius with a far larger suite of 'drive-by wire' technologies than has previously been seen in any production car.  Throttle, transmission and braking is [sic] all electronically controlled and free of the traditional mechanical linkages.

585.     The same brochure lists the new electronic throttle as a safety feature of the car:  "Safety … First car in the world to use 'by-wire' technology for throttle, brakes and gearshift simultaneously."  The brochure describes Toyota's "radical" and "futuristic" adoption of more electronically-controlled features in the Prius because of their supposed increased reliability, including:

> By suppressing mechanical and hydraulic links and replacing them with electric and electronic connections it's possible to achieve shorter activation times.  In addition, the communication between all these systems will be faster.  "By-wire" also brings advantages in weight reduction and saves precious space that can be used to house other systems…
>
> "By-wire" technology was originally developed for the aerospace industry, where certain mechanisms had to be activated without any hydraulic or mechanical link.  The only way to achieve this was through an electronic connection and electric activation.  This technology not only saves weight and space, but also provides a more immediate action than hydraulic or mechanical links, with even higher reliability.
>
> For this reason, Prius uses more "by-wire" technology than any other car on the road today.  Throttle, brakes, shift lever, Traction Control and Vehicle Stability Control Plus use this technology to improve their operation or even to provide improved ergonomics.

586.     In an advertisement appearing in the June 2003 issue of GOOD HOUSEKEEPING, Toyota promised the Sienna had "more safety."

587.     In a 2004 press release introducing the new Prius, TMS claimed:

588.     Designed to easily accommodate a small family, the 2004 Prius is also designed to provide the level of safety a family car buyer demands.  Passive safety features include front seatbelts with pre-tensioners and force limiters, 3-point seatbelts for all rear seating positions and two-step dual front airbags (SRS), with driver and passenger side and curtain airbags available as an option.

589.     Prius also features a high level of dynamic control, with some features that are not yet available in other midsize cars.  The standard anti-lock brake system (ABS) integrates Brake Assist and Electronic Brake Distribution features, which can help apply maximum braking pressure in an emergency stop.  Vehicle Stability Control (VSC) is available as an option.  The new Hill Acceleration Control helps the driver maintain better control on ascents and descents.

590.     The new Prius uses an electronically controlled "throttle-by-wire" throttle, which provides greater precision than a conventional cable-type throttle setup.  A new by-wire shift control replaces the traditional gearshift lever and allows tap-of-the-finger shifting using a small joystick mounted on the dash.

591.     This general promise of safety and specific promise that the new electronic components being installed in Toyota Vehicles are more reliable than their mechanical predecessors is a repeated theme in Toyota marketing:

592.     2004 Toyota 4Runner press release:  "It features a new linkless electronic throttle control system with intelligence (ETCS-i) that helps improve

performance and increase fuel economy…*The 4Runner utilizes the latest technology to deliver a high level of occupant safety*." [Emphasis added.]

593.     August 2004 Lexus Press Kit:  "Technical innovation is a key element of Lexus's all-around excellence, *delivering real benefits to owners in terms of safety*, performance, comfort and convenience." [Emphasis added.]

594.     November 2004 GOOD HOUSEKEEPING:  "Your destination should always be safety.  And Toyota SUV's raise the standard…."

595.     In GOOD HOUSEKEEPING's November 2004 issue and elsewhere:  "Safety First to Last," an advertisement for RAV4, Sequoia and Land Cruiser.

596.     2005 Press Release regarding Toyota SUVs:  "'Toyota customers have long counted on the brand for the best in performance, quality and durability,' said [Don] Esmond [senior vice president and general manager, Toyota Division].  '*They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs*.'" [Emphasis added.]

597.     In GOOD HOUSEKEEPING's May 2001 issue:  "Happy Mother's Day from the people obsessed with safety," an advertisement for the Sienna.

598.     In GOOD HOUSEKEEPING's March 2001 issue, Special Advertising Section:  "Serious about safety.  Camry utilizes the latest technology to ensure you

and yours arrive at your destination safe and sound." Also, "Value and safety. Part of the Corolla equation has always been high value and high safety."

599.    These proclamations of "safety" and "reliability" were misleading and deceptive because they failed to disclose the dangerous SUA defect and fail-safe mechanism defects. Toyota knew or should have known these representations were misleading and deceptive because, as discussed in detail below, Toyota knew there was a significant increase in SUA events in vehicles with electronic throttle controls over vehicles with mechanical throttle controls.

600.    In 2004, TMS issued a brochure that discussed the safety features of the Sienna:

> A safe place for your children to grow up. Sienna has a proud safety heritage, boasting some of the very best scores in its class on government and insurance industry crash tests. We've equipped the 2004 Sienna with even more safety features. [Lists the safety features.]

601.    In 2004, TMS issued a press kit noting that its RAV4 had enhanced safety features:

> The second-generation model, designed in Southern California by Toyota's Calty Design Research and introduced for the 2001 model year, increased Toyota's share of this growing segment. The 2004 revision is designed to strengthen the brand's position in the segment that it created, and to give the customer even greater value and enhanced standard safety features.
> "Toyota invented the formula for this segment, and for 2004 we're perfecting it with more of what everyone who

buys a small SUV wants – more power, more safety features, more style and more value," said Don Esmond, Toyota Division senior vice president and general manager. "What's more RAV4 still holds the ultimate advantage with Toyota quality."

602.     In a 2005 press release, TMS boasted about its safety in its RAV4, 4Runner, Land Cruiser and Sequoia SUVs:

> "Toyota offers one of the widest selections of SUVs on the market, and we equip every model with the same level of advanced safety technology," said Don Esmond, senior vice president and general manager, Toyota Division. "By making this technology standard on all our SUV models, Toyota provides the customer with peace of mind when purchasing and when driving."
> ….
> "Toyota customers have long counted on the brand for the best in performance, quality and durability,' said Esmond. 'They can take comfort knowing that driving safety is just as high a priority in our full line of SUVs."

603.     A 2006 brochure devoted entirely to Toyota's safety efforts acknowledged Toyota's responsibility as a vehicle manufacturer for the safety of its vehicles. The brochure stated that "Toyota is working to reduce traffic accidents, deaths and injuries" because accidents "have an enormous economic impact: lost productivity, medical bills and compensation for victims, physical losses of vehicles and structures and institutional costs (insurance management, police, trial costs, etc.)." The brochure then explained how Toyota pursues what it refers to as "real safety":

> A fundamental component of building safe cars is gathering information and analyzing why accidents occur and what causes injuries. Toyota analyzes data from real accidents that take place all over the world.  By analyzing accident data and using simulation, Toyota develops new safety technologies, testing them on actual vehicles before being offered to the public in our product line-up.  This is a perpetual cycle through which Toyota seeks to enhance safety technologies and reduce accidents continuously.

These same messages were echoed in safety brochures used by TMS in 2007. These statements were false and misleading because Toyota had not performed the tests necessary to diagnose, identify and fix the defect causing SUA.

604.     In the 2007 "Camry Owners Warranty Manual," Toyota represented that it builds "vehicles of the highest quality" and "reliability":

> At Toyota, our top priority is always our customers.  We know your Toyota is an important part of your life and something you depend on every day.  That's why we're dedicated to building products of the highest quality and reliability.
> Our excellent warranty coverage is evidence that we stand behind the quality of our vehicles.  We're confident – as you should be – that your Toyota will provide you with many years of enjoyable driving.
> *     *     *
> Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind throughout their ownership experience.

605.     This warranty language appears in identical text for other Toyota models.  The foregoing language was false and misleading because in fact Toyota vehicles were not of the highest quality and reliability but instead were unsafe and

unreliable due to the SUA defect and the failure to have an adequate brake-override and other fail-safe mechanisms.

606.    A brochure for the 2007 Camry indicated it was "Brimming with innovative technology" and that the "wheels of progress are attached to a Camry." Elsewhere the brochure represents that every Camry surrounds the driver in safety.

607.    In 2007, in its brochures, annual reports and other advertisements, Toyota made the following statements:

**Safety Technology & Quality**
To realize the ideal vehicle – a goal we never cease to pursue.  We continue to strive for the technology that prevents and minimizes the damage of an accident in any situation.  "What causes accidents?" "What can be done to prevent accidents?"  "What mitigates the damage of accidents that have occurred?"  These are the questions to which we are constantly seeking answers.  Our technologies will continue to advance toward the ultimate goal of making a vehicle that is safe for everybody.

**Safety Measurements**
Aiming for a society with no traffic accidents.

**Quality**
Based on our philosophy of "Cuter First: we test and evaluate vehicles in various ways.

**Safety Technology**
Toyota is aiming to develop safe vehicles and technology based on the "Integrated Safety Management Concept."

608.    Toyota also represented in 2009 that:

**Pursuit for Vehicle Safety.**
Toyota has been implementing "safety" measures to help create safer vehicles. Toyota analyzes the causes of the accident and passenger injuries by using various accident investigation data.  These accidents are reenacted in various simulations to create counter-plan technologies.  In addition,

- 151 -

experiments on an actual full-scale vehicle are conducted before launching the vehicle.  Afterwards, the effectiveness of the technologies is inspected by assessing any accidents that might occur.  We strive to learn from actual accidents to continue to meet industry's even higher standards in safety.

609.     In September 2009, Toyota announced a new marketing campaign that highlights six claims that Toyota has achieved through its philosophy of *kaizen*, or "constant improvement."     Included in the six claims are "Dependability," "Quality," "Reliability" and "Safety.

610.     A 2010 video of Toyota's Star Safety System includes the following description of Toyota's standard for vehicle control safety:

If a stereo system comes standard on an SUV, shouldn't a safety system?  Introducing Toyota's Star Safety System TM, a combination of five safety features that comes standard with every one of Toyota's five SUVs:  Vehicle Stability Control, Traction Control, Anti-lock Brakes, Electronic Brake-force Distribution, and Brake Assist. All designed for one purpose:  to help keep the driver in control of the vehicle at all times.  Because when it comes to the well-being of you and your passengers, Toyota has raised the standard.

611.     The above video is misleading as it does not mention the vehicle recalls, the unintended acceleration defect or the lack of a fail-safe mechanism to override unintended acceleration.

612.     Written advertisements also made representations about the Star Safety System as part of an accident avoidance system that "keeps you in control and out of harm's way."  Toyota knew these representations were false due to the deaths and crashes it was aware of due to SUA and lack of a fail-safe.

613.    In a brochure for the 2010 Corolla in Canada, Toyota stated:

> The 2010 Corolla lavishes attention on your safety. Corolla features standard driver and front passenger front seat-mounted side airbags and front - and second - row side curtain airbags. Antilock Braking System (ABS) is standard on all models and enhances driver steering control by reducing wheel lock-up under hard braking. Also standard on all models is the Electronic Brake-force Distributor (EBD) with Brake Assist (BA), which balances brake pressure distribution according to vehicle load and braking conditions. EBD also automatically adjust the amount of brake force applied to each wheel, and can transfer braking front-to-rear or side-to-side in order to balance braking pressure to help optimize the available traction.

614.    In Toyota's website in Mexico, Toyota indicated that when Toyota talks about security, it does so in an integral manner. Toyota vehicles are very well prepared in these two aspects: (1) Active Security are all the devices and systems that are activated when driving a vehicle which help prevent accidents. Examples are the excellent response by the steering, anti-block brakes or the stability control of the vehicle; and (2) Passive Security refers to the devices and systems which are put to work in case of an emergency. It refers to the safety belts, the deformable parts of the vehicle which absorb energy in case of a collision, and the lateral and front airbags.[75]

615.    In a video released in February 2010, Toyota states:

---

[75] *See* http://www.toyota.com.mx/toyota/seguridad/activa-y-pasiva.aspx?menuActivo=0&subMenuActivo=6

616.     For over 50 years providing you with a safe, reliable and high quality vehicles has been our first priority.  In recent days, our company hasn't been living up to the standards that you have come to expect from us or that we expect from ourselves.  That's why 172,000 Toyota and dealership employees are dedicated to making things right.  We have a fix for our recalls.  We stopped production so we could focus on our customers' cars, first.  Our technicians are making repairs.  We're working around the clock to ensure we build vehicles of the highest quality, to restore your faith in our company.

617.     The commercial does not mention that the recalls do not explain even a majority of the reports of unintended acceleration.

618.     These claims of safety were intended to and did cause individuals, like FELPs, to trust the safety of Toyota Vehicles and to purchase them.  As stated in a 1998 Corolla brochure, "Toyota is now one of the most trusted names in the automotive world – one of the few things you can really depend on."

619.     As stated in a 2004 Lexus LS brochure, "[t]he value of owning a Lexus involves much more than just its purchase price.  It also includes our well-earned reputation for vehicle dependability, projected low repair costs and high retained value.  In addition to such intangibles as outstanding customer satisfaction,

unparalleled quality, peace of mind and loyalty." Even Toyota's logo of three overlapping ovals is meant to convey a trust between the customer and Toyota.[76]

620.     Despite Toyota's proclamations of safety and severe testing regimes, it was also growing rapidly, adding new technology to its vehicles and increasingly unable to live up to its promises.

**D.     Damages**

**1.     Over 70% of Unintended Acceleration Events Are in Vehicles Not Covered by the Recall**

621.     Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations therefore:

622.     The documents appear to show that Toyota consistently dismissed the possibility that electronic failures could be responsible for incidents of sudden unintended acceleration. Since 2001, when Toyota first began installing electronic throttle controls on vehicles, Toyota has received thousands of consumer complaints of sudden unintended acceleration. In June 2004, the National Highway Traffic Safety Administration (NHTSA) sent Toyota a chart showing that Toyota Camrys with electronic throttle controls had over 400% more 'vehicle speed' complaints than Camrys with manual controls. Yet, despite these warnings,

---

[76] *See* http://www2.toyota.co.jp/en/vision/traditions/nov_dec_04.html.

Toyota appears to have conducted no systematic investigation into whether electronic defects could lead to sudden unintended acceleration.

623.     This concern is significant because it appears that from 2004 to 2009, Toyota was selling cars without ever having investigated the cause of the defect or disclosing the defect.

624.     Next, the House Committee rejected test reports submitted by Toyota that were prepared for Toyota by the consulting firm Exponent, Inc. at the request of Toyota's litigation counsel, Bowman and Brooke, LLP.  The one report that Toyota has produced that purports to test and analyze potential electronic causes of sudden unintended acceleration appears to have serious flaws.   In fact, these purported tests and analyses were only recently initiated.   Michael Pecht, a professor of mechanical engineering at the University of Maryland, and director of the University's Center for Advanced Life Cycle Engineering (CALCE), told the Committee that Exponent, Inc. "did not conduct a fault tree analysis, a failure modes and effects analysis … or provide any other scientific or rigorous study to describe all the various potential ways in which a sudden acceleration event could be triggered."   Mr. Pecht went on to state that Toyota seemed "only to have focused on some simple and obvious failure causes"; used "extremely small sample sizes"; and, as a result, produced a report that "I would not consider … of value … in getting to the root causes of sudden acceleration" in Toyota Vehicles.

625.     Again, the concern over Toyota's report highlights (a) that Toyota had no credible prior report or analysis of SUA; (b) that Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's inability to understand the basis for the defect; and (d) Toyota's failure to provide a fail-safe to prevent unintended acceleration.

626.     The Committee then addressed Toyota's lack of truthfulness in its statements and rejected the notion that floor mats or pedals were the sole cause of the problem:

627.     Toyota's public statements about the adequacy of its recent recalls appear to be misleading.  In a February 1, 2010, appearance on the *Today* show, you stated that Toyota has "studied the events of unintended acceleration, and [it] is quite clear that it has come down to two different issues," entrapment of accelerator pedals in floor mats and sticky accelerator pedals.  In an appearance the same day on CNBC you repeated this claim and reported that Toyota is "very confident that the fix in place is going to stop what's going on."

628.     The documents provided to the Committee appear to undermine these public claims.  We wrote to you on February 2, 2010, requesting any analyses by Toyota that show sticky pedals can cause sudden unintended acceleration.  Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "typically … does not translate into a sudden, high-speed acceleration event."  Moreover, our review of the consumer

complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved vehicles that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

629.    Toyota's denials of an ETCS defect persisted even when independent professional engineers concluded in February 2009 that an SUA incident in Tennessee was caused by deviations with ETCS.[77]

630.    One reason that Toyota lacks sufficient test data regarding the reliability of ETCS, and instead has relied on a belated report by Exponent, Inc. and Bowman & Brooke, is because of the overall negligence at Toyota regarding its attention to quality control.  As a result, Toyota has sacrificed safety for profit.

631.    In the last ten years, the culture at Toyota has changed.  Currently, as acknowledged by Toyota, the emphasis is on the rapid assembly of Toyota vehicles.  While production and production goals have increased, the number of trained quality control employees has decreased.  Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

---

[77] TOY-MDLID90053223.

632.     The result has been a significant increase in quality control problems per vehicle.  Defects are ignored in the interest of the quantity of production and profits.  Defects that in the past would have resulted in halting the assembly line are now overlooked.  Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a recall.  Quality control employees are given goals that set an upper limit on the number of defects they are to report.

### 2.     The Toyota North American Quality Advisory Panel

633.     On March 2, 2010, amid a series of high-profile government investigations and intense public scrutiny related to reports of SUA in Toyota vehicles, Toyota Defendants, through TMA, announced the creating of an independent Toyota North American Quality Advisory Panel ("Panel").  The creating of the Panel was in response to this particular crisis that Toyota Defendants were facing.  The seven-member Panel was composed of outside advisors and professionally diverse leaders, and was headed by former U.S. Transportation Secretary Rodney Slater.

634.     The Panel's purpose is to bring an outside perspective and provide objective advice to the highest levels of Toyota's North American management with respect to content, implementation, and further development of [its] quality

and safety processes.[78]   The Panel was also directed by Toyota Defendants to "evaluate all testing completed on the electronic throttle control system with intelligence (ETCS-i) installed in Toyota and Lexus vehicles, and release its findings to the public."[79]

635.    In May 2011, the Panel released its report entitled "A Road Forward: The Report of the Toyota North American Quality Advisory Panel" ("Report").  In making the Report, the Panel visited many Toyota facilities in the United States and Japan, including manufacturing plants, dealerships, research and development centers, and vehicle proving grounds.[80]   The Panel had meetings with Akio Toyoda and other members of Toyota's senior leadership team.  In addition, the Panel also met with an engineering consulting firm retained by Toyota to study the ETCS-I, with representatives from a number of independent groups, and with current NHTSA Administrator David Strickland and key members of his staff, as well as several former NHTSA Administrators.[81]

636.    The Panel, in trying to better understand and resolve the quality and safety issues that Toyota was facing, focused on five areas of inquiry as it proceeded to review Toyota's operations:

---

[78] See page 5 of the Report which is attached at Ex. D.

[79] Id.

[80] Id.

[81] Id.

- The Balance between Global and Local Management Control: Is there an appropriate balance in the management and decision making between TMC and its various regional operations, especially in North America?

- Responses to Problems Raised by Internal and External Sources: Are problems raised by sources outside Toyota treated as seriously as those identified inside the company? Is Toyota's acknowledged problem-solving strength in the Toyota Production System ("TPS") and the Toyota Way applied beyond its manufacturing processes in a way that helps it achieve optimal quality and safety throughout its business?

- Management Responsibilities for Quality and Safety: Toyota has traditionally treated vehicle safety as a subset of quality. Has this approach resulted in less than clear management responsibilities for safety? How does Toyota's management ensure that safety concerns receive the same priority as those involving quality?

- The Challenges of Integrating Electronics and Software: It is estimated that more than 50 percent of a vehicle's value is in electronics and software. As modern automobiles have incorporated more and more electronics and software into their designs, has this integration challenge created safety issues?

- Management of Supplier Product Quality: Toyota has been a very vertically-integrated company with very tight controls to oversee the quality of the parts produced by its vertically-integrated (*keiretsu*) suppliers. As Toyota has expanded production to North America and elsewhere and has started using more local suppliers, has it been able to maintain the same high levels of control over these newer suppliers?[82]

637.    Using the five areas of inquiry as a guide, the Panel made key observations including, in part, the following[83]:

---

[82] *Id.* at 7.

[83] *Id.* at 8-9.

638.     "Toyota has erred too much on the side of global centralization and needs to shift the balance somewhat toward greater local authority and control…vehicle design and development have historically been centrally managed and tightly controlled by TMC."

639.     "[W]hile it is clear that Toyota applies the TPS process and the Toyota Way to problems or flaws found internally, Toyota does not appear to treat feedback from external sources, including customers, independent rating agencies, and regulators, the same way."

640.     "[C]omparatively few of Toyota's UA recalls over the past two years had anything to do with vehicle quality in the traditional sense, i.e., they were not related to defects traceable to the manufacturing or assembly processes."

641.     "Toyota did not have a senior executive designated with overall responsibility for safety until recently…not having a single executive responsible for safety on either a regional or company-wide basis might diminish accountability for safety issues raised both inside and outside the company."

- "Continue to increase North American involvement in the product development and design process for vehicles in North American markets."

642.     The findings of the Panel once again confirm the reality that TMC maintains full control over the design and development of Toyota Vehicles.

### 3. The Defects Causing Unintended Accelerations Have Caused Toyota Vehicles' Values to Plummet

643.    A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of an uncontrollable and possibly life-threatening SUA event.  All FELP purchasers of the Toyota Vehicles have overpaid for their cars.  As news of the SUA defect hit the press, the value of Toyota Vehicles materially diminished.  Some class members attempted to return their vehicles due to the fear of a SUA event, but Toyota has uniformly refused to refund the price of a vehicle sought to be returned by any FELP.

644.    The economic loss suffered by FELP class members is revealed by the following few examples.  From the start of the spring market in 2009 through the summer of that year, the 2007 Toyota Camry LE and the 2007 Nissan Altima stayed consistent with each other, depreciating $438 and $295 respectively through these five months (April 09-Aug 09).  However, as news of the Camry recall started to spread, the Camry lost nearly 2.5 times the value of its competitor, the 2007 Nissan Altima.  More staggering is that the Camry lost $400 in value from January 2010 through April 2010 when almost every used vehicle historically gains significant value during these months.  By March 2010, the change in value between the Nissan and the Camry was over $1,200.

645.     From April 2009 through September 2009, the Corolla increased in value over its competitor, the Nissan Sentra, by $210.  However, as the defects in the Toyota line of vehicles became increasingly evident, the trend reversed.  During the next seven months, the Sentra only dropped $174 in value, while the Corolla dropped $839, a clear difference of $665.  The change in this trend resulted in an $875 negative variation for the Corolla versus the Sentra in a year's time, a decrease in value for the Corolla of almost four times that of the Sentra.

646.     From April 2009 through August 2009, the Toyota RAV4 increased in value over its competitor the Honda CRV by $472.  But as Toyota's problems continued, this trend also reversed.  During the next eight months, the CRV dropped $1,273 in value, while the RAV4 dropped $2,206; a net difference of $933.  The change in this trend resulted in a $1,405 negative variation for the RAV4 versus the CRV in a year's time.

647.     Kelley Blue Book ("KBB")  and the National Automobile Dealers Association ("NADA") Used Car Guide, two high profile used vehicle value guide books, have lowered the values of used Toyota models included in the recall.

648.     KBB is the United States' largest automotive vehicle valuation company. The company's website is a source for new and used vehicle pricing and information for consumers.  The company has become so popularly identified with its services that the trademarked terms "Blue Book" and "Blue Book Value" are commonly understood to mean a car's market value.

649.     On February 8, 2010, KBB announced that it was dropping the values of used, recalled vehicles by up to three percent.  KBB also noted that "[a] growing inventory of used Toyota vehicles, coupled with a reduction in demand, however slight, only leads to the potential for further devaluation."  KBB further lowered the estimated value of recalled Toyota vehicles by another 1.5% on February 12, 2010.

650.     The announcement by KBB of the devaluation of the Toyota Vehicles was echoed throughout North America.  For example, a number of reports outside the United States, due to the similar market conditions in Canada and the United States that lead to parallel reactions to changes in the respective markets, cited the KBB devaluations.   In particular, on February 8, 2010, The Canadian Press reported "Recall difficulties affecting resale value of used Toyota-brand vehicles".  Citing the KBB devaluation, the article stated: "Toyota's wilting reputation is beginning to affect the resale value of its vehicles, with one used-auto pricing service cutting its valuations by US$200 to $500, depending on the model".[84]

651.     The article pointed out that "Toyota recalled 270,000 vehicles in Canada and millions more in the U.S., Europe and Asia due to reports of a defective pedal that can stick and take longer than usual to return to the idle position.  This will likely impact demand for used Toyotas, particularly given that the problem has been lined to wear and tear on older vehicles."  *Id.*   And,

---

[84] *See* (http://www.theguardian.pe.ca/Living/Motoring/2010-02-08/article-1291477/Recall-difficulties-affecting-resale-value-of-used-Toyota-brand-vehicles/1) attached hereto as Exhibit E.

proceeded to further cite the KBB analysis as follows: "[i]n a survey on KBB's website, 20 percent of people who were intending to buy a Toyota before the recall are no longer considering the brand...'If you implement a basic supple-and-demand analysis, we know that when the supply returns, it will flood the market and that will put further pressure on prices.'" *Id.*

652.     The impact of the Recall on both Toyota's overall market share and the valuation of Toyota vehicles has been felt throughout the United States, North America, and the world.  Toyota consumers have realized a decline in the residual value of their vehicles, as noted, *inter alia,* by the KBB devaluation, due to the Recalls and the fact that many Toyota vehicles were defective.

653.     The NADA represents more than 19,700 new car and truck dealers, both domestic and international with more than 43,000 separate franchises.  NADA serves dealers by following pricing trends on new and used vehicles and is an advocacy association which represents dealerships before the U.S. Congress and other government agencies.  In addition to the advocacy role it provides on behalf of auto dealers, the NADA is one of the primary organizations offering pricing for both new and old cars.  Automotive sales companies use NADA guides to determine wholesale and trade-in values to purchase trade-ins and to buy vehicles at auction before determining a retail sales price.

654.     NADA also reported declining values for recalled Toyota vehicles and noted an expansion into all Toyota models:

**Toyota Recall:   Initial Observations and Short-Term Impact on Wholesale Values**

The facts surrounding the current recall of over 2 million Toyota models for unintended acceleration continues to change day to day and quality concerns are quickly spreading to other models, with the Prius being the next vehicle in question.  As more quality issues surface, consumers are more likely to incorporate this information on the Toyota brand as a whole, thereby reducing consumer confidence in the brand. Clearly the repercussions of this recall are going to result in a disruption in remarketing used models as well as price performance.  In fact, Toyota itself is expecting a decline in value of its current lease portfolio resulting from negative perceptions of the recall which will shift demand away from Toyota vehicles or at the very least drive down prices for used models entering the wholesale and retail markets.

NADA's analysis of last week's auction performance for Toyota was largely inconclusive at this time, however volumes were down on newer models and there was some above average softness in prices on newer models (2008-2009).  Meanwhile, not surprisingly, auction volume is down 23% week over week as many Toyota models have been sidelined based on recommendations from NADA.  On the retail side, Toyota has also shown

some early softness with prices dropping by slightly over 3% compared to a slight increase in retail prices for Honda models.

655.     Purchasers and lessees paid more for the car, through a higher purchase price or higher lease payments than they would have had the defects and non-conformities been disclosed.  In addition to being tied to a defective vehicle and having paid a higher rate than in a case where the defects were disclosed, lessees can, in some cases, end up paying for the difference in projected residual value and actual or realized value (*e.g.*, early termination clauses; open-end leases) at the end of their leases.  In these situations, lessees must pay out-of-pocket for the diminution in value caused by the partial disclosure of the SUA and brake-override defects to terminate their leases.

## V.     CLASS ALLEGATIONS

### A. Foreign Consumer Economic Loss Class

656.     Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Foreign Economic Loss Plaintiffs bring this action on behalf of themselves and two Foreign Consumer Sub-Classes initially defined as follows:

> North American Sub-Class
> All individuals or entities in Canada and Mexico, who purchased, own or lease a Toyota vehicle equipped with ETCS.

**Foreign Countries Sub-Class**
All individuals or entities in China, Germany, Turkey, Peru, South Africa, Egypt, Indonesia, Malaysia, Philippines, Guatemala, Russia and Australia, who purchased, own or lease a Toyota vehicle equipped with ETCS.

FELPs reserve the right to modify the Sub-Class definitions as discovery and/or further investigation so warrant.

657.    Excluded from the Foreign Consumer Sub-Classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries arising from a SUA incident.

658.    The Foreign Consumer Sub-Classes pursues claims for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961, *et seq.;* Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq*.; violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.; violation of the False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq*.; and breach of duty of care.

659.    Pursuant to Rule 23(a)(1), the Foreign Consumer Sub-Classes are so numerous that joinder of all members is impracticable.  Due to the nature of the

trade and commerce involved, the members of the Foreign Consumer Sub-Classes are geographically dispersed throughout North America and the World and joinder of all Foreign Consumer Sub-Classes members would be impracticable. While the exact number of Foreign Consumer Class members is unknown to FELPs at this time, FELPs believe that there are, at least, millions of members of the Foreign Consumer Sub-Classes.

660.     Pursuant to Rule 23(a)(3), FELPs' claims are typical of the claims of the other members of the Foreign Consumer Sub-Classes. FELPs and other Sub-Class members received the same or substantially similar misrepresentations and omissions of material fact about the safety and quality of Toyota Vehicles. Toyota's misrepresentations and omissions of material fact were made pursuant to standardized policies and procedures implemented by Toyota. FELPs and Sub-Class members purchased or leased Toyota Vehicles that they would not have purchased or leased at all, or at least for as much as they paid, had they known the truth regarding a SUA defect. FELPs and the members of the Foreign Consumer Sub-Classes have all sustained injury in that they overpaid for Toyota Vehicles due to Defendants' wrongful conduct.

661.     Pursuant to Rule 23(a)(4) and (g)(1), FELPs will fairly and adequately protect the interests of the members of the Foreign Consumer Sub-Classes and have retained counsel competent and experienced in class action and consumer fraud litigation.

662.     Pursuant to Rules 23(b)(2), Toyota has acted or refused to act on grounds generally applicable to the Foreign Consumer Sub-Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  In particular, Toyota has failed to properly repair Toyota Vehicles and has failed to adequately implement a brake-override repair or other fail-safe.

663.     Pursuant to Rule 23(a)(2) and (b)(3), common questions of law and fact exist as to all members of the Foreign Consumer Sub-Classes and predominate over any questions solely affecting individual members thereof.   Among the common questions of law and fact are as follows:

a.     Whether Toyota violated 18 U.S.C. §1962(c) through a pattern of racketeering activity designed to deceive and defraud consumers in North American and the World, including the Sub-Classes, and to conceal serious and dangerous defects of Toyota Vehicles from consumers in the FELP countries;

b.     Whether Toyota had knowledge of the defects prior to its issuance of the current safety recalls;

c.     Whether Toyota concealed defects affecting Toyota Vehicles;

d.     Whether Toyota misrepresented the safety of the Toyota Vehicles at issue;

e.      Whether Toyota's misrepresentations and omissions regarding the safety of its Toyota Vehicles were likely to deceive a reasonable person in violation of the CLRA;

f.      Whether Toyota violated the unlawful prong of the UCL by its violation of the CLRA;

g.      Whether Toyota violated the unlawful prong of the UCL by its violation of federal laws;

h.      Whether Toyota's misrepresentations and omissions regarding the safety of its Toyota Vehicles were likely to deceive a reasonable person in violation of the fraudulent prong of the UCL;

i.      Whether Toyota's business practices, including the manufacture and sale of Toyota Vehicles with an unintended acceleration defect that Defendants have failed to adequately investigate, disclose and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

j.      Whether Toyota's misrepresentations and omissions regarding the safety of its vehicles were likely to deceive a reasonable person in violation of the FAL;

k.      Whether Toyota acted negligently;

l.      Whether FELPs and the Foreign Consumer Sub-Classes are entitled to damages, restitution, restitutionary disgorgement, equitable relief, and/or other relief; and

m.      The amount and nature of such relief to be awarded to FELPs and the Foreign Consumer Sub-Classes.

664.      Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all FELP Sub-Class members is impracticable.  The prosecution of separate actions by individual members of the Foreign Consumer Sub-Classes would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to those classes.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

## COUNT I

## VIOLATION OF §1962(c) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

### A. The "Misleading Marketing Enterprise"

665.      18 U.S.C. §1962(c) makes it "unlawful for any person employed by or associated with any enterprise … to conduct or participate … in the conduct of

such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

666.    Since at least 2004 (and thereafter when these entities came into being), TMC, TMA, TEMA and TMS have associated-in-fact to conduct certain aspects of Toyota's "marketing, advertising, promotion and sales and leasing" activities ("misleading marketing enterprise") by means of false statements and omissions of material facts to sell and lease certain Toyota Vehicles known to Toyota to be unreasonably dangerous and defective through a pattern of racketeering activity in violation of 18 U.S.C. §§1341 (mail fraud); and 1343 (wire fraud).

667.    Toyota's "misleading marketing enterprise" as set forth in the preceding paragraph constitutes an "enterprise" as that term is defined in 18 U.S.C. §1961(4).

668.    Toyota's "misleading marketing enterprise" has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants have engaged since at least 2007.

669.    Toyota Defendants, their subsidiaries and worldwide affiliates are ongoing organizations which engage in, and the activities of which affect interstate and foreign commerce.

670.    Each Toyota Defendant associated with the enterprise.

671.     Principally, TMC designed, built, sold and marketed Toyota Vehicles that were defective in that they suffered from SUA problems which were caused by some combination of floor mats, sticky gas pedals and/or a defective ETCS.

672.     TMS, which is the sales and marketing arm for Toyota in North America, sold and marketed Toyota Vehicles that were defective in that they suffered from SUA problems which were caused by some combination of floor mats, sticky gas pedals and/or a defective ETCS.

673.     TEMA, which is responsible for engineering, design, research and development, and manufacturing activities of TMC in North America, designed, developed, distributed and marketed Toyota Vehicles that were defective in that they suffered from SUA which were caused by some combination of floor mats, sticky gas pedals and/or a defective ETCS.

674.     TMA is the holding company for all of TMC's North American operations, handling all design, engineering, manufacturing sales and marketing operations throughout North America. TMA handles government and regulatory matters, economic research, philanthropy, advertising, corporation communications and investor relations for TMC in North America. TMA sold, distributed and marketed Toyota Vehicles that were defective in that they suffered from SUA problems which were caused by some combination of floor mats, sticky gas medals and/or a defective ETCS.

675.     TMC, TMA, TMS and TEMA are liable for thousands of mail and wire fraud violations over, at a minimum, the last five to eight years. These mail and wire fraud violations were committed by TMC through various means, including, but not limited to: (1) misrepresentations and omissions made in mailings and wire communications provided directly to consumers; (2) misrepresentations and omissions made in mailings and wire communications to dealers; and (3) misrepresentations and omissions made in mailings and wire communications made to the NHTSA, including but not limited to false information provided in response to ODI investigations, and (4) misrepresentations and omissions made in public statements that were furthered by mailings and wire communications.

676.     Each Toyota Defendant intended that the enterprise transmit false and misleading information as set forth herein to FELPs, members of the proposed Sub-Classes, government investigators, and consumers in North America and the World through means of domestic and international mail and wire carriers.

677.     The legitimate purpose of the "misleading marketing enterprise" was to design, manufacture, test, market and sell Toyota Vehicles, and disseminate safety information to both the public and to appropriate governmental entities. However, the "misleading marketing enterprise" also had an illegal purpose, which was conducted under the veneer of legitimacy, which was to conceal design defects that resulted in a heightened risk or potential of SUA, as well as to disseminate

false and misleading safety information.  The overall purpose and function of the "misleading marketing enterprise" was to sell Toyota Vehicles for a sizeable profit to customers, including FELPs, and while the misleading marketing enterprise had a legitimate component, it also had an illegal aspect, in which it misled customers about the safety of its vehicles even though it knew of serious product defects or flaws in its vehicles.

678.    The Toyota Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity indictable under 18 U.S.C. §§1341, 1343, 1956 and 2314.

679.    The Toyota Defendants are "persons" as defined by 18 U.S.C. §1961(3) and have conducted or participated, directly or indirectly, in the conduct of the Toyota "misleading marketing enterprise" through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

**B. Predicate Acts**

**1.    Omissions of Material Fact**

680.    Toyota has generated a worldwide reputation for quality and safety which is the centerpiece of Toyota's marketing enterprise to increase sales of Toyota Vehicles. Toyota's marketing enterprise touts its safety awards, including an award in 2008 from the Insurance Institute for Highway Safety (hereinafter "IIHS") naming the Toyota Tundra and the Toyota Highlander as their "Top Safety

Picks." Toyota did not disclose at the time the defects and design flaws with its vehicles that could lead to SUA.

681.     Toyota was aware that the defect with certain vehicles posed a potentially dire safety risk to FELPs and members of the Sub-Classes. Rather than notify consumers of the defect and attendant safety risk, Toyota opted to conceal the existence of the defect for an unreasonable period of time, even after being contacted by consumers who experienced the problem. Toyota was in the exclusive possession of this information, which was material to FELPs and Sub-Class members, and Toyota had a duty, under all circumstances, to disclose the defect and associated safety hazards to FELPs and Sub-Class members.

682.     Instead of warning consumers that Toyota vehicles may experience a SUA event and providing instructions in the event a SUA occurred, Toyota Vehicle owners, like FELPs, were provided a Warranty and Maintenance Guide which states, *inter alia:*

> At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability.... Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind....

### a.  Toyota's History of Exerting Undue Influence To Conceal Material Facts Concerning Deadly Design Flaws

683.     According to Reuters, Christopher Tinto, Vice President of Regulatory Affairs in Toyota's Washington, D.C. office, left NHTSA in 1994 and joined

Toyota. Christopher Santucci, who now works for Tinto, did the same in 2003. Upon information and belief, these two individuals exerted undue influence over the former regulatory agency they worked in to stall or otherwise misdirect NHTSA's investigations into complaints and to conceal material defects.

684.     From 2003 to 2009, NHTSA opened eight investigations of SUA involving Toyota Vehicles. Of those, three resulted in floor mat recalls, and five were closed. According to court papers and other documents, Tinto and Santucci worked with NHTSA on Toyota's responses to the consumer complaints.

685.     The first investigation of SUA events involved 2002 and 2003 Toyota Camrys and Solaras, and a lawsuit filed on behalf of a Michigan woman who was killed in an April 2008 accident. The lawsuit blamed a defect in the ETCS for the fatal accident. According to Reuters, Santucci testified in a deposition for that lawsuit that Toyota and NHTSA discussed limiting an investigation of SUA to incidents lasting less than a second.

686.     The Reuters report went on to say that twenty days after starting its probe – and after talking with Tinto – NHTSA decided not to investigate "longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect." The decision was made to limit the cases to eliminate instances in which a driver may have used the wrong pedal.

687.     The second NHTSA investigation, which occurred in 2005, was prompted by a consumer complaint of two instances of sudden acceleration in a

2002 Camry, one of which involved a crash. The vehicle owner who filed the petition with NHTSA also cited eight complaints from other drivers about similar episodes with other Toyota Vehicles. According to Reuters, Toyota itself said dealer representatives investigated 59 of 100 vehicles whose owners complained.

688.     In November of that year, Tinto wrote to NHTSA that no evidence of a system or component failure was found and the vehicles were operating as designed. Based on the representations and statements of Tinto, NHTSA ended that probe in January, 2006, citing lack of evidence of a problem and the agency's need to allocate "limited resources" to other investigations.

689.     The third case, which started with a consumer complaint made in August of 2006, again involved the Camry, model years 2002 to 2006. The Camry owner who made the complaint to NHTSA blamed the throttle actuator or controller. According to Reuters, NHTSA also noted 3,546 cases where Toyota had replaced throttle actuators under warranty terms. Tinto wrote to the agency that Toyota had not found a defect with the throttle actuator, but did find evidence that returned actuators had corroded due to water intrusion. According to Tinto, intrusion was usually caused by drivers going through a flooded road or similar circumstances. NHTSA decided not to pursue the probe, saying it was "not warranted."

690.     The final investigation, in 2008, involved 2006-2007 Toyota Tacoma pickup trucks. According to Reuters, the consumer who made the initial complaint

reported two incidents of unintended acceleration in his 2006 Tacoma and pointed to 32 similar complaints in the NHTSA database. A memo from Tinto also said that Toyota had received similar complaints involving more than 400 Tacomas, model years 2004 to 2009. Of those reports, 49 involved crashes.

691.     Reuters discovered that Tinto wrote a letter to NHTSA stating that he felt the complaints didn't warrant NHTSA investigation and that he believed that media attention played a major role in the filing of these complaints. NHTSA closed that investigation in August of 2008, saying it was unable to find any underlying cause for the issue.

692.     Toyota continues to take actions to "shut-down" any material disclosures that its electronic accelerator system is defective, as revealed in an *Associated Press* article published in *The San Diego Union-Tribune,* on July 11, 2010, entitled, "A 'startling discovery' leads to fall out for school:"

> CARBONDALE, Ill – It's the kind of publicity any university might dream about: **An instructor uncovers a possible flaw that's causing some of the world's most popular cars to accelerate suddenly. His ground breaking work attracts interest from Congress and reporters worldwide.**
>
> But as Southern Illinois University's David Gilbert sought to show that electronics might be to blame for the problem in Toyotas, the world's largest automaker tried to cast doubt on his findings. One Toyota employee even questioned whether he should be employed by the school, which has long been a recipient of company donations.

Electronic messages obtained by The Associated Press show the automaker grew increasingly frustrated with Gilbert's work and made its displeasure clear to his bosses at the 20,000-student school. "It did kind of catch us off-guard," university spokesman Rod Sievers said.

So did the fallout. Two Toyota employees quickly resigned from an advisory board of the school's auto-technology program and the company withdrew offers to fund two springbreak internships.

**"I didn't really set out to take on Toyota. I set out to tell the truth, and I felt very strongly about that,"** said Gilbert, **who was among the first to suggest that electronics, not sticky gas pedals or badly designed floor mats, caused the acceleration** that required the Japanese automaker to recall millions of vehicles.

Toyota insists its relationship with the school remains "strong," and company officials say they have no plans to stop contributing to SIU. They also say the two Toyota representatives who stepped down from the advisory board did so merely to avoid any appearance that the company was exerting influence over Gilbert's testimony.

Driven by his own curiosity, **Gilbert in January found he could manipulate the electronics in a Toyota Avalon to re-create the acceleration without triggering any trouble codes in the vehicle's computer. Such codes send the vehicle's computer into a fail-safe mode that allows the brake to override the gas.**

**Gilbert said he reported his "startling discovery" to Toyota, and the automaker "listened attentively."** But Gilbert said he never heard back from the company, which has steadfastly maintained the problems were mechanical, not electronic.

> **A short time later, Mark Thompson – identifying himself as an SIU alumnus and, without elaboration, a Toyota Motor Sales employee – voiced in an e-mail to the university's then-chancellor, Sam Goldman, his "great concern and disappointment" about Gilbert. Thompson said he was "deeply disturbed" by what he called Gilbert's false accusations about the automaker.**

> Thompson reminded Goldman that he and Toyota regularly contributed to the university – including a $100,000 check to the auto-tech program in late 2008 – and "due to the outstanding reputation your automotive technology program has, we donate much more than money," including cars. [Emphasis added].

**2.    False and Misleading Statements Which Were and Were Intended to be Disseminated by Interstate and Foreign Carriers of Mail and Wire Communications with Knowledge of Their Falsity Concerning the Causes of SUA (18 U.S.C. §1341 AND 1343)**

693.    Driver complaints resulted in at least eight separate investigations into Toyota vehicles by NHTSA. In response to the complaints and investigations, Toyota issued six minor recalls to fix various problems related to its acceleration system, but defendants blamed human error for the problems.

694.    Toyota intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential consumers and owners that the electronic throttle control system in its vehicles may contribute to a SUA event. In a June 19, 2004, letter to NHTSA, Toyota falsely stated that its ETC system contained a built in redundancy to prevent acceleration and that in the event of sudden acceleration the "vehicle brakes would have restrained vehicle motion."

Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience SUA and that applications of the brakes have failed to restrain vehicle motion.

695.    Defendants intentionally and falsely denied in documents mailed to NHTSA and reasonably relied upon by dealers, potential customers and owners that Toyota's vehicles were subject to SUA. In a November 15, 2005, letter to NHTSA, Toyota falsely denied that its vehicles could ever experience SUA. According to Toyota, SUA cannot occur "without the driver applying the accelerator pedal because of ... several detection systems ..." Defendants have never withdrawn this position, yet the evidence suggests that Toyota vehicles can and do experience sudden unintended acceleration without application of the accelerator pedal.

696.    In March of 2007, Toyota identified problems with the accelerator pedals in the Tundra pickup. According to Toyota, it determined the problem was caused by the material in the accelerators' friction lever and made a change. Toyota falsely claimed that this was a drivability issue and not a safety issue.

697.    Similar issues arose with the Toyota Tacoma. Toyota denied that there was any problem with the acceleration system. An April 7, 2008 article in the *Detroit Free Press* entitled, "Toyota Pickup Probe Pushed; Sudden Accelerations Claims Hard to Pin Down," states:

> Toyota spokesman Bill Kwong says the company has found no problems with the Tacoma that would explain the complaints. "We don't feel it's an issue with the vehicle," he said. Regulators "get sudden acceleration complaints from consumers for various manufacturers. ... and in most cases they have found it's a misapplication of the pedals by the driver."

698. Toyota further claimed that there were no flaws in its trucks' design and the reports of sudden acceleration were "inspired by publicity." As reported in an article in the *Detroit Free Press* on June 10, 2008, entitled "Toyota Denies Tacoma is Defective; Media Inspired Acceleration Claims, It Says:"

> Some 431 customers from around the country have reported unintended or sudden acceleration in their Toyota Tacoma pickups, resulting in 51 crashes and 12 injuries, but the automaker said there are no flaws in the trucks and that many reports were "**inspired by publicity.**" [Emphasis added].

699. Toyota went on to blame "extensive media coverage" for spurring additional reports of problems with Toyota which would explain why no other pickup has similar complaints:

> Toyota believes that it is likely that many of the consumer complaints about the general issue of unwanted acceleration ... **as well as many of the complaints about this subject that have been received by Toyota,** were inspired by publicity," Toyota said in a letter to the NHTSA released Thursday. But even taking them at face value, it is clear that the majority of the complaints are related to *minor drivability issues and are **not indicative of a safety-related defect.*** * * * Toyota spokesman Bill Kwong said tests by the automaker and the NHTSA revealed no problems that would explain the complaints. He said

the problems were not as prevalent as the number of complaints suggested, saying the NHTSA asked for any cases where engine idle speed increased. "We remain confident in the safety of the vehicles," Kwong said. [Emphasis added].

700.    In December of 2008, a similar issue arose in Europe in the right-hand drive versions of Toyota's Aygo and Yaris models. After an investigation, Toyota allegedly found that condensation from heaters caused increased friction in the accelerator pedal, making it stick. In mid-August of 2009, Toyota made a design change in its European cars which lengthened the arm of the friction lever and changed its materials on all vehicles being produced in Europe. Despite the fact that the same material used in manufacturing of gas pedals in Europe -- the material that allegedly caused the sudden acceleration problems in Europe – was the same material used in the United States, Toyota did not make the change to vehicles sold in the United States.

701.    On April 23, 2009, *Westword* published an article entitled, "The Prius can take owners on a wild ride." The article discussed several incidents involving situations where Prius drivers experienced SUA. When asked for a response, Toyota denied any problems with its accelerators:

> Toyota responded to the acceleration problem in 2007 by recalling "*faulty floor mats*" that the company said could cause the gas pedal to stick. Another explanation from Toyota is *simple driver error.* "You get these customers that say, 'I stood on the brake with all my might and the car just kept on accelerating.' **They're not stepping on the brake,**" says corporate Toyota

spokesman Bill Kwong. "People are so under stress right now, people have so much on their minds. With pagers and cell phones and IM, people are just so busy with kids and family and boyfriends and girlfriends. So you're driving along, and the next thing you know, you're two miles down the road and you don't remember driving, because you're thinking about something else." [Emphasis added].

702.     On September 14, 2009, Toyota issued a press release entitled, "Lexus ES 350 Accident Investigation," which stated *inter alia*:

On August 28th, 2009, California Highway Patrol Officer Mark Saylor and three members of his family tragically lost their lives on a highway near San Diego California, while driving a 2009 ES350 loaned to them by a local Lexus dealer. Our deepest sympathies go out to the friends and family of Mark, Cleofe, Mahala, and Cleofe's brother Chris Lastrella. Preliminary information from law enforcement investigators indicates that **the cause may have been an all-weather floor mat** from a different Lexus model which, if installed incorrectly in the ES350, could cause it to interfere with the accelerator pedal.

All-weather floor mats are installed by dealers or customers as an accessory item. Driver's floor mat interference with the accelerator pedal is possible in any vehicle make with any combination of floor mats when the floor mat is not properly secured or if it is not the factory designed floor mat for the vehicle.

Toyota Motor Sales, USA, Inc. takes public safety very seriously and will fully cooperate with any investigation. We believe our vehicles to be among the safest on the road today. **We are instructing all of our Lexus and Toyota dealers** to immediately inspect their new, used, and loaner fleet vehicles and we urge all other automakers, dealers, vehicle owners, and the independent service and car wash industries to assure

that any floor mat, whether factory or aftermarket, is correct for the vehicle and properly installed and secured [Emphasis added].

703.     In a press release issued after the September 29, 2009 recall, Toyota unequivocally and falsely stated, "no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured." Toyota repeated such assurances in subsequent months, stating that the faulty floor mats were the only cause of SUA in Toyota vehicles.

704.     On November 2, 2009, Robert S. Carter, Group Vice President and Toyota Division General Manager of Toyota USA appeared on a conference call with the media at Thomson Reuters Autos Summit where he unequivocally denied all problems with Toyota vehicles, claiming that all incidents of sudden unintended acceleration could be traced to floor mats and denying any other problems with Toyota vehicles:

> [CARTER]: ***There has been speculation and theories that there are some concerns with our fuel delivery systems, our braking systems, our throttle systems. I will tell you there is absolutely no evidence to support any of that.***
>
> In fact, last week NHTSA just closed another investigation of a vehicle that was looked at, and again they concluded that the source was an incompatible floor mat or a floor mat that was not attached properly. So our position is this. Until we thoroughly review this and work with NHTSA, is to tell consumers that this potential exists; if there is any concern, remove the floor mat.

At the same time, if it is a properly designed floor mat for the vehicle and it is attached on the hooks that come from the factory, there is no concern, there is no evidence of any accelerator pedal interference. If consumers would like to keep the floor mat installed, we are suggesting four things. One, make sure it is a compatible mat. Two, make sure that it is hooked properly to the floor. Three, that floormats are designed to fit in the car. Don't reverse the floormat and expose the rubber side. And then the fourth is, in many inclement areas such as Detroit, some consumers will keep their carpet and floormats in their car and place a rubber mat on top and stack the mats. We highly recommend against that. * * *

[MEDIA]: But at the moment, though, as this moves to recall, I guess what you said will happen. ***The locus is just the floormat, floormat design, nothing beyond that?***

[CARTER]: ***Absolutely. Absolutely. There is no evidence that goes beyond that.*** [Emphasis added].

705.    On November 2, 2009, Toyota issued a press release entitled, "Toyota Begins Interim Notification to Owners Regarding Future Voluntary Safety Recall Related to Floor Mats," which states in part:

Toyota Motor Sales (TMS), U.S.A., Inc., today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position.

The letter, in compliance with National Traffic and Motor Vehicle Safety Act and reviewed by the [NHTSA] also confirms that **no defect exists in vehicles in which the driver's floor mat is**

**compatible with the vehicle and properly secured.**
* * *

This is the sixth time in the past six years that NHTSA
has undertaken such an exhaustive review of allegations
of unintended acceleration on Toyota and Lexus
vehicles and the sixth time the agency has found **no
vehicle based cause for the unwanted acceleration
allegations. The question of unintended acceleration
involving Toyota and Lexus vehicles has been
repeatedly and thoroughly investigated by NHTSA,
without any finding of defect other than the risk
from an unsecured or incompatible driver's floor
mat,** said Bob Daly, TMS senior vice president. * * *
[Emphasis added].

706.    In a highly unusual move, NHTSA publicly reprimanded Toyota for

statements made by the Company in its October 30th notification letter to owners.

On November 4, 2009, an *Associated Press* article entitled, "Govt Criticizes Toyota

Press Release on Floor Mats," states in part:

**Toyota   Motor   Corp.   released   misleading
information about an investigation into problems
with stuck gas pedals** that led to a massive Toyota
recall, the government said Wednesday, stressing the
issue is still under review by federal safety regulators.
The National Highway Traffic Safety Administration
said it was still investigating the case and meeting with
Toyota to hear about the company's plan to redesign
the vehicles and fix "this very dangerous problem." * *
* Toyota said in a statement on Monday that NHTSA
had confirmed " that *no defect exists* in vehicles in
which the driver's floor mat is compatible with the
vehicle and properly secured."

**But NHTSA said that was inaccurate and the
government was investigating possible causes of the
acceleration problem. Removing the floor mats was**

> **"simply an interim measure"** and **"does not correct the underlying defect in the vehicles involving the potential for entrapment of the accelerator by floor mats,** which is related to accelerator and floor pan design." **"The matter is not closed until Toyota has effectively addressed the defect by providing a suitable vehicle based solution,"** NHTSA said in the statement, which the department said was issued *to correct "inaccurate and misleading information" from the automaker.* * * * [Emphasis added].

707.    On November 25, 2009, without admitting fault or any design defects, Toyota issued a press release entitled, "Toyota Announces Details of Remedy to Address Potential Accelerator Pedal Entrapment," which states in part:

> ... In addition, as a separate measure independent of the vehicle based remedy, Toyota **will install a brake override system onto the involved [vehicles] as an extra measure of confidence. This system cuts engine power in case of simultaneous application of both the accelerator and brake pedals.** Toyota is in the process of completing development of these actions for the ES 350, Camry, and Avalon and will start notifying owners of the involved vehicles via first-class mail by the end of the year. The remedy process regarding the other five models will occur on a rolling schedule during 2010. [Emphasis added].

708.    The *International Herald Tribune* reported that on November 25, 2009, Toyota spokesman, Irving Miller, stated on a conference call that, "We are very confident that we have addressed this issue [referring to the sudden unintended acceleration problems]. Mr. Miller went on to say, "We can come up with **no indication whatsoever that there is a throttle or electronic control system malfunction.**"

709.     On November 29, 2009, *The New York Times* reported that Irving Miller stated that Toyota would begin shortening its vehicles' existing gas pedals by about three-quarters of an inch and would start equipping its vehicles with smart gas pedals, even though smart gas pedals have been used for years by European automakers like BMW, Audi and Volkswagen. Irving Miller, Toyota's spokesman stated that Toyota was confident that these steps would solve the SUA problem. According to Mr. Miller, "We have come to the conclusion this is pedal misapplication or pedal entrapment." Mr. Miller went on to say, "We continue to find no reason to believe that there is a problem with the electronic control systems."

710.     On December 9, 2009, Mr. Miller submitted a letter to the *Los Angeles Times* vigorously challenging a December 5, 2009 editorial that questioned Toyota's ETCS and ETCS-i system. The *Los Angeles Times* noted that incidents of sudden unintended acceleration grew exponentially after the introduction of Toyota's electronic throttle control system. Mr. Miller's letter emphatically denied that there was any problem with the electronic throttle control system.

711.     On December 23, 2009, the *Los Angeles Times* released another story accusing Toyota of hiding the defects and design flaws in its vehicles for years. According to the *Los Angeles Times,* Toyota destroyed documents and hid testing results from American consumers, as well as paying cash settlements to people who say their vehicles have raced out of control and caused serious accidents.

According to the news story, a computerized search of NHTSA records had issued eight previous recalls related to SUA – more than any other automaker. The *Los Angeles Times* news report found that Toyota had been allowing sudden acceleration problems to fester for nearly a decade, since the introduction of the electronic throttle controls system in the early 2000's.

712.     Mr. Miller, Toyota's spokesman, responded with a press release entitled, "Setting the Record Straight." The press release stated:

> Today the *Los Angeles Times* published an article that wrongly and unfairly attacks Toyota's integrity and reputation. While outraged by the *Times*' attack, we were not totally surprised. The tone of the article was foreshadowed by the phrasing of a lengthy list of detailed questions that the *Times* emailed to us recently. The questions were couched in accusatory terms. Despite the tone, we answered each of the many questions and sent them to the *Times*. Needless to say, we were disappointed by the article and much of what was used [sic] was distorted. Toyota has a well-earned reputation for integrity and we will vigorously defend it.

713.     On December 26, 2009, four people were killed in an accident involving a Toyota Avalon. At the time, a problem with the accelerator pedal was the suspected cause for the crash. However, it was determined that the floor mats could not have caused the accident as the mats were in the trunk at the time of the crash. This caused Toyota to change its story. On January 21, 2010, Toyota released a statement saying:

> Toyota has investigated *isolated reports* of sticking accelerator pedal mechanisms in certain vehicles without the presence of floor mats. *There is a possibility* that **certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position.** [Emphasis added].

A vehicle with the throttle stuck in a partially depressed position can lead to accidents which can kill or maim not only the drivers and passengers of the defective vehicles, but others whom the vehicles might run into. This is a serious design flaw and defect that poses serious risk to not only consumers but also the public as a whole worldwide.

714.    A January 25, 2010 *USA Today* article revealed that Toyota knew that there were problems with accelerator-pedal assemblies from one of its Canadian suppliers since 2009 but decided that it did not warrant a recall at that time. However, Toyota announced the January 2010 recall because the defect trend had picked up. John Hanson, Toyota's U.S. safety spokesperson stated, "The quickness that this all came together is one reason why I don't have numbers of complaints." Mr. Hanson further stated, "And why we don't have a fix."

715.    During a Congressional hearing on January 27, 2010, Toyota officials stated that they first learned of "sticking pedals" in England and Ireland in the spring of 2009. But Toyota acknowledged that it had received reports in England and Ireland as early as December 2008.

C.     Pattern of Racketeering Injury

716.     As a result, and by reason of the foregoing pattern of racketeering activity, false statements of material facts and omissions of material facts, the FELPs and the Foreign Consumer Sub-Classes have sustained injury to their property, to wit:

A.     Toyota was in the exclusive possession of the information set forth *supra,* which was material to FELPs and the Foreign Consumer Sub-Classes and Toyota had a duty, under all the circumstances, to disclose the design defects and associated safety hazards to FELPs and the Foreign Consumer Sub-Classes;

B.     FELPs and the Foreign Consumer Sub-Classes reasonably expected that the subject vehicles would not contain a serious safety design defect that could, *inter alia,* result in putting the occupants at risk of serious bodily injury or Death;

C.     As a result of the lack of safety systems, there is no mechanical or electronic failsafe mechanism to allow FELPs and the Foreign Consumer Sub-Classes to stop their Toyota Vehicles in the event the computerized "drive-by-wire" acceleration systems malfunction and engage in uncontrolled acceleration, putting the occupants at risk of serious bodily injury or death;

D.     As a result of the defect plaguing the Toyota Vehicles, FELPs and the Foreign Consumer Sub-Classes overpaid for their vehicles because their values are and will remain diminished;

E.     Given the widespread publicity associated with the recall, FELPs and the Foreign Consumer Sub-Classes who purchased a Toyota Vehicle have suffered injury in fact or otherwise been damaged because the resale and fair market values of their Toyota Vehicles are and will remain substantially depreciated;

F.     FELPs and the Foreign Consumer Sub-Classes who leased a Toyota Vehicle have been injured because they must continue to pay for leasing the subject unsafe vehicle or pay a penalty to break the lease prematurely.

717.     FELPs and the Foreign Consumer Sub-Classes are therefore entitled to recover treble damages and the costs of their suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

## COUNT II

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et seq.*)

718.     FELPs and the Foreign Consumer Sub-Classes incorporate the allegations set forth above as if fully set forth herein.

719.     Defendants are "persons" under CAL. CIV. CODE § 1761(c).

720.     FELPs and the Foreign Consumer Sub-Classes are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Toyota Vehicles.

721.     Defendants participated in unfair or deceptive acts or practices that violated the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, as described above and below.  Defendants each are directly liable for these violations of law.  TMC also is liable for TMS's violations of the CLRA because TMS acts as TMC's general agent in the United States for purposes of sales and marketing.

722.     By failing to disclose and actively concealing the dangerous risk of throttle control failure and the lack of adequate fail-safe mechanisms in Toyota Vehicles equipped with ETCS, Defendants engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq.*, including (1) representing that Toyota Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Toyota Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Toyota Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Toyota Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Toyota Vehicles has been supplied in accordance with a previous representation when it has not.

723.     As alleged above, Defendants made numerous material statements about the safety and reliability of Toyota Vehicles that were either false or misleading.   Each of these statements contributed to the deceptive context of TMC's and TMS's unlawful advertising and representations as a whole.

724.     Defendants knew that the ETCS in Toyota Vehicles was defectively designed or manufactured, would fail without warning, and was not suitable for its intended use of regulating throttle position and vehicle speed based on driver commands.   Defendants nevertheless failed to warn FELPs and the Foreign Consumer Sub-Classes about these inherent dangers despite having a duty to do so.

725.     Defendants each owed FELPs and the Foreign Consumer Sub-Classes a duty to disclose the defective nature of Toyota Vehicles, including the dangerous risk of throttle control failure, the ETCS defects, and the lack of adequate fail-safe mechanisms, because they:

     a.     Possessed exclusive knowledge of the defects rendering Toyota Vehicles inherently more dangerous and unreliable than similar vehicles;

     b.     Intentionally concealed the hazardous situation with Toyota Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from FELPs and the Foreign Consumer Sub-Classes; and/or

     c.     Made incomplete representations about the safety and reliability of Toyota Vehicles generally, and ETCS in particular, while purposefully

withholding material facts from FELPs and the Foreign Consumer Sub-Classes that contradicted these representations.

726.     Toyota Vehicles equipped with ETCS pose an unreasonable risk of death or serious bodily injury to FELPs and the Foreign Consumer Sub-Classes, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents of SUA.

727.     Whether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.   When FELPs and the Foreign Consumer Sub-Classes bought a Toyota Vehicle for personal, family, or household purposes, they reasonably expected the vehicle would (a) not accelerate unless commanded to do so by application of the accelerator pedal or other driver-controlled means; (b) decelerate to a stop when the brake pedal was applied, and was equipped with any necessary fail-safe mechanisms including a brake-override.

728.     TMC's and TMS's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including FELPs and the Foreign Consumer Sub-Classes, about the true safety and reliability of Toyota Vehicles.

729.     As a result of its violations of the CLRA detailed above, Defendants caused actual damage FELPs and the Foreign Consumer Sub-Classes and, if not stopped, will continue to harm FELPs and the Foreign Consumer Sub-Classes.

FELPs and the Foreign Consumer Sub-Classes currently own or lease, or within the class period have owned or leased, Toyota Vehicles that are defective and inherently unsafe. ETCS defects and the resulting unintended acceleration incidents have caused the value of Toyota Vehicles to plummet.

730.     FELPs and the Foreign Consumer Sub-Classes risk irreparable injury as a result of TMC's and TMS's acts and omissions in violation of the CLRA, and these violations present a continuing risk to FELPs and the Foreign Consumer Sub-Classes as well as to the general public.

731.     Pursuant to CAL. CIV. CODE § 1780(a), FELPs and the Foreign Consumer Sub-Classes seek monetary relief against TMS and TMC measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each FELP and each member of the Foreign Consumer Sub-Classes they seek to represent.

732.     FELPs and the Foreign Consumer Sub-Classes also seek punitive damages against Defendants because each carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting FELPs and the Foreign Consumer Sub-Classes to cruel and unjust hardship as a result. Defendants intentionally and willfully misrepresented the safety and reliability of Toyota Vehicles, deceived FELPs and the Foreign Consumer Sub-Classes on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Toyota

Vehicles it repeatedly promised FELPs and the Foreign Consumer Sub-Classes were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

733.    The recalls and repairs instituted by Toyota have not been adequate. Toyota Vehicles still are defective and the "confidence" booster offer of an override is not an effective remedy and is not offered to all Toyota Vehicles, including the 2002-2007 Camry.

734.    Repairs have been incomplete. For example, Toyota documented an incident with a 2007 Avalon that "unintentionally accelerated with high rotation (7000 rpm) and smoke out from brake. There was an eyewitness."[85] The dealer confirmed the "high rotation and not returning to idle" and replaced the pedal and the throttle. The dealer declined to provide a document saying UA would not recur and refused to buy back the vehicle. Most of the Recalled Vehicles have not had their throttles replaced.

735.    FELPs and the Foreign Consumer Sub-Classes further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

_____

[85] 41241T000,

## COUNT III

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

736.     FELPs and the Foreign Consumer Sub-Classes reallege and incorporate by reference all paragraphs alleged herein.

737.     FELPs assert this claim on behalf of themselves and on behalf of the Foreign Consumer Sub-Classes who purchased or leased a vehicle from Toyota or a Toyota dealership.

738.     California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

739.     Defendants have violated the unlawful prong of section 17200 by their violations of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I by the acts and practices set forth in this SAMCC.

740.     Defendants have also violated the unlawful prong because Defendants have engaged in business acts or practices that are unlawful because they violate the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act"), codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

741.     FMVSS 124, codified at 49 C.F.R. § 571.124, sets the standard for accelerator control systems.  Specifically, FMVSS 124 establishes requirements for

the return of a vehicle's throttle to the idle position when the driver removes the actuating force from the accelerator control, or in the event of a severance or disconnection in the accelerator control system.  The purpose of FMVSS 124 is to reduce deaths and injuries resulting from engine overspeed caused by malfunctions in the accelerator control system.

742.    FMVSS 124 requires that throttles in passenger vehicles return to the idle position within certain maximum allowable times after the driver has removed the actuating force from the accelerator control:  one second for vehicles of 4,536 kilograms or less gross vehicle weight rating ("GVWR"), two seconds for vehicles of more than 4,536 kilograms GVWR, and three seconds for any vehicle that is exposed to ambient air at – 18 degrees Celsius to – 40 degrees Celsius.

743.    Toyota Vehicles equipped with ETCS do not comply with FMVSS 124 because a design defect causes their throttles to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

744.    Defendants each violated 49 U.S.C. § 3-112(a)(1) by manufacturing for sale, selling, offering for introduction in interstate commerce, or importing into the United States, Toyota Vehicles equipped with ETCS that failed to comply with FMVSS 124.

745.    Defendants each violated 49 U.S.C. § 30115(a) by certifying that Toyota Vehicles equipped with ETCS complied with FMVSS 124 when, in the exercise of reasonable care, Defendants each had reason to know that the certification was false or misleading because a design defect causes throttles in Toyota Vehicles equipped with ETCS to be susceptible to remaining in an open position and incapable of returning to the idle position within the maximum allowable time after the driver has removed the actuating force from the accelerator control.

746.    Defendants have violated the fraudulent prong of section 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

747.    Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the SAMCC including the manufacture and sale of vehicles with a sudden acceleration defect that lack brake-override or other effective fail-safe mechanism, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented FELPs from making fully informed decisions about

whether to purchase or lease Toyota Vehicles and/or the price to be paid to purchase or lease Toyota Vehicles.

748.    The Named FELPs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  As set forth in the allegations concerning each FELP, in purchasing or leasing their vehicles, the FELPs relied on the misrepresentations and/or omissions of Toyota with respect of the safety and reliability of the vehicles.   Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control.  Had the Named FELPs known this they would not have purchased or leased their Toyota Vehicles and/or paid as much for them.

749.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California, nationwide and worldwide.

750.    FELPs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to FELPs and the Foreign Consumer Sub-Classes any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief set forth below.

## COUNT IV

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *et seq.*)

751.     FELPs and the Foreign Consumer Sub-Classes reallege and incorporate by reference all paragraphs alleged herein.

752.     FELPs assert this claim on behalf of themselves and on behalf of the Foreign Consumer Sub-Classes who purchased or leased a vehicle from Toyota or a Toyota dealership.

753.     California Business and Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

754.     Defendants caused to be made or disseminated through California, the United States and other parts of the world, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or

which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to FELPs and the Foreign Consumer Sub-Classes.

755.    Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

756.    Named FELPs and the Foreign Consumer Sub-Classes have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  In purchasing or leasing their vehicles, the Named FELPs relied on the misrepresentations and/or omissions of Toyota with respect to the safety and reliability of the vehicles.  Toyota's representations turned out not to be true because the vehicles can unexpectedly and dangerously accelerate out of the drivers' control.  Had the Named FELPs known this, they would not have purchased or leased their Toyota Vehicles and/or paid as much for them.

757.    Accordingly, the Named FELPs overpaid for their Toyota Vehicles and did not receive the benefit of their bargain.  One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles now that the truth has been exposed.  Both trade-in prices and auction prices for Toyota Vehicles have declined as a result of

Defendants' misconduct.  This decline in value measures the overpayment, or lost benefit of the bargain, at the time of the Named FELPs' purchases.

758.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California, nationwide and other parts of the world.

759.     FELPs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to FELPs and the Foreign Consumer Sub-Classes any money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT V

### FRAUD BY CONCEALMENT
### (BASED ON CALIFORNIA LAW)

760.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

761.     This Count is asserted by the FELPs and the Foreign Consumer Sub-Classes.

762.     As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

763.     Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as safe and proclaimed that safety is one of Toyota's highest corporate priorities.  Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

764.     In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by FELPs and the Foreign Consumer Sub-Classes.  These omitted facts were material because they directly impact the safety of the Toyota Vehicles.  Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Toyota Vehicles inherently more dangerous and unreliable than similar vehicles.

765.     Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce FELPs and the Foreign Consumer Sub-Classes to purchase Toyota Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

766.    Defendants still have not made full and adequate disclosure and continue to defraud FELPs and the Foreign Consumer Sub-Classes.

767.    FELPs and the Foreign Consumer Sub-Classes were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  FELPs and the Foreign Consumer Sub-Classes' actions were justified.   Defendants were in exclusive control of the material facts and such facts were not known to the public or the FELP Sub-Classes.

768.    As a result of the concealment and/or suppression of the facts, FELPs and the Foreign Consumer Sub-Classes sustained damage.  For those FELPs and Foreign Consumer Sub-Classes who elect to affirm the sale, these damages, pursuant to CAL. CIV. CODE § 3343, include the difference between the actual value of that which FELPs and Foreign Consumer Sub-Classes paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For those FELPs and Foreign Consumer Sub-Classes who want to rescind the purchase, then those FELPs and Foreign Consumer Sub-Classes are entitled to restitution and consequential damages pursuant to CAL. CIV. CODE § 1692.

769.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of FELPs' and the Foreign

Consumer Sub-Classes' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT VI**

**NEGLIGENCE**

770.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

771.     This Count is asserted by the FELPs and the Foreign Consumer Sub-Classes.

772.     Defendants had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably safe for their intended uses. Defendants had a duty to adequately test its vehicles' safety before selling millions to consumers worldwide. Defendants particularly had a duty to test vehicles for acceleration system problems once Defendants were on notice that its vehicles had a propensity to suddenly accelerate which can cause and has caused bodily injury, death, and property damage. Moreover, Defendants had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

773.     At all times relevant, Defendants sold, marketed, advertised, distributed, and otherwise placed Toyota Vehicles into the stream of commerce in

an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public.

774.     Defendants were negligent, and breached the duty owed to the FELPs and the Foreign Consumer Sub-Classes.

775.     As direct and proximate causes of the breach, FELPs and the Foreign Consumer Sub-Classes have been damaged including, but not limited to, the financial loss of owning or leasing the Toyota Vehicles that are unsafe as well as being subject to potential risk of injury.

### COUNT VII

### PRODUCTS LIABILITY – DESIGN DEFECT

776.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

777.     This Count is asserted by the FELPs and the Foreign Consumer Sub-Classes.

778.     Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Toyota Vehicles and its component parts and constituents, which was intended by the Defendants, and each of them, to be used as a passenger vehicle and for other related activities.

779.     Defendants, and each of them, knew that said vehicle was to be purchased and used without inspection for defects by FELPs and the Foreign Consumer Sub-Classes.

780.     The Toyota Vehicles were unsafe for their intended uses by reason of defects in their manufacture, design, testing, components and constituents, so that it would not safely serve their purpose, but would instead expose the users of said product to possible serious injuries.

781.     Defendants designed the Toyota Vehicles defectively, causing them to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

782.     The risks inherent in the design of the Toyota Vehicles outweigh significantly any benefits of such design.

783.     FELPs and the Foreign Consumer Sub-Classes were not aware of the aforementioned defects at any time prior to recent revelations regarding problems with Toyota Vehicles.

784.     As a legal and proximate result of the aforementioned defects of the Toyota vehicles, FELPs and the Foreign Consumer Sub-Classes have suffered damages including, but not limited to, the financial loss of owning or leasing the Toyota Vehicles that are unsafe as well as being subject to potential risk of injury.

# PRAYER FOR RELIEF

(a)   Injunctive relief, restitution, statutory, and punitive damages under the CLRA;

(b)   Restitution or restitutionary disgorgement as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3343;

(c)   Injunctive relief, restitution and appropriate relief under CAL. BUS. & PROF. CODE § 17500;

(d)   For damages for negligent conduct;

(e)   Punitive damages;

(f)   Attorneys' fees; and

(g)   An injunction ordering Toyota to implement an effective fail-safe mechanism on all vehicles with ETCS.

DATED:  June 10, 2011

RIBBECK LAW CHARTERED

By:_____/s/ Monica R. Kelly_____
Monica R. Kelly (Illinois Bar ID 6225920)
*monicakelly@ribbecklaw.com*
*mervinmateo@ribbecklaw.com*
RIBBECK LAW CHARTERED
505 N. Lake Shore Drive, Suite 102
Chicago, IL 60611
Telephone:  (312) 822-9999

*Lead Counsel for Foreign Economic Loss Plaintiffs*

1

Donald E. Haviland, Jr. (PA Bar ID 66615)
Michael J. Lorusso (PA Bar ID 203684)

2

Christina M. Rogomentick (PA Bar ID 92804)

3

*haviland@havilandhughes.com*
*lorusso@havilandhughes.com*

4

*rogomentick@havilandhughes.com*

5

HAVILAND HUGHES, LLC
111 S. Independence Mall East

6

The Bourse, Suite 1000

7

Philadelphia, PA 19106
Telephone: (215) 609-4661

8

9

**DEMAND FOR JURY TRIAL**

10

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

11

12

by jury on all issues so triable.

13

DATED:  June 10, 2011

14

RIBBECK LAW CHARTERED

15

By:_____/s/ Monica R. Kelly_____

16

Monica R. Kelly (Illinois Bar ID 6225920)
*monicakelly@ribbecklaw.com*

17

*mervinmateo@ribbecklaw.com*

18

RIBBECK LAW CHARTERED
505 N. Lake Shore Drive, Suite 102

19

Chicago, IL 60611
Telephone:  (312) 822-9999

20

21

*Lead Counsel for Foreign Economic Loss Plaintiffs*

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Donald E. Haviland, Jr. (PA Bar ID 66615)
Michael J. Lorusso (PA Bar ID 203684)
Christina M. Rogomentick (PA Bar ID 92804)
*haviland@havilandhughes.com*
*lorusso@havilandhughes.com*
*rogomentick@havilandhughes.com*
HAVILAND HUGHES, LLC
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106
Telephone: (215) 609-4661

## **PROOF OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on June 10, 2011.

/s/ Monica R. Kelly
Monica R. Kelly