Vincent Galvin (CA SBN 104448)
Vincent.Galvin@bowmanandbrooke.com
Mark V. Berry (CA SBN 70162)
Mark.Berry@bowmanandbrooke.com
Neil M. Kliebenstein (CA SBN 226060)
Neil.Kliebenstein@bowmanandbrooke.com
Anne O. Hanna (CA SBN 120947)
Anne.Hanna@bowmanandbrooke.com
Ryan A. McCarthy (CA SBN 233093)
Ryan.Mccarthy@bowmanandbrooke.com
BOWMAN AND BROOKE LLP
1741 Technology Drive, Suite 200
San Jose, CA 95110
Telephone No.: (408) 279-5393
Fax No.: (408) 279-5845

Attorneys for Defendants
Toyota Motor Sales, U.S.A., Inc.
Toyota Motor North America, Inc.
Toyota Motor Engineering & Manufacturing North America, Inc.
and Toyota Motor Corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

(SOUTHERN DIVISION – SANTA ANA)

| | |
|---|---|
| In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation<br><br>This document relates to:<br><br>CV11-08120 JAK (PJWx)<br>Shirlene Van Alfen, et al. v. Toyota Motor Sales, U.S.A., Inc., et al. | Case No. 8:10ML02151 JVS (FMOx)<br><br>**DISCOVERY MATTER**<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA DEFENDANTS' MOTION TO COMPEL FURTHER RESPONSES TO FIRST SET OF SPECIAL INTERROGATORIES<br><br>Date: June 8, 2012<br>Time: 10:00 a.m.<br>Location: JAMS (Orange, CA)<br>Special Masters: Hon. John K. Trotter (ret.)<br>Hon. Steven Stone (ret.) |

1691720-WE 1

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

TABLE OF CONTENTS

| | | Page(s) |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 2 |
| III. | HISTORY OF DISCOVERY DISPUTE | 2 |
| | A. THE DISCOVERY AT ISSUE | 2 |
| | B. TOYOTA'S MEET AND CONFER EFFORTS HAVE BEEN IN VAIN; PLAINTIFFS INITIALLY IGNORED IT AND HAVE SINCE STRUNG TOYOTA ALONG WITH THE EMPTY PROMISE OF SUPPLEMENTING AT SOME POINT | 2 |
| | C. THE DISCOVERY REQUESTS THAT THE COURT SHOULD COMPEL PLAINTIFFS TO PROVIDE FURTHER RESPONSE | 3 |
| IV. | ARGUMENT | 10 |
| | A. PLAINTIFFS' RESPONSES TO INTERROGATORIES ARE DEFICIENT AND SUPPLEMENTAL RESPONSES ARE NECESSARY *NOW* IN LIGHT OF THE UPCOMING EXPERT DISCLOSURES AND TRIAL | 10 |
| | B. TOYOTA ATTEMPTED TO COMPLY WITH LR-37 BEFORE RESORTING TO THIS MOTION | 12 |
| V. | CONCLUSION | 12 |

# TABLE OF AUTHORITIES

Page(s)

## CASES

Hansel v. Shell Oil Corp.,
169 F.R.D. 303, 305 (E.D. Pa. 1996).................................................................. 10

Saria v. Massachusetts Mutual Life Insurance, Co.,
(S.D.W.Va. 2005) 228 F.R.D. 536 ..................................................................... 7, 11

Williams v. Sprint/United Management Co.
(D.Kan. 2006) 235 F.R.D. 494............................................................................ 11

## CITES

FRCP 33(b)(3) ..................................................................................................... 10, 11
FRCP 37(a)(4) ..................................................................................................... 10
Rule 26(b)(1) ....................................................................................................... 10

The Toyota Defendants hereby submit the following Memorandum of Points and Authorities in support of their Motion to Compel Further Responses from plaintiffs to Toyota's First Set of Special Interrogatories:

## I. INTRODUCTION

Toyota served contention interrogatories on November 1, 2011. Plaintiffs responded by copying and pasting pages and pages of *allegations* from their complaint into their verified discovery responses. That is evasive and non-responsive, though demonstrates very well that despite two years of litigation, plaintiffs haven't discovered any facts, witnesses or documents to support their defect contentions beyond what they put in their Complaint in the first place. Plaintiffs' cover is that they could not answer interrogatories about what they think is defective because Toyota had not produced enough documents or enough witnesses yet and because plaintiffs had not yet inspected the subject vehicle. Since then, Toyota has produced dozens of engineers and other corporate representatives for deposition, and produced millions of pages of documents, and the vehicle has been inspected, and yet, despite the now-close proximity to trial, plaintiffs have provided no further responses. Even when Toyota attempted to meet and confer to obtain further responses to these basic contention interrogatories, which go to the essence of this product liability litigation that has been pending for over two years, Plaintiffs offer only the empty promise of intending to supplement their responses at some point, when they get around to it.

Expert disclosure is July 18, 2012. Since disclosure is simultaneous, Toyota should at least get to know what the defect contentions are so that it can be adequately prepared to provide fulsome expert reports that address those contentions; otherwise Toyota is left to guess which of the numerous, unsubstantiated, unsupported, vague allegations set forth in the boilerplate complaint—and now pasted nearly verbatim into the responses—plaintiffs intend to bring to trial. Plaintiffs should have provided complete and straightforward responses in the first instance, but now, at this late date, they absolutely must.

## II. FACTUAL BACKGROUND

As this case is the first Bellwether trial and has been the subject of extensive briefing on various issues, Toyota assumes the Court does not require an extensive recitation of the facts of the accident. In sum, this case arises from a single-vehicle crash on November 5, 2010 in Wendover, Utah. Paul Van Alfen was driving his 2008 Toyota Camry with his wife, son and his son's fiancé in the car. As Mr. Van Alfen exited I-80, he failed to slow the car and ran into a rock embankment at the end of the off-ramp. Mr. Van Alfen and his son's fiancé, Charlene Lloyd, died from their injuries.

## III. HISTORY OF DISCOVERY DISPUTE

### A. THE DISCOVERY AT ISSUE

On August 1, 2011, this court made clear statements of purpose for the contention and informational interrogatories, including that (1) "defendants ought to learn to the extent the plaintiff have a clear view of what the defects are"[1]; and (2) with respect to plaintiffs' claims for misrepresentation and fraud, defendants' would be entitled "to know sooner [rather] that later what is driving those allegations."[2] It was understood by the Court and the parties as of the August 1, 2011 hearing that Toyota would be propounding interrogatories beginning on September 1, 2011.[3] Defendants served Plaintiffs with Toyota's First Set of Interrogatories on November 1, 2011. (McCarthy Decl., ¶ 3, Exh. A) Plaintiffs served responses on December 5, 2011. (McCarthy Decl., ¶ 4, Exh. B)

### B. TOYOTA'S MEET AND CONFER EFFORTS HAVE BEEN IN VAIN; PLAINTIFFS INITIALLY IGNORED IT AND HAVE SINCE STRUNG TOYOTA ALONG WITH THE EMPTY PROMISE OF SUPPLEMENTING AT SOME POINT.

On April 12, 2012, Defendants initiated meet and confer efforts requesting further responses to a number of Plaintiffs' responses to Toyota's First Set of Special

---

[1] August 1, 2011 Hrg. Tr. ("Transcript"), 10:15-16
[2] Transcript, 18:17-18
[3] Transcript, 15:25-16:2; 17:16-19; 18:6-4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

Interrogatories. (McCarthy Decl., ¶ 5, Exh. C) Specifically, Defendants sought further responses to Interrogatories Nos. 1, 3-7, 9, 11, 14-16, and 18-2 on the grounds that Plaintiffs' responses to these interrogatories were deficient, as outlined below. Defendants' initial meet and confer efforts also requested a conference to discuss discovery issues, as required by Local Rule 37-1.

After twelve days, plaintiffs had not responded. Consequently, on April 24, 2012, Defendants followed up and again requested plaintiffs' counsel's participation in a conference of counsel to discuss Plaintiffs' responses to Toyota's First Set of Interrogatories. (McCarthy Decl., ¶ 6, Exh. D) Plaintiffs responded but wanted the conference call set for early May. (McCarthy Decl., ¶7, Exh. E) After a couple additional brief postponements of the call, the parties agreed to talk on May 9, but plaintiffs' counsel was a no-show. (McCarthy Decl., ¶9, Exh. F) While Plaintiffs have repeatedly stated in response to meet and confer efforts that they will supplement their responses, they have not done so, they have not even said by when they will do so, and they have not given any reason to believe that their supplemental responses will address the concerns raised in Toyota's meet and confer. (McCarthy Decl., ¶ 12, Exh. I & ¶ 13)

### C. THE DISCOVERY REQUESTS THAT THE COURT SHOULD COMPEL PLAINTIFFS TO PROVIDE FURTHER RESPONSE TO

The following outlines and summarizes the discovery addressed by Toyota's April 12, 2012 meet and confer (Exh. C).

Interrogatory No. 1: This interrogatory asks plaintiffs to identify statements by Toyota they claim show Toyota knew or should have known that its vehicles had a defect that caused UA. Plaintiffs copy and pasted, almost *verbatim*, all the boilerplate language, bold assertions, and unverified allegations from their Complaint into this response. Even though the request specifically asks for statements "by Toyota" plaintiffs' response contains only a few such statements, post-recall, and for the most part recites pages upon pages of statements by others, such as NHTSA. Rather than clearly identify statements that show knowledge of a defect related to unintended acceleration,

1691720-WE 1                                      3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

plaintiffs make a number of conclusory statements that *just say* Toyota knew of the defect without anything to back it up. Toyota listed a number of these statements in its meet and confer:

- "Toyota knew other manufacturers continued to use a manual fail-safe mechanism. For example, Toyota knew Audi had a system that mechanically closed the throttle when the brakes were applied." (5:26-28.)
- Toyota knew no later than 2002 fail-safes were insufficient to prevent UA events in its vehicles and that additional fail-safes were necessary." (6:22-23.)
- "As acknowledged by Toyota, the emphasis is on fast production. While production and production goals have increased the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers. The result has been a significant increase in quality control problems per vehicle. Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are over looked. Quality control employees have been told by supervisors that when they find a defect, they are not to record it but to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require to be recalled. Quality control employees are given goals that send upper limit on the number of defects they are to report." (16:1-12.)
- "Toyota knows, and knew, this was false because Toyota was fully aware that unintended acceleration had occurred on numerous occasions when there were no floor mats in the involved vehicles." (16:22-25.)
- "Toyota continued to maintain this position for years, even though it knew that Toyota manufactured vehicles can and do experience sudden unintended acceleration in that application of the brakes has failed to restrain vehicle motion." (19:4-6.)

1691720-WE 1

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

- "This response of 'no evidence' ignores and concealed the spike in UA events thatoccur within one year of a vehicle switching to ETCS, a trend known to Toyota." (21:7-8.)
- "Despite the growing number of UA complaints, Toyota had knowledge of fail-safe mechanisms that protect against unintended acceleration, but failed to employ them." (23:8-10.)
- "At the same time Toyota was pointing the finger at floor mats, it was investing UA events that it knew were not caused by floor mats, including an event where the service manager at Cedar Rapids Toyota confirmed that UA was not caused by the mat." (24:5-8.)
- "In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the vehicles, much less a safety-related defects." (27:1-2.)
- "Toyota knew that it had saved millions of dollars through concealing the known potential for unintended accelerations in its vehicles." (30:25-26.)
- "TMC continues to conceal information from United States consumers regarding potential causes for sudden unintended acceleration events." (34:18-20.)
- "Given Toyota's knowledge of the prevalence of unintended acceleration events and the importance of the safety issue, rather than merely installing the software in non-hybrid Camry vehicles, Toyota should have issued separate 'brake override system installation' recall and included additional vehicle models." (36:13-17.)
- "Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle." (39:2-4.)
- "Toyota was careful to make certain it would be difficult to discover what it knew about the UA defect, which models were affected and which managers were involved." (39:17-19.)
- "In reality, Toyota relies heavily upon its component suppliers to perform such testing. Toyota's suppliers typically complete Toyota's parts level testing

independently. Toyota performance standards apply only to Tear I suppliers. Toyota does not have any clear written rules or regulations about who much conform to Toyota's standards below its Tear 1 suppliers." (41:9-13.)

- "Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements. For example, when asked why Toyota believed there were no problems with the ETCS-i, it technical analysis manager testified falsely, '[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electronic control system that could be the cause of those matters." (42:11-17.) (Please identify any statements of Toyota which would demonstrate that the technical analysis manager's testimony false).

- "Toyota has used these issues (sticky pedals and floor mats) as a smoke screen to hide the electronic defects in their vehicles." (42:22-23.)

- "Despite Toyota's public position, evidence continue to mount that the recalls focus on limited mechanical issues are inadequate to prevent UA, and that the vehicles' electronics cannot be ruled out as a likely cause of the incidents." (43:1-3.)

- "Toyota knows, or should know, that its electronics are not infallible." (44:1.)

- "Toyota has continued to deny, and to conceal, that there is any flaw or defect in the acceleration control and throttle system itself." (45:22-23.)

- "Toyota knew from public statements as well of the dangers posed by the lack of a Brake Over Ride System in its vehicles." (51:15-16.)

In light of the Court's clear directive related to case-specific discovery, that Toyota learn the extent to which the plaintiffs have a clear view of the defects and that Toyota know sooner rather than later the basis for plaintiffs' claims of misrepresentation and fraud, plaintiffs must identify Toyota's specific statements that they claim support the contentions in their response. In particular, they need to identify all the statements *by*

*Toyota* that plaintiffs' claim support their conclusions listed above. Plaintiffs may not resort to referring to other pleadings in response to interrogatories, which require a separate and complete answer. Saria v. Massachusetts Mutual Life Insurance, Co., (S.D.W.Va. 2005) 228 F.R.D. 536. The shortcoming of plaintiffs' responses over all is compounded by the fact that a number of the responses refer to and incorporate this "response."

Interrogatory No. 3: This Interrogatory asked plaintiffs to state whether they contend Toyota vehicles susceptible to UA while other non-Toyota vehicles are not, since it is suggested by allegations in their complaint. Rather than provide an answer that is responsive, the response states the obvious, "Plaintiffs contend that Toyota vehicles are susceptible to UA." (Response at 60:13.) This is not responsive to the question as it asks for a comparison between Toyota vehicles and non-Toyota vehicles and their response ignores the question asked.

Interrogatory No. 4: This question asks Plaintiffs to describe and explain the design, manufacturing and software/hardware characteristics glitch of Toyota/Lexus vehicles that make them allegedly susceptible to UA. What plaintiffs have done here is identify the alleged "problem" areas of Toyota vehicles that they are *investigating*. (See Response at 61:19-62:5.) Identifying the aspects of Toyota vehicles that are planned to be investigated is not responsive to this question which asks for a description and an explanation of Toyota vehicle's alleged susceptibility to UA.

Interrogatory No. 5: Toyota requested plaintiffs to identify the documents supporting their claim of Toyota vehicles' susceptibility to UA. In response, plaintiffs refer to their response to Interrogatory No. 1. As discussed above, Interrogatory No. 1 seeks the identity of all statements by Toyota claimed to show that Toyota knew, or should have known, that its vehicles were defective, resulting in UA. Interrogatory No. 5 instead asks for support for Plaintiffs' contention that Toyota/Lexus vehicle are susceptible to UA. Plaintiffs' response to Interrogatory No. 1 is already non-responsive as it merely reiterates the complaint's allegations and extends well over 50 pages,

1 making it as difficult to pin point what information is responsive to Interrogatory No. 5.
2 Ultimately, Plaintiffs fail to identify any documents and should at this point, given the
3 plethora of documents produced by Toyota and the extensive documents they have
4 designated in preparation for depositions, be able to do so.

5     <u>Interrogatory No. 6</u>: This interrogatory referred to plaintiffs' claim in their
6 Complaint that from 2002-2010 the state-of-the art in the automotive industry for
7 electronic throttle control systems included installation of brake override system, and
8 asked plaintiffs to identify all vehicles in that time frame that were equipped with a brake
9 override system. In response, plaintiffs objected on the basis that it is premature because
10 *Toyota* has not provided plaintiffs with all the information that has been requested from
11 *Toyota* during discovery regarding this topic. It is not clear why *Toyota* would be the
12 source of this information concerning other manufacturers' vehicle. Although plaintiffs
13 attached a document that only "identifies the (sic) some of the vehicles made by other
14 manufacturers . . . that utilized a form of a Brake Override System." (Response at 63:18-
15 20.), Toyota is entitled to a complete answer and therefore a response indicating that the
16 vehicles listed in response to this interrogatory is a complete (and accurate) list or
17 whether plaintiffs will supplement the referenced list.

18     <u>Interrogatory No. 7</u>: Plaintiffs were asked to describe what about Toyota vehicles'
19 design and manufacture makes them "vulnerable to UA incidents" and to state whether
20 the same vulnerability exists in each vehicle. Plaintiffs' answer is non-responsive. They
21 merely describe aspects of the Toyota and Lexus vehicle that they are currently
22 *investigating*. This UA litigation has been ongoing for almost two years and at all times
23 plaintiffs alleged that Toyota and Lexus vehicles are vulnerable to UA incidents.
24 Plaintiffs' have taken over 40 depositions of Toyota-affiliated witnesses, which translate
25 into 40 opportunities to obtain discovery regarding the specific design and manufacture
26 of the Toyota and Lexus vehicles and are in a position to supplement this response with a
27 description and explanation of what about the specific design and manufacture of each
28 / / /

1691720-WE 1      8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

Toyota and Lexus vehicle makes it allegedly "vulnerable to UA incidents," including the specific Toyota and Lexus vehicles in which this vulnerability allegedly exists.

Interrogatory No. 9: This interrogatory asks the plaintiffs to identify each electronic failure and short circuit that plaintiffs contend caused and/or contributed to this incident. Plaintiffs' refer to its responses to Interrogatories Nos. 1, 4 and 7. However, there is nothing in the referenced interrogatories that discuss this incident in particular.

Interrogatory No. 11: This interrogatory asked plaintiffs to explain and identify documents or other evidence that supports their contention that the Van Alfen vehicle did not respond to attempts to brake and slow the vehicle, as alleged in their Complaint (¶ 35). Plaintiffs' response is non-responsive in that all it states is "Refer, for example, to the Utah Highway Patrol report and the statements of persons identified therein. Discovery is continuing." If plaintiffs will verify that the only document or evidence that they have that the 2008 Camry that Paul Van Alfen was driving failed to respond to his attempts to apply the brakes is the police report, then they need to do so in an unequivocal way – and not by "Refer, for example…" Otherwise they need to come forward with such evidence.

Interrogatory Nos. 14 & 15: Plaintiffs' responses to these interrogatory relating to the subject vehicle's chain of possession and prior inspections are demonstrably wrong, based on other recent discovery. And, based on the recent discovery, plaintiffs knew their responses were wrong when they provided them.

Interrogatory Nos. 18, 19, 20 and 21: These contention interrogatories are specific to the subject vehicle—the 2008 Toyota Camry that was involved in the crash giving rise to this lawsuit. Toyota asked plaintiffs to identify the components that were allegedly manufactured defectively (No. 18), the design defects plaintiffs claim existed in the vehicle (No. 19), and how the manufacturing or design defects caused or contributed to plaintiffs' injuries (Nos. 20-21). Plaintiffs' responses to these interrogatories refer to Interrogatory Nos. 1, 4, 7 and 8 wherein they pasted their Complaint and discussed

*anything but* the subject vehicle. <u>Nothing</u> in plaintiffs' responses to Interrogatory Nos. 1, 4, 7 and 8 discusses the subject vehicle in particular. Plaintiffs' response that the interrogatory is premature has long-since expired as expert reports are coming due and trial is mere months away. Further, plaintiffs have spent the past several months deposing numerous Toyota engineers and reviewing millions of pages of Toyota's design history. At a more fundamental level, Toyota wants to know what defect issues are going to be the subject of expert discovery and trial: UA? Brakes? Restraints? Crashworthiness? That is why Toyota served this discovery and that is why Toyota requests further responses to the same.

## IV. ARGUMENT

### A. PLAINTIFFS' RESPONSES TO INTERROGATORIES ARE DEFICIENT AND SUPPLEMENTAL RESPONSES ARE NECESSARY *NOW* IN LIGHT OF THE UPCOMING EXPERT DISCLOSURES AND TRIAL

Rule 26(b)(1) of the Federal Rules of Civil Procedure (FCRP) permits discovery of all information relevant to each of Plaintiffs' claims and each of Toyota's defenses, as well as information reasonably calculated to lead to the discovery of admissible evidence. FRCP 33(b)(3) requires that each interrogatory, "be answered separately and fully in writing under oath." Further, the responses must be "responsive, complete and candid. <u>Hansel v. Shell Oil Corp.</u>, 169 F.R.D. 303, 305 (E.D. Pa. 1996).

A motion to compel is permitted when a party's rightful discovery is frustrated by evasive and nonresponsive language is injected into a discovery response in an effort to avoid having to directly respond to a direct question. FRCP 37(a)(3)(B) ("A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if … (iii) a party fails to answer an interrogatory submitted under Rule 33 … "); FRCP 37(a)(4) ("an evasive or incomplete disclosure, answer or response must be treated as a failure to disclose, answer or respond.")

///

1691720-WE 1

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

In the matter of <u>Williams v. Sprint/United Management Co.</u> (D.Kan. 2006) 235 F.R.D. 494, the court held that, "Plaintiff may not answer the interrogatory by generally referring Defendant to the pleadings filed in this case, documents produced, opt-in questionnaire, depositions, or declarations." 235 F.R.D. 494 at 501. In <u>Saria v. Massachusetts Mutual Life Insurance, Co.</u> (S.D.W.Va. 2005) 228 F.R.D. 536, the court found that plaintiff "must specifically identify any responsive materials, rather than referring to other pleadings."

Toyota's First Set of Interrogatories include interrogatories prepared for the purpose of obtaining a clear view of what the alleged defects consist of as well as evidence supporting Plaintiffs' claims of misrepresentation and fraud. (McCarthy Decl., ¶ 2) Instead, Plaintiffs' responses to Toyota's First Set of Interrogatories consist of non-responsive responses that state allegations repeated verbatim from the Complaint or refer to responses that are devoid of any case-specific information. Therefore, such responses fail to comply with FRCP 33(b)(3) requirement that each interrogatory, "be answered separately and fully in writing under oath." These responses are not straight forward and are admittedly incomplete based on Plaintiffs' repeated meritless objection that the interrogatory is premature despite an order from the court allowing such discovery. Toyota read the Complaint. It didn't say what is defective about this vehicle, or any other vehicle, and it didn't identify the facts supporting those defect contentions. Consequently, Toyota served this discovery. Plaintiffs copy/paste of the complaint into their responses is wrong.

Plaintiffs' continued failure to supplement these responses at this stage is inexcusable considering the extensive deposition discovery obtained by Plaintiffs consisting of over forty depositions, all taken since Plaintiffs served the subject responses to Toyota's First Set of Interrogatories on December 5, 2011. Additionally, Plaintiffs have had in their possession, and utilized at the depositions, voluminous documents produced by Toyota. **They need to answer the discovery with what they know or admit they don't have any responsive information.**

1691720-WE.1                                    11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TOYOTA'S MOTION TO
COMPEL FURTHER RESPONSES TO TOYOTA'S FIRST SET OF INTERROGATORIES

### B. TOYOTA ATTEMPTED TO COMPLY WITH LR-37 BEFORE RESORTING TO THIS MOTION

On April 12, 2012, Defendants sent plaintiffs the requisite meet and confer letter requesting a conference of counsel and outlining Defendants' arguments regarding the deficiencies of Plaintiffs' discovery responses. As discussed above, Toyota's meet and confer requested a response by April 23 but none was received. Plaintiffs ignored the meet and confer until Toyota tried to get their attention a second time on April 24, formally requesting that a conference of counsel. After back and forth over setting up a date for the conference, a conference call was set. Toyota called in, plaintiffs did not.

The Toyota Defendants have made good faith efforts to obtain the requested further responses to its First Set of Special Interrogatories before resorting to the instant motion. Plaintiffs have not supplemented. They say they will supplement, but they haven't supplemented or said when they will supplement or said that their supplemental responses will alleviate the concerns raised by Toyota's meet and confer. Plaintiffs have no reasonable excuse for failing to supplement its interrogatory responses respective to this matter, which is proceeding as a bellwether case and is on a strict discovery scheduled as ordered by the court.

### V. CONCLUSION

For all of the foregoing reasons, the Toyota Defendants move this Court for an order compelling Plaintiffs to provide further responses to Toyota's First Set of Special Interrogatories within 10 days.

Dated: May 25, 2012

BOWMAN AND BROOKE LLP

/s/
Ryan A. McCarthy
Attorney for Defendants
Toyota Motor Sales, U.S.A., Inc.
Toyota Motor North America, Inc.
Toyota Motor Engineering & Manufacturing North America, Inc.
and Toyota Motor Corporation