STEVE W. BERMAN (*pro hac vice*)
(WA SBN 12536)
E-mail:  steve@hbsslaw.com
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

MARC M. SELTZER
(CA SBN 054534)
E-mail:  mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

FRANK M. PITRE (CA SBN 100077)
E-mail:  fpitre@cpmlegal.com
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

*Co-Lead Plaintiffs' Counsel for
Economic Loss Cases*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) |
| | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| THIS DOCUMENT RELATES TO: <br><br> ALL ECONOMIC LOSS CASES | Date:   June 14, 2013 <br> Time:  9:00 a.m. <br> Place:  Courtroom 10C <br> Judge:  Hon. James V. Selna |

10172.25 586378 V1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   CLASS NOTICE COMPLIED WITH THE COURT'S ORDER, RULE 23(c) AND (e), AND DUE PROCESS..................................... 4

    A.    Direct Notice .......................................................... 5

    B.    Notice Available at the Settlement Website ............................ 6

    C.    Notice by Paid Media.................................................. 8

    D.    Notice Satisfied the Requirements of Rule 23(c) and (e) and Due Process................................................................ 9

    E.    Claims, Requests for Exclusion, and Objections ....................... 10

III.  FOR PURPOSES OF SETTLEMENT, THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23 ................................ 11

IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ........... 11

    A.    The Amount Offered in Settlement is Substantial and Constitutes a High Percentage of Recoverable Damages ........................... 13

        1.    The cash value of the Settlement exceeds $757 million. ............. 14

            a.    The $250 million Alleged Diminished Value Fund. ........... 14

            b.    The $250 million Cash-In-Lieu-of-BOS Fund.................... 18

            c.    The $30 million Automobile Safety Research and Education Fund.................................................... 20

                (1)    Research focused on consumer knowledge and use of defensive driving techniques and vehicle safety systems, including use of active safety technologies in order to reduce UA. ........................ 21

                (2)    National driver safety education campaign............... 22

                (3)    Safety research. ...................................... 23

                (4)    Unclaimed monies from the Settlement Funds will be contributed to the Automobile Safety Research and Education Fund................................. 25

            d.    Toyota has agreed to pay $227 million in attorneys' fees and costs.................................................. 27

2. The value of the Settlement's non-monetary benefits approximates $875 million. .... 28

a. The $400 million BOS-installation program for BOS-Eligible Vehicles. .... 28

b. The $475 million Customer Support Program. .... 29

B. The Trial Risks and Claim Vulnerabilities Highlight the Reasonableness of the Proposed Settlement .... 31

1. Pending appeals threaten the entire case. .... 32

2. Preemption of non-monetary relief could occur. .... 33

3. Plaintiffs' experts were unable to reproduce UA in a Subject Vehicle under driving conditions. .... 34

4. Toyota's pending motions to strike present risk. .... 34

5. Plaintiffs' class-wide proof was hotly contested. .... 35

C. The Risk of Maintaining Class Action Status Throughout the Trial Warrants Approval .... 37

D. The Expense and Likely Duration of the Litigation in the Absence of a Settlement Are Substantial .... 39

E. Discovery and Investigation Were Nearly Complete at the Time of Settlement .... 40

1. Written discovery .... 40

2. Document and ESI productions. .... 41

3. Expert reports .... 42

4. Depositions .... 42

F. Plaintiffs' Class Counsel Fully Support the Settlement .... 42

G. Class Member Reaction Has Been Positive .... 43

H. The Parties Bargained in Good Faith, and There Was No Collusion .... 43

I. The Scope of the Settlement Release of Claims is Reasonable and Bounded by the Claims Asserted in the Litigation .... 45

V. CONCLUSION .... 46

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*9-M Corp. v. Sprint Commc'ns Co. L.P.*,
   2012 U.S. Dist. LEXIS 161578 (D. Minn. Nov. 12, 2012) ................................. 28

5

*In re "Agent Orange" Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984) ................................. 43

6

7

*American Honda Motor Co., Inc. v. Superior Court*,
   199 Cal. App. 4th 1367 (Cal. App. 2d Dist. 2011) ................................. 38

8

9

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) ................................. 33

10

11

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) ................................. 26

12

13

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ................................. 43, 44, 45

14

15

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ................................. 13

16

17

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ................................. 16

18

19

*Cholakyan v. Mercedes-Benz USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ................................. 38

20

21

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
   100 F.3d 1041 (1st Cir. 1996) ................................. 43

22

23

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ................................. 11

24

25

*Corder v. Ford Motor Co.*,
   283 F.R.D. 337 (W.D. Ky. 2012) ................................. 38

26

27

*Create-A-Card, Inc. v. INTUIT, Inc.*,
   2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22, 2009) ............... 11, 12, 39, 42

28

- iii -

*In re Critical Path, Inc. Secs. Litig.*,
  2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) .................................. 16

*Daigle v. Ford Motor Co.*,
  2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012) ................................. 38

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) .......................................................................... 25

*Edwards v. Ford Motor Co.*,
  2012 U.S. Dist. LEXIS 81330 (S.D. Cal. June 12, 2012) ................................. 38

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ............... 13

*Flinn v. FMC Corp.*,
  528 F.2d 1169 (4th Cir. 1975) ........................................................................ 43

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
  2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012) ...................................... 38

*Hartless v. Clorox Co.*,
  273 F.R.D. 630 (S.D. Cal. 2011), *aff'd*, 473 Fed. Appx. 716 (9th Cir. 2012) ... 28

*Hawkins v. Comm'r of the N.H. HHS*,
  2004 U.S. Dist. LEXIS 807 (D.N.H. Jan. 23, 2004) ....................................... 43

*Johnston v. Comerica Mortg. Corp.*,
  83 F.3d 241 (8th Cir. 1996) ............................................................................ 28

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) .......................................................................... 25

*Lloyd v. GMC*,
  275 F.R.D. 224 (D. Md. 2011), 266 F.R.D. 98 (D. Md. 2010) ........................ 38

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ........................................................................... 38

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*,
  834 F.2d 677 (7th Cir. 1987) .......................................................................... 43

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) .......................................................................... 38

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ............................................................................ 12

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011) ......................................................................... 25

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ............................................................ 11, 12, 13

*Oscar v. BMW of N. Am.*,
   274 F.R.D. 498 (S.D.N.Y. 2011), 2012 U.S. Dist. LEXIS 84922
   (S.D.N.Y. June 19, 2012) ................................................................................. 38

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) .......................................................................9, 10

*Siber v. Mabon*,
   18 F.3d 1449 (9th Cir. 1994) ............................................................................ 9

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ....................................................................28, 42

*Utility Reform Project v. Bonneville Power Admin.*,
   869 F.2d 437 (9th Cir. 1989) ........................................................................... 11

*Van Bronkhorst v. Safeco Corp.*,
   529 F.2d 943 (9th Cir. 1976) ........................................................................... 11

*In re Zoran Corp. Derivative Litig.*,
   2008 U.S. Dist. LEXIS 48246 (N.D. Cal. Apr. 7, 2008)................................... 45

### OTHER AUTHORITIES

NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) ........................................... 43

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.633 (4th ed. 2002) ................ 42

010172-25  586378 V1

# I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 23(e), Plaintiffs' Class Counsel respectfully submit this Memorandum in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement (the "Motion").  The terms of the Settlement are set forth in the December 26, 2012 Settlement Agreement preliminarily approved by the Court (the "Agreement"), which was signed just three months before the close of discovery and after three years of intensely fought litigation involving nearly endless motion practice, the production of millions of documents, hundreds of depositions, discovery of 43 experts, and two interlocutory appeals.

The cash value of the Settlement is $757,000,000 and has the following components:  (i) a $250,000,000 Alleged Diminished Value Fund for distribution to Class Members filing valid claims for payment for alleged diminished value incurred in association with vehicle sales, trade-ins, early lease terminations, total loss, and residual guarantee payments during the period from September 1, 2009 to December 31, 2010, and for early lease terminations following a reported unintended acceleration event; (ii) a $250,000,000 Cash-In-Lieu-of-BOS Fund for distribution to Class Members who own or lease a Subject Vehicle as of the date of the Preliminary Approval Order and are not otherwise eligible to receive a brake-override system ("BOS") pursuant to the Settlement (or already have one); (iii) a $30,000,000 Automobile Safety Research and Education Fund, which will be used to fund university-based automobile and transportation research initiatives closely related to the issues in the lawsuit, as well as an education and information program for

- 1 -

automobile drivers;[1] (iv) Toyota's agreement to pay $27 million in costs; and (v) Toyota's agreement to pay up to $200 million in attorneys' fees.

These recoveries represent a significant percentage of estimated damages. For example, Toyota's $250 million contribution to the Alleged Diminished Value Fund represents approximately 42 percent of Plaintiffs' expert's "best case" estimate of diminished value damages. Toyota's $250 million contribution to the Cash-in-Lieu-of-BOS Fund represents approximately 25 percent of the aggregate, Class-wide estimated average cost of a BOS installation. These are excellent recoveries in any litigation and a truly exceptional recovery in a class action fraught with as much risk as this one.

The Settlement's significant non-monetary benefits are worth even more and are valued at approximately $875,000,000. Class Members who own or lease BOS-Eligible Vehicles may have a BOS installed by Toyota Dealers at no cost. The estimated aggregate value of this benefit to the Class is approximately $400 million. Moreover, this will provide an important safety enhancement that is directly related to the risk of floor mat entrapment in over 6.3 million vehicles Toyota recalled for such a risk, because BOS reduces engine power when both the brake and accelerator pedals are applied simultaneously under certain driving conditions.

Toyota will also implement a Customer Support Program for all Class Members who own or lease their Subject Vehicles as of the date of the Final Order and Final Judgment. This program will provide prospective coverage for repairs and adjustments needed to correct defects in materials or workmanship in five specific

---

[1] This program has been specifically designed to benefit the Class and has a tight nexus with the objectives of the lawsuit.

- 2 -

parts related to the acceleration system and targeted in the litigation.[2]  This Customer Support Program coverage extends for the lesser of 10 years from the expiration of the existing warranty or 150,000 miles, subject to a minimum of three years of coverage.  Plaintiffs' expert estimates the aggregate value to the Class of the Customer Support Program to be $475,000,000.[3]

The non-monetary benefits provided by the Settlement will be realized in the near term if the Settlement receives final approval, notwithstanding the significant risk that the Ninth Circuit could find that Plaintiffs' quest for injunctive relief is preempted.  When these benefits are added to the cash components of the Settlement, the Settlement as a whole is conservatively valued by Plaintiffs at over **$1.63 billion** – a landmark, if not a record, settlement in automobile defect class action litigation in the United States.  The substantial Settlement benefits, in large part, encompass or exceed the relief that could be obtained through a jury verdict in favor of the Class.

The value of the Settlement is also increased by the efforts that the parties have taken to reach Class Members, encourage them to file claims, and maximize the payout from the two settlement funds.  Pursuant to the Preliminary Approval Order,[4] the Settlement has been communicated to the Class through a robust and intensive direct mail and national media Notice Plan coordinated by media experts, including the mailing of Short Form Notices to over 22 million Toyota consumers.  The

---

[2] The parts covered are:  (i) Engine Control Module; (ii) Cruise Control Switch; (iii) Accelerator Pedal Assembly; (iv) Stop Lamp Switch; and (v) Throttle Body Assembly.

[3] Other benefits of the Settlement include Toyota's agreement to pay the costs of notice and administration, subject to potential reimbursement from unclaimed settlement funds; and Toyota's agreement to pay any Plaintiff and Class Representative awards of up to $100 per hour per Plaintiff and Class Representative for their time devoted to the case, subject to a $2,000 minimum.

[4] Dkt. No. 3345.

- 3 -

Settlement terms also ensure that Class Members will be able to claim their benefits easily.  In order to take advantage of the Customer Support Program, if needed, and the BOS installations, if eligible, Class Members need only take their Subject Vehicles to a Toyota Dealer.  Eligible Class Members will receive cash payments from the Alleged Diminished Value and Cash-In-Lieu-of-BOS Funds after completing a simple, consumer-friendly Claim Form that can be submitted online.  And mechanisms are in place to ensure that any excess monies in one Settlement Fund are used to (i) step-up payouts to consumers, (ii) spillover to satisfy the claims of the other Settlement Fund if needed, and (iii) provide additional funding for safety research and education.

The proposed Settlement is fair, reasonable, and adequate.  It has been reached after years of litigation and discovery, and after extensive arm's-length, intensely fought negotiations conducted by Court-appointed Settlement Special Master Patrick A. Juneau.  Accordingly, Plaintiffs seek final approval of the Settlement and certification of the Class for settlement purposes.  A Proposed Final Order Approving Class Action Settlement and a Proposed Final Judgment are attached, respectively, as Exhibits 5 and 6 to the Agreement.

## II.    CLASS NOTICE COMPLIED WITH THE COURT'S ORDER, RULE 23(c) AND (e), AND DUE PROCESS

The notice program complied with the Court's Preliminary Approval Order.  That program had five components:  (i) direct, mailed postcard notice; (ii) a long-form notice available for download on the Internet; (iii) paid-media publication notice; (iv) a settlement website (where claims can be filed); and (v) a toll-free

- 4 -

telephone number with an option to speak with a live operator.[5]  As demonstrated below, notice has reached virtually all absent Class Members.

## A.      Direct Notice

From February 11, 2013 through March 29, 2013, Class Action Settlement Administrator Gilardi & Co. ("Gilardi") mailed the Short Form notice via first class mail to 22,623,077 potential Class Members who are current or former owners of Subject Vehicles.[6]  As approved by the Court, current and certain former owners received two different forms of the Short Form notice.[7]  These potential Class Members were identified in data that Toyota obtained from R.L. Polk & Co. ("Polk") for this purpose.  The Polk data was compiled from reasonably available computerized account information from various Departments of Motor Vehicles in the United States and its relevant Territories.  The data was meant to identify current owners of identified Subject Vehicles as of December 28, 2012 and any historical information that could be used to identify former owners who might be eligible for cash benefits under section II.A.2 of the Settlement Agreement which are defined as "having a current registration during the time period of September 1, 2009 to December 31, 2010."[8]  Gilardi ran the records through the National Change of Address database to update any addresses on file with the United States Postal Service.[9]

---

[5] *See* Dkt. No. 3345 at 5-6.

[6] Declaration of Markham Sherwood Re:  Notice and Administration of Settlement ("Sherwood Decl."), ¶ 10.

[7] *Id*., ¶ 6 & Exs. A & B.

[8] *Id*., ¶ 10.

[9] *Id*., ¶ 9.

- 5 -

010172-25  586378 V1

Class Members can also request (by mail, phone, or by e-mail) that a paper version of the Long Form Notice and/or claim form(s) be mailed to them, and Gilardi has fulfilled 17,524 such requests.[10]  Gilardi also mailed the Long Form Notice and cover letter to 14,914 Class Members who are current or former "fleet" owners of Subject Vehicles.[11]  Notice of the Settlement was also provided, in accord with the Class Action Fairness Act (28 U.S.C. § 1715), via Certified Mail, to all States' Attorneys General, the U.S. Attorney General, and the Attorneys' General for U.S. possessions and territories.[12]

**B.      Notice Available at the Settlement Website**

The Long Form Notice and other case information is available at the Settlement Website, www.toyotaelsettlement.com, which was launched on December 26, 2012.  This website is interactive and includes the following information and features:

(i) a description of the Settlement;

(ii) a list of important dates, including the date set for the Final Fairness hearing and deadlines for Class Members to object, opt-out, and file claims;

(iii) case documents including, but not limited to, the First Amended Complaint, Long Form Notice (in English, Spanish, Chinese, Vietnamese, Japanese and Korean), Settlement Agreement, and Preliminary Approval Order;

---

[10] *Id.*, ¶ 20.

[11] *Id.*, ¶ 11 & Ex. C.  A "fleet" owner is a business that owns many vehicles, such as a rental car company.

[12] *Id.*, ¶ 5.

- 6 -

(iv) an online claims filing feature which allows Class Members to file a claim online with or without having received a postcard Notice with an assigned Claim ID and personal identification number ("PIN");

(v) answers to frequently-asked questions, including a list of the Subject Vehicles addressed in this litigation and instructions on how to submit a claim for those Class Members who wished to print, complete, and file with Gilardi a paper Claim Form instead of filing a Claim Form online; and

(vi) contact information for Gilardi, including the case-dedicated mailing address, toll-free telephone number, and e-mail address.[13]

The interactive claim filing feature of the website became available to Class Members around February 11, 2013.  Claims can be filed as follows:

(i) Class Members to whom the Notice was mailed with an assigned Claim ID and PIN for each Subject Vehicle, can enter those assigned codes and file a claim;

(ii) Class Members identified as current owners are presented with the option of filing a claim for the monetary benefit for Non-BOS Eligible vehicles;

(iii) Class Members identified as former owners are presented with the option of filing a claim for Alleged Diminished Value;

(iv) potential Class Members who did not receive direct notice can also go through a series of steps to file a claim, by entering the make, model, and year of their Subject Vehicle from drop-down menus, as well as their ownership status, and likewise be presented with the appropriate claim; and

---

[13] *Id.*, ¶ 15.

- 7 -

(v) Class Members identified as fleet owners can download a prepopulated census form to complete claims for their known vehicles to expedite their claim process.[14]

The Settlement Website has seen robust activity, including over 16 million "hits" on the site, and over 11,500 e-mails received.  In addition, Gilardi has received over 186,000 telephone calls.[15]

## C.    Notice by Paid Media

In addition to direct, mailed notice, a robust Paid Media Program was implemented by Settlement Notice Administrator Kinsella Media, LLC ("Kinsella"), as the Court directed in its Preliminary Approval Order.  The Paid Media Program consisted of a broad-based paid media program utilizing newspaper supplements, consumer magazines, newspapers in U.S. Territories, and Internet advertising. Notice was provided through the Paid Media Program as follows:

(i) the Summary Settlement Notice appeared two times in *Parade* and *USA Weekend* newspaper supplements inserted in over 1,300 newspapers across the country;

(ii) the Summary Settlement Notice appeared two times in *People* magazine and one time in *Better Home and Gardens*, *ESPN The Magazine*, *Good Housekeeping*, *National Geographic*, *Parents*, *People en Español*, *Popular Science*, *Reader's Digest*, and *Time*;

(iii) the Summary Settlement Notice appeared one time in the following newspapers in the United States Territories:  *El Nuevo Dia*, *El Vocero*, *Pacific Daily*

---

[14] *Id.*, ¶ 16.
[15] *Id.*, ¶¶ 17, 22.

- 8 -

*News*, *Primera Hora*, *La Estrella De Puerto Rico*, *Saipan Tribune*, *Samoa News*, *St. Croix Avis*, *St. John's Trade Winds*, and *Virgin Islands Daily News*; and

(iv) Internet advertising appeared on websites across the *24/7 Real Media Network*, *AOL Network*, *Batanga Network*, *Facebook.com*, *Komli Network*, *Microsoft Media Network*, *RMM Network*, *Specific Media Network*, and on the *Yahoo! Network*.[16]

Based on the foregoing Notice Program, Kinsella estimates that paid media notice reached at least 95% of Toyota, Lexus, and Scion purchasers an average of 3.6 times each.[17]  This exceeds the 75 to 80 percent "reach" that many courts have required.[18]  Furthermore, the Settlement has received significant press attention, including front-page stories in the *Wall Street Journal*, *USA Today*, and many regional newspapers.

**D.     Notice Satisfied the Requirements of Rule 23(c) and (e) and Due Process**

The notice to the Class was adequate and satisfied both Rule 23 and due process.  Under Rule 23(e)(1), the court must direct notice in a reasonable manner to all class members who would be bound by the proposal.[19]  Rule 23 requires only that the best notice practicable rather than actual notice is provided.[20]  "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

---

[16] Declaration of Katherine Kinsella ("Kinsella Decl."), ¶¶ 12-18.

[17] *Id.*, ¶ 5.

[18] *Id.*, ¶ 22.

[19] *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009); Fed. R. Civ. P. 23(e)(1).

[20] *Siber v. Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994) (holding that the best notice practicable, rather than actual notice, is the proper standard for providing notice of a proposed settlement to absent class members).

- 9 -

heard,"[21] particularly where the very broad publication notice is accompanied by robust direct mail notice – here to over 22 million potential Class Members.

In approving the Notice Program, the Court found that the content of the notices and the methods of dissemination "(a) meet the requirements of due process and Fed. R. Civ. P. 23(c) and (e); (b) constitutes the best notice practicable under the circumstances to all persons entitled to notice; and (c) satisfies the Constitutional requirements regarding notice."[22]  Kinsella reports that all of the elements of the preliminary notice requirements set forth in the Preliminary Approval Order were completed.[23]

**E.     Claims, Requests for Exclusion, and Objections**

The claims deadline is not until July 29, 2013, yet Gilardi has already received a high volume of claims.  365,571 claim forms were filed electronically through the Settlement Website as of April 19, 2013.[24]  An additional 813 claim forms have been received by mail as of the same date.[25]

The postmark deadline for Class Members to object or request exclusion is May 13, 2013.  Gilardi has received 1,085 requests for exclusion and 45 purported objections so far.[26]

---

[21] *Rodriguez*, 563 F.3d at 962.

[22] Dkt. No. 3345 at 5.

[23] Kinsella Decl., ¶ 23.

[24] Sherwood Decl., ¶ 17.

[25] *Id.*, ¶ 21.

[26] *Id.*, ¶ 19.  Many of the objections do not satisfy the requirements under the Preliminary Approval Order.

- 10 -

1

2

### III.   FOR PURPOSES OF SETTLEMENT, THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23

3

4

5

6

7

8

9

10

11

The Court has already provisionally certified the Settlement Class, appointed the Class Representatives and appointed Co-Lead Counsel to represent the Settlement Class Members, and made substantial findings under Rule 23.[27]  As set forth in Plaintiffs' Motion for Preliminary Approval and the Court's Preliminary Approval Order and Preliminary Approval Opinion, which are incorporated herein by this reference, the Settlement Class satisfies the class certification requirements set forth in Rule 23(a) and Rule 23(b)(3).  So as not to add to an already lengthy brief, Plaintiffs will not repeat those points again here.

12

### IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

13

14

15

16

17

18

19

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution."[28]  Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation.  It is beyond question that "there is an overriding public interest in settling and quieting litigation," and this is "particularly true in class action suits."[29]

20

21

22

Approval of a tentative class action settlement is a matter within the sound discretion of the court.[30]  The "court's inquiry is whether the settlement is 'fair,

23

24

25

26

27

28

---

[27] Preliminary Approval Order at 2-4; Preliminary Approval Opinion at 3-13.

[28] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

[29] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *see also Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

[30] *See, e.g.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Create-A-Card, Inc. v. INTUIT, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *7 (N.D. Cal. Sept. 22, 2009).

- 11 -

adequate, and reasonable.'"[31]  "A settlement is fair, adequate, and reasonable when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'"[32]

The Ninth Circuit has set forth factors which may be considered and balanced in evaluating the fairness of a class action settlement:

> [T]he strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.[33]

The importance of any one of these factors "will depend upon and be dictated by the nature of the claims advanced, the types of relief sought, and the unique facts and circumstances presented by each individual case."[34]

In exercising its discretion, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."[35]  The Ninth Circuit defines the limits of the inquiry to be made:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.  Neither the trial

---

[31] 2009 U.S. Dist. LEXIS 93989, at *7 (quoting *City of Seattle*, 955 F.2d at 1276).

[32] *Id.*

[33] *Officers for Justice*, 688 F.2d at 625; *accord Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

[34] *Officers for Justice*, 688 F.2d at 625.

[35] *Id.*

- 12 -

> court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what ***might*** have been achieved by the negotiators.[36]

Moreover, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness," especially where, as here, the recommendations follow lengthy arm's-length and intensely fought negotiations overseen by a Court-appointed neutral settlement master.[37]

Evaluation of the foregoing factors supports final approval of the proposed Settlement.

**A.      The Amount Offered in Settlement is Substantial and Constitutes a High Percentage of Recoverable Damages**

The proposed Settlement has very high value and provides substantial economic and non-monetary benefits to the Class in comparison to what Plaintiffs could achieve through a successful trial.  The total value of the Settlement, considering all of its benefits, exceeds $1.63 billion.  A summary of the settlement benefits by Class Member circumstance is attached at Appendix A.  The value of those benefits are discussed below.

---

[36] *Id*. (emphasis in original).

[37] *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981).

- 13 -

**1.     The cash value of the Settlement exceeds $757 million.**

**a.     The $250 million Alleged Diminished Value Fund.**

A $250,000,000 "Alleged Diminished Value Fund" will be available for distribution to eligible Class Members who:  (i) sold or traded in a Subject Vehicle they owned during the period from September 1, 2009 to December 31, 2010; (ii) returned a Subject Vehicle before the lease termination date during the period from September 1, 2009 to December 31, 2010; (iii) insured and/or guaranteed the residual value of a Subject Vehicle as of September 1, 2009, and with respect to such Subject Vehicle, thereafter either made payment to an insured, or sold the Subject Vehicle, provided such payment or sale was made by a Residual Value Insurer on or before December 31, 2010; (iv) returned a leased Subject Vehicle before the lease termination date after having reported an alleged unintended acceleration event to Toyota, a Toyota Dealer, or the National Highway Transportation Safety Administration ("NHTSA"), before December 1, 2012; or (v) had a Subject Vehicle that was declared a total loss by an insurer during the period from September 1, 2009 to December 31, 2010.[38]

The period September 1, 2009 to December 31, 2010, known as the "damage period," is significant because this is the period for which Plaintiffs' economist, Ernest H. Manuel, Jr., has determined that the Subject Vehicles suffered a loss in value due to publicity associated with reports of unintended acceleration ("UA") events.  Using actual sales data, Mr. Manuel estimated economic loss for Class Members who sold or returned their vehicles during the damage period.  Losses were

_____

[38] Agreement at 13.

- 14 -

measured using multiple regression equations estimating the extent to which wholesale and retail prices of Class Vehicles actually declined after widespread publicity beginning in September 2009 concerning reported UA issues with the vehicles.[39]

No diminished value was found to be associated with sales *before* or *after* the damage period, except for instances of early lease terminations following a reported UA event.  More particularly, the selection of the September 1, 2009 through December 31, 2010 damage period was the product of a rigorous analytical process and the existence of compelling statistical evidence.  Customers selling their vehicles prior to September 1, 2009 would not have suffered harm caused by the depression in resale prices which began when UA events were widely publicized in late August 2009, and, therefore, would not have experienced the resale price depreciation that Plaintiffs claim was present during the damage period.  At the other end of the damage period, sale prices of the affected models at the end of 2010 were on a trajectory towards pre-damage period depreciation levels:  throughout the latter months of 2010, growing percentages of Subject Vehicle sales showed either little-to-no evidence of abnormal price depreciation or price variation for reasons unrelated to UA.[40]

A Matrix setting forth the estimated recovery by model, month, and year are available to Class Members at the Settlement Website and found at Tab 1 of the Manuel Declaration.  These model- and time-specific loss estimates provide the base

---

[39] Declaration of Ernest H. Manuel, Jr. Re:  Economic Damages Due to Unintended Acceleration ("Manuel Decl."), ¶¶ 8-31.

[40] *Id.*, ¶¶ 18-19.

- 15 -

amount for calculating the payments for eligible claimants to the Alleged Diminished Value Fund.  The base amounts return a minimum value of $37.50, depending on the vehicle model, model year, month and year of disposition, and the jurisdiction of the claimant's residence.  The largest individual base amounts exceed $10,000.[41]  Total, aggregate estimated economic losses calculated pursuant to Dr. Manuel's methodology are approximately $590 million, making the $250 million Alleged Diminished Value Fund recovery approximately 42 percent of total economic losses[42] – an excellent settlement recovery for the Class.[43]

The Matrix reflects discounts applied to the loss allocation for a particular claimant depending on the state in which the claiming Class Member resides.[44]  If the eligible Class Member purchased, leased, now resides or insured the residual value of a Subject Vehicle in a Non-Manifestation State, his or her base payment will be 100 percent of the amount appearing in the Matrix.  If the eligible Class Member purchased, leased, now resides or insured the residual value of a Subject Vehicle in a Manifestation State, his or her base payment will be 30 percent of the amount appearing in the Matrix.  If the eligible Class Member purchased, leased, now resides or insured the residual value of a Subject Vehicle in an Unclear State, his or her base

---

[41] Manuel Decl., ¶ 34.

[42] *Id.*, ¶ 35.  We should note that, under Toyota's damage expert's theory, the recovery constitutes 100% of estimated damage, if liability is assumed.

[43] *Compare, e.g., In re Critical Path, Inc. Secs. Litig.*, 2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ($17.5 million settlement where damages alleged were $200 million, resulting in 8.75% recovery percentage); *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 & n.22 (3d Cir. 2001) (citing securities settlements between 1.6% and 14% of damages).

[44] Agreement, Exhibit 16 at 2.  As explained in Plaintiffs' Motion for Preliminary Approval, the law in various jurisdictions differs on the issue of whether, in order to have standing to assert a claim, a Class Member's Subject Vehicle must have manifested a UA event.

- 16 -

payment will be 70 percent of the amount appearing in the Matrix.  However, Class

Members in Manifestation States and Unclear States will be entitled to the same

payment as Class Members in a Non-Manifestation State if such Class Members, on

or before December 1, 2012, reported to Toyota, a Toyota Dealer, or NHTSA that

they believed they experienced a UA event.[45]

The adjustments for state of residence were decided at an allocation mediation

presided over by Settlement Special Master Patrick Juneau, with each group having

separate and independent representation by Allocation Counsel appointed to

represent the interests of Class Members in Manifestation States, Non-Manifestation

States, and jurisdictions where the law is unclear, respectively.[46]

Payments from the Alleged Diminished Value Fund will be adjusted upwards

or downwards based on the volume of claims.  If the total allocation exceeds the

amount of money available to pay eligible claims, payments to eligible Class

---

[45] *Id.*

[46] *Id.* at 1.  Plaintiffs' Class Counsel grouped the states based on extensive legal research and were prepared to submit these groupings to the Court in support of certification of a litigation class.  The Non-Manifestation States are:  Alaska, Arizona, California, Connecticut, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York (only if Subject Vehicle was sold during the period September 1, 2009 through December 31, 2010), Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Washington, and West Virginia.  The Manifestation States are: Arkansas, District of Columbia, Indiana, Mississippi, New Hampshire, North Carolina, North Dakota, South Carolina, Utah, and Wisconsin.  The Unclear jurisdictions are:  Alabama, Colorado, Delaware, Florida, Georgia, New York (if Subject Vehicle was not sold during the period September 1, 2009 through December 31, 2010), Virginia, Wyoming, and the relevant U.S. Territories.  Attorneys Michael Kelly, Jayne Conroy, and Ben Bailey served as Allocation Counsel.  *See* Declaration of Steve W. Berman in Support of Plaintiffs' Motions for Final Approval of Class Action Settlement and for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs ("Berman Decl."), ¶¶ 96-100.

- 17 -

Members will be reduced pro rata.[47]  If unclaimed funds remain after the Claim Period has expired and the unclaimed funds are sufficient to bring all eligible Manifestation States and Unclear States claimants up to 100% of eligible payment, the unclaimed funds shall be applied for those purposes.[48]  Any remaining unclaimed funds will be distributed equally to:  (i) contribute to the Cash-In-Lieu-of-BOS Fund, in the event that it is unable to satisfy all authorized claims up to 100% of eligible payment; and (ii) reimburse the fees and costs paid by Toyota to Gilardi, Kinsella, or any other third-party vendor.[49]  If additional contributions to the Cash-In-Lieu-of-BOS Fund enable that fund to satisfy all authorized claims up to 100% of eligible payment, then the remaining amount will be distributed equally to (i) reimburse the fees and costs paid by Toyota to Gilardi, Kinsella, or any other third-party vendor, and (ii) contribute to the Automobile Safety Research and Education Fund.  If the administrative and/or notice costs are fully reimbursed, 100% of the further remaining amounts will be applied to contribute to the Automobile Safety Research and Education Fund.[50]

### b.    The $250 million Cash-In-Lieu-of-BOS Fund.

If the proposed Settlement is fully approved, a $250,000,000 "Cash-In-Lieu-of-BOS Fund" will be available for distribution to eligible Class Members who own or lease a Subject Vehicle as of the date of the Preliminary Approval Order, unless: (i) their Subject Vehicle is a hybrid vehicle; (ii) they already actually received BOS

---

[47] Agreement at 13-14.

[48] Agreement, Exhibit 16 at 3.

[49] Amendment No. 1 to Settlement Agreement (*see* Dkt. No. 3424).

[50] *Id.*

- 18 -

on their Subject Vehicle; or (iii) they are eligible to receive BOS on their Subject Vehicle as described below.[51]

Plaintiffs' expert has estimated the average value of a brake-override system, if such a system were available, to be $111.50, with the lowest reported charge at $92, and the highest reported charge at $150.[52]  The Parties negotiated $125 as the base amount for calculating the payments for eligible claimants to the Cash-In-Lieu-of-BOS Fund.[53]  As with payments from the Alleged Diminished Value Fund, a discount may be applied to this base amount depending on the jurisdiction in which the claiming Class Member resides.  Toyota's $250 million contribution to the Cash-in-Lieu-of-BOS Fund represents approximately 25 percent of the aggregate, Class-wide estimated average cost of a BOS installation based on 9,020,154 eligible vehicles.[54]

The same percentages determined by Allocation Counsel for distributing the Alleged Diminished Value Fund apply here.  Subject to any pro rata reductions if the total allocation exceeds the amount of money available to pay eligible claims against the Cash-In-Lieu-of-BOS Fund, the maximum payment from the fund to a Class Member in a Non-Manifestation state will be $125 (100% of $125); eligible Class Members in an Unclear jurisdiction will receive $87.50 (70% of $125); and eligible

---

[51] *Id.*

[52] Declaration of Michael Bonne Regarding the Retail Cost of Installing a Brake Override on Subject Vehicles ("Bonne Decl."), ¶ 10.

[53] Agreement at 5.

[54] Subtracting 6,309,384 BOS-eligible vehicles and 1,325,314 hybrid vehicles from the 16,654,852 universe of current registrations yields 9,020,154 vehicles.  *See* Sherwood Decl., ¶ 9.  9,020,154 eligible vehicles multiplied by the $111.50 average BOS installation cost yields $1,005,747,171.  The $250 million Cash-in-Lieu-of-BOS Fund is 25% of this number.

- 19 -

Class Members in a Manifestation State will receive $37.50 (30% of $125).[55]

However, Class Members in Manifestation States and Unclear States will be entitled

to the same $125 maximum payment as Class Members in a Non-Manifestation State

if such Class Members, on or before December 1, 2012, reported to Toyota, a Toyota

Dealer, or NHTSA that they believed they incurred a UA.[56]

As with the distribution of monies from the Alleged Diminished Value Fund,

if unclaimed funds remain in the Cash-In-Lieu-of-BOS Fund after the Claim Period

has expired and the unclaimed funds are sufficient to bring all eligible Manifestation

States and Unclear States claimants up to 100% of eligible payment, the unclaimed

funds will be applied for those purposes.[57]  Any remaining unclaimed funds

thereafter will be distributed pursuant to the same redistribution that applies to the

Alleged Diminished Value Fund.[58]

### c.     The $30 million Automobile Safety Research and Education Fund.

For the benefit of all Class Members, and particularly those who sold their

vehicles outside of the damage period (and are, therefore, not eligible to claim

against the Alleged Diminished Value Fund), Toyota will contribute $30,000,000 to

a fund for automobile safety research and education related to issues in the litigation.

The fund will be divided between contributions to university-based automobile and

transportation research institutes and an education and information program for

automobile drivers.  The research and education program, which will significantly

---

[55] Agreement at 5-6.

[56] *Id.* at 6-7.

[57] *Id.* at 7.

[58] Amendment No. 1 to Settlement Agreement (*see* Dkt. No. 3424).

advance vehicle and driver safety, will be undertaken by the following five national universities:  the Massachusetts Institute of Technology, Stanford University, the University of Michigan, the University of Iowa, and Texas A&M University. Additional funding for the Automobile Safety Research and Education Fund may come from unclaimed Settlement monies in the two cash funds.[59]  There are three principal components of the research and education program, as reflected in the research proposals accepted by the Parties and attached to the Berman Declaration.

> **(1)     Research focused on consumer knowledge and use of defensive driving techniques and vehicle safety systems, including use of active safety technologies in order to reduce UA.**

The program will start with a new national consumer study focusing on driver attitudes, behaviors, and levels of understanding concerning defensive driving techniques and the proper use of vehicle safety systems.  The University of Iowa Public Policy Center will direct this study and will be provided approximately $800,000 to fund the study.[60]  The study will focus on identifying critical gaps in public awareness of vehicle safety systems; gain knowledge regarding defensive driving skills currently used by drivers; and pinpoint the most effective messages and techniques for encouraging safer driver behavior and improve awareness and understanding of new technologies in order to reduce actual or perceived UA.[61]

The study will be an academically rigorous field study intended to inform the national driver safety education campaign described below; inform ongoing and

---

[59] *Id.*, Exhibit 15.

[60] One percent of each grant amount discussed in this brief has been reserved for the cost of administering and overseeing the grants.

[61] Berman Decl., Ex. F; Settlement Agreement, Exhibit 15 at 1-2.

- 21 -

future research by other institutions, safety agencies, and industry; and support other national and community-based driver safety education campaigns.  A focus of the study questions will concern UA.  Little definitive scientific knowledge about public perceptions of driver safety and associated technologies currently exists. Information gathered from the survey about how drivers understand current safety technologies can be used to enhance automotive safety technology and to educate drivers on how to best benefit from it.  Consequently, this survey will provide a significant benefit by advancing the field of traffic safety and crash prevention.

### (2)    National driver safety education campaign.

The national driver safety education campaign will follow the national consumer study and will be guided by its results.  The University of Iowa Public Policy Center will direct the campaign, with the assistance of the National Safety Council and Digital Art*e*facts.  The campaign will enhance American drivers' understanding of vehicle safety technologies and their ability to respond appropriately in emergency situations.  It will also educate drivers on defensive driving skills, the proper use of technology, and the most important vehicle safety errors associated with UA and driver attention.  The outreach will include a combination of print, television, Internet, and radio advertising and public service announcements to deliver the content of the program with the goal of reaching 90 percent of adults in key target markets 12 times for a total of 2.5 billion exposures over the length of the campaign.  Approximately $14.2 million will be budgeted for

- 22 -

1  this campaign, which would cover all costs of the campaign, including, but not

2  limited to, the cost of producing the advertisements and buying the media space.[62]

3  ### (3)    Safety research.

4  The third component of the program will fund university-based public

5  research to develop advances in active safety features, vehicle control, and driver

6  attention.  Leading U.S. universities will conduct research for the public benefit with

7  a multi-year mandate to pursue research programs into existing, new or emerging

8  active safety technologies, based around national and regulatory safety priorities, as

9  well as to develop a better understanding of key safety-related behaviors, with

10  findings to be shared broadly across the automotive industry.[63]

11  Approximately $15 million will be budgeted for this research program.  Each

12  of the following universities has developed research proposals covering the

13  following topic areas, which the parties have accepted:

- *University of Iowa Public Policy Center*:  Will conduct three studies that "bring together experts in human factors, medicine, and neuroscience to examine driver behavior in emergency situations; evaluate the effectiveness of cognitive and physical training on drivers' pedal application behavior; and to develop a concept study for a system that could combine information from technologies such as micro-GPS, machine-vision cameras, and sensors to monitor for inappropriate acceleration relative to the vehicle's surroundings."[64]

- *Texas A&M Transportation Institute*:  Will conduct research "intended to improve automobile safety by exploring ways to detect and mitigate hazardous driving situations that may be attributable to human factors,

---

[62] Settlement Agreement, Exhibit 15 at 2; Berman Decl., Ex. G.  Safety experts from Toyota's Collaborative Safety Research Center may be engaged to help educate consumers about defensive driving techniques and active safety technologies as part of this campaign, but shall not be paid from the fund to do so.  Settlement Agreement, Exhibit 15 at 2-3.

[63] *Id.* at 3.

[64] Berman Decl., Ex. H at 2.

- 23 -

vehicle faults, or interactions between vehicles and drivers, specifically targeting the symptoms of unintended acceleration."[65]

- *University of Michigan Transportation Research Institute*:  Will conduct "a three-year project to help drivers avoid or mitigate the severity of crashes on US roads[, and] provide new knowledge, models, and tools to enable improved designs of automotive crash avoidance systems and more effective deployment strategies."[66]

- *Stanford University*:  Will research "engineering solutions that modify the vehicle to provide additional information to the driver, engage the driver in training and share control in emergency situations," and "extend brain imaging systems and analysis to forms that are suitable for in-car use" so that the "effectiveness of the engineering solutions and associated training of the driver can then be evaluated at a fundamental level by monitoring the impact on driver brain activity while driving in a naturalistic setting."[67]

- *Massachusetts Institute of Technology AgeLab*:  The research proposes "to develop key insights into the human factors aspects of safety-related driving behaviors associated with emerging safety technologies, the impact of technologies on situational awareness, and the development of improved distraction assessment measures to aid in meeting national safety priorities"; "to provide manufacturers, regulators, and the public with more in-depth understanding of actual active vehicle safety technology use"; and "to examine to what extent intuitive, easy to understand, less distracting driver vehicle interfaces enhance system usage, reduce driver confusion during periods of emergent high demand (e.g. inappropriate acceleration and rapid changes in traffic flow) and minimize driver distraction."[68]

These research topics will benefit Class Members nationwide.  The parties have agreed that these research projects should be implemented if the Settlement is finally approved, and the parties are continuing to work with these institutions to document the final details, mechanics, and administration of the grants.

---

[65] *Id.*, Ex. I at 2.

[66] *Id.*, Ex. J at 4.

[67] *Id.*, Ex. K at 1.

[68] *Id.*, Ex. L at 1.

- 24 -

**(4)     Unclaimed monies from the Settlement Funds will be contributed to the Automobile Safety Research and Education Fund.**

Additional funds remaining in the Alleged Diminished Value Fund and/or Cash-In-Lieu-of-BOS Fund after expiration of the Claim Period may be available for further contribution to research and education as provided in the Agreement.  This portion of the Settlement, to the extent it may be considered a *cy pres* distribution, has been specifically designed to benefit all Class Members and conforms to Ninth Circuit standards for distributing unclaimed class action funds.

There must be "a driving nexus between the plaintiff class and the *cy pres* beneficiaries."[69]  This means that the award must be guided by the objectives of, and issues invoked by, the underlying statute or lawsuit and the interests of the class.[70]  The award must not benefit a group "too remote from the plaintiff class,"[71] and must "target the class" by accounting for the geographic dispersion of the class (that is, if the class is national, the *cy pres* distribution must have a national scope).[72]  Further, the *cy pres* recipients must be identified to the court at the time settlement approval is sought so the court can "undertake the searching inquiry" that precedent requires.[73]

The Automobile Safety Research and Education Program is an appropriate vehicle to receive *cy pres* funds.  Each component of the program addresses the

---

[69] *Dennis v. Kellogg Co.*, 697 F.3d 858, 265 (9th Cir. 2012) (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990)); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012) ("the district court must ensure that a cy pres award targets the plaintiff class").

[70] *Kellogg*, 697 F.3d at 858 (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011)).

[71] *Id.* (quoting *Six Mexican Workers*, 904 F.2d at 1308).

[72] *Nachshin*, 663 F.3d at 1040.

[73] *Kellogg*, 697 F.3d at 867.

- 25 -

objectives of, and issues in, the litigation and the interests of the Class, from the national survey focusing on driver attitudes, behaviors, and levels of understanding concerning defensive driving techniques and the proper use of vehicle safety systems; to the national education program relating to defensive driving skills, driver attention, and the proper use of technology (including to mitigate against UA); and the longer-term university-based research projects relating to advances in active safety features, vehicle control, and driver attention.

The award does not benefit a group "too remote" from the Class given that all Class Members will benefit from research and education concerning driving safety issues and will likely purchase or lease a new vehicle at some time in the future and should, therefore, have an interest in ensuring that new vehicles in the United States have enhanced safety systems and that drivers know how to use those systems. The plan "targets the Class" by accounting for the national scope of the Class: the results of the research will apply to all vehicles nationwide and all manufacturers doing business nationwide. All organizations receiving funding have been identified, as have the specific topics of research, and those organizations represent each region in the country.

Moreover, the Settlement is designed to drive participation from the cash funds so that any monies ultimately contributed in *cy pres* represent a small percentage of all settlement funds.[74] The comprehensive notice campaign and easy claims process serve this goal, as does the proposed redistribution of payments under which (i) payments to Class Members in manifestation-required and "unclear"

---

[74] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) ("Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds.").

- 26 -

jurisdictions are stepped up using unclaimed monies, and (ii) any residual from one Fund is used to increase payments to Class Members participating in the other Fund.

Further, Plaintiffs' Class Counsel are closely monitoring the claims against these Funds in the event that further action to maximize distributions becomes necessary.  While we are not proposing a change in the distribution plan at this time, we want the Court to know that we are maintaining vigilance concerning the volume of claims.  We want to ensure that the distribution of monies to qualifying Class Members is maximized in accordance with the spirit of the Agreement before any remaining funds spill-over into the Automobile Safety Research and Education Fund. And for this reason, we do not believe that the Court should grant final approval of the Settlement until the Claim Period has expired on July 29, 2013, and we are able to provide the Court with a report on the volume of claims and, if necessary, any additional proposals that should be taken to maximize distributions to the Class.

### d. Toyota has agreed to pay $227 million in attorneys' fees and costs.

After agreeing to the principal terms set forth in the Agreement, Plaintiffs' Class Counsel and Toyota's Negotiating Counsel negotiated the amount of Attorneys' Fees and Expenses that, following application to the Court and subject to Court approval, would be paid as the fee award and costs award to Plaintiffs' counsel.  As a result of negotiations that were overseen by the Settlement Special Master, Plaintiffs' Class Counsel, on behalf of all Plaintiffs' counsel, will apply for an award of attorneys' fees and expenses in the Actions in the amount of $200 million in fees, plus up to an additional $27 million in expenses incurred prior to the

- 27 -

Fairness Hearing.  Toyota agrees not to oppose an application for these amounts.[75]

And in the event that the Court awards an amount less than $200 million in fees and

up to $27 million in expenses, Toyota agrees to pay the remainder to the Automobile

Safety Research and Education Fund.[76]  Under applicable case law, this $227 million

should be considered in estimating the total cash value of the Settlement.[77]

### 2.    The value of the Settlement's non-monetary benefits approximates $875 million.

#### a.    The $400 million BOS-installation program for BOS-Eligible Vehicles.

Class Members who, as of the date the Preliminary Approval Order was

entered, own or lease any of the BOS-Eligible Vehicles listed in Exhibit 11 to the

Agreement, may have BOS installed by Toyota Dealers at no cost.  The BOS will

automatically reduce engine power when the brake pedal and the accelerator pedal

are applied simultaneously under certain driving conditions.  This benefit will be

transferable with the Subject Vehicle.  The Vehicle Identification Numbers ("VINs")

for all eligible Subject Vehicles will be identified in Toyota's systems so that an

eligible Subject Vehicle taken to a Toyota Dealer can be identified and have BOS

installed.  Toyota will begin to offer this benefit over time, beginning after final

---

[75] Agreement at 32-33.

[76] *Id.*

[77] *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 972-74 (9th Cir. 2003); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal. 2011), *aff'd*, 473 Fed. Appx. 716 (9th Cir. 2012); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *9-M Corp. v. Sprint Commc'ns Co. L.P.*, 2012 U.S. Dist. LEXIS 161578, at *6-8 (D. Minn. Nov. 12, 2012); Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for an Award of Attorneys' Fees ("Fitzpatrick Decl."), ¶ 9.  Including the attorneys' fees and costs for purposes of determining total value is especially appropriate because any reduction by the Court in the attorneys' fees Toyota agreed to pay will be added to the Safety Research and Education Fund.  Fitzpatrick Decl., ¶ 8.

- 28 -

approval of the Settlement by the Court, and the benefit will be available for two years from the date Toyota gives notice on the Settlement website that BOS is available for that Subject Vehicle.[78]

It is estimated that 3,031,477 Subject Vehicles have not previously been offered BOS and will now be eligible to receive BOS pursuant to the Settlement.[79] In addition, beginning in 2010, Toyota offered the installation of BOS with respect to approximately 3.2 million models and model years identified in Exhibit 11 to the Agreement, of which approximately 550,000 were originally estimated to have not yet received BOS.  Toyota will continue to offer to install BOS on those BOS-Eligible Vehicles that have not yet received BOS, and Toyota will send those Class Members a reminder of this benefit.[80]  Thus, a total of 3,581,477 Subject Vehicles will be eligible to receive BOS under the Settlement, providing an estimated aggregate value of $399,334,685 to these Class Members based on Plaintiffs' expert's estimate that it would cost these Class Members an average of $111.50 to have the BOS installed if they were to pay for it themselves outside of the Settlement.[81]

### b. The $475 million Customer Support Program.

If the Settlement is finally approved, Toyota will offer a Customer Support Program to all Class Members who own or lease their Subject Vehicles as of the date of the Final Order and Final Judgment.  The Customer Support Program will provide

---

[78] Agreement at 14-15.

[79] Sherwood Decl., ¶ 9.

[80] Agreement at 14-15.  In addition, hybrid Subject Vehicles already have Parts Protection Logic that, among other things, performs a similar function as BOS.  *Id.* at 15.

[81] Bonne Decl., ¶ 10.

- 29 -

prospective coverage for repairs and adjustments needed to correct defects in materials or workmanship in any of the following components that Plaintiffs allege are related to instances of UA:  (i) Engine Control Module; (ii) Cruise Control Switch; (iii) Accelerator Pedal Assembly; (iv) Stop Lamp Switch; and (v) Throttle Body Assembly.[82]

The duration of prospective coverage will be 10 years from the expiration of the existing warranty for each of these parts, with a maximum limit of 150,000 miles from the vehicle's in-service date, which is the first date the vehicle is either delivered to an ultimate purchaser, leased, or used as a company car or demonstrator. Regardless of mileage or warranty expiration, each eligible Subject Vehicle will receive no less than three years of coverage.  The VIN numbers for the Subject Vehicles will be identified in Toyota systems so that eligible Subject Vehicles taken to Toyota Dealers can be identified and the benefit provided, if needed, free-of-charge.[83]

Plaintiffs' valuation expert, Kirk Kleckner, estimates that approximately 16,145,000 Subject Vehicles are eligible for this benefit.  By estimating the market price for hypothetical extended service contracts that are equivalent to the Customer Support Program's benefits for each model year, Mr. Kleckner has concluded that the Customer Support Program provides an aggregate benefit to the Class of approximately $475,000,000.[84]

---

[82] *Id.* at 16.

[83] *Id.* at 16-17.

[84] Declaration of Kirk D. Kleckner Regarding Valuation of Customer Support Program ("Kleckner Decl."), ¶¶ 8-11.

**B.      The Trial Risks and Claim Vulnerabilities Highlight the Reasonableness of the Proposed Settlement**

Plaintiffs are confident of many aspects of their case.  As examples, Plaintiffs believe that they can prove that the Toyota vehicles had a statistically significant increased chance of UA after Toyota introduced ETCS, and that Toyota had the highest amount of UA reports out of all manufacturers selling vehicles in the United States.  Plaintiffs also believe that they can prove that Toyota was well aware of this trend and concealed it, all while promising that its vehicles were high quality, dependable, and reliable.  Plaintiffs are also confident that they can demonstrate a concrete diminution in the resale prices of the Subject Vehicles during a finite damage period as a direct result of the public disclosure of UA problems.

Notwithstanding these strengths, there are many risks.  Too often, uninformed observers believe that, just because a proposed settlement of a class action is pending, victory at trial must have been assured.  While rarely true, the notion is especially untrue here.  This case has been fraught with risk and remained so as trial approached, and the Settlement was achieved in the face of incredible odds.  For example, NASA and NHTSA concluded there was no defect.  Toyota said Plaintiffs could never prove one because Toyota believes that no such defect exists.  And many Plaintiffs' lawyers believed that the case was just too risky to take or continue to prosecute.

Furthermore, Toyota had an answer to each of the foregoing points put forth by Plaintiffs as strengths, and these are arguments that Toyota can be expected to continue making.  For example, Toyota asserted that one cannot use the UA reports as a basis upon which conclusions can be drawn because each report may itself not

- 31 -

truly reflect a UA and may, instead, stem from driver error or other problems, a point that NHTSA observed in UA investigations against other auto manufacturers over the years.  Toyota also contends that Plaintiffs' definition of UA is overbroad such that, among other things, many aspects of the definition do not relate to actual acceleration, let alone a safety concern, and the breadth of the definition is not susceptible to common proof across all of the Subject Vehicles.  Toyota also contests the admissibility of any class-wide proof of diminution in value and asserts that any diminution in value was a result of publicity and other external factors, which were heterogenous across the Class, indicating a lack of causal connection, and thus not the product of any actual defect.

Notwithstanding the risks, Class Members will receive the benefits of a Settlement valued at over **$1.63 billion** if approval is granted.  Below are some of the more salient risks that highlight the reasonableness of the Settlement.

### 1. Pending appeals threaten the entire case.

Two pending interlocutory appeals, if resolved in favor of Toyota, will effectively eliminate the case.  First, Toyota moved to dismiss the claims of all Plaintiffs whose vehicles did not experience SUA.  The Court rejected Toyota's standing challenge, holding that Plaintiffs need not allege a manifested UA defect, but that Plaintiffs must plead a benefit-of-the-bargain loss (and the claims of those Plaintiffs who did not were dismissed without prejudice).[85]  Toyota has appealed this ruling, and this ongoing challenge to Plaintiffs' Article III standing poses a global

---

[85] Dkt. No. 510 at 12-31; *see also* Dkt. No. 1623 at 27.

- 32 -

risk to all claims.[86]  If the Ninth Circuit rules that no Plaintiff or Class Member has standing to pursue any claim unless the alleged defects actually manifested in UA in their Subject Vehicles, the case will be gutted.  The only Plaintiffs and Class Members with standing to pursue claims will be those who actually experienced an SUA, who are but a small fraction of the total number of Subject Vehicle owners.

Another global risk to the claims of all Plaintiffs and Class Members is Toyota's pending appeal of the Court's order denying arbitration.  Two years into the case, and in the wake of the United States Supreme Court decision in *AT&T Mobility LLC v. Concepcion*,[87] Toyota filed a Motion to Compel Arbitration.[88]  The Court denied the motion,[89] and Toyota appealed.[90]  Reversal of that order would kill this litigation, forcing individual consumers to file for arbitration, something that none could afford to do given the enormous costs of marshaling the evidence necessary to prove a claim against Toyota.

### 2.    Preemption of non-monetary relief could occur.

In moving to dismiss, Toyota argued that Plaintiffs' claims for non-monetary relief were preempted by the National Traffic and Motor Vehicle Safety Act.  The Court rejected Toyota's preemption defense.  But the Ninth Circuit or even the Supreme Court could reverse that ruling and bar any and all forms of injunctive and equitable relief sought by Plaintiffs.  This has implications for Class Members who

---

[86] The appeal is pending under Ninth Circuit Case No. 11-57006.  Briefing before the Ninth Circuit is complete, although the appeal is stayed pending the outcome of Plaintiffs' Motion to approve this Settlement.

[87] 131 S. Ct. 1740 (2011).

[88] Dkt. No. 2007.

[89] Dkt. No. 2312.

[90] Dkt. No. 2388.  The appeal is pending under Ninth Circuit Case No. 12-55659.

- 33 -

had no economic loss but who still own vehicles. The relief Plaintiffs were seeking was an injunction forcing Toyota to replace engine control modules in all vehicles. Toyota would have argued that, given NHTSA and NASA's specific findings of no defect, such an injunction would conflict with NHTSA's decision and is either preempted or barred by the doctrine of primary jurisdiction. Some courts have agreed with such an approach as noted by the Court in denying Toyota's motion to dismiss the injunctive relief claims.[91]

**3. Plaintiffs' experts were unable to reproduce UA in a Subject Vehicle under driving conditions.**

Proving the existence of a uniform defect remains a huge challenge, especially given NASA and NHTSA findings that no defect in the ETCS causing UA could be found. While Plaintiffs' software experts raised certain software design and architecture issues, they have not been able to identify a defect that is responsible for the vast array of SUAs reported to Toyota and NHTSA by vehicle owners. More specifically, Plaintiffs have been unable to reproduce a UA in a Subject Vehicle under driving conditions. These facts, coupled with admissions that Toyota obtained from some of Plaintiffs' technical experts,[92] provide sufficient evidence that the risks of further litigation weigh heavily in support of Settlement approval.

**4. Toyota's pending motions to strike present risk.**

At the time of Settlement, pending before the Court in the *Van Alfen* matter, were motions to exclude material components of Plaintiffs' evidence of liability and

---

[91] *See* Dkt. No. 510 at 96-97.

[92] The Court will recall Toyota's cry of "unintended exoneration," made when Plaintiffs' expert inadvertently failed to review 20 percent of the source code relating to the Monitor CPU independent power cut failsafe, and when fail-safes triggered at or before brake application in vehicle testing done by Plaintiffs' expert.

damages contained in expert reports.  If granted, many of the motions would have had the potential to undermine Plaintiffs' entire case.  Many of the experts and opinions targeted by Toyota's motion in *Van Alfen* have also been proffered to the Court in this case, and those motions will undoubtedly be brought here if the Settlement is not approved.[93]

### 5. Plaintiffs' class-wide proof was hotly contested.

Another hotly contested area was damages and how Plaintiffs could prove damages on a class-wide basis for over 20 different models.  Plaintiffs' expert, Dr. Manuel, opined that, when news of Toyota's UA problems surfaced, the value of these vehicles diminished and those Class Members who sold during the damage period were harmed.  The timing of this "damage period" and the identification of which sales resulted in damages were hotly debated.  Defendants' expert, Dr. Edward Lazear, of Stanford University's School of Business, was critical of Plaintiffs' class-wide damage model and summarized his criticisms as follows:

- As an overarching matter, it is critical to recognize that the automobile transactions at issue differ from one another in many significant and often unobservable ways.  These differences lead to wide price variations among seemingly similar vehicle transactions-price variations that are much larger than any alleged diminution in value caused by the challenged conduct.  As a consequence, it is impractical in a case like this one to separate on a class-wide basis the impact on the relevant prices of the challenged conduct from the effect of other significant factors.  It is not possible to account for these other factors or determinants of prices in a reliable way because available data sources do not contain sufficient information on many of these critical factors.

- Even using Plaintiffs' proposed method of assessing economic impact and damages, a significant segment of the proposed class members *could not* have experienced any economic impact because

---

[93] Berman Decl., ¶ 107.

- 35 -

the timing of their individual transactions rules out harm as a logical matter.

- Plaintiffs' method is incapable of demonstrating reliably on a class-wide basis that any alleged price decline for any particular vehicle, let alone all vehicles in the proposed class, was caused by the challenged conduct. Indeed, if Plaintiffs were correct that all the vehicles in the proposed class were affected by the same alleged conduct or defect, one would expect to observe similar price declines for all Toyota vehicles in the proposed class relative to their comparison vehicles. But the empirical evidence shows that this is not true. There is wide variation among the price performance of Toyota vehicles relative to comparison vehicles with some Toyota vehicles appreciating, rather than depreciating, relative to their comparison vehicles. Moreover, in instances where Plaintiffs' method yields higher price depreciation for Toyota vehicles than for a comparison vehicle, there are examples of non-Toyota vehicles (e.g., Hondas) experiencing similar price depreciation relative to Plaintiffs' chosen comparison vehicle. But non-Toyota vehicles should not have been affected adversely by Toyota's challenged conduct. No logically consistent theory can reconcile all these contradictory price patterns as having resulted from a common cause.

- Even if Plaintiffs' method could derive the impact on the average transaction price or on some other single measure of transaction price for a given model and model year for some period of time, it cannot determine whether a particular class member owning that model and model year was impacted. No average or other single measure of price effect can be used to determine impact for each and every member of the class. No formulaic relationship exists between any alleged price decline of a given model and model year and that of a particular vehicle of the same model and model year owned by an individual class member. As a consequence, any diminution in value that a given class member may have actually experienced cannot be ascertained without individual inquiry. This is true both with respect to the fact of impact and amount of damages.

- Using Plaintiffs' method to measure impact and to award damages on a class-wide basis would inevitably and incorrectly lead one to assert impact for, and to award damages to, many class members who demonstrably were in fact not impacted or harmed by the challenged conduct.

Plaintiffs believe that they would have prevailed on this issue but acknowledge this litigation risk.

- 36 -

## C.      The Risk of Maintaining Class Action Status Throughout the Trial Warrants Approval

A litigation class has not been certified, and the Settlement was reached shortly before the motion to certify bellwether classes was due.  As the Court is well aware, class certification in this matter is a complex undertaking.  The Court refused to apply California law nationwide to all putative class members, and, consequently, decided to proceed incrementally by first entertaining a motion to certify bellwether classes of California, Florida, and New York residents.  If the bellwether trial were lost, the prospect of Plaintiffs succeeding in the remaining states would be dim.  And even if the bellwether trial resulted in a partial or full verdict in favor of the bellwether classes, Plaintiffs in other states would still have to prove their entitlement to Rule 23 certification, and Toyota would undoubtedly and vigorously contest each and every bellwether certification motion.  Settlement obviates the need for serial certifications and the challenges posed thereby.

Other class certification challenges abound.  For instance, Toyota will challenge whether common issues can predominate given Plaintiffs' experts' inability to (i) isolate a global defect explaining all UAs and (ii) reproduce a UA in a Subject Vehicle under driving conditions.  Another significant risk to achieving and maintaining class action status is whether Plaintiffs' aggregate damages models would withstand challenge at trial.  Toyota can be expected to strongly challenge Plaintiffs' lost benefit-of-the bargain model that uses the cost of replacing defective engine control modules as a proxy for the reduced purchase price that Class Members would have paid had the defects been disclosed.  Toyota will also challenge Plaintiffs' model for proving realized loss using common evidence of the

- 37 -

value consumers placed on the Subject Vehicles in the wake of adverse publicity surrounding alleged UA events.

Another risk is presented by the Court's dismissal of claims based on advertising for failure to allege exposure to the advertising.  Proving exposure to advertising on a class-wide basis could prove challenging at trial.  Toyota contended that its advertising messages varied widely in the class period; that each statement had to be judged separately; that none of the statements were false or misleading and were, in any event, rarely explicitly about safety; that consumers had many reasons to buy vehicles and had widely varying priorities; and that Plaintiffs would have to prove that all or nearly all Class Members were exposed to ads found to be deceptive.  Again, Plaintiffs believe that they would win on this issue, but risk exists, and Toyota was prepared to fight this battle to the end.

These are but a few of the more salient challenges that Plaintiffs will face in obtaining and maintaining class certification.  The risk of maintaining class action status through trial is great, as is further evinced by many recent decisions denying class certification in automobile defect cases, including in one case in which it was alleged that a defect in the ETCS caused unintended acceleration events.[94]

---

[94] *See, e.g., Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012); *Daigle v. Ford Motor Co*., 2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012); *Corder v. Ford Motor Co*., 283 F.R.D. 337 (W.D. Ky. 2012); *Edwards v. Ford Motor Co*., 2012 U.S. Dist. LEXIS 81330 (S.D. Cal. June 12, 2012) (alleged UA events caused by defective ETCS); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig*., 2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012); *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012); *American Honda Motor Co., Inc. v. Superior Court*, 199 Cal. App. 4th 1367 (Cal. App. 2d Dist. 2011); *Lloyd v. GMC*, 275 F.R.D. 224 (D. Md. 2011), 266 F.R.D. 98 (D. Md. 2010); *Oscar v. BMW of N. Am.*, 274 F.R.D. 498 (S.D.N.Y. 2011), 2012 U.S. Dist. LEXIS 84922 (S.D.N.Y. June 19, 2012).

- 38 -

**D.      The Expense and Likely Duration of the Litigation in the Absence of a Settlement Are Substantial**

This factor also weighs heavily in favor of approving the Settlement.  The risk, expense, complexity, and likely duration of further litigation can only be characterized as monumental.

If this matter went to verdict, a lengthy appeal period would certainly result. The litigation road has been arduous and promises to be even more difficult absent settlement.  Plaintiffs' counsel have already collectively incurred and advanced $27 million in out-of-pocket expenses pursuing Plaintiffs' claims.  Absent the Settlement, Plaintiffs' Class Counsel expected to incur at least $50 million more in time and expenses to conclude expert discovery, move for class certification, brief summary judgment motions, conduct trial, and handle appeals.[95]  Settlement will conserve the resources of the parties and the Court.  The proposed Settlement guarantees a substantial recovery for the Class now while obviating the need for a lengthy, complex, and uncertain trial.[96]

Moreover, if this matter went to verdict, a lengthy appeal period would certainly result for the bellwether claims alone.  The Ninth Circuit currently ranks the slowest among the 12 circuit courts for median time to resolve an appeal, requiring on average over 15 months from filing the notice of appeal to disposition.[97]

---

[95] Berman Decl., ¶ 116.

[96] *See Create-A-Card, Inc. v. INTUIT, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *13.

[97] Berman Decl., Ex. C (reprint from the Federal Judicial Center judicial-caseload profiles, available on-line at http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2012/appeals-fcms-profiles-september-2012.pdf&page=21).).

- 39 -

1

2

**E.     Discovery and Investigation Were Nearly Complete at the Time of Settlement**

3        This matter has been intensely litigated, as even a cursory review of the 3,553

4   Court docket entries reveals.  The fact discovery in the bellwether class cases was set

5   to close on January 15, 2013.[98]  Initial expert disclosures were made on June 18,

6   2012, with rebuttal reports produced in August and September 2012.[99]  The

7   bellwether class trial was scheduled for July 2013.  Thus, discovery was nearly

8
9   complete when the Settlement was reached.

10       The Berman Declaration details all of the discovery taken in this case.  We

11  will not repeat that narrative here and instead will summarize the gargantuan

12  discovery efforts undertaken.  Given the advanced stage of these proceedings, there

13  can be no question that Plaintiffs' Class Counsel have a clear view of the strengths

14  and weaknesses of the Class's claims and damage approaches.  Sufficient discovery

15  has been conducted in this matter to allow counsel to fairly investigate the pertinent

16  legal and factual issues and fully recommend the Settlement.

17

18       **1.     Written discovery.**

19       Very extensive written discovery was conducted.  Plaintiffs served seven sets

20  of requests for admissions, one set of contention interrogatories, 11 sets of regular

21  interrogatories, and 23 sets of requests for production.[100]  Toyota served four sets of

22  contention interrogatories to 27 Plaintiffs, one general set of regular interrogatories

23
24  to all Plaintiffs, one set of regular interrogatories to 81 specific Plaintiffs, three sets

25

26       [98] *See* Order No. 17: Class Discovery Plan and Schedule (Dkt. No. 1955).

27       [99] *See* Order Re Revised Class Schedule (Dkt. No. 2524); Order Regarding Joint Stipulation to Extend Deadline for Initial Expert Disclosures (Dkt. No. 2710).

28       [100] Berman Decl., ¶ 45.

- 40 -

of requests for production, and one set of requests for admissions.[101]  Approximately

339 third parties were served with subpoenas.[102]

### 2.    Document and ESI productions.

Documents were produced by the Toyota defendants and several third parties,

including, but not limited to, NHTSA, Denso (a part supplier partially owned by

Toyota), the Toyota North American Quality Advisory Panel, Exponent, and over

250 Toyota dealerships.  Toyota documents alone were produced from over 500

custodial and non-custodial sources.[103]  We implemented a comprehensive search

and coding system to review and organize these documents by issue.  More than 2.3

million documents were produced and searched for relevance by attorney

reviewers.[104]

In addition to stand-alone documents, Toyota produced records from a number

of structured databases.  These databases included customer complaints and warranty

records relating to unintended acceleration.  Toyota eventually produced hundreds-

of-thousands of records from these databases, which were used by Plaintiffs'

statistical and technical experts.[105]  Toyota also produced the software source code

for certain engine control units, which was reviewed by Plaintiffs' experts.[106]

---

[101] *Id.*, ¶ 46.

[102] *Id.*, ¶ 47.

[103] *Id.*, ¶ 48.  Obtaining discovery from Toyota was difficult, necessitating a blizzard of meet-and-confers and motions to compel.  *See id.*, ¶¶ 49-50, 69-70.

[104] *Id.*, ¶ 52.  Many of the documents produced were in Japanese and needed to be translated.  *Id.*, ¶ 53.

[105] *Id.*, ¶ 55.

[106] *Id.*, ¶ 57.

- 41 -

### 3.       Expert reports

The parties engaged in extensive discovery of expert witnesses, designating 43 primary and rebuttal experts.  Plaintiffs designated 23 experts, who each produced at least one expert report and, in some instances, multiple reports.  Toyota disclosed 20 experts, most of whom produced expert reports.  Many of these witnesses were experts in highly complex and technical subject matters such as software and electrical engineering.[107]

### 4.       Depositions

214 depositions were taken in this litigation.  The deponents, some of which were deposed more than once, included Plaintiffs (38), Toyota witnesses (86), third-party witnesses (4), absent class members who had "other similar incidents," referred to as "OSIs" (28), and experts (35).[108]

## F.       Plaintiffs' Class Counsel Fully Support the Settlement

Courts recognize that the opinion of experienced counsel supporting the settlement is entitled to considerable weight, although, of course, a district court should not simply rubber stamp stipulated settlements.[109]  In recommending the Settlement, Plaintiffs' Class Counsel exercised their judgment based on extensive knowledge of the facts of the case and the legal issues facing the Class, as well as judgments about the strengths and weaknesses of the case.  After an extensive

---

[107] *Id.*, ¶¶ 59-66.

[108] *Id.*, ¶¶ 63-64.

[109] *See* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.633 at 321-22 (4th ed. 2012); *INTUIT*, 2009 U.S. Dist. LEXIS 93989, at *12-13; *Staton v. Boeing Co.*, 327 F.3d at 959-60 (court assesses a class-action settlement for "actual fraud, overreaching or collusion").

- 42 -

analysis, Plaintiffs' Class Counsel concluded that the terms of the Settlement Agreement are fair, reasonable, and adequate.[110]

## G.   Class Member Reaction Has Been Positive

Objections and requests for exclusion are not due until May 13, 2013. So far, only 45 purported objections and 1,085 purported requests for exclusion have been received out of a universe of more than 22.6 million Class Members who were mailed direct notice.

## H.   The Parties Bargained in Good Faith, and There Was No Collusion

In addition to the factors just discussed, the Court must also be satisfied that "the settlement is not the product of collusion among the negotiating parties" when, as here, "a settlement agreement is negotiated prior to formal class certification."[111] Factors considered here include whether the settlement resulted from arm's-length negotiations between experienced, capable counsel;[112] the end result achieved;[113] and whether counsel are to receive a disproportionate distribution of the settlement under a "clear sailing" arrangement providing for the payment of attorneys' fees separate

---

[110] Berman Decl., ¶ 119.

[111] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011).

[112] *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) (a presumption of correctness attached to a class settlement reached in arm's-length negotiations between experienced, capable counsel); *see also Hawkins v. Comm'r of the N.H. HHS*, 2004 U.S. Dist. LEXIS 807, at *15 (D.N.H. Jan. 23, 2004); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG ON CLASS ACTIONS § 11.41, at 87-89 (4th ed. 2002).

[113] *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987) ("[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation. . . .  The proof of the pudding was indeed in the eating."); *see also In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

- 43 -

1   and apart from class funds where fees not awarded revert to defendants rather than to

2   the class.[114]   Applying these factors favors approval here.

3           The Settlement is the result of serious, informed, non-collusive negotiations

4   conducted in good faith.  The parties actively engaged in many rounds of arm's-

5   length negotiations for over a year-and-a-half, including 10 in-person mediation

6   sessions and countless phone calls.  These efforts were done under the supervision

7   and assistance of the Court-appointed Settlement Special Master, Patrick Juneau.

8   The parties worked long and hard to reach a resolution of this matter.  This

9   prolonged process reflects the vigor with which both sides represented their interests,

10  including those of the Class as whole.[115]

11

12          And the end result speaks for itself – a Settlement conservatively valued at

13  over $1.63 billion.  It is fair, appropriate, and in the best interests of the Class

14  Members.

15          Turning to the third *Bluetooth* factor, although Toyota has agreed to separately

16  pay any award of attorneys' fees and expenses up to a maximum of $200 million and

17  $27 million, respectively, there are structural protections associated with that

18  agreement.  First, attorneys' fees and expenses were not negotiated until ***after*** the

19  parties had agreed on all principal terms of the Settlement.[116]  Thus, these fees and

20  expenses did not influence the course of negotiations regarding the Settlement

21

22

23

24          [114] *In re Bluetooth*, 654 F.3d at 947.

25          [115] Berman Decl., ¶¶ 78-87.

26          [116] *Id.*, ¶ 121; *see also* Agreement at 32 ("After agreeing to the principal terms set forth in this Settlement Agreement, Plaintiffs' Class Counsel and Toyota's Negotiating Counsel negotiated the amount of Attorneys' Fees and Expenses that, following application to the Court and subject to Court approval, would be paid as the fee award and costs award to plaintiffs' counsel.").

27

28                                             - 44 -

benefits to the Class.  Second, the attorneys' fees that Plaintiffs' Class Counsel will ask the Court to approve represent approximately 12.3 percent of the total value of the $1,632,000,000 – a very reasonable request given the risks of the case and the results achieved.  Third, if the Court elects to award less than $200 million in fees and up to $27 million in expenses, Toyota has agreed to pay the remainder to the Automobile Safety Research and Education Fund for the benefit of the Class; the remainder will not revert back to Toyota.[117]  Indeed, the entire Settlement here is an all-in settlement with no possibility of reversion to Toyota.

I.     **The Scope of the Settlement Release of Claims is Reasonable and Bounded by the Claims Asserted in the Litigation**

Released claims should only be those made in the operative complaint and those closely related thereto.[118]  The parties have limited the release of claims to satisfy this standard and preserve those for personal injury, wrongful death, or physical property damage arising from an accident involving a Subject Vehicle (including damage to the Subject Vehicle itself).  Each Class Member, on behalf of themselves and any other legal or natural persons who may claim by, through or under them, will be subject to the following release and waiver of rights:

> [T]o fully, finally and forever release, relinquish, acquit, discharge and hold harmless the Released Parties from any and all claims, demands, suits, petitions, liabilities, causes of action, rights, and damages of any kind and/or type regarding the subject matter of the Actions, including, but not limited to, compensatory, exemplary, punitive, expert and/or attorneys' fees or by multipliers, whether past, present, or future, mature, or not yet mature, known or unknown, suspected or unsuspected, contingent or non-

---

[117] *Cf. Bluetooth*, 654 F.3d at 947 (adversely characterizing fee reverters to the defendant as depriving the class of that full potential benefit).

[118] *See, e.g., In re Zoran Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 48246, at *31 (N.D. Cal. Apr. 7, 2008).

- 45 -

contingent, derivative or direct, asserted or un-asserted, whether based on federal, state or local law, statute, ordinance, regulation, code, contract, common law, or any other source, or any claim of any kind related arising from, related to, connected with, and/or in any way involving the Actions,  the Subject Vehicles, any and all claims involving the ETCS, any and all claims of unintended acceleration in any manner that are, or could have been, defined, alleged or described in the Economic Loss Master Consolidated Complaint, the Amended Economic Loss Master Consolidated Complaint, the Second Amended Economic Loss Master Consolidated Complaint, the Third Amended Economic Loss Master Consolidated Complaint, the TAMCC, the Actions or any amendments of the Actions, including, but not limited to, the design, manufacturing, advertising, testing, marketing, functionality, servicing, sale, lease or resale of the Subject Vehicles.[119]

This Release is attached to the Long Form Notice and also available at the

Settlement Website.

## V.     CONCLUSION

For all the above-stated reasons, Plaintiffs respectfully request that, after

Plaintiffs file a supplemental report after the close of the Claim Period on July 29,

2013, the Motion be granted and the Court enter an order granting final approval to

the Settlement.

---

[119] Agreement at 28-29.

DATED:  April 23, 2013

HAGENS BERMAN SOBOL SHAPIRO LLP


By: _/s/ Steve W. Berman_____
      Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com


By: _/s/ Marc M. Seltzer_____
      Marc M. Seltzer, Bar No. 054534
SUSMAN GODREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
E-mail:  mseltzer@susmangodfrey.com

*Co-Lead Counsel for Economic Loss Plaintiffs*

By: _/s/ Frank M. Pitre_____
      Frank M. Pitre, Bar No. 100077
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
E-mail:  fpitre@cpmlegal.com

*Lead Counsel for Non-Consumer Economic Loss Plaintiffs*

- 47 -

1

# APPENDIX A:

2

## Summary of Settlement Benefits by Class Member Circumstance

3

4

| Class Member Circumstance | Benefits from the Settlement |
|---|---|
| Own or lease a BOS-Eligible Subject Vehicle as of the date of preliminary approval | BOS<br>Customer Support Program (if still own at final approval)<br>Automobile Safety Research and Education Fund |
| Own or lease a Subject Vehicle as of the date of final approval, and vehicle already had BOS installed | Customer Support Program<br>Automobile Safety Research and Education Fund |
| Own or lease a hybrid Subject Vehicle as of the date of final approval | Customer Support Program<br>Automobile Safety Research and Education Fund |
| Own or lease a non-hybrid Subject Vehicle as of the date of preliminary approval, and such vehicle is not otherwise eligible to receive BOS | BOS-Ineligible Fund<br>Customer Support Program (if still own at final approval)<br>Automobile Safety Research and Education Fund |
| Sold or traded in an owned Subject Vehicle during the damage period | Diminished Value Fund<br>Automobile Safety Research and Education Fund |
| Returned a leased Subject Vehicle before the lease termination date during the damage period | Diminished Value Fund<br>Automobile Safety Research and Education Fund |
| Insured and/or guaranteed the residual value of a Subject Vehicle as of Sept. 1, 2009 and, on or before Dec. 31, 2010, thereafter made payment to an insured or sold the vehicle | Diminished Value Fund<br>Automobile Safety Research and Education Fund |
| Owned a Subject Vehicle that was declared a total loss by an insurer during the damage period | Diminished Value Fund<br>Automobile Safety Research and Education Fund |
| Returned a leased Subject Vehicle before the lease termination date and after having reported an alleged UA event to Toyota, a Toyota Dealer, or NHTSA before December 1, 2012 | Diminished Value Fund<br>Automobile Safety Research and Education Fund |
| Returned a leased Subject Vehicle under any other circumstance outside the damage period | Automobile Safety Research and Education Fund |

- 48 -

010172-25  586378 V1

| Class Member Circumstance | Benefits from the Settlement |
|---|---|
| Sold a Subject Vehicle outside the damage period | Automobile Safety Research and Education Fund |

- 49 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PROOF OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 23, 2013.

/s/ Steve W. Berman

Steve W. Berman