STEVE W. BERMAN (*pro hac vice*)
(WA SBN 12536)
E-mail:  steve@hbsslaw.com
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

MARC M. SELTZER
(CA SBN 054534)
E-mail:  mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

FRANK M. PITRE (CA SBN 100077)
E-mail:  fpitre@cpmlegal.com
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

*Co-Lead Plaintiffs' Counsel for
Economic Loss Cases*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) **PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATION TO NAMED PLAINTIFFS** |
| THIS DOCUMENT RELATES TO:  ALL ECONOMIC LOSS CASES | Date:  June 14, 2013 Time:  9:00 a.m. Place:  Courtroom 10C Judge:  Hon. James V. Selna |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    HISTORY OF THE LITIGATION ........................................................... 3

III.   FEE AND EXPENSE AWARD STANDARDS ......................................... 4

    A.   Plaintiffs' Counsel are Entitled to Compensation Based upon the Benefits Created by the Litigation .............................................. 4

    B.   The Percentage-of-the-Fund Method is the Appropriate Method for Calculating Attorneys' Fees in this Circuit and in this Case .................... 5

IV.    THE REQUESTED FEE IS FAIR AND REASONABLE AS A PERCENTAGE OF THE BENEFITS ACHIEVED FOR THE CLASS............ 6

    A.   The Results Achieved Support the Requested Award ............................... 8

    B.   The Substantial Risks and Complexity of the Litigation Support the Requested Award ....................................................................... 11

    C.   The Contingent Nature of the Fee and Financial Burden Carried by Plaintiffs Support the Requested Award ...................................... 13

    D.   The Skill Required and Quality of Work Performed by Counsel Support the Requested Award.................................................... 17

    E.   The Length the Case has Transpired Supports the Requested Award ..... 18

    F.   Awards Made in Similar Cases Support the Requested Award .............. 19

    G.   Percentages in Standard Contingency-Fee Agreements in Similar Individual Cases Support the Requested Award...................................... 20

    H.   The Non-Monetary Benefits Obtained Support the Requested Award ... 21

    I.   The Reaction of the Class Supports the Requested Fee........................... 21

    J.   The Lodestar Cross-Check Confirms the Requested Fee's Reasonableness ................................................................................ 21

    K.   Negotiated Attorneys' Fee Agreements Are Favored in Class Action Settlements ................................................................................ 24

V.     PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND NECESSARILY INCURRED TO BENEFIT THE CLASS ............................. 26

VI.    AN AWARD OF COMPENSATION TO THE NAMED PLAINTIFFS AND CLASS REPRESENTATIVES IS APPROPRIATE ............................. 26

VII.   CONCLUSION ........................................................................................ 28

010172-25  602931 V1

1

2 **TABLE OF AUTHORITIES**

3
<b><u>Page(s)</u></b>

4 C**ASES**

5
*9-M Corp. v. Sprint Commc'ns Co. L.P.*,
6   2012 U.S. Dist. LEXIS 161578 (D. Minn. Nov. 12, 2012).................................5

7
*Adderley v. NFL Players Ass'n*,
8   2009 U.S. Dist. LEXIS 115742 (N.D. Cal. Nov. 23, 2009)...........................7, 19

9
*Alberto v. GMRI, Inc.*,
    2008 U.S. Dist. LEXIS 91691 (E.D. Cal. Nov. 12, 2008) ................................26
10

11
*Allapattah Servs. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006)...............................................................20
12

13
*In re Apollo Group Inc. Secs. Litig.*,
    2012 WL 1378677 (D. Ariz. April 20, 2012)......................................................20
14

15
*Blum v. Stenson*,
    465 U.S. 886 (1984) ......................................................................................5, 23
16

17
*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ..............................................................................................4
18

19
*Briggs v. United States*,
    2010 U.S. Dist. LEXIS 50990 (N.D. Cal. Apr. 30, 2010)......................4, 6, 7, 19
20

21
*Brotherton v. Cleveland*,
    141 F. Supp. 2d 907 (S.D. Ohio 2001)...............................................................28
22

23
*Camacho v. Bridgeport Fin., Inc.*,
    523 F.3d 973 (9th Cir. 2008) ..............................................................................23
24
*Campbell v. AMTRAK*,
    718 F. Supp. 2d 1093 (N.D. Cal. 2010)..............................................................24
25

26
*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) ................................................................................8
27

28
*Central R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) ..............................................................................................5

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011)..............................................................20

*In re Combustion Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997) ................................................................20

*In re Cont'l Ill. Secs. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ..........................................................................25

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   109 F.3d 602 (9th Cir. 1997) ......................................................................7, 19

*In re Critical Path, Inc. Secs. Litig.*,
   2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ...................6, 8, 14, 23

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
   130 F.R.D. 366 (S.D. Ohio 1990).....................................................................28

*In re Equity Funding Corp. Sec. Litig.*,
   438 F. Supp. 1303 (C.D. Cal. 1977)................................................................18

*Gerstein v. Micron Tech., Inc.*,
   1993 U.S. Dist. LEXIS 21215 (D. Idaho Sept. 10, 1993) ..................................6

*Grove v. Wells Fargo Fin. Cal., Inc.*,
   606 F.3d 577 (9th Cir. 2010) ..........................................................................23

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..................................................................5, 7, 19

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal. 2011), *aff'd*, 473 Fed. Appx. 716 (9th Cir. 2012) .....5

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) .......................................................................................24

*In re Heritage Bond Litig.*,
   2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005)..................................26

*In re Heritage Bond Litig.*,
   2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005)...........................11, 17

*In re Ikon Office Solutions, Inc. Secs. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ......................................................................20

*Ingram v. Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001) ......................................................................28

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...........................................................................24

*Johnston v. Comerica Mortg. Corp.*,
  83 F.3d 241 (8th Cir. 1996) ................................................................................5

*Kakani v. Oracle Corp.*,
  2007 U.S. Dist. LEXIS 95496 (N.D. Cal. Dec. 21, 2007) .......................6, 22, 23

*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986) ..............................................................................6

*Knight v. Red Door Salons, Inc.*,
  2009 U.S. Dist. LEXIS 11149 (N.D. Cal. Feb. 2, 2009)...........................17, 19

*Kurzwell v. Philip Morris Cos.*,
  1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) .................................................20

*In re Linerboard Antitrust Litig.*,
  2004 WL 1221350 (E.D. Pa. June 2, 2004) .....................................................20

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
  222 F.3d 1142 (9th Cir. 2000) .........................................................................25

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002) ........................................................................27

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
  671 F. Supp. 819 (D. Mass. 1987)...................................................................24

*In re M.D.C. Holdings Sec. Litig.*,
  1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990)................................24

*Malchman v. Davis*,
  761 F.2d 893 (2d Cir. 1985) ............................................................................25

*Mark v. Valley Ins. Co.*,
  2004 U.S. Dist. LEXIS 20602 (D. Or. Oct. 6, 2004) ......................................19

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2007).....................................................*passim*

- iv -

*In re Oracle Sec. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994)....................................................6

*In re Pacific Enters. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ......................................................7, 19

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989) ....................................................4, 5

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
   483 U.S. 711 (1987) ..................................................................23

*Pinto v. Princess Cruise Lines*,
   513 F. Supp. 2d 1334 (S.D. Fla. 2007)........................................4

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) ................................................7, 19

*Prison Legal News v. Schwarzenegger*,
   608 F.3d 446 (9th Cir. 2010) ..............................................23, 24

*Radcliffe v. Experion Information Solutions Inc.*,
   No. 11-56376, slip. op.  (9th Cir. Apr. 22, 2013)..........................27

*In re Revco Sec. Litig.*,
   1992 U.S. Dist. LEXIS 7852 (N.D. Ohio May 5, 1992) ..................28

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001)..........................................22

*In re Rite Aid Corp. Secs. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ......................................................17

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y. 1997) ............................................28

*Singer v. Becton Dickinson & Co.*,
   2010 U.S. Dist. LEXIS 53416 (S.D. Cal. June 1, 2010) ................28

*Six Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990)................................................5, 7

*In re Southern Ohio Correctional Facility*,
   175 F.R.D. 270 (S.D. Ohio 1997)..........................................27, 28

- v -

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939) ...................................................................................5

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ..............................................................*passim*

*Steiner v. American Broad. Co.*,
    248 Fed. Appx. 780 (9th Cir. 2007) .......................................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)......................................20

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire
    Litig.*,
    2001 WL 34312839 (D.D.C. July 16, 2001) .......................................4

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .........................................................7, 19

*Trustees v. Greenough*,
    105 U.S. 527 (1882) ..................................................................5

*Van Vranken v. Atlantic Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995)............................................22, 28

*Vasquez v. Coast Valley Roofing, Inc.*,
    266 F.R.D. 482 (E.D. Cal. 2010).............................................27

*Velez v. Roche*,
    2004 U.S. Dist. LEXIS 29848 (N.D. Cal. Sept. 22, 2004)................23

*In re Vitamins Antitrust Litig.*,
    2001 WL 34312839 (D.D.C. July 16, 2001) .......................................20

*Vizcaino v. Microsoft Corp.*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001) .......................................21

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................*passim*

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994).................................................*passim*

1

## OTHER AUTHORITIES

2
3
4
5
6

Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267 (1998) ........................................................20

Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247 (1996)............................................................20

MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2004) ...................................6

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1010172-25  602931 V1

# I.   INTRODUCTION

Plaintiffs' Class Counsel respectfully submit this Memorandum in Support of their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to the Named Plaintiffs.  As set forth below, Plaintiffs' Class Counsel request that the Court approve an award of fees in the amount of $200,000,000 and expense reimbursement in the amount of $27,000,000, to be paid by Toyota in accord with the Settlement Agreement.[1]  The requested attorneys' fees represents approximately 12.3 percent of the total value of the $1,632,000,000 Settlement – a very reasonable request given the risks of the case and the results achieved.

If awarded, the attorneys' fees and expenses would be paid, collectively, to the 31 Plaintiffs' firms that worked on the litigation.  Subject to Court approval, the attorneys' fees and expenses will be allocated by Plaintiffs' Class Counsel among eligible Plaintiffs' counsel in a manner that Plaintiffs' Class Counsel believes, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims against Toyota in the Actions.[2]  Pursuant to the terms of the Agreement, Toyota does not oppose the requests for attorneys' fees and expenses.[3]

Plaintiffs' Class Counsel also request that the Court approve compensation for the Named Plaintiffs and Class Representatives based on $100 per hour for their time invested in connection with the Actions, with a $2,000 minimum award.  The purpose of such awards is to compensate the Named Plaintiffs and Class Representatives for efforts undertaken by them on behalf of the Class; without their

---

[1] Settlement Agreement (the "Agreement") at 32-33.

[2] *Id.* at 33.

[3] *Id.* at 32-33.

efforts, the Settlement would not be possible.  Like the attorneys' fees and expenses, these amounts would be paid by Toyota if the Settlement is approved.[4]

Plaintiffs' counsel have expended a total of 165,930 hours in this case, accumulated an unaudited lodestar totaling $69,706,936 at historical billing rates, and incurred $30,606,117 in total expenses, for a total case investment of $100,313,053.[5]  The lodestar multiplier would be a reasonable 2.87 if the Court approves the Motion.  And lodestar and expenses will continue to increase as Plaintiffs' Class Counsel continue to work in support of Settlement approval and assist with claims administration issues going forward.

The Settlement provides real, immediate, and substantial cash and non-monetary benefits in an aggregate value exceeding $1.63 billion.  The attorneys' fee and cost award requested is eminently reasonable in light not only of the excellent result achieved for the Class (which is described more fully in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement), but also the risks involved in undertaking this groundbreaking and highly complex matter and the immense effort required in litigating the claims and the subsequent settlement negotiations.  From its inception, this case has been

---

[4] *Id.* at 34.

[5] The declarations found at Appendix A submitted herewith, in addition to the Declaration of Steve W. Berman in Support of Plaintiffs' Motions for Final Approval of Class Action Settlement and for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs ("Berman Decl."), set forth the breakdown of total unaudited attorney hours, fees, and expenses incurred from inception through the dates specified in each declaration.  Plaintiffs' Class Counsel will provide detailed back-up for all attorney fees and expenses sought for reimbursement, if the Court wishes.  We also note that it is possible that we have not received complete information from all counsel, that not all time has been audited, and that, consequently, the lodestar information may change.  Nonetheless, Plaintiffs' Class Counsel believe that it is a reasonable approximation of the hours and expenses incurred in the Actions.

- 2 -

intensely litigated as Toyota repeatedly challenged the sufficiency of Plaintiffs'
allegations to state any claims for relief, opposed Plaintiffs' efforts to conduct
discovery, contested Plaintiffs' arguments in favor of class certification, and denied
any liability.  The parties fought each other virtually every step of the way.
Litigating this case, therefore, has required immense time, energy and resources from
Plaintiffs' counsel.  Furthermore, as the Court is well aware, this case involved
extremely complex and challenging issues of fact and law.

Plaintiffs' counsel faced considerable risk in litigating this case on a wholly
contingent-fee basis.  To date, we have not received any compensation in association
with the case and have foregone other opportunities and devoted time to this matter
instead of others.  The result in this complex litigation and the effort required well
supports the requested attorneys' fee and expense award, which is justified by
relevant factors considered by courts in this Circuit and others.  Therefore, Plaintiffs'
Class Counsel respectfully request that the Court grant this petition.

## II.    HISTORY OF THE LITIGATION

This litigation has been pending for three-and-a-half years.  The volume of
work completed, and the number of complex issues involved, are staggering.  The
Berman Declaration, at paragraphs 3-87, reviews the case highlights and the work
done by Plaintiffs' Class Counsel.  Rather than repeat all of those points here, we
incorporate the Berman Declaration herein by this reference.

- 3 -

## III.   FEE AND EXPENSE AWARD STANDARDS

**A.   Plaintiffs' Counsel are Entitled to Compensation Based upon the Benefits Created by the Litigation**

A lawyer who recovers a "common fund" is entitled to reasonable attorney fees from the fund as a whole.[6]  The common-fund doctrine's fundamental purpose is to spread the burden of a party's litigation expenses among those who are benefited.[7]  Indeed, the doctrine "is founded on the equitable principle that those who have profited from litigation should share its costs."[8]  A court awarding fees under a common fund must ensure that attorney's fees and costs awarded to class counsel are "fair, reasonable, and adequate."[9]

Substantial fee awards in successful cases, such as the present action, encourage and support meritorious class actions, and promote private enforcement of, and compliance with, consumer protection laws.  Moreover, awards of attorney fees help to ensure adequate enforcement of class members' legal rights.  "[A] financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid."[10]

---

[6] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003).

[7] *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989).

[8] *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995).

[9] *See Staton*, 327 F.3d at 963-64 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)); *Briggs v. United States*, 2010 U.S. Dist. LEXIS 50990, at *14 (N.D. Cal. Apr. 30, 2010).

[10] *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007) (quoting *Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988)).

- 4 -

**B.     The Percentage-of-the-Fund Method is the Appropriate Method for Calculating Attorneys' Fees in this Circuit and in this Case**

The Supreme Court has repeatedly held in cases involving the computation of a common-fund fee award that it is appropriate to determine the fee as a percentage-of-the-fund.[11]   In a percentage fee award, the fee is measured by the benefit conferred upon the class.  In determining the value of the settlement, courts consider the non-monetary benefits conferred,[12] as well as any cash attorneys' fee and costs payments to be made pursuant to the settlement terms with the defendant.[13]

The Ninth Circuit has expressly approved the percentage-of-recovery approach, and this approach has become the prevailing method for awarding fees in common fund cases in the Ninth Circuit.[14]   The percentage method is desirable because it most fairly correlates the compensation of counsel with the benefit

_____

[11] *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the common fund doctrine … a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939); *Central R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Trustees v. Greenough*, 105 U.S. 527, 532 (1882).

[12] *Staton*, 327 F.3d at 973-74 (value of non-monetary benefits may be considered as part of the value of a common fund for purposes of applying the percentage method of determining fees if the non-monetary benefits can reasonably be valued); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (same).

[13] *See, e.g., Staton*, 327 F.3d at 972-74; *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal. 2011), *aff'd*, 473 Fed. Appx. 716 (9th Cir. 2012); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *9-M Corp. v. Sprint Commc'ns Co. L.P.*, 2012 U.S. Dist. LEXIS 161578, at *6-8 (D. Minn. Nov. 12, 2012); Declaration of Brian T. Fitzpatrick in Support of Plaintiffs' Motion for an Award of Attorneys' Fees ("Fitzpatrick Decl."), ¶ 9.  Including the attorneys' fees and costs for purposes of determining total value is especially appropriate because any reduction by the court in the attorneys' fees Toyota agreed to pay will be added to the research and education fund.  Fitzpatrick Decl., ¶ 8.

[14] *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); *Paul, Johnson*, 886 F.2d at 272; *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007).

- 5 -

conferred upon the class.[15]  It aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum possible recovery in the shortest amount of time.[16]  Further, it decreases the burden imposed on courts by eliminating a detailed and time-consuming lodestar analysis and assuring that the beneficiaries do not experience undue delay in receiving their share of the settlement.[17]  It is also consistent with the practice in the private marketplace where contingent-fee attorneys are customarily compensated by a percentage of the recovery.

The Ninth Circuit also encourages district courts to employ an enhanced lodestar analysis to cross-check the reasonableness of the result,[18] and the Court has directed counsel to "submit a lodestar calculation for purposes of comparison and validation."[19]  We provide both analyses below.

### IV.    THE REQUESTED FEE IS FAIR AND REASONABLE AS A PERCENTAGE OF THE BENEFITS ACHIEVED FOR THE CLASS

"Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."[20]  For attorneys' fees awarded under this method, the Ninth Circuit has repeatedly held that 25% of the settlement value is the appropriate

---

[15] *See Omnivision*, 559 F. Supp. 2d at 1046 (citing authorities that describe the advantages of using the percentage method).

[16] *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1454 (N.D. Cal. 1994).

[17] *See, e.g., Gerstein v. Micron Tech., Inc.*, 1993 U.S. Dist. LEXIS 21215, at *14 (D. Idaho Sept. 10, 1993); *see also* Fitzpatrick Decl., ¶¶ 10-11.

[18] *See In re Washington Pub. Power Supply Sys. Sec. Litig.*, ("*WPPSS*"), 19 F.3d 1291, 1296-98 (9th Cir. 1994); *Vizcaino*, 290 F.3d at 1050; *see also Briggs*, 2010 U.S. Dist. LEXIS 50990, at *25-25; *Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 95496, at *5-6 (N.D. Cal. Dec. 21, 2007); *In re Critical Path, Inc. Secs. Litig. v. Critical Path, Inc.*, 2002 U.S. Dist. LEXIS 26399, at *24-33 (N.D. Cal. June 18, 2002).

[19] Dkt. No. 3344 at 23.

[20] MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2004).

- 6 -

benchmark.[21]  That benchmark, however, "should be adjusted … when special circumstances indicate that the percentage recovery would be either too small or too large …."[22]  Courts in this Circuit consider the following factors:  (i) the results achieved;[23] (ii) the risks of litigation;[24] (iii) the complexity of the case;[25] (iv) the skill required and quality of work performed by counsel;[26] (v) the length the case has transpired;[27] (vi) the contingent nature of the fee and financial burden carried by Plaintiffs;[28] (vii) awards made in similar cases;[29] (viii) percentages in standard contingency-fee agreements in similar individual cases;[30] (ix) the non-monetary benefits obtained;[31] (x) the reaction of the class to the proposed fee and expense requests;[32] and (xi)  a lodestar cross-check.[33]

As discussed below, applying these factors here confirms that the requested fee is reasonable and justified.  The requested attorneys' fees represent 12.3 percent

---

[21] *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *Hanlon*, 150 F.3d at 1029; *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993); *see also Adderley v. NFL Players Ass'n*, 2009 U.S. Dist. LEXIS 115742, at *7 (N.D. Cal. Nov. 23, 2009); *Briggs*, 2010 U.S. Dist. LEXIS 50990, at *26.

[22] *Six Mexican Workers*, 904 F.2d at 1311.

[23] *Id.*; *Vizcaino*, 290 F.3d at 1050.

[24] *In re Pacific Enters. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995); *Vizcaino*, 290 F.3d at 1048-49.

[25] *Six Mexican Workers*, 904 F.2d at 1311; *In re Pacific Enters. Litig.*, 47 F.3d at 379.

[26] *Vizcaino*, 290 F.3d at 1048.

[27] *Six Mexican Workers*, 904 F.2d at 1311; *Vizcaino*, 290 F.3d at 1050.

[28] *Vizcaino*, 290 F.3d at 1050.

[29] *Id.*

[30] *Id.* at 1049.

[31] *In re Pacific Enters. Secs. Litig.*, 47 F.3d at 379; *Staton*, 327 F.3d at 946.

[32] *Omnivision*, 559 F. Supp. 2d at 1048.

[33] *Vizcaino*, 290 F.3d at 1050-51.

- 7 -

1 of the total value of the $1,632,000,000 Settlement.  If just the $757,000,000 total

2 cash component of the Settlement is considered, fees are 26.4 percent of the

3 monetary benefits.  Either way, the fees requested are reasonable.  Tellingly, this

4 Court, in employing the 25% of the common fund benchmark, has already

5 preliminarily approved Plaintiffs' fee request given the magnitude of the

6 Settlement's cash and non-monetary benefits, remarking that the "the amount of fees

7 sought by Plaintiffs' counsel falls well within the 25% benchmark . . . ."[34]

8 **A.     The Results Achieved Support the Requested Award**

9          This is an ***excellent*** settlement by any metric.  The Settlement's absolute value

10 – at over $1.63 billion – speaks volumes and is one of the largest automobile class

11 action settlements ever – if not the largest.  Indeed, either the cash component

12 (valued at $757 million) or the non-monetary component (valued at $875 million)

13 ***alone*** would be an outstanding result for the Class.

14          Plaintiffs' expert estimates economic loss caused by alleged diminished value

15 to be $590 million, making the $250 million Alleged Diminished Value Fund

16 recovery approximately 42 percent of total economic losses.[35]  It is rare to see class

17 settlements yield anywhere near this percentage-of-damages recovery.[36]  Toyota's

18 $250 million contribution to the Cash-in-Lieu-of-BOS Fund represents

19 approximately 25 percent of the aggregate, Class-wide estimated average cost of a

---

[34] Dkt. No. 3344 at 23.

[35] Declaration of Ernest H. Manuel, Jr., Ph.D., Re: Economic Damages Due to
Unintended Acceleration, ¶ 35.

[36] Fitzpatrick Decl., ¶ 16; *see also, e.g., In re Critical Path, Inc. Secs. Litig.*, 2002
U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ($17.5 million settlement where
damages alleged were $200 million, resulting in 8.75% recovery percentage); *In re
Cendant Corp. Litig.*, 264 F.3d 201, 241 & n.22 (3d Cir. 2001) (citing securities
settlements between 1.6% and 14% of damages).

- 8 -

BOS installation based on 9,020,154 eligible vehicles.[37]  And Class Members submitting eligible claims against the Cash-in-Lieu-of-BOS Fund may recover 100% of the estimated value of a brake-override systems, depending on the jurisdiction in which they reside and the volume of claims.

The non-monetary recoveries are equally, if not more, compelling.  Over 3.5 million Class Members who currently own or lease a qualifying vehicle will be eligible to receive the BOS.  This is a significant safety enhancement, as the BOS will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.  A senior Toyota executive in deposition admitted that BOS would have prevented the widely-publicized fatal crash involving Mr. Saylor's vehicle.[38]  And reduced to monetary terms, this benefit is valued at almost $400,000,000 based on the $111.50 average price for a BOS installation.[39]

The Customer Support Program will provide prospective coverage for repairs and adjustments needed to correct defects in materials or workmanship in five specific components related to the acceleration system and targeted in the litigation. Toyota will guarantee the reliability of these parts for the lesser of 10 years from the expiration of the existing warranty or 150,000 miles, subject to a minimum of three years of coverage.  Over 16.1 million Class Members can benefit from the Customer

---

[37] Subtracting 6,309,384 BOS-eligible vehicles and 1,325,314 hybrid vehicles from the 16,654,852 universe of current registrations yields 9,020,154 vehicles.  *See* Declaration of Markham Sherwood Re:  Notice and Administration of Settlement, ¶ 9.  9,020,154 eligible vehicles multiplied by the $111.50 average BOS installation cost yields $1,005,747,171.  The $250 million fund is 25% of this number.

[38] Berman Decl., ¶ 92.

[39] Declaration of Michael Bonne Regarding the Retail Cost of Installing a Brake Override on Subject Vehicles, ¶ 10.

- 9 -

Support Program, and Plaintiffs' expert estimates the aggregate value to the Class of the Customer Support Program to be $475,000,000.[40]

Further, the $30 million Automobile Safety and Education Research Fund will benefit all Class Members. All Class Members are interested in safer vehicles, and this component of the Settlement will fund surveys, studies, and communications efforts crafted to enhance auto safety with a particular focus on unintended acceleration issues invoked by the litigation.[41]

The value of the Settlement is also increased by the efforts that Plaintiffs' Class Counsel have taken to reach Class Members, encourage them to file claims, and to maximize the payout of the two settlement funds. The Settlement has been communicated to the Class through a robust and intensive direct mail and national media Notice Plan coordinated by media experts, including the mailing of Short Form Notices to over 22 million Toyota consumers. The Settlement terms also ensure that Class Members will be able to claim their benefits easily. In order to take advantage of the Customer Support Program, if needed, and the BOS installations, if eligible, Class Members need only take their Subject Vehicles to a Toyota Dealer. Eligible Class Members will receive cash payments from the Alleged Diminished Value and Cash-in-Lieu-of-BOS Funds after completing a simple, consumer-friendly Claim Form that can be submitted online. And mechanisms are in place to ensure

---

[40] Declaration of Kirk D. Kleckner Regarding Valuation of Customer Support Program ("Kleckner Decl."), ¶¶ 8-11.

[41] Other benefits of the Settlement include Toyota's agreement to pay the costs of notice and administration, subject to potential reimbursement from unclaimed settlement funds; Toyota's agreement to separately pay $200 million in attorneys' fees and $27 million in costs; and Toyota's agreement to pay any Plaintiff and Class Representative awards of up to $100 per hour per Plaintiff and Class Representative for their time devoted to the case, subject to a $2,000 minimum.

that excess monies in one Settlement Fund are used to (i) step-up payouts to consumers, and then (ii) spillover to satisfy the claims of the other Settlement Fund if needed, and (iii) provide additional funding for safety research and education.

The results achieved strongly support the requested award.

## B.     The Substantial Risks and Complexity of the Litigation Support the Requested Award

The risk that further litigation might result in Plaintiffs not recovering at all is an important factor in determining a fair fee award.[42]  Although Plaintiffs believe that their claims have merit, Plaintiffs' Class Counsel acknowledge the significant risks and expense necessary to prosecute Plaintiffs' claims through trial and subsequent appeals, as well as the inherent difficulties and delays complex litigation like this entails.

This case has been fraught with risk and remained so as trial approached, and the Settlement was achieved in the face of incredible odds.  To begin with, NASA and NHTSA concluded they could not find a defect in the electronic throttle control system in the vehicles they tested, and Toyota said Plaintiffs could never prove one because Toyota believes that no such defect exists.  Many Plaintiffs' lawyers believed that the case was just too risky.  As the gauntlet of dismissal motions demonstrate, Plaintiffs have had to navigate a thicket of difficult legal issues, including preemption, arbitration, choice of law, and whether relevant state law precludes recovery in instances where the alleged defect has not manifested in a

---

[42] *See*, *e.g.*, *Omnivision*, 559 F. Supp. 2d at 1047; *WPPSS*, 19 F.3d at 1299-1301; *see also In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13627, at *44 (C.D. Cal. June 10, 2005) ("[t]he risks assumed by Class Counsel, particularly the risk of non-payment or reimbursement of expenses, is a factor in determining counsel's proper fee award").

- 11 -

vehicle malfunction.  Notwithstanding these challenges, Class Members will receive the benefits of a Settlement valued at over **$1.63 billion** if approval is granted.

Many of the remaining risks are discussed in Plaintiffs' briefing supporting final approval of the Settlement and in the Berman Declaration, and we summarize some of them below:

- *Standing*:  Toyota has appealed the Court's standing ruling, and if the Ninth Circuit rules that no Plaintiff or Class Member has standing to pursue any claim unless the alleged defects actually manifested in UA in their Subject Vehicles, the case will be gutted.  The only Plaintiffs and Class Members with standing to pursue claims will be those who actually experienced a UA, who are but a small fraction of the total number of Subject Vehicle owners.

- *Arbitration*:  If Toyota wins its pending appeal of the Court's order denying arbitration, reversal will kill this litigation, forcing individual consumers to file for arbitration, something that no individual Class Member could afford to do given the enormous costs of marshaling the evidence necessary to prove a claim against Toyota.

- *Preemption*:  The Ninth Circuit or even the Supreme Court could reverse the Court's ruling finding no preemption, thereby derogating any and all forms of injunctive and equitable relief sought by Plaintiffs.  Gone would be the BOS installation and Customer Support Program benefits that Plaintiffs have garnered in the Settlement.

- *Defect*:  While Plaintiffs' software experts raised certain software design and architecture issues, they have not been able to identify a defect that is responsible for the vast array of SUAs reported to Toyota and NHTSA by vehicle owners.  More specifically, Plaintiffs have been unable to reproduce a UA in a Subject Vehicle under driving conditions.

- *Aggregate damages*:  Proving causation and the amount of economic loss on an aggregate basis pose significant challenges.

- *Bellwether risks*:  If the bellwether trial were lost, the prospect of Plaintiffs succeeding in the remaining states would be dim.  And even if the bellwether trial resulted in a partial or full verdict in favor of the bellwether classes, Plaintiffs in other states would still have to prove their entitlement to Rule 23 certification, and Toyota would undoubtedly and vigorously contest each and every bellwether class certification motion.

- 12 -

Many of the foregoing risks are animated by the enormous complexity of the case, as the Court can surely appreciate given the magnitude and breadth of issues raised in the substantive, scheduling, and discovery motions filed in the case and the tutorial presentations that the Court viewed.  For example, in light of the Court's decision not to apply California law nationwide, the case rested on an intricate web of state law causes of action and a piecemeal, bellwether approach to class certification and trial.  The very subject matter of the case is complex, involving highly technical, interrelated hardware components and millions of lines of the complex source code.  Many of these issues are highlighted by the droves of technical and economic loss experts retained by the parties and the lengthy reports that the experts prepared.  Further, the case involves a foreign defendant, and a considerable amount of the discovery produced was in Japanese and needed to be translated at great effort and cost.

In sum, it is difficult to imagine a more difficult or risky economic loss class action of nationwide scope.  Despite the foregoing complexities and risk, Plaintiffs' Class Counsel took on this consolidated litigation on a contingent-fee basis and obtained valuable benefits for the Class.  Under these circumstances, the requested fee is fully justified.

## C.    The Contingent Nature of the Fee and Financial Burden Carried by Plaintiffs Support the Requested Award

Attorneys are entitled to a larger fee when their compensation is contingent in nature.[43]  This fee enhancement stems from the "established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a

---

[43] *See Vizcaino*, 290 F.3d at 1048-50.

premium over their normal hourly rates for winning contingency cases."[44]  Indeed, there have been many class actions in which plaintiffs' counsel took on the risk of pursuing claims on a contingency basis, expended thousands of hours, yet received no remuneration whatsoever despite their diligence and expertise.

Plaintiffs' Class Counsel investigated and prosecuted this case intensely for almost three-and-a-half years.  We have devoted considerable time, energy, and resources from the beginning of this case through discovery, motion practice, and class certification motion preparation, until settlement.  From the very beginning, Toyota mounted an aggressive and vigorous defense that lasted the entire course of this litigation.  Indeed, Toyota still vigorously disputes that its vehicles have a defect and that Toyota engaged in any wrongful conduct or violated any law.

The litigation required an all-out effort by Plaintiffs' Class Counsel, and the amount of work done is staggering, as evidenced by the narrative set forth at pages 1 through 38 of the Berman Declaration.  We highlight just some of this work below:

- *Motion practice*:  Plaintiffs' Class Counsel spent countless hours researching and briefing complex legal issues for many rounds of motions to dismiss, motions on choice-of-law issues, the arbitration motion, scheduling motions, and the avalanche of discovery motions.[45]

- *Written discovery*:  Plaintiffs served seven sets of requests for admissions, one set of contention interrogatories, 11 sets of regular interrogatories, and 23 sets of requests for production.[46]  Toyota served four sets of contention interrogatories to 27 Plaintiffs, one general set of regular interrogatories to

---

[44] *WPPSS*, 19 F.3d at 1299; *see also Omnivision*, 559 F. Supp. 2d at 1047 ("[t]he importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee") (citations omitted); *In re Critical Path*, 2002 U.S. Dist. LEXIS 26399, at *29-30 (citing *Class Plaintiffs v. Jaffe & Schlesinger*, 19 F.3d 1306, 1308 (9th Cir. 1994)).

[45] Berman Decl., ¶¶ 11-37, 69-70.

[46] *Id.*, ¶ 45.

- 14 -

1010172-25  602931 V1

all Plaintiffs, one set of regular interrogatories to 81 specific Plaintiffs, three sets of requests for production, and one set of requests for admissions.[47]   Approximately 339 third-parties were served with subpoenas.[48]

- *Document discovery*:  Documents were produced by the Toyota defendants and several third parties, including, but not limited to, NHTSA, Denso (a part supplier partially owned by Toyota), the Toyota North American Quality Advisory Panel, Exponent, and over 250 Toyota dealerships. Toyota documents alone were produced from over 500 custodial and non-custodial sources.[49]  We implemented a comprehensive search and coding system to review and organize these documents by issue.  More than 2.3 million documents were produced and searched for relevance by attorney reviewers.[50]

- *ESI discovery*:  Toyota produced hundreds-of-thousands of records from structured databases, including customer complaints and warranty records relating to unintended acceleration and used by Plaintiffs' statistical and technical experts.[51]  Toyota also produced the software source code for certain engine control units, which was reviewed by Plaintiffs' experts.[52]

- *Expert discovery*:  The parties engaged in extensive discovery of expert witnesses, designating 43 primary and rebuttal experts.  Plaintiffs' Class Counsel designated 23 experts, who each produced at least one expert report and, in some instances, multiple reports.  Toyota disclosed 20 experts, most of whom produced expert reports.  Many of these witnesses were experts in highly complex and technical subject matters such as software and electrical engineering.[53]  Plaintiffs' Class Counsel spent considerable time consulting with the technical and economic experts.

- *Depositions*:  218 depositions were taken in this litigation.  The deponents, some of whom were deposed more than once, included Plaintiffs (38), Toyota witnesses (86), third-party witnesses (4), absent class members who had "other similar incidents," referred to as "OSIs" (28), and experts (35).[54]

---

[47] *Id.*, ¶ 46.

[48] *Id.*, ¶ 47.

[49] *Id.*, ¶ 48.  Obtaining discovery from Toyota was difficult, necessitating a blizzard of meet-and-confers and motions to compel.  *See id.*, ¶¶ 49-50, 69-70.

[50] *Id.*, ¶ 52.  Many of the documents produced were in Japanese and needed to be translated.  *Id.*, ¶ 53.

[51] *Id.*, ¶ 55.

[52] *Id.*, ¶ 57.

[53] *Id.*, ¶¶ 59-66.

[54] *Id.*, ¶¶ 63-64.

- 15 -

- *Tutorial*:  In order to assist the Court with technical issues, the parties submitted extensive briefing regarding the proper scope, content, format, and timing of a technical tutorial, which was held on December 9, 2011.[55]

- *Bellwether class certification*:  In the wake of the Court's order denying application of California law to the putative nationwide class, the parties extensively briefed their competing proposals for the selection of bellwether cases.  Bellwether class certification motions were due September 14, 2012 (later extended for a short period as settlement talks completed), and we had prepared comprehensive drafts of all papers in support of bellwether class certification at the time the Settlement was reached.  This project alone consumed many months and resulted in the substantial completion of the Motion for Class Certification, a supporting Memorandum, Trial Plan and Offer of Proof, Evidentiary Appendix, and supporting declarations.[56]

Additionally, since the Settlement has been preliminarily approved, Plaintiffs' Class Counsel have devoted considerable time investigating, promoting, and monitoring notice activities and preparing for final approval proceedings.

Throughout this entire process, Plaintiffs' Class Counsel received no compensation during the course of this litigation and invested more than $69,706,936 in lodestar and incurred litigation expenses of $30,606,117 to prepare for class certification and trial and obtain the Settlements for the benefit of the Class.  In Professor Fitzpatrick's survey of 688 class action settlements over a two year period, in only one did class counsel advance more expenses than Plaintiffs' Class Counsel have done here.[57]  In addition to advancing costs, lawyers working on the case have forgone the business opportunity to devote time to other cases.[58]  Any fee award has always been at risk and completely contingent on the result achieved and on this Court's discretion in awarding fees and expenses.  The percentage fee and expense

---

[55] *Id.*, ¶¶ 71-72.
[56] *Id.*, ¶¶ 73-77.
[57] Fitzpatrick Decl., ¶ 17.
[58] *See Vizcaino*, 290 F.3d at 1050.

- 16 -

award requested is reasonable in light of the contingent nature of the fee and the financial burden carried by counsel over the last three-and-a-half years.

Plaintiffs' Class Counsel's fee request is also reasonable in light of the future work and expenses that they will incur under the Settlement, which is not included in the current lodestar.  This includes all pre- and post-approval work such as overseeing claims administration, communications with Class Members, disputes over claims, appeals, and any other issues that may arise under the Settlement.  This future work is substantial, will last many months or more, and underscores the reasonable and fair nature of the fee request.

**D.      The Skill Required and Quality of Work Performed by Counsel Support the Requested Award**

Courts recognize that the "prosecution and management of a complex national class action requires unique legal skills and abilities."[59]  The reputation, experience and skill of Plaintiffs' Class Counsel were essential to the success in this litigation.[60]  Plaintiffs' Class Counsel are among the most experienced and skilled practitioners in national class actions and have a long and successful track record in such cases.  From the outset, we engaged in a concerted effort to obtain the maximum recovery for the Class.  Plaintiffs' Class Counsel's investigation and skillful work enabled them to plead detailed allegations and defend these allegations against a series of dismissal motions.  Plaintiffs' Class Counsel organized, led, and pursued the massive discovery effort required to support liability and the impending class certification motion, and spent countless hours working with experts on very complex issues.

---

[59] *Knight v. Red Door Salons, Inc.*, 2009 U.S. Dist. LEXIS 11149, at *16 (N.D. Cal. Feb. 2, 2009) (citation omitted); *Heritage Bond*, 2005 U.S. Dist. LEXIS 13627, at *39; *see also Vizcaino*, 290 F.3d at 1048.

[60] *See In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 304 (3d Cir. 2005).

- 17 -

1   Had the parties not reached a settlement, they would have continued to debate

2   complex legal questions before this Court and the Ninth Circuit.  At no time has

3   Toyota ever conceded liability, the appropriateness of certification other than for

4   settlement purposes, or the existence of damages.  Given the significant risks and

5   uncertainty associated with this complex class action, it is a testament to Plaintiffs'

6   Class Counsel's skill, creativity, and determination that they were able to negotiate

7   an excellent Settlement providing substantial economic and non-monetary relief.

8   The quality and vigor of opposing counsel is also important in evaluating the

9   services rendered by Class Counsel.[61]  Toyota was represented by large, respected

10  law firms with tremendous resources that vigorously defended against the class-wide

11  claims asserted by Plaintiffs.  That Plaintiffs' Class Counsel achieved the Settlement

12  for the Class in the face of formidable legal opposition further evidences the quality

13  of their work.

14  **E.     The Length the Case has Transpired Supports the Requested Award**

15  This case has been litigated for longer than the typical class action at the time

16  settlement was reached.  This case began in November of 2009 when the first of

17  several consolidated actions was filed.[62]  It is now three and one-half years later.

18  The average and median times in which settlements were reached in consumer class

19  actions were under three years, and the average and median times to reach settlement

---

[61] *See, e.g.*, *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977).

[62] *See Choie, et al., v. Toyota Motor Corp., et al.*, Cause No. 2:09-cv-08143-JVS-FMO (C.D. Cal. Nov. 5, 2009), Dkt. No. 1.

- 18 -

1    in all cases were slightly over three years.  This factor counsels in favor of meeting

2    or exceeding the 25 percent benchmark.[63]

3    **F.    Awards Made in Similar Cases Support the Requested Award**

4           As noted above, the Ninth Circuit has repeatedly held that 25% of the

5    settlement value is the appropriate fee benchmark.[64]  Professor Brian Fitzpatrick

6    conducted the most complete empirical study yet done into attorneys' fee awards in

7    class action cases and found that, in 2006 and 2007, the most common fee

8    percentages awarded by all federal courts were 25%, 30%, and 33%.  Nearly two-

9    thirds of the awards were between 25% and 35%, with a mean award of 25.4% and a

10   median award of 25%.  The metrics for 111 settlements in the Ninth Circuit where

11   the percentage-of-the-fund method was used were quite similar:  the most common

12   percentages were also 25%, 30%, and 33%, with the vast majority of awards also

13   between 25% and 35%, and a mean of 23.9% and median of 25%.[65]  And the Ninth

14   Circuit has rejected the notion that fee percentages should decline as settlement sizes

15   increase.[66]  Indeed, there have been many class settlements throughout the country

---

[63] Fitzpatrick Decl., ¶ 15.

[64] *Powers*, 229 F.3d at 1256; *Hanlon*, 150 F.3d at 1029; *In re Petroleum Prods. Antitrust Litig.*, 109 F.3d at 607; *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d at 1376; *see also Adderley v. NFL Players Ass'n*, 2009 U.S. Dist. LEXIS 115742, at *7; *Briggs*, 2010 U.S. Dist. LEXIS 50990, at *26.

[65] Fitzpatrick Decl., ¶ 20; *see also Vizcaino*, 290 F.3d at 1051-52 (including table of percentage-based attorneys' fee awards in common fund cases of $50-200 million from 1996 through 2001); *Omnivision*, 559 F. Supp. 2d at 1047 (28% fee award); *Knight v. Red Door Salons, Inc.*, 2009 U.S. Dist. LEXIS 11149, at *15 (30% fee award); *In re Pacific Enters. Sec. Litig.*, 47 F.3d at 379 (33% fee award); *Mark v. Valley Ins. Co.*, 2004 U.S. Dist. LEXIS 20602, at *3-6 (D. Or. Oct. 6, 2004) (30% fee award).

[66] *Vizcaino*, 290 F.3d at 1047; *see also* Fitzpatrick Decl., ¶¶ 21-24.

- 19 -

1    where settlement values were hundreds-of-millions of dollars or more and where the

2    courts awarded fees *above* 25 percent of the common fund.[67]

3         Whether viewed as 12.3 percent of the total value of the $1,632,000,000

4    Settlement or 26.4 percent of just the cash component, the fees requested here fall

5    comfortably within the foregoing ranges.

6

7    **G.    Percentages in Standard Contingency-Fee Agreements in Similar Individual Cases Support the Requested Award**

8         Standard contingency-fee percentages in individual litigation are at least 33

9    percent.[68]  Whether considered as 26.4% of the cash funds or approximately 12.3

10   percent of the total value of all Settlement benefits, the award requested here is much

11   lower.

12

13

14

15

16

_____

17   [67] *See, e.g., See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7-8 (N.D. Cal. Apr. 3, 2013) (28.5% award from the $571 million in round-two settlements); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) (31.33% of $1.075 billion); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) (30% of $410 million); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (34% of $365 million); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (30% of $202 million); *In re Apollo Group Inc. Secs. Litig.*, 2012 WL 1378677, at *9 (D. Ariz. April 20, 2012) (33% of $145 million); *In re Combustion Inc.*, 968 F. Supp. 1116, 1142 (W.D. La. 1997) (36% of $127 million); *Kurzweil v. Philip Morris Cos.*, 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% of $123 million); *In re Ikon Office Solutions, Inc. Secs. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (30% of $111 million); *see also* Fitzpatrick Decl., ¶ 24.

[68] *See, e.g.,* Fitzpatrick Decl., ¶ 25; Lester Brickman, *ABA Regulation of Contingency Fees:  Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996) (noting that "standard contingency fees" are "usually thirty-three percent to forty percent of gross recoveries" (emphasis omitted)); Herbert M. Kritzer, *The Wages of Risk:  The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 286 (1998) (reporting the results of a survey of Wisconsin lawyers, which found that "[o]f the cases with a [fee calculated as a] fixed percentage [of the recovery], a contingency fee of 33% was by far the most common, accounting for 92% of those cases").

**H.     The Non-Monetary Benefits Obtained Support the Requested Award**

The injunctive relief obtained, if any, should be considered in determining what percentage of the fund is reasonable as fees.[69]  Indeed, if the fee percentage is not favorably adjusted to reflect non-cash relief, the incentive to class lawyers to pursue non-cash relief is diminished.[70]  Again, the non-monetary benefits gained in the Settlement are substantial, include an important vehicle safety enhancement, and can be reasonably valued at $875 million.  This factor strongly supports the fee requested.

**I.     The Reaction of the Class Supports the Requested Fee**

Over 22.6 million notices were mailed to Class Members.  Objections and requests for exclusion are not due until May 13, 2013, but Gilardi advises that only 45 purported objections and 1,085 purported requests for exclusion have been received.

**J.     The Lodestar Cross-Check Confirms the Requested Fee's Reasonableness**

Although courts in this Circuit typically apply the percentage approach to determine attorneys' fees in common fund cases, courts may use a lodestar analysis "as a cross-check on the percentage method."[71]  In *Vizcaino*, the Ninth Circuit noted that:

> "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases….  This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases…."  In common fund cases,

---

[69] *Staton*, 327 F.3d at 946.

[70] Fitzpatrick Decl., ¶ 19.

[71] *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1302 (W.D. Wash. 2001); *WPPSS*, 19 F.3d at 1296-98.

1        "attorneys whose compensation depends on their winning
     the case [] must make up in compensation in the cases they
2        win for the lack of compensation in the cases they lose."[72]

3   In *Vizcaino*, the Ninth Circuit affirmed a fee awarded in this district that equaled

4   28% of the settlement fund and a lodestar multiplier of 3.65.  Indeed, "[m]ultipliers

5   in the 3-4 range are common in lodestar awards for lengthy and complex class action

6   litigation."[73]

7        Here, such a "cross-check" confirms that the requested fee amount is

8   reasonable.  In support of the lodestar determination, Plaintiffs' Class Counsel

9   submit the declarations of Plaintiffs' counsel attesting to their total hours, hourly

10  rates, experience, and efforts to prosecute this action.[74]  Plaintiffs' attorneys' lodestar

11  is $69,706,936 and its litigation expenses are $30,606,117, for a total investment of

12  $100,313,053.[75]  Dividing just the lodestar into the $200 million requested fee award

13  yields a multiplier of only 2.87.  This is at the low to median end of the range of

14  multipliers that courts regularly approve as fair and reasonable.[76]

---

[72] 290 F.3d at 1051 (quoting *WPPSS*, 19 F.3d at 1300).

[73] *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) (finding multipliers of 4.5-8.5 within the reasonable range).

[74] *See* Appendix A; Berman Decl., ¶¶ 129-35.

[75] The total lodestar is unaudited, yet the attorney declarations for the most part establish that the fees and expenses reported conform to the Court's Order Re Time and Expense Reporting for Plaintiffs' Counsel (Dkt. No. 483) (the "Fee Order"). There, the Court set forth monthly reporting obligations and directed that "[o]nly time spent on matters common to all claimants in MDL 2151 ("Common Benefit Time") will be considered in determining fees," and that "[i]n general, time will not qualify as Common Benefit Time unless it relates to tasks that have been assigned by Co-Lead Counsel."  *Id.* at 4.  Some firms did not submit monthly reporting but consulted with Plaintiffs' Class Counsel and/or completed work assigned by Plaintiffs' Class Counsel, and we believe that these firms should participate in any fee award.  Berman Decl., ¶ 135.

[76] *See, e.g.*, *Vizcaino*, 290 F.3d at 1051-52 (affirming fee award where the lodestar multiplier was 3.65 and including table of common multipliers); *Steiner v. American Broad. Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (affirming fee award where the lodestar multiplier was 3.65); *Kakani v. Oracle Corp.*, 2007 U.S. Dist.

- 22 -

Plaintiffs' Class Counsel's hourly rates, which range from $150 to $950, are also reasonable. When determining a reasonable hourly rate, the forum in which the district court sits is the relevant community.[77] The rates prevailing in this district for "similar services by lawyers of reasonably comparable skill, experience, and reputation" thus furnish the proper measure of the reasonableness of the rates billed.[78] Courts often apply each attorney's current rates for all hours of work regardless when performed as a means of compensating for delays in payment,[79] although historical rates are being reported by Plaintiffs' Class Counsel here.

The Ninth Circuit recently discussed the range of rates charged by attorneys involved in federal civil litigation in California:

> At one firm, for example, a partner with twenty-three years' experience charged $700 per hour, an associate with five years' experience charged $325 per hour, and paralegals charged up to $190 per hour. At another firm, partners billed an hourly rate of up to $875, and associates billed an average hourly rate of $403. At yet another firm – a disability rights advocacy firm – the co-director of litigation, a 1961 law school graduate, charged $745 per hour, while a staff attorney, a 2003 law school graduate, charged $425 per hour.[80]

---

LEXIS 95496, at *11 (summarizing *Vizcaino* table to conclude that a 1.0 to 4.0 multiplier is "typically awarded in common-fund cases"); *In re Critical Path, Inc. Secs. Litig.*, 2002 U.S. Dist. LEXIS 26399, at *32-33 (3.2–3.7 multiplier in a case that settled quickly and at "the low end of reasonableness," criticisms that do not apply here); *see also* Fitzpatrick Decl., ¶¶ 25-26.

[77] *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).

[78] *Blum v. Stenson*, 465 U.S. at 896 n.11; *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 583 (9th Cir. 2010).

[79] *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 716 (1987); *WPPSS*, 19 F.3d at 1305; *Velez v. Roche*, 2004 U.S. Dist. LEXIS 29848, at *13-14 (N.D. Cal. Sept. 22, 2004) (citing *Bouman v. Block*, 940 F.2d 1211, 1235 (9th Cir. 1991)).

[80] *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (discussing community-rate declaration submitted to district court).

- 23 -

The court affirmed the district court's attorney-fee award derived from a lodestar based on hourly rates as high as $740.[81]  Similarly, in a recent decision from northern California, Judge Wilken awarded fees based on hourly rates of up to $700 for experienced attorneys, plus $160 for paralegals.[82]

Plaintiffs' Class Counsel's experience, reputation and ability justify the hourly rates charged and are comparable to rates for similar services by lawyers of reasonably comparable skill, experience, and reputation in this legal community.

## K.  Negotiated Attorneys' Fee Agreements Are Favored in Class Action Settlements

Federal courts at all levels encourage litigants to resolve fee issues by agreement whenever possible.  "A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."[83] In affirming the award of a negotiated fee, the Second Circuit has observed:

> [W]here . . . the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged.  It is difficult to see how this

---

[81] *Id.* at 449-50.

[82] *Campbell v. AMTRAK*, 718 F. Supp. 2d 1093, 1100, 1102-03 (N.D. Cal. 2010).

[83] *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); s*ee also In re M.D.C. Holdings Sec. Litig.*, 1990 U.S. Dist. LEXIS 15488, at *12 (S.D. Cal. Aug. 30, 1990) ("[b]ecause this Court believes the parties should be encouraged to settle all their disputes as part of the settlement . . . including the amount of the fee . . . if the agreed-to fee falls within a range of reasonableness, it should be approved as part of the negotiated settlement"); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 829 (D. Mass. 1987) ("Whether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees, ideally the parties will settle the amount of the fee between themselves."); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

- 24 -

could be left entirely to the court for determination after the settlement.[84]

The virtue of a fee negotiated by the parties at arm's-length is that it is, in effect, a market-set price.  Defendants have an interest in minimizing the fee; plaintiffs have an interest in maximizing it; and the negotiations are informed by the parties' knowledge of the work done and result achieved, and their views on what the court might award if the matter were litigated.  In *In re Cont'l Ill. Secs. Litig.*, Judge Posner endorsed a market-based approach to evaluating fee requests.  "[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."[85]  Judge Posner also explained that "[t]he object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible."[86]

Here, such a negotiation was feasible, and was conducted.  Toyota has agreed to a separate payment of up to $200 million in fees and $27 million in costs, and, if any lesser amount is awarded, to pay the difference to the Automobile Safety Research and Education Fund.[87]  Further, an experienced mediator oversaw the negotiations and the final terms of the Settlement, further demonstrating the reasonableness of Plaintiffs' request.

---

[84] *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985); *see also Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) (affirming award of fees and expenses, where defendant has agreed not to oppose request for fees and expenses up to negotiated ceiling, which was paid separately from class settlement benefits).

[85] *In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992).

[86] *Id.* at 572.

[87] Agreement at 32-33.

- 25 -

## V.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND NECESSARILY INCURRED TO BENEFIT THE CLASS

Toyota has agreed to pay litigation expenses of $27 million.  In addition to being entitled to reasonable attorney fees, it is well-settled that "an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund."[88]

The litigation expenses incurred in this litigation in the amount of $30,606,117 are described in the accompanying Berman and Seltzer Declarations[89] and the declarations of counsel found in Appendix A.  They are the type of expenses contemplated by the Court's Fee Order[90] and typically billed by attorneys to paying clients in the marketplace and include such costs as fees paid or incurred to experts, computerized research and other services, court filing and service costs, deposition and court reporter costs, costs associated with the document depository, printing, copying, shipping costs, and travel costs.  These expenses were reasonable and necessary to prosecute this litigation, and Plaintiffs' Counsel advanced these expenses without assurance that they would be recouped.

## VI.   AN AWARD OF COMPENSATION TO THE NAMED PLAINTIFFS AND CLASS REPRESENTATIVES IS APPROPRIATE

Toyota has agreed to separately pay compensation of up to $100 per hour per Named Plaintiff and per Class Representative for their time devoted to prosecuting

[88] *See, e.g.*, *Alberto v. GMRI, Inc.*, 2008 U.S. Dist. LEXIS 91691, at *35 (E.D. Cal. Nov. 12, 2008); *Omnivision*, 559 F. Supp. 2d at 1048 ("[a]ttorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters") (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)); *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *75 (C.D. Cal. June 10, 2005).

[89] *See* Berman Decl., ¶¶ 129-35; Declaration of Marc M. Seltzer Decl. in Support of Award of Attorneys' Fees and Costs, ¶¶ 34-36 & Ex. C.

[90] *See* Dkt. No. 483.

- 26 -

their claims on behalf of the Class, with a minimum $2,000 award.[91]  Payment of this compensation is tied to the actual hours each Plaintiff and Class Representative worked on the litigation, and each Plaintiff and Class Representative was not required to approve the Settlement in order to receive the compensation.[92]  Appendix B contains declarations from all claiming Named Plaintiffs and Class Representatives setting forth the work conducted and the compensation requested. Notice to the Class advised Class Members that approval of such compensation would be sought.

Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.[93]  In some cases, the awards have been substantial.[94]

---

[91] Agreement at 34.

[92] Berman Decl., ¶ 136.  The incentive awards in this case are, thus, unlike those recently struck down by the Ninth Circuit in *Radcliffe v. Experian Information Solutions, Inc.*, No 11-56376, slip. op. (9th Cir. Apr. 22, 2013).  The *Experian* Court observed that it had approved incentive awards to class representatives in other cases, but found that the proposed incentive awards at issue in the *Experian* settlement were:  (i) "conditioned on the class representatives' support for the settlement"; and (ii) were in a fixed amount of $5,000 that "significantly exceeded . . . what absent class members could expect to get under the settlement."  *Id.* at 9. Unlike in *Experian*, the incentive awards in this case were not conditioned upon supporting the settlement; the total value of the Settlement here and the amounts potentially payable to Class Members dwarfs the corresponding amounts in *Experian*; and the payment of any incentive award above $2,000 is linked to the actual time and effort expended by the Class Representatives on behalf of the Class in this case.

[93] *See Staton*, 327 F.3d at 977 (holding that "… named plaintiffs … are eligible for reasonable incentive payments.  The district court must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions,… the amount of time and effort the plaintiff expended in pursuing the litigation … and reasonabl[e] fear[s of] workplace retaliation.'"); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 490 (E.D. Cal. 2010) ("Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002); *see also In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272-73 (S.D.

- 27 -

1    The Named Plaintiffs and Class Representatives here actively and effectively

2    fulfilled their obligations as plaintiffs and proposed representatives for the Class.

3    They were integral in helping Plaintiffs' Class Counsel analyze the claims and the

4    evidence.  The Plaintiffs met with counsel, responded to interrogatories, searched for

5    and produced documents to forward the litigation, requested and received reports

6    from their counsel, monitored the status of the case, and some prepared for and

7    attended their depositions.  The Settlement would not exist without the efforts of

8    these Plaintiffs.[95]

9

10   ## VII.   CONCLUSION

11   From the beginning of this litigation, Plaintiffs and their attorneys have faced

12   determined adversaries represented by experienced counsel.  With no assurance of

13   success, Plaintiffs and Plaintiffs' Class Counsel pursued this litigation and obtained a

14   Settlement valued at more than $1.63 billion.  The Settlement reflects Plaintiffs'

15   Class Counsel's efforts in the face of significant risk.  Accordingly, we respectfully

16   submit that the Court should approve the fee application and award Plaintiffs' Class

17

18

19   Ohio 1997) (collecting cases in which awards to named representatives were approved).

20   [94] *See, e.g., Singer v. Becton Dickinson & Co.*, 2010 U.S. Dist. LEXIS 53416, at *18-19 (S.D. Cal. June 1, 2010) ($25,000 awarded to named plaintiff based on plaintiff's efforts and excellent litigation results); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving service awards of $300,000 to each named plaintiff for the services they provided to the class by responding to discovery, participating in the mediation process, and taking the risk of stepping forward on behalf of the class); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. at 299 (approving $ 50,000 participation award to plaintiffs); *In re Revco Sec. Litig.*, 1992 U.S. Dist. LEXIS 7852, at *21-23 (N.D. Ohio May 5, 1992) (awarding $200,000 to a named plaintiff); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 203-04 (S.D.N.Y. 1997) (awarding $85,000 to a named plaintiff); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding $55,000 each to two named plaintiffs); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) (awarding $50,000 to the class representative).

[95] Berman Decl., ¶ 137.

- 28 -

Counsel $200,000,000 in fees and $27,000,000 in litigation expenses and provide the requested awards for the Named Plaintiffs and Class Representatives.  A proposed order is submitted herewith.

DATED:  April 23, 2013

HAGENS BERMAN SOBOL SHAPIRO LLP


By:   /s/ Steve W. Berman
      Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com


By:   /s/ Marc M. Seltzer
      Marc M. Seltzer, Bar No. 054534
SUSMAN GODREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150
E-mail:  mseltzer@susmangodfrey.com

*Co-Lead Counsel for Economic Loss Plaintiffs*

By:   /s/ Frank M. Pitre
      Frank M. Pitre, Bar No. 100077
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577
E-mail:  fpitre@cpmlegal.com

*Lead Counsel for Non-Consumer Economic Loss Plaintiffs*

- 29 -

1010172-25  602931 V1

1

## **PROOF OF SERVICE**

2

        I hereby certify that a true copy of the above document was served upon the

3

attorney of record for each other party through the Court's electronic filing service

4

on April 23, 2013.

5

6

                                                  /s/ Steve W. Berman
                                                  Steve W. Berman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      - 30 -