BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504
Email:  b.barnow@barnowlaw.com

RICHARD L. COFFMAN
THE COFFMAN LAW FIRM
The First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email:  rcoffman@coffmanlawfirm.com

*Attorneys for Objectors Angela C. Boles, Wayne Harris, and Julie Rainwater*

*(additional counsel listed on signature page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br>TOYOTA MOTOR CORP.<br>UNINTENDED ACCELERATION<br>MARKETING, SALES PRACTICES,<br>AND PRODUCTS LIABILITY<br>LITIGATION<br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ECONOMIC LOSS CASES | Case No. 08:10-ML-2151-JVS-FMO<br><br>The Honorable James V. Selna<br><br><br><br>**OBJECTION OF ANGELA C. BOLES, WAYNE HARRIS, AND JULIE RAINWATER TO THE SETTLEMENT AGREEMENT AND NOTICE OF INTENT TO APPEAR AT THE FAIRNESS HEARING** |

Settlement Class Members Angela C. Boles, Wayne Harris, and Julie Rainwater (collectively, "Objectors"), by and through counsel, file this Objection to the proposed settlement in the December 26, 2012 Settlement Agreement [D.E. #3342-1] ("Settlement") and Notice of Intent to Appear at the Fairness Hearing, and respectfully state as follows:

## I.    Introduction

At its inception, this case revolved around defective floor mats. To this day, the issue of defective floor mats has gone unresolved. Instead, other issues have been raised and pursued. Co-Lead Class Counsel recently admitted that "'[w]e have not resolved the issue of is there a bug' in the system." Mike Ramsey, *Toyota in $1.1 Billion Gas-Pedal Settlement*, WALL ST. J. Dec. 27, 2012, at A1 (Exhibit 1). And, regarding the proposed Settlement itself:

> Although Toyota is steadfast that there were no other problems than those that were covered by recalls, the settlement includes extended warranties on vehicles' engine-control modules, cruise-control switches, accelerator pedal assemblies, stop-lamp switches and throttle body assemblies. Toyota maintains there are no problems with these parts.

*Id.*

Since the beginning of this litigation, Toyota has trumpeted the floor mats it directed consumers to immediately remove from their vehicles as a cause of the unintended acceleration in Toyota vehicles. Yet, consumers who paid $100 or more for the floor mats—whether as an extra charge or as a part of the base price of the vehicle—receive nothing for the admittedly defective product as part of the proposed Settlement. Toyota should be required to compensate consumers for the defective floor mats and related damages.

Accordingly, Objectors respectfully object to the Settlement for the following three reasons:

1) the Settlement fails to compensate Settlement Class Members for defective floor mats and related damages;

2) the proposed Automobile Safety and Education Program (Settlement Agreement, ¶ II.A.6, Ex. 15) is an improper initial *cy pres* fund that diverts Settlement funds away from Settlement Class Members; and

3) any funds remaining in the Alleged Diminished Value Fund (Settlement Agreement, ¶ II.A.2) and/or Cash-In-Lieu-of-BOS Fund (Settlement Agreement, ¶ II.A.4) at the close of the Settlement should be distributed to identifiable Settlement Class Members rather than contributed to the proposed Automobile Safety and Education Program as additional *cy pres* funds.

These are not minor objections. Consumers who have incurred damages because of defective floor mats and/or the unintended acceleration of Toyota vehicles should recover as much of their losses as possible in an effort to make them whole. Redistributing current and future funds earmarked for the Automobile Safety and Education Program *cy pres* fund, as set forth below, will accomplish this objective.

## II.    Requirements for Objecting to the Settlement

Under the Court's requirements for objecting to the Settlement set forth in its Preliminary Approval Order [D.E. #3345 at ¶14], Objectors provide the following information in addition to the arguments and legal authority set forth in detail below:

| Name, Address, Telephone Number of Objectors | Make, Model Year, and VIN Number of Objectors' Vehicles | Whether Objectors Intend to Appear at the Fairness Hearing | List of Vehicles to which Objection applies | Proof of Purchase, Ownership, or Lessee Status |
|---|---|---|---|---|
| Angela C. Boles, 4472 Mary Ingles Highway, Cold Spring, KY 41076, (859) 431-5927 | 2010 Toyota Camry, 4T1BK3EK3AU108097 | Appearance will be made through counsel | 2010 Toyota Camry | A copy of Objector Boles' Certificate of Title is attached as Exhibit 2 |
| Wayne Harris, 260 Silverlode Dr., Aspen, CO 81611, (970) 925-7646 | 2005 Toyota Tacoma, VIN number unavailable | Appearance will be made through counsel | 2005 Toyota Tacoma | Objector Harris sold his 2005 Toyota Tacoma on June 29, 2010 |
| Julie Rainwater, 43 Matt Abbott Dr., North Little Rock, AR 72120, (501) 951-5323 | 2008 Toyota Tundra, 5TFDV54108X070376 | Appearance will be made through counsel | 2008 Toyota Tundra | Objector Rainwater owns the vehicle, but proof of purchase is not readily available |

## III.      Statement of Relevant Facts

On November 2, 2009, Toyota announced a voluntary safety recall campaign related to floor mats in certain models of its automobiles. *See Toyota Begins Interim Notification to Owners Regarding Future Voluntary Safety Recall Related to Floor Mats* (Nov. 2, 2009) (Exhibit 3). The recall was announced because the driver's side floor mat could interfere with the accelerator pedal and cause it to get stuck in the wide-open position, thereby resulting in unintended

acceleration of the vehicle. Until it could develop a remedy, Toyota instructed owners of affected Toyota and Lexus vehicles to "take out any removable driver's floor mat and NOT replace it with any other floor mat." *Id.* (emphasis in original).

Consistent with its announcement, and pursuant to the National Traffic and Motor Vehicle Safety Act, Toyota sent letters to its customers (referred to herein as "Interim Notices") advising them to remove all driver's side floor mats of affected vehicles. *See Sample Letter to Floor Mat Owners* (Exhibit 4) ("We request that you take out ***any removable*** driver's floor mat and NOT replace it with any other floor mat until the campaign remedy is ready and implemented on your vehicle.") (emphasis in original). Toyota also confirmed it was "currently developing a campaign remedy," and would notify consumers when it was ready. *Id.*

Toyota subsequently amended the recall campaign to expand the list of included vehicles and model years and announced its plan to "modify or replace the accelerator pedals on the subject vehicles to address the risk of floor mat entrapment." *See Toyota Amends Recall on Potential Floor Mat Interference with Accelerator Pedal* (Jan. 27, 2010) (Exhibit 5). Toyota promised to compensate consumers for the cost of the driver's side floor mats that Toyota instructed them to remove:

> Toyota will replace any Toyota all-weather floor mat in a subject vehicle with a newly designed mat, free of charge. For those customers who have the previous design all-weather floor mat but do not need or want the newly designed all-weather floor mat, Toyota will recover the previous design all-weather floor mat and reimburse its price.

*Id.*

To date, however, (i) Objectors have not, to their knowledge, received the follow-up correspondence from Toyota pertaining to the driver's side floor mat recall campaign promised in their Interim Notices, (ii) Toyota has not reshaped or repaired the accelerator pedal in Objectors' vehicles, and (iii) Toyota has not

replaced the driver's side floor mat in Objectors' vehicles or otherwise compensated them for price of the floor mats. Equally important, the proposed Settlement provides no compensation to Objectors and the other Settlement Class Members for the lost use of their driver's side floor mats, the additional wear and tear on their vehicle carpeting resulting from the direct, extended, and unprotected exposure to water, snow, dirt and grit, and/or the expense to clean the carpeting.

Compensation for these damages was originally sought in complaints filed by various putative class members—including Objectors Harris and Rainwater—prior to consolidation in this MDL proceeding, but were not pursued by Co-Lead Class Counsel. *See, e.g., Harris v. Toyota Motor Sales, U.S.A., Inc.*, Case No. 10-CV-00460 (D. Colo.); *Rainwater v. Toyota Motor Sales, U.S.A., Inc.*, Case No. 4:10-CV-116-WRW (E.D. Ark.).

Rather, the proposed Settlement seeks to establish a $30 million Automobile Safety and Education Program (Settlement Agreement, ¶ II.A.6, Ex. 15)—an initial *cy pres* fund that will be distributed to "university-based automobile/transportation research institutes and an education/information program for automobile drivers." *Id*. These funds will not be used to compensate Settlement Class Members for the floor mats, lost use of the floor mats, and/or carpet cleaning damages; nor will the funds be distributed to Settlement Class Members as additional compensation via the Alleged Diminished Value Fund (Settlement Agreement, ¶ II.A.2) and/or Cash-In-Lieu-of-BOS Fund (Settlement Agreement, ¶ II.A.4).

## IV.   Statement of Reasons for Objecting to the Proposed Settlement

Objectors object to the proposed Settlement because of the following deficiencies, all of which are curable by rejecting the proposed Settlement and amending the Settlement Agreement.

**A.   The proposed Settlement fails to compensate Settlement Class Members for their floor mats, lost use of their floor mats, and/or carpet cleaning expenses and, therefore, should be rejected and amended to compensate Settlement Class Members for these damages.**

It is indisputable that floor mats are at the core of this litigation—the defective driver's side floor mats were an important part of Toyota's recall campaign. Co-Lead Plaintiffs' Counsel acknowledges as much in their Memorandum in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement. *See* D.E. #3556 at 2 (stating the non-monetary benefits of the settlement "will provide an important safety enhancement that is directly related to the risk of floor mat entrapment in over 6.3 million vehicles Toyota recalled for such a risk."). Objectors object to the proposed Settlement because it does not compensate Settlement Class Members for the floor mats, the cost of the floor mats, the loss of use of their floor mats, excessive carpet wear and tear, and/or carpet cleaning expenses resulting from the failure of the intended purpose of the floor mats, Toyota's directive to immediately remove them, and Toyota's subsequent failure to replace the floor mats in a timely manner and/or replace the floor mats at all.

That said, Objectors respectfully suggest that Settlement Class Members be compensated for such damages either by supplementing the proposed Settlement with additional funding and/or using the $30 million currently allocated to the proposed Automobile Safety and Education Program *cy pres* fund (Settlement Agreement, ¶ II.A.6) to create a Floor Mat Compensation Fund—especially because the proposed Automobile Safety and Education Program *cy pres* fund does not comport with governing law and improperly diverts Settlement funds away from Settlement Class Members. *See* Section IV.C, *infra*. Under the Floor Mat Compensation Fund, Settlement Class Members would be compensated for their

floor mats in an amount determined by further negotiations and approved by the Court.[1] A Settlement Class Member could submit his or her claim on a simple claim form, verified under penalty of perjury to the best of his or her belief and knowledge.

Under a Floor Mat Compensation Fund, Settlement Class Members also could and should be compensated for excessive carpet wear and tear and carpet cleaning expenses. The total amount of each Settlement Class Member's claim for these damages could be supported by receipts or other appropriate documentation and a verification, under penalty of perjury to the best of his or her belief and knowledge, that the Settlement Class Member cleaned or had cleaned his or her vehicle's carpets because of removing the driver's side floor mat at Toyota's direction. In the alternative, in the absence of supporting receipts or documentation, a Settlement Class Member could elect to receive an agreed upon payment of such value the Court deems appropriate, which could be submitted with a verification, under penalty of perjury to the best of his or her belief and knowledge and reasonable supporting information, that the Settlement Class Member cleaned his or her carpet because of removing the driver's side floor mat at Toyota's direction, but no longer possess the receipts evidencing such expenses.

**B.    Alternatively, the Settlement Agreement's Release and Waiver should be amended to carve out and exclude all claims for compensation of the price of the floor mats, the purchase of the floor mats, lost use of the floor mats, and/or carpet cleaning expenses.**

While the proposed Settlement does not compensate Settlement Class Members for the price of the floor mats, the purchase of the floor mats, loss of use

---

[1] Current information is that standard Toyota floor mats cost, per set, approximately $125–$300, depending on the make and model of the vehicle, and all weather Toyota floor mats cost approximately $100–$110, again depending on the make and model of the vehicle.

of the floor mats, and/or carpet cleaning expenses, the proposed Settlement, as written, nevertheless releases these claims. *See* Settlement Agreement, ¶ VI. Accordingly, and in the alternative, should the proposed Settlement not be modified to include a Floor Mat Compensation Fund as stated above, the Settlement Agreement should be amended to carve out and exclude all claims for the price of the floor mats, the purchase of the floor mats, lost floor mat use, and/or carpet cleaning expenses, thereby allowing such claims to survive the proposed Settlement.

### C. The proposed Settlement improperly diverts Settlement funds from readily identifiable and reachable Settlement Class Members to *cy pres* recipients.

Objectors object to the proposed Settlement because the intended Automobile Safety and Education Program is an improper initial *cy pres* fund[2] that diverts $30 million of Settlement funds away from Settlement Class Members. Such funds should be distributed directly to Settlement Class Members through a newly-created Floor Mat Compensation Fund (as described above) and/or through one of the other proposed funds created by the Settlement Agreement, rather than directed from the beginning to third parties who have no claims in this litigation. This improper initial *cy pres* should be excised entirely from the proposed Settlement and all funds should be distributed to identifiable Settlement Class Members.

---

[2] The term "*cy pres*" is derived from the Norman French expression *cy pres comme possible,* which means "as near as possible." *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 84 F.3d 451, 455 n.1 (D.C. Cir. 1996). The *cy pres* doctrine originated in trusts-and-estates law as a rule of construction used to preserve testamentary charitable gifts that otherwise would fail. "When it becomes impossible to carry out the charitable gift as the testator intended, the doctrine allows the 'next best' use of the funds to satisfy the testator's intent 'as near as possible.'" *Id.* (quoting Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions,* 38 HASTINGS L.J. 729, 730 (1987)).

1.   **The proposed Settlement provides for the creation of an impermissible initial *cy pres* fund that diverts Settlement funds away from Settlement Class Members.**

In a class action settlement, "[t]he *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) (citation omitted). *Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity. *Id.*

Direct distributions to settlement class members are preferred over *cy pres* distributions. *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013). The private causes of action aggregated in this MDL proceeding—as in other class actions—were initiated to allow plaintiffs to recover compensatory damages for their injuries. *Cy pres* distributions imperfectly serve that purpose by substituting for such direct compensation an indirect benefit that is, at best, attenuated and, at worse, illusory. *Id.* (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784–85 (7th Cir. 2004)). *Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because including a *cy pres* distribution may increase a settlement fund, and with it, attorneys' fees, without increasing the direct benefit to the class. *In re Baby Products Antitrust Litig.*, 708 F.3d at 173. Where a court fears counsel is conflicted, it should subject the settlement to increased scrutiny. *Id.*

That said, *cy pres* is an accepted method of addressing leftover, or residual, funds remaining in a settlement account once all known settlement class members have been made whole. *Cy pres* may be used in class action settlements "where the proof of individual claims would be burdensome or distribution of damages costly." *Dennis v. Kellogg Co.,* 697 F.3d 858, 865 (9th Cir. 2012). Under principles established by the American Law Institute ("ALI"), any leftover funds should first

be distributed to known class members; only when it is not economically viable to do so should a court engage in a *cy pres* program:

> A court may approve a settlement that proposes a *cy pres* remedy even if such a remedy could not be ordered in a contested case. The court must apply the following criteria in determining whether a *cy pres* award is appropriate:
>
> > (a)     If individual class members can be identified through a reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.
> >
> > (b)     lf the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.
> >
> > (c)     If the court finds that individual distributions are not viable based on the criteria set forth in subsections (a) and (b), the settlement may utilize a *cy pres* approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (Am. Law. Inst. 2010); *see also In re Checking Account Overdraft Litig.*, Case No. 1:09-MD-02036-JLK, at 2–3 (S.D. Fla. Apr. 15, 2013) (Exhibit 6). The ALI further clarifies in its comments to § 3.07:

> [A]ssuming that further distributions to the previously identified class
> members would be economically viable, that approach is preferable to
> *cy pres* distributions. This Section rejects the position urged by a few
> commentators that a *cy pres* remedy is preferable to further
> distributions to class members. . . . This Section takes the view that in
> most circumstances, distributions to class members better approximate
> the goals of the substantive laws than distributions to third parties that
> were not directly injured by the defendant's conduct.

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 cmt. b.

A *cy pres* distribution, therefore, should take place only when a court cannot distribute settlement funds to known class members. *See In re Checking Account Overdraft Litig.*, at 3; *Nachshin*, 663 F.3d at 1038 ("In the context of class action settlements, a court may employ the *cy pres* doctrine to 'put the *unclaimed fund* to its next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of the class.'") (emphasis added) (citing *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007) (quoting 2 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 10:17 (4th ed. 2002))).

Similar to the proposed Automobile Safety and Education Program *cy pres* fund in the present Settlement Agreement (¶ II.A.6, Ex. 15), the settlement agreement in *In re Checking Account Overdraft Litigation* skipped over the "distribution to known class members" provided for by the ALI procedures and moved directly to *cy pres* through an "initial *cy pres* program." *In re Checking Account Overdraft Litig.*, at 3. There, the "initial *cy pres* program" set aside 12.5% of the net settlement fund as the estimated amount that would have been paid to the settlement class members who the lawyers estimated were "unidentifiable due to a dearth of adequate banking records." *Id.* at 3–4. While the settlement agreement allowed for the remainder of the fund to be paid to known settlement class members for whom the parties had adequate data, the 12.5% set aside would go directly to the *cy pres* fund. *Id.* at 4.

The court, however, went on to hold that such a settlement provision did not comply with the ALI principles outlined above, requiring unidentifiable class members' shares of settlement funds to be paid to known settlement class members before any *cy pres* program is enacted. *Id*. In fact, the court changed its mind regarding the *cy pres*, noting that an objector correctly argued at the final fairness hearing that "*cy pres* is intended to be a residual program, what you do with the remainder," and that this initial pre-distribution of funds was not *cy pres* at all, because the known class members have not yet been made whole. *Id* (citations omitted).

The court ultimately required the 12.5% set aside to be given to known settlement class members ahead of non-party *cy pres* charities, noting that the 12.5% set aside "was, and is, not a proper *cy pres* program," but instead "a diversion of funds that does not comport with the proper procedure for utilizing a *cy pres* program in the distribution of class action settlement funds as outlined by the ALI." *Id*. at 4–5; *see also Dennis*, 697 F.3d at 865–67 (initial *cy pres* fund comprising $5.5 million of Kellogg food items to be donated to charities feeding the indigent rejected by the court—albeit for reasons other than ALI class settlement fund distribution principles).

Similarly, here, the proposed Automobile Safety and Education Program *cy pres* fund in the Settlement Agreement (¶ II.A.6) is not a proper *cy pres* program, but is instead a diversion of funds away from Settlement Class Members that does not comport with the proper procedure for utilizing a *cy pres* program in distributing class action settlement funds under the ALI principles and governing case law. It is indisputable that Settlement Class Members are readily identifiable by their vehicle VIN numbers and/or Toyota's internal records, and Co-Lead Plaintiffs' Counsel acknowledge that Settlement Class Members will only receive a percentage of their total damages under the Settlement—and will thus not be made whole. It is also indisputable that it would not be burdensome or costly to

distribute additional Settlement funds to known Settlement Class Members with the existing Settlement funds under the current distribution mechanism, as no payments have yet been made.

Thus, the $30 million currently earmarked for the proposed Automobile Safety and Education Program *cy pres* fund, respectfully, should be distributed to Settlement Class Members first—preferably through the creation of a Floor Mat Compensation Fund (as described above).

### 2. The proposed Settlement improperly diverts residual amounts that may remain in the Alleged Diminished Value Fund and Cash-In-Lieu-of-BOS Fund to *cy pres* recipients; these funds should be distributed directly to Settlement Class Members in a further effort to make them whole.

The proposed Settlement provides for the creation of a $250,000,000 Alleged Diminished Value Fund and a $250,000,000 Cash-In-Lieu-of-BOS Fund. Settlement Agreement, ¶¶ II.A.2, A.4. After payments to eligible Settlement Class Members are made under these provisions, "[t]he remaining amounts will be distributed . . . equally to: (i) reimburse the fees and costs paid by Toyota to the Class Action Settlement Administrator, Settlement Notice Administrator, or any other third-party vendor; and (ii) contribute to the Automobile Safety and Education Program described in Section II(A)(6), below. If the administrative and/or notice costs are fully reimbursed, 100% of the further remaining amounts will be applied to contribute to the Automobile Safety and Education Program [*cy pres* fund]." Thus, the possibility exists that tens of millions of dollars or more will remain in one or both of these funds after Class claims and administrative expenses are paid.

Any funds remaining in the Alleged Diminished Value Fund and/or Cash-In-Lieu-of-BOS Fund should be distributed to identifiable Settlement Class Members as additional compensation for their losses in a further effort to make them whole

and/or through the newly created Floor Mat Compensation Fund.

**V.    Notice of Intent to Appear at the Fairness Hearing**

Objectors hereby give notice of their intent to appear at the Fairness Hearing through counsel.

**VI.    Conclusion**

For all of the foregoing reasons, Objectors respectfully request that the Court enter an order:

1)    (a) denying final approval of the proposed Settlement in the form before the Court, (b) recommending the parties amend the Settlement Agreement to create a Floor Mat Compensation Fund (as described above) by supplementing the Settlement with additional funding and/or reallocating the $30 million of Settlement funds initially diverted to the Automobile Safety and Education Program *cy pres* fund, under such terms and in such amounts as the Court deems just and proper, and (c) recommending the parties amend the Settlement Agreement so that any residual funds in the Alleged Diminished Value Fund (Settlement Agreement, ¶ II.A.2) and/or Cash-In-Lieu-of-BOS Fund (Settlement Agreement, ¶ II.A.4) are distributed directly to identifiable Settlement Class Members through these funds and/or the newly created Floor Mat Compensation Fund; or, in the alternative,

2)    (a) denying final approval of the proposed Settlement in the form before the Court, (b) recommending the parties amend the Settlement Agreement so that the $30 million of Settlement funds initially diverted to the Automobile Safety and Education Program *cy pres* fund be distributed directly to Settlement Class Members through the Alleged Diminished Value Fund (Settlement Agreement, ¶ II.A.2) and/or the Cash-In-Lieu-of-BOS Fund (Settlement Agreement, ¶ II.A.4) (and/or through some other mechanism), under such terms and in such amounts as the Court deems just and proper, and (c) recommending the parties amend the Settlement Agreement so that any residual funds in the Alleged

Diminished Value Fund (Settlement Agreement, ¶ II.A.2) and/or Cash-In-Lieu-of-BOS Fund (Settlement Agreement, ¶ II.A.4) are distributed directly to identifiable Settlement Class Members through these funds.

3)    Should the proposed Settlement not be modified to create a Floor Mat Compensation Fund and program (or similar program as described above), Objectors respectfully request that the Court enter an order denying final approval of the proposed Settlement in the form before the Court until such time as the Release and Waiver in the Settlement Agreement (¶ VI) are amended to carve out and exclude (and therefore preserve) all Settlement Class Members' claims for compensation of the price of the floor mats, the purchase of the floor mats, lost use of the floor mats, and/or carpet cleaning expenses.

4)    Objectors request that the Court grant such other and further relief as the Court deems just and proper.

Dated: May 13, 2013        By:  _/s/ Ben Barnow_

BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Telephone:  (312) 621-2000
Facsimile:  (312) 641-5504
Email:  b.barnow@barnowlaw.com

RICHARD L. COFFMAN
THE COFFMAN LAW FIRM
The First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone:  (409) 833-7700
Facsimile:  (866) 835-8250
Email:  rcoffman@coffmanlawfirm.com

THOMAS P. THRASH
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone:  (501) 374-1058
Facsimile:  (501) 374-2222
Email:  tomthrash@sbcglobal.net

DEWITT M. LOVELACE
LOVELACE AND ASSOCIATES, P.A.
12870 US Hwy 98 West
Suite 200
Miramar Beach, FL  32550
Telephone:  (850) 837-6020
Facsimile:  (850) 837-4093
Email:  dml@lovelacelaw.com

JOHN STEWARD
STEWARD LAW FIRM, LLC
1717 Park Avenue
St. Louis, MO 63104
Telephone:  (314) 571-7134
Facsimile:  (314) 594-5950
Email:  glaw123@aol.com

CHARLES T. LESTER, JR.
CHARLES T. LESTER, JR., ATTORNEY AT LAW
P.O. Box 75069
Fort Thomas, KY 41075-0069
Telephone: (859) 838-4294, (859) 781-2406
Fax:  (859) 486-6590
Email: cteljr@yahoo.com, cteljr@fuse.net

RALPH K. PHALEN
RALPH K. PHALEN LAW, P.C.
1000 Broadway, Suite 400
Kansas City, MO 64105
Telephone:  (816) 589-0753
Facsimile:  (816) 471-1701
Email:  phalenlaw@yahoo.com

ARON D. ROBINSON
LAW OFFICE OF ARON D. ROBINSON
180 West Washington St., Suite 700
Chicago, IL 60602
Telephone:  (312) 857-9050
Email:  Adroblaw@aol.com

*Attorneys for Objectors Angela C. Boles,
Wayne Harris, and Julie Rainwater*

1

## SETTLEMENT CLASS MEMBER SIGNATURE

2

3          I, Angela C. Boles, make the foregoing objections to the proposed Settlement in this matter.

4

5

6     Date:        May 13th, 2013

7                                                 Angela C. Boles

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SETTLEMENT CLASS MEMBER SIGNATURE

I, Wayne Harris, make the foregoing objections to the proposed Settlement in this matter.


Date:          May 9, 2013          _Wayne S. Harris_
                                     Wayne Harris

## SETTLEMENT CLASS MEMBER SIGNATURE

I, Julie Rainwater, make the foregoing objections to the proposed Settlement in this matter.


Date:        May 9, 2013

_____
Julie Rainwater

1

## **CERTIFICATE OF SERVICE**

2       I certify that on May 13, 2013, I caused to be filed and served, via ECF, a

3 copy of the foregoing on all counsel of record in this matter, and an additional

4 copy to be served on the following counsel via email:

5

6 **Class Counsel**
Steve W. Berman

7 Hagens Berman Sobol & Shapiro LLP
1918 Eighth Ave., Suite 3300

8 Seattle, WA 98101

9

10 **Toyota's Counsel**
John P. Hooper

11 Reed Smith
599 Lexington Avenue, 22nd Floor

12 New York, NY 10022

13

14 J. Gordon Cooney, Jr.
Morgan Lewis & Bockius LLP

15 1701 Market Street
Philadelphia, PA 19103-2921

16

17

18

19                                /s/  Ben Barnow

20                                Ben Barnow

21

22

23

24

25

26

27

28