STEVE W. BERMAN (*pro hac vice*)
(WA SBN 12536)
E-mail:  steve@hbsslaw.com
HAGENS BERMAN SOBOL
SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

MARC M. SELTZER
(CA SBN 054534)
E-mail:  mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067
Telephone:  (310) 789-3100
Facsimile:   (310) 789-3150

FRANK M. PITRE (CA SBN 100077)
E-mail:  fpitre@cpmlegal.com
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

*Co-Lead Plaintiffs' Counsel for
Economic Loss Cases*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 8:10ML2151 JVS (FMOx) **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| THIS DOCUMENT RELATES TO: ALL ECONOMIC LOSS CASES | Date:  June 14, 2013 Time:  9:00 a.m. Place:  Courtroom 10C Judge:  Hon. James V. Selna |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................ 1

II.    STATUS OF CLAIMS AND PROPOSED AMENDMENT TO
       THE ALLOCATION PLAN ...................................................... 1

       A.    The Status of Claims ...................................................... 1

       B.    The Parties Propose an Allocation Plan Amendment
             Designed to Increase Direct Payouts to the Class....................... 3

       C.    Supplemental Notice to the Class of the Allocation Plan
             Amendment is Not Required.................................................. 8

III.   FEW OBJECTIONS HAVE BEEN RECEIVED ....................... 11

IV.    THE COURT SHOULD OVERRULE THE OBJECTIONS
       AND APPROVE THE SETTLEMENT ................................... 12

       A.    The Settlement Amounts are Fair and Reasonable and
             Represent Substantial Recoveries for the Class...................... 13

       B.    Based on Expert Testimony, the Settlement Reasonably
             Excludes Recovery for Alleged Diminished Value Outside
             of the Damage Period........................................................ 18

       C.    The Scope of the BOS Program is Reasonable....................... 22

       D.    The BOS Installation Provides a Substantial Benefit to
             the Class ....................................................................... 23

       E.    The Customer Support Program Provides a Substantial
             Benefit to the Class ......................................................... 25

       F.    An Initial Claims Process was Necessary .............................. 32

       G.    The Automobile Safety Research and Education Fund is
             Tailored to Benefit all Class Members and Conforms to
             Ninth Circuit Standards..................................................... 33

             1.    The initial funding of the Safety Research and
                   Education Fund is not a *cy pres* contribution. ................. 33

             2.    Using the Safety Research and Education Fund as a
                   vehicle to receive any residual funds is entirely proper
                   under Ninth Circuit *cy pres* standards. ......................... 35

- i -

010172-25  613134 V1

1
2
      H.    The Allocation Groups Are Reasonable and Well-Grounded in Applicable State Law ........................................................... 41

3
           1.    Plaintiffs' allocation groupings are well supported by law............................................................................ 42

4
           2.    Subclassing is unnecessary. ......................................... 46

5
           3.    Plaintiffs have the requisite Article III standing........................... 47

6
      I.    The Scope of the Release of Claims is Reasonable and Bounded by the Claims Asserted in the Litigation ................................. 49

7

8
      J.    Rule 23 Is Satisfied ................................................. 51

9
      K.    Miscellaneous Objections Should Also be Rejected ............... 54

10
V.    THE COURT SHOULD VIEW WITH SKEPTICSM THE ARGUMENTS OF "SERIAL" OR "PROFESSIONAL" OBJECTOR COUNSEL ............................................. 57

11

12
VI.   CONCLUSION .......................................................... 59

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- ii -

1

## TABLE OF AUTHORITIES

2                                                                                    **Page(s)**

3                                         CASES

*Achtman v. Kirby, McInerney & Squire, LLP*,
    464 F.3d 328 (2d Cir. 2006) ..................................................................9

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................53

*Angus v. Shiley Inc.*,
    989 F.2d 142 (3d Cir. 1993) ................................................................43

*Barnes v. FleetBoston Fin. Corp.*,
    2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ...........................58, 59

*Beasley v. Prudential Gen. Life Ins. Co.*,
    No. cv-2005-58-1, slip op. (Ark. Cir. Ct., Miller Cty., June 9, 2006) ..............58

*Blankenship v. CFMOTO Powersports, Inc.*,
    161 Ohio Misc. 2d 5 (Ohio C.P. 2011) ..................................................43

*Bussie v. Allmerica Fin. Corp.*,
    50 F. Supp. 2d 59 (D. Mass. 1999)........................................................52

*Childs v. United Life Ins. Co.*,
    2012 U.S. Dist. LEXIS 70113 (N.D. Okla. May 21, 2012) ...........................9

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ....................................................11, 51

*Collins v. Cargill Meat Solutions Corp.*,
    274 F.R.D. 294 (E.D. Cal. 2011)..........................................................51

*Create-A-Card, Inc. v. INTUIT, Inc.*,
    2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22, 2009)......................11, 18

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006) ..............................................................43

*Deadwyler v. Volkswagen of Am., Inc.*,
    1986 U.S. Dist. LEXIS 28449 (W.D.N.C. 1986) ................................52, 53

*Degelmann v. Advance Med. Optics Inc.*,
    659 F.3d 835 (9th Cir. 2011), *vacated on other grounds*, 699 F.3d 1103
    (9th Cir. 2012) ................................................................................49

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ............................................34, 35, 36, 37

*Dewey v. Volkswagen of Am.*,
    728 F. Supp. 2d 546 (D.N.J. 2010)........................................................58

- iii -

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
   177 F.R.D. 54 (D. Mass. 1997) ........................................................................ 52

*Glass v. UBS Fin. Servs., Inc.,*
   2007 U.S. Dist. LEXIS 8476 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331 Fed.
   Appx. 452 (9th Cir. 2009) .............................................................................. 42

*Grant v. Bridgestone/Firestone Inc.,*
   2002 Pa. Dist. & Cnty. Dec. LEXIS 121 (Pa. Cnty. Ct. June 10, 2002) ........... 44

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................... 25, 52

*Hansen v. Monumental Life Ins. Co.,*
   2008 U.S. Dist. LEXIS 112254 (D. Conn. Mar. 6, 2008) ................................. 52

*Hoffer v. Cooper Wiring Devices, Inc.,*
   2007 U.S. Dist. LEXIS 42871 (N.D. Ohio June 13, 2007) ............................... 43

*In re AOL Time Warner ERISA Litig.,*
   2007 WL 4225486 U.S. Dist. LEXIS 99769 (S.D.N.Y. Nov. 28, 2007) ........... 58

*In re Auto. Refinishing Paint Antitrust Litig.,*
   2004 U.S. Dist. LEXIS 29161 (E.D. Pa. Sept. 27, 2004) ............................ 42, 43

*In re Baby Prods. Antitrust Litig.,*
   708 F.3d 163 (3d Cir. 2013) ....................................................................... 8, 35

*In re Cardinal Health, Inc. Sec. Litig.,*
   550 F. Supp. 2d 751 (S.D. Ohio 2008) ........................................................... 59

*In re Cendant Corp. Litig.,*
   264 F.3d 201 (3d Cir. 2001) ........................................................................... 14

*In re Charles Schwab Corp. Sec. Litig.,*
   2011 U.S. Dist. LEXIS 18840 (S.D. Fla. Feb. 11, 2011) ................................. 58

*In re Checking Account Overdraft Litig.,*
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) .......................................................... 58

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
   292 F. Supp. 2d 184 (D. Me. 2003) ................................................................ 11

*In re Critical Path, Inc. Secs. Litig.,*
   2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ................................ 14

*In re Initial Pub. Offering Secs. Litig.,*
   721 F. Supp. 2d 210 (S.D.N.Y. 2010) ....................................................... 54, 58

*In re Ins. Brokerage Antitrust Litig.,*
   579 F.3d 241 (3d Cir. 2009) ............................................................... 42, 47, 49

*In re Integra Realty Res., Inc.,*
   262 F.3d 1089 (10th Cir. 2001) ..................................................................... 10

- iv -

*In re Motorsports, Merch. Antitrust Litig.*,
  160 F. Supp. 2d 1392 (N.D. Ga. 2001) ............................................................ 37

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  252 F.R.D. 83 (D. Mass 2008) ....................................................................... 52

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) .......................................................................... 52

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998) ................ 52

*In re Royal Ahold N.V. Sec. & Erisa Litig.*,
  461 F. Supp. 2d 383 (D. Md. 2006) ................................................................ 58

*In re School Asbestos Litig.*,
  789 F.2d 996 (3d Cir. 1986) .......................................................................... 52

*In re Sony Corp. SXRD Rear Projection TV Mktg., Sales Practices & Prods. Liab. Litig.*,
  2010 U.S. Dist. LEXIS 87643 (S.D.N.Y. Aug. 24, 2010) ............................... 42

*In re TD Ameritrade Account Holder Litig.*,
  2011 U.S. Dist. LEXIS 103222 (N.D. Cal. Sept. 12, 2011) ............................. 42

*In re Telectronics Pacing Sys., Inc.*,
  172 F.R.D. 271 (S.D. Ohio 1997) .................................................................. 52

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*,
  790 F. Supp. 2d 1152 (C.D. Cal. 2011) ............................................ 45, 48, 49

*In re Zoran Corp. Derivative Litig.*,
  2008 U.S. Dist. LEXIS 48246 (N.D. Cal. Apr. 7, 2008) ................................. 50

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ................................................................ 39, 41

*Manners v. American Gen. Life Ins. Co.*,
  1999 U.S. Dist. LEXIS 22880 (M.D. Tenn. Aug. 10, 1999) ............................ 10

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ...................................................................... 49

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ........................................................................ 49

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ................................................................ 36, 37

*O'Keefe v. Mercedes-Benz United States, LLC*,
  214 F.R.D. 266 (E.D. Pa. 2003) ....................................................... 28, 29, 30

- v -

*Ouellette v. Wal-Mart Stores, Inc.*,
No. 67-01-CA-326, slip op. (Fla. Cir. Ct., Wash. Cty, Aug. 21, 2009) ............ 58

*Shaw v. Toshiba Am. Info. Sys.*,
91 F. Supp. 2d 942 (E.D. Tex. 2000) ................................................. 52

*Simon v. Phillip Morris*,
124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................. 53

*Six Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990) ........................................................ 38

*Solarz v. DaimlerChrysler Corp.*,
2002 Phila. Ct. Com. Pl. LEXIS 34 (Pa. C.P. Marc. 13, 2002) ........................ 43

*Spark v. MBNA Corp.*,
289 F. Supp. 2d 510 (D. Del. 2003) ................................................... 58

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......................................................... 25

*Steinberg v. Nationwide Mut. Ins. Co.*,
224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................ 52

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct.
1876, 182 L. Ed. 2d 646 (2012) ................................................... 52, 53

*Superior Beverage Co., Inc. v. Owens-Illinois, Inc.*,
827 F. Supp. 477 (N.D. Ill. 1993) ..................................................... 37

*Tenuto v. Transworld Sys.*,
2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002) ................................. 58

*Union Asset Mgmt. Holding A.G. v. Dell*, *Inc.*,
669 F.3d 632 (5th Cir.), *cert. denied*, __ U.S. __, 133 S. Ct. 317,
184 L. Ed. 2d 239 (2012) ........................................................... 9, 10

*Vasquez v. Coast Valley Roofing, Inc.*,
670 F. Supp. 2d 1114 (E.D. Cal. 2009) ................................................ 51

*Vaughn v. American Honda Co.*,
627 F. Supp. 2d 738 (E.D. Tex. 2007) ................................................. 28

*Wolin v. Jaguar Land Rover North Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ........................................................ 49

*Zwiercan v. Gen. Motors. Corp.*,
2002 Phila. Ct. Com. Pl. LEXIS 24 (Pa. C.P. May 22, 2002) ........................... 43

**OTHER AUTHORITIES**

3 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 8.32
(4th ed. 2002) ....................................................................... 55

- vi -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b)
(2010).................................................................................................................53

Barbara J. Rothstein and Thomas E. Willging, *Managing Class Action
Litigation: A Pocket Guide for Judges* (Federal Judicial Center 2010) .............30

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
Fee Award*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) ........................................13

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.633 (4th ed. 2004) ...............18

NHTSA Notice of Proposed Rulemaking, 73 Fed. Reg. 22638 (April 16, 2012)...23

- vii -

010172-25  613134 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     INTRODUCTION

Few objections have been made to the proposed Settlement.  Only 76 objections on behalf of 90 objectors have been received from a universe of 22,623,077 Class Members who were mailed the Short Form Notice.  This very small number of objections, many of which were filed by "serial" or "professional" objector counsel, constitutes additional evidence supporting the fairness and reasonableness of the proposed Settlement.  The Court should reject the objections and approve the Settlement as fair, reasonable, and adequate.

## II.     STATUS OF CLAIMS AND PROPOSED AMENDMENT TO THE ALLOCATION PLAN

### A.     The Status of Claims

As directed by the Court, the parties executed a comprehensive notice plan advising Class Members of the Settlement and encouraging them to file claims.  To review, Short Form notice was sent via first class mail to 22,623,077 potential Class Members who are current or former owners of Subject Vehicles.  Potential Class Members were identified in data that Toyota obtained from R.L. Polk & Co. ("Polk"), which compiled the information from reasonably available computerized account information from various Departments of Motor Vehicles in the United States and its relevant Territories.[1]

Current and certain former owners received two different forms of the Short Form notice.[2]  A Long Form Notice is also available at the Settlement website

---

[1] Declaration of Markham Sherwood Re:  Notice and Administration of Settlement (Dkt. No. 3559) ("Sherwood Decl."), ¶ 10.

[2] *Id.*, ¶ 6 & Exs. A & B.

- 1 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(www.toyotaelsettlement.com).  The parties also executed a broad-based Paid Media Program utilizing newspaper supplements, consumer magazines, newspapers in U.S. Territories, and Internet advertising, as directed by the Court.

The claims deadline is July 29, 2013.  The parties designed and implemented, with the Court's approval, a claims process that places minimum burdens on Class Members who are eligible to receive cash compensation from the Settlement funds. Eligible Class Members will receive cash payments from the Alleged Diminished Value and Cash-In-Lieu-of-BOS Funds after completing a simple, consumer-friendly Claim Form.[3]  Claims can be filed online at the Settlement website as follows:

- Class Members to whom the Notice was mailed with an assigned Claim ID and PIN for each Subject Vehicle can enter those assigned codes and file a claim for Alleged Diminished Value or Cash-in-Lieu-of-BOS, as applicable;

- Potential Class Members who did not receive direct notice can also file a claim, by entering the make, model, and year of their Subject Vehicle from drop-down menus, as well as their ownership status, and likewise be presented with the appropriate claim; and

- Class Members identified as fleet owners can download a prepopulated census form to complete claims for their known vehicles to expedite their claim process.[4]

Class Members can also print, complete, and file with the Claims Administrator a paper Claim Form instead of filing a Claim Form online.

As of May 31, 2013, Claims Administrator Gilardi & Co, LLC ("Gilardi") has received 422,918 total electronic claims, 347,782 claims on the Cash-in-Lieu-of-

---

[3] The use of Claim Forms was necessary in this Settlement because the Polk data, while providing a comprehensive database of current and former Subject Vehicle owners, does not constitute a complete source of address and other information for all Class Members.

[4] *Id.*, ¶ 16.

- 2 -

010172-25  613134 V1

BOS Fund and 75,136 claims on the Alleged Diminished Value Fund.[5]  Gilardi has calculated the value of these claims under the Court-approved Allocation Plan under which base amounts are adjusted according to the state of the Class Member's residence.[6]  Those total values are $17,611,636.50 for the Cash-In-Lieu-of-BOS Fund and $19,677,865.00 for the Alleged Diminished Value Fund.[7]

**B.     The Parties Propose an Allocation Plan Amendment Designed to Increase Direct Payouts to the Class**

The Settlement is designed to encourage claims.  The comprehensive notice campaign and easy claims process serve this goal, as does the increased payout procedure under which (i) payments to Class Members in manifestation-required and "unclear" jurisdictions are stepped up to as high as 100% of the base amount if there are sufficient funds to do so, and (ii) any residual from one Fund is used to increase payments to Class Members participating in the other Fund.

In Plaintiffs' opening brief, Class Counsel advised the Court that we would closely monitor the claims being filed:

> Plaintiffs' Class Counsel are closely monitoring the claims against these Funds in the event that further action to maximize distributions becomes necessary.  While we are not proposing a change in the distribution plan at this time,

---

[5] Second Declaration of Markham Sherwood Re:  Notice and Administration of Settlement ("Second Sherwood Decl."), ¶ 5.

[6] For non-manifestation jurisdictions, base payments will be 100 percent of the amount appearing in the Matrix for Alleged Diminished Value claims or 100 percent of $125 for Cash-In-Lieu-Of-BOS claims.  For manifestation-required jurisdictions, the base payment will be 30 percent of those corresponding amounts.  In unclear states, the base payment will be 70 percent of those corresponding amounts.  But Class Members in manifestation states and unclear states will be entitled to the same payment as Class Members in a non-manifestation state if such Class Members, on or before December 1, 2012, reported to Toyota, a Toyota Dealer, or NHTSA that they believed they experienced a UA event.

[7] Second Sherwood Decl., ¶ 5.

- 3 -

1
2
3
4

> we want the Court to know that we are maintaining
> vigilance concerning the volume of claims. We want to
> ensure that the distribution of monies to qualifying Class
> Members is maximized in accordance with the spirit of the
> Agreement before any remaining funds spill-over into the
> Automobile Safety Research and Education Fund.[8]

5
6
7
8
9
10
11

We have done as promised and monitored claims filing on a weekly basis. Even though there is roughly two more months left in the claims period, the parties believe that the level of claims will result in substantial balances from the two cash funds after expiration of the claims deadline. Because we believe that direct payouts to eligible Class Members should be maximized, the parties propose to supplement the distribution plan as follows:

12
13
14
15
16
17

1.      All claims made as of July 29, 2013 will be paid pursuant to the terms of the Settlement Agreement. Checks will be valid for 90 days. If, as now appears to be the case, sufficient monies will be available in each Fund to bring all eligible Manifestation State and Unclear State claimants up to 100% of eligible payment, this will be done as currently provided in the Plan of Allocation.

18
19
20
21
22
23
24

2.      As provided for in the Settlement Agreement and Amendment No. 1 to Settlement Agreement, payments will then be made equally to (i) reimburse the fees and costs paid by Toyota to the Class Action Settlement Administrator, Settlement Notice Administrator, or any other third-party vendor, and (ii) contribute to the Automobile Safety and Education Fund, until the administrative and/or notice costs are fully reimbursed.

25
26
27

3.      After the payments described in paragraphs 1 and 2 are made, monies will remain in each Fund for payment to eligible Class Members who did not file

_____

[8] Dkt. No. 3556 at 26-27.

28

- 4 -

claims.  For the Alleged Diminished Value Fund, Gilardi will utilize the data used to disseminate notice (*e.g.*, Polk data) to identify Class Members who they believe to be eligible to make a claim on the Diminished Value Fund and to calculate the amounts to which each non-claiming Class Member who qualifies for a Diminished Value payment is entitled, adjusted based on the state of the Class Member's residence pursuant to the terms of the Settlement Agreement and subject to a minimum amount to be approved by the Court and that exceeds the estimated fees and costs associated with the printing, mailing, processing, and administering this distribution.  Gilardi will then send checks to each of these Class Members on a pro rata basis.  Checks will be valid for 90 days and then automatically expire.

4.     For the Cash-in-Lieu-of-BOS Fund, Gilardi will utilize the data used to disseminate notice to identify those non-claiming Class Members who they believe to be eligible to make a claim and calculate the amount of the claim pursuant to the terms of the Settlement Agreement based on the state of the Class Member's residence, subject to a minimum amount to be approved by the Court and that exceeds the estimated fees and costs associated with the printing, mailing, processing, and administering this distribution.  Gilardi will then mail checks to these eligible Cash-in-Lieu-of-BOS Fund Class Members on a pro rata basis.  Checks will be valid for 90 days and then automatically expire.

5.     Prior to calculating the aggregate amount available in each Fund for payment as provided for in paragraphs 3 and 4, the estimated fees and costs of this entire supplemental distribution plan shall be deducted from the aggregate amount to be distributed.

- 5 -

6.      After the 90-day check cashing period expires, checks will be re-issued within 45 days to all Class Members who did not negotiate their initial checks. These checks will be valid for 90 days and then automatically expire.

7.      Within 60 days of the issuance date of the re-issued checks, a reminder notice will be sent to Class Members who have not cashed their checks.  The reminder notices shall inform the Class Member of, among other things: (i) the second check that was previously mailed to the Class Member; (ii) the deadline for cashing the check; (iii) if the Class Member no longer possesses the check, the Class Member can request a reissuance of the check if the Class Member notifies Gilardi; and (iv) if the check is not timely cashed, the proceeds will be escheated.  Gilardi shall honor check reissuance requests from Class Members at least six months from the date of the re-issued check.

8.      After expiration of any re-issued check (including the time to request reissuance for a lost check), an escheatment process will follow consistent with applicable law.

9.      Any monies remaining thereafter will be contributed to the Safety Research and Education Fund.

In sum, under this proposal, those Class Members who followed the Court's instructions and filed a proper claim will receive the maximum amount to which they are entitled under the Settlement and, therefore, be rewarded for taking the time to file their claims.  For claimants to the Cash-in-Lieu-of-BOS Fund, the maximum amount will be $125, which is the average retail cost of a BOS installation.  For claimants to the Alleged Diminished Value Fund, this maximum amount will be the

- 6 -

1   specific model- and time-specific loss estimates contained in the recovery Matrix.

2   For example, payouts will exceed $10,000 for certain claimants who sold higher-

3   value vehicles during months in which the excess price depreciation was most

4   pronounced.[9]

5

6       Thereafter, non-claiming eligible Class Members will receive pro rata

7   distribution amounts, which is more than the $0 they are scheduled to receive under

8   the Settlement's distribution plan as presently structured (because they did not take

9   the time to file a simple Claim Form).  Gilardi has calculated average payouts to

10  non-claiming Class Members under this supplemental proposal, assuming that the

11  total value of claims filed by the claims deadline will approximate $58,839,375 for

12  the Cash-in-Lieu-of-BOS Fund and $75,886,377 for the Alleged Diminished Value

13  Fund.[10]  This will leave substantial balances for distribution to eligible Class

14  Members pursuant to the supplemental plan of allocation, even after deductions are

15  taken for reimbursement of the Settlement administration costs advanced by Toyota,

16  equal funding to the Safety Research and Education Fund, and payment of future

17  administrative costs.

18

19      Members of the Lead Class Counsel team have made similar proposals in prior

20  class action settlements, which have been approved by the presiding courts.[11]  The

21

22  _____

23      [9] Declaration of Ernest H. Manuel, Jr. Re:  Economic Damages Due to Unintended Acceleration (Dkt. No. 3560) ("Manuel Decl."), ¶ 34.

24      [10] These are Gilardi's reasonable estimates of the total value of claims given the time left in the claims period and the fact that most "fleet" Class Members, which

25  will have the largest claims, have not yet filed claims.  These figures assume that adjustments for state-of-residence are removed and the claims are calculated as

26  uplifted to 100% of their value under the Plan of Allocation.  Second Sherwood Decl., ¶¶ 5-6.

27      [11] See, e.g., In re Charles Schwab Corp. Sec. Litig., Order Approving (1) Distribution of Remaining Settlement Funds to Class Members; (2) Payment of

28

- 7 -

proposed supplemental distribution plan here maximizes direct payouts of Settlement Funds to Class Members who expended the effort to file claims and provides non-claiming Class Members who can be identified in the Polk data with a direct payment that they otherwise would not be entitled to receive under the Settlement as presently structured.  The supplemental distribution plan also provides a reasonable method for minimizing *cy pres* payments.[12]  Therefore, we believe that the amendment is in the best interests of the Class and respectfully request that the Court approve this amendment to the Allocation Plan.

## C.    Supplemental Notice to the Class of the Allocation Plan Amendment is Not Required

The proposed amendment to the Allocation Plan does not reduce Class Member benefits and, instead, substantially increases the number of Class Members who will obtain direct payments pursuant to the Settlement.  Indeed, the Settlement, as presently structured, is more than fair, adequate, and reasonable without the amendment, and the amendment merely serves to maximize direct payouts to eligible Class Members.  As a result, supplemental notice to the Class is not necessary.

---

Administration fees and (3) Payment of Second Half of Attorney's Fee Award (N.D. Cal. Mar. 20, 2012) (Dkt. No. 1134) (approving redistribution of funds to class members who previously cashed checks, subject to a $100 minimum); *In re Bayer Corp. Combination Aspirin Prods. Marketing & Sales Practices Litig.*, No. 09-md-2023 (E.D.N.Y. April 11, 2013) (approving pro rata distribution of remaining funds to non-claiming class members identified in certain purchase records).  Both of these decisions are attached as Exhibits B and C, respectively, to the Declaration of Steve W. Berman in Support of Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to the Named Plaintiffs (the "Berman Reply Decl.").

[12] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) ("Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds.").

- 8 -

010172-25  613134 V1

Given that the minimum amount of money *actually due* to any individual Class Member under the terms of the Settlement is not changed by the amended Allocation Plan, the proposed amendment is not a fact of the type that would impact a reasonable person's decisions to either remain in the Class or request exclusion.[13] Furthermore, courts do not require supplemental notice when class member relief *increases*. For example, in *Childs v. United Life Ins. Co.*, the court explained that "[c]ourts have held that where amendments to a proposed settlement expand or improve rights for the class, new notice may not be required" where the proposed "amendments to the original settlement agreements provide enhanced relief for the Class Members" by providing that "Class members with valid claims will be reimbursed 100 percent of their premiums, rather than 50 percent."[14]

In *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,[15] the Fifth Circuit affirmed the district court's restructuring of a class action settlement that revised a planned distribution by eliminating a settlement's *de minimis* provision, all without requiring supplemental notice. As the Fifth Circuit explained:

> Under the new plan of allocation, class members who stood to receive less than ten dollars from the settlement were now eligible to recover. The court nevertheless refused to

[13] *See, e.g.*, *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 338 (2d Cir. 2006) (notice "need only contain 'information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class.'") (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977)).

[14] 2012 U.S. Dist. LEXIS 70113, at *16-17 (N.D. Okla. May 21, 2012). The court ultimately required that supplemental notice be sent in the circumstances of that case because the court previously required direct notice by individual first class mailings, but the claims administrator mailed individual notices in bulk in single envelopes to various nursing homes where class members resided. *Id.*

[15] 669 F.3d 632 (5th Cir.), *cert. denied*, __ U.S. __, 133 S. Ct. 317, 184 L. Ed. 2d 239 (2012).

- 9 -

1
2
3

> reissue notice to the class and did not reopen the claims-
> filing period, concluding that "[t]here is no justiciable basis
> to incur the additional expense and time to re-notice the
> class and re-open the time for claims to be filed."[16]

4  Objectors contended that the district court's approval of the restructuring without

5  supplemental notice violated Rule 23 and due process.  The Fifth Circuit disagreed,

6  finding "persuasive support for the district court's judgment," where, as here, "[t]he

7  notice was sent to all potential class members … and warned that by doing nothing,

8  they would give up their rights and get no payment" and where "the objectors

10  point[ed] to no cases requiring a second round of notice to class members, nor an

11  extended filing deadline, when a plan of allocation is amended."[17]

12      Other courts have not required supplemental notice when class member relief

13  increases.[18]

14      The substantial costs of mailed notice also militate heavily against requiring a

15  supplemental notice.  The costs of mailing individual notice exceeded $6,250,000.[19]

16  Sending out supplemental notice to 22,623,077 Class Members would cost

17

18

19

---

[16] *Id.* at 641.

[17] *Id.*

[18] *See*, *e.g.*, *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001)
("[T]he addition of opt-out rights merely expanded the rights of class members and
gave members the right to opt out after they saw all of the terms of the settlement.
Therefore, we see no way that the court's failure to provide new notice of the opt-out
rights prior to accepting the settlement gave rise to a risk that unfavorable terms
would be forced upon some class members or otherwise diminished class members'
ability to bring objections before the court. Accordingly, we hold the district court
did not abuse its discretion by failing to notify class members of their opt-out rights
prior to conducting a fairness hearing of the settlement's terms."); *Manners v.
American Gen. Life Ins. Co.*, 1999 U.S. Dist. LEXIS 22880, at *37 (M.D. Tenn.
Aug. 10, 1999) ("Because these amendments enhance the relief provided to Class
Members, the Court finds that additional notice was not and is not necessary.").

[19] Second Sherwood Decl., ¶ 7.

- 10 -

approximately $6,105,000[20] and would only serve to deplete the monies available for distribution to the Class.  Moreover, Class Members have been on notice of the Settlement website located at www.toyotaelsettlement.com, where an update to the proceedings is maintained and available (including this brief) and where the amendment will be posted.[21]

The proposed amended allocation here does not take away rights from Class Members or reduce any Class Member's recovery under the Settlement.  Rather, it only enhances rights by eliminating the claim form requirement for those who have not already filed claims and were previously sent direct notice of the Settlement. Supplemental notice is not required.

### III.   FEW OBJECTIONS HAVE BEEN RECEIVED

"A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it . . . ."[22]  Class member reaction has been positive.  From a universe of 22,623,077 Class Members who were mailed the Short Form Notice, only 76 objections on behalf of 90 Class Members

---

[20] *Id.*

[21] *See*, *e.g.*, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 185-86 (D. Me. 2003) (concluding "notice was sufficient because it would be too burdensome and costly to repeat a mailing to the over eight million class members informing them of favorable changes in the proposed amended settlement, especially to those who never objected to the first proposed settlement" and noting that certain "websites were continuously updated and maintained to reflect the terms of the amended settlement and an informational toll-free number was continued").

[22] *Create-A-Card, Inc. v. INTUIT, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *15-16 (N.D. Cal. Sept. 22, 2009) (citing *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977)); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291-96 (9th Cir. 1992).

- 11 -

have been received.  The extremely low number of objections indicates substantial support for the reasonableness of the proposed Settlement.

## IV.    THE COURT SHOULD OVERRULE THE OBJECTIONS AND APPROVE THE SETTLEMENT

For the Court's convenience, a Table of Objectors is attached at Appendix A, which identifies each objector, his or her relevant vehicle model, the benefits to which the objector is entitled under the Settlement, and a short summary of the content of the objection.[23]  Many of the objections are non-conforming because they did not follow the Court's instructions for objecting.[24]  The Court should strike these, particularly those non-conforming objections filed by counsel.[25]

The objections largely invoke overlapping issues.  Below is our response, by issue, to the objections.  Although some of the objectors are vociferous, the Court should keep in mind that they do not represent the views of 99.9999% of the Class members who did not object.

---

[23] The objections themselves are attached and organized as Exhibit A to the Berman Reply Decl.

[24] At least the following objections are non-conforming:  1-3, 8, 10-11, 15-17, 23-24, 29-30, 32, 34, 37-38, 41-44, 51, 53-54, 61, 68, 73, 74-75.  The Court's preliminary approval order established a clear procedure for filing a valid objection.  Any objection must be in writing and include the following information:  (i) a statement of objection to the settlement in the case; (ii) the name, address, and telephone number of the objecting Class Member; the make, model year, and VIN number of the objecting Class Member's Subject Vehicle(s); (iii) the specific reasons why the Class Member objects to the settlement (including any legal support); (iv) any evidence or other information the objecting Class Member intends to rely on; (v) a statement whether the objecting Class Member intends to appear at the Fairness Hearing; (vi) a list of the Subject Vehicles to which the objection applies; and (vii) the Class Member's signature and proof of purchase, ownership, lessee status or status as a Residual Value Insurer of a Subject Vehicle.  The objection also must have been delivered to Class Counsel, Toyota's counsel, and the Court on or before May 13, 2013.  *See* Dkt. No. 3345, ¶ 14.

[25] *See* Objection Nos. 15, 23, 52, 75.

- 12 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## A.    The Settlement Amounts are Fair and Reasonable and Represent Substantial Recoveries for the Class

Twenty-two objections state that the Settlement's cash payouts are insufficient and should be higher.[26]  Eleven of these want to be fully reimbursed for specific damage and repair costs or total losses that they incurred resulting from alleged UA events.[27]  Some objectors want individualized treatment for somewhat idiosyncratic situations such as costs of repossession,[28] increased maintenance costs,[29] or repair costs unrelated to alleged UA events[30] – costs that would not be included in the damages Plaintiffs would seek at trial.

By any measure, the proposed cash recoveries are fair and reasonable.  In absolute terms, class action cash recoveries amounting to $500 million are rare.  For example, in an empirical study of every class action settlement approved by a federal court over a two-year period (2006-2007), the average consumer class action settlement was $18.8 million.  Only ten settlements, or 1.65% of all settlements, equaled or exceeded $500 million.[31]

The cash Funds are also fair and reasonable on a percentage-of-the-recovery basis.  For the Alleged Diminished Value Fund, total, aggregate estimated economic losses calculated pursuant to Dr. Manuel's methodology are approximately $590

---

[26] *See* Objection Nos. 3, 9, 11, 13, 20, 28, 29, 30, 39, 40, 42, 47, 50, 52, 54, 59, 62, 63, 68, 70, 72, 74.

[27] *See* Objection Nos. 9, 11, 20, 39, 52, 59, 62, 68, 70, 72, 74.

[28] *See* Objection No. 13.

[29] *See* Objection No. 40.

[30] *See* Objection Nos. 29, 42.

[31] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award*, 7 J. EMPIRICAL LEGAL STUD. 811, 828 (2010).

- 13 -

010172-25  613134 V1

1    million, making the $250 million Alleged Diminished Value Fund recovery

2    approximately 42 percent of total economic losses.[32]  The $250 million Cash-in-

3    Lieu-of-BOS Fund represents approximately 25 percent of the aggregate, Class-wide

4    estimated average cost of a BOS installation based on 9,020,154 eligible vehicles.[33]

5    These are excellent recoveries as compared to percentage recoveries in other class

6    action settlements.[34]  Further, the amounts are tied to the specific damages that

7    Plaintiffs would seek at trial.

8         Notably, none of the objectors present any expert testimony testifying to the

9    magnitude of damages in this case.  As an example, objector Bernstein contends

10   without expert analysis that the Diminished Value Matrix does not "represent the

11   measure of damages actually incurred as a result of Toyota's defective acceleration

12   systems . . . ."[35]  Yet, that is precisely what the Matrix does.  Based on actual sales in

13   the auction market from 2005 through October 2011, Dr. Manuel has identified the

14   relevant Toyota and Lexus models, model years, and sale months for which there

15   was sufficient evidence to conclude that prices were reduced as a result of publicity

16   associated with alleged UA events.  The price reductions were estimated using

17

18

19

---

[32] Manuel Decl., ¶ 35.  We should note that, under Toyota's damage expert's theory, the recovery constitutes 100% of estimated damage, if liability is assumed.

[33] Subtracting 6,309,384 BOS-eligible vehicles and 1,325,314 hybrid vehicles from the 16,654,852 universe of current registrations yields 9,020,154 vehicles.  *See* Sherwood Decl., ¶ 9.  9,020,154 eligible vehicles multiplied by the $111.50 average BOS installation cost yields $1,005,747,171.  The $250 million Cash-in-Lieu-of-BOS Fund is 25% of this number.

[34] *Compare, e.g., In re Critical Path, Inc. Secs. Litig.*, 2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ($17.5 million settlement where damages alleged were $200 million, resulting in 8.75% recovery percentage); *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 & n.22 (3d Cir. 2001) (citing securities settlements between 1.6% and 14% of damages).

[35] Objection No. 9 at 4-5.

- 14 -

010172-25  613134 V1

regression equations applied to each of Toyota's 22 product segments, statistically controlling for factors that would affect used Toyota vehicle prices such as vehicle design characteristics, vehicle condition, vehicle supply, characteristics of competitors' vehicles, and general economic conditions (including gasoline prices, the robustness of the local and national economies, and the GM and Chrysler bankruptcies).[36]

The Matrix, found at Attachment 2 to the Manuel Declaration, reports these actual damage estimates for each vehicle, subject to two adjustments: (i) a 30 percent or 70 percent adjustment for manifestation required and "unclear" jurisdictions, respectively; and (ii) a minimum $125 payment to recognize that certain claimants may have sold their vehicles at market prices that did not show statistically significant evidence of excess price depreciation, even though UA issues impelled those claimants to sell during the damage period when they otherwise would not have.[37]   Some examples from the Matrix of model-specific estimated damage resulting from excess price depreciation during the damage period are:[38]

- 2008 Avalon disposed of[39] in October 2009: $1,571[40]

- 2009 Avalon disposed of in March 2010: $4,679[41]

- 2007 Camry disposed of in September 2009: $1,715[42]

---

[36] Manuel Decl., ¶¶ 13-17, 21.

[37] *Id.*, ¶¶ 26-28.

[38] The figures presented assume that the claimant resides in a jurisdiction in which manifestation of the defect is not required.

[39] "Disposed of" encompasses a sale, early lease return, or total loss.

[40] Manuel Decl., Attach. 2 at 4.

[41] *Id.* at 49.

[42] *Id.* at 12.

- 15 -

- 2007 Camry disposed of in March 2010:  $125[43]

- 2010 Corolla disposed of in March 2010:  $125[44]

- 2008 Prius disposed of in April 2010:  $3,814[45]

- 2005 Tacoma 2x4 Prerunner disposed of in October 2010:  $343[46]

- 2007 Lexus ES disposed of in June 2010:  $1,117[47]

- 2008 Lexus LS460 disposed of in May 2010:  $3,411[48]

- 2008 Lexus LX470 disposed of in May 2010:  $4,056[49]

Actual distribution amounts are then pro-rated to accommodate the fact that the Settlement provides for 42% recovery of estimated aggregate alleged diminished value damages, although timely claimants will be uplifted to the full 100 percent amount.  If approved, the Settlement and the amended distribution plan will result in substantial payments to remaining Class Members who did not file claims.

While some objectors would prefer to pass up this opportunity to settle the action for very substantial percentages of potential damages at trial, these objectors improperly assign no value to the risks of going to trial and of the adverse impact on other Class Members that would ensue if that trial was lost.  We discussed those

---

[43] *Id.*

[44] *Id.* at 135.  Note that this is Mr. Bernstein's anticipated recovery, which is a minimum threshold amount.  Although Mr. Bernstein asserts that his actual loss was greater ($2,634.22, *see* Objection No. 9 at 2), Dr. Manuel's regression analysis does not support that figure given the Matrix model's inputs.

[45] *Id.* at 71.

[46] *Id.* at 78.

[47] *Id.* at 51.

[48] *Id.* at 346.

[49] *Id.* at 406.

- 16 -

1   risks in detail in our opening brief and will not repeat all of those arguments here but

2   instead summarize them as follows:

- *Standing*: Toyota has appealed the Court's standing ruling, and if the Ninth Circuit rules that no Plaintiff or Class Member has standing to pursue any claim unless the alleged defects actually manifested in UA in their Subject Vehicles, the case will be gutted. The only Plaintiffs and Class Members with standing to pursue claims will be those who actually experienced a UA, who are but a small fraction of the total number of Subject Vehicle owners.

- *Arbitration*: If Toyota wins its pending appeal of the Court's order denying arbitration, reversal will kill this litigation, forcing individual consumers to file for arbitration, something that no individual Class Member could afford to do given the enormous costs of marshaling the evidence necessary to prove a claim against Toyota.

- *Preemption*: The Ninth Circuit or even the Supreme Court could reverse the Court's ruling finding no preemption, thereby precluding any and all forms of injunctive and equitable relief sought by Plaintiffs. Gone would be the BOS installation and Customer Support Program benefits that Plaintiffs have garnered in the Settlement.

- *Defect*: NASA and NHTSA concluded that, in their limited analysis of the ETCS, they could not find a specific software defect in the ETCS that explained the reports of UA in the NHTSA database (although NASA did note that "[b]ecause proof that the ETCS-i caused the reported UAs was not found does not mean it could not occur").

- *Daubert motions*: Toyota would bring motions to exclude material components of Plaintiffs' evidence of liability and damages contained in expert reports, which, if granted, could undermine Plaintiffs' entire case. Such motions were pending in *Van Alfen* at the time of this Settlement.

- *Aggregate damages*: Defendants' experts hotly contested Plaintiffs' expert's proof of aggregate damages, including assertions that price variations unrelated to alleged UA cannot be separated on a class-wide basis from alleged UA price impacts; the resale prices for some vehicles actually appreciated during the damage period; and no average or other single measure of price effect can be used to determine impact for each and every Class Member.

- *Bellwether and class certification risks*: There is a substantial risk that the Court would not certify classes for consumers in many states and that the Court will ultimately find that common issues do not predominate for

- 17 -

1
2
3
4
5

issues encompassing defect identification, aggregate damages, and exposure to advertising.  If the bellwether trial were lost, the prospect of Plaintiffs succeeding in the remaining states would be dim.  And even if the bellwether trial resulted in a partial or full verdict in favor of the bellwether classes, Plaintiffs in other states would still have to prove their entitlement to Rule 23 certification, and Toyota would undoubtedly and vigorously contest each and every bellwether class certification motion.

6
7
8
9
10
11
12
13
14

Courts recognize that the opinion of experienced counsel supporting the settlement is entitled to considerable weight, although, of course, courts should not simply rubber stamp settlements.[50]  Based on our extensive experience in class action litigation and our careful analysis here, Class Counsel believe that it is in the best interests of the Class as a whole to consummate the Settlement and provide these substantial recoveries to the Class Members as soon as possible rather than risk losing a liability verdict at trial or risk receiving a damages award substantially lower than what Plaintiffs would seek.

15
16

**B.      Based on Expert Testimony, the Settlement Reasonably Excludes Recovery for Alleged Diminished Value Outside of the Damage Period**

17
18
19
20
21
22
23
24

The period for Diminished Value claims is September 1, 2009 through December 31, 2010.  The $250,000,000 Alleged Diminished Value Fund will be available for distribution to certain Class Members who sold, traded in, returned, or incurred a total loss during this time period, or returned a leased Subject Vehicle before the lease termination date after having reported an alleged unintended acceleration event to Toyota, a Toyota Dealer, or the National Highway Transportation Safety Administration ("NHTSA"), before December 1, 2012.[51]

25
26
27

---

[50] *See Create-A-Card, Inc. v. INTUIT, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *12-13; MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.633 at 321-22 (4th ed. 2004).

[51] Agreement at 13.

28

- 18 -

1
2
3
4
5

Several objectors believe that this period should be expanded.[52]  These objectors either sold or traded in their vehicles or experienced a total loss before or after the damage period and are, therefore, ineligible to receive a distribution from the Alleged Diminished Value Fund.

6
7
8
9
10
11
12
13
14
15
16
17
18

The damage period was identified only after careful and thorough analysis by Plaintiffs' economics expert, Dr. Manuel, who found that Class vehicles did not suffer any diminished value associated with transactions *before* or *after* the damage period (except for instances of early lease terminations following a reported UA event).  The selection of the September 1, 2009 through December 31, 2010 damage period was the product of a rigorous analytical process and the existence of compelling statistical evidence.  Customers selling their vehicles prior to September 1, 2009 would not have suffered harm caused by the depression in resale prices which began when UA events were widely publicized in late August 2009, and, therefore, would not have experienced the resale price depreciation that Plaintiffs claim was due to disclosures about UA.  As Dr. Manuel explains:

19
20
21
22
23
24

> The selection of the damage period described (September 2009 through December 2010) was a function of affirmative evidence for that time period, the damage theory itself, and an absence of evidence beyond December 2010.  As stated above, economic loss findings during the damage period were the product of a rigorous analytical process and the existence of compelling statistical evidence.  These findings coincided with a damage theory that Toyota's alleged concealment of vehicle defects

25
26
27

[52] *See* Objection Nos. 7 (traded in July 2009 and admits that "[n]o known problems of Toyota vehicles had been established at that time), 12 (December 2012 trade-in), 14 (April 2012 sale), 18 (disposition date unstated), 33 (disposition date unstated), 34 (March 2011 trade-in), 38 (August 2009 total loss), 44 (February 2011 trade-in), 49 (June 2009 trade-in), 57 (January 2011 trade-in), 60 (January 2011 trade-in), 61 (August 2011 sale), 71 (November 2011 sale).

28

- 19 -

010172-25  613134 V1

1
2
3
4

caused sale prices to decline once those defects became known.  As such, customers selling their vehicles prior to September 2009 would not have sold into a market in which the alleged vehicle defects were known.  Thus, they would not have experienced the excess price depreciation that was present during the damage period.[53]

5

The start of the damage period in September 2009 is based on public

6

awareness of UA issues in Subject Vehicles.  Dr. Manuel identifies several news

7

events as providing "bright line dates concerning public awareness."  They are:

8
9
10
11
12

i.    The August 28, 2009 crash of a 2009 Lexus ES350 vehicle driven by California Highway Patrolman Mark Saylor.  During that incident, Officer Saylor's brother-in-law called 911 from the back seat of the vehicle and said "our accelerator is stuck . . . we're approaching the intersection."  Shortly after the call, the Saylor family was dead….

13
14
15
16
17
18

ii.    A January 21, 2010 announcement by Toyota Motor Sales, Inc. ("TMS") that it was recalling approximately 2.3 million vehicles to correct sticking accelerator pedals on specific Toyota Division models including certain model years of the Avalon, Camry, Corolla, Highlander, Matrix, RAV4, Sequoia and Tundra models. This followed the November 2, 2009 TMS announcement that it was recalling 4.2 million Toyota and Lexus vehicles including certain model years of the Avalon, Camry, Prius, Tacoma, Tundra, ES350 and IS250/350 models for accelerator pedal entrapment problems caused by floor mats….

19
20
21
22

iii.    The highly unusual announcement by TMS on January 26, 2010 that it was suspending the sale of eight Toyota models in the United States because of a sticking accelerator pedal.  These included certain model years of the Avalon, Camry, Corolla, Highlander, Matrix, RAV4, Sequoia and Tundra models….

23
24
25

iv.    Press releases by [NHTSA] between February 1, 2010 and February 10, 2010 regarding Toyota recalls of Toyota and Lexus vehicles for accelerator pedal entrapment by floor mats and sticky accelerator pedals involving nine Toyota vehicles, three Lexus

26
27
28

---

[53] Manuel Decl., ¶ 18.

- 20 -

vehicles and the Pontiac Vibe, which is the Toyota Matrix twin….[54]

Between August 28, 2009 and January 26, 2010, there were numerous newspaper articles and television stories concerning alleged UA problems with certain Toyota and Lexus vehicles.  Numerous articles followed in the automotive trade press "commenting on the adverse effects that the unintended acceleration issue was having on the prices for used Toyota vehicles."[55]

At the other end of the damage period, sale prices of the affected models at the end of 2010 were on a trajectory towards pre-damage period depreciation levels and showed either little-to-no evidence of abnormal price depreciation or price variation for reasons unrelated to UA by the end of 2010:

> The decision to terminate economic loss calculations at the end of 2010 reflected initial findings that sale prices of the affected models were on a trajectory towards pre-damage period depreciation levels.  Through the later months of 2010, growing percentages of subject Toyota and Lexus models showed either little-to-no evidence of excess price depreciation or price variation for reasons other than issues related to unintended acceleration.  Continuing the economic loss calculations into 2011 would have involved investigating market conditions for damage when available evidence suggested a return to prevalent unaffected prices of subject Toyota and Lexus models.[56]

---

[54] July 2012 Expert Report of Ernest H. Manuel, Jr., Ph.D., ¶ 37(b) & Tab 3; *see also* September 2012 Rebuttal Expert Report of Ernest H. Manuel, Jr., Ph.D., ¶¶ 68-74 & Tab 6 pages 1-14 (charting quantity of UA-related news stories by specific model over the time period September 2009 through September 2011).

[55] *Id.*, ¶ 37(c) and (d).

[56] Manuel Decl., ¶ 19.

- 21 -

010172-25  613134 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The objectors do not provide any evidence – expert or otherwise – rebutting Dr. Manuel's analysis limiting the damage period to September 1, 2009 through December 31, 2010.

## C.     The Scope of the BOS Program is Reasonable

Six objectors ask that BOS be made available for all Class Members who do not have BOS and will not be offered BOS under the Settlement.[57]  Over 3.5 million Subject Vehicles will be eligible to receive a BOS under the Settlement.  These vehicles were part of Toyota's recall directly related to the risk of floor mat entrapment.  In addition, hybrid vehicles have "parts protection logic" that performs a function equivalent to BOS, and additional vehicles have previously received BOS.

BOS provides additional protection in the event of accelerator entrapment or human error, but does not address any potential electronic cause of unintended acceleration.  The BOS program, therefore, is focused on vehicles subject to the floor mat entrapment recall.  Vehicles not receiving BOS under the Settlement were not subject to the floor mat entrapment recall, and include models that do not have the capacity to accept the BOS reflash without also replacing the engine control module, which Toyota would not agree to do given the enormous costs involved.  Further, Toyota believed strongly in its state-of-the-art defense and concluded that it faced little liability risk related to a lack of BOS on what are primarily older vehicle models.

---

[57] *See* Objection Nos. 10, 24, 25, 38, 43, 56.

- 22 -

1

**D.     The BOS Installation Provides a Substantial Benefit to the Class**

2

3          In contrast to the six objectors who would like to receive BOS but will not,

4    five of the objections contend that the BOS installation is not a benefit because it was

5    already offered or provides no real value.[58]  Both contentions are incorrect.

6          Toyota previously offered the installation of BOS with respect to

7    approximately 3.2 million models.  As of the Settlement date, approximately 550,000

8    of the vehicles had not had BOS installed.  The Settlement renotifies Class Members

9    whose vehicles were previously eligible for BOS installation.  In addition, and only

10   as a result of this Settlement, Toyota is offering to install BOS on approximately

11   3,031,477 Subject Vehicles that have not previously been offered BOS.  Thus, the

12   objector's contention that the BOS installation benefit of the Settlement is illusory

13   because Toyota was already offering it outside of the Settlement is simply incorrect.

14         And BOS provides a real benefit.  The BOS will automatically reduce engine

15   power when the brake pedal and the accelerator pedal are applied simultaneously

16   under certain driving conditions.  Thus, Plaintiffs believe that BOS offers an

17   important safety enhancement,[59] and the objectors do not and cannot provide any

18   evidence to the contrary.

19

20

21

22

23         [58] *See* Objection Nos. 5, 21, 46, 53, 67.  Objectors Bandas (Objection No. 5), and Neumann (Objection No. 46) do not have standing to object to the BOS installation portion of the Settlement, because they are current owners of Subject Vehicles that are not eligible to receive the benefit.

24

25         [59] *See*, *e.g.*, NHTSA Notice of Proposed Rulemaking, 73 Fed. Reg. 22638, 22639 (April 16, 2012) ("We believe brake-throttle override would prevent most crashes where a stuck or trapped accelerator pedal was to blame because, with a BTO system, the driver would be able to maintain control through normal application of the vehicle's brakes.").

26

27

28                                              - 23 -

010172-25  613134 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Objector Bernstein also contends that it is unlikely the BOS installation benefit will be realized by the Class because, in his opinion, "[i]t is obviously impossible to calculate with precision the number of Toyota owners who will actually avail themselves of the brake retrofitting option . . . ."[60] Mr. Bernstein is wrong. First, that some Class Members may not take advantage of a class action settlement benefit – for instance, those who choose not to file claims for money – does not render the benefit superfluous. To the contrary, the BOS benefit is there for the taking, the same as a cash distribution. Second, that Toyota previously offered the installation of BOS with respect to approximately 3.2 million models, and the owners of all but 550,000 of those vehicles responded and elected to have BOS installed, demonstrates that drivers value the benefits provided by BOS.

Plaintiffs value the BOS benefit, in the aggregate, at $399,334,685 based on an average of $111.50 to have the BOS installed if Class Members were to pay for it themselves outside the Settlement.[61] Objectors Bandas and Serafino state that this is the price that Toyota would charge for the installation;[62] this contention is false, as it is the average price that independent dealers selling a variety of automobile brands would charge, thereby establishing the retail value of the benefit.[63] Bandas and Serafino also assert that the BOS benefit cannot be valued for purposes of valuing the entire Settlement because, they contend, it is a "fictive valuation[] of inestimable

---

[60] Objection No. 9 at 8.

[61] Declaration of Michael Bonne Regarding the Retail Cost of Installing a Brake Override on Subject Vehicles (Dkt. No. 3557) ("Bonne Decl."), ¶ 10.

[62] Objection Nos. 5 and 67 at 6.

[63] Bonne Decl., ¶ 8.

- 24 -

injunctive relief."[64]  They are again wrong.  First, the assertion is wholly unsupported by any expert testimony, let alone testimony that rebuts the opinion of Mr. Bonne, who is an automobile engineer with twenty years of experience and who has developed electronic throttle control systems.  Second, Bandas and Serafino misinterpret seminal Ninth Circuit authority holding that courts consider the non-monetary benefits conferred where those benefits can be reasonably valued.[65]  The aggregate benefits of the BOS installation have been reasonably valued by an expert here in an opinion that remains unrebutted.

The Court should overrule the objections to the BOS installation portion of the Settlement.[66]

**E.     The Customer Support Program Provides a Substantial Benefit to the Class**

Three objections contend that the Customer Support Program ("CSP") does not provide any benefits,[67] but these objections are unsupported by any evidence, expert or otherwise, and should be rejected.

---

[64] Objection Nos. 5 and 67 at 6.

[65] *Staton v. Boeing Co.*, 327 F.3d 938, 973-74 (9th Cir. 2003); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (noting value of liftgate latch replacement campaign at $115 million, which was Chrysler's cost of the campaign). In describing the benefits of the *Hanlon* settlement, the court in *Staton* explained that "[a]lthough the replacement of latches is injunctive in nature, the agreement bestowed upon each beneficiary a clearly measurable benefit:  one replacement latch for each minivan owned.  The court could therefore, with some degree of accuracy, value the benefits conferred."  327 F.3d at 973.  And so it is here:  each Class Member that is eligible for BOS receives a clearly measurable benefit – one BOS installation.

[66] Objector Guerriero, who does not own a vehicle eligible for BOS installation and, therefore, does not have standing to object to this portion of the Settlement, contends that BOS installation is a disfavored "coupon" settlement.  Objection No. 65 at 27-31.  This is incorrect.  A coupon requires a claimant to spend money to use it.  No Class Member is required to spend any money to take advantage of the BOS installation.

- 25 -

1   The CSP will provide prospective coverage for repairs and adjustments needed

2   to correct defects in materials or workmanship in any of the following components

3   that Plaintiffs allege are related to instances of UA:  (i) engine control module; (ii)

4   cruise control switch; (iii) accelerator pedal assembly; (iv) stop lamp switch; and (v)

5   throttle body assembly.  The accelerator pedal assembly, the throttle body assembly,

6   and the ECM are the three main hardware components of the ETCS and, therefore,

7   the parts of most concern in the lawsuit.[68]

8   

9   The duration of prospective coverage will be 10 years from the expiration of

10   the existing warranty for each of these parts, with a maximum limit of 150,000 miles

11   from the vehicle's in-service date, but subject to a minimum of three years of

12   coverage regardless of mileage or warranty expiration.  And taking advantage of the

13   CSP will be easy, because the VIN numbers for the Subject Vehicles will be

14   identified in Toyota systems so that eligible Subject Vehicles taken to Toyota

15   Dealers can be identified and the benefit provided, if needed, free-of-charge.[69]

16   

17   Contrary to the objectors' assertion, the CSP provides real value.

18   Approximately 16,145,000 Subject Vehicles are eligible for this benefit.  By

19   estimating the market price for hypothetical extended service contracts that are

20   equivalent to the CSP's benefits for each model year, Plaintiffs' valuation expert,

---

[67] *See* Objection Nos. 32, 46, 65.

[68] And the cruise control switch, throttle body assembly, and ECM are the hardware components associated with cruise control.

[69] Agreement at 16-17.

- 26 -

Kirk Kleckner, has concluded that the CSP provides an aggregate benefit to the Class of approximately $475,000,000.[70]

Objectors Neumann, Howell, and Morrison complain that the CSP has no value because Toyota cannot be trusted to exercise discretion in deciding whether the coverage afforded by the CSP will be provided to a particular future claimant,[71] and objector Guerriero contends that the CSP has "zero" value until it can be determined – at the end of CSP coverage period for all vehicles – how many Class Members actually sought the coverage.[72]  Both positions are incorrect.  Courts have frequently approved class action settlements providing extended warranty programs and, in doing so, found that such programs result in substantial benefits to the class.  For example, the settlement in *In re Sony Corp. SXRD Rear Projection TV Mktg., Sales Practices & Prods. Liab. Litig.* included an extension of the limited warranty.  In determining the value of the extended warranty plan for purposes of awarding attorneys' fees, the court discussed two alternative valuation methods:  (i) the costs to Sony of extending the warranties, and (ii) the benefit to the class as measured by the cost to purchase extended warranties.  Sony estimated that it would cost about $6.8 million to satisfy future claims under the extended warranty, based on

---

[70] Declaration of Kirk D. Kleckner Regarding Valuation of Customer Support Program (Dkt. No. 3558) ("Kleckner Decl."), ¶¶ 8-11.  Mr. Kleckner is a Certified Public Accountant with special accreditation in business valuation and intangible asset valuation.  His relevant experience includes serving as Chief Financial Officer for a Top 50 dealership group, where he reviewed extended service contract relationships and established and oversaw dealer-owned reinsurance entities and structures for extended service contracts.  *Id.*, ¶¶ 1-3.

[71] Objection No. 46 at 2; Objection No. 66 at 6-7.

[72] Objection No. 65 at 16-18.

- 27 -

projecting future warranty costs from actual warranty claim costs already incurred.[73] Alternatively, Sony estimated the value of the extended warranties to the class to be $15.9 million based on what class members would have paid under an extended service agreement for the same amount of warranty extensions provided in the settlement.[74]

In *Vaughn v. American Honda Motor Co.*, Honda agreed to extend the warranties and lease contracts of all current owners of 2002-2006 Honda and Acuras by 5 percent. The total value of the settlement was estimated to cost Honda approximately $115 million. Plaintiffs' expert testified that the total value to the class of the settlement benefits was $244 million.[75] The opinion did not discuss how these numbers were estimated, but the plaintiffs submitted a declaration of an actuary, who estimated the value of the extended warranty part of the settlement by taking Honda's experts' projected future repair costs under the warranty extensions and converting those costs into the price of extended warranty and service plans marketed to vehicle owners by various underwriters.[76]

Providing a third example, the class action settlement in *O'Keefe v. Mercedes-Benz United States, LLC*[77] included a 10 year/150,000 mile warranty specific to the engine damage at issue in the case. Plaintiffs' actuary, Mark Johnson, took the

---

[73] 2010 U.S. Dist. LEXIS 87643, at *26-27, *31 (S.D.N.Y. Aug. 24, 2010).

[74] *Id.* at *32-34. The calculation was made by taking the average cost of a 2-year extended service plan, dividing it by 24 to obtain a monthly cost, discounting it by 40% to account for the fact that an extended service plan covers repairs for issues beyond the optical block, and then multiplying the resulting amount by the number of months of warranty extension provided in the settlement for each model. *Id.*

[75] 627 F. Supp. 2d 738, 747 (E.D. Tex. 2007).

[76] Berman Reply Decl., Ex. D.

[77] 214 F.R.D. 266 (E.D. Pa. 2003).

- 28 -

Mercedes 7-year/100,000 mile extended powertrain warranty, which was priced at $658, and then multiplied it by 1.75 to convert to a 10-year/150,000 mile warranty. Even though duration of the extended warranty was only 42% longer than the base warranty and the mileage coverage was only 50% longer, Johnson added 75% to account for the fact that, as a vehicle ages, repair bills increase and more warranty claims are filed towards the tail end of the warranty period. Johnson then multiplied that figure by 15% given his belief that 15% of a powertrain warranty's coverage is devoted to "internally lubricated engine claims." Johnson then multiplied the total by 1.5 because he believed that Mercedes cars in the U.S. were three to four times more likely to experience the oil sludging problem and then added a $25 administrative fee for paying an outside party to handle the claims processing. This resulted in Johnson valuing the extended warranty at $284.09 per vehicle for a total class value of $119,700,000. The court found the Johnson methodology to be generally correct.[78]

Mercedes submitted a valuation by George Eads, who measured the value of the extended warranty by estimating Mercedes' likely costs of satisfying claims – about $4.1 million. The court rejected this approach based on its finding that the benefit to the class is best measured by estimating the market price of the extended warranty:

> We found Dr. Eads's report unrelated to the settlement's valuation because it measured the common fund by MBUSA's costs and not by the benefit the class. … We believe that the benefit[s] to the class are most accurately

---

[78] *Id.* at 306. The court found the $25 administrative fee and the 1.5 multiplier unsupported by any evidence. The court was also reluctant to accept Johnson's 15% reduction but was not in a position to choose a better number. *Id.*

010172-25  613134 V1

measured by making an estimation of the Extended Coverage Program's market price.  We realize that this figure is difficult to estimate because the Extended Coverage Program-or any similar warranty product-is not on the market.  Yet, economists, actuaries, investors and businesspeople must estimate and value risk in all types of market transactions.  A warranty is simply the ex ante market price of insuring against a foreseeable risk.  Any other measure except the market price would over or underestimate the benefit to the class.[79]

Mr. Kleckner's valuation methodology is firmly supported by these three authorities.  In opposition, objector Guerriero quotes from the Federal Judicial Center's *Managing Class Action Litigation:  A Pocket Guide for Judges*, which states that "determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits."[80]  Guerriero then omits a key sentence of the passage he quotes:  "In some cases, particularly settlements involving injunctive or declaratory relief, you might use expert valuations based on reliable, objective standards."[81]  That is precisely what Mr. Kleckner has done here.

Guerriero offers nothing of substance in response.  His attorney's effort to derail this Settlement is unsupported by any expert opinion and is merely based on incorrect, scattershot mischaracterizations of Mr. Kleckner's work.  For example, Guerriero surmises that Mr. Kleckner did not consider data for the five principal components covered by the CSP.[82]  This is untrue.  Included among the many data points that Mr. Kleckner considered in forming his opinion were historical failure

---

[79] *Id.* at 305 (footnote omitted).

[80] Barbara J. Rothstein and Thomas E. Willging, *Managing Class Action Litigation:  A Pocket Guide for Judges* at 34 (Federal Judicial Center 2010).

[81] *Id.*

[82] *Id.* at 22.

- 30 -

occurrence rates, labor and cost data, and average historical repair costs *for the five specific parts at issue*.[83]  And there is nothing speculative about this data, as Guerriero suggests, for Mr. Kleckner was provided Toyota's actual warranty claims data for the subject components through May 2012 for model years 2001-2010.[84]  Thus, Mr. Kleckner's valuation is based, in part, on Toyota's actual claims experience for the specific parts covered by the CSP.

Guerriero cites a *Consumer Reports* article opining that the need for serious repairs is uncommon because modern cars are generally reliable and advising consumers to reflect on how much "peace of mind" an extended warranty is really worth to them.[85]  A three-page article cautioning consumers to carefully evaluate extended warranties is hardly a substitute for a valuation opinion from an independent expert.  Moreover, the reliability of the Subject Vehicles is already considered in the valuation because Mr. Kleckner has reviewed actual claims information for these vehicles and parts, and reliability (as well as likelihood of future claims) is also inherent in the existing Toyota-specific extended warranties that Mr. Kleckner consulted in his work.

Further, Guerriero's observation that modern vehicles are generally more reliable than earlier model generations, even if true for each and every Subject Vehicle, is not a reason to deprive the Class of the CSP benefits.  Even high-end cars come with standard warranties for a reason:  consumers want them.  And Mr. Kleckner's review of actual claims data for the parts at issue – that is, *actual*

---

[83] Kleckner Decl., ¶¶ 8(c) and (e).

[84] *Id.* at Ex. B.

[85] Objection No. 65 at 16-20 and Ex. A.

- 31 -

*evidence* – suggests that Class Members are certainly better off by receiving extended protection against the risk that these parts will fail at some point during the useful life of the vehicle (because they have been shown to fail in the past). Even the *Consumer Reports* article supports this conclusion given that the CSP will cost Class Members nothing: the survey done for the article found that those who purchased extended warranty coverage incurred covered repair costs, on average, of $700 that they would have paid for themselves in the absence of the extended warranty coverage.[86] Indeed, 38 percent of survey respondents reported that they were "highly satisfied" with their extended warranty purchase.

In sum, Mr. Kleckner employed methods and analyses of a type reasonably relied on by valuation experts,[87] and his valuation opinion is reliable and remains unrebutted by any objector. The Court can and should quickly reject Mr. Guerriero's unsupported conjecture and overrule his and the other two objections to the CSP.[88]

## F.   An Initial Claims Process was Necessary

Two objectors believe that claim forms should not be required and that all Class Members should just be sent checks.[89] As noted above, the use of Claim Forms was necessary in this Settlement because the Polk and other registration data received by Gilardi, while providing a comprehensive database of current and former

---

[86] The article criticized this $700 average benefit because the average cost of the coverage was $1,000. But that criticism does not apply here given that the CSP is being provided without charge.

[87] Kleckner Decl., ¶ 7.

[88] An additional objector, Ms. Murray, wishes the CSP lasted longer. Objection No. 45. The 10 year/150,000 mile limitation, subject to a three-year minimum, is what the Parties bargained for and, as demonstrated, provides substantial value.

[89] *See* Objection Nos. 46, 65.

- 32 -

Subject Vehicle owners, does not constitute a complete source of address and other information for all Class Members.  Consequently, Class Members not included in the Polk data needed to self-identify by submitting claims.[90]

In any event, Class Members eligible for payment from the two cash funds and identifiable through Polk data will receive a check under the Parties' proposed supplemental distribution plan, so these objections are moot.  And those Class Members who did make the effort to file valid claims will be rewarded by receiving 100% of the base amounts to which they are entitled from each Fund.

**G.    The Automobile Safety Research and Education Fund is Tailored to Benefit all Class Members and Conforms to Ninth Circuit Standards**

Many objectors complain that no monies should be contributed to the Automobile Safety Research and Education Fund.  Contending that the Safety Research and Education Fund does not comply with Ninth Circuit *cy pres* standards, they object to the $30 million initial contribution and/or additional contributions in *cy pres* and urge the Court to distribute all monies directly to Class Members instead.[91]  Some objectors believe that the education and research proposals should be changed to focus more on UA.[92]  The Court should reject these objections.

**1.    The initial funding of the Safety Research and Education Fund is not a *cy pres* contribution.**

Importantly, the $30 million initial contribution to the Safety Research and Education Fund is not a *cy pres* component of the Settlement, as some objectors

---

[90] Even objector Guerriero admits that requiring Claim Forms for Class Members not identified in Toyota's databases "makes sense."  Objection No. 65 at 25.

[91] *See* Objection Nos. 5, 6, 9, 18, 21, 33, 36, 46, 64, 65, 67, 75.

[92] *See* Objection Nos. 55 and 65.

- 33 -

contend.  "*Cy pres*" is "shorthand for the old equitable doctrine '*cy prés comme possible*' – French for 'as near as possible.'"[93]  In class action settlements, federal courts deploy the doctrine in lieu of direct distribution of damages to class members "where the proof of individual claims would be burdensome or distribution of damages costly."[94]  But the $30 million initial contribution to the Safety Research and Education Fund is not made in lieu of direct distribution of damages to Class Members, who have been identified and will be receiving money directly from the Settlement proceeds – whether by filing valid claims or being provided checks directly under the Parties' contemplated amendment to the Allocation Plan.  The $30 million contribution is an independent, separately negotiated Settlement component obtained for the benefit of all Class Members in order to further an objective of the lawsuit to make driving vehicles with ETCS safer.[95]  Importantly, it also provides a benefit to Class Members who sold or traded-in their Subject Vehicles outside of the damage period, and who otherwise would receive no cash payments or other benefits under the Settlement despite being subject to the release of claims.[96]  The objectors overlook this integral purpose of the $30 million initial contribution in mistakenly

---

[93] *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012).

[94] *Id.* (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)).

[95] The creation and funding of the Safety Research and Education Fund was negotiated after agreement was reached on the $500 million cash funds, and, therefore, does not serve to reduce the amount of cash payments made directly to Class Members.

[96] Objectors Bandas (Objection No. 5) and Serafino (Objection No. 67), without citing supporting authority, contend that Lead Class Counsel breached fiduciary duties to Class Members by agreeing to the $30 million initial contribution.  It can hardly be considered a breach of fiduciary duty to provide a benefit to Class Members who provide a release of claims but receive no payment based on expert opinion that they suffered no economic loss on the sale or trade-in of their vehicles.

- 34 -

characterizing the $30 million contribution as a *cy pres* use of funds that will take away from Class Members who will receive a cash payment.

The only *cy pres* component of the Settlement is associated with any monies that may spillover into the Safety Research and Education Fund after all cash distributions are complete and monies remain as a result of uncashed checks.  Given the measures that the parties have taken (and will continue to take) to distribute the two cash Funds directly to Class Members, and the operation of state escheatment statutes, it is unclear whether **any** residual monies will be left over for contribution to the Safety Research and Education Fund.  If any monies do spillover, the amount is likely to be small.[97]

> ### 2.    Using the Safety Research and Education Fund as a vehicle to receive any residual funds is entirely proper under Ninth Circuit *cy pres* standards.

The Ninth Circuit instructs that there must be "a driving nexus between the plaintiff class and the *cy pres* beneficiaries."[98]  This means that the award must be guided by the objectives of, and issues invoked by, the underlying statute or lawsuit and the interests of the class.[99]  The award must not benefit a group "too remote from the plaintiff class,"[100] and must "target the class" by accounting for the geographic dispersion of the class (that is, if the class is national, the *cy pres* distribution must

---

[97] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 174 ("Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds.").

[98] *Kellogg Co.*, 697 F.3d at 865 (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990)).

[99] *Kellogg*, 697 F.3d at 858 (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011)).

[100] *Id.* at 865 (quoting *Six Mexican Workers*, 904 F.2d at 1308).

- 35 -

have a national scope).[101]  Further, the *cy pres* recipients must be identified to the court at the time settlement approval is sought so the court can "undertake the searching inquiry" that precedent requires.[102]

In articulating the foregoing framework for evaluating *cy pres* distributions, the Ninth Circuit addressed what it saw as the unwise use of *cy pres* in three cases. The plaintiffs in *Kellogg* alleged that Kellogg violated the California Unfair Competition Law ("UCL") and the California Consumer Legal Remedies Act ("CLRA") by disseminating advertisements claiming that eating a breakfast of Frosted Mini-Wheats helps improve children's attentiveness.  The settlement created a fund against which class members could file claims, and any unclaimed monies would be donated to unidentified charities to be chosen by the parties and approved by the court.  In addition, Kellogg agreed to donate $5.5 million worth of food items to charities that feed the indigent.[103]

The court found the *cy pres* awards "divorced from the concerns embodied in consumer protection laws such as the UCL and CLRA," which were enacted to protect the public from unfair and deceptive business practices.  While the Ninth Circuit acknowledged that providing food for the indigent is a noble goal, it had "little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved."[104]  More appropriate *cy pres* recipients would be organizations

---

[101] *Nachshin*, 663 F.3d at 1040.

[102] *Kellogg*, 697 F.3d at 867.

[103] 697 F.3d at 862-63.

[104] *Id.* at 866 (quoting *Nashshin*, 663 F.3d at 1039).  The settlement also could not be approved because all *cy pres* recipients had not been identified.  *Id.* at 867.

- 36 -

1    dedicated to protecting consumers from, or redressing injuries caused by, false

2    advertising.[105]

3        In *Nachshin*, the plaintiffs accused AOL of violating a number of statutes,

4    including the UCL and CLRA, by wrongfully inserting commercial footers into

5    outgoing emails.  As part of the settlement, AOL agreed to make substantial

6    donations to the Legal Aid Foundation of Los Angeles, the Federal Judicial Center

7    Foundation, and the Los Angeles and Santa Monica chapters of the Boys and Girls

8    Club of America.[106]  The Ninth Circuit held that the proposed *cy pres* distribution

9    failed to target the plaintiff class, because it did not account for the class's broad

10   geographic distribution (66 million AOL users across the country), and the donation

11   to the Federal Judicial Center Foundation "ha[d] no apparent relation to the

12   objectives of the underlying statutes, and it [wa]s not clear how this organization

13   would benefit the plaintiff class."[107]  Given that all class members used the Internet,

14   and that their claims arose from an allegedly unlawful advertising practice, the court

15   directed the parties to select non-profit organizations that work to protect Internet

16   users from fraud and other forms of online deceptive conduct.[108]  Thus, assuming

---

[105] *Id.*

[106] 663 F.3d at 1037.

[107] *Id.* at 1040.

[108] *Id.* at 1041.  The court also criticized *cy pres* distributions in other cases that had little or nothing to do with the purposes of the underlying lawsuit or the plaintiff class.  *Id.* at 1039 (citing as examples *In re Motorsports Merch. Antitrust Litig.*, 160 F. Supp. 2d 1392, 1396-99 (N.D. Ga. 2001) (distributing $1.85 million remaining from a price-fixing class action settlement relating to merchandise sold at professional stock car races to ten organizations including the Duke Children's Hospital and Health Center, the Make-a-Wish Foundation, the American Red Cross, and the Susan G. Komen Breast Cancer Foundation); *Superior Beverage Co., Inc. v. Owens-Illinois, Inc.*, 827 F. Supp. 477, 480 (N.D. Ill. 1993) (awarding $2 million from an antitrust class action settlement to 15 applicants, including the San Jose

- 37 -

suitable *cy pres* recipients were designated, the Ninth Circuit held that the entire settlement fund could be paid to those recipients.

In *Six Mexican Workers*, a class of undocumented Mexican farm workers sued various companies for violations of the Farm Labor Contractor Registration Act. After a bench trial, the district court found the defendants liable for statutory damages and identified the Inter-American Fund, which provided humanitarian aid in Mexico, as the *cy pres* recipient of any unclaimed funds.[109]  The appellate court held that the *cy pres* distribution was an abuse of discretion, because the proposal benefitted a group "far too remote from the plaintiff class," and there was "no reasonable certainty" that any class member would benefit, even though the money would go "to areas where the class members may live."[110]  The purpose of the statute was to compensate victims of unscrupulous employers and to deter future violations, but there was no evidence that the Inter-American Fund conducted projects that were consistent with this purpose or otherwise protected the interests of the class members.  The court also found inadequate supervision of the distribution of the funds.[111]

Any *cy pres* contributions that are ultimately made to the Safety Research and Education Fund conform to these Ninth Circuit standards, and the criticisms of the *cy pres* components of the foregoing three settlements are not remotely applicable here.

---

Museum of Art, the American Jewish Congress, a public television station, and the Roger Baldwin Foundation of the American Civil Liberties Union of Illinois)).

[109] *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990).

[110] *Id.* at 1308.

[111] *Id.*

- 38 -

First, the proposed program addresses the objectives of, and issues raised in, the litigation and serves the interests of all Class Members.  The case is about UA and how to remedy it, and the primary components of the planned research and education programs do just this by focusing on driver attitudes, behaviors, and levels of understanding concerning defensive driving techniques and the proper use of vehicle safety systems; educating drivers in defensive driving skills, driver attention, and the proper use of technology (including, specifically, to mitigate against UA); and funding university-based research projects relating to advances in active safety features, vehicle control, and driver attention.[112]

Second, the plan "targets the Class" by accounting for the national scope of the Class:  the benefits of the research will not be limited to one state or region of the country, but rather will apply to all Class Members, vehicles, and manufacturers on a nationwide basis.  Thus, unlike the proposed programs in the *Kellogg*, *Nachshin*, and *Six Mexican Workers* cases, any *cy pres* uses here will not benefit a group "too remote" from the Class given that all Class Members will benefit from research and education concerning driving safety and will likely purchase or lease a new vehicle at some time in the future and should, therefore, have an interest in ensuring that new

---

[112] Indeed, the nexus here between the proposed use of *cy pres* funds and the objectives of the lawsuit and interests of the Class is tighter than those in the *cy pres* program recently approved by the Ninth Circuit in *Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012).  There, the plaintiffs alleged that Facebook had violated various state and federal privacy statutes by gathering and publicly disseminating information about Facebook members' online activities without permission.  An integral part of the proposed settlement, which was approved by the court, was the creation of a $65 million fund to create a new charitable organization with the stated purpose of funding and sponsoring programs designed to educate Internet users and regulators on how to protect their identity and personal information online.  Unlike this case, the settlement did not include any direct payments to class members.  *Id.* at 817.

- 39 -

010172-25  613134 V1

1    vehicles in the United States have enhanced safety systems and that drivers are

2    informed about how best to use those systems.

3         Third, unlike the proposal at issue in *Kellogg*, the Parties have carefully

4    selected and identified the organizations that will conduct the national consumer

5    survey and the national driver education campaign (University of Iowa Public Policy

6    Center), and the organizations that will conduct the safety research component

7    (University of Iowa Public Policy Center, Texas A&M Transportation Institute,

8    University of Michigan Transportation Research Institute, Stanford University, and

9    Massachusetts Institute of Technology AgeLab), as well as the specific dollar

10   amounts devoted to this objective ($15 million).[113]

11

12        The Snyder and Weeks objections do not object to the creation of the Safety

13   Research and Education Fund but take issue with the proposed safety research

14   programs and propose alternative, nebulous research topics that focus on the use of

15   lead solder in electronic components, lithium-ion batteries in hybrids, fault detection

16   capabilities, and supply chain management.[114]  Yet Snyder and Weeks fail to explain

17   how these topics have a tighter nexus to this litigation than do the very specifically-

18   described and comprehensive research and education topics proposed in the

19   Settlement.[115]  The lawsuit focuses on UA, its alleged causes, and ways it might be

20   avoided.  And that is what the research initiatives proposed by the Parties do.  More

---

[113] Thus, the Collins, Roberts, and Patel objectors are just wrong in stating that the Parties have not identified the actual recipients of the money.  *See* Objection No. 64 at 12.

[114] *See* Objection No. 55 at Ditlow Declaration (Dkt. No. 3668) at Attach. A.

[115] It is a stretch to suggest that proposals to study lithium-ion batteries in hybrids and supply chain management problems have a tight nexus to the issues invoked in the lawsuit.  Neither topic is the subject of Plaintiffs' claims in the operative Third Amended and Consolidated Complaint.

- 40 -

specifically, the funded programs include (i) research on vehicle design to avoid UA, (ii) research and education on what drivers should do in the event of a UA occurrence, and (iii) research and education on how drivers can avoid UA.  The Snyder and Weeks proposals should not displace the plan carefully constructed by the parties to best advance the underlying issues invoked by this litigation.[116]/[117]

## H.   The Allocation Groups Are Reasonable and Well-Grounded in Applicable State Law

As the Court's prior rulings recognize, the law among the 50 states varies with regard to whether a plaintiff must demonstrate manifestation of the defect in order to pursue viable claims.[118]  Consequently, for purposes of distributing monies from the two cash Settlement Funds, the Allocation Plan applies a percentage to a Class Member's base payment amount depending on the state in which the claiming Class Member resides (100% for non-manifestation jurisdictions, 30% for manifestation-required jurisdictions, and 70% for unclear jurisdictions), except that Class Members receive 100% of base amount if they, on or before December 1, 2012, reported to

---

[116] *See Facebook*, 696 F.3d at 820-21 (court's task is not to require the "settling parties [to] select a *cy pres* recipient that the court or class members find ideal," which would constitute an "improper and disruptive" "intrusion into the private parties' negotiations").

[117] Snyder and Weeks argue that research should further the purpose of statutes that "protect consumers from defective products, prohibit the concealment of defects and compel manufacturers to honor their promises to consumers," Objection No. 55 at 6, yet they do not explain how their research topics advance these interests (or advance these interests to any extent greater than the parties' proposed topics do). The Guerriero, Collins, Roberts, and Patel objections suggest that, if there is to be any *cy pres* use of funds, it be done generally in relation to false advertising and breach of warranties.  *See* Objection No. 65 at 14; Objection No. 64 at 12-13.  But they do not provide any specific topics, so the suggestion is unhelpful.  In addition, it is off-base, because the proposed research and education initiatives to be funded by the Safety Research and Education Fund have a close nexus with underlying consumer protection statutes and the issues raised in this litigation.

[118] *See, e.g.*, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. No 2496) *passim*.

- 41 -

Toyota, a Toyota Dealer, or NHTSA that they believed they experienced a UA event.[119]

Plaintiffs' Class Counsel grouped the states into the three categories based on extensive legal research. The base payment percentage adjustments were decided at an allocation mediation presided over by Settlement Special Master Patrick Juneau, with each group having separate and independent representation by Allocation Counsel appointed to represent the interests of Class Members in each group.[120] The groupings are well-supported by law, and there were no disabling conflicts impeding adequate representation.

### 1. Plaintiffs' allocation groupings are well supported by law.

Two objectors take issue with the Allocation Plan's use of the three subgroups to differently allocate monies across non-manifestation, manifestation required, and unclear jurisdictions.[121] Objector Guerriero appears to complain that different allocation groups should not be used.[122] However, courts permit different treatment where differences in law or fact warrant it.[123] Guerriero next contends that the use of

---

[119] Agreement, Exhibit 16 at 2, 6.

[120] *Id.* at 1.

[121] *See* Objection Nos. 48, 65.

[122] Objection No. 65 at 5-8.

[123] *See*, *e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 273 (3d Cir. 2009) (approving settlement "allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe"); *In re TD Ameritrade Account Holder Litig.*, 2011 U.S. Dist. LEXIS 103222, at *24-25 (N.D. Cal. Sept. 12, 2011) (settlement approved where monetary relief provided for some class members who experienced identity theft but not for other class members who did not); *Glass v. UBS Fin. Servs.*, *Inc.*, 2007 U.S. Dist. LEXIS 8476, at *25 (N.D. Cal. Jan. 26, 2007) (rejecting objection to allocation plan and explaining that differential payments based on state of residence is justified because claims of plaintiffs in some states were "more valuable . . . than the claims of class members in other jurisdictions"), *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S.

- 42 -

groupings are unexplained and arbitrary,[124] yet the Allocation Plan and Plaintiffs' opening brief clearly identify each state included in each group.  Guerriero also complains that claimants who experienced a UA can have their payment amounts stepped-up if they participate in the Cash-in-Lieu-of-BOS Fund but not if they participate in the Alleged Diminished Value Fund.[125]  Putting aside the fact that Guerriero is not affected by the Allocation Plan as it applies to the Alleged Diminished Value Fund because he is a current owner and only has a claim to the Cash-in-Lieu-of-BOS Fund, Guerriero misunderstands the Allocation Plan – it clearly increases the percentage recovery for Alleged Diminished Value Fund claimants who experienced a UA.[126]

Objectors Carpenter, Tyler, and the Piazzas object to the inclusion of Ohio and Pennsylvania in the non-manifestation category, stating that the Court already held that these two states would highly likely preclude claims where no defect manifested.[127]  The Court did not engage in an in-depth analysis of Ohio and Pennsylvania law, instead categorizing those states in a string cite of cases.  We suggest, respectfully, that the Court incorrectly classified Ohio and Pennsylvania in the manifestation category.  In Ohio, it is clear that manifestation of defect is not required for claims under Ohio's Consumer Sales Practices or Deceptive Trade

---

Dist. LEXIS 29161, at *26 (E.D. Pa. Sept. 27, 2004) ("In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable.") (internal quotation omitted).

[124] Objection No. 65 at 6.

[125] *Id.* at 6-7.

[126] Agreement, Exhibit 16 at 2.

[127] Objection No. 48 at 2 (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices & Prods. Liab. Litig.*, 785 F. Supp. 2d 925, 932 (C.D. Cal. 2011)).

- 43 -

1   Practices Act (the "CSPA").[128]  Similarly, Pennsylvania does not require

2   manifestation of defect for the Unfair Trade Practices and Consumer Protection Law

3   ("UTPCPL") claims.[129]

4

5        Carpenter, Tyler, and the Piazzas also object to Class Members residing in

6   manifestation-required states from recovering at all.[130]  The objection should be

7   rejected for three reasons.  First, it ignores this Court's ruling that all Plaintiffs and

8   Class Members have Article III standing to pursue claims because they all suffered

9   an economic loss ***at the time of purchase*** by virtue of receiving an allegedly

10

11       [128] *See*, *e.g.*, *See Blankenship v. CFMOTO Powersports, Inc.*, 161 Ohio Misc. 2d
    5, 10-11 (Ohio C.P. 2011) (because the "CSPA is designed to assure that consumers

12   will recover 'any damages' caused by deceptive acts or practices," "plaintiff and
    proposed class members need not allege an actual physical injury, but are instead

13   required under the CSPA to allege some type of injury, whether economic or
    noneconomic, and/or to request injunctive relief"); *Hoffer v. Cooper Wiring Devices,

14   Inc.*, 2007 U.S. Dist. LEXIS 42871, at *9 (N.D. Ohio June 13, 2007) (refusing to
    dismiss CSPA claim where plaintiff and not suffered injury but where the defendant

15   "misrepresented the push-in receptacles it sold were of superior quality and safe;
    when in fact, they are inferior in quality to binding screw terminal receptacles and

16   are unsafe"); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552, 554 (6th Cir. 2006)
    (certifying Ohio class and explaining that "the legal question of whether the warranty

17   contract is properly read to contain a promise to repair the type of common 'defect'
    in all the 1999 or 2000 throttle body assemblies (regardless of whether or not

18   manifested during the warranty period) is [] common to the class" seeking recovery
    for overpayment for and diminution in value of vehicles).

19       [129] *Zwiercan v. Gen. Motors. Corp.*, 2002 Phila. Ct. Com. Pl. LEXIS 24, at *15
    (Pa. C.P. May 22, 2002) ("The fact that the Plaintiff has not suffered a manifestation

20   of the alleged defect in her Vehicle does not preclude her UTPCPL claim, but bars
    her breach of warranty claim."); *Solarz v. DaimlerChrysler Corp.*, 2002 Phila. Ct.

21   Com. Pl. LEXIS 34, at *19 (Pa. C.P. Marc. 13, 2002) (plaintiffs' claims under
    UTPCPL sustained where "all the plaintiffs have alleged ascertainable losses to

22   support their UTPCPL claims," including "the cost of installing the park-brake
    interlock in [Daimler]Chrysler minivans and/or the difference in value between

23   minivans with the park-brake interlock device and those without it"); *Grant v.
    Bridgestone/Firestone Inc.*, 2002 Pa. Dist. & Cnty. Dec. LEXIS 121, at *74-78 (Pa.

24   Cnty. Ct. June 10, 2002) (dismissing claim for breach of implied warranty because
    plaintiffs did not suffer a failure of the allegedly defective tires but sustaining claim

25   under UTPCPL because plaintiffs alleged that they expected to receive tires and
    vehicles of a particular standard or quality but actually received a lower standard or

26   quality).  It appears that the case cited by the Court, *Angus v. Shiley Inc.*, 989 F.2d
    142, 147 (3d Cir. 1993), did not consider a UTPCPL claim.

27       [130] Objection No. 48 at 2.

28                                    - 44 -

defective vehicle.[131]   Second, Class Members in these states are providing a release of claims and are entitled to consideration in exchange for the release of the disputed claim.  Third, it is not clear that the highest courts in manifestation-required jurisdictions would, in fact, hold that experiencing a UA is necessary to state a cause of action *under the specific circumstances of this case*, where a safety defect is alleged and where the vehicles in question have statistically higher rates of UA than other vehicles.  Courts in these states may find that a consumer can assert claims for economic losses arising from safety defects that trigger grave and sudden malfunctions in automobiles even before that consumer's vehicle actually malfunctions, particularly where, as here, there is a demonstrable loss in value when the defects became known.  Until that very specific issue is definitively decided in this case, one cannot say that Class Members residing in jurisdictions classified as manifestation-required should not recover anything in this Settlement.

Carpenter, Tyler, and the Piazzas next contend that Class Members residing in "unclear" jurisdictions should receive 50% instead of 70%.[132]  These objectors do not provide any rationale for the suggested 50% recovery, and merely wish to substitute their arbitrary figure for a discount that was carefully negotiated among independent allocation counsel under the supervision of the Settlement Special Master.  They should not be permitted to impose their idiosyncratic views on the

---

[131] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 790 F. Supp. 2d 1152, 1165 (C.D. Cal. 2011).

[132] Objection No. 48 at 3.

- 45 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

independent process that was instituted to safeguard the interests of **all** Class Members.[133]

Lastly, if the foregoing objectors choose to file claims, their objections are mooted by the parties' proposed supplemental distribution plan which would uplift all claimants to 100% of their base recovery amount.

### 2.    Subclassing is unnecessary.

Objectors Bandas and Serafino contend that intraclass conflicts exist and that that the allocation groups should have been divided into seven, unspecified and separate subclasses with separate representation.[134]  Again, courts recognize that intra-class allocations can be tailored to the specific circumstances of different groups and specifically consider differing strengths of their claims.[135]  Allocations that are "simply a reflection of the extent of the injury that certain class members incurred" do "not clearly suggest that the class members had antagonistic

---

[133] These objectors also claim it is unclear which state a claimant is considered to reside in when the vehicle was purchased in one state and the claimant subsequently moved to another state.  Objection No. 48 at 3-4.  There should be no confusion. The Allocation Plan refers to where the Class Member purchased, leased, now resides or insured the residual value of a vehicle, thereby giving the Class Member a choice of jurisdiction.  In the event that multiple jurisdictions may apply, the claims process puts the Class Member into the jurisdiction having the highest recovery.  For example, the Settlement website permits a claimant to input (i) the state where they purchased, leased, registered, etc., their vehicle and (ii) the state in which they currently reside.  Claimants are instructed to select all of the options that may apply. So, if a claimant purchased his or her vehicle in a non-manifestation state, he or she would click the box from the website designated for that state.  If the claimant currently resides in a manifestation state, they would also click the box from the website designated to those states.  The website would then automatically default to the state that provides the claimant with the highest value – in this example, the non-manifestation state value.  As another example, if a claimant only clicks the box for a manifestation or unclear state, but their address information shows that they currently reside in a non-manifestation state, the website automatically overrides the selection of the manifestation or unclear state election and provides the claimant with the maximum non-manifestation state claim value.

[134] *See* Objection Nos. 5 and 67 at 8.

[135] *See*, *supra*, authorities cited at footnote 123.

- 46 -

interests."[136]  A fair distribution results when class members "who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe."[137]

Furthermore, subclassing is unnecessary.  Subclasses are used when class members have divergent interests, but conflicting or antagonistic interests do not result just because the relief varies among the different groups.  What is important is that the central questions in the case about defendant's alleged conduct and the damage inflicted thereby affect the plaintiffs and the absent class members in a similar fashion, and that all class members have a unified interest in establishing the defendant's liability.[138]  That is certainly the case here, where the Court has already conditionally found that all Class Member's claims arise from the same allegations regarding a common defect, derive from similar or identical warranties, are based on common advertisements and representations regarding the vehicles, and have suffered the same injuries based on Toyota's common course of conduct.[139]

### 3.    Plaintiffs have the requisite Article III standing.

Objectors Collins, Roberts, and Patel, in their joint objection, contend that the Court does not have jurisdiction to certify the Settlement Class or approve the Settlement because Plaintiffs and Class Members who did not experience a UA or retained their vehicle after December 31, 2010 cannot meet the requirements of

---

[136] *Ins. Brokerage*, 579 F.3d at 272.

[137] *Id.* at 273.

[138] *Id.* at 272-73.

[139] Order Re: Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 3344) at 6-7.  The Court has also found that the Plaintiffs are fair and adequate Class Representatives and that "the Court can discern no conflict of interest between the Class Representatives and the class members."  *Id.* at 8.

- 47 -

1   Article III standing.[140]  Incredibly, under their very own argument, objectors Collins,

2   Robert, and Patel *themselves* would lack standing to assert claims because they each

3   purport to be current vehicle owners, and none of them has stated that they have

4   suffered a UA.  Although these objectors "contend they have been harmed by the

5   Defendants' actions," they fail to describe exactly how.  If they want their objection

6   considered, Collins, Roberts, and Patel should be compelled to explain how they

7   have been damaged while all Plaintiffs and other Class Members in identical

8   circumstances have allegedly not been damaged.[141]  In any event, the objection can

9   be quickly rejected because it misapplies well-established Article III standing law.

10          The objection confuses Article III standing with a formula for distributing

11  settlement proceeds.  As this Court has already and correctly held, because Plaintiffs

12  allege "that all Toyota vehicles had the safety defect at the time of purchase, and the

13  defects were not subsequently remedied through recalls, all Plaintiffs suffered an

14  economic loss *at the time of purchase* because they received a defective vehicle.

15  The fact that Plaintiffs discovered this defect after the time of purchase is of no

16  moment.  The economic loss was present *from the beginning*."[142]  Put simply by the

17  Court, "Plaintiffs bargained for safe, defect-free vehicles, but instead received

18  unsafe, defective vehicles."[143]  Because "[a] vehicle with a defect is worth less than

---

[140] Objection No. 64 at 2-5.

[141] Collins, Robert, and Patel are represented by Jeffrey Weinstein, a well-known "serial" or "professional" objector.  His inconsistent – if not hypocritical – standing argument highlights the perils of giving credence to professional objections, which are often brought solely to disrupt class action settlements regardless of their merits, in order to extort attorneys' fee payments (as discussed further below).

[142] *Toyota Motor Corp.*, 790 F. Supp. 2d at 1165 (emphasis added).

[143] *Id.* at 1163.

- 48 -

010172-25  613134 V1

one without a defect," reasoned the Court, the "overpayment for the defective, unsafe

vehicle constitutes the economic-loss injury that is sufficient to confer standing."[144]

In several recent cases, the Ninth Circuit has also sustained Article III standing based

on allegations of economic loss suffered at the time of purchase.[145]  Thus, Plaintiffs'

Settlement methodology for distributing monies for alleged diminished value, which

does not recognize sales before September 1, 2009 and after December 31, 2010,

does not alter the fact that, for Article III purposes, standing for all Plaintiffs and

Class Members was established at the time of purchase or lease.

## I.      The Scope of the Release of Claims is Reasonable and Bounded by the Claims Asserted in the Litigation

Only three objections take issue with the release of claims, contending that it

is too broad.[146]  Objection No. 31 is filed by the class attorneys in the *In re: Toyota*

*Motor Corp. Hybrid Brake Mktg., Sales Practices, and Prods. Liab. Litig.*, pending

in this District before Judge Carney.  These attorneys are concerned that the release

will end the claims in that MDL.[147]  Class Counsel do not believe that the release

affects these claims.

The remaining objection, filed by Erich Neumann, contends that the release is

overbroad because it would release all claims relating to the Subject Vehicles,

---

[144] *Id.*

[145] *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012); *Degelmann v. Advance Med. Optics Inc.*, 659 F.3d 835 (9th Cir. 2011), *vacated on other grounds*, 699 F.3d 1103 (9th Cir. 2012); *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011); *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168 (9th Cir. 2010).  *See also Ins. Brokerage*, 579 F.3d at 275 ("The named plaintiffs only needed to allege that they suffered an injury in fact and were not required to prove the merits of their case against the [defendants] to establish standing.").

[146] *See* Objection Nos. 23, 31, 46.

[147] Objection No. 23, filed by another attorney for a Prius owner, wants a release carve-out similar to that requested in Objection No. 31.

- 49 -

1    "irrespective of whether the claim has anything to do with the acceleration issue."[148]

2    This is not true.  The release and waiver of rights provides as follows:

3            In consideration for the Settlement, Class Representatives,
4            Plaintiffs and each Class Member, on behalf of themselves
             and any other legal or natural persons who may claim by,
5            through or under them, agree to fully, finally and forever
             release, relinquish, acquit, discharge and hold harmless the
6            Released Parties from any and all claims, demands, suits,
             petitions, liabilities, causes of action, rights, and damages
7            of any kind and/or type ***regarding the subject matter of the
             Actions***, including, but not limited to, compensatory,
8            exemplary, punitive, expert and/or attorneys' fees or by
             multipliers, whether past, present, or future, mature, or not
9            yet mature, known or unknown, suspected or unsuspected,
10           contingent or non-contingent, derivative or direct, asserted
             or un-asserted, whether based on federal, state or local law,
11           statute, ordinance, regulation, code, contract, common law,
             or any other source, or any claim of any kind related
12           arising from, related to, connected with, and/or in any way
             involving the Actions,  the Subject Vehicles, any and all
13           claims involving the ETCS, any and all claims of
14           unintended acceleration in any manner that are, or could
             have been, defined, alleged or described in the Economic
15           Loss Master Consolidated Complaint, the Amended
             Economic Loss Master Consolidated Complaint, the
16           Second Amended Economic Loss Master Consolidated
17           Complaint, the Third Amended Economic Loss Master
             Consolidated Complaint, the TAMCC, the Actions or any
18           amendments of the Actions, including, but not limited to,
             the design, manufacturing, advertising, testing, marketing,
19           functionality, servicing, sale, lease or resale of the Subject
20           Vehicles.[149]

21           Released claims should only be those made in the operative complaint and

22   those closely related thereto.[150]  By limiting the release to claims "regarding the

23

24   _____

25       [148] Objection No. 46 at 4.

26       [149] Agreement at 28-29 (emphasis added).

27       [150] *See*, *e.g.*, *In re Zoran Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 48246, at
     *31 (N.D. Cal. Apr. 7, 2008).

28                                           - 50 -

subject matter of the Actions," the Parties have limited the release of claims to satisfy this standard.  Released claims must pertain to the subject matter of the Actions and, thus, Mr. Neumann's assertion that all claims relating to the Subject Vehicles are released is incorrect.  Moreover, the release expressly preserves those claims for personal injury, wrongful death, or physical property damage arising from an accident involving a Subject Vehicle (including damage to the Subject Vehicle itself).  Courts routinely approve settlements containing similar release language, including a release of claims that could have been, but were not, brought in the case.[151]

## J.      Rule 23 Is Satisfied

The Gibson and Cozby objectors assert that Rule 23(a)'s commonality and typicality requirements are not satisfied because Plaintiffs cannot represent absent Class Members who have not suffered Article III injury.[152]  This is not true, as

---

[151] *See, e.g.*, *Class Plaintiffs v. Seattle*, 955 F.2d at 1287 ("The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*.'") (emphasis in original) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 303 (E.D. Cal. 2011) (finding release of "any and all claims, demands, rights, liabilities, and/or causes of action arising out of the facts alleged in the Complaint" proper and not overly broad because the "released claims appropriately track the breadth of Plaintiffs' allegations in the action and the settlement does not release unrelated claims that class members may have against defendants."); *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1120, 1126 (E.D. Cal. 2009) (finding release of "any and all claims, known and unknown, for or related to all claims based on or arising from the allegations that they were or are improperly compensated under federal, California, or local law" proper because the "released claims appropriately track the breadth of Plaintiffs' allegations in the action and the settlement does not release unrelated claims that class members may have against defendants.").

[152] Objection No. 33 at 15.

- 51 -

1
2
3
4
5
6

explained *supra* in Section IV.H.3.  Further, including in the Class only those members who have "colorable" claims would effectively preclude class action settlements given that the defendant would not be able to achieve "global peace," thereby undermining the strong presumption in favor of voluntary settlement agreements.[153]

7
8
9
10
11
12
13

These objectors also contend that Plaintiffs' Class Counsel are not adequate because they agreed to contribute money in *cy pres*,[154] but, as demonstrated above in Section IV.G, the initial $30 million contribution to the Safety Research and Education Fund is not a *cy pres* use of funds, and what little money that will be contributed to the Safety Research and Education Fund thereafter complies with Ninth Circuit *cy pres* standards.

14
15
16
17
18

These objectors also assert that common issues cannot predominate given the nationwide scope of the claims at issue and differing treatment of the manifestation requirement across jurisdictions.[155]  But courts recognize that differences in state law can be appropriately managed when the core facts are common to the class.[156]  The

19
20

[153] *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 1876, 182 L. Ed. 2d 646 (2012).

21

[154] *Id.*; Objection No. 33 at 15.

[155] *Id.* at 7-14.

22
23
24
25
26
27
28

[156] *See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998); *In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir. 1986); *Hanlon v. Chrysler Corp,* 150 F.3d at 1022; *Hansen v. Monumental Life Ins. Co.*, 2008 U.S. Dist. LEXIS 112254, at *22-29 (D. Conn. Mar. 6, 2008); *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 93-101 (D. Mass 2008); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 76-80 (E.D.N.Y. 2004); *Shaw v. Toshiba Am. Info. Sys.,* 91 F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp. 2d 59, 71 (D. Mass. 1999); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 64 (D. Mass. 1997); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997); *Deadwyler v. Volkswagen of Am., Inc.,* 1986 U.S. Dist.

- 52 -

Court need not find complete uniformity of state law, only that there are no material conflicts among the laws so that they can be divided into a small number of sub-groups,[157] as Plaintiffs have done here in creating three geographic subgroups for purposes of allocating cash payments.  Further, variations in state law largely dissipate when a court is considering certification of a settlement class.  As the Third Circuit recently explained:

> [W]e need not rely merely on certifications involving actual litigation of the class issues for the proposition that differing state laws do not defeat commonality or predominance.  The correct outcome is even clearer for certification of a settlement class because the concern for manageability that is a central tenet in the certification of a litigation class is removed from the equation.  Indeed, the class settlement posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance.[[158]]

The Court has already found that the Rule 23 requirements have been satisfied for settlement purposes.[159]  In doing so, the Court expressly highlighted the predominating, common issue of whether the vehicles have a common defect or defects, an issue that would be decided by evidence relevant to all Class Members.[160]  This objection provides no reason for the Court to change its ruling.[161]

---

LEXIS 28449, at *4-5 (W.D.N.C. 1986); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997) ("[p]redominance is a test readily met in certain cases alleging consumer or securities fraud").

[157] *See Simon v. Phillip Morris,* 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000); *see also* American Law Institute, *Principles of the Law:  Aggregate Litigation* § 2.05(b) (2010).

[158] *Sullivan*, 667 F.3d at 302-303.

[159] Dkt. No. 3344 at 3-13.

[160] *Id.* at 10.

[161] The Gibson and Cozy objection (Objection No. 33) purports to proceed *pro se*, but it appears that a clandestine "serial" objector counsel may have ghostwritten the objection.  We cannot speak to the reasons why counsel would orchestrate a *pro se*

- 53 -

**K.     Miscellaneous Objections Should Also be Rejected**

A number of miscellaneous objections have been raised, which, in the interests of brevity, will be discussed only briefly below.

*New cars*.  Some objectors do not wish to drive their vehicles any longer and appear to want new vehicles or help with financing.[162]  However, new cars are not being provided in the Settlement, and, as discussed above, the consideration being offered is fair and reasonable.

*Floor mats*.  The Boles, Harris, and Rainwater objectors complain that the Settlement fails to compensate for floor mats, lost use of floor mats, and carpet cleaning expenses.[163]  The issues invoked by these objectors are addressed in Toyota's reply brief, and we will not repeat those arguments here.  But we note that these claims are not encompassed by Plaintiffs' operative complaint and, therefore, have been dismissed.[164]

*Alleged notice deficiencies*.  Lin Ly and Margaret Strohlein object to the notice, contending that it does not permit them to estimate their individual recoveries because the notice does not specify the numbers of Class Members who will claim

---

objection, but a reasonable speculation may be that counsel has been labeled a serial objector in a prior opinion (*see, e.g.*, *In re Initial Pub. Offering Secs. Litig.*, 721 F. Supp. 2d 210, 214 (S.D.N.Y. 2010) (excoriating Pentz)) and may want to appear to be making the argument of an "unsolicited" class member.  Also, if ghostwritten, counsel behind the objection may be avoiding an appearance in an attempt to improperly circumvent state bar admission or *pro hac vice* requirements.

[162] *See* Objection Nos. 1, 2, 76.

[163] Objection No. 6 at 7-8.

[164] *See* Dkt. Nos. 367 and 498; Berman Decl., ¶¶ 28-32 (explaining how all claims not included in the Master Consolidated Complaints are considered dismissed).  Mr. Barnow, who is counsel for these objectors, had the opportunity to object to not seeking compensation for carpet cleaning expenses but did not do so.  It is now too late for him to clean up his apparent oversight.

- 54 -

against the cash Funds and the number of claimants falling into the no-manifestation required, unclear, and manifestation-required categories.[165]  This information was not provided simply because it was not known at the time notice was disseminated given that many Class Members had to self-identify themselves as a result of the incompleteness of the Polk data.  Further, class notices rarely tell Class Members precisely what their individual recovery under the settlement will be, which does not make the notice deficient.  Indeed, "[i]t is not necessary for the settlement distribution formula to specify precisely the amount that each class member may expect to recover."[166]  Nonetheless, the long-form notice, among many other things, provided a detailed description of how to file a claim and exactly how payments would be calculated.  For the Cash-in-Lieu-of-BOS claimants, the notice advised that "payments may range from $37 to $125, depending on the state in which you reside, the number of claims submitted, and other adjustments and deductions."[167]  For claimants against the Alleged Diminished Value Fund, the notice explained that "[p]ayment may range from a minimum of $37.50 to several hundreds or thousands of dollars depending on the year and model of the vehicle, the date of sale and subject to the number of claims made."[168]  An additional data point is provided at the

---

[165] Objection No. 75 at 6.

[166] 3 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 8.32 at 265 (4th ed. 2002).

[167] Notice at 6.

[168] *Id.* at 4-5.

- 55 -

010172-25  613134 V1

Settlement website, where the claimant can look up his or her base payment, before adjustments, on the Matrix.  This objection should therefore be rejected.[169]

The Settlement will allegedly be paid by future purchasers of Toyota vehicles. Brian Egge objects because, inter alia, he believes that future purchasers of Toyota vehicles will in effect pay for the Settlement.[170]  Mr. Egge provides no evidentiary support for the assertion, which is purely speculative.  His objection should also be rejected because the Court's inquiry is whether the Settlement is fair, reasonable, and adequate to the Class Members before the Court, and not to an undefined group of future Toyota vehicle owners.

The Court should strike blanket joinders.  Objectors Falls Auto Gallery, Tracy Sivillo, Green Taxi, Lin Ly, and Margaret Strohlein attempt to incorporate all other objections made to the Settlement.[171]  These joinder attempts fail to identify with specificity which objections they attempt to join and, therefore, are invalid pursuant to this Court's order mandating that each objection "must . . . include . . the specific reasons why the Class member objects to the settlement (including any legal support) . . . ."[172]  These attempted joinders should also be stricken because they would serve no function other than to allow these objectors to appeal from this Court's rejection

---

[169] An additional objection to the notice is offered by Darrell Carpenter, who contends that not enough has been done to reach out to hearing-impaired Class Members.  Objection No. 16.  Since its inception, the website has had robust visual text content and other information accessible by hearing-impaired Class Members. Moreover, Gilardi established TTY capability so that Class Members would have that additional assistance.

[170] Objection No. 27 at 2.

[171] See Objection No. 15 at ¶ 12; Objection No. 36 at ¶ 7; Objection No. 75 at 8.

[172] Order Granting Ex Parte Application for Preliminary Approval of Class Settlement, Provisionally Certifying Settlement Class, Directing Notice to the Class and Scheduling Fairness Hearing (Dkt. No. 3345) at 9.

010172-25  613134 V1

of everyone else's objections, thus circumventing the general rule that an objector may only raise matters on appeal that he or she raised in the district court.

*Certain objectors are happy with their vehicles and object to the lawsuit.* Four objectors are pleased with their vehicles and object to the lawsuit itself.[173] These are not objections to the fairness of the Settlement but are worth noting given that some Class Members believe that any recovery over $0 is unwarranted – in contrast to those who are claiming the Settlement is insufficient.

## V.   THE COURT SHOULD VIEW WITH SKEPTICSM THE ARGUMENTS OF "SERIAL" OR "PROFESSIONAL" OBJECTOR COUNSEL

Affording the opportunity for class members to interpose objections to settlements provides an important safeguard against collusive settlements and ensures that all points of view are considered by the trial court. However, a troubling abuse of this procedure has developed in recent years as a certain contingent of the bar has made it a practice to object to and appeal every significant class action settlement as unfair, inadequate, and unreasonable. This practice has added years onto the litigation of these cases and serves no function other than to delay class members' receipt of the settlement proceeds.

This litigation is the latest victim of this practice. Many courts have voiced genuine concern about serial objector counsel and their tactics. We urge this Court to do so as well.

Plaintiffs submit that the following objections were filed on behalf of 16 objectors by "serial" or "professional" objector counsel:

---

[173] *See* Objection Nos. 4, 17, 41, 51.

- 57 -

| Objection No. | Objector(s) | Counsel |
|---|---|---|
| 5 | Bandas | Hanigan |
| 15 | Falls Auto Gallery, Sivillo | Cannata |
| 18 | Ranieri, Huang | G. Cochran |
| 36 | Green Taxi | Luppi |
| 48 | Carpenter, Tyler, Piazza, J., Piazza, B., Piazza, S. | Pentz, E. Cochran |
| 64 | Roberts, Patel, Collins | Weinstein |
| 65 | Guerriero | Miller, Kress, Fortman |
| 67 | Serafino | Hanigan |

Attorneys Palmer, Pentz, Miller, Fortman, Kress, George Cochran, Edward Cochran, Cannata, and Weinstein routinely represent objectors challenging class action settlements by filing canned, unhelpful objections. Attached at Appendix B is a list of cases in which each of these lawyers has appeared on behalf of objectors. These are just examples, and there are likely many more than those identified. Many of the decisions roundly criticize these attorneys.[174]

While the reasons for the repeated dismissal of their objections is not always clear from the records of the cases listed, it is well-established that some "serial" or "professional" objectors extract payments from parties or counsel in the litigation to avoid years of delay associated with their unmeritorious settlement objections:

---

[174] *See, e.g., In re Charles Schwab Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 18840 (N.D. Cal. Feb. 11, 2011) (Pentz); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 574-75 (D.N.J. 2010) (Pentz and Edward Cochran); *In re Initial Public Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214 (S.D.N.Y. 2010) (Pentz and Weinstein); *Ouellette v. Wal-Mart Stores, Inc.*, No. 67-01-CA-326, slip op. (Fla. Cir. Ct., Wash. Cty., Aug. 21, 2009) (Pentz); *In re AOL Time Warner ERISA Litig.*, 2007 U.S. Dist. LEXIS 99769 (S.D.N.Y. Nov. 28, 2007) (Pentz); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) (Pentz); *Barnes v. FleetBoston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072, at *3-4 (D. Mass. Aug. 22, 2006) (Pentz); *Beasley v. Prudential Gen. Life Ins. Co.*, No. cv-2005-58-1, slip op. (Ark. Cir. Ct., Miller Cty., June 9, 2006) (Pentz); *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 514 (D. Del. 2003) (Pentz); *Tenuto v. Transworld Sys.*, 2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002) (Pentz); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (Fortman).

- 58 -

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements.  The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal).  Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost:  Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing.[175]

As another court has observed:

> [C]lass actions also attract those in the legal profession who subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys.  These are the opportunistic objectors.  Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counsel or the class in the hope that lead plaintiff will pay them to go away.  Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors, which now seem to accompany every major securities litigation.[176]

Such lawyer-driven objections, as we have here, cast doubt on the veracity of the positions advanced by these objectors.

## VI.   CONCLUSION

For all the above-stated reasons, and for the reasons set forth in Plaintiffs' opening brief in support of final approval, Plaintiffs respectfully request that the Motion be granted and the Court enter an order granting final approval to the Settlement.

---

[175] *Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3-4.

[176] *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio 2008).

- 59 -

DATED:  June 3, 2013

HAGENS BERMAN SOBOL SHAPIRO LLP


By:   /s/ Steve W. Berman
      Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com


By:   /s/ Marc M. Seltzer
      Marc M. Seltzer, Bar No. 054534
SUSMAN GODREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
E-mail:  mseltzer@susmangodfrey.com

*Co-Lead Counsel for Economic Loss Plaintiffs*

By:   /s/ Frank M. Pitre
      Frank M. Pitre, Bar No. 100077
COTCHETT, PITRE & MCCARTHY
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
E-mail:  fpitre@cpmlegal.com

*Lead Counsel for Non-Consumer Economic Loss Plaintiffs*

- 60 -

1

2

### **PROOF OF SERVICE**

3

     I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service

4

on June 3, 2013.

5

6

                 /s/ Steve W. Berman

7

                  Steve W. Berman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

010172-25 613134 V1