**C. RICHARD NEWSOME** (SBN 827258)
newsome@newsomelaw.com
**DANIEL W. ECKHART** (SBN 488674)
eckhart@newsomelaw.com
**WILLIAM C. OURAND** (SBN 092503)
ourand@newsomelaw.com
NEWSOME MELTON
201 South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile:  (407) 648-5282

*Attorneys for Plaintiff Michael McDaniel*

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV - 7 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

(SOUTHERN DIVISION – SANTA ANA)

| | |
|---|---|
| In Re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation<br><br>This document relates to:<br><br>SACV13-01475 JVS (Ex)<br>*Michael McDaniel vs. Toyota* | Case No. 8:10MDL02151 JVS (FMOx)<br><br>Assigned To:  Hon. James V. Selna<br>Department: 10C<br><br>Amended Complaint |

Plaintiff, MICHAEL MCDANIEL, by and through undersigned counsel, hereby sues Defendants, TOYOTA MOTOR SALES, U.S.A., INC., a California corporation; TOYOTA MOTOR CORPORATION, a foreign corporation;  and TOYOTA MOTOR NORTH AMERICA, INC., a California corporation (collectively referred to as "Toyota"), and alleges as follows:

## INTRODUCTION

1.      Toyota misleadingly promised safety and trust, while at the same time purposely concealing evidence of electronic defects in its vehicles from the American public, and hiding its own knowledge of an alarming number of incidents of unintended accelerations, deaths and injuries.

2.      Toyota vehicles with the electronic throttle control system ("ETCS") manufactured between 2002 and 2010 were defective in design due to an inadequate fault detection system.  This fault detection system was not robust enough to anticipate foreseeable serious unwanted outcomes including unintended accelerations. Additionally, the ETCS systems and their various components were

- 1 -

defectively designed and manufactured in that they were highly susceptible to malfunction caused by various electronic failures, including but not limited to short circuits and electromagnetic interference from electromagnetic sources outside the vehicle.

3.     Further, the absence of a brake override system by itself renders the vehicles defective and unreasonably dangerous, and the vehicles do not perform as safely as an ordinary consumer would expect, and the danger is magnified even more by the susceptibility of Toyota vehicles and their electronic throttle control systems to electronic-related and/or mechanical-related computer/software/hardware glitches.  Despite the feasibility and availability of a "brake override system" whereby driver brake application will immediately stop any unintended acceleration, and despite the fact that Toyota's internal documents show that Toyota was aware that the vehicles were defective and presented an unreasonable risk of serious injury or death in the absence of a such a system, Toyota negligently and recklessly failed to install a brake override system in its vehicles.

4.     Though Toyota vehicles did have floor mat and sticky pedal problems, a far greater number of vehicles were and are affected by the design and manufacturing defects described herein. Toyota used these floor mat and sticky pedal problems to downplay and divert attention away from the major design defects and safety problems with the ETCS, which included the need for a brake override on the Toyota vehicles.  Instead of telling the consuming public the truth about its unintended acceleration electronic/software/hardware defects, Toyota highlighted and promoted the floor mat and pedal recalls as a "smoke screen" while at the same time misleadingly characterizing the "reflashing" of the computer software on the recalled vehicles as a "confidence" boost, rather than acknowledging the serious safety issues and defects that it was intended to remedy, which were the defects in the ETCS and the lack of a brake override.

5.     From 1998 through 2010 Toyota continuously and consistently promised safety for their Toyota/Lexus/Scion vehicles, and repeatedly promised a brand of "trust" to prospective purchasers of their vehicles. From 2002 to 2010 Toyota continuously denied any problems with their throttle control systems on their vehicles, while during that same time period through 2010 Toyota received thousands of reports of unintended acceleration, surging and/or speed control problems with Toyota/Lexus/Scion vehicles.

6058474v1

6.    In fact, Toyota was forced to disclose to Congress 37,900 complaints of such reported events. A Toyota random sample of 3,430 such events showed that 1,008 involved unintended acceleration events, including 233 which resulted in crashes.  For the entire 37,900 reported events, this would translate to 2,600 unintended acceleration events with 760 crashes.

7.    From 2002 to 2010 Toyota knew and/or should have known that the state of the art in the automotive industry for electronic throttle control systems included the installation of a brake override system.  Toyota's own documents show that as early as 2007, Toyota knew that unintended acceleration events were preventable by installing a brake override system in their vehicles.  With a brake override system, when an unintended acceleration event begins to occur, drivers can override the acceleration or surging by placing their foot on the brake.

8.    Toyota manager Koji Sakakibara stated in a document dated September 1, 2009, (Ex. 12), that "during the floor mat sticking issue in 2007 TMS suggested that there should be failsafe option similar to that used by other companies to prevent unintended acceleration." In fact, "Mr. M. said this kind of system will be investigated by Toyota, not by body engineering division.... Information concerning the sequential inclusion of a failsafe system would be given by Toyota to NHTSA when Toyota was invited in 2008."

9.    Instead of installing a brake override system in 2007 or 2008, Toyota waited until the media and the public heard about the August 2009 unintended acceleration crash in San Diego involving a Lexus vehicle, which killed a CHP officer and three other family members.

10.   Even in late 2009 and early 2010 when Toyota announced a recall involving a brake override, Toyota purposely hid the fact that this redesign was safety related.  Instead, Toyota labelled their recalls "floor mat" and "sticky pedal" recalls with a "throw-in" at the end of the recall about an "override" reflash of the software in the recalled vehicles for consumer confidence purposes.

11.   An inventory of statements from Toyota leadership at the highest levels clearly shows that Toyota knows and has known its vehicles present an extreme danger, in that they are subject to unintended acceleration as a result of defects in their design and manufacture, and confirms that Toyota has acted carelessly and recklessly in addressing this grave danger presented by the defects in their vehicles:

• Koji Sakakibara, Toyota Motor Engineering & Manufacturing North America, Inc.'s  manager, knew in 2007 of the need for a brake override;

• Toyota Motor Corporation's CEO, Akio Toyoda, acknowledged that Toyota had grown "too quick;"

• Toyota Motor Sales President, James Lentz, admitted that the floor mat pedal recall does "not totally solve" the unintended acceleration problem;

• Toyota North America's President, Yoshimi Inaba, conceded that "Toyota has not lived up to its high standards;" and

• Toyota Motor Corporation's Executive Vice President, Shinichi Sasaki concluded that Toyota did not listen to "many voices" of unintended acceleration.

## PARTIES, JURISDICTION, AND VENUE

12.    This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees, therefore vesting this Court with jurisdiction under 28 U.S.C. §1332.  Additionally, venue is proper pursuant to 28 U.S.C. §1391.

13.    Plaintiff, MICHAEL MCDANIEL, is a citizen of the state of Florida who resides within this District.

14.    Defendant, TOYOTA MOTOR SALES, U.S.A., INC. ("TMS") is, and at all material times was, a California corporation which is authorized and doing business in the state of Florida for which it receives substantial revenue.  TMS has designated the C.T. Corporation System located at 1200 South Pine Island Road, Plantation, Florida 33324 as its registered agent for the purpose of accepting service of process on its behalf in Florida.

15.    Defendant, TMS, submitted itself to the jurisdiction of this Honorable Court by doing, personally or through its agents, at all times material to this cause of action, the following acts:

a.    Conducting and engaging in substantial business and other activities in Florida by selling and/or delivering defective vehicles, including the Subject Avalon, to persons, firms, or corporations in this state via its distributors, dealers, wholesalers, and brokers.  Such products were used by consumers in Florida in

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

1    the ordinary course of commerce and trade;

2        b.    Committing a tortious act within this state by selling and delivering defective

3    vehicles, including the Subject Avalon, to persons, firms, or corporations in this

4    state via its distributors, dealers, wholesalers, and brokers.  Such products were

5    used by consumers in Florida in the ordinary course of commerce and trade;

6        c.    Causing injury to persons in Florida, including Plaintiff. At or about the time said

7    injuries occurred, Defendant engaged in solicitation activities in Florida to

8    promote the sale, consumption, and use of its products and such products were

9    consumed within Florida in the ordinary course of commerce, and Defendant

10    was engaged in substantial and not isolated activity within this state; and

11        d.    Selling and delivering defective vehicles to persons, firms, or corporations via its

12    distributors, dealers, wholesalers, and brokers, with knowledge or reason to

13    foresee that they would be shipped in interstate commerce and would reach the

14    market of Florida users or consumers.

15        16.    At all material times, Defendant, TOYOTA MOTOR CORPORATION ("TMC"), was and

16    is a Japanese corporation.

17        17.    Defendant, TMC, submitted itself to the jurisdiction of this Honorable Court by doing,

18    personally or through its agents, at all times material to this cause of action, the following acts:

19        a.    Conducting and engaging in substantial business and other activities in Florida

20    by selling and/or delivering defective vehicles, including the Subject Avalon, to

21    persons, firms, or corporations in this state via its distributors, dealers,

22    wholesalers, and brokers.  Such products were used by consumers in Florida in

23    the ordinary course of commerce and trade;

24        b.    Committing a tortious act within this state by selling and delivering defective

25    vehicles, including the Subject Avalon, to persons, firms, or corporations in this

26    state via its distributors, dealers, wholesalers, and brokers.  Such products were

27    used by consumers in Florida in the ordinary course of commerce and trade;

28        c.    Causing injury to persons in Florida, including Plaintiff. At or about the time said

1  injuries occurred, Defendant engaged in solicitation activities in Florida to

2  promote the sale, consumption, and use of its products and such products were

3  consumed within Florida in the ordinary course of commerce, and Defendant

4  was engaged in substantial and not isolated activity within this state; and

5  d.  Selling and delivering defective vehicles to persons, firms, or corporations via its

6  distributors, dealers, wholesalers, and brokers, with knowledge or reason to

7  foresee that they would be shipped in interstate commerce and would reach the

8  market of Florida users or consumers.

9  18.  Defendant, TOYOTA MOTOR NORTH AMERICA, INC. ("TMA") is, and at all material

10  times was, a California corporation which is authorized and doing business in the state of Florida for

11  which it receives substantial revenue.  TMA has designated the C T Corporation System located at

12  1200 South Pine Island Road, Plantation, Florida 33324 as its registered agent for the purpose of

13  accepting service of process on its behalf in Florida.

14  19.  Defendant, TMA, submitted itself to the jurisdiction of this Honorable Court by doing,

15  personally or through its agents, at all times material to this cause of action, the following acts:

16  a.  Conducting and engaging in substantial business and other activities in Florida

17  by selling and/or delivering defective vehicles, including the Subject Avalon, to

18  persons, firms, or corporations in this state via its distributors, dealers,

19  wholesalers, and brokers.  Such products were used by consumers in Florida in

20  the ordinary course of commerce and trade;

21  b.  Committing a tortious act within this state by selling and delivering defective

22  vehicles, including the Subject Avalon, to persons, firms, or corporations in this

23  state via its distributors, dealers, wholesalers, and brokers.  Such products were

24  used by consumers in Florida in the ordinary course of commerce and trade;

25  c.  Causing injury to persons in Florida, including Plaintiff. At or about the time said

26  injuries occurred, Defendant engaged in solicitation activities in Florida to

27  promote the sale, consumption, and use of its products and such products were

28  consumed within Florida in the ordinary course of commerce, and Defendant

- 6 -

1    was engaged in substantial and not isolated activity within this state; and

2        d.    Selling and delivering defective vehicles to persons, firms, or corporations via its

3    distributors, dealers, wholesalers, and brokers, with knowledge or reason to

4    foresee that they would be shipped in interstate commerce and would reach the

5    market of Florida users or consumers.

6        20.    Defendants, TMS, TMC, and TMA will be referred to herein collectively as "Toyota" or

7    the "Toyota Defendants" or "Defendants."

8        21.    Plaintiff is informed and believes, and thereupon alleges, that at all times relevant and

9    mentioned herein, Defendants, and each of them, were at all times material hereto acting within the

10   authorized course, scope and purpose of said agency and employment and that all of said acts were

11   subsequently performed with the knowledge, acquiescence, ratification and consent of the respective

12   principals, and the benefits thereof accepted by said principals.

13   **THE SUBJECT CRASH**

14       22.    On or around August 20, 2012, Plaintiff was driving a 2011 Toyota Avalon bearing VIN

15   4T1BK3DB2BU413285 (the "Subject Avalon") on southbound Interstate 95 in the vicinity of the Port St.

16   John Parkway exit in Brevard County, Florida.

17       23.    At that time and place, the Subject Avalon suddenly and unexpectedly accelerated and

18   did not respond to attempts to brake and slow the vehicle. Despite Plaintiff's efforts to slow and stop

19   the vehicle by application of the brakes, the braking system of the Subject Avalon failed to operate as

20   intended, and failed to adequately slow or stop the Subject Avalon prior to impact. Plaintiff was

21   therefore required to take evasive action to avoid colliding with other motorists and, as a result,

22   overturned numerous times. The Subject Avalon ultimately came to a rest facing southeast within the

23   wooded area on the west shoulder of southbound Interstate 95.

24       24.    The Subject Avalon was designed, manufactured, equipped, warranted, promoted,

25   advertising, warned, distributed and sold by Toyota.

26       25.    The aforesaid events and resulting injuries and damages to Plaintiff were caused by the

27   Subject Avalon, including its design, failure to warn, manufacture, marketing, service, inspection,

28

- 7 -

SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint

6058474v1

1    distribution, and sale.  At no time prior to the Subject Avalon's sudden and unexpected acceleration on

2    or around August 22, 2012 did Toyota provide any warning regarding the dangerous propensities

3    within the Subject Avalon.  At no time prior to the Subject Avalon's sudden and unexpected

4    acceleration on August 22, 2012, did the Subject Avalon include a brake override system or fail-safe

5    device to impede or stop the sudden, unexpected acceleration of the Subject Avalon, although such a

6    feasible alternate design was available and had been used by other prominent manufacturers.

7                    **TIMELINE OF KEY EVENTS REGARDING TOYOTA VEHICLES**

8            26.     Toyota has been receiving evidence for many years, from a variety of sources, which

9    established there are serious safety defects in Toyota vehicles (the "Subject Vehicles"), including an

10    alarming increase in the number of complaints, injuries, and deaths, which Toyota knew or should have

11    known were likely caused by said defects ("Defect(s)").

12            27.     In the late 1990's, Toyota began to replace its mechanical throttle linkage with a

13    computer-controlled accelerator system or fly-by-wire system.  Eventually, Toyota discontinued the

14    mechanical linkage in throttle systems and changed to a computer-controlled accelerator system.

15    ETCS vehicles operate with an electronic throttle control system.  Complex computer and sensor

16    systems now communicate -- the accelerator pedal position to the engine control module which in turn

17    interprets the signal to determine the amount of engine torch needed.

18            28.     In 2003, Toyota sold 6,780,000 vehicles and overtook Ford Motor Company in annual

19    sales to become second in the United States behind only General Motors.

20            29.     In February 2003, NHTSA conducted its first of many investigations regarding speed

21    control problems in Toyota vehicles.  The first two involved the Camry and Solara models.

22            30.     In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during

23    production testing of the Sienna model.  Toyota blamed a "faulty trim panel clip," deemed it an isolated

24    incident, and did not make such information available to NHTSA until 5 years later in response to a

25    blanket information request by the agency.

26            31.     In July 2003, NHTSA opened the first probe of sudden acceleration complaints in Lexus

27    sedans at the request of an owner.

28

32.    In March 2004, NHTSA opened a wider probe into Lexus sedans after another complaint regarding sudden acceleration.  NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models.  Toyota succeeded in narrowing the investigation to 11 incidents involving 5 crashes.

33.    In July 2004, NHTSA closed its investigation of the Lexus sudden acceleration complaints without finding a defect.  Citing a lack of resources, NHTSA turned down two more requests from consumers to investigate the problem.

34.    In 2005, the auto part supplier CTS began making pedal assemblies for Toyota.

35.    In August 2005, NHTSA conducted an evaluation of the Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

36.    In November 2005, Toyota wrote NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

37.    In 2006, Toyota passed General Motors as the number one brand of cars sold in the United States, with 8,800,000 vehicles sold.

38.    In January 2006, NHTSA opened a second investigation of Toyota Camry models and received questionnaires from Camry owners, who reported hundreds of problems with acceleration and braking.  After communicating with Toyota, NHTSA closed the investigation without finding a defect and stated the claims were of "ambiguous significance."

39.    In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

40.    In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles.  Toyota represented to NHTSA that there was no abnormality in the throttle control system and blamed water damage.  NHTSA closed this investigation without finding a defect, citing "the need to best allocate limited administrative resources."

41.    In March 2007, NHTSA launched a probe into the floor mats of Lexus models.  Toyota responded by claiming the "issue is not a safety concern."  NHTSA also preliminarily reviewed the 2007 Lexus ES for unwanted acceleration due to floor mat interference, but closed the investigation seven

months later.

42.    In August 2007, NHTSA upgraded its investigation to "engineering analysis," which means the agency would test Toyota vehicles rather than merely review complaints.

43.    In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to suspected floor mats that purportedly interfered with the accelerator pedal.

44.    In January 2008, NHTSA launched a probe into sudden unintended acceleration of the Tacoma pickups after receiving notice of potentially 478 incidents with 2004-2008 models.  In response, Toyota told NHTSA they could not find enough evidence to support allegations and that an investigation was not warranted.

45.    In August 2008, NHTSA closed its investigation of the Tacoma without finding a defect, despite hundreds of complaints.  This was the eighth investigation of Toyota vehicles since 2003.  As of that time, there were over 2,600 complaints made regarding "run away" Toyota vehicles.

46.    In April 2009, NHTSA received another petition for an investigation of throttle-control problems in Toyota vehicles unrelated to floor mat issues.

47.    On August 28, 2009, California Highway Patrol officer Mark Saylor and his family were killed when his Toyota vehicle (Lexus ES350) accelerated out of control to over 100 mph.  A 911 call by a passenger said the car had "no brakes."

48.    In September 2009, NHTSA told Toyota to expect wider recalls of floor mats.  Toyota warned consumers to remove floor mats because of a supposed potential to jam the accelerator, purportedly causing sudden unintended acceleration.

49.    In October 2009:

- Toyota received reports in the United States and Canada that pedals were sticking in certain models.

- Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

- Akio Toyoda, president of the Japanese parent corporation, issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern. I can't begin to express my remorse."

- The Los Angeles Times published the first of many stories concerning claims of sudden unintended acceleration in Toyota vehicles, including nine NHTSA investigations that included five deaths and hundreds of complaints filed with the federal government. Toyota then sent letters to consumers regarding the unintended acceleration issue, claiming "no defect exists."

50. In November 2009:

- Toyota expanded the floor mat recall by over a million vehicles.

- NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect."

- Toyota then publicly apologized for its inaccurate press release.

- Toyota issued another press release denying media reports that a problem existed with the electronic throttle system.

- The Los Angeles Times wrote another article stating that Toyota ignored over 1,200 complaints of sudden unintended acceleration over the preceding eight years.

- Toyota announced a preliminary fix for the "floor mat problem" by cutting off part of the gas pedal and expanded the total number of Toyota vehicles subject to recall to 4.2 million.

- Toyota instructed dealers to remove the gas pedal and shorten it so it would not interfere with floor mats.

51. In December 2009:

6058474v1

- NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning.

- NHTSA opened an investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

52.    In January 2010:

- Toyota announced a brake override software "fix" would be applied to its vehicles globally by 2011.

- Toyota told NHTSA it may have "an issue" with sticking accelerator pedals.

- NHTSA told Toyota it must conduct a recall.

- Toyota issued a recall for sticking accelerator pedals affecting 2.3 million vehicles.

- Toyota then expanded the pedal recall to include another 1.1 million vehicles.

- United States Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.

- Toyota told NHTSA it had a fix for the sticky-pedal problem, as well as a permanent fix for the mat problem.

53.    On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized." Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

54.    In February 2010:

- Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.

- Kelly Blue Book said affected Toyota models were devalued as much as 5%.

- Edmunds stated the average devaluation was between 4%-8%.

- Toyota admitted to brake software problem in 2010 Prius Hybrids.

- Toyota recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty

- 12 -

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

1    brakes (437,000 vehicles worldwide).

2    55.    Toyota admits that the recalls have not addressed the problem.  Indeed, James Lentz,

3    Toyota's second-highest ranking North American executive who works out of the Torrance, CA

4    headquarters of Toyota Motor Sales, in response to the question, "[d]o you believe that the recall on

5    the carpet changes and the recall on the sticky pedal will solve the problem of sudden unintended

6    acceleration," answered "not totally."  In addition, over 70% of unintended acceleration events have

7    occurred in vehicles not covered by the recalls.

8    56.    Akio Toyoda, President and CEO of Toyota Motor Corporation, in his prepared

9    testimony before the Committee on Oversight and Government Reform of the U.S. House of

10    Representatives on February 24, 2010, admitted that Toyota's growth in recent years was "too quick"

11    and the company's priorities of "first, safety; second, quality; third, volume" had become "confused."

12    Mr. Toyoda went on to apologize to American consumers, "I regret that this has resulted in the safety

13    issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota

14    drivers have experienced."

15    57.    On March 4, 2010, United States Representatives Henry Waxman and Bart Stupak

16    wrote in a letter to Toyota: "We do not understand the basis for Toyota's repeated assertions that it is

17    'confident' there are no electronic defects contributing to incidents of sudden unintended acceleration .

18    . . There's a Glitch . . . You really don't know when it's going to occur and that's the uncertainty which

19    should cause safety concerns."

20    58.    On March 5, 2010, new data released showed that more than 60 drivers have

21    complained of sudden unintended acceleration incidents despite the fact that their cars were repaired

22    by Toyota Motor Corp. in the current recalls.  The figures released by NHTSA significantly increased

23    the total number of complaints involving repaired vehicles.  The new complaints alleged several

24    accidents and at least three injuries resulting from runaway unintended acceleration despite the

25    vehicles' modifications at Toyota dealerships designed to resolve the issue.

26    59.    As of March 6, 2010, the number of deaths attributed to possible sudden unintended

27    acceleration in Toyota cars had risen to 58.  The Detroit Free Press reported that the number of

28    complaints to U.S. auto safety regulators related to sudden unintended acceleration also had grown to

- 13 -

1   3,300.

2        60.    As of March 2010, Toyota reported more than $200 billion in worldwide sales for the

3   fiscal year that ended in March 2010.

4        61.    Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America,

5   Inc. likewise acknowledged that Toyota had failed its customers.  Mr. Inaba testified in the Senate Sub-

6   Committee hearings on Toyota recalls:

7        In recent months we have not lived up to the high standard our customers and the public
         have come to expect from Toyota, despite our good faith efforts.  As our president, Akio
8        Toyoda, told members of Congress last week, we sincerely regret our shortcomings
         have resulted in the issues associated with our recent recalls.
9
         62.    Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before
10
    Congress that Toyota "did not listen to its consumers:"
11
         How this issue came about is because there were many vehicle – excuse me – many
12       voices were sent to us from the customers, but we really did not listen to every one of
         them very carefully, one by one.  We should have really listened to them carefully and
13       rendered some technical analysis so that it would be connected to our following product
         improvement.  However, the quality of this work or the efficiency of our work or speed
14       with which we worked had become sluggish, or sort [sic] failed gradually, and this has
         come to a much larger issue.
15
         63.    On April 5, 2010, NHTSA informed Toyota in a letter that it was imposing a $16.375
16
    million fine for hiding safety defects related to sudden acceleration in 2.3 million vehicles.  NHTSA
17
    imposed the record fine after finding that Toyota had failed to notify the National Highway Traffic Safety
18
    Administration for at least four months after learning that the accelerator pedals in some of its vehicles
19
    could stick and cause sudden unintended acceleration.  Under federal law, automakers are required to
20
    disclose defects to NHTSA within five business days.  In its April 5 letter, NHTSA cited how Toyota had
21
    sent instructions to its European operations in September 2009 which explained how to fix accelerator
22
    pedals that could stick, yet decided against similarly notifying U.S. dealers and government regulators.
23
    The NHTSA letter indicated that Toyota may have known about the Defects for at least three years.
24
         64.    On April 19, 2010, Toyota agreed to pay the $16.375 million fine imposed by NHTSA.
25
    On April 19, 2010, NHTSA Secretary Ray LaHood released a statement saying, "By failing to report
26
    known safety problems as it is required to do under the law, Toyota put consumers at risk."
27
         65.    Since 2001, and likely earlier, many people have been injured or have died in accidents
28

- 14 -

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

relating to the Defects.  While the exact injury and death toll is unknown, due to Toyota's campaign of concealment and suppression, as alleged herein, numerous other drivers and passengers of Toyota vehicles have died or suffered serious injuries and property damage.

66.    Against this backdrop of fraud and concealment, Toyota has, for decades, touted its reputation for safety and reliability, and known that people bought its vehicles because of that reputation, and yet purposefully chose to conceal and suppress the existence and nature of the Defects.  Instead of disclosing the truth about the dangerous propensity of Toyota-manufactured vehicles to suddenly and unintentionally accelerate, California consumers were given assurances that their vehicles were safe and defect free.  For example, California consumers were given a Warranty and a Maintenance Guide that states:

> At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building **products of the highest quality and reliability.** . . . Our goal is for every Toyota customer to enjoy **outstanding quality, dependability and peace of mind** . . . (Emphasis added).

67.    After more than eight years of suppression and concealment of the existence and nature of the Defects, presumably because it could no longer conceal the rising injury and death toll, in September 2009, Toyota admitted there was a defect in its vehicles that causes sudden unintended acceleration.  However, Toyota's belated admission only concedes that some of its models have had sudden unintended acceleration and resulting crashes, and Toyota continues its plan and scheme of concealment by denying the existence of the Defects in numerous models which also have suffered sudden unintended acceleration.  For example, Toyota claims the Defects do "not exist in vehicles in which the driver's side floor mat is compatible with the vehicle and properly secured."  Toyota knows, and knew, this was false because Toyota was fully aware that unintended acceleration had occurred on numerous occasions when there were no floor mats in the involved vehicles.

68.    Even though Toyota has made a limited admission of a defect in a limited number of its models, Toyota continues to manufacture and sell even those models without making the changes it announced in the October 30, 2009 "Interim Notice," and without installing a "smart pedal" it promised in that notice.  While it has commenced making the repairs it claims are needed to correct the

- 15 -

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

1  acceleration problem in some of the Subject Vehicles, it still has not adequately disclosed the Defect.

2  Moreover, there have been scores of reports that the recall repairs that Toyota claims will fix the

3  problem have not in fact done so, and that sudden unintended acceleration problems persist after

4  those so-called repairs have been made.   On information and belief, the reason the recall repairs have

5  not worked is because the problem is not limited to the causes publicly identified by Toyota.

6      69.    As a direct and proximate result of defects in the Subject Toyota Tacoma and the

7  wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff suffered

8  significant harm, conscious pain and suffering, physical injury and bodily impairment resulting

9  permanent physical deficits, permanent impairment and other sequelae likely to continue manifesting in

10  the future.

11      70.    As a further direct and proximate result of defects in the Subject Toyota Tacoma and the

12  wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff has also

13  incurred medical expenses and other economic harm including loss of earnings, and lost earning

14  capacity, and will continue to incur expenses and loss of earnings in the future, as a direct and

15  proximate result of the injuries alleged herein as a result of the use of the Subject Toyota Tacoma.

16      71.    As a further direct and proximate result of defects in the Subject Toyota Tacoma and the

17  wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff has

18  required medical treatment, and will continue to require reasonable and necessary health care,

19  attention and services, and Plaintiff has incurred, and continues to incur, medical, incidental, and

20  service expenses pertaining to the injuries.

21      72.    The acts, conduct, and omissions of Defendants, and each of them, as alleged

22  throughout this petition were fraudulent, wilful and malicious and were done with a conscious disregard

23  for the rights of the Plaintiff and users of the Subject Vehicles and for the primary purpose of

24  increasing Defendants' profits from their sale and distribution.  Defendants' outrageous and

25  unconscionable conduct warrants an award of exemplary and punitive damages against each

26  Defendant in an amount appropriate to punish and make an example of each Defendant.  Prior to the

27  manufacturing, sale and distribution of the Subject Vehicles, Defendants and each of them knew that

28  said products were in a defective condition as previously described herein and knew that those who

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

1  purchased, leased and/or were passengers in said vehicles would experience and did experience

2  severe physical, mental, and emotional injuries.  Further, Defendants and each of them through their

3  officers, directors, managers, and agents, had knowledge that the Subject Vehicles presented a

4  substantial and unreasonable risk of harm to the public, and as such, were unreasonably subjected to

5  risk of injury or death. Despite such knowledge, Defendants, and each of them, acting through their

6  officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly

7  and deliberately failed to remedy the known Defects in the product and failed to warn the public,

8  including Plaintiff, of the extreme risk of injury occasioned by said Defects inherent in the product.

9  Defendants and their individual agents, officers, and directors intentionally proceeded with the

10  manufacturing, sale, and distribution and marketing of the Subject Vehicles knowing persons would be

11  exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary

12  profits. Defendants' conduct was fraudulent, despicable, and so contemptible that it would be looked

13  down upon and despised by ordinary decent people, and was carried on by Defendants with wilful and

14  conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

15  **TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL**

16      73.    Any applicable statutes of limitation have been equitably tolled by Toyota's affirmative

17  acts of fraud, fraudulent concealment, suppression and denial of the true facts regarding the existence

18  of the defective acceleration control and throttle system in the Subject Vehicles.  Since as early as

19  2001, Toyota knew of the Defects and concealed and suppressed these facts.  However, despite

20  Toyota's exclusive knowledge of the Defects, Toyota continued to make statements touting the

21  reliability and safety of its vehicles, including the Subject Vehicles with the dangerous Defects that

22  Toyota knew had caused and were likely to cause further serious injuries and deaths.

23      74.    At all times relevant, Toyota has had exclusive knowledge of the dangerously defective

24  nature of the acceleration control and throttle system on the Subject Vehicles and continued to conceal

25  these facts from Plaintiffs, the public, and NHTSA. The following timeline of documents and events

26  demonstrates Toyota's awareness and concealment of the defective nature of the acceleration control

27  and throttle system:

28

- 17 -

75.    In February 2002, Toyota received its first consumer complaint relating to engine surging when the brakes were depressed. Ten other similar complaints were received by Toyota by August 2002. TMC investigated the root cause of the surging, and a May 20, 2002, internal record reported that the "root cause of the surging condition remains unknown" and "no known remedy exists for the surging condition at this time."

76.    In response to a NHTSA investigation on similar incidents, Toyota issued at least three "Technical Service Bulletins" related to the issue of unintended acceleration. On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38–42 MPH with lock-up (L/U) 'ON.'" Toyota advised that the cars' Engine Control Module (ECM) calibration had been revised to correct the problem. Yet, on December 23, 2002, Toyota released another bulletin noting that certain 2002 and 2003 Camrys "may exhibit a triple shock (shudder) during the shift under 'light throttle' acceleration." The bulletin advised dealers to follow the repair procedure in the bulletin to rectify the situation. Less than nine months later, Toyota released a nearly identical advisory notice on May 16, 2003 which cited that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-42 mph with lock-up (L/U) 'ON.'" Again, Toyota claimed the ECM calibration had been revised to correct this condition. The existence of these technical service bulletins was not disclosed to consumers.

77.    On April 25, 2003, NHTSA issued Defect Petition DP03 003. The petitioner requested that the agency to conduct an analysis of 1997 through 2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal," and noted 271 other complaints he found on the NHTSA website about these vehicles. Thirty-six of the complaints referred specifically to unintended acceleration and described several crashes, including one in which a Lexus had "collided with five other cars in the space of ½ mile before it could be stopped."

78.    On May 5, 2003, in a "Field Technical Report" Toyota acknowledged the fact that "[s]udden acceleration against our intention," was an "extremely serious problem for customers." The technician reported a UA incident and stated: "We found miss-synchronism between engine speeds and throttle position movement." The probable cause was unknown, but "(e)ven after replacement of

- 18 -

6058474v1

1  those parts, this problem remains." The author requested immediate action due to the "extremely

2  dangerous problem" and continued: "[W]e are also much afraid of frequency of this problem in near

3  future."

4        79.     In January 2004, another consumer filed a petition with NHTSA, requesting an

5  investigation of 2002 and 2003 Lexus ES 300s, "alleging that [her] throttle control system

6  malfunctioned on several occasions, one of which resulted in a crash." On March 3, 2004, Office of

7  Defects Investigation ("ODI") opened a Preliminary Evaluation. NHTSA documents describe the

8  problem to be investigated as: "Complainants allege that the throttle control system fails to properly

9  control engine speed resulting in vehicle surge." The investigation was expected to cover more than

10  one million 2002-2003 Camry, Camry Solara and Lexus ES 300 vehicles. ODI had received 37

11  complaints and reports of 30 crashes resulting in five injuries. Mr. Scott Yon was the designated

12  investigator. He would remain NHTSA's principal investigator on many subsequent investigations and

13  developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

14        80.     The NHTSA investigation specifically described the defect alleged by vehicle owners, in

15  part, as:

16        Allegations of (A) an engine speed increase without the driver pressing on the
          accelerator pedal or, (B) the engine speed failing to decrease when the accelerator
17        pedal was no longer being depressed – both circumstances requiring greater than
          expected brake pedal application force to control or stop the vehicle and where the
18        brake system functioned normally.

19        81.     On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota employee in

20  Technical and Regulatory Affairs, an email showing a greater than 400% difference in "Vehicle Speed"

21  complaints between Camrys with manually controlled and electronically controlled throttles. This

22  statistically significant increase in the number of unintended acceleration complaints put Toyota on

23  notice that there was a defect in its vehicles with electronic throttle controls that could potentially cause

24  unintended accelerations.

25        82.     In a June 19, 2004 letter to NHTSA, Toyota falsely stated that its Electronic Control

26  Throttle system contained a built-in redundancy to prevent acceleration, and that in the event of

27  sudden acceleration the "vehicle brakes would have restrained vehicle motion." Toyota maintained this

28  position for years, even though it knew that Toyota-manufactured vehicles can and do experience

- 19 -

6058474v1

1    sudden unintended acceleration and that application of the brakes has failed to restrain vehicle motion.

2    83.    At the outset of its 2004 investigation, NHTSA asked Toyota for information on similar

3    incidents including the number of complaints, field reports, crash reports, property damage claims and

4    lawsuits.  The decision on how to respond to NHTSA emanated from a group of Toyota employees,

5    including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the

6    Product Quality and Service Support group in Torrance, CA.  The scope of NHTSA's information

7    request became the subject of negotiations between Christopher Tinto and Christopher Santucci of

8    Toyota and NHTSA representatives, with the result that certain relevant categories of incidents were

9    excluded from Toyota's reporting of events.

10    84.    In its response to NHTSA's information request, Toyota denied that a defect existed,

11    stated that there was no defect trend and that its electronic control system could not fail in ways its

12    engineers had not already perceived.  Toyota reported 123 complaints that it said "may relate to the

13    alleged defect."  But Toyota excluded from its response the following relevant categories of complaints,

14    among others:

15        (1)    an incident alleging uncontrollable acceleration that occurred for a long duration;

16        (2)    an incident in which the customer alleged that he could not control a vehicle by

17            applying the brake; and

18        (3)    an incident alleging unintended acceleration occurred when moving the shift

19            lever to the reverse or the drive position.

20    85.    The Toyota Defendants thus concealed from NHTSA and the public an entire universe

21    of potentially relevant customer complaints.  Despite Mr. Yon's statement in the ODI Closing Resume

22    dated July 22, 2004, that "[t]he investigation focused on the electronic throttle control system," NHTSA

23    had conducted no testing of the integrity of the ETCS-i and did not review any records of Toyota's test

24    reports concerning the ETCS-i.  NHTSA did not conduct any tests as to the efficacy of the braking

25    system in an open-throttle condition.  Toyota itself did not have the capability of fully modeling, testing

26    or validating the safety of ETCS-i due to a lack of standard design platforms, meaningful EMC test

27    procedures, or control of subsystem designs.  NHTSA closed its five-month investigation PE04-021 on

28    July 22, 2004, stating that "[a] defect trend has not been identified at this time and further use of

- 20 -

1  agency resources does not appear to be warranted."

2      86.    While Toyota continued to claim that there was no unintended acceleration defect, other

3  independent experts concluded otherwise.  In May 2004, a Forensic Technologist and MSME

4  examined a vehicle in New Jersey that had experienced a UA event.  The report was forwarded to

5  Toyota on January 13, 2005.  It concluded that the vehicle's ETCS was not operating correctly.   This

6  report was not provided to NHTSA.

7      87.    In August 2005, NHTSA opened Defect Petition DP05-002 to investigate a consumer's

8  claims relating to unintended acceleration in the 2002 Camry.  Scott Yon again was assigned as

9  NHTSA's investigator.  The target vehicle population was 1,950,577 2002-2005 Camrys and Lexus ES

10  models.  After receiving the petition and reviewing the underlying complaints, Toyota did not launch its

11  own investigation or identify any new tests that it would perform to check for a defect in the ETCS.

12  Instead, in a November 15, 2005 letter to NHTSA, Toyota recommended NHTSA deny the petition

13  based only on the information Toyota had previously provided "as well as the lack of evidence

14  supporting concurrent failure of the vehicle braking systems."  After explaining how the electronic

15  throttle system and its fail-safes were designed to operate, Toyota concluded:

16      [T]here is no factor or trend indicating that a vehicle or component defect exists.  Toyota
       believes that this Defect petition to be similar to other, prior petitions and investigations
17      into mechanical throttle controls.  Toyota has found no evidence that differentiates that
       consumers alleging vehicles equipped with electronic throttle controls can suddenly
18      accelerate when compared to those equipped with mechanical throttle controls.  Toyota
       has not found any evidence on the subject vehicles of brake failure, let alone brake
19      failure concurrent with ETC failure.

20      88.    On September 22, 2005, Carol Hargrave of TMS' Customer Relations Department wrote

21  the following in a letter to a concerned Lexus owner who had complained to Toyota about her

22  experiences of unintended acceleration:

23      It is our understanding that you reported that you stepped on the brake pedal and the
       vehicle accelerated and that this has happened several other times.
24
       As you are aware your vehicle was inspected in regards to your concerns with the
25      brakes and unintended acceleration.  **Your concerns could not be duplicated.**  The
       throttle body was inspected and there was no binding and the cable operated freely.
26      The vehicle was test driven and the brakes were functioning properly.  There were no
       codes to indicate any type of failure of the system.
27
       **It is virtually impossible for this type of incident to happen.**  The brakes and the
28

throttle are two totally separate systems and both would have to fail at exactly the same time. The brakes will always over ride the throttle."

(Emphasis added).

89.    In December 2005, in connection with the IS 250 All Weather Drive investigation, Toyota removed any reference to speed control in letters sent to owners, as evidenced by an email drafted by George Marino: "They pulled out the 'vehicle speed control' part. NHTSA may come back, but TMC wanted to try."

90.    In September 2006, ODI opened Defect Petition DP06-003 in order to investigate incidents relating to vehicle surging in 2002-2006 Camry and Camry Solara vehicles. Instead of expressing willingness to investigate the issue, in internal emails Chris Santucci expressed skepticism of the Petitioner's account of the unintended acceleration and hope that NHTSA would not ask Toyota to provide any additional data as part of the investigation: "Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation."

91.    In a February 27, 2007 email sent by Michiteru Kato to Christopher Santucci, Mr. Kato decided against sending his most knowledgeable ECU engineer to an ECU demonstration being conducted for NHTSA, in order to avoid questions regarding ECU failures: "...I thought that 3 guys from TMS is too many (two at most), and if the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU. (I want to avoid such situation)."

92.    On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES 350 vehicles, opened PE07-016. The principal investigator was again Scott Yon. The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal." Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES 350 owners "reminding them not to install all weather mats on top of existing mats." As evidenced by an email from Chris Tinto, NHTSA did not agree: "NHTSA feels that they have too many complaints on this one vehicle to drop the issue; The results of a stuck throttle are 'catastrophic.'"

93.    In an email dated April 2, 2007, George Morino urged others within Toyota to re-frame

- 22 -

the investigation as an "All Weather Floor Mat issue," and carefully eliminated reference to the much

broader and more alarming issue of unintended acceleration:

> Sorry we had a last minute change to the Q&A.  Please utilize this revised version of the
> Statement and Q&A.  The issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
> NHTSA has received five consumer complaints regarding unintended throttle control in
> the subject vehicles.
>
> [New]
> NHTSA received five consumer where the All Weather Floor Mat may have interfered
> with the accelerator pedal operation.

94.    On August 8, 2007, ODI upgraded the preliminary evaluation to engineering analysis

EA07-010 to investigate unintended accelerations in a target population of 98,454 2007 Lexus ES

350s.  The Opening Resume for EA07010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries.  Complainants
> interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle
> then experienced unwanted acceleration after release.  Subsequent (and sometimes
> repeated) applications of the brake pedal reduced acceleration but did not stop the
> vehicle.  In some incidents drivers traveled significant distances (miles) at high vehicle
> speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake
> applications with the throttle in an open position can deplete the brake system's power
> [vacuum] assist reserve resulting in diminished braking).

95.    Despite having received a number of complaints of unintended acceleration that could

not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of

any intent to study the electronic throttle control system employed.  Toyota did not study the ETCS

system either.

96.    A September 14, 2007 email from Chris Tinto demonstrates that internally, Toyota

executives were pleased that NHTSA had limited the ES350 unintended acceleration issue to a "floor

mat" recall, and that this limitation saved the company "upwards of one hundred million dollars:"

Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the

accelerator pedal geometry coupled with the push button "off" switch.  We estimate that had the

agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be

looking at upwards of $100M + in unnecessary cost.

97.    During this same time period, Toyota failed to disclose to consumers how its own

- 23 -

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

technicians were continuing to replicate sudden unintended acceleration events.  This same defect had

been predicted in the May 5, 2003 "Field Technical Report" summarized above, where the technician

experienced "[s]udden acceleration against [his] intention," and continued: **"[W]e are also much**

**afraid of frequency of this problem in near future."** (Emphasis added).  Two examples of

unintended acceleration replication include a Field Technical Report dated December 12, 2008, where

a technician stated: "After traveling 20-30 feet the vehicle exhibited a slight hesitation then began to

accelerate on its own.  Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the

time of the occurrence...Probable Cause =Unknown." Another example is described in an email from a

customer contained in a Case Detail Report dated February 6, 2009: "We just got a 2008 LE 4Cyl with

the 5spd auto. Only had it two weeks. When driving 35-45mph, the tranny will shift up into 5th gear and

then basically STAY there. As we approach a slight upward grade, the tachometer is stuck at 1200

RPM and the whole car shudders and vibrates as the engine "lugs" down. We find ourselves constantly

playing with the gas pedal in order to FORCE the tranny to downshift. Took it to dealer.

They......experienced same thing. They said it was 'Normal for this model - at this time.' They quietly

told me they are getting other complaints and look forward to Toyota releasing new programming for

the ECU.   Rather than provide an appropriate repair at this time, Toyota often blamed these types of

reports of sudden unintended acceleration on the driver.

98.     Toyota never fully disclosed to the regulators the actual numbers of customer reports of

unintended acceleration events in the various Toyota models under investigation that the company had

received.  In fact, Toyota disclosed that it had received only 1,008 such complaints.  Three years later,

however, Toyota would be required to disclose to Congressional investigators that it had received

37,900 complaints potentially relating to sudden acceleration in Defective Vehicles from January 1,

2000, through January 27, 2010.

99.     Despite the growing number of unintended acceleration complaints, Toyota had

knowledge of fail-safe mechanisms that protect against unintended acceleration, but failed to employ

them.  In August 2007, in internal emails entitled "UPDATE on ES 350 investigation," Chris Santucci

stated that NHTSA investigators had discussed with him fail-safe mechanisms used by other vehicle

manufacturers to protect against unintended acceleration, including "[u]sing ETC to shut down throttle control" and "cutting off the throttle when the brakes are applied." Mr. Santucci also noted, "Jeff [Quandt, Chief, Vehicle Controls Division, Office of Defects Investigation] mentioned that another manufacturer allows the engine to be shut off if you press the ignition button repeatedly."

100.    In September 2007 Toyota also acknowledged internally that that "floor mat interference is possible in **any vehicle with any combination of floor mats."** (Emphasis added). Despite this admission, no broader recall or effort to implement a brake override took place.

101.    Toyota also knew at this time that the root cause of sudden unintended acceleration was not often traceable, as demonstrated by Chris Tinto's email dated October 19, 2007: "[O]ne big problem is that no codes are thrown in the ECU so the allege [sic] failure (as far as we know) can not be documented or replicated." The implications were that "the service tech therefore can't fix anything, and has no evidence that any problem exists."

102.    This same email chain also discloses the fact that it was Toyota's intention in 2007 to "stop this from moving forward;" a reference to the possibility of a public hearing before Congress on unintended acceleration years before the congressional hearings actually occurred in 2010.

103.    In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating." The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

104.    In another internal PowerPoint Toyota addresses "Key Safety Issues" including the following:

• 'Sudden Acceleration' on ES/Camry, Tacoma, LS, etc.

• Recurring issue, PL/Design Implications.

(Emphasis added).

105.    In a May 5, 2009 email sent to Takeharu Nishida, Chris Santucci discusses information to be requested by NHTSA in relation to another defect petition. Rather than providing all relevant

- 25 -

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

documentation to assist in the investigation, Mr. Santucci expresses his pleasure over the fact that NHTSA will not be requesting inexplicable reports related to throttle issues: "They [NHTSA] are struggling with sending an IR letter, because they shouldn't ask us about floor mat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floor mat-related.  So they should ask us for non-floor mat related reports, right?  But they are concerned that if they ask for other reports, they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them.  Does that make sense?  I think it is good news for Toyota."

106.    In a power point presentation dated July 6, 2009, Toyota's lead executive in American Operations, Yoshi Inaba, describes as a "win" the fact that Toyota saved $100 million dollars by negotiating an "equipment" recall instead of some other alternative safety measure to address the sudden acceleration issue: "Wins for Toyota – Safety Group ... Negotiated 'equipment' recall on Camry/ES re: SA, saved $100M+, w/ no defect found."  Toyota knew that it had saved millions of dollars through concealing the known potential for unintended accelerations in its vehicles.

107.    A September 1, 2009 email "[t]o all concerned staff" from Koji  Sakakibara evidences the fact that Toyota was aware of the unintended acceleration problem back in 2007 but opted not to develop additional safety measures at that time:

> To all concerned staff,
>
> The following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.) Within America, there are 196 articles on Google News, so the mass media is interested.
>
> **- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration".** I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008. **(The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.)**
>
> ==>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assy structure is the cause, how to secure the floor mats, the

timing for introducing shape improvements). - Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues.

Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

(Emphasis added).

108.    Also in September 2009, another Toyota internal document demonstrates how "global ramifications," rather than safety dictated Toyota's position with respect to "vehicle defect:"

TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect.  Especially considering the global ramifications.  In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.

109.    In early 2010, Toyota's internal documents and emails discuss "phase 1 of Safety Recall 90L...Potential Floor Mat Interference with Accelerator Pedal."  Although not implied by the name, this recall included the installation of new brake override software in 2007-2010 Camry and Camry Hybrid vehicles to provide customers with "an extra measure of confidence."  Given Toyota's knowledge of the prevalence of unintended acceleration events and the importance of this safety issue, rather than merely installing the software in non-hybrid Camry vehicles, Toyota should have issued a separate "brake override system installation" recall and included additional vehicle models.

110.    A January 8, 2010 email demonstrates that the new brake override software had not been emphasized internally, nor was it well understood by TMS employees in early 2010: "As discussed previously, there is almost no information – certainly no general understanding – about the brake override system within TMS at this time."

111.    On January 16, 2010, in an email to Katsuhiko Koganei, Irv Miller admits Toyota has been concealing defects from its customers and that the time has come for the company to come

SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint
6058474v1

1  clean: "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator

2  pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping

3  this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz

4  and Yoshi are on the way to DC for meetings with NHTSA to discuss options...We better just hope that

5  they can get NHTSA to work with us in coming with a workable solution that does not put us out of

6  business."  This mechanical tendency for failure was known to Toyota for years and still has not been

7  properly disclosed.

8       112.    Also in early 2010, Toyota announced that it would finally install a brake override system

9  on an expanded range of customers' vehicles.   Jim Lentz, President and Chief Operating Officer of

10  Toyota Motor Sales explained:  "Expansion of this brake override system underscores Toyota's

11  commitment to building the safest and most reliable vehicles on the road, as we have for 50 years, and

12  to ensuring that our customers have complete confidence in the vehicles they drive."  Mr. Lentz did not

13  address why it has taken eight years and thousands of unintended acceleration complaints before this

14  safety feature was actually implemented.

15       113.    On March 3, 2010, Toyota produced a "Brake Override System" pamphlet

16  demonstrating how their new vehicles are being manufactured with a safety system that will combat the

17  effects of a defective electronic control throttle system.  The pamphlet indicates that "the Brake

18  Override System operates when the following conditions are met:  1. The throttle opening is greater

19  than 1/3; 2. Vehicle speed is above 5 mph; and 3. Brakes are applied firmly."

20       114.    Plaintiffs were, at all times relevant, ignorant of the existence of the Defects described

21  above and, knowing this, Toyota continued to broadly disseminate statements about the safety and

22  reliability of the Subject Vehicles, while denying the existence of the Defects.  For example, on

23  September 29, 2009, Toyota issued a press release entitled "Toyota Lexus Consumer Safety Advisory:

24  Potential Floor Mat Interference with accelerator Pedal," stating in part:   "Toyota Motor Sales, USA,

25  Inc. takes public safety very seriously.  It believes its vehicles to be among the safest on the road

26  today."

27       115.    Toyota's fraudulent concealment scheme includes, but is not limited to, intentionally

28  covering up and refusing to publicly disclose critical internal memoranda, design plans, studies, Notices

of Action, Problem Detail Reports and other reports of failure and injury. Through such acts of fraudulent concealment, Toyota was able to actively conceal from the public for years the truth about the existence of the dangerously defective acceleration control and throttle system in the Subject Vehicles, thereby tolling the running of any applicable statute of limitations.

116. Toyota is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the dangerously defective acceleration control and throttle system on the Subject Vehicles. Toyota was, at all times relevant, aware of the nature and existence of the Defects in the Subject Vehicles, but at all times has continued to manufacture, certify, market, advertise, distribute, and sell the Subject Vehicles without revealing the true facts concerning the Defects, in order to sell Toyota and Lexus cars, to avoid bad publicity, and to avoid expensive recall processes. The true facts about the Subject Vehicles continue to be concealed from the public, including Plaintiff.

117. Through such acts of fraudulent concealment, Toyota has successfully concealed from the public facts necessary to support the claims herein. Plaintiffs were and continue to be prevented from knowing and having knowledge of such unlawful, unfair, fraudulent, and deceptive conduct, or of facts that might have led to the discovery thereof. Despite the exercise of due diligence, Plaintiff failed to uncover the existence of the violations alleged herein until within four (4) years of the filing this complaint.

118. Particularly given Toyota's past and continuing denials of, and concealment of, the existence of any defect in the acceleration control and throttle system, and Toyota's repeated past and continuing assertions that unintended acceleration episodes were due to other causes, Plaintiffs were not placed on inquiry notice regarding the Defects in the acceleration control and throttle system until, at the earliest, February, 2010. It was in February, 2010 that Toyota stated publicly, in connection with Congressional hearings, that it does not, in fact, know the cause of the unintended acceleration problem in the majority of cases (contrary to its repeated past claims about floor mats, sticking pedals, etc.). Toyota has continued to deny, and to conceal, that there is any flaw or defect in the acceleration control and throttle system itself. Toyota's April 19, 2010 agreement to pay NHTSA's $16.4 million fine constitutes an acknowledgement that Toyota engaged in a pattern and practice of concealing the true

- 29 -

1  problems which resulted in unintended acceleration in its cars, the full extent of which will only become

2  known through further governmental investigation and litigation.

3      119.    Plaintiff files this lawsuit within two years of first suspecting that defects in the Subject

4  Toyota Tacoma were a cause of Plaintiff's injuries and damages. Plaintiff could not, by the exercise or

5  reasonable diligence, have discovered the wrongful cause of the injuries at an earlier time because

6  Plaintiff did not know or suspect, nor did Plaintiff have reason to know or suspect, the cause of the

7  injuries, or the tortious nature of the conduct causing injuries, until less than four years prior to the filing

8  of this action.

9      120.    Additionally, Plaintiff was prevented from discovering this information sooner because

10  Defendants herein misrepresented and continue to misrepresent to the public and to the government

11  that the Subject Vehicles are safe and free from defects, and Defendants have fraudulently concealed

12  facts and information that could have led Plaintiff to discover potential causes of action.

13              **COUNT I**
          **Strict Products Liability against Toyota**

14

15      121.    Paragraphs 1 through 120 are realleged.

16      122.    Plaintiff is informed and believes, and thereon alleges, that the aforementioned Subject

17  Avalon and its component parts, including, but not limited to, its acceleration and braking systems, and

18  constituents thereof, or lack of same, were defectively designed, manufactured, fabricated, distributed,

19  sold, retailed, wholesaled, recommended, tested, modified, controlled, advertised, created, processed,

20  prepared, constructed, packaged, utilized, provided, warranted, repaired, maintained, marketed,

21  leased, rented, vended, installed, handled, labeled, promoted, furnished, analyzed, inspected,

22  supplied, warned, and placed into the stream of commerce by Toyota.

23      123.    Toyota designed, manufactured, distributed and sold the Subject Avalon, and placed the

24  Subject Avalon into the stream of commerce knowing that the Subject Avalon would be used in its

25  intended manner.

26      124.    At the time of the aforesaid events occurring on August 20, 2012, the Subject Avalon,

27  which was being used in a reasonably foreseeable manner, was substantially unchanged from its

28  condition when sold and distributed by Toyota.

125.    The Subject Avalon was defective and unreasonably dangerous to ultimate users, operators, or consumers, including Plaintiff, when sold and distributed by Toyota.  The defects in the Subject Avalon included, but were not limited to:

> (a)    The Subject Avalon failed to perform as safely as an ordinary consumer would have expected;

> (b)    The Subject Avalon was improperly designed, manufactured, distributed and sold in such manner that it had an unreasonably dangerous propensity to unintentionally accelerate when being operated in a foreseeable and intended manner;

> (b)    The Subject Avalon failed to conform with its manufacturing specifications;

> (c)    The risks inherent in the Subject Avalon's design outweighed the benefits of that design;

> (c)    The Subject Avalon failed to incorporate available and feasible alternative designs which would have significantly reduced the risk of the Plaintiff's injuries without substantially impairing the utility of the Subject Avalon; and

> (d)    The Subject Avalon lacked sufficient warnings regarding the aforementioned defects and dangers.

126.    As a direct and proximate result of the foregoing defects in the Subject Avalon, Plaintiff sustained serious bodily injuries, resulting in pain and suffering, impairment, disability, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and treatment and loss of the ability to earn money.  Accordingly, Plaintiff is entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**WHEREFORE**, Plaintiff prays for judgment against the Toyota Defendants, for compensatory damages, costs, interest, and for such other relief as the Court deems just, and demands a trial by jury on all issues so triable as a matter of right.

## COUNT II
## Negligence against Toyota

127.    Paragraphs 1 through 120 are realleged.

6058474v1

128.    At all times herein relevant, Defendants were and are engaged in the business of, including but not limited to, selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, providing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying, warnings and placing into the stream of commerce the Subject Avalon.

129.    Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, had a legal duty to conform their conduct in accordance with the law and that of a reasonable person, which includes adequately and properly managing and operating their business and their manufacturing, design, warning, distribution, and retail operations; adequately and properly training and supervising their employees and agents, including their designers, inspectors, quality control agents and other manufacturing, testing, distribution and delivery personnel; properly designing, manufacturing, warning, inspecting, servicing, and distributing the Subject Avalon; recalling the Subject Avalon; and acting without negligence, conscious disregard, despicable or other wrongful conduct.

130.    Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject Avalon was defectively designed and inherently dangerous and had a propensity to suddenly accelerate, lose control, and cause injuries and/or deaths.

131.    Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject Avalon was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

132.    Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, failed to exercise ordinary care and breached their duty by, among other things:

    a.    Failing to use due care in the manufacture, distribution, design, sale, testing, and

6058474v1

1                servicing of the Subject Avalon and its component parts in order to avoid the

2                aforementioned risks to individuals;

3        b.      Failing to provide adequate warnings of the sudden acceleration problem and its

4                propensity to cause and/or contribute to an accident;

5        c.      Failing to incorporate within the Subject Avalon and its design reasonable

6                safeguards and protections against sudden acceleration and the consequences

7                thereof;

8        d.      Failing to make timely correction to the design of the Subject Avalon to correct

9                the sudden acceleration problems, including the failure to install and provide a

10              proper brake override system;

11       e.      Failing to reasonably and accurately advise and inform dealers and the public

12              that the failure to have the brake override system was a safety related defect and

13              was urgently required to protect owners, operators and occupants of Toyota

14              manufactured vehicles; and

15       f.       Failing to adequately identify and mitigate the hazards associated with sudden

16              acceleration in accordance with good engineering practices.

17     133.   The negligence described above directly and proximately caused Plaintiff's injuries in

18 that it directly, and in natural and continuous sequence, produced or contributed substantially to his

19 injuries.

20     134.   As a direct and proximate result of the foregoing negligence, Plaintiff sustained serious

21 bodily injuries, resulting in pain and suffering, impairment, disability, mental anguish, loss of capacity

22 for the enjoyment of life, expense of hospitalization, medical care and treatment and loss of the ability

23 to earn money. Accordingly, Plaintiff is entitled to damages in an amount to be proven at trial, together

24 with interest thereon and costs.

25     **WHEREFORE**, Plaintiff prays for judgment against the Toyota Defendants, for compensatory

26 damages, costs, interest, and for such other relief as the Court deems just, and demands a trial by jury

27 on all issues so triable as a matter of right.

28

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*

6058474v1

## COUNT III
## Fraudulent Concealment against Toyota

135.    Paragraphs 1 through 120 are realleged.

136.    As alleged herein, Toyota knew, as early as 2001, that certain of the vehicles it designed, manufactured, marketed, distributed, sold or leased in the State of Florida contained the aforementioned defects in the acceleration control and throttle system and, at all relevant times, Defendants concealed and suppressed this material fact from Plaintiff.

137.    At all relevant times, Toyota had exclusive and superior knowledge of the aforementioned defects and concealed, suppressed and failed to disclose the true facts to Plaintiff who, at all relevant times, was ignorant of and was unaware of the existence and nature of these defects.  Toyota therefore had a duty to disclose the nature and existence of the defects before and after the vehicle was purchased.  Had Toyota disclosed the whole truth about the existence and nature of the defects, Plaintiff would have not purchased the Subject Avalon.

138.    As alleged herein, Toyota made repeated statements to Plaintiff touting the safety and reliability of the Subject Vehicles.  An example, among many, is the uniform written statements contained in the Toyota Warranty and Maintenance Guides that accompanied the sale or lease of each of the Subject Vehicles.  They uniformly stated:

> At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building **products of the highest quality and reliability**. . . Our goal is for every Toyota customer to enjoy **outstanding quality, dependability and peace of mind** . . .

(Emphasis added).

This statement was only partially true, and hardly at all with respect to uncontrolled acceleration.  This partially true statement created a duty for Toyota to disclose the whole truth that, in fact, the Subject Vehicles were dangerously defective as a result of the sudden uncontrollable acceleration defects alleged herein.

139.    Whether a car or truck contains a known defect that has resulted in crashes, deaths and injuries, is critically important information for consumers and families alike, when choosing to purchase or lease a vehicle.  The omitted information, as alleged herein, was objectively material to both the

- 34 -

6058474v1

1  decision as to whether to purchase the Subject Avalon and whether to drive the Subject Avalon on the

2  day of the crash.

3      140.    At all relevant times, Defendants intentionally concealed and suppressed the nature and

4  extent of the aforementioned defects with the intent to defraud Plaintiff.

5      141.    At all relevant times, Plaintiff was unaware and ignorant of the nature and existence of

6  the aforementioned defects in the Subject Vehicles.

7      142.    At all relevant times, Toyota purposefully and intentionally devised its scheme of

8  concealment and suppression of the true facts concerning the existence and nature of the

9  aforementioned defects.  Plaintiff is not asserting a claim based upon fraud on NHTSA or any federal

10  agency, but rather, upon concealment and suppression of material facts from the public, including

11  Plaintiff, and misrepresentations which were made to the public, including Plaintiff.

12      143.    As a direct and proximate result of the aforementioned defects in the Subject Avalon

13  and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff

14  sustained serious bodily injuries, resulting in pain and suffering, impairment, disability, mental anguish,

15  loss of capacity for the enjoyment of life, expense of hospitalization, medical care and treatment and

16  loss of the ability to earn money.  Accordingly, Plaintiff is entitled to damages in an amount to be

17  proven at trial, together with interest thereon and costs.

18      **WHEREFORE**, Plaintiff prays for judgment against the Toyota Defendants, for compensatory

19  damages, costs, interest, and for such other relief as the Court deems just, and demands a trial by jury

20  on all issues so triable as a matter of right.

21                              **PRAYER FOR RELIEF**

22      **WHEREFORE**, Plaintiff prays for judgment against the Toyota Defendants, for compensatory

23  damages, costs, interest, and for such other relief as the Court deems just, and demands a trial by jury

24  on all issues so triable as a matter of right.

25

26

27

28

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*
6058474v1

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable as a matter of right.

Dated: November 6th, 2013                    Respectfully submitted,

                                             NEWSOME MELTON


                                             /s/ Daniel Eckhart
                                             **C. RICHARD NEWSOME, ESQUIRE**
                                             Florida Bar No.: 827258
                                             **DANIEL W. ECKHART, ESQUIRE**
                                             Florida Bar No.: 488674
                                             **WILLIAM C. OURAND, JR., ESQUIRE**
                                             Florida Bar No.: 092503
                                             NEWSOME MELTON
                                             201 South Orange Avenue, Suite 1500
                                             Orlando, Florida 32801
                                             Telephone: (407) 648-5977
                                             Facsimile: (407) 648-5282
                                             *Attorneys for Plaintiff*
                                             *Emails for service:*
                                             *newsome@newsomelaw.com*
                                             *eckhart@newsomelaw.com*
                                             *ourand@newsomelaw.com*
                                             *pleadings@newsomelaw.com*

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*
6058474v1

## CERTIFICATE OF SERVICE

I am a citizen of the United States and employed in Orange County, Florida.  I am over the age of eighteen years and not a party to the within-entitled action.   My business address is Newsome Melton, 201 South Orange Avenue, Suite 1500, Orlando, FL 32801.

The foregoing document was served on all parties and their attorneys of record in *In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Product Liability Litig.*, No. 10-2151-JVS; and *McDaniel v. Toyota*, No. SACV13-01475 JVS (Ex), via ECF.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Orlando, Orange County, Florida on November 6, 2013.


/s/ Daniel Eckhart
Daniel Eckhart

*SACV13-01475 JVS (Ex) – Michael McDaniel vs. Toyota – Amended Complaint*
6058474v1